FILE COPY

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ROBERT O. DAVIS, III,                       )
                                            )
            Appellant,                      )
                                            )
    vs.                                     )
                                            )
STATE OF ALASKA,                            )
                                            )       Court of Appeals No. A-13308
            Appellee.                       )
                                            )       Trial Court No. 3AN-S011717 CR
_____ )

APPEAL FROM THE SUPERIOR COURT
THIRD JUDICIAL DISTRICT AT ANCHORAGE
THE HONORABLE DAN A. HENSLEY, PRESIDING

**VRA AND APP. R. 513.5 CERTIFICATION.** I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court. I further certify, pursuant to App. R. 513.5, that the font used in this document is Universal 12 point.

## APPELLANT'S EXCERPT OF RECORD
## VOLUME 1 OF 1

ALASKA PUBLIC DEFENDER AGENCY

BARBARA K. BRINK (8206009)
Public Defender
900 West Fifth Avenue, Suite 210
Anchorage, Alaska 99501
(907) 334-4400

J. JAKE KETSCHER (9910054)
Assistant Public Defender
518 West Marine Way, Suite 20
Kodiak, Alaska 99615
(907) 486-8114

Filed in the Court of Appeals of
the State of Alaska, this _20th_ day
of _August_____, 2003.

Marilyn May, Clerk

By: _____
    Deputy Clerk

Exhibit B – 1

# TABLE OF CONTENTS

Page(s)

INDICTMENT    .    .    .    .    .    .    .    .    1-3
Dated July 2, 2001

REQUEST FOR PAYMENT OF TRAVEL WITH    .    .    .    4-10
PER DIEM AND SUBPOENA COSTS
Dated November 16, 2001

TRANSCRIPT OF PROCEEDINGS    .    .    .    .    .    11-88
Dated November 21, 2001

JUDGMENT AND COMMITMENT    .    .    .    .    .    89-91
Dated April 17, 2002

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,                    )
                                    )
            Plaintiff,              )
                                    )        FILED IN OPEN COURT
        vs.                         )        Date: 7·2·01 ____
                                    )
ROBERT O DAVIS III,                 )
DOB: 1/28/1968                      )
APSIN ID: 6361752                   )
ATN: 103-002-696                    )
                                    )
            Defendant.              )
_____)

No. 3AN-S01-1717  CR

## INDICTMENT

I certify this document and its attachments do not contain the (1) name of a victim of a sexual offense listed in AS 12.61.140 or (2) residence or business address or telephone number of a victim of or witness to any offense unless it is an address identifying the place of a crime or an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

The following counts charge a crime involving DOMESTIC VIOLENCE as defined in AS 18.66.990: NONE

Count I - AS 11.71.030(a)(1)
Third Degree Misconduct Involving A Controlled Substance
Robert O Davis - 001

Count II - AS 11.71.030(a)(1)
Third Degree Misconduct Involving A Controlled Substance
Robert O Davis - 002

Count III - AS 11.71.030(a)(1)
Third Degree Misconduct Involving A Controlled Substance
Robert O Davis - 003

Count IV - AS 11.71.030(a)(1)
Third Degree Misconduct Involving A Controlled Substance
Robert O Davis - 004

DISTRICT ATTORNEY, STATE OF ALASKA
310 K STREET, SUITE 520
ANCHORAGE, ALASKA 99501
(907) 269-6300

00001

THE GRAND JURY CHARGES:

### Count I

That on or about February 8, 2001, at or near Anchorage in the Third Judicial District, State of Alaska, ROBERT O DAVIS knowingly manufactured or delivered any amount of a schedule IIA or IIIA controlled substance, cocaine.

All of which is a class B felony offense being contrary to and in violation of AS 11.71.030(a)(1) and against the peace and dignity of the State of Alaska.

### Count II

That on or about February 20, 2001, at or near Anchorage in the Third Judicial District, State of Alaska, ROBERT O DAVIS knowingly manufactured or delivered any amount of a schedule IIA or IIIA controlled substance, cocaine.

All of which is a class B felony offense being contrary to and in violation of AS 11.71.030(a)(1) and against the peace and dignity of the State of Alaska.

### Count III

That on or about February 21, 2001, at or near Anchorage in the Third Judicial District, State of Alaska, ROBERT O DAVIS knowingly manufactured or delivered any amount of a schedule IIA or IIIA controlled substance, cocaine.

All of which is a class B felony offense being contrary to and in violation of AS 11.71.030(a)(1) and against the peace and dignity of the State of Alaska.

### Count IV

That on or about March 1, 2001, at or near Anchorage in the Third Judicial District, State of Alaska, ROBERT O DAVIS knowingly manufactured or delivered any amount of a schedule IIA or IIIA controlled substance, cocaine.

DISTRICT ATTORNEY, STATE OF ALASKA
310 K STREET, SUITE 520
ANCHORAGE, ALASKA 99501
(907) 269-6300

00002

All of which is a class B felony offense being contrary to and in violation of AS 11.71.030(a)(1) and against the peace and dignity of the State of Alaska.

DATED this __2__ day of ~~June~~ July, 2001 at Anchorage, Alaska.

A true bill

_____        _____
Grand Jury Foreperson                           Assistant District Attorney

WITNESSES EXAMINED BEFORE THE GRAND JURY:

Officer Mark Laporte, 1382

DISTRICT ATTORNEY, STATE OF ALASKA
310 K STREET, SUITE 520
ANCHORAGE, ALASKA 99501
(907) 269-6300

- - 3

00003

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,       )
                       )
        Plaintiff,     )
                       )
vs.                    )
                       )
ROBERT ONEAL DAVIS, III, )
AKA:    Rico           )    3AN-S01-1717 CR
DOB:    01/28/68       )    3AN-S01-2602 CR
APSIN ID: 6361752      )
DMV No.: 6361752       )
ATN:    103-002-696    )    REQUEST FOR PAYMENT
                       )    OF TRAVEL WITH
                       )    PER DIEM AND
                       )    SUBPOENA COSTS
        Defendant.     )
_____ )

VRA CERTIFICATION: I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any offense unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

Defendant, Robert O. Davis, by and through his counsel

of record, Dennis P. James, hereby requests this court to

pay in the fees required for travel in regards to Officer

Bennett of the Nome Police Department.  Counsel has

previously requested that Officer Bennett be allowed to

participate telephonically, however this request was denied.

Officer Bennett's testimony in regards to the situation in

Nome may be vital to impeach the testimony of Jeremy Fish.

Defendant, due to trial and other financial obstacles

cannot afford the $616.00 of airfare plus per diem required

00004

*(left margin, rotated)* 1500 West 33rd Avenue, Suite 100  Anchorage, Alaska 99503-3639  (907) 276-3037  Fax (907) 272-9705

*(stamp)* ALASKA COURT SYSTEM RECEIVED NOV 1 3 2001 Chambers of Judge Hensle

for Officer Bennett's attendance.  Defendant requests that

if the court is unable to pay these fees that the State of

Alaska be required to provide for these costs.

Mr. Davis relies upon the Alaska Constitution Article

I, Section II to wit "to have compulsory process for

obtaining witnesses in his favor…,"

Please see attached affidavit of Robert Davis in

support of this request.

DATED this ___ day of November, 2001.

Dennis P. James
ABA No. 7405023

### ORDER

BASED upon the above request, affidavit of counsel,

good cause being shown and any opposition of counsel IT IS

HEREBY ORDERED that the travel per diem and subpoena costs

**shall/shall not** be at the expense of the **court/State of**

**Alaska**.

DATED this ____ day of November, 2001.

Judge Hensley
Superior Court Judge

CERTIFICATE OF SERVICE

Hereby certifies that on  11 / 16/ 01  I caused a
true and correct copy of the foregoing to be mailed/ hand delivered to:
Carey Brady /APL , P & DA

ATTORNEY AT LAW
1500 West 33rd Avenue, Suite 100
Anchorage, Alaska 99503-3639
(907) 276-3037  Fax (907) 272-9705

Exhibit B – 7

00005

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
ROBERT ONEAL DAVIS, III,            )
AKA:       Rico                     )
DOB:       01/28/68                 )
APSIN ID:  6361752                  )
DMV No.:   6361752                  )    3AN-S01-1717 CR
ATN:       103-002-696              )    3AN-S01-2602 CR
                                    )
                                    )
            Defendant.              )
_____)

ALASKA COURT SYSTEM
RECEIVED
NOV 1 6 2001
Chambers of Judge Hensle

### AFFIDAVIT OF DENNIS P. JAMES

### IN SUPPORT OF REQUEST FOR ASSISTANCE

### IN TRAVEL/SUBPOENA FEES

VRA CERTIFICATION:  I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any offense unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

STATE OF ALASKA          )
                         ) s.s.
THIRD JUDICIAL DISTRICT  )

I have read the below information by telephone to

Robert O. Davis, III at 2:15 p.m. 11/16/2001.  He has

confirmed it and will be signing an affidavit stating the

ATTORNEY AT LAW
1500 West 33rd Avenue, Suite 100
Anchorage, Alaska 99503-3639
(907) 276-3037    Fax (907) 272-9705

same information for filing with the court on Monday,
November 19, 2001.

I, Robert O. Davis, being first duly sworn states and
deposes as follows:

1.    I am the above named defendant in this action.

2.    I know that the testimony offered by Officer
Bennett will be helpful in my case, due to his involvement
with the Nome burglary case that initiated Jeremy's
involvement with the Police Departments and District
Attorney's Office.

3.    I do not have the funds of $616.00 to bring
Officer Bennett, plus per diem costs here to Anchorage to
testify and have been informed by the court that he could
not participate telephonically.  Since I have been in trial
from November 12, 2001 and continuing through November 21,
2001, I am not able to work during the day to earn these
funds.

ATTORNEY AT LAW
1500 West 33rd Avenue, Suite 100
Anchorage, Alaska 99503-3639
(907) 276-3037  Fax (907) 272-9705

Davis/ Affidavit of Robert O. Davis in Support of Request for Assistance
State v. Davis, 3AN-S01-1717 CR
Page 2 of 3

4.    I am requesting this court to pay the flight funds and allow Officer Bennett to travel to Anchorage and offer his testimony to this court.

5.    I would further request at this time that if the court system cannot pay these flight funds, that the State of Alaska be required to pay these funds.

FURTHER SAY YOUR AFFIANT NOT.

_____
Dennis P. James

SUBSCRIBED AND SWORN to before me this 16ᵗ day of November, 2001.

