**Page 238**

1 talking about is subsequent police contacts after
2 March 1 of 2000. Okay? Okay. Now, you apparently
3 pawned a -- some type of stereo system?
4 A   Sega Saturn.
5 Q   Pardon, please?
6     THE COURT: All right. Just a second, Mr. Fish, before
7 we get into these subjects, and -- I'm going to tell you
8 that although you're not under arrest or you're not.....
9 A   Right.
10     THE COURT: .....you are subpoenaed here by the
11 district attorney's office, I assume. Some of the questions
12 may relate to some potential liability. I don't really
13 know, because I'm not in charge of investigating and
14 prosecuting crimes. But some of the questions may relate to
15 outstanding crimes, and you have a right not to answer the
16 questions. You have a right to ask for an attorney before
17 you answer the questions, to consult with an attorney before
18 you answer the questions, and most importantly, if you
19 answer the questions, you're on tape here and everything is
20 being recorded, and your answers may be used against you
21 later on if -- if some of these police investigations turn
22 out to -- to pursue you. So you need to know that. You're
23 not -- nobody is going to force you to answer the questions
24 that we're talking about now in front of the jury. And so I
25 want to make sure that you understand that and ask if you --

**Page 239**

1 if you're willing to answer the questions?
2 A   Yeah, I'm willing to answer them.
3     THE COURT: All right.
4 Q   Okay. With those admonitions, Mr. Fish, now you
5     indicated that -- when I was talking about a pawning of
6     a stereo, you indicated it was a Sega?
7 A   Yeah, that's the only thing I pawned.
8 Q   Okay. What -- what did you pawn?
9 A   It was a Play Station.
10 Q   Play Station?
11 A   Yes. It was something like that.
12 Q   Okay. Where did that come from?
13 A   It came from Liz Redwine.
14 Q   Okay. How did you get it?
15     THE COURT: Mr. James, the question isn't.....
16     MR. JAMES: All right.
17     THE COURT: The.....
18     MR. JAMES: All right.
19     THE COURT: The area of inquiry isn't -- isn't what
20 happened, it's this witness' knowledge. Now, there are more
21 than one way to get there, but -- but for purposes of this
22 trial, I want you to focus on the knowledge of potential
23 repercussions and not whether a particular crime was
24 committed.
25 Q   Did you have -- did the police contact you regarding

**Page 240**

1 that?
2 A   No, they have not.
3 Q   All right.
4 A   I contacted them. I contacted Officer Triplett and
5     told him to the best of my knowledge everything that
6     was behind that. That's -- I never heard anything back
7     on it.
8 Q   All right. Now, to your knowledge, was that stolen
9     from Liz Redblood [sic]?
10 A   Not to my knowledge, or I wouldn't have pawned it.
11 Q   All right.
12     THE COURT: What's the date on this one, Mr.....
13     MR. JAMES: This is the -- this is the 4/14, it's.....
14     THE COURT: 4/10?
15     MR. JAMES: 4/10, right.
16     THE COURT: Okay. Ms. Brady's position was that if the
17 witness had any idea that the police were interested in the
18 case, the evidence was admissible.
19     MR. JAMES: Right.
20     THE COURT: Is that still your position, Ms. Brady?
21     MS. BRADY: Yeah, Your Honor.
22     THE COURT: Then the evidence, based on this testimony,
23 you can go into that subject at trial.
24     MR. JAMES: Okay. Thank you.
25 Q   Moving along here, calling your attention to the

**Page 241**

1 forgery involving a Colleen Hensley, where you received
2     two checks were written out to you, one for $275 and
3     one for $250?
4 A   It wasn't involving me.
5 Q   Did you receive those checks?
6 A   No, I did no.
7 Q   You didn't cash a check for.....
8 A   No, I did not.
9 Q   Let me finish the question, if I may.
10 A   Sorry.
11     THE COURT: Mr. -- Mr. James, the issue isn't guilt or
12 innocence, it's knowledge of repercussions.
13     MR. JAMES: All right.
14 Q   No, there is no -- there is no police investigation
15     involving you involving these checks?
16 A   No. No.
17 Q   All right. Did a Mr. James Cage from MBA/Wells Fargo
18     contact you?
19 A   No.
20 Q   Just a moment, sir. On 9/29, were you contacted by the
21     police regarding a banishment of a weapon, gun?
22     MS. BRADY: I all ready agreed that could come in.
23     MR. JAMES: Okay.
24     MS. BRADY: The only one's that's left is the 9/2 threat.
25     MR. JAMES: Threat, right.

3AN-01-1717 CR                                                    November 15, 2001

| | |
|---|---|
| 1 Q  Mr. Fish, on 9/2, that's September 2nd, were you | 1    THE COURT: All right. Mr. Fish, just keep your seat. |
| 2    contacted, or are you aware of a police investigation | 2  We're going to go get the jury. |
| 3    involving a threat involving a Mr. -- I believe it's | 3 A  Thank you. |
| 4    Milky (ph)? | 4    THE COURT: When the jury comes in, you can -- we all |
| 5 A  No. | 5  stand up when they come in. |
| 6 Q  You was going to burn down his -- were you going to | 6 A  All right. |
| 7    burn down his house? | 7    (Jury summoned) |
| 8 A  No, I wasn't. | 8    MS. BRADY: You listened to all the tapes, right?  So |
| 9 Q  All right. | 9  if I say to you, this tape is the tape that you have that's |
| 10   (Whispered conversation) | 10 marked 2/28, do you know what's on this tape, what would you |
| 11   MR. JAMES:  Well, I guess we've covered the ground | 11 say? |
| 12 then, Judge that..... | 12 A  No. |
| 13   THE COURT:  I can't hear you. | 13   MS. BRADY:  It's a copy of what -- the tape that was |
| 14   MR. JAMES:  I'm sorry. | 14 given to you..... |
| 15   (Whispered conversation) | 15 A  I mean, I know -- I don't know them in order. |
| 16   MR. JAMES:  We've covered that, the forgery and the | 16   MS. BRADY:  Okay. |
| 17 threat. Those are in all ready. Do we have those -- oh, | 17 A  I don't know what's on the 28th. But I know if you |
| 18 you've got the list up there, Judge? | 18   start -- start it, I can finish it. |
| 19   THE COURT:  Would you like them? | 19   MS. BRADY:  Okay. |
| 20   MR. JAMES:  Yeah, great. | 20   (Pause) |
| 21   THE COURT:  I have the -- reports. Right. That's | 21   THE COURT:  Have a seat, everybody. We are back on |
| 22 fine. I'm missing one page here, or something. | 22 record. We have all the jurors back. Thanks again for your |
| 23   (Pause) | 23 patience, everybody. We have another witness in the witness |
| 24   (Whispered conversation) | 24 box. Sir, if you would stand up, we will swear you in. |
| 25   MR. JAMES:  So we've got -- marijuana is in.  I'm just | 25   THE CLERK:  Please raise your right hand. |
| Page 242 | Page 244 |
| 1 -- banishing, that's in. The -- alluding, that's in, coke | 1    (Oath administered) |
| 2 is in. These are -- I think we've covered all the issues. | 2    MR. FISH:  Yes, I do. |
| 3 I just wanted to make sure that we've covering the ones | 3         JEREMY FISH |
| 4 that..... | 4 called as a witness on behalf of the plaintiff, testified as |
| 5    THE COURT:  Do you want to ask any questions, | 5 follows on: |
| 6 Ms. Brady? | 6         DIRECT EXAMINATION |
| 7    MR. JAMES:  Here's the..... | 7    THE CLERK:  Please be seated. For the record, sir, |
| 8    MS. BRADY:  Of this witness, no, Your Honor. But I do | 8 will you state your full name, and spell your last? |
| 9 want to clarify for purposes of the protective order, the | 9 A  Jeremy Joel Fish, F-i-s-h. |
| 10 relevant line of inquiry with regard to these acts is only | 10   THE COURT:  Thank you. |
| 11 witness bias. It's what he thinks may or may not happen as | 11   THE COURT:  Go ahead, Ms. Brady. |
| 12 a result. I mean, I think limited inquiry into the facts is | 12 BY MS. BRADY: |
| 13 appropriate, but not..... | 13 Q  How old are you, Mr. Fish? |
| 14   THE COURT:  Well, what may happen as a result may in | 14 A  I just turned 19. |
| 15 part turn on how serious the events are, and so it's kind of | 15 Q  All right. And how far did you go in school? |
| 16 hard to put parentheses around it, or narrow it down. But | 16 A  Probably about tenth grade, ninth grade. |
| 17 if..... | 17 Q  Have drugs affected your life? |
| 18   MS. BRADY:  Okay. | 18 A  Yeah. |
| 19   THE COURT:  .....it gets cumulative, or if the | 19 Q  How? |
| 20 questioning gets in -- begins to the point where we're | 20 A  They've always been a part of it. |
| 21 talking about more propensity than bias, I'll hear -- | 21 Q  Did your parents use drugs? |
| 22 entertain objections. | 22 A  Yeah. |
| 23   MS. BRADY:  Okay. And I'm ready to go. | 23 Q  And so you've been aware of the drug community since |
| 24   THE COURT:  All right. Are you ready to go, Mr. James? | 24   you were very young? |
| 25   MR. JAMES:  Yes, sir. | 25 A  Yeah. |
| Page 243 | Page 245 |

**Page 254**

1    to buy cocaine?

2 A    Yes.

3 Q    Where was -- where was the arrangement made for?

4 A    At his old house.

5 Q    Okay. And what happened once he agreed to meet with

6     you?

7 A    I just -- then we -- I don't think -- well, the first

8     -- the first time, we just -- they all followed me over

9     there, we went there, and I went inside. And I bought

10    the dope and.....

11 Q   Okay. I'm still back at the police station though. I

12    want to know, you hang up the phone, and you say okay,

13    we're going to meet.....

14 A   Okay. I hang up the phone, then I think it was Officer

15    LaPorte went and got the money to go -- or somebody

16    went to go get the money, and he was hooking me up with

17    a wire.

18 Q   Okay. The first time.....

19 A   The first -- first time, there wasn't a wire. It was

20    just -- there wasn't a wire. It was just a buy.

21 Q   Were you searched?

22 A   Yes, I was.

23 Q   Can you explain to the members of the jury how that

24    search is done?

25 A   Yeah. There's -- he tells me to take off all my

**Page 255**

1    clothes. I take off all clothes, including my shoes,

2     my socks, my underwear. They go through my socks.

3     They go through my shoes. They go through my pant

4     pockets. They, you know, make me bend over, like bend

5     down. And then I get back up, and if I'm clean, I put

6     all my clothes back on.

7 Q   Was your car searched also?

8 A   Yeah.

9 Q   Okay. And did you know ahead of time that both you and

10    your car were going to be searched?

11 A   Yeah.

12 Q   Okay. And you were given money?

13 A   Right.

14 Q   How much money were you given?

15 A   $150.

16 Q   Okay. And then when you -- when you left the police

17    station, were you driving?

18 A   Yes, I was.

19 Q   What car were you driving?

20 A   A 1986 Plymouth -- Plymouth Reliant.

21 Q   Is that your car?

22 A   Yes.

23 Q   All right. And did you know where Mr. Davis lived?

24 A   Yes, I did.

25 Q   Where was that at?

**Page 256**

1 A   Off of Muldoon on Grand Larry

2 Q   Okay. And how did you get there?

3 A   I drove there.

4 Q   Which route did you take?

5 A   I take -- take Tudor to -- go to -- go down Tudor until

6     it hits like Totem Theater, Totem -- where Tudor turns

7     into Muldoon. Right? I believe it's Tudor that turns

8     into Muldoon. You go all the way down Tudor, wraps

9     around, and you just go all the way down the Muldoon

10    Road, all the way down, by Ramada Inn and then turn.

11 Q   Okay. And what happened once you got to Mr. Davis'

12    house?

