FILE COPY

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROBERT O. DAVIS III, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Court of Appeals No. A-8808 |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Superior Court No. 3AN-S01-1717 Cr.

### APPEAL FROM THE SUPERIOR COURT
### THIRD JUDICIAL DISTRICT AT ANCHORAGE
### THE HONORABLE DAN A. HENSLEY, JUDGE

### APPELLEE'S EXCERPTS OF RECORD
### VOLUME I OF I

> GREGG D. RENKES
> ATTORNEY GENERAL
> Timothy W. Terrell (9011117)
> Assistant Attorney General
> Office of Special Prosecutions
> and Appeals
> 310 K Street, Suite 308
> Anchorage, Alaska 99501
>
> Telephone: (907) 269-6250
> Facsimile: (907) 269-6270

Filed in the Court of Appeals
of the State of Alaska
January 9, 2004

MARILYN MAY, CLERK OF
THE APPELLATE COURTS

Deputy Clerk

VRA CERTIFICATION. I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

## TABLE OF CONTENTS

State v. Robert Davis Transcript
     November 14, 2001 ................................................................. 92

State v. Robert Davis Transcript
     November 15, 2001 ................................................................. 107

State v. Robert Davis Transcript
     November 19, 2001 ................................................................. 118

State v. Robert Davis Transcript
     November 20, 2001 ................................................................. 133

**Page 61**

1 A  Yes, I do. I know him after -- I -- actually, the
2  first time I met him was when he was working as an
3  informant.
4 Q  When did you first meet Jeremy Fish?
5 A  I probably met him -- we started this case in February,
6  I would guess I met him a couple of days prior to the
7  start of the case.
8 Q  And what were the circumstances that you met him?
9 A  I was -- sat in on his original debrief.
10 Q  Okay. And when was that?
11 A  Probably a couple of days before we started the case,
12  so I couldn't tell you the exact date.
13 Q  You don't keep police reports on that?
14 A  No.
15 Q  So the case started on the 8th, so you started the
16  debrief on the 6th, would that be correct?
17 A  I couldn't tell you when the debrief was, I didn't -- I
18  did write it down, I don't know. And I wasn't the case
19  officer for this case. I just sat in on the original
20  debrief.
21 Q  Okay. Where was the original debrief at?
22 A  At the police station.
23 Q  Okay. How did you originate contact with Jeremy Fish?
24 A  I didn't originate contact with him. One of the other
25  detectives said they had an informant they were going

**Page 62**

1  to debrief, and asked me if I wanted to sit in on it.
2 Q  And who was that, please?
3 A  That was Detective Pam Pernue (ph).
4 Q  Payne [sic] Pernue (ph)?
5 A  Pam Pernue (ph).
6 Q  Pam Pernue (ph)? And Detective Pam Pernue (ph), the
7  reason I'm pronouncing her name is she's new to us in
8  this case, but tell me what happened then. Well, first
9  off, who is Pam Pernue (ph)? I mean, you said she's a
10  detective?
11 A  She's a detective in the metro drug unit.
12 Q  Okay. Metro, all right. That's different than --
13 A  That's different --
14 Q  -- special forces, or.....
15 A  A special assignment unit.
16 Q  A special.....
17 A  Correct.
18 Q  .....assignment. Okay. And that -- just so everybody
19  knows, metro is a combination AST, APD, it stands for
20  metropolitan drug something or other, correct?
21 A  Right. But actually, metro is strictly an APD unit.
22 Q  Oh, okay. You guys have taken over, all right, fine.
23  I'm not trying to cut you off, but historically, it
24  was, but -- tell me about Pam Pernue (ph), how did you
25  get contact with Jeremy Fish two days before the buy

**Page 63**

1  that you just testified earlier that was on the 8th,
2  but I want to start your contact was, please.
3 A  And I don't remember whether it was two days or a week
4  before the buy, but Detective Pernue (ph) had an
5  informant that she was going to debrief. She had
6  another officer that was with her in training. She
7  asked me if I wanted to sit in on the debrief. I said,
8  sure.
9 Q  Who was the other in training?
10 A  I believe that she had Officer Herrad (ph) with her.
11 Q  So did you keep any notes of the debrief?
12 A  I did not.
13 Q  And based upon your testimony on direct, the contacts,
14  at least in the police reports indicate the activity
15  started on the 8th of February, correct?
16 A  Correct.
17 Q  Okay. But that's incorrect, because the activity
18  started a couple of days before now, isn't that
19  correct?
20 A  The debrief did, yes, that's correct.
21 Q  All right.
22 A  There's -- it's standard to debrief an informant prior
23  to having the informant work for you. You sit down and
24  you talk about who they can buy from, and whether
25  you're going to use them as an informant.

**Page 64**

1 Q  Okay. So -- but in the police reports, there's nothing
2  mentioned of that?
3 A  In mine there isn't. I'm sure in somebody's there is.
4 Q  Okay. Who would that somebody be, based upon.....
5 A  Probably the case officer.
6 Q  And that would be?
7 A  I believe it's Johnstone, is it? I'm not sure who the
8  case officer is.
9 Q  You.....
10 A  It's either Johnstone or LaPorte, I would guess.
11 Q  Okay. All right. Now, to your knowledge, how did this
12  confidential information come into the possession of
13  APD?
14 A  I don't know.
15 Q  You don't know?
16 A  I don't know.
17 Q  You know nothing about Nome?
18 A  I don't know the circumstances about how he became an
19  informant, no, I don't.
20 Q  What was the deal?
21 A  What was what deal?
22 Q  Did you make a deal -- did APD make a deal with Jeremy
23  Fish relating to him providing alleged buy
24  opportunities?
25 A  I didn't make any deal with Jeremy Fish, so I can't

3AN-01-1717 CR

**Page 65**

1    answer that.
2 Q  Do you have any knowledge of any deal of Jeremy Fish?
3 A  No.
4 Q  Zero?
5 A  No.
6 Q  Okay.  Do you know an Officer Cross?
7 A  Jim Cross?  There's -- we've had a Ken Cross, and we've
8    got a James Cross.
9 Q  I'll have to get you the -- the number.  DSN 1397?
10 A  I don't know what their DSN's are.  I would guess
11    that's James Cross, but I -- I don't know.
12 Q  Calling your attention to September 4th, 2001, did you
13    have any contact with Jeremy Fish in the area of Medfra
14    and Mountain View?  I believe Medfra, Medfra?
15 A  I don't believe so, no, not that I -- I can recall.
16 Q  Based upon your seven years experience, if you would
17    have someone that you find with cocaine in their
18    possession, what would you do?
19 A  Cocaine in their possession?
20 Q  Uh-huh.  (Affirmative)
21 A  They would be arrested.
22 Q  All right.  Now behind you is an easel.....
23 A  Uh-huh.  (Affirmative)
24 Q  .....and would you please diagram, to the best of your
25    ability, and no one -- no one expects you to be an

**Page 66**

1    artist, but the area of Grand Larry and where you were
2    staked out on the 8th?
3 A  This is Muldoon running north and south.  This is Peck.
4    And this is Grand Larry.  I recall that we were parked
5    over here, and the target residence was right in here.
6 Q  Is there a driveway into the -- into the residence?
7    What is the residence address?
8 A  202.
9 Q  Okay.  Is there a driveway into 202, in other words,
10    off-street parking?
11 A  I believe there is.
12 Q  Would you please indicate that?  Okay.  How far does
13    that go in?
14 A  I -- I couldn't tell you.
15 Q  All right.  Is it -- is there a garage or carport, or
16    is it just a drive -- perhaps paved or driveway type of
17    parking area, off-street.....
18 A  I don't recall.  I couldn't even tell you what the
19    front of the house looked -- the front of the residence
20    looks like.
21 Q  I'm sorry?
22 A  I couldn't tell you, I don't recall what it looks like.
23 Q  You have no idea if it's a flat roof, peaked.....
24 A  No.
25 Q  .....the color of it?

**Page 67**

1 A  No.  I couldn't tell you.
2 Q  All right.  And how many times were you over there?
3 A  I think I was over there two times, or maybe three
4    times.
5 Q  Okay.  And you indicated there's a box up by the north
6    side, by peck there?
7 A  There's a what?
8 Q  A box on your diagram.
9 A  No, this is a vehicle.
10 Q  Okay.
11 A  This is what I was sitting in.
12 Q  Oh, okay.
13 A  This is a surveillance vehicle.
14 Q  I just.....
15 A  And that's -- that's where I was.
16 Q  Okay.  And you're pointed towards.....
17 A  The west.
18 Q  The west?  All right.
19 A  I wasn't actually looking at the house.  My job wasn't
20    to look at the house.  It was to follow the informant
21    once he left the house, or see him turn into the street
22    of Grand Larry.
23 Q  You're pointed west?
24 A  Correct.  North, south, west and east.
25 Q  Okay.  Indicate west to the left then of you?

**Page 68**

1 A  This is west.
2 Q  Okay.  All right.  That's fine.  I'm just -- now, what
3    -- you arrived there at a specific time?
4 A  Correct.
5 Q  And that time was what, please?
6 A  On which date are you talking about?
7 Q  I'm talking about the 8th, I'm sorry.
8 A  On the 8th at 2206 hours.
9 Q  Okay.  When did Mr. Fish arrive there?
10 A  2207 hours.
11 Q  Okay.  So you were not following him then, is that
12    correct, you had.....
13 A  No, I was not following him.
14 Q  All right.  And how long was he in the house?
15 A  He was -- surveillance advised that he was coming out
16    at 2216, so he was in the area at 2207, and he was
17    coming out of the residence at 2216.
18 Q  So he was in there for -- is it 2207 or 2007?  2207.
19 A  2207.
20 Q  I'm sorry.  Okay.  So we've got about 10 minutes?
21 A  Uh-huh.  (Affirmative)
22 Q  All right.  How many -- do you know how many entrances
23    there are to that house?
24 A  No, I wasn't looking at the house, so I couldn't tell
25    you.

