DISKETTE ENCLOSED

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT

STATE OF ALASKA,                  )
                                  )
                Plaintiff,        )
                                  )
vs                                )
                                  )
ROBERT O. DAVIS,                  )
                                  )
                Defendant.        )
                                  )
                                  )

No. 3AN01-1717 CR

VOLUME I

TRANSCRIPT OF PROCEEDINGS

November 13, 2001 - Pages 2 through Page 168

November 14, 2001 - Pages 169 through Page 325

DISCLAIMER

Transcripts prepared for the Alaska Court System

The Alaska Court System accepted this transcript based on either review of a random sample or without review because the transcriber's prior work has consistently met court system standards. Because it is possible that this transcript may contain some errors, the court system encourages parties to listen to the tapes of critical portions of the proceedings and to bring any significant errors to the ACS Transcript Coordinator's attention immediately.

AURORA COURT REPORTING

Exhibit J — 1

# TABLE OF CONTENTS

TRIAL BY JURY (EXCERPT)                                    PAGE   2

| WITNESSES: | VOL | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | | |
| Kathleen Bushue | I | 170 | 184 | 223 | |
| James Triplett | I | 227 | 231 | | |
| Steven Frank Haas | I | 237 | 249 | | |
| Grant Johnstone | I | 259 | 292 | | |

| EXHIBITS: | | ADMITTED |
|---|---|---|
| FOR THE PLAINTIFF: | | |
| 1 | Baggie of powdered cocaine | 177 |
| 2 | Baggie of powdered cocaine | 178 |
| 8 | Photocopy of buy funds | 240 |
| 11 | Photocopy of buy funds | 324 |
| 23 | Diagram by Kathleen Bushue | 224 |
| 24 | Diagram by Kathleen Bushue | 225 |
| 25 | Diagram by Steven Frank Haas | 247 |
| FOR THE DEFENDANT: | | |
| C | Photocopy of Grant Johnstone's letter of 9-10 | 314 |

AURORA COURT REPORTING

Exhibit J – 2

i

TRIAL BY JURY (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 13, 2001
8:30 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:     KERIANN BRADY
                       Assistant District Attorney
                       310 K Street
                       Suite 300
                       Anchorage, Alaska

FOR THE DEFENDANT:     DENNIS PATRICK JAMES
                       Attorney at Law
                       1500 West 33rd Avenue
                       Suite 100
                       Anchorage, Alaska

AURORA COURT REPORTING

2

---

P R O C E E D I N G S

3AN 42-1659

8:30:08

THE COURT: Any other issues we need to take up or can we get our jury?

MS. BRADY: Just briefly, Your Honor, we had discussed doing openings today. Mr. James and I discussed the 404(b) stuff. I'd like to have that cleared up before we do openings. So what my request would be is to pick a jury. I think it's going to take us about half an hour to hammer out what exactly is allowed in and what is not allowed in. I cannot -- I'm objecting to some of what he's requesting.

THE COURT: All right. Well, we'll see how we do. Mr. James, you have any issues?

MR. JAMES: I've mentioned to Ms. Brady that, on Friday, that I was going to ask the court to compel Mr. Fish to take a urinalysis. And I don't know whether the court's prepared to rule on that. I -- I have reason to believe that he continues to use elicit drugs.

THE COURT: And you're filing.....

MR. JAMES: And I think it's relevant.

THE COURT: .....a motion for me to make a witness take a urinalysis?

MR. JAMES: Yes, Your Honor.

THE COURT: What's the basis for it?

AURORA COURT REPORTING

---

MR. JAMES: Your Honor, it's our information, and it.....

THE COURT: What's the legal basis for it?

MR. JAMES: Well, I think it goes to the credibility, and if the individual is under the influence of any type of drugs, it goes to his ability to testify truthfully.

THE COURT: Would I have the authority in any case then if I thought a witness was taking some substance that might affect their credib -- their ability to observe, to simply order them to comply with the invasive procedure of giving a urinalysis? Is that right? I'm curious about my legal authority to do that.

MR. JAMES: Well, Your Honor, this -- is just a -- is a threshold issue. I think the court has inherit authority to insure that every witness testifies truthfully. The court may want to consider that or give you an opportunity while we're picking the jury here. I don't believe we're going to go any farther today, but that -- with the jury.

THE COURT: All right. Right. I'm not going to hear argument.....

MR. JAMES: And I think.....

THE COURT: You're going to have to show me something that gives me -- Mr. James, because.....

MR. JAMES: I understand.

THE COURT: .....my inclination is is that although you

AURORA COURT REPORTING

4

---

may have the right to cross examine the witness about things which affect his ability to perceive and recall, I likely don't have the legal authority to order that kind of invasive procedure for a witness. So, I'm open to be educated on it, but my inclination is is that I don't have the authority to do that. Even if I had strong evidence that suggested some kind of drug use.

MR. JAMES: I understand, Your Honor. I'm just -- we've got to ask.

THE COURT: I understand. Anything else?

MR. JAMES: Not at this time, sir.

THE COURT: All right. Lawyers.....

MR. JAMES: Do we have a list of the jurors who.....

THE COURT: It will be coming up with the jurors.

MR. JAMES: Oh.

THE COURT: Lawyers, we -- and Mr. Davis, we start at 8:30. Rolling in at 25 til and saying I'm ready isn't -- doesn't cut it. We start at 8:30, which means that you need to be here ready to -- Mr. James, you were here ready to go, but it's kind of like -- this is just kind of a relaxed procedure, we'll get started when everybody is ready, and that's not the way it works. We start at 8:30, on the nose. I'm going to tell the jury to be here ready to go at 8:30 and I'm going to expect the lawyers and Mr. Davis to be here ready to go at 8:30, which means if you have to be here a

AURORA COURT REPORTING

5

little early so you can be ready to go, then you have to be here a little early.

MR. JAMES: Okay. Judge, before we go off the record, or it doesn't matter if it's on record. Mr. Davis' mother and his third party, Mr. Davenport, are present here, and I don't know -- I assume we're going to have a full galley of -- is there any particular place you would -- is it okay if they stay right there where they are?

THE COURT: I have no problem with them sitting.....

MR. JAMES: I mean I don't mind....

THE COURT: .....in the jury box. This is an open proceeding.

MR. JAMES: I understand. I understand.

THE COURT: Anybody associated with the case -- I'm going to tell the jury not to have any contact with anybody that they see associated with the case, and you might want to talk with your -- with people associated with your case about what they can and can't do in terms of talking to the jury, but other than that, they're welcome to sit wherever they want.

MR. JAMES: Okay. And also we'd invoke the exclusionary rule during the trial.

THE COURT: All right. All right, I'll rely on the lawyers to implement that.

MR. JAMES: And I'll explain to the people. I'll

AURORA COURT REPORTING

6

agree to keep their minds open until a verdict is reached. As jurors we want you to be as free as humanly possible from bias, prejudice or sympathy and not be influenced by preconceived ideas either as to what the facts of this case are or what the law is that applies to this case, and that's a long-winded way for me to say that we're going to let the lawyers and my -- I, as well, am going to ask you some questions. The questions aren't designed to pry into your personal affairs. They are designed to discover if you have any particular knowledge about this case or preconceived ideas about this case. I make my living talking in front of large groups of people on -- almost on a daily basis but I'm suspecting most of you don't, and you may be uncomfortable answering some of the questions in front of a large group of people. All you have to do is tell me that we're touching on an area that you believe is private, or we're getting into some area of discomfort. All you have to do is tell me that and we will talk in private. But you have to tell me so that I know. If you tell me, I'll honor that.

Because we're going to ask you some questions we're going to, of course, ask you to be as honest as possible in answering our questions, and I'm going to ask Ms. McKewin, the court clerk, to swear you in.

THE CLERK: Please stand and raise your right hand.

(Oath administered to panel)

AURORA COURT REPORTING

explain to my people.

THE COURT: All right. Let's get the jury.

(Off record)

(Prospective panel present)

THE COURT: Can everybody hear me all right? We'll start with that. How about you folks in the back, are you all right? You have been summoned as prospective jurors in a case entitle State of Alaska versus Robert Davis. I'll tell you a little bit more about the case and introduce the parties in a moment. My name is Judge Hensley. You're in courtroom 402, in case you have to come back, I want you to know where to come. And let me apologize. I know it's very warm in here. I don't know what happened with our cooling system this weekend, but we're working on it, and we have the doors open and it should cool off as we go along, and I'll just apologize that it's a little bit of a steamroom here this morning.

We're going to pick a jury this morning in State versus Robert Davis. This is a very important stage of the trial because both sides have a right to a fair and impartial jury. In this case the jury will be composed of 12 regulars and two alternates. We won't decide who the alternates are until the end of the trial. The parties in this case are entitled to jurors who approach the case with open minds and

AURORA COURT REPORTING

7

THE PANEL: I do.

THE CLERK: Please be seated.

THE COURT: All right. Let me tell you a little bit about the trial and the schedule so that you can answer some of the questions we're going to ask you. The -- first of all, we run our trial day 8:30 to 1:30. We don't take a long lunch break, we take a few short breaks, including one long enough for you to get some food in your system, but we try to do it that way so we can stop at 1:30 and you can go back to your homes or your jobs, your families, at least for part of the day. The trial in this case is scheduled to last about five days, six at the tops. That would be Tuesday, Wednesday, Thursday of this week. Monday, Tuesday of next week, and perhaps Wednesday, although it's not likely. So the schedule is Tuesday, Wednesday, Thursday, 8:30 to 1:30, this week. Monday, Tuesday, 8:30 to 1:30 when you are -- when the case is sent to you for deliberation we would ask you to spend the full day here, 8:00 to 4:30, if you're still deliberating at that time. Just so that you know. I schedule other cases from 1:30 on in the afternoon and on Friday I have a full schedule of other cases that don't involve juries.

