A   Yes, engineering cases.

Q   Anything about that that gave you particularly strong feelings about courts or lawyers?

A   Mankind would be better off if we could avoid them. We could settle our cases outside of court.

Q   Okay. Fair enough. What about -- have not been a juror. Okay. What about any of the questions that I asked everybody else? What do you think about CI's, using CI's, when police officers use confidential informants? Fair, unfair, any opinions?

A   I'll give you my impression of when my kids bring to me a confidential informant.

Q   Okay.

A   They get the same punishment as the person who did the wrong. I think there's a level of human integrity that requires that you be honest with people who are honest to you, and the issue of a confidential informant has to be very carefully evaluated because if you're asking a person to trust you for the sake of giving them a way to someone else, you have to be careful in that because what you're asking is for a negative behavior characteristic to be built up in that person. It's very hard to believe someone who has

AURORA COURT REPORTING

78

A   Not myself, not anyone in my family.

Q   Okay. But you said that like there might be someone else that you're thinking of right now, close friend, something along those lines?

A   I went to college Boulder where there was a place called the Hill.

Q   Uh-huh (affirmative).

A   Okay. Enough said, enough known. When I was in Boulder I knew a lot of street people. I still know several of them. One of them is in the Marine Corps still. He's an excellent drug counselor. He's been there. I went to high school up here, some of my friends from high school are dead now from drug usage and from other things. I also have friends who historically dealt and used drugs. So I mean I have both sides of it in -- in my knowledge of people, so I -- I can't say I'm for or against anything except there is a reason for the laws and the laws need to be upheld.

Q   Okay. Fair enough. Thank you very much.

    MS. BRADY:  That's all I have, Your Honor.

    THE COURT:  Thank you, Ms. Brady. Mr. James, your questions for these folks.

    MR. JAMES:  Thank -- yes, Your Honor, thank you. I've

AURORA COURT REPORTING

80

such negative characteristics. So one has to be very, very careful and make sure that of the information that they are not receiving a benefit for hurting someone else. So in terms of my children, I am -- I am very careful about how I let them know what the results of that could be.

Q   Okay. Now let me ask you this. So if you were to find out that someone got in trouble for something, and said, well, I know where I can be used to buy drugs. They're already in trouble for something themselves, and then they tell the police officers, look, I can buy drugs, I'll work as an informant and they get some sort of favorable treatment in their case for doing that. You would -- how would you view that?

A   I would say that their testimony had -- is questionable.

Q   Okay.

A   Because they are receiving the benefit for hurting someone else. In other words, they are being paid to drop bombs.

Q   Okay. And let's just switch topics for just a second. Have you or anyone in your family ever been involved in drugs or had anything to do with drugs?

AURORA COURT REPORTING

got some general questions and I have a tendency to speak softly, so hopefully if I don't -- if I stand away from the mike and you can't hear me, please tell me and I'll repeat my question to you. If I get you into an uncomfortable zone as the judge said, let us know and -- this isn't a torture chamber, so. The purpose, of course, as the judge says, is to pick an impartial jury to the best of our abilities, and so that's what we're trying to do.

    You've seen -- it's not up there now, but there's about six state witnesses that they intend to call, and obviously you can expect those people to be cross examined. My job is not to hurt people, it's not to hurt people's feelings, but it is to establish, as any attorney's job is here, to establish as much truth as we possibly can bring out here. So that -- what I'm saying is they're probably going to be vigorously cross examined. I may not be friends with them when they're done, but hopefully you folks will still, if not my friends, at least be tolerant of me.

    There was a question about whether we put forth some evidence. Now the judge has already told you beyond a reasonable doubt is the standard for this case. Some of you have sat on civil juries. Is that correct? How many? All right; and that was a preponderance of the evidence, right? Remember when the judges gave you those instructions, everybody started off on an even keel, and then some

AURORA COURT REPORTING

evidence went and they just tilted the scale just a little
bit, and those of you that reached a verdict, that was how
it was decided, right? Were you in a civil -- do you
remember that?

Some of you that have sat on criminal cases. How many have
sat on criminal cases? That have gone to a decision.
Right? Okay, remember, every criminal case is different and
I'm not here to instruct you on the law, that's the court's
prerogative, and I certainly wouldn't infringe on that. But
remember the judge, in the very beginning, says the standard
is beyond a reasonable doubt, right? Do we have any problem
with that one? Totally different standards.

We start off, what?

THE PANEL: Innocent.

MR. JAMES: Innocent, that's right. The burden of
proof is what?

THE PANEL: (Indiscernible).

MR. JAMES: What?

JUROR: Is on the prosecution.

MR. JAMES: The burden is on the prosecution, but
what's the standard?

THE PANEL: (Indiscernible).

MR. JAMES: Beyond a reasonable doubt. Not
preponderance, right? Has anybody got a problem with that?
We've got two different iss -- two different standards here.

AURORA COURT REPORTING

82

that his children have enjoyed for a long period of time.
If he is going to be concerned about being a father that is
not inflicting strange and weird punishments on his
children. He has to be -- he has to beyond a reasonable
doubt otherwise he knows for sure that people will question
his integrity.

MR. JAMES: Okay. Would you agree that that is beyond
and to the exclusion of every reasonable doubt?

MR. WILLIAMS: In the mind of the father, yes.

MR. JAMES: And the father is the decider of fact, is
that right?

MR. WILLIAMS: That is correct.

MR. JAMES: Okay. Now I suspect, and I don't know what
this case is about. I mean I know what the case is about, I
mean that was a foolish statement to make. I don't know
what the exact evidence is going to be developed on the
witness stand here, but I suspect that there's going to be
opinion evidence given. And would everybody agree with the
statement, everybody is entitled to their opinion?

THE PANEL: Uh-huh (affirmative).

MR. JAMES: All right. Absolutely. But that doesn't
mean that you -- I've got to buy your opinion and you've got
to buy my opinion, right; would you agree with that? So the
fact that I say UAA basketball is going to be the NCAA
national champions is my opinion. Would you agree with me

AURORA COURT REPORTING

84

We start off totally innocent and as the prosecutor asked
one of the prospective jurors, if you were to go back in
right now, and the judge said vote, what would be your vote?

THE PANEL: Innocent.

MR. JAMES: Not guilty. The standard is we have -- are
down here with this huge weight of innocence on us. Do we
have any problem with that right now? The state, they have
got to take away that presumption of innocence, not balance
it like a preponderance of the evidence; not tilt the scale
like was suggested that perhaps we have some evidence,
right, so far? From what the judge has told us? They have
to come way down here, beyond a reasonable doubt. Does
anybody got a problem with that? So we start way over here,
come up, they've got to be way down here. Not to an
absolute certainty, as the judge said, but beyond a
reasonable doubt. Okay.

Now, does anybody know what beyond a reasonable doubt
is? Hands? Yes, sir.

MR. WILLIAMS: That's what I have to have before I.....

MR. JAMES: Perhaps we could pass the microphone.....

THE COURT: Hold on. Pass the mike up to Mr. Williams.
There we go. Thanks.

MR. WILLIAMS: Beyond a reasonable doubt is what a
father has to have when he is going to take away a privilege

AURORA COURT REPORTING

83

there? That's right. Now I suspect that there would be
some disputes with that opinion, would you not agree?

THE PANEL: Yes.

MR. JAMES: All right. But that doesn't mean I don't
have my opinion, correct? I just, perhaps, haven't got
enough facts or I've misjudged the facts and interpreted
them in a way that was beneficial to me that perhaps you,
standing back there would say, hey, Pat, come on. You know,
what about Duke? What about UCLA? You know, some other
factors come in here, but it's opinion and that's all right.
But you are the deciders of fact. Could we agree with that?
You know nothing about this case, okay.

Now, and we've already talked about the idea that it's
beyond a reasonable doubt. Now there's different standards
that happen in the criminal process. The police have got
to use probable cause to arrest. They use -- the grand jury.
Those of you that sat on a grand -- how many sat on a grand
jury? Right. Remember when you sat on your grand jury, and
maybe you don't remember, that -- was it up here in Alaska,
the grand jury in Alaska?

PROSPECTIVE JUROR: Uh-huh (affirmative).

PROSPECTIVE JUROR: Yes.

THE COURT: All right. The standard under Rule 6 is
the evidence is unexplained or uncontradicted. That's not
beyond a reasonable doubt, would you agree with that?

AURORA COURT REPORTING

85

Exhibit J – 23

PROSPECTIVE JUROR: Would you repeat the (indiscernible)?

MR. JAMES: Sure. Pass the microphone back, please.

VOIR DIRE OF LEONE GARRETT

BY MR. JAMES:

A    Garrett.

Q    I'll learn it eventually. Ms. Garrett, what I said was you sat on a grand jury, right?

A    Yes.

Q    Okay, and I don't want to know about what happened at the grand jury, but you were instructed that the standard that you used was that the evidence if unexplained or uncontradicted would warrant a conviction. Do you remember that?

A    Uh-huh (affirmative). Okay.

Q    Okay, all right. That's not beyond a reasonable doubt. Did anybody explain that to you?

A    Yes, it was explained.

Q    Okay. And at a grand jury, if you remember, the state put on their case didn't they?

A    Yes.

Q    Right. There was no defense there was there?

A    No.

Q    All right. So it was all one sided, would you -- think in terms of that it was just the state

AURORA COURT REPORTING

86

the jury box? You were around a room maybe?

A    No, I think I was in -- in the box.

Q    In the jury -- in a box?

A    Yeah.

Q    Was it -- did the defense have a -- was there a defense attorney there?

A    I don't remember.

Q    Okay. Well, we've -- all right.

MR. JAMES: Ms. Cotter -- Cutler?

MS. COTTER: Cotter.

MR. JAMES: Cotter?

MS. COTTER: T-t-e-r.

MR. JAMES: Okay. I forgot your other T, cross it, b that's all right. I'll cross it for you.

