minutes.  Counsel?

MR. JAMES:  We need some -- yeah.

(Bench conference as follows:)

THE COURT:  We're still on record.  Any challenges for cause, Ms. Brady?

MS. BRADY:  No, Your Honor.

THE COURT:  Mr. James?

MR. JAMES:  If I may just have a brief -- couple minutes.  I'm going to use the jury room (indiscernible).

THE COURT:  Okay.  Well -- but I want to take challenges for cause first.

MR. JAMES:  Oh, I'm sorry.  Cause.  I'm sorry.

THE COURT:  That's all right.

MR. JAMES:  I apologize.

THE COURT:  That's all right.

MR. JAMES:  No, no.

THE COURT:  Okay, all right.  Take.....

MR. JAMES:  Challenges for cause are not pre-empts.  That's the ones that somebody can't be a fair juror.

THE COURT:  All right.

MR. DAVIS:  Okay.

MR. JAMES:  They're not (indiscernible).  We have no challenges for cause.

THE COURT:  All right, so no challenges for cause.  Exercise your pre-empts and take, you know, what time you

AURORA COURT REPORTING

162

---

(End of bench conference)

THE COURT:  Back on the record.  All right, we're back on record.  We can excuse a few more folks and then we'll proceed on, and as with the last folks, don't take it personally, it's all part of the jury selection process, and if I forget to do it later, if you're excused today, please call in the rest of the week to see if your group is called again.

So we will excuse Ms. Cleaveland, juror number 8; juror number 10, Mr. Oswald, you have been excused.  Juror number 13, Mr. Wortman, you have been excused, thank you, sir.  And Mr. Katchatag, juror number 18, you are excused.  I'll give you an excuse from school today but not for tomorrow.

(Laughter)

MR. KATCHATAG:  You guys have a good day.

THE COURT:  See you.  I have 14 jurors, which was what we were shooting for.  And you folks are going to be our jury in this case.  I'm going to swear you in tomorrow morning, and when I swear you in tomorrow morning I'm going to ask you these questions.  I'm going to ask you to swear or affirm that you can be fair in this case.  I'm going to ask you to swear or affirm that there's nothing else that you think we need to know that we haven't bothered to ask.  And if there is something that you think we need to know, even if you think you can still be fair I'm going to ask you

AURORA COURT REPORTING

164

---

need, but if -- and we'll come and get you when -- or just come back into this corridor when you're finished, please.

MR. JAMES:  Thank you.

THE COURT:  Are you finished, Ms. Brady?  Do you need some more time?

MS. BRADY:  No, I'm done.  I'm just finding the right numbers.

(Whispered conversation)

THE COURT:  Tell Nancy to go off the record.  And madam clerk, would you go off the record now.

(Off record)

(Portion of CD corrupted)

(Whispered conversation)

THE COURT:  So between you, you've exercised four pre-empts, that takes us down to 14.

MS. BRADY:  Perfect.

THE COURT:  So that would be our jury.  I'm not going to swear them in today, I'll swear them in tomorrow, assuming they all come back, and I'm going to turn them over to Ms. McKewin, and then we -- I have a 1:00 o'clock so we'll recess.  The question is -- we're still on the record.  You have some other issues you want to take up?

MS. BRADY:  We have issues that need to be taken up before we do opening statements tomorrow.

THE COURT:  We'll take them up at 8:15.

AURORA COURT REPORTING

16

---

to tell us before we swear you in.  So that will be the first question I put to you tomorrow morning.

Between now and tomorrow morning I want to be very careful that you think about this.  I want you to not talk with anyone else or express any opinions about this case to others, and here's why.  We want you to make your decision based on the evidence you hear and see in the courtroom; both the testimony of witnesses who testify from the witness stand, any documentary or physical evidence.  You need to remember that evidence comes in a piece at a time, so if you start making up your mind about the case after you hear the first piece of evidence you may close your mind to hearing the second, third, and fourth piece of evidence.

If you start talking to folks you may be put into the position where you start having to express an opinion, whether you really intended to do that when you talked -- when you began talking.  In addition, if you talk to folks, family or friends about the case, somebody may express an opinion to you or offer a tidbit of knowledge or fact to you that might influence your decision down the road; so the best way to avoid getting in that bind is to not talk to anyone about the case.  And the best way to avoid that is you can tell them you're on jury duty and you can tell them that beyond that the judge told you you couldn't talk about the case, period.  Blame it on me.  When the case is over

AURORA COURT REPORTING

165

you can talk all you want but until then the best way to
avoid getting in conversations about the case is simply to
tell people you can't talk about it, and you can use me as
an excuse if you'd like, please.

Don't do any research on your own, don't go on the net
and start looking up information, don't do any other kind of
investigations.  Make -- that way you'll be sure to make
your decisions based on what you hear and see in the
courtroom.  I told you 8:30 to 1:30.  Tomorrow at 9:00
o'clock rather than 8:30, please.  The last word.  If you
want to bring some food, we'll take breaks.  We're not going
to take a long lunch break but if you want to bring
something to tide you over I have a refrigerator in my
office, in my chambers.  I also have a microwave, so you're
welcome to bring something in and use our facilities so that
-- to tide you over until 1:30.  Can I answer any questions
about schedule or procedure or anything like that?  Nobody
is raising his or her hands.  The rest of you folks, we
almost got to you so you did serve a purpose.  It could have
very easily been you, and you are excused and free to go.
Keep calling in, please, to see if you're needed.  And the
last thing I'm going to do is turn you over to Ms. McKewin,
who is going to show you your jury room, show you how to get
in and out of the back hallway here so you can get to your
jury room.  And then when you come in tomorrow morning at

comes up, just -- the best way to do it is not try to -- of
course, obviously don't talk to the lawyers and preferably
not to me.

MR. IVERSON:  Yeah.

THE COURT:  Everything that any of you tell me I have
to tell everybody else and it's best to do it in open court,
but if you tell Ms. McKewin or my secretary then I will pass
it along to everybody and we'll sort all that out, and we're
not going to try to make this any more inconvenient than it
already is.

MR. IVERSON:  Thank you.

THE COURT:  Anything else?  Then if you folks want to
head out that door and just wait in the hall, Ms. McKewin
will hook up with you and show you what to do next.

(Jurors excused)

THE CLERK:  Off record.

(Court recessed)

12:49:26

9:00 o'clock you'll know how to get there.  Any other
instructions I should give to these folks, Ms. Brady?

MS. BRADY:  No, Your Honor.

THE COURT:  Mr. James?

MR. JAMES:  Just the standard no communication, no hard
feelings.

THE COURT:  All right.  Any questions you all have?
Yes, sir, Mr. Iverson?

MR. IVERSON:  In the -- if my lawyer -- if my son's
lawyer called and said the schedule had changed for one of
his court appearances, can I call the court or would I -- I
definitely would want to attend.....

THE COURT:  If you have a court appearance you have to
make, tell us.  One of the reasons we pick alternates is
that sometimes people become ill.....

MR. IVERSON:  Right.

THE COURT:  .....or otherwise have emergencies, and we
already kind of screened everybody once about things that
you know about, but if something comes up that you don't
know about and can't avoid, let us know.

MR. IVERSON:  Yeah.  I mean the one I mentioned was the
one I mentioned but.....

THE COURT:  Right.

MR. IVERSON:  .....it potentially could change.

THE COURT:  If you have a schedule -- something that

TRIAL BY JURY, CONTINUED (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 14, 2001
10:05 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
                      Assistant District Attorney
                      310 K Street
                      Suite 300
                      Anchorage, Alaska

FOR THE DEFENDANT:    DENNIS PATRICK JAMES
                      Attorney at Law
                      1500 West 33rd Avenue
                      Suite 100
                      Anchorage, Alaska

Exhibit J -44

P R O C E E D I N G S

3AN 42-1660

10:05:17

KATHLEEN BUSHUE

called as a witness on behalf of the plaintiff, testified as

follows on:        DIRECT EXAMINATION

THE CLERK: For the record will you state your full

name and spell your last?

A    Kathleen Bushue, B-u-s-h-u-e.

THE CLERK: B-u-s-h.....

A    U-e.

THE COURT: Go ahead, Ms. Brady.

BY MS. BRADY:

Q    Good morning, Officer Bushue.

A    Good morning.

Q    How long have you been an APD officer?

A    Seven years.

Q    Okay. And have you had any training or experience

in the detection and identification of crimes

involving controlled substances?

A    Yes, I have.

Q    Could you just describe what that was for the

members of the jury?

A    I had my basic training in the police academy,

your basic drug classes on detection,

170

whoever was case officer for that particular

person the rest of the unit would act in support

capacity for the -- for that particular operation.

In this particular operation I usually was

involved with surveillance.

Q    All right. And let me direct your attention to

February 8th, 2001. With regard to that

particular day did you have -- what was your

assignment?

A    My assignment on that particular day was

surveillance for, during and after an undercover

drug buy using an informant.

Q    Were you with anyone?

A    Yes, I was with Officer Chris Simms.

Q    Okay. And what happened -- just explain what you

did, from the very beginning?

A    What I did, we'd have a briefing in our office and

we'd go over what was to happen during the buy.

Officer Simms and I were assigned to surveillance

so we parked north of the location where the buy

was to occur at 202 Grand Larry. And our job was

to sit there, watch the informant drive in, watch

him park, and stay there during the whole buy,

watch him drive away until he was picked up by

another officer and follow him back to the

172

identification of drugs; and I spent eight months

assigned, TDY to the Metro Drug Unit specifically

working informants and drug cases. I have seven

years experience as a patrol officer on the

street. I'm currently a Sergeant with the

Anchorage Police Department, and I also spent a

little more than a year in the Special Assignment

Unit targeting street-level drug crimes.

