1    information for that account, is that correct?
2 A   Correct.
3 Q   And could you just please explain to the members of the
4     jury what subscriber information is?
5 A   Subscriber information will be their name, address,
6     social security number, date of birth, and employer, if
7     known.
8 Q   Okay. And what is the subscriber information that you
9     have for that telephone number?
10 A  We have Robert Davis at 732 Pearl Drive, Anchorage,
11    Alaska, 99518. And then his social security number,
12    date of birth, and his Alaska driver's license numbers.
13 Q  Okay. And is the -- now you were also asked to bring
14    the records for the phone that was being used on that
15    account, is that right?
16 A  Correct.
17 Q  And what kind of phone was being used on that account?
18 A  It was a Lucky Goldstar.
19 Q  Okay. And the serial number is on there?
20 A  Yes, commonly referred to as the ESN. There's two
21    different formats. One is a decimal version, one is a
22    hex format. I think on the phone itself, the hex
23    format was Charlie 9 Delta 01 Bravo 92.
24 Q  Okay. And that information is on the document in front
25    of you?

Page 230

1 Q   Okay. Okay. So anytime then that that phone was --
2     okay, well -- and do you have those records in front of
3     you?
4 A   I do not. Well, I have my own copy.
5 Q   Well, that's what I meant.
6 A   Yes.
7 Q   Okay. It's -- is this.....
8 A   Yes.
9 Q   .....multi-page? All right. I'm not going to go into
10    a lot of detail. I just want to get a few items
11    cleared, if I may. So this would reflect all activity,
12    according to your records on that phone.....
13 A  Correct.
14 Q  .....for the -- for the period that you have supplied?
15 A  Correct.
16    MR. JAMES: Okay. All right. Okay. Thank you. Thank
17 you.
18 A  You're welcome.
19    THE COURT: Redirect, Ms. Brady?
20    MS. BRADY: I don't have any redirect, Your Honor.
21    THE COURT: All right. Thank you. You can step down.
22 Do you have the marked exhibit?
23 A  It's right here.
24    THE COURT: Thank you very much. And I understand we
25 need to take a break before we -- before the next witness,

Page 232

1 A   Yes, it is.
2     MS. BRADY: Okay. And at this time, I move to admit
3 that as state's exhibit 14.
4     THE COURT: Number 14, Mr. James?
5     MR. JAMES: No objection.
6     THE COURT: 14 is admitted.
7        (Plaintiff's exhibit 14 admitted)
8     MS. BRADY: That's all the questions I have for this
9 witness.
10    THE COURT: Mr. James?
11        CAM LAMPMAN
12 testified as follows on:
13        CROSS EXAMINATION
14 BY MR. JAMES:
15 Q  Ms. Cam Lampman?
16 A  Uh-huh. (Affirmative)
17 Q  You brought a whole packet that shows different, I
18    guess a telephone log, isn't it, would that be a
19    correct statement?
20 A  All records.
21 Q  Yeah.
22 A  Yes.
23 Q  Okay. Does that reflect oncoming -- incoming and
24    outgoing calls, is that what that was?
25 A  Correct.

Page 231

1 is that correct?
2     MS. BRADY: That is correct, Your Honor.
3     THE COURT: I'm going to ask you to take another break,
4 folks. And again, I appreciate your patience.
5     (Jury excused)
6     MS. BRADY: He was waiting downstairs, so Detective
7 Johnstone went to go get him, and he's not back yet.
8     THE COURT: We'll go off record, but everybody can stay
9 in the courtroom, and as soon as he gets back, we will bring
10 Mr. Fish in and make very limited inquiry, and then move
11 back with the jury.
12    MR. JAMES: Understood. Thank you.
13    THE COURT: Deal with while we're waiting for Detective
14 Johnstone to get back with Mr. Fish, Ms. Brady?
15    MS. BRADY: I don't have any, Your Honor.
16    THE COURT: Mr. James?
17    MR. JAMES: I -- I can't think of any right at the
18 moment, Judge.
19    THE COURT: All right. Then we'll go off record.
20    (Off record)
21    (Jury not present)
22    THE COURT: .....record. Let's do some housekeeping
23 work while we're -- while we have the time to do that.
24 First of all, you all have an agreement regarding exhibit
25 number -- what was the exhibit that was just admitted?

Page 233

**3AN-01-1717 CR**

1  MS. BRADY: 14.
2  THE COURT: 14, and that is to edit out the fax
3  reference, attention Judge Hensley, is that correct?
4  MR. JAMES: Yes, sir.
5  MS. BRADY: That's correct, Your Honor.
6  THE COURT: All right. So I'll rely on you folks to
7  make the agreeable -- agreed upon edit and then substitute
8  the exhibit, and unless I hear further objection, then --
9  then I'll assume that you've agreed on what it says and it
10 will go to the jury. I had four police reports that were
11 given to me as part of the other evidentiary disputes that
12 we had this morning, why don't we get those marked with
13 exhibit stickers, and since they won't be admitted into
14 evidence, let's use some numbers that aren't likely to.....
15 MS. BRADY: Why don't.....
16 THE COURT: .....foul up somebody's.....
17 MS. BRADY: Why don't we use EH1, 2, 3, like -- and so
18 on?
19 THE COURT: EH?
20 MS. BRADY: Yeah.
21 THE COURT: That's fine with me.
22 MR. JAMES: What's EH stand for?
23 THE COURT: Evidentiary hearing.
24 MR. JAMES: Oh, evidentiary hearing.....
25 MS. BRADY: Yeah.....

Page 234

1  THE COURT: Although I have some of them marked with --
2  otherwise, but we'll go ahead and do that. And so we'll
3  mark the 9/29 report EH1.
4  THE CLERK: Here you go. Why don't you just go ahead
5  and do it (indiscernible).....
6  THE COURT: Actually, let me -- yeah, it doesn't -- I
7  guess that doesn't have to be chronological. We'll mark the
8  3/29 report EH2. We'll mark the 7/26 report EH3. We'll
9  make, although I didn't use it again today, the report
10 involving Redwine auto case, which is July 3rd as EH4. Get
11 some more, Ms. Brady.
12 MS. BRADY: Okay.
13 THE COURT: We will remark exhibits which were marked
14 yesterday, the Mumford burglary April 4 will be remarked as
15 EH5.
16 THE CLERK: What was it previously marked?
17 THE COURT: Previously marked as exhibit C. The June,
18 2001 vehicle theft, previously marked as 22, we will remark
19 as EH6. And the previously marked exhibit B, which is the
20 car stereo, 7/13, July 13, 01, will be remarked as exhibit
21 -- evidentiary hearing 7, EH7. So that gets all of those in
22 the record for whoever else wants to look at them later.
23 And it will give us a record to refer to if we need to later
24 in the trial. And we can go off record now and wait for
25 Mr. Fish.

Page 235

1  MS. BRADY: I'm going to go downstairs and see if I can
2  find out what's going on.
3  THE COURT: I'd appreciate that. Thanks.
4  (Off record)
5  THE CLERK: On record.
6  THE COURT: We're on record. We have parties, counsel,
7  our jury is not here, and I'm assuming that you are Jeremy
8  Fish in the witness box, is that right?
9  MR. FISH: Yes, sir.
10 THE COURT: All right. Now, if you will stand up, sir,
11 Ms. McKewin is going to swear you in, and I'm going to give
12 the lawyers an opportunity to ask you a few questions before
13 we continue with the trial.
14 THE CLERK: Please raise your right hand.
15 (Oath administered)
16 MR. FISH: Yes, I do.
17         JEREMY FISH
18 called as a witness on behalf of the plaintiff, testified as
19 follows on:
20         VOIR DIRE EXAMINATION
21 THE CLERK: Please be seated. Sir, for the record,
22 will you state your full name and spell your last?
23 A  Jeremy Joel Fish, F-i-s-h.
24 THE CLERK: Thank you.
25 THE COURT: That's a pretty hot mike. You don't have

Page 236

1  to lean into it.
2  A  Sorry about that.
3  THE COURT: It will pick you up, as long as you're
4  reasonably close. Mr. James?
5  BY MR. JAMES:
6  Q  Thank you, Mr. Fish. Just for clarification, do you --
7     well, are you under -- have you used any drugs in the
8     last 24 hours?
9  A  Yes, I have.
10 Q  What have used?
11 A  Marijuana.
12 Q  When is the last time you used it?
13 A  Probably yesterday.
14 Q  When?
15 A  Evening time, probably about 7:00 o'clock.
16 Q  Okay. How about when is the last time you used
17    cocaine?
18 A  I don't know, a while. It's been a long time.
19 Q  Like what?
20 A  About -- I don't know, like eight months.
21 Q  All right. Now, you're under oath, and is there
22    anything about your use of drugs that you feel may
23    cloud your memory at this time?
24 A  No, I do not.
25 Q  What we're talking about here, what we're going to be

Page 237

3AN-01-1717 CR

1   talking about is subsequent police contacts after
2   March 1 of 2000. Okay? Okay. Now, you apparently
3   pawned a -- some type of stereo system?
4 A   Sega Saturn.
5 Q   Pardon, please?
6       THE COURT: All right. Just a second, Mr. Fish, before
7   we get into these subjects, and -- I'm going to tell you
8   that although you're not under arrest or you're not.....
9 A   Right.
10       THE COURT: .....you are subpoenaed here by the
11   district attorney's office, I assume. Some of the questions
12   may relate to some potential liability. I don't really
13   know, because I'm not in charge of investigating and
14   prosecuting crimes. But some of the questions may relate to
15   outstanding crimes, and you have a right not to answer the
16   questions. You have a right to ask for an attorney before
17   you answer the questions, to consult with an attorney before
18   you answer the questions, and most importantly, if you
19   answer the questions, you're on tape here and everything is
20   being recorded, and your answers may be used against you
21   later on if -- if some of these police investigations turn
22   out to -- to pursue you. So you need to know that. You're
23   not -- nobody is going to force you to answer the questions
24   that we're talking about now in front of the jury. And so I
25   want to make sure that you understand that and ask if you --

Page 238

1   if you're willing to answer the questions?
2 A   Yeah, I'm willing to answer them.
3       THE COURT: All right.
4 Q   Okay. With those admonitions, Mr. Fish, now you
5   indicated that -- when I was talking about a pawning of
6   a stereo, you indicated it was a Sega?
7 A   Yeah, that's the only thing I pawned.
8 Q   Okay. What -- what did you pawn?
9 A   It was a Play Station.
10 Q   Play Station?
11 A   Yes. It was something like that.
12 Q   Okay. Where did that come from?
13 A   It came from Liz Redwine.
14 Q   Okay. How did you get it?
15       THE COURT: Mr. James, the question isn't.....
16       MR. JAMES: All right.
17       THE COURT: The.....
18       MR. JAMES: All right.
19       THE COURT: The area of inquiry isn't -- isn't what
20   happened, it's this witness' knowledge. Now, there are more
21   than one way to get there, but -- but for purposes of this
22   trial, I want you to focus on the knowledge of potential
23   repercussions and not whether a particular crime was
24   committed.
25 Q   Did you have -- did the police contact you regarding

