1 Q    And now you're.....
2 A    I believe......
3 Q    .....going to have to stop here and go a little bit
4        slower, because we're talking -- you went -- okay.....
5 A    I didn't go the same way as I did the first time.
6 Q    All right.
7 A    I mean, I -- it was the same direction from the police
8        station. But I made my immediate -- I made my first
9        right instead of my second right. And I made a left
10      instead of right.
11      THE COURT: You don't have to lean into the mike.
12 We'll still pick you up.
13 A    Sorry. All right.
14 Q    So the second time then, you came from the bottom of
15      the page.....
16 A    Right.
17 Q    .....would that be correct?
18 A    Yeah.
19 Q    All right. You drove up -- now, what time of day or
20      night was this?
21 A    I don't know, like 7:30, 8:30. I can't really
22      remember.
23 Q    7:30, 8:30, could it have been closer to quarter to
24      11:00 in the p.m.?
25 A    Yeah. Maybe.

Page 396

1        MS. BRADY: Objection, Your Honor. Asked and answered.
2        THE COURT: Sustained.
3        MR. JAMES: All right.
4 Q    Where was the lights the second time?
5 A    They was coming off the red building across the street
6        from his house.
7 Q    A red building?
8 A    Yeah.
9 Q    What kind of building is the red building?
10 A    I don't know. Like it was another duplex.
11 Q    All right. And the second time you were there, this is
12      -- excuse me, did you go in the same entrance?
13 A    Yeah.
14 Q    Okay.
15 A    I guess.
16 Q    Who was there?
17 A    The second time, there was -- there was Rico and a --
18      and a car full of people.
19 Q    A car full of people?
20 A    Yeah.
21 Q    All right. How many is a car full of people?
22 A    Probably like four.
23 Q    All right. Do you remember any of the people that were
24      there?
25 A    No. I didn't know none of them.

Page 398

1 Q    Maybe?
2 A    Yeah. I don't know for sure. If that's what it says.
3 Q    I'm asking you if you can tell me what you remember,
4        not what something says.
5 A    I -- I can't remember a lot about it, you know. I just
6        remember that I bought dope off of him, that's it.
7 Q    Ah, okay. Now you -- were the lighting conditions the
8        same the second time as the first time?
9 A    Well, I don't know. Like I went to his house twice.
10      And I remember one time there was lights. There was
11      more lights the second time. That's why I can't --
12      there was like -- one time he just looked more lit up
13      than the second time. That's why I thought there might
14      be light on his street.
15 Q    So the first time was more lit up than the second time?
16 A    No. The second time was lit up, I believe.
17 Q    Than the.....
18 A    Yeah.
19 Q    Okay. So were there lights on the street the second
20      time, the street lights?
21 A    I can't remember.
22 Q    All right.
23 A    It was just more lit up.
24 Q    All right. And what do you recall about it being lit
25      up the second time versus the first time?

Page 397

1 Q    You knew -- do you know a Brandon Day?
2 A    No, I do not.
3 Q    All right. Do you know a Darrell Cash?
4 A    No, I do not.
5 Q    Were they male or female?
6 A    There was two males, and there was a couple females
7        too.
8 Q    Okay. What happened when you got there? Well.....
9 A    I walked in the door. And as soon as I walked in the
10      door, on his -- on his -- on his bar table, there was a
11      pile of bud.
12 Q    Okay. Let's talk about the pile of bud. How much is a
13      pile of bud?
14 A    A pile of bud.
15 Q    Okay.
16 A    Okay. If there's -- if the table -- it was -- it was
17      -- his table -- his table was about this -- about as
18      wide as this thing, as this thing before me right here.
19 Q    And you're talking about.....
20 A    And it was a pile.
21 Q    Wait a minute. Just -- are you talking about the flat
22      surface of the witness stand?
23 A    No, I'm talking about the whole thing. The whole
24      width.
25 Q    But that's the horizontal surface, right, that you're

Page 399

1    talking about right now, the horizontal.....
2 A    Yeah.
3 Q    .....surface?
4 A    Width?
5 Q    No.
6 A    I don't know what you're talking about.
7    MR. JAMES: Let the record reflect that he's referring
8 to the horizontal surface of the bench so we can move along
9 now.
0    THE COURT: Is he referring to that?
1    MR. JAMES: He keeps on.....
2    THE COURT: I'm not sure that he is.
3    MR. JAMES: All right.
4 A    Going this way. It was -- I mean, you know, it was a
5    pretty -- it's a table.
6 Q    All right.
7 A    There was -- I can show you, compared to this here.
8 Q    All right. Why don't you show us, if you would,
9    please.
:0 A    Okay. Here's -- there's the table I'm talking about.
:1 Q    All right.
:2 A    And we used -- you know, if his table was this big, the
:3    pile of bud was like this. It was scattered around.
:4    The bag was laying right here. He's standing right
:5    here. He had a strap on him.

Page 400

1 A    No.
2 Q    .....or anything?
3 A    No.
4 Q    Was it in the holster?
5 A    No.
6 Q    It was stuck in his pants?
7 A    Yeah.
8 Q    Was it loaded?
9 A    I don't know.
10 Q    All right. Okay. So how big was this pile of bud?
11    And we're not talking beer, we're talking marijuana,
12    right?
13 A    Right.
14 Q    All right.
15 A    I don't know, you know. There's the table, you know,
16    it took up about a quarter size. I mean, it was -- it
17    was a nice size, pile of bud. Probably about two, two
18    ounces, maybe.
19 Q    Okay. Give us -- can you hold up your hands and tell
20    me how much it.....
21 A    Yeah. It was -- it was a pile of bud like that.
22 Q    Okay. Now you're showing about a foot wide?
23 A    Right.
24 Q    And.....
25 A    It was a circle, man. It was a pile, like that. It

Page 402

1 Q    A what?
2 A    A gun.
3 Q    A strap?
4 A    Yeah. A big old black, I think it was a .44.
5 Q    .44?
6 A    Yeah. It was a big gun. Revolver.
7 Q    It was a revolver?
8 A    Yeah.
9 Q    Okay. Now you do know the difference between a
10    revolver and a pistol?
11 A    Yeah. Yeah.
12 Q    What's the revolver?
13 A    The revolver spins.
14 Q    Okay. The cylinder spins?
15 A    Yeah.
16 Q    All right. Okay. And where was this gun on him?
17 A    Right -- right in his drawers.
18 Q    I'm sorry, please?
19 A    Right -- right in his pants. It was sticking out of
20    his pants.
21 Q    Like in his pocket?
22 A    No. Right out of his waist.
23 Q    Stick in his waist?
24 A    Right.
25 Q    All right. Was it covered like with a jacket.....

Page 401

1    went all the way around. It was nice size of bud.
2 Q    All right. So is -- the radius is -- the diameter is a
3    circle of a foot?
4 A    Yeah.
5 Q    Okay. The diameter is from one corner of a circle to
6    the other corner of a circle.
7 A    Yeah. I know that.
8 Q    All right. You know that? All right. And I'm talking
9    about -- so if we cut this.....
10 A    Yeah, it was a circle.
11 Q    All right. How tall was this pile of bud?
12 A    I don't know. It was probably like, you know, it was a
13    pile.
14 Q    Okay. And are you talking six inches as you.....
15 A    I'm talking about probably three inches. It was only,
16    you know, it wasn't -- it wasn't a humongous pile. It
17    was just a pile a bud. A big pile of bud.
18 Q    Okay. So it's about a foot in diameter by about three
19    feet tall pile?
20 A    No, not three feet tall.
21 Q    I mean, three inches. I'm sorry.
22 A    Right.
23 Q    Excuse me. I'm not trying to put words in your.....
24 A    A big pile of bud.
25 Q    All right. And where are the other people in the -- in

Page 403

1    the duplex then?
2 A   When I first walked in, there was already a
3    conversation taking place, and it was who was going to
4    run and go get a pan and go get sandwich baggies.
5 Q   Okay. And you indicated there were a car full of
6    people?
7 A   Yes.
8 Q   And do you know if -- what color they were? Were they
9    white, black, Asian?
10 A   There was two black guys and black girl, and then one
11    of them was kind of tan.
12 Q   All right. Now you got in there, and you saw -- did
13    you ask Rico what he was doing with this big gun
14    sticking in his waist band?
15 A   No. I asked him if he would sell it.
16 Q   If he would sell it?
17 A   Yeah.
18 Q   Okay. Do you like guns?
19 A   No. I was just -- I was just talking.
20 Q   All right. And how much was it -- were you offering to
21    buy it for?
22 A   $100. I said, do you want to sell it for $100? And he
23    said, no, and he laughed.
24 Q   Okay. Well, a gun is worth more than -- a .44 is worth
25    more than $100, isn't it?

Page 404

1 A   I don't know. I don't own a gun.
2 Q   All right. Did you stay in the house?
3 A   Well, the conversation was somebody had to go -- when I
4    pulled in, there was all ready a car there. And.....
5 Q   Okay. Let me stop you right -- how many cars were in
6    there, when you pulled in?
7 A   There was -- I think Rico's truck was pulled up, pulled
8    on the side where you're not supposed to park. His
9    truck might -- I believe is truck was pulled up right
10    here. And then there's his -- his carport. There
11    wasn't a car pulled into his carport, and the car was
12    like right before his carport. So I pulled in right be
13    -- right behind that car. And when I walked in, they
14    were all ready having a conversation about who was
15    going to leave and get it.
16 Q   So.....
17 A   So I had to leave.
18 Q   .....we're clear on this, there was no car in the
19    carport, but there was one on the.....
20 A   Right before......
21 Q   .....right before......
22 A   .....you get into the carport, right.
23 Q   And then you pulled in behind that car off the street?
24 A   Yes.
25 Q   So then you would get three cars deep there?

Page 405

1 A   Yeah.
2 Q   All right. Now you said that Rico's pickup -- what
3    kind of pickup is this?
4 A   Well, I don't know if it was his. He's got a lot of
5    cars.
6 Q   Okay. What kind of pickup did you see?
7 A   It was a gray truck.
8 Q   What kind of truck?
9 A   A Toyota, I believe, maybe a Toyota.
10 Q   A little one, big one? Toyotas.....
11 A   A Dakota, maybe. It was a small pickup truck.
12 Q   All right. One of the little -- little ones?
13 A   Right. Like the size of, you know, a S-10, something
14    like that.
15 Q   Okay.
16 A   It was more like a Toyota, an old Toyota one, though.
17 Q   Do you think it was a Toyota?
18 A   Yeah.
19 Q   All right.
20 A   Something like that, in that body shape.
21 Q   All right. What color was it?
22 A   It was gray.
23 Q   Gray? All right. All right. Then did you look around
24    the house?
25 A   Yeah. There was nothing in his house.

