1 think you all need to consult and see if that's likely to
2 happen.
3   MR. JAMES: Okay. In conjunction with that, is -- do
4 you plan on calling Officer Garcia, Greg Garcia?
5   MS. BRADY: No.
6   MR. JAMES: Okay. I -- we earlier talked about -- I
7 advised the court that he was -- had just had surgery. And
8 the issue was whether or not he wold be able to -- excuse me
9 -- testify telephonically. And we were kind of up in the
10 air as far as the state's position went in relationship to
11 that. I need to get a readout.
12   THE COURT: Ms. Brady?
13   MS. BRADY: I indicated that I may not oppose if I know
14 the substance of the testimony, as I can not oppose
15 something in a vacuum. So if you want to tell me what the
16 substance of the testimony is.....
17   MR. JAMES: Yeah. Basically, it's my -- in talking
18 with Officer Garcia, he was the booking officer. And that's
19 based upon the fact of his signing the stuff.
20   THE COURT: Uh-huh. (Affirmative)
21   MR. JAMES: The police reports from Officer LeBlanc
22 says that -- and we haven't heard from Officer LeBlanc yet,
23 but says that he asked the CIPT, I think is the terms he
24 used, I can grab the right terminology to search for the
25 money. And they did and no money was found. In conjunction

Page 564

1 visit a person that's incarcerated in there, it's logged in.
2 And in talking with Officer Healy, it's my understanding
3 that Officer Davenport is really the computer man who has
4 all this stuff in the machine. And if you hit the right
5 buttons, and out it comes. But if we're going to be -- if
6 all of the records are going to be brought in by Davenport,
7 then that's going to alleviate Healy. If they're not going
8 to be brought in by Davenport, then I'm going to bring -- I
9 would want to have a subpoena issued for Healy. Am I making
10 myself kind of clear?
11   THE COURT: You are.
12   MR. JAMES: I'm babbling, but.....
13   THE COURT: Right. But what about Garcia?
14   MR. JAMES: Oh. Well, I mean -- oh, that's what my
15 purpose in calling Garcia is, is that did he conduct the
16 search according to their procedures at the request of APD,
17 and did he find.....
18   THE COURT: A search of?
19   MR. JAMES: Of Mr......
20   THE COURT: After he was booked?
21   MR. JAMES: In the booking process. He's the booking
22 officer.
23   THE COURT: All right.
24   MR. JAMES: So the way I understand the sequence of
25 events is arresting officer bring someone in there. There's

Page 566

1 with that, the -- I just want to establish that, in fact,
2 CIP did -- CIP did, in fact, search for the money and no
3 money was found. Because, obviously, the issue here, as
4 testified by Officer LaPorte, they found the money in the
5 common fund of some $8,000 is -- according to what my
6 recollection of it is. Consequently, if it was not found on
7 his person, not found, and this is not a secret, so, wasn't
8 found on his person, wasn't found during the search at CIPT
9 and then was found later on in a common fund, as to how -- I
10 just want to get this clarified that he did, in fact do
11 that. I intend to call -- and I don't know, do you intend
12 to call someone from the office -- excuse me, from records
13 from CIPT?
14   MS. BRADY: Uh-huh. (Affirmative)
15   MR. JAMES: Okay. Who are you going to call?
16   MS. BRADY: Davenport.
17   MR. JAMES: Okay. Is he going to bring all the
18 records? Because I've got a subpoena ready for Healy, which
19 I believe works for -- I think her name is Esther Healy, who
20 is a -- who works for CIPT in the records department to
21 bring all the records. But if he's going to bring all the
22 records, including the medical records, and any money, or
23 trans -- visitors or transactions relating to the file --
24 the way I understand CIPT, Judge, is if you bring money into
25 a person that's incarcerated there, it's logged in. If you

Page 565

1 a booking process where they put somebody in a holding cell
2 while they're processing the paperwork. They then do a
3 booking search and the inventory, at which one of the things
4 that he did was list his personal items. And then this is
5 where the $180 comes in the computer printout. If the
6 search was done by Officer Garcia at that time, utilizing
7 normal procedures and nothing was found, and he reported
8 that according to Officer LeBlanc of APD, then I think we've
9 established that Mr. Davis did not have any money in -- on
10 his person that related to this particular buy money.
11   THE COURT: But -- but Garcia was the -- the actual
12 booking officer at Cook Inlet who booked in Mr. Davis?
13   MR. JAMES: That's according to what he -- I -- I faxed
14 him over.....
15   THE COURT: All right.
16   MR. JAMES: .....the sheet, and that's what he told me,
17 yes.
18   THE COURT: All right. Ms. Brady?
19   MS. BRADY: Can I indicate to the court in the morning? I
20 want to do some checking myself this afternoon, and then
21 I'll tell the court first thing in the morning tomorrow if
22 I'm going to object. But it sounds at this point like I'm
23 not going to, but before I agree, I just want to check
24 something.
25   THE COURT: All right. And Garcia is ill and can't

Page 567

1 come to court?

2   MR. JAMES: My office talked to him today, Judge. And
3 he's -- he's still -- according -- and I have not talked to
4 him today. But according to Keri McClure (ph) of my office,
5 he's still down and cannot come.

6   THE COURT: While you're deciding whether you object,
7 you need -- I mean, it seems to me that there's a
8 significant difference between choosing not to pay to bring
9 somebody and not being able to bring somebody because of
0 illness. And the only other answer would be to wait until
1 the guy is capable to come to court, which might cause -- at
2 least be grounds for requesting a continuance.

3   MS. BRADY: I agree, and that's -- I was just going to
4 call him and find out what he thought about coming and that
5 kind of thing so that I can decide whether or not.....

6   THE COURT: All right.

7   MS. BRADY: .....I should continue objecting. If he's
8 sick, I'm not going to make him come to court. I'll not
9 oppose that.

0   THE COURT: All right.

1   MR. JAMES: Well, I need to get a subpoena to him.
2 That's my situation, is if he's -- he's willing to testify,
3 but he would like to testify telephonically. If.....

4   THE COURT: Why don't you get a subpoena to him and --
5 but also tell them that we're -- you're trying to convince

Page 568

1 me to allow him to testify telephonically.

2   MR. JAMES: All right.

3   THE COURT: And then you'll be covered.

4   MR. JAMES: I understand. And we've got a little bit
5 of time-wise here. I think he lives in Eagle River, a 694
6 number. So I just feel kind of.....

7   THE COURT: Well, I'm going to give Ms. Brady the
8 opportunity to check and the representation that he's not
9 physically capable of coming to court. And we'll take that
0 up first thing in the morning.

1   MR. JAMES: All right. That -- I mean, I understand
2 what you're saying, I just -- I don't want to get in the
3 position of saying, hay, I've got to have some more time to
4 get him here. I mean, I understand the court would like to
5 keep this thing rolling, and I'm trying to get my ducks
6 lined up now so that if we're going to roll -- you know, to
7 roll, rather than end up in a situation of saying, well,
8 we're going to take an hour, I picked it out of the sky.....

9   THE COURT: No, I understand that. And I -- I hear Ms.
0 Brady saying that if she really believes that he's ill,
1 she's not going to object to telephonic testimony. If he's
2 capable of coming in, she's going to ask you to bring him
3 in. And I think that's a wise -- in terms of not objecting
4 if he's really ill, that's probably a good idea. And that
5 -- so.....

Page 569

1   MR. JAMES: All right. Well, okay. Well, I guess
2 we're kind of up in the air at this particular juncture.
3 Now, I don't know. Do I need to subpoena -- I guess that's
4 my call on Healy, right? Healy is the records -- one of the
5 records ladies. So if that's.....

6   THE COURT: I'm going to stay out of that one.

7   MR. JAMES: All right. Well, I can talk to.....

8   THE COURT: All right.

9   MR. JAMES: .....Ms. Brady on that.

10   THE COURT: All right.

11   MR. JAMES: A couple of other housekeeping. Now I
12 never moved to admit any of the diagrams that Jeremy Fish
13 drew.

14   MS. BRADY: I have no objection to their admission.

15   MR. JAMES: Okay. Well, that's fine. I'm just doing
16 some housekeeping.

17   THE COURT: Are you moving them in now?

18   MR. JAMES: Yeah, I move to move -- I would move to
19 have them admitted now and I think.....

20   THE COURT: All right. Let's just -- let's just do it.
21 And those are E, F, G and H. And those are admitted.

22       (Defendant's exhibits E, F, G and H admitted)

23   MR. JAMES: All right.

24   THE COURT: And do we have another issue, or did we
25 resolve that our self?

Page 570

1   THE CLERK: We resolved it.

2   THE COURT: All right.

3   MR. JAMES: Do we have any other -- while you're still
4 there, do any other ones that are admitted, Madam clerk,
5 that we have.....

6   THE CLERK: I show defendant exhibit D as a report.
7 But I don't have it.

8   UNIDENTIFIED VOICE: I think that was changed to an EH
9 number.

10   THE CLERK: Okay. All right. Yeah. You're probably
11 right. Then so the only one I have is defendant's exhibit
12 C, which is a letter to the DA and the diagrams.

13   THE COURT: The only other defense exhibits admitted?

14   THE CLERK: Right.

15   THE COURT: All right.

16   THE CLERK: C, E, F, G and H.

17   MR. JAMES: Do you have any objection to the letter
18 that we talked about?

19   MS. BRADY: I think it's all ready been admitted.

20   MR. JAMES: I thought.....

21   THE COURT: C was admitted.

22   MR. JAMES: C was admitted? Okay. I'm sorry. I just.

23   THE COURT: All right. So if we're going -- if it's
24 likely, and I'm not -- if you're going to finish with the
25 evidence by 11:30 or 12:00, then I'm likely to require you

Page 571

1 to -- we're going to take it to the jury tomorrow. We can
2 still get it to the jury by about 2:00 o'clock or 2:30. If
3 you're not, and if we shut down at 12:30 or so, then we'll
4 just shut down and start Wednesday morning with closings.
5 And all of this may be overly optimistic, but I'm --
6 I'm.....
7    MS. BRADY: I think it is.
8    THE COURT: .....just warning you.
9    MR. JAMES: Okay. Before we go off record, you talked
10 with Mr. Iverson, and in fairness to him, because he's got
11 that 1:30 tomorrow, now that's not a long period -- he
12 doesn't -- he's scheduled for 1:30, but it could be 2:00
13 o'clock.....
14    THE COURT: It's Wednesday.
15    MR. JAMES: I'm sorry.
16    THE COURT: It's a children's -- it's a children's
17 case. They stack them up at 1:30 and he may need to go wait
18 around. And I'm not excited about having him on the jury on
19 Wednesday having to take a break to go to his children --
20 his son's juvenile case. So if he - and I'll hear what you
21 all have to say when he comes back in the morning. But if
22 he tells us that it's still on the calendar. I'm going to
23 ask you all whether it isn't a good idea to let him off the
24 jury and let him go tomorrow morning rather than making him
25 stick around. I guess there are two arguments on that. One

