3AN-01-1717 CR

| | Page 647 | | Page 649 |
|---|---|---|---|

**Page 647**

1    house -- in 202 at that time?
2 A   Other than the one other subject?
3 Q   Right. You saw -- according to the police report, you
4    saw someone open the door?
5 A   Correct.
6 Q   And then you -- obviously Jeremy Fish was there.....
7 A   Correct.
8 Q   .....because you saw him go in and go out? Anybody
9    else?
10 A   I -- I don't know.
11 Q   All right. Okay. After Jeremy Fish left -- got back
12    in the car, what happened then?
13 A   After he left?
14 Q   Well, he got back in the car and then someth -- he
15    obviously.....
16 A   He left.
17 Q   He left. Okay.
18 A   Correct. And I passed surveillance off to another
19    unit.
20 Q   And who was that?
21 A   I don't recall.
22 Q   All right. And are you folks talking to each other on
23    radios, or something during this time?
24 A   Correct.
25 Q   Okay. Okay. Then that was the totality of your

**Page 648**

1    involvement on the 9th, correct?
2 A   Actually it was on the 8th.
3 Q   I'm sorry, the 8th. I was looking at the.....
4 A   After Jeremy got back to the station, I conducted the
5    post-buy search of his vehicle, as well.
6 Q   Okay. Did you -- had you disturbed anything in the
7    vehicle from the time that -- by removing anything
8    other than the marijuana out of his -- you said it was
9    pretty messy, right?
10 A   Correct.
11 Q   Did you take anything -- clean the car out for him?
12 A   I didn't clean the car out. I do believe he had a
13    steak knife under his seat that I put way in the back,
14    but I wasn't going to clean his car for him.
15 Q   Okay. All right. And so the -- there is no mention in
16    your search about finding the steak knife either, is
17    there?
18 A   No.
19 Q   All right. And when you did the post search, is it
20    fair to assume that the interior of the vehicle was
21    basically how you had left it after the pre-search?
22 A   Correct.
23 Q   Okay. What was in the vehicle?
24 A   As far as the trash that was in it?
25 Q   Yeah. Yes.

**Page 649**

1 A   I don't really recall exact trash. I mean, I believe
2    there was some fast food stuff, dirt, lots of rocks,
3    and gravel on the floorboards.
4 Q   Okay. Did you search all the fast food stuff?
5 A   I looked through everything, yes. And in the back, I
6    believe, he had a baby car seat, and some other -- some
7    clothes, and some other things.
8 Q   Okay. Now, going to the 20th. That is the next time
9    you had any involvement in this, is that correct?
10 A   Correct.
11 Q   Okay. And the -- you were again assigned to the eye,
12    is that.....
13 A   The close in surveillance, yeah.
14 Q   Surveillance, okay. And where were you that time?
15 A   Same splace [sic].
16 Q   Same spot? So -- okay. Was -- what time was this?
17 A   Looks like the informant showed up at about 8:09.
18 Q   Okay. And were the lighting conditions the same?
19 A   It would have been. It actually would have been a
20    little bit lighter, because it was a little bit later
21    in the month, but at this time of night it would have
22    been the same probably.
23 Q   Okay. 8:00 at night, that time frame?
24 A   Correct. Yes.
25 Q   Okay. And Grand Larry still very dark -- the street

**Page 650**

1    itself?
2 A   Correct.
3 Q   Okay. And you started the recording -- when did you
4    start the recording?
5 A   As he drove into the area.
6 Q   Okay. What did you hear on the recording when he was
7    driving into the area?
8 A   Well, referring to my report, what I heard was, I heard
9    several people talking.....
10 Q   No, let me stop you, if I may.
11 A   Okay.
12 Q   What did you hear when you -- you turned on the
13    recorder, right?
14 A   Correct.
15 Q   As he was driving in?
16 A   Uh-hum. (Affirmative)
17 Q   What did you hear?
18 A   I don't remember.
19 Q   Okay. And then he pulls in. Where did he pull in?
20 A   I believe it was pretty much the same place, only on
21    this occasion there was other vehicles to where he
22    couldn't pull in all the way.
23 Q   All right. How many vehicles were there?
24 A   Several.
25 Q   Okay. Did you know how many people were in the house?

1 A   No.
2 Q   Okay. Again, Jeremy Fish, according to your police
3     report with testimony, he came out of the house,
4     correct? He went in the house.....
5 A   And then he exited the house, yes.
6 Q   I'm sorry, please? I didn't hear.
7 A   He went in the house.....
8 Q   Right.
9 A   .....and then he came back out. Correct.
10 Q   Okay. Right. And what happened?
11 A   After he was all done, or.....
12 Q   No, no. He came in, went back out. Take me from
13     there?
14 A   He moved his car.
15 Q   All right. Then why did he move his car, according to
16     what you are -- you observed?
17 A   To allow another vehicle to leave.
18 Q   Okay. Who was in the other vehicle?
19 A   I have no idea.
20 Q   All right. Were you the only one that was close in
21     surveillance?
22 A   I believe so, yes.
23 Q   Okay.
24 A   That was my assignment.
25 Q   That was -- and according to how you understand the

1     procedures, one person is close in surveillance?
2 A   Sometimes two.
3 Q   Okay.
4 A   But usually just one.
5 Q   All right. And on the 9th and on the 20th, to your
6     knowledge, you were the only close in surveillance?
7 A   Correct.
8 Q   Okay. And so anything that was observed as to going
9     in, coming out, where someone parked, would have been
10     based upon your observation, since you were the eye?
11 A   Correct.
12 Q   Okay. Do you know -- did you stay at that location on
13     the 20th?
14 A   I'm not sure I understand.
15 Q   You arrived at the location, which was the same spot
16     that you were on the 9th?
17 A   Correct.
18 Q   The 8th, I'm sorry, The 8th. All right. Did you stay
19     there until such time as Mr. Fish departed?
20 A   Yes.
21 Q   Okay. Okay. Calling your attention to your report of
22     2/20. Do you have that?
23 A   Yes.
24 Q   Okay. The second paragraph of action taken?
25 A   Uh-hum. (Affirmative)

1 Q   I heard some dialogue, but was repositioning my
2     vehicle, and could not understand the contents?
3 A   Correct.
4 Q   So you didn't stay there?
5 A   I did stay there, I just repositioned my vehicle.
6 Q   How would that -- would did you mean, reposition?
7 A   Basically, as I was parked right here, a bunch of --
8     what I would call gang bangers, showed up for a party,
9     carrying beer. A bunch of cars all pulled up around
10     me, so I basically pulled out onto the street so that I
11     wasn't in their driveway where they were all coming
12     into with -- for their party.
13 Q   Okay. So that was happening across the street
14     from.....
15 A   Correct.
16 Q   Okay.
17 A   Well, kitty corner.
18 Q   Kitty corner? All right.
19 A   Not directly across the street, correct.
20 Q   Not directly across the street, but where you were
21     parked?
22 A   Correct. In the -- I was basically in the parking area
23     for this eight-plex, or six-plex, whatever it is.
24 Q   So how many cars showed up?
25 A   At -- where I was at?

1 Q   Yes.
2 A   I know at least two.
3 Q   All right. When you say you repositioned your car,
4     what did you do to reposition your -- cars are coming
5     in.....
6     MS. BRADY: Objection, Your Honor, asked and answered.
7     THE COURT: You can finish your question, but if you
8 have already asked it once.....
9     MR. JAMES: Right.
10     THE COURT: .....I'm going to sustain the objection.
11 Q   Where did you reposition your car to, to accommodate
12     these cars -- they were coming in?
13 A   Basically I just pulled it out onto the street. I just
14     kind of parked myself in front of the dumpster.
15 Q   Right. Did you stay there, then?
16 A   Until after it was all done, yes.
17 Q   Okay. Now, you controlled the wire, right?
18 A   I controlled the recording, yes.
19 Q   I'm -- Okay. So you had the on, off switch?
20 A   I had the recording on, off switch.
21 Q   Right. And that would have controlled what would --
22     would be heard, what would be recorded?
23 A   Correct.
24 Q   Okay. And the only recording that would have been
25     inputted into that recorder would have been from the

**Page 655**

1  microphone on Jeremy Fish?
2 A  Correct.
3 Q  Okay. Okay. And while you were repositioning the car,
4  could you understand what was -- what you were -- were
5  you hearing, also, at the same time?
6 A  Yes.
7 Q  Okay. Could you understand what was being said?
8 A  No.
9 Q  All right. And when did you stop the recording?
10 A  I don't remember the exact time, but it would have been
11  as the -- the informant was driving out of the area.
12 Q  Okay. Do you know which way he went when he drove out
13  of the area?
14 A  Southbound, by referring to my report.
15 Q  Okay. Looking at the map -- oh, excuse me, the drawing
16  behind you, which was would he have gone?
17 A  This way.
18 Q  Down the base of the paper?
19 A  Yes.
20 Q  Okay. And does that refresh your memory as to when you
21  stopped your recording?
22 A  No.
23 Q  All right. Did the vehicle that you observed move?
24  Did it return to 202 while you were there? The ve.....
25 A  I'm not sure I understand.

**Page 656**

1 Q  All right. You have testified that the vehicle -- some
2  people got in a vehicle -- a person -- somebody got in
3  a vehicle, and that is why Mr. Fish had to move his
4  vehicle?
5 A  Correct.
6 Q  Okay. Did you see that vehicle leave?
7 A  Yes.
8 Q  Okay. Did that vehicle return while you were there?
9 A  I don't recall.
10 Q  All right. Where were your other officers at, do you
11  know?
12 A  Basically I'm not -- I can't tell you exactly where
13  each person was at, but we had surveillance set up so
14  that which ever way Jeremy left somebody would be able
15  to pick him up and follow -- from each end of the
16  street.
17 Q  To your knowledge, was anybody else on that street --
18  officers?
19 A  I don't know. I don't know exactly where they were
20  positioned at.
21 Q  Okay. But to your -- to your knowledge, was anybody
22  else on the street?
23  MS. BRADY: Objection, Your Honor.
24  THE COURT: Sustained. Asked and answered.
25 Q  Okay. When -- Okay. Was that your involvement in this

**Page 657**

1  case at that time -- at the conclusion there?
2 A  I think the only other thing for that was that I turned
3  the tape of the recording over to Officer LaPorte, and
4  that would have been it.
5  THE COURT: I want to stop here, and take about a 10
6  minute break. Give everybody a chance to take a short
7  break, and we will come and get you in about 10 minutes.
8  Parties and counsel here for a second.
9  (Pause)
10  (Jury not present)
11  All right. Before we go off record, counsel, I have
12  some real concerns about the pace of this case, and I have
13  -- you can all sit down. We are pushing right up to
14  Thanksgiving. We didn't ask these folks what they were
15  doing on Friday after Thanksgiving or next week, because --
16  at least I didn't ask them because I couldn't imagine that
17  we would go this long. I have real concerns that if we go
18  pa -- even slip into late tomorrow and certainly after
19  tomorrow that we are going to lose enough jurors that I am
20  going to have to declare a mistrial. And I would hate to do
21  that.
22  But I have real concerns that that is happening. So I
23  am just warning you about that. And I am not going to make
24  jurors stay if it would be inconvenient for them, because we
25  didn't ask them about Friday or next week. So you need to

**Page 658**

1  know that, and we will -- you know, if that happens I'll
2  deal with it, and we will deal with why we got to this
3  point. But at this point I am just putting you on notice
4  that I have concerns. I hope you all do about that problem.
5  So let's take a short break and we will get the jury back
6  in.
7  (Off record)
8  THE COURT: Everybody have a seat. Are we back on
9  record Madam clerk?
10  THE CLERK: We're on record.
11  THE COURT: All right. Would you like to continue your
12  cross examination?
13  MR. JAMES: Thank you.
14  CROSS EXAMINATION CONTINUED
15  BY MR. JAMES:
16 Q  Either time when Mr. Fish went back into the -- got
17  back in his car -- I'm focusing on the 8th and the 20th
18  now, could you see what he was doing in the car, other
19  than the fact, I know on the 20th he moved the car?
20 A  No.
21 Q  All right. All right. So that ended your involvement
22  on the 20th. The 20 -- what was your next involvement
23  in this case?
24 A  It would be on the 21st.
25 Q  Okay. And what was your job on the 21st?

