1    need to know what is going on.

2 Q  You are on trial?

3 A  Well, I'm up here testifying, that is what I'm saying.

4    So.....

5 Q  Okay. And I was directing your attention to February

6    20th.....

7 A  Uh-hum. (Affirmative)

8 Q  .....when Mr. Fish and Mr. Davis were talking in the

9    kitchen, you said on direct, when Mr. James was talking

10   to you.....

11 A  Oh, Mr. F -- okay. Okay.

12 Q  .....that you weren't too concerned with what they were

13   doing, is that right?

14 A  I got the name mixed up. It's Mr. Fish, that's Jeremy

15   Fish, okay. We can start there. I know what you are

16   talking about now.

17 Q  Okay.

18 A  So I really -- I was thinking you was talking about

19   the.....

20 Q  I could tell you were misunderstanding me, and that's

21   why I kept asking you.....

22 A  Yeah, so that is what I'm talking about. The names and

23   all that, I do know the person, and the names I'm

24   really kind of lost on. So.....

25 Q  Okay. Now, when Jeremy Fish was there -- when

Page 731

---

1    Mr. James was asking you questions, you said you

2    weren't too concerned with what he was doing with

3    Mr. Davis in the kitchen.

4 A  I wasn't. I was in the living room, at the time.

5 Q  Okay. Excellent. Now, did you -- do you know what

6   they discussed -- if they discussed anything?

7 A  No, ma'am.

8 Q  Okay. Did -- while Mr. Fish was there, now, who was in

9   the apartment at that time?

10 A  Me, Darryl and maybe two other people.

11 Q  Who is the -- who were those other people?

12 A  Just a couple of friends, Heather, and Woogie (ph).

13 Q  Oh, the -- is Woogie (ph) a male person, or a female

14   person?

15 A  It's a male -- it's a female and a male, so it's

16   basically three male -- three males and one female.

17 Q  Okay. And did someone leave to go buy a pot?

18 A  No, I had no one -- no.

19 Q  Or to go get a pot?

20 A  No.

21 Q  Did -- you know nothing about anybody being sent for a

22   pot?

23 A  Well, I was there until 11:00, so I know no one came

24   back with a pot. So most likely they haven't left to

25   get a pot. So.....

Page 732

---

1 Q  What about a 7-up?

2 A  7-up, no.

3 Q  Okay. And now, let me ask you this. You testified

4   that you followed Mr. Fish from the courthouse

5   yesterday?

6 A  I didn't follow him there. I was sitting right outside

7   the courtroom. You can see everything on the top

8   floor.

9 Q  Oh, so you were just watching him?

10 A  Yeah.

11 Q  Where was he parked at?

12 A  He was parked in the Anchorage Youth facility across

13   from the courthouse.

14 Q  He was parked where?

15 A  The little youth -- youth court.

16 Q  Youth court?

17 A  Youth court, I guess. So.....

18 Q  Okay. And you could see that from where you were?

19 A  Yes, ma'am.

20 Q  All right. And have you ever seen Mr. Fish at

21   Mr. Davis' house on any other occasion?

22 A  No.

23 Q  Okay. Did you -- were you aware that Mr. Dish and --

24   Mr. Davis and Mr. Fish were friends?

25 A  Maybe hello and hi and all that type of stuff. Not

Page 733

---

1    just like me and him are. So.....

2 Q  Okay. So they are not as good of friends as.....

3 A  No.

4 Q  .....you guys are but are you.....

5 A  Maybe hello, how you doing, or whatever like that, you

6   know. Basically seeing someone you greet them hello.

7   So.....

8   MS. BRADY: That's all I have, Your Honor.

9   THE COURT: Redirect, Mr. James?

10       BRANDON MAY

11 testified as follows on:

12      REDIRECT EXAMINATION

13 BY MR. JAMES:

14 Q  When you were in the living room, could you see in the

15   kitchen?

16 A  Yeah, you basically can see just a little distance in

17   the living room. You couldn't see the whole living

18   room.

19 Q  Could you see Robert in the -- in the kitchen?

20 A  Yes.

21 Q  Okay. So, thank you.

22   THE COURT: Thank you, sir. You can step down.

23 A  Thank you.

24   THE COURT: How we doing? Anybody need a break from

25 the jury? Nobody? Let me know. Next witness?

Page 734

MR. JAMES: I got one fairly quick one, then, if you
want to take a break.....

THE COURT: All right.

MR. JAMES: .....because that would be Officer Healy.
So.....

THE COURT: All right.

MR. JAMES: Please put your coat down, and if you would
come forward, and go up to the witness chair, there, and
remain standing, and Madam Clerk will swear you in, please.

(Oath administered)

MS. HEALY: I do.

MILDRED HEALY

called as a witness on behalf of the defendant, testified as
follows on:

DIRECT EXAMINATION

THE CLERK: Thank you. You can be seated. For the
court record, please state you name, spelling your last
name.

A  Mildred Healy, H-e-a-l-y.

THE CLERK: Thank you.

THE COURT: Go ahead.

BY MR. JAMES:

Q  Officer Healy, you are in uniform, and is that a CI --
department of corrections uniform?

A  Yes, it is.

Page 735

Q  Okay. And do you work for Cook Inlet Pretrial?

A  Yes, I do.

Q  Okay. And how long have you worked there, ma'am?

A  Since January of '99.

Q  All right. And so were you employed on or about
March 1 of 2001.....

A  Yes.

Q  .....at the facility?

A  Yes, I was.

Q  And what do you do at the facility?

A  Now I am a correc -- corrections records officer.

Q  And as part of your duties as corrections off --
records corrections officer, do you keep the records of
individuals who are -- are kept at Cook Inlet, as far
as when they arrive, what happens when they are there,
and when they depart -- up to the point they depart?

A  Yes, I do. And sometimes after they depart.

Q  After they depart? Okay. And pursuant to my request,
did I ask you to bring the records relating to a Robert
Davis from about February 1 -- excuse me, February 28
slash March 1, which would have been that -- that
morning, and up through the 2nd or 3rd of March of
2001?

A  Yes, I did.

Q  Okay. And you have those with you, ma'am?

Page 736

A  I have the records, and a copy of the records.

Q  Okay. And I asked you to bring the records and a copy,
so that we could leave one here, if necessary, and you
could take the originals back with you?

A  Yes.

Q  Okay. And is the copy an exact duplication of the
records that you have?

A  Yes.

Q  Okay. And you made that yourself, or.....

A  This morning.

Q  .....had that made? Okay. Could you open up your
package, please? And they are both in bound -- did you
bind that?

A  Yes, I did.

Q  Okay. One is a copy bound, and the other is the -- the
original?

A  Yeah.

Q  Correct?

A  Yeah. I brought a binder so that I could separate it
the way it was separated in our folder.

Q  Okay. Could you go through the folder, and tell me --
you separated it in different areas, is there areas
that are separated, and the reason they are separated?

A  The first area is the court paperwork, remand slips,
criminal history.

Page 737

Q  All right.

A  The second is the paperwork with his booking, and
transfers, and releases.

Q  All right.

A  Then the third page -- which there is nothing there,
that is classification and time accounting when they
are sentenced. And then this is any copouts, or any
other extra paperwork that comes in. It is in
chronological order.

Q  All right. Going to the first page, ma'am, is there an
indication when Mr. Davis arrived to CIPT?

A  Mr. Davis arrived on March 1st, 2001, at 1:00 a.m.

Q  Okay. And is there indication as to -- do you have a
booking officer in the normal procedures, is that how
it works, a CIPT officer?

A  We have one booking -- we have a booking -- one booking
officer at Cook Inlet. Occasionally another officer
might help, but we have one -- one officer on duty that
is considered the booking officer.

Q  All right. And does your records reflect who the
booking officer was?

A  Well, it is kind of hard to tell, but I think it was
Ted Garcia.

Q  Okay. And does that booking indicate what was on
Mr. Davis' person at that time?

Page 738

| | |
|---|---|
| 1 A  No. | 1 Q  Okay. All right. Now, how much was Mr. Davis -- when |
| 2 Q  All right. | 2     did -- when did Mr. Davis leave? |
| 3 A  That would be on the booking..... | 3 A  3/2/2001, at 19:20 hours. |
| 4 Q  Another place? | 4 Q  Okay. And that is 7:20 in the evening? |
| 5 A  Booking sheet. | 5 A  Yes. |
| 6 Q  All right. Going to the booking sheet, is there | 6 Q  All right. And what did he leave with? |
| 7     indication as to what was in his pers -- or on his | 7 A  90 dollars. |
| 8     person, or in his person -- on his person, I guess..... | 8 Q  All right. |
| 9 A  Yes. | 9 A  And all of his property. |
| 10 Q  .....would be the proper -- what did he have? | 10 Q  Okay. And you have what is called -- you indicated |
| 11 A  He was booked in with 180 dollars, a blue ball cap, a | 11     there is a cop section, c-o-p, is that what it is? |
| 12    black wallet, a pair of black jeans, a black coat, a | 12 A  Yes. |
| 13    pair of black shorts, a white T-shirt, white socks, one | 13 Q  What is -- is there -- is cop mean something? |
| 14    ear stud with a clear stone, one silver-like chain | 14 A  Copout. Well, it is actually a request for interview, |
| 15    necklace, one gold-colored necklace with a medal. | 15     but everybody calls it a copout. |
| 16 Q  Okay. And is that signed by what you believe to be | 16 Q  All right. Is there anything in that file relating to |
| 17    possibly..... | 17     the time period he was there? |
| 18 A  It's -- it is Ted Garcia. | 18 A  Well, there is a monetary disbursement. |
| 19 Q  .....the same signature? | 19 Q  Okay. |
| 20 A  Uh-hum. (Affirmative) | 20 A  And a -- the release of records that -- permission that |
| 21 Q  All right. And Mr. Davis also signed that, is that | 21     you sent to me earlier. He disbursed 100 dollars to |
| 22    correct, acknowledging that was..... | 22     APD. |
| 23 A  Yes, he did. He signed it in two places. One that | 23 Q  He did, or you did, or..... |
| 24    acknowledges the list of personal property, and one | 24 A  We did it because of a warrant. |
| 25    that acknowledges that he was given the opportunity to | 25 Q  All right. |
| Page 739 | Page 741 |
| 1     make phone calls. | 1 A  And I don't know who verified it, because I don't -- I |
| 2 Q  Okay. Now, the -- do you have records about if anybody | 2     can't even begin to see who that is. |
| 3     brought any money into Mr. Davis? | 3 Q  Would you know when that disbursement was made? |
| 4 A  The records for money, because Mr. -- are not | 4 A  The 2nd of March. It doesn't give a time. |
| 5     available. We can only go back two months. | 5 Q  All right. And is that it, other than the release that |
| 6 Q  Okay. | 6     you mentioned before? |
| 7 A  I think there is a way to go back further, but I think | 7 A  Yes. |
| 8     it is done by some administrator. I tried, and could | 8 Q  Okay. |
| 9     not get it, so we have no records for that date. Our | 9 A  That's it. And that..... |
| 10    -- you know, we don't have any -- he is gone, so it | 10 Q  Is that the totality of the file? |
| 11    doesn't bring it up. | 11 A  Well, there is a booking sheet, the chart, the warrant |
| 12 Q  All right. How about any type of medical treatment? | 12     -- the warrant for the money, and then the release |
| 13 A  Medicals -- medical..... | 13     sheet, and pictures. |
| 14    MS. BRADY: Objection, Your Honor, relevance. | 14 Q  All right. Relating to in, out, or the money, have you |
| 15    THE COURT: Rel..... | 15     covered everything in your testimony that relates to |
| 16    MR. JAMES: If it is part of that record. I'm just | 16     the documentation that CIPT has? |
| 17 asking is it part..... | 17 A  Yes. |
| 18    THE COURT: Relevance? | 18 Q  All right. If another officer, based on your |
| 19 A  No, it's not. | 19     experience, had been the booking officer, or had |
| 20    THE COURT: No, just a second. | 20     assisted in the booking officer, would you expect their |
| 21    MR. JAMES: I'm -- excuse -- the rel..... | 21     signature to appear in some of the intake materials? |
| 22    THE COURT: The answer is no? You don't have any? | 22 A  No. |
| 23 A  No. | 23 Q  No? |
| 24    MR. JAMES: All right. | 24 A  If there had been two there, no. |
| 25    THE COURT: Then never mind. | 25 Q  Okay. Just one? |
| Page 740 | Page 742 |

Page 743

1 A  Yeah.
2 Q  Okay.
3 A  The primary booking officer is the one that signs it --
4    usually signs it.
5 Q  Okay.  That's all I got.  Thank you, Ms. Healy.
6    THE COURT:  Ms. Brady?
7              MILDRED HEALY
8 testified as follows on:
9            CROSS EXAMINATION
0 BY MS. BRADY:
1 Q  Ms. Healy, if Mr. Davis arrived with 180 dollars,
2    right?
3 A  Uh-hum.  (Affirmative)
4 Q  And a search warrant seized -- seized $100, is that
5    right?
6 A  Uh-hum.  (Affirmative)
7 Q  And he was given $90?
8 A  Yes.  I -- I can -- I said I could have access to the
9    monetary records, but somehow he got another $10 on his
0    books, it would seem.
1 Q  Okay.  So it.....
2    MS. BRADY:  That's all the questions I have, Your
3 Honor.  Thank you.
4    THE COURT:  Re -- anything else?
5    MR. JAMES:  No.