_____
Notary for the State of Alaska
My Commission Expires: 04/09/03

CARRIE L. McCLURE
NOTARY PUBLIC
STATE OF ALASKA

CERTIFICATE OF SERVICE

_____
Hereby certifies that on 11 / 16 / 01 I caused a true and correct copy of the foregoing to be hand delivered to:

Carey Brady

Davis / Affidavit of Robert O. Davis in Support of Request for Assistance
St_____ vis, 3AN-S01-1717 CR
Pa

1500 West 33rd Avenue, Suite 100
Anchorage, Alaska 99503-3639
(907) 276-3037  Fax (907) 272-9705

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )        FILED IN OPEN COURT
                                    )        Date: 11-19-01 nth
ROBERT ONEAL DAVIS, III,            )
AKA:     Rico                       )
DOB:     01/28/68                   )
APSIN ID: 6361752                   )
DMV No.:  6361752                   )        3AN-S01-1717 CR
ATN:      103-002-696               )        3AN-S01-2602 CR
                                    )
                                    )
            Defendant.              )
                                    )
_____     )

### AFFIDAVIT OF ROBERT O. DAVIS
### IN SUPPORT OF REQUEST FOR ASSISTANCE
### IN TRAVEL/SUBPOENA FEES

VRA CERTIFICATION: I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any offense unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

STATE OF ALASKA            )
                           ) s.s.
THIRD JUDICIAL DISTRICT    )

    I, Robert O. Davis, being first duly sworn states and

deposes as follows:

    1.    I am the above named defendant in this action.

    2.    I know that the testimony offered by Officer

Bennett will be helpful in my case, due to his involvement

ATTORNEY AT LAW
1500 West 33rd Avenue, Suite 100
Anchorage, Alaska 99503-3639
(907) 276-3037   Fax (907) 272-9705

Davis/ Affidavit of Robert O. Davis in Support of Request for Assistance
State v. Davis, 3AN-S01-1717 CR
Page 1 of 2

with the Nome burglary case that initiated Jeremy's
involvement with the Police Departments and District
Attorney's Office.

3.    I do not have the funds of $616.00 to bring
Officer Bennett, plus per diem costs here to Anchorage to
testify and have been informed by the court that he could
not participate telephonically.  Since I have been in trial
from November 12, 2001 and continuing through November 21,
2001, I am not able to work during the day to earn these
funds.

4.    I am requesting this court to pay the flight funds
and allow Officer Bennett to travel to Anchorage and offer
his testimony to this court.

5.    I would further request at this time that if the
court system cannot pay these flight funds, that the State
of Alaska be required to pay these funds.

        FURTHER SAY YOUR AFFIANT NOT.


                                    _____
                                    Robert O. Davis

    SUBSCRIBED AND SWORN to before me this _19_ day of
November, 2001.

                                    _____
                                    Notary for the State of Alaska

                    _____ My Commission Expires: 07/18/05

Davis... avit of Robert O. Davis in Support of Request for Assistance
... 3AN-S01-1717 CR

Exhibit B – 12

1          IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

2                    THIRD JUDICIAL DISTRICT

3   STATE OF ALASKA,              )
                                  )
4           Plaintiff,            )
                                  )
5      vs.                        )
                                  )
6   ROBERT DAVIS,                 )
                                  )
7           Defendant.            )
    _____)

8
    Case No. 3AN-01-1717 CR
9

10                       VOLUME I

11              TRANSCRIPT OF PROCEEDINGS

12          October 29, 2001  - Pages 02 through  17

13          November 09, 2001 - Pages 18 through  38

14          November 13, 2001 - Pages 39 through  44

15          November 14, 2001 - Pages 45 through  193

16          November 15, 2001 - Pages 194 through 359

17          November 19, 2001 - Pages 360 through 574

18          November 20, 2001 - Pages 575 through 775

19          November 21, 2001 - Pages 776 through 846

20

21

22

23                      DISCLAIMER
          Transcripts Prepared for the Alaska Court System
24   The Alaska Court System has accepted this transcript based on either review of a random sample or without review
     because the transcribers work consistently met court system standards. Because it is possible that this transcript may
     contain some errors, the court system encourages parties to listen to the tapes of critical portions of the proceedings and
25   to bring any significant errors to the ACS Transcript Coordinator's attention immediately.

**Page 49**

1   unit; what is that?

2 A   It's a small unit consisting of -- depending on our

3   manning from six to seven officers that work in plain

4   clothes, drive unmarked vehicles. We work -- we target

5   street-level crimes, which include prostitution and

6   drug cases.

7 Q   Okay. And were you assigned to a particular unit when

8   -- during the investigation of this case?

9 A   Yes, I was. I was assigned to the special assignment

10   unit.

11 Q   Okay. And how did you become involved in this case?

12 A   I became involved in this case as just another one of

13   the officers in the unit. I working surveillance for

14   this particular case. Each officer developed cases,

15   developed informants and whoever was case officer for

16   that particular person, the rest of the unit would act

17   in support capacity for that -- for that particular

18   operation. In this particular operation, I usually was

19   involved with surveillance.

20 Q   All right. And let me direct your attention to

21   February 8th, 2001. With regard to that particular

22   day, did you have -- what was your assignment?

23 A   My assignment on that particular day was surveillance

24   before, during, and after an under-cover drug buy using

25   an informant.

**Page 50**

1 Q   Were you with anyone?

2 A   Yes. I was with Officer Chris Simms.

3 Q   Okay. And what happened -- just explain what you did

4   from the very beginning.

5 A   What I did, we would have a briefing in our office, and

6   we would go over what was to happen during the buy.

7   Officer Simms and I were assigned to surveillance, so

8   we parked north of the location where the buy was to

9   occur at 2002 Grand Larry, and our job was to sit

10   there, watch the informant drive in, watch him park,

11   and stay there during the whole buy, watch him drive

12   away until he was picked up by another officer, and

13   follow him back to the station. That occurred -- do

14   you want me to go into the details of that?

15 Q   Please.

16 A   We arrived just north of the location, and we parked on

17   Peck Street. The buy was to occur at 202 Grand Larry.

18   We arrived there at 2206 hours, surveillance advised

19   that the informant, P0106, was in the area at 2207.

20   They then advised that he, P0106, was coming out of the

21   residence. Officer Simms and I then followed him and

22   Officer Johnstone back to the police station. Once

23   there, Officer Johnstone handed me a small Baggie of

24   suspected powder cocaine, and I tested the cocaine and

25   put into property and evidence.

**Page 51**

1 Q   Okay. Now you say you tested the cocaine, let me just

2   back you up for a couple of minutes.

3 A   Okay.

4 Q   P0106, who is that?

5 A   Jeremy Fish.

6 Q   Okay. And could you explain why you're using a number?

7 A   We use a number to protect the -- the informant's

8   identity throughout all the police reports. We do that

9   for a number of reasons. We do that to protect any

10   retaliation against him. We do that from anybody else

11   reading these reports so they wouldn't have any idea

12   who it is. And we protect his identity throughout the

13   entire investigation. And so he is always assigned a

14   number. He is always referred to as a number. In

15   police reports, you say he/she, so people don't even

16   know his identity if they were to -- if records clerks

17   or anybody would read that report, they wouldn't know

18   who it was.

19 Q   All right. Now you say that you tested the cocaine,

20   what kind of test did you use?

21 A   A Scott (ph) reagent test type G.....

22 Q   Okay.

23 A   .....for cocaine.

24 Q   Could you just explain to the members, it's called a

25   field test, is that right?

**Page 52**

1 A   Correct. It's called the field test. It's a little

2   kit that we carry in our -- in our property and

3   evidence kits, our search kits. And it's just a small

4   little kit, and you just put a very small amount of

5   cocaine in it and pop three different vials, and it

6   will give you a positive or negative for cocaine.

7 Q   All right. Now, when you -- when something like drugs

8   is seized, what do you do with it?

9 A   We take a small amount of it and field test it, and be

10   it positive or negative, it is then -- the drugs are

11   then sealed in a property and evidence envelope with

12   two officers present. It is taped, evidence taped, and

13   is placed into our property and evidence. And that's

14   the last contact that we have with it.

15 Q   With regard to this particular cocaine, did it field

16   test positive?

17 A   Yes, it did.

18 Q   Okay. Let me just approach you with two items, and

19   they'll be starting with state's exhibit 1. Do you

20   recognize what state's exhibit 1 is?

21 A   Yes, it is. It's a Baggie of suspected powder cocaine.

22 Q   How do you know that that's what it is?

23 A   Because it says it on the envelope. I submitted and

24   sealed it. These are my initials. Chris Simms

25   witnessed and verified it.

Page 53

1 Q  Is it dated?

2 A  Yes, it is.  It's dated 2/8/2001.

3 Q  Okay.  And is there -- now is there a number on that

4     somewhere?

5 A  There's a number in the upper right-hand corner, and

6     that's our tag number.  Each one of these envelopes is

7     numbered, and that's the number that goes on our

8     property and evidence form when it's put in.  It's a

9     number unique to this envelope.

10 Q  Okay.  So is the number called anything?

11 A  It's called a tag number.

12 Q  Or a P and E number?

13 A  Or a P and E number.

14 Q  Okay.  And could you just explain to the members of the

15     jury how P and E numbers work?

16 A  This particular number is tracked.  Once -- once you

17     use this envelope and you take that number and you put

18     it onto a P and E, or a property and evidence form,

19     that -- this number is tracked on the property and

20     evidence form.  It's also tracked when it's logged into

21     property and evidence, and anytime anyone does anything

22     with this envelope, removes it from property and

23     evidence, they use that number to track it.

24 Q  Okay.  So -- and that -- you know that that is the

25     cocaine that was given you to by Detective Johnstone?

Page 53

1 A  Yes.

2     MS. BRADY:  Okay.  At this time, I move to admit

3 state's exhibit 1.

4     MR. JAMES:  May I look at it?

5     THE COURT:  Yes.  You can approach the witness and look

6 at it.

7     MR. JAMES:  I'm sorry?

8     MS. BRADY:  I should have showed it to you.

9     (Whispered conversation)

10     THE COURT:  Exhibit number 1 is admitted.

11          (Plaintiff's exhibit 1 admitted)

12 Q  Okay.  And what is the P and E number for exhibit 1?

13 A  It is 503125.

14 Q  Okay.  Now let me direct your attention to February

15     20th, with regard to this case, did you have a

16     particular assignment on that day?

17 A  I did, and again, it was surveillance.  Officer Simms

18     and I were riding together, we arrived in the area of

19     Peck and Grand Larry at 2205 hours on the 20th.  The

20     informant, P0106, arrived a minute later and went

21     inside the residence.  At 2210 hours, he advised he

22     was -- surveillance advised he was coming out of the

23     residence and he got back into his vehicle.  And at

24     that point, we handed -- we went back to the police

25     station and Officer LaPorte handed me the suspected

Page 54

1     cocaine, which I again field tested and got a positive

2     result.

3 Q  Did you assign a P and E number to that cocaine?

4 A  I did.  And that was on the 20th.  And that one is

5     505551.

6 Q  Okay.  And how do you know that that P and E number,

7     505551 is the cocaine that you seized on February 20th?

8 A  This is my handwriting on this -- on the outside of

9     this envelope.  It's dated on 2/20/01, and it has my

10     initials that I submitted and sealed it, and my DSN.

11     MS. BRADY:  Okay.  At this time, I move to admit

12 state's exhibit 2.

13     THE COURT:  Number 2?

14     MR. JAMES:  I've seen it.  Thank you.  No objection.

15     THE COURT:  Number 2 is admitted.

16          (Plaintiff's exhibit 2 admitted)

17 Q  Okay.  And let me direct your attention to February

18     21st, with regard to this case, did you have a

19     particular assignment on that day?

20 A  I did.  I, again, was assigned to surveillance, and

21     this time, I was -- I believe I was with Sergeant

22     Stevens and I, and the buy on this day was to occur at

23     Old Seward and International at the Chevron parking

24     lot.  I arrived in the area at 2018 hours.  At 2021

25     hours, the informant arrived to meet with the suspect

Page 55

1     who was in a '97 green Suburban, Alaska license DSA914.