13 A   When I got there, I went in and bought some dope.

14 Q   Okay. Where -- I want you to just tell the members of

15    the jury what you're seeing. Where did he get the

16    cocaine from?

17 A   He usually.....

18     MR. JAMES: Objection. There's no indication of

19 cocaine.

20 A   Like every time that I went.....

21     THE COURT: The objection is overruled.

22 A   Sorry.

23     THE COURT: Go ahead.

24 A   Go ahead.

25     THE COURT: The question, please.

**Page 257**

1 A   Okay. When you -- every -- every time I walked in

2     house, you walk in house, and there's like -- there's

3     -- there's like a bar table where there should be seats

4     wrapped around. And then there -- if you turn around,

5     if you look straight, he's looking at me, there's a

6     barstool and then there's like a drawer right here.

7     But then usually his dope would be up in his cabinet

8     right above his stove. You open his cabinet and it's

9     usually right there. It's a bag. Usually, probably a

10    half once to an ounce at a time. And just pulled it

11    out of his cabinet, a little black scale. Put a piece

12    of paper down, usually you put a piece of a paper down,

13    like a little piece of paper, and just start pouring

14    dope on there until it measured up. And he put it in a

15    bag for me, and be it.

16 Q   How long were you inside Mr. Davis' house that day?

17 A   Probably 10 minutes.

18 Q   Okay. And what happened when you left the apartment?

19 A   I left the apartment and then I pulled out. And I went

20    behind a church, I believe, that was the first time.

21     We went behind a church and I gave him the dope.

22 Q   You gave who the dope?

23 A   I gave Officer Johnstone.

24 Q   Okay. Now, when you said the dope, are you talking

25    about.....

1 challenging Ms. Brady as to whether she copied the tape, the
2 same tape that Mr. Fish listened to.
3    MR. JAMES: Well, I don't know that he listened to that
4 tape that she intends to introduce. He does say he's -- he
5 had a tape, but I -- that tape there, I don't -- he has
6 never said that issue, that I listened to that tape.
7    THE COURT: Ms. Brady?
8    MS. BRADY: What I -- the question I asked him was if
9 he had received a copy of a tape that was marked February
10 13th, and if I represented to him that that was an exact
11 duplicate of that tape, would he know what was on there, and
12 he answered yes.
13    MR. JAMES: Okay. Well.....
14    THE COURT: So what's the objection?
15    MR. JAMES: The objection is is the tape that he is
16 listening -- the representations of Ms. Brady are not the
17 testimony of Mr. Fish.
18    THE COURT: So you're challenging Ms. Brady's -- you're
19 not willing to accept Ms. Brady's representations?
20    MR. JAMES: That's correct, at this time.
21    THE COURT: All right. Then we'll excuse the jury, and
22 we'll let Mr. Fish listen to the entire tape, and we'll do
23 that with everyone.
24    MR. JAMES: Okay. And I think that's probably to save
25 time, Judge.

Page 262

1 minutes for this tape. There are total of four tapes. The
2 rest of them are not as long as this.
3    THE COURT: All right.
4    MS. BRADY: And maybe we should just let them.....
5    THE COURT: Do you want to play them all?
6    MS. BRADY: I -- my preference would be to play them
7 all now, if that's the objection, that I've altered them,
8 and we'll see whether or not Mr. James agrees they're not
9 altered, and then we'll play them for the jury.
10    THE COURT: All right. How long are the tapes?
11    MS. BRADY: They're probably five minute -- they're
12 between five and eight minutes a piece, the reminders.
13    THE COURT: Can you tailor your questioning to this
14 tape?
15    MS. BRADY: It is tailored to this tape. We can stop
16 after this tape. It's.....
17    THE COURT: Can you tailor your -- the next bit of
18 questioning to this tape.....
19    MS. BRADY: I sure can.
20    THE COURT: .....so that we can then use non-jury time
21 to listen to the rest of the tapes?
22    MS. BRADY: Sure.
23    THE COURT: To have Mr. Fish listen to the rest of the
24 tapes?
25 A  I know the rest of them.

Page 264

1    THE COURT: No, that doesn't save time, Mr. James, but
2 that's what we'll do.
3    MR. JAMES: All right.
4    (End of bench conference)
5    THE COURT: All right, folks. I have to excuse you.
6 It will be 10 or 15 minutes, I think, so -- and I again
7 thank you for your patience.
8    (Jury excused)
9    THE COURT: All right. Ms. Brady, do you want to play
10 -- we'll stay on record. We'll play exhibit number 5 for
11 Mr. Fish and then we will bring the jury back in and you can
12 follow up with your questioning.
13 10:4035
14    (Audio tape played for court)
15 10:4911
16    THE COURT: All right. I told the jury it was going to
17 take about 10 minutes, because I thought we were going to
18 listen to the phone conversations as the tape as well.
19 Ms. Brady?
20    MS. BRADY: What I thought I would do, Your Honor,
21 since I'm going to be using this tape for several things,
22 rather than have the jury come in and out and in and out, if
23 the objection is that I have altered the tape in some way,
24 let's play the tape. let him listen to it, and then we won't
25 have them coming in and out. This is maybe three more

Page 263

1    THE COURT: Well, that is -- you have to stay out of
2 this, Mr. Fish.
3 A  I'm sorry.
4    MS. BRADY: Okay. Sure.
5    THE COURT: Can you do that?
6    MS. BRADY: Yeah.
7    THE COURT: All right. Then finish this tape.
8    MS. BRADY: Okay.
9 10:5035
10    (Audiotape played)
11 10:5522
12    THE COURT: Let's bring the jury back in.
13    (Jury summoned)
14    THE COURT: All right. Everybody have a seat, please.
15 Are we back on record, Ms. McKewin? Thanks again for your
16 patience, folks. Ms. Brady, your next question?
17    DIRECT EXAMINATION CONTINUED
18 BY MS. BRADY:
19 Q  Mr. Fish, you've listened to this tape, right?
20 A  Yes.
21 Q  Is this tape a true and accurate representation of the
22    phone calls that you made on February 13th, February
23    15th and February 20th?
24 A  Yes.
25 Q  Does it include a copy of the wire that was done on the

Page 265

Page 266

    1       February 20th buy?
    2 A     Yes.
    3       MS. BRADY:  At this time, I move to admit state's
    4   exhibit 5, Your Honor.
    5       THE COURT:  Exhibit number 5?
    6   MR. JAMES:  No objection.
    7       THE COURT:  Number 5 is admitted.
    8                   (Plaintiff's exhibit 5 admitted)
    9 Q     Okay.  We're going to deal with this in portions, so
   10   let's just play a portion of it.
   11   10:5712
   12   (Audio tape played for jury)
   13  10:5958
   14       MS. BRADY:  Okay.  I'm going to stop it right there.
   15 Q     All right.  I'm going to ask you some questions about
   16   that portion of the tape.  Now, whose voice is that
   17   that -- one of the voices is yours obviously.  Who's
   18   the other voice?
   19 A     Rico.
   20 Q     And who is Rico?
   21 A     That guy right there, Robert Davis the III.
   22       MS. BRADY:  Let the record reflect that the defendant
   23   -- I mean the witness had identified the defendant.
   24 Q     Now, what did Mr. Davis mean when he said it was no
   25   good on that end?

Page 267

    1 A     He had no dope, had none for sale.
    2 Q     Who is Athena?
    3 A     That's -- that's my baby's mother.
    4 Q     Does she know Mr. Davis?
    5 A     Yeah.
    6 Q     What did he mean when he said put you on child support?
    7 A     Well, it's like Athena -- it's like it's either mine,
    8   or it's a Josh's, or it's some guy named Ryan.  So --
    9   and we haven't had a paternity test or nothing yet.  So
   10   we don't know for sure whose it is.
   11 Q     When you say it, you're talking about Athena's child?
   12 A     Yeah.
   13 Q     That you might be the father of?
   14 A     Right.
   15 Q     Okay.  And Mr. Davis knows you well enough to know
   16   about all of this stuff?
   17 A     He knows Athena well enough to know about all this
   18   stuff.
   19 Q     Okay.  And let's go ahead and we'll move on to February
   20   12th.  You -- is the conversation contained on that
   21   tape a true and accurate representation of a
   22   conversation that you had with the defendant on that
   23   day?
   24 A     Yes.
   25       MS. BRADY:  Okay.  I'm going to go ahead and play that

Page 268

    1   portion.
    2   11:01:45
    3   (Audio tape played for jury)
    4   11:03:57
    5       MS. BRADY:  I'll just stand here and hold the
    6   microphone next to it.
    7   11:04:09
    8   (Audio tape played for jury)
    9   11:05:12
   10 Q     I'll just ask you some questions about that portion of
   11   the tape now.  What was going on during that phone
   12   call?
   13 A     What do you -- I don't know.
   14 Q     Okay.  Let me ask you a more specific question.  When
   15   he says that he's at his shop, what's he talking about?
   16 A     He's at work.
   17 Q     And where does he work?
   18 A     He's a mechanic, fixes cars.
   19 Q     All right.  And when you asked for two balls, what are
   20   you talking about?
   21 A     I'm talking about coke.  I'm talking about like 3.0
   22   each.
   23 Q     Okay.  And when -- now you guys had a little
   24   negotiation there, what was going on during that
   25   negotiation?

Page 269

    1 A     I asked him how much a ball cost and he said two.  I
    2   asked him how much should I bring.  He said how much --
    3   I asked him how much it was going to be for a ball, and
    4   he said $200 and then he said $225.  And I said -- I
    5   said I got $200.
    6 Q     Is that a lot, $225?
    7 A     $225, yeah.
    8 Q     Okay.  And then did that cancelled, that buy that you
    9   set up with him?
   10 A     Yeah.
   11 Q     Do you know why it got cancelled?
   12 A     Right.  Because there was something else going on with
   13   the officers I was working with.  So they postponed it
   14   and they went along with what they had planned or
   15   something.
   16 Q     Did you call him back then?
   17 A     Yes, I did.
   18 Q     And what happened when you called him back?
   19 A     I just told him that we got to reschedule it.  That --
   20   when I -- when I called him back, I didn't get his -- I
   21   didn't get him.  I got his voice mail.  So I left a
   22   message saying that I -- that I wasn't going to do
   23   nothing tonight, and that I was taking the weekend off
   24   and that I would see him like on Monday or something.
   25 Q     Okay.  And that was tape recorded?

**Page 270**

1  A  Right.

2  Q  And is that on that tape?

3  A  Yeah.

4  Q  Okay.

5  11:0705

6     (Audiotape played for jury)

7  11:0756

8  Q  Okay.  Now did you meet with Officer LaPorte again on

9     February 20th?

10 A  Yeah.

11 Q  Okay.  And was that -- did you make a telephone call to

12    Mr. Davis?

13 A  Yes, I did.

14 Q  Was that call recorded?

15 A  Yes, it was.

16 Q  Is that recording contained on this tape?

17 A  Yes, it is.

18    MS. BRADY:  Okay.  I'm going to publish that to the

19 jury.

20 11:0811

21    (Audio tape played for jury)

22 11:1009

23 Q  All right.  Now, when he says come on by the house,

24    what does he mean?

25 A  Come by his house.

**Page 271**

1  Q  Okay.  And how much were you going to buy?

2  A  A ball.

3  Q  Okay.  And what -- when he says come on by his house,

4     is there an address?

5  A  Yeah.  I don't -- I can't remember his address.  I know

6     what street it's on.

7  Q  What street is it on?

8  A  Grand Larry.

9  Q  Okay.  And how much were you supposed to bring with

10    you?