3AN-01-1717 CR

1 Q   You weren't looking at the house on the 8th?
2 A   No.
3 Q   What were you looking at as you were parked?
4 A   I was -- I was to pick up the informant as he came out
5      of here and follow him back.
6 Q   So you don't know what, if anything, happened in the
7      vicinity of the house, you were just waiting for him
8      to.....
9 A   Correct.
10 Q  .....come out that.....
11 A  Correct.
12 Q  .....Grand Larry and then proceed?
13 A  Uh-huh. (Affirmative)
14 Q  Okay. All right. Now, you were a participant in the
15     debriefing, or were you not a participant?
16 A  I was not a participant in the.....
17 Q  Okay. So you don't know what Mr. Fish told the police
18     officers?
19 A  No.
20 Q  Okay. Were you a participant in the pre-briefing, if
21     there is such a word as pre-briefing or.....
22 A  No.
23 Q  No? All right. When you left -- excuse me. When you
24     observed Mr. Fish leave the vehicle, depart the area at
25     2216, how did you know it was Mr. Fish leaving?

Page 69

1 A   I know -- I don't -- I couldn't swear to it until I got
2      back to the station.
3 Q   Okay.
4 A   But it -- whoever was leaving, was driving his car, and
5      then when I got back to the station, he was behind the
6      wheel of the car.
7 Q   How did you know it was his car?
8 A   Because we had been briefed on what he was driving, and
9      I actually went out and looked at his car prior to us
10     going on the buy.
11 Q  Okay. But you didn't have any contact with Jeremy
12     Fish, you just went out and looked at the car before
13     the buy?
14 A  Correct.
15 Q  Okay. All right. And then you became the evidence
16     custodian, is that correct?
17 A  For the cocaine, correct.
18 Q  For the cocaine, all right.
19     MR. JAMES: If I may approach, Your Honor?
20 Q  And that's exhibit 1, correct?
21 A  Correct.
22 Q  Okay. And was -- it indicates a baggie of suspected
23     powder cocaine, is that -- am I reading that correct?
24 A  Uh-huh. (Affirmative)
25 Q  You said it's a baggie? There's a baggie in there.....

Page 70

1 A   Correct.
2 Q   .....which we would know as a sandwich baggie or
3      something like that?
4 A   Correct.
5 Q   Okay. Did you have that printed?
6 A   We put in a request to have it printed, yes.
7 Q   And what was the result of that?
8 A   I don't know. I can't tell you.
9 Q   Okay. And what you fill out on the front of that sheet
10     is -- is correct to the best of your knowledge, based
11     on your seven year's experience as a police officer,
12     right?
13 A  On the front of what sheet?
14 Q  The.....
15 A  Property and evidence?
16 Q  .....exhibit 1. The evidence.
17 A  Yes.
18     MR. JAMES: If I may approach?
19 Q  I'm not trying to.....
20 A  No, I don't actually have it with me here. I don't
21     have a copy.
22 Q  I'm talking about.....
23 A  Oh, absolutely. Yes. Yes.
24 Q  So that's -- we can take that information to the bank
25     then?

Page 71

1 A   This actually -- this writing on the front of this?
2 Q   Yeah.
3 A   This is not mine. This is Officer Simms'.
4 Q   Okay.
5 A   This is my initials and my DSN right here.
6 Q   So you didn't fill that out?
7 A   Correct. Officer Simms filled.....
8 Q   Did you check it?
9 A   Yes, I did.
10 Q  And you know it -- it's correct then?
11 A  Yes.
12 Q  And you would take that to the bank, right?
13 A  Yes.
14 Q  How about looking at 2?
15 A  This one?
16 Q  Exhibit 2. Yeah.
17 A  This is my writing on the front of this one.
18 Q  That is your writing? Okay.
19 A  Yes, it is.
20 Q  And that's correct, and you would take that to the bank
21     too, right?
22 A  Yes.
23 Q  Okay. How many grams of cocaine is indicated there?
24 A  On Exhibit 2 or 1?
25 Q  Yes, ma'am.

Page 72

1 A  Exhibit 2, 11.8.
2 Q  Okay.  How much is that, volume-wise, I mean, not --
3      11.2 grams, of course, yeah, but I mean volume-wise?  I
4      don't know.
5 A  It's a -- well, you can kind of see, it's a small
6      amount.
7 Q  And that would be what you submitted to the crime lab?
8 A  A request for that is submitted to the crime lab.
9 Q  Okay.  And that would -- the crime lab would get that
10    and weigh whatever.....
11 A  Correct.
12 Q  .....there and conform -- confirm the crack that you
13    had down?
14 A  Correct.  Uh-huh.
15 Q  It says 11.2 grams.....
16 A  11.8.
17 Q  Excuse me.  How did you know it was 11.8?
18 A  We weighed it on our scale.
19 Q  Okay.  And the other is 1?
20 A  1.0.
21 Q  1.0.  All right.  Okay.  Now, one of those -- I believe
22    the first one you indicated was, it tested positive.
23    It was white powder, is that right?
24 A  Uh-huh.  (Affirmative)
25 Q  All right.  And the only knowledge you have of where

Page 73

1      Mr. Fish got that is based upon what Mr. Fish said,
2      correct?
3 A  And the fact that we searched him prior.
4 Q  Okay.
5 A  We search him and his vehicle prior to him going on the
6      buy.
7 Q  Do you have a checklist you use to search to ensure
8      that you have consistency and accuracy in your
9      searches?
10 A  Searching of the person or a vehicle?
11 Q  Let's start with the person.
12 A  No, we do not have a checklist.
13 Q  All right.  How about a vehicle?
14 A  No.
15 Q  And you -- and then doing this for at least how many
16    years?
17 A  Seven years.
18 Q  Okay.  And there's other people that work on your team,
19    is that right?
20 A  Correct.
21 Q  Okay.  And there's other people that work in metro and
22    you worked in metro, correct?
23 A  Uh-huh.  (Affirmative)
24 Q  And that's all part of APD now?
25 A  Correct.

Page 74

1 Q  Okay  And so the search is strictly a subjective search
2      then, you rely upon what someone else said as to how
3      that search was conducted?
4 A  Correct.
5 Q  And there's no checks and balances?  There's no
6      objective testing that says, yeah, there's a check
7      mark, just like -- have you ever done a DWI arrest?
8 A  Yes, I have.
9 Q  Okay.  And there's a -- APD has a checklist, doesn't
10    it?  Have you been drinking?  How much have you had to
11    drink?  Assuming the person is going to talk with you.
12    When was your last drink?  Have you taken any medicine?
13    What type of medicine?  Do you have any problems?  Any
14    seeing problems?
15 A  It's a questionnaire.
16 Q  Okay.
17 A  Yes, there is a questionnaire.
18 Q  Then you fill it out and there's a checklist, right?
19 A  Uh-huh.  (Affirmative)
20 Q  Okay.  When you do the Breathalyzer test, there's a
21    checklist too, isn't there?
22 A  There's procedures.  We don't have a checklist, per se.
23    There are procedures to follow.
24 Q  Okay.  And they're written procedures, aren't they?
25 A  Yes, they are.

Page 75

1 Q  Okay.  So as you go through on those type of cases, you
2      know that you're supposed to fill out a specific thing,
3      because someone is going to come back and look at it
4      and see that you did it correctly, correct?
5 A  Correct.
6 Q  All right.  That doesn't exist in your unit, is that
7      correct?
8 A  A -- for specific things, it might, but for a pre-
9      search, no, it doesn't.
10 Q  Okay.  What specific thing might it exist for?
11    You.....
12 A  My unit does -- that unit also does DWI's.  It does a
13    lot of other crimes as well, but, no, we don't -- we
14    don't have very many checklists or anything.  We have
15    procedures that we need to follow.
16 Q  Okay.  And those are written procedures?
17 A  Well, we have a P -- what's called our PI, our policies
18    and procedures.
19 Q  Okay.
20 A  That covers most things.
21 Q  And who promulgates that?
22 A  The department.
23 Q  All right.  Is that part of your training manual?
24 A  Yes.
25 Q  All right.  And when you -- okay.  So I understand, and

Page 76

1 A   I'm a patrol sergeant on swing shift.
2 Q   Okay. So you were there when the arrest of Mr. Davis
3      took place, is that right, on the 28th/1st?
4 A   Correct.
5 Q   Okay. Where were you physically? Could you flip over
6      and draw us another picture of that, please?
7 A   There were several businesses along here. I don't know
8      their names. This is, again, Muldoon, and this is
9      north, and there was the -- there was a sign, a tall
10     sign here that said Northern -- Northern China
11     Restaurant. The defendant had pulled in this way in a
12     pickup truck, and I was parked -- Sergeant Stevens and
13     I were parked over here. And the informant, I believe
14     pulled in behind the pickup truck, but I couldn't swear
15     to that. This is where the defendant was, was in this
16     vehicle.
17 Q   Okay.
18 A   And I was right here.
19 Q   You're X?
20 A   Yes.
21 Q   Okay. And how far away is X from the defendant's
22     vehicle, Mr. Davis' vehicle?
23 A   I guess about 75 yards, maybe.
24 Q   Okay. And you've indicated, I believe the arrow on
25     Mr. Davis' vehicle is pointing toward Muldoon?
                                                       Page 81

1 A   Correct.
2 Q   Is that immediate access out to Muldoon, is there a
3      barrier there?
4 A   Well, there -- yeah, there's driveways all along here,
5      and I couldn't tell you specifically if there was one
6      right in front of him. I don't think there was. There
7      was one -- they came in this way. There's driveways
8      all along these businesses in the strip mall.
9 Q   All right. Now your -- what was the building behind
10     Mr. Davis' car?
11 A   I don't know.
12 Q   All right.
13 A   I just know he was -- that there was a sign here that
14     said Northern China Restaurant, and they were parked
15     pretty much under it was my recollection.
16 Q   Okay. Are you sure that vehicle, Mr. Davis' vehicle
17     was pointed toward Muldoon rather than in the opposite
18     direction?
19 A   That's my recollection at this point.
20 Q   Okay.
21 A   It was Muldoon.
22 Q   Okay. And your recollection is there was a second
23     person in the vehicle?
24 A   I believe so.
25 Q   Okay. Now, what happened? Mr. Jeremy Fish drives in
                                                       Page 82

1      and take me from there. Were you already there at the
2      scene?
3 A   I was already there.
4 Q   How did you know to be there?
5 A   Because that's where the buy was to occur.
6 Q   Okay. And who were you with at that time, was that
7      Simms again?
8 A   Sergeant Stevens I was with.
9 Q   Stevens, okay. And what happened -- you arrived at the
10     scene?
11 A   I arrived and parked and waited until surveillance
12     advised that the informant was pulling into the parking
13     lot, and they advised he was pulling into the parking
14     lot, and at that point, I looked up and could see him
15     pull up next to the defendant's vehicle, or near the
16     defendant's vehicle.
17 Q   Okay.
18 A   And, actually, I say he pulled up behind the silver
19     pickup truck that the defendant was in.
20 Q   Uh-huh. Okay. Like T-bone or is that parallel or.....
21 A   I couldn't tell you.
22 Q   And what happened at that particular juncture?
23 A   The informant got out of his vehicle and walked up to
24     the pickup truck.
25 Q   Okay.
                                                       Page 83