Now knowing the schedule, is there anyone here who has an emergency or personal hardship that would absolutely prohibit you from being here during this time that the trial

AURORA COURT REPORTING

Exhibit J − 4

is scheduled? And before you answer the question, I used the term emergency and personal hardship very carefully. I understand that jury service can be inconvenient. It's inconvenient to almost everyone for a myriad of reasons. What I'm curious about now is whether anyone has an absolute emergency or personal hardship that would prevent you from participating as a juror in this trial. If you do, raise your hand and I'll ask you a few more questions about it. And we'll just start from the left, and -- I'm going to ask each person to identify himself for herself, and then I'll ask you a little bit about it. Yes, ma'am? What's your name?

MS. ARMSTRONG: I'm Helen Armstrong.

THE COURT: Okay, Ms. Armstrong.

MS. ARMSTRONG: And I have a trip planned to Mexico on Saturday morning, visit family.

THE COURT: All right. Ms. Armstrong, I'm going to excuse you from this trial. Rather than asking you to call in the rest of the week to participate as a juror in this week what I would like you to do is go back down and talk to the jury clerk and reschedule your jury service when you don't have a trip planned right at the end of the week. Would you do that, please.

MS. ARMSTRONG: Yes.

THE COURT: Does she need to pick up a slip from you?

AURORA COURT REPORTING

10

Ms. McKewin has a slip for you. Next person. Yes, sir? What is your name?

MR. LOCKERY: James Lockery.

THE COURT: All right, Mr. Lockery.

MR. LOCKERY: I've got court myself down in Homer tomorrow.

THE COURT: All right. And you're sure that's going to happen?

MR. LOCKERY: It's supposed to.

THE COURT: All right. The reason I ask is sometimes court proceedings get continued and I just want to make sure that you -- if you're convinced it's going to happen I'll excuse you so you can go to court.

MR. LOCKERY: Well, I've got a -- I'm going to do it telephonically at like 1:00 o'clock.

THE COURT: All right.

MR. LOCKERY: I don't know if it's a problem with you guys or anything like that, but I don't know how long I'll be on the phone or.....

THE COURT: And it's at 1:00 o'clock?

MR. LOCKERY: Yeah.

THE COURT: All right. Mr. Lockery, I think that if you're -- we'll know whether you're selected on the jury before the end of the day today. If you're selected we might just take a break at 1:00 o'clock and let you

AURORA COURT REPORTING

11

participate in your court proceeding by telephone, since you don't have to drive down there. Anybody else with a scheduling problem? Yes, sir? What.....

MR. IVERSON: Potentially if it went through to Wednesday, my son is involved in a court case and there's a pretrial conference Wednesday the 21st.

THE COURT: All right. And what is your name, sir?

MR. IVERSON: Robert Iverson.

THE COURT: Mr. Iverson. All right, I don't think that's going to happen, and we select alternates just in case people develop scheduling problems during the middle of -- or emergencies during the middle of the trial, so -- all right, anybody else? Nobody over here. All right.

Next, I'm going to identify the parties and the witnesses, and we'll tell you a little bit about the case. Please understand that these introductory remarks will tell you a little bit about the case. They're not evidence. They're just trying to give you some information so that you understand what the case is about. If you're selected as a juror in this case you'll make your decision not based on anything that we tell you in these introductory remarks or jury selection, you will make your decision based on what the witnesses who testify up here in the witness stand are sworn to tell to tell the truth, you'll base your informa -- your decision on what they tell you, on documentary or

AURORA COURT REPORTING

12

physical evidence that is actually admitted, on the instructions that I give you regarding the law; and, of course, on with the aid of the lawyers who will make arguments and suggestions to you, but our introductory remarks are just to kind of help you along to figure out what's going on. So we'll start with introductions.

The state is represented by Ms. Brady, assistant district attorney. Ms. Brady, would you like to introduce yourself and who is sitting with you?

MS. BRADY: Yes, I would, Your Honor. My name is Keri Brady, I'm an assistant district attorney, and I'm representing the state in this case. My case officer, Grant Johnstone, an APD officer, is seated next to me.

THE COURT: Thank you, Ms. Brady. And Mr. Davis is represented by Mr. James. Mr. James, you could introduce yourself and your client.

MR. JAMES: Thank you. I'm Pat James, and this is Robert Davis.

THE COURT: I see we have a list of potential witnesses or the names of people who might be mentioned during trial. Ms. Brady, maybe you could read that off. Pay attention to this because I'm going to ask you some questions about this in a minute, folks.

MS. BRADY: The names of the witnesses and people who may be mentioned in this trial are APD officers Mark LaPort,

AURORA COURT REPORTING

13

Grant Johnstone, Roy LaBlanc, Summerset Jones, Steve Haas, Kathy Bushue, and Carolyn Stevens. There's a criminalist by the name of Jane Booth. Civilians by the names of Jeremy Fish and Kim Lamphem(ph). And DOC personnel named Davenport and Gonzales.

THE COURT: All right. Next I'm going to read the charges in this case. The charges are called the indictment, but before I read them I want you to understand that the indictment is just the charging document in the case, it's a mere accusation against the defendant, Mr. Davis. It's not evidence of guilt of the defendant, and don't -- you shouldn't permit yourself to be influenced to any extent against the defendant merely because of the filing of charges.

Count I alleges that on or about February 8, 2001 at or near Anchorage, in the Third Judicial District, State of Alaska, Robert O. Davis knowingly manufactured or delivered any amount of a schedule 2-A or 3-A controlled substance, cocaine.

Count II, that on or about February 20, 2001 at or near Anchorage in the Third Judicial District, State of Alaska, Robert O. Davis knowingly manufactured or delivered any amount of a schedule 2-A or 3-A controlled substance, cocaine.

Count III, that on or about February 21, 2001 Robert O.

character that after consideration you would be willing to rely and act upon it without hesitation in your important affairs.

A defendant is never to be convicted on mere suspicion or conjecture. The burden of proving the defendant guilty beyond a reasonable doubt always rests with the prosecution. This burden never shifts throughout the trial for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. A defendant has the absolute right not to testify and you must not draw any inference against the defendant for not testify. Thus a reasonable doubt may arise not only from the evidence produced but also from a lack of evidence, since the burden is upon the prosecution to prove every essential element of the crime charged beyond a reasonable doubt. A defendant has the right to rely upon the failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross examination of witnesses for the prosecution.

I need to ask you a few questions. Raise your hand if the answer is yes. Is there any of you who is not a citizen of the United States? No hands. Is there any one of you who is not a resident of the state of Alaska? No hands. I there any one of you who is not at least 18 years of age? No hands. Is there any one of you who is not in possession

Davis knowingly manufactured or delivered cocaine.

Count IV, that on or about March 1, 2001 Robert O. Davis knowingly manufactured or delivered cocaine.

These are the charges, and to these charges Mr. Davis has entered a plea of not guilty. This is a criminal trial and I want to tell you some things about that which are very important. The distinguishing features of a criminal trial are what are known in the language of the law as the presumption of innocence and the burden of proof beyond a reasonable doubt. The law presumes a defendant to be innocent of crime, thus a defendant, although accused, begins the trial with a clean slate, with no evidence favoring conviction. The presumption of innocence alone is sufficient to acquit a defendant unless you are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

This last mentioned requirement that you be satisfied beyond a reasonable doubt of the defendant's guilt is what is called the burden of proof. It is not required that the prosecution prove guilt beyond all possible doubt for it is rarely possible to prove anything to an absolute certainty. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense. Proof beyond a reasonable doubt must be proof of such a convincing

of a sound mind? A few chuckles, but no hands. Is there any one of you who has difficulty with other faculties? Seeing, hearing, the other natural faculties? Yes, ma'am?

MS. LISENBEE: I have a little bit of problem with my eyes. I'm blind in one eye.

THE COURT: All right. What is your name, ma'am?

MS. LISENBEE: Stella Lisenbee.

THE COURT: All right. And I don't know what the evidence is going to be in this case. Maybe some papers, maybe some physical things. As long as you're able.....

MS. LISENBEE: As long as it's close enough and I have my glasses on it shouldn't be a problem.

THE COURT: All right. That was going to be my question. So, anybody -- we try to accommodate everybody, so anybody else? All right. Is there any one of you who has difficulties with speaking or understanding the English language? Any one of you who has ever been convicted of a felony and not unconditionally discharged? Is there any one of you who has served as a member of a jury within the last one year? No hands. Is there any one of you who is related to any of the parties or witnesses in the case? That would include the names of the people up on the board here. Yes sir?

MR. WORTMAN: My name is Bill Wortman. I don't know how far you do the relationship, but my wife was married to

Exhibit J – 6

Kathy Bushue's brother.

THE COURT: Is? Was?

MR. WORTMAN: Was.

THE COURT: Was. That's correct.

MR. WORTMAN: Yeah.

THE COURT: All right. Okay. And you're Mr. Wortman?

MR. WORTMAN: Yes.

THE COURT: Okay, thank you, sir. Is there any one of you who is employed by any of the parties or witnesses in this case? If you're employed by the State of Alaska then the -- there would be a yes answer. If you were employed by the Department of Public Safety or the Department of Law. All right. Is there any one of who otherwise know any of the parties or witnesses in the case? Yes, ma'am? Your name?

MS. NYBACK: Terry Nyback.

THE COURT: All right, Ms. Nyback.

MS. NYBACK: Steve Haas is married to the daughter of people who used to be our neighbors.

THE COURT: All right. Thank you. What we're doing is kind of identifying issues that the lawyers may want to follow up with you all later, so that's why I'm asking many of these questions. Anybody else? Is there any one of you who knows any of the attorneys involved in the case? Yes, sir.

MR. HUGHES: James Hughes. I may have known Pat James way in the past. Drum and Bugle Corps, West High.