VOIR DIRE OF ROILEE COTTER

BY MR. JAMES:

A    Penmanship.

Q    What went through your mind when you received the jury summons?

A    What went through my mind?

Q    Uh-huh (affirmative). Yes.

A    I don't know. I filled out the thing and mailed it in.

Q    Now did you think, oh my goodness?

A    Well, I do wonder why it's always my daughter and

AURORA COURT REPORTING

putting on their case?

A    Oh, yes.

Q    Okay.

MR. JAMES: And Ms. Kendall, you sat on one, too, I believe? I hope I've got the right, 2-3.

VOIR DIRE OF NICOLE RANDALL

BY MR. JAMES:

A    Me?

Q    Yeah, Randall. I'm sorry, I said Kendall, I'm sorry. Randall. Ms. Randall. And that was in Kotzebue?

A    Yes.

Q    And when I was talking with Ms. Garnet(ph), remember the different standards that was used?

A    Yes.

Q    Okay. When did you sit on your grand jury?

A    It was before '97, I moved from Kotzebue, so I -- put I don't remember when.

Q    Okay. Who was the prosecutor, do you remember?

A    No.

Q    Okay. And you served on a jury also, right?

A    I think it was just grand jury that I was on, now that we're talking about everything; I remember it was grand jury.

Q    Okay. It wasn't -- you weren't in a box here, in

AURORA COURT REPORTING

I and not my husband and my other daughter. That always crosses my mind because they've never been called, they've never received a summons and my other daughter and I we get them every two years like clockwork.

Q    Was there any type of oh here we go again, or is it.....

A    No.

Q    .....this is my.....

A    Oh, no.

Q    .....civic duty? Okay. Now you indicated that the word CI, which stands for confidential informant, that sometimes it's the only way to get the truth, get information. Not the truth, but information?

A    I believe that, yes.

Q    Okay. You expect the people that they, the confidential informants, do you expect them to be honest?

A    I would, yes.

Q    Okay. And would you expect them to be responsible? Meaning if they say they're going to do something, that they would follow through with it?

A    If I was relying on a confident.....

AURORA COURT REPORTING

Q    Yeah.

A    Yes, I would.

Q    Okay. What about you as, sitting here in the jury box? There will be a confidential informant here. He won't be confidential any more, but there will be an informant. What are you looking for in that person?

A    While I'm watching him?

Q    Uh-huh (affirmative). Yes.

A    Again, in relation to just -- I'm going to watch how he answers the questions, I'm going to watch for nervousness, flippancy, possibly. That's a hard question.

Q    Okay.

A    I'm just going to observe the person, really.

Q    You work for Alaska USA, right?

A    Yes, I do.

Q    Okay. Do you use some kind of a checklist to make sure that you've covered all the issues that you're particularly dealing.....

A    Yes, we do.

Q    Okay. Is that kind of standard procedure for you folks?

A    Yes, it is.

Q    And the purpose of that is, what?

AURORA COURT REPORTING

90

---

make a decision. When you're administering, you know, 25 staff and lots of children, you need to make sure that you're leading them in a fair and honorable way.

Q    Okay. Now we've talked about beyond a reasonable doubt and there's elements of every cri -- I mean the judge is going to instruct you on the elements and -- do you have any problem with the fact, the requirement -- not the fact, the requirement.....

A    No, none whatsoever.

Q    .....that the -- they have got to prove each and every element beyond a reasonable doubt?

A    Absolutely.

Q    You can't get two out of three. Do you have any problem with that?

A    No. No.

Q    And I'm not saying there's three elements.

A    Right.

Q    And what happens if you are not satisfied, that there's reasonable doubt? What happens if.....

A    If there's.....

Q    .....there's reasonable doubt?

A    .....reasonable doubt, then you have to find him innocent, not guilty.

Q    It's not that you have to, is it? I mean it

AURORA COURT REPORTING

92

---

A    To make sure you've done your job accurately.

Q    Okay. So -- all right.

MR. JAMES: Now, Ms. Wangstrom.

VOIR DIRE OF THERESA WANGSTROM

BY MR. JAMES:

A    Yes.

Q    You -- you're bookkeeping. And.....

A    I'm a teacher also.

Q    That's what I thought. Where do you teach?

A    I don't any more. I retired in August. I took time off to take care of my children, actually.

Q    Where did you teach I guess would fairly be.....

A    Anchorage Montessori School.

Q    Montessori, that's right, correct. I recall now.....

A    Uh-huh (affirmative). I was a teacher and then I ran the school for five or six years.

Q    Okay. All right. In your capacity as a teacher and administrator, and especially dealing with maybe -- well, in that capacity, did you use checklists?

A    Sure. Sure.

Q    What was the purpose of the checklist?

A    To make sure you do the right job, to make sure that you're listening to all sides and trying to

AURORA COURT REPORTING

9

---

sounds like it's an onerous charge. Well, I've got to do this then. That's what I'm hearing from you. Isn't it that he must be found not guilty?

A    It -- well, of course, I mean that's part of your duty.

Q    I -- maybe I'm taking on words.

A    No, no. No, it's part of your duty to listen and if there's beyond a reasonable doubt you can find them guilty.

Q    Okay.

VOIR DIRE OF CESSILYE WILLIAMS

BY MR. JAMES:

Q    Ms. Williams, do you have any problem with the concept that, as a disciplinarian now, okay, because we know that you do that. That the defense, under our Constitution, has an absolute right to do nothing, just -- not to take the stand or take the stand, whatever it wants to do?

A    Yes.

Q    We have no burden of proof, do you understand that?

A    Yes, I do.

Q    Okay. And so that's a little different maybe in your administrative details at Hanshew where you're trying to get all the -- you know, talk to

AURORA COURT REPORTING

93

me, Jimmy, concept.

A   Uh-huh  (affirmative).

Q   So we're putting on a different hat, right?

A   That's true, it is a little bit similar, because I
mean students are afforded their due process as
well, and so they have an opportunity to come in
and say nothing as well.  I think it's still a
part of my obligation to make sure that I do my
job and do it well, as far as making sure that if
I'm going to give consequences in any shape, form
and fashion, that I do it according to what has
been done and what's been found.  So it is very
similar.

Q   Okay.  But.....

A   Not the same, similar.

Q   All right, but there's a different -- this is a
different world.....

A   Uh-huh  (affirmative).

Q   .....than a school disciplinary environment, would
you agree with that?

A   I'm aware of that, yes.

Q   All right.  And I'm not belittling it, I know
you've got two degrees.....

A   Yes, I'm aware.  Uh-huh (affirmative).  Yes.

Q   But it's -- so the standard that we're talking

A   Well, it has to do with supply.  He -- basically
he writes plans to make sure that anything that is
traveling in or out or around pretty much the
world, as far as Elmendorf is concerned, he very
much knows where it is, how it's going to get
there, how it's going to get back, who's
responsible for that, how much it's going to cost,
all aspects of making that happen.

Q   Okay.  So he's tied in with the C-5's, and the
141's and that that are in and -- back and
forth.....

A   Everything.

Q   Back and forth, back and forth.

A   Yes, he is.

Q   Okay.  And how long have you been with the school
district?

A   Wow, it's been -- hmm, since 19 -- in Fairbanks -
- I mean, no, I'm sorry, in Anchorage it's been
since '92.  I believe that's when we came.  We
were in Fairbanks eight years before that, but I
have a total of 17 years.

Q   How did you get out of being rotated?  I assume
you were married with your husband when you said
we?

A   Yes, yes.  Everybody asks that same question.

about, you know, the idea of beyond a reasonable
doubt, do you have any problem with that idea?
That it's.....

A   None whatsoever.

Q   Okay.  And do you have any problem with the fact
that the state has the burden, they have got the
burden?

A   No, I don't have a problem.  That's been stated
very clearly.

Q   Okay.  Did you ever go to a meat market and look
at a piece of fish and say, hmm, looks pretty
good, and then you get it out and you maybe smell
it, or you get a closer look at it and you say
there's something wrong?

A   Uh-huh  (affirmative).  Yes.

Q   All right.  You may not be able -- and have you
ever been able not to pinpoint exactly what's
wrong but there's something wrong?

A   Very much so.

Q   Did you buy the fish?

A   Nope.  Not at all.

Q   All right.  What does your husband do in the Air
Force?

A   He's a logistics planner.

Q   Okay.  So that's in supplish(ph)?  .

Q   Okay.  So I'm not.....

A   I know.

Q   I'm not embarrassing you then?

A   No, not -- not in any shape, form or fashion.
There was a period of time when we first came up
that it was, you know, spouses were not to come
because they didn't have housing that was
available.  Then the Air Force, and Army as well,
experienced a shortage in funds and so they had us
stay put.  We were pretty much if you desire to
stay you could stay.  And then there was an eight-
year clause that we were there, so we did our eight
years in Fairbanks, and then moved to another base
which was here in -- at Elmendorf.  And so he was
due to retire and since the current issues that
are facing our nation at this point, that has been
pulled back so he is not eligible to retire at
this time.

Q   All right.

        VOIR DIRE OF KAREN NYBACK

BY MR. JAMES:

Q   Mrs. Nyback, you're a retired R.N.  And I -- am I
correct in assuming you retired up here?

A   Yes.

Q   Who did you work for?

Exhibit J – 26

A    Alaska Regional Hospital.

Q    Did you work for them for your entire.....

A    Twenty-three years.

Q    Twenty-three years. So you went through all the changes from Teamsters, Humana.....

A    You've got it.

Q    Whatever to whatever, to whatever. What kind of medicine did you practice?

A    Most of the time, and until I retired, discharge planning.

Q    Okay. All right. And are your children up here?

A    Yes.

Q    Okay. And what do they do?

A    My daughter works for a business newspaper here in town, and my son is a computer guy for Lockhead Martin.

Q    Okay. And what did your husband do?

A    Property management for Alaska Native Medical Center.

Q    Okay. And when you were working -- what are your hobbies now?