Q    All right. Now you mentioned the Special

Assignment Unit. What is that?

A    It's a small unit consisting of -- depending on

our manning, from six to seven officers that work

in plain clothes, drive unmarked vehicles. We

work -- we target street-level crimes, which

include prostitution and drug cases.

Q    Okay. And were you assigned to a particular unit

when -- during the investigation of this case?

A    Yes, I was. I was assigned to the Special

Assignment Unit.

Q    Okay. And how did you become involved in this

case?

A    I became involved in this case as just another one

of the officers in the unit. I was working

surveillance for this particular case. Each

officer developed cases, developed informants, and

station. That occurred. Do you want me to go

into the details of that?

Q    Please.

A    We arrived just north of the location and we

parked on Peck Street. The buy was to occur at

202 Grand Larry. We arrived there at 2206 hours.

Surveillance advised that the informant, P01-06

was in the area at 2207. They then advised that

he, P01-06, was coming out of the residence.

Officer Simms and I then followed him and Officer

Johnstone back to the police station. Once there

Officer Johnstone handed me a small baggie of

suspected powdered cocaine and I tested the

cocaine and put it into property and evidence.

Q    Okay. Now you say you tested the cocaine. Let me

just back you up for a couple of minutes.

A    Okay.

Q    P01-06, who is that?

A    Jeremy Fish.

Q    Okay. And could you explain why you're using a

number?

A    We use a number to protect the -- the informant's

identity throughout all the police reports. We do

that for a number of reasons. We do that to

protect any retaliation against him. We do that

173

Exhibit J – 45

from anybody else reading these reports wouldn't
have any idea who it is, and we protect his
identity throughout the entire investigation, and
so he is always assigned a number.  He is always
referred to as a number.  In police reports you
say he, slash, she so people don't even know his
identity if they were to -- if records clerks or
anybody would read that report they wouldn't know
who it was.

Q  All right.  Now you say that you tested the
cocaine.  What kind of test did you use?

A  A Scott reagent, test type G for cocaine.

Q  Okay.  Could you just explain to the members --
it's called a field test, is that right?

A  Correct, it's called a field test.  It's a little
kit that we carry in our -- in our property and
evidence kits, our search kits; and it's just a
small little kit and you just put a very small
amount of cocaine in it and pop three different
vials and it will give you a positive or negative
for cocaine.

Q  All right.  Now when you -- when something like
drugs is seized what do you do with it?

A  We take a small amount of it and field test it,
and be it positive or negative, it is then -- the

put in.  It's a number unique to this envelope.

Q  Okay.  So is the number called anything?

A  It's called a tag number.

Q  Or a P&E number?

A  Or a P&E number.

Q  Okay.  And could you just explain to the members
of the jury how P&E numbers work?

A  This particular number is tracked.  Once -- once
you use this envelope and you take that number and
you put it onto a P&E, a property and evidence
form, that -- this number is tracked on the
property and evidence form.  It's also tracked
when it's logged into property and evidence, and
any time anyone does anything with this envelope,
removes it from property and evidence they use
that number to track it.

Q  Okay.  So -- and that -- you know that that is the
cocaine that was given to you by Detective
Johnstone?

A  Yes.

Q  Okay.

MS. BRADY:  At this time I'd move to admit State's
Exhibit 1.

MR. JAMES:  May I look at it?

THE COURT:  Yes.

drugs are then sealed in a property and evidence
envelope with two officers present.  It is taped,
evidence taped and it's placed into our property
and evidence, and that's the last contact that we
have with it.

Q  With regard to this particular cocaine did it
field test positive?

A  Yes, it did.

Q  Okay.  Let me just approach you with two items.
We'll be starting with State's Exhibit 1.  Do you
recognize what State's Exhibit 1 is?

A  Yes, it is.  It's a baggie of suspected powdered
cocaine.

Q  How do you know that that's what it is?

A  Because it says it on the envelope.  I submitted
and sealed it.  These are my initials.  Chris
Simms witness and verified it.

Q  Is it dated?

A  Yes, it is.  It's dated 2-8-2001.

Q  Okay.  And is there -- now is there a number on
that somewhere?

A  There's a number in the upper right hand corner,
and that's our tag number.  Each one of these
envelopes is numbered, and that's the number that
goes on our property and evidence form when it's

MS. BRADY:  Oh.

THE COURT:  You may approach the witness and look at
it.

(Whispered conversation)

THE COURT:  Exhibit number 1 is admitted.

(State's Exhibit 1 admitted)

Q  Okay.  And what is the P&E number for Exhibit 1,
Sergeant Bushue?

A  It is 5-0-3-1-2-5.

Q  Okay.  Now let me direct your attention to
February 20th.  With regard to this case, did you
have a particular assignment on that day?

A  I did.  And, again, it was surveillance.  Officer
Simms and I were riding together.  We arrived in
the area of Peck and Grand Larry at 2205 hours on
the 20th.  The informant, P01-06, arrived a minute
later and went inside the residence.  At 2210
hours he advised he was -- surveillance advised he
was coming out of the residence and he got back
into his vehicle, and at that point we handed --
we went back to the police station and Officer
LaPort handed me the suspected cocaine, which I,
again, field tested and got a positive result.

Q  Did you assign a P&E number to that cocaine?

A  I did, and that was on the 20th, and that one is

Exhibit J – 46

5-0-5-5-5-1.

Q   Okay.  And how do you know that P&E number, 5-0-5-5-5-1 is the cocaine that you seized on February 20th?

A   This is my handwriting on this -- on -- on the outside of this envelope, it's dated on 2-20-01 and it has my initials that I submitted and sealed it, and my DSN.

Q   Okay.

MS. BRADY:  At this time I'd move to admit State's Exhibit 2.

THE COURT:  Number 2.

MR. JAMES:  I've seen it, thank you.  No objection.

THE COURT:  Number 2 is admitted.

(State's Exhibit 2 admitted)

Q   Okay.  And let me direct your attention to February 21st.  With regard to this case did you have a particular assignment on that day?

A   I did.  I, again, was assigned to surveillance, and this time I was -- I believe I was with Sergeant Stevens and I, and the buy on this day was to occur at Old Seward and International at the Chevron parking lot.  I arrived in the area at 2018 hours.  At 2021 hours the informant arrived to meet with the suspect who was in a '97 green

Suburban, Alaska license DSA 914.  A few minutes later the informant left the area and surveillance and I -- I was with Sergeant Stevens at the time.  We followed the vehicle.  We followed it first to Juneau and 45th where it stopped.  The suspect met with someone for a few minutes and then we followed the vehicle back to 202 Grand Larry where it stayed for a few minutes and at that point we broke off surveillance.

Q   Okay.  And why were you following the Suburban?

A   We were following the Suburban because that's what the suspect was in for this buy, and so we were following it to find out where it went after the buy.

Q   All right.  And let me direct your attention to February 28th.  With regard to this particular case did you have a particular assignment on that day, as well?

A   I did.  I was assigned to close-in-cover during the buy and I was assigned to run the wire recording, pursuant to a Glass warrant.

Q   Okay.  And could you just explain to the members of the jury what close-in-cover is for a start?

A   Close-in-cover is where I'm assigned to have what we call the eye.  I'm assigned to be -- usually

close-in-cover is there prior to the suspect and the informant arriving, and your assignment is to be as -- to be the closest person, to have the eye, to let all the rest of surveillance know what is happening during the buy.

Q   Now you're also assigned to run the wire?

A   Correct.

Q   Could you explain to the members of the jury what exactly that entails?

A   Running the wire is we receive a Glass warrant to -- to do a recording of the conversation.  The informant wears a body wire that we put on the informant.  We all have bug radios so we can listen to the conversation.  Anything the informant says we can hear it, and we can hear who the informant is talking to.  I activate the wire recording when the informant gets out of the car, when the informant gets in -- in the area I start recording at that point.  You hear all the conversation that goes on.  When the informant leaves the suspect I end -- I stop the recording, and that was also my duty for this particular buy.

Q   Where was the buy supposed to occur at?

A   The buy supposed to -- was supposed to occur at the Pancake, and I can't remember the name of it.

The Pancake House I think is where it was supposed to occur.  Sergeant Stevens and I, again, when -- when you're going to run the wire recording you usually have two people in the vehicle.  We arrived in the area and we parked just to the north of the location.  When they pulled up at a -- a little bit after midnight, I saw the informant pull into the parking lot of the Northern China restaurant, which was just a little bit to the south.  This Pancake House is a little bit further north, and then the -- this Northern China restaurant where it actually occurred was still within our sight, we could still see the whole thing happening from where we were parked.  I saw the informant pull up behind a silver pickup truck.  And that plate was DVE 272.  The informant got out of his vehicle and walked up to the pickup truck.  I activated the recording at that time.  At 0004 hours I saw the informant get out of the pickup truck and get into the back of his vehicle.  Get back into his vehicle.  I turned off the tape recording at that time, and then.....

Q   Let me stop you right there.

A   Okay.

Q   Can -- does the informant have any control over

when you guys are tape recording what's going on?

A  No, the informant has no control whatsoever. He -
- the wire is placed on him, we can hear that the
wire is working before we ever get to the buy. He
-- he can't even take it off he wanted to when the
buy is happening, and we can hear any conversation
but he doesn't have any control over whether we
record it or whether we hear it or not.

Q  What happened once the meeting was over?