Page 239

1   that?
2 A   No, they have not.
3 Q   All right.
4 A   I contacted them. I contacted Officer Triplett and
5   told him to the best of my knowledge everything that
6   was behind that. That's -- I never heard anything back
7   on it.
8 Q   All right. Now, to your knowledge, was that stolen
9   from Liz Redblood [sic]?
10 A   Not to my knowledge, or I wouldn't have pawned it.
11 Q   All right.
12       THE COURT: What's the date on this one, Mr.....
13       MR. JAMES: This is the -- this is the 4/14, it's.....
14       THE COURT: 4/10?
15       MR. JAMES: 4/10, right.
16       THE COURT: Okay. Ms. Brady's position was that if the
17   witness had any idea that the police were interested in the
18   case, the evidence was admissible.
19       MR. JAMES: Right.
20       THE COURT: Is that still your position, Ms. Brady?
21       MS. BRADY: Yeah, Your Honor.
22       THE COURT: Then the evidence, based on this testimony,
23   you can go into that subject at trial.
24       MR. JAMES: Okay. Thank you.
25 Q   Moving along here, calling your attention to the

Page 240

1   forgery involving a Colleen Hensley, where you received
2   two checks were written out to you, one for $275 and
3   one for $250?
4 A   It wasn't involving me.
5 Q   Did you receive those checks?
6 A   No, I did no.
7 Q   You didn't cash a check for.....
8 A   No, I did not.
9 Q   Let me finish the question, if I may.
10 A   Sorry.
11       THE COURT: Mr. -- Mr. James, the issue isn't guilt or
12   innocence, it's knowledge of repercussions.
13       MR. JAMES: All right.
14 Q   No, there is no -- there is no police investigation
15   involving you involving these checks?
16 A   No. No.
17 Q   All right. Did a Mr. James Cage from MBA/Wells Fargo
18   contact you?
19 A   No.
20 Q   Just a moment, sir. On 9/29, were you contacted by the
21   police regarding a banishment of a weapon, gun?
22       MS. BRADY: I all ready agreed that could come in.
23       MR. JAMES: Okay.
24       MS. BRADY: The only one's that left is the 9/2 threat.
25       MR. JAMES: Threat, right.

Page 241

1 Q  Mr. Fish, on 9/2, that's September 2nd, were you
2    contacted, or are you aware of a police investigation
3    involving a threat involving a Mr. -- I believe it's
4    Milky (ph)?
5 A  No.
6 Q  You was going to burn down his -- were you going to
7    burn down his house?
8 A  No, I wasn't.
9 Q  All right.
10   (Whispered conversation)
11   MR. JAMES:  Well, I guess we've covered the ground
12 then, Judge that.....
13   THE COURT:  I can't hear you.
14   MR. JAMES:  I'm sorry.
15   (Whispered conversation)
16   MR. JAMES:  We've covered that, the forgery and the
17 threat.  Those are in all ready.  Do we have those -- oh,
18 you've got the list up there, Judge?
19   THE COURT:  Would you like them?
20   MR. JAMES:  Yeah, great.
21   THE COURT:  I have the -- the reports.  Right.  That's
22 fine.  I'm missing one page here, or something.
23   (Pause)
24   (Whispered conversation)
25   MR. JAMES:  So we've got -- marijuana is in.  I'm just

Page 242

1    THE COURT:  All right.  Mr. Fish, just keep your seat.
2 We're going to go get the jury.
3 A  Okay.
4    THE COURT:  When the jury comes in, you can -- we all
5 stand up when they come in.
6 A  All right.
7    (Jury summoned)
8    MS. BRADY:  You listened to all the tapes, right?  So
9 if I say to you, this tape is the tape that you have that's
10 marked 2/28, do you know what's on this tape, what would you
11 say?
12 A  No.
13   MS. BRADY:  It's a copy of what -- the tape that was
14 given to you.....
15 A  I mean, I know -- I don't know them in order.
16   MS. BRADY:  Okay.
17 A  I don't know what's on the 28th.  But I know if you
18   start -- start it, I can finish it.
19   MS. BRADY:  Okay.
20   (Pause)
21   THE COURT:  Have a seat, everybody.  We are back on
22 record.  We have all the jurors back.  Thanks again for your
23 patience, everybody.  We have another witness in the witness
24 box.  Sir, if you would stand up, we will swear you in.
25   THE CLERK:  Please raise your right hand.

Page 244

1 -- banishing, that's in.  The -- alluding, that's in, coke
2 is in.  These are -- I think we've covered all the issues.
3 I just wanted to make sure that we've covering the ones
4 that.....
5    THE COURT:  Do you want to ask any questions,
6 Ms. Brady?
7    MR. JAMES:  Here's the.....
8    MS. BRADY:  Of this witness, no, Your Honor.  But I do
9 want to clarify for purposes of the protective order, the
10 relevant line of inquiry with regard to these acts is only
11 witness bias.  It's what he thinks may or may not happen as
12 a result.  I mean, I think limited inquiry into the facts is
13 appropriate, but not.....
14   THE COURT:  Well, what may happen as a result may in
15 part turn on how serious the events are, and so it's kind of
16 hard to put parentheses around it, or narrow it down.  But
17 if.....
18   MS. BRADY:  Okay.
19   THE COURT:  .....it gets cumulative, or if the
20 questioning gets in -- begins to the point where we're
21 talking about more propensity than bias, I'll hear --
22 entertain objections.
23   MS. BRADY:  Okay.  And I'm ready to go.
24   THE COURT:  All right.  Are you ready to go, Mr. James?
25   MR. JAMES:  Yes, sir.

Page 243

1    (Oath administered)
2    MR. FISH:  Yes, I do.
3          JEREMY FISH
4 called as a witness on behalf of the plaintiff, testified as
5 follows on:
6          DIRECT EXAMINATION
7    THE CLERK:  Please be seated.  For the record, sir,
8 will you state your full name, and spell your last?
9 A  Jeremy Joel Fish, F-i-s-h.
10   THE CLERK:  Thank you.
11   THE COURT:  Go ahead, Ms. Brady.
12 BY MS. BRADY:
13 Q  How old are you, Mr. Fish?
14 A  I just turned 19.
15 Q  All right.  And how far did you go in school?
16 A  Probably about tenth grade, ninth grade.
17 Q  Have drugs affected your life?
18 A  Yeah.
19 Q  How?
20 A  They've always been a part of it.
21 Q  Did your parents use drugs?
22 A  Yeah.
23 Q  And so you've been aware of the drug community since
24   you were very young?
25 A  Yeah.

Page 245

1 Q  When you were a juvenile, did you get into criminal
2    trouble?
3 A  Yeah.
4 Q  Were you adjudicated two times as a juvenile of crimes
5    involving dishonesty?
6 A  Yes, I was.
7 Q  Okay. And did there -- was there a time when you --
8    have you always lived in Anchorage?
9 A  Yeah.
10 Q Okay. Did there come a time when you moved away from
11   Anchorage?
12 A Yeah.
13 Q Where did you move to?
14 A Nome, Alaska.
15 Q What did you do in Nome?
16 A I worked.
17 Q How long were you there for?
18 A Probably about four and a half months.
19 Q Okay. And you got in trouble in Nome as well, isn't
20   that right?
21 A Yes, I did.
22 Q Okay. Why don't you just explain to the jurors what
23   you were doing on January 25th of this year, 2001, at
24   the AC apartments?
25 A I was -- I was under the influence of alcohol and we

Page 246

1    were just -- I was with a couple of other people, and
2    there really -- we were just walking around and
3    knocking on doors and I opened this one door, I opened
4    the door and there was some money laying on a table,
5    $7, I took $7 and I walked out.
6 Q  Okay. Now, as a result of that, Nome police officers
7    came and contacted you, right?
8 A  Yes, they did.
9 Q  Okay. And what happened when the Nome police officers
10   came and talked to you?
11 A He came and talked to me, and he told me that the
12   people I was with already told them it was me. And so
13   he asked me, you know, what did I want to do about it.
14   And I -- I told him that I wanted to make grievance, I
15   wanted to go back and tell the lady I'm sorry and give
16   her back her seven bucks. It was -- it was stupid of
17   me. And he told me that -- that, you know, I couldn't
18   go back over there and talk to the lady, that we would
19   have to try to work something out. And he thought I
20   knew somebody who sold dope, which is coke or
21   something, in Nome, and I didn't. That's why I moved
22   away from Anchorage, to get away from all this. And so
23   I told him that I -- I did know somebody, and then I
24   just came back here.
25 Q You left in the middle of the night?

Page 247

1 A  Yeah.
2 Q  Okay. Now, let me stop you for just a second. When
3    you were talking to the Nome police officer, did he
4    tell you what you could be charged with as a result of
5    what you had done?
6 A  I can't remember.
7 Q  Burglary in the first degree?
8 A  Right. Burglary.
9 Q  Okay. And when you got here, did you get arrested?
10 A No, I did not.
11 Q Okay. How did it come to pass that you ended up being
12   in contact with APD?
13 A Well, I have a girlfriend and a baby, and they told me
14   -- you know, they got a hold of my girlfriend because
15   my girlfriend's dad is a major, he's a trooper. And
16   they told him that -- they told me that if I didn't
17   turn myself in, that they were going to arrest my
18   girlfriend for being an accomplice with me and put my
19   daughter in DFYS. So I turned myself in.
20 Q Okay. And when you turned yourself in, did you tell
21   anybody that you could -- that you wanted to work on a
22   deal?
23 A Well, in Nome, the guy told me that -- what they wanted
24   to see was a drug bust in Nome. And I didn't know
25   nobody in Nome who dealt with dope. So I came to where

Page 248

1    I knew somebody who dealt with dope. And I offered to
2    give -- give up some people who sold dope, if I could
3    just go on with my life.
4 Q  Did you come -- did you reach an agreement where your
5    Nome burglary case would be dismissed.....
6 A  Right. Yes.
7 Q  .....in exchange for making buys here in Anchorage?
8 A  Yes.
9 Q  Okay. And was that agreement written down anywhere
10   or.....
11 A No. It was just a -- it was like a talk, you know.
12 Q Who was the person that you talked with?
13 A I think it was -- like I can't remember, but it was
14   police departments.
15 Q And APD officer?
16 A Yeah. They were special investigators, I believe.
17 Q Was it a many or a woman?
18 A It was a woman. The first person I talked to was a
19   woman.
20 Q Okay. And was that Detective Pernue, Pam Pernue?
21 A Yes.
22 Q Okay. Now, was Mr. Davis one of the people that you
23   said that you could make buys from?
24 A Yes, it was.
25 Q Okay. And when you first started -- when you told the

Page 249

1 officers that you could make buys, did you tell them
2 that you could buy....:
3 MR. JAMES: I'm going to object. She's leading him all
4 over the place.
5 THE COURT: You -- I'll sustain leading objections. I
6 don't know if the next question was leading or not.
7 MS. BRADY: Okay.
8 Q Did you know what -- his name was Robert Davis, or did
9 you know him as something else?
10 A I knew him as Rico.
11 Q Okay. And did you know him by any other name, other
12 than Rico, when you said that you could make buys?
13 A No, I did not.
14 Q Okay. And has your Nome case now been dismissed?
15 A I don't know.
16 Q Okay. Now, were you supposed to be making buys from
17 anybody besides him?
18 MR. JAMES: Objection. Relevance.
19 THE COURT: Overruled.
20 A Yeah.
21 Q Okay. And, in fact, did you make buys from anyone
22 besides him?
23 A Yeah.
24 Q Okay. Now, what happened when you first got to APD,
25 the very first time you went there to make -- make your

Page 250

1 deal?
2 A The very first time I went there?
3 Q Uh-huh. (Affirmative)
4 A Well, the very first time I went there and talked, they
5 searched me and stuff. And when they searched me, they
6 searched my car and they found some pot. I -- you
7 know, they found some pot and they found a marijuana
8 pipe. And the told me, don't bring it back to the
9 station or, you know, they'll discontinue working with
10 me, so....:
11 Q Okay. Did they talk to you about who you could make
12 buys from?
13 A Yeah. I said Rico.
14 Q Okay.
15 A I don't know.
16 Q Then did they tell you a time to come back after that?
17 A I -- I can't remember. It was a while ago.
18 Q Okay.
19 A But it was -- it was definitely we were going to, you
20 know, be on a weekly basis.
21 Q Okay. Did you -- let me direct your attention to
22 February 8th, which would be a day that's important to
23 this case. So just -- I want you to concentrate on
24 this particular case. Did you meet with Officer
25 Johnstone that day? Oh, he just left.