Page 406

1 Q   Zero?
2 A   Well, there was -- I mean, there was stuff in his
3    house. There was just -- it was nothing, really. All
4    he had was his stereo in there. His -- like an
5    entertainment center.
6 Q   That was it?
7 A   Yeah.
8 Q   Any couches?
9 A   No.
10 Q   All right. Any lamps?
11 A   He might have had a lamp.
12 Q   All right. How about any -- any beds?
13 A   No. I don't -- he didn't have none of that stuff in
14    there.
15 Q   Did you look?
16 A   Well, I could see -- you could kind of see in -- in the
17    bedroom when -- when you go walk in his house. There's
18    like -- there's no walls, so you can like see all
19    through it without even walking through his house. It
20    was empty.
21 Q   All right. So there was no furniture, other than this
22    stereo set?
23 A   I believe that's right.
24 Q   Okay. And how big is this stereo set?
25 A   I don't know. Probably -- probably as tall as that

Page 407

1    stand.
2  Q  Tall as this podium that I'm......
3  A  Yeah.
4  Q  .....standing behind?
5  A  Right.
6  Q  Would that be about three and a half feet?
7  A  No, about five, six feet tall.
8  Q  Okay.
9  A  It was about -- probably about five and a half.
10 Q  Okay. How wide was it?
11 A  Probably about four and a half.
12 Q  Okay. What was in it? You said a stereo, it is
13    just.....
14 A  Yeah, a stereo. Yeah. I believe it was just a stereo
15    system in there.
16 Q  Okay.
17 A  Two big old speakers.
18 Q  All right. Did he have a TV in there? A TV in the
19    house?
20 A  Yeah. I think he had a TV in there too.
21 Q  Where?
22 A  Inside the entertainment center.
23 Q  Okay. Do he have CDs and that kind stuff? Was there a
24    different place for those?
25 A  I don't know. I -- I really wasn't looking at it.....

Page 408

1    door. Like he -- he could see his carport and all that
2    stuff. So I didn't really see the camera, but I saw
3    his TV. It was like a little black and white
4    television recording all the time.
5  Q  You saw there.....
6  A  Yeah.
7  Q  .....saw it there then?
8  A  Yeah.
9  Q  Okay.
10 A  I -- but I didn't see it when I came back. I didn't
11    see the TV.
12 Q  Which time did you see the TV?
13 A  The first time I went there.
14 Q  Okay. Did you have a phone with you on either one of
15    those times?
16 A  Yeah -- no. I didn't have a phone.
17 Q  Okay. A cell phone is what I'm talking.....
18 A  Right. No, I didn't.
19 Q  No one gave you a cell phone either time?
20 A  No.
21 Q  All right. And you didn't own one yourself? In other
22    words.....
23 A  No.
24 Q  .....you didn't have one and no one gave you one?
25 A  All right.

Page 410

1  Q  All right.
2  A  .....like that.
3  Q  Do you recall doing a debrief afterwards, when you
4    talked to the police afterwards?
5  A  Yes, I do.
6  Q  Okay. What -- do you recall mentioning, there's a --
7    the camera is gone, everything is gone?
8  A  Yeah. There was -- everything was gone.
9  Q  What's the camera?
10 A  A camera is a camera.
11 Q  Do you mean like a.....
12 A  Yeah. A little camera. No. Not a -- not a -- not a
13    camera like a picture camera. It was like a VCR like
14    video camera little recorder thing.
15 Q  Why did you mention a camera, a little small thing like
16    that?
17 A  Because it wasn't there.
18 Q  Had it been there before?
19 A  Yeah.
20 Q  Where was it before?
21 A  There was -- it was right on the -- I can't really
22    remember. It was either -- it was either in the
23    kitchen, or it was outside the door. But either way,
24    it was so he could see his door. Because I remember he
25    had a little TV, and he could see like right on his

Page 409

1  Q  Okay. Now this gun you saw on the 20th, had you ever
2    seen that gun before?
3  A  No.
4  Q  You talked about a Glock 9, is that a gun?
5  A  Yeah. He used to have a Glock 9, when he used to live
6    in Mountainview on North Flower, on the corner of North
7    Flower.
8  Q  Okay. How do you know he had a Glock 9?
9  A  Because he would walk around with it.
10 Q  Was it in a shoulder holster?
11 A  In his house. No. I don't -- you know, just like
12    whenever -- whenever he had a whole bunch of people
13    over, he would just bring it out.
14 Q  And show it off or just.....
15 A  Whatever he was doing with it.
16 Q  All right. Would he stick it in his waist band like
17    the.....
18 A  He put it right on his table.
19 Q  Okay. Now between the 8th, the first time you were at
20    Grand Larry and the second time, which you were there,
21    what did you do? Did you maintain contact with the
22    police?
23 A  Yeah.
24 Q  Okay. Did you -- was it constant contact? Were you
25    with him all the time or were you free to come and go?

Page 411

Page 412

1 A  No. It was -- I mean, I was -- I was free as -- as,
2    you know -- as -- I wasn't really free until I did what
3    I did. And when I finished what I did then, you know,
4    I still -- unless -- I don't know. I'm not really -- I
5    wasn't really free. I had to check in with the
6    officers, like call them every, you know, two days, two
7    and -- you know, I always had to keep -- I always had
8    to let them know where I was and I always had to give
9    them my phone number and make sure they could get a
10   hold of me. I always had to do that.
11 Q  Okay. I just wanted to -- something just crossed -- on
12   the 8th, when you were -- when you went to the police
13   station on the 8th, did you testify on Thursday that
14   they found a bag of marijuana in your car?
15 A  Yeah, they found a bag of marijuana.
16 Q  Okay. That was the first time you were.....
17 A  Yeah. That was like a 20 sack.
18 Q  I'm sorry, please?
19 A  It was like a 20 sack.
20 Q  A 20 sec?
21 A  A 20 sack of bud.
22 Q  A 20 sack of bud?
23 A  Yeah.
24 Q  Okay.
25 A  It was a little bag of weed.

Page 413

1 Q  Okay. Were was that?
2 A  I don't know. It was like on my -- it was like in my
3    -- it was either in my glove box or on my seat.
4 Q  All right. Okay. Now going back to the 20th, I just
5    want -- so you're there, what happens when you're
6    there? You've already told us there's a big foot wide
7    pile of marijuana on the counter, nothing in the house.
8    He's packing this .45. You go in.....
9 A  I go in, and I hear the conversation about the -- the
10   sandwich baggies and the pan. And then I hear somebody
11   say that they needed to get -- I remember that they
12   said -- they said that -- that Rico wanted a 7-Up.
13   And then they were like -- they were going to go and
14   then they -- they walked out the door and I needed to
15   move my car. So I had to get out -- go out and move my
16   car and then come back in.
17 Q  So someone was going to go out and get Rico a 7-Up?
18 A  No, and -- yeah, 7-Up, some sandwich baggies and a pot.
19 Q  Okay. Does he have a microwave in there, or did he?
20 A  I don't think he did when I -- when I went in there.
21 Q  The first time, second time?
22 A  I can't really remember.
23 Q  Okay. All right. Now who left?
24 A  I think it was two guys, two guys and a girl. There
25   was -- still somebody there when I -- after those --

Page 414

1    when I came back in, there was still somebody there.
2 Q  Okay. Well, you've told us that there were two black
3    guys, one black girl and one tan girl?
4 A  Yeah.
5 Q  Okay. It was one of the girls were still there when I
6    went back in. I can't remember which one.
7 A  Okay.
8 Q  So the two guys and a girl left and the girl was still
9    there?
10 A  Yeah.
11 Q  And was that the black girl or the tan girl?
12 A  I can't remember.
13 Q  Okay. Did you take any of the bud with you when you
14   left?
15 A  No, I did not.
16 Q  Okay. Do you know why the house was empty on the
17   second time you were there?
18 A  Yeah, because people were -- I -- he told me that the
19   people were complaining about his music.
20 Q  And he told you that evening?
21 A  No. But he told me that like the day, I don't know,
22   the next buy, he told me that. That's why he got
23   kicked out or something. That's why he's moving.
24 Q  Okay. So the next one, the third one, he told you at
25   some point between when you were -- he and you were

Page 415

1    together that the reason he had to move was his
2    music.....
3 A  Yeah. He said the people were complaining about his
4    music.
5 Q  Okay. Now how long were you in there the second time?
6 A  Probably about 10, 10 minutes.
7 Q  Okay. And you went outside and then moved the car I
8    believe is what you testified to.
9 A  Yeah.
10 Q  Then you came back in. How long were you there after
11   you came back in?
12 A  I was there altogether, probably about 15 minutes
13   altogether.
14 Q  All right.
15 A  So it was -- it was in and out.
16 Q  My questions is, after you moved the car, how long were
17   you in there?
18 A  I don't know, like five minutes.
19 Q  All right. All right. Now, the 21st, do you remember
20   that?
21 A  Yeah.
22 Q  What happened -- did you rendevous with the police
23   department on the 21st?
24 A  Yes.
25 Q  Okay. I'm talking February.

1  A  Right.
2  Q  All right. And where did you meet?
3  A  At the police station.
4  Q  Okay. And who did you meet with on the 21st?
5  A  Officer LaPorte, I believe.
6  Q  All right. And about what time was that?
7  A  I can't really remember.
8  Q  Okay. And was that when you had the conversation
9     involving the move and the noise?
10 A  Yeah. That was -- it was the time when we were at
11    Chevron.
12 Q  Chevron?
13 A  Yeah.
14 Q  And that's Hansen Chevron, is that right?
15 A  Hansen's?
16 Q  Is that the one on International and Old.....
17 A  No.
18 Q  .....Seward?
19 A  No.
20 Q  What's the name of that Chevron?
21 A  Chevron.
22 Q  Do you know, does it have a name besides Chevron?
23 A  No. Chevron.
24 Q  It's not called Hansen's -- it's not Hansen's Chevron?
25    MS. BRADY: Objection, Your Honor. Asked and answered.

Page 416

1     THE COURT: Sustained.
2  Q  Okay. When did you go to Chevron?
3  A  At -- what do you mean, at night.
4  Q  What is at night? Okay. What time of night was it?
5  A  Probably about 7:30, 8:30.
6  Q  Okay. Okay. And that particular time, was anybody
7     else with you?
8  A  In my car?
9  Q  Yes.
10 A  No.
11 Q  Okay. And was this the same Plymouth Reliant that you
12    earlier testified that got torched?
13 A  Yeah.
14 Q  All right. Okay.
15 A  I did -- I did everything in that Plymouth.
16 Q  You did everything in the Plymouth?
17 A  Yeah, I -- I drove all the -- all the time. Every --
18    every dope deal we made was -- I was driving my car.
19 Q  In the Plymouth?
20 A  Yeah.
21 Q  Okay. Okay. And how long had you had the Plymouth?
22 A  I think a while.
23 Q  Had you had it before you went to Nome?
24 A  Huh? Yeah. It was at a friend's, and then.....
25 Q  All right. Now during these times that you were

Page 417

1     driving, did the police ever ask if you had a driver's
2     license?
3  A  No.
4  Q  Okay. Now you met, according to your testimony, you
5     met Mr. Davis at the Chevron station, right?
6  A  Right.
7  Q  Okay. And what kind of car was that that.....
8  A  It was his mom's car, I think.
9  Q  All right. Could you describe that car for us, please?
10 A  Yeah. It was a green GMC. It's a Suburban.
11 Q  All right. Does it have smoke windows on it or.....
12 A  Tinted windows?
13 Q  Tinted windows?
14 A  Yeah.
15 Q  So you can't see in, right?
16 A  Well, the front two aren't tinted.
17 Q  Okay. That would -- the front as in.....
18 A  The driver and passenger side.
19 Q  All right. All right. And the back is tinted though?
20 A  Yeah. All of -- all of the rest of them are tinted.
21 Q  Okay. And how did you get to the Chevron station?
22 A  I drove.
23 Q  All right. How did you -- what route did you use?
24 A  Tudor to Old Seward. And then Old Seward to Chevron.
25 Q  Okay. Where did you park?