Page 572

1    MR. JAMES: .....so that we're not dealing with
2 these.....
3    THE COURT: The last thing I we need to say on that is
4 that we all promised him that he wouldn't have to miss his
5 son's court hearing, if -- even though he was selected on
6 the jury, so -- all right. I'll see you in the morning.
7    MR. JAMES: Yeah. I'm going to ask Madam clerk just to
8 -- if she could issue it, or do I go downstairs and get the
9 subpoena?
10    THE CLERK: I don't issue subpoenas.
11    MR. JAMES: You don't -- okay. I'll go downstairs and
12 take care of it. Because I don't know -- we'll talk and see
13 what she's going to do with it.
14    THE COURT: All right.
15    MR. JAMES: All right. 8:30 in the morning?
16    THE COURT: Yeah.
17    MR. JAMES: All right.
18    (Off record)
19 3:19:38
20
21
22
23
24
25

Page 574

1 is that if we have three people come down with pneumonia
2 during the day and couldn't come back on Wednesday morning,
3 then Mr. -- then we would desperately need Mr. Iverson. On
4 the other hand, we're getting awful close and so I'll let --
5 but I think if -- if I knew that we had enough people, I
6 would excuse him if he had a court appearance at 1:30. We
7 told him that when we picked the jury.
8    MR. JAMES: I was just wondering whether the court
9 would possibly -- in -- just take a recess, let him go to
10 his court appearance and then have him come back?
11    THE COURT: He would likely be deliberating at that
12 time, and I.....
13    MR. JAMES: Okay.
14    THE COURT: I don't think that's a very good idea.
15    MR. JAMES: All right. Just -- I would like the court
16 to consider it, but the court has.....
17    THE COURT: Well, I'm not telling you.....
18    MR. JAMES: .....you considered it.
19    THE COURT: .....how I'm going to rule.
20    MR. JAMES: Right.
21    THE COURT: I just think that these are all kind of
22 things that we need to think about.
23    MR. JAMES: Well, I'm just trying to get them out in
24 the air right now.....
25    THE COURT: Yeah.

Page 573

Exhibit K – 150

TRIAL BY JURY, CONTINUED (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 20, 2001
8:25 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
                      Assistant District Attorney
                      310 K Street
                      Anchorage, Alaska

FOR THE DEFENDANT:    DENNIS PATRICK JAMES
                      Attorney at Law
                      1500 West 33rd Avenue
                      Anchorage, Alaska

Page 575

---

## P R O C E E D I N G S

421-664

8:2500

THE COURT: We're on record in State v. Davis. Jury is not here.

MR. JAMES: The reason I ask to go off without the jury, Judge, is Garcia -- the issue of Garcia. Ms.....

MS. BRADY: Oh, it is not an issue any more. I talked to Mr. Garcia last night. He will be here at 9:15, and I plan on calling him as a witness.

THE COURT: Oh. Okay. Well, then, do you want me to have -- start having my witnesses ready later this morning?

THE COURT: I hope -- yeah. I.....

MR. JAMES: Okay. I just.....

THE COURT: I -- yes, if the state finishes.....

MR. JAMES: Okay. I just.....

THE COURT: .....we are going to roll into yours, and I don't know whether the state is going to -- whether we are going to finish or not, but you should have somebody ready.

MR. JAMES: I just wanted to -- you know, it's better to know it now.....

THE COURT: Yeah.

MR. JAMES: .....than a little later. Okay. I'm just going to lis -- step out and I'll be right back.

THE COURT: All right. I'm going to bring the.....

Page 576

---

MR. JAMES: You can bring in the jury if you want to. I'm just telling people to roll them in.

THE COURT: All right.

THE CLERK: Shall I bring in the jury?

THE COURT: Why don't you give the jury a bathroom warning, and then bring them in, and we should all be ready by then.

MS. BRADY: Oh. There is one other really quick thing. You asked me to prepare the instructions. I.....

THE COURT: Yeah. We'll deal with that later.

MS. BRADY: Okay.

THE COURT: You can get in the witn -- back in the hot seat if you want.

MS. BRADY: In like two minutes.

THE COURT: Just -- actually just tell them to get ready, and let's roll. So.....

UNIDENTIFIED VOICE: (Indiscernible).

MS. BRADY: I know. I just realized I'm in the control seat.

THE COURT: How are you doing this morning?

MR. LAPORTE: Oh, pretty good. Yourself?

THE COURT: Fine, thank you.

MR. LAPORTE: Excuse me.

(Pause)

MS. BRADY: Hey, Sue, it's Keri. I forgot to tell you

Page 577

---

that you need to call Jack Hurd. And he's supposed to be in a half an hour call, so when LeBlanc gets here, and we get to cross with LeBlanc, I'll have LaPorte step out and call you, and you can call Hurd. Okay. Bye.

THE COURT: Are they ready?

THE CLERK: Just about.

THE COURT: Okay.

MS. BRADY: And -- are we on record?

THE COURT: No.

(Off record)

THE COURT: We're back on record in state versus Davis. Good morning everybody.

MR. JAMES: Good morning.

MS. BRADY: Good morning.

THE COURT: When we -- we have our jury here, and parties and counsel. And when we broke yesterday, we have Officer Laporte in the witness stand. Yes, ma'am?

UNIDENTIFIED JUROR: There are no spare pencils I am noticing.

THE COURT: Okay. Well, we need to get you some pencils, then.

UNIDENTIFIED JUROR: Thank you.

THE COURT: And we happen to have some. So.....

(Whispered conversation)

THE COURT: All right. And we have Officer Laporte.

Page 578

1 You are still under oath.
2    MR. LAPORTE: Yes, sir.
3    THE COURT: And Mr. James, you can continue your cross
4 examination.
5    MR. JAMES: Thank you, Your Honor. If I may approach?
6        MARK LAPORTE
7 previously sworn, called as a witness on behalf of the
8 plaintiff, testified as follows on:
9        CROSS EXAMINATION CONTINUED
10 BY MR. JAMES:
11 Q    Officer, when we left last -- yesterday, I was going to
12    say last night. It wasn't last night. You had, I
13    believe, behind you there, you had -- flip up to where
14    you drew a diagram. Do you recall that?
15 A    I didn't draw a diagram.
16 Q    You didn't draw a diagram? Flip up to kind of the last
17    -- last one if you would, please?
18 A    This one?
19 Q    Yeah. Well, just flip up to the next page since you
20    didn't draw that one. Let's just go to one that's --
21    if you could very briefly give me a quick diagram of
22    Grand Larry as you recall it? And the two side street
23    -- are they -- yeah, they are two streets,
24    intersecting streets.
25 A    Okay.

Page 579

1 Q    Okay. Okay, we got 202. Am I correct to say that that
2    is a duplex?
3 A    Yes.
4 Q    Okay. Which side is 202?
5 A    I couldn't tell you.
6 Q    Okay.
7 A    I never -- as I testified before, once the informant
8    would turn off onto Grand Larry, from either direction
9    I had someone that was close in -- is a close in high,
10    and I would not follow them further down the street, so
11    -- so many vehicles wouldn't be driving down the
12    street.
13 Q    All right. The incidents at Grand Larry took place at
14    night, correct?
15 A    Correct.
16 Q    Okay. And that was about -- a ballpark, it was about
17    10:30, that time frame?
18 A    A ballpark, yes, sir.
19 Q    Okay. What are the lighting conditions like on Grand
20    -- excuse me, Grand Larry and Duben and Peck? Well,
21    first of all, let me -- Duben and Grand Peck [sic], are
22    they the two horizontal streets in between Grand Larry
23    where we were talking about?
24 A    Yes.
25 Q    Okay. Do you -- what are the lighting street -- oh,

Page 580

1    excuse me, what are the lighting conditions like on
2    Grand Larry?
3 A    I couldn't tell you, sir. As I said, I -- I didn't
4    drive down into the buys.
5 Q    Okay.
6 A    I never went by and did surveillance after that.
7 Q    Okay.
8 A    I didn't deem it necessary.
9 Q    All right. Now, I'm going to call your attention to
10    page 16 of the document I gave you.
11 A    Okay.
12 Q    Do you recall the gr -- telling the grand jury, on July
13    the 2nd, that the informant didn't have a cell phone?
14 A    I'm sorry, what was the question again, sir?
15 Q    Do you recall telling the grand jury, on July 2nd, that
16    the -- excuse me, Jeremy Fish did not have a cell
17    phone?
18 A    That is correct.
19 Q    Okay. (Pause) Okay, turn to page 21, please. The
20    last paragraph where it starts off mark report
21 A    Okay.
22 Q    Not the last one, but do you understand what I'm
23    talking about there?
24 A    I do.
25 Q    Okay. Did you tell the grand jury at the Cook Inlet

Page 581

1    Pretrial where a search was conducted there?
2 A    I did.
3 Q    Okay. Turn to page 22, please.
4 A    Okay.
5 Q    Up on the second paragraph where it says Mark LaPorte?
6 A    Yes.
7 Q    Okay. Do you recall telling the grand jury words -- or
8    that -- well, we are going to hear from Office -- you
9    are talking about Officer LeBlanc here, aren't you?
10 A    Yes, sir.
11 Q    Okay. Do you remember telling the grand jury you were
12    in a hurry to get back with the drugs and get that
13    under control?
14 A    Yes.
15 Q    Okay. You had -- to your information, now, you had
16    Jeremy Fish under visual observation, and at some point
17    in time, you folks obtained from him the product,
18    right, at that -- we're talking -- I'm talking now
19    about the 28th/1st?
20 A    The last buy?
21 Q    The last buy, right.
22 A    Yes.
23 Q    Okay, so we are not confused, and I'm not trying to
24    confuse you. You were in a hurry to get back with the
25    drugs and get that under control. Did you tell the

Page 582

| | |
|---|---|
| 1    grand jury that on the 2nd? | 1 Q   I'm sorry. I'm not trying to cut you off, but when the |
| 2 A   Yes, I did. | 2    -- I'm talking -- when I'm talking scene, I'm talking |
| 3 Q   Okay. You -- APD already had that situation under | 3    about when the actual arrest took place? |
| 4    control, didn't they? | 4 A   I got there just after he was placed in handcuffs. |
| 5 A   Yes, we did. | 5 Q   All right. So anything else prior to that would have |
| 6 Q   Okay. So why would you tell the grand jury that if you | 6    been based upon what you were lead to believe by other |
| 7    already had it under control? | 7    in -- other information you received? |
| 8 A   I remember we were all tired that night. We had had -- | 8 A   That, and just my perception of the events after the |
| 9    we had served an earlier search warrant on an unrelated | 9    fact, and trying to find out where the missing 20 |
| 10    case, and had conducted another buy bust. And it was | 10    dollars went. |
| 11    running late, and I think everybody was just wanting to | 11 Q   Okay. When you were at the scene, just after Mr. Davis |
| 12    get back and get the paperwork taken care of so we | 12    was put in handcuffs, were you aware that the officers |
| 13    could go home. It may not have been the best | 13    that did the actual arrest could not find any buy money |
| 14    descriptive manner in the world, but I said it as is. | 14    on Mr. Davis? |
| 15    We were under complete control. | 15 A   No, I wasn't. I just remember telling Officer Le |
| 16 Q   Okay. Page 23, please? | 16    LeBlanc when he goes to jail to look for the buy money, |
| 17 A   All right. | 17    and that is all I can recall. |
| 18 Q   The last paragraph? | 18 Q   Okay. As part of police procedures, would you not deem |
| 19 A   Okay. | 19    it important to have got control of the buy money at |
| 20 Q   Could you just read that? | 20    the scene? |
| 21 A   Sure. | 21 A   That is something we like to do, but in this state more |
| 22 Q   Just to yourself, please. I'm sorry. | 22    thorough, intensive searches are conducted at the jail, |
| 23 A   Oh, okay. Okay. | 23    just because of other case law that has been set forth. |
| 24 Q   All right. Is that your -- was that your testimony to | 24    It is a cold night, so a much more thorough search |
| 25    the best of your recollection? | 25    would have been conducted at the jail, not out on the |
| Page 583 | Page 585 |