1 A   I was to operate the wire -- record the conversation.
2 Q   All right. And where were you on the 21st -- I mean,
3     first of all, let me ask you this. That's an unfair
4     question. On the 21st your job was assigned the wire.
5     All right. What happened after you got your assignment
6     to operate the wire?
7 A   I set it up to make sure it works, test it, and put a
8     tape in it.
9 Q   All right. And then did you put the wire on Jeremy
10    Fish?
11 A  I don't know if I put it on him that day. I'm sure I
12    would have double checked to make sure it was on right,
13    make sure it worked right.
14 Q  Okay. And -- all right. Now, at about 8:30, according
15    to your report here, you arrived at what location?
16    8:24 to be specific?
17 A  Oh, International Airport Ave and Old Seward Highway.
18 Q  Okay. And where were you parked?
19 A  I don't remember exactly where I was parked at.
20 Q  All right. And after -- you had a job to do after
21    running the wire. How long did you run the wire?
22 A  Looks like about a minute.
23 Q  Okay. And what kind of vehicle was Jeremy driving that
24    day, same one?
25 A  I don't remember.

Page 659

1 Q   Okay. What kind of vehicle was at the location of Old
2     Seward and International, other that -- well, first of
3     all, did Jeremy make -- who did you see when Jeremy
4     arrived at International and Seward?
5 A   I didn't see anything.
6 Q   Okay. Now, you were assigned to do something after you
7     turned off the wire?
8 A   Correct.
9 Q   Okay. What were you assigned to do?
10 A  Our -- remaining members of our unit, those that
11    weren't following Jeremy back to the station, were
12    going to attempt to follow the suspect.
13 Q  Okay.
14 A  And I don't recall if that was an -- an assignment that
15    we decided on at our briefing, or if it is something
16    that we decided on later on.
17 Q  Okay.
18    THE COURT: Move that mike a little closer to you,
19 would you? That's good.
20 Q  Who -- you were a part of that group, correct?
21 A  The group to follow the suspect, yes.
22 Q  Yeah. All right. And who else was involved in that?
23 A  I don't recall which.....
24 Q  Okay.
25 A  .....which members.

Page 660

1 Q   When did -- you had testified earlier that you returned
2     to 202 Grand Larry that day?
3 A   Correct.
4 Q   Okay. When did -- what was the suspect vehicle driving
5     at that time?
6 A   He was in a large sport utility. I believe it was a
7     Durango -- like a Dodge Durango, or something similar.
8 Q   Okay. And that information had to have been supplied
9     to you from some other source if you didn't see
10    anything at the scene?
11 A  Correct.
12 Q  Okay. How long ago was that? How long after the --
13    that you departed International that you saw the
14    vehicle arrive at -- the described vehicle that you
15    were to watch for?
16 A  I don't remember. We tried following it around for a
17    while, and then once we lost it I basically made a
18    beeline for that address just with the hopes that it
19    might show back up there.
20 Q  Okay. Okay. And that is -- does that finish off your
21    involvement on the 21st?
22 A  Once I back -- got back to the police station, I turned
23    over the tape of the recording to Officer LaPorte.
24 Q  Okay.
25 A  And that would end.....

Page 661

1 Q   That was the end?
2 A   Yes.
3 Q   Okay. Going to the 28th/1st, you were in a marked
4     police car at this time?
5 A   Yes.
6 Q   Prior times, were you in a marked police car?
7 A   No.
8 Q   Okay. So this is the first time you were in a cop car?
9 A   Yes.
10 Q  Marked.....
11 A  Right.
12 Q  .....police car? Okay. And you were assigned to make
13    the arrest, is that correct?
14 A  Correct.
15 Q  Okay. And were you running any wire at that time?
16 A  No. I had a bug radio which monitors the wire but no
17    recording device.
18 Q  Okay. All right. And at that particular juncture,
19    what kind of car was Mr. Davis -- or, excuse me,
20    Mr. Jeremy driving then?
21 A  I don't recall. I imagine probably the same one he has
22    been driving the whole time.
23 Q  Okay. You were not involved in any more searches other
24    than the -- the ones you previously described of the
25    vehicle?

Page 662

1 A  Correct.
2 Q  Okay. And at that time, then, where were you at -- on
3     the 28th slash 1st? Where were you physically located?
4 A  Where was I parked?
5 Q  Yes.
6 A  Waiting for it to occur?
7 Q  Yes.
8 A  I was on Duben, west of Muldoon.
9 Q  All right. Is that the Palmer side of Duben?
10 A  No.
11 Q  Oh, I'm sorry. Duben goes.....
12 A  Duben runs east/west. Muldoon is a north/south street.
13 Q  All right. So you were on -- all right. And how did
14    you know when to effectuate the arrest?
15 A  Other officers telling me.
16 Q  All right. And how long did it take you to get from
17    your location to where Mr. Davis' vehicle was?
18 A  Not very long. Probably a minute, maybe less.
19 Q  Okay. And how did you know to stop Mr. -- or to locate
20    Mr. Davis' vehicle? What.....
21 A  They told me where he was at.
22 Q  Okay. Did they tell you what kind of vehicle?
23 A  They described it, yes.
24 Q  Okay.
25 A  And I believe someone gave the plate.

Page 663

1 Q  All right. So you arrived at the scene. What do you
2     do?
3 A  I blocked him in with my lights on, and -- and
4     contacted him.
5 Q  Okay. And he was sitting in the driver's side?
6 A  Yes.
7 Q  Okay. And you -- did you pull your gun out right away?
8 A  Not right away, no.
9 Q  Okay. And what happened? You contacted him. How do
10    you mean you contacted him?
11 A  Anchorage police, put your hands up.
12 Q  Okay. And was the window up or down?
13 A  I believe it was partially down.
14 Q  Okay.
15 A  Not completely down, but partially down.
16 Q  And he put his hands up, is that correct? Am I.....
17 A  Correct.
18 Q  Okay.
19 A  Initially.
20 Q  Initially. Then.....
21 A  Then he put his hands back down, and that is when I
22    drew my handgun.....
23 Q  Okay.
24 A  .....and told him put his hands back up in the air.
25 Q  And do you know if he was trying to get the car out of

Page 664

1     gear?
2 A  I have no idea what he was trying to do.
3 Q  All right. Was it a standard or automatic?
4 A  I don't know.
5 Q  Okay. And then puts his hands back up. You got your
6     -- your gun drawn. Does he exit the vehicle?
7 A  He follows -- he complies with commands at that point,
8     and steps out.
9 Q  Did you tell him to get out?
10 A  Yes.
11 Q  Okay. So he gets out of the vehicle?
12 A  Uh-hum. (Affirmative)
13 Q  Okay. Did you -- what did you do? Did you put him up
14    against the car?
15 A  I had him face the -- would be the back left corner
16    panel of the car, and put him in handcuffs.
17 Q  Okay. So just boom, boom?
18 A  Basically, yes.
19 Q  All right. Okay. Now, was Somerset Jones there?
20 A  He was.
21 Q  Okay. And where was he, to your recollection?
22 A  I'm not exactly sure where he was at.
23 Q  Okay. Was he in the immediate vicinity?
24 A  Yes.
25 Q  I mean.....

Page 665

1 A  Yes. Those who didn't stay with the informant took
2     part in the -- what we call the buy bust -- the arrest.
3 Q  Okay. And okay, you got his hands behind him. I
4     assume you cuffed him?
5 A  Yes.
6 Q  Okay. All right. Then what did you do?
7 A  Searched him.
8 Q  All right. Did you put your hands in his pockets?
9 A  Some of them, yes.
10 Q  Okay. Did you take his wallet out and get his driver's
11    license out?
12 A  I took his wallet out. I don't recall if I took his
13    driver's license out, or if somebody else did.
14 Q  Okay.
15 A  More than likely I handed his wallet off to somebody
16    else.
17 Q  Okay. Did you find any buy money on him?
18 A  No.
19 Q  Okay. You knew what the buy money was, right?
20 A  Yes.
21 Q  Okay. Okay. Did you find any other money on him?
22 A  I don't believe so, no.
23 Q  So he was zeroed out? No money?
24 A  No money that I found.
25 Q  All right. And you were the one that was looking,