Page 744

1    THE COURT:  Thank you, ma'am.  You are free to go.
2    MR. JAMES:  Thank you, Ms. Healy.
3 A  Do you need these files?
4    MR. JAMES:  No, ma'am.  Not -- you testified.
5    THE COURT:  Why don't we take 10 minutes, folks.  And
6 then we will come back and continue on.
7    (Off record)
8    THE COURT:  Have a seat, please.  And are we on record?
9    THE CLERK:  We are.
10    THE COURT:  All right.  We are back on record, and we
11 have all of our jurors back, and you have -- this is your
12 next witness.....
13    MR. JAMES:  Yes, sir.
14    THE COURT:  .....Mr James?  You want to stand up ma'am,
15 and we will swear you in?
16    (Oath administered)
17    MS. SODER:  Yeah.
18              ATHENA SODER
19 called as a witness on behalf of the defendant, testified as
20 follows on:
21            DIRECT EXAMINATION
22    THE CLERK:  You can have a seat.  State your full name,
23 for the record, and spell your last name.
24 A  Athena Jo Soder, S-o-d-e-r.
25    THE CLERK:  Thank you.

Page 745

1    THE COURT:  Go ahead, Mr. James.
2    MR. JAMES:  All right.
3 BY MR. JAMES:
4 Q  Athena -- may I call you Athena?
5 A  Yeah.
6 Q  All right.  Have you ever been in and testified before?
7 A  No.
8 Q  All right.  So if you don't und -- like I told you
9    outside, if you don't understand something, you ask,
10    all right?
11 A  All right.
12 Q  Okay.  Do you know Jeremy Fish?
13 A  Yes.
14 Q  How do you know Jeremy Fish?
15 A  He is the father of my daughter.
16 Q  All right.  And.....
17 A  We used to date.
18 Q  I'm sorry?
19 A  We used to date.
20 Q  Okay.  And calling your attention to April of 2001.....
21 A  Uh-hum.  (Affirmative)
22 Q  .....that month.  Did you see Jeremy Fish?
23 A  Yeah.  I saw him on April 1st.
24 Q  Why do you know it was April 1st?
25 A  Because it was April fool's day.

Page 746

1 Q  Why did you go see him -- or did you go see him, or you
2    saw him?
3 A  Yeah.  I went and saw him at Subway.  He was working
4    there.  And I went there just to see if he wanted to,
5    you know, see his daughter, or whatever, because her
6    birthday was the following month.
7 Q  All right.
8 A  Uh-hum.  (Affirmative)
9 Q  And when the following month is her birth.....
10 A  May 3rd.
11 Q  All right.  Did you have a conversation with Jeremy
12    Fish regarding Robert Davis?
13 A  Yes.
14 Q  Okay.  Did you ask?
15 A  Huh?
16 Q  Did you ask Jeremy Fish anything?
17 A  Yeah.  I asked him why he turned in Rico -- Robert.
18    And at first he denied doing it.  And then he said --
19    he started getting mad.
20    MS. BRADY:  Objection, Your Honor.  This is hearsay.
21    MR. JAMES:  Okay.
22    THE COURT:  The objection is overruled.
23    MR. JAMES:  Thank you.
24 Q  That means you can go ahead and answer.
25 A  Oh, he started to get mad, and then he said that he

Page 747

1 would do anything he could to get Rico in trouble --
2 Robert, Rico. And -- and then, after he said that, he
3 started crying and acting -- saying he had AIDS -- him
4 and his girlfriend had AIDS.
5 Q Did you see him.....
6 A And that was.....
7 Q Did you see him after that date?
8 A Yeah. I saw him May 3rd.
9 Q Why did you see him May 3rd?
10 A That was our daughter's birthday.
11 Q All right.
12 A And I saw him at the Diamond Mall for about 15, 20
13 minutes.
14 Q All right. Did you see him after May 3rd?
15 A I saw him September 11th.
16 Q Why do you -- why are you comfortable with September
17 11th?
18 A Because I was staying at his sister's house for a
19 couple of days. And that morning the news was on about
20 the terrorist attacks. And that evening we ran into
21 him on the road. And he pulled over behind us, and he
22 got out of the car, and our daughter was eating a
23 sucker, and he took the sucker from her and he at it.
24 And then he went back to his car, and he came back to
25 his sister's car, which is where I was, and he had a

Page 748

1 big gallon size bag of weed with him, and he asked me
2 if I wanted to buy any from him. I told him no, I'm
3 pregnant. And then his sister told him to give her
4 some. So he gave her about a bowl, but -- and then he
5 left. And then about 30 minutes later he showed up at
6 her house, because he had forgotten his cell phone in
7 his sister's car. And he came inside, and he was
8 smoking weed with his sister's boyfriend, and then he
9 left. But in the -- when he left, he left weed there,
10 like a eighth of weed. And so he returned again. And
11 that time Jared had took the weed that he left -- Jared
12 is his sister's boyfriend, and he hid it. And he was
13 going to keep it. And Jeremy was mad saying, you know,
14 give me my weed back. And Jared was like, I don't got
15 it. And then Jeremy wanted to fight Jared. And so
16 Jared -- or Jeremy went down to his car, and I was
17 watching him through the window, and he opened his car
18 door, and he bent over and he pulled his seat down, and
19 he took a gun out. And he told Jared to go down there,
20 and he was going to shoot him. And then Tamara -- that
21 is his sister, told Jeremy that she was going to call
22 the cops, so Jeremy got in the car and left. And we
23 called the cops, but they said they couldn't do
24 anything about it.
25 Q Okay. Is that the last time you saw Jeremy?

Page 749

1 A Yes.
2 Q Okay. Now, are you familiar with cocaine, and crack
3 cocaine, and marijuana?
4 A Like, what do you mean?
5 Q Do you know what it is.....
6 A Yeah.
7 Q .....when you see it?
8 A Yeah. Yeah.
9 Q All right. When you were with Jeremy before, this
10 year, did you see Jeremy with any cocaine?
11 A Yes, I did.
12 Q I'm -- you know I'm talking cocaine. I'm not
13 talking.....
14 A Yes.
15 Q .....crack?
16 A Cocaine, yeah. Powder.
17 Q The powder?
18 A Uh-hum. (Affirmative)
19 Q When was that?
20 A That was the end of July, or the beginning of August
21 2000. And I ran into mean downtown Anchorage, fifth
22 avenue mall, and it was out -- outside by that grass,
23 and me and Jeremy were talking, and it was a couple of
24 months after I had my baby, and I had lost of lot of
25 weight, so I don't know if he thought I was doing coke,

Page 750

1 or whatever, but he took it out of his pocket, and he
2 was like, do you want to -- you know, do you want to do
3 some? And I told him, no, you know. And then he put
4 it back in his pocket, and then he never said anything
5 else about it.
6 Q How do you know it was cocaine?
7 A Because I saw it. I mean, I know what it is. I have
8 done it before, years ago.
9 Q All right.
10 A Before I got pregnant.
11 Q Okay. Now, do you do drugs -- do any drugs now?
12 A No.
13 Q Do you know why Jeremy would be mad, or make a
14 statement that he would do anything he could to get
15 Rico?
16 A Yeah. Because he -- he knows how Rico would, like --
17 during my pregnancy, Rico would give me rides to the
18 doctor's, and he would buy my daughter diapers and
19 wipes and food. And Jeremy never bought anything for
20 his daughter. And so he was mad, and jealous, or
21 something, I guess.
22 Q Did you have a relationship with Robert Davis -- a
23 sexual relationship?
24 A No. Never.
25 Q Okay. Now, have you ever been over to 202 Grand Larry?

1  A  Yes.
2  Q  All right.  And have you ever seen any drugs over
3     there?
4  A  No.
5  Q  And how many times you been over there?
6  A  I don't know.
7  Q  Okay.
8  A  Quite a few times.
9  Q  All right.  Did you ever see any guns -- any -- in the
10    possession of Mr. Davis?
11 A  No.
12 Q  Thank you.  Like I told you out there, the other side
13    gets to ask questions, too.
14 THE COURT:  Cross examination, Ms. Brady?
15             ATHENA SODER
16 testified as follows on:
17          CROSS EXAMINATION
18 BY MS. BRADY:
19 Q  Okay.  So you used to date Mr. Fish, is that right?
20 A  Right, yeah.
21 Q  How long did you date him for?
22 A  For about a couple of weeks.
23 Q  A couple of weeks?
24 A  Yes.
25 Q  Okay.  So during that couple of weeks, how many times

Page 751

1  A  Yeah.
2  Q  Okay.  So you know what that amount of marijuana.....
3  A  Right.
4  Q  .....looks like?  You smoked it before?
5  A  To an extent.  Yeah.
6  Q  Still smoke it?
7  A  No.
8  Q  When was the last time you smoked it?
9  A  July.
10 Q  Okay.  And have you ever smoked marijuana with
11    Mr. Davis?
12 A  No.
13 Q  Never?
14 A  No.
15 Q  So if Mr. Davis said you did, he would be lying?
16 A  Right.
17 Q  Okay.  And who is the father of your baby that you are
18    pregnant with now?
19 A  Josh.
20 Q  Okay.
21 A  I have been dating him for about two years, ever since
22    me and Jeremy broke up.
23 Q  When, specifically, did you date Jeremy?
24 A  August of -- August 1st of '99.  That's when we dated.
25    That's when we started going out.

Page 753

1     did you sleep with him?
2  A  Two times.
3  Q  Two times?  Okay.  So.....
4  A  No, excuse me.  Three times.
5  Q  Okay.
6  A  Three.
7  Q  Did you sleep with anybody else around the same time?
8  A  No.
9  Q  Okay.  Does Mr. Fish have any way of knowing that?
10 A  That -- knowing that I haven't?
11 Q  Yeah.
12 A  I don't -- I don't know.
13 Q  Okay.  Have you ever had a paternity test to establish,
14    then, that he is the father of your daughter?
15 A  No.
16 Q  Okay.  Has Mr. Fish asked you to?
17 A  No.
18 Q  Okay.  Now, you said that on one time Jeremy Fish left
19    behind an eighth of weed, is that right?
20 A  Right.
21 Q  How do you know it was an eighth?
22 A  Because Jared said so.  I saw it.  It was in a baggie
23    about that big, and it was filled about that much with
24    weed -- across.
25 Q  Would you recognize an eighth of weed?