2     A few minutes later, the informant left the area and

3     surveillance and I -- I was with Sergeant Stevens as

4     the time, we followed the vehicle.  We followed it

5     first to Juneau and 45th where it stopped.  The suspect

6     met with someone for a few minutes, and then we

7     followed the vehicle back to 202 Grand Larry where it

8     stayed for a few minutes, and at that point, we broke

9     off surveillance.

10 Q  Okay.  And why were you following the Suburban?

11 A  We were following the Suburban because that's what the

12     suspect was in for this buy, and so we were following

13     it to find out where it went after the buy.

14 Q  All right.  And let me direct your attention to

15     February 28th, with regard to this particular case, did

16     you have a particular assignment on that day as well?

17 A  I did.  I was assigned to close and cover during the

18     buy, and I was assigned to run the wire recording,

19     pursuant to a glass warrant.

20 Q  Okay.  And could you explain to the members of the jury

21     what close and cover is for a start?

22 A  Close and cover is where I'm assigned to have what we

23     call the eye.  I'm assigned to be -- usually, close and

24     cover is there prior to the suspect and the informant

25     arriving, and your assignment is to be as -- to be the

Page 56

**Page 57**

1 closest person to have the eye to let all the rest of
2 the surveillance know what is happening during the buy.
3 Q Now you're also assigned to run the wire?
4 A Correct.
5 Q Could you explain to the members of the jury what
6 exactly that entails?
7 A Running the wire is we receive a glass warrant to do a
8 recording of the conversation. The informant wears a
9 body wire that we put on the informant. We all have
10 bug radios so we can listen to the conversation,
11 anything the informant says, we can hear it, and we can
12 hear who the informant is talking to. I activate the
13 wire recording when the informant gets out of the car,
14 when the informant gets in the area, I start recording
15 at that point. You hear all the conversation that goes
16 on when the informant leaves the suspect, and I stop
17 the recording. And that was also my duty for this
18 particular buy.
19 Q Where was the buy supposed to occur at?
20 A The buy was supposed -- was supposed to occur at the
21 Pancake, and I can't remember the name of it, the
22 Pancake House, I think, is where it was supposed to
23 occur. Sergeant Stevens and I again, when -- when
24 you're going to run the wire recording, usually have
25 two people in the vehicle. We arrived in the area and

**Page 58**

1 we parked just to the north of the location. When they
2 pulled up a little bit after midnight, I saw the
3 informant pull into the parking lot of the Northern
4 China restaurant, which was just a little bit to the
5 south. This Pancake House is a little bit further
6 north, and this Northern China restaurant where they --
7 it actually occurred was still within our sight. We
8 could still see this whole thing happening from where
9 we were parked.
10    I saw the informant pull up behind a silver pickup
11 truck, and that plate was DVE 272. The informant got
12 out of his vehicle and walked up to the pickup truck.
13 I activated the recording at that time. At 0004 hours,
14 I saw the informant get out of the pickup truck and get
15 into the back of his vehicle, get back into his
16 vehicle. I turned off the tape recording at that time
17 and.....
18 Q Now let me stop you right there.
19 A Okay.
20 Q Can -- does the informant have any control over when
21 you guys are tape recording what's going on?
22 A No, the informant has no control, whatsoever. He --
23 the wire is placed on him, we can hear that the wire is
24 working before we ever get to the buy. He -- he can't
25 even take it off if he wanted to when the buy is

**Page 59**

1 happening. And we can hear any conversation, but he
2 doesn't have any control over whether we record it or
3 whether we hear it or not.
4 Q What happened once the meeting was over?
5 A Once the meeting was over, we had Office LeBlanc pull
6 into the parking lot, and he was in a marked patrol
7 vehicle. He activated his lights. We had also pulled
8 in right behind the suspect vehicle. And at that
9 point, they took the defendant Davis out of the vehicle
10 and he was arrested.
11 Q Was anybody in the car with him?
12 A I recall -- I don't have it in my report here, but I
13 recall there was someone else in the car. I think
14 there was someone in the right passenger seat.
15 Q And you don't know who that was?
16 A I don't.
17 Q Okay. And did you have anything else to do with this
18 case?
19 A No.
20 Q Okay. Now did you subsequently run into Mr. Fish
21 again?
22 A Yes, I did.
23 Q And did you have a contact with him where you found
24 marijuana in his car?
25 A Yes.

**Page 60**

1 Q What was the date of that?
2 A The date of that was July 13th, 2001.
3 Q And about how much marijuana did you find in his car?
4 A Well, it was a small baggie of marijuana, and actually,
5 Officer Daily took it and put it into evidence, and I
6 don't have it here. It was -- it was one small baggie.
7 Q Okay. And what did you do as a result of finding him
8 with marijuana?
9 A We arrested him.....
10 Q Okay. Now when.....
11 A .....for the possession of marijuana, and we -- what we
12 typically do with marijuana possession is it's called a
13 site release. They're basically arrested and released
14 with a court date, a 30-day court date.
15 Q Okay. So in layman's terms, you gave him a ticket?
16 A Correct.
17   MS. BRADY: Okay. That's all the questions I have for
18 this witness.
19   THE COURT: Mr. James?
20   MR. JAMES: Thank you.
21          KATHLEEN BUSHUE
22 testified as follows on:
23          CROSS EXAMINATION
24 BY MR. JAMES:
25 Q Do you know Jeremy Fish?

Case 3:05-cv-00255-TMB-JDR    Document 118    Filed 02/07/2006    Page 17 of 30

**Page 77**

1    I'm not going to belabor it, there is no written
2    checklist to ensure accuracy?
3  A  There is no written checklist.
4  Q  Now you indicated that you were running the wire,
5    that's the glass warrant, correct?
6  A  Correct.
7  Q  Okay. And that was on the 20th, correct?
8  A  No.
9  Q  No? All right. When was that, please?
10 A  That was on the 1st of March.
11 Q  March 1?
12 A  Correct.
13 Q  Okay. Did you -- now the opening statement indicates
14    that you allege that cocaine was sold on the 8th, on
15    the 20th and on the 21st, and then the 28th/1st, would
16    you agree with that?
17 A  On the 8th, the 20th, the 21st and the 1st.
18 Q  Okay. 28th/1st. Okay. Your involve-- you had
19    involvement on the 8th, correct?
20 A  Correct.
21 Q  Okay. And you had involvement on the 20th?
22 A  Correct.
23 Q  Okay. You did not run the wire on the 20th?
24 A  Correct.
25 Q  Okay. What was your involvement on the 20th?

**Page 78**

1  A  Surveillance.
2  Q  Surveillance?
3  A  Uh-huh. (Affirmative)
4  Q  Where did you park that time, please?
5  A  In the same place, Peck and Grand Larry, right about
6    where this shows right here.
7  Q  Okay. So that's the same basic location for both the
8    8th and the 20th, correct?
9  A  All right.
10 Q  And who was with you?
11 A  On which day?
12 Q  The 8th. Is that Simms?
13 A  On the 8th was Office Simms.
14 Q  And on the 20th?
15 A  Was Officer Simms.
16 Q  Okay. Do you work as a team?
17 A  It just kind of depends on who gets into whose car at
18    the time.
19 Q  Okay. All right. And then so your view of 202 Grand
20    Larry was the same on the 20 -- excuse me -- on the 8th
21    as it was on the 20th?
22 A  Yes.
23 Q  All right. Did you observe Mr. Fish on the 8th go into
24    the.....
25 A  No.

**Page 79**

1  Q  Okay. So you didn't observe him exit either then?
2  A  No.
3  Q  Okay. How about on the 20th?
4  A  No.
5  Q  All right. Either way, in or out?
6  A  No.
7  Q  All right. Now, there -- you indicated that on the
8    21st, there was a surveillance involving a Suburban, is
9    that correct?
10 A  Correct.
11 Q  Okay. And what was your involvement in that, please?
12 A  I was surveillance, and on the 21st. Yeah, I just did
13    surveillance on the 21st.
14 Q  Could you tell me what you mean by surveillance?
15 A  I was assigned to be in the area where the buy was to
16    occur, and to assist in following the suspect vehicle
17    when it left the buy area.
18 Q  Okay. And describe that vehicle to me.
19 A  It's a '97 green Suburban, Alaska license DSA 914.
20 Q  Okay. Does it have dark windows, other than the
21    driver's window?
22 A  I recollect that it had tinted windows, but I couldn't
23    swear to which windows were tinted.
24 Q  Okay. Could you see inside the vehicle?
25 A  From where I was, no, I could not.

**Page 80**

1  Q  So you have no knowledge of how many people were in
2    that vehicle?
3  A  No.
4  Q  Okay. Now, did you do the strip-search on Jeremy Fish
5    on the 8th?
6  A  Jeremy Fish is a male, and females don't strip-search
7    males.
8  Q  So it would be fair to say that you did not participate
9    in any of the strip-searches?
10 A  Correct.
11 Q  Okay. I wasn't baiting you, I just wanted to make
12    sure. Now, did you participate in the search of the
13    vehicle on the 8th, 20th.....
14 A  No.
15 Q  .....21st or 1st?
16 A  No.
17 Q  Okay. All right. So as a sergeant, are you in some
18    type of administrative capacity? Are you in charge of
19    this organization?
20 A  No. I was not a sergeant when I was in this unit.
21 Q  Okay.
22 A  I transferred out of the unit before being promoted.
23 Q  And when did you do that?
24 A  I transferred out of the unit in May, May 1st.
25 Q  All right. And then I assume -- what do you do now?

1    THE COURT: All right.
2    MS. BRADY: Do you want me to.....
3    THE COURT: Let's just swear him in.
4    MS. BRADY: Okay.
5    (Oath administered)
6    MR. TRIPLETT: I do.
7              JAMES TRIPLETT
8  called as a witness on behalf of the plaintiff, testified as
9  follows on:
10        DIRECT EXAMINATION
11    THE CLERK: Please be seated. For the record, sir,
12  will you state your full name, and spell your last?
13 A   James Triplett, T-r-i-p-l-e-t-t.
14    THE CLERK: Thank you.
15 BY MS. BRADY:
16 Q   How did you become involved in investigating the
17    vehicle theft case?
18 A   I was investigating a burglary involving another
19    individual, and upon talking with the victim of that
20    particular crime, I had learned information that that
21    the individual I was investigating's girlfriend
22    allegedly had been hurt during the vehicle theft.
23 Q   Okay. Now let me stop you. Let's name some names.....
24 A   Okay.
25 Q   .....just for clarity. Okay. You were investigating a

Page 101

1    burglary that was targeting what person?
2 A   The individual by the name of John Redwine.
3 Q   And what's John Redwine's girlfriend's name?
4 A   Elizabeth Smith.
5 Q   Okay. And you learned as a result of your
6    investigation that?
7 A   That from the victim of the burglary, who happened to
8    be John Redwine's sister.....
9 Q   Uh-huh.
10 A   .....who had told me that Elizabeth Smith was injured
11    in an accident or a stolen vehicle. So I started going
12    through the computer system to try to find those report
13    numbers. And once I found those report numbers, I
14    would learn that a warrant was obtained for Jeremy Fish
15    for the stolen vehicle.
16 Q   Okay.
17 A   And after that, and personal knowledge of talking to
18    other officers, that the family has a tendency to cover
19    for John Redwine.
20 Q   Okay.
21 A   So when I was trying to locate John Redwine for
22    investigation of the burglary, I had learned with Jeremy
23    Fish and John Redwine's sister, who learned that
24    Elizabeth Smith was at the Redwine residence. So I
25    said, okay. I went to meet with them and I got a