11 A  $200.

12 Q  All right.  And once that phone call was completed,

13    what happened -- where were you at?

14 A  I was at the police station.

15 Q  Okay.  So the phone call is completed, then what

16    happens immediately after that?

17 A  Then they went out and searched my car.  They searched

18    me.  They set up me up a wire.  Then we drove and they

19    followed me to his house.

20 Q  Okay.  Now let me -- let me stop you for a second.  All

21    right.  You said your car was searched, they searched

22    you, what -- tell the jury what the search -- what you

23    mean by the searched me.

24 A  The searched me.  There's usually two officers talking

25    to you, and then one and searches your car and the

**Page 272**

1     one who stays in the room, you know, you take off all

2     your clothes, every piece, your underwear, your socks,

3     shoes.  And they look through everything.  Your socks,

4     empty out your socks.  Empty out, shake it all out.

5     And then you put -- and that's it.  A complete search.

6  Q  Okay.  And you were -- were you given money?

7  A  Yeah.

8  Q  How much?

9  A  $200.

10 Q  Okay.  Andy you said that you put on a wire, or

11    something, what do you mean?

12 A  Yeah.  It's like a strap goes around your shoulder.

13    And it just goes like -- I don't know, just put it on

14    you, and then you put your clothes over it.

15 Q  Did an officer put it on you?

16 A  Yeah.

17 Q  Okay.

18 A  Oh.

19 Q  Now, did you know that the wire was going to make --

20    was going to record everything that was going on?

21 A  Yes.

22 Q  Okay.  And let's just play -- is a copy of the wire

23    that you made that day contained on that tape?

24 A  Yes, it is.

25    MS. BRADY:  It's loud at the beginning, so I'm going to

**Page 273**

1     turn it down a little bit.

2  11:1217

3     (Audio tape played for jury)

4  11:1301

5  Q  Okay.  Let me stop the tape for a second.  What's going

6     on here, on the tape?  What are you doing while this

7     being recorded?

8  A  I'm driving to his house.

9  Q  And how do you know that?

10 A  Because that's my music.

11 Q  Okay.

12 11:1314

13    (Audio tape played for jury)

14 11:1347

15 Q  Now let me stop the tape right there.  Are you talking

16    with him at that time?

17 A  No.

18 Q  Okay.

19 A  He just opened the door.

20 Q  Okay.  Now what is -- what is that on the tape then?

21    Is that Mr. Davis' voice?

22 A  There's -- there's like -- I believe that was a time

23    when I walked in there and there was -- there was only

24    -- there was four people in there, including Mr. Davis.

25    That was including everybody, there was four people.

1   And they were asking for sandwich baggies, because he
2   was cleaning out his house. And when I walked in, he
3   had nothing in there. They were looking for some
4   baggies, so they -- they were going to run to the store
5   and get some baggies. And then he asked for a pot,
6   which is a pot to make a ball of dope, to cook some
7   dope.
8 Q   When he means a pot, does he mean like a pot you cook
9   in?
10 A   Yeah, like a pot, pan.
11 Q   Okay.
12   11:1442
13   (Audio tape played for jury)
14   11:1515
15 Q   Now are you still inside the house at this time?
16 A   No, because they were leaving and I -- I pulled up
17   right behind the car. So -- and they opened the door.
18   I had to let them -- I had to move my car so I could
19   let them out.
20 Q   Okay.
21   11:1526
22   (Audio tape played for jury)
23   11:1600
24 Q   Okay. Now that's your voice?
25 A   Right.

Page 274

1   could on the tape for the cops, that way they could get
2   a clear view of what was going on there. And then when
3   he -- I don't know. If -- if -- it was the gun, and
4   then there was the bud. And then that was all I was
5   commenting on.
6 Q   Was there any -- was his apartment furnished or.....
7 A   No, it was all cleaned out. The only thing he had left
8   there was a stereo.
9 Q   Okay.
10 A   That's why he didn't have a pot.
11 Q   Okay.
12   11:1837
13   (Audio tape played for jury)
14   11:1933
15 Q   Okay. And did you -- where did you go once you left
16   his apartment or the house?
17 A   I went right -- I went back to the station.
18 Q   What happened when you got back to the police station?
19 A   I gave him the dope. As soon as I got out of my car, I
20   gave them the dope, and then they searched my car. And
21   I was followed back into the police station, and then I
22   was searched.
23 Q   Okay. And did you meet with Officer LaPorte again the
24   next day?
25 A   Yes, I did.

Page 276

1 Q   Who are you talking to?
2 A   I was talking to the police.
3 Q   Okay.
4   11:1606
5   (Audio tape played for jury)
6   11:1714
7 Q   What are you talking about right there?
8 A   A gun.
9 Q   A gun?
10 A   Yeah.
11 Q   Okay.
12   11:1720
13   (Audio tape played for jury)
14   11:1746
15 Q   Okay. Now what are you commenting on there?
16   THE COURT: Ms. Brady, can you move?
17   MS. BRADY: Oh.
18   THE COURT: So the jury can -- thank you.
19 A   Well, there's a couple -- the first thing I was -- it
20   was -- it was chronic. It was the weed. And he had a
21   whole bunch of weed on his counter, like a pile of bud.
22   And -- and then there was -- there with the .45, that's
23   what I was commenting on. He said -- I asked him how
24   much he -- I asked him if he would take a bill for it,
25   just to -- because I was supposed to get everything I

Page 275

1   MS. BRADY: Okay. And that is a different tape.
2   THE COURT: Let's take a bench conference, please.
3   MS. BRADY: Okay.
4   (Bench conference as follows:)
5   THE COURT: How long is that tape?
6   MS. BRADY: My recollection is it's between five and
7 eight minutes.
8   THE COURT: All right. We'll -- same objections,
9 Mr. James?
10   MR. JAMES: Yes, sir.
11   THE COURT: All right. We'll stand down and let him
12 listen to it.
13   MR. JAMES: Could I use the (indiscernible) before
14 we.....
15   THE COURT: We'll take a break in a little bit.
16   MR. JAMES: Okay. So we're going to listen to tapes
17 and then take a break?
18   (End of bench conference)
19   THE COURT: I need to excuse for about 10 minutes,
20 folks. And I again appreciate your patience and
21 understanding in bouncing back and forth in here like this.
22   (Jury excused)
23   MS. BRADY: State 6.
24   THE COURT: We're still on record. You are putting
25 state's exhibit number 6 into the tape recorder?

Page 277

| | |
|---|---|
| 1  testimony here today, is that right? | 1  it was coke then. They didn't tell me it was coke |
| 2 A  Yeah. | 2  until later. They didn't run no test on it or nothing. |
| 3 Q  Okay. And let me just talk to you about -- all of | 3  I didn't know what it was. But they told me later it |
| 4  those things that happened, every time the police | 4  was coke, and I acknowledged that the money was mine, |
| 5  contacted you, that was after you involvement in this | 5  yes, but..... |
| 6  case, right? | 6 Q  You didn't -- when you looked at it, you had not |
| 7 A  Yes. | 7  realization it was coke and..... |
| 8  MS. BRADY: Okay. That's all the questions I have for | 8 A  They didn't know what it was either. |
| 9 this witness. | 9 Q  I asked you. |
| 10  THE COURT: Cross examination? | 10 A  No, I -- I did not. |
| 11  MR. JAMES: Yes. Thank you. | 11 Q  They were in clear baggies? |
| 12          JEREMY FISH | 12 A  Excuse me? |
| 13 testified as follows on: | 13 Q  Clear baggies? |
| 14          CROSS EXAMINATION | 14 A  Yes. |
| 15 BY MR. JAMES: | 15 Q  You're not familiar with cocaine? |
| 16 Q  Let's go to the coke issue, which was, I believe, | 16 A  I'm very familiar with cocaine. |
| 17  September the 4th. Whose car was that? | 17 Q  Okay. Okay. Now, when the -- you were stopped another |
| 18 A  George Redwine's, Redwine's Towing. | 18  time involving, which Ms. Brady already discussed with |
| 19 Q  All right. And that was your box though, right? | 19  you very briefly, involving finding -- well, drive-by |
| 20 A  Yes. | 20  shooting where they found a case, a round in the -- in |
| 21 Q  All right. And who was the officer that did the arrest | 21  your vehicle, is that right? |
| 22  or stopped you -- I'm sorry, did the stop? | 22 A  Not my vehicle. |
| 23 A  I -- it -- it was no stop. I..... | 23 Q  Okay. Your girlfriend's vehicle? |
| 24 Q  Who contacted you? | 24 A  It's not my girlfriend's vehicle. |
| 25 A  I don't -- I can't remember. | 25 Q  Whose is it? |
| Page 298 | Page 300 |

| | |
|---|---|
| 1 Q  A uniformed officer? | 1 A  George Redwine's. |
| 2 A  Yes. | 2 Q  Okay. So we're talking about the same -- the same |
| 3 Q  All right. Any other officers show up? | 3  vehicle, the one that was involved with the coke? |
| 4 A  One other uniformed officer. | 4 A  Yes, sir. |
| 5 Q  Who was that? | 5 Q  Okay. And were you driving that vehicle? |
| 6 A  I can't remember. | 6 A  Yes, I was. |
| 7 Q  What did he look like? He or she? | 7 Q  All right. So you would have controlled where it was |
| 8 A  Both guys. | 8  going? |
| 9 Q  Both guys? All right. No -- just the two officers in | 9 A  No. I went and picked up the vehicle. |
| 10  uniforms? | 10 Q  After you picked up the vehicle, you're driving the |
| 11 A  Yeah. | 11  vehicle? |
| 12 Q  Now we're talking about the September 4th, are we not? | 12 A  I was driving it to my girlfriend's, yes, I was. |
| 13  Are we focused on that one? | 13 Q  So you were controlling where it was going? |
| 14 A  September 4th, that's the one where -- that's the only | 14 A  Yes, I was. |
| 15  coke issue I've had, so, yeah. | 15 Q  Okay. All right. Now, another time you were -- in |
| 16 Q  With the five bags of coke? | 16  July, July 13th, specifically, you were cited by |
| 17 A  Right. | 17  Officer Daily for possession of marijuana, is that |
| 18 Q  All right. And do you recall telling the officer you | 18  correct? |
| 19  acknowledged the ownership of the three $20's, dollars, | 19 A  Yes. |
| 20  the -- your ID, but that the five bags of coke had been | 20 Q  And nothing has ever happened in that case, is that |
| 21  planted? Do you recall making that statement to the | 21  correct? |
| 22  officer? | 22 A  That's right. |
| 23 A  I didn't say that they were planted on me. I said I | 23 Q  All right. Nothing has ever happened to the cocaine |
| 24  had a friend in the car, and I didn't know, you know, | 24  case, correct? |
| 25  if he put them in there or not, but they didn't know if | 25 A  I believe so. I don't know. They haven't -- it's all |
| Page 299 | Page 301 |

1   under investigation.  That's what the police have told
2   me.
3 Q   To your knowledge, nothing has happened to that?
4 A   Well, it's under investigation.
5 Q   Okay.  And that was in September, and here we are in
6   November, correct?
7 A   Correct.
8 Q   All right.  The drive-by shooting where the casing was
9   found, anything happen with that case?
10 A   Well, it's -- it's all under investigation.
11 Q   Everything is under investigation?
12 A   Yeah.
13 Q   All right.  But you -- you don't expect anything to
14   happen with regard -- in regards to you from any of
15   those investigations?
16 A   Excuse me?
17 Q   You do not expect anything to happen to you regarding
18   those investigations?
19 A   To me?
20 Q   Correct.
21 A   It matters -- it matters what the investigators, you
22   know, if the investigators think I'm guilty, then I'll
23   probably have to go to court and prove myself innocent.
24 Q   All right.  So they do matter to you?
25 A   Yes, they matter to me.