1 A   And then he got out of the pickup truck and got back
2      into his vehicle.
3 Q   Okay. And how long did this take?
4      THE COURT: Mr. James, I can't hear you.
5      MR. JAMES: I'm sorry. Excuse me. I apologize, jury,
6      I told you I would do this. I didn't mean to. I've got to
7      stay next to the mike.
8 Q   How long did that take?
9 A   He pulled into the parking lot at 0003 hours. At 0004
10     hours, he got back into his pickup truck, or got back
11     into his vehicle, the informant did.
12 Q   Okay. And then.....
13 A   So less than -- it looks like about a minute.
14 Q   All right. What happened then? Take me through it.
15 A   Then the informant pulled out and Officer LeBlanc
16     pulled into the parking lot, activated his overhead
17     lights and at that point, we took Mr. Davis into
18     custody.
19 Q   Okay. Set me the stage. Fish pulls out, LeBlanc pulls
20     in?
21 A   Yes.
22 Q   Boom, boom?
23 A   Yes.
24 Q   Instantaneous, not -- sequentially, it happened boom,
25     boom, is that correct?
                                                       Page 84

**Page 113**

1  is that number?
2 A  That's our APD case number that we assigned to a case.
3 Q  Can you explain to the members of the jury what a case
4  number is?
5 A  Every time we generate a report, it's assigned a case
6  number.  And in this case, it's 01, for the year 2001,
7  followed by the sequential number for when the case is
8  assigned.
9 Q  Okay.  And so you know that that's the photocopy of the
10  buy funds that you made because of what reasons?
11 A  Because that case number is the same number that's on
12  my report.
13 Q  And are your initials on it?
14 A  Yes.
15 Q  Okay.  And is that document a true and accurate
16  representation of the photocopy of the buy
17  funds that you gave to Mr. Fish?
18 A  Yes.
19  MS. BRADY:  Okay.  I move to admit state's 8 at this
20 time.
21  THE COURT:  8?
22  MR. JAMES:  No objection.
23  THE COURT:  State's 8 is admitted.
24      (Plaintiff's exhibit 8 admitted)
25 Q  Okay.  And did you assist any further with this case

**Page 114**

1  that day?
2 A  On that particular day, just reviewing my report here
3  real quick, I just basically assisted with
4  surveillance, and that was pretty much it.
5 Q  Okay.  And directing your attention to what's been
6  marked as, I think, state's 23, which is right behind
7  you, there's a diagram, do you recognize what that
8  diagram is of?
9 A  This would be a diagram of the area in which the buy
10  occurred on that day.
11 Q  Okay.  And I'm going to ask you to take a different
12  colored marker than what's already been used on that,
13  and just show the members of the jury where you were
14  and tell us what you observed.  Okay.  I'm going to ask
15  you not to use a highlighter, because we won't be able
16  to see that, so get something red or.....
17 A  Orange?
18 Q  Orange is fine.
19 A  Let's see, on the 8th of February of this year, I was
20  assigned to be on Duben, south of the residence, and
21  Duben is down here, Grand Larry continues down to
22  Duben, which runs out to Muldoon.  There's the -- the
23  Mapco right at the corner of Muldoon and Duben, and I
24  sat on Duben, south of the residence.  If I recall, I
25  believe I sat somewhere down here, because I could look

**Page 115**

1  down this way and see -- just see the car, but I
2  couldn't see the actual residence.
3 Q  Okay.  And what were you doing while you were sitting
4  there?
5 A  Listening to the radio.  We were all on the same
6  channel, and I was listening to traffic, that Officer
7  Johnstone was telling me when the informant's vehicle
8  was coming into the area.
9 Q  Okay.  And what were you supposed to be doing when the
10  informant's vehicle came in the area?
11 A  Just watch it and watch it go up to the residence.
12 Q  Okay.  And did you -- do you know if the informant's
13  vehicle went up to the residence?
14 A  I saw the vehicle come down onto Grand Larry, go north
15  on Grand Larry, and pull up to where I believe about
16  the house was, but I couldn't see the actual house
17  numbers.
18 Q  Okay.  Then what happened after the -- could you hear
19  on the radio the informant was leaving?
20 A  I heard Officer LeBlanc advise that he could see the
21  informant go inside the house, go back to his car, and
22  then go back inside.  And then after a few minutes,
23  Officer LeBlanc advises again when the informant went
24  to his car and left the area.
25 Q  Okay.  And then what did you do after he left?

**Page 116**

1 A  I just advised that I could see the vehicle leaving,
2  going -- if I recall correctly, he came back out to
3  Duben, and left that way, and I believe Officer LaPorte
4  and Officer Johnstone followed the informant back to
5  the police station.
6 Q  Okay.  Now let me direct your attention to February
7  20th, did you have a particular assignment on that day?
8 A  Once again, we were continuing the investigation of
9  this case, I was assigned to search the informant's
10  vehicles to make sure that there was no contraband or
11  money in the vehicle.  I did so, didn't find anything
12  in the car, and once again, I was assigned to park
13  south of the location on Grand Larry.  And this
14  particular time, I arrived and parked west of Grand
15  Larry on Duben.
16 Q  Okay.  Now let me stop you for just a second, because I
17  failed to make a record of -- you have been marking in
18  orange on what's previously been marked as state's
19  exhibit 23, when you were talking about the 2/8 buy, is
20  that right?
21 A  That's correct, ma'am.
22 Q  Okay.  Now let me talk about -- we'll go back to 2/20,
23  and you said that you did a search of the informant's
24  car?
25 A  That's correct.

3AN-01-1717 CR

State v. Robert Davis
November 14, 2001

1 informant's vehicle arrived, if I recall correctly, he
2 came in off of Old Seward and then came up and met with
3 the green Suburban.
4 Q Could you see the informant get out of his car?
5 A No, I couldn't actually see that.
6 Q Okay.
7 A I could just see the top of the Suburban.
8 Q Okay. And then what happened after the meeting was
9 over?
10 A After the -- the buy occurred, we followed the green
11 Suburban when it left, and went down Old Seward to
12 approximately 45th and stopped a residence, I believe
13 it's on 45th, just east of Old Seward.
14 Q And did you follow it anywhere else?
15 A Then after that, we followed it back to his -- the
16 residence at 202 Grand Larry.
17 Q Okay. And did you have any other involvement with this
18 case?
19 A No, that was it.
20 Q Okay. And have you had any contacts since this case
21 with Mr. Fish?
22 A Yes, I have.
23 Q And what -- what were those contacts?
24 A I ran into him at his place of employment, which was
25 Subway, when I went there to get a sandwich.

Page 121

1 Q Okay. Anything else?
2 A No, ma'am.
3 MS. BRADY: Thank you. That's all I have for this
4 witness.
5 THE COURT: Mr. James?
6 MR. JAMES: Thank you, Your Honor.
7           STEVEN HAAS
8 testified as follows on:
9      CROSS EXAMINATION
10 BY MR. JAMES:
11 Q Turn around and take a look at your diagram, Officer,
12 please.
13 A Yes, sir.
14 Q The Chevron station that we're referring to, what's the
15 name of it, do you know off the top of your head, the
16 Chevron.....
17 A The Chevron?
18 Q Yeah. The International and Old Seward, it's been
19 there forever, right?
20 A As long as I've been here.
21 Q Okay. What restaurant are you referring to? Are you
22 referring to.....
23 A Road Runner's.
24 Q .....Road Runner's? Okay.
25 A Yes, sir.

Page 122

1 Q All right. Now, where -- alert me to -- to the right
2 hand side of your diagram, is that Old Seward,
3 International, what are we.....
4 A No, this is Old Seward Highway. I actually drew -- I
5 guess drew it upside down with south being at the top
6 of the page and north being at.....
7 Q That's fine.
8 A .....the bottom. This is the International Airport
9 Road, and this is the little alleyway that runs over to
10 the parking lot of the Road Runner.
11 THE COURT: Can you all see over there, Mr. Iverson?
12 UNIDENTIFIED VOICE: Yes.
13 THE COURT: Okay.
14 Q I -- and what's between -- there's some woods and stuff
15 that -- in the Road Runner complex, is in there, I
16 mean, the creek goes through it and the.....
17 A That's on the south side.....
18 Q Okay.
19 A .....of the restaurant. That's where the creek runs
20 through and there's a green belt.
21 Q All right. And what, if any -- well, first of all, how
22 is the Suburban pointed? You've got yourself pointed
23 south, which would be toward the restaurant, correct?
24 A That's correct.
25 Q Okay. And how was the suburban pointed?

Page 123

1 A It was pointed, if I recall, to the -- to the west.
2 Q Okay. And so you were kind of -- if you were in the
3 driver's seat of your car -- was anybody else with you?
4 A No, I was in the car by myself.
5 Q Okay. So you were -- you would have had to have been
6 looking over.....
7 A Over my shoulder.....
8 Q .....over your shoulder, all right. And how far away,
9 approximately, is the -- your car from the Suburban?
10 A It was probably about 70 yards, give or take.
11 Q Okay. So that would be 210 feet, somewhere in that
12 neck of the woods?
13 A Yes.
14 Q I get to do my math. And you've indicated that it was
15 dark and you couldn't tell what was going on in there,
16 other than the fact that you were assigned to show up
17 there, and follow the Suburban wherever it went?
18 A That's correct.
19 Q Okay. And it went to where, please?
20 A 202 -- well, first it went to a residence on 45th
21 Avenue.
22 Q Uh-huh.
23 A And I don't recall if he picked somebody up or dropped
24 somebody off, but there was some contact with another
25 individual, and then it went to 202 Grand Larry.