THE COURT: All right, Mr. Hughes, thank you. Anybody else? We learn a lot of interesting things during these trials. Is there any one of you who has been involved in a lawsuit or court matter where you were on the same side or the other side of any of the lawyers in the case? No hands. Is there any one of you who knows anything or has heard anything or read anything about this case other than what you just found out this morning? No hands. Is there any one of you who has religious scruples against serving as a juror regardless of what the case may be? And based upon what little you know about this case is there any one of you who has a reason why you feel you could not be fair and impartial in this case? All right. The next step in the process is we're going to call 18 names and ask you all the fill in the jury box. I know it's hot and I think what I'll do is take a few more breaks than normal if -- but you're also free to get up if you're not sitting up -- if your name isn't called for sitting up here you're also free to step out for a few minutes just to get a drink of water or a little fresh air. And if somebody is really uncomfortable and I need to give you a break all you have to do is let me know. I want to make you as comfortable as we can under the circumstances. So when your name is called, please come up

and have a seat and I'll point out where you should sit.

9:13:44

(Clerk calls 18 jurors)

9:19:04

THE COURT: All right. The next step in the process is I'm going to ask each of you -- you want to give me a hand with that? To answer the questions on the board. I want you to remember both as to these questions and the questions that the lawyers will be asking you in a moment there aren't any absolute right or wrong answers. Honest answers are the best ones that we can get. And Ms. Randall, can you give me a -- or Ms. Wangstrom, you're -- if you squeeze the bottom, the black part there, the mike will come loose and if you would hand that down to Mr. Musgrave. The last thing I want to tell you is I have to record everything we're doing, so if you all will help me with the mike to make sure I get that done I really appreciate it. Mr. Musgrave, can you see the board?

MR. MUSGRAVE: You just want me to go through that?

THE COURT: Yes, sir, just answer them for us, please.

MR. MUSGRAVE: My name is Robert Musgrave, I live in the Midtown neighborhood at 15th and G Street. I work in photography, I do part-time work as video technician with the Anchorage School District. I have two children, both daughters, one is 34, the other is 26. I was born and

raised in Des Moines, Iowa. Oh, a lot of hobbies and interests. Outdoor, firearms shooting, family, reading, church work. Number 7, I cannot remember -- member of your family -- I do not believe that I have any history of that. I have served on a jury here in Anchorage several times. Well before a year ago. Cannot think of any reason why I should not serve, and do not know anyone in the trial.

THE COURT: All right, thank you, Mr. Musgrave. Before we ask Ms. Krathwohl, for those of you whose names were not selected -- this is -- it's really helpful to follow along and pay attention. You may be picked if somebody is excused, and one of the things that happens is that we often ask you whether you've heard all the other questions, so first of all, you have to stick around and it helps if you kind of follow along. Go ahead.

MS. KRATHWOHL: My name is Jackie Krathwohl, I live in Foxwood Condominiums.

THE COURT: Would you spell that for me?

MS. KRATHWOHL: Foxwood? Or Krathwohl?

THE COURT: No, you're last name.

MS. KRATHWOHL: K-r-a-t-h-w-o-h-l.

THE COURT: Krathwohl.

MS. KRATHWOHL: Krathwohl.

THE COURT: All right.

MS. KRATHWOHL: I'm retired. I have one daughter who

Exhibit J – 7

is 37. I was born in Hale, Michigan. My hobbies are fishing, hiking and church work. No to number 7; yes, to number 8. Number 9, I have a problem remembering. I had a stroke about four years ago and a couple of seizures after that, so my memory is a little bad, but other than that I'm okay. And.....

THE COURT: Are -- Ms. Krathwohl, is it all right if the lawyers follow up and ask you questions about that? And if so.....

MS. KRATHWOHL: Sure.

THE COURT: Can we do it in private or do you mind talking about it?

MS. KRATHWOHL: No, that's fine.

THE COURT: All right. Do you -- if you have to participate in a jury trial that requires you to remember things that happen, if you make a decision next week you have to remember what happened this week. Is that going to be a problem?

MS. KRATHWOHL: Possibly. And number 10 is no.

THE COURT: I think -- let's get back to Ms. Krathwohl. I -- the ultimate question is whether you think you'll be able to do that. If you're not sure, then the next question is whether you think you would be -- it would be a good idea to be on a jury that lasts for a couple of weeks? Some juries last for three or four weeks, some jury trials last

AURORA COURT REPORTING

22

THE COURT: All right, thank you. Ms. Williams.

MS. WILLIAMS: Good morning. My name is Cessilye Williams, I live in the South Anchorage area, close to Abbott. Currently I'm unemployed by the Anchorage School District as the assistant Principal at Hanshew Middle School. I am married. My spouse is in the Air Force, out on Elmendorf. I have two children, ages six and 12. I was born in Abilene, Texas, and my hobbies are lots of art, lot of kids, lots of community service projects. I have not been involved in any lawsuit, I've not served on a jury, an I don't -- cannot think of any reason why I could not serve and I do not know anyone that's involved in this trial.

THE COURT: Yes, ma'am. Ms. Wangstrom?

MS. WANGSTROM: I forgot to tell you what my husband does.

THE COURT: All right. Why don't you give her the mik back.

MS. WANGSTROM: I'm sorry, I forgot that. My husband is Pare(ph) Wangstrom, and he's an engineer.

THE COURT: All right, thank you. And let's go to Ms Nyback now.

MS. NYBACK: My name is Karen Nyback, I live in Eagle River. I am a nurse, just retired in May. Doing some fill in work at a doctor's office. My husband works -- is Al, and he retired from civil service. I have two children, 3

AURORA COURT REPORTING

for two or three days, but the question is whether you think that you could serve on a jury that requires you to come back next week and remember and sort out things that happened this week?

MS. KRATHWOHL: I'm not sure.

THE COURT: All right. Okay.

MS. KRATHWOHL: Some things I remember well and some things I don't.

THE COURT: All right. Go ahead.

MS. RANDALL: My name is Nicole Randall, I live off of Dimond and Minnesota. My occupation, I'm a receptionist. My husband is Tom. He's a carpenter. We have two children. Their ages are 13 and ten. I was born here in Anchorage, raised in Kotzebue, Alaska. Hobbies, crafts, beadwork, sewing. My husband had a few DUI's, on number 7. Yes, I've served jury duty in Kotzebue, number 8. Number 9, no, I don't have reason. And number 10, no, I don't know anyone.

THE COURT: All right, thank you. Ms. Wangstrom.

MS. WANGSTROM: My name is Theresa Wangstrom, I live South Anchorage, off of Huffman. I'm a Montessori teacher. Was director of Anchorage Montessori School, I'm now retired from that. Bookkeeper employed by myself. Two children, ages three and 13. I was born in Seattle, Washington and have lived here since '77. I like to travel, sew, quilt. No to number 7. Yes to number 8. No and no.

AURORA COURT REPORTING

2

and 30. Born in Spokane, Washington and raised there. I a sewing person and a quilter and outdoor interests. We'v never been involved in any lawsuits, I have served on a ju before. No reason not to serve, and I did mention the person I do -- I know Steve.

THE COURT: Thank you, ma'am. Mr. Sura.

MR. SURA: My name is Frederick Sura, I live in South Anchorage, off DeArmoun, work at Chugach Electric, I'm a journeyman lineman and commercial meterman. I have two children, two and a half and two months old. I was born i Columbus, Ohio. I fish and play handball. I was in a sma real estate lawsuit about five years ago. I've never serv on a jury, and there's no reasons why I can't serve on a jury and I don't know anyone in this trial.

THE COURT: Thank you, Mr. Sura. Now if you would al help me we're going to get the mike back to Mr. Lockery wh is over here on the right. My right anyway. Go ahead.

MR. LOCKERY: James Lockery. I live on Arctic and Tudor, trailer court there. I'm not employed. Usually w in the commercial fishing industry, no children. Born in Germany, raised in Connecticut and Arizona. Hunt, trap, fish. I've been in court before on the other side of the table. No, I haven't served on a jury before and don't k why I shouldn't be able to serve on jury, and I don't thi I know anyone in this trial.

AURORA COURT REPORTING

Exhibit J — 8

THE COURT: All right, thank you, Mr. Lockery. Ms. Lisenbee.

MS. LISENBEE: My name is Stella Lisenbee, I live in Midtown. My occupation, I work at Alaska Pacific University in the Registrar's office. My husband, his name is Jerry, he works at the Sheraton Hotel. He's the chief engineer there. We have no children. Let's see. My hobbies are I'm -- I sew, I cook, I do beadwork, I fish. No, I've not been to court and I -- I have served on a jury before. Oh, I forgot. I was born in Castle, Germany, and I was raised in Ohio. And number 9 and ten, the answer is no.

THE COURT: Okay, thanks, ma'am. Mr. Hughes.

MR. HUGHES: My name is James Hughes, I live in West Anchorage. West 35th Avenue. My occupation is a manager/cashier at a service station. I'm not married and have no children. I was born in Boise, Idaho, raised in Anchorage. Hobbies are reading and music. I have not been involved in a lawsuit or come to court. I have never served on a jury. There's no reason that I cannot serve on this jury, and I indicated I knew Mr. James.

THE COURT: All right, thank you. Ms. Lazur.

MS. LAZUR: My name is Louise Lazur, I live in the Sand Lake area. I'm vice president of administration at the Anchorage Convention and Visitors Bureau. My husband, Richard, is a clinical psychologist. We have no children.

26

I was born and raised in Boston, and my hobbies and interests are community service, reading, travel, socializing with our friends. Never been involved in a lawsuit. I have served on jury maybe 12 years ago. There's no reason why I should not serve, and I know no one involved in this trial.

THE COURT: Thank you, ma'am. Mr. Hartner.

MR. HARTNER: John Hartner, live in Eagle River. I'm a geologist for an oil and gas company in town here. My wife's name is Dale Sheraton, she's unemployed, no children. I was born and raised -- born in Detroit, Michigan, raised in Michigan. I move around a lot with my occupation. Fishing and home improvement are my hobbies, a little bit of furniture repair. I haven't been involved in any court situations, never served on a jury. I can't think of a reason why I can't serve on this one, and I don't know anyone involved in this trial.