A    Quilting and sewing in the winter, and fishing and playing outside in the summer, gardening.

Q    Okay. So -- and as I asked Mrs. Williams, have you ever, well, caught a fish and have thought,

AURORA COURT REPORTING

98

Q    You're a lineman for Chugiak, right?

A    Yes, sir.

Q    Okay. And you -- some notes here. How long have you been with Chugiak?

A    This is my -- start of my 13th -- 12th or 13th year.

Q    Okay. So you're a journeyman lineman then I would assume, is that.....

A    Yes, IBEW. I've been in the trade for -- I got in in '81 and went to the apprenticeship program and worked up here.

Q    Has that always been up here with IBEW?

A    No. I've been -- I mean IBEW is nationwide.

Q    Right.

A    But I -- I went Outside in like '86 to get my hot hours. I was an apprentice in California, and it was slow because of the oil crunch so I had to work Outside for a few years before I came back.

Q    Okay. And your experience as an electrician, when you come on a scene, have you found that things aren't exactly the way you initially perceived them to be? In other words, you come on, you made an observation and you said, okay, this I think is the problem, and then you kind of opened up the box and said, bad guess?

AURORA COURT REPORTING

100

A    Yes, but I've got to correct you. Linemen don't like to be called electricians.

Q    I'm sorry.

A    That's all right, don't -- yeah, it happens all the time. You look at something, you think it's one way, and by the time you start in like a power outages, you never know what you think, oh, I've got it fixed and all of a sudden it -- you never know what's going on.

Q    Okay. So I will throw myself on my sword and not call you an electrician.

A    It doesn't bother me, that's.....

Q    All right, so what happens basically is as something develops you explore it, right? Okay. Now you've never been on a jury. Have you ever been called?

A    Yes.

Q    How far did you get?

A    About right here, then I got bumped off.

Q    Okay. And was that a criminal case or a civil case, or do you remember?

A    Criminal case.

Q    Criminal case. In Anchorage?

A    Yes, sir.

Q    Okay. And do you recall what the case was about?

AURORA COURT REPORTING

101

hmmm, that looks pretty good until you maybe open it up and said, no?

A    I've seen fish with worms in them.

Q    Okay. You're kind of making a.....

A    I wouldn't keep the fish with worms. Uhh-unh. (negative).

Q    But until you actually opened it up you didn't see the worms, did you?

A    That's right.

Q    Okay. It looked pretty good from the outside?

A    Any fish I catch looks good.

Q    All right. And in your profession, in nursing discharge, did you use lists and checklists to make sure that you did everything correctly?

A    Always.

Q    All right. And did you have people that checked on things? You asked them to do something and they said yeah it was done and you -- did you ever rely or.....

A    You have to.

Q    Sure. Okay.

MR. JAMES: Mr. Sura.

VOIR DIRE OF FREDERICK SURA

BY MR. JAMES:

AURORA COURT REPORTING

9

Exhibit J — 27

A  It was a drug case.

Q  Drug case, all right. And you've indicated -- well, do you have any strong feelings regarding drugs one way or the other?

A  Well, you know, I don't think -- you know, drugs are everywhere, let's face it, you know. And coming up in the construction world, you know, I've seen it all over the place. You know, I haven't -- when I was a kid growing up, yeah, I was around it. But like when I got in the trade, it's such a dangerous trade I quit all that stuff and I went on, but I don't think, you know, a person should go to jail the same length of time for drugs as somebody who has murdered somebody. Seems like they sometimes they get stiffer sentence. That, to me, is kind of mind boggling. How you can get, you know, kill someone and get out of -- go for seven years, and then I read about people getting 25, 30 years for -- for drugs, you know. I'm an open minded person, but that seems a little strange to me. I -- I think if you kill someone that should -- it should be a lot stiffer penalty.

Q  Do you have any problem with this awesome responsibility of the state of beyond a reasonable

AURORA COURT REPORTING

102

open minded person but I'm going to be honest with you, and I'm sure I'm not the only one that's thinking this, they're probably saying, well, he got arrested for something, and I don't know, you know. I'm just being honest with you, but I'm an open minded person. Once all the facts are on the table, if it shows he's innocent, or you know, and they can't prove it, then.....

Q  Prove it to what.....

A  Without a reasonable doubt, then, you know. I'm a professional enough person to, you know, like I say, I'm not prejudice, I don't care about race, religion or anything like that. And -- but I think it's in a lot of peoples' minds here, you know, I mean. He got arrested for something, and if they have an informant and he handed him money and he sold him something, you know, that's just my first impression on it, but that can all change, you know, after five days or three days, or whatever, after all the facts are on the table. That can all change.

Q  Okay. You understand that the police standard is probable cause for an arrest?

A  Yes, sir.

Q  Okay. And you understand that this is a totally

AURORA COURT REPORTING

10

doubt?

A  No, I'm a fair person and I -- I can -- I can do the job.

Q  Now being a fair person and it's not -- you know, we talked about the scales I talked about earlier. Do you have any problem with this idea of -- and it's not just an idea, it's our American justice system, of moving -- forcing the state -- forcing them to move that scale all the way even, and then way down here beyond a reasonable doubt? Do you have any problem with that?

A  No. I don't have a problem with it, but I'll be honest with you, you know, like to me, you know, like you've got a drug case and you've got a guy here and he's been arrested for drugs. He's supposedly, you know, everybody says, well, yeah he's innocent until proven guilty, but in the back of my mind I'm thinking, hey, he had it on him, he sold it to somebody and he got the money, and they probably have him video taped and this and that, so you're thinking, well, he's guilty; but, hey, there's a lot of things that could have happened in there, you know. Maybe -- you know, maybe he thought he was giving him a bag of sugar, maybe -- you know, there's a million things. So I'm an

AURORA COURT REPORTING

awesome burden in comparison to probable cause?

A  Yes, sir.

Q  Do you have any problem with the fact that I have no burden of proof?

A  No. Like I say, I can give -- once the evidence weighed, I can give an honest, fair opinion like that's my duty.

Q  Okay. Do you think that someone who is dishonest in one action might very well be dishonest in another action?

A  Well, it's possible, oh, yeah.

Q  And do you think that people who have, as was discussed earlier by one of the jurors, has something hanging over their head is going to do what they have to do to get out of their particular problem, no matter who they take or what they have to say?

A  I don't know, I like to think people have a code of ethics they go by, but you know, desperate people do desperate things.

Q  Now you as a lineman, and I'm not being facetious there.

A  Right.

Q  You have a code of ethics, a code of standards that you use, that you rely upon your fellow

AURORA COURT REPORTING

10

Exhibit J — 28

workers to adhere to, correct?

A   Yes, sir.

Q   All right.  Would you agree that not everybody has those high standards?

A   Right.  Yes, I agree.

Q   And what does your spouse do?

A   I forgot to mention.  She -- well, she's off work now, but she works at sales at Global North Van Lines, she's a sales manager there.  We have a child that's two months old.  Yeah.

Q   Okay.

MR. JAMES:  Mr. Lockery?

VOIR DIRE OF JAMES LOCKERY

BY MR. JAMES:

A   Yes.

Q   You have a brother in corrections in Arizona, is that -- works for the Department of Corrections?

A   Yes.

Q   Okay.  And does he work for the State of Arizona or is he part of the private contracting system that we've read about?

A   I believe it's State of Arizona.

Q   Okay.  And is he older, younger than you?

A   Older.

Q   Older.  And does the fact that your brother works

---

for Corrections, granted it's not related to the State of Alaska; is that going to cause you to feel that you could not be a fair and impartial juror in this particular case?

A   It's not going to cause me any problems with that issue.

Q   All right.  Is there another issue that's going to cause you problems?

A   One is I'm -- I don't like really hard drugs at all.

Q   Yeah.

A   I had a girlfriend that was on cocaine occasionally, and the only reason that we broke up is she wouldn't get off that and I could tell right off the bat whenever she was on coke, she'd just turn into a -- I don't want to say the words in court here, something not very nice.  And so I'm a little biased towards hard drugs.

Q   Okay.  Now -- do you fish?  Is that.....

A   Usually I do, yes.

Q   Commercial?

A   Usually.  I work in the fishing industries.

Q   What type of fishing do you do?

A   I've long-lined.  I've set net, gill net, you know, drifted.

---

Q   Okay.  So salmon and cod?

A   Salmon and black cod, halibut.

Q   Okay.  And how long have you been up here fishing?  Or how long have you been up here?

A   I've lived here in Alaska since pretty much '90.

Q   '90.  And have you been fishing -- well, '90's -- since about then?

A   On and off.  I didn't fish this year.

Q   Okay.  Now the fact that you have some experience, based upon a former girlfriend with drugs, my question is and is this standard.  Do you have any problem with the fact that we don't have any burden of proof?

A   No, I don't really.

Q   What do you mean, really?

A   I -- I usually don't deal with drugs.  If they're around I just leave and don't let it bother me.  I just -- if I go somewhere, like to a place and they have drugs there or something I just see you.  I just walk away and I don't -- I don't want to deal with it, usually.

Q   All right.  But in a criminal case the burden of proof -- it doesn't matter what the criminal case is, would you agree with me there, that the burden of proof is the burden of proof?

---

A   Yeah, the burden of proof.

Q   Okay.  My question is, do you have any problem with the fact that we, as an innocent defendant, have no burden of proof?

A   No, I don't.

Q   Okay.  And just like -- you indicated that sometimes because of your dress and hair style that you've been stopped by the police and for whatever their perception reason, and their perceptions didn't turn out correct, did they?

A   Sometimes.

Q   Sometimes, okay.  Well, sometimes they're wrong, sometimes they're right, huh?

A   Most of the time they're wrong.

Q   Most of the time they're wrong, okay.  So, -- and when you fish do you have checklists or something to make sure that everything is done correctly?

A   No, we just know how to do our job and we do it.

Q   Okay.  And you're dependent upon the other members of your team to do their job correctly so that no one gets hurt, right?

A   Yes.