A  Once the meeting was over we had Officer LaBlanc
pull into the parking lot and he was in a marked
patrol vehicle. He activated his lights. We had
also pulled in right behind the suspect vehicle,
and at that point they took the defendant, Davis,
out of the vehicle and he was arrested.

Q  Was anybody in the car with him?

A  I recall -- I don't have it in my report here, but
I recall there was someone else in the car. I
think there was someone in the right passenger
seat.

Q  And you don't know who that was?

A  I don't.

Q  Okay. And did you have anything else to do with
this case?

A  No.

---

MS. BRADY:  That's all the questions I have for this
witness.

THE COURT:  Mr. James?

MR. JAMES:  Thank you.

KATHLEEN BUSHUE

testified as follows on:

CROSS EXAMINATION

BY MR. JAMES:

Q  Do you know Jeremy Fish?

A  Yes, I do. I know him after -- actually the first
time I met him was when he was working as an
informant.

Q  When did you first meet Jeremy Fish?

A  I probably met him -- we started this case in
February. I would guess I met him a couple days
prior to the start of the case.

Q  And what were the circumstances that you met him?

A  I was -- sat in on his original debrief.

Q  Okay. And when was that?

A  Probably a couple days before we started the case,
and I couldn't tell you the exact date.

Q  You don't keep police reports on that?

A  No.

Q  So the case started on the 8th so you started
debrief on the 6th, would that be correct?

---

Q  Okay. Now did you subsequently run into Mr. Fish
again?

A  Yes, I did.

Q  And did you have a contact with him where you
found marijuana in his car?

A  Yes.

Q  What was the date of that?

A  The date of that was July 13th, 2001.

Q  And about how much marijuana did you find in his
car?

A  It was a small baggie of marijuana, and actually
Officer Dailey took it and put it into evidence,
and I don't have it here. It was -- it was one
small baggie.

Q  Okay. And what did you do as a result of finding
him with marijuana?

A  We arrested him for the possession.....

Q  Okay. Now when.....

A  .....of marijuana, and we -- what we typically do
with marijuana possession is -- it's called a
sight release. They're basically arrested and
released with a court date, a 30 day court date.

Q  Okay. So in layman's terms you gave him a ticket?

A  Correct.

Q  Okay.

---

A  I couldn't tell you when the debrief was. I
didn't -- I didn't write it down, I don't know,
and I wasn't the case officer for this case. I
just sat in on the original debrief.

Q  Okay. Where was the original debrief at?

A  At the police station.

Q  Okay. How did you originate contact with Jeremy
Fish?

A  I didn't originate contact with him, one of the
other detectives said they had an informant they
were going to debrief and asked me if I wanted to
sit in on it.

Q  And who was that, please?

A  That was Detective Pam Perrue(ph).

Q  Paine Perrue(ph)?

A  Pam Perrue(ph).

Q  Pam Perrue(ph). And Detective Pam Perrue(ph) --
the reason I'm pronouncing her name is she's new
to us in this case, but tell me what happened
then? Well, first of all, who is Pam Perrue(ph)?
I mean you've said she's a detective.

A  She's a detective in the Metro Drug Unit.

Q  Okay. Metro. All right. That's different than
your special.....

A  That's different.....

Q    .....forces, or your special.....

A    The Special Assignment Unit, correct.

Q    .....assignment, okay. And that -- just so everybody knows, Metro is a combination of AST/APD. It stands for Metropolitan Drug something or another, correct?

A    Right, but it -- actually Metro is strictly an APD unit.

Q    Okay. You guys have taken over. Okay, fine. I'm not trying to cut you off, but -- historically it was. Tell me about Pam Pernue(ph). How did you get contact with Jeremy Fish two days before the buy that you just testified earlier that was on the 8th that all this stuff -- your contact was, please?

A    And I don't remember whether it was two days or a week before the buy, but Detective Pernue(ph) had an informant that she was going to debrief. She had another officer that was with her in training. She asked me if I wanted to sit in on the debrief. I said sure.

Q    Who is the other officer in training?

A    I believe that she had Officer Herod(ph) with her.

Q    Okay. So did you keep any notes of the debrief?

A    I did not.

---

A    It's either Johnstone or LaPort I would guess.

Q    Okay. All right. Now to your knowledge, how did this confidential informant come into the possession of APD?

A    I don't know.

Q    You don't know?

A    I don't know.

Q    You know nothing about Nome?

A    I don't know the circumstances of how he became an informant, no, I don't.

Q    Okay. What was the deal?

A    What was what deal?

Q    Did you make a deal -- did APD make a deal with Jeremy Fish relating to him providing alleged buy opportunities?

A    I -- I didn't make any deal with Jeremy Fish, so I can't answer that.

Q    Do you have any knowledge of any deal with Jeremy Fish?

A    No.

Q    Zero?

A    No.

Q    Okay. Do you know an Officer Cross?

A    Jim Cross. There's -- we've had a Ken Cross and we've got a James Cross.

---

Q    And based upon your testimony on direct, the contacts, at least -- and the police reports indicate the activity started on the 8th of February, correct?

A    Correct.

Q    Okay. But that's incorrect because the activity started a couple days before now, isn't that correct?

A    The debrief did. Yes, that's correct.

Q    All right.

A    There's -- it's standard to debrief an informant prior to having the informant work for you. You sit down and you talk about who they can buy from and whether you're going to use them as an informant.

Q    Okay. So -- but in the police reports there's nothing mentioned of that?

A    In mine there isn't. I'm sure in somebody's there is.

Q    Okay. Who would that somebody be based upon.....

A    Probably the case officer.

Q    And that would be?

A    I believe it's Johnstone, is it? I'm not sure who the case officer is.

Q    I don't -- you.....

---

Q    I'll have to get you the number. DSN 1397?

A    I don't know what their DSN's are. I would guess that's James Cross, but I -- I don't know.

Q    Calling your attention to September 4th, 2001, did you have any contact with Jeremy Fish in the area of Metro in Mountain View? With Metro -- Metro?

A    I don't believe so, no. Not that I -- I can recall.

Q    Based upon your seven years experience, if you have someone that you find with cocaine in their possession, what would you do?

A    Cocaine in their possession?

Q    Uh-huh (affirmative).

A    They'd be arrested.

Q    All right. Now behind you is an easel and would you please diagram, to the best of your ability, no one expects you to be an artist, but the area of Grand Larry and where you were staked out on the 8th? Please.

A    (Drawing diagram) This is Muldoon running north and south. This is Peck and this is Grand Larry. If I recall that we were parked over here and the target residence was right in here.

Q    Is there a driveway into the residence? What was -- what is the residence address?

**Page 190**

A   202.

Q   Okay.  Is there a driveway into 202?  In other words, off street parking?

A   I believe there is.

Q   Would you please indicate that.

A   (Drawing).

Q   Okay.  How far does that go in?

A   I -- I couldn't tell you.

Q   All right.  Is it -- is there a garage, a carport or is it just a dri -- perhaps paved or driveway type of parking area, off street I'm talking about?

A   I -- I don't recall.  I can tell you what the front of the house looked like -- residence looks like.

Q   I'm sorry?

A   I couldn't tell you, I don't recall what it looks like.

Q   You have no idea if it's flat roof, peaked?

A   No.

Q   Color of it?

A   No.  I couldn't tell you.

Q   All right.  And how many times were you over there?

A   I think I was over there two times, or maybe three

**Page 191**

times.

Q   Okay.  And you've indicated there's a box up by the north side, by Peck there.

A   There's a what?

Q   A box on your diagram.

A   This -- no, this is a vehicle.  This is what I was sitting in.

Q   Okay.  Okay.

A   This is a surveillance vehicle.  And that's.....

Q   I just wanted.....

A   .....where I was.

Q   All right.  And you were pointed towards.....

A   The west.

Q   .....the west, all right.

A   I -- I wasn't actually looking at the house.  My job wasn't to look at the house, it was to follow the informant once he left the house or see him turn into the street of Grand Larry.

Q   You were pointed west?

A   Correct.  North, south, west and east.

Q   Okay.  You indicate west to the left then, okay.

A   This is west.

Q   Okay.  All right, that's fine, I'm just -- all right.  Now what -- you arrived there at a specific time?

**Page 192**

A   Correct.

Q   And that time was what, please?

A   Which date are you talking about?

Q   I'm talking about the 8th.  I'm sorry.

A   On the 8th at 2206 hours.

Q   Okay.  When did Mr. Fish arrive there?

A   2207 hours.

Q   Okay.  So you were not following him then, is that correct?  You had pre.....

A   No, I was not following him.

Q   All right.  And how long was he in the house?

A   He was -- surveillance advised that he was coming out at 2216, so he was in the area at 2207, and he was coming out of the residence at 2216.

Q   So he was in there for -- is it 2207 or 2007?  2207, I'm sorry.

A   2207.

Q   Okay.  So we've got about ten minutes?

A   Uh-huh  (affirmative).

Q   All right.  How many -- do you know how many entrances there are to that house?

A   No, I wasn't looking at the house so I couldn't tell you.

Q   You weren't looking at the house on the 8th?

A   No.

**Page 193**

Q   What were you looking at as you were parked?

A   I was -- I was to pick up the informant as he came out of here and follow him back.

Q   Okay.  So you don't know what, if anything, happened in the vicinity of the house, you were just waiting for him to.....

A   Correct.

Q   .....come out that.....

A   Correct.

Q   .....Grand Larry and then proceed?

A   Uh-huh  (affirmative).