Page 251

1 A February 8th, yes.
2 Q Okay. And where did you meet with him at?
3 A On February 8th?
4 Q Uh-huh. (Affirmative)
5 A At the police station.
6 Q And what happened when you got to the police station?
7 A I think I was -- I was searched and I can't remember.
8 Q Did they ask you to call Rico.....
9 A Yeah.
10 Q .....the person you knew as Rico?
11 A Yeah.....
12 MR. JAMES: Leading.
13 THE COURT: Sustained.
14 A We did make phone calls.
15 Q You made phone calls?
16 A Yes.
17 Q Who did you make a phone call to?
18 A To Rico.
19 Q Okay. Did you know his number right off the top of his
20 -- right off your.....
21 A Yeah.
22 MR. JAMES: Objection. Leading.
23 THE COURT: That was not leading. The objection is
24 overruled.
25 A Yes, I did.

Page 252

1 Q Okay. What was the number?
2 A 727-9465.
3 Q Okay. Now, did you make an arrangement to go buy some
4 cocaine from Mr. Davis?
5 A Yes, I did.
6 Q Okay. And how much cocaine were you going to buy?
7 A I believe the first time it was $150 worth.
8 Q Did you ask for $150.....
9 A No, I -- I asked for a ball, but he said he didn't have
10 it. I believe he said he didn't have it. And he said
11 he had a buck 50 he could do something with or
12 something.
13 Q Okay. Now in -- when you were asking him for a ball,
14 what you were asking him for?
15 A I was asking him for coke or crack.
16 Q And was there a specific amount? Is a ball an amount?
17 A Well, usually a ball is like 3.2 to 2.9, I don't know.
18 Q 3.2 to 2.9.....
19 A Yeah. Like.....
20 Q .....what?
21 A Grams.
22 Q Okay. And he -- and then when you said, he said a buck
23 50, what does that mean?
24 A $150.
25 Q Okay. So was it arranged for you to meet him somewhere

Page 253

| | | |
|---|---|---|
| 1 | | to buy cocaine? |
| 2 | A | Yes. |
| 3 | Q | Where was -- where was the arrangement made for? |
| 4 | A | At his old house. |
| 5 | Q | Okay.  And what happened once he agreed to meet with |
| 6 | | you? |
| 7 | A | I just -- then we -- I don't think -- well, the first |
| 8 | | -- the first time, we just -- they all followed me over |
| 9 | | there, we went there, and I went inside.  And I bought |
| 10 | | the dope and..... |
| 11 | Q | Okay.  I'm still back at the police station though.  I |
| 12 | | want to know, you hang up the phone, and you say okay, |
| 13 | | we're going to meet..... |
| 14 | A | Okay.  I hang up the phone, then I think it was Officer |
| 15 | | LaPorte went and got the money to go -- or somebody |
| 16 | | went to go get the money, and he was hooking me up with |
| 17 | | a wire. |
| 18 | Q | Okay.  The first time..... |
| 19 | A | The first -- first time, there wasn't a wire.  It was |
| 20 | | just -- there wasn't a wire.  It was just a buy. |
| 21 | Q | Were you searched? |
| 22 | A | Yes, I was. |
| 23 | Q | Can you explain to the members of the jury how that |
| 24 | | search is done? |
| 25 | A | Yeah.  There's -- he tells me to take off all my |

Page 254

| | | |
|---|---|---|
| 1 | A | Off of Muldoon on Grand Larry. |
| 2 | Q | Okay.  And how did you get there? |
| 3 | A | I drove there. |
| 4 | Q | Which route did you take? |
| 5 | A | I take -- take Tudor to -- go to -- go down Tudor until |
| 6 | | it hits like Totem Theater, Totem -- where Tudor turns |
| 7 | | into Muldoon.  Right?  I believe it's Tudor that turns |
| 8 | | into Muldoon.  You go all the way down Tudor, wraps |
| 9 | | around, and you just go all the way down the Muldoon |
| 10 | | Road, all the way down, by Ramada Inn and then turn. |
| 11 | Q | Okay.  And what happened once you got to Mr. Davis' |
| 12 | | house? |
| 13 | A | When I got there, I went in and bought some dope. |
| 14 | Q | Okay.  Where -- I want you to just tell the members of |
| 15 | | the jury what you're seeing.  Where did he get the |
| 16 | | cocaine from? |
| 17 | A | He usually..... |
| 18 | | MR. JAMES:  Objection.  There's no indication of |
| 19 | | cocaine. |
| 20 | A | Like every time that I went..... |
| 21 | | THE COURT:  The objection is overruled. |
| 22 | A | Sorry. |
| 23 | | THE COURT:  Go ahead. |
| 24 | A | Go ahead. |
| 25 | | THE COURT:  The question, please. |

Page 256

| | | |
|---|---|---|
| 1 | | clothes.  I take off all clothes, including my shoes, |
| 2 | | my socks, my underwear.  They go through my socks. |
| 3 | | They go through my shoes.  They go through my pant |
| 4 | | pockets.  They, you know, make me bend over, like bend |
| 5 | | down.  And then I get back up, and if I'm clean, I put |
| 6 | | all my clothes back on. |
| 7 | Q | Was your car searched also? |
| 8 | A | Yeah. |
| 9 | Q | Okay.  And did you know ahead of time that both you and |
| 10 | | your car were going to be searched? |
| 11 | A | Yeah. |
| 12 | Q | Okay.  And you were given money? |
| 13 | A | Right. |
| 14 | Q | How much money were you given? |
| 15 | A | $150. |
| 16 | Q | Okay.  And then when you -- when you left the police |
| 17 | | station, were you driving? |
| 18 | A | Yes, I was. |
| 19 | Q | What car were you driving? |
| 20 | A | A 1986 Plymouth -- Plymouth Reliant. |
| 21 | Q | Is that your car? |
| 22 | A | Yes. |
| 23 | Q | All right.  And did you know where Mr. Davis lived? |
| 24 | A | Yes, I did. |
| 25 | Q | Where was that at? |

Page 255

| | | |
|---|---|---|
| 1 | A | Okay.  When you -- every -- every time I walked in |
| 2 | | house, you walk in house, and there's like -- there's |
| 3 | | -- there's like a bar table where there should be seats |
| 4 | | wrapped around.  And then there -- if you turn around, |
| 5 | | if you look straight, he's looking at me, there's a |
| 6 | | barstool and then there's like a drawer right here. |
| 7 | | But then usually his dope would be up in his cabinet |
| 8 | | right above his stove.  You open his cabinet and it's |
| 9 | | usually right there.  It's a bag.  Usually, probably a |
| 10 | | half once to an ounce at a time.  And just pulled it |
| 11 | | out of his cabinet, a little black scale.  Put a piece |
| 12 | | of paper down, usually you put a piece of a paper down, |
| 13 | | like a little piece of paper, and just start pouring |
| 14 | | dope on there until it measured up.  And he put it in a |
| 15 | | bag for me, and be it. |
| 16 | Q | How long were you inside Mr. Davis' house that day? |
| 17 | A | Probably 10 minutes. |
| 18 | Q | Okay.  And what happened when you left the apartment? |
| 19 | A | I left the apartment and then I pulled out.  And I went |
| 20 | | behind a church, I believe, that was the first time. |
| 21 | | We went behind a church and I gave him the dope. |
| 22 | Q | You gave who the dope? |
| 23 | A | I gave Officer Johnstone. |
| 24 | Q | Okay.  Now, when you said the dope, are you talking |
| 25 | | about..... |

Page 257

| | |
|---|---|
| 1 A  Coke. | 1 A  Yeah. |
| 2 Q  Okay.  Now, did you -- and you gave it Officer | 2 Q  .....would you be able to recognize it? |
| 3    Johnstone at the church, is that..... | 3 A  Yes, I would. |
| 4 A  Yeah. | 4    THE COURT:  Exhibit number? |
| 5 Q  And then what happened -- where did you go after that? | 5    MS. BRADY:  Let me just -- this is exhibit number 5, |
| 6 A  Then we went back to the -- to the station.  And I was | 6    Your Honor. |
| 7    searched.  And the car was searched.  And then we | 7    THE COURT:  Thank you. |
| 8    scheduled the next appointment, when I would come and | 8  10:36:31 |
| 9    see him. | 9    (Audio tape played for jury) |
| 10 Q  Did they interview you? | 10  10:36:44 |
| 11 A  Yeah, I got a debrief. | 11 Q  Do you remember this tape now? |
| 12 Q  Did they tape record that? | 12 A  Not really.  You've got to..... |
| 13 A  Yes, they did. | 13 Q  Not yet? |
| 14 Q  All right.  And did you know that both you and your car | 14 A  No. |
| 15    were going to be searched again once you left? | 15 Q  You listened to this tape though, right? |
| 16 A  Yeah.  That was just a mandatory thing, routine. | 16 A  Yeah. |
| 17 Q  Now, did you get the amount of cocaine that you were | 17 Q  Okay. |
| 18    expecting to get? | 18 A  Yeah, I remember it.  I remember now. |
| 19 A  Well, the first time, it -- it was kind of shallow.  I | 19 Q  You remember it now? |
| 20    mean, it wasn't as much as he usually gives me.  But | 20 A  Yeah. |
| 21    that first time was the -- that was just the first | 21 Q  Okay.  Is the -- is the recording that's contained on |
| 22    time, because that was the first time I had bought dope | 22    this tape a true and accurate representation of the |
| 23    off him in a while, because I had just got back from | 23    conversations that you had by calling Mr. Davis? |
| 24    Nome.  And he said $150, and that's just what he gave | 24 A  Yes. |
| 25    me for what he got. | 25    MS. BRADY:  Okay.  At this time, I would move for |
| Page 258 | Page 260 |