Page 418

1  A  Chevron parking lot.
2  Q  Could you flip over to a clean page and indicate, if
3     you can, a layout of the Chevron and where you parked?
4     THE COURT: Actually, before you do that, I want to
5     take about a 10 minute break, please. And we'll come back
6     and get you all in about 10 minutes.
7     (Off record)
8     THE COURT: You all can have a seat, please. Are we
9     back on record?
10    THE CLERK: Yes.
11    THE COURT: On record. We have all of our jurors here.
12    Do you want to continue, Mr. James?
13    MR. JAMES: Thank you, your Honor.
14 Q  Going back to the 20th, very briefly, you offered to
15    buy this gun for $100. What if he had sold it to you
16    for $100, how much money did you have on you?
17 A  I wouldn't have bought it.
18 Q  You were just playing games?
19 A  Yeah.
20 Q  Okay. Now the 20th, you were wired, the 21st you were
21    wired, correct? You had a -- they had a recorder on
22    you?
23 A  I can't really remember.
24 Q  Okay. Well, let's put it in sequences of the first
25    time that you were there, you didn't have any kind of

Page 419

| | |
|---|---|
| 1   recorder on you, right? | 1 Q   And you talked about a gun, right? Did you -- did you |
| 2 A   Right. | 2   say, how much is the gun? |
| 3 Q   Correct? Am I right there? Okay. After that, you say | 3 A   No, I did not. |
| 4   -- you claim there was four buys, correct? | 4 Q   What did you say? I mean..... |
| 5 A   Yeah. Three -- three were wired, one was -- wasn't. | 5 A   I said, I'll buy it off of you for $100. |
| 6 Q   Okay. So number 1, number 2 was wired, number 3 was | 6 Q   Buy what? |
| 7   wired and number 4 was wired? All right. So -- and | 7 A   I was like that's nice. And he was like, yeah. And he |
| 8   you have -- did you have control over the wire? In | 8   said something. I was like, I'll buy off of you for |
| 9   other words, could you control what time to turn it on, | 9   $100, and he said -- and he laughed. |
| 10   turn it off, that type of situation? | 10 Q   Okay. So that's -- there's no talk about a gun though |
| 11 A   No. They turned it off. I mean, they turned it on at | 11   from you, correct? |
| 12   the station, and they didn't turn it off until I got | 12   MS. BRADY: Objection, Your Honor. Asked and answered. |
| 13   back to the station. | 13   THE COURT: Sustained. |
| 14 Q   Okay. Now how do you know that? Is there a little -- | 14   MR. JAMES: All right. |
| 15   sometime that tells you it's on or off? | 15 Q   So the wire will tell us everything? |
| 16 A   Well, they were -- they test it. Like when I put it | 16 A   Yeah. |
| 17   on, they would be like, you know, speak into, check it. | 17 Q   All right. Now you were going to draw the diagram |
| 18   And, you know, I would be like, okay. And then they | 18   before we took a recess, do you remember? |
| 19   would tell me, okay, it's good. And then when I got | 19 A   Yeah. |
| 20   back to the station, they would take it off of me. So | 20 Q   Okay. Why don't you get a clean of piece of paper with |
| 21   I don't know if they turned it off, or if they just | 21   the court's permission and draw me the diagram I |
| 22   kept going, but they took it off of me, so. When they | 22   requested? |
| 23   -- when they did the search on me, it came off with | 23   (Pause) |
| 24   everything else. | 24   THE COURT: Are you finished? |
| 25 Q   Okay. So you have no idea yourself when it was turned | 25 A   Yes, I am. |
| Page 420 | Page 422 |

| | |
|---|---|
| 1   on, if it -- and when it was turned on? | 1   THE COURT: All right. |
| 2 A   Well, it was turned on as soon as like we walked | 2 Q   Okay. Why don't you describe that diagram for us, |
| 3   outside. They would be like, you know, they would be | 3   please? |
| 4   like speak into the -- just talk, and I would talk and | 4 A   This is Old Seward. Here is a car dealership and a car |
| 5   they would tell me it's all good. They would talk back | 5   dealership. And then there's Showboat's. And this is |
| 6   to me. | 6   the road International, right here. And then there's a |
| 7 Q   Okay. So you -- am I correct that you presumed from | 7   Chevron right on the corner of Old Seward and |
| 8   the time you walked outside of the police station until | 8   International. And there -- there's the gas station. |
| 9   you got back, the wire was on..... | 9   And then there's this little spot right here that has |
| 10 A   Right. I was recording. | 10   like a spot for air and water and a spot for your |
| 11 Q   ....as far as you knew? | 11   phone. And then there's like -- you know, right here. |
| 12 A   Yeah. | 12   And that's where we -- he was already -- he was already |
| 13 Q   All right. And so anything that happened during that | 13   parked there when I -- when I was right here, he was |
| 14   time period would have been recorded on that wire, | 14   already parked. So I pulled in right next to him. |
| 15   right? | 15 Q   And to your knowledge, that was all recorded too, |
| 16 A   Yeah. | 16   wasn't it? |
| 17 Q   All right. And you had a conversation with Mr. Davis | 17 A   Yes, it was. |
| 18   at some time about him having to leave because of loud | 18 Q   Okay. What happened that -- what -- you got there, |
| 19   music? | 19   what did you do? |
| 20 A   Yeah. | 20 A   I got in his car. He was drinking some alcohol, and I |
| 21 Q   And that would have been recorded, right? | 21   bought some dope from him. He only had..... |
| 22 A   Yeah. | 22 Q   Okay. |
| 23 Q   Okay. The offer to buy the gun would have been | 23 A   .....he only -- he had crack, so I bought it. He |
| 24   recorded, right? | 24   didn't give me a baggie or nothing. He just gave it to |
| 25 A   Yeah. | 25   me in his hand, in my hand. |
| Page 421 | Page 423 |

1 Q  Did you -- what was he drinking?
2 A  He was drinking a Corona.
3 Q  Did you ask him for one?
4 A  No.
5 Q  Okay. Do you drink beer?
6 A  No.
7 Q  All right. And what was your conversation in the car?
8 A  It was brief. I asked him where he was staying. He
9    said with his mom. I asked him if his cell phone
10   number would be the same. He said yes. And that's it.
11 Q  Did you engage him in any conversation regarding that
12   -- here's the $200 -- was -- how much did you pay?
13 A  $200.
14 Q  Okay. Did you engage him in any conversation regarding
15   here's the $200, how much am I going to get?
16 A  No.
17 Q  All right.
18 A  I gave him -- I mean, it was already known why -- we --
19   we went there to meet to -- for me to buy dope off of
20   him.
21 Q  So at this time, you were still under the impression
22   that he thought you were his friend?
23 A  Yeah.
24 Q  Okay. And you didn't engage him in any other
25   conversation, other than what you've just testified to,

Page 424

1    where are you staying, the same phone number?
2 A  Right.
3 Q  Do you remember the denominations of the bills? I
4    assume it was bills?
5 A  Yeah. Probably $100 and five $20's, maybe.
6 Q  Okay. Is that when you had the conversation regarding
7    having to leave because of the loud noise?
8 A  No, I -- that when I -- I asked him where he was
9    staying. And he said with his mom. And he said he --
10   I was -- I was like what happened or something and I --
11   I can't remember how -- how it came up, but he said
12   that he got kicked out because of the noise.
13 Q  He said he got kicked out?
14 A  Or he's leaving because of a complaint or something,
15   people were complaining about the music.
16 Q  Okay. This was on one of the times that you were
17   wired, this.....
18 A  No. I -- I believe it was -- it was on that third one.
19 Q  Okay. And what happened then?
20 A  Then I -- after I got my dope, I got back in my car and
21   drove off.
22 Q  Where did you go?
23 A  Back to the police station.
24 Q  Directly back there?
25 A  Yeah.

Page 425

1 Q  No stops?
2 A  Unh-unh. (Negative)
3 Q  I'm sorry, please?
4 A  No.
5 Q  All right. And who did you talk with then?
6 A  In what?
7 Q  Who did you talk with then? You went back to the
8    police station you testified?
9 A  Yeah.
10 Q  All right.
11 A  I went back to the police station, and then I got
12   debriefed by either Officer Johnstone or Officer
13   LaPorte.
14 Q  Okay. Then do you know how many people or how many
15   officers were -- or if any officers were around you at
16   the Chevron station?
17 A  I didn't know where they were, but they were definitely
18   there.
19 Q  How do you know that?
20 A  I just know. I just -- I just knew because of previous
21   -- how it -- how it happened.
22 Q  Well, did someone tell you that there were going to be
23   X number of people around?
24 A  No. There was -- I mean, it was told that, you know,
25   they were -- they were around.

Page 426

1 Q  Okay. Who told you they were around?
2 A  Officer Johnstone and officer LaPorte.
3 Q  Okay. The -- diagrams that you've driven [sic] --
4    drawn for me, now I know they're not artist diagrams,
5    but is that true and correct to the best of your
6    recollection now?
7 A  Yes, they are.
8    MR. JAMES: Okay. Your Honor, I would like to have
9    marked for exhibits E, F and G, I believe are my next
10   numbers, starting with the diagram of.....
11   THE COURT: Why don't you get the -- do you have
12   stickers marked? Why don't you put them on the -- and then
13   tell me what you put them on and then.....
14   MR. JAMES: I can (indiscernible).
15   THE COURT: .....we'll know which ones we're talking
16   about here. You can go back to -- that's fine.
17   MR. JAMES: Okay. Madam clerk, I'm going to mark the
18   first one, which is the -- we marked the first one, which is
19   the diagram that has -- that depicts Grand Larry E. I'm
20   going to mark the diagram that depicts the interior of the
21   duplex as F. That's the -- F is the one without the
22   interior layout. D, I'm going to mark as another diagram of
23   the interior, which reflects the stove and the counter with
24   a circle on it. And H, I'm going to mark as the Chevron.
25 Q  Okay. Now on the 20th, how much did you get? How much

Page 427

1    -- you said dope.  How much did you get?  Could you
2    tell me?
3 A  (Indiscernible).
4 Q  Okay.  Is that -- you're holding up a -- your fingers,
5    is that like an inch and a half in diameter?
6 A  Yeah.
7 Q  What.....
8 A  Yes.
9 Q  Yes?  Okay.  And Did you receive a ball that size?
10 A  Yeah, it was a ball.
11 Q  A ball that size?
12 A  Right.
13 Q  Okay.  And how much was that, based on your experience?
14 A  A ball.
15 Q  What -- give me some kind of a weight on it.
16 A  I don't know, anywhere from like, you know, I don't
17    know.  I really don't know the gram size, you know, but
18    it was -- it was worth money.  You look at dope, I
19    could see it was worth it.
20 Q  Okay.  Do you remember telling us on Thursday that a
21    ball was about 2.8 or 3.2 grams, somewhere in that
22    neighborhood?
23 A  Right.  It was -- it was -- it was between there.  It
24    was between that.
25 Q  Okay.  So a ball is about a -- you held up your

Page 428

1    fingers, was that about an inch and a half diameter?
2 A  Yeah.
3 Q  Take a look, sir.  Please.
4 A  Right.  Huh?
5 Q  How much is.....
6 A  Yeah, it's like that.
7 Q  Okay.  How much is that?  If you could describe in
8    diameter?  What's the diameter of that?  It's a ball
9 A  Width?
10 Q  Okay.  Well, the radius, diameter, whatever you want,
11    it's a ball?
12 A  Right.
13 Q  So a ball would theoretically be circle?
14 A  Right.
15 Q  Okay.  So it has a diameter, it has a radius?
16 A  Yeah.
17 Q  And you held up your hands.  What I'm interested in
18    knowing is what's the distance between the diameter,
19    which is a straight line.....
20 A  I don't know for sure.
21 Q  Well, take a look.  You're the one that held up your
22    hand.
23 A  Right.  Well, I don't for sure, you know.....
24 Q  Inch?
25 A  I haven't seen -- I haven't seen the dope in a while.