| | |
|---|---|
| 1 A   Fairly close. After you questioned me yesterday, I | 1    scene. |
| 2    went back to listen to the tape, and I found a few | 2 Q   Okay. So you were aware, based upon your instructions |
| 3    minor errors. But I listened to the whole paragraph | 3    to Officer LeBlanc, that the buy money had not been |
| 4    and reread it. And my view in looking at it is that I | 4    recovered at the scene? |
| 5    was speaking about the money. The informant said | 5 A   Yes, and to look for it at the jail. |
| 6    during the debrief that Mr. Davis had put the money in | 6 Q   Okay. Go to page 25? |
| 7    his lap before he got out of the car. So the reason I | 7 A   Okay. |
| 8    said the money could have been lost or blown away, if | 8 Q   Your attention -- the first paragraph where it says |
| 9    part of it was in his lap and he got out of the car, | 9    Mark LeBlanc -- there is one just before that but -- |
| 10    then it easily could have blown away on that cold | 10    where is -- a question came up and you were responding |
| 11    night. | 11    to it, correct? |
| 12 Q   Was it windy out that day? | 12 A   A question about a search warrant? |
| 13 A   It was windy, it was cold. I can't tell you -- I | 13 Q   Yeah, and you were..... |
| 14    wouldn't say super hard, but the wind was blowing. It | 14 A   Yes. |
| 15    was a -- it was a colder night. | 15 Q   You were responding to it? Okay. |
| 16 Q   Did you check the weather report recently to confirm | 16 A   Correct. |
| 17    that? | 17 Q   All right. You went on to say, did you not, that he |
| 18 A   No, I didn't. I just recall the snow on the ground, | 18    ran a business out of his mother's hou -- residence? |
| 19    and -- and me being cold when I'm outside of the car, | 19 A   Yes. |
| 20    and the other officers being cold. | 20 Q   Okay. Where did you get that information? |
| 21 Q   Okay. You weren't there at the scene, were you? | 21 A   From the informant and from tapes where -- where he was |
| 22 A   As I testified yesterday, I -- I was at the scene. I | 22    doing a mechanical business. He would always say he |
| 23    got..... | 23    was at work when we would call him. |
| 24 Q   I'm..... | 24 Q   Okay. Is that a supposition on your part, then? |
| 25 A   .....there..... | 25 A   It is. |
| Page 584 | Page 586 |

**Page 587**

1 Q  All right.

2 A  I never saw him actually have a business at his
3     mother's house. I never did surveillance on his
4     mother's residence.

5 Q  So that supposition is based upon -- at least part on
6     what Jeremy Fish told you?

7 A  Correct.

8 Q  Okay. And in July, when you were testifying before the
9     grand jury, were you aware that Jeremy Fish has a
10    problem telling the truth?

11 A  In July?

12 Q  Yes, when you testified before the grand jury?

13 A  I had received notice from detectives that there was a
14    locate for Mr. Fish about being involved in some other
15    activities.

16 Q  I guess -- the question that I have is, in July when
17    you testified before the grand jury, were you aware
18    that Jeremy Fish had a problem telling the truth?

19 A  No. I had not spoken with him about any of the other
20    activities he was suspected in, so I can't say one way
21    or the other.

22 Q  Okay. You were aware that he -- out of Nome, was
23    charged with burglary, right?

24 A  Yes, that was part of the deal agreement with the
25    district attorney for becoming an informant to purchase

**Page 588**

1     cocaine for the special assignment unit.

2 Q  All right. And did you see any type of written
3     agreement with Jeremy Fish rela -- relating to what he
4     was going to do, and what APD, or the DA's office was
5     going to do in return?

6 A  No. We don't set forth written agreements. It is a
7     gentleman effect. We keep our word, and we expect them
8     to keep their word as far as their agreements. When
9     they don't, the deal is off. The department and the
10    DA's office has an excellent reputation for that. That
11    is why defense attorney's call the metro drug unit, or
12    the special assignment unit when they think their
13    clients can be of assistance to us, because they know
14    Phil Moberly and other DAs at the metro -- or at the
15    drug unit always keep their word.

16 Q  That assumes also that Jeremy Fish would keep his word
17    and do what he said, and not lie to you folks, right?

18 A  Well, that's -- that was an assumption. He did keep
19    his word. He made the four buys with two different
20    targets that he.....

21 Q  Okay. I.....

22 A  .....agreed to, and.....

23 Q  Officer, I'm asking.....

24    THE COURT: He gets to finish his answer, Mr. James.

25    MR. JAMES: Thank you.

**Page 589**

1 A  And one of the cases is -- we are currently here, and
2     the other case is finished.

3 Q  All right. It is your belief that he kept his word,
4     right, in all aspects of this case?

5 A  In aspects of this case, yes. He made the four buys
6     that he agreed to, and on the previous case.

7 Q  One moment please. (Pause) Officer Johnstone, now he
8     was your striker at this particular point? Do you know
9     what I mean by striker?

10 A  No, sir.

11 Q  You were training him?

12 A  I'm sorry?

13 Q  You were training him?

14 A  Yes, I was training him.....

15 Q  Okay.

16 A  .....in this case.

17 Q  And subsequent to that time, does he still work with
18    your special unit?

19 A  No, he has relocated. He is a detective with the
20    detect division.

21 Q  Okay. So based upon your dealings subsequent to that
22    time, did you rely upon his opinion?

23 A  On Officer Johnstone?

24 Q  Right.

25 A  Yes.

**Page 590**

1 Q  Okay. Did you, during this buy, do anything to --
2     well, specifically what I'm asking, and I have -- I'm
3     going to set a little stage. Banks sometimes powder
4     their money, put some kind of a powder on it so that if
5     someone handles the money you can put their hands under
6     flourescent light, or some kind of a lighting system
7     and it will show up, that, in fact, whoever touched it,
8     touched it. Did you do that with this -- any of this
9     buy money?

10 A  No. We don't have that capability. We xerox our buy
11    money.

12 Q  Okay. And did you attempt to lift any prints off of
13    any of the buy money, or the containers it was in when
14    it was given to you by Jeremy Fish?

15 A  The containers what buy money was in?

16 Q  I'm sorry, the drugs. I'm sorry. Excuse me. Let me
17    rephrase. Let me re-ask the question. Did you attempt
18    to print -- lift prints off any of the packages that
19    the items that Jeremy Fish gave you during these
20    incidents?

21 A  No. As you saw, the crack cocaine just came in a rock
22    and nothing else. You can't obtain prints from the
23    crack cocaine rock. I think on the two occasions where
24    it was powdered cocaine, it was folded up in a very
25    small newspaper or paper type, but that was small. I

1  did not request fingerprint analysis on that.
2 Q  Okay. The -- one of them -- let's go back, if I may.
3 A  The one that was previously opened was placed in
4  another bag and sealed for custodial reasons, yes.
5 Q  I think the one we previous -- I believe the one that
6  -- yesterday that you previously opened, you indicated
7  that you had had the -- it was your baggie that you put
8  the.....
9 A  That's correct.
10 Q  Okay. This is the one you are talking about
11  (indiscernible)?
12 A  Yes.
13 Q  Okay. Call your attention to exhibit 1.
14 A  Okay.
15 Q  And exhibit 2, and exhibit 4.
16 A  Okay.
17 Q  Now, what is the -- on exhibit 1, sir? That's -- I
18  think it is right in front of you there, that one.
19 A  Yes.
20 Q  Okay. What does the front of it say, the manilla
21  envelope?
22 A  It has a tag number which is an APD tracking number for
23  evidence. It has checked the box for evidence, and
24  checked the box for felony crime. The nature of the
25  call is MICS, which is an acronym for misconduct

Page 591

1 A  Oh, I'm sorry. Exhibit number 2.
2  THE COURT: Thank you.
3 Q  Okay. That's y -- whose baggie is that?
4 A  This outer baggie is APD's baggie. We put it in so we
5  don't -- you can see it spilling out. We don't want it
6  to spill out.
7 Q  Okay. So is that -- my question is, is that powder or
8  is that -- or can you tell? You can open -- I guess
9  you can open -- not I guess.
10 A  It is powder.
11 Q  Oh, it's powder?
12 A  It is just -- it is what we term is -- has been cut off
13  the -- the brick -- the brick of cocaine, that is why
14  it still has a compressed hard form.
15 Q  Okay.
16 A  But it is powder cocaine.
17 Q  All right. So the -- without opening the other one,
18  just -- you -- feel the other one.
19 A  It feels like crack cocaine.....
20 Q  Okay.
21 A  .....and that is what is listed on the -- on the
22  envelope. And I'm aware that we had two purchases of
23  powder cocaine, and two purchases of crack cocaine, so
24  that matches exactly.
25 Q  Okay. So the powder came to you in the.....

Page 593

1  involving a controlled substance. Detailed item
2  description is listed as, baggie of suspected powder
3  cocaine.
4 Q  Stop right there, if you would, and you can continue on
5  later. But I'm just.....
6 A  Okay.
7 Q  I mean it just -- that's what I was looking for.
8  Baggied -- so it came to you in a baggie?
9 A  Yes.
10 Q  All right. Did you print the baggie?
11 A  No. As I said before, no.
12 Q  Okay. One of them has to be -- it references a
13  newspaper?
14 A  Yes. One of the product came in a newspaper, in
15  exhibit number 2.
16 Q  Okay. Now, that says cocaine. Is that cocaine, or is
17  that crack?
18 A  It says cocaine. I don't know. I would have to open
19  it or look at the state crime lab to be confirmed.
20 Q  Now, perhaps.....
21 A  It -- it feels like crack cocaine.
22 Q  Now, perhaps if we could use the scissors and find out,
23  because.....
24 A  Sure, if you like. (Pause) Phew. It smells.
25  THE COURT: Which one did you open, officer?

Page 592

1 A  In the small section of little rolled up newspaper, and
2  as you can see why it has the hard-like substance.
3  I'll take it out of the newspaper. Don't know if you
4  want me to pass it around.
5  It's in.....
6  THE COURT: ....to do that?
7 A  Sure.
8 Q  No. I don't see it.....
9  THE COURT: That's fine. I -- can you folks see from
10  there? Can you see?
11  MR. JAMES: Well, then, perhaps.....
12  THE COURT: I can -- pardon me?
13  MR. JAMES: I don't care whether he passes it at this
14  point. It is in evidence. They are going to.....
15  THE COURT: What's -- what is the question?
16  MR. JAMES: Like -- I didn't have a question.....
17  THE COURT: All right. Then.....
18  MR. JAMES: .....regarding that.
19  THE COURT: Then, let's move on.
20  MR. JAMES: He had asked whether he wanted me to pass
21  it around.
22 A  Okay.
23  THE COURT: Let's move on.
24 A  Everybody say okay.
25  MR. JAMES: All right.