Page 666

| | |
|---|---|
| 1    checking and..... | 1 Q   All right. And the -- anybody else in the car with |
| 2 A   Correct. | 2     you? |
| 3 Q   Okay. What pockets did you go into? | 3 A   No. |
| 4 A   I don't remember exactly. | 4 Q   All right. So where did you go from there? |
| 5 Q   Okay. How was he dressed? | 5 A   To the magistrate's office. |
| 6 A   He was wearing a fairly large baggy winter coat, and I | 6 Q   Okay. Anybody meet you at the magistrate's office? |
| 7     believe blue jeans, but I'm not positive. | 7 A   Yes. |
| 8 Q   Uh-huh. Did you have your flashlights with you? | 8 Q   Who was that? |
| 9 A   I always have a flashlight with me. | 9 A   Officer LaPorte. |
| 10 Q   You always have a flashlight -- did you use your | 10 Q   Did he give you any instructions at the magistrate's |
| 11     flashlight to turn it on? | 11     office relating to the buy money? |
| 12 A   Probably not. | 12 A   He gave me the bail paperwork, and I don't belie -- I |
| 13 Q   Okay. Good lighting? | 13     don't -- don't recall if he told me to make sure he was |
| 14 A   Street lighting. It is -- I mean, it is adequate, but | 14     strip searched, but that would have just been standard |
| 15     not very good. | 15     -- standard practice. |
| 16 Q   All right. You didn't have any problems seeing | 16 Q   Okay. So you were still looking for the buy money at |
| 17     Mr. Davis? | 17     that point? |
| 18 A   Seeing his person, no. | 18 A   Correct. |
| 19 Q   Yeah. | 19 Q   Okay. Now, then, after the magistrate, you still had |
| 20 A   Yeah. | 20     Mr. Davis? |
| 21 Q   I mean -- not this lighting but evening street | 21 A   Yes. |
| 22     lighting? | 22 Q   Okay. Did anybody else come with you from that point |
| 23 A   Correct. | 23     on, other than Mr. Davis? |
| 24 Q   Okay. And we are in a parking lot? | 24 A   I don't believe so, no. |
| 25 A   Yes. | 25 Q   Okay. So then we go to CIPD [sic] from the magistrate? |
| Page 667 | Page 669 |

| | |
|---|---|
| 1 Q   Okay. So there is -- is there parking lot lighting | 1 A   CIPT, yes. |
| 2     available? | 2 Q   CIPT, right. All right. And we have already talked |
| 3 A   It is real close. It was on -- actually on the edge of | 3     about how to get in there, and all that. |
| 4     Muldoon road. Muldoon is fairly well lit for a street. | 4 A   Correct. |
| 5 Q   Okay. So there is adequate artificial lighting, then, | 5 Q   Okay. Did -- did you stay for the strip search? |
| 6     at night on Muldoon? | 6 A   I stayed there until they came back to me, yes. They |
| 7 A   For most tasks, yes. | 7     didn't strip search him in front of me. |
| 8 Q   All right. For this task? | 8 Q   Okay. No, but I'm -- you were there for the..... |
| 9     MS. BRADY: Objection, Your Honor. Asked and answered. | 9 A   I waited for some sort of results -- or indication of |
| 10     THE COURT: Sustained. | 10     results, yes. |
| 11 Q   And was happened at that point in time? You got -- you | 11 Q   Okay. And the results were zero zero? |
| 12     have searched him, his hands are behind him? | 12 A   Correct. |
| 13 A   He is put in the police car. | 13 Q   All right. |
| 14 Q   Okay. Whose car? | 14     MR. JAMES: One moment, Your Honor. |
| 15 A   Mine. | 15 Q   Did Officer LaPorte show up at the scene of the -- when |
| 16 Q   Okay. | 16     the arrest took place? |
| 17 A   The marked police car. | 17 A   I don't remember if he did or not. |
| 18 Q   All right. And did you put him in the car? | 18 Q   Okay. Is your first recollection of Officer re -- |
| 19 A   I believe so. | 19     report -- LaPorte that evening after the arrest went |
| 20 Q   Okay. And was anybody else with you in the car other | 20     down, at the magistrate's office? |
| 21     than Mr. Dav -- excuse me. After Mr. Davis is in the | 21 A   I'm not sure I understand what your question is. |
| 22     car, I assume you left? | 22 Q   Okay. You don't know whether he showed up at the -- |
| 23 A   Correct. | 23     during the arrest -- or, at the arrest scene? |
| 24 Q   Okay. And you were driving the car? | 24 A   Correct. |
| 25 A   Correct. | 25 Q   Okay. My question is, is it your recollection that the |
| Page 668 | Page 670 |

first time you recall seeing him after the arrest
happened was at the magistrate's, because we know,
according to your testimony, he was at the
magistrate's, right?

A Right.

Q Is that fair?

A I believe so, yes.

Q Okay.

A If I understand the correction correctly, yes.

Q Okay. I'm not trying to put words in your mouth. Your
recollection -- I'm just asking what your recollection
is.

A Uh-hum. (Affirmative)

Q All right. Is it your recollection that, for
certainty, the last -- the first time you saw him after
the arrest was at the magistrate's?

MS. BRADY: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

Q All right. What is your recollection?

A I think if you are trying to ask me if went anywhere
else and met with him.....

Q No, I didn't ask that.

A .....then I -- I'm afraid I don't understand. I'm
sorry.

Q All right. Prior to the magistrate, do you have any

Page 671

1  independent recollection of seeing Officer LaPorte
2  after the arrest?
3 A No.
4 Q Okay. Just one moment then. I need to -- have you
5  listened to any of these wires after you made them and
6  turned them over to.....
7 A No.
8 Q .....LaPorte or anybody?
9 A No.
10 Q Okay. When you did your pat down search on the 28th
11  slash 1st, did you find any weapons, or anything --
12  dangerous instrumentality on Mr. Davis?
13 A Not that I remember, no.
14 Q Okay. Thank you, officer.
15  THE COURT: Redirect?
16      ROY LEBLANC
17 testified as follows on:
18      REDIRECT EXAMINATION
19 BY MS. BRADY:
20 Q Let's talk about the marijuana that you found for just
21  a second. Did you indicate in your report on the day
22  that you found the marijuana that no contraband was
23  found?
24 A No.
25 Q Okay. And when you were talking on direct with

Page 672

1  Mr. James, you said that you would suspect that Fish's
2  possession of marijuana was not prosecuted?
3 A Correct.
4 Q Why is that?
5 A Because the state has very -- very liberal views about
6  marijuana. Most people don't even consider it a crime.
7  And then such a small amount would have been the lowest
8  possible offense concerning marijuana that exists.
9  Routinely we wouldn't even cite somebody for that.
10 Q So routinely when you contact people out on the street
11  that have that same amount of marijuana, you wouldn't
12  even cite them for it?
13 A Correct. We would just take it, and turn it in to be
14  destroyed. It would be declined by the state for
15  prosecution, being that small amount, anyway. So it is
16  just a big waste of state money.
17 Q Now, do you recall whether or not Mr. Fish had any
18  animals with him during any of the buys?
19 A He brought a puppy to one of them, I remember.
20 Q Do you recall which buy it was?
21 A I don't recall which one. I believe it was a rot --
22  pit bull puppy.
23 Q A pit bull puppy?
24 A Correct.
25 Q Okay. Do you recall whether it was one of the buys

Page 673

1  that occurred at the defendant's house, or at one of
2  the other locations?
3  MR. JAMES: I'm going to object. This is beyond the
4  scope of.....
5 A I don't remember.
6  THE COURT: Just a second. The -- yeah, it is beyond
7  the scope of the cross and the original direct. Unless you
8  -- you can explain to me in bench conference why.....
9  MS. BRADY: I'll be happy to do that.
10  THE COURT: You get to do that.
11  (Bench conference as follows:)
12  (Inaudible)
13  (End of bench conference)
14  THE COURT: The objection is overruled.
15 Q Do you recall what the question was?
16 A Can you ask it one more time, just so I don't answer
17  the wrong thing?
18 Q Okay. I just asked if you -- you said that he had a
19  puppy with him one time. Do you recall whether it was
20  at the buys at the house, or at the other locations,
21  or.....
22 A I know it would of had to been one of the buys at the
23  house, because he had the puppy when I searched the
24  vehicle. And I only searched the vehicle on the buys
25  at the house.

Page 674

Multi-Page™

State v. Robert Davis
November 20, 2001

3AN-01-1717 CR

| | | |
|---|---|---|
| 1 Q | Did you only search the vehicle in the first buy? | |
| 2 A | I believe I searched the vehicle the first and the | |
| 3 | second buy. | |
| 4 Q | Okay. | |
| 5 A | I would suspect it was probably the first time, | |
| 6 | because, of course, I would have told him not to bring | |
| 7 | the puppy again, either. And I can't even see Jeremy | |
| 8 | bringing a puppy after I told him to clean his car out | |
| 9 | after the first buy. | |
| 10 Q | All right. And even though you couldn't see what Fish | |
| 11 | was doing inside of his car, could you hear what was | |
| 12 | going on? | |
| 13 A | Yes. | |
| 14 Q | And Mr. James asked you how long you ran the wire, and | |
| 15 | you responded one minute. What were you talking about | |
| 16 | when you answered that question? | |
| 17 A | That is how long the recording was running, and that | |
| 18 | was on the very last..... | |
| 19 Q | Okay. | |
| 20 A | .....very last buy. | |
| 21 Q | And..... | |
| 22 A | Not the very last buy, but the -- the one before the | |
| 23 | buy bust. | |
| 24 Q | Okay. And when you arrested Mr. Davis, did you know | |
| 25 | the jail was going to do a search on him? | |

Page 675

| | | |
|---|---|---|
| 1 A | Yes. | |
| 2 Q | Okay. | |
| 3 | MS. BRADY: That's all the questions I have for this | |
| 4 | witness, Your Honor. | |
| 5 | THE COURT: You can step down. Your next witness, Ms. | |
| 6 | Brady? | |
| 7 | MS. BRADY: My next witness is Jack Hurd. | |
| 8 | (Oath administered) | |
| 9 | MR. HERD: I do. | |
| 10 | JACK HURD | |
| 11 | called as a witness on behalf of the plaintiff, testified as | |
| 12 | follows on: | |
| 13 | DIRECT EXAMINATION | |
| 14 | THE CLERK: You can have a seat. State for the record | |
| 15 | your full name, and spell your last name. | |
| 16 A | My full name is Jack Hurd, H-u-r-d. | |
| 17 | THE COURT: Go ahead, Ms. Brady. | |
| 18 | BY MS. BRADY: | |
| 19 Q | Who do you work for, Mr. Hurd? | |
| 20 A | I work for the state of Alaska, the crime lab. | |
| 21 Q | And where is the crime lab at? | |
| 22 A | 5500 east Tudor Road. | |
| 23 Q | How long have you worked there? | |
| 24 A | Since 1995. | |
| 25 Q | What kind of work do you do there? | |

Page 676

| | | |
|---|---|---|
| 1 A | Basically I analyze drugs. | |
| 2 Q | And where did you work previously? | |
| 3 A | I worked for a company called Analytical Technologies, | |
| 4 | Inc. and we analyzed petroleum hydrocarbons, gasoline, | |
| 5 | diesel, other fossil fuels, and soil and water. | |
| 6 Q | How long did you do that for? | |
| 7 A | I did that for about a year? | |
| 8 Q | All right. And what kind of education do you have that | |
| 9 | -- what is your specific occupation with the crime lab? | |
| 10 A | My specific title is criminalist in the controlled | |
| 11 | substance section. | |
| 12 Q | What type of education do you have that qualifies you | |
| 13 | to be a criminalist? | |
| 14 A | I have a bachelor's of science degree in chemistry. | |
| 15 Q | And have you instructed or trained others? | |
| 16 A | I have. | |
| 17 Q | And have you done testing for the presence of | |
| 18 | controlled substances including cocaine? | |
| 19 A | I have. | |
| 20 Q | About how many times have you done testing for cocaine? | |
| 21 A | Thousands of times. | |
| 22 Q | All right. And have you testified in court before | |
| 23 | regarding that kind of testing? | |
| 24 A | I have. | |
| 25 Q | About how many times? | |