Page 752

1  Q  And you finished going out on the 15th of '99 -- August
2     of '99?
3  A  Somewhere around there, the middle of August.
4  Q  Okay.  Now, you testified that you know what crack and
5     cocaine are?
6  A  Right.
7  Q  How do you know that?
8  A  Well, because I used to do cocaine back when I was
9     dating Jeremy.
10 Q  Okay.  So you haven't done it for two years?
11 A  Right.
12 Q  Is that your testimony?
13 A  Right.
14 Q  Okay.  And what about crack?  You ever smoked crack?
15 A  No.
16 Q  Okay.  Then, how do you know what that looks like?
17 A  Because I have seen it before.
18 Q  Under what circumstances have you seen it?
19 A  Jeremy has had it before, and my friend's have had it,
20    and I have seen it.
21 Q  Have you ever seen Mr. Davis with crack?
22 A  No.
23 Q  Ever seen him with cocaine?
24 A  No.  Okay.  And.....
25 MS. BRADY:  Okay.  I don't have any further questions,

Page 754

1 Your Honor.
2          ATHENA SODER
3 testified as follows on:
4          REDIRECT EXAMINATION
5 BY MR. JAMES:
6 Q  You were asked if you smoked cocaine or crack before.
7    Do you smoke anything else?
8 A  Have I what?
9 Q  Do you smoke?
10 A  Yeah.  I smoke cigarettes.
11 Q  All right.  Thank you.
12    THE COURT:  Thank you.  You can step down, ma'am.  Your
13 next witness?
14    MR. JAMES:  What I would like you to do, please, is if
15 you kind of weave your way around, and there is a seat up
16 there, would you just remain standing?
17    MS. EPEAGBA:  All right.
18    MR. JAMES:  And Madam clerk will swear you in.
19    (Oath administered)
20    MS. EPEAGBA:  Yes.
21          BUENA EPEAGBA
22 called as a witness on behalf of the defendant, testified as
23 follows on:
24          DIRECT EXAMINATION
25    THE CLERK:  You can have a seat.  Please state, for the

Page 755

1 record, your full name, and spell your last name.
2 A  My name is Buena Epeagba.  E-p-e-a-g-b-a is my last
3    name.  B-u-e-n-a is my first name.
4    THE CLERK:  Can you spell your last name again, I'm
5 sorry.
6 A  E-p-e-a-g-b-a.  B as in boy.
7    THE CLERK:  Thank you.
8 BY MR. JAMES:
9 Q  Mrs. Epeagba, you are the mother of Robert Davis,
10    right?
11 A  Yes.
12 Q  Okay.  The name Rico has come up.  You know how --
13    where that name comes from?
14 A  Well, his father is Robert.  And his dad didn't want
15    two Roberts, you know.  So he named him Rico before he
16    was born.
17 Q  And he has always been known -- is that his nickname?
18 A  Always.
19 Q  All right.  Okay.  Now, what does your son do for a
20    living, what does he work at?
21 A  Right now he is an auto mechanic.  He works on Old
22    Seward and 72nd.  He has a shop there.
23 Q  Okay.  So he is self employed, is that right?
24 A  Yes, he is self employed.
25 Q  Okay.  And how long has that -- how long has he had the

Page 756

1    shop, to your knowledge, at East side?
2 A  I think since, maybe, October or November of '99.
3 Q  Okay.  During February of 2001, was he running a
4    business out of your house?
5 A  No.  He left -- he did have a business there in maybe
6    June or July of '99 until October of '99, because the
7    storage building that he was using does not have heat.
8    So it was mainly like a garage.
9 Q  Now, do you have a suburban?
10 A  Yes.
11 Q  Is that your car?
12 A  Yes.
13 Q  All right.  And does it have twin -- tinted windows?
14 A  Yes.
15 Q  Which windows are tinted?
16 A  All the windows, except the two windows on the side in
17    the front, and the windshield.  The rest of the windows
18    are a dark tint.
19 Q  Can you sit -- see in that vehicle, in the back portion
20    of the vehicle?
21 A  No.  You can't -- you can't see in there.  You can see
22    in the front.  You can see if a passenger is in the
23    front, but you can't see the back and the sides.
24 Q  Okay.  All right.  Calling your attention to February
25    2001 -- that time frame, February, march 2001, okay?

Page 757

1 A  Uh-hum.  (Affirmative)
2 Q  Were you in Anchorage in that time?
3 A  Yes.
4 Q  Okay.  Do you recall whether the weather conditions
5    were  --  was it getting towards break up, was it still
6    heavy winter, do you know?
7 A  No, it was muddy.  Freezing and thawing out.  It was
8    really muddy.
9 Q  All right.  In regards to your vehicle, do you have a
10    schedule about washing it, or.....
11 A  Well, during break up, I don't -- I don't worry about
12    washing it, you know.  I might take the hose and spray
13    it down, but I don't -- because I live on an alley.  My
14    -- my carport is on the alley, and the alley is just
15    dirt and gravel, and there is lots of holes, and there
16    is no point in washing it.
17 Q  Okay.  Now, have you known your son, Robert, to ever
18    own a firearm -- a handgun?
19 A  No.  I have never known him to -- to own a gun.  Even
20    as a child, I never bought him a gun.
21    MR. JAMES:  All right.  One moment, please.  (Pause)
22 That's all I've got.  Thank you.  You can ask some
23 questions.
24 A  That's it?
25    THE COURT:  Thank you, Mr. James.  Ms. Brady,

Page 758

1   questions?

2                  BUENA EPEAGBA

3   testified as follows on:

4                  CROSS EXAMINATION

5   BY MS. BRADY:

6   Q   How far is it from your house to International and Old

7       Seward?

8   A   Maybe a mile. Could.....

9   Q   Okay. How long would it take you to drive there,

10      about?

11  A   Five minutes.

12  Q   Okay. And was your son living with you on February

13      21st, 22nd, around there?

14  A   He was living at a hotel, but he was -- his -- most of

15      his clothes were at my house.

16  Q   Okay. So when he was moving out of 202 Grand Larry,

17      did he move his stuff to your house -- a lot of it?

18  A   He moved his personal things, like his clothing, his

19      stereo, and his small items. He put them in the -- the

20      storage shed.

21  Q   All right. And was he driving your car?

22  A   Yes.

23  Q   Okay. Did he frequently drive your car?

24  A   Yes.

25  Q   So how do you know he was driving your car on February

Page 759

1       21st?

2   A   If I didn't drive it, his sister didn't drive the car

3       -- we have the large car because we have a large

4       family, and we all fit in the car. So there are

5       three people, other than myself, that will drive my

6       car.

7   Q   Okay.

8   A   So if I didn't have the car, and the car was gone, they

9       all have keys. I don't fuss over it, long as they

10      leave me a vehicle to drive.

11  Q   You have other cars?

12  A   Yes.

13  Q   What other kinds of cars do you have?

14  A   There is a Montero Sports SUV. It is not actually my

15      car. It is in my name. It is my daughter's car. So

16      if they drive my car, they leave a car available for

17      me. They leave their car.

18  Q   I see.

19  A   With the keys in the car, because if I come outside and

20      my car is gone, then I use whatever car is available.

21  MS. BRADY: Thank you. That's all the questions I

22  have.

23  A   Uh-hum. (Affirmative)

24  THE COURT: Mr. James, redirect?

25                  BUENA EPEAGBA

Page 760

1   testified as follows on:

2   BY MR. JAMES:                REDIRECT EXAMINATION

3   BY MR. JAMES:

4   Q   You said the little items were kept at your house.

5       Where were the big items?

6   A   In the storage.

7   Q   All right. And on February 21, you don't know who was

8       driving the car if you weren't driving the car,

9       correct?

10  A   No.

11  Q   All right. Could -- thank you.

12  THE COURT: All right, ma'am. Thank you very much.

13  You can step down. Mr. James?

14  MR. JAMES: Could I just have one minute? (Pause) If

15  I may just have one second, I want to check and see if I

16  have another witness out there? (Pause) Thank you, Your

17  Honor. At this time we will rest, sir.

18  THE COURT: I need to have a bench conference with you

19  all first, please.

20  MR. JAMES: Before I rest?

21  THE COURT: Uh-hum. (Affirmative)

22  MR. JAMES: Fine.

23  (Bench conference as follows:)

24  (Inaudible)

25  (End of bench conference)

Page 761

1   THE COURT: All right. Mr. James?

2   MR. JAMES: Yes, Your Honor. At this time, we rest.

3   THE COURT: All right. The defense rests, means the

4   defense won't be presenting any additional witnesses. If

5   you remember back to the beginning of the trial, I indicated

6   that the state may have the opportunity to present limited

7   rebuttal evidence. Ms. Brady, any rebuttal evidence?

8   MS. BRADY: No, Your Honor.

9   THE COURT: All right. All right. You've received all

10  the evidence you're going to receive. The next step in the

11  case is for the lawyers to make closing arguments or

12  summations. Then I will instruct you on the law. After we

13  do all that I'll check everybody's health, and assuming

14  everybody is healthy, and we have too many jurors, I'll draw

15  a couple of names by random to winnow you down to 12, and

16  we'll send the 12 of you in to begin deliberations.

17      I expect deliberations will begin between 10:30 and

18  11:00 tomorrow. And I'll ask you to be -- I don't know how

19  long it will take you to make whatever decision you make,

20  but I'll ask you to plan on being here the full day. And

21  with that, I'm going to send you home. We're not going to

22  do closing arguments now. And one of the things that I have

23  to do is check with the lawyers to -- double-check that the

24  instructions on the law are accurate. And I'm going to

25  spend the rest of our trial time now doing that.

Page 762

1 Can I answer any procedure or scheduling kind of
2 questions?
3    UNIDENTIFIED JUROR: Is there a lunch break? If we go
4 in deliberation at 10:30, then what happens to lunch?
5    THE COURT: We'll buy you lunch tomorrow. And the
6 bailiff will -- you'll have a bailiff who you'll be assigned
7 to. The bailiff will give you menus. You'll be given the
8 option of whether to go out to lunch or whether to order
9 lunch in and have a working power lunch. So it's your
10 choice. And all of that will be handled tomorrow. Yes,
11 sir?
12    UNIDENTIFIED JUROR: You mentioned instructing us in
13 the law. Will you be instructing us as to the exact charges
14 and then also the exact parts of the law that were applied?
15    THE COURT: Yes, sir. I will.
16    UNIDENTIFIED JUROR: Okay. Thank you.
17    THE COURT: And I'll warn you now, I'm required by law
18 to read them to you, but I'll also give you a copy to follow
19 along so if it helps you to absorb information, you can
20 follow along with your copy, and then you'll also have the
21 original instructions and your copies in the jury room to
22 refer to as you begin to deliberate and talk about the case.
23 And -- yes, sir?
24    UNIDENTIFIED JUROR: What time are we to be back here
25 again tomorrow?