Page 102

1    couple of other officers with me, and we went to the
2    residence to, in fact, try to contact John Redwine, so
3    I could continue my investigation.
4 Q   Okay.
5 A   Once there, I spoke with Elizabeth Smith. She assured
6    me that John wasn't there. I believe it's his
7    grandmother, it's kind of like a split-type house,
8    where upstairs is one unit and downstairs is another,
9    and the Redwine's father and mom live in the lower
10    level, and the mother of, I believe it's the father, so
11    it's his grandmother's house, live on the other side.
12    They all said that he wasn't there. They, in fact, let
13    us search the house and, in fact, he wasn't there. I
14    started inquiring to Elizabeth, because my gut feeling
15    was telling me that Jeremy Fish wasn't involved with
16    the stolen vehicle, so I started pressing the issue to
17    see what she had to say. She, in fact, told me that,
18    no, she ended up covering for John, and that it wasn't
19    Jeremy Fish who stole the vehicle, that it was John.
20    So Officer Chavers, who took the original report, I
21    summoned him to come over, because I figured he should
22    follow up on it, and which he did. And he did, in
23    fact, do a report of that conversation in another
24    interview with Elizabeth Smith.
25    MS. BRADY: Okay. And we've already given that to you,

Page 103

1  you have the police reports, Your Honor.
2 Q   So -- and the thing that we didn't have was John
3    Redwine charged with anything after Officer Chavers
4    talked to Ms. Smith?
5 A   Yeah. After the conclusion of the follow-up interview
6    with Elizabeth Smith, Officer Chavers contacted the
7    DA's office and let them know of the new information.
8    And in turn, there were charges for John Redwine for --
9    he was a juvenile at the time, so the charges at that
10    time for him were reckless driving and driving -- and
11    driving in violation of an -- without an instruction
12    permit.
13 Q   Okay. And now John Redwine is a juvenile?
14 A   He's an adult now, but he was at that time.
15 Q   Okay. And what was Fish originally charged with; what
16    were all the charges?
17 A   Vehicle theft, reckless endangerment and reckless
18    driving.
19    MS. BRADY: Okay. That's all the questions I have,
20 Your Honor.
21    THE COURT: Mr. James, do you have any questions for
22 Officer Triplett?
23              JAMES TRIPLETT
24 testified as follows on:
25        CROSS EXAMINATION

Page 104

**Page 109**

1    subjects in the lineup, but if he were to guess, it
2    would be -- would have been number 5. Bennett states
3    he didn't get a real good look at the driver because he
4    was following his vehicle. He states he could only see
5    the driver through the side mirror, when the female was
6    on the ground, the vehicle fled the scene.
7  Q  Okay. And what number was Redwine?
8  A  I don't have that with me.
9  Q  And to your knowledge, there was no follow up that
10   Bennett either could or could not identify Jeremy Fish
11   after the 3rd of July?
12 A  To my knowledge, that's correct.
13 Q  Okay. And there was no photo lineup involving Jeremy
14   Fish.....
15   THE COURT: You just asked -- you asked that question
16 already.
17   MR. JAMES: Prior the 3rd of July.
18   THE COURT: You've already asked that.
19   MR. JAMES: All right. Thank you.
20   THE COURT: Do you know what happened with the charges
21 against Mr. Redwine, what the disposition is?
22 A  I do not, sir.
23   THE COURT: All right. Anybody else with questions for
24 Officer Triplett?
25   MS. BRADY: No, that's it.

**Page 110**

1    MR. JAMES: No.
2    THE COURT: Thank you very much. Ready for your next
3 witness, Ms. Brady?
4    MS. BRADY: I am, Your Honor.
5    THE COURT: Shall we get the jury? Shall we get the
6 jury, Ms. Brady?
7    MS. BRADY: Yes, Your Honor.
8    (Pause)
9    THE COURT: All right. Everybody have a seat, please.
10 Are we back on record?
11   THE CLERK: We are.
12   THE COURT: And you have another witness, Ms. Brady?
13   MS. BRADY: I do, Your Honor.
14   THE COURT: All right. We'll swear this witness in.
15   THE CLERK: Please raise your right hand.
16   (Oath administered)
17   MR. HAAS: I do.
18           STEVEN HAAS
19 called as a witness on behalf of the plaintiff, testified as
20 follows on:
21        DIRECT EXAMINATION
22   THE CLERK: Please be seated.
23 A  Thank you.
24   THE CLERK: For the record, sir, will you state your
25 full name and spell your last?

**Page 111**

1  A  Steven Frank Haas, H-a-a-s.
2    THE CLERK: Thank you.
3    THE COURT: Go ahead, Ms. Brady.
4 BY MS. BRADY:
5  Q  How long have you been an APD officer?
6  A  Since May, 1996.
7  Q  Okay. And do you have -- are you assigned to a special
8    unit?
9  A  Currently I'm assigned to the special assignment unit.
10 Q  Is that the same assignment that you had during the
11   investigation of this case?
12 A  Yes, it is.
13 Q  All right. And have you had any training or experience
14   in the detection and identification and investigation
15   of cases involving controlled substances?
16 A  Yes, I have.
17 Q  Could you just explain to the members of the jury what
18   that is?
19 A  I attended the police academy that was put on by the
20   Anchorage Police Department here at the Jewel Lake
21   training center. I have attended a DEA clandestine lab
22   school, and then other field training that I've done.
23   I've been the case officer on cases, I've assisted in
24   cases and the testing of drugs, the identification of
25   drugs, et cetera.

**Page 112**

1  Q  How did you become involved in this case?
2  A  Officer LaPorte and Officer Johnstone had acquired an
3    informant, and I was just assisting in the surveillance
4    of the case.
5  Q  Okay. And let me direct your attention to February
6    8th. Did you have a particular assignment with regard
7    to this case on that day?
8  A  Yes, I did.
9  Q  What.....
10 A  I'm sorry. Go ahead.
11 Q  What was your assignment?
12 A  On that day, I was assigned to assist in surveillance,
13   and I photocopied the money prior to the buy.
14 Q  Okay. And how much money did you give the informant on
15   that day?
16 A  $150.
17 Q  Let me approach you with a document. This document has
18   previously been marked state's exhibit 8.
19 A  Thank you.
20 Q  Do you recognize that document?
21 A  That would be the photocopied buy money.
22 Q  Okay.
23 A  With my initials right below the date on it.
24 Q  All right. And you anticipated my questions. What --
25   there -- it has a number on it that says 017273, what

1 Q   Is that a typical kind of thing that you do when you
2     work with informants?
3 A   Yes. If we're sending the informant in and they're
4     driving their own vehicle, we always search the
5     informant's car before and after to make sure that they
6     don't already have any contraband, drugs, money, et
7     cetera in their car. And then we check it afterwards
8     and make sure that they didn't conceal anything in
9     their car.
10 Q   What kind of car was it?
11     THE COURT: Can I get you to move back in front of the
12 microphone?
13 A   Oh, I'm sorry, sir.
14     THE COURT: Thank you.
15 A   If I recall correctly, he was driving a station wagon,
16     but I think he -- he drove two different cars during
17     this.
18 Q   Okay.
19 A   I don't recall what the other car was.
20 Q   How thorough was the search that you did?
21 A   It's pretty thorough. It probably takes me maybe five
22     to 10 minutes to search the car, and I start where the
23     driver sits and search everything that they can reach,
24     could possibly get to, and then work my way back.
25 Q   So you look in the ash trays?

Page 117

1 A   Ash tray, floor mats, seats, sun visor, door panels,
2     any nook and cranny where you could hide the type of
3     items we're dealing with.
4 Q   Okay. And what happened after you searched Fish's car?
5 A   After I searched his car, we all proceeded over to the
6     area of 202 Grand Larry and, as I stated before, I
7     parked on Duben, west of Grand Larry this time.
8 Q   Okay. And then did you have any further involvement
9     with the case after Fish left Grand Larry that day?
10 A   Yes. Let me just review and make sure I cover
11     everything here. I assisted in following the informant
12     back to the police station. Once back at the police
13     station, I searched his car again.
14 Q   Now -- okay, you searched the car before, so why do you
15     need to search it afterward?
16 A   To make sure that they didn't conceal anything in the
17     car, and after the drug transaction, drugs, money, et
18     cetera.
19 Q   Was any contraband found?
20 A   No.
21 Q   Okay. And did you do anything else with regard to this
22     case on that day?
23 A   No, I did not.
24 Q   Okay. Then let me direct your attention to February
25     21st, did you have a particular assignment that day?

Page 118

1 A   Once again, I was assigned to assist in the
2     surveillance. And I -- on this occasion, I didn't
3     search the informant's car, it was assigned to somebody
4     else.
5 Q   Okay. And what was -- your assignment was
6     surveillance, that was -- where was the meeting at?
7 A   This time it occurred at the Chevron, International and
8     Old Seward.
9 Q   Okay. And I'm going to ask you to flip over 23 and 24,
10     and I want you to just diagram roughly what your
11     recollections are of the meeting at the Chevron.
12     (Pause) Is that depiction a true and accurate
13     representation of what the observations that you made
14     on February 21st at the Chevron station?
15 A   Yes, it is.
16 Q   Okay. At this time, I'm going to ask you to mark it
17     state's 25.
18     MS. BRADY: And at this time, I would move to admit
19 state's 25.
20     THE COURT: 25, Mr. James?
21     MR. JAMES: I have no objections, Your Honor.
22     THE COURT: 25 is admitted.
23             (Plaintiff's exhibit 25 admitted)
24 Q   Okay. Where were you at?
25 A   During this transaction, I was parked in the restaurant

Page 119

1     parking lot just south of the location where I could
2     see the green Chevy Suburban, and I think the plate was
3     DSA 413. I don't have it in my notes marked.
4 Q   Okay. Now, you've drawn something, it looks like a box
5     with a triangle on top of it, and it's in green, and
6     it's facing toward the top of the page, and that
7     represents you?
8 A   Correct.
9 Q   Okay. And then you've drawn another thing, and you
10     have something written on it, but I can't see what it
11     says from here.
12 A   This one?
13 Q   Yeah.
14 A   I wrote the plate of what the green Suburban was. And
15     I said, I think it's DSA 413, but I.....
16 Q   Okay. So that mark indicates the Suburban?
17 A   Yes, ma'am.
18 Q   Okay. And now go ahead and just explain what you saw,
19     because I interrupted you.
20 A   On this day, I was parked over here in the parking lot
21     of the restaurant, where I could look back and see the
22     Suburban parked with its parking lights on. I couldn't
23     -- it's kind of dark in this corner of the parking lot,
24     I couldn't see who was in the car, or how many people
25     were in the car, et cetera. And then when the