Page 302

1 Q   So you were not paying any taxes on that?
2 A   No, I was not.
3 Q   All right.  Now, you indicated another place you were
4   working?
5 A   Yes.
6 Q   Okay.  I'm sorry, let me stop there, how long did you
7   work for this under the table at $10.....
8 A   That was only two months.
9 Q   Two months?  How much did you make?
10 A   I don't know.
11 Q   You don't know -- any idea how much money you made,
12   it's.....
13   MS. BRADY:  Objection, Your Honor.  Relevance?
14   THE COURT:  Overruled.
15 Q   My question is how much money you made at the
16   construction job working under the table at $10 an
17   hour?  You worked for two months?
18 A   Right.  I don't know.  I probably pulled about maybe
19   $1,000.
20 Q   Total?
21 A   Yeah.
22 Q   So in two months, you worked 100 hours, if you worked
23   $10 an hour?
24 A   Yeah.
25 Q   Okay.

Page 304

1 Q   All right.  Now let's go back to Nome, if we may.  You
2   indicated that -- I'm sorry I'm stepping away from the
3   mike -- you indicated -- we're going back to Nome, all
4   right?
5 A   Okay.
6 Q   Okay.  You indicated that you had been to Nome for
7   about four months, right?
8 A   Right.
9 Q   Okay.  What were you doing in Nome?
10 A   I was working.
11 Q   Doing what?
12 A   I was working under -- under the table construction.  I
13   also worked at Carrs.  And I also worked at the Glue
14   Pot.  And I also worked at Twin Dragon.
15 Q   Okay.
16 A   I held two -- two jobs for over two and a half months.
17 Q   I kind of want to -- you're moving a little a faster
18   than my hand is writing.
19 A   Okay.
20 Q   All right.  You worked construction?
21 A   Yes, I did.
22 Q   What kind of construction did you work?
23 A   It's clean up, construction clean up.
24 Q   Okay.  How much were you making an hour?
25 A   I was only making $10 underneath the table.

Page 303

1 A   It was part-time.
2 Q   All right.  You indicated another place you worked,
3   please, Carrs, I believe......
4 A   At Hansen's.
5 Q   Hansen's?
6 A   Yeah.
7 Q   Okay.  Hansen's, let's deal with Hansen's.  What is
8   Hansen's?
9 A   It's Carrs.
10 Q   Carrs?  All right.  And what did you do there, please?
11 A   I was a stocker.
12 Q   Stocker?  All right.  And how long did you work there?
13 A   Probably about three and a half months.
14 Q   Okay.  All right.  And how much do you -- were you paid
15   an hour there?
16 A   $8.50.
17 Q   Was that union that was -- was that a union job?  Do
18   they -- are they union?
19 A   Excuse me?
20 Q   Are they union?
21 A   I don't know.
22 Q   All right.  But that was on top of the table money,
23   right?
24 A   Yeah.  I got taxed.
25 Q   All right.  The next job you had, please?

Page 305

Case 3:05-cv-00255-TMB-JDR    Document 11-4    Filed 02/07/2006    Page 10 of 22

| | |
|---|---|
| 1  A  Twin Dragon. | 1   you have a child, you have a legal obligation generally |
| 2  Q  And what is the Twin Dragon? | 2   to support that child..... |
| 3  A  Dishwasher. It's a food place. | 3   MS. BRADY: Objection, Your Honor. This calls for a |
| 4  Q  Okay. And how much were you making there? | 4 legal conclusion. |
| 5  A  $10. | 5   THE COURT: Just ask the conclusion. |
| 6  Q  All right. Were you paid on top of the table? | 6  Q  All right. Do you have a -- do you understand a legal |
| 7  A  Yeah. | 7   obligation? Can someone make you pay to support that |
| 8  Q  All right. How long did you work there? | 8   child? |
| 9  A  Probably about a month. | 9  A  No. |
| 10  Q  Okay. Let me -- how much did you make with them? | 10  Q  And how old is that child? |
| 11  A  I don't know, probably about $700. | 11  A  She just turned two. |
| 12  Q  Okay. How much did you make with Carrs, going back to | 12  Q  Two? |
| 13    Carrs? | 13  A  Yeah. |
| 14  A  Probably about $1,800. | 14  Q  All right. |
| 15  Q  Okay. And I believe there was a fourth place? | 15  A  She was only almost a year old when we were -- when we |
| 16  A  Yeah. Glue Pot (ph). | 16    were in Nome. |
| 17  Q  Glue Pot (ph)? | 17  Q  All right. Okay. Going back to Nome, now we were up |
| 18  A  I was a cook. I made $10 an hour. | 18    there for about four and a half months, correct? All |
| 19  Q  All right. And how long did you work for them? | 19    right. You left the 27th of January, would you agree |
| 20  A  Probably about a month. | 20    with that..... |
| 21  Q  And how much did you make? | 21  A  Yeah. |
| 22  A  $10 an hour. | 22  Q  .....on the night, the midnight flight, or the night |
| 23  Q  I mean..... | 23    flight? |
| 24  A  Total? I don't know, probably about 500 bucks. I | 24  A  Yeah. |
| 25    didn't work too much. It was only nights, on Fridays | 25  Q  Okay. So that would mean that you were there in |
| Page 306 | Page 308 |

| | |
|---|---|
| 1   and Saturdays. | 1   January, December, November, October, and possibly some |
| 2  Q  All right. Where did you live in Nome? | 2   of September, would you agree with that? |
| 3  A  I lived with my girlfriend's mother, and then I got my | 3  A  Yeah. We left September like 30th. |
| 4    own place. | 4  Q  Left where, please? |
| 5  Q  When did you get your own place? | 5  A  Left Anchorage. |
| 6  A  Probably about two months after we had enough money to | 6  Q  Okay. So you were there from September 30 through |
| 7    be saved up and all that. I was the only one working. | 7   January 27? Approximately September 30? |
| 8  Q  Okay. So you were the sole supporter of you and your | 8  A  Yeah. |
| 9    girlfriend? | 9  Q  Okay. And during that time, we've covered all the |
| 10  A  And your daughter. | 10   places that you worked, which would have been under the |
| 11  Q  Okay. Is that your daughter? | 11   table, you made $1,000? You think you made about |
| 12  A  Yeah. | 12   $1,800..... |
| 13  Q  By..... | 13   MS. BRADY: Objection, Your Honor. Asked and answered. |
| 14  A  Not my blood, but that's my daughter. | 14   THE COURT: I don't know what the question is. |
| 15  Q  Do you have a legal obligation..... | 15   MR. JAMES: I'm just getting a total of the..... |
| 16  A  Yeah. | 16  Q  How much did you make total? |
| 17  Q  Okay. Are you married, is that how you have..... | 17   THE COURT: The objection is..... |
| 18  A  No. What do you mean, legal? | 18  A  I don't know. |
| 19  Q  Okay. My question is, if it's not your blood..... | 19   THE COURT: .....is sustained. |
| 20  A  Right. | 20   MR. JAMES: Thank you. |
| 21  Q  .....all right, and you're not married, and you say | 21  Q  How much money did you make, total? |
| 22    it's your daughter? | 22   THE COURT: The objection is sustained. |
| 23  A  Yeah. | 23  Q  How much did you pay for rent? |
| 24  Q  And I asked you if you have a legal obligation and you | 24  A  I don't know. I -- I gave her mother probably -- like |
| 25    said yeah, or yes, the law, and I'm not going to -- if | 25    I gave her $400 when we left her house. But we you |
| Page 307 | Page 309 |

**Page 310**

1  know, we put groceries in and stuff. And then for rent
2  over at the other place, it was $850 a month.
3 Q  $850? And how long did you live at the other place,
4  please?
5 A  Probably about two months.
6 Q  Okay. So that -- all right. And how much did you pay
7  for groceries? How much.....
8 A  It's pretty expensive. It's expensive there.
9 Q  All right. Would you please tell me how much you paid
10  for groceries?
11 A  I don't know how much I paid for groceries.
12 Q  Okay. Do you know how much a month you paid for
13  groceries?
14 A  No, I don't. I ate -- I worked at -- I mean, my
15  girlfriend and my daughter would eat food, but I -- I
16  worked at fast food restaurants. I mean, I worked at,
17  you know, I don't know -- and I worked at places where
18  I could eat. So I really didn't eat too much.
19 Q  Okay. Now, on the 25th of January, as you went in --
20  did you live in the AC apartments?
21 A  No, I did not.
22 Q  You had no business being in there, did you?
23 A  No, I did not.
24 Q  All right. So you went in the AC apartments and
25  started checking doors to see if they were locked,

**Page 311**

1  correct?
2 A  Yes.
3 Q  All right  And, unfortunately, or one of those doors
4  was unlocked, correct?
5 A  Yes.
6 Q  All right. You then entered that apartment, didn't
7  you?
8 A  Yeah.
9 Q  All right. And you entered that apartment and you
10  stole the money that was -- that you could see there,
11  didn't you?
12 A  Yes.
13 Q  All right. Now you were contacted -- do you know
14  Officer Daniel Bennett?
15 A  Yes, I do.
16 Q  All right. And he works for the Nome Police
17  Department, does he not?
18 A  Yes, he does.
19 Q  All right. And he contacted you, right?
20 A  Yes, he did.
21 Q  Okay. And you told him you had nothing to do with it,
22  right?
23 A  Yes, I did.
24 Q  All right. And then you tried to put it on to some
25  Native fellow, right?

**Page 312**

1 A  No, I did not.
2 Q  You didn't? Okay. And he called you a couple of times
3  to come on into the officer before you actually came
4  in, correct?
5 A  He called me and I came in.
6 Q  Okay. You came in and he confronted after you -- you
7  made the denials. He confronted you with the facts,
8  and you then admitted to the burglary, right?
9 A  Right. He asked me who all was involved. I told him
10  it was me and another guy.
11 Q  And who is a juvenile, which we can't mention here,
12  correct?
13 A  Right. It was a juvenile.
14 Q  All right. So.....
15 A  He was a white guy.
16 Q  All right. And when you were going out of the
17  apartment, you ran out of that apartment building,
18  didn't you, because the landlady said, hey, that's
19  going on, and you responded, we didn't go in your place
20  or something to that effect?
21 A  Right. I didn't run out. I just told her that -- that
22  -- I didn't say that, I didn't go in the place. I
23  think it was the guy who was with me said he didn't go
24  in the place.
25 Q  All right. So Officer Bennett then contacts you, and

**Page 313**

1  you tell him that you had nothing to do with it?
2  MS. BRADY: Objection. Asked and answered.
3  THE COURT: Sustained.
4 Q  All right. And he confronts you.....
5  MS. BRADY: Objection. Asked and answered.
6  MR. JAMES: She doesn't even know what I've confronted
7 him with yet.
8  THE COURT: Okay. Ask the question.
9 Q  Confronted you with facts, and you admitted to the
10  burglary, correct?
11 A  Yes.
12 Q  All right. And then you wanted to make a deal, you
13  asked -- as asked in direct, to contact the victim to
14  see if you could get out of it right?
15 A  I asked if -- if I could talk to the lady, because she
16  said it was $100 that was taken, and there was only $7
17  taken off the table. I felt I was -- I was -- I was
18  under the influence of alcohol, so I wanted to make my
19  grievance with the lady.
20 Q  So you thought you were getting ripped off as far as
21  the amount that you stole?
22 A  Which -- which she said I stole, yes. I felt like she
23  was lying.
24 Q  You did steal money though, right?
25 A  Yes, I did.