Page 124

3AN-01-1717 CR

---

**Page 125**

1 Q   Okay. Now on the 8th, you testified you made a
2     photocopy of the money, and I believe that's your
3     exhibit.....
4 A   Yes, sir.
5 Q   .....whatever number that is, 24?
6 A   Exhibit number 8.
7 Q   8? I'm sorry. Thank you. And then you said you gave
8     that to Jeremy Fish?
9 A   Yes, sir.
10 Q  Okay. Bear with me just a minute, please. I'm looking
11    for something. Have you had an opportunity to -- you
12    didn't generate any police reports in this, right?
13 A  Yes, I did.
14 Q  You did?
15 A  The report I have before me.
16 Q  Oh, okay. On 2/28, your report of 2/28?
17 A  I don't have a report for that day, sir.
18 Q  The date written, 2/2-- I'm sorry, 2/8, excuse me,
19    I'm sorry.
20 A  No problem, sir. I have one dated February 8th, 2001.
21 Q  Right. Okay. It starts off, information?
22 A  That's correct.
23 Q  Okay. One, 2, 3, line 3 down on that, line 2 and line
24    3, I photocopied $150 in buy money and gave the money
25    and the photocopies to Officer Johnson [sic], that's

---

**Page 126**

1     not correct?
2 A   That could be. I thought I had given the money to --
3     to Jeremy Fish, but I could have given it to Officer
4     Johnstone, who gave it to him.
5 Q   In your police training, part of your training was to
6     -- when you testify, to testify accurately, correct?
7 A   Yes, it is.
8 Q   And you've had these police reports with you, is that
9     not true?
10 A  I got them when I showed up to court today.
11 Q  Okay. Did you talk about this case while you were
12    outside with the other officers?
13 A  Yes, I did.
14 Q  What did you talk about?
15 A  We just talked about how little my involvement was, and
16    I wasn't sure what I was supposed to here to testify
17    to.
18 Q  Okay. What did you talk about with Officer Bushue?
19 A  We had talked about some other issues that had gone
20    around at the police department.
21 Q  Okay. Nothing about this case?
22 A  I don't recall. I'm trying to remember. I think we
23    just talked about how short our involvement was, and
24    how Officer Johnstone and Officer LaPorte did the
25    majority of the work.

---

**Page 127**

1 Q   All right. We're talking about perhaps a half hour
2     ago, and you don't recall?
3 A   That's not what I said.
4 Q   Okay. Tell me.....
5 A   I'm trying to remember the extent of our conversation,
6     and I believe we just talked about how short our
7     involvement was.
8 Q   All right. You had nothing to do with the 28th, is that
9     -- 28th.....
10 THE COURT: I can't hear you, Mr. James.
11 Q   You had nothing to do with the -- now I'm yelling --
12    you had nothing to do with the 28th, that one? The
13    only two you were involved with was the 8th and the
14    20th, right?
15 A  That's not correct.
16 Q  I'm sorry, and the 21st, I'm sorry.
17 A  I was also there on the -- I don't recall the exact
18    date, but for the buy bust.
19 Q  Okay. And.....
20 A  But I didn't witness anything and wasn't -- didn't do
21    anything significant on that day.
22 Q  Who were you with on that day?
23 A  I was in a car by myself.
24 Q  In a car by yourself?
25 A  Yes.

---

**Page 128**

1 Q   Could you flip over, which is probably the one behind
2     that, please?
3 A   The one reference Muldoon?
4 Q   Yes. Yeah. Okay. We're on.....
5 THE COURT: It's got an evidence sticker on it, maybe
6 you can give me that information?
7 A   Exhibit number 24, sir.
8 THE COURT: Thank you.
9 Q   24. All right. Where were you physically located?
10 A  On that day, I was watching the residence, and we were
11    expecting the green Suburban, but it didn't show up,
12    and we were attempting to locate that.
13 Q  So you weren't on Muldoon?
14 A  No, sir.
15 Q  Oh, okay.
16 A  I was over off Duben and watching Grand Larry.
17 Q  Oh.....
18 A  I didn't actually see anything that transpired over
19    here until it was all over.
20 Q  All right. So you had nothing to do with what went
21    down there, you were at another location and.....
22 A  That's correct. I was over off of Duben and Grand
23    Larry, and I couldn't even see this location from where
24    I was at.
25 Q  Did you generate a police report on that?

---

1 A   No, I did not.

2 Q   All right.  From your location, going back to the 8th.
3     if you would, please, and you can flip back to the
4     chart, please.

5 A   Back to exhibit 23?

6 Q   Yes, please.  Thank you.  Could you describe the
7     residence at 202 Grand Larry?

8 A   It's a single story, and I believe it's a zero lot
9     line.  There's two houses, two places right next to
10    each other, and if I recall, 202 is the one that's on
11    the north side.

12 Q  Okay.  Is that like a duplex, for visuals?

13 A  Yes, sir.

14 Q  A side by side duplex?

15 A  Yes, sir.

16 Q  Okay.  So it would be like a side by side ranch duplex,
17    would that be kind of.....

18 A  Right.

19 Q  All right.  What is the parking facilities there?

20 A  I don't recall if it's a carport or just a driveway,
21    but I don't believe there's a garage.

22 Q  Okay.  Where did Mr. Fish pull in, if he did pull in?

23 A  He pulled into the driveway.

24 Q  Okay.  And did you have a good observation of him
25    during the entire period he was there?

Page 129

1 A   No, I did not.  As I said before, I could just see the
2     tail end of the car.  I really couldn't even see the
3     front door to the house.

4 Q   Was there other cars there?

5 A   I don't recall.

6 Q   So you have no idea of how he entered the structure
7     itself?

8 A   No, I couldn't see.

9 Q   Okay.  And was his -- excuse me, was his car sticking
10    out kind of to what would be considered the sidewalk
11    driving area?

12 A  It was at the far edge of the driveway, near the road.

13 Q  Far edge, thank you for your words.  I was looking for
14    those.  All right.  And -- okay.  And on the 20th, you
15    were -- going to the 20th, sir, you were listening to
16    the radio, you saw him turn in, were you basically in
17    the same position seeing the same thing?

18 A  No, sir.  This occasion, I was parked to the west of
19    Grand Larry.  I could not even see the driveway.

20 Q  Okay.

21 A  There's really not a lot of good places to park on
22    Duben in that area.

23 Q  Okay.  So you had no visual of what was in that
24    driveway, didn't see him drive into it, it's -- you're
25    basically there to pick up at the end and.....

Page 130

1 A   That's correct, sir.

2 Q   .....follow.....

3 A   I believe it was Officer LeBlanc was the one assigned
4     to have the close end eye.

5 Q   Okay.  Okay dokey.  One moment, please, sir.  If the
6     court will permit me.

7     MR. JAMES:  Thank you, sir.  That's all the
8 questions.....

9     THE COURT:  Thank you, Mr. James.  Redirect, Ms. Brady?

10    MS. BRADY:  I don't have any redirect, Your Honor.
11 Thank you.

12    THE COURT:  Thank you, Officer.  You can step down.

13 A  Thank you, sir.

14    THE COURT:  Your next witness, Ms. Brady?

15    MS. BRADY:  The state calls Officer Johnstone,
16 Detective Johnstone.

17    THE CLERK:  Would you raise your right hand?

18    (Oath administered)

19    MR. JOHNSTONE:  I do.

20            GRANT JOHNSTONE
21 called as a witness on behalf of the plaintiff, testified as
22 follows on:

23            DIRECT EXAMINATION

24    THE CLERK:  Please be seated.  For the record, sir,
25 will you state your full name, and spell your last?

Page 131

1 A   Grant Johnstone, J-o-h-n-s-t-o-n-e.

2     THE CLERK:  Thank you.

3     THE COURT:  Go ahead, Ms. Brady.

4     MS. BRADY:  If I could just have one moment, Your
5 Honor?

6 BY MS. BRADY:

7 Q   How long have you been an APD officer?

8 A   A little over six years.

9 Q   Okay.  And what is -- what's your title?

10 A  I'm a detective with the burglary unit.

11 Q  How long have you been doing that?

12 A  Since September of this year.

13 Q  Okay.  And have you had any training or experience in
14    the detection and identification and investigation of
15    controlled substances?

16 A  Yes, I have.

17 Q  Okay.  And could you just explain to the members of the
18    jury what that was?

19 A  I've attended numerous classes on domestic drug
20    interdiction of highways, rave and counter-culture
21    drugs.  I spent six months in the metropolitan drug
22    enforcement unit of the APD detective division, and
23    have gone to several clandestine-style laboratory
24    dismantling courses through the drug enforcement
25    agency.

Page 132

3AN-01-1717 CR

**Page 133**

1 Q   Okay. And now is -- you said that with you're with the
2      burglary unit right now, is that the same unit you were
3      with during the investigation of this case?
4 A   No. During the investigation of this case, I was with
5      the special assignment unit of the patrol division.
6 Q   Okay. And how did you become involved in this case?
7 A   I was contacted by Officer LaPorte, who was contacted
8      by now Sergeant Bushue and Detective Pernue (ph) of the
9      metropolitan drug enforcement unit stating that they
10     had an informant that we could use to purchase some
11     cocaine. And Officer LaPorte contacted me, this would
12     have been my -- the first time I had actually conducted
13     an investigation utilizing an informant, and -- on my
14     own. And so he contacted me and asked me to sit in
15     with him while he talked to the informant initially,
16     before our first purchase, and then to step into a more
17     in-depth role as the case developed.
18 Q  Okay. So ordinarily there would be one case officer,
19     but in this particular case, would it be fair to say
20     that he was sort of teaching you how to conduct one of
21     these kind of.....
22 A  Yes.
23 Q  Okay. And why don't you just tell -- describe for the
24     members of the jury what your first contact with
25     Mr. Fish was.