THE COURT: All right, thank you, sir. And now we'll get the mike back to Mr. Dorsey, please.

MR. DORSEY: My name is David Dorsey, I live in Midtown, off of 15th and A. I'm retired Air Force. I'm presently a sales manager for a locally owned automotive parts distributor. My wife's name is Ruth. She's a service writer at a car dealership. I have three children. They're 14, 17 and 20. I was born and raised in Maryland. My

27

hobbies are fishing, hunting, snowmobiling, bicycling. I do not know if anybody has been in a lawsuit. I know I haven't. I've never served on a jury, this is as far as I've ever made it, and I know of no reason why I shouldn't, and I don't know anyone that's involved.

THE COURT: Thank you. Mr. Holmes.

MR. HOLMES: Good morning. I'm Dave Holmes, I live in Eagle River. I'm also retired Air Force and currently work for the Federal Aviation Administration as a budget analyst. My wife is Savanah, and she also works for FAA. We have no children, but I have two daughters from a previous marriage. They're about 27 and 21. I was born and raised in West Virginia, traveled around the country from that point. My hobbies are running and I'm a volunteer with the American Cancer Society. No lawsuit or had to come to court before. I've served on a jury several times, and I have no reason that I couldn't serve on this one, and I don't know anyone in this particular trial.

THE COURT: All right, thank you, Mr. Holmes. Mr. Tognetti, I understand from the clerk that you're having difficulty seeing the board from where you're sitting?

MR. TOGNETTI: No, I have dyslexia.

THE COURT: All right.

MR. TOGNETTI: So my reading is really bad.

THE COURT: Do you want me to read the questions to

28

you?

MR. TOGNETTI: I pretty much remember it from listening here.

THE COURT: Okay.

MR. TOGNETTI: My name is Todd Tognetti, I live off Boniface. I'm a framer. Let's see, the next one. I have five daughters, ranges from sixes to 14. I've had to come to court in the past, own personal reasons. No, I've never served on a jury. Didn't -- number 9, I have dyslexia so that's why I'm kind of curious. And number 10, no, I don't know anybody.

THE COURT: Mr. Tognetti, you said you had your own personal reasons for coming to court. If somebody wanted to ask you about that should we do that in private?

MR. TOGNETTI: Yeah, please.

THE COURT: All right. And dyslexia doesn't disqualify people from being on juries.....

MR. TOGNETTI: No.

THE COURT: .....unless there's a massive amount of reading, and I don't think that's going to be the case.

MR. TOGNETTI: Yeah, that's what I figured.

THE COURT: All right.

MS. GARRETT: Yes, my name is Leone Garrett, I live in Midtown, 36th and McGinnis area. I am retired Air Force. My husband is also retired, engineer with DOT. I have no

29

Exhibit J – 9

children but I do have three stepchildren, they're in their
40's. I was born and raised in Wisconsin. I enjoy bridge,
reading, do church work and other volunteer work. I have
never been involved in a lawsuit, however, my youngest
stepson, who lives in Oregon, has served time in prison. I
have served on a jury several times. I don't see any reason
why I shouldn't serve on this one, and I don't know anyone
involved in this trial.

THE COURT: All right, thank you, Ms. Garrett. And
you're Ms. Thorpe?

MS. THORPE: I am. My name is Stacey Thorpe, I live in
Eagle River, I am a special ed teacher assistant with the
Anchorage School District for the past 16 years. My husband
is a retired assistant principal with the district, and he
is currently a photography manager for Life Touch Studios.
I have two children, ages nine and 14. Born and raised in
Seattle, Washington. Hobbies, interests, organizations,
children, church and community service. I have never been
involved in a lawsuit, nor has my family. I have served on
a jury before. I see no reason why I shouldn't serve on
this jury, nor do I know anyone involved in this trial.

THE COURT: Thank you. Ms. Kocsis.

MS. KOCSIS: Good morning. My name is Gloria Kocsis, I
live in the Muldoon area. I am a (indiscernible) with the
Anchorage School District. I used to work for three and a

half years and I worked at the prosecutor's office, and four
years at the attorney general's office. My husband's name
is James and he is an airport safety police. I have two
children, ages 19 and a half and 20. I was born and raised
in the Philippines. My hobbies are camping, fishing,
gardening, sewing. My husband and I were involved in a
lawsuit, real estate in which we were the plaintiffs. I've
never served on a jury. I don't see any reason why I
shouldn't serve on the jury. And working at the AG's
office, I don't know the defense attorney personally, but I
think I've seen him over there occasionally.

THE COURT: All right. Thank you very much. All
right, the next step in the process is the lawyers are going
to have an opportunity to ask you questions. They'll have
about 45 minutes each to talk with you as a group, and Ms.
Brady will get to go first. And I'll ask the lawyers to
stay away from issues that folks want to talk about in
private and we'll do that at the end of the period of time
rather than in the middle. I'll give you your chance, but
we'll do it at the very end. Ms. Brady, are you ready?

MS. BRADY: I am, Your Honor. All right. Keeping in
mind that the more you talk the more likely it is that you
won't get picked on the jury, so if you're trying to get
out, this is your big opportunity. I just want to ask you
guys a few questions, sort of generally about drug cases.

You heard the indictment, this is a drug case. Does anybody
think that -- have any strong feelings about whether or not
the state should be prosecuting drug cases or anything about
the legality of drugs, anything along those lines? Yes?

THE COURT: Hold on a second. Ms. Wangstrom, you're
going to be the microphone monitor, and this is going to
even be a harder test now because we're going to have to
pass it around, and I'll really appreciate it if you'll help
me. And you are Mr. Harter?

VOIR DIRE OF JOHN HARTNER

BY MS. BRADY:

A    Hartner, yes.

THE COURT: Go ahead.

A    My political views tend toward the Libertarian,
and I think as long as someone is doing what
they're doing in their own home it's their
business and I do think some of the drug laws are
too strict. Sometimes the punishment is worse
than the crime.

Q    Okay, fair enough. Let me just explore that a
little bit though for a second. So if you -- if
say selling drugs -- do you have different views
about different kinds of drugs, or, you know, are
you talking about marijuana or do you think just
all drugs?

A    Yeah, obviously marijuana isn't as big a problem
as some other drugs. I'm not sure that I've
formulated and decided on several of the I guess
more dangerous drugs. But I don't know.....

Q    How about crack?

A    I don't really know enough about that. I'm not --
haven't had any experience with it. I only know
what I read in the papers. I would like to say
though, I mean the laws are the laws, and if the
situation is is that, you know, we're here
deciding on what laws are on the books.....

Q    Uh-huh (affirmative).

A    That's different than my personal opinions. I'm
not -- I'm not saying -- telling you that I would
break the laws, or whatever, if that's what the
laws are at this time, that's fine.

Q    Okay. Do you see a difference in culpability
between someone who is say in their own home using
some sort of drug and out selling that drug?

A    Yes, I see a difference.

Q    Okay.

MS. BRADY: Anybody else have any opinions that are
maybe different than Mr. Harter's? No. Nobody wants to
volunteer. If you don't volunteer I have to pick someone.
Okay. How about Ms. Randall.

Exhibit J – 10

VOIR DIRE OF NICOLE RANDALL

BY MS. BRADY:

A   What was the question?

Q   Is there -- this is a drug case, and I just want
to know if anybody has any strong feelings about
whether or not the state should be prosecuting
drug cases or anything along those lines?

A   Yes, they should be prosecuting them.

Q   Okay.

MS. BRADY:  Does anybody else have any sort of
different opinions about that?  Okay, I don't see any hands,
so we'll just go on.  Now let me ask you ask you guys about
the use of confidential informers.  Does anybody have any
ideas about maybe what a confidential informer would be
like?  What kinds of people they are?  Does anybody have any
strong feelings about the police using confidential
informers?  Okay.  How about, Ms. Wangstrom.

VOIR DIRE OF THERESA WANGSTROM

BY MS. BRADY:

A   I'm the keeper of the mike, yes.

Q   Can you think of any reasons why the police would
use confidential informers?

A   I haven't pondered it, but to gather information I
would guess.

Q   Do you think that if you're a police officer -- I

AURORA COURT REPORTING

34

---

VOIR DIRE OF CESSILYE WILLIAMS

BY MS. BRADY:

Q   What about you?  If you were a drug dealer would
you sell drugs to Officer Johnstone sitting there?

A   Now if I were a drug dealer, right?

Q   Right.

A   Okay.

Q   This is total hypothetical.

A   Really, basically it -- it -- it's not a
determinant as far as what you have on, because it
-- it crosses the span.  People have on suits,
people who are attorneys, people who are lawyers,
people who have no jobs, some job, any kind of
job, it's not based on, you know, ethnicity, it's
not based on what you wear, your job.  Lots of
people purchase drugs for lots of different
reasons, so I can't -- yeah, I mean -- yeah, if he
would buy it and he had the money.  I mean, you
know.

Q   So the major criteria would be if somebody came up
to you with money?

A   Yeah.

Q   Okay, fair enough.  Do you think that officers
sometimes use confidential informants because they
know who to go to and they're already sort of

AURORA COURT REPORTING

36

---

mean if you were a drug dealer, that you would
sell drugs to Officer Johnstone sitting over
there?  Does he look like the type -- kind of
person that would be a drug user?

A   Let's see.

THE COURT:  There are no right or wrong answers.

A   Right.  I figure that if I'm a drug dealer my goal
is to sell drugs, so if he comes and asks me for
drugs then, yeah, I'm going to sell them to him.

Q   Would you be suspicious of him sitting there
looking the way he does in his suit that he came
to purchase drugs from you?

A   Well, if he's a good undercover person he's not
going to look like that.

Q   Okay.  Okay.

A   He's probably going.....

Q   Good.  So you think he'd be dressed different?

UNIDENTIFIED:  Street clothes.

A   Probably.

Q   Okay.