Q   Okay.  And if one person fails in their job what happens?  Potentially happens?

A   Sometimes you can die.

Exhibit J – 29

Q   Yeah; sometimes people can die.  I would assume

then that you sail with a crew that you feel

comfortable with?

A   A couple times, no.

Q   All right.  And did you wish you were off that

boat?

A   Yeah, I kind of got off the boat the next day.

Q   The next day, yeah, okay.  All right.

          VOIR DIRE OF STELLA LISENBEE

BY MR. JAMES:

Q   Ms. Lisenbee?

A   Lisenbee.

Q   Lisenbee.  The -- you work at the registrar's

office at the UA -- how long have you worked

there?

A   At Alaska Pacific University.

Q   Yeah, I was going to say.....

A   Twenty-two years.

Q   Twenty-two years, okay.

A   It used to be Alaska Methodist University.

Q   AMU, yeah.  And you have no children.  You have

served on a jury but you don't remember when, is

that.....

A   No, it was I think in the early 80's but I -- I

just can't remember when.

110

Q   Are you prepared to hold them to that standard?

A   Yes.

Q   You ever bought a fish?

A   I've fished before.

Q   Have you fished before?  And I assume you caught

one?

A   Lots of them.

Q   Okay.  And those fish, have you ever looked,

thought, well, it looks pretty good and then

opened it up and said, oh, oh?

A   Yeah, most fish have worms.  You just cut them out

and go on.

Q   Okay.  So the fact that your fish has worms

doesn't bother you, since you're able to extract

them?

A   No, it doesn't bother me.

Q   What if you can't extract them?

A   Then I do away with the fish.

Q   Okay.  So what you caught wasn't necessarily what

you were going to eat, right?

A   True.

          VOIR DIRE OF JAMES HUGHES

BY MR. JAMES:

Q   Mr. Hughes,.....

THE COURT:  Just a second.  Mr. James, you have five

1

Q   That's okay.  Was it up here?

A   Yes, it was.

Q   Okay.  And what kind was it?  Was it criminal,

civil?

A   I don't know which kind.  It was DWI, bribing a

police officer.....

Q   Criminal?

A   .....and leaving the scene of an accident.

Q   If I were to tell you that's a criminal case would

you.....

A   Yeah, I -- yeah.

Q   .....buy off on that?  Okay.  Now this is a

totally different case, and you probably just have

a distant memory of the last case.  But the

standard of proof is beyond a reasonable doubt

which I've talked about.

A   Right.

Q   And do you have any problem with the fact that we

start from way down here with this huge

presumption of innocence and they have to take

that away, take it away, take it away, and through

their witnesses and their evidence they've got to

establish beyond a reasonable doubt in your mind,

individually, do you have any problem with that?

A   No.

111

minutes.

MR. JAMES:  Thank you.

Q   .....when you mentioned the drum and bugle corps,

was that with the Boy Scouts?

A   Yes.  Uh-huh (affirmative).

Q   Okay.  That was -- was that was 815?

A   Yes.

Q   Okay.  That was the Explorer Post, yeah.  And we

haven't seen each other since high school?

A   That's right.

Q   Since I have five minutes I've got to rock and

roll.

          VOIR DIRE OF LOUISE LAZUR

BY MR. JAMES:

Q   Ms. Lazur, you're -- have you always been with the

Visitor's Bureau?

A   I have.

Q   Okay.  And how long has that been?

A   Fif -- nearly 16 years.

Q   Sixteen years, all right.  And I assume you use

checklists and different procedures to make sure

that things are done correctly every time, so

there's consistency?

A   Not necessarily.

Q   Necessarily, all right.  Do you expect

consistency?

A   I demand consistency.

Q   You demand consistency. Do you expect consistency from one person and not expect it from another person?

A   No, that's not how it's done.

VOIR DIRE OF JOHN HARTNER

BY MR. JAMES:

Q   And Mr. Hartner? Use up my couple minutes here. You're a geologist, and what does your wife do?

A   She doesn't work outside the home.

Q   She stays at home, okay.

A   Homemaker.

Q   Do you have any problem with the burden of proof?

A   No.

Q   Okay.

VOIR DIRE OF DAVID DORSEY

BY MR. JAMES:

Q   Mr. Dorsey, how about you. Any problem with the burden of proof?

A   No.

Q   All right. Any problem with the fact that my client is innocent?

A   He's innocent right now.

Q   All right. And until the state proves each and

AURORA COURT REPORTING

114

---

Q   Okay. Were they here in Anchorage?

A   Yes, sir.

Q   Okay. And do you have any problem with the fact that we have no duty of coming forth with any evidence?

A   None whatsoever.

Q   Okay. Do you fish?

A   No, sir.

Q   Bought a fish?

A   Not very often.

Q   Don't like fish?

A   I like red meat.

Q   All right. So if there's something fishy here you don't really care.

PROSPECTIVE JUROR: It's somebody else.

MR. JAMES: Pass the mike, please. Ms. Nelson.....

VOIR DIRE OF CRYSTAL NELSON

BY MR. JAMES:

Q   .....what are you studying?

A   Communications.

Q   All right. And where did you graduate -- you went to high school up here I assume?

A   Uh-huh (affirmative).

Q   Where did you go?

A   East High.

AURORA COURT REPORTING

116

---

every element beyond what?

A   A reasonable doubt. He stays innocent.

Q   He's innocent. All right.

A   Uh-huh (affirmative).

Q   Is there anything wrong with him being innocent?

A   No.

VOIR DIRE OF DAVID HOLMES

BY MR. JAMES:

Q   Mr. Holmes.

A   Yes.

Q   You served on a jury about four or five years ago?

A   I think that was the last time.

Q   The last time. How many times, sir?

A   Two criminal, one civil.

Q   Okay. And some of those I believe you guys -- or excuse me, guys -- you folks went to verdict and I think you were foreman on.....

A   Two of the criminal cases.

Q   .....two of the -- two out of two?

A   Yes, sir.

Q   All right. And what were those cases involving?

A   The last one was multiple issues with the most sincere being murder.

Q   Okay. And the prior one?

A   Attempted murder and armed robbery.

AURORA COURT REPORTING

115

---

Q   East High. All right. And what year are you in college?

A   Sophomore.

Q   Sophomore, all right. And have you studied any government in college? In high school?

A   In high school.

Q   All right. Do you have any problem with the concepts of beyond a reasonable doubt?

A   No.

Q   Do you have any problem with the concept that the American system of justice says you're innocent until proven guilty beyond a reasonable doubt?

A   No.

Q   Does that make you feel good?

A   Sure.

Q   Why?

A   Because, you know, if -- you at least have a chance to be innocent because in some other countries it's like you're guilty first, you have to prove you're innocent, so.

Q   Okay. It's not just a chance here, is it?

A   No.

Q   It's an absolute, isn't it?

A   Right.

VOIR DIRE OF LEONE GARNET (PH)

AURORA COURT REPORTING

117

Exhibit J — 31

BY MR. JAMES:

Q   Mrs. Garnet(ph), I think we talked a little bit.
    Do you have -- what's your husband retired at?

A   He retired Department of Transportation, civil
    engineer.

Q   Civil engineer, okay.  And you retired from the
    Air Force as a nurse?

A   Air Force Nurse Corps.

Q   The Nurse Corps.  Did you retire up here?

A   Yes.

Q   Okay.  So you worked out of 5040th or whatever it
    was?

A   Well, I'm -- yes, I was stationed here several
    times.

Q   All right.  And do you have any problem with what
    I've talked with the other jurors about?
    Anything, say, hey, if I asked that que -- he
    asked me that question I'd change the answer, I
    don't agree with what they said or I would modify
    it?  The questions I've asked the other jurors?

A   No, I believe that the man is innocent until
    proven beyond a reasonable doubt that he's guilty.

Q   Okay.  And as a nurse did you ever use checklists
    and have consistency everything is done.....

A   Oh, in the Air Force?  We always had checklists.

AURORA COURT REPORTING

118

---

Q   All right.  And you -- everybody is the same
    standard, right?

A   That's right.

Q   Okay.  So what you do to one you do to the other,
    right?

A   Uh-huh  (affirmative).

Q   So you can't do this and say, oh, we just did that
    for him over here, but we do this over here
    differently?

A   No.

Q   No fly, right?

A   That's right.

Q   Thank you.

    THE COURT:  Mr. James, you're out of time.

    MR. JAMES:  Thank you.  I almost made it.  Thank you
    for your attention, ladies and gentlemen.

    THE COURT:  What I'm going to do -- is this on?  No.
    What I'm going to do next is take the lawyers back in bench
    conference again, and rather than call a massive break, if
    you need to slip out and take a break we'll probably be back
    there five minutes or so; go ahead and do that, and we'll
    take a longer break in a little while.  And please bear --
    if you don't leave, just relax and bear with us for a
    minute.  Lawyers, bring your blue sheets with you, please.

    (Bench conference as follows:)

    AURORA COURT REPORTING

119

---

    THE COURT:  Now we're at bench conference.  Any
additional challenges for cause?  Ms. Brady?

    MS. BRADY:  I have one, Your Honor.  Mr. Lockery.  I
should have done this last time, I forgot.  He is being
prosecuted by the state and I think that's a.....

    THE COURT:  Mr. James?

    MR. JAMES:  He's indicated that he can proceed, but I
think the  evidence -- or I mean, excuse me; the criminal
rules cover that.

    THE COURT:  Yes, you're entitled to a challenge for
cause of Mr. Lockery.  Any additional challenges for cause
from the state?

    MS. BRADY:  No, Your Honor.

    THE COURT:  From the defense?

    MR. JAMES:  I (indiscernible) believe so.

    (Whispered conversation)

    THE COURT:  I thought maybe you'd.....

    MR. JAMES:  (Indiscernible).

    MS. BRADY:  (Indiscernible) back over that.

    (Whispered conversation)

    MR. JAMES:  No, Your Honor.