Q   Okay.  All right.  Now you were a participant in the debriefing or were you not a participant in.....

A   I was not a participant in the.....

Q   So you don't know what Mr. Fish told the police officers?

A   No.

Q   Okay.  Were you a participant in the pre-briefing, if there is such a word as pre-briefing for Mr.....

A   No.

Q   No, all right.  When you left -- excuse me.  When you observed Mr. Fish leave the vehic -- depart the area at 2216 how did you know it was Mr. Fish

Exhibit J - 50

**Page 194**

```
     leaving?
 2 A  I know -- I don't -- I couldn't swear to it until
      I got back to the station.
 4 Q  Okay.
 5 A  But it -- whoever was leaving was driving his car
      and then when I got back to the station he was
      behind the wheel of the car.
 8 Q  How did you know it was his car?
 9 A  Because we had been briefed on what he was driving
      and I actually went out and looked at his car
      prior to us going on the buy.
12 Q  Okay.  But you didn't have any contact with Jeremy
      Fish, you just went out and looked at the car
      before the buy?
15 A  Correct.
16 Q  Okay.  All right.  And then you became the
      evidence custodian, is that correct?
18 A  For the cocaine, correct.
19 Q  For the cocaine, all right.
      MR. JAMES:  If I may approach, Your Honor.
21 Q  And that's Exhibit 1, isn't it?
22 A  Correct.
23 Q  Okay.  And was -- it indicates a baggie of
      suspected powdered cocaine, is that -- am I
      reading that.....
              AURORA COURT REPORTING
```

**Page 196**

```
 1 A  Oh, absolutely, yes.  Yes.
 2 Q  So that's -- we can take that information to the
      bank then?
 4 A  This actually -- this writing on the front of
      this, this is not mine, this is Officer Simms.
 6 Q  Okay.
 7 A  This is my initials and my DSN right here.
 8 Q  So you didn't fill that out?
 9 A  Correct, Officer Simms filled.....
10 Q  Did you check it?
11 A  Yes, I did.
12 Q  And you know it's correct then?
13 A  Yes.
14 Q  And you'd take that to the bank, right?
15 A  Yes.
16 Q  How about looking at two.
17 A  This one?
18 Q  Exhibit 2.
19 A  This is my writing on the front of this one.
20 Q  That is your writing?
21 A  Yes, it is.
22 Q  And that's correct and you'd take that to the
      bank, too, right?
24 A  Yes.
25 Q  Okay.  How many grams of cocaine is indicated
              AURORA COURT REPORTING
```

194 ... 196

**Page 195**

```
 1 A  Uh-huh (affirmative).
 2 Q  .....correct?  There's a baggie -- there's a
      baggie in there (indiscernible).....
 4 A  Correct.
 5 Q  What, a sandwich baggie or something like that?
 6 A  Correct.
 7 Q  Okay.  Did you have that printed?
 8 A  We put in a request to have it printed, yes.
 9 Q  And what was the result of that?
10 A  I don't know, I can't tell you.
11 Q  Okay.  And what you filled out on the front of
      that sheet is correct to the best of your
      knowledge, based on your seven years of experience
      as a police officer, right?
15 A  On the front of what sheet?
16 Q  The exhibit one.
17 A  Property and evidence?
18 Q  The evidence?
19 A  Yes.
      MR. JAMES:  If I may approach again with the -- I'm not
21    trying to.....
22 A  No, I -- I don't actually have it with me here, I
      don't have a copy.
24 Q  No, I'm talking about (indiscernible - away from
      microphone).
              AURORA COURT REPORTING
```

**Page 197**

```
      there?
 2 A  On Exhibit 2 or one?
 3 Q  Two.
 4 A  Exhibit 2, 11.8.
 5 Q  Okay.  How much is that?  Volume-wise.  I mean
      obviously 11.2 grams is 11.2, of course, yeah; but
      I mean volume-wise.....
 8 A  It's.....
 9 Q  .....I don't know.
10 A  It's a -- well, you can kind of see.  It's a small
      amount.
12 Q  And that would be what you submitted to the crime
      lab?
14 A  A request for that is submitted to the crime lab.
15 Q  Right.  And that would -- the crime lab would get
      that and weigh whatever is there?
17 A  Correct.
18 Q  And conform -- confirm the fact that.....
19 A  Correct.
20 Q  .....you had that?
21 A  Uh-huh (affirmative).
22 Q  So there's 11.2 grams.....
23 A  11.8.
24 Q  How did you know it was 11.8?
25 A  We weighed it on our scale.
              AURORA COURT REPORTING
```

15 ... 197

Q  Okay.  And the others, one?

A  1.0.

Q  Okay.  All right.  Now one of those -- I believe the first one you indicated was -- it tested positive.  It was a white powder, is that right?

A  Uh-huh (affirmative).

Q  All right.  And the only knowledge you have of where Mr. Fish got that is based upon what Mr. Fish said, correct?

A  And the fact that we searched him prior.  We search him and his vehicle prior to him going on the buy.

Q  Do you have a checklist to use to search to insure that you have consistency and accuracy in your searches?

A  Searching of person or vehicle?

Q  Let's start with a person?

A  No, we do not have a checklist.

Q  How about a vehicle?

A  No.

Q  And you -- and been doing this for at least how many years?

A  Seven years.

Q  Okay.  And there's other people that work on your team, is that right?

AURORA COURT REPORTING

198

---

A  Uh-huh (affirmative).

Q  Okay.  When you do the breathalyzer test there's a checklist, too, isn't there?

A  There's procedures.  We don't have a checklist, per se.  There are procedures to follow.

Q  Okay.  And they're written procedures, aren't they?

A  Yes, they are.

Q  So as you go through on those type of cases, you know that you're supposed to fill out a specific thing because someone is going to come back and look at it and see that you did it correctly, correct.

A  Correct.

Q  All right.  That doesn't exist in your unit, is that correct?

A  It -- for specific things it might, but for a pre-search, no, it doesn't.

Q  Okay.  What specific things might it exist for?  You actually.....

A  My unit does -- that unit also does DWI's.  It does a lot of other crimes as well, but, no, we don't -- we don't have very many checklists or anything, we have procedures that we need to follow.

AURORA COURT REPORTING

200

---

A  Correct.

Q  Okay.  And there's other people that work in Metro, and you've worked in Metro, correct?

A  Uh-huh (affirmative).

Q  And that's all part of APD now?

A  Correct.

Q  Okay.  And so the search is strictly a subjective search then.  You rely upon what someone else said as to how that search was conducted?

A  Correct.

Q  And there's no checks and balances?  There's no objective testing that says, yeah, here's a check mark, just like -- have you ever done a DWI arrest?

A  Yes, I have.

Q  Okay.  And there's a -- APD has a checklist, doesn't it?  Have you been drinking, how much have you had to drink, assuming the person is going to talk with you.  When was your last drink, have you taken any medicine, what type of medicine, do you have any problems in -- any seeing problems?

A  It's a questionnaire.  Yes, there is a questionnaire.

Q  Okay.  Let's -- then you fill it out and there's a checklist, right?

AURORA COURT REPORTING

---

Q  Okay.  And those are written procedures?

A  Well, we have a P -- what's called our PI, our policies and procedures.

Q  Okay.

A  That covers most things.

Q  And who promulgates that?

A  The department.

Q  All right.  Is that part of your training manual?

A  Yes.

Q  Okay.  All right.  And when you -- okay.  So I understand, and I'm not going to believe it.  There is no written checklist to insure accuracy.

A  There is no written checklist.

Q  All right.  Now you indicated that you were running the wire, and that's the Glass warrant, correct?

A  Correct.

Q  Okay.  And that was on the 20th, correct?

A  No.

Q  No.  All right.  When was that, please?

A  That was on the 1st of March.

Q  March 1?

A  Correct.

Q  Okay.  Did you -- now the opening statement indicates that you allege that cocaine was sold on

AURORA COURT REPORTING

201

the 8th, on the 20th, and on the 21st, and then
the 28th, slash, 1st, would you agree with that?

A  On the 8th, the 20th, the 21st and the 1st.

Q  Okay.  28th, slash, 1st, okay.  Your involve --
you had involvement on the 8th, correct?

A  Correct.

Q  Okay.  And you had involvement on the 20th?

A  Correct.

Q  Okay.  You did not run the wire on the 20th?

A  Correct.

Q  Okay.  What was your involvement on the 20th?

A  Surveillance.

Q  Surveillance?

A  Uh-huh (affirmative).

Q  Where did you park that time, please?

A  The same place, Peck and Grand Larry, right about
where this shows right here.

Q  So that is the same basic location for both the
8th and the 20th?

A  Correct.

Q  All right.  And who was with you?

A  On which day?

Q  The 8th.  Was that Simms?

A  On the -- on the 8th was Officer Simms.

Q  And on the 20th?

A  Was Officer Simms.

Q  Okay.  Do you work as a team?

A  It just kind of depends on who gets into whose car
at the time.

Q  Okay.  All right.  And then -- so your view of 202
Grand Larry was the same on the 20th -- excuse me,
on the 8th as it was on the 20th?

A  Yes.

Q  All right.  Did you observe Mr. Fish on the 8th go
into the.....

A  No.

Q  Okay.  So you didn't observe him exit either then?

A  No.

Q  Okay.  How about on the 20th?

A  No.

Q  All right.  Either way, in or out?

A  No.

Q  All right.  Now there -- you indicated that on the
21st there was a surveillance involving a
Suburban, is that correct?

A  Correct.

Q  Okay.  And what was your involvement in that,
please?