| | |
|---|---|
| 1 Q  Okay.  What did -- when -- when you got back and you | 1 admission of this portion.  I'm going to play it, Your |
| 2    were talking to the officers, what did you do after | 2 Honor. |
| 3    talking to the officer? | 3    THE COURT:  Number 5, Mr. James? |
| 4 A  I called Rico back and told him it was a little shy, | 4    MR. JAMES:  I'd like to -- I'm going to object, because |
| 5    and he agreed, and said he would make it up to me next | 5 given the testimony..... |
| 6    time. | 6    THE COURT:  We'll have a bench conference. |
| 7 Q  Did you call the same number? | 7    MR. JAMES:  Yes. |
| 8 A  Yes. | 8    THE COURT:  Hold on a second, please. |
| 9 Q  Okay.  And -- now, did you meet with Officer LaPorte on | 9    (Bench conference as follows:) |
| 10    February 13th? | 10    THE COURT:  The objection is? |
| 11 A  Yes, I did. | 11    MR. JAMES:  Okay.  I'm going to object to it on the |
| 12 Q  And did you make an calls that day? | 12 foundation.  Fish is bouncing around here saying well, he |
| 13 A  I can't really remember. | 13 didn't remember, now, he says he does remember.  I seriously |
| 14 Q  Okay.  Do you remember when you met with Officer | 14 question whether he's listened to that tape, and if it is a |
| 15    LaPorte if your conversations were being recorded? | 15 true and accurate representation of what transpired of |
| 16 A  The ones that I made to -- to Rico. | 16 another tape.  So I'm -- it's on the foundation is what I'm |
| 17 Q  The conversation that you had with Officer LaPorte. | 17 objecting to. |
| 18 A  Yeah. | 18    THE COURT:  Well, there -- there's a sufficient |
| 19 Q  Okay.  Now you listened to some tapes with regard to | 19 threshold foundation for admission based on his testimony |
| 20    this case.  If I tell you that I have a tape right here | 20 that he remembered, that it is the tape that he listened to |
| 21    that is an identical copy of the tape that you received | 21 the other day.  I mean, you can always challenge his |
| 22    that said 2/13 on it, would you know what's on this | 22 credibility, but that's the -- finally, a jury decision. |
| 23    tape? | 23 You made two objections though.  The first one is overruled. |
| 24 A  Not right offhand. | 24 The second one is whether you seriously doubt whether the |
| 25 Q  Okay.  If I play small portion of it..... | 25 copy is a true and accurate copy, and that's really |
| Page 259 | Page 261 |

1 challenging Ms. Brady as to whether she copied the tape, the
2 same tape that Mr. Fish listened to.
3    MR. JAMES: Well, I don't know that he listened to that
4 tape that she intends to introduce. He does say he's --
5 had a tape, but I -- that tape there, I don't -- he has
6 never said that issue, that I listened to that tape.
7    THE COURT: Ms. Brady?
8    MS. BRADY: What I -- the question I asked him was if
9 he had received a copy of a tape that was marked February
10 13th, and if I represented to him that that was an exact
11 duplicate of that tape, would he know what was on there, and
12 he answered yes.
13    MR. JAMES: Okay. Well.....
14    THE COURT: So what's the objection?
15    MR. JAMES: The objection is is the tape that he is
16 listening -- the representations of Ms. Brady are not the
17 testimony of Mr. Fish.
18    THE COURT: So you're challenging Ms. Brady's -- you're
19 not willing to accept Ms. Brady's representations?
20    MR. JAMES: That's correct, at this time.
21    THE COURT: All right. Then we'll excuse the jury, and
22 we'll let Mr. Fish listen to the entire tape, and we'll do
23 that with everyone.
24    MR. JAMES: Okay. And I think that's probably to save
25 time, Judge.

Page 262

1 minutes for this tape. There are total of four tapes. The
2 rest of them are not as long as this.
3    THE COURT: All right.
4    MS. BRADY: And maybe we should just let them.....
5    THE COURT: Do you want to play them all?
6    MS. BRADY: I -- my preference would be to play them
7 all now, if that's the objection, that I've altered them,
8 and we'll see whether or not Mr. James agrees they're not
9 altered, and then we'll play them for the jury.
10    THE COURT: All right. How long are the tapes?
11    MS. BRADY: They're probably five minute -- they're
12 between five and eight minutes a piece, the reminders.
13    THE COURT: Can you tailor your questioning to this
14 tape?
15    MS. BRADY: It is tailored to this tape. We can stop
16 after this tape. It's.....
17    THE COURT: Can you tailor your -- the next bit of
18 questioning to this tape.....
19    MS. BRADY: I sure can.
20    THE COURT: .....so that we can then use non-jury time
21 to listen to the rest of the tapes?
22    MS. BRADY: Sure.
23    THE COURT: To have Mr. Fish listen to the rest of the
24 tapes?
25 A  I know the rest of them.

Page 264

1    THE COURT: No, that doesn't save time, Mr. James, but
2 that's what we'll do.
3    MR. JAMES: All right.
4    (End of bench conference)
5    THE COURT: All right, folks. I have to excuse you.
6 It will be 10 or 15 minutes, I think, so -- and I again
7 thank you for your patience.
8    (Jury excused)
9    THE COURT: All right. Ms. Brady, do you want to play
10 -- we'll stay on record. We'll play exhibit number 5 for
11 Mr. Fish and then we will bring the jury back in and you can
12 follow up with your questioning.
13 10:4035
14    (Audio tape played for court)
15 10:4911
16    THE COURT: All right. I told the jury it was going to
17 take about 10 minutes, because I thought we were going to
18 listen to the phone conversations as the tape as well.
19 Ms. Brady?
20    MS. BRADY: What I thought I would do, Your Honor,
21 since I'm going to be using this tape for several things,
22 rather than have the jury come in and out and in and out, if
23 the objection is that I have altered the tape in some way,
24 let's play the tape, let him listen to it, and then we won't
25 have them coming in and out. This is maybe three more

Page 263

1    THE COURT: Well, that is -- you have to stay out of
2 this, Mr. Fish.
3 A  I'm sorry.
4    MS. BRADY: Okay. Sure.
5    THE COURT: Can you do that?
6    MS. BRADY: Yeah.
7    THE COURT: All right. Then finish this tape.
8    MS. BRADY: Okay.
9 10:5035
10    (Audiotape played)
11 10:5522
12    THE COURT: Let's bring the jury back in.
13    (Jury summoned)
14    THE COURT: All right. Everybody have a seat, please.
15 Are we back on record, Ms. McKewin? Thanks again for your
16 patience, folks. Ms. Brady, your next question?
17    DIRECT EXAMINATION CONTINUED
18 BY MS. BRADY:
19 Q  Mr. Fish, you've listened to this tape, right?
20 A  Yes.
21 Q  Is this tape a true and accurate representation of the
22   phone calls that you made on February 13th, February
23   15th and February 20th?
24 A  Yes.
25 Q  Does it include a copy of the wire that was done on the

Page 265

1 February 20th buy?
2 A Yes.
3 MS. BRADY: At this time, I move to admit state's
4 exhibit 5, Your Honor.
5 THE COURT: Exhibit number 5?
6 MR. JAMES: No objection.
7 THE COURT: Number 5 is admitted.
8            (Plaintiff's exhibit 5 admitted)
9 Q Okay. We're going to deal with this in portions, so
10 let's just play a portion of it.
11 10:57:12
12 (Audio tape played for jury)
13 10:59:58
14 MS. BRADY: Okay. I'm going to stop it right there.
15 Q All right. I'm going to ask you some questions about
16 that portion of the tape. Now, whose voice is that
17 that -- one of the voices is yours obviously. Who's
18 the other voice?
19 A Rico.
20 Q And who is Rico?
21 A That guy right there, Robert Davis the III.
22 MS. BRADY: Let the record reflect that the defendant
23 -- I mean the witness had identified the defendant.
24 Q Now, what did Mr. Davis mean when he said it was no
25 good on that end?

Page 266

1 portion.
2 11:01:45
3    (Audio tape played for jury)
4 11:03:57
5 MS. BRADY: I'll just stand here and hold the
6 microphone next to it.
7 11:04:09
8    (Audio tape played for jury)
9 11:05:12
10 Q I'll just ask you some questions about that portion of
11 the tape now. What was going on during that phone
12 call?
13 A What do you -- I don't know.
14 Q Okay. Let me ask you a more specific question. When
15 he says that he's at his shop, what's he talking about?
16 A He's at work.
17 Q And where does he work?
18 A He's a mechanic, fixes cars.
19 Q All right. And when you asked for two balls, what are
20 you talking about?
21 A I'm talking about coke. I'm talking about like 3.0
22 each.
23 Q Okay. And when -- now you guys had a little
24 negotiation there, what was going on during that
25 negotiation?

Page 268

1 A He had no dope, had none for sale.
2 Q Who is Athena?
3 A That's -- that's my baby's mother.
4 Q Does she know Mr. Davis?
5 A Yeah.
6 Q What did he mean when he said put you on child support?
7 A Well, it's like Athena -- it's like it's either mine,
8 or it's a Josh's, or it's some guy named Ryan. So --
9 and we haven't had a paternity test or nothing yet. So
10 we don't know for sure whose it is.
11 Q When you say it, you're talking about Athena's child?
12 A Yeah.
13 Q That you might be the father of?
14 A Right.
15 Q Okay. And Mr. Davis knows you well enough to know
16 about all of this stuff?
17 A He knows Athena well enough to know about all this
18 stuff.
19 Q Okay. And let's go ahead and we'll move on to February
20 12th. You -- is the conversation contained on that
21 tape a true and accurate representation of a
22 conversation that you had with the defendant on that
23 day?
24 A Yes.
25 MS. BRADY: Okay. I'm going to go ahead and play that

Page 267

1 A I asked him how much a ball cost and he said two. I
2 asked him how much should I bring. He said how much --
3 I asked him how much it was going to be for a ball, and
4 he said $200 and then he said $225. And I said -- I
5 said I got $200.
6 Q Is that a lot, $225?
7 A $225, yeah.
8 Q Okay. And then did that cancelled, that buy that you
9 set up with him?
10 A Yeah.
11 Q Do you know why it got cancelled?
12 A Right. Because there was something else going on with
13 the officers I was working with. So they postponed it
14 and they went along with what they had planned or
15 something.
16 Q Did you call him back then?
17 A Yes, I did.
18 Q And what happened when you called him back?
19 A I just told him that we got to reschedule it. That --
20 when I -- when I called him back, I didn't get his -- I
21 didn't get him. I got his voice mail. So I left a
22 message saying that I -- that I wasn't going to do
23 nothing tonight, and that I was taking the weekend off
24 and that I would see him like on Monday or something.
25 Q Okay. And that was tape recorded?