Page 429

1 Q  An inch, two inches?  But you held up your hand?
2 A  Right.  I mean, it was a ball, man.
3 Q  All right.  Well, tell me.....
4 A  It was a ball.  I don't know for sure.
5 Q  Take a look at your hand that you held up.....
6 A  Like an inch.
7 Q  Inch diameter?
8 A  Yeah.
9 Q  All right.  But you're comfortable with the size that
10    you held up as the quantity received?
11 A  Yeah, I believe so.
12 Q  Now on the 28th/1st of March, the 28th, you also were
13    wearing a right?
14 A  Yeah.  Yes.
15 Q  Okay.  So anything in that wire -- would have -- any of
16    your conversation would have been recorded on that
17    wire?
18 A  Right.
19 Q  And again, am I correct in assuming you did not control
20    turning it on or turning it off.....
21 A  Right.
22 Q  .....that date?  Okay.  All right.  Do you smoke?
23 A  Yeah.
24 Q  And I mean not coke, crack, I'm talking cigarettes?
25 A  Cigarettes.

Page 430

1 Q  Now where did you go on the 28th?  You met with the
2    police, I assume, that's a fair assumption, correct?
3 A  Yeah.  I don't know if we did a buy that day, I'm not
4    sure.
5 Q  All right.  So how many buys did you do?
6 A  I did four buys all together.
7 Q  When was the last buy?
8 A  The last time I did it.
9 Q  What day?
10 A  I'm not for sure.
11 Q  Okay.  You have no idea when the date or the day was?
12    In other words, there's days in a week, and there's
13    dates in a month.
14 A  Right.  Yeah.  I don't know.
15 Q  Okay.  Where -- you met.....
16 A  Muldoon -- oh, never mind.  Sorry.
17 Q  You met at where?  Where did this thing start?
18 A  It -- the last buy?
19 Q  Yes.
20 A  I met at the police station on Tudor.  Then we went to
21    Muldoon, the Pancake House.
22 Q  Okay.  And what, if any amount of money did they give
23    you?  They being the cop -- the police.
24 A  $200.
25 Q  Okay.  And how was that money laid out?  In other

Page 431

| | |
|---|---|
| 1 | words, how much..... |
| 2 A | Maybe $50's. I think it was $50's. |
| 3 Q | $50's? |
| 4 A | I believe so. |
| 5 Q | Okay. |
| 6 A | I'm not sure. |
| 7 Q | And so you go to the -- what happens after you leave |
| 8 | the police station? |
| 9 A | I -- I drive to the Pancake House in Muldoon. He was |
| 10 | already there. |
| 11 Q | All right. What happened then? |
| 12 A | What happened then is I pulled up and he was in a |
| 13 | different car. I thought he was going to be in the |
| 14 | green truck, and he wasn't in the green truck, he was |
| 15 | in a gray truck. |
| 16 Q | Is that the gray truck you had seen earlier? |
| 17 A | Right. |
| 18 Q | All right. And that's the Toyota, or whatever that |
| 19 | size car -- truck? |
| 20 A | Yeah. |
| 21 Q | All right. All right. So is that -- is that a club |
| 22 | cab, or..... |
| 23 A | Single. |
| 24 Q | Single? |
| 25 A | Yeah. |

Page 432

| | |
|---|---|
| 1 Q | All right. So what happened then? |
| 2 A | I got in his car, bought some dope, asked him where he |
| 3 | was staying. He said he was staying at a hotel. And I |
| 4 | said, all right. I got back in my car and drove off. |
| 5 Q | Okay. And that was recorded? |
| 6 A | Yeah. And I told the cops what kind of car he was in |
| 7 | and a license plate number. |
| 8 Q | Okay. What did you -- now, after you got in your car, |
| 9 | what happened? |
| 10 A | After I got in my car, I told the police the license |
| 11 | plate number. |
| 12 Q | Did you tell them after you got in your car or before |
| 13 | you got in the car? |
| 14 A | When I got in my car. |
| 15 Q | In your car? Okay. |
| 16 A | I told them the license plate number and make of the |
| 17 | vehicle, and I drove back to the -- it might have been |
| 18 | to the church, or that buy, I think it was back to the |
| 19 | station. |
| 20 Q | Okay. Did you make any stops? |
| 21 A | No, I don't think so. |
| 22 Q | All right. Did you leave immediately, or did you stick |
| 23 | around? |
| 24 A | Yeah, I left. |
| 25 Q | Did you see anything happen as you were leaving? |

Page 433

| | |
|---|---|
| 1 A | No. I didn't look behind me. |
| 2 Q | Okay. And what did you get this time, if anything? |
| 3 A | What did I get? |
| 4 Q | If anything, what did you get? |
| 5 A | What do you mean, what did I get? |
| 6 Q | Okay. |
| 7 A | As far as dope? |
| 8 Q | Right. |
| 9 A | I got -- it might have been, I think it was soft. I'm |
| 10 | not sure. Or, no, it might have been hard. I'm not |
| 11 | sure. But it was, you know, the same size as usual. |
| 12 Q | Same size? |
| 13 A | Yeah. |
| 14 Q | So everything should have been consistent..... |
| 15 A | Yeah. |
| 16 Q | .....the weights? |
| 17 A | Well, you know, I just eyed it out man, I just took it. |
| 18 | I really didn't care. I was just trying to get the |
| 19 | dope and get out as quick as I could. |
| 20 Q | Okay. So that was your -- your last contact with -- in |
| 21 | regards to these events, correct? |
| 22 A | Yes, it was. |
| 23 Q | Okay. And the first buy, was that crack or coke? |
| 24 A | Coke. |
| 25 Q | Coke? Powder coke? |

Page 434

| | |
|---|---|
| 1 A | Yeah. |
| 2 Q | All right. All right. Now you've all ready testified |
| 3 | you don't do coke, you do crack, why would you buy |
| 4 | coke? |
| 5 A | I don't do nothing now. I've done dope. But it's |
| 6 | because that's what he had. It's -- it's the same |
| 7 | thing, man. Crack and coke are the same thing. |
| 8 Q | Okay. And the second one, was that crack or coke? |
| 9 A | The rest of them were crack. |
| 10 Q | Crack? All right. |
| 11 A | I believe. |
| 12 Q | All right. Now no one was with you when these alleged |
| 13 | buys went down, correct? |
| 14 A | No one was with me? |
| 15 Q | Correct. You were by yourself? |
| 16 A | Yeah. |
| 17 Q | All right. And you were using your Plymouth Reliant |
| 18 | vehicle that you've had for a period of time, at least |
| 19 | six, eight months before -- we'll, how long have you |
| 20 | had that car? |
| 21 A | A while. A couple of years. |
| 22 Q | A couple of years? Okay. A couple of years. So you |
| 23 | were using the same car all the time? |
| 24 A | Huh? |
| 25 Q | You were..... |

Page 435

1 A   Yes. I was using the same vehicle all the time.

2 Q   All right.

3 A   Every time I did a buy, it was with that car.

4 Q   Okay. So would you agree that there -- this case rises

5       and falls on your testimony?

6   MS. BRADY: Objection, Your Honor.

7 A   No.

8   THE COURT: Just a second. The objection is sustained.

9 Disregard the question. Don't guess as to what the answer

10 is, please.

11 Q   And your testimony you've given today is -- and

12       yesterday, excuse me, on Thursday, is truth -- is the

13       truth, isn't that right?

14 A   Yes, it is.

15 Q   Okay. So if anybody else comes in here and testifies

16       contrary, they're lying and you're not?

17 A   That's right.

18 Q   Okay. Including the police?

19 A   That's right.

20 Q   All right. And you never had a conversation with

21       Athena where you stated words to the effect, I'll do

22       whatever I can to get him, meaning Rico?

23 A   No. Me and her don't talk no more.

24 Q   Well, you talked at the Subway station, right?

25 A   Yeah. That's because he came by my work.

Page 436

1 Q   All right. When did you quit talking with her?

2 A   After that, I didn't want nothing to do with her. She

3       told him where I worked, and he came by my work.

4 Q   Who did?

5 A   Rico.

6 Q   He came by your work?

7 A   Yeah.

8 Q   When was that?

9 A   That was when I was working. That's why I quit my job

10       there.

11 Q   Did you tell the police he had come by your work?

12 A   Yeah. Yeah.

13 Q   Who did you tell?

14 A   Officer LaPorte.

15 Q   All right. When -- and when did he come by your work?

16 A   At night.

17 Q   At night?

18 A   Yeah.

19 Q   What time at night?

20 A   Like 9:30, 10:00.

21 Q   Okay. What date was that? I would think that would

22       stick in your mind.

23 A   No, that don't stick in my mind. It was back in --

24       back in -- back when I was working at Taco -- I mean,

25       at Subway, like during the summertime.

Page 437

1 Q   All right. Who did he come by with?

2 A   My himself.

3 Q   What happened?

4 A   Nothing.

5 Q   All right. He just came by?

6 A   He drove by my work, you know, kind of stopped a little

7       bit and kept going.

8 Q   He didn't come in?

9 A   No.

10 Q   All right. And that was after you had talked with

11       Athena?

12 A   Yeah.

13 Q   And your conversation with Athena dealt with you

14       supporting your baby, right?

15 A   No. She asked why he's in jail, and I said because he

16       deals dope.

17 Q   Ah.....

18 A   She said it was my fault. I said it wasn't my fault.

19 Q   Do you deal dope?

20 A   No, I do not.

21   MR. JAMES: Let me just have a moment. (Pause) Let me

22 just have one moment. I think I'm pretty well done with

23 Mr. Fish. (Pause) Oh, just very briefly.

24 Q   Now after you left on Thursday, you went over to the

25       DA's office, didn't you?

Page 438

1 A   Yes.

2 Q   What did you talk about?

3 A   Huh?

4 Q   What did you talk about?

5 A   I didn't talk about nothing. I sat in the waiting

6       room. She gave me -- she gave my witness fees, and she

7       gave me a check -- a Checkered Cab -- I mean, an Alaska

8       Cab slip to take a cab home.

9 Q   Okay. So you didn't -- you just sat over there?

10 A   Yeah.

11 Q   Okay. Did you smoke any dope this weekend?

12 A   No, I did not.

13 Q   Any marijuana?

14 A   No, I did not.

15   MR. JAMES: Thank you. That's all the questions I have

16 right now, Mr. Fish.

17   THE COURT: Thank you, Mr. James. Redirect, Ms. Brady?

18       JEREMY FISH

19 testified as follows on:

20       REDIRECT EXAMINATION

21 BY MS. BRADY:

22 Q   When you were doing the buys that we've been talking

23       about in this case, were you also doing buys in another

24       case with the same officers?