Page 594

1 Q   Okay. Just for clarification, then, you -- Mr. Davis
2     was out of the car when you arrived?
3 A   Yes. At.....
4 Q   I mean, had not got put in the car?
5 A   At the last buy bust?
6 Q   Yes. Yes.
7 A   On the 28th.
8 Q   That's what I'm talking about.
9 A   Correct.
10 Q   Now, you never did find the five twenties, correct?
11 A   That is correct, sir.
12 Q   All right. If Mr. Fish had a cell phone, would it have
13     been supplied by APD during the.....
14     MS. BRADY: Objection, Your Honor.
15     THE COURT: Sustained.
16     MR. JAMES: All right. May I just have one second,
17 Judge?
18     (Pause)
19     THE COURT: Mr. James, I would like you to finish your
20 cross examination.
21     MR. JAMES: Thank you. That's all I got, thanks.
22 Thank you, officer.
23     THE COURT: Redirect, Ms. Brady?
24           MARK LAPORTE
25 testified as follows on:

Page 595

1           REDIRECT EXAMINATION
2 BY MS. BRADY:
3 Q   Officer LaPorte, could you look at the transcript that
4     is in front of you of the grand jury proceeding, and go
5     to page 16?
6 A   All right.
7 Q   And Mr. James asked you about that transcript on that
8     page, is that right?
9 A   Yes, he did.
10 Q   And could you just read the question and answer at the
11     top of the page?
12 A   Keri Brady. Question, now, when you say the informant
13     was followed, about how many officers involved were
14     following the confidential informant. Myself. You
15     always keep a two officer control. Now, lots of
16     officers in the surveillance unit may be around the
17     area, but two officers are in a car following him
18     directly. We don't lose contact. In this case,
19     information -- or, the informant did have a cell, but I
20     make sure that the informant knows that we are around.
21     They need to be looking for us, also, just in case
22     something does happen. I set up a pre-buy surveillance
23     unit that is in the area watching the location for
24     safety concerns.
25 Q   Okay. And also, I would like you to go to page 25 to

Page 596

1     28, and read the question and answer at the top of that
2     page as well?
3 A   A juror asking a question. Did you get a search
4     warrant to search the apartment -- and that was the
5     apartment at 202 Grand Larry they were asking about.
6     Myself. I did not because what happened during
7     this, if you will look at the time of the buys, it is
8     almost a full month. He had actually moved out of his
9     apartment, moved back in with his mother. He ran a
10     business out of his mother's residence, and it was his
11     mother's suburban that he was driving on the third buy.
12     So that was -- he had completely moved out, and we
13     confirmed that -- that not only by the phone calls, but
14     on the second buy when the informant came out, we
15     always conducted a debrief after each buy with the
16     informant to confirm what we heard on the body wire.
17     And what he tells us, and he says that there was
18     nothing in the house, that he had already moved his
19     stuff out.
20 Q   Okay. And why didn't you request that the cocaine that
21     was seized in this case be fingerprinted?
22 A   Well, the -- just the two items there that had it
23     wrapped up in a small amount of newspaper with the ink
24     and stuff from the newspaper, we have made attempts in
25     the past to try and -- and print that, and have been

Page 597

1     completely unsuccessful. There is acid in the cocaine.
2     I don't know if that has an effect. I'm not an expert,
3     but it has never been successful. We had vision of the
4     informant going into the residence, coming out of the
5     residence. We had three of the buys on wire. We heard
6     contact, conversation. We actually saw Mr. Davis in
7     the suburban on the third buy, nobody else but the
8     informant. There was no doubt in their mind that the
9     informant was purchasing cocaine from Mr. Davis.
10 Q   Okay. Do you think that there was a problem with the
11     buy funds in this case?
12 A   Yes, there is. A mistake was made. I try at every
13     possibility not to have any mistakes, but I am not
14     perfect, and neither is anybody else in my unit. It is
15     unfortunate. This is the first time that this has
16     happened to me. And to the positive side of that, I
17     was utterly amazed after a full weekend at Cook Inlet
18     Pretrial that I was actually able to retrieve a $100
19     bill of our buy funds after an entire weekend. That
20     shocked me, I must say.
21     MS. BRADY: That's all the questions I have, Your
22 Honor.
23     THE COURT: You can step down, thank you.
24 A   Thank you.
25     THE COURT: Your next witness, Ms. Brady?

Page 598

1    MS. BRADY: My next witness is due to be here at 9:15,
2 Your Honor.
3    MR. JAMES: May I approach the witness stand and
4 retrieve that paper that is not in evidence?
5    THE COURT: All right. Why don't you all take a
6 stretch, and we will call you back in when the next witness
7 is here. (Pause) Ms. Brady, get the rest of your witnesses
8 here. I don't want to wait for any more witnesses.
9 Seems.....
10    MS. BRADY: The rest of them are here, Your Honor.
11    THE COURT: All right.
12    MS. BRADY: It's just this one.....
13    THE COURT: Well, let's take.....
14    MS. BRADY: .....couldn't be left sitting around
15 because of his medical condition, and so I told him to be
16 here at 9:15, figuring that was the soonest we would get to
17 him.
18    THE COURT: Well, we're running on borrowed time, now.
19 I don't want to wait for witnesses anymore. So.....
20    MS. BRADY: There won't be any other wait.
21    (Pause)
22    (Jury present)
23    THE COURT: Everybody have a seat. Are we on record,
24 Madam clerk?
25    THE CLERK: We're on record.

Page 599

1 Q   What were you doing on March 1st of this year?
2 A   I was a booking officer at Cook Inlet Pretrial.
3 Q   Okay. And I'm just going to approach you with
4    something I have previously marked as state's exhibit
5    17, and I want to ask you if you recognize this
6    document?
7 A   That's a booking record -- last page of the booking
8    record -- booking sheet.
9 Q   Does your signature appear on it?
10 A   Yes, it does, as booking officer.
11 Q   Okay. The date?
12 A   Of the document was 3/1/01.
13 Q   Okay. And the time?
14 A   03:01:26.
15 Q   Okay. Now, there is two times on there, is there not?
16 A   Yes, there is.
17 Q   What's the 301 time, and then the other time, what is
18    that?
19 A   Well, the -- the time is -- 1:00 o'clock is the other
20    time. That is the time that the inmate was admitted
21    into the correctional facility, and the 301 is the time
22    that he was actually booked.
23 Q   Okay. And are these booking record just kept in the
24    usual course of CIPT's business?
25 A   Yes, they are.

Page 601

1    THE COURT: And this is your next witness, Ms. Brady?
2    MS. BRADY: It is, Your Honor.
3    THE COURT: Sir, we are going to have to ask you to
4 stand up to swear you in.
5    (Oath administered)
6    MR. GARCIA: I do.
7        TED GARCIA
8 called as a witness on behalf of the plaintiff, testified as
9 follows on:
10      DIRECT EXAMINATION
11    THE CLERK: You can have a seat. For the record,
12 please state your full name and spell your last name.
13 A   Ted L. Garcia, G-a-r-c-i-a.
14    THE COURT: Thank you. Go ahead.
15 BY MS. BRADY:
16 Q   Who do you work for, Mr. Garcia.
17 A   State of Alaska, department of corrections.
18 Q   Okay. And how long have you been working for them?
19 A   A little over seven years.
20 Q   Okay. And specifically what part of the department of
21    corrections do you work in right now?
22 A   I work in the home arrest surveillance officer.
23 Q   Okay. Is that the same office that you were working in
24    on March 1st of this year?
25 A   No, I wasn't.

Page 600

1 Q   Are they the kind of records that are relied on by
2    CIPT?
3 A   To my knowledge, yes.
4 Q   Okay.
5    MS. BRADY: At this time, I move to admit state's
6 exhibit 17.
7    MR. JAMES: No objection.
8    THE COURT: 17 is admitted.
9       (Plaintiff's exhibit 17 admitted)
10 Q   Okay. Now, do you recall anything in particular -- is
11    that your -- your signature is on that document, right?
12 A   Yes, it is.
13 Q   Do you recall anything in particular about this
14    booking?
15 A   No, I can't say I do.
16 Q   Okay. Now, let me just ask you, then, what normally
17    happens when an officer brings someone in for booking
18    at CIPT?
19 A   When an officer brings somebody in, we meet him at the
20    back door. The person being brought in is normally
21    handcuffed. At that time we glance over the paperwork,
22    making sure that he is being brought in as a felony --
23    on a felony charge. We search the individual by just
24    going over his pockets and his hands, make sure he
25    doesn't have a weapon on him that the officer might

Page 602

Page 603

1  have missed. We try to get the handcuffs off him as
2  soon as possible and get the officer out of there,
3  because normally the inmate is -- or, the person at
4  that time is considered an inmate, is upset with the
5  officer. So we try.....
6 Q  Okay. Let me stop you right there. That first search
7  that you conduct, is that -- is there another search
8  coming?
9 A  Yes. The initial search is a pat down search just to
10  ensure that there aren't any large weapons of some kind
11  sticking out on -- on this individual. We go kind of
12  lean him up against the wall, and pat him down, and
13  empty their pockets, and take out everything at that
14  time.
15 Q  Okay. Then, what happens -- you said you try to get
16  the officer out of there?
17 A  We get the handcuffs off and return those to the
18  officer, then I take the individual and place him into
19  a holding cell directly in front me, usually, so I can
20  sign the paperwork for the officer, get him out of
21  there -- the remand slip.
22 Q  Okay. And then, what is the next thing that you do?
23 A  Then I pull the individual out. I had already emptied
24  his pockets on the previous search by taking everything
25  out of his coat, or his pants, or whatever the case may

Page 604

1  be. Then I take him back to a room -- dress out room,
2  where we strip him down and take his clothing away from
3  him, put those into a matching bag with a number on it
4  to match his previous bag that we put his pocket items
5  into.
6 Q  Okay. Now, let me stop you right there, because you
7  said previous bag. Are -- is the stuff that comes out
8  of the pockets put into a bag?
9 A  Yes. When an individual comes in, we have two bags.
10  One is a laundry bag that is rolled up and placed into
11  a large plastic bag -- plastic bag being approximately
12  10 inches high. They both have numbers --
13  corresponding numbers to match the two with each other.
14  The smaller bag is -- is his pocket items and jewelry,
15  things of that nature that would go into a box for
16  security, and his other bag is naturally his clothing
17  bag -- his boots and clothes could go into -- a much
18  larger bag. Now, once we strip him out and put his
19  clothing into the other bag, and we bring him back into
20  booking area, we then take the individual to a
21  telephone room and put him in for -- so he can start
22  making his phone calls to try to make bail, if
23  possible.
24 Q  Okay. And if somebody has money, is that -- do they
25  get to keep the money, or how does that work?