Page 677

| | | |
|---|---|---|
| 1 A | As far as cocaine, about 20 times with cocaine. 40 | |
| 2 | times altogether in controlled substances. | |
| 3 Q | Have you ever been qualified to testify as an expert | |
| 4 | and give an opinion as to whether or not a substance is | |
| 5 | cocaine before? | |
| 6 A | Yes. | |
| 7 Q | In courts in the state of Alaska? | |
| 8 A | Yes. | |
| 9 Q | About how often? | |
| 10 A | How often do I testify? | |
| 11 Q | How often has you been -- have you been accepted as an | |
| 12 | expert in courts of the state of Alaska? | |
| 13 A | It is over 40 times. I have lost count. | |
| 14 Q | All right. And let's just talk about this particular | |
| 15 | case, now. First, let's talk in general about the | |
| 16 | procedures at the crime lab for chain of custody. | |
| 17 | Could just explain to the members of the jury what the | |
| 18 | procedure is for items that are received at the crime | |
| 19 | lab? | |
| 20 A | Sure. Items are received at the crime lab one of two | |
| 21 | ways. They are either sent to the crime lab via the | |
| 22 | registered mail system, or they are hand delivered by | |
| 23 | an officer, or a custodian. They -- we do have two | |
| 24 | evidence custodians at the state crime lab, and they | |
| 25 | receive the evidence. And upon receipt of the | |

Page 678

Exhibit K – 176

1   evidence, before they sign on the chain of custody,
2   they will examine the evidence to make sure that it is
3   properly packaged, and that it is properly identified,
4   that the agency case number is on the packaging, the
5   item number, et cetera. They then will sign for it on
6   an internal chain of custody. After receiving that
7   evidence, then they will log that evidence into the
8   database at the computer -- or at the state crime lab,
9   and assign it a unique laboratory number. Then that
10  evidence is basically stored within the evidence room,
11  which is a building within a building. It has its own
12  unique security system, unique to that of the lab.
13  Those that are -- have access to it are the evidence
14  custodians and their supervisor.
15 Q Okay. Now, what happens once it makes it into that
16  secured room. If it -- like, say, you want to take it
17  out and test it, what do you have to do?
18 A First of all, each section is given notice that the
19  evidence is there and ready to be worked. We are given
20  a copy of the chain of custody. When it becomes to my
21  attention that there is evidence to work, then I will
22  proceed to check it out. I have to request it from the
23  evidence custodian, and then again as he or she gives
24  me the evidence, there is going to be an exchange of
25  signatures. I sign for the evidence, and then I do the

Page 679

1   same thing the evidence custodian did originally. I
2   look at the evidence, is it properly packaged, is it
3   properly identified. And then I will proceed to work
4   it.
5 Q And when you work it, what do you do to make sure it
6   doesn't get mixed up with other evidence or -- how do
7   you -- what is the procedure that you use for that?
8 A We analyze evidence one -- one sample at a time so that
9   we avoid cross contamination issues.
10 Q All right. And what do you do when you are done with
11  it, after you have tested it?
12 A After we are done testing the evidence, I repackage it,
13  reseal it, and then I check it back into the evidence
14  custodian, and then I issue a report to the submitting
15  agency.
16 Q Okay. And what are these procedures all designed to
17  ensure?
18 A Basically to maintain the integrity of the evidence.
19 Q Okay. And let's talk about testing cocaine. What
20  kinds.....
21  MR. JAMES: I'm going to object. She has never offered
22  him as a witness.
23  THE COURT: The objection is overruled.
24 Q What kinds of tests do you perform on cocaine?
25 A Basically when I receive evidence, and I have an idea

Page 680

1   whether it is cocaine or not, I use two types of
2   methods to determine if it is cocaine or not. The
3   first method is -- it is what is called a gold chloride
4   test. It is very simple. We take a glass slide -- a
5   microscope slide. We take a representative sample of
6   the suspect substance and apply it to the glass slide.
7   And then we have a chemical called gold chloride, and
8   we add it to mix it up with the unknown sample. And
9   gold chloride does something that is unique to cocaine.
10  When it combines with cocaine, it forms this really
11  quite beautiful crystalline structure, looks kind of
12  like a cross, or a snowflake. And we examine that
13  underneath a microscope. That is the first test. The
14  second test is much more specific. We are actually
15  able to look, in essence, at the molecular structure
16  of the unknown substance. We run it on an instrument
17  called a gas chromatography. And that allows us to
18  actually -- to look at the molecular structure to
19  identify cocaine as such.
20 Q Are these common methods that are accepted among your
21  colleagues for testing controlled substances that
22  contain cocaine?
23 A Yes.
24 Q Okay. And in your experience and opinion, is the --
25  the GCMS is which of the two tests that you were

Page 681

1   talking about?
2 A The instrumental test.
3 Q The instrumental test. Is that test accurate?
4 A Yes, it is.
5   MR. JAMES: I'm renewing my objection.
6   THE COURT: Could we have a bench conference please?
7   (Bench conference as follows:)
8   (Inaudible)
9   (End of bench conference)
10  THE COURT: Go ahead, Ms. Brady.
11 Q In your experience and opinion, is the GCMS test
12  accurate?
13 A Yes, it is accurate.
14 Q And how many times have you performed this kind of
15  test?
16 A Thousands, if not tens of thousands of times.
17 Q What about the gold chloride test, accurate?
18 A Yes.
19 Q And how many times have you performed that test?
20 A Same amount. Thousands of times.
21 Q Okay. Now, let's talk about the testing that you did
22  in this case, and I'm going to put some exhibits in
23  front of you, and I'm going to have you look at the
24  item that is marked state's exhibit 1.
25 A Okay.

Page 682

1 Q  Now, did you do the testing in APD case number 017273?
2 A  Yes, I did.
3 Q  Okay. And do you recognize that is in front of you?
4 A  I do.
5 Q  Did you test -- and what is the P and E number for that
6    item?
7 A  P and E number is not familiar with me.
8 Q  Okay. Is there an item -- is there a number on that
9    somewhere that identifies that?
10 A  Yes.
11 Q  So that you know what you are testing? Okay, what is
12    that?
13 A  Yes, there is. Item number 503125.
14 Q  And is that the item you tested?
15 A  Yes, it is.
16 Q  How do you recognize it?
17 A  When I first receive the package, I will apply our
18    laboratory number, the item number, my initials, and
19    then the date that I opened it up.
20 Q  Okay. And when you tested that item, what were you
21    testing it for?
22 A  Well, I was -- on the request for laboratory services
23    form, it said suspect -- or something to that effect,
24    crack cocaine, or cocaine, so I was looking for
25    cocaine.

Page 683

1 Q  And what procedures did you use on that item?
2 A  I used the two procedures that we talked about earlier.
3    The gold chloride and the instrumental test.
4 Q  And as a result of your testing on that item, did you
5    form any opinions?
6 A  I did.
7 Q  And what was your opinion?
8 A  This evidence tested positive for cocaine.
9 Q  Okay. And in your testing of this item, did you also
10    weigh the item?
11 A  I did.
12 Q  And how much did this particular item weigh?
13 A  I would have to refer to my notes. I don't commit that
14    to memory.
15 Q  Would you like to refer to your notes?
16 A  0.8 grams.
17 Q  Okay. Now, when you take an item out of the lab and
18    weigh it, could you just explain to the members of the
19    jury what the procedure is that you go through?
20 A  Yes. That is actually the first thing that we do
21    before we actually analyze it is we weigh the product
22    out. So we have a laboratory scale -- a digital scale,
23    and we have weigh boats that are disposable that are
24    only used once so they are clean. And we, in essence,
25    pour the contents into the weigh boats and place it

Page 684

1    onto the scale. Bef -- actually, back up. Before we
2    do that, we do a procedure called taring, which takes
3    into account the weight of the weigh boat. So
4    obviously we are not going to include the weight of the
5    weigh boat in the final weight of the substance. So we
6    will pour the contents into the weigh boats after it is
7    tared, and weigh that substance out.
8 Q  Do you leave it in the packaging material when you
9    weigh it, or do you take it out of any packaging
10    material it may be in?
11 A  We re -- we removed it from its packaging.
12 Q  All right. And so that weight that have you just told
13    me, with regard to that particular piece of evidence,
14    represents only the weight of the cocaine?
15 A  Correct.
16 Q  All right. And now, when you are testing items such as
17    this -- these items in this case, how do you make sure
18    that these items do not contaminate each other then?
19 A  I will open this package. I will go through all the
20    testing on this package. And once I am done with it, I
21    will seal the packaging up, and then I will proceed to
22    the next one.
23 Q  All right. So let's talk about exhibit number 2 now.
24 A  Okay.
25 Q  Did you test an item marked P and E number 505551?

Page 685

1 A  I did.
2 Q  And is that what that is?
3 A  Yes, it is.
4 Q  Is that the item you tested?
5 A  Yes, it is.
6 Q  How do you know that?
7 A  Again, when I checked this out, before I opened it up,
8    I applied the lab number, the item number, my initials
9    and the date, which I see right here.
10 Q  Okay. And were you testing that for the same kinds of
11    things?
12 A  Yes.
13 Q  What test did you use on that?
14 A  The gold chloride and the instrumental test.
15 Q  All right. And as a result of your testing, did you
16    form an opinion?
17 A  I did.
18 Q  And what was your opinion?
19 A  This evidence tested positive for cocaine.
20 Q  Did you also weigh that object?
21 A  I did.
22 Q  And what was the weight that it had?
23 A  Again, referring to my notes, I recorded 3.1 grams.
24 Q  All right. And let's move on to exhibit number 3. Did
25    you test an item marked P and E number 430515?

Page 686

1 A  Can you repeat the number? It is covered up here, so I
2    can't see it in the packaging.
3 Q  Why don't we go ahead and open it. I think there is
4    two in there anyway. That way you'll be able to take a
5    look at it. The number I said was 430515.
6 A  Yes, I did.
7 Q  And is that the item you tested?
8 A  Yes.
9 Q  And how do you recognize it?
10 A  Same reason I recognized the other two.
11 Q  What procedures did you use?
12 A  Same procedures I analyzed the other two.
13 Q  Okay. And as a result of your testing of that item,
14    did you come to any conclusions?
15 A  I did.
16 Q  What was your conclusion?
17 A  This evidence tested positive for cocaine.
18 Q  In your testing did you weigh it?
19 A  I did.
20 Q  And what was the weight of that one?
21 A  1.4 grams.
22 Q  Thank you. And then I ask you to direct your attention
23    to exhibit 4, and did you test an item marked P and E
24    number 413245?
25 A  I did.

Page 687

1 Q  Okay. Is that the item you tested?
2 A  It is.
3 Q  How do you know that?
4 A  I know that because of the same reason I knew the other
5    three, the lab number, the item, my initials and the
6    date applied to the packaging.
7 Q  When you tested that item, what were you testing it
8    for?
9 A  For cocaine.
10 Q  Okay. And did you use the same procedures?
11 A  I did.
12 Q  As a result of your testing on that item, did you form
13    any opinions?
14 A  I did.
15 Q  What conclusion did you reach?
16 A  This evidence also tested positive for cocaine.
17 Q  All right. And did you weigh that object as a part of
18    your test?
19 A  I did.
20 Q  And what was the weight of that particular item?
21 A  It weighed 1.2 grams.
22 Q  Okay. And did you submit a report that contained your
23    conclusions? I'm going to approach with state's
24    exhibit 18.
25 A  Yes, I did.