Page 763

1    THE COURT: 8:30 tomorrow.
2    UNIDENTIFIED JUROR: 8:30?
3    THE COURT: Yes. All right. Let me just remind you
4 again we're getting near the end, and it's as important as
5 ever that you not speak with one another. Even though
6 you've heard all the evidence now, you still haven't heard
7 the closing instruction -- the closing arguments that tie it
8 together, and you haven't heard the instructions on the law.
9 So it's premature to begin talking with one another about
10 how you might decide the case, and of course, it's always
11 premature and inappropriate to talk with anybody else about
12 deciding the case. So don't do any investigation or
13 research on your own and please just remember not to speak
14 with anyone else about the case. And Mr. Iverson, could you
15 stick around? We'll ask you about your schedule after I let
16 everybody else go. We'll see you tomorrow, folks.
17    (Jury excused)
18    THE COURT: All right. Everybody have a seat. Mr.
19 Iverson, what's your schedule for tomorrow? Do you know any
20 more than you knew yesterday?
21    MR. IVERSON: No, sir. My son's attorney, Sid
22 Billingslea, I spoke to her on the phone late yesterday
23 afternoon. The pretrial conference is scheduled at 1:30 in
24 the building next door. She has been attempting to work
25 with the juvenile I guess and probation officer to determine

Page 764

1 if she can wrap things up, and if so, then they probably use
2 that time to just dispense of matters and come to agreement.
3 Otherwise it would just be a confirming a court date or
4 something like that. But she -- she would know during the
5 course of -- she should know by the end of today she said,
6 and of course, the morning is gone, but she had planned to
7 be in her office all morning this morning. But that's the
8 situation.
9    THE COURT: All right. Well, either way, it's
10 important for you to be there. And here's what I would like
11 you to do. I'd like you to show up for us tomorrow morning.
12    MR. IVERSON: Okay.
13    THE COURT: I'll take a head count and make sure that
14 everybody is feeling well.
15    MR. IVERSON: Uh-hum. (Affirmative)
16    THE COURT: If everybody is feeling well, then we'll
17 talk about cutting you loose tomorrow morning so that you
18 can make sure -- so that you're not involved here. If
19 something happens and we lose a couple of jurors tonight we
20 may ask you to stay on the jury, but we'll give you a break
21 to take care of your other personal business.
22    MR. IVERSON: Yeah, and any case, she didn't feel it
23 would be a long duration, and I'm willing to do whatever.
24    THE COURT: All right. Well, why don't we check with
25 -- then come back with everybody else tomorrow at 8:30, and

Page 765

1 we'll make a decision then if you're not -- if you're going
2 to end up not serving, you don't necessarily have to stick
3 around, but I need to -- if I lost two jurors tonight
4 through pneumonia or a broken leg or something, then I would
5 be hurting, and so why don't we see tomorrow?
6    MR. IVERSON: All right.
7    THE COURT: All right. Good night. Thank you. All
8 right. The rest of our jurors have departed. Let's take
9 care of any additional substantive procedural issues that we
10 can. Mr. James, you wanted to make a motion for.....
11    MR. JAMES: Oh, yeah.
12    THE COURT: .....judgment of acquittal, and I asked you
13 to reserve it until we took a break, without, of course,
14 waiving your right to do that. So.....
15    MR. JAMES: Understood. Your Honor, at this time I
16 make judgement -- my motion. Basically, as the testimony
17 has indicated, this case rises or falls on Jeremy Fish. And
18 I think we've established more than adequate evidence on his
19 direct examination, cross examin -- excuse me, his cross
20 examination testimony that Jeremy Fish is a complete liar.
21 And given that, I don't think reasonable minds can differ
22 that he is a liar and he's totally unbelievable. And the
23 officers who testified, including Officer Johnstone, said he
24 did acknowledge it rises and fall -- Johnstone said that,
25 Officer Johnstone. And without Jeremy Fish, they don't have

Page 766

1 a case, and I think he's -- we certainly have established
2 that this should not go to the jury. And that's just it in
3 a nutshell. I mean you've heard all the testimony, so.....
4    THE COURT: Motion is denied. Reasonable minds can
5 differ on whether the state has presented sufficient
6 evidence to convict Mr. Davis on each one of the counts.
7 It's not my de -- I don't get to decide how strong the
8 evidence is. I just have to decide whether there's enough
9 evidence to get past the motion for judgment of acquittal,
0 and there clearly is. Any other procedural issues?
.1    MS. BRADY: Yes, Your.....
.2    THE COURT: Ms. Brady?
13    MS. BRADY: .....Your Honor. This morning I returned
14 the jury instructions that you asked me to correct, and when
15 I was correcting the count instruction.....
16    THE COURT: Let me get mine.
17    MS. BRADY: Okay.
18    THE COURT: I'll just step out for a second.
19    (Pause)
20    THE COURT: All right. Go ahead, Ms. Brady.
21    MS. BRADY: The way Your Honor asked me to do it, the
22 way it was decided during our discussions of jury
23 instructions is on the first page. It has each individual
24 date that on or about February 8th, February 20th. When I
25 did that, it looked kind of cumbersome. I did the second

Page 767

1 instructions.
2    THE COURT: On one, I think. And that one is -- I
3 didn't reser -- I don't think I reserved ruling. I
4 indicated that I wasn't going to give it until -- unless I
5 heard a reason to give it, but now I don't remember which
6 one it was.
7    MS. BRADY: That was based on our arguments of counsel.
8    THE COURT: That's closing arguments, yes.
9    MS. BRADY: Right. And then there was also the expert
10 witness one that was discussed, and you said that.....
11    THE COURT: I was going to give the pattern, the new
12 pattern.
13    MS. BRADY: Right. My notes indicated that Mr. James
14 said that no expert had testified.....
15    THE COURT: Well, but one has, and I have the new
16 pattern 1.11 in your packet.
17    MS. BRADY: Thank you.
18    THE COURT: You just wanted to make sure it was there?
19    MS. BRADY: Right.
20    THE COURT: All right. And we'll give the defendant
21 has not testified instruction rather.....
22    MR. JAMES: Right.
23    THE COURT: .....than the defendant has testified
24 instruction. Do I need -- and I'll hold out the arguments
25 of counsel until after hearing arguments of counsel. Are

Page 769

1 one that says on or about the date specified in the count,
2 in that same place. I don't have a strong preference as to
3 which one. I just thought I'd bring them both and we can
4 use whichever. I -- I don't care. I just thought that that
5 was a bit cumbersome, so I wanted to bring that to your
6 attention.
7    THE COURT: Mr. James, do you have a preference as to
8 which one of these we use?
9    MR. JAMES: No, Your Honor. Ms. Brady brought it to my
10 attention earlier this morning. I don't -- I don't care.
11 Probably the -- I'm kind of inclined to agree if she's
12 suggesting the one -- the count rather than the -- the
13 repeat of the dates. But it matters not to us. I mean,
14 quite honestly.
15    THE COURT: On or about the date specified in each
16 count then, rather than.....
17    MR. JAMES: I mean either way. Whatever.
18    THE COURT: That's fine.
19    MR. JAMES: I mean we all know what we're talking about
20 I think, comfortably.
21    THE COURT: All right. We'll use the on or about the
22 date specified in each count.
23    MS. BRADY: Okay.
24    THE COURT: Anything else?
25    MS. BRADY: You reserved ruling on a couple of jury

Page 768

1 there any other instruction issues? Ms. Brady?
2    MS. BRADY: Not from me, Your Honor.
3    THE COURT: Mr. James?
4    MR. JAMES: Can we get a packet of those today?
5    THE COURT: They'll be done later this afternoon. I
6 need to double-check them one more time, then I'll have them
7 numbered, and we'll call your office when they're ready.
8    MR. JAMES: Okay. Yeah. That would be great. Because
9 we got to -- Madam clerk, is she going to call or.....
10    THE COURT: My secretary will call.
11    MR. JAMES: Okay. We got a voice machine, so if it
12 clicks into voice machine, we'll be monitoring. But.....
13    THE COURT: Right. We'll leave a message for you.
14    MR. JAMES: Yeah, yeah. Thank you.
15    THE COURT: How much time for your closing? Ms. Brady?
16    MS. BRADY: Forty-five minutes.
17    THE COURT: Forty-five?
18    MS. BRADY: Uh-hum. (Affirmative)
19    THE COURT: Mr. James?
20    MR. JAMES: Forty-five.
21    THE COURT: All right. You can both have 45. I'll
22 give you warnings. Do you want a warning?
23    MS. BRADY: I want a five minute warning. On the first
24 at 20 minutes, I want a five minute warning, so I can save
25 the rest for rebuttal.

Page 770

1    THE COURT: You want to save 25 for rebuttal or 20 for
2 rebuttal?
3    MS. BRADY: I'm trying to save 20 for rebuttal, so at
4 20 -- when I'm done at 20 minutes, I want a five minute
5 warning.
6    THE COURT: All right. Mr. James, do you want a
7 warning?
8    MR. JAMES: Yeah. Yes, Your Honor. Why don't we just
9 keep it a straight five minutes to? That way it's
10 standardized, I guess would be the word I'm looking for.
11    THE COURT: All right. And we'll talk with Mr.
12 Iverson in the morning and see what his status is, and let's
13 just make a record again if -- if everyone else is healthy
14 when they show up in the morning, may I excuse Mr. Iverson?
15 Ms. Brady.
16    MS. BRADY: No objection from the state?
17    MR. JAMES: The only thing I've got, and I know you've
18 -- we've already kind of talked about it, but the signal I
19 got from him this afternoon was he was ready to go forward,
20 if he could have a short break. So it's really -- I
21 think.....
22    THE COURT: Well, I know he is, but I guess -- and I'll
23 hear from you both. My concern is, is that the jury will be
24 in the middle of deliberation. But they will be in the
25 middle of deliberations, assuming they're not finished, at

Page 771

1 1:30. And my concern is, is that he'll end up over -- first
2 of all, I don't want his thought process broken up with --
3 I'm not sure it's a good idea to have his thought process as
4 a deliberating juror broken up with another case that he's
5 involved with. Second of all, as we all know, he could go
6 over to Children's Court, and instead of being there 10
7 minutes, be there an hour and a half or two hours, and we're
8 pushing 3:30 or 4:00 o'clock, and the rest of the jurors are
9 waiting for him. So I'm really reluctant to.....
10    MR. JAMES: Do you understand what he's saying?
11    THE COURT: .....to take a break.
12    MR. JAMES: Remember when we talked to the jurors early
13 in the morning, (indiscernible) and Mr. Iverson said hey,
14 next Wednesday I got to be someplace?
15    MR. DAVIS: Yeah, I remember.
16    MR. JAMES: Okay. Well now is the time the judge is
17 saying right now that we made that commitment, and he's
18 expressed concerns about having -- taking time out and
19 disrupting the thought process and everybody should stay
20 together, think together. And so if Mr. Iverson has to go
21 tomorrow, then the proposal is that we let him go in the
22 morning because if everybody is healthy. I -- we have 13 of
23 them left. And that's what we're talking about right now.
24    Yeah, we understand that with the intent of the
25 (indiscernible). I think we could -- you agree we're bound

Page 772

1 by what we made, the commitment to others?
2    MR. DAVIS: Yeah.
3    MR. JAMES: Okay. We're bound by what we told Mr.
4 Iverson in the beginning.
5    THE COURT: Right.
6    MR. JAMES: That we've already talked about this
7 several times.
8    THE COURT: So if he -- if everybody else shows up and
9 is well, and if the rest -- the other 13 are well, and don't
10 have any conflicts, I can excuse Mr. Iverson in the morning?
11    MR. JAMES: If he says -- remember he said he was going
12 to find out today.....
13    THE COURT: Yeah. Assuming he still has the court
14 appearance?
15    MR. JAMES: Right. That's -- that's my understanding.
16    THE COURT: All right. Are you okay with that, Ms.
17 Brady?
18    MS. BRADY: Yes, Your Honor.
19    (Whispered conversation)
20    THE COURT: All right. Lawyers, can you do the -- at
21 least double-check and make sure all the exhibits that are
22 marked are those which are admitted, and make sure that
23 nothing not admitted is marked and in the admitted pile so
24 we don't have to do it at the -- tomorrow? Can you do that
25 now?