Page 120

1 the effect on him, that they believed that there was a buy
2 set up. And Mr. Fish will be testifying.
3     THE COURT: You -- the objection is sustained. You can
4 ask the witness whether based on what he heard from
5 Mr. Fish, did he become suspicious of cocaine sales or
6 something like that.
7     MS. BRADY: Okay.
8     THE COURT: But you can't go into the details.
9     MR. JAMES: I mean, that's where we were heading, I
10 felt we were heading, and that's why the objection was made.
11 Thank you.
12     (End of bench conference)
13     THE COURT: The objection is sustained.
14          DIRECT EXAMINATION CONTINUED
15 BY MS. BRADY:
16 Q   Okay. Based on the conversation that you could hear,
17     did you become suspicious that a cocaine sale might be
18     about to occur?
19 A   I -- based upon the conversation, I believed that we
20     could make a cocaine purchase from Rico.
21 Q   Did you know how much it was going to be for?
22 A   From what Jeremy Fish stated, that it was going to be
23     for approximately $150.
24 Q   Okay. And where was it going to be at?
25 A   It was going to occur at 202 Grand Larry, which was the

Page 137

1 defendant's residence.
2 Q   Okay. Now, once the conversation was over, and it was
3     decided that this was going to happen, what did you do
4     next?
5 A   I requested -- there's several things we have to do.
6     First, we have to obtain the -- the money that's going
7     to be use during the -- during the transaction, and
8     that all has to be photocopied to document serial
9     numbers. So I requested -- or had somebody withdraw the
10     money, $150 worth, and had that photocopied. Officer
11     LeBlanc then searched Jeremy's car, and I strip-
12     searched Jeremy.
13 Q   Okay. Now, strip-searched Jeremy, what do you mean
14     exactly by you strip-searched Jeremy? Could you -- I
15     want you to describe for the members of the jury
16     exactly what you do when you strip-search someone.
17 A   Okay. We have them in a closed door -- in a closed
18     area. We have them remove all of their clothing,
19     socks, shoes, underwear, everything. And once they do
20     that, then we conduct a search on them of their person.
21     And then also go through all their shoes, go through
22     all their clothing, check the -- the elastic bands of
23     their underwear, check all their socks, just to make
24     sure that there's nothing in their shoes, that they
25     don't have a false bottom on their shoe, and check

Page 138

1 everything, pockets of pants, pockets of shirts. Any
2     item of clothing that they may have on them, we go
3     through it to make sure there's nothing on it, or in it
4     at the time.
5 Q   You check every orifice of their body too?
6 A   Yes, we do.
7 Q   Now, what are some of things that you would be looking
8     for when you're doing this kind of search?
9 A   Well, first and foremost, we would be looking for any
10     contraband, drugs, drug paraphernalia. We also would
11     be looking for any additional money that they may have
12     on them, because we don't want to confuse our money
13     that we have photocopied and given to them with any of
14     their funds that they -- that they may all ready have.
15 Q   Okay. And did you find any contraband on Mr. Fish at
16     all?
17 A   No.
18 Q   Okay. Then what happened after he was searched?
19 A   Once he was searched, he was given then $150 in pre-
20     recorded buy funds. And I followed -- Officer LeBlanc
21     left the station a head of time and went and took up a
22     position around 202 Grand Larry. I don't knew where --
23     exactly where he was, but where he could actually see
24     the residence. I then followed.....
25     MR. JAMES: I'm going to object to what he's telling

Page 139

1 about Officer LeBlanc. He clearly said that he.....
2     THE COURT: Ms. Brady, you asked the officer what he
3 did next.
4     MS. BRADY: Right.
5     THE COURT: Why don't you.....
6 A   Okay. Jeremy left the -- the station, and I followed
7     him to the area of Duben and Grand Larry. Once he made
8     the turn onto Grand Larry, I continued on and Officer
9     LeBlanc took up the surveillance at that point.
10 Q   Okay. And so do you know how long Mr. Fish was inside
11     the address at Grand Larry?
12 A   Approximately 10 minutes.
13 Q   Okay. And did you have reason to call him once he was
14     inside?
15 A   Yeah, it -- in just chatting with him, he said that
16     normally he and Rico will chat a little bit, we prefer
17     that things not going on for an extended period of
18     time, so I called him on his cell phone after several
19     minutes and asked him when he would be done, and he
20     said he was on his way out at that time.
21 Q   What happened once he left the residence?
22 A   Once he left the residence, Officer LeBlanc told
23     everybody via radio that he was leaving the residence,
24     and that he was going -- headed northbound on Grand
25     Larry to Peck Avenue. And once he turned west onto

Page 140

1  Peck, I was in a position where I could then pick up
2  his vehicle, and I followed him back to the station.
3 Q  Okay.  And what happened.....
4 A  Actually, I take that back.  We had decided at -- prior
5  to going to the station, we were going to meet at a
6  pre-determined location.  There is a -- I don't know
7  what denomination church it is, but there is a large
8  red church on Muldoon, and our meeting point was to be
9  immediately behind that church on the west side, and so
10  we met there.  I retrieved the product from him and
11  then followed him back to the station.
12 Q  All right.  Then what happened once he got to APD?
13 A  Once he got to the headquarters, he was taken back in
14  the same interview room, the same strip-search that we
15  conducted before the buy was done again, same -- of his
16  person.  Also, his car was searched again, and then I
17  conducted a debrief with him of how the buy had
18  transpired.
19 Q  Okay.  Now why do you do a strip-search after the buy
20  is over?
21 A  Because it has happened in the past where an informant
22  has purchased whatever and has stashed it on their
23  person, in their clothing, somewhere.  And so we
24  conduct a strip-search to make sure that has not
25  happened.

Page 141

1 Q  Was any contraband found?
2 A  No.
3 Q  All right.  Now, did -- did Mr. Fish turn over the
4  amount of cocaine that you were expecting to get?
5 A  No.  It was less than -- than what I had expected for
6  $150 worth.
7 Q  And what did you direct him to do as a result of your
8  observation?
9 A  Well, I told him that this -- this was a short amount
10  of product for the money that we had given him, and I
11  asked him to contact Rico again and tell him that, hey,
12  this was a little short, can you make up the difference
13  at another time.
14 Q  Now, when -- when he placed that call, you were sitting
15  there in front of him?
16 A  Correct.
17 Q  Did -- who dialed the number?
18 A  He did.
19 Q  Was the it same number that was dialed initially to
20  make the buy?
21 A  Yes.
22 Q  Okay.  And -- okay.  What did you do next in
23  investigating this case?
24 A  That was the end -- after we made the initial call,
25  Rico said that he could get him some more tomorrow.

Page 142

1  MR. JAMES:  Objection.
2  THE COURT:  What's the objection?
3  MR. JAMES:  Hearsay.
4 Q  Let me just direct your attention.....
5 A  Okay.
6 Q  .....to the next.....
7  THE COURT:  Just a second.  The hearsay objection is
8  sustained.  Disregard the last answer.  And your next
9  question, Ms. Brady?
10 Q  Let me direct your attention to the next activity you
11  conducted in the investigation of this case.
12 A  Okay.
13 Q  The next -- the next involvement that I had was I
14  obtained a search warrant for -- I determined that the
15  phone number that Jeremy was calling 727-9465 was a
16  prefix to Alaska Digitel cellular phone numbers.  So I
17  obtained a search warrant to get the subscriber
18  information of that particular phone number, since we
19  wanted to make positive identification of who Rico was.
20 Q  Whose phone was it?
21 A  The phone was registered to a Robert Davis, III.  And
22  they -- Alaska Digitel had an address of 202 Grand
23  Larry for him.
24 Q  What was your next involvement in this case?
25 A  On the 20th, Jeremy arrived at the station and we were

Page 143

1  going to be making phone calls to purchase drugs again.
2 Q  All right.  Now let me -- let me stop you, and did
3  somebody -- somebody obtained a glass warrant though in
4  the meantime, right?
5 A  Yes.
6 Q  Okay.  Could you just briefly describe for the members
7  of the jury what a glass warrant is?
8 A  A glass warrant is once you've established that, in
9  this case, you can make a purchase of a drug from a
10  person.  A glass warrant is necessary in order to
11  record the conversations then that the informant is
12  going to have with the supplier or suppliers.  And it
13  allows us to record that contact, whether it's by
14  telephone or in person.
15 Q  Okay.  And -- okay.  So what happened when Mr. Fish
16  arrived at APD on the 20th?
17 A  We, myself and Officer LaPorte, again made several
18  phone calls to attempt to purchase products.  Officer
19  LaPorte began that.  I was out of the room.  He began
20  that, and I came in as Jeremy was on the phone, I
21  believe to Mr. Davis.  We listened to the telephone
22  conversation, and it was who he -- who he described as
23  Rico.
24 Q  Okay.
25 A  At any rate, Jeremy was heard to ask if he could get an

Page 144

**Page 145**

1  eight ball and then the next one was in about 20
2  minutes.
3 Q  All right. And now what happened once the buy was
4  arranged?
5 A  Once the buy was arranged, since we had the glass
6  warrant, it was then necessary to put an electronic
7  monitoring device on Jeremy. And so I retrieved that
8  and set that up on his -- set it up so that it would be
9  ready to go when Officer LaPorte placed it on him. And
10  the strip-search of Jeremy was done. It was done at
11  the beginning -- on all the buys that we do. He was
12  always strip-searched before and after. His vehicle
13  was searched again.
14  MR. JAMES: I'm going to object based on personal
15 knowledge.
16  THE COURT: The objection is overruled.
17 Q  And then what happened after.....
18 A  After he was set up with the -- with the electronic
19  monitoring device, I escorted him to his vehicle.
20  Officer LaPorte then brought out the -- the money. And
21  we gave it to him and we followed him again to 202
22  Grand Larry.
23 Q  Okay. Now, were you in a car with Officer LaPorte, or
24  were you in a separate car?
25 A  Officer LaPorte and I were in the same vehicle.