1 Q   All right.  You just disputed the amount?

2 A   Yes.

3 Q   All right.

4 A   $7.

5 Q   Okay.  So given these facts then, you and Officer
6     Bennet enter into a deal of some type, wherein he is
7     going to go talk to the DA if you will turn and work
8     for the Nome Police Department as a buyer of illicit
9     contraband, correct?

10 A   Yeah.  He -- he wanted a drug bust in Nome, Alaska, and
11     it -- it was kind of like I -- I kind of made a point
12     to the guy.  I told him I didn't know nobody there who
13     did dope.  And then I lied to the guy and told him that
14     I did.  And I was -- I -- I lied pretty much a lot to
15     that guy.  And then he expected something from me that
16     I couldn't deliver to him, so I left.

17 Q   Okay.  So you lied to the cop?

18 A   Yeah.

19 Q   And then he set up a meeting for you to meet back with
20     him to kind of solidify the situation, and in the
21     interim period, you fled Nome and went to Anchorage?

22 A   Well, he told me he wanted to see a drug bust.  He said
23     that that's what they like to see there in Nome.  And,
24     you know, so he -- that was my option.  He wanted a
25     drug bust.  He told me that he knew that I knew

                                                         Page 314

1     somebody who did dope, which I didn't.  And so I came
2     back to Anchorage where I know people who serve dope.
3     If that's the only way my charge was going to get
4     lifted off of my thing, then that's just where I came.
5     And that's what I did.

6 Q   Okay.  You told him you didn't want to go to jail, and
7     that's why you would work for him, right?

8 A   That's right.

9 Q   Okay.

10 A   I didn't want to get a felony for seven bucks.

11 Q   Okay.  Who is Jeffrey Scalamana [sic]?

12 A   Sakamano (ph)?

13 Q   Pardon, please?

14 A   Jeffrey Sakamano (ph).

15 Q   Sakamano (ph)?

16 A   Yeah.

17 Q   All right.  Did you not tell Officer Bennett that you
18     had bought on two occasions.....

19 A   Yeah, I lied to him.

20 Q   Okay.

21 A   I told him I bought dope off of him.  I never bought
22     dope off the kid.  He's just -- he was just a punk, and
23     everybody thought he was a punk.  So I made him think
24     that everybody was right about the kid.

25 Q   Who is Jeffrey -- Jerry Patton [sic]?

                                                         Page 315

1 A   Jerry Paton?

2 Q   Paton (ph).

3 A   Well, that was just a guy, when I -- when I moved
4     there, he was -- he was the one who -- who had bud.
5     And I think the police kind of knew that he was the one
6     who had bud.  And he got caught with something, and he
7     snitched on some people, and he was out, and he was --
8     he was like out at his mom's house all the time.  And I
9     told the police that I bought dope off of that guy too.
10     But I never bought no dope in Nome.

11 Q   Okay.  You told them that you had purchased cocaine
12     twice from him, right?

13 A   Yeah.  That's what I said.

14 Q   And Ernie Butler, you told them that you could buy
15     cocaine from Ernie Butler too, didn't you?

16 A   Right.

17 Q   Who is Ernie Butler?

18 A   I -- I was -- there's -- it's -- Nome is so small, you
19     know, you know everybody.  I really didn't even -- I
20     was just saying names and telling him what he wanted to
21     hear.

22 Q   All right.  On the 26th then you had contact with
23     Officer Bennet again, didn't you?

24 A   On the 26th?

25 Q   January 26th?

                                                         Page 316

1 A   Yes.

2 Q   Okay.  And you told him that there was going to be a
3     large shipment coming in on Saturday and would not be
4     available until Sunday the 28th?

5 A   Right.

6 Q   All right.  And then on the 27th, you had contact with
7     the officer, and you indicated you were -- you were
8     moving into another location?

9 A   Yeah.  I told him that I was -- I was moving to a
10     different apartment.

11 Q   Yeah.  And that was a lie, wasn't it?

12 A   Yes, it was.

13 Q   All right.  Okay.  And then are you telling us now that
14     this -- the statements you made, all the statements
15     you've made to Officer Bennett were lies?

16 A   Yes, they were.

17 Q   Okay.  But he wouldn't let me work off my charges in
18     any other way.  So I told him what he wanted to me,
19     because that's what he wanted.  He wanted drug busts.
20     I didn't know where to give a drug bust at.  You know,
21     if I would have known people in Nome that did drugs, I
22     damn sure would have turned them in before I came back
23     to Anchorage and turned somebody in.

24 Q   All right.  Now he didn't tell you he was going to fix
25     it, he said he would talk to the DA and the DA was

                                                         Page 317

1    going to make the decisions, right?
2 A   Well, he told me that if I worked with them, everything
3    would be all right.
4 Q   What do you mean, all right?
5 A   All right. My charges would be dismissed. He said he
6    would overlook it, like it never happened.
7 Q   Okay. He would overlook it. So he was.....
8 A   He was the officer who had the case. And he's the one
9    who told me that if I brought him somebody who was
10    doing drugs, he said, I would have at least three
11    people, and that's why I gave three names.
12 Q   Okay. Didn't he tell you that if he was going to go
13    the district attorney, John Vacek, and review the
14    information you supply, and if the DA decided, then the
15    DA may not bring the charges against you?
16 A   Right. Something like that.
17 Q   Okay. So, in fact, it wasn't Officer Bennett then, it
18    was someone higher up that was going to make that
19    decision, which is called the district attorney in
20    Nome, right?
21 A   Yeah. I didn't know all that stuff. This was my first
22    time ever dealing with any of this. And he made it
23    sound like he would make the charge disappear. That's
24    -- that's what I interpret [sic] of everything that we
25    talked about, in -- on and off tape, that was my

Page 318

1    predicament on all of it. He told me it -- it would be
2    gone.
3 Q   And are you telling us that this is your first -- in
4    January was your first experience.....
5 A   Yeah, with the whole DA.....
6 Q   .....in the criminal justice......
7 A   Yes.
8 Q   In the criminal justice system?
9 A   Not in the criminal justice system.
10 Q   All right.
11 A   Dealing with the DA, yes. And this type of court
12    system, yeah.
13 Q   Never dealt with the DA before?
14 A   No, I have not.
15 Q   Okay. Now on the 6th of January -- or excuse me, of
16    February, you were arrested in Anchorage, weren't you?
17 A   The 5th of what?
18 Q   The 6th of February. You were arrested in Anchorage,
19    weren't you? And bail was set at $5,000 on a bench
20    warrant out of Nome, Alaska for burglary.
21 A   I turned myself in. I wasn't arrested. I turned
22    myself in.
23 Q   Did you go to the jail?
24 A   I went to the police station.
25 Q   All right.

Page 319

1 A   I called, and they told me that they were going to put
2    my -- they were going to arrest my girlfriend as an
3    accomplice, with -- to leaving with me to Nome and put
4    my daughter in DFYS care. So I figured, you know, I
5    ain't going to put my daughter and my little girl
6    though it, so I turned myself in, because it was me.
7 Q   Who told you that?
8 A   Who -- who told me what?
9 Q   What you just said. That someone was going to arrest
10    your girlfriend.....
11 A   That was Officer Bennett.
12 Q   How would Bennett know where you were?
13 A   Because I had to call him. He called my girlfriend.
14    My girlfriend had got a job when she came here. She
15    got her CNA license when she was in Nome. And.....
16 Q   Okay. What.....
17 A   .....she had to get a reference.
18 Q   What is a CNA license?
19 A   It's a certificate -- certified nurse assistant.
20    That's probably -- that's another reason why went to
21    Nome, because school there is cheaper.
22 Q   And how would Officer Bennet have known.....
23 A   Because she had to get a reference from the hospital
24    that she worked with in Nome. And when she called to
25    get that reference, it was known in Nome, because Nome

Page 320

1    is so small, that, you know, I fled. And that it was
2    in the Nome Nugget that I robbed a house. And they
3    went to -- my girlfriend's worked to called to get a
4    reference, the police called and gave -- the hospital
5    at Nome gave the police my girlfriend's number. They
6    called my girlfriend, and they told her all that. And
7    they gave me the number to call him at. I called him
8    up, and he told me the exact same thing he told my
9    girlfriend.
10 Q   All right. And -- so then you say you went to the
11    police department?
12 A   An hour after I got off the phone, I turned myself in.
13 Q   All right. And -- so you -- on the 6th of February,
14    you were in the police department. What happened then?
15 A   I can't really remember.
16 Q   All right. Do you remember being arraigned on the 7th
17    of February before Judge Finn?
18 A   Yes.
19 Q   All right. And the state at that time -- bail was set
20    at $5,000, wasn't it?
21 A   Yes, it was.
22 Q   All right. And what happened between February 6th and
23    February 7th?
24 A   I got -- I was out.
25 Q   You were out? No one -- you never posted any bail?

Page 321

1 A   No.

2 Q   So they -- the Anchorage Police Department ignored

3       the.....

4 A   No. I got -- I wasn't -- I didn't get let out on bail.

5       I was let out on my own recognizance.

6 Q   All right.

7 A   I believe that's how it went.

8 Q   Okay. So the -- as far as you know, the Anchorage

9       Police Department had a warrant for your arrest out in

10      Nome, right, dated the 31st.....

11 A   I had a bench warrant out at Nome for my arrest, right.

12      They -- they were going to send me back.

13 Q   Issued on the 31st of January? You received a copy of

14      that, correct, from the judge?

15 A   A bench warrant?

16 Q   The warrant.

17 A   Yes, I did.

18 Q   Okay. So you know that the 31st of January, things

19      were happening in Nome. The 6th of February, you

20      turned yourself in to APD. My question is what

21      happened -- and are you telling me that they just let

22      you go with a $5,000 arrest warrant?

23 A   Yes.

24 Q   All right. So they ignored the Nome arrest warrant?

25 A   They didn't ignore the Nome arrest warrant.

Page 322

1 Q   They didn't arrest you.

2 A   Well, they -- I got arrested, and then they let me out

3       on my own recognizance. I don't know why.

4 Q   All right. Did you ever post the $5,000?

5 A   No, I did not.

6 Q   All right. And then you went -- do you remember going

7       in front of Judge Finn, who is a lady judge?

8 A   No.

9 Q   All right. How about Judge Rhodes, who is another lady

10      judge?

11 A   I don't know.

12 Q   How about Judge Wanamaker, who is another -- well,

13      he's -- he's a male judge?

14 A   No.

15 Q   Okay. You don't remember these things happening the

16      first week in February?

17 A   No, I don't.

18 Q   Okay. Now did -- who did you talk to, Officer Percel

19      (ph) or some -- Perell (ph), or something like that, on

20      the 6th, is that correct?

21 A   Excuse me?

22 Q   On the 6th of February, okay, we're -- focus on the 6th

23      of February with me.

24 A   Okay.

25 Q   All right. You stated you went to the police

Page 323

1       department and you -- did you talk with anybody?

2 A   Yeah.

3 Q   All right. Who did you talk with?

4 A   I talked to a lady cop.

5 Q   A lady cop? All right. What did this lady cop look

6       like?

7 A   She had blonde hair.

8 Q   All right.

9 A   Short, white girl.

10 Q   And was there any other police there?

11 A   Yeah, there was -- there was another girl cop there. I

12      think -- and I think there was another -- there was all

13      girls.

14 Q   All right. What did these all girls look like? We

15      know one's a blonde and short.

16 A   One is a blonde, and one had brown -- darkish-brown

17      hair. And I can't remember the other one.

18 Q   One short blonde one, brown hair, height?

19 A   Both tall and slim.

20 Q   Okay. So there's two tall and slim, one short and

21      blonde? Three -- three lady cops?