**Page 134**

1 A   I believe it was on February 8th at 2000 -- 2001, this
2      year. Mr. Fish came to the front counter of APD, and I
3      went up to -- to meet with him and to talk with him.
4      We took him into a closed interview room and asked him
5      what -- what he could do for us. And he stated that
6      he had a friend that he knew he could buy cocaine from,
7      and that the person's name was Rico. He wasn't sure of
8      his entire name, but he knew him as Rico. And he had
9      another friend who had a phone number of Rico, and he
10     says, I can get that phone number and call him and we
11     can see if we can arrange some sort of drug
12     transaction.
13 Q  Did he do that?
14 A  Yes, he did.
15 Q  Okay. What number did he give you as Rico's number?
16 A  He was given a cell phone number, and I have that
17     number written down in here. It was a number of 727-
18     9465.
19 Q  Okay. And did Mr. Fish make any calls to 727-9465 that
20     day?
21 A  Yes, he did.
22 Q  Okay. And who dialed the number when he called it?
23 A  He dials the number. The -- there's a telephone
24     sitting in front of the -- there's a little table and
25     telephone right there. He sits here. I sit here. He

**Page 135**

1      dials the number. I watch him dial the number.
2 Q   All right. And was that call recorded?
3 A   No, it was not.
4 Q   All right. And is that normal procedure?
5 A   The first time that we make a purchase, the call is not
6      recorded because we have to develop the necessary
7      evidence to obtain a glass warrant in order to recall
8      -- in order to record those conversations.
9 Q   All right. And what happened during that call?
10 A  During the call, Rico stated to Mr. Fish that he was
11     going to be at his residence. He gave the residence of
12     202 Grand Larry.....
13     MR. JAMES: I'm going to object. Hearsay.
14     THE COURT: Just a second.
15     MR. JAMES: It's hearsay.
16     THE COURT: Hearsay objection.
17     MS. BRADY: This is an overview. The witness is going
18 to be.....
19     THE COURT: We'll take a bench conference, please.
20     MS. BRADY: Okay.
21     (Bench conference as follows:)
22     THE COURT: All right. The objection is hearsay?
23     MS. BRADY: I'm sorry. I thought you were directing me
24 to respond.
25     THE COURT: I was, but -- but based on the response, I

**Page 136**

1 thought we ought to take it at bench conference.....
2     MS. BRADY: Okay.
3     THE COURT: .....and that's where we are.
4     MS. BRADY: It's not offered to prove the truth of the
5 matter asserted, Your Honor. This is offered simply to show
6 what the informant was saying, it's -- and it's not offered
7 for the truth.
8     MR. JAMES: I don't think it can be offered for any
9 other reason. I mean, he's saying that this is what we're
10 going to -- this is what's happening. I mean, it is
11 offered for the truth, arguably, I mean, I an understand
12 their argument, but it's not the way the impact is
13 happening.
14     THE COURT: What's the answer going to be?
15     MS. BRADY: I forgot what the question was.
16     THE COURT: What did the officer hear on the other end
17 of the line from Rico?
18     MS. BRADY: No, it's what he heard from -- he could
19 only hear what Fish was saying. He couldn't hear what Rico
20 was saying, so he heard Fish say, do you have a ball, when
21 can we meet, 20 minutes, that kind of thing.
22     THE COURT: All right.
23     MS. BRADY: That's roughly what he's going to say. And
24 then as a result of that, it caused him to take action.
25 They started their procedures. It's just offered to show

3AN-01-1717 CR

1 correctly, was a box. Mr. Fish said the box was his.
2 The patrol officer opened the box. Inside was
3 Mr. Fish's ID, and I believe it was five small bags of
4 cocaine, all individually packaged, along with some --
5 some currency. Mr. Fish denied ownership of the
6 cocaine, but did say that the currency and the ID was
7 his. I took that case and forwarded it to the district
8 attorney's officer for charges of Mr. Fish for
9 possession and distribution of cocaine.
10 Q And as far as you're aware of, that case is still
11 pending?
12 A That is correct.
13 Q Okay. And have you had any occasion to charge Mr. Fish
14 with anything else, or had any further contacts with
15 him, beside that 9 -- that September 5th incident?
16 A I have not had any further contacts, or have charged
17 him within anything else.
18 MS. BRADY: All right. That's all the questions I
19 have.
20 THE COURT: Hold on a second, Mr. James. We're going
21 to go to 1:30, if anybody wants to take a break, maybe now
22 would be a good time to do it. If you're all -- can forge
23 through until 1:30, then we won't take a break. Anybody
24 need a break? Nobody? Okay. Mr. James? That applies to
25 the lawyers too.

Page 161

1 MR. JAMES: Thanks, Judge.
2 THE COURT: Go ahead, Mr. James.
3 MR. JAMES: You weren't looking at me when you said
4 that though, not the first offer.
5 GRANT JOHNSTONE
6 testified as follows on:
7 CROSS EXAMINATION
8 BY MR. JAMES.
9 Q Officer Johnstone, going to the cocaine, let's get that
10 kind of squared away here.
11 A I'm sorry, sir, I can't hear you.
12 Q Excuse me. Going to the cocaine.....
13 A Okay.
14 Q .....September.....
15 A Okay.
16 Q Do recall if that was Officer Cross?
17 A Yes, that is correct, sir.
18 Q Okay. And to your knowledge, after Officer Cross made
19 the stop.....
20 A Uh-huh. (Affirmative)
21 Q .....and discovered the cocaine, who was next on the
22 scene, or did you understand was next on the scene, if
23 anybody?
24 A Without looking at the report, I don't know -- who else
25 had responded. I'm sure Officer Cross had someone else

Page 162

1 respond, but I don't recall who that might have been.
2 Q Do you know if Mr. Fish was arrested?
3 A For that contact, no, he was not arrested.
4 Q Is it -- you've heard -- you were here when Officer
5 Bushue testified, you were sitting -- were you here --
6 sometimes you're in and out, so.....
7 A Was that -- if that's in regards to the marijuana, I
8 had stepped out. I don't remember.
9 Q No, it had to do with someone based upon her experience
10 as a police officer.....
11 A No.
12 Q Well, based upon your experience.....
13 A Okay.
14 Q Okay. You come -- someone with five bags of cocaine,
15 do you arrest them or not arrest him?
16 A I would have arrested him.
17 Q All right.
18 A Which is why I charged him with what.....
19 Q I'm sorry, please?
20 A Which is why I charged him with what I did. When I got
21 the case, I charged him with the possession so --
22 because I would have arrested him on the spot.
23 Q So there is a criminal charge out there that says the
24 State of Alaska versus Jeremy Fish, Count I, possession
25 or -- of cocaine for purpose of distribution.

Page 163

1 A I sent the case to the district attorney, Phil Moberly.
2 I spoke to him on the phone prior to sending it over,
3 and he said to send it over with the charging
4 documents. I don't know what the status of that case
5 is currently.
6 Q Okay. Okay. And that's your letter of September 10th,
7 is that correct?
8 A That is correct.
9 Q All right. You have that in front of you, sir?
10 A I do not.
11 MR. JAMES: Could I have a D, please, Madam clerk?
12 THE CLERK: A D?
13 MR. JAMES: If I may approach? A D, Delta. I'm sorry.
14 Q I'm going to hand you what's marked for identification,
15 and show you.....
16 MR. JAMES: If I may approach, Your Honor?
17 .....what's been marked for identification. Is that a
18 photocopy of the letter you sent with it?
19 A Yes.
20 THE COURT: What's this, exhibit D, is that correct?
21 A Yes.
22 THE COURT: Does it have an exhibit sticker on it?
23 A D, Delta, yes.
24 THE COURT: Thank you.
25 Q Okay. Take a look at it, have you had a chance?

Page 164

1 that I have to search, otherwise, there is a -- a
2 possibility that something might get by.
3 Q  As -- to your knowledge, are there checklists for like
4    DWI and other things to make sure that everything is
5    done, is that correct?
6 A  There have been -- someone within APD has developed a
7    checklist of the field sobriety tests, so as you're
8    doing those tests, you can mark them off.  One of them
9    is fairly extensive, and it's difficult to remember all
10   the clues that you might see.
11 Q  Okay.  And that's just a checks and balance to make
12   sure everything is done, right?
13 A  It's just so that you can remember all the -- all the
14   things that you saw as, you know, for you bail hearing
15   or whatever it might be.
16 Q  Okay.  And you did not do the vehicle searches in this
17   particular -- all of the vehicle searches, correct?
18 A  No, I think I -- if I remember correctly, I only
19   participated in one.
20 Q  All right.  And did you do all of the strip-searches?
21 A  I did the majority.  I think there might have been one
22   where I did not.  But we do have a -- a checklist of
23   what officers did what things after each -- after each
24   -- before and after each transaction, and so I could
25   refer to that and tell you what I did and what I didn't

Page 173

1    do.
2 Q  And do you have that with you?
3 A  I think Ms. Brady is digging it out of the file right
4    now.
5 Q  Okay.  The checklist that you have?
6 A  Right.
7 Q  Now, so do you have certain checklists to make sure
8    certain things are done?
9 A  One of the officers just developed that so that we know
10   what happened, and we've come across a lot of efforts
11   being duplicated.  And so with somebody saying, okay, I
12   did this, and initialing it, we know that it got done.
13 Q  Okay.  And do you do a digital inspection when you do
14   your strip-search?
15 A  I do not insert my finger or anything like that.
16 Q  Okay.
17 A  If that's what you're referring to.
18 Q  That's what I'm referring to.
19 A  Okay.
20 Q  And -- okay.  You took control of the possession of
21   what Jeremy Fish had on the 28th/1st?
22 A  Yes, sir.
23 Q  And you weren't involved -- did not see what happened
24   at the time that -- you watched that vehicle leave
25   the.....

Page 174

1 A  Mr.....
2 Q  .....parking lot?
3 A  Mr. Fish's vehicle?
4 Q  Yes.
5 A  Yes, sir.
6 Q  Okay.  Did you see him get in the vehicle?
7 A  No.
8 Q  So you watched the vehicle, which you rendezvoused up
9    at Shuck's or.....
10 A  Yes.  They advised me that the vehicle was pulling out,
11   at that time, I just jumped on Muldoon and waited for
12   him to pull in front of me, and then I followed him to
13   the Shucks' Auto Supply.
14 Q  Okay.  How far away is that?
15 A  It -- that is at 16th and Muldoon, and the Pancake
16   House is -- or where the -- the other -- Northern China
17   is located at 353 Muldoon.  So it's about 13 -- a
18   little under 13 blocks.
19 Q  Okay.  Did you have him constantly in your view?
20 A  Yes, I did.
21 Q  Okay.  Was there any concern of -- about -- let me
22   withdraw that question.  Approximately how was it from
23   the time that he left the parking lot until you made
24   contact with him and secured what he had, Jeremy Fish?
25 A  One minute, if that.