A   But also if my main goal is to sell drugs, you
know, I'm going to sell drugs to somebody that
would ask me for it, I suppose.

Q   Okay.

MS. BRADY:  Ms. Williams?

AURORA COURT REPORTING

35

---

involved in the criminal milieu, and that would
give them an advantage?

A   I don't know if it's so much an advantage or not,
it's just your ears that are out there.  You know,
police officers can't be everywhere at all times.
I think they are very -- they're good people that
are out there.  Not that they're good or bad, but
there are people that are out there who have
issues with people who break the law, you know.
And when they come across that information, you
know, for whatever reason, they share that.  And
so once they share it, then I think it's an
obligation by our police department to follow up
on that, and if they find information that's there
then they've incriminated themselves by having
whatever substance that's there.

Q   All right.

MS. BRADY:  Does anybody have any different ideas about
this or have an opinion they want to share?  If I get to
something that you have a really strong opinion about it,
then please share your opinion with me.  I'm trying to do
less talking and encourage you to do more talking.  Nobody
wants to volunteer?  Okay.  Then let's go ahead and go to
Ms. Williams.

A   That's me.

AURORA COURT REPORTING

37

Exhibit J – 11

MS. BRADY: I mean Ms. Nyback.

VOIR DIRE OF KAREN NYBACK

BY MS. BRADY:

Q   Ms. Nyback, how -- what would you look for to tell
if someone was lying? What are some of the things
that you would look for?

A   Oh, dear. Well, I -- I would think their
reputation, first of all. How they've reacted in
different situations. What people -- other people
know about them.

Q   Would it matter to you if they were looking you in
the face or would you be looking for things like
that?

A   I think you can tell a lot when people are talking
to you directly.

Q   By the person's demeanor?

A   Uh-huh (affirmative).

Q   Okay.

MS. BRADY: And, Mr. Sura.

VOIR DIRE OF FREDERICK SURA

BY MS. BRADY:

Q   Have you ever had to decide between two sides of a
story?

A   Oh, yes.

Q   You have children?

AURORA COURT REPORTING

38

now that I'm older and I've seen what it does to
children and other people, I think the laws aren't
strong enough on drug people. I think they get
out of jail too quickly, because the jails are
full. And I think that they need to go to jail
for that.

Q   All right, now let me ask you this. You sound
like you have a very strong opinion about that.

A   I do.

Q   Okay. Is that going to make you not be able to be
fair in this case to somebody who is -- like Mr.
Davis is just charged. I have the burden of
proof, so if I don't make my burden of proof are
you going to be able to acquit Mr. Davis?

A   Yes, I think so.

Q   Okay. You can be fair?

A   I'm a pretty fair judge of -- of people, and I
will listen to all the -- all this -- everything
that comes through and make my decision from that.

Q   Okay.

MS. BRADY: And Mr. Tognetti, I think you had
something, too.

VOIR DIRE OF TODD TOGNETTI

BY MS. BRADY:

A   If I'm not mistaken you remarked to if I had any

AURORA COURT REPORTING

4

A   Oh, yes, two.

Q   Okay. Parents are usually very experienced at
that. How do you tell when -- which side to
believe? When you have two conflicting versions,
how do you -- what's some of the things you look
for?

A   Well, I guess it depends on the situation, but I
found a lot of times -- well, in some certain
situations the first guy that comes -- person that
comes complaining is usually in the wrong, but,
you know, I just have to evaluate the situation,
go from there.

Q   Okay.

MS. BRADY: Does anybody have themselves or a family
member that's been involved in any kind of drugs or drug
use, or anything along those lines? And -- okay, now if we
get to an area where you want to go to the back, just tell
me, and we can save this for when we go to the back. Okay.
And you are? Ms. Lisenbee, if you could pass the microphone
to Ms. Lisenbee, please.

VOIR DIRE OF STELLA LISENBEE

BY MS. BRADY:

A   When I was a young girl, teenager, many, many
years ago, I used to do drugs. Not hard-core
drugs, but I did acid and stuff like that. And

AURORA COURT REPORTING

39

dealings with somebody that's had this kind of a
problem in the past.

Q   Right.

A   Yes, my ex.

Q   Uh-huh (affirmative). Okay. And so your ex was
somebody who was using drugs?

A   Yes.

Q   Is that.....

A   And I had a really bad time about it, had to go
for custody of my daughter, got some really strong
feelings towards people that use crack.

Q   Okay. Is that something that would maybe make you
-- if -- this is a case about crack sales.

A   Uh-huh (affirmative).

Q   About somebody selling crack. So is that
something that might make you feel -- you feel so
very strongly about it that you wouldn't be able
to be fair in this case?

A   I think it would be pretty hard for me.

Q   Okay.

MS. BRADY: Okay. And does anybody else, for that sam
question, you or your -- any member of your family use
drugs, involved in drugs, anything along those lines? Okay
What about particularly favorable or unfavorable impressio
of the police or lawyers? Anybody have particularly stron

AURORA COURT REPORTING

Exhibit J – 12

feelings about police officers or lawyers? Yes. Mr.
Lockery?

                    VOIR DIRE OF JAMES LOCKERY
BY MS. BRADY:

A    Lockery. I pretty much go my own way, I don't
     want to be bothered by anybody and it seems
     sometimes I get hassled by the police just for the
     way I look or -- you know, I'll be walking down
     the street and get pulled over, you know, I'm just
     walking and oh, we thought you were a suspect or
     something like that, and it just -- I don't know.
     I wear jeans, shirt, usually have a beard, long
     hair, and I think the police are biased to how
     people look.

Q    All right. Fair enough. And let me ask you this.
     Do -- so that's your opinion of police officers,
     so if there were several police officers who are
     going to be witnesses in this case, do you think
     that you would have a tendency to view their
     testimony less favorably than the testimony of
     other people just because they're police officers?

A    I don't think so. I -- I think, you know, what
     they do is they do, but usually I just -- like I
     said, I try and go my own way and not bother with
     anybody and don't bother with me.

AURORA COURT REPORTING

42

---

Q    Okay, fair enough. What about lawyers?

A    They've never done me good in the world.

     (Laughter)

Q    I think a lot of people.....

A    That's why I've got to go to court tomorrow.

Q    Okay.

     MS. BRADY: And Ms. Krathwohl?

                    VOIR DIRE OF JACQUELIN KRATHWOHL
BY MS. BRADY:

Q    You had something as well?

     MS. BRADY: Could you just pass this up to Ms.....

     UNIDENTIFIED: Yeah.

A    I don't have much faith in the police department
     because I've called them several times and they
     never came.

Q    Okay.

A    And lawyers, well, they're just lawyers, and.....

Q    Understood. Okay.

     MS. BRADY: And let me just -- now if you could --
     since we're right here, why don't you go ahead and pass
     the microphone to Mr. Musgrave. And I'm going to just go --
     you can just pass it this way now because I have some individual
     questions that I want to ask each of you.

                    VOIR DIRE OF ROBERT MUSGRAVE
BY MS. BRADY:

AURORA COURT REPORTING

43

---

Q    Mr. Musgrave, you said you served on several
     juries?

A    Yes.

Q    Okay, now let me just ask you about that. Without
     revealing to anyone me what a verdict in a particular
     case was, I want to ask you some questions; were
     they civil cases or criminal cases?

A    There was a criminal case some years back, there
     was a civil case that was dismissed. There was
     another one somewhere back there, I don't recall
     the details.

Q    On the criminal case did you reach a verdict in
     that case?

A    Yes.

Q    Okay. Were you the foreperson?

A    I believe I was.

Q    Okay. And you said that you like reading?

A    Uh-huh (affirmative).

Q    What kinds of things do you like to read?

A    A lot of adventure type things. Rogue Warrior,
     for one. Anything that has to do with people
     reaching out and testing themselves.

Q    Okay.

     MS. BRADY: And Ms. Krathwohl.

                    VOIR DIRE OF JACQUELIN KRATHWOHL
AURORA COURT REPORTING

44

---

BY MS. BRADY:

A    Uh-huh (affirmative).

Q    Now when the judge was talking to you a few
     minutes ago you said you weren't sure if --
     because of your medical condition, you were going
     to be able to remember stuff next week from this
     week.

A    Or even tomorrow.

Q    Or even tomorrow. Okay. So if you were unable to
     remember then that would definitely affect your
     ability to decide the case wouldn't it?

A    Probably.

Q    Probably?

A    Possibly, yeah.

Q    Okay, but -- and you're not sure -- is it
     something that sort of comes and goes so you could
     let us know if you're having difficulty
     remembering along the way or is it something
     that's fairly consistent?

A    No, it's not consistent, it just -- I guess it may
     be just depends on what it is.

Q    And you said that you've been a juror before?

A    Long time ago.

Q    Okay. So you have.....

A    Before the -- before the strokes and the seizures

AURORA COURT REPORTING

45

and.....

Q    Okay.  So you have an idea about how it would go.
     Were you able to reach -- were you in a civil case
     or a criminal case?

A    Criminal case.

Q    Were you able to reach a decision in the case?

A    I was an alternate.

Q    You were an alternate.  Okay.  So knowing what you
     know about the way cases go and how they can
     sometimes drag out, do you think that that's the
     kind of thing that you would remember or is it --
     would it be a different enough experience that you
     would remember it, or since it sort of can be
     wordy and long and boring at times, would that be
     the kind of thing that you'd have difficulty
     remembering?

A    Right.

Q    It would be the kind of thing you'd have
     difficulty remembering?

A    Right.

Q    Okay.
     MS. BRADY:  Okay, and if you could just pass the
microphone back to Ms. Randall.
             VOIR DIRE OF NICOLE RANDALL
BY MS. BRADY:

AURORA COURT REPORTING

46

---

Q    Okay.  And was it a civil or criminal case?

A    Criminal.

Q    Criminal.  And without telling me what the verdict
     was, did you reach a verdict?

A    Yes, we did.

Q    Were you the foreperson of the jury?

A    I was.