    THE COURT:  All right.  Are you -- can you do your pre-
emptory challenges back here, separate you -- want to do it
way?  We don't have to kick the jury out or they also don't
have to watch you working at your tables while you do them?

    AURORA COURT REPORTING

120

---

Are you able to do that or do you need additional
information?  Can you.....

    MS. BRADY:  I've got some.

    THE COURT:  You're ready to do your's?

    MS. BRADY:  I'm ready to go.

    THE COURT:  Mr. James?

    MR. JAMES:  I need some time to talk with my client
before we go into the pre-empts.  Now the rules are that we
go over the rules very.....

    THE COURT:  Well, exer -- pre-empt whoever you want.
Whoever is in the box, on paper.

    MR. JAMES:  I understand.

    THE COURT:  In bulk.  I'll excuse them all and then
we'll start over again.

    MR. JAMES:  Okay.  Can we have five minutes, Your
Honor?

    THE COURT:  Yes, you can have -- and do you want to
just stay back here?  I'll -- we'll leave this -- we'll
leave you alone back here, and I won't go back in the
courtroom.  Ms. Brady and I will go out in the hall and --
or if you need some stuff from your desk you can get it and
bring it back here.

    MR. JAMES:  Yeah.  Do you want to do it here or do you
want to do it in the conference room?  Basically.....

    MR. DAVIS:  I want to do it in the conference room.

    AURORA COURT REPORTING

1

THE COURT: You can use our conference room.

MR. JAMES: Oh.

MS. BRADY: The other rule that should probably be gone over is that once we bumped -- pre-empted these people that are seated and you can't go back and pre-empt or (indiscernible).....

THE COURT: Right, you can only use your pre-empts.....

MR. JAMES: All right (indiscernible). I couldn't remember whether we did two, two or.....

THE COURT: No, do it.....

MR. JAMES: .....whether we can do the four.

THE COURT: Right; and I'm going to -- unless you object, I'm going to ex -- I'm going to tell the jury it's going to be about five minutes and we're going to go off record.....

MR. JAMES: Or (indiscernible).....

THE COURT: .....and you're entitled to be in the courtroom during the process, but unless -- do you object if I just step back in and tell them.....

MR. JAMES: No, no, that's all right.....

THE COURT: .....it will be at least another five minutes?

MR. JAMES: No. How do we know what the other side -- who they pre-empted so we don't use up our challenges?

THE COURT: You don't.

AURORA COURT REPORTING

122

---

them to work in a conference room back there. If you -- I'm going to excuse some of you. When I do that, please don't take it personally, it's all part of the jury selection process, and I think madam clerk, what they need to do is keep calling in this week and see if your group number is called. So I'll thank you in bulk, and if I remember I'll thank each one of you when I excuse you, as well. Ms. Randall, you have been excused, thank you very much. Number -- juror number 3. Juror number 8, Ms. Williams, you have been excused, thank you very much. And juror -- excuse me.

PROSPECTIVE JUROR: Do I need a slip or something?

THE COURT: You don't need a slip, just call in. Mr. Lockery, juror number -- you are juror number 8, Ms. Williams was number 5. But, Mr. Lockery, you've been excused, thank you. Ms. Lisenbee, juror number 9, you have been excused, as well. Mr. Dorsey.....

MR. LOCKERY: Keep calling in?

THE COURT: Keep calling in, Mr. Lockery, thank you. Mr. Dorsey, number 13, you've been excused, thank you, sir. Ms. Nelson, number 15, you have been excused, and Mr. Hughes, number 10, you have been excused as well. Thank you very much.

All right, I need 14.....

MS. BRADY: Actually, Your Honor, could we have a bench

AURORA COURT REPORTING

124

---

MR. JAMES: Oh, we don't.

THE COURT: Right.

MR. JAMES: (Indiscernible).

THE COURT: When you -- if you both pre-empt the same person that's.....

MR. JAMES: Show biz.

THE COURT: Yeah, that's.....

MR. JAMES: Okay, I understand. All right.

THE COURT: That still counts.

MR. JAMES: All right, that's fine. We're going to go back, we need to take care of that, that's all right.

MS. BRADY: I'll just stay right here.

MR. JAMES: All right. (Indiscernible).

(End of bench conference)

THE COURT: It will be about five minutes, which means ten. But don't wander off, please. If anybody needs to take a short break you can -- we'll go off.....

(Off record)

THE COURT: All right, we're back on record. Thank you very much for your patience. What's happened is is that part of the jury selection process, the lawyers are entitled to excuse a fixed number of jurors for each side without offering any explanation, and they don't have to tell me why, they just have a right to do it; and that's what they were doing, and rather than kick you all out here I asked

AURORA COURT REPORTING

---

conference, please.

THE COURT: Yes, we can. Excuse us for a second.

(Bench conference as follows:)

THE COURT: We're at bench conference.

MS. BRADY: Did I not put -- what is it -- yeah, one is number 18 did not get excused out. He's number.....

THE COURT: You gave me Williams, number 8. And I disqualif -- I excused Ms. Williams, who was number 5 rather than Mr. Williams, who was number 18.

MS. BRADY: I'll just count that as a pre-empt for me then, an additional one, and I -- but I wanted -- I meant and intended to excuse Mr. Williams, 18.

THE COURT: All right.

MS. BRADY: Okay. And so Ms. Williams was number what?

THE COURT: Five.

MS. BRADY: Okay. Oh,.....

THE COURT: The problem -- that was my mistake because you have -- well, it was a combination of mistakes. You have Williams and.....

THE COURT: I had Lockery, right.

THE COURT: And you have Hughes, number 18. Your numbers were incorrect, but I should have checked because there are two Williams.

MS. BRADY: I apologize, Your Honor, I'm sorry.

THE COURT: Well, I apologize for not asking, but

AURORA COURT REPORTING

125

Exhibit J – 33

you're going to eat that mistake for both of us.

MS. BRADY:  I'll eat it.

THE COURT:  And excuse Mr. Williams, number 18, as well; is that correct?

MS. BRADY:  Yes.

THE COURT:  All right.

(End of bench conference)

THE COURT:  And Mr. Williams, number 18, you have been excused as well, sir, thank you.  So let's -- how many seats do I have?  1-2-3-4-5-6-7-8.  We'll call eight names.

(Clerk calls eight prospective jurors)

THE COURT:  All right.  The same process we did earlier, folks.  The new folks please answer these questions for me.  Mr. Katchatag, there's a seat for you in the back row.  We'll start with Mr. Ross.  Go ahead.

MR. ROSS:  My name is Gary Ross, I live in South Anchorage, off of Upper O'Malley Road.  I'm a production foreman on off shore oil production platform in Cook Inlet, I've been there for 24 years.  My wife's name is Becky, she's a teacher with the Anchorage School District.  I have two children, 15 and 18.  I was born in Oklahoma and raised in Wyoming.  My hobbies are golf, fishing and horses.  I've never been involved in a lawsuit nor has any member of my family.  I have served on numerous juries.  I know of no reason why I should not serve on this one, and I know no one

involved in this trial.

THE COURT:  Thank you, Mr. Ross.  Mr. Iverson.

MR. IVERSON:  My name is Robert Iverson, I live over on the East side of town.  I'm project manager, systems analyst.  Working in the oil industry for 20 some years up here.  My wife's name is Marguerite and she works for the Anchorage School District as a teacher's assistant at Whaley.  I have three children, ages 20, 18 and 15.  I was born in Texas and raised all over.  My father was in the military.  Hobbies, traveling, music.  I sing in some choral groups.  Some church work.  I currently have a -- my son is involved in a juvenile case, it came up last month.  I have served on a jury several times.  I don't see any -- have a specific reason why I couldn't serve on this jury, other than this possible conflict of dates next Wednesday that I mentioned.  And I, to my knowledge, I don't know anyone in the trial.

THE COURT:  All right, thank you, Mr. Iverson.  Let's go to Ms. Traver.  Or excuse me, Ms. Cleaveland, I'm sorry.

MS. CLEAVELAND:  Hi.  I'm Kim Cleaveland, I live in Eagle River, I'm a registered nurse.  My husband's name is Gary, he's in the Air Force, he's in aircraft maintenance.  We have one eight year old son.  I was born and raised in Lake City, Florida.  I like to read, garden, and recreational gold mining.  Never have been in a lawsuit,

none of my family have ever been involved, and this is my first time being called for jury duty.  I see no reason I couldn't serve, and I don't know anyone here.

THE COURT:  Thank you, Ms. Cleaveland.  Now Ms. Traver.

MS. TRAVER:  My name is Nancy Traver, I live off of Lake Otis and Tudor.  I work for the Anchorage School District as a speech pathologist assistant.  I'm married and my husband is an acoustical engineer.  We have two boys, ages 11 and 13.  I was born in Ohio, raised in California.  I like crafts, gardening, outdoors and I do a lot of volunteer work through the school.  I've never been involved in a lawsuit, I've never served on jury duty.  I don't see any reason why I can't, and I don't know anyone involved in this trial.

THE COURT:  Thank you, Ms. Traver.  Mr. Oswald.

MR. OSWALD:  My name is Ron Oswald, I live in East Anchorage, off Northern Lights.  I work for the FAA in flight inspection, facility maintenance.  I'm married.  My wife is Patricia, she's an Anchorage school teacher.  I have two boys, 24 and 26.  I was raised in Ohio.  Hobbies are reading, woodworking, traveling, computers.  I belong to the VFW.  I've never been involved in a lawsuit.  I have served on a jury, I think in '98 I believe.  I see no reason why I shouldn't serve as a juror, and I do not know anybody in this trial.

THE COURT:  Thank you, sir.  Let's see, we'll go to Mr. Wortman.