A  It's -- I was surveillance and on the 21st.  Yeah,
I just did surveillance on the 21st.

Q  Could you tell me what you mean by surveillance?

A  I was assigned to be in the area where the buy was
to occur, and to assist in following the suspect
vehicle when it left the buy area.

Q  Okay.  And describe that vehicle to me?

A  It's a '97 green Suburban, Alaska license DSA 914.

Q  Okay.  Does it have dark windows, other than the
driver's window?

A  I recollect that it had tinted windows, but I
couldn't swear to which windows were tinted.

Q  Okay.  Could you see inside the vehicle?

A  From where I was, no, I could not.

Q  So you have no knowledge of how many people were
in that vehicle?

A  No.

Q  Okay.  Now did you do the strip search on Jeremy
Fish on the 8th?

A  Jeremy Fish is a male and the females don't strip
search males.

Q  Okay.  So it would be fair to say that you did not
participate in any of the strip searches?

A  Correct.  Correct.

Q  Okay.  I wasn't baiting you, I just wanted to make
sure.  Now, did you participate in the search of
the vehicle on the 8th, 20th,.....

A  No.

Q  .....21st or 1st?

A  No.

Q  Okay.  So as a Sergeant are you in some type of
administrative capacity?  Are you in charge of
this organization?

A  No, I was not a Sergeant when I was in this unit.

Q  Okay.

A  I transferred out of the unit before being
promoted.

Q  And when did you do that?

A  I transferred out of the unit in May.  May 1st.

Q  All right.  And then I assume -- what do you do
now?

A  I'm a patrol Sergeant on a swing shift.

Q  So you were there when the arrest of Mr. Davis
took place, is that right?  On the 28th, slash,
1st?

A  Correct.

Q  Okay.  Where were you physically?  Could you flip
over and draw us another picture of that, please.

A  (Witness complying).  There were several
businesses along here, I don't know their names.
This is, again, Muldoon.  And this is north, and
there was the -- there was a sign, a tall sign

here that said Northern China restaurant. The
defendant had pulled in this way in a pickup
truck, and I was parked -- Sergeant Stevens and I
were parked over here, and the informant, I
believe, pulled in behind the pickup truck, but I
couldn't swear to that. This is where the
defendant was. He was in this vehicle.

Q   Okay. And.....

A   I was right here.

Q   You're X?

A   Yes.

Q   Okay. And how far away is X from the defendant's
vehicle? Mr. Davis' vehicle?

A   I'd guess about 75 yards maybe.

Q   Okay. And you've indicated I believe the arrow on
Mr. Davis' vehicle is pointing toward Muldoon?

A   Correct.

Q   Okay. Is that immediate access out to Muldoon?
Is there a barrier there?

A   Well, there -- yeah, there's driveways all along
here, and I couldn't tell you specifically if
there was one right in front of him. I don't
think there was. There was one -- they came in
this way. There's driveways all along these
businesses, and it's a strip mall.

206

---

Q   Stevens, okay. And what happened -- you arrived
at the scene?

A   I arrived and parked and waited until surveillance
advised that the informant was pulling into the
parking lot. And they advised he was pulling into
the parking lot, and at that point I looked up and
could see him pull up next to the defendant's
vehicle, or near the defendant's vehicle.

Q   Okay.

A   And actually I say he pulled up behind the silver
pickup truck that the defendant was in.

Q   Uh-huh (affirmative). Okay. Like, you know, T-
bone or is it parallel or.....

A   I couldn't tell you.

Q   All right. And what happened at that particular
juncture?

A   The informant got out of his vehicle and walked up
to the pickup truck.

Q   Okay.

A   And then he got out of the pickup truck and got
back into his vehicle.

Q   Okay. And how long did this take?

THE COURT: Mr. James, I can't hear you.

MR. JAMES: I'm sorry. Excuse me. I'm -- I apologize
to the jury. I told you I'd do this. I didn't mean to.

20

---

Q   All right. Now you're -- what was the building
behind Mr. Davis' car?

A   I don't know.

Q   All right.

A   I just know he was -- there -- there was a sign
here that said Northern China restaurant, and they
were parked pretty much under it was my
recollection.

Q   Okay. Are you sure that vehicle -- Mr. Davis'
vehicle was pointed toward Muldoon rather than in
the opposite direction?

A   That's my recollection, it was pointed towards
Muldoon.

Q   Okay. And your recollection is there was a second
person in the vehicle?

A   I believe so.

Q   Okay. Now what happened -- Mr. -- Jeremy Fish
drives in and take me from there. You were
already there at the scene?

A   I was already there.

Q   How did you know to be there?

A   Because that's where the buy was to occur.

Q   Okay. And who were you with at that time? Was
that Simms again?

A   Sergeant Stevens I was with.

---

I've got to stay next to the mike.

Q   How long did that take?

A   He pulled into the parking lot at 0003 hours. At
0004 hours he got back into his pickup truck. Or
got back into his vehicle, the informant did,
so.....

Q   Okay. And then.....

A   .....less than -- it looks like about a minute.

Q   All right. What happened then? Take me through
it.

A   Then the informant pulled out and Officer LaBlanc
pulled into the parking lot, activated his
overhead lights, and at that point we took Mr.
Davis into custody.

Q   Okay. Set me the stage. Fish pulls out, LaBlanc
pulls in?

A   Yes.

Q   Boom, boom?

A   Yes.

Q   Instantaneou -- not instantaneous -- sequentially
it happened boom, boom, is that correct?

A   Fish pulled out and the patrol vehicle pulled in
is my recollection.

Q   All right. So nothing could happen from a
practical point of view.....

Exhibit J – 54

A   The suspect vehicle did not move.

Q   Okay. And it was going click, click so that this -- Mr. Davis, who was arrested, didn't get out of his vehicle, correct?

A   Correct.

Q   Okay.

A   As far as I know he didn't get out of his vehicle. All right. And he was -- as soon as Fish left, Officer LaBlanc pulled up, so it was a boom, boom; anything that was going down was -- the police should have been able to find, right?

A   Correct.

Q   All right. Now what did you do at that point in time?

A   I got out of my car when they pulled up and -- and took Mr. Davis into custody. I didn't have any other involvement, other than the fact that I -- Sergeant Stevens drove Mr. Davis' vehicle back to indoor secure storage and I followed her in the vehicle that I was in.

Q   Okay.

A   After he was arrested then I -- then she got into the truck and took it back to indoor secure storage and I followed.

Q   So tell me about the arrest, please. You -- were

AURORA COURT REPORTING

210

---

Stevens.

Q   Oh, okay. I'm sorry, I -- that was after Mr. Davis was arrested?

A   Correct.

Q   Okay. How far are you -- how far away were you when whoever did the arrest did the arrest?

A   I was probably within a car -- car's length of it.

Q   Okay. And a car is about 20 feet, isn't it? Eighteen, 20 feet?

A   I'll take your word for it, I don't know.

A   A regular car, not a mini car or something. You know, I can't swear to exactly where I was standing.....

Q   Okay.

A   .....when he was arrested. I know I was present, I was in the area. It was pretty dynamic, and I couldn't swear to exactly where I was standing or exactly how far away I was.

Q   Okay. Did you have a clear view of what went down?

A   I don't recall the arrest, so probably not. I might have been standing on the other side of the car. From where I had my car positioned maybe I was walking around the car, I -- I don't recall the specifics of the arrest.

AURORA COURT REPORTING

212

---

you the one that arrested him, said get out of the car.....

A   No.

Q   .....or whatever?

A   No, I didn't participate in the arrest.

Q   All right. What did you do?

A   I -- I just stood there maintaining perimeter.

Q   Okay. What did you see? Who -- first of all, let me ask you this. Who did the arrest? That would be.....

A   I couldn't tell you that.

Q   Okay. How many peop -- how many officers were there?

A   I couldn't tell you that either.

Q   Okay. Well, we know Stevens was there.

A   Stevens was there, I was there, Officer LaBlanc was there.

Q   Okay.

A   And I don't recall who else was there.

Q   Now we know Stevens, she drove the truck to the indoor storage?

A   Correct.

Q   Okay. So that's the truck. And am I correct that you drove Mr. Davis -- what.....

A   No. I -- I drove my vehicle, following Sergeant

AURORA COURT REPORTING

21

---

Q   During an arrest of a drug buy, based upon your experience, is there generally backup right there for the arresting officer? In other words, if I can set kind of a mental stage. If I'm the arresting officer, my partner or my backup is right there visually so that if something happens that person has a good visual so that they can respond?

A   Correct.

Q   All right. All right. So who was -- was there a backup?

A   Sergeant Stevens was probably closer than I was, since she got out of the passenger side of my car and I was driving my car. She was probably closer. Officer LaBlanc was there, and I don't know who else was there. I just don't recall who else was there. I'm sure there were other officers there but I don't -- I couldn't tell you exactly who was where.

Q   Now did -- you had -- you didn't touch Mr. Davis, right?

A   No.

Q   Okay. Did you observe the search incident to arrest?

A   Not that I recall.

AURORA COURT REPORTING

213

Q   Okay.  Did -- when did you depart the area
    following Officer, slash, Sergeant Stevens?

A   I didn't note the time.

Q   Okay.

A   So I couldn't tell you exactly.

Q   Was it before or after somebody transported Mr.
    Davis?

A   I would guess that it was after, but I couldn't --
    somebody else took Mr. Davis so I didn't have Mr.
    Davis so I couldn't tell you exactly when he left.
    I'm going to guess that we took the vehicle after
    he had left.

Q   Okay.  And you've had a chance to go through your
    -- at least your police reports, is that correct
    then?