Page 269

1  A  Right.
2  Q  And is that on that tape?
3  A  Yeah.
4  Q  Okay.
5  11:0705
6  (Audiotape played for jury)
7  11:0756
8  Q  Okay. Now did you meet with Officer LaPorte again on
9  February 20th?
10 A  Yeah.
11 Q  Okay. And was that -- did you make a telephone call to
12 Mr. Davis?
13 A  Yes, I did.
14 Q  Was that call recorded?
15 A  Yes, it was.
16 Q  Is that recording contained on this tape?
17 A  Yes, it is.
18    MS. BRADY: Okay. I'm going to publish that to the
19 jury.
20 11:0811
21 (Audio tape played for jury)
22 11:1009
23 Q  All right. Now, when he says come on by the house,
24 what does he mean?
25 A  Come by his house.

Page 270

1  Q  Okay. And how much were you going to buy?
2  A  A ball.
3  Q  Okay. And what -- when he says come on by his house,
4  is there an address?
5  A  Yeah. I don't -- I can't remember his address. I know
6  what street it's on.
7  Q  What street is it on?
8  A  Grand Larry.
9  Q  Okay. And how much were you supposed to bring with
10 you?
11 A  $200.
12 Q  All right. And once that phone call was completed,
13 what happened -- where were you at?
14 A  I was at the police station.
15 Q  Okay. So the phone call is completed, then what
16 happens immediately after that?
17 A  Then they went out and searched my car. They searched
18 me. They set me up me up a wire. Then we drove and they
19 followed me to his house.
20 Q  Okay. Now let me -- let me stop you for a second. All
21 right. You said your car was searched, they searched
22 you, what -- tell the jury what the search -- what you
23 mean by the searched me.
24 A  The searched me. There's usually two officers talking
25 to you, and then one goes and searches your car and the

Page 271

1  one who stays in the room, you know, you take off all
2  your clothes, every piece, your underwear, your socks,
3  shoes. And they look through everything. Your socks,
4  empty out your socks. Empty out, shake it all out.
5  And then you put -- and that's it. A complete search.
6  Q  Okay. And you were -- were you given money?
7  A  Yeah.
8  Q  How much?
9  A  $200.
10 Q  Okay. Andy you said that you put on a wire, or
11 something, what do you mean?
12 A  Yeah. It's like a strap goes around your shoulder.
13 And it just goes like -- I don't know, just put it on
14 you, and then you put your clothes over it.
15 Q  Did an officer put it on you?
16 A  Yeah.
17 Q  Okay.
18 A  Oh.
19 Q  Now, did you know that the wire was going to make --
20 was going to record everything that was going on?
21 A  Yes.
22 Q  Okay. And let's just play -- is a copy of the wire
23 that you made that day contained on that tape?
24 A  Yes, it is.
25    MS. BRADY: It's loud at the beginning, so I'm going to

Page 272

1  turn it down a little bit.
2  11:1217
3  (Audio tape played for jury)
4  11:1301
5  Q  Okay. Let me stop the tape for a second. What's going
6  on here, on the tape? What are you doing while this
7  being recorded?
8  A  I'm driving to his house.
9  Q  And how do you know that?
10 A  Because that's my music.
11 Q  Okay.
12 11:1314
13 (Audio tape played for jury)
14 11:1347
15 Q  Now let me stop the tape right there. Are you talking
16 with him at that time?
17 A  No.
18 Q  Okay.
19 A  He just opened the door.
20 Q  Okay. Now what is -- what is that on the tape then?
21 Is that Mr. Davis' voice?
22 A  There's -- there's like -- I believe that was a time
23 when I walked in there and there was -- there was only
24 -- there was four people in there, including Mr. Davis.
25 That was including everybody, there was four people.

Page 273

1   And they were asking for sandwich baggies, because he
2   was cleaning out his house. And when I walked in, he
3   had nothing in there. They were looking for some
4   baggies, so they -- they were going to run to the store
5   and get some baggies. And then he asked for a pot,
6   which is a pot to make a ball of dope, to cook some
7   dope.
8 Q   When he means a pot, does he mean like a pot you cook
9     in?
10 A   Yeah, like a pot, pan.
11 Q   Okay.
12   11:1442
13     (Audio tape played for jury)
14   11:1515
15 Q   Now are you still inside the house at this time?
16 A   No, because they were leaving and I -- I pulled up
17     right behind the car. So -- and they opened the door.
18     I had to let them -- I had to move my car so I could
19     let them out.
20 Q   Okay.
21   11:1526
22     (Audio tape played for jury)
23   11:1600
24 Q   Okay. Now that's your voice?
25 A   Right.

Page 274

1   could on the tape for the cops, that way they could get
2   a clear view of what was going on there. And then when
3   he -- I don't know. If -- if -- it was the gun, and
4   then there was the bud. And then that was all I was
5   commenting on.
6 Q   Was there any -- was his apartment furnished or.....
7 A   No, it was all cleaned out. The only thing he had left
8     there was a stereo.
9 Q   Okay.
10 A   That's why he didn't have a pot.
11 Q   Okay.
12   11:1837
13     (Audio tape played for jury)
14   11:1933
15 Q   Okay. And did you -- where did you go once you left
16     his apartment or the house?
17 A   I went right -- I went back to the station.
18 Q   What happened when you got back to the police station?
19 A   I gave him the dope. As soon as I got out of my car, I
20     gave them the dope, and then they searched my car. And
21     I was followed back into the police station, and then I
22     was searched.
23 Q   Okay. And did you meet with Officer LaPorte again the
24     next day?
25 A   Yes, I did.

Page 276

1 Q   Who are you talking to?
2 A   I was talking to the police.
3 Q   Okay.
4   11:1606
5     (Audio tape played for jury)
6   11:1714
7 Q   What are you talking about right there?
8 A   A gun.
9 Q   A gun?
10 A   Yeah.
11 Q   Okay.
12   11:1720
13     (Audio tape played for jury)
14   11:1746
15 Q   Okay. Now what are you commenting on there?
16     THE COURT: Ms. Brady, can you move?
17     MS. BRADY: Oh.
18     THE COURT: So the jury can -- thank you.
19 A   Well, there's a couple -- the first thing I was -- it
20     was -- it was chronic. It was the weed. And he had a
21     whole bunch of weed on his counter, like a pile of bud.
22     And -- and then there was -- there with the .45, that's
23     what I was commenting on. He said -- I asked him how
24     much he -- I asked him if he would take a bill for it,
25     just to -- because I was supposed to get everything I

Page 275

1     MS. BRADY: Okay. And that is a different tape.
2     THE COURT: Let's take a bench conference, please.
3     MS. BRADY: Okay.
4     (Bench conference as follows:)
5     THE COURT: How long is that tape?
6     MS. BRADY: My recollection is it's between five and
7 eight minutes.
8     THE COURT: All right. We'll -- same objections,
9 Mr. James?
10     MR. JAMES: Yes, sir.
11     THE COURT: All right. We'll stand down and let him
12 listen to it.
13     MR. JAMES: Could I use the (indiscernible) before
14 we.....
15     THE COURT: We'll take a break in a little bit.
16     MR. JAMES: Okay. So we're going to listen to tapes
17 and then take a break?
18     (End of bench conference)
19     THE COURT: I need to excuse for about 10 minutes,
20 folks. And I again appreciate your patience and
21 understanding in bouncing back and forth in here like this.
22     (Jury excused)
23     MS. BRADY: State 6.
24     THE COURT: We're still on record. You are putting
25 state's exhibit number 6 into the tape recorder?

Page 277

1    MS. BRADY: I am, Your Honor. And I'm.....
2    THE COURT: Player.
3    MS. BRADY: .....about ready to hit play.
4    THE COURT: Go ahead. Our jury out.
5 11:2207
6    (Audio tape played)
7 11:2817
8    THE COURT: That's the end? That's 6?
9    MS. BRADY: That's 6.
10    THE COURT: All right. We'll take a very short
11 restroom break for everybody, and then we'll get the jury.
12    MS. BRADY: Okay.
13    THE COURT: I'm talking about as quickly as you can,
14 please.
15    (Off record)
16    THE COURT: Have a seat, everybody. Are we back on
17 record, Ms. McKewin?
18    THE CLERK: We are, uh-huh.
19    THE COURT: We want to -- our jury is back. Thanks,
20 folks. Do you want to continue, Ms. Brady?
21    MS. BRADY: Yes, Your Honor.
22    DIRECT EXAMINATION CONTINUED
23 BY MS. BRADY:
24 Q    Now, you met with Officer LaPorte on February 21st, is
25    that right?
                                        Page 278

1 A    Yes.
2 Q    Did you call the defendant that day?
3 A    Yes, I did.
4 Q    And was that conversation recorded?
5 A    Yes.
6 Q    And did it lead to setting up a buy that day?
7 A    Yes.
8 Q    And was that also recorded?
9 A    Yes.
10 Q    And is that what's contained on this tape?
11 A    Yes.
12 Q    Is the tape a true and accurate representation of both
13    your conversation and the buy that was made?
14 A    Yes.
15    MS. BRADY: Okay. At this time, I move to admit
16 state's exhibit 6.
17    THE COURT: Number 6, Mr. James?
18    MR. JAMES: Yes, sir. No objection.
19    THE COURT: Number 6 is admitted.
20    (Plaintiff's exhibit 6 admitted)
21 Q    Now let's play a little bit of it, then I'm going to
22    ask you some questions.
23 11:3449
24    (Audio tape played for jury)
25 11:3743
                                        Page 279

1 Q    Let me stop this for just a second, and I want to ask
2    you a question. When he says, I don't have anything
3    but hard stuff, what's he talking about?
4 A    Crack.
5 Q    Okay.
6 11:3756
7    (Audio tape played for jury)
8 11:3904
9 Q    Okay. Now once the call was made, what happens next?
10 A    Then search -- they searched my car and they searched
11    me. And they go get the money, come back and put the
12    wire on. They put the wire on me. And we go.
13 Q    Okay. How much money did they give you?
14 A    $200.
15 Q    Okay. And when we're talking about they, who are we
16    talking about?
17 A    The -- the investigators.
18 Q    Okay. And when you're talking about putting the wire
19    on, explain what you're talking about.
20 A    Wire. The -- it's on a strap.
21 Q    Uh-huh.
22 A    Talking about the thing that records everything.
23 Q    Okay. And is it over your clothes, under your clothes?
24 A    Yeah, it's under my clothes and on my shoulder.
25 Q    Okay. And we'll go ahead and play the wire now.
                                        Page 280

1 11:4009
2    (Audio tape played for jury)
3 11:4059
4 Q    Okay. Now let me stop you for just a second, and stop
5    the tape for just a second. What's going on right
6    there?
7 A    He's -- he's -- we're talking about -- we're talking.
8 Q    Where are you talking at?
9 A    In his car.
10 Q    And what car is that?
11 A    I believe that's in his -- yeah, that's in his Jeep.
12 Q    Okay. And.....
13 A    It's not a Jeep. It's a Suburban, green Suburban.
14 Q    Okay. And could you -- on the tape, it sounded like
15    there was a ringing?
16 A    Yeah.
17 Q    What was going on then?
18 A    He got a phone call.
19 Q    Okay. And so it was on cell phone?
20 A    Yeah.
21 Q    Okay. And you said -- there was something said about
22    him living at his mom's, is that right?
23 A    Yeah. I asked him where he was staying. And he said
24    he was living with his mom. And he basically said he
25    still had the same cell phone number.
                                        Page 281

1 Q When you say, is it cool, what are you referring to?
2 A I was just like, is it cool? And then he was like, no,
3    you can't come over there.
4 Q Okay.
5 A So he thought I was meaning, you know, come over for
6    dope or something.
7 Q Okay.
8 11:4204
9    (Audio tape played for jury)
10 11:4232
11 Q Now when the music is playing, you're in his car, is
12    that right?
13 A Right.
14 Q And then after there's no music anymore, where are you
15    at?
16 A In my car.
17 Q Okay.
18 11:4243
19    (Audio tape played or jury)
20 11:4306
21 Q The tape goes on, but nothing else is said on the tape,
22    is that right?
23 A That's right.
24    MS. BRADY: Okay. Then we'll stop it there. And that
25 takes me to the next tape.