25 A   Yes, I was.

Page 439

1 MR. JAMES: Objection. Relevance.

2 THE COURT: Overruled.

3 Q How many buys did you do in other cases?

4 A The same amount.

5 Q The same amount? Okay. And when Mr. James was talking

6 to you, you said that the defendant had his gun out

7 when there was a whole bunch of people over?

8 A Yeah.

9 Q Okay. What did you mean by that?

10 A I mean there's a lot of people he brought his gun out.

11 Just like when there was -- when I walked in the door

12 and there was like five people there, he had a gun in

13 his waist. It's just -- I don't know, that's what he

14 did.

15 Q Is that when people over socializing or were they over

16 to do something else?

17 A Right. Socializing.

18 Q Okay.

19 A He just pulled a gun out, like pulls it out.

20 Q Okay. And the marijuana that was found in your car,

21 which -- which time was that when you went to the

22 police office, when you went to the police station?

23 A That was the first time.

24 Q The first time you.....

25 A Yeah.

Page 440

1 Q .....went to the police station?

2 A Yeah.

3 Q Was that the time that you talked to the female

4 officers, or the time that you met with the male

5 officers?

6 MR. JAMES: Objection. Leading. This is.....

7 A The time I met with the male officers.

8 THE COURT: Overruled. And I didn't hear the answer.

9 We were -- the lawyers were talking. What was the answer?

10 A The time I went there to speak -- the first time I went

11 there after I talked to the ladies was the male

12 officers that I talked to.

13 MS. BRADY: Thank you. That's all the questions I had,

14 Your Honor.

15 THE COURT: Thank you. You can step down. Mr. James,

16 what -- Mr. James, did you have something?

17 MR. JAMES: I just -- no, Your Honor. Thank you.

18 THE COURT: All right. You can step down. Your next

19 witness, Ms. Brady?

20 MS. BRADY: The state calls Officer Somerset Jones.

21 MR. JAMES: Your Honor, could we approach the bench

22 here while we're waiting for the next witness, very briefly.

23 I just want to get a game plan for time.

24 THE COURT: Sure. Madam clerk, if the witness comes

25 in, ask the witness just to have a seat out in the audience

Page 441

1 and we'll swear the witness in in a moment.

2 (Bench conference as follows:)

3 THE COURT: All right. We're at bench conference.

4 Mr. James?

5 MR. JAMES: The reason I asked for this is we were --

6 how many more do you have today? It's 11:00 o'clock. I

7 just wanted -- if I'm going to put on a case, I need to --

8 know you would like us to keep rolling here. So I'm just

9 trying to get a game.....

10 MS. BRADY: My case will go through the end of the day

11 easy.

12 MR. JAMES: End of the day? Okay. That's -- that's

13 all I was interested in finding out. Thank you.

14 THE COURT: While I have you here, we're going to do

15 jury instructions -- I'd like to do jury instructions today

16 at 3:00 o'clock.

17 MS. BRADY: I have a 3:30, so if it's going to take

18 longer than a half an hour, we need to do it earlier than

19 that.

20 THE COURT: What if we start at 3:00 and see what

21 happens?

22 MS. BRADY: Okay.

23 THE COURT: We can get some done then.

24 MS. BRADY: Okay.

25 THE COURT: Mr. James, can you do that?

Page 442

1 MR. JAMES: We can still go through hers. I know I've

2 got her packet, so.....

3 THE COURT: Have you looked at them? Can we go through

4 them?

5 MR. JAMES: We can go through hers this afternoon.

6 THE COURT: Have you proposed any?

7 MR. JAMES: I haven't got any yet, because I haven't

8 seen what's developing as we go along.

9 THE COURT: When did you intend to propose them?

10 MR. JAMES: I don't know if I'm going to go through a

11 -- I'm going to put on a case or not. I don't know yet.

12 But I'll get some, try and get some for you later.

13 (Indiscernible).

14 (End of bench conference)

15 THE COURT: All right. Do you want to call your next

16 witness, Ms. Brady?

17 MS. BRADY: The state calls Somerset Jones, Your Honor.

18 THE CLERK: Please raise your right hand.

19 (Oath administered)

20 MR. JONES: I do.

21          SOMERSET JONES

22 called as a witness on behalf of the plaintiff, testified as

23 follows on:

24          DIRECT EXAMINATION

25 THE CLERK: Please be seated. For the record, sir,

Page 443

1 will you state your full name and spell your last?

2 A  Somerset L. Jones, III. J-o-n-e-s.

3  THE CLERK:  Thank you.

4  THE COURT:  Go ahead, Ms. Brady.

5 BY MS. BRADY:

6 Q  How long have you been an APD officer?

7 A  About six and a half years.

8 Q  Okay.  And are you assigned to a particular unit?

9 A  Well, I'm assigned to the special assignment unit.

10 Q  All right.  And is that the same assignment unit you

11  were assigned to during this case?

12 A  Yes.

13 Q  All right.  And how did you become involved with this

14  case?

15 A  Well, being on the team, I was told that they were

16  going to have a controlled purchase and Officer LaPorte

17  provided a briefing of that controlled purchase.  And

18  -- and assigned me to conduct surveillance and to

19  assist in the arrest of the suspect.  And so I, you

20  know, went to the area where the controlled purchase

21  was to take place.

22 Q  Okay.  Now before you did that, did you do anything

23  else?

24 A  Yes.  I was given the keys to the confidential

25  informant's vehicle and told to go out to the vehicle,

Page 444

1  which was parked in front of the police station and to

2  search that vehicle.

3 Q  Okay.  And did you do that?

4 A  Yes, I did.

5 Q  How throughly did you search the car?

6 A  Well, when I search the car, I look underneath the

7  seats and the ashtrays.  If there's a -- a VHS film

8  box, I'll open it up.  Cigarette packs over the visors,

9  just everywhere inside the vehicle, I search.  I look

10  for money, because we only want him to have our money.

11  Controlled substances, weapons, anything that might be

12  considered illegal or contraband.

13 Q  Did you find any contraband in his car?

14 A  No, I did not.

15 Q  Okay.  And now what was our role in the surveillance?

16 A  Well, as part of the surveillance, I went to the area

17  in Muldoon near the Pancake House, which I was told was

18  where it was going to transpire.  And after I -- I got

19  there, I could hear on our portable radios, they were

20  telling me pretty much what was going on, that when the

21  confidential informant got in and got out of the

22  vehicle, and then they told me that the vehicle was

23  parked at an oriental restaurant just south of the

24  Pancake House and gave me a description of the vehicle

25  and the license plate.  And as the informant got out of

Page 445

1  the vehicle, I drove into the parking lot along with

2  Officer LeBlanc.  Officer LeBlanc was in a marked

3  vehicle with, you know, police symbols and lights on

4  the top.  And we subsequently arrested the suspect, had

5  him removed in the vehicle, placed in handcuffs and

6  impounded the vehicle.

7 Q  Okay.  So were you in a different car than Officer

8  LeBlanc?

9 A  Yes, I was.  I was in an unmarked car.

10 Q  All right.  And what about -- what happened after the

11  defendant was arrested?

12 A  Well, Officer LeBlanc took him and processed him, I

13  believe took him to jail and then, you know, conducted

14  a bail hearing.  And the vehicle, like I said, was

15  impounded.

16 Q  Okay.  And was there anyone in the car besides him?

17 A  No.

18 Q  All right.  And what did you do when you got back to

19  APD?

20 A  Well, when we got back to APD, the controlled

21  substances that were purchased from the defendant were

22  taken, and I field tested them with a Beck and

23  Dickinson (ph) test kit for cocaine, and it was

24  positive.

25 Q  Okay.  And did you search the car again?

Page 446

1 A  Yes, sub -- after the vehicle had been removed to

2  secure storage, subsequent to a search warrant, we went

3  and searched the vehicle.

4 Q  Okay.  Let me ask you a different way.  Did you search

5  Mr. Fish's car when you got back to the police station?

6 A  Oh, yes.  I'm sorry.  Yes, absolutely.

7 Q  Okay.

8 A  Prior to and after the controlled purchase, I -- I had

9  searched the confidential informant's vehicle.  And on

10  the second one, I did the same thing that I did on the

11  first one, went through every -- all the little boxes

12  and everything else, and again found nothing that was

13  contraband or illegal.

14 Q  Okay.  And you said that you took control of the -- the

15  crack that had been purchased?

16 A  Well, I think Officer Johnstone and I processed it.  He

17  filled out the P and E, and I did the field test.

18 Q  Okay.  And let me just approach you with something

19  that's previously been marked as state's exhibit 4.  Do

20  you recognize this?

21 A  Yes, I do.

22 Q  What is it?

23 A  Well, it's a drug envelope that contains crack cocaine.

24  And the sealing tape has my initials and the date on

25  it.

Page 447

1 Q  Okay. Could you just tell me about that sealing tape a
2     little bit? What -- you called it sealing tape, is
3     that some special kind of tape?
4 A  Well, it's tamper proof. If the envelope had been
5     opened at any time and that would have been damaged, it
6     would indicate that because you can't reseal it.
7     MS. BRADY: Okay. And at this time, I move to admit
8 state's exhibit 4.
9     THE COURT: Number 4, Mr. James?
10    MR. JAMES: No objection.
11    THE COURT: Number 4 is admitted.
12 Q  Okay. Now did you do anything else with regard to the
13    investigation of this case?
14 A  I searched the vehicle at indoor secure.....
15    MR. JAMES: Asked and answered.
16    THE COURT: Overruled.
17 Q  Okay. And was any -- you searched the defendant's car?
18 A  Yes.
19 Q  Okay.
20 A  Correct.
21 Q  And was anything seized during that search?
22 A  Yes, a cell phone and a battery to it.
23 Q  Okay. And let me just approach you with what I've
24    previously marked as state's exhibits 12 and 22. Do
25    you recognize those items?

Page 448

1 A  Yes, I do.
2 Q  Can you please explain to the jury what item number 12
3     is?
4 A  Item number 12. Yeah. This is a cell phone and it --
5     when we get cell phones and batteries, we have to
6     separate the two because they're serial number items,
7     and so we list both of them separately on the P and E.
8     So this is a part of the same phone. Both of them, the
9     battery and the cell phone.
10 Q  Okay. And I'm glad you mentioned that serial number.
11    Does it have a serial number on it?
12 A  Yes, they do.
13 Q  And what is the serial number that's on it?
14 A  Oh, gees. 003 Kilo 04702 is the phone. And I think
15    I'm going to need my glasses, which I didn't bring with
16    me, to read the one on the battery.
17 Q  That's okay. I don't even need the one the battery.
18    MS. BRADY: At this time, I move to admit state's 12
19 and 22.
20    THE COURT: Mr. James?
21    MR. JAMES: No objection.
22    THE COURT: 12 and 22 are admitted.
23          (Plaintiff's exhibits 12 and 22 admitted)
24    MS. BRADY: Okay. And that's all I have for this
25 witness, Your Honor.