Page 605

1 A  No, no, no. No, everything is taken off that
2  individual at that time on the -- usually in the
3  initial search. Sometimes people have money in their
4  socks or underwear, things of that nature, but
5  initially we take all their money off, put it into the
6  initial plastic bag, the first bag, even if we find
7  money later on, we put it into that plastic bag.
8 Q  Okay. And in this particular case, did Mr. Davis come
9  in with any money?
10 A  180 dollars.
11 Q  Okay. And then, when is the booking record filled out
12  in this process?
13 A  At -- with this particular case, it was filled out at
14  3:00 in the morning when he was booked.
15 Q  Okay. And does the person who is being booked have to
16  sign that form?
17 A  Yes, he does.
18 Q  Why is that?
19 A  That he has gone over everything that has been
20  inventoried, all of his clothing and items that were on
21  him is correct.
22 Q  Okay. And once money is taken away from someone, where
23  does that go?
24 A  It goes into the till, which is a draw that the booking
25  officer is the only one has a key to, and it is kept at

Page 606

1  his front desk. It is mounted to the desk like a
2  drawer -- like a cash drawer.
3 Q  So if I were being booked, and I had money, then it
4  would go into the till with everybody else's money?
5 A  That is correct.
6 Q  Okay. And as far as you are aware, did you have
7  anything else to do with this defendant, or this case,
8  after this booking?
9 A  Not to my knowledge, no.
10  MS. BRADY: That's all the questions I have for this
11  witness, Your Honor.
12  THE COURT: Mr. James?
13          TED GARCIA
14  testified as follows on:
15          CROSS EXAMINATION
16 BY MR. JAMES:
17 Q  Mr. Garcia, we talked before, right?
18 A  Yes, we have, sir.
19 Q  Okay. And how long have you been -- how long had you
20  been working as a booking officer for Cook Inlet?
21 A  Prior to this incident?
22 Q  Yeah. Yes.
23 A  I would say a couple of years.
24 Q  Okay. And is there any type of standard procedure that
25  you utilize, as far as -- if an officer were to ask you

1  to look for a specific item when he brought someone in,
2  that -- what you would do?
3 A  If an officer asked me to look for something specific
4  on that individual, I would do that at that time. We
5  would make that a precedence at that time to -- to
6  search him, maybe take him back and strip search him
7  prior to the officer leaving, as an example, and we
8  would do that at that time.
9 Q  All right. And if you had been asked to -- when you
10  were in the process of booking Mr. Davis, to look for
11  buy money, would you have done that?
12 A  Certainly.
13 Q  All right. And would you have reported back to the
14  officer your findings?
15 A  Yes, I would.
16 Q  All right. And if a police report indicated that when
17  booked into CIPT he was searched and no buy money was
18  found, would you have been the one that would have
19  authored that if you were the booking officer --
20  booking -- would you have been the one to convey that
21  information, if you were the booking officer?
22 A  If I understand what you are asking.....
23 Q  Yeah.
24 A  .....here, if -- if somebody had asked me, did I find
25  any buy money after searching the individual, I would

Page 607

1  have been the one to answer that, yes. I would have
2  been the one normally searching the individual.
3 Q  Okay. Now, based upon your experience at CIPT, and if
4  you said no buy money was found, would you be
5  comfortable in saying now that no buy money was found?
6 A  If I had said that at the time, yes, I would feel
7  comfortable now.
8 Q  All right. And if buy money had been found, would you
9  have set it aside -- in other words, kept it separate
10  from the other -- any other money?
11 A  Well, normally when something like that happens, when
12  an individual is suspected of having something else on
13  them, all this strip search, this -- for the officer,
14  that kind of thing is done prior to me signing any kind
15  of paperwork. That individual still belongs to the --
16  the arresting authority at that time. So if buy money,
17  as an example, had been found on him, the officer could
18  have taken it at that time, because nothing belonged to
19  me at that time. I hadn't signed any paperwork. Once
20  I sign that remand slip, then the individual and all of
21  his property becomes department of corrections
22  property. And at that time, then an officer would have
23  to have a warrant, or that type of thing, to come and
24  pick up anything else. But prior to that he can take
25  his clothing, he can take everything the individual has

Page 608

1  got, prior to incarcerating him.
2 Q  Okay.
3 A  If he chooses to so -- do so, but once I have signed
4  for the -- the individual and his property, then it
5  becomes department of corrections property.
6 Q  All right. And you have -- the property
7  became under the custody of corrections at about 3:00
8  o'clock, in that neck of the woods?
9 A  That is correct. Well, actually, at 1:00 o'clock when
10  I signed for his paperwork -- signed for his arrest, he
11  became property of the department of corrections at
12  that time.
13 Q  All right. Now, the money -- there was money found on
14  him, correct?
15 A  Yes, 180 dollars.
16 Q  Okay. And given the previous questions that I asked,
17  and the assumptions I have asked you to make, was any
18  of that 180 dollars buy money?
19 A  I haven't any idea. There is no way of me telling
20  that.
21 Q  Okay. I mean, I'm asking you -- you had already --
22  I've give you the situation where someone asked you to
23  search for buy -- look for buy money.
24 A  And if he had asked me that, to search for specific
25  money, specific serial numbers, thing of that nature, I

Page 609

1  would have done that, and given it to him if I had it
2  at that -- prior to signing for his paperwork.
3 Q  If you had done that.....
4 A  Uh-hum. (Affirmative)
5 Q  .....and then you had the $180, is it safe to assume
6  that $180 was not buy money?
7 A  I would say so, yes. I would feel that.
8 Q  And going to -- once the money has become part of Cook
9  Inlet, if that is the right term, it goes -- what
10  happens to that buy -- or, what happens to that money
11  that is taken off of any individual once the inventory
12  is done?
13 A  This cash drawer that the booking officer maintains,
14  all money of all people being arrested for any given
15  day is put into that cash drawer. All gift money that
16  visitors might bring in to -- to put on the books of
17  any inmate being housed there, each day is put into
18  that same drawer. At the end of each day -- or
19  numerous times throughout the day, then an accounting
20  is taken throughout the time. We try not to keep the
21  mon -- cash drawer over a certain balance. And then we
22  make a deposit into the bank twice or three times a
23  week, depending on what is necessary.
24 Q  If an individual were to bring money into an -- it -- a
25  resident at CIPT or -- do you invento -- or, do you --

Page 610

1   do you copy down the serial numbers and -- of that
2   particular money?
3 A No, we do not. The money is brought in. It is in cash
4   or money orders or checks, and it is put on -- no
5   checks, I'm sorry, it is cash or money orders, and it
6   is put on the individual's books. And each day the
7   booking officer, when he has time in the afternoons,
8   will -- it is brought into the front desk, and given to
9   one of the receptionists, who in turn writes out a
10  receipt for it. The receipt and the cash attached to
11  it will go to the booking officer that afternoon. Then
12  he will sit down and download that thousand, or
13  whatever it is -- couple thousand dollars into the
14  drawer, and place it on the individual's books.
15 Q Okay. And then that money becomes part of the
16  common.....
17 A Becomes part of a common drawer.
18 Q Okay. Assuming that you had searched for buy money,
19  did not find any buy money, and later on a hundred
20  dollar bill which was identified as buy money a couple
21  days later is found in this common drawer. Based upon
22  your experience at CIPT, could you draw a conclusion as
23  to where that buy money came from, as to whether it
24  came from the person that you had booked?
25 A If -- if it was not part of that -- that hundred

Page 611

1   asked you to look for the buy money, okay? The book --
2   when he brought Mr. Davis in, and you have earlier
3   testified, assuming that you did, in fact, as you
4   testified, looked for the buy money, is it fair to
5   assume that the money found in the common pot -- or,
6   the common drawer did not come from Mr. Davis when you
7   booked him?
8 A I would say it is fair to assume that, yes.
9 Q All right. Thank you.
10  THE COURT: Redirect, Ms. Brady?

11           TED GARCIA

12  testified as follows on:

13        REDIRECT EXAMINATION

14 BY MS. BRADY:
15 Q Okay. Now, with regard to this specific case, do you
16  recall whether an officer asked you to look for any
17  money?
18 A No, ma'am, I do not.
19 Q Don't recall? Okay. How many booking officers work
20  during a given shift at CIPT?
21 A That is hard to say. It's -- there is normally one
22  booking officer assigned to a booking facility during
23  the day, one at night. That doesn't necessarily mean
24  that there won't be more. The -- we have two or three
25  on each shift usually, and if we are overloaded, a lot

Page 613

1   dollars that he had, as an example, then it could have
2   come from either a guest bringing money in to put on
3   somebody's books, or another person arrested after he
4   was arrested.
5 Q All right.
6 A For that matter, it could have been in the drawer prior
7   to him being arrested, by somebody at 12:00 o'clock, or
8   something like that. We don't look at serial numbers,
9   or marked bills, or anything like that unless
10  specifically asked to do so. And so I have no idea how
11  it could have got in the drawer, unless it come in by
12  somebody else, or was a gift put on somebody else's
13  books the following day.
14 Q Is it fair to assume on -- based on your experience and
15  your procedures that you did not find any buy money on
16  Mr. Davis when you booked him?
17  MS. BRADY: Objection, Your Honor.
18  THE COURT: Sustained.
19  MR. JAMES: Could I have the reason for that objection?
20  THE COURT: Yes, you may. I'll have a bench
21 conference.
22  (Bench conference as follows:)
23  (Inaudible)
24  (End of bench conference)
25 Q .....I'm going to ask you, assuming that the officer

Page 612

1   of times, especially in the evenings, another booking
2   officer will be brought up to assist the booking
3   officer that is on, to catch up from anything left over
4   from the day, and anything coming in throughout the
5   night to -- so we can clean up everything at night to
6   start anew each morning at 6:00 o'clock.
7 Q Okay. So if this person were brought in at 1:00
8   o'clock in the morning, and he was actually booked in
9   at 3:00 o'clock, is that a long booking that would
10  indicate anything to you?
11 A It would indicate that I was a little bit behind, yes.
12 Q Oh --
13 A That there was a couple ahead of him, probably.
14 Q Okay. And is it likely that someone else was assisting
15  you, then?
16 A It is a possibility.
17  MR. JAMES: I'm going to object. This is beyond the
18 scope.
19  THE COURT: Overruled.
20 Q Okay. Now, do you have any way of knowing what serial
21  numbers are used as buy funds by APD?
22 A I have no way of knowing that.
23 Q So if an officer asked you to look for money, you
24  wouldn't have any way of knowing if you were looking
25  for buy money, or any other kind of money, is that