Page 688

1 Q  Do you recognize that document?
2 A  This looks like a copy of the report that I submitted
3    to the agency that submitted the evidence.
4 Q  Is that a fair and accurate copy of your report?
5 A  Yes, it looks like it.
6    MS. BRADY:  Okay. At this time I move to exhibits --
7 move to admit state's exhibit 18.
8    MR. JAMES:  No objection.
9    THE COURT:  18 is admitted.
10           (Plaintiff's exhibit 18 admitted)
11    MS. BRADY:  Thank you. That's all the questions I have
12 for this witness.
13    THE COURT:  All right. Thank you. Mr. James, your
14 questions?
15          JACK HURD
16 testified as follows on:
17        CROSS EXAMINATION
18 BY MR. JAMES:
19 Q  Mr. Hurd, we talked -- is there a different between
20    crack and cocaine?
21 A  There is a difference between crack and cocaine
22    hydrochloride, or powdered cocaine, yes.
23 Q  Okay. And what is the difference there?
24 A  When you look at it, usually there is a difference, but
25    basically hydrochloride, or powdered cocaine is water

Page 689

1    soluble. And the significance of that is that it can
2    be absorbed into the mucous membranes of the body.
3    That means you can toot it up your nose, you can eat
4    it, you can inject it into the body. But you usually
5    wouldn't smoke it, because the melting point of it is
6    too high, and so the psychoactive effect would -- would
7    be negligible there. Crack cocaine, on the other hand,
8    is not water soluble, but it has a low melting point,
9    so you usually smoke crack cocaine. And that is the
10    difference.
11 Q  Okay. And when you test crack cocaine versus -- you
12    described how you test cocaine, is there a difference
13    in the test between crack cocaine and -- and cocaine?
14 A  Well, again, crack cocaine is cocaine, but I think you
15    are referring to cocaine hydrochloride, the powdered
16    form.
17 Q  Right, I'm -- yes.
18 A  We can distinguish the two, and there is a procedure
19    that we can test for coc -- or crack cocaine. We
20    usually don't do that unless it is a federal case,
21    because it is a moot point in the state of Alaska. The
22    state of Alaska doesn't -- it doesn't matter to them if
23    it is crack cocaine or powdered cocaine, it is all
24    cocaine. So unless we are specifically asked to
25    distinguish the two, we don't usually do so. But we

Page 690

1    can. We have the ability to do so.

2 Q  Okay. Do you break out the -- the difference -- I

3    mean, do you chemically try to separate what is in

4    crack cocaine versus what is in hydro -- cocaine

5    hydrochloride, or whatever?

6 A  I'm not sure what you mean by separate.

7 Q  Do you -- do you try to separate and say okay, this --

8    this much is cocaine, this is much is something else?

9 A  No. It is either cocaine, or it is not cocaine, is

10    pretty much.....

11 Q  All right.

12 A  .....what we do at the lab.

13 Q  Okay. What is -- based upon your experience, what is

14    -- what is crack cocaine that is not in cocaine?

15 A  It's just one small molecule, an oxygen molecule.

16    Basically to make it -- there is lots of recipes to

17    make it, but you -- all you need to do is add baking

18    soda to your powdered cocaine, add some water, and cook

19    it. And then it will evaporate the water off, and what

20    remains is the crack form, and usually that is a little

21    bit purer. But it is just a small little molecule that

22    makes the difference. But it is still cocaine.

23 Q  Okay. Now, when you received these different items of

24    -- you testified that you took them out whatever they

25    were in, and took them out and weighed them. Do you

Page 691

1    cross compare what the weight is on the report that is

2    requesting the analysis versus what your weight is?

3 A  Not specifically. Sometimes I'll notice it, and if

4    there is a big difference I will record it in my notes,

5    but I could care less what the packaging says. If the

6    packaging says a pound, and I weigh a tenth of a gram,

7    I'm going to report a tenth of a gram whether it says a

8    pound or not. So it is not that important to us

9    because we are reporting out what we actually receive

10    from the -- from the agency.

11 Q  Okay. Are you saying if there is a discrepancy that is

12    prevalent, then you would make a note as to what.....

13 A  Some -- sometimes we will, and when we re -- when we --

14    when we receive the request for laboratory services

15    form, and it might have a weight on there, I don't know

16    how they weighed it. They could have weighed the

17    product with the packaging, sometimes cocaine comes in

18    plastic bindles, and maybe they weighed the bindles and

19    the cocaine. I don't know how they weighed it. So I

20    don't pay much attention to that. I'm only concerned

21    about the product itself and not the -- the packaging.

22    So I -- I don't -- I don't look at the details there.

23 Q  Okay. Now, you opened one of those up, right, to look

24    at the name? You cut something like the.....

25 A  Oh. Yes, I did. I think it is exhibit number 13, it

Page 692

1    says here. No.

2 Q  It would be exhibit three? Could that be.....

3 A  Three. Uh-hum. Uh-hum. (Affirmative)

4 Q  Three? Okay.

5 A  Yes, sir.

6 Q  All right. Is there more than one item in that

7    exhibit? Go ahead, if you.....

8 A  There appears to be. It looks like there is an exhibit

9    number 13.

10 Q  Which is -- is that product of some kind, or is that --

11    sorry.

12    THE COURT: Approach the bench, counsel. Both of you

13 approach the bench, please.

14    (Bench conference as follows:)

15    THE COURT: We put them -- You don't have to stand up.

16 Oh, there's a table.

17    MS. BRADY: There's a table.

18    THE COURT: We put the money and the drugs in an

19 envelope last night so that -- just for safekeeping.

20    MR. JAMES: That's the -- that's the other.....

21    THE COURT: That's why they are both in the package.

22 Shall I tell the jury that or not?

23    MR. JAMES: I'm just -- I've been just put the

24 (indiscernible) down.

25    THE COURT: Okay.

Page 693

1    (End of bench conference)

2 Q  Mr. Hurd, just to kind of move this along. The exhibit

3    3, apparently there is -- there is another thing in it

4    which is -- last night some mon -- the money, a $100

5    bill was put in there, and that is why there is two

6    items in there. Without opening it, okay?

7 A  Okay.

8 Q  I'm just -- I'm not trying to trip you up, all right?

9    Okay. Now, I'm interested in -- one of those items,

10    the report requested -- reported 11 point something

11    grams. Do you have your -- you have a request sheet

12    from APD?

13 A  Yes, I do. Yes, sir.

14 Q  Okay. Take a looksee at that, if you could.

15 A  Okay.

16 Q  Did you see it 11 point something?

17 A  I do not. I only have, actually, a request for

18    laboratory services. I didn't receive a report. So I

19    don't -- I'm not sure what you are referring to.

20 Q  Okay. Do you have anything in there -- in your reports

21    -- first of all, you had a chance to go through this

22    stuff before you came in and testified?

23 A  Yes, I have.

24 Q  Okay. Do you see anything in there from APD that

25    relates to weights of the product that is being

Page 694

AN-01-1717 CR

1   submitted to you for analysis?

2 A   No, sir.

3 Q   Okay.

4   MR. JAMES: If I may approach the.....

5 Q   And I call your attention to exhibit 2, sir?

6 A   Okay.

7 Q   All right?

8 A   Uh-hum. (Affirmative)

9 Q   And I pointed it out to you. That's what I was doing

10   over there, right?

11 A   Sure.

12 Q   Okay. How much does that say was there? What was

13   submitted, according to the envelope?

14 A   On the packaging it says 11.8 grams.

15 Q   Okay. Do you have any idea what those 11.8 grams

16   represent?

17 I   have.....

18   MS. BRADY: Objection, Your Honor. This has been asked

19 and answered.

20   THE COURT: Overruled.

21 Q   All right. The answer is no?

22 A   I have no idea, no.

23 Q   All right. Do you use both tests -- the gold chloride

24   and the gas test on both of them, or do you pick and

25   choose based on your own discretion?

                                        Page 695

1 Q   Which of the exhibit numbers I -- let's start with

2   exhibit 1. Was that water soluble?

3 A   I'll have to refer back to my notes here.

4   MR. JAMES: I'm going to object. This is beyond the --

5 this is beyond cross, I mean.....

6   THE COURT: No, overruled.

7   MR. JAMES: Fine. That's fine.

8 Q   Exhibit number 1 is 503125.

9 A   Okay. 503125 was water soluble.

10 Q   So that means it is not crack, is that right?

11 A   That is correct.

12 Q   Okay. And.....

13 A   Probably means that.

14 Q   Pardon me?

15 A   It probably means that.

16 Q   Okay.

17 A   It's a pretty good -- yeah.

18 Q   And for exhibit number 2, was that water soluble?

19 A   This was water soluble as well, yes.

20 Q   Okay. And what about exhibit number 3?

21 A   Exhibit number 3 was not water soluble.

22 Q   Meaning it is probably crack?

23 A   Correct.

24 Q   Okay. And what about exhibit number 4?

25 A   And exhibit number 4 was also not water soluble.

                                        Page 697

1 A   We use two tests to be able to report out a controlled

2   substance for just about every controlled substance

3   that comes into the lab. So for every item that I

4   report out cocaine, I have performed two tests on

5   it.....

6 Q   Okay.

7 A   .....at a minimum.

8 Q   Okay. How much is a gram? I mean, can you give me a

9   visual, so.....

10 A   Sure. If you -- if you think about the contents of a

11   package of sweet and low, that is about a gram.

12 Q   Okay. The little individual packages?

13 A   Yes, sir.

14 Q   Okay. One moment, please. Thank you, Mr. Hurd.

15   THE COURT: Redirect, Ms. Brady?

16           JACK HURD

17 testified as follows on:

18           REDIRECT EXAMINATION

19 BY MS. BRADY:

20 Q   Mr. Hurd, did you actually distinguish between the

21   samples of -- as far as water solubility in this case?

22 A   I did.

23 Q   Okay. Did you determine that s -- determine that some

24   of those were water soluble and some of them weren't?

25 A   I did.

                                        Page 696

1 Q   Thank you.

2   MS. BRADY: That's all the questions I have for this

3 witness.

4   THE COURT: Any other questions on that subject,

5 Mr. James?

6   MR. JAMES: No, Your Honor. Thank you.

7   THE COURT: All right. Thank you, sir. You can step

8 down. Ms. Brady, your next witness?

9   MS. BRADY: Your Honor, the state rests.

10   THE COURT: All right. That means the state is not

11 going to present any additional witnesses. Let me confer

12 with the lawyers for a moment. Are you all ready for a

13 break or -- I'm having head shaking no, so hold on a second.