Page 773

1    MS. BRADY: I can.
2    MR. JAMES: Yeah, yeah. Sure. Yes.
3    THE COURT: Okay. Thank you. We'll see you tomorrow
4 at 8:30.
5    MR. JAMES: Okay.
6    (Off record)
7    THE CLERK: Go ahead.
8    MR. JAMES: Okay.
9    THE CLERK: Speak into the -- one of the microphones.
10    MR. JAMES: Mikes, okay. This is Pat James. We've
11 changed exhibit -- the last H, which is the U-Haul receipt
12 to J as in James.
13    MS. BRADY: Okay. Here, let me -- and this is Keri
14 Brady. We're off record outside the presence of the jury.
15 The court clerk, Sharon, is here, and we're.....
16    THE CLERK: Don't bring me in it.
17    MS. BRADY: .....putting the exhibits in, and the
18 exhibit that was formerly marked as H, which is a receipt
19 from a rental car, is now J.
20    MR. JAMES: The rental U-Haul receipt.
21    THE CLERK: Stipulate counsel to change.....
22    MS. BRADY: Right.
23    THE CLERK: .....A to J?
24    MS. BRADY: Change H.
25    MR. JAMES: H.

Page 774

Multi-Page™

State v. Robert Davis
November 20, 2001

```
 1    THE CLERK:  H?
 2    MR. JAMES:  Hotel.
 3    THE CLERK:  H, okay.
 4    MR. JAMES:  To Juliet.
 5    THE CLERK:  Is that it?
 6    MR. JAMES:  Yeah.
 7    MS. BRADY:  Yep.
 8    MR. JAMES:  (Indiscernible).  I think we've got it
 9  cover, what, 23 forward?  1 through 23? (Indiscernible)
10  exhibit number 1?
11    UNIDENTIFIED VOICE:  I've covered all of them.
12    MS. BRADY:  Here.
13    MR. JAMES:  2, 3, 4, 5.....
14    MS. BRADY:  Let's just -- he has to do them with us.
15    UNIDENTIFIED VOICE:  Oh, on record?  Okay.
16    MS. BRADY:  Yeah.
17    MR. JAMES:  Yeah.
18    (Off record)
19  1:16:02
20
21
22
23
24
25
```