**Page 146**

1 Q  Okay. And you followed Mr. Fish. Do you recall what
2  kind of car Mr. Fish was driving?
3 A  He was driving a dark color, I think it was a really
4  dark blue or black, a Chrysler, I think it's a LeBaron.
5  It's an older model four-door sedan.
6 Q  All right. And now you said that he was wired?
7 A  Uh-huh. (Affirmative)
8 Q  Just describe briefly for the members of the jury what
9  exactly that means.
10 A  It means that the electronic monitoring device is
11  turned on, and we have radios that we can hear what is
12  being said, what is going on inside the vehicle. One
13  member of our team will have an actual recording device
14  that records, the signal comes in and it actually makes
15  a tape of everything that goes on. In this case,
16  Officer LaPorte and I just had the radio. Somebody
17  else was going to be recording the conversation. We
18  just had a radio so that we could listen to what was
19  going on.
20 Q  Okay. And how close did you get to the 202 Grand Larry
21  address on this occasion, when you were following
22  Mr. Fish?
23 A  I don't know how close we were proximity wise. The
24  radios will only work within about at two to three
25  block radius of the location, and we were within range

**Page 147**

1  of where we could hear what was going on. So I don't
2  know where our exact position was.
3 Q  Okay. And what happened once he went inside, where did
4  you go?
5 A  We -- when Jeremy went inside the residence, we took up
6  a position where we could pick up his vehicle as it was
7  leaving, and so we just sat. And if memory serves me
8  correctly, I think we were across the street from the
9  Williams at 6th and Muldoon, but I -- I'm not certain.
10  At any rate, we set up there just to listen to the
11  radio and see what transpired on the wire.
12 Q  Okay. So you could hear everything that was going on
13  on the wire? All right. And did you assist any
14  further in this case that day?
15 A  When we returned to the police headquarters, I escorted
16  Jeremy into the same interview room, and he had a torn
17  piece of newspaper that he placed on the table and
18  unwrapped it, and there was a white block of powder
19  about the size of small marble inside. I turned that
20  over to Officer LaPorte, and then I conducted the
21  strip-search of Mr. Fish again.
22 Q  How thorough was the strip-search that you conducted of
23  him after the buy was over?
24 A  It's the same as we do -- I mean, clothing, all done,
25  you take all the clothing off, search the shoes, the

**Page 148**

1  elastic, every -- all the clothing. Any -- anyplace on
2  the clothing where something could be hidden, we
3  search. And anyplace on the body, with the exception
4  of stomach contents, we search.
5 Q  So you look in people's hair, and in their ears, and in
6  their noses and all that kind of stuff?
7 A  In their hat, yeah, in their mouths, rectum, every --
8  everywhere.
9 Q  Okay. And was any contraband found?
10 A  No.
11 Q  Okay. Now what was your next involvement with this
12  case? What's the next thing you did?
13 A  That day or the next time?
14 Q  That day.
15 A  That -- I did a debrief of Jeremy, referencing the --
16  the buy.
17 Q  Okay. Now when you say you did a debrief, could you
18  just explain to the members of the jury what it is that
19  you're talking about when you do a debrief?
20 A  What we do is go over the entire situation that just
21  transpired. I talk to him about what was said on the
22  telephone conversation, even though I was there, I
23  still want him to tell me everything that was said. I
24  talk with him about who gave him the money to purchase
25  the -- the product. I talk with him about what

1   happened when he left the station and when he got to
2   the location where he was going in this case, 202 Grand
3   Larry, what he saw when he was in there, who else might
4   have been in the -- in the residence, and where the --
5   the drugs came from. If they pulled them out of a
6   draw, that's very important for search warrant
7   purposes. Who he handed the money to, who seemed to be
8   kind of in charge at the location. And then coming
9   back to the station, you know, who did he turn over the
10   drugs too. Just a complete and detailed description of
11   the events as they transpired, regardless of whether or
12   not I was all ready there and saw some of this stuff.
13 Q  How close in time to the actual event does this debrief
14   occur?
15 A  It occurs immediately. Once -- once we get back to the
16   station, and the first thing we do if we've not
17   obtained the product is obtain that. The second thing
18   we do is do the strip-search. The next thing we do is
19   the debrief. Because it's very important that there
20   are minute details that we want to retrieve that they
21   may forget at -- as time goes on.
22 Q  All right. And are -- debriefs are tape recorded?
23 A  Yes, they are.
24 Q  Okay. And you put the tape in evidence?
25 A  Correct.

Page 149

---

1 Q  Is an eight ball associated with other drugs besides
2   cocaine, or...
3 A  It can be, yeah. I think it's associated also with
4   heroin.
5 Q  Okay. Now, once the -- once the buy had been set up,
6   what happened next?
7 A  I conducted the strip-search of Mr. Fish again, same
8   manner as before, and he was provided with $200 in U.S.
9   currency, photocopied. The purchase was to occur at
10   the Chevron at Old Seward and International Airport
11   Road. And Officer LaPorte and myself, again, followed
12   Mr. Fish to that location.
13 Q  Now let me stop you for just a second. Did you
14   actually see him pull in the parking lot of that
15   Chevron sation?
16 A  Oh, yes.
17 Q  And then you -- did you break off and go somewhere
18   else, or.....
19 A  We actually -- directly on the east side of Internat
20   -- correction, of Old Seward, is the Peanut Farm
21   showboat, show club parking area. We parked in a row,
22   I think it was the first row right on the right facing
23   the Chevron station so that we could see what was going
24   on. The -- Jeremy and the -- he made contact with a --
25   a newer model Suburban, I don't know what year it was,

Page 151

---

1 Q  All right. Now, what's your -- what your next
2   involvement in this case?
3 A  On the 21st of February, we again had Jeremy come into
4   the station, and he attempted a call to Mr. Davis, left
5   a message on the cellular telephone -- the number that
6   -- left a message on a phone that he had called,
7   asking him to call back in a little bit. That was
8   approximately 1854. We tried again at 1904 hours,
9   about 10 minutes later, received no answer. At about
10   8:05, Jeremy called and spoke with Mr. Davis about
11   getting a ball, which is a term of -- of the size of
12   drugs.
13 Q  Okay. Now wait, let me stop you right there. Is that
14   -- what does the term signify to you? What
15   specifically is that talking about, and could you just
16   describe that to the members of the jury?
17 A  An -- an eight ball, if this is what he was referring
18   to, again, I didn't hear the word eight, I just heard a
19   ball, but if he's referring to an eight ball, it is a
20   -- it is size or a rock or baggie of cocaine that's
21   about the size of a medium size marble. And when
22   people talk to each other on the street in -- in that
23   particular lingo, there's a lot of terms that they use
24   to describe certain amounts, and an eight ball is one
25   of them.

Page 150

---

1   but that was on the -- the east side of Chevron. So
2   from where we were sitting, we could see the Suburban,
3   and see the passenger side of the Suburban.
4 Q  All right. And what did you see happen?
5 A  Jeremy pulled in, into the parking lot at about 2023
6   hours, and got out of his vehicle, and then climbed
7   into the passenger side of the Suburban, the front
8   passenger side of the Suburban.
9 Q  All right. And without telling me what was said, you
10   could hear the conversation inside the suburban over
11   the wire, is that right?
12 A  That is correct.
13 Q  All right. And then what happened once Fish got out of
14   the Suburban?
15 A  He got out of the Suburban, got back in his vehicle.
16   Myself and Officer LaPorte followed him back to APD. I
17   conducted a strip-search of him again. And I also at
18   that -- on that particular occasion -- occasion also
19   searched his vehicle and did a debrief with him.
20 Q  Now when you searched his vehicle, could you just
21   please describe for the members, why search his vehicle
22   afterward?
23 A  On some occasions, we have had the unfortunate
24   circumstances of having an informant who is -- who will
25   remove part of the -- the drugs that he purchases and

Page 152

1   hide them in locations of the vehicle.  And so we
2   search the vehicle before to determine if -- if there's
3   any contraband in the vehicle, and after to determine
4   if they have taken some what they purchased in an
5   attempt to hide it.
6 Q   So just describe what you do to conduct that search to
7   the members of the jury.
8 A   Where -- from the driver's seat, I actually sit in the
9   driver's seat of the vehicle, and I search everything
10   that can be opened, ashtrays, consoles, everything
11   within an arm's reach or so of -- of where the driver
12   is sitting.  I search underneath the seat.  I search in
13   between the seat cushions.  If they have a seat cover
14   on, I pull that off.  If their seats are the style that
15   you can actually unzip and remove the foam, I unzip the
16   seat, stick my hands in there, search all through that.
17   Anyplace that can be opened relatively easily, I
18   search.
19 Q   Under floor mats?
20 A   Under floor mats.  The mat pockets.  I do go as far as
21   to check the dash to make sure that the dash is
22   fastened down.  There's been circumstances where the
23   dash has actually been loose enough for the purpose of
24   stuffing things underneath.  And so we check the dash
25   to make sure that it is, it is secure.

Page 153

1 Q   What was your next involvement in this investigation?
2 A   My next involvement was on February 28th/March 1st.
3   And again, at approximately 1810 hours, Jeremy made a
4   call to Mr. Davis and arranged a purchase of cocaine
5   again.
6 Q   Okay.  Now, there were several calls made, but the
7   actual call arranging the purchase wasn't made until
8   later, isn't that right?
9 A   Right.  We tried at 1810, that was the first one.  And
10   then we tried at 1910.  We tried at 1938, at 1950, at
11   2000.  And then finally at 2345 we were able to make
12   contact with -- with Mr. Davis.
13 Q   All right.  And a buy was arranged?
14 A   That is correct.
15 Q   And so what happened once the buy had been arranged?
16 A   It was arranged to occur at a location called the
17   Pancake House, which is on Muldoon, and it was to be in
18   approximately 20 minutes or so.  I notified other
19   units, other units were out and about on other
20   investigations, so I notified them that we were going
21   to have this purchase in approximately 20 minutes.  I
22   obtained $200 in U.S. currency, and I photocopied and
23   gave that to -- to Jeremy.
24 Q   Now, let me stop you right there.  I'm going to
25   approach you with a document that was previously marked

Page 154

1   as state's exhibit 11.  Do you recognize this document?
2 A   It is a photocopy of some U.S. currency, and it has my
3   signature along with the date and the case number
4   written on it.
5 Q   All right.  And is that the photocopy, is that a true
6   and accurate representation of the photocopy that you
7   made of the money that you gave to Mr. Fish?
8 A   Yes.
9 Q   How much money did you give to Mr. Fish?
10 A   $200.
11 Q   What were the denominations?
12 A   Five $20's and one $100.
13   MS. BRADY:  All right.  And at this time, I move to
14 admit state's exhibit 11.
15   MR. JAMES:  Could I just look at that quick?
16   THE COURT:  Sure.
17   MR. JAMES:  May I voir dire on the dates, Your Honor?
18   THE COURT:  On cross.  I'll reserve admission.
19   MR. JAMES:  Thank you.
20   THE COURT:  I'll reserve ruling on admission until
21 after cross.
22   MS. BRADY:  Okay.  And I couldn't hear what was said up
23 there.
24   MR. JAMES:  I asked if I could voir dire on the dates,
25 and the judge said I could cross.  Reserve admission.

Page 155

1   MS. BRADY:  Okay.
2   DIRECT EXAMINATION CONTINUED
3 BY MS. BRADY:
4 Q   All right.  Is the APD case number anywhere on that
5   document?
6 A   Yes, it is.
7 Q   And your initials are on there?
8 A   That is correct.
9 Q   And the date of the buy is on there?
10 A   Yes.
11 Q   Okay.  And did you document the fact that you
12   photocopied these buy funds in your report?
13 A   Yes, I did.
14 Q   Okay.  And was your report prepared close in time to
15   the -- to when this happened?
16 A   It was prepared afterwards, yes.
17 Q   All right.  And did you also conduct the pre-buy strip-
18   search?
19 A   Yes, I did.
20 Q   All right.  And again, how through was that search?
21 A   It was again, the same, taking all clothing off,
22   searching all aspects of their person and clothing.
23 Q   All right.  And did you document searching Mr. Fish in
24   your report?
25 A   Yes, I did.