22 A   Yeah.

23 Q   All right. Now, did you talk with anybody that

24      district attorney's office in Anchorage at that time?

25 A   No.

Page 324

1 Q   All right. Did you talk -- after you talked to the

2       three lady cops, then you were let go and you.....

3 A   I was taken to jail.

4 Q   You were taken to jail?

5 A   Yeah.

6 Q   Okay. Now, they took you to jail, which jail?

7 A   Cook Inlet.

8 Q   Cook Inlet? All right. And that's down on Third

9       Avenue, right? Yes?

10 A   Yeah.

11 Q   Okay. Because.....

12 A   Yes.

13 Q   .....it's being recorded.

14 A   Sorry.

15 Q   So that's right? So how long were you in Cook Inlet?

16 A   I was 24 hours.

17 Q   Ah, okay. So we weren't released, we were put in --

18      they effectuated the arrest warrant and an you went to

19      jail?

20 A   Oh, okay.

21 Q   So the next day.....

22 A   I was let out on my own recognizance.

23 Q   Well, you went to court, didn't you?

24 A   I went to -- is it court, or is it a hearing, a bail

25      hearing?

Page 325

1  Q  A bail hearing?

2  A  Right.

3  Q  All right.  Did they -- did you come -- leave Cook

4     Inlet, or did you stay in Cook Inlet?

5  A  I left Cook Inlet.

6  Q  Okay.  Where did you go?

7  A  To this courthouse.

8  Q  To this courthouse?  All right.

9  A  Yeah.

10 Q  And you went to an arraignment, did you not?

11 A  Arraignment, yeah.

12 Q  Okay.  And what happened at the arraignment?

13 A  I got let out on my recognizance.

14 Q  Then what happened was is they set the bail, and they

15    set it for a bail review?

16 A  No, they let me out on my recognizance, I believe.

17 Q  All right.  Do you remember what the judge looked like?

18 A  White.

19 Q  Male or female white?

20 A  I can't remember.

21 Q  All right.

22 A  I don't got a good memory.

23 Q  You don't have a good memory?  Okay.  That's fine if

24    you don't have a good memory.  All right.  So you get

25    out on your own recognizance.  Now who asked -- did you

Page 326

1     say, let me out on my own recognizance?

2  A  Yeah.

3  Q  And the judge said, right on, you're out of here?

4  A  No, she said, you're -- I don't know -- I got taken

5     back to Cook Inlet, and then I was released.

6  Q  Did anybody ask that you be released on your own

7     recognizance?

8  A  I think my girlfriend did.

9  Q  How about the district attorney?

10 A  I don't -- yeah, I guess, if they did.

11 Q  You were there.

12 A  I can't really remember.  I forgot.

13 Q  Okay.  So your girl -- you think your girlfriend asked

14    that you be allowed to be released on your

15    recognizance, and whoever the white judge was released

16    you out of Nome arrest warrant, $5,000, and cut you

17    loose?

18 A  Right.

19 Q  All right.  What happened then?  Now this is the 7th,

20    all right?  Okay.  The 6th, you got arrested.  The 7th,

21    you went to jail -- excuse me, the 6th, you went to

22    jail.  The 7th, you went to a courtroom, remember?

23 A  Yeah.

24 Q  Okay.  What happened after you were released on your

25    own recognizance?

Page 327

1  A  I left the -- I mean, I went back to Cook Inlet, and

2     then I got out.

3  Q  Okay.  And then what happened?

4  A  I don't know.

5  Q  All right.  Where did you go when you got out?

6  A  I can't remember.

7  Q  All right.  What time of day was it when you got out?

8  A  Probably about 6:00.

9  Q  All right.  WA sit light or dark outside?

10 A  It was light, lightish-dark.

11 Q  Okay.

12 A  It was getting dark.

13 Q  All right.  Now this is February 7th, right?  Okay.

14    You got out, you don't really remember what you did, is

15    that correct?

16 A  Correct.

17 Q  When is the first time you remember what you did?

18 A  I don't know.  What are -- what are you trying -- I --

19    I don't get what you're trying to say.

20 Q  Okay.

21 A  When's the first time I -- I remember a lot.  I just

22    don't remember a whole bunch.

23 Q  Okay.  Do you remember -- all right.

24 A  You -- you know.  I remember when you start telling me

25    stuff, I can remember.

Page 328

1  Q  You don't remember what you did when you got out of

2     jail on the 7th?

3  A  I went and talked to the police department on trying to

4     set up drug buys.

5  Q  Who did you talk to -- when did you do that?

6  A  I can't remember.

7  Q  Was it that day?

8  A  I don't think so.

9  Q  Okay.  Do you know what you did from the time you got

10    out of jail, which would have been Cook Inlet, correct?

11 A  Yes.

12 Q  All right.  On the 7th, but pretty much decided that's

13    when you got of jail, is that what your memory is?

14 A  Yeah, the next day.  I don't remember -- I didn't know

15    I went to jail on the 6th.  I didn't know that.

16 Q  You don't remember going to jail?

17 A  I remember going to jail.  I just didn't -- no, I don't

18    know the dates.

19 Q  Okay.  So -- but you're -- are you comfortable with the

20    idea that you got out of jail the same day that you

21    went to court?

22 A  Yes.

23 Q  When did you have contact with the police, that day?

24 A  I can't remember.

25 Q  Who did -- where did you have contact with the police

Page 329

1    at?
2 A    At the police station.
3 Q    When police station?
4 A    Tudor. Tudor.
5 Q    Tudor? Okay. Who did you talk to?
6 A    Officer -- that guy right there.
7 Q    That guy right there?
8 A    Yeah.
9 Q    Okay. Do you know what his name is?
10 A    Officer Johnstone.
11 Q    Okay. And was it -- and when you went to the police
12    station, was it day light or night, or when was it?
13 A    Probably in the -- it was -- it was always usually done
14    at night.
15 Q    So it wasn't the 7th, you don't think, which would have
16    made it the 8th, or the next day, would that be
17    correct?
18 A    All right. I don't know exactly when I -- when was the
19    first time that I -- I went there and talked to the
20    police. I can't really remember that offhand. I don't
21    know that. I don't know the date. I remember it was
22    always at night though. It was usually -- it was
23    always at night time.
24 Q    Okay. So we have no idea when you talked to -- you
25    think it was Officer Johnstone, the first person you

Page 330

1 Q    Who was she?
2 A    That -- the lady with the blonde hair.
3 Q    All right. When did she say this?
4 A    I can't remember that.
5 Q    All right. You said that you were given some phone
6    numbers.....
7 A    I was given the phone number to the -- to the police
8    station.
9 Q    Okay. And what -- now you were -- you were in jail,
10    right, for a period of time, for the 6th and 7th, did
11    you try and call those numbers from jail?
12 A    No, I did not.
13 Q    All right. Did you ask to use a phone?
14 A    No, I did not.
15 Q    Why not?
16 A    Because I had nobody to call.
17 Q    You had the cops. Didn't you call the numbers that
18    this blonde cop had told you to call to make contact,
19    or arrange the situation?
20 A    No. It was all ready going to be done as soon as --
21    when I got out.
22 Q    Well, how did you know you were going to get out?
23 A    Because that's what I was told. They told me they were
24    working a deal with me. That if I -- if I did what
25    they wanted me to do that, you know, and then if it all

Page 332

1    talked to when you got out of jail who was a policeman?
2 A    Right.
3 Q    Detective, cop, police, whatever you want to refer to
4    him as?
5 A    Right.
6 Q    Okay. What did you talk about?
7 A    I just -- I -- we just talked about -- I think he -- he
8    just -- they just wanted to know who I could buy dope
9    from.
10 Q    All right. Why did you go to talk to Officer Johnstone
11    on some unknown day? Why did you go to him?
12 A    Because that's what I was told to do.
13 Q    Who told you to do that?
14 A    The lady. She's the one who gave me the numbers, and
15    then like I was supposed to call. And I called, and
16    then they were like, well, you know, I'm not going to
17    -- she said that she's not the one I'm going to -- that
18    I was going to meeting with. I was going to be meeting
19    with, and then she told me the number. And then when I
20    went to the police station, I told them who I was there
21    to see. And they came out. And they -- they briefed
22    me. They told me who they were. And I was like, okay,
23    and I followed them back to the room. And they -- they
24    were telling me, you know, asking me question about how
25    I knew that sold dope.

Page 331

1    came through and it worked out good, that this was --
2    I'd be let out.
3 Q    In other words, the success of this mission is
4    dependant -- you're dependant on the success of this
5    mission to walk?
6 A    To walk? To be free?
7 Q    To be free?
8 A    Yes. To get my charges dropped, yes.
9 Q    All right. So a lot hangs on this with you, doesn't
10    it?
11 A    No, it was a success.
12 Q    It was a success? You're here today, it's not a
13    success.
14 A    It was a success.
15 Q    Oh, in your mind, it was a success?
16 A    Yeah.
17 Q    Okay. So did the charges get dropped?
18 A    I don't know.
19 Q    In other words, you've got a burglary charge hanging
20    over your head, this was a success, you don't know
21    whether it was dropped or not?
22 A    Well.....
23 Q    You don't care, huh?
24 A    Well, they'll tell me.
25 Q    Oh, they'll tell you? When.....

Page 333

**Page 334**

1 A   I care.

2 Q   Okay. Now, you didn't -- how did you know that if

3     Bennett was your handler in Nome, how did you know that

4     Anchorage Police Department could control what Bennett

5     did in Nome, or what the court system did in Nome, if

6     you just said they had made representations they were

7     going to take care of this?

8 A   How did I know?

9 Q   Yes.

10 A  Well, I just thought, you know, if they were going to

11    drop my charges for me giving away some kids that, you

12    know, that if I gave away a drug dealer that, you know,

13    that it -- it would be the same -- the same

14    circumstances if I gave away them.

15 Q  Okay. So all these people in Nome are kids?

16 A  Yeah.

17 Q  Juveniles, kids?

18 A  Yeah.

19 Q  Okay. These crack dealers that you.....

20 A  They're not crack dealers. They -- they never sold

21    dope. The all smoke weed, man.

22 Q  Okay.

23 A  There's no dope in Nome.

24 Q  Okay. How do you know that?

25 A  Because that's why they want drug busts. There's

**Page 335**

1     Ecstasy, that's it.

2 Q   How do you know there's Ecstasy?

3 A   Because it's a small town. And if anything that

4     happens, like if you do two things, the next day,

5     they'll all -- everybody knows. Even if -- they just

6     know, man. It's small. If somebody steals a soda pop,

7     you know, they -- they know who stole the soda pop.

8 Q   So did you do Ecstasy in Nome?

9 A   I never done no Ecstacy. I've never done Ecstacy in my

10    life.

11 Q  How do you know that they -- there's Ecstacy in Nome?

12 A  Because it's a small town, man, and you know what's

13    going around. And the cop told me that there's Ecstasy

14    in town and I just know.

15 Q  You just know? Okay. And if you knew there was no

16    coke in Nome, don't you think the cop would know

17    there's no coke in Nome?

18 A  Well, I mean, there's coke, but just not through who I

19    knew. I mean, you know, I wasn't looking for it. I

20    didn't know who had it. I -- I didn't know, you know.

21    That's why I came back here.

22 Q  I'm sorry, please?

23 A  I said that's why I came back here.

24 Q  You came back here because your girlfriend was going to

25    get a job back here, didn't it?

**Page 336**

1 A   No, she had a job in Nome.

2 Q   Okay. So you came back here to work for the Anchorage

3     Police Department?

4 A   Yeah. If that's the only way my charges -- I didn't

5     know nobody there who did dope.

6 Q   Okay.

7 A   I didn't know. So I came back here to where I knew

8     people who did dope.