Page 175

1 Q  Okay.  So -- and then once you had the product.....
2 A  Uh-huh.  (Affirmative)
3 Q  .....did you have physical possession of the product
4    then?
5 A  Yes, I did.
6 Q  Okay.  And so what happened at that particular
7    juncture?
8 A  Then we left from where we were, the other officer, the
9    other people involved were taking care of Mr. Davis and
10   we left.
11 Q  All right.  When you say we.....
12 A  Myself and Jeremy.  I followed him.
13 Q  All right.  So you left in two cars?
14 A  Right.
15 Q  You didn't search him at that point in time?
16 A  I did not search -- strip-search him or the vehicle at
17   that time, no.
18 Q  And at the end, did you -- were the strip-searcher and
19   the searcher of the vehicle at that time, on the
20   28th/1st?
21 A  I was the strip-searcher.  I'll have to refer and see
22   if I actually -- if I scratched the vehicle.  No,
23   Officer Summerset Jones searched the vehicle once we
24   got -- once we returned to APD.
25 Q  And -- but you did the strip-search?

Page 176

3AN-01-1717 CR

State v. Robert Davis
November 14, 2001

1 A  Yes, I did.
2 Q  Now, you also obtained a search warrant for CIPT, which
3     is Cook Inlet, isn't it?
4 A  That is correct, yes, sir.
5 Q  And is it not -- did you have anything to do with the
6     booking process?
7 A  No, sir, I did not.
8 Q  And the search of Cook Inlet.....
9 A  Uh-huh.
10 Q  .....that's a common front for everybody's money,
11     right, as you understand it?
12 A  That is my understand, yes, sir.
13 Q  All right. So if 100 people come into Cook Inlet and
14     they each have X number of dollars on them, it goes
15     into this pot, no one knows whose money is whose,
16     right?
17 A  That's my understanding, yes.
18 Q  So it's kind of like going in the bank and putting in
19     money and withdrawing money, they just.....
20 A  You're not -- you probably won't get the same out.
21 Q  You won't get the same back, okay. And you don't know
22     who put that money in there, do you? I mean, you can
23     subject, but do you know yourself who put the money in
24     there?
25 A  I do not.

Page 177

1 A  Just before midnight, yes.
2 Q  Okay. So you made a photocopy, why didn't you date it
3     right then?
4 A  Because we had a lot of activity going on. We were
5     being very rushed. I made the photocopy, initialed it,
6     put it in our office, locked it, and when I got back,
7     since the buy had occurred on the 1st, I dated the
8     money as the 1st.
9 Q  You were just too busy to photo -- date it as it came
10     off the copy.....
11 A  Well, since -- since we had the buy occur on the 1st,
12     it would create confusion within the channels if the
13     money was photocopied as 02/28, and attached to a buy
14     that was dated March 1st. There would -- that create
15     confusion both with in the channels with the DA, with
16     the person who makes the entry into the system with the
17     -- with the money, and so I dated it as the 3/1 when
18     the buy actually occurred.
19 Q  So I understand, you make a photocopy of the money.....
20 A  Uh-huh.
21 Q  .....on the 28th, you give it to Jeremy Fish on the
22     28th, but so that none of these professional people get
23     confused, you date it the 1st?
24 A  Yes.
25 Q  Okay. Why did you then date it the second?

Page 179

1 Q  All right. When you marked your money, did you -- you
2     know, like banks, they have the powder?
3 A  We don't mark it. All we do is just take the photocopy
4     of the serial numbers.
5 Q  Is there -- what effort is there to put this powder
6     that if you put under an infrared light that shows up
7     that you touched the -- the -- whatever the product is?
8 A  We don't do that.
9 Q  Okay. Is there any effort involved, or do you have any
10     knowledge of it?
11 A  I have no knowledge of that, whatsoever.
12 Q  The judge told me that I could ask about this.....
13 A  Sure.
14 Q  .....and this here. My -- my questions.....
15 A  Uh-huh.
16 Q  .....these are your initials, correct?
17 A  Correct.
18 Q  And it's dated 3/1, right?
19 A  Right.
20 Q  Okay. So that's when you dated this?
21 A  That's when I dated that money, yes.
22 Q  Okay.
23 A  That was the date of the buy.
24 Q  But the money was distributed by you on 2/28, wasn't
25     it, just before midnight?

Page 178

1 A  Date what the second?
2 Q  There's a 3/2 date there.
3 A  Yeah, that's from the clerk of our metro division. She
4     enters all the photocopied money into a single database
5     to track -- APD is given a certain amount of funds, and
6     she enters all that money into a database to track
7     where those funds are going out. And the initials on
8     here are from 3/2. This is Clerk Patty Rhea (ph). It
9     says, entered 3/2/01.....
10 Q  Yeah.
11 A  .....by Patty Rhea (ph), that's when she entered the
12     money into -- as being used into the computer database.
13 Q  Okay. What was the deal you made with Jeremy?
14 A  I didn't make a deal with Jeremy.
15 Q  You were his handler, weren't you?
16 A  That's a -- yeah, I guess you could say that. I was --
17     I was actually under the -- working under the umbrella
18     of Mark LaPorte. Mark was very -- had done this many
19     times. I was -- he was -- I guess you would call him
20     my field training officer in this one. Whatever
21     arrangements he talked to the district attorney about,
22     I -- I am not aware of. He just said, I'm going to
23     have you work with me on this case, and he turned over
24     more of the responsibility to me as the case went
25     along.

Page 180

State v. Robert Davis
November 14, 2001

3AN-01-1717 CR

1 Q    Did you know that Jeremy Fish had pending burglary
2         charges against him?
3 A    Yes, I did know that.
4 Q    Did you inquire as to what was going down there?
5 A    No.
6 Q    You didn't care what you were dealing with?
7 A    I knew that he had pending burglary charges against
8         him.
9 Q    You were the striker for LeBlanc then, you were under
10       his training, is that the idea?
11 A   I was the what?
12 Q   We called them strikers in the Navy, the trainer, you
13       were being trained?
14 A   He was overseeing -- yeah.
15 Q   Okay.  And -- but you're commissioned police officer,
16       you have.....
17 A   That is correct.
18 Q   .....six years under your belt, or five years, whatever
19       it is, so.....
20 A   Yes.  I had -- the reason that he was assisting me with
21       this is I had never worked an informant from start to
22       finish on my own.
23 Q   You have no knowledge of what deal was cut.....
24 MS. BRADY:  Objection, Your Honor, asked and answered.
25 THE COURT:  Sustained.

Page 181

1 MR. JAMES:  All right.
2 Q    Were you interested in what deal was cut?
3 THE COURT:  Objection, asked and answered.
4 MR. JAMES:  I didn't ask that.
5 THE COURT:  Sustained.
6 MR. JAMES:  All right.
7 Q    The -- what did the house at 202 Grand Larry look like?
8 A    I never saw it.
9 Q    Did you ever drive by it?
10 A   No.
11 Q   How do you know that Fish went in there?
12 A   Because the other officers that were there conducting
13       the surveillance of him going into the residence said
14       so on the radio.
15 Q   All right.
16 A   And I called him once while he was inside the house.
17 Q   What number did you call?
18 A   He had a cell phone with him, and I don't remember what
19       that number was.
20 Q   Okay.  What did you talk about?
21 A   I asked him when he was coming out, if he was almost
22       done, and he says, yes, he's on his way out now.
23 Q   All right.  Weren't you concerned about his well being,
24       here you -- APD makes a phone call to somebody that's
25       supposedly in the midst of a buy?

Page 182

1 A    Yes, which is why we put so many officers out there to
2         monitor.
3 MR. JAMES:  Okay.  Your Honor, if I may, could I move
4 exhibit D marked to C rather than D?
5 THE COURT:  You want to change?
6 A    I think he took it back.
7 THE COURT:  You want to change the marking on exhibit D
8 to exhibit C?
9 MR. JAMES:  Yeah, I had some pre-marked, and I'm just
10 going to get this all goofed up if I don't stay with it.
11 THE COURT:  That's fine.
12 MS. BRADY:  I don't object.
13 THE COURT:  That's fine.  It hasn't been admitted, it
14 can be changed from.....
15 MR. JAMES:  No, sir, it hasn't.....
16 THE COURT:  .....D to C.
17 MR. JAMES:  It's right here.  I'm going to cross out D
18 and move in C.  I would ask that this be admitted now.
19 MS. BRADY:  No objection.
20 Q    I'm going to hand you what's been.....
21 THE COURT:  You're offering C?
22 MR. JAMES:  I'm offering C.
23 THE COURT:  And.....
24 MS. BRADY:  I'm not objecting.
25 THE COURT:  C is admitted.

Page 183

1              (Defendant's exhibit C admitted)
2 MR. JAMES:  I moved.....
3 THE COURT:  Okay.
4 THE COURT:  .....C to D and D to C.
5 A    Sure.
6 MR. JAMES:  I just need a couple minutes, or, I mean a
7 moment judge.
8      (Pause)
9 Q    The -- did you field test the product on the 1st?
10 The.....
11 A   March 1st?
12 Q   March 1st.
13 A   I don't think I did any of the field tests.
14 Q   Okay.  What's the procedure, as you understand it, what
15       happens to the contraband, the -- so I can set the
16       stage for you, you receive contraband from somebody or
17       take it from somebody, okay, it's now in a particular
18       officer's possession.  That individual either field
19       tested it themselves or passes it on to somebody, and
20       there's a chain at that particular juncture?
21 A   That is correct.
22 Q   Okay.  At some point in time then, like Officer Bushue
23       talked about, is that consistent on the outside of the
24       manilla envelope that the -- in this particular case, I
25       believe it's 1 and 2 are marked, there's a weight and a

Page 184

**Page 185**

1  time and who -- who handled it?
2 A  Yes, that is correct, sir.
3 Q  Okay. All right. Then -- what happens to it then?
4 A  After it's put into the envelope?
5 Q  Right. I mean, it's -- not it's in a sealed -- if I
6   may approach so we're talking the same -- we've got 1
7   and 2.....
8 A  Yes.
9 Q  .....that have blue marking evidence, apparently
10   they're sealed?
11 A  Correct.
12 Q  Now they look like they're in a -- one of those air
13   suction bags.....
14 A  Uh-huh. (Affirmative)
15 Q  .....that seal it up. Who does that?
16 A  Property and evidence does the -- does the bags. We do
17   the -- brown manilla folder. We do, as officers,
18   we do the evidence tape around the seams, initial it
19   and date it. And then property and evidence, when it
20   comes to them, they seal it into these bags, into the
21   clear plastic bags.
22 Q  Okay. And then what happens to it after property and
23   evidence?
24 A  If there is no lab request that is done to test the
25   product, it is held at our property and evidence