Q    Okay.
     MS. BRADY:  Okay, and Ms. Williams, back to you.
             VOIR DIRE OF CESSILYE WILLIAMS
BY MS. BRADY:

A    Uh-huh (affirmative).  Yes.

Q    And you have never been a juror?

A    That's correct.

Q    Okay.  And you're an assistant principal at
     Hanshew?

A    That's correct.

Q    Okay.  And so is -- is being on a two-week jury
     service going to be a problem with your job or is
     that going to be fine?

A    I do have a person who is subbing in for me at
     this time, so.

Q    Are you going to be thinking about that to the
     extent that you can't be fair in this case, or you
     can sit on this case and be fair?

AURORA COURT REPORTING

4

---

Q    All right.  Now, Ms. Randall, you said when we
     were talking about the questions that your husband
     had had a few DWI's?

A    Uh-huh (affirmative).

Q    Is there anything about that that has -- would
     cause you to not be able to fair in a criminal
     case?

A    That was before we were married or even together.

Q    Okay.  And you said that you were a juror before?

A    Yes.  In Kotzebue.

Q    Was it a criminal case or a civil case?

A    I don't know what it -- what it -- the difference
     is.  It was a sexual assault.

Q    Was it -- it was a sexual.....

A    I remember, yeah.

Q    Okay.  And without telling me what a verdict was,
     were you able -- was the jury able to reach a
     verdict in that case?

A    Yes.

Q    Okay.  Okay, that's all I have for you.
     MS. BRADY:  And Ms. Wangstrom.
             VOIR DIRE OF THERESA WANGSTROM
BY MS. BRADY:

Q    You're a prior juror as well?

A    Yes.  Yes.

AURORA COURT REPORTING

47

---

A    No, as soon as I leave here I'm going to my job.

Q    Okay.

A    Yeah.  Uh-huh (affirmative).

Q    Now I bet, I just strongly suspect -- are you sort
     of the discipline principal at Hanshew?

A    Yes, that would be me.

Q    Okay.  So I would.....

A    Uh-huh (affirmative).

Q    .....suspect that you probably have a lot of
     experience deciding between two people who are
     telling conflicting stories?

A    That would be true.

Q    Okay.  And how do you go about doing that?

A    It really is on a case-by-case basis.  We ask
     students to come in, they write statement forms
     that are there.  The ones that turn out the best
     are the ones where I go back and investigate.
     That's the majority of my time is spending, going
     back.  If it's a bus incident finding other
     students on the bus, what did you hear, what did
     you say; you know, without giving any leading
     information, thanking them for that, making sure
     that that information is confidential, and then
     once I have all of that information coming back
     then I speak to that person again, making sure

AURORA COURT REPORTING

that they are aware of the information that I
have. Not so much who it came from, but.....

Q    Uh-huh (affirmative).

A    .....the information that I've collected. And
then at that point I'm able to go to the student
handbook to point to where the rule is,.....

Q    Uh-huh (affirmative).

A    .....what you've broken, and what the consequence
is for that. And I do appreciate honesty. It
does work a lot faster.

Q    Okay. Fair enough.

     MS. BRADY: All right. And Ms. Nyback.

          VOIR DIRE OF KAREN NYBACK

BY MS. BRADY:

Q    You are a prior juror?

A    Yes.

Q    And was it a criminal case or a civil case?

A    I -- I don't know, it was prostitution.

Q    Okay. Was the jury able to reach a verdict in
that case?

A    Yes.

Q    And were you the foreperson on that jury?

A    No.

Q    Okay. And you said that Officer Haas, who is one
of the witnesses in this case, married your

AURORA COURT REPORTING

50

---

Q    Okay. All right.

     (Laughter)

A    We'll check his witnesses.

Q    What if his -- okay, what if his testimony was
it's sunny outside and I didn't walk under any --
I didn't get wet in any way in the courthouse?

A    That's kind of a strange example. I think
somebody would have identified why he was dripping
wet before he -- before he sat down. I don't
know, it's just a little odd, isn't it?

Q    Yeah, it's an odd example. What I'm trying to get
at is, if he's -- if he were to come on the stand
and he were to obviously be lying, that's what I
was trying to present an example where he would
obviously be lying. Would you, because of your
relationship, believe him anyway?

A    I don't think so.

Q    Okay. Okay.

     MS. BRADY: And Mr. Sura, never a juror. I actually
don't have any follow up questions for you.

     MR. SURA: Thank you.

     MS. BRADY: So if you could pass it back to Mr.
Hartner. Okay. Mr. Hartner -- actually, I don't have any
follow up questions for you either.

          VOIR DIRE OF LOUISE LAZUR

AURORA COURT REPORTING

52

---

neighbor's daughter, is that right?

A    Yes.

Q    Okay. Is there anything about the -- do you --
have you ever seen Officer Haas over at your
neighbor's house?

A    A couple times.

Q    Okay.

A    They -- they don't live there any more.

Q    Okay. So, for instance, would you recognize him
if you saw him today?

A    I think I would.

Q    Okay. Is there anything about the fact that
you've seen him at your neighbor's house going to
cause you to view his testimony either more
favorably or more unfavorably as a result of that?

A    I think I would try to weigh it in a fair way.

Q    Okay. Let me ask it this way. If Officer Haas
were on the stand and he were to come in and he
was dripping wet and he said I swear to tell the
truth, it's sunny outside. And then the next
witness came in and the next witness said, it's
raining like cats and dogs outside; which witness
would you believe?

A    Well, you know, he might have walked under a
leaking pipe, too, I don't know. You know.

AURORA COURT REPORTING

51

---

BY MS. BRADY:

Q    Ms. Lazur, you were a juror before?

A    Yes.

Q    And was it a criminal case or a civil case?

A    Civil.

Q    Okay. Did the jury reach a verdict in that case?

A    Yes.

Q    Okay. Were you the foreperson of the jury?

A    No.

Q    And your husband is a psychologist?

A    Yes.

Q    So do you -- based on your being married to a
psychologist, do you have any ideas about ways
that you can tell people are lying or, you
know.....

A    Being married to a psychologist doesn't give me
the education.

Q    True; but you've probably talked with him.

A    I -- I've also reached a certain age where you get
to watch people's body language and I think
that.....

Q    So you have your own ideas?

A    Yes, I do.

Q    And what are those ideas?

A    About what?

AURORA COURT REPORTING

53

Exhibit J – 15

Q  How you could tell if somebody is being honest or
the kinds of things that you would be looking for
to see if someone is telling the truth, as a
witness?

A  I never really thought about it that way. We
perceive and interpret as information flows toward
us and we make our own interpretations of those
perceptions. Is this true, is this not true. Is
it balderdash, is it the real thing. Is my leg
being pulled, but that's just an internal thing.

Q  Okay. So you would be looking for how the
witness' testimony fits in with the total scheme
of all the facts?

A  With the whole picture, yeah.

Q  Okay. Fair enough.
   MS. BRADY: And Mr. Hughes, okay.

       VOIR DIRE OF JAMES HUGHES

BY MS. BRADY:

Q  Now, Mr. Hughes, you know Mr. James from high
school, is that right?

A  Yes, that's right.

Q  And where did you go to high school at?

A  It was West Anchorage High School.

Q  Okay. Is there anything about knowing Mr. James
from high school that would cause you to not be

       VOIR DIRE OF JAMES LOCKERY

BY MS. BRADY:

Q  You said that you've been in court on the other
side. Is that something that you would prefer to
discuss in private or.....

A  DUI.

Q  DUI, okay. And is that currently still pending,
is that why you have to go to Homer?

A  Yep.

Q  And who is the agency that's prosecuting that? Is
that the troopers?

A  I believe so. It's -- I had it three, four years
ago and I just didn't do my follow up work, so
it's an outstanding warrant.

Q  So you didn't do your ASAP or something along
those lines?

A  No, I didn't.

Q  Okay. And initially did you go to trial or did
you just plead or how did that work?

A  Well, like I said, the lawyers weren't really
good. I was in jail for 23 days, and I talked to
the lawyer that was representing me for about ten
minutes before the case, and he got in front of
the judge and stuttered, slurred, and I just said,
you know, forget it, you know, plead it out. You

able to fair in this case?

A  No.

Q  Okay. And have you seen Mr. James a lot since
high school?

A  No.

Q  Okay.
   MS. BRADY: And that's all the questions I have for
you. Okay, and Ms. Lisenbee.

       VOIR DIRE OF STELLA LISENBEE

BY MS. BRADY:

Q  Is that -- did I say that right?

A  Uh-huh (affirmative).

Q  Okay. You were a juror before?

A  Yes. Yes, I was.

Q  And was that a criminal case or a civil case?

A  I don't know, I think -- it was a drunken driving
and bribing a police officer and leaving the scene
of an accident.

Q  Okay. And was the jury able to reach a verdict in
that case?

A  Yes.

Q  Okay. And were you the foreperson of the jury?

A  No.

Q  Okay.
   MS. BRADY: And Mr. Lockery.

know, he wasn't very confident, and the judge, at
the time, wouldn't give an extension and I only
talked, like I said, to the lawyer for about ten
minutes and I had been in jail for 23 days, so I
don't feel very confident with most lawyers.

Q  Fair enough. Okay.
   MS. BRADY: And Mr. Dorsey. If you could just pass the
microphone back to Mr. Dorsey.

       VOIR DIRE OF DAVID DORSEY

BY MS. BRADY:

Q  I understand you made it to the box but you didn't
get put on the jury.

A  I always sit out there and go home, you know, an
hour or so later, you know, so.

Q  Okay. So you never actually even made in to where
you were questioned?

A  Nope.

Q  Okay. You've just been called before?

A  Plenty of times.

Q  Okay. So you've been called.....

A  Seems like every three years.

Q  And is this the first time you've made it into the
box?

A  Uh-huh (affirmative).

Q  Okay.

MS. BRADY: That's all the questions I have for you.

A   Okay.

MS. BRADY: Mr. Holmes?