MR. WORTMAN:  My name is Bill Wortman, I live in Spernagain, which is between Turnagain and Spenard.  And I'r retired.  And I worked as a security supervisor on the pipeline.  Military.  And did counseling for employment.  I'm married, my wife's name is Robin Loster(ph) and she's a neuropsychometrist.  And I have four children.  She has two children by a previous marriage.  I was born in Boston, raised in California, Alaska and Germany, Kentucky and Maryland.  I'm on the board of directors for Fur Rendezvous Do volunteer work for the Dancing Bears.  I was involved in a lawsuit in 1981.  And I've got a son that's gone to court twice for DWI.  I have served on grand jury.  I can't think of any reasons why I couldn't serve, and the only person I know is Kathy Bushue.

THE COURT:  Thank you.  And Mr. Owens.

MR. OWENS:  My name is Dick Owens, I live in South Anchorage.  I'm a geologist in the oil industry for 26 years.  My wife's name is Janie.  She is a grants technicia at the Anchorage School District.  I have two boys, 28 and 25.  Born and raised in Minnesota.  Hobbies are most sports hockey, running, golf.  Never been involved in a lawsuit.  I've been on one jury.  Don't know of any reasons why I couldn't serve on this jury, and I don't know anybody

Exhibit J – 34

involved in the trial.

THE COURT: Thank you, Mr. Owens. And Mr. Katchatag.

MR. KATCHATAG: My name is Chris Katchatag, I live by East off of Russian Jack. I'm not employed right now. I have no children. Born and raised here in Anchorage. Hobbies are outdoor sports during the summertime. I've never had to come to court. My mom's gotten in trouble a couple times with DUI's or something like that. Never been on a jury. There's no reason why I shouldn't be, and I don't know anyone in this trial.

THE COURT: Thank you, Mr. Katchatag. Ms. Brady, do you have questions for this new group of folks?

MS. BRADY: I sure do, Your Honor.

THE COURT: Take about 20 minutes.

MS. BRADY: Okay. All right. I'll start off with Mr. Ross, number 3.

VOIR DIRE OF GARY ROSS

BY MS. BRADY:

Q Hi.

A Hello.

Q At this stage what I usually like to do is -- you were present during the time when I was asking people in the box questions for the most part, right?

A Yes.

AURORA COURT REPORTING

130

---

A Yes.

Q If we get to something that you'd feel more comfortable discussing in the back, then just let me know.

A Okay.

Q You've been a juror before?

A Yes, I have.

Q And was it a criminal or a civil case?

A I think two civil and one or two criminal.

Q Okay.

A Over the years.

Q Was the -- were each of the juries that you were seated on, without telling me what the verdict was, were they able to reach verdicts in those cases?

A Yes, they were. One of them, I knew another juror, but I was an alternate, so I was excused, but that jury didn't reach a verdict.

Q Okay. But you were an alternate on that one anyway?

A Right. Other -- other jurors -- I was foreman of one, and just a member of another, and they reached verdicts.

Q Okay. And I'm going to ask you the same question that I asked Mr. Ross. When you were seated out

AURORA COURT REPORTING

132

---

Q And you heard the kinds of questions I was asking about confidential informers and judging credibility, that kind of thing?

A Yes.

Q Was there anything that anybody said that made you go, wow, if I were there I would say something very different, or anything along those lines?

A Nothing I recall, nothing comes to mind.

Q Okay. And you said you've served on numerous juries?

A Four, I believe.

Q Four. Criminal, civil?

A They were all criminal.

Q All criminal. Ever been a foreperson?

A No.

Q Was the jury, without telling me what the verdict was, was the jury able to reach a verdict in the four cases that you served on?

A In three cases we reached a verdict, in the fourth, as soon as the jury was seated, the defendant changed his plea and we were dismissed.

Q Okay. That's all I have for you.

MS. BRADY: Mr. Iverson.

VOIR DIRE OF ROBERT IVERSON

BY MS. BRADY:

AURORA COURT REPORTING

---

there and I was asking people questions, did you hear anything that you said, wow, I would have said something very different or anything along those lines?

A No, just -- you know, regardless of confidential informant or any witness you have -- the juror has to decide whether they're -- it's the truth or the true facts in the case.

Q And do you understand that police have to sometimes make deals with people or they wouldn't be confidential informants, and that's the only way to get people to do things; would you agree with that?

A Right. Right.

Q Okay. And I want to ask you about your.....

A I understand that -- I understand they have to do that, I don't know that it's always the best thing, but.....

Q Okay.

A You know, qualify my answer a little.

Q All right.

A I don't have a strong opinion. I just.....

Q So you're just willing to listen to the facts of the case and.....

A Right.

AURORA COURT REPORTING

133

Exhibit J – 35

Q     .....decide on whatever the facts may be?

A     Right.

Q     Okay.  You can be fair?

A     Yeah.

Q     The next thing I wanted to ask you about was that your son is involved in a criminal case?

A     Yes.

Q     Who is the entity that's prosecuting?  Is it the city or is it the state, or it's.....

A     Hmmm.  This is my first experience with anything along these lines.

Q     Uh-huh (affirmative).  And if I've gotten.....

A     I think it was the city.

Q     Okay.  If I've gotten into an area where you'd feel more comfortable.....

A     Yeah.

Q     .....talk in private.....

A     Yeah.

Q     .....we can certainly do that in a few minutes.

A     Okay.

Q     Is there anything about your son's involvement in this case that is making you feel reluctant to serve on a jury right now while that's going on, or anything along those lines?

A     Well, only the schedule where I would want to be

in the -- in my son's case, at court, and that's scheduled, right now, to my knowledge next Wednesday.

Q     Okay.

A     Yeah.

Q     Do you feel like you can be fair to both sides even though that's going on, sort of in the background?

A     Yeah, I think so.  There -- I mean having had not really personal dealings with police or -- in this type of a matter, it does involve, you know, witnesses who says what, et cetera, and working with the lawyer, I'm all of a sudden getting a crash course in seeing both sides, so that's about all I can say.  Yeah.

Q     Okay.  Do you feel like your son is being treated fairly?

A     I would -- I think the charges are a little harsher than with the circumstances.  It's -- it's almost like you're talking about the police will do something on probable cause and yet when you get down to the nuts and bolts it's not always on the -- the same thing on the surface as is underneath, so.

Q     Okay.  Do you think the police treated your son

fairly when they.....

A     Oh, absolutely.

Q     Do you think that he's being treated fairly by the courts?

A     Yes, I just -- yes to both questions.  I'm probably biased with respect to my son, so -- but I don't have a problem with any of the functions of the system that's been going on, no.  That's a.....

Q     Okay.  So nothing stands out in your mind -- you don't have like a particularly bad impression of lawyers or courts or anything at this time?

A     No, I have several friends that are lawyers.

Q     Okay.  That's all I have for you.

A     Okay.

      MS. BRADY:  If we could go to Ms. Cleaveland.

             VOIR DIRE OF KIMBERLY CLEAVELAND

BY MS. BRADY:

Q     You're a nurse?

A     Yes, ma'am.

Q     What kind of nurse are you?

A     I work in a doctor's office in internal medicine.

Q     Okay.  And when I was -- did you hear the questions that I was asking people about CI's and how you judge credibility and that kind of thing?

A     Yes, ma'am.

Q     Were you sitting out there thinking, wow, I would say something very different at any -- you know, when anybody was answering a question?

A     Okay.  The only thing I really thought of was when I'm looking for the truth I want consistent truth.

Q     Could -- I'm not quite sure I understand what you mean, could you explain that a little bit more?

A     The story needs to stay the same.  The basic elements.

Q     Okay.  So a story that switches around a lot would be indicative to you that that's not true?

A     Right.  Right.

Q     Okay.  That's fair.  And that's all I have for you.

      MS. BRADY:  Ms. Traver.

             VOIR DIRE OF NANCY TRAVER

BY MS. BRADY:

A     Traver.

Q     Traver.  The same question.  Was there anything that stood out that you said, wow, I would say something very different to any of the questions I was asking?

A     No.

Q     Okay.  No strong -- anybody in your family

involved in drugs or anything like that?

A   No.  Uhh-unh.  (negative).

Q   Okay.  No particularly favorable or unfavorable
    experiences with either police officers or courts
    or anything?

A   No, just observing and listening.

Q   Okay.  That's all I have for you.
    MS. BRADY:  Mr. Oswald.
           VOIR DIRE OF RONNIE OSWALD
BY MS. BRADY:

A   Yes.

Q   You served on a jury in '98?

A   That's correct.

Q   Criminal or civil?

A   Criminal.

Q   And without telling me what the verdict was were
    you able to reach a verdict in that case?

A   Yes.

Q   Was it a -- were you the foreperson on the jury?

A   No.

Q   No.  Okay.  And the same question I would pose to
    you, when you were listening to me asking people
    questions about confidential informers and judging
    credibility, and that kind of thing, did anything
    stand out that you said, wow, I would have said

---

Okay.

Q   Oh, that's right.

A   Okay.  And he and I went to college together.  All
    three of us went to college together at one time.

Q   Okay.  So is there anything about that
    relationship that would cause you to view her
    testimony very favorably, or more favorably than
    other witnesses or not be able to be fair in this
    case?

A   No, I've only seen her about three times in three
    years.

Q   Okay.  And you said that your son has been
    involved in two DWI's?

A   Yes.

Q   Anything about that that has -- do you feel like
    he was treated fairly?

A   No.

Q   Okay.  And who do you feel treated him unfairly?

A   Probably the police department at the time.  It
    wasn't this police department.

Q   Okay.  It was a police department in another
    state?

A   Fairbanks.

Q   Okay.  Do you have any impressions about the
    Anchorage Police Department?

---

something very different?

A   No.

Q   Okay.  That's all I have for you.
    MS. BRADY:  And Mr. Wortman.
           VOIR DIRE OF WILLIAM WORTMAN
BY MS. BRADY:

A   Yes, ma'am.

Q   Okay.  You've served on a grand jury before?

A   Yes.

Q   Have you served on a petit jury like this or just
    the grand jury?

A   No, I don't get this far usually.

Q   Okay.  Have you been out there and not been called
    to the box or have you ever been called to the box
    before?