A   Just my reports.

Q   Right.  Okay.  And the --(indiscernible).  So
    there's only one police report from you on --
    relating to the 2-8 incident, one page, is that
    correct?

A   Relating to which incident?

Q   2-8.  February 8th.

A   Yes.

Q   One page?

A   Correct.

AURORA COURT REPORTING

214

---

A   Correct.

Q   Okay.  And that's all that you generated?

A   Correct.

Q   On that day, also?  Okay.  Now you told us that --
    on direct, that you -- did you put the wire on Mr.
    -- on Jeremy?

A   No, because he's a male.  No.

Q   Okay.  Did you see it put on?

A   No.

Q   All right.  How do you know it couldn't be taken
    off?

A   Because it's -- it could be taken off; if he took
    all of his clothes off.....

Q   Okay.

A   .....it could be taken off.

Q   Okay.  So your statement on direct is qualified
    now?

A   I said he couldn't take the wire off without us
    knowing it.  We would hear him trying to take his
    clothes off.

Q   All right.  And where is the wire kept?  I mean
    where do they put the wire?

A   Where do they put it on his body?

Q   Yeah.  I mean generally speaking.  I mean you
    weren't there to.....

AURORA COURT REPORTING

216

---

Q   Okay.  Okay, and there's one page relating to you
    on the February 20th incident?

A   Correct.

Q   And.....

    MR. JAMES:  If I may approach, Your Honor.

Q   Is that your signature?

A   No.

Q   Okay.

    MS. BRADY:  Can I see that?  Oh.

    MR. JAMES:  I'm sorry.  (Indiscernible - away from
microphone).

Q   And February 21 has one page from you, is that
    correct?

A   Correct.

Q   So on the -- there was two at the house, at 202,
    that you were involved in as surveillance, and
    then you did one surveillance on the 21st where
    you followed Mr. -- the green Suburban back.....

A   Correct.

Q   .....to 202?

A   Correct.

Q   Okay.  And then on your report dated 3-1 is the
    last incident, is that correct?

A   Correct.

Q   Okay.  And that's a one pager also?

AURORA COURT REPORTING

---

A   It goes.....

Q   .....know how.....

A   It's a harness and it goes through the arm and
    there's a -- part of it wraps around the back,
    around the shoulder.  It goes across the back,
    wraps around this shoulder and it's usually hung
    under one arm, under clothing.

Q   Okay.

A   And sometimes it's even taped to the body to keep
    it from.....

Q   Kind of like a shoulder holster?

A   Exactly.

Q   All right.  So you are the one that determines
    when you're going to turn it on and you're going
    to want to turn it off?

A   Correct.

Q   And you can hear movement going on with the wire -
    - if someone's got the wire you can hear them.....

A   Uh-huh (affirmative).

Q   .....shuffling around or whatever?

A   You can hear them walking in snow, you can hear
    knocking on the door.

Q   Or things like that, moving around in cars and
    that kind of stuff?

A   Uh-huh (affirmative).  Uh-huh (affirmative).

AURORA COURT REPORTING

217

Q  All right. So you don't know what Jeremy Fish was doing while he was in the car before you turned the wire on do you?

A  I could hear it, I wasn't recording it, but I can hear it.

Q  Okay. Why would you not record what you can hear so that if it came up later on you would have the best evidence which would have been the recording?

A  Because standard practice is to re -- turn on the recording prior to them meeting the suspect.

Q  Is that written down some place?

A  I couldn't tell you whether it was or wasn't.

Q  Okay. And the -- you didn't have anything to do with the control of the -- anything that came off of Jeremy, other than the two dates you've indicated up there? One and two, Exhibits 1 and 2?

A  Correct.

Q  Okay. I'm just -- so -- and these police reports are made contemporaneous with the incident that happens, is that correct?

A  Usually we write them as soon as we get back to the station, as soon as the buy is over with.

Q  Okay. And as part of your training at APD they are to be as truthful and as correct as possible,

isn't that true?

A  Correct.

Q  Okay. Just like if you were going to do a search warrant or anything else, based on your training, you would put in there everything that you know for the benefit of whoever was going to read that?

A  Correct.

Q  All right. And the marijuana that -- Officer Dailey was the one that actually did all the work, isn't it?

A  Correct.

Q  On the marijuana deal. And that went away, right? Bye bye?

A  I don't know.

Q  You don't know?

A  No. When you say it went away, what do you mean?

Q  Dismissed, asta la vista(ph)?

A  I couldn't tell you. I couldn't tell you whether it did or not.

Q  Okay. All right. And just so I've got this clear, and I'm not -- I'm going to do what I'm going to do. You had contact of some type with Fish, Jeremy Fish, a couple days before the 8th as part of a Metro interview?

A  Correct.

Q  All right. There's no police reports or anything relating to those contacts?

A  I couldn't tell you whether there was or not.

Q  Okay. From your.....

A  From.....

Q  .....personal knowledge?

A  No. I didn't write one. We don't write one for debriefs unless you're the case officer. I was not the case officer.

Q  Well, a debrief would be after something happened, a pre-brief or something would be before, wouldn't it?

A  When you first meet the informant it's called a debrief. When you find out what they know. If you're going to continue to work with them and it's going to go forward, you usually write in your report what the debrief consisted of. What happened during the debrief, what the informant told you during the debrief.

Q  Okay. So if a case is going to go forward then you would have retrospectively brought it back in the debrief?

A  You -- you take notes during the debrief if you're the case officer. And you would use that in your police report if you're going to use the

informant, correct.

Q  Okay. So you being a member of this task group would not have been involved in -- from the 8th, would not have retroed back and mentioned the fact that you had been involved with Mr. Fish on the -- approximately on the 6th?

A  Correct; I would not have written.

Q  All right. And you believe that was at APD?

A  I know it was at APD, but I don't know it was the 6th.

Q  All right. I'm referring to a couple days, 8th, 6th, and I'm not locking you into that. All right. You have no knowledge of any deals that were made with Jeremy Fish relating to him.....

MS. BRADY: Objection, Your Honor, asked and answered.

THE COURT: Sustained.

MR. JAMES: Thank you.

Q  The police reports and your testimony given today, are they the totality of your knowledge and your involvement with Jeremy Fish?

A  With the exception of the debrief, correct. I don't have a police report of my involvement with the debrief.

Q  Let me say it again. The police reports and your testimony today, which is broader than your police

Exhibit J – 57

report, okay. Are they the totality of your
involvement in any manner with Jeremy Fish?

A    I can't -- I can't say that. Working as a patrol
officer I could have had contact with Jeremy Fish
at another time and date that I'm -- I don't
recall. Or could be in a police report somewhere.
To the best of my knowledge those are the only
contacts I've had with Jeremy Fish, but I couldn't
swear to it.

Q    From February 8th, 2001 the police reports and
your testimony today as to your contacts with
Jeremy Fish, is that the totality of your
contacts.....

     MS. BRADY:  Objection, Your Honor, asked and answered.
     THE COURT:  Sustained.

Q    Have you had any contacts with Jeremy Fish from
May, 2001 to today? Other than what you've
testified today?

     MS. BRADY:  Objection, Your Honor, asked and answered.
     THE COURT:  Sustained.
     MR. JAMES:  If I may just have a moment, Your Honor.
(Pause)
I think that's all the questions I have at this time for
Officer Bushue, thank you.
     THE COURT:  Thank you. How long is your redirect going

AURORA COURT REPORTING

222

---

A    Correct.

Q    Okay.
     MS. BRADY:  Let me just approach.

Q    And I'd like you to mark your initial diagram,
State's 23, and the other one, State's 24. Okay,
and that is State's 23?

A    Correct.

Q    And is that the -- is that a true and accurate
depiction of the buys that you were -- the 2-8 buy
that you were involved in at 202 Grand Larry?

A    To the best of my knowledge, correct.

Q    Okay.
     MS. BRADY:  At this time I'd move to admit State's 23.
     THE COURT:  23, Mr. James?
     MR. JAMES:  No objection.
     THE COURT:  23 is admitted.
                           (State's Exhibit 23 admitted)
     MS. BRADY:  Okay, and let's go to State's 24.

Q    Is that diagram a true and accurate depiction of
the buy that occurred near the Pancake House on
February 28th and March 1st?

A    Yes.

Q    True and accurate depiction?

A    To the best of my knowledge, correct.
     MS. BRADY:  Move to admit State's 24, Your Honor.

AURORA COURT REPORTING

22(

---

to be? I want to give the jury a break.
     MS. BRADY:  I have about ten questions. Not very long.
     THE COURT:  Go ahead.
                    KATHLEEN BUSHUE
testified as follows on:
                  REDIRECT EXAMINATION
BY MS. BRADY:

Q    What is a debrief?

A    A debrief is where you bring a potential informant
in and you talk to them about who they know in the
drug community, who they can possibly buy from,
how much they normally buy, what car they drive,
where do they live, what's their name; everything
that they know about the potential person that
they're going to buy from.

Q    Okay. When you weighed the cocaine in the two
exhibits that are before you, Exhibit 1 and
Exhibit 2......

A    Uh-huh (affirmative).

Q    .....do you take the cocaine out of the packaging
material?

A    No.

Q    So that weight that you indicated on there is the
cocaine and any packaging material it happened to
be in at the time?

AURORA COURT REPORTING

---

     MR. JAMES:  No objection.
     THE COURT:  24 is admitted.
                           (State's Exhibit 24 admitted)

Q    What time was that buy, that buy that is diagramed
right there? About what time did that occur at?