Page 282

1    MR. JAMES: All right. Well, then I think we have to
2 play the whole thing, because otherwise.....
3    MS. BRADY: Okay.
4    MR. JAMES: .....you're only hearing.....
5    THE COURT: Why? Why do they have to play the whole
6 thing?
7    MR. JAMES: Well, it.....
8    THE COURT: What rules requires that?
9    MR. JAMES: They're going to take it into evidence, and
10 we're only going to play a portion of it, then that's the
11 portion they should take into evidence.
12    THE COURT: Is there a rule that requires that it be
13 played? The jury can listen to it in the jury room?
14    MR. JAMES: I can't think of the rule right off the top
15 of my head. But logically speaking, I mean, what he's
16 testified to is what the -- now what's out of the presence
17 of the jury to be played. Now, if you want to talk, I'm not
18 going to play it. It probably would set the stage, but
19 that's.....
20    THE COURT: You can have the witness describe what's on
21 the tape. You're not required to play.....
22    MS. BRADY: Okay.
23    THE COURT: You can play whatever portions of the tape
24 you want.
25    (Pause)

Page 284

1    THE COURT: We need to take another break, folks. What
2 we're doing during the breaks, if you haven't figured it
3 out, is Mr. -- is the witness is listening to the exhibit so
4 that he can testify about it, so.....
5    (Jury excused)
6    MS. BRADY: My suggestion, Your Honor, these are both
7 very short, would be to do the next two together.
8    THE COURT: That would be fine. What are you starting
9 with?
10    MS. BRADY: I'm starting with state's 7.
11    THE COURT: All right. That's good.
12 11:4410
13    (Audiotape played for court)
14 11:5348
15    MS. BRADY: What I would suggest, I don't want to have
16 any allegation I altered the tape, I'll just cue it to the
17 place where it starts with Detective Johnstone, and only
18 play that for the jury. If that's all right?
19    THE COURT: That's not my call. I don't understand
20 what you mean. You want to offer number 7, but you don't
21 necessarily want to play the whole thing, is that correct?
22    MS. BRADY: Right.
23    MR. JAMES: But then if you're going to offer it, then
24 it's -- do you plan on having that admitted as evidence?
25    MS. BRADY: Uh-huh. (Affirmative)

Page 283

1    MS. BRADY: Okay. That's cued. That's state's. And
2 state's 21 is only about three or four minutes.
3 11:5828
4    (Audiotape played for court)
5 11:5943
6    MS. BRADY: That's it.
7    THE COURT: We'll get the jury.
8    (Jury summoned)
9    THE COURT: Everybody have a seat, please. And are we
10 back on record?
11    THE CLERK: Yes.
12    THE COURT: All right. We have everybody back.
13 Ms. Brady, do you want to continue?
14    MS. BRADY: I do you, Your Honor.
15    DIRECT EXAMINATION CONTINUED
16 BY MS. BRADY:
17 Q Did you meet with Officer LaPorte on February 28th?
18 A Yes, I did.
19 Q Okay. And did you call the defendant that day?
20 A Yes, we did.
21 Q And were those calls recorded?
22 A Yes, they were.
23 Q Did you make several calls?
24 A Yes, I did.
25 Q Okay. Then did you keep trying on into the night?

Page 285

1 A  Yes, I did.

2 Q  Okay. Then did you meet with Detective Johnstone later

3      that night?

4 A  Yes.

5 Q  And did you call Mr. Davis again?

6 A  Yes, I did.

7 Q  And was that call recorded?

8 A  Yes, it was.

9 Q  And you've listened to the tape marked state's exhibit

10    7, is that a true and accurate representation of the

11    call you made?

12 A  Yes, it is.

13    MS. BRADY: Okay. At this time, I move to admit 7.

14    THE COURT: Mr. James?

15    MR. JAMES: No objection.

16    THE COURT: 7 is admitted

17           (Plaintiff's exhibit 7 admitted)

18    MS. BRADY: I'm going to play that for the jury.

19 12:0141

20    (Audio tape played for jury)

21 12:0249

22 Q  So let me just ask you a question. When he says it's

23    ready, what is he talking about?

24 A  He's talking about his crack.

25 Q  Okay. And when you say, I've got two, what are you

Page 286

1      talking about?

2 A  I'm talking about I got $200.

3 Q  Okay.

4 12:03:05

5    (Audio tape played for jury)

6 12:03:55

7 3

8 Q  All right. And then after you make that call.....

9    THE COURT: Hold on a second, Ms. Brady. You need to

10  explain to the jury through the witness that you didn't play

11  all of exhibit number 7.

12    MS. BRADY: Oh, okay.

13 Q  Now, that tape has a lot of calls on it, is that right?

14 A  Yes.

15 Q  Okay. And we cued it to the point where you actually

16    go a hold of Mr. Davis, is that right?

17 A  Right.

18 Q  What's going on on the tape for several minutes prior

19    to the place where we actually get to the call that you

20    had to him?

21 A  What's going on before all that?

22 Q  Yeah.

23 A  We just kept calling and calling and calling. And he

24    -- he wasn't answering his phone. I -- I left like

25    three messages, he wasn't calling me back. So we went

Page 287

1      and got something to eat, and then we -- we came back.

2      I went and got a Snickers bar and a soda pop and then I

3      came back and he answered his phone.

4 Q  Okay. Now let me ask you about what happened after

5      that call was made. Where were you at when you made

6      the call?

7 A  I said I was at Tudor.

8 Q  Pardon me?

9 A  The police station over there on Tudor.

10 Q  Okay. And so the call gets made, and then what happens

11    immediately after that?

12 A  Immediately after that, they go search my car. They

13    search me. They put a wire on me, and we go.

14 Q  Okay. Now when you say those things, is it the same

15    kinds of things that you've been talking about before?

16 A  Yeah, it's all -- it's routine.

17 Q  Okay.

18 A  The same thing.

19 Q  And did the wire record what happened in your meeting?

20 A  Yes, it did.

21 Q  Okay. And you previously listened to this tape, which

22    is marked state's 21. Do you know what's on this tape?

23 A  Yes, I do.

24 Q  Is this a true and accurate representation of the wire

25    from March 1st?

Page 288

1 A  Yes, it is.

2    MS. BRADY: Okay. And at this time, I would move to

3  admit and publish to the jury.

4    THE COURT: 21, Mr. James?

5    MR. JAMES: No objection.

6    THE COURT: 21 is admitted.

7           (Plaintiff's exhibit 21 admitted)

8 12:0547

9    (Audio tape played for jury)

10 12:0631

11 Q  All right. Let me stop it for just a second. Where

12    are you at when this is going on?

13 A  Where am I at right then?

14 Q  Uh-huh. (Affirmative)

15 A  I'm inside of his truck.

16 Q  Okay. And so you guys were sitting inside of his truck

17    talking?

18 A  Yeah.

19 Q  When the music is playing?

20 A  Right.

21 Q  Then the music stops, and where are you at?

22 A  Probably outside of my car. I'm getting out of his

23    car. I'm getting out of his car.

24 Q  Okay.

25 12:0651

Page 289

Page 290

1    (Audio tape played for jury)
2    12:07:07
3 Q  Now what did you just say?
4 A  I said gray Toyota, DVD 272, which is the license plate
5    number and the make of his car.
6 Q  Okay. And you were instructed to -- who were you
7    talking to when you say that?
8 A  I was talking with police.
9 Q  Okay.
10 A  Because they thought he was going to come in a
11    different car. And it was -- it was different. It was
12    all different, and I wanted them to be aware of what
13    was going on.
14 Q  So what happens after -- after you say that on the
15    wire?
16 A  I go to the -- I go to Tudor, and he gets arrested.
17 Q  Okay. But let's back up. You're still at the -- in
18    the parking lot at the Pancake House, is.....
19 A  Right.
20 Q  .....that right? Okay. So do you get in your car?
21 A  Yeah.
22 Q  And then once you get in your car, where did you go to?
23 A  I go to Tudor. I go back to the police station.
24 Q  Okay. And what happens when you get back? Did you
25    stop somewhere on the way?

Page 291

1 A  I don't believe so.
2 Q  Okay. Did you turn over the cocaine to an officer?
3 A  Okay. Yeah. Okay. I remember now. I'm sorry. It
4    was -- it was a long -- I stopped at -- I think it was
5    at Schuck's, or something. We might have stopped. I
6    can't really remember. It was either there or at the
7    -- at the church.
8 Q  Okay. So you stopped somewhere and you turned the
9    cocaine over to the officer?
10 A  Yeah. Crack.
11 Q  Okay. And then what happens -- what do you do next?
12    Where do you go?
13 A  Rode to the police station.
14 Q  And then what happens when you get to the police
15    station?
16 A  I get searched. And my car gets searched. And they
17    tell me that they'll get in contact with me.
18 Q  Okay. And now you're debriefed after every single time
19    you make a buy, is that right?
20 A  Right.
21 Q  Okay. And are all those recorded?
22 A  Yes, they are.
23 Q  Okay. So let's talk about -- that's -- is that the end
24    of you involvement in this case?
25 A  Yes.

Page 292

1 Q  Okay. Let's talk about some things that happened after
2    those buys were over on March 1st.
3 A  Okay.
4 Q  Now, on July 26th, you were contacted by some APD
5    officers who were investigating a truck that were
6    involved in damaging some cars outside an apartment on
7    Mumford, is that right?
8 A  Yes.
9 Q  Okay. And your truck was seized, is that right?
10 A  It was not my truck.
11 Q  It wasn't your truck?
12 A  No.
13 Q  Whose truck was it?
14 A  My friend's.
15 Q  Okay. And in the bed of the truck, there was a bunch
16    of stereo equipment, right? And that was also seized?
17 A  Yeah.
18 Q  Were you ever charged with anything as a result of that
19    police contact?
20 A  No, I was not.
21 Q  Okay. Has your testimony here today been influenced in
22    anyway by your thought or perception that you could be
23    charged or that you may have something to worry about
24    there?
25 A  No.