Page 449

1     THE COURT: Mr. James?
2             SOMERSET JONES
3 testified as follows on:
4             CROSS EXAMINATION
5 BY MR. JAMES:
6 Q  Officer Jones, you were involved on the 28th, and
7     that's all, correct?
8 A  The 28th and the 1st, yes.
9 Q  28th and the 1st.....
10 A  That's correct.
11 Q  .....which is the rollover? There are 28 days in.....
12 A  Yeah. Right. That's correct.
13 Q  Okay. And you were part of a surveillance team, is
14    that correct, at the Pancake House on Muldoon?
15 A  Yes.
16 Q  Okay. All right. And when did you arrive there?
17 A  It was shortly before the confidential informant
18    arrived in the area.
19 Q  And did you see the confidential informant?
20 A  No, I did not.
21 Q  Okay. Where were you?
22 A  I was in -- in streets adjacent to the area. I did not
23    want to be in -- in plain view. I was part of the
24    takedown team, so I just stayed out of sight until I
25    was told that the confidential informant was leaving

Page 450

1     the suspect's vehicle by those that were -- had what we
2     call the eye, able to see what was going on.
3 Q  Why don't you, if you would, flip over -- turn around,
4     please and flip over to a clean sheet of paper, if you
5     would, please? And if you can, and without going into
6     great deal of detail, kind of give us a rough sketch of
7     where this took place and where you were.
8 A  Well, maybe. Okay. Let's see. Muldoon Road. And the
9     Pancake House is back here. Here's a street here. I
10    don't remember the name of it. I think it's -- not
11    Duben but Peck, maybe. And then there is a street sign
12    right about here. And then there's an entrance into
13    the parking lot right about here. And then there's --
14    I think there's a little strip mall back here. And the
15    defendant's vehicle was parked here facing towards the
16    street.
17 Q  Okay.
18 A  And I was riding the streets in here. There's an alley
19    here, back in here. So I was back in this area. I
20    wasn't stationary all the time.
21 Q  Okay. So there's no location that you can say I was
22    there? You were kind of a rover, is that correct?
23 A  I just -- you know, I -- as things progressed, because
24    they was told it was going to go down here, I moved my
25    vehicle when I knew that the vehicle was about here.

Page 451

| | |
|---|---|
| 1   So -- and -- and this being north. So as things | 1 A   Yes, he was. |
| 2   progressed, I changed my position as time went on. | 2 Q   Okay. Did he have..... |
| 3 Q   Okay. Could we perhaps just put M for Muldoon and | 3 A   Yes. Yes. |
| 4   either P with a question mark for Peck, because you | 4 Q   .....the whole rigamarole..... |
| 5   didn't know if that was Peck or not? | 5 A   It was a -- you know, what we call a felony traffic |
| 6 A   Yeah, I don't know exactly. I'd have to get a map. | 6   stop. At this point, we were arresting somebody for |
| 7 Q   Okay. I'm not holding you to Peck. | 7   committing a felony offense. |
| 8 A   Okay. | 8 Q   All right. And who approached Mr. Davis' car? |
| 9 Q   All right. All right. Now -- go ahead and have a | 9 A   Neither one of us approached it. What we did was call |
| 10   seat, if you would, please. All right. So this -- did | 10   him out of the vehicle. And then after he got out of |
| 11   you observe Jeremy Fish leave? | 11   the vehicle, when he -- then we approached him and |
| 12 A   No, I did not. | 12   placed him in handcuffs and then put him in the back of |
| 13 Q   Okay. You were monitoring this on radio, I..... | 13   the patrol car. |
| 14 A   Yes. | 14 Q   All right. So you guys said, okay, whoever you are, or |
| 15 Q   .....I assume? Okay. All right. How many officers | 15   called him by name, come out of the car, or words to |
| 16   were there? | 16   that effect? |
| 17 A   About five or six of us, I believe. I could look it | 17 A   Yes. |
| 18   up. I have it -- all the names written in my report. | 18 Q   You had your guns drawn and the -- all right. Now he |
| 19   I just don't recall off the top of my head. | 19   got out of the car, right? |
| 20 Q   You generated your own report on this? | 20 A   Correct. |
| 21 A   Of course. Okay. One, two, three, four, five..... | 21 Q   All right. And did you have him put his hands up on |
| 22 Q   You've got it with you? | 22   the car like the movies show and pat him down? |
| 23 A   Six of us. Seven counting me. Seven of us. | 23 A   No. No, that's not the way we do it. |
| 24 Q   Now -- I'd like to see your report in just a minute, if | 24 Q   All right. I don't -- how do you do it? |
| 25   I may. But to continue on here, so -- somebody must | 25 A   Well, we ask him to walk backwards towards us. |
| Page 452 | Page 454 |

| | |
|---|---|
| 1   have told you that it was time? | 1 Q   Okay. |
| 2 A   Yes. | 2 A   And then we have him put his hands behind his back and |
| 3 Q   All right. And who was that? | 3   we put him in handcuffs while one officer watches him and |
| 4 A   I don't know. I believe it was Officer LaPorte, but | 4   the other one controls him. |
| 5   I'm not absolutely certain at this time. And the | 5 Q   All right. |
| 6   reason I believe it was him is because it was his case | 6 A   And then he's patted down and then placed in the patrol |
| 7   file. He was the one that was controlling what was | 7   car. |
| 8   going on. And so I believe he would have been the one | 8 Q   Okay. And did you have him empty his -- turn his |
| 9   that would have said it's time now, because he's lead. | 9   pockets inside out? |
| 10 Q   Okay. And after he said it's time, how long were you | 10 A   Well, I wasn't the one that searched him. Officer |
| 11   there -- how long did it take you to get there? | 11   LeBlanc was the one that patted him down for weapons. |
| 12 A   Oh, a matter of seconds, maybe five, 10 seconds. | 12 Q   Did you see LeBlanc search him? |
| 13 Q   Okay. So you were, boom, right there? | 13 A   Yeah. I saw him pat him down. |
| 14 A   Yeah. Oh, yeah. | 14 Q   Did he empty his pockets..... |
| 15 Q   All right. And when you got there, was Officer LeBlanc | 15 A   I believe he pulled some things out of his pockets, but |
| 16   there or..... | 16   I don't remember..... |
| 17 A   He -- he pulled in the same time I did. | 17 Q   Okay. |
| 18 Q   All right. | 18 A   .....what that was. There was a wallet and some |
| 19 A   We both stopped our cars, got out, opened our doors at | 19   stuff.... |
| 20   the same time. | 20 Q   And so Mr. Davis has got his hands behind him, so he's |
| 21 Q   Okay. And you were in a..... | 21   obviously not doing any pulling, right? |
| 22 A   Unmarked vehicle. | 22 A   No. |
| 23 Q   .....unmarked vehicle? Is that -- never mind, it's | 23 Q   Okay. So this is the police that are doing the search? |
| 24   unmarked. So did LeBlanc have his lights on and that | 24 A   Right. |
| 25   kind of stuff? He was in a police car, right? | 25 Q   Which would be, to your recollection, Officer LeBlanc? |
| Page 453 | Page 455 |

| | |
|---|---|
| 1 A   Yes. | 1 Q   Okay. Did anybody else, to your knowledge? |
| 2 Q   All right. And he's -- Mr. Davis is standing up, | 2 A   No, not that I know of. |
| 3   right? There's no on the ground..... | 3 Q   Okay. No money found him, right? |
| 4 A   No. He's standing..... | 4 A   As far as I know. |
| 5 Q   No? None of that cowboy stuff? | 5   MR. JAMES: Okay. Could I approach, Your Honor, just |
| 6 A   No. | 6 for minute? |
| 7 Q   All right. And so it's all going down fairly | 7 Q   Could I take a look at your police report? (Pause) |
| 8   civilized, no ruckus, no anything, right? | 8   The first part of that police report -- well, never |
| 9 A   That's correct. | 9   mind, Officer. Let me just withdraw the question. So |
| 10 Q   All right. And which pockets -- well, how was | 10   you're standing in front of Mr. Davis, Officer LeBlanc |
| 11   Mr. Davis dressed? | 11   is behind and did the pat-down search, got in his |
| 12 A   I -- I don't recall. I mean, it was cold out. I would | 12   pockets that you saw, which pockets did he get into? |
| 13   assume he had a coat and pants and shirt on. But, I | 13 A   I would imagine all of them. I don't -- I wasn't the |
| 14   mean, there was nothing unusual about his attire for | 14   one doing the searching. Officer LeBlanc was. |
| 15   that time of the year. | 15 Q   But you were standing right there..... |
| 16 Q   Okay. Did -- you didn't touch Mr. Davis, as far as | 16 A   But I'm also observing the suspect and watching other |
| 17   patting him down or anything? | 17   things in the area. I'm not just focusing on what |
| 18 A   No. | 18   Officer LeBlanc is doing. It's, you know, he's a |
| 19 Q   You're just standing back, looking at..... | 19   capable officer, so there's no reason for me to do |
| 20 A   Yes. | 20   that. |
| 21 Q   Okay. So are you the guy in front, or the one to put | 21 Q   I'm just asking for your observations. |
| 22   the cuffs on him? | 22 A   Yeah, that's no problem. |
| 23 A   I was the one in front. | 23 Q   All right. |
| 24 Q   Okay. So the cuffs go on him, and now you saw Officer | 24 A   That's why it's done. |
| 25   LeBlanc turn his pockets, some of his pockets or | 25 Q   All right. How far away were you from Mr. Davis when |
| Page 456 | Page 458 |

| | |
|---|---|
| 1   something inside out, like that? | 1   you were standing in front of him? |
| 2 A   No, I -- I didn't see him turn his pockets inside out. | 2 A   Oh, less than six foot. |
| 3 Q   Okay. Did you see it go into his pockets? | 3 Q   Okay. So while you were watching Mr. Davis, and you've |
| 4 A   Yes. | 4   already testified you're watching everything, this is |
| 5 Q   Hands in his pockets? | 5   -- this is what you saw is what you've told us so far, |
| 6 A   I believe patted him down and then searched his | 6   correct? |
| 7   pockets, yes. | 7 A   Correct. |
| 8 Q   Searched his pockets? | 8 Q   All right. Now, you didn't do any search -- did |
| 9 A   Yeah. | 9   anybody inform you that they had found money on |
| 10 Q   Okay. Did he take his wallet out? | 10   Mr. Davis, specifically -- based -- let me back up. |
| 11 A   I believe so. | 11   Based upon your experience with the issue -- I'm not |
| 12 Q   All right. Open it up? | 12   getting the name right -- do you guys record the money? |
| 13 A   I have no idea. | 13 A   Yes. |
| 14 Q   You weren't watching that? | 14 Q   Before it goes down? Okay. Now you're there, LeBlanc |
| 15 A   I believe he got his ID out of his wallet, but I'm not | 15   is there, who else is there? |
| 16   sure. | 16 A   During the particular arrest? |
| 17 Q   Okay. So then one of the officers had to -- Officer | 17 Q   Yes. I mean..... |
| 18   LeBlanc had to get his ID out , I mean, because..... | 18 A   I believe Sergeant Stevens came up after we had been |
| 19 A   I believe that's the case, yes. Correct. | 19   there for about 30, 40 seconds. |
| 20 Q   ......Mr. Davis..... | 20 Q   Okay. And anybody else? |
| 21 A   Oh, yeah. No, he couldn't do it himself. | 21 A   No, I don't recall anybody else coming up there. |
| 22 Q   He couldn't do anything? | 22 Q   Do you know if Kathy Bushue or Officer...... |
| 23 A   No. | 23 A   She -- she may have. I -- I'm not absolutely certain. |
| 24 Q   Okay. So did you find any money on him? | 24   I just remember -- I know who pulled up with me, and I |
| 25 A   I didn't, no. | 25   remember Sergeant Stevens arriving there. |
| Page 457 | Page 459 |

**Page 460**

1 Q  Okay. How about Johnstone?
2 A  No, I -- I don't recall.
3 Q  Okay. Did you hear a conversation involving any of the
4    police officers about their inability to find buy money
5    at the scene?
6    MS. BRADY: Objection, Your Honor, calls for hearsay.
7    THE COURT: Let's take a bench conference. Bear with
8 us for a moment, folks.
9    (Bench conference as follows:)
10    THE COURT: Your response, Mr. James?
11    MR. JAMES: Your Honor, I think it goes to his state of
12 mind. That's -- it's not offered for the truth of the
13 matter asserted.
14    THE COURT: What's -- why is his state of mind
15 relevant?
16    MR. JAMES: Because his state of mind, as he later
17 testified that he searched the car, I believe, and the car
18 -- and what he found in the car was the telephone and the
19 battery.
20    THE COURT: Why is his state of mind relevant?
21    MR. JAMES: I think his state of mind is relevant to
22 show what actions or inactions he did at that particular
23 point in time.
24    THE COURT: Can you do any better than that? Why is
25 what actions he did at that moment in time relevant?