Page 614

| | |
|---|---|
| 1 right? | 1 called as a witness on behalf of the plaintiff, testified as |
| 2 A  Right. | 2 follows on: |
| 3 Q  Okay.  Do officers frequently ask you to look for money | 3          DIRECT EXAMINATION |
| 4    when they bring in people? | 4      THE CLERK:  Have a seat.  For the record, please state |
| 5 A  Not frequently, no. | 5 your full name, and spell your last name? |
| 6 Q  Okay.  When you find money at -- if -- when you find | 6 A  Roy B. LeBlanc.  Last name is spelled L-e-B-l-a-n-c. |
| 7    money after an officer leaves, do you call the officer | 7      THE CLERK:  Thank you. |
| 8    and tell the officer? | 8      THE COURT:  Go ahead, Ms. Brady. |
| 9 A  No. | 9 BY MS. BRADY: |
| 10 Q  So even if an officer would have said, we are looking | 10 Q  How long have you been an APD officer? |
| 11    for money, the money wasn't found initially and it was | 11 A  A little bit over five years. |
| 12    found later, would you then call the officer? | 12 Q  Okay.  And are you assigned to a particular unit? |
| 13 A  Yes, we would then.  If he makes it known the he is | 13 A  Currently I am assigned to the patrol division. |
| 14    looking for something specific, then we -- we would | 14 Q  Okay.  And is that the same assignment that you had |
| 15    notify him that we found something specific, if we did | 15    when this case was going on? |
| 16    find something later. | 16 A  No, it is not. |
| 17 Q  Okay. | 17 Q  What assignment did you have then? |
| 18 A  We would call him back to see if he wants to add | 18 A  Back then I was assigned to the special assignment |
| 19    charges, or things of that nature, or see what he wants | 19    unit. |
| 20    to do about it.  But not unless we are asked, we don't. | 20 Q  All right.  And how did you become involved with this |
| 21 Q  Thank you very much. | 21    case? |
| 22      MS. BRADY:  That's all the questions I have. | 22 A  Basically, our unit focused primarily on vice crimes, |
| 23      THE COURT:  You can step down, sir.  Mr. James, | 23    street level drugs, prostitution, gambling.  I believe |
| 24 anything else? | 24    Officer Johnstone had acquired an informant, and we |
| 25      MR. JAMES:  I just -- I would like a couple follow ups | 25    used the informant to make several cases against drug |
| Page 615 | Page 617 |

| | |
|---|---|
| 1 on this, if I may please? | 1    dealers. |
| 2      THE COURT:  Well, we'll have a bench conference. | 2 Q  Let me direct your attention to February 8th.  Did you |
| 3      (Bench conference as follows:) | 3    conduct the pre-buy and post-buy searches of Mr. Fish's |
| 4      (Inaudible) | 4    car? |
| 5      (End of bench conference) | 5 A  Yes, I did. |
| 6      THE COURT:  Go ahead, Mr. James. | 6 Q  How thorough were these searches? |
| 7           TED GARCIA | 7 A  Quite thorough. |
| 8 testified as follows on: | 8 Q  Could you just explain what you do when you do a car |
| 9          RECROSS EXAMINATION | 9    search, to the members of the jury? |
| 10 BY MR. JAMES: | 10 A  Basically I look in every nook and cranny in the |
| 11 Q  Based upon your -- the documentation that you have in | 11    vehicle, check in the crack between the seats, under |
| 12    front of you, did anybody else help you on this | 12    the seats, open all the compartments.  Basically an |
| 13    particular booking? | 13    interior search.  I don't take apart anything in the |
| 14 A  Based on this documentation, I have no way of knowing | 14    vehicle.  I don't open the hood.  Usually the informant |
| 15    that. | 15    wouldn't have any reason to get underneath his hood. |
| 16 Q  All right.  Thank you. | 16    Basically we are concerned with the area that is under |
| 17      THE COURT:  All right, thanks.  Thanks Mr. Garcia, you | 17    the control of the informant to make sure that there is |
| 18 can step down.  Ms. Brady, your next witness? | 18    nothing hidden before or after the buy. |
| 19      MS. BRADY:  Okay.  Can you get the -- the state is | 19 Q  And did you find any contraband on February 8th? |
| 20 calling Officer Roy LeBlanc, and Officer LaPorte went out to | 20 A  I believe I did.  I'm not sure if it was actually for |
| 21 get him. | 21    this case, or another case we worked, because we worked |
| 22      (Pause) | 22    several cases, kind of at the same time.  I do know |
| 23      (Oath administered) | 23    that on one of the searches of Mr. Fish's vehicle, I |
| 24      MR. LEBLANC:  I do. | 24    did find a small amount of marijuana. |
| 25           ROY LEBLANC | 25 Q  All right.  And then, did you attend a briefing about |
| Page 616 | Page 618 |

1   this buy?
2 A  Yes, I did.
3 Q  Okay. And did you participate in the surveillance?
4 A  Yes, I did.
5 Q  What was your assignment in the surveillance?
6 A  For the February 8th buy, I was assigned what we call
7    the close in surveillance. It was my job to be in
8    position where I could watch the informant get out of
9    his vehicle and go into the suspects house, or actually
10   make contact with the suspect if it was going to be
11   outside.
12 Q  All right. Now, we have heard other officers testify
13   that someone has the eye. Is this the position that
14   they are talking about?
15 A  Correct. When.....
16 Q  So you had the eye?
17 A  I would have the eye at the moment of the contact, and
18   then I would pass it off to another officer as --
19   basically as the -- as the informant would drive into
20   the area it would be passed to me, and I would watch
21   him make the contact, and then watch him leave, and
22   pass it to somebody else as he is leaving the area.
23 Q  All right. And I think that behind you is a diagram
24   that Officer LaPorte started to draw of the Grand Larry
25   area?

Page 619

1 A  Okay.
2 Q  Is that a true and accurate representation of the Grand
3    Larry area?
4 A  It is pretty accurate. Muldoon is of course to the
5    west. Grand Larry runs -- it is a north-south street.
6    202 is actually a part of a duplex. It is 202 and 200.
7    They're -- they are joined, but they have their own
8    separate addresses.
9 Q  Okay. So why don't you make a line, and separate
10   those. Make it accurate. Okay. Now, is that a true
11   and accurate representation of the Grand Larry layout?
12 A  Yes.
13 Q  Okay.
14 A  But it is not to scale, of course.
15 Q  Fair enough.
16   MS. BRADY: And we are going to mark that as state 26.
17 Okay. And at this time I move to admit state's 26.
18   MR. JAMES: No objection.
19   THE COURT: 26 is admitted.
20        (Plaintiff's exhibit 26 admitted)
21 Q  Okay. Now, why don't you show the members of the jury
22   where you were at?
23 A  I was parked across the street basically to the east,
24   kind of kitty corner. There is -- directly across the
25   street there is a large multi-unit building, like a

Page 620

1    six-plex, or an eight-plex, and next to that is another
2    similar building, a six-plex, or an eight-plex, and I
3    was parked at the -- kind of, I guess, would be the
4    north end of that property. I believe there was like a
5    dumpster that was here at the time, and I was kind of
6    parked next to the dumpster, almost into the road, but
7    not quite into the road.
8 Q  All right. And do you know how far that is from the
9    residence?
10 A  Yes, I do.
11 Q  And how do you know that?
12 A  Actually I went by there with my laser range finder,
13   and shot a line of sight measurement. And it was 45
14   and a half yards.
15 Q  Okay.
16 A  And that would be from where I was sitting to the door
17   that was used, which is on the -- kind of on the back
18   side, the south side of the building more towards the
19   west of the -- of the building.
20 Q  Okay. And how long were you there prior to Fish
21   arriving?
22 A  A short while. A matter of minutes. I would say
23   probably five minutes or more.
24 Q  Okay. And what happened when Fish arrived?
25 A  On this particular buy, referring to my report, he

Page 621

1    walked up to the door, he knocked. After several
2    seconds a subject answered the door. I could tell that
3    it was a black male with shorter -- short hair or bald,
4    but I couldn't make out any facial features, because he
5    was more or less backlit. Of course, he was in the
6    doorway, and it was -- it was later at night, so it was
7    dark.
8 Q  What else did you observe to happen?
9 A  I watched the informant step into the doorway, and then
10   he returned to his car. After going off to his car and
11   getting in his car for just a second he went back, and
12   went back inside the house. He went inside the
13   residence. Closed the door. Looks like about 10
14   minutes later he came back out of the house, and
15   returned to the vehicle, and left the area to the
16   north.
17 Q  When he left the area to the north, then what did you
18   do?
19 A  I watched him as he drove, and I passed the eye off to
20   another surveillance officer.
21 Q  Okay. And then did you participate in the case after
22   the informant returned to APD?
23 A  I believe after there, I conducted the post-buy search
24   of his vehicle, and then that would be the end of my
25   involvement on that buy.

Page 622

1 Q   Okay. Let me direct your attention to February 20th.
2     Were you participating in this case on that day as
3     well?
4 A   Yes, I was.
5 Q   What was your assignment that day?
6 A   I was assigned to operate the wire. Basically which is
7     what -- the term we use for the recording device that
8     we use to record the conversations between the
9     informants and the suspects.
10 Q  Okay. And did you have any other assignment?
11 A  Just for close in surveillance at the residence during
12    the buy, and I believe also that I withdrew some of our
13    buy funds and made photocopies of them.
14 Q  Okay. I am going to approach you with two documents,
15    and I want to direct your attention to nine for right
16    now. Do you recognize this document?
17 A  I do.
18 Q  What is that document?
19 A  This appears to be a photocopy of the photocopy of buy
20    funds that I made.
21 Q  Okay. And how do you know that is what it is?
22 A  Because I initialed it.
23 Q  Okay. It is a true and accurate representation of the
24    photocopy you made of the buy funds you withdrew?
25 A  It appears to be, yes.

1 Q   Okay. And is the date anywhere on that document?
2 A   It is.
3 Q   Is the case number on the document?
4 A   Yes, it is.
5 Q   What are those things?
6 A   The case number is 01-7273, and the date would be 2-20
7     of 2000 and one.
8     MS. BRADY: Okay. At this time I move to admit state's
9     9?
10    THE COURT: Number 9, Mr. James?
11    MR. JAMES: No objection. No objection.
12    THE COURT: 9 is admitted.
13              (Plaintiff's exhibit 9 admitted)
14 Q  Okay. And what else did you do besides the buy funds?
15    You had mentioned other things, ran the wire?
16 A  Oh, yes. I ran the wire, and I also was the close in
17    surveillance again on that.
18 Q  Okay. Now, did you prepare the wire?
19 A  Actually I don't believe I did. I believe Officer
20    LaPorte prepared the tape for that one. If you give me
21    a second I'll re -- yes, he had.
22 Q  Okay.
23 A  And basically what that means is, he makes a little
24    pre-announcement on the tape giving the case number,
25    the date, and the fact that it is going to be an

1     attempted controlled buy of cocaine.
2 Q   And when you say you ran the wire then, what are
3     you talking about?
4 A   Basically as the informant pulls into the area I
5     activate the recording, and then once he leaves the
6     area I stop the recording. Part of that is to make
7     sure that it works, make sure it is fitted on him
8     properly. You have to make sure, of course, it is
9     hidden, and then you want to make sure that it is put
10    on the clothes so we don't get a lot of static. The
11    microphones on those are so sensitive that any little
12    bit of rubbing on clothes creates an ungodly amount of
13    static that makes it real difficult to understand.
14 Q  Okay. And once -- did you attend the briefing?
15 A  Yes, I did.
16 Q  And did you participate in the surveillance?
17 A  Yes, I did.
18 Q  What was your role in the surveillance?
19 A  I was the close in surveillance again. Get in a
20    position where I could watch the -- the contact he
21    made.
22 Q  Okay. And where did you position yourself this time?
23 A  This would have been the exact same place as last time.
24    This one occurred at 202 Grand Larry. I parked in the
25    same place I did last time. It had the best advantage