14   (Bench conference as follows:)

15   (Inaudible)

16   (End of bench conference)

17   THE COURT: If you remember back, folks, to the -- to

18 the road map of the trial that I gave you. The next stage

19 of the case is the defendant may put on evidence if he

20 chooses to do so. And since defense counsel reserved his

21 right to make opening statement, if you recall, he has an

22 opportunity to make an opening statement before he presents

23 evidence, now. And then he can present his evidence.

24 Mr. James, are you ready with your opening statement?

25   MR. JAMES: If I may have just one minute. I'm trying

                                        Page 698

1  to take care of one item here, please. Thank you.
2      Ladies and gentlemen of the jury, you have heard quite
3  a bit of testimony, and quite a bit from Mr. Fish. And you
4  have heard quite a bit of testimony from different officers,
5  most of which was relied -- relayed from Mr. Fish.
6  Specifically, he talks about what happened on February 20th.
7      I intend to present two witnesses who were there. And
8  I think, when you get done listening to them, you are going
9  to feel more uncomfortable. I intend to present Robert
10 Davis' mother, who is going to clarify some of that
11 statements made by Officer LaPorte. I intend to present
12 Athena Soder, the mother of Jeremy Fish's daughter. And I
13 intend to, if time permits, present Officer Healy, from
14 CIPT. She is going to be the records custodian. And the
15 records custodian is the person, as she will testify, is --
16 they keep all the records. When someone goes to CIPT, it is
17 -- it is kind of like a file is opened up on them, and
18 everything is documented to the best of their ability as a
19 trans -- until they leave CIPT. So theoretically, those
20 records would reflect the entire of an individual in CIPT.
21     Now, the reason we are presenting this testimony is to
22 establish -- to show you that, in fact, what the state
23 alleges has great holes in it. And the holes are such.....
24     MS. BRADY: Objection, Your Honor. This is argument.
25     THE COURT: Just the facts at this point. No argument,

Page 699

1  please.
2      MR. JAMES: That the witnesses are going to relay their
3  own observations, and in -- of course, in question of Mr. --
4  Ms. Healy -- she is a lady -- what the documentation is in
5  CIPT. And that is pretty much it. So with that, I would
6  like to call my first witness.
7      THE COURT: You may call your first witness, Mr. James.
8      MS. BRADY: Your Honor, may I approach and clear the
9  witness bench?
10     THE COURT: That would be good. You may do that.
11     (Pause)
12     MR. JAMES: Darryl, would you come forward and go up to
13 that chair up there? You have to walk around the
14 (indiscernible). Would you remain standing please?
15     MR. CASH: Okay.
16     THE COURT: This lady is going to swear you in.
17     (Oath administered)
18     MR. CASH: I do.
19         DARRYL CASH
20 called as a witness on behalf of the defendant, testified as
21 follows on:
22         DIRECT EXAMINATION
23     THE CLERK: Thank you. You may be seated. For the
24 court record, please state your name, spelling your last
25 name.

Page 700

1  A  Darryl Cash, C-a-s-h.
2     THE CLERK: Okay. And what was the first name?
3  A  Darryl.
4     THE CLERK: Thank you.
5  BY MR. JAMES:
6  Q  Okay. Mr. Cash, do you know Robert Davis?
7  A  Yes, I do.
8  Q  All right. How long have you known Mr. Davis?
9  A  Two years.
10 Q  All right. And are you familiar with 202 Grand Larry?
11 A  Yes. Yes, sir.
12 Q  And why are you familiar -- how are familiar with that?
13 A  I used to -- I live right down the street -- I used to
14    live right down the street from him, until he moved.
15 Q  All right. Have you.....
16 A  I used to be over there every day -- just about every
17    day.
18 Q  All right. And calling your attention to February 20th
19    -- the evening of February 20th?
20 A  Uh-hum. (Affirmative)
21 Q  Were you over there that evening?
22 A  Yes, I was.
23 Q  All right. And was there anything that focuses your
24    mind on February 20th?
25 A  I was just watching TV. In front of the set -- it was

Page 701

1     -- I was just watching TV.
2  Q  Okay. Was anything planned to happen on February 21st?
3  A  February 21st?
4  Q  The next day?
5  A  We was supposed to move.
6  Q  I'm sorry?
7  A  We was supposed to move that day.
8  Q  February 21st?
9  A  Uh-hum. (Affirmative)
10 Q  All right. When we say we were supposed to move, were
11    you moving someplace?
12 A  I wasn't.
13 Q  Who was?
14 A  Rico.
15 Q  All right. And Rico is Robert?
16 A  Right.
17 Q  All right. And how long were you there on February
18    20th?
19 A  I'm usually over there just 'til about 12:00 o'clock
20    every night.
21 Q  All right. About what time do you get over there?
22 A  About 8:00. Just about 8:00 o'clock.
23 Q  All right. And you indicated there was going to be a
24    move on the 21st. What were you doing on the 20th?
25    Were you doing anything in anticipation of the move?

Page 702

| | |
|---|---|
| 1 A  We was just picking up little things here, putting | 1    stay in the kitchen. |
| 2      little things there. | 2 Q  Okay. Were you ever in the kitchen? |
| 3 Q  Are you familiar with the layout of the house? | 3 A  Uh-hum. (Affirmative) |
| 4 A  Yeah. | 4 Q  All right. Did you see anything unusual in the |
| 5 Q  All right. What is in the kitchen? | 5     kitchen, marijuana or anything?  Did you ever see |
| 6 A  The kitchen is -- you got a couple of bar stools, and | 6     Mr. Davis packing a gun? |
| 7      you got the counter, and then there is the | 7 A  No, I never did. |
| 8      refrigerator, and then there is the stove. | 8 Q  That evening? |
| 9 Q  Okay. Do you know if there is -- are you familiar with | 9 A  No, I didn't. |
| 10     any type of surveillance camera?  Do you know what that | 10 Q  Prior to that? |
| 11     means -- or you know -- do you know what I'm talking | 11 A  No, sir. |
| 12     about? | 12 Q  All right. Other than yourself, do you know how many |
| 13 A  Uh-hum. (Affirmative) | 13     people were there on the 20th? |
| 14 Q  Do you ever see one of those over there? | 14 A  About four, mostly family. |
| 15 A  I never did. | 15 Q  Okay. Do you know a Jeremy Fish? |
| 16 Q  All right. And what was in the front room, if | 16 A  I never heard of him. |
| 17     anything? | 17 Q  All right. Were there white people as well as -- you |
| 18 A  There was two couches, an entertainment center, TV and | 18     are black, for the record..... |
| 19     a couple of little electronic things, like stereo | 19 A  Uh-hum. (Affirmative) |
| 20     equipment. | 20 Q  .....right? African-American. Were there any white |
| 21 Q  Is that -- had you been over there prior to February | 21     people over there, as well as yourself and Mr. Davis, |
| 22     20th? | 22     of course, is African. |
| 23 A  Uh-hum. (Affirmative) | 23 A  Well, he had friends. He had -- he had white friends. |
| 24 Q  Were the items the same in there at that time..... | 24     They would come over once in a while. |
| 25 A  Yes. | 25 Q  Did you know all his friends? |
| Page 703 | Page 705 |

| | |
|---|---|
| 1 Q  .....as prior time? | 1 A  I knew them, yes. |
| 2 A  Uh-hum. (Affirmative) | 2 Q  All right. Did you ever see Mr. Davis deal any drugs |
| 3 Q  Okay. Were the bar stools still in the kitchen area? | 3     with anybody that evening? |
| 4 A  Bar stools. | 4 A  No, sir. |
| 5 Q  All right. Are you familiar with marijuana? | 5 Q  What kind of car does he have? |
| 6 A  I am. I know what it is, but as far as -- I don't me | 6 A  Oh, man. |
| 7      -- I don't do it. | 7 Q  Do you have a..... |
| 8 Q  All right. Did you see any marijuana over there that | 8 A  He got a couple cars. |
| 9      evening..... | 9 Q  Okay. Does he have a pickup? |
| 10 A  No, sir. | 10 A  Yeah. |
| 11 Q  .....on the 20th? | 11 Q  What kind of pickup is it? |
| 12 A  Unh-unh. (Negative) | 12 A  It is a -- like a gray Toyota. |
| 13 Q  Are you familiar with hand guns? | 13 Q  All right. One of those little Toyotas, a big Toyota? |
| 14 A  Yes, sir. | 14 A  It's a little small one. |
| 15 Q  All right. Pistols and revolvers? | 15 Q  A small one? Okay. Were you in a -- were in a |
| 16 A  Uh-hum. (Affirmative) | 16     position that evening, on February 20th, to see what |
| 17 Q  Okay. Did you see any hand guns over there on February | 17     was going on in that house -- or that apar -- that unit |
| 18     20th? | 18     -- it's a duplex, isn't it? |
| 19 A  No, sir. I never did. | 19 A  Uh-hum. (Affirmative) |
| 20 Q  Were you in a position to observe Robert Davis that | 20 Q  Two houses there? But in the house that you were in? |
| 21     evening? | 21 A  Uh-hum. (Affirmative) |
| 22 A  Yes. | 22 Q  Yes, no? |
| 23 Q  Okay. How were you able to see him? | 23 A  Yes. |
| 24 A  Well, he was -- you know, he walked back and forth. I | 24 Q  All right. Did anything unusual happen to your |
| 25     was sitting down. He'll come in the front room, he'll | 25     observation? |
| Page 704 | Page 706 |

1 A  No, sir.

2 Q  All right. Do you do drugs?

3 A  No, sir.

4 Q  Do you associate with people who do drugs?

5 A  No. Thank you. You can -- no.

6  THE COURT: Hold on.

7 Q  Stay seat.....

8  THE COURT: A few more questions.

9 Q  Stay seated.

10  THE COURT: Are you finished with direct?

11  MR. JAMES: Yes, I am. Thank you.

12  THE COURT: Cross examination, Ms. Brady?

13  DARRYL CASH

14 testified as follows on:

15  CROSS EXAMINATION

16 BY MS. JAMES:

17 Q  What is your date of birth, Mr. Cash?

18 A  10/30/67.

19 Q  Okay. And now, you testified on direct that the night

20  that Mr. James is asking you about, February 20th, you

21  know that it was February 20th because Ricco was moving

22  the next day. Is that right?

23 A  Right. We got out on the 22nd.

24 Q  Okay. And wait -- and you said that that night nothing

25  was packed in boxes, is that right?

Page 707

1 A  We was getting ready. We was loading stuff up.

2 Q  You were loading stuff up?

3 A  We was getting ready.

4 Q  But you said everything that was in the apartment -- it

5  was all still there, is that right?

6 A  Uh-hum. (Affirmative)

7 Q  Couches hadn't been moved out, nothing had been moved

8  out?

9 A  Right.

10 Q  Okay. So what had -- what had been done to prepare for

11  this move the next day?

12 A  Well, we -- the next day -- I know everything was out

13  on the 22nd. He got out on the 22nd.

14 Q  Okay. So the night that you are talking about could

15  have been the 21st, is that right?