Page 775

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10              TRIAL BY JURY (EXCERPT)
                        VERDICT
11
            BEFORE THE HONORABLE DAN A. HENSLEY
12                  Superior Court Judge
13                  Anchorage, Alaska
                    November 13, 2001
14                  8:25 o'clock a.m.
15  APPEARANCES:
16      FOR THE PLAINTIFF:    KERIANN BRADY
                              Assistant District Attorney
17                            310 K Street
                              Anchorage, Alaska
18
19      FOR THE DEFENDANT:    PATRICK DENNIS JAMES
                              Attorney at Law
20                            1500 West 33rd Avenue
                              Anchorage, Alaska
21
22
23
24
25
                                        Page 776
```

1    THE CLERK: And.....

2    THE COURT: In terms of trial -- I don't know how they
3 manage trials in district court, counsel. So when I say can
4 I do that, my question to Ms. Richardson, who knows.....

5    THE CLERK: The state has a trial call, is Friday
6 morning at 9:00. And then if it's ready for trial in
7 district court, it goes to trial call Monday, the city. And
8 they -- it takes priority over (indiscernible - simultaneous
9 speech).

10    THE COURT: So if I issue an order saying it's signed
11 to the district court trial calendar on Monday and.....

12    THE CLERK: Is it ready for trial? It's totally ready
13 for that weekend.

14    THE COURT: It's ready for trial and.....

15    THE CLERK: We can set it for Monday at 9:00. Monday
16 at 9:00 o'clock, trial call.

17    THE COURT: And that -- no -- so no trial call was
18 required or something like that.

19    MR. JAMES: Your Honor?

20    THE COURT: So we'll do a little minute order. Maybe
21 you could do that?

22    MR. JAMES: It's 2602, Madam clerk.

23    THE CLERK: I can -- I'll just put it on. 2602.

24    MS. BRADY: Okay. And then what I thought we were
25 going to take up, Your Honor, is.....

Page 778

P R O C E E D I N G S

2 421-665

3 8:25:18

4    (Jury not present)

5    THE COURT: .....can see, but you all can sit down. I
6 can see now.

7    MR. JAMES: Judge, this has to do with our next
8 trial.....

9    THE COURT: Uh-hum.

10    MR. JAMES: .....the following trial in this matter.

11 And you had instructed the jury they may have to go ahead.
12 I've talked with Ms. Brady, and we've agreed to go ahead and
13 set this on for Monday in district court, so that we'll not
14 require the jury to come back and deliberate relating this,
15 but we would like an order so I don't -- we don't have to go
16 to trial call on Friday, because normally what happens is
17 Friday morning have a trial call in district court and then
18 they say, okay, who's all going? The state is definitely
19 indicated they're going, so we just ask that this be set on
20 Monday morning.

21    THE COURT: Ms. Brady?

22    MS. BRADY: That's fine, Your Honor.

23    THE COURT: And Madam clerk, can I do that?

24    THE CLERK: Sure. I just need a case number.

25    THE COURT: All right.

Page 777

1    THE CLERK: What's the name?

2    MS. BRADY: .....that you told the jury they were
3 actually going to deliberate twice. And I think you should
4 at this point say something like.....

5    THE COURT: Well, I'll tell them that when I give them
6 their instructions.

7    MS. BRADY: Right. It should be -- we've done
8 something.....

9    THE COURT: All right.

10    MS. BRADY: .....to tell them.

11    THE COURT: All right. While I have you all here, you
12 got your -- both people, both sides got their instructions
13 yesterday?

14    MS. BRADY: Yes, Your Honor.

15    THE COURT: Any additional instruction issues?
16 Ms. Brady?

17    MS. BRADY: None from the state.

18    THE COURT: Mr. James?

19    MR. JAMES: No, sir.

20    THE COURT: All right. Shall we bring our -- so we can
21 bring our jury in and talk to Mr. Iverson, we can bring
22 Mr. Iverson in and talk to him without the jury?

23    MR. JAMES: I would prefer talking without the jury, I
24 think, would be fair.

25    MS. BRADY: I have no preference.

Page 779

Multi-Page™

State v. Robert Davis
November 21, 2001

3AN-01-1717 CR

1  THE COURT: Well, then let's go get Mr. Iverson. We'll
2  talk to him, and as soon as we talk to him and do -- make
3  our decision with him, we'll bring in the rest of the jury
4  and commence with closings. So if you get Mr. Iverson, I
5  need to get my copy of the jury instructions.
6     (Pause)
7     (Whispered conversation)
8  THE COURT: Come on in, Mr. Iverson. And if you could
9  grab a seat in front of the mike, that would help me.
10    MR. IVERSON: Okay.
11    THE COURT: And we talked to you yesterday about a
12  potential court hearing that you had for a family member
13  today, is that still on as far as you know?
14    MR. IVERSON: It is still on, but I talked to the
15  lawyer twice, once mid-afternoon and once late-afternoon,
16  and what she had been trying to, you know, work out an
17  arrangement deal so that this appointment this afternoon
18  would have been a consolidation wrap-up. That's not going
19  to occur. And so she suggested that I just go ahead and do
20  whatever I'm doing, and she would explain that. Next door
21  my wife is available by telephone, if she had any questions,
22  and my son was staying at school. So what she had been
23  hoping for to occur at this scheduled 1:30 timing will not
24  -- not happen. So.....
25    THE COURT: Do you want to go to your other hearing

Page 780

1  today, Mr. Iverson? Do you feel like you need to be there?
2     MR. IVERSON: She said I did not. At this point, I
3  didn't need to be there. I mean I'd obviously thought I was
4  going to be there, but...
5     THE COURT: All right.
6     MR. IVERSON: That was her suggestion last night.
7     THE COURT: All right. Are you going to follow -- my
8  question is what you would like to do. We promised you when
9  we picked this jury that if you needed to go to court that
10  you would not -- we wouldn't conflict you out of that.
11    MR. IVERSON: Yeah.
12    THE COURT: So you need to tell me what you want to do.
13    MR. IVERSON: At this point in time, it doesn't -- it
14  doesn't matter to me.
15    THE COURT: All right.
16    MR. IVERSON: Based on what she told me.
17    THE COURT: Okay. Unless -- why don't you just go have
18  a seat with your fellow jurors. I'll talk to the lawyers a
19  minute, and then.....
20    MR. IVERSON: Thank you.
21    THE COURT: ....we'll get started. Thank you for
22  giving us that information, Mr. Iverson.
23    All right. Lawyers, what do you want to do about
24  Mr. Iverson? Ms. Brady?
25    MS. BRADY: He can just stay as far as I'm concerned.

Page 781

1     THE COURT: Mr. James?
2     MR. JAMES: That's fine.
3     THE COURT: All right. That's what I heard him say,
4  that he was happy to stay and he didn't feel like he needed
5  to go to the other hearing. So we'll keep him on unless his
6  name is drawn as an alternate. Are you ready with your
7  closing, Ms. Brady?
8     MS. BRADY: I am, Your Honor.
9     MR. JAMES: Yes, sir.
10    THE COURT: All right. Mr. James, will you be ready to
11  roll into yours without taking a break?
12    MR. JAMES: Yes, sir.
13    THE COURT: All right. We'll get the jury.
14    (Pause)
15    (Jury present)
16    THE COURT: You all have a seat, please. And we're
17  still on record, Madam clerk?
18    THE CLERK: Yes, we are on the record.
19    THE COURT: Good morning everyone.
20    THE JURY: Good morning.
21    THE COURT: All doing okay this morning? Good. The
22  next phase of the trial, as I told you yesterday, is closing
23  statements or summations. The lawyers have an opportunity
24  to tell you what they believe the evidence has shown in the
25  case and to suggest to you how you should make your

Page 782

1  decision. The comments of the lawyers, although they may be
2  helpful, are not evidence. The evidence, I'll remind you is
3  what you heard from the witness stand and the documentary
4  evidence, and you will be able -- be the ones who will make
5  the final decision as to what actually happened in this
6  case. Ms. Brady, are you ready with your summation?
7     MS. BRADY: I am, Your Honor. First I'd like to thank
8  you very much for your time and attention during this trial.
9  And I'll just start in with, I think you heard several times
10  in this case that the state has the burden of proof. So at
11  this stage, what I usually like to do since you're not going
12  to get the instructions until after we give our closings, is
13  to tell you what it is that the state has -- exactly what
14  the state, it needs to prove beyond a reasonable doubt. So
15  we're going to start off by taking a look at the instruction
16  that you guys have in your packet, and it will tell you --
17  oh, you don't have your packets yet, that you will have in
18  your packet, and it tells you that a person commits the
19  crime of misconduct involving a controlled substance in the
20  third degree, if he knowingly delivers any amount of
21  cocaine, in order to establish the crime of misconduct
22  involving a controlled substance in the third degree, it is
23  necessary for the state to prove beyond a reasonable doubt
24  the following.
25    First, that the event in question occurred at or near

Page 783

1 Anchorage on or about the dates specified in the count, and
2 second, that Robert O. Davis the III, knowingly delivered
3 any amount of cocaine.
4    You must consider each count separately. Then it goes
5 on say if you think we have, then you have to find them
6 guilty, and if you don't, you have to find them not guilty.
7 This is all sort of fancy law talk that boils down into
8 this. This is the only things the state has to prove beyond
9 a reasonable doubt.
10    First, on or about. We have to prove that it happened
11 on a given date. We have to prove that that person sitting
12 right over there is the one who knowingly delivered, he knew
13 he was delivering cocaine. Those are the only four things
14 the state has to prove with regard to each count in this
15 case.
16    Now, I don't know what Mr. James is going to say when
17 he stands up, but I strongly suspect there's not going to be
18 a giant dispute about the dates in the case. What have you
19 heard about the dates? Well, you heard tape recordings for
20 most of them, and the tape recordings start off with Officer
21 LaPorte saying this is such and such of a date. I mean, the
22 CI testified about the date, all the officers testified
23 about the date. The dates are really not going to be hugely
24 at issue in this case. I can't say. And you have an
25 instruction that says when -- as in this case, it's alleged

Page 784

1 the crime was committed on or about. It's not necessary to
2 prove -- show it was the precise day. It's sufficient if
3 the proof shows the crime was committed on or about. So for
4 that one count where it's the 28th going into the first, it
5 doesn't matter whether it was a -- whether you find it was
6 actually the 28th or the 1st, as long as it's around that
7 date, then that count will be proven. So I don't strongly
8 suspect there's going to be a lot of talk about the dates at
9 all.
10    Now, before I get to that, the fourth element that we
11 have to prove, that last -- number 4, is that it was
12 cocaine. Now, I don't strongly suspect that Mr. James is
13 going to stand up here and he's going to say, it wasn't
14 cocaine. I mean you heard the testimony of Jack Hurd, and
15 he was very convincing, he was the state's expert. He
16 explained that he tested the cocaine, he explained that he
17 used two methods of testing it. He explained how it was
18 that he could tell the difference between crack, which is
19 not soluble, and cocaine, which is soluble. There was
20 nothing contradicting his testimony. Obviously the things
21 that are in state's exhibits 1 through 4, those things are
22 all obviously cocaine, and I don't seriously suspect there
23 is going to be some huge discussion about whether or not it
24 is. The only real issue in this case is going to be the
25 knowing delivery.

Page 785

1    Now, so I expect that what's going to happen is
2 Mr. James is going to stand up here and he's going to say
3 this case rises and falls on Jeremy Fish, and that you only
4 have Jeremy Fish's word for whether or not he knowingly
5 delivered. So let's talk about that for a second and let's
6 just go through each count. And I'm going to start with the
7 last count first. Okay. This is for Count IV, which
8 happened on February 28th going into March 1st. This is the
9 proof of the defendant's knowing delivery of cocaine. These
10 are all the things that you have. And the first thing that
11 you have, is you have the testimony of Jeremy Fish. And
12 Jeremy Fish told you that he got in the defendant's truck,
13 he handed him the $200 worth of buy funds, and the defendant
14 handed him cocaine. So you have that testimony.
15    Then in addition to that, you have a bunch of
16 corroboration of Jeremy Fish's testimony. So let's talk
17 about the things that corroborate. Well, first of all, you
18 have a taped conversation regarding the buy that Officer
19 Johnstone made, and he was sitting in front of Jeremy Fish
20 when the conversation took place. The conversation -- the
21 call was placed to his cell phone. The voices on all the
22 tapes matched. You can listen to them all again if you want
23 to. Every single call and every single delivery involves
24 all of the same people. And you can tell that because the
25 voices on the tape are consistent. They're all exactly the

Page 786

1 same voices. What does he say? He says, I've got some
2 hard. He says it's ready. What do you think he's talking
3 about? I have some crack, and it's ready to go. I finished
4 cooking it. And Jeremy says, I've got two. I've got $200.
5 What happens to Jere -- now, let's remember that when this
6 happens, the call is made, hang up, Jeremy is supposed to be
7 meeting him in 20 minutes. What goes on in that 20 minutes?
8 Jeremy Fish is strip-searched, his clothes are searched, his
9 car is searched, a wire is put on him. He doesn't have a
10 lot of time to go stick cocaine somewhere. Okay? And then
11 what happened? He is followed and he's observed by officers
12 that he doesn't know where they are or what they're driving,
13 and he's watched the whole entire time by officers. He is
14 inside this defendant's truck for a matter of minutes. And
15 then what does he do? He leaves, and as he's leaving, he's
16 saying under the wire what the license plate number of the
17 truck is, and he goes immediately to Schuck's Auto Supply,
18 which is very near, I think the testimony was it was within
19 a minute or two, and at Schuck's Auto Supply is when he
20 turns the crack over. He's not allowing his car for some
21 long period of time that he can be pulling out of somewhere.
22 It's within a matter of minutes.
23    Now, he is alone in the truck where the buy took place.
24 His cell phone, the same cell phone that was used in all of
25 the buys is with him in the truck. Now, there's a wire of

Page 787

1 the conversation that occurred when Jeremy Fish is inside
2 his truck. And if you listened to the wire again, you've
3 already heard it, but what does he say? He says he's living
4 in a hotel. And what did his mom say when she came in and
5 testified? She said he was living at a hotel. Hurd
6 testified Jeremy Fish said he bought crack, and Hurd said
7 this buy was crack. This is all the corroboration, all of
8 this corroborates what Jeremy Fish is telling you. This --
9 you're not left with just Jeremy Fish's word. There's the
10 testimony of officers, there's the testimony of Jack Hurd,
11 all of that, there's the testimony of Defendant's mother
12 that all matches exactly what Jeremy Fish is telling you.
13    Now, let's go to Count III. What -- of course,
14 initially you have Jeremy Fish's testimony again. And
15 Jeremy Fish said, I got into his mother's Suburban, I handed
16 him the buy funds, he handed me back crack. You have that
17 testimony. It's in evidence.
18    Now, you also have the evidence that corroborates what
19 Jeremy Fish told you. And what is that corroboration?
20 LaPorte and Johnstone, both there, they tape the buy, making
21 the call, and the call was placed to his cell phone, the one
22 that he had with him in the truck on the last buy. What
23 does he say? He says I have hard stuff. And Fish says he
24 wants two bills. Again, these are the same voices that were
25 on the last buy. This buy occurs within a mile of his mom's

Page 788