Page 156

| | |
|---|---|
| 1 Q Did you find any contraband? | 1 Q Where did that search occur? |
| 2 A No. | 2 A In the APD indoor secure storage area. |
| 3 Q Did you also document that in your report? | 3 Q Okay. So what happened once you did the search? |
| 4 A Yes. | 4 A The only we recovered in the search was a cellular |
| 5 Q And did attach the wire to Mr. Fish this day? | 5 telephone. The buy money was not located. I notified |
| 6 A Yes. | 6 Officer LaPorte of that and -- so at that point, he |
| 7 Q All right. And did you document that in your report as | 7 made -- he decided to pursue another angle, possibly |
| 8 well? | 8 checking with CIPT. And at that point, we discovered |
| 9 A Yes. | 9 that he had -- Mr. Davis had come in with money to |
| 10 Q What happened once you arrived at the scene? | 10 CIPT. I obtained a search warrant to go through all |
| 11 A Prior to that, I told Jeremy that once the purchase was | 11 the cash that they have. They pile it like a general |
| 12 made, he was to meet me south of the location, at -- | 12 fund, and so I obtained a search warrant for them to go |
| 13 there's Shuck's Auto Supply at Muldoon and 16th, and I | 13 through that in attempt to -- they had the pre- |
| 14 wanted him to drive away from the area, and he was to | 14 recorded buy fund serial numbers and they had to go |
| 15 meet me down there and turn over what he had purchased | 15 through all of that to find the money that we had used |
| 16 at that time. So once Jeremy pulled off, I followed | 16 in the buy. |
| 17 him from the station to the area of the Pancake House. | 17 Q All right. And did you do anything else with regard to |
| 18 And once he pulled into the lot, I then continued north | 18 the investigation of this case? |
| 19 and turned around so that -- so that I could pick him | 19 A I don't think so, aside from just doing the return of |
| 20 up as he came southbound, because he was going to have | 20 the search warrants, that's all. |
| 21 cross traffic, and we don't want to deal with a lot of | 21 Q All right. Now let's talk about Mr. Fish for a second. |
| 22 traffic issues. So I just wanted to be able to jump | 22 A Okay. |
| 23 out right behind him, as he was going southbound on | 23 Q Did you run into Mr. Fish again later? |
| 24 Muldoon. | 24 A Yes. Actually, I haven't -- since this time, I have |
| 25 Q Was Officer LaPorte in the car with you on this date? | 25 not personally had contact with Mr. Fish, but I have |
| Page 157 | Page 159 |

| | |
|---|---|
| 1 A No, he was not. | 1 had dealings with him because of my position as a |
| 2 Q All right. And what happened after Mr. Fish left the | 2 burglary detective. |
| 3 Pancake House parking lot? | 3 Q Okay. So what you're saying is you didn't run into him |
| 4 A Once he left there, I followed him from that point to | 4 because of this case, you ran into him because of |
| 5 the Shuck's Auto Body. I obtained -- he handed me the | 5 something that he was doing that you were |
| 6 -- the product, and I obtained that and we went back to | 6 investigating? |
| 7 the station. | 7 A That is correct. |
| 8 Q Did you notify anybody that you had obtained product? | 8 Q All right. And did you have a contact with him on |
| 9 A Oh, yes. | 9 September 5th? |
| 10 Q All right. And what happened at the station? | 10 A I -- I have not had personal contact with him at all |
| 11 A We did another debrief, another strip-search, another | 11 since this case. I was assigned a burglary case where |
| 12 search of his car. | 12 an officer had stopped Mr. Fish. I have not had -- |
| 13 Q Okay. And did you do anything else with regard to the | 13 personally had any contact with him since this case. |
| 14 investigation in this case? | 14 Q Okay. So you didn't personally contact him, but you |
| 15 A Yes. On the 2nd of March, I became aware that there | 15 did end up referring another case over to the district |
| 16 had been a problem in the recovery of the -- of the buy | 16 attorney's office as a result of that contact? |
| 17 funds used from Mr. Davis. The funds were not found in | 17 A That is correct. |
| 18 a search of the vehicle. Oh, that's right, I also | 18 Q All right. Can you just tell us about that case, what |
| 19 searched his vehicle. I think it was Officer LaPorte | 19 happened? |
| 20 had obtained a search warrant for his vehicle and we | 20 A Mr. Fish was stopped outside of a residence for -- as |
| 21 were expecting to find in the vehicle the buy funds | 21 part of an investigation of a burglary by a patrol |
| 22 since we had not recovered them on Mr. Davis. | 22 officer. During the course of talking with Mr. Fish, |
| 23 Q All right. Now let me stop you right there. You | 23 the patrol officer requested permission to -- from |
| 24 participated in a search of the vehicle? | 24 Mr. Fish to search the vehicle, which Mr. Fish granted. |
| 25 A Uh-huh. (Affirmative) | 25 Inside the vehicle was -- was a -- if I'm remembering |
| Page 158 | Page 160 |

**Page 222**

1 must be running late. She's supposed to be here by now and
2 she's not outside. That's my next witness. I need a break
3 until she gets here.

4   THE COURT: All right. Is Mr. Fish here?

5   MS. BRADY: No, he's going to be here at 10:00.

6   THE COURT: All right. Well, Mr. James?

7   MR. JAMES: Nothing we can do.....

8   THE COURT: Nothing we can do.

9   MR. JAMES: .....until we get a witness. I mean.....

10   THE COURT: All right. I'll tell them.....

11   MR. JAMES: .....I could ask for a judgement of
12 acquittal, but I don't think you're going to give it to me.

13   THE COURT: I'll tell them to cool their heels for a
14 while until your witness gets here. Maybe you can check on
15 her when we send the jury out?

16   MS. BRADY: Okay. Yeah, I'll wait outside for her.

17   THE COURT: Thank you.

18   (End of bench conference)

19   THE COURT: We're going to have to take a little break.
20 We're waiting for a witness, it shouldn't be too long, so I
21 could ask you to step out of the courtroom, go your jury
22 room, and we'll come and get you when we're ready. And
23 thanks for your patience.

24   (Jury excused)

25   THE COURT: Any other work -- our jury has departed,

**Page 223**

1 any other work we can do while we're waiting for the
2 witness?

3   MR. JAMES: I just want to -- yes, there is. I think I
4 -- and I'm not trying to beat this. You indicated -- let's
5 see here -- that 9/29 -- or let's see, the 2/10 and the 4 --
6 excuse the 9/2 and the 2/10, this is on the Jeremy police
7 report, those are subject invest-- -- proceed-- -- let me try
8 it again, out of jury voir dire of Mr. Fish.....

9   THE COURT: 3/29, 9/2 -- let's put them in
10 chronological order.

11   MR. JAMES: I'm sorry. I just want to get to get
12 right, Judge.

13   THE COURT: 3/29, 4.....

14   MR. JAMES: 3.....

15   THE COURT: 4/10, 9/2.

16   MR. JAMES: 9/2. Those are the ones that are available
17 for examination out of the jury?

18   THE COURT: We'll talk to Mr. Fish.

19   MR. JAMES: Yes, sir. That's what I.....

20   THE COURT: You may -- you may talk to Mr. Fish afer
21 you all talk to -- when I say that, we'll probably do it on
22 the record. After I hear from Mr. Fish, I'll make a
23 determination as to whether reasonable jurors could infer
24 that he may have something to fear from the state or the
25 police arising out of those incidents.

**Page 224**

1   MR. JAMES: And then the -- the 7/26 and 9/29, I can
2 ask if he's aware of -- I mean, he is aware of those,
3 because he was contacted.....

4   THE COURT: There's no objection to those, so.....

5   MR. JAMES: Yeah.

6   THE COURT: .....you may ask about those.

7   MR. JAMES: All right. I just wanted to take advantage
8 of the time so we don't.....

9   THE COURT: Yeah. All right.

10   MS. BRADY: I have something we can take up, Your
11 Honor. Mr. James indicated yesterday he was going to be
12 calling witnesses telephonically, and I am going to be
13 objecting to that. So we can take that up right now if you
14 want to.

15   MR. JAMES: We.....

16   THE COURT: I think where we left it was I said you
17 need to make a motion.....

18   MR. JAMES: Right.

19   THE COURT: .....and I suppose we'll count yesterday as
20 your motion so.....

21   MR. JAMES: All right. Basically, Your Honor, I don't
22 know what Mr. Fish is going to testify to, but we have an
23 extensive police report, three page, from Dan -- Officer Dan
24 Bennett, Nome Police Department, relating to the sequences
25 of events. One of those issues that I wish to explore is

**Page 225**

1 that he had -- he, being Fish, had agreed to meet with
2 Bennett. There was supposed to -- he was supposed to
3 participate in some buys up in Nome was what this all came
4 down -- it originally came down to. He was to meet with
5 him, he -- the 31st, I believe, and he departed unbeknownst
6 to Bennett on the 27th, which activated -- this January now,
7 of this year -- activated the arrest warrant issued by Judge
8 Ben Esch up in Fairbanks -- excuse me, Nome, which resulted
9 in his arrest down here on the 6th of February.

10   And if he denies that he had any kind of agreement, or
11 that, in fact, he lied to the police -- just denies he lied
12 to the police, I think I'm entitled to establish that, A, he
13 lied to his -- the police there.

14   As far as Ted Garcia, who is the CIP officer -- CIPT
15 officer, my last communication with him was is he was under
16 doctor's orders at home, had just come off of his pain pump,
17 and -- now, that was two days ago. And I don't know whether
18 he's going to be physically able to come. Now he is the one
19 that is really -- not Gonzales, but Garcia is the booking
20 officer. And those are the two that I -- I wish to
21 telephonic -- I don't know whether I'm going to use Bennett
22 or not, to be honest with you, because I don't know what
23 Fish is going to say. But Garcia, obviously -- and, of
24 course, as we progress here, his -- I hope his condition
25 improves. He's just went over rotator cuff surgery. And

Case 3:05-cv-00255-TMB-JDR   Document 14-3   Filed 02/07/2006   Page 28 of 30

1 Bennett is 400 miles away, I think.

2      THE COURT: Ms. Brady?

3      MS. BRADY: The rule pertaining to telephonic testimony

4 says that both parties have to agree in order to have

5 telephonic testimony. And I don't agree to that. I think

6 the jury should be able to see -- I may agree to it for

7 Mr. Garcia if it becomes -- if there's some sort of offer of

8 proof that shows testimony will be relevant, I may go ahead

9 and agree to that. But as far as Officer Bennett, he should

10 be here if he's going to testify. There's no reason for him

11 not to be here. That's why I brought it up now so there

12 would be plenty of notice, just in case Mr. James needs to

13 get him here. And he can take the stand like any other

14 witness and testify, and the jury can view him, there's

15 reason why.....

16      THE COURT: Which rule?

17      MS. BRADY: Pardon me?

18      THE COURT: Which rule?

19      MS. BRADY: It's -- I think it's.....

20      THE COURT: 38.1.

21      MS. BRADY: Thank you.

22      THE COURT: With the consent of the prosecution and the

23 defendant. Mr. James?

24      MR. JAMES: Yes, Your Honor. Obviously, it's -- it's

25 strictly economics. I mean, I don't have any reason, when I

Page 226

1 I talked to Bennett, of course, this was before the trial, and

2 I -- Officer Bennett, there was no indication that he would

3 no be available and be a willing participant. We're talking

4 $500, $600 bucks to bring him down here. I think, you know,

5 that at some point in time the economics of it certainly

6 have to come into play and the court has discretion under --

7 to relax the rules under -- since you're -- we're citing the

8 criminal rules.

9      THE COURT: All right.

10      MR. JAMES: I don't think it's an unreasonable request.

11      THE COURT: Because the state objects to Mr. Bennett

12 testifying telephonically, under criminal rule 38.1, which

13 is designed to protect both sides' right to a fair trial,

14 and recognize the importance of the actual presence of

15 witnesses so that the jury can -- can view them and make a

16 credibility determination based not only on what they hear,

17 but what the see, the application for telephonic testimony

18 is denied. And exceptional circumstances, even if I had the

19 authority to relax this particular rule, it's not clear I

20 do, but even if I did the -- I don't have exceptional

21 circumstances warranting that. We'll wait and see what

22 happens with Mr. Gonzales, and Ms. Brady indicated she may

23 -- may agree to that one.