9 Q   All right.

10 A  Who sold dope.

11 Q  And so your mission -- leaving Nome on the 27th was to

12    work for the Anchorage Police Department?

13 A  No, it was trying to get away from everything.

14 Q  Ah, okay. All right. So now, we're down to the -- you

15    indicated that Officer Johnstone was the person you

16    contacted, or made -- when you went to the police

17    station?

18 A  I believe so.

19 Q  Okay.

20 A  Either him or LaPorte.

21 Q  You said they were out there?

22 A  Yeah. There was -- there was a couple cops, man.

23    There was cops all over the building.

24 Q  All right. Anchorage Police Department, okay. I'm

25    more interested in who made contact with you, not the

**Page 337**

1     rest of the police department.

2 A   The only people I -- I usually talked to either was

3     Officer Johnstone. There was Office LaPorte. And

4     there was an older cop, but I can't remember his name.

5 Q   All right. The first time, you said they. You

6     identified Johnstone.

7 A   And Officer LaPorte. That's the only two people.

8 Q   Was he there the first time?

9 A   I believe so.

10 Q  All right. Now, did you talk to Officer Johnstone or

11    LaPorte, or both of them, about your situation in Nome

12    and how you could alleviate the problem, do away with

13    the problem, make it go away?

14 A  It was all ready made clear to me what was going on.

15    It was made clear to me the day that I turned myself

16    in. When I went to the police station and talked to

17    people, they -- they told me, you know, that I got the

18    same deal going on. And I asked them if I could have

19    the same deal that I had in Nome here. And they said

20    that we would have to talk to the DA.

21 Q  Okay.

22 A  And then I guess after they talked to the DA, and

23    that's -- that must have been why the DA, you know,

24    let me out or something.

25 Q  So the people that you talked to initially, you've not

3AN-01-1717 CR    November 15, 2001

| | |
|---|---|
| 1 | had anymore contact with? |
| 2 A | I talk to Officer LaPorte every now and then. |
| 3 Q | No. No. I guess I'm not making my -- initially, you |
| 4 | talked to three women cops, according to..... |
| 5 A | Right. |
| 6 Q | Girl cops? |
| 7 A | Yeah. |
| 8 Q | I think is what you -- all right. That was the end of |
| 9 | them? You've not had contact with them again? |
| 10 A | Right. |
| 11 Q | Right? |
| 12 A | Well, no, I have had contact with them. I've seen |
| 13 | them. I've had contact with them. I haven't talked to |
| 14 | them about nothing though. |
| 15 Q | All right. That's what I meant by contact. Not seeing |
| 16 | them and saying how are you doing, but dealing with |
| 17 | them on a one-to-one or group basis? |
| 18 A | Right. |
| 19 Q | The answer is no? |
| 20 A | No. |
| 21 Q | All right. Now you indicated that on the 8th, you went |
| 22 | to Grand Larry, correct? |
| 23 A | Yes. |
| 24 Q | All right. Now does -- so is -- is the 8th the day you |
| 25 | had contact with Officer Johnstone? |

Page 338

| | |
|---|---|
| 1 A | Well, if -- if that's the day that I want to the Grand |
| 2 | Larry, then that's the day that I had contact with the |
| 3 | police. |
| 4 Q | You don't know when you went to Grand..... |
| 5 A | No, I do not. |
| 6 Q | Okay. All right. Now, you did not have any type of |
| 7 | wire or anything else on you that -- that day, right? |
| 8 A | The first time, no, I didn't. |
| 9 Q | Okay. So you went there and there were people there, |
| 10 | correct, at Grand Larry? |
| 11 A | I can't remember. |
| 12 Q | Okay. Not a problem. All right. You went out -- |
| 13 | after you got to Grand Larry, did you go back outside |
| 14 | and then come back in? |
| 15 A | At Grand Larry? |
| 16 Q | Yeah. |
| 17 A | No, I don't think so. |
| 18 Q | Okay. Now, after you left Grand Larry, you went where? |
| 19 A | I probably went back to the police station. |
| 20 Q | Okay. How -- how did you get to Grand Larry? |
| 21 A | I drove. |
| 22 Q | What did you drive? |
| 23 A | My car. |
| 24 Q | What car? |
| 25 A | A black Reliant. |

Page 339

| | |
|---|---|
| 1 Q | What happened to the black Reliant? |
| 2 A | Somebody burnt it. |
| 3 Q | Okay. When did that happen? |
| 4 A | Probably about a month and a half before this trial. |
| 5 | Not even -- probably a month before this trial. |
| 6 Q | Why did they burn it? |
| 7 A | I don't know. Well, first, the windows were broke out |
| 8 | of it. I've got five cars, man. I had five cars. |
| 9 Q | Okay. |
| 10 A | I don't see why that Reliant would get targeted. I had |
| 11 | five cars. And it was broke down when it got -- the |
| 12 | transmission was out of it. And I sold the -- the -- |
| 13 | the -- there was a couple parts off the car that I |
| 14 | sold. But, you know, the car is no more. All my |
| 15 | stuff, my baby's stuff, it all got burnt up. It almost |
| 16 | burnt my house down. I got kicked out of my apartment, |
| 17 | so..... |
| 18 Q | This happened a month and a half ago? |
| 19 A | Yeah. |
| 20 Q | Which apartment is this? |
| 21 A | It was Mumford. |
| 22 Q | Mumford? Is that number 8? |
| 23 A | Yeah. |
| 24 Q | Okay. You got kicked out because of what? |
| 25 A | Because it was too much stuff. |

Page 340

| | |
|---|---|
| 1 Q | Too much racket or too much treasures? |
| 2 A | Too much what? |
| 3 Q | Racket or too much treasures? |
| 4 A | No, I just -- I don't know, man. It was just too much. |
| 5 Q | Too much? |
| 6 A | It was too much for me, you know, I left. I'm living |
| 7 | in a secured building now. |
| 8 Q | Okay. So you didn't get -- did you get kicked out or |
| 9 | not kicked out? |
| 10 A | I left. I didn't kicked out. |
| 11 Q | Oh, okay. So when you said you got kicked out before, |
| 12 | that was not correct? |
| 13 A | Well, you know..... |
| 14 Q | Yeah..... |
| 15 A | I just didn't want to be there. |
| 16 Q | Oh, okay. |
| 17 A | And the guy was getting upset at me because, you know, |
| 18 | half of his..... |
| 19 Q | Too much..... |
| 20 A | .....half of his building was burnt because of my car. |
| 21 Q | Uh-huh. |
| 22 A | And he's wondering why is somebody going to burn your |
| 23 | car? And I'm wondering the same thing. |
| 24 Q | It sounds like you talked about it. Is that the guy, |
| 25 | is that where he lived with that -- that -- when you |

Page 341

1   talked about on direct examination, that someone had
2   stolen all those drugs?
3 A There was -- there was two vials of pills that were
4   stolen, and it wasn't me.
5 Q How did you know there was two vials of pills?
6 A Because that's what the police told me.
7 Q Ah, but that was the apartment of the landlord, whoever
8   was the management of it, was that their apartment that
9   the vials of pills were stolen from?
10 A No, I don't believe so.
11 Q Okay. It wasn't Wilma Leonard is not the apartment
12   manager?
13 A No, she's not.
14 Q Okay  Is someone who lives with her the apartment
15   manager?
16 A No, they're not.
17 Q Oh, okay. So the manager, or the owner, or whoever it
18   is is hassling you, and there's just too much, and so
19   you leave?
20 A Right. And my dog got stolen and my house was -- there
21   was some people coming in my house. When I wasn't
22   there, they stole my dog.
23 Q What kind of dog was this?
24 A A pit bull.
25 Q Okay. And when was this?

Page 342

1 A Right. And my girlfriend. She's old enough. She has a
2   license and insurance.
3 Q Okay. But.....
4 A Right.
5 Q .....the times that we talked about earlier, the DA
6   talked about earlier, we didn't have the girlfriend
7   with us, did we?
8 A No.
9 Q Okay. Now, you earlier told us you owned five cars, if
10   my recollection.....
11 A Right.
12 Q Now you're telling us you don't own the cars.....
13 A Well, they weren't -- I have the titles to every single
14   one of them, but they weren't in my name. They were in
15   my girlfriend's name. I worked every car off.
16 Q What do you mean you worked every car off?
17 A I worked it off.
18 Q I don't understand what you mean.
19 A I just -- I work, and I work for a towing service.
20 Q You work for a towing service? What did you do for a
21   towing service?
22 A I work, work around the lot, clean up, fix brakes, you
23   know, do all that stuff.
24 Q What was the name of the towing service?
25 A Redwine's Towing.

Page 344

1 A It was like probably four days before my car got burnt
2   up.
3 Q So about a month and a half ago also?
4 A Yeah.
5 Q And a month and a half ago would have put us kind of
6   September-ish, huh? September-ish?
7 A September, October, November.
8 Q Today is the 15th of November.
9 A Right. Well, it was like at the -- maybe -- probably
10   September 30th.
11 Q Okay. All right. And you had five cars, and what five
12   cars do you have?
13 A I had a bunch.
14 Q Okay. Well, you had a bunch, but I assume that
15   five.....
16 A None of them were mine. I didn't own none of them, but
17   I had keys to all of them. And I -- I didn't drive the
18   tran- -- the Reliant at all. That's why I don't
19   understand why it got burnt up.
20 Q Okay. Do you have a driver's license?
21 A No.
22 Q So you were driving four of them.....
23 A I have a permit. I had a permit.
24 Q The permit requires you to drive with somebody else
25   that.....

Page 343

1 Q Redwine's Towing? Is that part of the Redwine problems
2   that we've heard about?
3 A Yeah.
4 Q Okay.
5 A I don't work for them no more.
6 Q Uh-huh. (Affirmative)
7 A Their son was -- he was using my name and all this --
8   all kinds of stuff. So I terminated them from me.
9 Q Are you related to the Redwine's?
10 A No, I'm not.
11 Q Okay. Okay. We're going to get back to the 8th, but
12   I'm kind of confused. We've got four cars that you've
13   got the titles to, but you don't own them because your
14   girlfriend owns them?
15 A Right.
16 Q And we have the Plymouth Reliant that you own or not
17   owned?
18 A That we owned.
19 Q You? We?
20 A We.
21 Q Title in your name?
22 A It was in our name.
23 Q Our name? In other words, Amy Bohman (ph) and Jeffrey
24   [sic] -- and/or Jeremy Fish?
25 A Yes.