**Page 186**

1   section until the case goes to trial, and at that
2   point, they may request the lab -- the lab to test it.
3   If.....
4 Q  Assume it goes to the lab.
5 A  Then I don't have any idea what happens from that
6   point. I know it goes to the lab, it's tested and it
7   comes back. I don't know what their handling procedure
8   are there.
9 Q  All right. Do you know who -- how it gets from -- you
10   take to it evidence?
11 A  Correct.
12 Q  Okay. Somebody then, and I take it from your
13   testimony, not you or of your group, would take it from
14   wherever it's sealed into evidence.....
15 A  Uh-huh.
16 Q  .....to the next step, which could possibly be the lab?
17 A  The state -- the lab -- yeah, our lab does not test the
18   cocaine, it's the state of Alaska.....
19 Q  I'm talking about the state lab.
20 A  Yeah, right.
21 Q  Do you have any idea -- I mean, do you -- can you tell
22   me who takes it from your evidence to state lab?
23 A  I don't know the person's name, no. I believe it's --
24   they work in -- I believe that the property and
25   evidence technicians do a run, so to speak, over to the

**Page 187**

1   state lab. We send things over there often, and they
2   will take them over and then bring them back, once
3   they're completed testing.
4 Q  Once you put the blue seal on the manilla envelope.....
5 A  Evidence tape.
6 Q  The evidence tape, does that seal that envelope to
7   prevent anybody from accessing it?
8 A  Yes.
9 Q  Do you watch the evidence people put the clear plastic
10   around it?
11 A  No, I've never seen them do that.
12 Q  But you just know it's done because of your experience?
13 A  Yeah.
14 Q  I mean, looking at those two, but it's -- it's the way
15   it happens?
16 A  Right.
17 Q  Okay. All right. And one of those has one gram in it,
18   I think one, and the other has 11.-something grams in
19   it?
20 A  11.8, yes.
21 Q  All right. Those two do not -- those deal with number
22   -- the 8th and the 20th, is that correct?
23 A  Yeah, the one gram is the 8th. The 11.8 is the 20th.
24 Q  20th? All right.
25 A  Yes.

**Page 188**

1 Q  So the 21st and the 22nd are not accountable?
2 A  They're not right here.
3 Q  Right there. Right there. I mean.....
4 A  That's correct.
5 Q  Okay. We haven't seen those yet? Is there a tracking
6   mechanism on those forms, or those manilla sheets that
7   says this piece of evidence, by some type of a number
8   system, matches this piece -- this item that was
9   tested? In other words, do you have like 501217, and
10   that is a particular piece of evidence, and if the lab
11   tests 501217, that should be the same?
12 A  You're talking about the state lab?
13 Q  Yes.
14 A  Okay. When we send the requests to the state lab, we
15   actually fill out the request form with our tag number
16   as -- and I'll use the case of the one from the 20th,
17   we fill out our tag number as 505551 on their lab
18   request form. That form goes with the evidence, it is
19   then returned with the results matching that tag
20   number.
21 Q  Okay. So -- and that should dove -- everything should
22   dovetail then?
23 A  Yes.
24   MR. JAMES: All right. Your Honor, I'm going to be a
25 few more minutes, and I just.....

1  was my first introduction to Mr. Fish.
2  THE COURT: If you don't have anything more than that,
3  Mr. James, the evidence is not relevant to Mr. -- to the
4  detective's credibility, because you haven't shown any
5  suggestion that he knew about the juvenile convictions, and
6  therefore you can't show that he withheld them from the
7  magistrate.
8  MR. JAMES: I -- well, obviously another issue gone
9  upstairs, if we get upstairs. Thank you.
10  THE COURT: Ready for the jury?
11  MR. JAMES: Right.
12  THE COURT: Assuming they're all here. We'll go off
13  record. I'm not sure they're all here, but if the are,
14  we'll get rolling.
15  (Off record)
16  THE COURT: All right. Have a seat, everybody. We are
17  back on record in state versus Davis. We have all of our
18  jurors here, and we have parties and counsel. Good morning,
19  everybody.
20  THE JURY: Good morning.
21  THE COURT: Are you doing all right this morning?
22  Good.
23  UNIDENTIFIED JUROR: Uh-huh. (Affirmative)
24  THE COURT: When we broke yesterday, we had Detective
25  Johnstone in the witness stand. And Mr. James, your cross

Page 210

1 A  Okay.
2 Q  Okay. Just take a quick look at that and see if that's
3  the one that I'm referring to that you're assigned to?
4 A  Yes, sir.
5 Q  Okay. Now, part 12 indicates that assisting Anchorage
6  Police Department at the discretion of the district
7  attorney's office, is that right?
8 A  Yeah, that's correct.
9 Q  Okay. So is it your understanding as to this affidavit
10  that the DA's office was orchestrating Mr. Fish rather
11  than APD as far as any agreements that were being
12  instituted?
13 A  As I had stated yesterday, I am not aware of any of the
14  agreements that were made. All I know is that he was
15  assisting us to -- as it says, to mitigate an
16  outstanding charge. What that mitigation is, I do no
17  know.
18 Q  Okay. Now, yesterday and we discussed, you had certain
19  jobs that you did, correct.....
20 A  That is correct.
21 Q  .....during this entire procedure?
22 A  Yes, sir.
23 Q  All right. And other people had other jobs, right?
24 A  That is correct.
25 Q  Okay. And so everybody had to do their right job

Page 212

1 examination, you want to continue, please?
2  MR. JAMES: Yes, sir. Thank you.
3  GRANT JOHNSTONE
4 previously sworn, called as a witness on behalf of the
5 plaintiff, testified as follows on:
6  CROSS EXAMINATION CONTINUED
7 BY MR. JAMES:
8 Q  Officer Johnstone, just very briefly, sir, yesterday
9  when we left, we were talking about affidavits, do you
10  remember that?
11 A  Yes.
12 Q  Okay. And we had been talking about the March
13  affidavits. All right. Now there was another
14  affidavit that was done by you on February 13th,
15  correct? Does that.....
16 A  Let me check the date to be sure of that. Yes, that is
17  correct, for a glass warrant.
18 Q  Okay. And number 12 of that affidavit.....
19 A  I don't have that one in front of me.
20  MR. JAMES: Okay. If I may approach the bench, please?
21 For the record, Your Honor, I've marked as D for the
22 record.....
23  UNIDENTIFIED VOICE: Okay. Pardon me?
24  MR. JAMES: D as in Delta.
25 Q  Okay. And (indiscernible).

Page 211

1  correctly in order to ensure that as you proceed, the
2  situation developed to the police's satisfaction, is
3  that correct?
4 A  That is correct, yes, sir.
5 Q  Were you -- turning to Grand Larry, which is behind you
6  there.....
7 A  Yes, sir.
8 Q  And I believe you're orange, aren't you?
9 A  I'm.....
10 Q  The color orange?
11 A  Are you talking about on her?
12 Q  Yeah, gold, orange.
13 A  This is Officer Haas here.
14 Q  Oh, okay. Were you a part of the stakeout on Grand
15  Larry?
16 A  When Mr. Fish would turn onto Grand Larry, we would not
17  watch the residence. We would obtain a position
18  usually up in this area and, and actually at one point,
19  I believe were across Muldoon, and allow the other
20  units to conduct the surveillance. Our main function
21  was as he left this area, we were to fall in behind him
22  and follow him back to the station.
23 Q  So you, yourself, and when you say our.....
24 A  Officer LaPorte was with me on.....
25 Q  Okay.

Page 213

**Page 214**

1 A  .....at least one occasion.

2 Q  All right.  You didn't have any view of who could come

3  and go as far as the residence at Grand Larry?

4 A  I did not see anybody.  I could not see the residence

5  on Grand Larry.

6 Q  And if Officer LaPorte was with you, would he be in the

7  same position you would have, as far as observation?

8 A  Yeah, on at least on occasion, neither one of us would

9  have been able to see the residence.

10 Q  Okay.  And is there another occasion where you could?

11 A  No.  We -- I have never -- during -- when -- when the

12  products were purchased from the Grand Larry location,

13  at no point during that did I see the residence.

14 Q  So you have no independent knowledge as to who was

15  there or what Jeremy Fish did while in or out of the

16  residence?

17 A  Just what was heard on the transmission.

18  MR. JAMES:  One moment, please.

19 Q  You indicated that yesterday you took possession on the

20  9th -- excuse me, February 28th/March 1?

21 A  That's correct.

22 Q  Okay.  When was it tested?

23 A  It was tested when we returned to the -- to APD.

24 Q  By you?

25 A  I don't believe I did the field test on that, but let

**Page 215**

1  me refer to my report real quick.  No, it was turned

2  over to Officer Somerset Jones, who conducted the field

3  test.

4 Q  And after you turned it over to Officer Somerset Jones,

5  is that the last contact you had.....

6  THE COURT:  Can you move closer to the mike, Mr. James?

7  MR. JAMES:  I'm sorry.  Again, I apologize.

8  THE COURT:  Thank you.

9 Q  After -- after you turned it over to Officer Somerset

10  Jones.....

11 A  Yes.

12 Q  .....is that the last contact you had with it?

13 A  That I had with the -- with the cocaine?

14 Q  Yeah.

15 A  I may have, after it was weighed and in the package

16  that it is currently in.  I may have looked at the

17  weight of it, but I never handled the actual product

18  from that point on.

19 Q  Okay.  So you have -- yourself, have no personal

20  knowledge whether it was not cocaine?

21 A  I was told.

22 Q  I understand, but.....

23 A  Yeah.

24 Q  .....without hearsay?

25 A  I did not field test.  I did not see the results of the

**Page 216**

1  field test.

2 Q  Okay.  That's all I have.  Oh, wait a minute.  Just a

3  couple more.  Did you field test any of the others?  We

4  know that Bushue, according to her testimony, and I'm

5  not -- but she -- she was involved in the field tests

6  of a couple?

7 A  I don't -- let me refer to all these -- where we did

8  all of this.  I don't believe that I did conduct a

9  field test on these, on the -- Officer -- or Sergeant

10  Bushue conducted one.  Officer Somerset Jones conducted

11  one.  I don't believe that I participated in any of the

12  field tests of the cocaine.

13 Q  So is that fair to say to your own personal knowledge,

14  you don't know whether what was received from Jeremy

15  Fish was, in fact, cocaine?

16 A  I was told that the tests were positive.

17 Q  I understand, but your own personal knowledge, that's

18  what I'm asking.....