VOIR DIRE OF DAVID HOLMES

BY MS. BRADY:

A   Yes.

Q   You've been on several juries?

A   Yes.

Q   Criminal or civil?

A   Both.

Q   Okay, let's talk about the civil for a second. Were you able to reach verdicts in those cases?

A   The judge actually took it over on the last day of the trial and made the decision, and this was in Fairbanks.

Q   Okay. And in the criminal cases did the jury reach a verdict in those cases?

A   Yes, we did.

Q   How many criminal cases have you sat on?

A   Two.

Q   Were you ever a foreperson?

A   Two times.

Q   Okay.

MS. BRADY: And Mr. Tognetti.

VOIR DIRE OF TODD TOGNETTI

58

---

Q   Okay. Thank you.

MS. BRADY: And Ms. Garrett.

VOIR DIRE OF LEONE GARRETT

BY MS. BRADY:

A   Uh-huh (affirmative).

Q   The only thing I wanted to ask you about is you said your stepson was in prison?

A   In -- yes.

Q   What kind of case was he convicted for?

A   It was felony.

Q   Okay. Is this something that you would be more comfortable discussing in private?

A   Well.....

Q   What I'm trying to get at, just so you know, is I'm curious as to whether or not the charges involved drugs, or drug sales or anything like that?

A   No.

A   No.

A   No.

Q   Okay. That's more -- that's really what I was interested in. And you've been a juror before?

A   Yes.

Q   What kind of case......

A   Several. One was a DUI in which a verdict was

60

---

BY MS. BRADY:

Q   Right. So we're going to go talk to you about the reasons to come to court in a few minutes so I'm not going to go over that right now. Five daughters?

A   Uh-huh (affirmative).

Q   Lots of experience deciding conflicting things I imagine?

A   Oh, yeah.

Q   Do they all live with you?

A   Oh, yeah.

Q   Okay. What are some of the things that you look for in trying to distinguish two conflicting versions of something? Which one is right?

A   Well, that's kind of hard to say because they all can work together to work for the lesser of evil of things when they know they're in trouble though. Work together to come to a great compromise so they can get out of trouble, and then go back to what they were doing right after the fact. But usually it's more of a case of who is more persistent and the way they come across. They just have certain characteristics that I look for. And the attitudes that they -- that they get.

59

---

reached, and I was not the foreperson.

Q   Okay.

A   And the other one summer I was on a grand jury.

Q   Oh, okay. Were you the foreperson on the grand jury?

A   No.

Q   Okay. All right, thank you.

A   Uh-huh (affirmative).

MS. BRADY: And if you could just pass it to Ms. Thorpe.

VOIR DIRE OF STACEY THORPE

BY MS. BRADY:

Q   Ms. Thorpe, you've been a juror before?

A   Yes.

Q   What kind of case? Criminal or civil?

A   Civil.

Q   Civil. Did the jury reach a verdict in that case?

A   Yes.

Q   Okay. Were you the foreperson?

A   Yes.

Q   Okay. That's all I have for you.

MS. BRADY: And Ms. Kocsis.

VOIR DIRE OF GLORIA KOCSIS

BY MS. BRADY:

61

Exhibit J – 17

1 Q  Now let me ask you this.  Your husband is an
2    airport safety officer?  That's.....
3 A  Yes.
4 Q  .....obviously different than APD? ·
5 A  Yes.
6 Q  Okay.  Is the fact that your husband, an airport
7    safety officer, going to cause you to view the
8    testimony of officers more favorably, just
9    automatically think they're more truthful than
10   other witnesses like the criminalist or some of
11   the civilian witnesses or people like that?
12 A No, I don't think so.
13 Q Okay.  So you think you can be fair in this case?
14 A Yes.
15 Q You said you worked for the prosecutor's office.
16   Did you work for the state district attorney's
17   office?
18 A The municipal.
19 Q Municipal prosecutor's office.  Okay.  And you
20   used to work for the AG's office?
21 A Yes.
22 Q Okay.  So does the fact that you used to work for
23   the state in any way going to cause you to not be
24   able to be fair in this case?
25 A I don't think so.
                AURORA COURT REPORTING
                                                   62

1 Q  Okay.  And what about your experience working for
2    the Municipal prosecutor's office?
3 A  I don't think it -- it -- I don't think it will
4    affect my judgment.
5 Q  Okay.  And you said that you know both law
6    enforcement people and.....
7 A  Well, I was referring to my husband.....
8 Q  Okay.
9 A  .....as law enforcement, and then the prosecutor,
10   working at the prosecutor's office.
11 Q Okay.  So you know some of the people who work at
12   the Municipal prosecutor's office still?
13 A I know most of them.  If they're still there.  And
14   I also know Susan Parks, the DA.
15 Q Okay.
16 A I used to work with her husband, same section as -
17   - at the AG's office.
18 Q Okay.  Is that going to cause you to not be able
19   to fair in this case?
20 A No, I don't -- well, I don't know.  I think
21   working on the other side of the law, working with
22   the Department of Law, I think, yes.  It will
23   affect my judgment.
24 Q Okay.  So let me ask you this.  The same question
25   that I was trying to ask Ms. Nyback.  If state's
                AURORA COURT REPORTING
                                                   63

1    witnesses were to come in and obviously not be
2    telling the truth, would you still believe them
3    anyway?
4 A  No.
5 Q  Okay.  Would you take a look at -- there's two
6    sides to every story, you understand that, right?
7 A  Yeah.
8 Q  Okay.  And what if I just failed miserably -- I
9    mean we're here because there's been charges that
10   have been filed, but there's not been any proof at
11   this point.
12 A Uh-huh (affirmative).  Yes.
13 Q So if we were to say, okay, why don't the 18 of
14   you go back and deliberate right now, what verdict
15   would you have to reach at this point?
16 A I don't know.
17 Q Knowing that I haven't put on any evidence
18   whatsoever.
19 A I think I'll try to learn as much about the case
20   as I can, and if I can read all the, you know, the
21   charging documents and the witnesses testimonies -
22   - I'll -- I can try -- I can try to be fair, you
23   know.
24 Q Okay, but you understand that the defendant right
25   now has something called the presumption of
                AURORA COURT REPORTING
                                                   64

1    innocence, so we are presuming that he's innocent
2    until I bring forward some kind of proof that says
3    he's not, right?
4 A  He was charged, apparently he got caught, he was
5    doing something, that's why he's charged.
6 Q  Okay.  So are you going to be able -- but you --
7    do you understand that under the law the defendant
8    is presumed innocent at this stage?
9 A  Yes, I understand.
10 Q Okay.  So do you -- if we were to go vote right
11   now would you vote not guilty because I haven't
12   put on any evidence yet?
13 A Like I -- said, if maybe after reading the
14   documents, maybe I can, maybe I will charge him or
15   I'll go for maybe charging him or indicting him.
16 Q Okay.
17 A I don't know.
18 Q Right.  Maybe I'm not explaining it very well.
19   Right now at this stage before any evidence is
20   presented the defendant is innocent.
21 A Yes.
22 Q And I have the burden of proof in the case, I have
23   to bring forward some kind of evidence that says
24   he's guilty, right?
25 A Yes.
                AURORA COURT REPORTING

Q    So right now as he's sitting there, if you were to
     go and deliberate and make a vote, you would have
     to vote not guilty because I haven't presented any
     evidence, there's not any evidence that's in this
     question right now.....

A    Yeah, yeah.

Q    .....right?

A    Yeah, he's innocent until proven guilty, yes.

Q    Exactly.  So if I were to not -- if I were to just
     fail miserably at my burden of proof, if I didn't
     bring forward any evidence would you be able.....

A    Uh-huh (affirmative).

Q    .....to find him not guilty of the charges?

A    I don't know.

Q    Okay.

     MS. BRADY:  That's all I have at this time, Your Honor.

     THE COURT:  All right.  The next thing I'm going to do,
folks, is I'm going to talk with the lawyers and we call it
a bench conference.  We used to bring the lawyers up here
and we would talk but we would find that if we whispered
really softly we couldn't hear each other and we couldn't
record it, and if we talked loud enough that we could hear
each other, you could hear us, too.  And the purpose for
having the conversation -- and we're going to talk about
some of you -- and the purpose for having the conversation

AURORA COURT REPORTING

66

is to be able to have free discussions without you hearing,
and I can either kick you all out or I can go in this other
room where I have a microphone and do it that way; so that's
why it's called a bench conference, that's what we're going
to do.  It will take about five minutes.  Please bear with
us and we'll be right back.  Yes, sir?

     MR. LOCKERY:  Can I use the restroom out there?

     THE COURT:  Yes, you may, Mr. Lockery.

     MR. LOCKERY:  Thank you.

     THE COURT:  You have to come back, but we'll take a
short break.  Please.....

     UNIDENTIFIED:  (indiscernible) leave my coat.

     UNIDENTIFIED:  Can I go, too?

     THE COURT:  Yes, ma'am.  All right, the lawyers and Mr.
Davis, if you'll go back here.

     (Bench conference as follows:)

     THE COURT:  All right, we're at bench conference.  I
told you we didn't have to do challenges for cause until
both sides had questioned the jurors, but it seemed to me
like there might be some obvious challenges for cause, and
it might be more efficient to take care of them now and let
you finish talking to some new people, Ms. Brady; so are
there any people that you believe should be excused for
cause?

     MS. BRADY:  Ms. Krathwohl, juror number 2.

AURORA COURT REPORTING

67

     MR. JAMES:  That's our lady that has the memory
problem.

     THE COURT:  Yes.  Mr. Davis, do you -- Mr. James.....

     MS. BRADY:  Yes.

     THE COURT:  .....do you agree?

     MR. JAMES:  Yes.  I mean she's clearly stated.....

     THE COURT:  Okay.

     MR. JAMES:  .....that she doesn't.....

     MS. BRADY:  Ms. Kocsis is juror number 18.

     THE COURT:  The last person you talked to.  Do you
agree?