A   I've been called to the box before.

Q   And you didn't make it onto the jury after being
    called to the box?

A   I was still on active duty at the time.

Q   Oh, so you were excused?

A   Yes.

Q   Okay.  And you said that you know Kathy Bushue?

A   Yes.

Q   Is she a close friend or an acquaintance or.....

A   She's the sister of my wife's first husband.

---

A   Pluses and minuses with Fur Rendezvous.  The
    police department helps us with what we do for Fur
    Rendezvous, so it's a very positive aspect, and
    then sometimes you hear or see things that are
    negative, so it's about even.

Q   It's about even, okay.  And do you feel like you
    can be fair in this case?

A   Yes.

Q   Okay.  And I'm going to ask you the same question.
    When I was asking people earlier about
    confidential informants and judging credibility
    and whether their families had -- themselves or
    their family members had been involved in drugs,
    anything along those lines?  Did you have an
    answer or an opinion or something different?

A   No, there was a fair amount of experience in the
    military in judging events and people about what
    went wrong or what happened, et cetera.

Q   Okay.  And your spouse is a counselor?

A   She's a neuropsychometrist, and I can't spell it.

Q   I can't either.  That's my -- might be why I put
    counselor.  Okay.

A   She tests people for brain damage.

Q   Okay.  That's all I have for you.
    MS. BRADY:  And if we could go to Mr. Owens.

VOIR DIRE OF RICHARD OWENS

BY MS. BRADY:

Q    Mr. Owens, you've been a juror before?

A    Yes.

Q    And was it a criminal case or a civil case?

A    Criminal.

Q    Okay. And were -- without telling me what the
verdict was, were you able to reach a verdict in
that case?

A    Yes.

Q    And were you the foreperson?

A    No.

Q    Okay. And the same question for you. The
questions that I was asking, do you have an
opinion, anything you wanted to add?

A    No, nothing -- nothing different, really.

Q    Did you think at any point in time that you would
have said something very different than somebody
who said something?

A    No.

Q    Okay. That's all I have for you.

     MS. BRADY: And Mr. Katchatag.

     VOIR DIRE OF CHRISTOPHER KATCHATAG

BY MS. BRADY:

Q    Mr. Katchatag, I see by your questionnaire that

142

---

please.

     MR. JAMES: Yes, sir. The new members that are sitting
on the panel, I assume you were all listening when I was
discussing the different standards that are used. Has
anybody got a problem with this idea that you're innocent,
and as you're sitting on this scale of innocence down here
when we start this? All right. Anybody got a problem with
the fact that it's the state's burden to move those scales
to that onerous burden that's awesome of beyond a reasonable
doubt? Anybody got a problem with the concept that an
individual under the American system of justice has an
absolute right to do nothing? Say nothing, do nothing, and
it's all on the part of the government. The government has
got to bring these charges and prove these charges. Anybody
got that problem?

     Anybody got a problem with the idea that they have to
prove each and every element beyond a reasonable doubt? No
two out of three, not four out of five, but each one? You
new jurors? Okay. Now I had spoke about opinion evidence
and I suspect, given what I know about the case, that there
will be opinions that are -- come forward. Has anybody got
any problem with the fact that I think UAA is going to win
the national championship in basketball? Not that I'm
correct, but I have that opinion. All right. And the fact
is that -- the fact that someone has an opinion does not

14

---

you're in school now?

A    Yeah.

Q    Is that going to pose a problem for you with the
schedule that you have to be here between 8:00 and
1:30?

A    I'm sure they'll let me off.

Q    Okay. So that will be a good thing for you?

A    Yeah.

Q    Okay. And I'm going to ask you the same question.
Did you hear when I was asking people questions,
did you think of anything like somebody said
something maybe and you had a very different
answer or?

A    Pretty -- pretty much the same. Same.....

Q    Any views about confidential informants?

A    No, not really. Sometimes, like -- like other
people said, you can't always trust them. You
know, they might be in it for what they might get
out of it, and be lying, and that's about it.

Q    Okay.

     MS. BRADY: That's all the questions I have at this
time, Your Honor.

     THE COURT: Thank you, Ms. Brady. Mr. James?

     MR. JAMES: Thank you, Your Honor.

     THE COURT: You want to take about 20 minutes as well,

14

---

mean that they are correct in that opinion, has anybody got
an idea where that flashing a badge doesn't make you God?

     Anybody have a problem with that? Has anybody got a
problem with the concept that the defense, without offering
any evidence, can raise a doubt which a reason could be
attached, and that's a reasonable doubt? Just by exploring
the state's case, their case. Anybody have a problem with
that? Okay. Now we've heard the fact that the police make
an arrest, there was some innuendos that I heard earlier,
that doesn't mean anything in this courtroom. Does anybody
have any problem with that? The arrest does not mean that
they are correct and are able to prove their case, does
anybody have a problem with that concept?

     Some of you that are new jurors sat on -- who sat on a
grand jury before? All right. And you've also -- have you
sat on juries be-- no, you have not sat on juries.

     THE COURT: Pass the mike back to Mr. Wortman, please.

     MR. JAMES: Back to Mr. Wortman, right.

     VOIR DIRE OF WILLIAM WORTMAN

BY MR. JAMES:

A    Yes, I've sat on grand jury, and, no, I haven't
been on -- other jury.

Q    A petit jury -- what they call petit jury. Okay.
And we've talked about reasonable doubt here and
I'm -- the court is going to instruct you on it,

Exhibit J – 38

but the standard that was used -- were you
instructed on the grand jury about the standard
that's used there?

A   Yes.

Q   Okay.  And as a grand jury, of course you're aware
that the only people that put on any evidence or -
- were the prosecutor right?

A   Yes.

Q   Okay.  And the only people that did any cross
examining of the witnesses were the grand jury,
right?

A   That's correct.

Q   All right.  And no one supplied you with a list of
questions to ask these witnesses, did they?

A   No.

Q   Okay.  So you were kind of going at that cold at
that particular juncture.  Now I need to explore
this Sergeant Bushue business, all right?

A   Sure.

Q   And the reason is, is that obviously they have
offered her, or intend to offer her as a witness
and you've indicated to me that you have seen her
maybe three times in the last year I believe
is.....

A   Three years.

AURORA COURT REPORTING

146

---

A   Fairbanks.

Q   In Fairbanks, okay, so -- okay.  You indicated you
knew a probation officer on your form?

A   My daughter.

Q   Your daughter.  And where does she work?

A   In the Federal Building.

Q   In the Federal Building.  So she's a federal
probation officer?

A   Yeah, she used to be a state.

Q   Okay.  And do you -- what kind of contact will you
have with your daughter?  I mean is it daily,
weekly?

A   Not as much as I'd like, yeah.

Q   There's.....

A   Say monthly, bi-monthly.

Q   Okay.  And how old is your daughter?

A   Thirty.

Q   About 30, all right.  And do you generally see her
and the other -- are the other children in town,
too?

A   There's one in Fairbanks, one in Nashville, one in
Moscow, Idaho and she lives in Palmer.

Q   Okay.  But the kids that are around, do you
generally get together for holidays and that?

A   Usually she stops by, yes.

AURORA COURT REPORTING

148

---

Q   In three years, all right.  She's going to get on
the stand and say -- and I'm paraphrasing now, but
she's going to offer her testimony and say this is
the truth, because she's going to be under oath.
And you've had a rela -- proper words here.
You've had a -- take it out of my mouth now.

A   I married into that family is.....

Q   Yes, that's -- thank you.  You're most helpful.
My question is, is how is that going to affect you
sitting here?  And how is it -- if you were
sitting next to me, how would you -- how is that
going to affect you?  Let's first.....

A   Well, I know Kathy in a positive light.  I mean I
don't have that much interaction to see her other
than that.  So how is it going to affect, I'm not
sure.

Q   All right.

A   You know, depending on what she says.

Q   Sure.  Okay, now you -- you, your wife and her
first husband.....

A   Yes.

Q   .....all went to school together?

A   And my ex-wife as well.

Q   There's four of you went to school together.
Where did you go to school?

AURORA COURT REPORTING

14

---

Q   Do you ever discuss what she does, any of you?
What's going on in her life professionally?

A   A little bit, yeah.

Q   Okay.

A   She doesn't discuss specific cases.

Q   Okay.  In generalities.

A   Yeah.

    MR. JAMES:  Okay.  Mr. Owens.

        VOIR DIRE OF RICHARD OWENS

BY MR. JAMES:

Q   Do you know any of these other people at all that
work for the school district?  It seems like we've
wiped out ASD here?

A   Yeah, I was surprised, but I don't -- I don't know
any of them, no.

Q   And you served on a jury and I think you indicated
that was criminal, is that correct?

A   Yes.

Q   Okay.  What type of case was it?  I'm not
interested in knowing what the verdict was, but
what type of.....

A   It was a burglary.

Q   Burglary, all right.  And so you've had a little
exposure to the elements of burglary, right?

A   Yes.

AURORA COURT REPORTING

149

Exhibit J – 39

**Page 150**

Q  Okay. And as part of -- since you went into deliberations, the court told you there was certain elements of a burglary. We're not dealing with burglary here, but there's -- you've got to prove A, you've got to prove B, you've got to prove C, you've got to prove D. I think there's only three, but that's neither here nor there. But you -- did you have any problem with the concept that it is.....

A  I don't think so, it was -- it was over 20 years ago, so I don't remember a lot, but it's.....

Q  Oh, okay, so you don't remember a lot, so.....

A  Yeah.

Q  The idea I guess I'm trying to ask you is that your -- if your recollection is that they had to prove each of those elements. That you couldn't get two out of three and say, well, gosh, they got the two so the third one must be there, too?

A  Right, yeah.

Q  All right. Okay. And where does -- does your wife work for the -- down at the headquarters, is that.....

A  She does -- she's actually a grants technician for Safe and Drug Free Schools program.