A    That happened, I believe, a couple moments after
midnight.

Q    Okay. And what is indoor secured storage?

A    Indoor secured storage is a -- basically a
building where we keep vehicles for evidence.
They're towed there with an officer following
them, or driven in this case. They're placed in
indoor secure, a tag is put on them saying the
case number, why it's there; and the only people
that have keys to indoor secure are supervisors or
above.

Q    All right. So once the vehicle goes in there, can
anybody take anything out of it?

A    No, the vehicle is not touched until the case
officer releases the vehicle.

Q    Can anybody put anything into it?

A    Only other officers could if they have the key to
it, and if they have access to indoor secure.
Only police officers have access.

Q    Okay.

AURORA COURT REPORTING

Exhibit J – 58

MS. BRADY: That's all the questions I have, Your

Honor.

THE COURT: Thank you, Ms. Brady. Why don't we take a

break folks. We'll take about ten minutes and we'll come

and get you when we're ready to start again. We'll all take

a break. Go off record.

(Off record)

MS. BRADY: Yeah, go ahead.

THE COURT: We're on record. We have -- parties and

counsel, our jury is not here. You had an issue you wanted

to take up?

MS. BRADY: I do, Your Honor. This is Detective

Triplett. He's here solely for the vehicle theft case.

THE COURT: All right.

MS. BRADY: And I just wanted to let him go. So if we

could talk to him, it's going to be just a few minutes, and

then he can leave.

THE COURT: All right.

MS. BRADY: He's been outside waiting to testify.

THE COURT: All right.

MS. BRADY: Do you want me to examine him?

THE COURT: Let's just swear him in.

MS. BRADY: Okay.

(Oath administered)

OFFICER TRIPLETT: I do.

AURORA COURT REPORTING

226

---

THE CLERK: Please be seated.

JAMES TRIPLETT

called as a witness on behalf of the plaintiff, testified as

follows on:

DIRECT EXAMINATION

THE CLERK: For the record, sir, will you state your

full name and spell your last.

A    James Triplett, T-r-i-p-l-e-t-t.

THE CLERK: Thank you.

BY MS. BRADY:

Q    How did you become involved in investigating the

vehicle theft case?

A    I was investigating a burglary involving another

individual and upon talking with the victim of

that particular crime I had learned information

that the individual I was investigating's

girlfriend allegedly had been heard during the

vehicle theft.....

Q    Okay, now let me stop you. Let's name some names,

just for clarity.

A    Okay.

Q    Okay, you were investigating a burglary that was

targeting what person?

A    The individual by the name of John Redwine(ph).

Q    And what's John Redwine's(ph) girlfriend's name?

AURORA COURT REPORTING

---

A    Elizabeth Smith.

Q    Okay. And you learned as a result of your

investigation that?

A    That from the victim of the burglary, who happened

to be John Redwine's(ph) sister.....

Q    Uh-huh (affirmative).

A    .....who had told me that Elizabeth Smith was

injured in an accident or a stolen vehicle, so I

started going through the computer system to try

to find those report numbers, and once I found

those report numbers I would learn that a warrant

was obtained for Jeremy Fish for the stolen

vehicle.

Q    Okay.

A    And after that, and personal knowledge of talking

to other officers, that the family has a tendency

to cover for John Redwine(ph).

Q    Okay.

A    So when I was trying to locate John Redwine(ph)

for investigation of the burglary I had re --

talked with Jeremy Fish and John Redwine's(ph)

sister, who learned that Elizabeth Smith was at

the Redwine(ph) residence. So I said, okay, I

went to meet with them. I've got a couple of

other officers with me and we went to the

AURORA COURT REPORTING

228

---

residence to, in fact, try to contact John

Redwine(ph) so I could continue my investigation.

Q    Okay.

A    Once there I spoke with Elizabeth Smith. She

assured me that John wasn't there. I believe it's

his grandmother. It's a -- kind of like a split

type house where upstairs is one unit, downstairs

is another, and the Redwines(ph) father and mom

live in the lower level, and the mother of -- I

believe it's the father. So it's his

grandmother's house. Live on the other side.

They've all said that he wasn't there. They, in

fact, let us search the house, and, in fact, he

wasn't there. I started inquiring to Elizabeth

because my gut feeling was telling me that Jeremy

Fish wasn't involved with the stolen vehicle, so I

started pressing the issue to see if -- what she

had to say. She, in fact, told me that, no, she

ended up covering for John. And that it wasn't

Jeremy Fish who stole the vehicle, that it was

John. So Officer Chavers(ph), who took the

original report, I summoned him to come over

because I figured he should follow up on it, and

which he did. And he did, in fact, do a report of

that conversation of -- in another interview with

AURORA COURT REPORTING

229

---

Exhibit J – 59

Elizabeth Smith.

Q    Okay. We've already given that to you. You have
the police reports, Your Honor, so -- but -- and
the thing that we didn't have was John Redwine(ph)
charged with anything after Officer Chavers(ph)
talked to Ms. Smith.

A    Yeah; after the conclusion of the follow-up
interview with Elizabeth Smith, Officer
Chavers(ph) contacted the DA's office and -- and
let them know of the new information, and in turn
there were charges for John Redwine(ph) for -- he
was a juvenile at the time; so the charges at that
time for him were reckless driving and driving --
and driving in violation of -- without an
instruction permit.

Q    Okay. And now John Redwine(ph) is a juvenile?

A    He's an adult now, but he was at that time.

Q    Okay. And what was Fish originally charged with,
what were all the charges?

A    Vehicle theft, reckless endangerment, and reckless
driving.

Q    Okay.

MS. BRADY: That's all the questions I have, Your
Honor.

THE COURT: Mr. James, do you have any questions for

230

---

A    That's correct. And.....

Q    I'm talking about the time you're involved in.....

A    When Officer Chavers(ph) was with me?

Q    Well, I assume that was the same day, wasn't it?

A    No, it was not the same day.

Q    Okay. Okay. I guess -- you made contact at
Redwine's(ph) residence on a specific -- that's
the date I'm interested in.

A    Yeah, July 5th.

Q    Okay. Is that the day that Officer Chavers(ph)
also.....

A    That -- that is correct.

Q    Okay. And so do you know why Redwine(ph) wasn't
charged with vehicle theft?

A    He's -- he was a juvenile, and my understanding is
that that particular charge has to go through the
juvenile system, and so he was in turn charged
with driving offenses that can be charged to
minors, but that particular offense I'm not sure
what the process or what the status of that went,
but my understanding was it was all sent over to
MYC intake for the charges.

Q    Okay. Do you know -- there was a Mr. Bennett who
was the victim in that theft?

A    That's correct.

232

---

Officer Triplett?

JAMES TRIPLETT

testified as follows on:

CROSS EXAMINATION

BY MR. JAMES:

Q    When did this investigation go down with you?
What were the dates? The date? Excuse me.

A    From which aspect?

Q    Okay. You indicated that you were investigating a
burglary.

A    That's correct.

Q    Okay. And based upon that investigation of the
burglary you went over to Redwine's(ph) residence.
Where is that residence?

A    That is at 501 Togiak.

Q    Where is that?

A    That's in Midtown.

Q    Okay.

A    Just south of the Lowe's, Eagle -- old Eagle
Hardware.

Q    Okay. And when was this -- can you set the time
stage, that's what I'm interested in.

Q    Of the original stolen vehicle report?

A    The original stolen vehicle report was the 22nd or
23rd of June.

---

Q    Do you know anything about the photo lineup?

A    Yeah, I do. I showed Mr. Bennett.....

Q    You were the one?

A    I was the one that.....

Q    Okay.

A    And it's in my supplement.

Q    All right. And, please?

A    And the photo lineup I showed him, which was a
lineup of John Redwine(ph), he did not pick Mr.
Redwine(ph) out.

Q    Okay. How about Fish? Did you show him.....

A    At that point in time I didn't have a photo lineup
of Jeremy Fish and I never showed him a photo
lineup of Jeremy Fish.

Q    So your knowledge, as of right now, is you don't
know, other than a -- Officer Chavez'.....

A    Chavers(ph).

Q    Chavers(ph) contacted the DA's office, you don't
know whether Bennett -- Mr. Bennett identified
Fish.....

A    That's correct.

Q    .....or not?

A    That's correct.

Q    Okay. And you don't know -- you do know that he
didn't identify Redwine(ph)?

Exhibit J – 60

A   That's correct.

Q   So Elizabeth Smith telling you Redwine (ph) was the driver doesn't match up with what Bennett saw?

A   I don't know that.

Q   Okay.

A   I can only go by what Elizabeth Smith had told me.

Q   My question is I guess this. You showed Bennett - - Mr. Bennett a photo lineup of one of the vic -- persons was Redwine (ph), John Redwine (ph)?

A   That's correct.

Q   Okay. He did not identify John Redwine (ph)?

A   Correct.

Q   The information, if I'm correct, that you had at the time was is that he saw the person behind the vehicle of -- driving the car that was his car, that was taken?

A   I can only assume what-- what's in the report.

Q   I mean but the information you had at that time, was that your understanding?

A   Well, I can read you my report as to what he told me when I showed him that.

Q   Okay. Well, why don't you just read it and then just quickly.....

A   Okay.

Q   We're not trying -- I'm not trying to draw this

234

---

Q   Okay. And there was no photo lineup involving Jeremy Fish prior to.....

THE COURT: You just asked -- you asked that question already.

Q   Prior to the 3rd of July.

THE COURT: You've already asked that question.

MR. JAMES: All right. Thank you. I'm.....