Page 293

1 Q  Okay. And has anyone offered you any kind of deal,
2    that if you testify in this case, that that case will
3    be dismissed or it won't be filed on, or anything.....
4 A  No.
5 Q  .....along those lines? Okay. And as far as you know,
6    that case could be prosecuted if the police decide they
7    want to make a case, is that.....
8 A  Right.
9 Q  .....right? Okay. Do you hope that by cooperating and
10    testifying that you'll be helping yourself in that
11    case?
12 A  Well, I hope. I hope I'll be helping my -- no, I don't
13    -- I don't think I'll help myself in that case. I
14    mean, if I -- if they think I'm guilty, I'm -- I'm
15    guilty.
16 Q  Okay. And let's talk about September 5th. Now, an APD
17    officer contacted you on that day, and you consented to
18    having your car searched, is that right?
19 A  Yeah.
20 Q  Okay. And inside your car, the officer found a box?
21 A  Right.
22 Q  What was in the box?
23 A  Well, my -- my ID was in the box. There was some coke
24    in the box, and there was some money in the box. But
25    there was my friend that was in the car, and he wasn't

1    in the car when I got stopped. Because I -- I pulled
2    into my house and they -- they thought I -- they just
3    -- they thought I -- they thought I had something to do
4    with some pills being taken. But I had nothing to do
5    with the pills be taken. So I told the cop, you know,
6    I have nothing to do with this, so you can search my
7    car, because I know there's not no pills. And then you
8    can search my house, because I know there's not no
9    pills in my house. I haven't done anything wrong. And
10   when he searched my car, I gave my friend my ID, and he
11   put it in his box. And in the box, I guess he put his
12   dope in the box. So then my ID was in the box, was in
13   the dope, so I got kind of, you know, messed up.
14 Q  Okay. Now, did you -- did you tell that to the
15   officer?
16 A  Yes, I did.
17 Q  Okay. And has any law enforcement agency offered you
18   any deal so that if you testify in this case that any
19   charges that could be coming from that contact won't be
20   prosecuted or anything like that?
21 A  No.
22 Q  Okay. So you're just on your own, there's no deals?
23 A  That's right.
24 Q  As far as you know, that case may still be being
25   prosecuted?

Page 294

1 A  Right.
2 Q  Okay. And are you hoping that by cooperating and
3   testifying, as you promised you would to get your
4   burglary dismissed, that you're going to help yourself
5   somehow in that case?
6 A  If I -- if they think I'm guilty, I'm guilty. They're
7   going to.....
8 Q  Okay. And you don't expect that that case would be
9   dismissed if it were filed because of your testimony
10   here today?
11 A  No.
12 Q  Okay. And then a couple of weeks later on September
13   30th, you were contacted by APD officers again and your
14   car was searched twice that day, is that right?
15 A  Yeah.
16 Q  Okay. And they were searching your car with regard to
17   a drive-by shooting, is that right?
18 A  Yeah, that's what they told me.
19 Q  Okay. And the first time they searched your car, did
20   they find anything?
21 A  No.
22 Q  Okay. And then the second time they came back and
23   searched your car -- did you give them consent to
24   search your car?
25 A  Yes, I did.

Page 295

1 Q  Okay. And then the second time they came back, did
2   they find anything that time?
3 A  Well, they -- they searched the car one thoroughly for
4   -- for the gun. And then they searched it again
5   thoroughly again, and then they found something. And
6   then -- they said they found a casing off of -- of a
7   gun that was used in the shooting. But, you know, I
8   don't know, man. It's not my car. And my -- the car
9   was -- was -- it was took previously that day by my
10   friend, Jeff, and he put a full tank of gas in it. I
11   went and got my car back, and the next thing I know, I
12   got pulled over. And I -- I got pulled over and I gave
13   them consent to search my vehicle because, you know, I
14   -- I didn't know what was happening. And then after
15   they told me what was going on, then I said, yeah, you
16   guys can search my car because there's -- there's
17   nothing going on, and I didn't do that. And then they
18   -- me and my friend were getting in an argument about
19   why my car just got searched, and they came up on us
20   again and they searched my car again for the same
21   thing, so.....
22 Q  And that's when they found the.....
23 A  Yeah.
24 Q  .....nine millimeter casing?
25 A  And they impounded -- they impounded the car. It -- it

Page 296

1    wasn't my car. It was my girlfriend's. I was getting
2    it back for her. I don't have a license. I'm not
3    supposed to be driving. So my girlfriend didn't want
4    to go to the kid and get her car back, so I went and
5    got her car back.
6 Q  Okay. And so did they seize that car?
7 A  It was seized, but my girlfriend just got -- she got --
8   she got -- it's out of impound.
9 Q  Okay. Has your testimony here today been influenced in
10   anyway by the thought that you could be charged as a
11   result of that?
12 A  No, it has not.
13 Q  Okay. And any deals in that case? Have you talked to
14   anyone in law enforcement that you'll testify here, and
15   that there's something should happen with that case?
16 A  No, there's -- no.
17 Q  Okay. Are you aware of whether any charges have been
18   filed?
19 A  No, I'm not.
20 Q  Okay. Do you expect -- are you hoping that by
21   cooperating and testifying that you could help yourself
22   in that case?
23 A  No. I don't know.
24 Q  Okay. And if that case were to be filed, you wouldn't
25   expect that case to be dismissed because of your

Page 29

1   testimony here today, is that right?
2 A   Yeah.
3 Q   Okay. And let me just talk to you about -- all of
4   those things that happened, every time the police
5   contacted you, that was after you involvement in this
6   case, right?
7 A   Yes.
8   MS. BRADY: Okay. That's all the questions I have for
9 this witness.
10   THE COURT: Cross examination?
11   MR. JAMES: Yes. Thank you.
12   JEREMY FISH
13 testified as follows on:
14   CROSS EXAMINATION
15 BY MR. JAMES:
16 Q   Let's go to the coke issue, which was, I believe,
17   September the 4th. Whose car was that?
18 A   George Redwine's, Redwine's Towing.
19 Q   All right. And that was your box though, right?
20 A   Yes.
21 Q   All right. And who was the officer that did the arrest
22   or stopped you -- I'm sorry, did the stop?
23 A   I -- it -- it was no stop. I.....
24 Q   Who contacted you?
25 A   I don't -- I can't remember.

Page 298

1 Q   A uniformed officer?
2 A   Yes.
3 Q   All right. Any other officers show up?
4 A   One other uniformed officer.
5 Q   Who was that?
6 A   I can't remember.
7 Q   What did he look like? He or she?
8 A   Both guys.
9 Q   Both guys? All right. No -- just the two officers in
10   uniforms?
11 A   Yeah.
12 Q   Now we're talking about the September 4th, are we not?
13   Are we focused on that one?
14 A   September 4th, that's the one where -- that's the only
15   coke issue I've had so, yeah.
16 Q   With the five bags of coke?
17 A   Right.
18 Q   All right. And do you recall telling the officer you
19   acknowledged the ownership of the three $20's, dollars,
20   the -- your ID, but that the five bags of coke had been
21   planted? Do you recall making that statement to the
22   officer?
23 A   I didn't say that they were planted on me. I said I
24   had a friend in the car, and I didn't know, you know,
25   if he put them in there or not, but they didn't know if

Page 299

1   it was coke then. They didn't tell me it was coke
2   until later. They didn't run no test on it or nothing.
3   I didn't know what it was. But they told me later it
4   was coke, and I acknowledged that the money was mine,
5   yes, but.....
6 Q   You didn't -- when you looked at it, you had not
7   realization it was coke and.....
8 A   They didn't know what it was either.
9 Q   I asked you.
10 A   No, I -- I did not.
11 Q   They were in clear baggies?
12 A   Excuse me?
13 Q   Clear baggies?
14 A   Yes.
15 Q   You're not familiar with cocaine?
16 A   I'm very familiar with cocaine.
17 Q   Okay. Okay. Now, when the -- you were stopped another
18   time involving, which Ms. Brady already discussed with
19   you very briefly, involving finding -- well, drive-by
20   shooting where they found a case, a round in the -- in
21   your vehicle, is that right?
22 A   Not my vehicle.
23 Q   Okay. Your girlfriend's vehicle?
24 A   It's not my girlfriend's vehicle.
25 Q   Whose is it?

Page 300

1 A   George Redwine's.
2 Q   Okay. So we're talking about the same -- the same
3   vehicle, the one that was involved with the coke?
4 A   Yes, sir.
5 Q   Okay. And were you driving that vehicle?
6 A   Yes, I was.
7 Q   All right. So you would have controlled where it was
8   going?
9 A   No. I went and picked up the vehicle.
10 Q   After you picked up the vehicle, you're driving the
11   vehicle?
12 A   I was driving it to my girlfriend's, yes, I was.
13 Q   So you were controlling where it was going?
14 A   Yes, I was.
15 Q   Okay. All right. Now, another time you were -- in
16   July, July 13th, specifically, you were cited by
17   Officer Daily for possession of marijuana, is that
18   correct?
19 A   Yes.
20 Q   And nothing has ever happened in that case, is that
21   correct?
22 A   That's right.
23 Q   All right. Nothing has ever happened to the cocaine
24   case, correct?
25 A   I believe so. I don't know. They haven't -- it's all

Page 301

| | |
|---|---|
| 1 under investigation. That's what the police have told | 1 Q So you were not paying any taxes on that? |
| 2 me. | 2 A No, I was not. |
| 3 Q To your knowledge, nothing has happened to that? | 3 Q All right. Now, you indicated another place you were |
| 4 A Well, it's under investigation. | 4 working? |
| 5 Q Okay. And that was in September, and here we are in | 5 A Yes. |
| 6 November, correct? | 6 Q Okay. I'm sorry, let me stop there, how long did you |
| 7 A Correct. | 7 work for this under the table at $10..... |
| 8 Q All right. The drive-by shooting where the casing was | 8 A That was only two months. |
| 9 found, anything happen with that case? | 9 Q Two months? How much did you make? |
| 10 A Well, it's -- it's all under investigation. | 10 A I don't know. |
| 11 Q Everything is under investigation? | 11 Q You don't know -- any idea how much money you made, |
| 12 A Yeah. | 12 it's..... |
| 13 Q All right. But you -- you don't expect anything to | 13 MS. BRADY: Objection, Your Honor. Relevance? |
| 14 happen with regard -- in regards to you from any of | 14 THE COURT: Overruled. |
| 15 those investigations? | 15 My question is how much money you made at the |
| 16 A Excuse me? | 16 construction job working under the table at $10 an |
| 17 Q You do not expect anything to happen to you regarding | 17 hour? You worked for two months? |
| 18 those investigations? | 18 A Right. I don't know. I probably pulled about maybe |
| 19 A To me? | 19 $1,000. |
| 20 Q Correct. | 20 Q Total? |
| 21 A It matters -- it matters what the investigators, you | 21 A Yeah. |
| 22 know, if the investigators think I'm guilty, then I'll | 22 Q So in two months, you worked 100 hours, if you worked |
| 23 probably have to go to court and prove myself innocent. | 23 $10 an hour? |
| 24 Q All right. So they do matter to you? | 24 A Yeah. |
| 25 A Yes, they matter to me. | 25 Q Okay. |
| Page 302 | Page 304 |