**Page 461**

1    MR. JAMES: I'm thinking. Just a second. I'll
2 withdraw the question. That's fine.
3    THE COURT: All right. So shall I tell the jury that
4 you're withdrawing the question?
5    MR. JAMES: I'll just tell them, Your Honor. You can
6 tell them or there's -- do you want me to, or you to? I'll
7 do it.
8    THE COURT: Go ahead.
9    (End of bench conference)
10        CROSS EXAMINATION CONTINUED
11 BY MR. JAMES:
12 Q  I'm going to withdraw that last question, Officer.
13    Okay. What happened -- what did you do after -- now
14    you've taken us up to Mr. Davis with his hands behind
15    him and the search. You did -- what did you do after
16    that point in time?
17 A  Well, I watched Officer LeBlanc put him in the car and
18    drive him off. I went back to the station and assisted
19    with the processing of the evidence.
20 Q  Okay. At the scene, did you personally see any buy
21    money?
22 A  No.
23 Q  Now you later participated in direct examination
24    regarding a search of an automobile, right?
25 A  Correct.

**Page 462**

1 Q  What were you searching the automobile -- whose
2    automobile was it?
3 A  It was the one that was operated by Mr. Davis the night
4    of the incident, his arrest.
5 Q  All right. From the time that Mr. Davis exited the
6    vehicle until the time that you searched the vehicle,
7    what happened to that vehicle?
8 A  It was moved to indoor secure storage for the Anchorage
9    Police Department.
10 Q  Who moved the vehicle, do you have any.....
11 A  I don't recall.
12 Q  Okay. Did you participate in a search of that vehicle?
13 A  Yes, I did.
14 Q  Okay. What was the purpose of your search?
15 A  Well, we were looking for drugs and money and other
16    things that are associated with drug transactions.
17 Q  Did you find any drugs?
18 A  No.
19 Q  Did you find any money?
20 A  No.
21 Q  Other than the telephone and the battery that was
22    earlier -- you've earlier identified, did you find
23    anything else that -- in the car?
24 A  No.
25 Q  Okay. And how thorough was your search?

**Page 463**

1 A  Well, we go through the vehicle quite extensively. I
2    mean, often -- when I do it, I actually look under the
3    engine hood and other places, so.....
4 Q  Did you do it that time?
5 A  Yes. It's just one of those practices I like to do.
6 Q  Were you given any instructions on a specific mission
7    of what particular to look for? In other words, were
8    you instructed, find the buy money?
9 A  No. I mean, there's a -- you know, I would have looked
10    for the buy money regardless of whether instructed to
11    do so or not. There's an attachment or a list of
12    things that we normally look for when we're look --
13    doing searches that concern drug transactions.
14 Q  Did you review the -- you had a search warrant when you
15    did this, right?
16 A  Yes.
17 Q  Did you review the search warrant?
18 A  Yes.
19 Q  Okay. And did you review the affidavit attached to the
20    search warrant? There was.....
21 A  I don't believe I reviewed the affidavit attached to
22    the search warrant.
23 Q  Who participated in the search with you?
24 A  I don't remember the other officer -- who the other
25    officer was, to tell you the truth. We always do it in

1   pairs of twos at a minimum. And I know that I went
2   over, because I had processed the cell phone.
3 Q  Okay. Going back to your police report there in front
4   of you, where it says other officers?
5 A  Yes.
6 Q  Okay. You've identified Stevens, LaPorte and LeBlanc,
7   I believe in your testimony. Take a look there and see
8   if that refreshes your memory regarding Bushue, Haas,
9   and anybody else.
10 A  Well, my memory in reference to what, sir?
11 Q  When it went down. Is this when it went -- this.....
12 A  This is -- this is the night that Mr. Davis was
13   arrested.
14 Q  Okay. Am I correct in looking at your police report
15   and understanding that those were the officers that
16   were present?
17 A  They -- they took just in either the surveillance or
18   the arrest or of the particular -- that particular buy.
19 Q  Okay. The names that you testified to today were the
20   people you specifically recall being physically present
21   when Mr. Davis was arrested?
22 A  No.
23 Q  No?
24 A  They were present at the briefing by Officer LaPorte
25   prior to the transaction.

Page 464

1 A  Not that I recall.
2 Q  Okay. That's the lady.....
3 A  Yeah.....
4 Q  .....female officer?
5 A  She's a female lieutenant now, but yes.
6 Q  Okay. And that's the totality of your involvement in
7   this case?
8 A  Yes, sir.
9 Q  Did you have any contact with Jeremy Fish, other than
10   searching his car? You've testified you searched his
11   car.
12 A  No. Not -- I don't really know.....
13 Q  So you don't know him from Adam, other than he
14   made.....
15 A  Well, I mean, I saw him around the station but, no, we
16   didn't have any conversations or anything of that
17   nature.
18 Q  Okay. Who took the -- the truck from the scene to the
19   impound?
20 A  I believe Sergeant Stevens drove it from the scene to
21   the impound lot.
22   MR. JAMES: Thank you. That's all I've got, Officer.
23   THE COURT: Redirect, Ms. Brady?
24   MS. BRADY: I don't have any redirect, Your Honor.
25   THE COURT: All right. Thanks, Officer. You can step

Page 466

1 Q  I think we're talking two different things.
2 A  Okay.
3 Q  All right. Let's start again. Okay. I'm interested
4   -- you identified during your testimony people that
5   were physically present at the arrest, and that was
6   LeBlanc, yourself, you remember Stevens, right?
7 A  Yes.
8 Q  And I think those are the three you mentioned?
9 A  That's correct.
10 Q  Okay. My question is, the others that you have listed,
11   looking at that report, does that refresh your memory
12   as to whether or not they were present at the scene of
13   the arrest, not doing surveillance.....
14 A  No. I can -- I can tell you they all weren't present
15   at the scene of the arrest because when we do a drug
16   transaction, when the confidential informant drives
17   away from the scene, a officer has to follow him back
18   to the station and stay in contact with him so that he
19   doesn't get out of our sight. That normally is the
20   case officer. And then other officers may be assigned
21   other duties, such as to go back to the station and to
22   receive the evidence and -- and begin to process it.
23   So not all of them probably would have gone to the
24   scene of the actual arrest.
25 Q  Was anybody with Sergeant Stevens?

Page 465

1   down.
2 A  Thank you.
3   THE COURT: Why don't we take 10 minutes before we call
4   our next witness?
5   (Off record)
6   THE COURT: Back on record. Our jury is not back.
7   Ms. Brady, you had something you needed to take up?
8   MS. BRADY: I do, Your Honor. I have a 404(b)
9   application that I would like to make. The prior bad act
10   that I would like to bring in is another bad act, actually.
11   And it's the fact that the defendant was without his third-
12   party custodian while this case was going on.
13   The relevance of that is that Mr. Fish called Officer
14   LaPorte and said Rico has been to my work. He's going to
15   kill me. I'm afraid of him. You've got to do something
16   about this. And as a direct result of Fish calling LaPorte
17   and saying that, LaPorte went and started looking at him and
18   found him without his third party. And then he got in
19   trouble for being without his third-party custodian as a
20   direct result of that. So the relevance of it is that
21   Mr. James has indicated -- has sort of implied by his
22   questions that Mr. Fish didn't report it, number one. And
23   isn't telling the truth about it. And that if he did, it
24   was recently fabricated. And this is being offered to rebut
25   those questions.

Page 467

Multi-Page™

State v. Robert Davis
November 19, 2001

3AN-01-1717 CR

1   THE COURT: Mr. James?
2   MR. JAMES: Yes, Your Honor, I believe that the record
3   should show that the -- and I'm looking for it right now.
4   Mr. Fish testified that he worked for Subway in the summer.
5   And he hadn't worked for a couple of months beforehand. I'm
6   looking to see when the charge on -- the alleged charge on
7   the bail -- okay, thanks. Yeah. This is in April. April 3
8   was when Officer LaPorte's -- this report was generated.
9   And it has to do with Mrs. -- he followed my client to a
10  bank, and he had his sister with her [sic], and that was the
11  basis, rather than his mother. First of all, it's highly
12  prejudicial.
13      Secondly, I -- it's not in time and frame. We've all
14  ready got -- Fish testified it was in the summer. This is
15  the first of April. This is springtime. This isn't even
16  close to summer. Consequently, it's -- I question the
17  relevance, question the prejudicial and it's really just
18  offered to buttress Fish, which you've already heard from.
19  So I think it's totally out of -- out of line. And so I
20  would strongly object.
21      THE COURT: Ms. Brady?
22      MR. JAMES: Your Honor, Mr. James, it's simply offered
23  to show that A, Mr. Fish did report it and B...
24      THE COURT: Why don't you have the officer testify that
25  Mr. Fish reported it? Why do you have to put in the charge?