1     view of the doorway and the building itself.
2 Q   Okay. So you could actually see Fish enter the
3     residence at 202 Grand Larry on both occasions?
4 A   Correct.
5 Q   Okay. And what happened with Mr. Fish got there this
6     time?
7 A   I have to refer to my report because on this one it was
8     a little different. I watched him drive into the
9     area, of course, and park, and he entered the
10    residence. After a short amount of time he came out
11    and moved his car, which allowed another vehicle that
12    was in the driveway to leave, and then re-parked his
13    car and then went back in.
14 Q  Okay. And how long on this time were you there prior
15    to Fish arriving?
16 A  A matter of maybe five minutes again.
17 Q  Okay. And how long was he in after he moved his car
18    and went back in?
19 A  It looks like he was in there for about five minutes
20    total, and I want to say that he was in there for less
21    than a minute when he went in the first time, before he
22    moved his car, so probably about three minutes, I would
23    say.
24 Q  Okay. And what happened after he left the residence?
25 A  After he left the residence, he left the area

3AN-01-1717 CR

1    southbound.
2 Q  And did you have any further participation in this case
3    that day?
4 A  I passed off the eye, and that was about it.
5 Q  Okay. Now let me direct your attention to February
6    21st. Actually on the 21st, what was your assignment
7    that day?
8 A  I was assigned to operate the wire.
9 Q  Okay. And were you assigned anything else at the
10   station before it happened?
11 A I don't believe so. I believe that was all that I was
12   assigned to do.
13 Q Do you wish to read your report and see if that
14   refreshes your recollection?
15 A I'm looking through it right now, yes. Looking through
16   my report, it looks we decided at some point that we
17   were going attempt to follow the suspect after the buy,
18   but I don't know if that was an impromptu thing we
19   decided, or if that was decided initially.
20 Q Okay. Let me just approach you with something that has
21   been previously marked as state's exhibit 19, and see
22   if this helps you refresh your recollection? Does that
23   refresh your recollection about something else you did
24   on the 21st?
25 A It appears that I must have been the one who

Page 627

1    photocopied the buy money.
2 Q  Okay. Now, I have set a document in front of you
3    marked state's 10.
4 A  Uh-huh. (Affirmative)
5 Q  It is in front of you, upside down.....
6 A  Oh.
7 Q  .....marked state's 10. Do you recognize that
8    document?
9 A  This would be the buy money from the buy on the 21st.
10 Q And how do you know that is what it is?
11 A Because I initialed it, and photocopied it, and wrote
12   the date, and page 1 of 1 like I normally do when I
13   photocopy buy money.
14 Q Is the case number on there?
15 A The case number is.
16 Q Okay. And is that a true and accurate representation
17   of the photocopy that you made of the buy funds?
18 A Yes, it is.
19   MS. BRADY: Okay. I move to admit state's 10.
20   THE COURT: Number 10, Mr. James?
21   MR. JAMES: No objection.
22   THE COURT: 10 is admitted.
23         (Plaintiff's exhibit 10 admitted)
24 Q Okay. And what else did you do that day, Officer
25   LeBlanc?

Page 628

1 A  I believe that is all.
2 Q  Did you participate in the surveillance?
3 A  Yes.
4 Q  Okay. And where did this buy happen?
5 A  This buy happened at a different location. It was in
6    the area of International Airport Ave and Old Seward
7    Highway.
8 Q  Okay. Was it at a business of some sort?
9 A  I don't act -- actually recall what business it was at.
10   If I remember correctly on this one, I actually didn't
11   have eyes on anything. I was just in the area making
12   sure I was in a position where I could monitor the
13   wire.
14 Q Okay. So is that what you were doing, was just
15   monitoring the wire?
16 A Correct. I was -- my job was to operate the wire and
17   the recording.
18 Q Okay. And so you were relying on what other officers
19   were telling you to turn it on and turn it off?
20 A Correct.
21 Q Okay.
22 A Plus I mean, I could hear over the wire, so I could
23   hear as -- you know, in the vehicle, because we monitor
24   it continuously. We just record it during the -- the
25   aspects that are pertinent to the case. So I could

Page 629

1    hear as Jeremy was driving to the scene, listening to
2    his radio, and as he was stopping at stop signs, and
3    stuff like that. You could hear the car sounds and
4    everything. So I could tell when he was driving, when
5    he was stopped, and you can pretty much understand what
6    is going on just by listening.
7 Q  Okay. And then -- so what happened after Jeremy got
8    out of the suburban? Did you do anything there?
9 A  After the buy was done, you mean?
10 Q Uh-huh.
11 A After the buy was done we attempted to follow the
12   suspect away from the area, unsuccessfully.
13 Q Okay. So you never found out where he was going that
14   day?
15 A Actually what I did was I drove back to 202 Grand
16   Larry.....
17 Q Uh-huh.
18 A .....and waited, hoping that maybe he would come back
19   there. And the vehicle did show up there for a very
20   brief period of time. I don't know if he ever went in
21   the house or not. All I know is that the vehicle
22   pulled in the driveway, the lights were on, and after a
23   few minutes it left again.
24 Q All right. Thank you. Let me direct your attention to
25   February 28th going into March 1st. Did you

Page 630

1  participate in this case on that day?
2 A  Yes, I did.
3 Q  And what was your assignment that day?
4 A  I was assigned to be the -- the marked police unit that
5    was going to conduct the takedown, or wh -- the actual
6    arrest of the suspect, and what we call the buy bust.
7 Q  Okay. So where were you at?
8 A  Actually I was hiding, I believe, west of Mul --
9    Muldoon on Duben. I kind of went west on Duben and
10   parked in a little cubby hole there off the side of the
11   road.
12 Q  Okay. So -- and you couldn't be seen from what was
13   going on at the scene?
14 A  Correct.
15 Q  You couldn't see the scene, they couldn't see you?
16 A  Correct.
17 Q  Okay. Then how did you know when to go?
18 A  Basically listening to a bug radio which monitors the
19   wire, but mainly relying on the other officers over the
20   radio.
21 Q  Okay. And then what did you do when you were put into
22   action?
23 A  Basically I drove into the area. They had described
24   the vehicle and where it was at. Once I spotted it I
25   blocked it in with my patrol car with my lights on, and

Page 631

1  made contact with the suspect.
2 Q  Was anyone in the car with him?
3 A  No.
4 Q  Okay. And what happened once you contacted him?
5 A  Basically he was placed under arrest.
6 Q  Okay. What -- was he still inside the car?
7 A  He was.
8 Q  Okay. And was the car running?
9 A  I believe it was running when I initially stopped. Of
10   course I would have told him to turn it off. Of course
11   I told him to show me his hands. I remember that his
12   hands were up initially, and then he put them back
13   down, so I drew my -- my handgun, and then his hands
14   went back up, and I had him step out of the vehicle.
15   At that time, of course, everybody else was arriving,
16   too. And he was placed in -- placed under arrest.
17 Q  Okay. Now, once you placed him under arrest, what did
18   you do?
19 A  I conducted a search of him.
20 Q  Okay. And could you just please describe to the
21   members of the jury what kind of search you conducted?
22 A  Basically I -- a pat search. My primary concern, of
23   course, would be weapons. In this case also I was
24   looking for some evidence, money or drugs. Of course,
25   being that it is outside and it is dark, it is a lot

Page 632

1  easier to do that once you are inside. Do a more
2  thorough search inside.
3 Q  Okay. Did you find anything on him?
4 A  No.
5 Q  All right. Then were you surprised that you didn't
6  find the buy funds?
7 A  No.
8 Q  Why not?
9 A  I actually expected it to be in the vehicle.
10 Q  All right. And did you search the vehicle right then
11   and there?
12 A  No.
13 Q  All right. So then what did you do with the defendant
14   after he was in your car?
15 A  I believe I -- I went took him to the magistrate's
16   office where Officer LaPorte had gone enroute, and got
17   the appropriate bail paperwork, and warrant paperwork
18   signed. And once I got that paperwork from him, I took
19   him over to Cook Inlet Pretrial where he was processed
20   in under the charges.
21 Q  All right. Now, let me ask you what happened at CIPT.
22   Had you been told to ask anybody at CIPT to do
23   something?
24 A  Well, typically in drugs cases we want the defendant to
25   be searched -- strip searched at the jail by

Page 633

1  corrections, so, of course, I asked them to strip
2  search him for drugs or money.
3 Q  Do you recall which officer you asked?
4 A  No, I don't.
5 Q  Okay. Did you see the witness that was here before
6  you?
7 A  I saw the corrections officer that was leaving, yes.
8 Q  Did you -- do you recognize him from having anything to
9  do with this case?
10 A  I recognize him from CIPT, but I -- I couldn't tell you
11   if he was the corrections officer that was working that
12   night or not.
13 Q  Okay. And so you don't recall who you asked?
14 A  Correct. Whoever the booking officer was at that
15   night, that -- that processed that prisoner, that is
16   the person who I asked.
17 Q  Okay. And do you recall whether or not more than one
18   booking officer was working that night?
19 A  There is always several kind of wandering around. I'm
20   not exactly sure how they work, if one books this one,
21   and the next guy that comes in the other does it, or if
22   one person does it for a whole hour. There is always
23   several corrections officers around the booking area.
24 Q  Okay. So did you verify that the person you were
25   talking to was the booking officer for this defendant?

Page 634

1 A   No.

2 Q   All right. Now, then what -- you pull up to CIPT.
3   Could you just describe for the members of the jury
4   what happens?

5 A   Sure. Over at CIPT on the, I guess it would be the
6   west side, they have some garage doors. And we pull up
7   and we push a little button and tell them who we are,
8   and they open one of the garage doors. You pull in.
9   Park. You get your prisoner out, and there is kind of
10   a set of double doors where you have to wait for one to
11   open and walk into a narrow hallway. And when the one
12   behind you closes, the next one opens. And that lets
13   you into the booking area. Booking area kind of has a
14   big room that has windows all around it where the
15   corrections officers sit. And they have some computers
16   and some office equipment, and it is surrounded on all
17   sides by basically holding areas -- holding cells. Not
18   typically what you would see on TV as far as with bars,
19   but rooms with -- with doors that lock and big windows.
20   They come out to that area and they meet you, and they
21   take control of the prisoner. They do a pat search,
22   and they take the handcuffs off, and they -- they take
23   their jacket and their shoes and their belts and stuff
24   like that, and put them into bags, and process them in
25   with all their protocol.

Page 635

1 Q   Now, when you asked -- did you ask them to look for
2   anything?

3 A   Yes.

4 Q   What did you ask them to look for?

5 A   Money and drugs.

6 Q   Did you give them any serial numbers of any buy funds
7   to look for?

8 A   No.

9 Q   Okay. And what ha -- what did they do in response to
10   your request?

11 A   Basically I told them he needed to be stripped for --
12   for money and drugs, which means I want him stripped
13   searched for money and drugs. And they took him
14   basically around the back of the booking area, back
15   into another room where you can't see from booking
16   area. I'm not sure if it is a shower room, or what it
17   is. I have never been back there.