16 A  Well, I was there.....

17 Q  If you moved the next day?

18 A  I was there the 20th.

19 Q  How do you know it was the 20th?

20 A  Ev -- everything was still there.

21 Q  Everything was still there on the 20th. That is not

22  the question I'm asking you, though. I'm asking you

23  how do you know the night that you were there was the

24  20th?

25 A  Well, I know, because we was supposed to pack. We was

Page 708

1  packing up the next day.

2 Q  Okay. So if you said everything was out on the 22nd,

3  then would the night you have been there -- you were

4  there, would that have been the 21st?

5 A  Right. I was there the 20th, 21st, and -- I was there.

6 Q  Not sure?

7 A  I was there.

8 Q  You were there which night?

9 A  The 20th and the 21st. I -- I helped move all the days

10  I was there.

11 Q  Okay. So when Mr. James was asking you questions about

12  seeing marijuana on a specific night, would it be fair

13  to say that you are saying that you have just never

14  seen marijuana at Mr. Davis' house, or do you have a

15  specific recollection about a specific night?

16 A  I never did. I never -- never saw any marijuana at his

17  house.

18 Q  Okay. So based on the fact that you never saw it, that

19  is how you are answering his question about not seeing

20  marijuana, is that right?

21 A  Well, I be -- I'm be -- I mean, I was over there every

22  day. I have never -- like I said, I'll be over there

23  just about every day, and I never ever seen any drugs

24  or anything.

25 Q  Okay. And you said you are familiar with marijuana?

Page 709

1 A  Sure.

2 Q  Seen it before?

3 A  I mean, I seen it before. I never -- you know, I never

4  messed with it. I mean, back in New Jersey when I was

5  in -- you know, when I was younger.

6 Q  Okay. So I'm sorry, is it your testimony that you have

7  seen it before, or you haven't?

8 A  I mean, I have seen it -- you know, back in New Jersey,

9  a while ago, when I was, you know, 16 or younger.

10 Q  Okay. So if you were born in 1967, when you were 16,

11  that would have been about 20 years ago?

12 A  A little bit.

13 Q  Okay. And you haven't seen it since?

14 A  I haven't seen it.

15 Q  Okay. So are you sure you know what it looks like?

16 A  Of course, yeah.

17 Q  Okay. And did you -- on -- now, we are back to the

18  night of the 20th, do you recall anything about leaving

19  to go get a pot?

20 A  Unh-unh. (Negative)

21 Q  Do you recall leaving that night from Mr. Davis'

22  apartment?

23 A  Unh-unh. (Negative) I didn't leave. I was over there

24  until like 12:00 o'clock.

25 Q  Okay. And did anybody else leave from Mr. Davis'

Page 710

**Page 711**

1 apartment while you were there?
2 A   I don't recall. I'm not -- Unh-unh. (Negative)
3 Q   Okay. So you were there -- let me just make sure I
4    understand this. You were there from 8:00 o'clock
5    until midnight?
6 A   Uh-hum. (Affirmative)
7 Q   And during the time that you were there, do you recall
8    anyone arriving?
9 A   A few people might have came over. Like I said, his
10    family -- you know, his family always comes over.
11 Q   Do you recall anyone that was not family arriving
12    between 8:00 and midnight that night?
13 A   No.
14 Q   Do you recall anyone that was not family leaving from
15    that house?
16 A   Unh-unh. (Negative)
17    MS. BRADY: Okay. That is all the questions I have.
18 Thank you.
19    THE COURT: Redirect, Mr. James?
20           DARRYL CASH
21 testified as follows on:
22       REDIRECT EXAMINATION
23 BY MR. JAMES:
24 Q   Regarding the date on the 20th, the 21st, and the 22nd.
25    Did something happen that caused you to move -- if you

**Page 712**

1 did move the date of the move from the 21st to the
2 22nd?
3 A   Excuse me?
4 Q   Did something happen that made you have to.....
5    MS. BRADY: Objection. This is leading, Your Honor.
6    THE COURT: Ask the question, please.
7    MR. JAMES: All right.
8 Q   My question is, did something happen the 21st that
9    caused the move date to be moved to the 22nd?
10    THE COURT: The objection is overruled. You can answer
11 the question.
12 A   I believe he couldn't fit -- we couldn't -- his truck
13    was too small. He couldn't -- we had to wait to get
14    the -- the U-haul.
15 Q   Okay. Thank you.
16    THE COURT: Thank you, Mr. Cash. You can step down.
17 Your next witness, Mr. James?
18    MR. JAMES: Mr. May, if you would come forward, and
19 there is a seat up there. Would you go ahead and take a
20 seat up there, please? Or, no, remain standing. I'm sorry.
21    MR. MAY: Okay.
22    THE COURT: On around here, please. Thank you. She
23 will swear you in.
24    (Oath administered)
25    MR. MAY: I do.

**Page 713**

1               BRANDON MAY
2 called as a witness on behalf of the defendant, testified as
3 follows on:
4        DIRECT EXAMINATION
5    THE CLERK: Okay. You may be seated. For the court
6 record, please state your name, spelling your last name.
7 A   Brandon Lomar May. Last name, M-a-y.
8    THE CLERK: And what was the first name?
9 A   Brandon.
10    THE CLERK: Thank you.
11 BY MR. JAMES:
12 Q   Mr. May, where do you work?
13 A   Hewitt's drugstore in Northway Mall.
14 Q   What do you do there?
15 A   Assist the manager and rehab tech.
16 Q   Okay. And is that -- does Hewitt's mint items for
17    people who are disabled?
18 A   Yes.
19 Q   Mechanical devices?
20 A   Dura medical, yes.
21 Q   Okay. And is part of your job to work on those
22    and.....
23 A   Make sure -- repair them, and go to home if they need
24    repaired, and whatever.
25 Q   Okay. And are you related to Robert Davis?

**Page 714**

1 A   Yes.
2 Q   Okay. And how are you related to him?
3 A   Brother-in-law.
4 Q   All right. And calling in -- how long have you known
5    Mr. Davis?
6 A   Ten plus years. About 10, I would say for that.
7 Q   Do you know Jeremy Fish?
8 A   Yes, I do.
9 Q   Okay. Calling your attention to February 20th.....
10 A   Uh-hum. (Affirmative)
11 Q   .....of 2001, this last February. Okay. Were you over
12    at 202 Grand Larry, the evening of February 20th?
13 A   20th, yes.
14 Q   Okay. Why are you comfortable -- if you are
15    comfortable in saying you were over there?
16 A   Uh-hum. (Affirmative)
17 Q   Why?
18 A   Because I was there moving -- helping them move.
19    Because we was going to move on the 21st.
20 Q   All right. And how long -- when did you get over
21    there?
22 A   Probably about 7:30 -- before 8:00 I know for sure.
23    So.....
24 Q   And how long did you stay there?
25 A   Until about 11:00 p.m. that night.

Page 715

1 Q  Okay. What were you moving -- what were you doing that
2    night in preparation for the move?
3 A  Oh, just packing small thing up, letters and CDs and
4    stuff that I had over there, so we were just getting
5    everything prepared for the next day.
6 Q  Okay. And have you -- are you familiar with that house
7    other than that evening?
8 A  Yes.
9 Q  Okay. And do you have access to that house if Robert
10   Davis is not there?
11 A  Sure, I had a key, too.
12 Q  Why would you have a key?
13 A  Because I used to come over there on lunch, and in the
14   evening if he is not there before I come. So.....
15 Q  All right. Are you familiar with the layout of the
16   house and what is in the house?
17 A  Sure.
18 Q  All right. And what is in the house -- what was in the
19   house on the 20th? That's.....
20 A  On the 20th?
21 Q  Yeah.
22 A  Everything is there, the couch, the computer,
23   entertainment center, the stereo, and the main things.
24   So yeah, the stereo, the couch, both the love seat and
25   the couch, and the computer, night stand and water, and

Page 716

1    the coffee table.
2 Q  Okay. How many bedrooms is the place?
3 A  Two.
4 Q  Okay. Was the -- do you know if the beds were still
5    there?
6 A  They was there, yeah, at that time, too.
7 Q  If -- assuming there were beds there?
8 A  Sure.
9 Q  All right. Okay. How about the kitchen, what was in
10   the kitchen?
11 A  The microwave and -- basically that's the main thing in
12   the kitchen, the microwave.....
13 Q  Any.....
14 A  .....that you can see when you.....
15 Q  Any chairs?
16 A  Any chairs? Two barstools when you first come in.
17 Q  How is it normal access to 202? How do you normally
18   get in there?
19 A  Through the side door. That is the carport side --
20   carport door, basically.
21 Q  All right. And did something happened which delayed --
22   well, first of all, was the move on the 20th -- 21st
23   delayed on the 21st?
24 A  Yes.
25 Q  Okay. And what was the problem, if anything, that was

Page 717

1    delayed?
2 A  First we had to get the -- the storage, and then
3    delayed on the 22nd when we moved. We didn't have the
4    truck, because the small truck -- we couldn't get the
5    sofa and all the big items in it, et cetera, inside.
6 Q  And are you comfortable with those dates at to what
7    happened in the storage and the truck?
8 A  Yes.
9 Q  How are you comfortable with them?
10 A  How I'm comfortable with the 20th? Well, it's the day
11   we did -- just did the preparation and everything. The
12   21st, we had planned on moving, but we didn't have the
13   big truck, so we couldn't get the couch and the beds
14   and everything in, so -- so we made the 22nd. We just
15   moved everything out. So.....
16 Q  Did you refer to any documentation to refresh your
17   memory as to these dates?
18 A  Sure. I have all paperwork on me.
19 Q  Okay. And that paperwork consists of what?
20 A  The rental fee for the truck, and the rental for the
21   storage.
22 Q  Okay. Could you take a look at the paperwork, if you
23   would? What is the date on the commencement of the
24   rental fee of the storage?
25 A  The storage -- let me see. That was on the 21st.

Page 718

1 Q  Okay. Who is that storage facility rented to?
2 A  Robert Davis.
3 Q  And when was the rental fee on the truck?
4 A  Let me see, on the truck -- it was the 22nd.
5 Q  And who is that rented to?
6 A  Robert Davis.
7 Q  Okay. And is there any size truck indicated there? Or
8    do you recall what kind of truck it was?
9 A  It was basically like the 29.99 truck, I -- I do
10   believe.
11 Q  From who?
12 A  Robert Davis.
13 Q  No, no. Who -- the 29.99 truck -- you get it from
14   somebody?
15 A  Oh, U-haul.
16 Q  U-haul?
17 A  U-haul. Uh-hum. (Affirmative)
18 Q  All right. Now, focusing in on the -- let's see -- on
19   the 20th, sir. I'm thinking of the 20th now, okay?
20 A  Okay.
21 Q  Who was over there, if anybody, with you on the 20th?
22 A  Me, Robert and Darryl.
23 Q  Anybody else?
24 A  Well, people in and out. So that's really about the
25   main ones when we first came over. So and people was

coming over to see what -- did we need any help, and
back and forth. So -- so me, Darryl and Robert --
basically the main movers.