1 house. That again came in through the testimony of his mom.
2 She said it would take minutes to get there. It was in a --
3 within a mile of her house.
4    Jeremy Fish, he's strip-searched both before and after,
5 clothing is looked at. You heard the testimony about what
6 those searches entail. His car is thoroughly looked through
7 by an officer. And the officer testified -- if you want to
8 know which officer did which thing, you can look at that
9 exhibit number 19, which is the buy checkoff list, and
10 you'll know exactly which officer did which thing for each
11 buy.
12    Now, Jeremy Fish is followed and he's observed in this
13 defendant's mother's Suburban by the officers. They verify
14 that the -- this was his mother's Suburban. The mom
15 testified that he was driving her Suburban. This was his
16 mother's Suburban. Jeremy Fish is inside the Suburban for a
17 matter of minutes. This isn't a long, drawn-out chitty-chat
18 thing. There -- he's in the truck, then he's out of the
19 truck with crack. He's in the truck with money, he's back
20 out, has crack.
21    Fish says that he handed him a rock. And what he's
22 talking about when he says a rock, is crack. The defendant,
23 on the tape -- now, you don't have to take Jeremy Fish's
24 word for this. This is on the tape. He says he's living at
25 his mom's on February 21st. He -- and -- because Fish asked

Page 789

1 him where you living now? He was moving on the 20th, or he
2 couldn't have been living at his mom's on the 21st. What
3 does Jeremy Fish do with the cocaine? He turns it over at
4 the first opportunity. And what did Jack Hurd tell you that
5 was? He told you it was crack. And you can verify that
6 because the P&E numbers -- let me just show you how this
7 works.
8    P&E numbers are right here in the corner of these
9 envelopes. And then if you look at the lab report, it says
10 what the P&E number was and what it looked like. If you
11 want to look in any of these envelopes, you are certainly
12 more than welcome to do that. You have to have a bailiff
13 help you, but you can certainly look at the evidence in this
14 case. And on the description, Jack Hurd writes a
15 description, hard-based substance, hard-based substance, and
16 the ones that match these P&E numbers, Jack Hurd testified
17 that these hard-based substances were non-soluble. That
18 means they're crack.
19    Now, the other two he testified were both soluble,
20 meaning they're cocaine. And you can verify that by looking
21 at the P&E's in the corner of each envelope. Now, let's
22 talk about the buy on the 20th. On February 20th, you have
23 Jeremy Fish's testimony that he went to this person's house.
24 The same address he used on his truck registration. He was
25 clear -- his friends came in and said he lived there.

Page 790

1 Everybody agrees he was living at 202 Grand Larry. There's
2 no dispute about that. It's his house. Okay. And Jeremy
3 Fish said that when he went to his house, he handed him
4 crack cocaine. Now -- no, he handed him regular, powder
5 cocaine.
6    Now, what do you have that corroborates the testimony
7 of Jeremy -- Jeremy Fish also said a couple other things.
8 He said there's a big pound of marijuana. Now, he said the
9 defendant had a gun stuck in his pants, and if you want to
10 listen to that tape of that wire, you're going to hear on
11 the wire, hey, what's that? You can't -- he doesn't say is
12 that a gun? He says, hey, what's that? Would you take a
13 bill for it? And that's what he's talking about. He's
14 talking about the gun. Nobody is saying, what do you mean?
15 Jeremy Fish says on the wire, hey, you got everything all
16 cleared out but your stereo. Nobody says, are you on --
17 from Mars? What are you talking about? Nobody says that.
18 That's because it's true. They don't dispute it because
19 that's what's going on. Now, the call is placed to his cell
20 phone again. Same cell phone that was in the truck with
21 him. And what does he say? He says you're clowning me.
22 Don't clown me. Jeremy Fish is negotiating on behalf of APD
23 not wanting them to spend excessive buy funds. So he
24 doesn't want to overpay for it. The voices on all the
25 recordings match, even the ones that didn't produce buys.

Page 791

Page 792

1  You can listen to them all. You can hear these are the same
2  people talking every time.
3      Now, it occurs at defendant's house. Jeremy Fish is
4  strip-searched. You have the testimony of the officers.
5  He's strip-searched before and after, his car is searched
6  before and after. He's followed. He is observed going in
7  to 202 Grand Larry by Officer LeBlanc. Now, he says the
8  defendant is moving. The next day the defendant says he's
9  living at his mom's. That tends to corroborate what Jeremy
10 Fish is telling you, even if Jeremy Fish is the biggest liar
11 on the face of the planet. For that, he was telling the
12 truth. Fish says he'll pay a bill for the gun on the tape.
13     Now, let's talk about the conversation on the tape
14 about somebody leaving to get a pot. And Jeremy told you
15 that they were leaving to get a pot because they needed to
16 cook crack, and everything had been cleared out of the
17 apartment. Now, what corroborates that? The defendant
18 brought people who came in here and said, oh, no, we hadn't
19 moved anything out. But that's on the tape. You can hear
20 the people leaving. You can hear Jeremy Fish moving his car
21 so they can leave. You can hear a pot being asked for, and
22 the next two buys, what are they for? They're for crack.
23 What's the pot used for? It's to cook the crack. There's
24 where they get the pot to make the crack.
25     Now, for the first count on February 8th, proof of

Page 793

1  defendant's knowing delivery, Jeremy Fish's testimony, and
2  what corroborates Jeremy Fish's testimony? LaPorte and
3  Johnstone listened to (indiscernible) side of the
4  conversation. Where does he call? His cell phone. The
5  same cell phone that was with in the truck. Okay. Where
6  does he go? His house. Who is seen answering the door to
7  his house?
8      Well, LeBlanc couldn't identify him because he couldn't
9  see features, but it was a Black male, balding or with very
10 short hair who answered the door at his house. That's who
11 was seen by Officer LeBlanc. You don't have to believe
12 Jeremy Fish for that. You can believe Roy LeBlanc.
13     Now, Jeremy Fish is strip-searched before and after.
14 His car is searched. This is important. He's not taking
15 anything with him to go do these, and he's not bringing
16 anything back. So even -- let's just say for a second that
17 he's taking the money over there but he has the cocaine
18 stashed somewhere. What is he doing with the money? Is he
19 giving it to him? Don't you think that if he was giving him
20 $200 a pop, and he had a tape recorder on, the defendant
21 would say something about getting that money, or a reason
22 that he has no idea what it's for? That would be on the
23 tape.
24     Now, Jeremy Fish told you the amount was light. It
25 wasn't what he expected to get for the money. And you can

Page 794

1  look at the weights, they're on the lab report. This one
2  weighed less than a gram, .08 grams. All of that
3  corroborates what Jeremy Fish is saying.
4      Now, in addition, it's the same cell phone and it's the
5  same location. Okay. Now, I expect that Mr. James is going
6  to stand up here in a minute. He's going to say Jeremy
7  Fish, Jeremy Fish, look at Jeremy Fish. And I can tell you
8  what that's about. I have two kids, and I know a lot of you
9  guys have kids. And I know that when I say to my daughter,
10 Samantha, have you done the dishes? It's very likely that
11 her response is going to be, Steven hasn't fed the dogs.
12 And that has nothing to do with whether or not Samantha did
13 the dishes. The fact of the matter is, is that if Steven
14 didn't feed the dogs, that's fine, she still didn't do the
15 dishes. And there's going to be a lot of finger pointing
16 here about Jeremy Fish, oh, he's a bad person and maybe he
17 paid for Athena's baby and maybe it is his baby and maybe
18 it's not his baby and all of this murky smoke in mirrors is
19 going to be what they're going to be throwing up. That's
20 what you can expect to hear. And maybe that's a good
21 subject matter for a Jerry Springer show, but it doesn't
22 have a lot to do with this case. Okay.
23     Let's talk about Fish for a minute. I told you in the
24 opening you weren't going to like him. He wasn't very
25 credible. You weren't going to want to have him over for

Page 795

1  dinner, and I doubt if any of you are sitting here going,
2  gosh, I really hope that my daughter brings home a nice boy
3  like Jeremy Fish. That's not going on. Jeremy Fish is not
4  a credible person. And who's the only person in this case
5  who trusted Jeremy Fish? It's his good buddy, his friend
6  Rico. He's the only one. When Jeremy Fish came to APD,
7  they didn't trust Jeremy Fish. They knew he was going to be
8  hard to work with, and they kept extra tight controls on him
9  because of it. Why do we use people like Jeremy Fish? We
10 need people like Jeremy Fish because Fish has legitimacy.
11 He knows the slang. He knows to ask for a ball, he's been
12 talking to this guy. These guys are running buddies. You
13 listen, he knows all about Jeremy Fish's babies and
14 girlfriends, and these guys -- this is not -- these guys are
15 hanging around together. These -- Jeremy Fish is the kind
16 of person that he hangs out with.
17     Now, of course, the police are going to make deals with
18 the Jeremy Fish's of this world to get people who deal drugs
19 like Mr. Davis. You examine Jeremy Fish's testimony with
20 great care and you look at what corroborates it, because
21 there's plenty of evidence that corroborates Jeremy Fish's
22 testimony. And I want -- I want you to think about this for
23 a minute. If this whole thing was a setup, like I'm sure
24 Mr. James is going to tell you in just a second, then
25 Mr. James should be able to provide you with a reasonable

**Page 796**

1 explanation for why this defendant was the only one in the
2 car on the last buy. And he should be able to explain what
3 his client was talking about when his client, in response to
4 requests for a ball or two balls, was agreeing to sell
5 something for a couple of hundred bucks. What was he
6 talking about if it wasn't -- what kind of balls do you buy,
7 except for 8-balls that cost two bills? He should be
8 explaining all this stuff for you.
9     So I think what he plans on doing is standing up here
10 and telling you that you have bad fish here and you need to
11 throw him back, sort of like what was going on in voir dire.
12 But you need to examine the evidence, ladies and gentlemen,
13 and when you look at the evidence in this case, the one
14 reasonable conclusion you can reach is that he's guilty of
15 every count.
16    THE COURT: Thank you, Ms. Brady. Mr. James, are you
17 ready with your summation closing argument?
18    MR. JAMES: Yes, Your Honor, thank you.
19    Good morning, ladies and gentlemen. Remember in the
20 beginning we talked about reasonable doubt? Remember we
21 talked about veiled justice and how we would hear, and the
22 state had to bring it not just up here, not by supposition,
23 not by speculation, not by what if's, but way down here.
24 Almost touching the ground, beyond a reasonable doubt.
25 You're going to be instructed -- prove anything to -- we're

**Page 797**

1 not -- they're not expected to prove anything to an absolute
2 certainty. And I'm not going to read you jury instructions
3 or tell you the law, that's the responsibility of the court.
4 The court is going to take care of that for use.
5     But reasonable doubt. And it's every reasonable doubt.
6 A reasonable doubt. Is there a reasonable doubt in this
7 particular case? You go into a restaurant, never been
8 there. You order fish stew. A big bowl of it. Dip your
9 spoon in, take a bite. The first piece of fish that you
10 bite into is spoiled. Do you set it aside and continue
11 eating or do you push the whole bowl aside? I suggest to
12 you that probably you're not going to continue eating.
13    What do we know about Jeremy Fish? She's right. We're
14 going to talk about Jeremy Fish because, remember, the
15 officer, the control officer, was Officer Johnstone. And
16 Officer Johnstone told you that this case rises and falls on
17 Jeremy Fish. And in fact, it does, because APD put the buck,
18 all their marbles on Jeremy Fish. Now, they tried to cover
19 their bets, but did they?
20    We have no burden of proof. You were told that in the
21 beginning. The whole burden of proof rests with them. You
22 people, the 12 of you who are going to make this decision,
23 have got to -- and you agreed to, hold them to that
24 standard. It's not what-if's, it's not, well, golly gee,
25 how can we explain this away? Why do we have to explain

**Page 798**

1 anything away? You listen to the tapes, when these
2 purported buys went down, there is absolutely no discussion
3 of drug transaction. There's preliminary stuff. We don't
4 know what Fish was doing in between his appearances at APD.
5 Who he was contacting, what was going on. But what we do
6 know is according to the testimony you heard, they did not
7 tell Fish that this last time was going to be the arrest.
8 So theoretically everything should have been the same then,
9 right?
10    The police arrive immediately on the scene. They took
11 Robert Davis out of his car at gunpoint. There was two
12 officers there. Remember there was Jones five feet in front
13 of them, LeBlanc. And LeBlanc says he went in the pockets
14 and he searched. Couldn't find any money, any buy money.
15 We're not talking about other money, we're talking about buy
16 money. Could not find any buy money. Now, what kind of a
17 car are we talking about? We're talking about a little
18 Toyota pickup. Not a crew cab, but a little two-seater
19 Toyota pickup. So the police say, ah, can't find any buy
20 money. They tell you, oh. And remember we talked to
21 Officer LaPorte who is sitting over here. We talked about
22 this grand jury, and I asked him a few questions. He told
23 the grand jury, oh, he's down on the ground -- or not exact
24 words down on the ground, but there's such confusion and the
25 winds was blowing and maybe $20 blew away. Okay. And

**Page 799**

1 that's how -- they couldn't find any buy money on Robert
2 Davis. They could not find any buy money on him. If these
3 were buys that went down, and Robert Davis was selling
4 cocaine, and receiving money for it, and it was instant --
5 basically instantaneous, there was no place that he could
6 go, because remember this was going to be the arrest, so we
7 had cops all over the place here, they were watching. And
8 they searched him right at the scene. Right at the scene.
9 No buy money. And that really bugged them. So what did
10 they do? They took him to jail, they asked Sergeant -- or
11 excuse me, Officer Garcia, who testified, search him again.
12 Boy, this time really search him. Find us that buy money.
13 And they searched him. No buy money found.
14    Then as Officer LeBlanc -- LaPorte told us, oh, it was
15 a weekend, and then afterwards I went into the big cash
16 pile, $8,000 co-mingled funds from everybody at CIPT.
17 People bring money in as the -- people at CIP -- CIPT staff.
18 If someone is in there, you bring them money, it goes on the
19 books. But it's not separated. It's all in this great big
20 fund. It's like a bank. And a couple days later, lo and
21 behold, after all this traffic has gone through CIPT, they
22 diligently search through $8,000 and they find $100 bill.
23 Where did that $100 bill come from? I think it originally
24 came from Jeremy Fish. I think it then, after this went
25 down, and the arrest was made and no buy money was found,

**Multi-Page™**

3AN-01-1717 CR

State v. Robert Davis
November 21, 2001

Page 800

1 because there was no buy money found on Robert Davis, why?
2 Because Jeremy Fish had it. He still had the buy money.
3 Jeremy Fish is a very busy young person. Regrettably, his
4 activities are not the same activities that perhaps you and
5 I would participate in. He's a drug dealer. That buy money
6 came from one of his other deals. And some person brought
7 it in for some other buddy in jail, add a check on the
8 books, and that's how it got into that pile. There is no
9 way that Robert Davis had any buy money on him on the
10 28th/1st. They checked him three times. They had him under
11 absolute control. Absolute vision. There's just absolutely