24      MR. JAMES: Okay.

25      THE COURT: Why don't you check on your witness,

Page 227

1 Ms. Brady, and maybe telephonically and out in the hall?

2 We'll go off record.

3      (Off record)

4      THE COURT: Everybody have a seat, please. And are we

5 back on record, Madam clerk?

6      THE CLERK: We are.

7      THE COURT: We are back on record. We have our jury.

8 Thanks for your patience, folks. Ms. Brady, are you ready

9 with your next witness?

10      MS. BRADY: I am, Your Honor. The state calls Cam

11 Lampman.

12      THE COURT: Stand up, ma'am, and we will swear you in.

13      THE CLERK: Please raise your raise your right hand.

14      (Oath administered)

15      MS. LAMPMAN: I do.

16              CAM LAMPMAN

17 called as a witness on behalf of the plaintiff, testified as

18 follows on:

19          DIRECT EXAMINATION

20      THE CLERK: Please be seated. Ma'am, for the record,

21 will you state your full name, and spell your last? Yes,

22 spell your last.

23 A   My name is Cam Lampman, L-a-m-p-m-a-n.

24      THE CLERK: And how do you spell your first name?

25 A   C-a-m.

Page 228

1      THE CLERK: Thank you.

2      THE COURT: Go ahead, Ms. Brady.

3 BY MS. BRADY:

4 Q   Who do you work for?

5 A   Alaska DigiTel.

6 Q   And you're here -- are you here as a record's custodian

7      on their behalf?

8 A   Yes, I am.

9 Q   All right. And you were asked to bring some records

10     pertaining to a cell phone used by one of your

11     customers?

12 A   Correct.

13 Q   And are those records that are kept in the usual course

14     of Alaska DigiTel's business?

15 A   Yes.

16 Q   And are they relied on, the kind of records that are

17     relied on by Alaska DigiTel in the course of its

18     business?

19 A   Yes.

20 Q   Were they prepared in anticipation of litigation?

21 A   No.

22 Q   Okay. What's the phone number on the account for the

23     records?

24 A   It is 7 -- 907-727-9465.

25 Q   Okay. And you were asked to bring the subscriber

Page 229

1   information for that account, is that correct?
2 A   Correct.
3 Q   And could you just please explain to the members of the
4     jury what subscriber information is?
5 A   Subscriber information will be their name, address,
6     social security number, date of birth, and employer, if
7     known.
8 Q   Okay. And what is the subscriber information that you
9     have for that telephone number?
10 A   We have Robert Davis at 732 Pearl Drive, Anchorage,
11     Alaska, 99518. And then his social security number,
12     date of birth, and his Alaska driver's license numbers.
13 Q   Okay. And is the -- now you were also asked to bring
14     the records for the phone that was being used on that
15     account, is that right?
16 A   Correct.
17 Q   And what kind of phone was being used on that account?
18 A   It was a Lucky Goldstar.
19 Q   Okay. And the serial number is on there?
20 A   Yes, commonly referred to as the ESN. There's two
21     different formats. One is a decimal version, one is a
22     hex format. I think on the phone itself, the hex
23     format was Charlie 9 Delta 01 Bravo 92.
24 Q   Okay. And that information is on the document in front
25     of you?

Page 230

1 Q   Okay. Okay. So anytime then that that phone was --
2     okay, well -- and do you have those records in front of
3     you?
4 A   I do not. Well, I have my own copy.
5 Q   Well, that's what I meant.
6 A   Yes.
7 Q   Okay. It's -- is this.....
8 A   Yes.
9 Q   .....multi-page? All right. I'm not going to go into
10     a lot of detail. I just want to get a few items
11     cleared, if I may. So this would reflect all activity,
12     according to your records on that phone.....
13 A   Correct.
14 Q   .....for the -- for the period that you have supplied?
15 A   Correct.
16     MR. JAMES: Okay. All right. Okay. Thank you. Thank
17 you.
18 A   You're welcome.
19     THE COURT: Redirect, Ms. Brady?
20     MS. BRADY: I don't have any redirect, Your Honor.
21     THE COURT: All right. Thank you. You can step down.
22 Do you have the marked exhibit?
23 A   It's right here.
24     THE COURT: Thank you very much. And I understand we
25 need to take a break before we -- before the next witness,

Page 232

1 A   Yes, it is.
2     MS. BRADY: Okay. And at this time, I move to admit
3 that as state's exhibit 14.
4     THE COURT: Number 14, Mr. James?
5     MR. JAMES: No objection.
6     THE COURT: 14 is admitted.
7         (Plaintiff's exhibit 14 admitted)
8     MS. BRADY: That's all the questions I have for this
9 witness.
10     THE COURT: Mr. James?
11         CAM LAMPMAN
12 testified as follows on:
13     CROSS EXAMINATION
14 BY MR. JAMES:
15 Q   Ms. Cam Lampman?
16 A   Uh-huh. (Affirmative)
17 Q   You brought a whole packet that shows different, I
18     guess a telephone log, isn't it, would that be a
19     correct statement?
20 A   All records.
21 Q   Yeah.
22 A   Yes.
23 Q   Okay. Does that reflect oncoming -- incoming and
24     outgoing calls, is that what that was?
25 A   Correct.

Page 231

1 is that correct?
2     MS. BRADY: That is correct, Your Honor.
3     THE COURT: I'm going to ask you to take another break,
4 folks. And again, I appreciate your patience.
5     (Jury excused)
6     MS. BRADY: He was waiting downstairs, so Detective
7 Johnstone went to go get him, and he's not back yet.
8     THE COURT: We'll go off record, but everybody can stay
9 in the courtroom, and as soon as he gets back, we will bring
10 Mr. Fish in and make very limited inquiry, and then move
11 back with the jury.
12     MR. JAMES: Understood. Thank you.
13     THE COURT: Deal with while we're waiting for Detective
14 Johnstone to get back with Mr. Fish, Ms. Brady?
15     MS. BRADY: I don't have any, Your Honor.
16     THE COURT: Mr. James?
17     MR. JAMES: I -- I can't think of any right at the
18 moment, Judge.
19     THE COURT: All right. Then we'll go off record.
20     (Off record)
21     (Jury not present)
22     THE COURT: .....record. Let's do some housekeeping
23 work while we're -- while we have the time to do that.
24 First of all, you all have an agreement regarding exhibit
25 number -- what was the exhibit that was just admitted?

Page 233

**Page 234**

1    MS. BRADY: 14.

2    THE COURT: 14, and that is to edit out the fax

3 reference, attention Judge Hensley, is that correct?

4    MR. JAMES: Yes, sir.

5    MS. BRADY: That's correct, Your Honor.

6    THE COURT: All right. So I'll rely on you folks to

7 make the agreeable -- agreed upon edit and then substitute

8 the exhibit, and unless I hear further objection, then --

9 then I'll assume that you've agreed on what it says and it

10 will go to the jury. I had four police reports that were

11 given to me as part of the other evidentiary disputes that

12 we had this morning, why don't we get those marked with

13 exhibit stickers, and since they won't be admitted into

14 evidence, let's use some numbers that aren't likely to.....

15    MS. BRADY: Why don't.....

16    THE COURT: .....foul up somebody's.....

17    MS. BRADY: Why don't we use EH1, 2, 3, like -- and so

18 on?

19    THE COURT: EH?

20    MS. BRADY: Yeah.

21    THE COURT: That's fine with me.

22    MR. JAMES: What's EH stand for?

23    THE COURT: Evidentiary hearing.

24    MR. JAMES: Oh, evidentiary hearing.....

25    MS. BRADY: Yeah.....

**Page 235**

1    THE COURT: Although I have some of them marked with --

2 otherwise, but we'll go ahead and do that. And so we'll

3 mark the 9/29 report EH1.

4    THE CLERK: Here you go. Why don't you just go ahead

5 and do it (indiscernible).....

6    THE COURT: Actually, let me -- yeah, it doesn't -- I

7 guess that doesn't have to be chronological. We'll mark the

8 3/29 report EH2. We'll mark the 7/26 report EH3. We'll

9 make, although I didn't use it again today, the report

10 involving Redwine auto case, which is July 3rd as EH4. Get

11 some more, Ms. Brady.

12    MS. BRADY: Okay.

13    THE COURT: We will remark exhibits which were marked

14 yesterday, the Mumford burglary April 4 will be remarked as

15 EH5.

16    THE CLERK: What was it previously marked?

17    THE COURT: Previously marked as exhibit C. The June,

18 2001 vehicle theft, previously marked as 22, we will remark

19 as EH6. And the previously marked exhibit B, which is the

20 car stereo, 7/13, July 13, 01, will be remarked as exhibit

21 -- evidentiary hearing 7, EH7. So that gets all of those in

22 the record for whoever else wants to look at them later.

23 And it will give us a record to refer to if we need to later

24 in the trial. And we can go off record now and wait for

25 Mr. Fish.

**Page 236**

1    MS. BRADY: I'm going to go downstairs and see if I can

2 find out what's going on.

3    THE COURT: I'd appreciate that. Thanks.

4    (Off record)

5    THE CLERK: On record.

6    THE COURT: We're on record. We have parties, counsel,

7 our jury is not here, and I'm assuming that you are Jeremy

8 Fish in the witness box, is that right?

9    MR. FISH: Yes, sir.

10    THE COURT: All right. Now, if you will stand up, sir,

11 Ms. McKewin is going to swear you in, and I'm going to give

12 the lawyers an opportunity to ask you a few questions before

13 we continue with the trial.

14    THE CLERK: Please raise your right hand.

15    (Oath administered)

16    MR. FISH: Yes, I do.

17         JEREMY FISH

18 called as a witness on behalf of the plaintiff, testified as

19 follows on:

20         VOIR DIRE EXAMINATION

21    THE CLERK: Please be seated. Sir, for the record,

22 will you state your full name and spell your last?

23 A   Jeremy Joel Fish, F-i-s-h.

24    THE CLERK: Thank you.

25    THE COURT: That's a pretty hot mike. You don't have

**Page 237**

1 to lean into it.

2 A  Sorry about that.

3    THE COURT: It will pick you up, as long as you're

4 reasonably close. Mr. James?

5 BY MR. JAMES:

6 Q  Thank you, Mr. Fish. Just for clarification, do you --

7    well, are you under -- have you used any drugs in the

8    last 24 hours?

9 A  Yes, I have.

10 Q  What have used?

11 A  Marijuana.

12 Q  When is the last time you used it?

13 A  Probably yesterday.

14 Q  When?

15 A  Evening time, probably about 7:00 o'clock.

16 Q  Okay. How about when is the last time you used

17    cocaine?

18 A  I don't know, a while. It's been a long time.

19 Q  Like what?

20 A  About -- I don't know, like eight months.

21 Q  All right. Now, you're under oath, and is there

22    anything about your use of drugs that you feel may

23    cloud your memory at this time?

24 A  No, I do not.

25 Q  What we're talking about here, what we're going to be