Page 345

**Page 346**

```
 1  Q  Okay.  What kind of cars were the other four that you
 2     had the titles to that you did now own?
 3  A  There was LeMans, a Toyota.
 4  Q  Okay.  Let's go to the LeMans, what kind -- what year
 5     LeMans?
 6  A  '89.
 7  Q  '89?  Okay.  Color?
 8  A  Black.
 9  Q  All right.  Where was that located?
10  A  In my -- at the -- that's another reason they were
11     upset.  I had so many cars at Mumford.  They were all
12     at my apartment.
13  Q  Okay.
14  A  They were -- all my cars were in the same place.
15  Q  Were they running?  Other than the -- other than the
16     Reliant?
17  A  Right.  The Reliant was the only car that didn't run.
18  Q  Okay.  Were they licensed?
19  A  Yes, they were.
20  Q  Okay.  We've got the LeMans '89, black.  Next please?
21  A  Toyota.
22  Q  Toyota?  What kind was that?
23  A  '90, like a '90.
24  Q  '90?  What kind of Toyota?
25  A  Just Toyota 4-Runner.
```

**Page 347**

```
 1  Q  Is that a pickup or a.....
 2  A  Yeah, it's a pickup.
 3  Q  Okay.  Is that the one with the big tires?
 4  A  No.
 5  Q  Another one?
 6  A  Yeah.
 7  Q  Okay.  What color is the Toyota 4-Runner with the.....
 8  A  Black.
 9  Q  Black?  Okay.  And is that -- that's just kind of like
10     a little pick, a mini.....
11  A  Yeah, it's just a little.....
12  Q  Okay.
13  A  .....it's a little.....
14  Q  Is that a four-wheel drive?
15  A  No.
16  Q  Okay.
17  A  I don't believe so.  I mean it -- manually, it was a
18     four-wheel drive.  I had to get out and lock the tires
19     up.
20  Q  All right.  Next?  Next?
21  A  My Beretta.
22  Q  I'm sorry, please?
23  A  Beretta.
24  Q  Beretta?
25  A  1989.
```

**Page 348**

```
 1  Q  '89?  Okay.  And what is that, a Beretta is, that like
 2     a Chevy or something?
 3  A  Yeah.
 4  Q  Okay.  Is that a passenger car?
 5  A  Yeah, it's a five -- five passenger.
 6  Q  Okay.  And what color is that?
 7  A  White.
 8  Q  White?  Okay.  Okay.  That's three.  How about number
 9     four?
10  A  Number four would be my Subaru.
11  Q  Subaru?  Okay.  And what's that?
12  A  That's -- it's a Subaru Outback -- or not an Outback.
13     It was a Subaru -- I don't know, it was an old one,
14     man, a 1984.
15  Q  '84?
16  A  It's old.  Rust bucket.
17  Q  Rust bucket.  All right.  What color was the rust
18     bucket?
19  A  Rust.
20  Q  Rust?  Okay.  So we're going to assume that that's kind
21     of a gold-ish color?
22  A  Yeah.
23  Q  All right.  Is that its real color, or are we talking
24     just that it was totally rust?
25  A  It was -- it was -- it was gold, but it had -- it was a
```

**Page 349**

```
 1     rusty color, but it also had, it was rust all over the
 2     car.
 3  Q  All right.  Yeah.  Okay.  What kind of Subaru was it?
 4  A  I don't know.  I got it for cheep.  I think I got that
 5     car from Dave Dooley (ph).
 6  Q  Okay.  Was it a passenger car or a pickup?
 7  A  Yeah.
 8  Q  Okay.  What about the pickup with the big tires?
 9  A  That wasn't mine.  That was Tim Trudeau's (ph).
10  Q  Oh, okay.
11  A  And I was just watching that car.
12  Q  Was that parked there too?
13  A  Yeah.  It was -- it was parked there, but then it got
14     stolen.
15  Q  Ah, okay.  When did it get stolen?
16  A  I can't remember.
17  Q  Okay.  What happened to the LeMans?
18  A  It broke.  The clutch went out.
19  Q  Okay.  What happened to it?
20  A  It got towed.
21  Q  All right.  So it's.....
22  A  It's no longer around.
23  Q  Okay.  What happened to the Toyota?
24  A  To the Toyota truck?  I sold it for $800.
25  Q  When did you do that?
```

1 A  Probably back in October.
2 Q  Okay. And who did you sell it to?
3 A  I think it was Raymond Cortez (ph).
4 Q  And the Beretta?
5 A  I still got it.
6 Q  Okay. And the Subaru?
7 A  They took it back.
8 Q  The rust bucket?
9 A  Yeah. It was -- it had a brand new engine in it. It
10    was just the outside was ugly.
11 Q  Okay. And you said they took it back?
12 A  Yeah.
13 Q  Who is they?
14 A  Dave Dooley (ph) and his wife.
15 Q  Is that -- did you just tell me you sold the car to
16    Dave Dooley (ph)?
17 A  No, he took it back from me.
18 Q  Okay. For what reason would he take it back?
19 A  Because of Rico.
20 Q  Meaning what?
21 A  Meaning he knows -- he knows Dave, and he -- Rico told
22    Dave that I got him busted. So then Dave thought I was
23    a snitch and he didn't want nothing to do with me, so
24    he took my car. He came with the police and we had
25    like a -- we had an agreement, like a -- a verbal

Page 350

1    agreement saying I would pay him money. And then it
2    was like, I owed him like $200 and he took my car back,
3    and I never got no money back from the guy.
4 Q  So Dave Dooley (ph) and you had a deal that you were
5    going to buy -- you were buying the car on time, right?
6 A  Right.
7 Q  And you didn't pay, so Dave came and took the car back,
8    right?
9 A  No. I paid. I paid him the night before.
10 Q  You paid.....
11 A  He came the next morning after I paid him and took my
12    car and he told me I was a snitch and he didn't want
13    nothing to do with me.
14 Q  And he used the cops to do that?
15 A  Yes, he did.
16 Q  All right. Now, did you own these different cars in
17    February.....
18 A  No, I did not.
19 Q  Okay. So the only we're talking about is.....
20 A  Is that Plymouth.
21 Q  Plymouth Reliant? Okay. Now, sometime you went -- you
22    don't remember when it was, but you went up to 202
23    Grand Larney [sic], right?
24 A  When?
25 Q  You don't remember when it was, but at sometime, you

Page 351

1    went up to Grand Larney [sic]?
2 A  Grand Larry?
3 Q  Larry. I'm sorry. Larry, yes, of course.
4 A  When I went there for a drug buy?
5 Q  Right. The first one.
6 A  Yeah.
7 Q  Okay. We don't know who was there, we don't know when
8    it was, but we went there? Okay. I'm just setting the
9    stage.....
10 A  The first drug buy was just me and him, when I went
11    there.
12 Q  The only two people that were there were you and him?
13 A  Yeah.
14 Q  Okay. All right. And did you -- okay. And then you
15    -- when you went in, you stayed in until you came back
16    out, and then you got in the Plymouth Reliant and you
17    drove someplace, wherever that was, and you turned over
18    whatever you bought, right? What did you get?
19 A  I got coke.
20 Q  Coke? All right. How much coke did you get?
21 A  $150 worth.
22 Q  How much coke is that?
23 A  $150 worth.
24 Q  All right. You're going to have to put it in terms of
25    quantity for me, not dollar sign. You've talked

Page 352

1    about.....
2 A  I don't -- I don't know how much it weighed. I mean,
3    it -- I -- I can look at dope and see if it's, you
4    know, if that's the right size. And it was the right
5    size, and I took it, and I gave it to them.
6 Q  That was the right size for $150?
7 A  Yeah.
8 Q  I'm sorry?
9 A  Yeah.
10 Q  Oh, okay. Do you remember on -- in the direct
11    examination that you said, that you called them back
12    and said it was light and they were going to make it
13    up?
14 A  Yeah.
15 Q  Okay. So it wasn't the right size then, was it? Or
16    it's the right size and it wasn't.....
17 A  Well.....
18 Q  One of them is correct?
19 A  Well, it was -- for me, I thought it was good. But for
20    the officers that I gave it to, they didn't like it.
21 Q  Okay.
22 A  So I had to call him back and tell him it was light,
23    that way it wouldn't happen again. Or I was going to
24    go to jail.
25 Q  They told you you were going to go to jail?

Page 353

**Page 354**

1 A  Or it was -- if they ain't happy with it, then they
2    ain't happy, then, you know, then they ain't happy.
3 Q  Oh, okay.
4 A  So that's how it goes.
5 Q  Do they cry when they're not happy?
6 A  No.
7 Q  All right.
8 A  They don't cry.
9 Q  Okay.  So, you ended up with $150, and you got some
10    amount of -- was it cocaine or crack or.....
11 A  It was cocaine.
12 Q  Cocaine?  Okay.  Now for my edification, that's the
13    powder, right?
14 A  Right.
15 Q  All right.  You have no idea how much there was?
16 A  No.
17 Q  Do you have experience utilizing, consuming cocaine?
18 A  Utilizing?  I don't know what that means.
19 Q  Snorting it, shooting it.....
20 A  No.
21 Q  .....eating it?
22 A  No.
23 Q  No?
24 A  No.
25 Q  Didn't you just tell us the last time you used cocaine

**Page 355**

1    was about eight months ago?
2 A  I don't use cocaine, dude.  I smoke crack.
3 Q  I thought you do.....
4 A  I've smoked crack before.  I've never done coke.  I
5    mean, I -- you know, I've never done it.  I've smoked
6    dope.  I don't put stuff up my noes.
7 Q  Oh, okay.  So you're telling us that you didn't know
8    what you were buying when you got the cocaine, because
9    you had never had experience with it before?
10 A  I knew what I was buying.  I thought it was good.
11 Q  How did you know it was good?
12 A  Because it's always good from Rico.
13 Q  It's always good from Rico?  But you don't do coke, how
14    do you know the coke -- Rico is a good coke man?
15 A  Because he's -- he's been in business for a while.
16 Q  He's been in business for a while?  Okay.  And you're
17    -- you're an authority on him being in business for a
18    while?
19 A  Yeah.
20 Q  All right.  Now.....
21    THE COURT:  We need to stop.
22    MR. JAMES:  All right.  Thank you, Judge.  I'm not
23 quite done.
24    THE COURT:  All right.  Let me talk with the lawyers
25 real quickly, folks, before I let you go for the day.  Ms.

**Page 356**

1 Brady, it's going to be us (indiscernible).
2    MR. JAMES:  No.  Your (indiscernible).
3    (Bench conference as follows:)
4    THE COURT:  Any reason why we can't have the jury come
5 in at 8:30 on Monday?
6    MR. JAMES:  All right.  I think I have a problem with
7 8:30.  Oh, no, it's earlier than 8:00.
8    THE COURT:  No?
9    MR. JAMES:  Okay.
10    THE COURT:  8:30?  I mean, do we have anything that we
11 need to take up?  There's some -- if you think of something,
12 I have time on the calendar tomorrow, and I'll require you
13 to -- I'll expect you to do that, I'll get you on the
14 calendar.  Otherwise, we'll start with the jury on Monday.
15 What can I tell them about time, Ms. Brady?
16    MS. BRADY:  We're behind.  We're behind by four
17 witnesses now.
18    THE COURT:  Will you finish your case on Monday?
19    MS. BRADY:  I'll try.  It's difficult for me to
20 anticipate how much cross is going to be for some witnesses.
21 I've underestimated the cross up to this point, so I think
22 -- I think we can finish on Monday, I'm not sure.
23    THE COURT:  All right.  If we finish on Monday, Mr.
24 James?
25    MR. JAMES:  I'm rocking and rolling.  I really -- I'm

**Page 357**

1 going to try to put it on in one day, Judge, if I put on a
2 case.  I don't know.  I'm going to try to get it done in one
3 day, because I know Wednesday you would want it to go the
4 jury.  And probably then.....
5    THE COURT:  Well, I wanted it to go to the jury on
6 Monday, Mr. James, but.....
7    MR. JAMES:  Well, okay.....
8    THE COURT:  But for your misdemeanor case, it's -- at
9 this stage, I think you can count on it not going.  It will
10 be reassigned to a district court judge and be tried as soon
11 as possible.
12    MR. JAMES:  That's fine.
13    THE COURT:  Because I -- we've already -- I'm not going
14 to be able to keep this jury past Wednesday.  So -- and if
15 we don't finish the case by Wednesday, then, of course,
16 we'll have to keep the jury past Wednesday and we'll deal
17 with that.  But I'm not going to take up a second at this
18 point, unless we finish sooner, it's not likely.
19    MR. JAMES:  (Indiscernible), I'm going to use my best
20 efforts to get it done.
21    THE COURT:  Okay.
22    MR. JAMES:  I mean (indiscernible).
23    (End of bench conference)
24    THE COURT:  All right, folks.  I'm going to send you
25 home.  A long weekend for you.  I have a stack of other