19 A  I didn't see the tests.

20 Q  All right.

21 A  You're correct.

22  MR. JAMES:  Thank you, sir.  Thank you.

23  THE COURT:  Redirect, Ms. Brady?

24  GRANT JOHNSTONE

25 testified as follows on:

**Page 217**

1  REDIRECT EXAMINATION

2 BY MS. BRADY:

3 Q  Detective Johnstone, does it frequently occur that

4  police officers don't make arrests in cases, and they

5  send them off to Detectives pending further

6  investigation?

7 A  Quite frequently, yes.

8 Q  Okay.  And I'm going to ask you, what's an ATN?

9 A  It is a -- it is a criminal intake disposition form,

10  which means that we -- it was what the district

11  attorney and the court system needs in order to -- to

12  view all the charges.  We complete ATN's and forward

13  them over to the district attorney's officer, or the

14  municipal prosecutor's office.  When we have cases that

15  we want to charge, we send the ATN over, because they

16  won't screen the case for charging until that is

17  attached to it.  So we send that form out that's all

18  filled out over to them with the charges that we would

19  like to see on this particular person.  They then take

20  it from there with our police reports and -- and the

21  charging documents.

22 Q  Now, is that a single sheet form, or are there several

23  copies, or how -- could you just explain that to the

24  jury?

25 A  It's a multiple -- multiple copy form, and I don't -- I

Multi-Page

State v. Robert Davis
November 15, 2001

3AN-01-1717 CR

1   think there's at least three copies to the form.
2   And.....
3   MR. JAMES: I'm going to object. This is beyond the
4   scope of cross.
5   THE COURT: The objection is overruled.
6 A   It is again sent over and then distributed. I don't --
7   I'm not aware of the distribution channels, but it's a
8   multiple copy form.
9 Q   Do you get a copy back when the case is closed?
10 A   I don't know.
11 Q   Okay.
12 A   I haven't been a detective long enough to get one of
13   those back yet, so.....
14 Q   Okay. Fair enough.
15 A   .....I don't know.
16 Q   And let me just approach with something I have marked
17   state's exhibit 19. Do you recognize this document?
18 A   Yes, I do.
19 Q   Can you explain to the members of the jury what it is?
20 A   This document was developed actually by Officer Mark
21   LaPorte and.....
22 Q   Before you show it to them, we haven't -- we can't show
23   it to them until after it's admitted into evidence.....
24 A   Oh.
25 Q   .....so I just want you to just to.....

Page 218

1 Q   And you didn't initial it?
2 A   That is correct.
3 Q   Okay. Why didn't you initial it?
4 A   I don't know.
5 Q   But you did.....
6 A   I was -- I was -- that actually was Officer LaPorte
7   filled this particular part out and so I don't under --
8   I don't know why it was not initialed.
9 Q   Okay. And -- but all the other places where your name
10   appears and your initials are below it, you did that?
11 A   Yes.
12 Q   Okay. And you indicated that you did those things in
13   your report, is that correct?
14 A   That is correct.
15   MS. BRADY: Okay. At this time, I move to admit
16   state's 19.
17   THE COURT: 19, Mr. James?
18   MR. JAMES: Could I just look at it again, Your Honor?
19   THE COURT: Sure.
20   (Pause)
21   THE COURT: I'm not going to object. I'm not going to
22   object, Your Honor.
23   THE COURT: All right 19 is admitted.
24           (Plaintiff's exhibit 19 admitted)
25 Q   All right. And my final question for you, Detective,

Page 220

1 A   Okay.
2 Q   .....tell me that you recognize what it is.
3 A   I do. It is a buy check-off list form developed by
4   Officer Mark LaPorte for each of the buys, as they
5   progress, there's a spot for the date, who copied the
6   -- the money, who conducted the strip-searches both
7   before and after, who conducted the vehicle search both
8   before and afer, and who did the field test on whatever
9   drug it might have been, and what the results of that
10   test were. The officers write their name in and
11   initial it. And under each one of those is -- under
12   each of the dates of the buy. So you can look at say
13   buy number 1, it has the date, and then the officers'
14   names and initials of who conducted all those tests.
15 Q   And is that the report -- is that the buy checkoff list
16   that was filled out in this case involving Mr. Davis?
17 A   Yes, it is.
18 Q   All right. And I'm going to direct your attention to
19   the last buy, which is February 28th.....
20 A   Uh-huh.
21 Q   .....and it has a place for buy money copied and pre-
22   buy strip-search and post-buy strip search?
23 A   Right.
24 Q   And then it indicates your name for those three items?
25 A   Uh-huh. (Affirmative)

Page 219

1   is one of the maps that Detective Bushue drew, I think
2   it's the Grand Larry map, is -- is -- or is it the
3   Chevron.....
4 A   It's the -- it's the last purchase map, near the China
5   Garden, or whatever the.....
6 Q   All right. What exhibit is that, for the record?
7 A   Excuse me? 24.
8 Q   State's 24?
9 A   Yes.
10 Q   Is north facing the right direction that map?
11 A   No, actually, the arrow that she has indicated as the
12   direction of north, south is actually in this
13   direction, and north would be towards the bottom of the
14   page.
15   MS. BRADY: Thank you. That's all I have.
16   THE COURT: You can step down, Detective. Are you
17   ready with another witness, Ms. Brady?
18   MS. BRADY: I am, Your Honor. Can we approach Your
19   Honor?
20   THE COURT: Yes. We'll take a bench conference,
21   please.
22   (Bench conference as follows:)
23   THE COURT: Ms. Brady, we're at bench conference.
24   MS. BRADY: My next witness is Cam Lampman. I've used
25   her several times before. She's a record's custodian. She

Page 221

| | |
|---|---|
| 1 Q  When you were a juvenile, did you get into criminal | 1 A  Yeah. |
| 2      trouble? | 2 Q  Okay.  Now, let me stop you for just a second.  When |
| 3 A  Yeah. | 3      you were talking to the Nome police officer, did he |
| 4 Q  Were you adjudicated two times as a juvenile of crimes | 4      tell you what you could be charged with as a result of |
| 5      involving dishonesty? | 5      what you had done? |
| 6 A  Yes, I was. | 6 A  I can't remember. |
| 7 Q  Okay.  And did there -- was there a time when you -- | 7 Q  Burglary in the first degree? |
| 8      have you always lived in Anchorage? | 8 A  Right.  Burglary. |
| 9 A  Yeah. | 9 Q  Okay.  And when you got here, did you get arrested? |
| 10 Q Okay.  Did there come a time when you moved away from | 10 A No, I did not. |
| 11      Anchorage? | 11 Q Okay.  How did it come to pass that you ended up being |
| 12 A Yeah. | 12      in contact with APD? |
| 13 Q Where did you move to? | 13 A Well, I have a girlfriend and a baby, and they told me |
| 14 A Nome, Alaska. | 14      -- you know, they got a hold of my girlfriend because |
| 15 Q What did you do in Nome? | 15      my girlfriend's dad is a major, he's a trooper.  And |
| 16 A I worked. | 16      they told him that -- they told me that if I didn't |
| 17 Q How long were you there for? | 17      turn myself in, that they were going to arrest my |
| 18 A Probably about four and a half months. | 18      girlfriend for being an accomplice with me and put my |
| 19 Q Okay.  And you got in trouble in Nome as well, isn't | 19      daughter in DFYS.  So I turned myself in. |
| 20      that right? | 20 Q Okay.  And when you turned yourself in, did you tell |
| 21 A Yes, I did. | 21      anybody that you could -- that you wanted to work on a |
| 22 Q Okay.  Why don't you just explain to the jurors what | 22      deal? |
| 23      you were doing on January 25th of this year, 2001, at | 23 A Well, in Nome, the guy told me that -- what they wanted |
| 24      the AC apartments? | 24      to see was a drug bust in Nome.  And I didn't know |
| 25 A I was -- I was under the influence of alcohol and we | 25      nobody in Nome who dealt with dope.  So I came to where |
| Page 246 | Page 248 |

| | |
|---|---|
| 1      were just -- I was with a couple of other people, and | 1      I knew somebody who dealt with dope.  And I offered to |
| 2      there really -- we were just walking around and | 2      give -- give up some people who sold dope, if I could |
| 3      knocking on doors and I opened this one door, I opened | 3      just go on with my life. |
| 4      the door and there was some money laying on a table, | 4 Q  Did you come -- did you reach an agreement where your |
| 5      $7, I took $7 and I walked out. | 5      Nome burglary case would be dismissed..... |
| 6 Q  Okay.  Now, as a result of that, Nome police officers | 6 A  Right.  Yes. |
| 7      came and contacted you, right? | 7 Q  .....in exchange for making buys here in Anchorage? |
| 8 A  Yes, they did. | 8 A  Yes. |
| 9 Q  Okay.  And what happened when the Nome police officers | 9 Q  Okay.  And was that agreement written down anywhere |
| 10      came and talked to you? | 10      or..... |
| 11 A He came and talked to me, and he told me that the | 11 A No.  It was just a -- it was like a talk, you know. |
| 12      people I was with already told them it was me.  And so | 12 Q Who was the person that you talked with? |
| 13      he asked me, you know, what did I want to do about it. | 13 A I think it was -- like I can't remember, but it was |
| 14      And I -- I told him that I wanted to make grievance, I | 14      police departments. |
| 15      wanted to go back and tell the lady I'm sorry and give | 15 Q And APD officer? |
| 16      her back her seven bucks.  It was -- it was stupid of | 16 A Yeah.  They were special investigators, I believe. |
| 17      me.  And he told me that -- that, you know, I couldn't | 17 Q Was it a many or a woman? |
| 18      go back over there and talk to the lady, that we would | 18 A It was a woman.  The first person I talked to was a |
| 19      have to try to work something out.  And he thought I | 19      woman. |
| 20      knew somebody who sold dope, which is coke or | 20 Q Okay.  And was that Detective Pernue, Pam Pernue? |
| 21      something, in Nome, and I didn't.  That's why I moved | 21 A Yes. |
| 22      away from Anchorage, to get away from all this.  And so | 22 Q Okay.  Now, was Mr. Davis one of the people that you |
| 23      I told him that I -- I did know somebody, and then I | 23      said that you could make buys from? |
| 24      just came back here. | 24 A Yes, it was. |
| 25 Q You left in the middle of the night? | 25 Q Okay.  And when you first started -- when you told the |
| Page 247 | Page 249 |