     MR. JAMES:  Yes.  So there's now the two people we're
talking about (indiscernible).

     THE COURT:  All right.  Anybody else?

     MS. BRADY:  That's all I would say at the -- oh, wait.
Mr. Tognetti we haven't talked to so I don't know.

     THE COURT:  Mr. Tognetti said that he couldn't be fair
to crack users.....

     MS. BRADY:  Oh, that's right.  That's right.  I forgot
about him.

     THE COURT:  .....and I don't know what your position on
him is.

     MS. BRADY:  I think he should be excused, Your Honor.

     THE COURT:  And anybody else?

     MS. BRADY:  That's all I had.

AURORA COURT REPORTING

68

     THE COURT:  Okay.  Mr. James?

     MR. JAMES:  Why don't we -- can we just have one brief
moment here.

     (Whispered conversation)

     MS. BRADY:  Just to scheduling, Your Honor.  Could we
just take a quick break, because I feel a little.....

     THE COURT:  It's getting better.  I was going to try --
I'll call the -- do you need to do it right away?  Can we
call -- can we fill in some names?

     MS. BRADY:  No, we can.....

     THE COURT:  Can we fill in.....

     MS. BRADY:  That's fine, yeah.

     THE COURT:  .....without questioning?

     MS. BRADY:  Right, that would be great.

     (Whispered conversation)

     THE COURT:  Any other challenges for cause, Mr. James?

     MR. JAMES:  Ms. Randall I believe is the lady who said
that she believed that all drug users should be prosecuted.
I think that's -- I feel that given her predisposition that
she does not come into this with an open mind.

     THE COURT:  I disagree.  She said she could be fair,
just like the -- Mr. Hartner who said that drug users
shouldn't be prosecuted also said he could be fair.  That
doesn't meet the challenge for cause.  You have 11 pre-
empts, you can use them however you wish, but she doesn't

AURORA COURT REPORTING

69

Exhibit J – 19

qualify for a challenge for cause.

MR. JAMES: We still believe (indiscernible).....

THE COURT: So I'm going to excuse Ms. Krathwohl, Mr. Tognetti, Ms. Kocsis. We'll fill in those seats, let them answer the questions, and then we'll take a short break and then Ms. Brady you'll have a brief period of time with the new people and then you can talk with the new people.

MR. JAMES: Very good, thank you, sir. Do you understand what he said?

MR. DAVIS: (indiscernible).

MR. JAMES: Can you wait until we get done?

MR. DAVIS: Yeah.

(End of bench conference)

10:15:43

(Portion not recorded)

10:16:02

THE COURT: .....speak up for now. Are we on record?

THE CLERK: You've been on it.

THE COURT: All right, we're going to call three more names to fill those seats. I'm going to ask those persons to answer the questions on the board, but then we're going to take -- the rest of us are going to take a break and we'll continue on after that.

THE CLERK: Roi Cotter, C-o-t-t-e-r.

MR. JAMES: Is he going for juror two, sir?

THE COURT: Yes.

MR. JAMES: Okay.

THE COURT: This is Ms. Cotter?

MS. COTTER: Uh-huh (affirmative).

THE COURT: I'm going to put you in the second seat here, please.

THE CLERK: Crystal Nelson, N-e-l-s-o-n.

THE COURT: Ms. Nelson, we'll put you in the back row in that middle seat, please.

THE CLERK: David Williams, W-i-l-l-i-a-m-s.

THE COURT: All right, Mr. Williams, you get the last empty seat, and Ms. Wangstrom, could you get the mike for Ms. Cotter I believe it is.

MS. WANGSTROM: Sure. Yes.

THE COURT: Would you answer these questions for us, please.

MS. COTTER: Certainly. My name is Roilee Cotter, I live off of Huffman on Cleo Street. I work as a member service officer for Alaska USA Federal Credit Union. I'm married, my husband's name is Patrick, he's retired. He works a part-time courier job for Phoenix Central Lab out of Everett, Washington. I have three children, 23, 21, and 14. I was born in Butte, Montana, raised there, moved up here in my 30's. I quilt, sew, read, ride horses, work at the church. I've never been to court, never been involved in a

lawsuit. My husband's been to court for a DUI. I've served on a jury. There's no reasons why I should not serve on this jury, and I do not know anyone that's involved in this trial.

THE COURT: All right, thank you, Ms. Cotter.

MS. COTTER: Uh-huh (affirmative).

THE COURT: We need to get the mike all the way back to Ms. Nelson in the back row.

MS. NELSON: My name is Crystal Nelson, I live off of Muldoon, I work at a car place. I don't have any children, I'm not married. I was born in Tampa and I was raised in Alaska. My hobbies include volunteering, outdoor activities, working out, church activities. I have never been involved in any lawsuit. I do have family members that have been involved. I have never served on a jury. There is no reason why I should not serve on this jury, and I don't know anyone that's involved.

THE COURT: Thank you, Ms. Nelson. And over to Mr. Williams here.

MR. WILLIAMS: My name is David Williams, I live in Chugiak. I'm an engineer and do project management work for the Corps of Engineers. Worked that way in Alaska for the last 24 years. I am married to Linda who homeschools our two children, which are ages 14 and 15. I was born in Walla Walla, Washington and raised here in Alaska. I hunt, fish,

build houses. Obviously involved in homeschooling. Do whatever suits my fancy. As far as lawsuits, I have been a witness in civil suits. I have been not on a jury, but I -- let's see, my brother and my mom have both been in lawsuits, I believe. Don't know of any reason why I can't serve on this jury, and I do not know anyone involved in this trial.

THE COURT: Thank you, Mr. Williams. I think we'll take about a ten minute break at this point. Let me tell you a couple things that are very important. First of all, please don't begin to speak with one another about this case, you haven't heard any evidence yet. It would be a shame if you started talking about the facts or what you might do if you're selected on the jury. Actually, if you're actually -- if you're selected I'm going to tell you not to talk about the case among yourself or with anybody else until you're actually sent to the jury room to deliberate and I'll explain why that's important. I'm not going to go through that lengthy explanation now, but please don't talk with one another about the case.

The lawyers and the people associated with them know that they're not supposed to contact you so if you think they're rude while you're out in the hall that's because they know they're not supposed to talk to you, and it's not because they're rude. They're just following the rules. We'll take ten minutes. Please, just come on back in the

jury room and you folks be in your same seats at 20 til on
this clock. If the restrooms get crowded, punch the
elevator button, go up or down. This is a state designed
building, there's a restroom at that same place on each
floor, and we'll go off record now and we'll see you back in
here at 20 til.

(Off record)

THE COURT: Is it better? Are we better?

THE CLERK: Yes.

THE COURT: Does that fan help?

THE CLERK: Yes.

THE COURT: If anybody is bothered by the fan I can
move it. All right, I'm going to give Ms. Brady a chance to
talk with the three new folks, Ms. Cotter, Ms. Nelson and
Mr. Williams. Take a couple minutes each and then Mr. James
will have an opportunity to talk to the group. Ms. Brady.

MS. BRADY: Let me go ahead and start with Ms. Cotter.

THE COURT: And we need help with the microphone again.

MS. WANGSTROM: I'm sorry. (Indiscernible).

THE COURT: (Indiscernible).

VOIR DIRE OF ROILEE COTTER

BY MS. BRADY:

Q    Ms. Cotter, you were most recently on a jury in
     2000?

A    January.

about that? Think it's fair, unfair?

A    I think it's probably the only way you're going to
     get your information.

Q    Okay. And what do you look for to tell if there's
     two conflicting sides? You have three kids, I'm
     sure you.....

A    I rely mostly on eye contact. I watch my
     children, they each have a characteristic that's
     different when they're lying. You can tell. Some
     fidget, some don't. Some people try to talk fast,
     they try to smooth talk you. It varies, it
     depends on the situation.

Q    Okay.

A    But you have to watch the person.

Q    Okay. And that's all I have for you.
     MS. BRADY: If you want to pass the microphone to Ms.
Nelson is next.

VOIR DIRE OF CRYSTAL NELSON

BY MS. BRADY:

Q    Ms. Nelson, you said that you had family members
     that had been involved in lawsuits?

A    Yes.

Q    Your -- did you say who?

A    No.

Q    Who?

Q    Okay. And was that a criminal or a civil jury?

A    Civil.

Q    Okay. Did the jury reach a decision in that case?

A    Yes, they did.

Q    Were you the foreperson?

A    No.

Q    Okay. And you said that your husband had a DWI?

A    Uh-huh (affirmative).

Q    Is there anything about that that would cause you
     to have.....

A    No, no.

Q    Okay. Did he plead on that or go to trial? Or do
     you know?

A    I don't know.

Q    Okay.

A    I didn't go.

Q    Okay. And what about the questions that I was
     asking. Anybody in your family ever been involved
     with drugs, or you know anybody that's been
     involved with drugs, anything along those lines?

A    No.

Q    Particularly favorable or unfavorable opinions
     about the police or lawyers?

A    No.

Q    What about using CI's? Do you have any feelings

A    My brothers.

Q    Brothers? Were those criminal or civil cases?

A    My older brother criminal, and the other ones
     minor criminal because the other two are
     juveniles, so I don't know what you call that.

Q    Okay. Is there anything about that involvement of
     your family in courts that has given you any kind
     of strong opinions, either favorable or
     unfavorable, about police officers, lawyers, or
     courts or anything like that?

A    No.

Q    Do you think that the courts are generally fair?

A    In my brothers' cases they were fair.

Q    Okay. And what sort of volunteering activities do
     you do?

A    I work with homeless people on the streets, that
     kind of thing.

Q    Okay. And that's all I have for you.
     MS. BRADY: If you could just pass the microphone over
to Mr. Williams.

VOIR DIRE OF DAVID WILLIAMS

BY MS. BRADY:

A    Ready.

Q    Mr. Williams, you've been a witness in several
     civil suits is what you said?

Exhibit J – 21