Q  Okay. So she seeks federal monies to put forth

AURORA COURT REPORTING

**Page 152**

Q  .....first grade teacher? All right.

A  Uh-huh (affirmative).

MR. JAMES: And Mrs. Traver.

VOIR DIRE OF NANCY TRAVER

BY MR. JAMES:

Q  Traver?

A  Traver.

Q  Traver?

A  Traver.

Q  Traver. I pronounced it right?

A  Uh-huh (affirmative).

Q  Okay. Where do you work?

A  I work at three schools, Taku, Willowcrest and Spring Hill.

Q  Okay. And you work with speech therapy, which is.....

A  Children that have problems with articulation and language.

Q  Okay. And that's -- and how long have you worked for the school district?

A  This is about my fifth year.

Q  All right. And you've never been on a jury?

A  No.

Q  Okay. Any problems with the concepts that I talked about earlier, beyond a reasonable doubt,

AURORA COURT REPORTING

**Page 151**

the word?

A  Right.

Q  Okay. All right.

MR. JAMES: I think we're -- Mr. Oswald. Mr. Oswald is right below there, please.

VOIR DIRE OF RONNIE OSWALD

BY MR. JAMES:

Q  And you served on a jury in '98, right, sir?

A  Yes.

Q  Criminal?

A  Yes.

Q  Okay. What was the charge? The charge? What was he charged with?

A  He stole a car.

Q  He stole a car, all right. And I think you indicated that one went to -- you made a decision on that?

A  That's correct.

Q  Okay. Was that here?

A  Yes, it was.

Q  Okay. All right. Okay, and where does your wife teach?

A  College Gate.

Q  College Gate, okay. So she's a.....

A  First grade teacher.

AURORA COURT REPORTING

**Page 153**

the standard of proof, these kind of concepts?

A  I don't have any problems with that.

Q  Do you fish?

A  Yes, I do.

Q  Bought a fish in the market before?

A  Yes, I have.

Q  Ever buy one that didn't -- you got it home or you got a closer look at it and said.....

A  Well, I'd try to take it back.

Q  You'd take it back? Why?

A  Well, if something was wrong with it, yes.

Q  That's right. So when you -- they iced it down, it looked pretty good, huh?

A  Uh-huh (affirmative).

Q  Got it home and the truth came out, right?

A  Right.

Q  All right. And you, as a therapist, do you use checklists and standards that you try to maintain consistency?

A  Yes, we do, because we're held.....

Q  So you're.....

A  .....accountable to our program.

Q  Okay. And someone else holds you accountable to a -- with an objective standard, right?

A  Right. Uh-huh (affirmative).

AURORA COURT REPORTING

Q  So they can come and look and say, Ms. Traver, I
don't care what you think you might went to do,
this is how it's going to be done?

A  Well, that puts my job in jeopardy.

Q  All right.  But the point of it is, is that
someone else has said I want to be able to look at
something on paper that says this is how I know
you were doing it this time, last time, the time
before that, and you're going to do it in the
future this way?

A  Correct.

Q  All right.  Do you think there's anything
unreasonable about that?

A  No, I don't.

Q  All right.  Did you ever build anything that
required pieces such as, well, I like to use the
brick wall or a rock wall, but you know, something
mosaics or something like that and you get it all
done, and it looks real nice, and then a piece
falls out?  Ever happen to you?

A  No, not that I recall.

Q  Okay.

A  I'm trying to.....

Q  But can visualize that where it didn't set up
because maybe you didn't mix the mortar right, or

A  We've been here about four and a half years.

Q  Okay.  And you've never served on a jury before.
Have you ever got close?

A  No, sir.

Q  All right.  And as a nurse I assume that you also
utilize checklists and standards that are some --
somebody else can look at and say, yeah, I can
judge what she did because of that, right?

A  Yes, sir, if you don't chart it, it didn't happen.

Q  It didn't happen.  Okay.  And is there definite
techniques that are utilized within the medical
community -- in your community so that you may
chart something and another nurse who knows
nothing about it can look at it, or even a lay
person can look at it if it knows what the graph
is and read it?

A  Yes, sir.

Q  So there's standardization then, right?

A  Yes, sir.

Q  Any problem with using standardization?

A  No, not at all.

Q  What's the good thing about it?

A  Well, I -- I can go along and follow along what's
happened in that patient's care without having to
talk to each and every person involved.  It's all

whatever it was, and the mosaic kind of crumbles
down because of the lynch pins fell apart on it?

A  I haven't had that experience, but with a quilt,
you know, I don't like the finish product
sometimes.

Q  Okay.  Why not?

A  My expectation wasn't met of the colors or the
style or what I had in mind.

Q  Or maybe there was a mistake earlier that you
didn't catch?

A  Correct.  Uh-huh (affirmative).

MR. JAMES:  Ms. Cleaveland.

        VOIR DIRE OF KIMBERLY CLEAVELAND

BY MR. JAMES:

Q  I guess -- have I talked to you yet?

A  No, sir.  Unh-unh.  (negative).

Q  Okay.  I didn't want to leave you out.

A  Okay.

Q  All right.  We have to move along here.  You're a
registered nurse, you work for an internist.  Who
do you work for?

A  Dr. Gurster(ph).

Q  Okay.  And your husband is in the Air Force in
aircraft maintenance.  How long have you been
here?

laid out.  You know, you know what's expected, you
know what your next step is.

Q  And you also have a, at least a written document
that you presume something was done because it was
checked off?

A  Yes, sir.

Q  Okay.  And if some of the -- what happens if you
don't have that type of a thing?

A  It really gums up the works.  You have to do a lot
of other checking.

Q  Makes you suspect, doesn't it?

A  Uh-huh (affirmative).

Q  Makes you uncomfortable?

A  Oh, yeah.

MR. JAMES:  Mr. Iverson.

        VOIR DIRE OF ROBERT IVERSON

BY MR. JAMES:

Q  My ticking -- my time is ticking.  Where does your
wife work?

A  She works -- she's a teacher's assistant at
Whaley.

Q  I'm sorry, you -- Whaley, I'm sorry.  I think you
already mentioned that.  I'm going to.....

A  Yeah.

MR. JAMES:  Let's see, I think I -- is there anybody

Exhibit J – 41

I've not talked to. Ah, okay. Mr. -- could you pass it
over to Mr. Ross, please, since you're real close.

                VOIR DIRE OF GARY ROSS

BY MR. JAMES:

Q    Mr. Ross, we've got a couple -- where does your
     wife teach?  I knew I was going to get a teacher
     in there.

A    She teaches at Russian Jack Elementary.

Q    Okay.  And what level?

A    First grade.

Q    Okay.  And you've got two kids, 15 and 18.  And
     you work for Unocal.  Do you use checklists and
     standards that you can -- objective standards?

A    Yes, continually, yes.

Q    Okay.  What's the importance of that?

A    Well, to make sure that we've done it the same way
     every time, and also for documentation that it's
     been done at all.

Q    All right.  And so the same standard that you used
     on the well -- I'm just using a well here, I don't
     know that you do wells, but well A you'd, with
     your checklist and your standards you know that
     those standards are being met when you're
     reviewing stuff that was done on well B?

A    Correct.

                    AURORA COURT REPORTING

                                                      158

Q    Okay.  And so this is a brand new experience for
     you, huh?

A    Yeah.  Never done this before.

Q    All right.  Any of your friends ever sat on a jury
     before?

A    Not that I know of.

Q    You're number one, all right?

A    Number 1.

Q    Going to do the job that the court is expecting of
     you?

A    Yeah.

Q    You're going to apply the law?

A    Yeah.

Q    You're going to hold the state to the standard of
     beyond a reasonable doubt?

A    Yes.

Q    What happens if they don't make it?

A    Then whatever happens happens or.....

Q    What do you mean, whatever happens happens?

A    I mean, the question -- what was the question
     again?

Q    I said what are you going to do if the state
     doesn't make it?

A    Oh, not guilty.

Q    Why?

                    AURORA COURT REPORTING

                                                      160

Q    Okay.  Anything wrong with that?

A    No.  No, it makes things function much more
     smoothly.

Q    It also helps the review process doesn't it?

A    Correct.

Q    What happens if you missing the checklist as a
     reviewer?

A    Well, it throws into doubt functions that could
     have or should have occurred in -- in the task.

Q    Okay.  What if Harry says to you, but, gosh, Mr.
     Ross, I did that.  I just don't use checklists.

A    It throws suspicion into whether or not it's been
     done.

     MR. JAMES:  And Mr. Katchatag, you're the last one I
think.  All right.

            VOIR DIRE OF CHRISTOPHER KATCHATAG

BY MR. JAMES:

Q    Where do you go to school?

A    Vale.

Q    Vale.  Is that part of ASD or is that.....

A    Yeah, I think so.

Q    All right.  And you've indicated -- well, what are
     you -- are you a senior there, is that the -- a
     senior?

A    Yeah.

                    AURORA COURT REPORTING

A    You know, see that he's not guilty so he doesn't
     go to jail for something he didn't do.

Q    Or they didn't what?

A    Do.

Q    They didn't prove beyond a reasonable doubt?

A    Yeah.

Q    Correct?

A    That they didn't, yeah.

Q    They did not prove beyond a reasonable doubt.  Any
     problem with my little scales?

A    Uhh-unh.  (negative).

Q    Do you think that's a standard you'd like to be
     judged with if you were sitting in -- next to me?

A    Yeah.  It's fair.

Q    Are you going to hold them to it?  Yes, no?

A    Yeah.  Yes.

Q    Thank you.

     THE COURT:  Thank you, Mr. James.  All right.  The next
-- we're going to do the same thing we did a little while
ago.  The lawyers have an opportunity to exercise some
additional pre-emptive challenges.  We're all going to go
back here so that you don't have to leave.  We'll stay on
record for just a moment, madam clerk.  You're welcome to
get up and take breaks, just don't make a mass -- if you do
make a mass exodus, come back.  We'll -- it should be ten

                    AURORA COURT REPORTING