THE COURT: Do you know what happened with the charges against Mr. Redwine (ph), what the disposition is?

A   I do not, sir.

THE COURT: All right. Anybody else with questions for Officer Triplett?

MS. BRADY: No, that's it.

MR. JAMES: No, sir.

THE COURT: Thank you very much. Ready for your next witness, Ms. Brady?

MS. BRADY: I am, Your Honor.

THE COURT: Shall we get the jury. Shall we get the jury, Ms. Brady?

MS. BRADY: Yes, Your Honor.

                              (Jury recalled)

(Witness summoned)

(Whispered conversation)

THE COURT: All right, everybody have a seat, please. Are we back on record?

236

---

thing out, I just want to make sure we're talking about.....

A   My report, written on July 3rd, in reference to the stolen vehicle was on July 7th, 2001 approximately 1411 hours I had the victim witness, Bennett, respond to APD to attempt to identify the suspect defendant regarding this case. The interview with Bennett. Bennett was advised, as well as read the preview and advisement with regards to the photo lineup he viewed. He then signed the advisement. When he turned the lineup over he stated he didn't recognize any of the subjects in the lineup, but if he were to guess it would be -- would have been number 5. Bennett states he didn't get a real good look at the driver because he was following his vehicle. He states he could only see the driver through the side mirror. When the female was on the ground the vehicle fled the scene.

Q   Okay. And what number was Redman -- Redwine (ph)?

A   I don't have that with me.

Q   And to your knowledge there was no follow up that Bennett either could or could not identify Jeremy Fish after the 3rd of July?

A   To -- to my knowledge that's correct.

---

THE CLERK: You are.

THE COURT: And you have another witness, Ms. Brady?

MS. BRADY: I do, Your Honor.

THE COURT: All right, we'll swear this witness in.

(Oath administered)

OFFICER HAAS: I do.

THE CLERK: Please be seated.

OFFICER HAAS: Thank you.

                    STEVEN FRANK HAAS

called as a witness on behalf of the plaintiff, testified as follows on:

                    DIRECT EXAMINATION

THE CLERK: For the record, sir, will you state your full name and spell your last.

A   Steven Frank Haas, H-a-a-s.

THE COURT: Go ahead, Ms. Brady.

BY MS. BRADY:

Q   How long have you been an APD officer?

A   Since May, 1996.

Q   Okay. And do you have a -- are you assigned to a special unit?

A   Currently I'm assigned to the Special Assignment Unit.

Q   Is that the same assignment that you had during the investigation of this case?

237

Exhibit J – 61

A   Yes, it is.

Q   All right.  And have you had any training or experience in the detection and identification or investigation of cases involving controlled substances?

A   Yes, I have.

Q   Could you just explain to the members of the jury what that is?

A   I attended the police academy that was put on by the Anchorage Police Department here at the (indiscernible) training center.  I have attended a DEA clandestine lab school, and then other field training that I've done.  I've been the case officer on cases, I've assisted in cases in the testing of drugs, the identification of drugs, et cetera.

Q   How did you become involved in this case?

A   Officer LaPort and Officer Johnstone had acquired an informant and I was assisting in the surveillance of the case.

Q   Okay.  And let me direct your attention to February 8th.  Did you have a particular assignment with regard to this case on that day?

A   Yes, I did.

Q   What.....

AURORA COURT REPORTING

238

---

2001, followed by the sequential number for when the case is assigned.

Q   Okay.  And so you know that that's the photocopy of the buy funds that you made because of what reasons?

A   Because that case number is the same number that's on my report.

Q   And are your initials on it?

A   Yes.

Q   Okay.  And is that document a true and accurate representation of the photocopy you made of the buy funds that you gave to Mr. Fish?

A   Yes.

Q   Okay.

MS. BRADY:  I'd move to admit State's 8 at this time.

MR. JAMES:  No objection.

THE COURT:  Eight.  State's 8 is admitted.

(State's Exhibit 8 admitted)

Q   Okay.  And did you assist any further with this case that day?

A   On that particular day -- just reviewing my report here real quick.  I just basically assisted with surveillance and then that was pretty much it.

Q   Okay.  And directing your attention to what's been marked as I think State's 23 which is right behind

AURORA COURT REPORTING

240

---

A   I'm sorry, go ahead.

Q   What was your assignment?

A   On that day I was assigned to assist in surveillance, and I photocopied the money part of the buy.

Q   Okay.  And how much money did you give the informant on that day?

A   $150.00.

Q   Let me approach you with a document.  This document has previously been marked State's Exhibit 8.

A   Thank you.

Q   Do you recognize that document?

A   That would be the photocopy of buy money.

Q   Okay.

A   And with my initials right below the date on it.

Q   All right.  And you anticipated my questions.  What -- there -- it has a number on it that says 017273.  What is that number?

A   That's our APD case number that we assign to a case.

Q   Can you explain to the members of a jury -- of the jury what a case number is?

A   Every time we generate a report it's assigned a case number.  In this case it's 01 for the year

AURORA COURT REPORTING

2

---

you, there's a diagram.  Do you recognize what that diagram is of?

A   This would be a diagram of the area in which the buy occurred on that date.

Q   Okay.  And I'm going to ask you to take a different colored marker than what's already been used on that, and just show the members of the jury where you were and tell us what you observed?  Okay, I'm going to ask you not to use a highlighter because we won't be able to see that, so get something red or -- orange is fine.

A   Let's see.  On the 8th of February of this year I was assigned to be on Dubin south of the residence, and Dubin is down here.  Grand Larry continues down to Dubin, which runs out to Muldoon.  There's the Mapco right at the corner of Muldoon and Dubin.  And I sat on Dubin south of the residence if I recall.  I believe I was sat somewhere down here because I could look down this way and see -- just see the car, but I couldn't see the actual residence.

Q   Okay.  And what were you doing while you were sitting there?

A   Listening to the radio.  We were all on the same channel, I was listening to traffic that Officer

AURORA COURT REPORTING

24

---

Johnstone was telling me when the informant's
vehicle was coming into the area.

Q   Okay.  And what were you supposed to be doing when
the informant's vehicle came in the area?

A   Just watch it and watch it go up to the residence.

Q   Okay.  And did you -- do you know if the
informant's vehicle went up to the residence?

A   I saw the vehicle come down onto Grand Larry, go
north on Grand Larry and pull up to where I
believe about the house was, but I couldn't see
the actual house numbers.

Q   Okay.  Then what happened after the -- did you --
could you hear on the radio the informant was
leaving?

A   I heard Officer LaBlanc advise that he could see
the informant go inside the house, go back to his
car, then go back inside.  And after a few minutes
Officer LaBlanc advised again when the informant
went up to his car and left the area.

Q   Okay.  And then what did you do after he left?

A   I just advised that I could see the vehicle
leaving, going up  -- if I recall correctly he
came back out to Dubin and left that way, and I
believe Officer LaPort and Officer Johnstone
followed the informant back to the police station.

the informant's car before and after to make sure
that they don't already have any contraband,
drugs, money, et cetera in their car; and then we
check it afterwards and make sure that they didn't
conceal anything in the car.

Q   What kind of car was it?

THE COURT:  Can we get you to move back in front of the
microphone.

A   Oh, I'm sorry, sir.

THE COURT:  Thank you.

A   If I recall correctly he was driving a station
wagon, but I think he -- he drove two different
cars during this.

Q   Okay.

A   I don't recall what the other car was.

Q   How thorough was the search that you did?

A   It's pretty thorough, because it probably takes me
maybe five to ten minutes to search the car and I
start where the driver sits and search everything
that they can reach, could possibly get to, and
then work my way back.

Q   So you look in the ashtrays?

A   Ashtray, floor mat, seats, sun visor, door panels,
any nook and cranny where you could hide the type
items we're dealing with.

Q   Okay.  Now let me direct your attention to
February 20th.  Did you have a particular
assignment on that day?

A   Once again we were continuing the investigation of
this case.  I was assigned to search the
informant's vehicle to make sure that there was no
contraband or money in the vehicle.  I did so,
didn't find anything in the car; and, once again,
I was assigned to park south of the location on
Grand Larry.  And at this particular time I
arrived and parked west of Grand Larry on Dubin.

Q   Okay.  Now let me stop you for just a second
because I failed to make a record of you've been
marking in orange on what's previously been marked
as State's Exhibit 23 when you were talking about
the 2-8 buy, is that right?

A   That's correct.

Q   Okay.  Now let me talk about -- we'll go back to
2-20 and you said that you did a search of the
informant's car?

A   That's correct.

Q   Is that a typical kind of thing that you do when
you work with informants?

A   Yes.  If we're sending the informant in and
they're driving their own vehicle we always search

Q   Okay.  And what happened after you searched Fish's
car?

A   After I searched his car we all proceeded over to
the area of 202 Grand Larry, and as I stated
before, I parked on Dubin west of Grand Larry this
time.

Q   Okay.  And then did you have any further
involvement with the case after Fish left Grand
Larry that day?

A   Yes.  Let me just review and make sure I cover
everything here.  I assisted in following the
informant back to the police station.  Once back
at the police station I searched his car again.

Q   Now -- okay, you searched the car before so why do
you need to search it afterward?

A   To make sure that they didn't conceal anything in
the car after the drug transaction; drugs, money,
et cetera.

Q   Was any contraband found?

A   No.

Q   Okay.  And did you do anything else with regard to
this case on that day?

A   No, I did not.

Q   Okay.  Then let me direct your attention to
February 21st.  Did you have a particular

Exhibit J – 63