| | |
|---|---|
| 1 Q All right. Now let's go back to Nome, if we may. You | 1 A It was part-time. |
| 2 indicated that -- I'm sorry I'm stepping away from the | 2 Q All right. You indicated another place you worked, |
| 3 mike -- you indicated -- we're going back to Nome, all | 3 please, Carrs, I believe...... |
| 4 right? | 4 A At Hansen's. |
| 5 A Okay. | 5 Q Hansen's? |
| 6 Q Okay. You indicated that you had been to Nome for | 6 A Yeah. |
| 7 about four months, right? | 7 Q Okay. Hansen's, let's deal with Hansen's. What is |
| 8 A Right. | 8 Hansen's? |
| 9 Q Okay. What were you doing in Nome? | 9 A It's Carrs. |
| 10 A I was working. | 10 Q Carrs? All right. And what did you do there, please? |
| 11 Q Doing what? | 11 A I was a stocker. |
| 12 A I was working under -- under the table construction. I | 12 Q Stocker? All right. And how long did you work there? |
| 13 also worked at Carrs. And I also worked at the Glue | 13 A Probably about three and a half months. |
| 14 Pot. And I also worked at Twin Dragon. | 14 Q Okay. All right. And how much do you -- were you paid |
| 15 Q Okay. | 15 an hour there? |
| 16 A I held two -- two jobs for over two and a half months. | 16 A $8.50. |
| 17 Q I kind of want to -- you're moving a little a faster | 17 Q Was that union that was -- was that a union job? Do |
| 18 than my hand is writing. | 18 they -- are they union? |
| 19 A Okay. | 19 A Excuse me? |
| 20 Q All right. You worked construction? | 20 Q Are they union? |
| 21 A Yes, I did. | 21 A I don't know. |
| 22 Q What kind of construction did you work? | 22 Q All right. But that was on top of the table money, |
| 23 A It's clean up, construction clean up. | 23 right? |
| 24 Q Okay. How much were you making an hour? | 24 A Yeah. I got taxed. |
| 25 A I was only making $10 underneath the table. | 25 Q All right. The next job you had, please? |
| Page 303 | Page 305 |

| | |
|---|---|
| 1 A  Twin Dragon. | 1    you have a child, you have a legal obligation generally |
| 2 Q  And what is the Twin Dragon? | 2    to support that child..... |
| 3 A  Dishwasher.  It's a food place. | 3    MS. BRADY:  Objection, Your Honor.  This calls for a |
| 4 Q  Okay.  And how much were you making there? | 4 legal conclusion. |
| 5 A  $10. | 5    THE COURT:  Just ask the conclusion. |
| 6 Q  All right.  Were you paid on top of the table? | 6 Q  All right.  Do you have a -- do you understand a legal |
| 7 A  Yeah. | 7    obligation?  Can someone make you pay to support that |
| 8 Q  All right.  How long did you work there? | 8    child? |
| 9 A  Probably about a month. | 9 A  No. |
| 0 Q  Okay.  Let me -- how much did you make with them? | 10 Q  And how old is that child? |
| 1 A  I don't know, probably about $700. | 11 A  She just turned two. |
| 2 Q  Okay.  How much did you make with Carrs, going back to | 12 Q  Two? |
| 3    Carrs? | 13 A  Yeah. |
| 4 A  Probably about $1,800. | 14 Q  All right. |
| 5 Q  Okay.  And I believe there was a fourth place? | 15 A  She was only almost a year old when we were -- when we |
| 6 A  Yeah.  Glue Pot (ph). | 16    were in Nome. |
| 7 Q  Glue Pot (ph)? | 17 Q  All right.  Okay.  Going back to Nome, now we were up |
| 8 A  I was a cook.  I made $10 an hour. | 18    there for about four and a half months, correct?  All |
| 9 Q  All right.  And how long did you work for them? | 19    right.  You left the 27th of January, would you agree |
| 0 A  Probably about a month. | 20    with that..... |
| 1 Q  And how much did you make? | 21 A  Yeah. |
| 2 A  $10 an hour. | 22 Q  .....on the night, the midnight flight, or the night |
| 3 Q  I mean..... | 23    flight? |
| 4 A  Total?  I don't know, probably about 500 bucks.  I | 24 A  Yeah. |
| 5    didn't work too much.  It was only nights, on Fridays | 25 Q  Okay.  So that would mean that you were there in |
| Page 306 | Page 308 |

| | |
|---|---|
| 1    and Saturdays. | 1    January, December, November, October, and possibly some |
| 2 Q  All right.  Where did you live in Nome? | 2    of September, would you agree with that? |
| 3 A  I lived with my girlfriend's mother, and then I got my | 3 A  Yeah.  We left September like 30th. |
| 4    own place. | 4 Q  Left where, please? |
| 5 Q  When did you get your own place? | 5 A  Left Anchorage. |
| 6 A  Probably about two months after we had enough money to | 6 Q  Okay.  So you were there from September 30 through |
| 7    be saved up and all that.  I was the only one working. | 7    January 27?  Approximately September 30? |
| 8 Q  Okay.  So you were the sole supporter of you and your | 8 A  Yeah. |
| 9    girlfriend? | 9 Q  Okay.  And during that time, we've covered all the |
| 10 A  And your daughter. | 10    places that you worked, which would have been under the |
| 11 Q  Okay.  Is that your daughter? | 11    table, you made $1,000?  You think you made about |
| 12 A  Yeah. | 12    $1,800..... |
| 13 Q  By..... | 13    MS. BRADY:  Objection, Your Honor.  Asked and answered. |
| 14 A  Not my blood, but that's my daughter. | 14    THE COURT:  I don't know what the question is. |
| 15 Q  Do you have a legal obligation..... | 15    MR. JAMES:  I'm just getting a total of the..... |
| 16 A  Yeah. | 16 Q  How much did you make total? |
| 17 Q  Okay.  Are you married, is that how you have..... | 17    THE COURT:  The objection is..... |
| 18 A  No.  What do you mean, legal? | 18 A  I don't know. |
| 19 Q  Okay.  My question is, if it's not your blood..... | 19    THE COURT:  .....is sustained. |
| 20 A  Right. | 20    MR. JAMES:  Thank you. |
| 21 Q  .....all right, and you're not married, and you say | 21 Q  How much money did you make, total? |
| 22    it's your daughter? | 22    THE COURT:  The objection is sustained. |
| 23 A  Yeah. | 23 Q  How much did you pay for rent? |
| 24 Q  And I asked you if you have a legal obligation and you | 24 A  I don't know.  I -- I gave her mother probably -- like |
| 25    said yeah, or yes, the law, and I'm not going to -- if | 25    I gave her $400 when we left her house.  But we, you |
| Page 307 | Page 309 |

| | |
|---|---|
| 1 know, we put groceries in and stuff. And then for rent | 1 A No, I did not. |
| 2 over at the other place, it was $850 a month. | 2 Q You didn't? Okay. And he called you a couple of times |
| 3 Q $850? And how long did you live at the other place, | 3 to come on into the officer before you actually came |
| 4 please? | 4 in, correct? |
| 5 A Probably about two months. | 5 A He called me and I came in. |
| 6 Q Okay. So that -- all right. And how much did you pay | 6 Q Okay. You came in and he confronted after you -- you |
| 7 for groceries? How much..... | 7 made the denials. He confronted you with the facts, |
| 8 A It's pretty expensive. It's expensive there. | 8 and you then admitted to the burglary, right? |
| 9 Q All right. Would you please tell me how much you paid | 9 A Right. He asked me who all was involved. I told him |
| 10 for groceries? | 10 it was me and another guy. |
| 11 A I don't know how much I paid for groceries. | 11 Q And who is a juvenile, which we can't mention here, |
| 12 Q Okay. Do you know how much a month you paid for | 12 correct? |
| 13 groceries? | 13 A Right. It was a juvenile. |
| 14 A No, I don't. I ate -- I worked at -- I mean, my | 14 Q All right. So..... |
| 15 girlfriend and my daughter would eat food, but I -- I | 15 A He was a white guy. |
| 16 worked at fast food restaurants. I mean, I worked at, | 16 Q All right. And when you were going out of the |
| 17 you know, I don't know -- and I worked at places where | 17 apartment, you ran out of that apartment building, |
| 18 I could eat. So I really didn't eat too much. | 18 didn't you, because the landlady said, hey, that's |
| 19 Q Okay. Now, on the 25th of January, as you went in -- | 19 going on, and you responded, we didn't go in your place |
| 20 did you live in the AC apartments? | 20 or something to that effect? |
| 21 A No, I did not. | 21 A Right. I didn't run out. I just told her that -- that |
| 22 Q You had no business being in there, did you? | 22 -- I didn't say that, I didn't go in the place. I |
| 23 A No, I did not. | 23 think it was the guy who was with me said he didn't go |
| 24 Q All right. So you went in the AC apartments and | 24 in the place. |
| 25 started checking doors to see if they were locked, | 25 Q All right. So Officer Bennett then contacts you, and |
| Page 310 | Page 312 |

| | |
|---|---|
| 1 correct? | 1 you tell him that you had nothing to do with it? |
| 2 A Yes. | 2 MS. BRADY: Objection. Asked and answered. |
| 3 Q All right And, unfortunately, or one of those doors | 3 THE COURT: Sustained. |
| 4 was unlocked, correct? | 4 Q All right. And he confronts you..... |
| 5 A Yes. | 5 MS. BRADY: Objection. Asked and answered. |
| 6 Q All right. You then entered that apartment, didn't | 6 MR. JAMES: She doesn't even know what I've confronted |
| 7 you? | 7 him with yet. |
| 8 A Yeah. | 8 THE COURT: Okay. Ask the question. |
| 9 Q All right. And you entered that apartment and you | 9 Q Confronted you with facts, and you admitted to the |
| 10 stole the money that was -- that you could see there, | 10 burglary, correct? |
| 11 didn't you? | 11 A Yes. |
| 12 A Yes. | 12 Q All right. And then you wanted to make a deal, you |
| 13 Q All right. Now you were contacted -- do you know | 13 asked -- as asked in direct, to contact the victim to |
| 14 Officer Daniel Bennett? | 14 see if you could get out of it right? |
| 15 A Yes, I do. | 15 A I asked if -- if I could talk to the lady, because she |
| 16 Q All right. And he works for the Nome Police | 16 said it was $100 that was taken, and there was only $7 |
| 17 Department, does he not? | 17 taken off the table. I felt I was -- I was -- I was |
| 18 A Yes, he does. | 18 under the influence of alcohol, so I wanted to make my |
| 19 Q All right. And he contacted you, right? | 19 grievance with the lady. |
| 20 A Yes, he did. | 20 Q So you thought you were getting ripped off as far as |
| 21 Q Okay. And you told him you had nothing to do with it, | 21 the amount that you stole? |
| 22 right? | 22 A Which -- which she said I stole, yes. I felt like she |
| 23 A Yes, I did. | 23 was lying. |
| 24 Q All right. And then you tried to put it on to some | 24 Q You did steal money though, right? |
| 25 Native fellow, right? | 25 A Yes, I did. |
| Page 311 | Page 313 |