Page 468

1   MR. JAMES: Without getting in -- opening the door for
2   other things.
3       THE COURT: Well, you're right, Mr. Davis [sic]. It
4   his hearsay and we have and do you have an exception to the
5   hearsay rule for that?
6       MS. BRADY: Yes, Your Honor. It's not offered to prove
7   the truth of the matter asserted that....
8       THE COURT: Yes, it is. It's offered to corroborate
9   Mr. Fish's testimony.
10      MS. BRADY: Okay. Wait a minute. Can we go back to
11  exactly what the context was and what was being asked? I've
12  lost that and I apologize, Your Honor. What -- okay. Now
13  let's try this one more time. I've lost my train of
14  thought. If I asked Officer LaPorte if Mr. Fish called him,
15  it's offered to.....
16      THE COURT: Prove that Mr. Fish called him.
17      MS. BRADY: It's offered to -- it's not offered to
18  prove that Mr. Fish called him. It's offered to show that
19  -- yeah, it is. It's offered to show when he did though.
20  And it's not offered to show, in fact, that he -- it's --
21  it's offered to show that when this chain of events
22  happened. So it's not actually offered to show that he
23  called him, because Jeremy Fish has already testified to
24  that. It's offered to show that it was reported to Officer
25  LaPorte immediately and he talked to Jeremy Fish about the

Page 470

1   MS. BRADY: It substantiates what Mr. Fish said that he
2   was -- he was hanging around by himself. I don't have to go
3   to the charge. I just want to.....
4       THE COURT: Well.....
5       MS. BRADY: Oh, actually, I.....
6       THE COURT: .....you offered to put in the charge.
7       MS. BRADY: Right. Oh, I don't need to put in the
8   charge. I just wanted to -- I guess I was being in
9   abundance of caution. He was supposed to be with a third
10  party. He wasn't with his third party.....
11      THE COURT: Officer LaPorte -- well, you can't go into
12  his third-party.
13      MS. BRADY: Okay.
14      THE COURT: If Officer LaPorte, Officer LaPorte should
15  be, I mean, I'll -- unless there's an objection, there
16  doesn't seem to me that there should be any objection to
17  Officer LaPorte testifying that Mr. Fish called him and told
18  him that Mr. Davis was at his work.
19      MR. JAMES: That's hearsay. I'm going to object on
20  hearsay.
21      THE COURT: Okay. Well, that objection is overruled.
22      MR. JAMES: Then I'm entitled to -- just so we get --
23  while we're here. And I'm entitled to establish the day
24  then?
25      THE COURT: You can -- you can do that.

Page 469

1   immediacy of the report, whether or not it was made. He did
2   all of that on cross and he's opened the door to this.
3       THE COURT: All right. It's -- the phone call is
4   admissible to show when the phone call was made. And
5   Officer LaPorte's testimony is limited to the fact that he
6   heard from Jeremy Fish about Rico being at his work. And,
7   of course, then he's opened to cross examination about the
8   timing of that. But he can't go into the fact that
9   Mr. Davis was charged -- had a third party, was charged --
10  that there were suspicions about violation of his third-
11  party obligation or that he was charged with violating his
12  third party.
13      MS. BRADY: Okay.
14      THE COURT: Anything else?
15      MR. JAMES: No, I understand, Your Honor.
16      THE COURT: Anything else? Can we get the jury?
17      MS. BRADY: Yes, Your Honor.
18      THE COURT: And is Officer LaPorte your next witness?
19      MS. BRADY: He is, Your Honor.
20      THE COURT: Why don't we get him in the witness stand
21  while we're getting the jury?
22      (Jury summoned)
23      THE CLERK: We're on record.
24      THE COURT: All right. Thank you. All right. (Pause)
25  All right. Everybody have a seat, please.

Page 471

Exhibit K – 124

Page 468 - Page 471

1    THE CLERK: Please raise your right hand.
2    (Oath administered)
3    MR. LAPORTE: I do.
4          MARK LAPORTE
5  called as a witness on behalf of the plaintiff, testified as
6  follows on:
7          DIRECT EXAMINATION
8    THE CLERK: Please be seated. For the record, sir,
9  will you state your full name, and spell your last?
10 A  Mark William LaPorte, L-a-P-o-r-t-e.
11   THE CLERK: Thank you.
12   THE COURT: Go ahead, Ms. Brady.
13 BY MS. BRADY:
14 Q  How long have you been an APD officer, Officer LaPorte?
15 A  For five and a half years now.
16 Q  And what did you do before becoming an APD officer?
17 A  I was a police officer for about two and a half years
18   in Texas.
19 Q  Okay. And have you ever had any training or experience
20   in detection, identification and investigation of cases
21   involving controlled substances?
22 A  I have. I've had numerous schools to include Drug
23   Enforcement Administration's basic narcotics
24   investigator school.
25 Q  About how many investigations -- or -- that you've

Page 472

1    conducted, or cases you've worked on that involve
2    cocaine?
3 A  Working informants in larger scale cases such as this,
4    probably a dozen.
5 Q  Are you assigned to a particular unit?
6 A  I am.
7 Q  And what is that unit?
8 A  It's a special assignment unit.
9 Q  Is that the same unit you were assigned to during the
10   investigation of this case?
11 A  Yes, it was.
12 Q  Okay. And are you familiar with Jeremy Fish?
13 A  I am.
14 Q  How did you become assigned to work with Mr. Fish?
15 A  I received a call from Officer Bushue and Detective
16   Pernue. They had conducted a debriefing with Mr. Fish
17   at the request of district attorney Phil Moberly.
18   Detective Pernue could not use Mr. Fish as an informant
19   because she had other cases.....
20   MR. JAMES: I'm objecting. He's -- it's hearsay, and
21 he's talking about.....
22   THE COURT: Yeah. Yeah. Just -- the objection is
23 sustained.
24 Q  Let's just go on to Mr. Fish's deal. Did Mr. Fish have
25   a deal to work as an informant?

Page 473

1 A  He did. He was to work as an informant, and there were
2    two targets that he had identified. And part of that
3    deal, he had a burglary charge out of Nome that was
4    going to be mitigated or dismissed.
5 Q  Okay. And how many people was he supposed to be
6    targeting in order to get that deal?
7 A  There were two subjects that he had identified he could
8    purchase cocaine from.
9 Q  And did he make the buys that he agreed to make?
10 A  Yes, he did.
11 Q  Okay. And what happened to the other case?
12   MR. JAMES: Objection. Relevance.
13   THE COURT: The -- can I have a bench conference,
14 please?
15   (Bench conference as follows:)
16   THE COURT: What's the answer to the question?
17   MS. BRADY: Where I'm trying to go is that the other
18 case is over, and it was going on at the same time as this
19 case. That's all I'm.....
20   THE COURT: Well, no. the question you asked is what
21 happened. Were you asking.....
22   MS. BRADY: That it's over.....
23   THE COURT: ......to say.....
24   MS. BRADY: That it's over.
25   THE COURT: You can say it's over. You can.....

Page 474

1    MR. JAMES: I still -- I don't -- I'm going to strongly
2 object. I'm saying it right on the record right now, if
3 she's trying to work in by the backdoor the credibility of
4 Jeremy Fish, by saying, yeah, that one was pled out or.....
5    THE COURT: That's why I called a bench conference.....
6    MS. BRADY: Can I ask a leading -- can I ask a leading
7 question that says is that case over now?
8    THE COURT: Yes, you may.
9    MS. BRADY: And then we'll go.....
10   THE COURT: And that will avoid that.
11   MS. BRADY: Right.
12   THE COURT: And the reason I overruled your earlier
13 objection is because you asked -- actually, both lawyers
14 inquired into Mr. Fish working the other case during
15 questioning earlier. And you made a relevance objection
16 about that. But it was already on the table. But you can't
17 bolster his credibility by saying that we got a conviction
18 in that case, which is where I thought you were going.
19   MS. BRADY: Okay.
20   THE COURT: So you can avoid it by asking the leading
21 question, is that other case over.
22   MR. JAMES: I think too, Judge, the witness had got to
23 instruct -- be instructed the answer is yes or no, not
24 anything -- explanation about what happened, because that
25 pulls it right in the door and I don't want that to happen.

Page 475

1  THE COURT: Well, you can do it one way or the other.
2  You can just make it as leading as possible. And tell him I
3  don't want.....
4      MR. JAMES: Just ask him for a yes or no answer.
5      THE COURT: Well.....
6      MR. JAMES: You could say.....
7      THE COURT: Wait a second. I get.....
8      MR. JAMES: I'm sorry.
9      THE COURT: I get to do that.
10     MR. JAMES: I'm sorry. I'm sorry.
11     THE COURT: That's all right. If you're confident that
12 he won't say anything inappropriate, you can ask a leading
13 question and make it as leading as possible. If you think
14 you need to do something else then.....
15     MS. BRADY: If he starts going into anything other than
16 yes or no, I'll just stop him.....
17     THE COURT: That's fine.
18     MS. BRADY: .....and redirect his attention.
19     THE COURT: That's fine.
20     MR. JAMES: I'm trying to decide if you want it on
21 here, because we're not going to -- this case is not going
22 to go on that.
23     (End of bench conference)
24     THE COURT: Rephrase your question, Ms. Brady.
25          DIRECT EXAMINATION CONTINUED

Page 476

1 BY MS. BRADY:
2 Q  Is that other case over?
3 A  Yes, it is.
4 Q  Okay. And to the best of your knowledge, has
5     Mr. Fish's burglary case from Nome now been dismissed?
6 A  Yes, it has.
7 Q  Okay. And does Mr. Fish have any other deals with
8     regard to any other cases or any other charges that
9     could come against him, or anything along those lines?
10 A  No, he does not.
11 Q  Okay. And were you the case officer assigned to this
12     case?
13 A  Yes. I was the case officer, and I was instructing or
14     mentoring Officer Grant Johnstone in how to work an
15     informant controlled case.
16 Q  Was there a reason that you were assisting Officer
17     Johnstone?
18 A  Yes. He did not have the experience I did. And I had
19     worked numerous cases in other types of drugs just
20     besides cocaine. And so I was basically the lead in
21     making sure he understood how the investigation carried
22     forth, everything he needed to do. Excuse me.
23 Q  Is Mr. Fish considered an easy informant to work with
24     or a hard informant to work with?
25 A  He was considered a difficult informant to work with.

Page 477

1  And that's another reason why I was assigned.
2 Q  All right. And let me just approach you with something
3     that's been previously admitted into evidence, state's
4     19. Can you just explain what this is?
5 A  Yes. When I began working drug cases, these go on for
6     some time, you make multiple buys. And to make sure
7     the information is clear and concise for me personally,
8     in my case file, I developed this. It's called a buy
9     check off list. And basically, it's -- it's got the
10     dates of each buy, and I put the person's name and what
11     their task was specifically on the controls that we
12     have on every buy. Because sometimes when officer
13     writes their paperwork or something, we do this so
14     often and so regular, they may forget to list that they
15     did a strip-search or list that. And -- and this helps
16     me as a case officer to know who did what job,
17     especially months later because it goes to court so
18     many months later. And this is just something, it's
19     not APD standard. It's my standard to try and make my
20     cases more efficient and for me to keep track of them.
21 Q  Okay. Now you talked about controlled buys, can you
22     just explain to the members of the jury what a
23     controlled buy is?
24 A  Yes. We -- we have controls, because when you're using
25     informants, understandably, the problems that you can

Page 478

1  have with informants, we -- there are several controls
2  that you have to have on each buy. Specifically, all
3  the money that is used to purchase the drugs is all
4  pre-recorded. It's all xeroxed, and that's kept.
5  Also, the informant is not allowed to take his or her
6  own money for the buys. It's only the police
7  department's money. The informant is strip-searched.
8  What I mean by a strip-search is the informant is
9  completely unclothed. All the clothing is gone
10  through, sock, pockets, everything the informant has
11  and is wearing on the buy, and he is searched. He has
12  to open his mouth. He has to pull his scrotum up,
13  check the front and back to make sure he has no other
14  money, no other controlled substances, no contraband.
15      If the informant drives their own vehicle, that
16  vehicle is also searched thoroughly. And for both the
17  person search and the vehicle search, I use, as often
18  as I can, the same person, because that person knows
19  how things are placed in the car, what's in the car,
20  and does the exact same search before and after. And I
21  just think that's a good thing to use. Also, the
22  conversations, we conduct debriefs after each search.
23  And let me back up. There must be a search before and
24  after each buy. And it's done in very close proximity.
25  The search of the vehicle, the search of the person is

Page 479