18 Q   Okay. And then about how long were they gone?

19 A   I don't recall, but I know it wasn't very long.

20 Q   Okay. Do you recall about what time you got there?

21 A   No, I don't.

22 Q   Okay. Do you recall about how long you were there all
23   total?

24 A   I -- I don't. I'm sorry.

25 Q   Okay. Do you know if it was more than a half an hour,

Page 636

1   or less than a half an hour.

2 A   It would have been less than a half an hour. I've
3   never spent a half hour at CIPT.

4 Q   More than 20 minutes, or less than 20 minutes?

5 A   I would probably say 15 minutes or less.

6 Q   15 minutes or less? Okay. And then did you do
7   anything else in connection with this case?

8 A   I believe the only other thing I would have done was
9   deal with the tape, which I probably just turned over
10   to Officer LaPorte.

11 Q   Okay.

12 A   Actually I didn't even have a tape on this case -- on
13   this -- this instance. So that would be it for me.

14   MS. BRADY: That's all the questions I have for this
15   witness.

16   THE COURT: You folks need to take a break, anybody?
17   We've been at it for a while. Nobody is raising their hand.
18   We'll go a while if you need to. All you have to do is let
19   me know, and we will take a break. Otherwise, I'll just
20   call one anyway. Go ahead, Mr. James.

21   MR. JAMES: Thank you.

22                  ROY LEBLANC
23   testified as follows on:

24          CROSS EXAMINATION
25 BY MR. JAMES:

Page 637

1 Q   Officer LeBlanc, go into CIPT first. You indicated
2   that you drove in through the doors, got into what is
3   the holding area, and you asked one of the office --
4   the booking officer. Was that the -- you were speaking
5   with the one booking officer all this time?

6 A   Correct.

7 Q   Okay. And you asked that officer to look for money or
8   contraband, right?

9 A   Money and drugs, correct.

10 Q   Money and drugs? Okay. And do you recall -- so you
11   didn't -- you just wanted money. You wanted any money
12   and any drugs?

13 A   Correct.

14 Q   All right. And do you recall receiving any type of
15   communication back from CIPT saying that no buy money
16   was found?

17 A   I didn't specifically ask for buy money.....

18 Q   Oh.

19 A   .....so they wouldn't have.....

20 Q   Did you re.....

21 A   .....said buy money, but obviously they told me -- or,
22   somehow they indicated theys hadn't found anything,
23   because I left without anything.

24 Q   Okay. So you stuck around to see whether the goodies
25   showed up?

Page 638

| | |
|---|---|
| 1 A | Correct. |
| 2 Q | All right. Going to Grand Larry, behind you, the |
| 3 | diagram that is now there, okay. You are about 45 and |
| 4 | a half yards by your beamer -- or, some kind of a |
| 5 | distance..... |
| 6 A | Correct. |
| 7 Q | .....calculator? |
| 8 A | Uh-hum. (Affirmative) |
| 9 Q | Okay. And what is the lighting conditions on -- well, |
| 10 | first of all, let's go to the 8th and tell me when that |
| 11 | happened? When were you there? |
| 12 A | It was at night. It was dark. |
| 13 Q | All right. And about what time of night was it? |
| 14 A | About 8:10. |
| 15 Q | Okay. And what are the lighting conditions on Grand |
| 16 | Larry? |
| 17 A | It is a pretty dark street. There is a few street |
| 18 | lights, I believe, but it is fairly dark. |
| 19 Q | Okay. Could you tell me where -- you have been out |
| 20 | there because you measured this apparently? |
| 21 A | Correct. |
| 22 Q | Okay. Could you tell me where the street lights are |
| 23 | located? |
| 24 A | I don't -- I know -- I believe there that there is one at |
| 25 | each end. I'm not sure if there is any in between this |

Page 639

| | |
|---|---|
| 1 | span of block at all, or not. |
| 2 Q | Okay. |
| 3 A | I don't believe so. |
| 4 Q | Is it a wide street? |
| 5 A | No, it is a fairly narrow street. |
| 6 Q | And if you can recall, what was the car layout at 202 |
| 7 | Grand Larry? |
| 8 A | I'm not sure I understand what you mean by car layout. |
| 9 Q | I kind of figured you weren't, because I thought to |
| 10 | myself I didn't understand it myself. Is there a |
| 11 | driveway at Grand Larry? |
| 12 A | There is. |
| 13 Q | All right. |
| 14 A | Actually..... |
| 15 Q | Where is the driveway? |
| 16 A | .....there is a driveway..... |
| 17 Q | I m -- excuse me, a parking area. Not a driveway, but |
| 18 | a..... |
| 19 A | I would call it a driveway. |
| 20 Q | Okay. I'll go with you. |
| 21 A | Basically right here, and the back -- I'd say maybe the |
| 22 | back third of the residence has a small little carport. |
| 23 Q | Okay. |
| 24 A | Maybe big enough -- maybe big enough for one car to be |
| 25 | under. |

Page 640

| | |
|---|---|
| 1 Q | All right. |
| 2 A | That would be like right -- right here. This door is |
| 3 | actually under the carport. |
| 4 Q | And that's the door that you were observing? |
| 5 A | Correct. Actually, I could see both doors for where -- |
| 6 | where I was at, but the only one that was used, in this |
| 7 | case, would have been this one. |
| 8 Q | All right. |
| 9 A | The other door would have been right about here. There |
| 10 | is a door, and there is a window on each side of the |
| 11 | door, and the other half is basically a copy of that. |
| 12 Q | Uh-huh. Now, when you -- on the 8th now, we're |
| 13 | talking, okay? |
| 14 A | Okay. |
| 15 Q | Excuse me. When you did your search of the vehicle |
| 16 | before -- this happened at the police department, |
| 17 | right? |
| 18 A | Correct. |
| 19 Q | Okay. Did you report the finding of the marijuana? |
| 20 A | Report it to? |
| 21 Q | Somebody? |
| 22 A | Yes. |
| 23 Q | Okay. Who did you report it to? |
| 24 A | I reported it back to the unit, of course. |
| 25 Q | Okay. |

Page 641

| | |
|---|---|
| 1 A | I believe Officer LaPorte was the one who went in and |
| 2 | had a long come-to-God talk with the informant. |
| 3 Q | Okay. And where do -- you have your police reports in |
| 4 | front of you, right? |
| 5 A | Yes, I have the police report from this case. |
| 6 Q | That's what I meant, yeah. |
| 7 A | Yes. |
| 8 Q | And does it have any indication there that you found |
| 9 | contraband during your search? |
| 10 A | No. |
| 11 Q | And would you agree, as a five and a half year police |
| 12 | officer -- I think it is five and a half years, isn't |
| 13 | it? |
| 14 A | Five -- a little over five years. |
| 15 Q | Okay. I'll give you another six months -- that it is |
| 16 | important to put in information relating to -- |
| 17 | especially contraband, in that type of situation when |
| 18 | you are -- you are doing such a search? |
| 19 A | Well, I don't think that that is actually indicative of |
| 20 | the defendant's guilt or innocence in this case. It is |
| 21 | more indicative of the informant's guilt of innocence. |
| 22 | And I don't know that specifically the search where the |
| 23 | marijuana was found was for this case, or for one of |
| 24 | the other cases we used him for. Because, like I said, |
| 25 | we did many cases with this -- or several cases with |

Page 642

1  this informant. It may very well have been this one.
2  I do believe it was the first search we did, because I
3  do recall that his car was quite messy, and it took a
4  long time to search the first time. And I -- my talk
5  with him was that he needed to clean out his car so
6  that it didn't take so long.
7 Q  And what kind of car was this -- what kind of car was
8  this?
9 A  It was an old beater station wagon.
10 Q  All right. And if someone had testified that on th --
11  during the search marijuana was found in relationship
12  -- we are talking about this case, now.
13 A  Okay.
14 Q  Would you have put it in your report?
15 A  Probably not, no.
16 Q  Why not?
17 A  Because it is not -- it doesn't have anything to do
18  with the defendant or the subject of this case.
19 Q  But it has to do with the fact you did a thorough
20  search, and what you found?
21 A  Correct. And there was no contraband in the car when
22  this case proceeded.
23 Q  So you found some but -- so -- you use selective
24  reporting, then, correct?
25 A  No, I wouldn't call it selective reporting. It would

Page 643

1 Q  That was about 10:10 hours?
2 A  Actually, it was about 20:10 hours. That is just a
3  typo.
4 Q  Okay, I mean -- but 10 -- 10:00 p.m. is what you are
5  talking about, then? All right. I'm sorry, excuse me.
6 A  8:00. That would be 8:00.
7 Q  8:00. Okay. So.....
8 A  8:10. Correct.
9 Q  All right. So the one should be a two?
10 A  Correct.
11 Q  You are talking military time then?
12 A  Correct.
13 Q  Okay. All right. Okay. And was there any cars -- how
14  many cars were in the driveway, which is part of the
15  carport?
16 A  I don't recall.
17 Q  All right.
18 A  If I remember correctly, there was something under the
19  carport. It just kind of looked like it was abandoned
20  there, but I don't remember if there were anything el
21  -- was anything else in the driveway.
22 Q  All right. Is there parking to the left, if you turn
23  in -- when you are facing 202 from Grand Larry?
24 A  Uh-hum. (Affirmative)
25 Q  You have already diagramed in a parking driveway?

Page 645

1  just be handled as a separate incident.
2 Q  And do you know whether or not the incident was
3  prosecuted?
4 A  I would take -- I would suspect that it wasn't.
5 Q  All right. Okay. Who was involved in that one? Go
6  ahead and have some water, but watch the pitcher. I
7  think that is the drippy one. Who was part of the team
8  at that time?
9 A  At that time it was myself, Officer LaPorte, Officer
10  Johnstone, Officer Steve Haas, Officer -- now Sergeant
11  Bushue. She was an officer back then, and Officer
12  Sims. I'm not sure if he was on leave at the time, or
13  if he was involved at all.
14 Q  Okay.
15 A  And Officer Somerset Jones, as well.
16 Q  Uh-huh. When you saw -- okay, you arrived about five
17  minutes early, I believe, to the scene, is that
18  correct? You were there.....
19 A  Approximately, correct, yes.
20 Q  Okay. And -- and that was about -- calling your
21  attention to your report dated 2/9/2001, down at the
22  bottom there, do you see it?
23 A  Yes.
24 Q  Okay. That was about 10:10 hours?
25 A  I'm sorry?

Page 644

1 A  Correct.
2 Q  Is there parking available on the left of that?
3 A  Here?
4 Q  Yeah.
5 A  What you are referring to?
6 Q  Yes.
7 A  I don't exactly remember. I believe it is kind of wide
8  enough for two rows of cars, but I'm not positive. I
9  don't think I could -- could say for sure.
10 Q  Did -- where did Mr. Jeremy Fish's -- where did he
11  park?
12 A  Each time.....
13 Q  Excuse me, I'm talking about the 8th, now.
14 A  The 8th?
15 Q  Uh-huh.
16 A  He pulled right in.
17 Q  Okay. Behind.....
18 A  Whatever else was in the driveway.
19 Q  Okay. And you indicated that he got out and he went
20  in, then came back out, then went back in?
21 A  Correct.
22 Q  Okay. And this -- according to your report basically
23  was about a 10 minute from arrival to departure?
24 A  Correct.
25 Q  Okay. Now, do you know if anybody else was in the

Page 646