Q Did you see Jeremy Fish that evening?

A I did.

Q Okay. About what time and where did you see him?

A Around what time you said?

Q Yeah, about what time?

A Around rightish.

Q Okay. And where did you see him?

A He was in the kitchen.

Q All right. Of 2-0.....

A 202 Grand Rot -- Grand Larry.

Q All right. What was he doing?

A Well, just running the mouth like always.

Q And were you in the kitchen?

A Not at the time, no.

Q How do you know he was in the kitchen?

A Because you could see -- when you first walk in the
living room section, you could see in the kitchen. So
right when you first walk in the living room you don't
have -- you can just basically see right into the
kitchen right then, if you pass the wall.

Q Do you do any marijuana or any drugs?

A No.

Page 719

Q Are you familiar with marijuana?

A I do.

Q And calling your attention to the 20th, did you see a
big pile of marijuana on the kitchen counter?

A No.

Q Okay. Would you have been in a position to tell
whether there was a big pile of marijuana on the
kitchen counter?

A Yes.

Q All right. I'm talking about all evening, did you ever
see any?

A I never seen any marijuana, no.

Q All right. Are you familiar with handguns?

A I do.

Q Did you see Robert Davis that evening?

A Yes.

Q Okay. And was that on a -- was that intermittently,
fairly continuously, how would you describe that?

A I really couldn't hear the question good.

Q Okay. Was it intermittently, continuously -- I mean,
how would you describe your interrelationship with
Robert Davis that evening?

A That evening? Well, we were always by each other that
evening anyway, because we were getting ready to, you
know, plan on packing little things up. So we was

Page 720

always kept in contact and eye contact, before I left.

Q All right. And did you see him have a conversation
with Jeremy Fish?

A Jeremy Fish? Maybe a light sl -- light conversation,
or whatever. So I wasn't directly in the kitchen, so I
really weren't concerned on what they was doing.

Q Did you see any firearms in that house that evening?

A No.

Q Specifically, did you see a 40 -- do -- do you know the
difference between a revolver and a pistol?

A I do know the difference between a handgun and a
revolver. So.....

Q All right. Did you see any revolvers there?

A No.

Q Did you see any guns stuck in Mr. Davis' waistband, or
on a holster, or on his person in any way?

A No.

Q Is there anything that could have -- that he was
wearing that would have covered up such a weapon?

A No.

Q Okay. Are you comfortable with that statement?

A Sure.

Q Now, you have earlier testi -- you have indicated you
have a key to the place?

A Sure.

Page 721

Q Do you have free reign of the place?

A For.....

Q In other words, do you have free reign -- can you go
where you want to in the apartment?

A Sure.

Q Okay. And have you ever seen a handgun in that
apartment?

A No.

Q Have you had the opportunity to look in the apartment
so if one was there you would have seen it?

A I would have. Well, I have a opportunity to look all
over, but that wasn't my choice to do. But I never
seen any handgun there.

Q How long did -- to your knowledge, did Jeremy Fish stay
there?

A Maybe about f -- no longer than 20 minutes, I know.

Q All right.

A So maybe 15 minutes. So 15, 18 minutes. Around that
time. So.....

Q Was anybody else coming and going in during this time
period?

A Not at that time.

Q Okay. Did anybody leave, and -- do you know?

A Yeah. One person left out. So.....

Q All right. And you know why they left?

Page 722

**Page 723**

1 A They said they was going out to move a car. So.....

2 Q Now, have you seen Jeremy Fish since that day?

3 A That day? Yes.

4 Q Okay. Did you see him yesterday?

5 A I seen him yesterday when he was leaving the courtroom.

6 Q What did you see him do, if anything?

7 A Well, basically he was rushing out. So -- and then he

8   went out to the -- across the street over to the youth

9   center. He was parked there. And then, after that, he

10   left.

11 Q He left?

12 A He left, yes.

13 Q Okay. Did someone pick him up?

14 A No. He was driving.

15 Q Okay. What was he driving?

16 A It was a white Beretta.

17 Q Between the times of the 20th and the -- of February

18   now.....

19 A Okay.

20 Q .....and yesterday, had you seen Jeremy Fish?

21 A Not since yesterday, no.

22 Q Do you have any type of friendship -- relationship with

23   Jeremy Fish?

24 A No.

25 Q Are you comfortable with the fact that you saw Jeremy

**Page 724**

1   of February 20th?

2 A I comf -- I'm well comfortable with that.

3   MR. JAMES: Your Honor, if I may approach the witness?

4 Q You testified off of two documents, did you not?

5 A Oh, just bas -- yeah. One document here. And, no,

6   that's the copy of that one. So -- that's the same

7   (indiscernible).....

8 Q Do you have a copy of it?

9   MS. BRADY: Could I first take a look at those, too?

10   THE COURT: Yes.

11   (Pause)

12   THE COURT: Ready to go, Mr. James?

13   MR. JAMES: Yes, Your Honor, I'm sorry. I didn't know

14 she was ready.

15 Q Now, I'm going to hand you back what has been marked H

16   for identification.....

17 A Okay.

18 Q .....and I for identification. Okay?

19 A Uh-hum. (Affirmative)

20 Q All right. Now, what is H? What is H?

21 A The rental for the -- for the storage.

22 Q Okay. And what is I?

23 A I is for the rental for the U-haul.

24   MR. JAMES: All right. Your Honor, I'd offer H and I?

25   MS. BRADY: No objection.

**Page 725**

1   THE COURT: H and I are admitted.

2   (Defendant's exhibit H and I admitted)

3 Q Just leave them up there, then. Those two with the

4   stickies on them?

5 A Okay.

6 Q Ms. Brady is going to ask you some questions.

7   THE COURT: You are finished with direct?

8   MR. JAMES: Yes.

9   THE COURT: Ms. Brady, cross examination?

10   BRANDON MAY

11 testified as follows on:

12   CROSS EXAMINATION

13 BY MS. BRADY:

14 Q Okay. Mr. May, what is your date of birth?

15 A 12/18/74.

16 Q Okay. And now, Mr. Davis is your brother-in-law,

17   right?

18 A Yes, ma'am.

19 Q And so you are married to his sister, is that right?

20 A That is correct.

21 Q Okay. Have you talked about this case with him at all?

22 A No.

23 Q So during the entire time this case has been pending,

24   you have never discussed this case?

25 A No.

**Page 726**

1 Q Did you ever talk with his attorney?

2 A No. We were just going over a couple, you know, try to

3   get everything prepared. So that's about it. So when

4   I need to come in, and what time, and whatever.

5 Q Okay. So did you know -- did you know that Jeremy Fish

6   said the house was empty on the 20th?

7 A Did I know he said that?

8 Q Uh-huh.

9 A No.

10 Q Okay. And how much time did you spend preparing for

11   your testimony today?

12 A For my testimony?

13 Q Uh-huh.

14 A I re -- basically I didn't. I just came down today.

15   So around 10.

16 Q You just came today around 10?

17 A Yes.

18 Q How much time did you spend talking -- did you talk

19   with only Mr. Davis' attorney?

20 A Yes.

21 Q How much time did you spend talking with him?

22 A Maybe about 30 minutes.

23 Q Okay. And you said that you are familiar with

24   marijuana?

25 A Yes.

Q   How is it that you are familiar with marijuana?

A   How familiar? Well, basically when I was in school, they give you a picture of everything, crack, and marijuana, pcp, and all that type of stuff. So I'm well educated on that. So.....

Q   Okay. So when you were in school they showed you what different drugs look like?

A   Yeah. You can rent a book that show you things like that. So.....

Q   What school were you going to that you.....

A   Lamiere (ph) High in Montgomery, Alabama.

Q   Okay. And you rent books that.....

A   Uh-hum. (Affirmative)

Q   .....tell you -- and, just out of curiosity, why would you want a book about.....

A   Because most of the time people do reports on things like that.

Q   Did you do a report on marijuana?

A   I didn't. So.....

Q   Okay. So why did you rent a book about marijuana?

A   Well, I didn't say I rented one. My couple friends rented one. We just basically want to know everything, what is going on. We don't want to get on -- you know, start using things that we can't get off of, and cause crimes and problems in this world. So.....

Page 727

Q   Okay.

A   So I like to know things before I started to do things. So.....

Q   And so any familiarity that you have with cocaine or crack, would that have come from the same book?

A   That one -- you may had the second edition on that if -- if went down to crack.

Q   Okay. So if I understand the testimony, books were rented two times. There was second edition. Is that what you just said?

A   Yes. It's different drugs, and whatever. They don't have all of them related on the same book.

Q   So you have never seen marijuana in person in real life?

A   Yeah, I have seen it in person, too.

Q   Oh, okay. When was that?

A   Years ago.

Q   Many years ago?

A   Yes.

Q   How many?

A   Maybe six years ago.

Q   Okay. And what about crack?

A   Crack? I know what crack look like. It is a white substance, but I never been too close to it. So.....

Q   Have you ever seen it in person?

Page 728

1 A   Yes.

2 Q   Where would that be of at -- where would that have been
3    at?

4 A   In another state.

5 Q   In another state?

6 A   Yes.

7 Q   Okay. What state?

8 A   Atlanta, Georgia.

9 Q   Okay. And how was it that you came about seeing the
10    crack?

11 A   Oh, a couple of friends had it, and they was trying to
12    tell me what was that, and then I say, okay, and get
13    rid of that, because I didn't want to involve myself in
14    that.

15 Q   What about powdered cocaine, have you ever seen that?

16 A   Yes. It's a powder substance. Something like baby
17    powder, basically. So.....

18 Q   Okay. Have you ever seen it in person?

19 A   In person? Yeah.

20 Q   And when would that have been?

21 A   Around the same time.

22 Q   Okay. And do you know how to make crack from cocaine?

23 A   I don't, no.

24 Q   Okay. And on those occasions that you have been over
25    to Mr. Davis' house with a key when he wasn't there,

Page 729

1    and you have looked around in his house, have you ever

2    seen any crack cocaine in this house?

3 A   No, ma'am.

4 Q   Have you ever seen any powder cocaine in this house?

5 A   No, ma'am.

6 Q   Have you ever seen any white powder substances at all

7    at Mr. Davis' house?

8 A   No, ma'am.

9 Q   No baking soda?

10 A   Well, baking soda might be in the freezer for -- to

11    keep food fresh. So.....

12 Q   Okay. So that is a white powdery substance, right?

13 A   Yeah.

14 Q   Okay. And you testified that when Mr. Fish was talking

15    to Mr. Davis, you weren't concerned with they were

16    doing, is that right?

17 A   I didn't say I wasn't concerned, but I was just in

18    there if he need to ask me some things, and make sure

19    we got the court dates, and everything taken care of.

20    So.....

21 Q   Okay. When Mr. Fish was talking to Mr. Davis on the

22    20th -- I think I misdirected you. You said you

23    weren't concerned with what they were doing, is that

24    right?

25 A   I was concerned because I'm -- I'm on trial and so I

Page 730