12 no way.
13     Now, we've heard about smoke in mirrors. I think the
14 smoke in mirrors came from the other side. Believe me,
15 trust me. Let's just blow off Jeremy Fish. And all of
16 these other things happened. There is conversations about a
17 ball and two bills and what have you. That's all — all
18 pre-buy. There is no evidence other than Jeremy Fish, that
19 establishes that a buy took place. There's nothing on those
20 that says here's the two bills, here's the ball. Those
21 tapes are talking about where you're living, what are you
22 doing?
23     Now, let's just think about this for a minute. If, as
24 the state says, these are good buddies, which is
25 questionable, to say the least. But let's just say

Page 801

1 hypothetically that's the case. Why wouldn't they have
2 talked about it at the scene? What would be so secret there
3 that a while before they were freely talking about this?
4 And the reason is, it didn't happen. If it had happened, I
5 would have been on the tape. Isn't there any more perfect
6 evidence than to say here's the 200, let me see the stuff,
7 looks good. Not chhhh, no pot? There's no reason for them
8 not to have discussed this.
9     Now, let's take a look at Jeremy Fish for a minute.
10 What do we know about Jeremy Fish? We know he's an admitted
11 liar. We know he admitted to you that he lied to the Nome
12 Police Department without a problem. Lied to them numerous
13 times. His excuse was, well, I told them what they wanted
14 to hear because I was booking. I was heading out.
15     Then he gets on the stand and he tells us, oh, I turned
16 myself in to APD because Officer Bennett up there was going
17 to arrest my girlfriend and put her in jail, and then they
18 would have taken CI — CSED, which is child support, the
19 state would have taken the child. And he did all this out
20 of fear for the well-being of his girlfriend. I don't think
21 Jeremy Fish has got feelings of well-being towards anybody.
22 I think the person is totally amoral. Not immoral, amoral.
23 I don't think he's got a moral.
24     MS. BRADY: Objection, Your Honor.
25     THE COURT: Overruled.

Page 802

1     MR. JAMES: I think he does exactly what Jeremy Fish
2 wants to do, when he wants to do it, and he will tell you
3 anything that he thinks you want to hear. And he did. He
4 told you his girlfriend dropped him off there on the last
5 day he testified. The fact is, he even described where she
6 dropped him off. That was over at the Alaska Gym, which is
7 over on 4th and F Street, right next door in the next block.
8 What did you find out? That was a lie. Brandon May said I
9 was looking out the courthouse window and I saw him get into
10 that white Chevy Berretta and drive away. There's no reason
11 he should have lied like that, other than it was to
12 reinforce I don't drive, I don't do this, I don't do that.
13 He said I only do crack. I don't do cocaine. I don't put
14 anything up my nose. Athena said I was sitting out in the
15 park with him, he pulled out a bag of cocaine and offered me
16 some. He said he doesn't sell drugs, doesn't sell
17 marijuana. Athena said in September he had a big gallon bag
18 of it. He offered to sell me some. I didn't buy any. She
19 said she smoked in the past. She didn't lie to anybody.
20     The one person you heard that was a total an complete
21 liar, and I say that generously, is Jeremy Fish. And
22 they're asking you to believe Jeremy Fish. He lied to you
23 when he said he wasn't arrested in Anchorage. We finally
24 pinned him down on that one. He lied to you he didn't go to
25 jail. We pinned him down on that one. Lie, lie, lie.

Page 803

1     Now, he says on the 20th, which is -- there is a wire,
2 that there was a big pile of marijuana on the kitchen
3 counter, a foot wide in diameter. Three inches high. And
4 he tells us that bong bong or mong mong (ph) or something
5 was a term that he used for marijuana. If you listen to
6 that wire, you'll hear where's the mong bong (ph), or the
7 bong bong, whatever it's called. Why would someone ask
8 where is something if he's looking at not a little bit of
9 marijuana, not an eighth, what they call an eighth, which is
10 an eighth of an ounce, but this big humongous pile of it.
11     Then he says, oh, everything is gone but the stereo.
12 Two people came in and said we were there. And in fact,
13 everything was in (indiscernible). Now, we're talking about
14 a bachelor pad here. We're not talking about where families
15 got -- and there's women living there, was bouquous stuff,
16 knicknacks and all this other stuff. And you can rely on
17 your own experiences in life. And some of you probably have
18 adult children that are males. And you've gone into their
19 houses and it looks pretty austere. There's not much in
20 there. It's functional. We've told you everything was
21 gone. Yet two people who were never impeached, in other
22 words, no one could establish -- the state could not
23 establish that they twisted something. These two people
24 came in and said we were there. Why were we there? Because
25 a move was going to take place. He got that part right.

1  Again, he lied to you, though.
2      It wasn't that day. It was the next day they made
3  plans to have this stuff, and in fact, you heard that, and
4  there's evidence. Take a look. They rented the storage
5  facility on the 21st. And they were trying to make plans to
6  move stuff, but the big stuff wouldn't fit into the little
7  Toyota pickup, so they had to rent a U-Haul on the 22nd and
8  move out. So on the 21st things were out of the house.
9  They're saying, wow, that corroborates Jeremy Fish's
10  statements. I don't. I disagree. And I believe you will
11  disagree with them.
12      Let's think about certain things. Remember I asked
13  you, some of you, during the voir dire, if you utilized
14  lists to make sure everything is covered? APD and one of
15  the officers testified that Officer LaPorte had developed
16  this great checklist to make sure searches were done. That
17  they were done. Not how they were done. They have four
18  different people -- excuse me, two or three -- three or four
19  different people testified that they did the automobile
20  searches. No standardization. You don't know where they
21  searched other than what they told you. They said they
22  looked under the seat. Did they reach up under the seat?
23  There's no testimony that they reached up under the seat.
24  If they'd reached up under the seat they would have told you
25  that.

Page 804

1      We heard, other than Jeremy Fish and the lady from the
2  telephone company, they were all professional police
3  officers. Professionals. Professionals should have
4  standards that are accountability. That are objective
5  standards. That you and I and anybody else can look at and
6  say, yeah, all right. This was done. This was documented
7  right at the time. So we can look at something later on and
8  say, yeah, this was done.
9      If you have a medical chart, a patient, someone who has
10  a relationship with a physician or a medical facility, and
11  just think of four buys that supposedly happened as a
12  relationship as far as the police department goes. Wouldn't
13  you expect that there would be documentation to ensure that
14  what happened on the first day, was the same thing that
15  happened on the second day, that happened on the third day,
16  that happened on the fourth day? It's not there. Why not?
17      Because you can get on the stand -- now, these are
18  professionals, right? These people are five years -- the
19  average is five to six years on APD. They're used to
20  testifying in court. Jones was smooth. LeBlanc was smooth.
21  They sat in the jury box. They turned to you. They
22  explained things. Trust me. Where is the documentation?
23  Mr. Hurd, the chemist, he had his documentation. He told
24  you, boom, boom, boom.
25      Jeremy Fish snookered them. Pure and simple. He might

Page 805

1  be young, but he knows the system as far as the drug world
2  goes. Because he's a druggie. He knew he had to produce
3  something for the satisfaction of APD to get out of Nome,
4  the problems in Nome. He readily admitted he's a thief and
5  a burglar.
6      They said they searched the car. What do we know about
7  that car? It's a Plymouth Reliant. It's a station wagon.
8  And it's full of trash. Who told us that? APD. Oh, we
9  searched it thoroughly. How do you know that? Where is
10  there to say we searched it thoroughly? Why would someone
11  create this as a checklist and not have a follow-up
12  checklist as to what the search consisted of? Why? Because
13  this is objective evidence that something happened, and it
14  happened in a certain sequence, and it was consistent. We
15  don't have that. Why not? If I can take the trouble to
16  make one of these, and I take the trouble to make something
17  else that supports this, that says this is how we do it.
18  That's not reasonable. Not from what we would consider as
19  professionals.
20      We aren't creating smoke in mirrors. We're looking at
21  the evidence, just as you're going to look at the evidence
22  in saying, do I feel that the state has established beyond a
23  reasonable doubt to the exclusion of any other reasonable
24  doubt. And the answer is no. Pure and simple, no. You
25  cannot convict somebody on supposition. You cannot convict

Page 806

1  somebody on, oh, golly gee, I heard the tape at APD, so
2  obviously the buy went down. There's nothing on a tape that
3  talks about a buy at the scene. And there's no reason that
4  it shouldn't have taken place at the scene. Theoretically
5  there was only two people on the 8th at the house. You can
6  look at the 20th, which is when the wire was on. There's no
7  discussion about dope. There's no discussion about guns
8  that Jeremy Fish talks about. He's creating this
9  smokescreen like he goes into this place, there's this guy
10  packing this big canon, got this big pile of marijuana, the
11  place is empty other than the stereo system. There's this
12  pot, we're going to cook pot -- coke in it. You're giving
13  him the belief -- a pot is not used exclusively to make
14  crack cocaine. You cannot say, well, they were going to get
15  a pot. Who was going to get a pot? Did anybody come back?
16  No. You heard that from Brandon. So we've got all these
17  little things, and say, oh, if you take this one,
18  selectively pick this, selectively pick this over here, put
19  it all together, and then you can come to a conclusion.
20      Think a minute. If this happened the way they say it
21  did, the money would have been found on Robert Davis.
22  Because Fish, according to the police, if you believe the
23  police, had no inkling that on the 28th/1st of March that
24  this was going to be the rest. He did the very same thing
25  he did on the 8th, the very same thing he did on the 20th,

Page 807

1 and the very same thing he did on the 21st. He hated Robert
2 Davis. He hated Robert Davis for a reason. He had
3 impregnated Athena. He says, well, I don't know if it's my
4 kid or not. Yet he told you one time in a slip of the
5 tongue, my baby. He was talking about Athena's baby. He
6 identified it as my baby. What was the thing that he
7 couldn't stand? He couldn't stand the fact that someone
8 else was helping Athena. Not in a sexual relationship where
9 there was a tradeoff. Someone out of the goodness of their
10 heart was helping Athena. Helping her with what? With baby
11 stuff that he wouldn't do. He couldn't see. And I suspect
12 that he felt it was more than a platonic relationship
13 between Robert Davis and Athena, and he was terribly
14 jealous. And he said, well, I had a new girlfriend. He
15 said, well, I never got back with her again, man, she's
16 wild, couldn't -- she came to Subway one time and that was
17 it. Lies. Pure and simple lies.
18    So is there a motive a terrific motive? There's anger,
19 there's jealousy, and it all boils down to a hate. And he
20 took advantage of what a good person talking to him, and
21 that tape had to -- one of the tapes had to do about Athena,
22 how she was doing, here's her number, you know, she wants to
23 talk to you. And then she told you whether he wanted to see
24 his baby. He may, on her birthday. He brought -- she
25 brought the baby so he could see her. In September, now

Page 808

1 this is 2001, he said he didn't -- remember the day before
2 he didn't do drugs, didn't sell marijuana, he's got a gallon
3 bag of it he offers to sell her.
4    You say, okay, what's that got to do with this case?
5 It has to do with the case because you're dealing with a
6 total and complete liar. And there were not adequate checks
7 and balances by the Anchorage Police Department. They
8 didn't do their job. Because if they had done their job,
9 and if this had happened, they would have found the money on
10 him. Not in a common pot a few days later that had gone
11 through the entire banking system of Cook Inlet. $8,000.
12    If, and as they want you to believe that Robert Davis
13 came in with that hundred dollar bill, would you not have
14 expected the state to bring forth the evidence to say, okay,
15 here's how we can add up $180 minus $90, which is what he
16 got back, remember. And here's the $100, and someone
17 brought in money and have you, as Officer Garcia
18 testified, people can bring in money and check it in. He
19 didn't do that.
20    Who has the ability to produce evidence, and who didn't
21 produce evidence? We don't have any duty to produce
22 evidence, yet we did. They have the ability to produce
23 evidence; they did not produce. And they had the capability
24 of doing it. They didn't want to hear the answers. They
25 didn't want you to hear the answers. Because those answers

Page 809

1 were very simple. He never got any money off of Robert
2 Davis. No money, no buy.
3    So you say, okay, that was the first time that -- the
4 last time. So let's count the other three times then.
5 Obviously, Jeremy Fish because of the close controls was
6 able to pull off the last -- the first three buys, and the
7 last buy was just one great big faux pas.
8    It doesn't make sense. It does not make sense. He
9 went out to his car the first time. He went out to his car,
10 the second time. Each time he was alone in his car for a
11 period of time. He had a secret place in that mess that he
12 stashed. And I suggest to you, since you have no objective
13 evidence to contradict other that they didn't search the car
14 as adequately as they claim. They thought this was shooting
15 in a barrel -- fish in a barrel. The just put the wrong
16 fish in the barrel.
17    Let's think about some of the testimony you heard from
18 the police officers. I don't recall. I don't remember. We
19 made a phone call. No, we didn't make a phone call. We
20 were making a phone call to check on the welfare, see how --
21 because he was there a long time. Where did you hear that?
22 Officer Bushue.
23    Why can't we have consistency? You say, well, it's
24 different people observing, and people make mistakes. This
25 is what they do for a living. They come to court and they

Page 810

1 testify. They look at you and say, believe me, I did this
2 right. You're just going to have to believe me because I
3 don't keep documentation. And we don't. We just never get
4 around to it. Schools keep documentation. The prosecutor
5 used documentation. I obviously have made notes and have
6 lots of paper in front of me. I used documentation. The
7 court is not going to read you the jury instructions and
8 then say go in there. They're going to give you
9 documentation. Why is APD to a different standard than the
10 rest of us?
11    Trust me. I don't think you need to trust me. You
12 don't need to trust anybody because you people coming here
13 with open and blank minds. It's what happened in here that
14 fills those minds. And if you have doubt, reasonable doubt,
15 that reasonable doubt is why wasn't this done? Is there a
16 reason that wasn't done? Why wasn't the money found? Was
17 there a reason the money wasn't found? Why should we
18 believe Jeremy Fish? Is there a reason we shouldn't believe
19 Jeremy Fish? Is it a reasonable reason? Is it a reasonable
20 reason why they didn't find the money? Is it a reasonable
21 reason why they cannot get their story straight?
22    Reasonable doubt is all over this case. Totally all
23 over this case. Would you go to a bank and hypothetically
24 give them the information that we have here in this
25 courtroom when we've been at it five days and expect the

Page 811