3AN-01-1717 CR · Case 3:05-cv-00255-TMB-JDR   Document 19-8   Filed 03/06/2006   Page 1 of 21 · State of Alaska v. Robert Davis

November 19, 2001

**Page 444**

1 will you state your full name and spell your last?

2 A   Somerset L. Jones, III.  J-o-n-e-s.

3   THE CLERK:  Thank you.

4   THE COURT:  Go ahead, Ms. Brady.

5 BY MS. BRADY:

6 Q   How long have you been an APD officer?

7 A   About six and a half years.

8 Q   Okay.  And are you assigned to a particular unit?

9 A   Well, I'm assigned to the special assignment unit.

10 Q   All right.  And is that the same assignment unit you

11   were assigned to during this case?

12 A   Yes.

13 Q   All right.  And how did you become involved with this

14   case?

15 A   Well, being on the team, I was told that they were

16   going to have a controlled purchase and Officer LaPorte

17   provided a briefing of that controlled purchase.  And

18   -- and assigned me to conduct surveillance and to

19   assist in the arrest of the suspect.  And so I, you

20   know, went to the area where the controlled purchase

21   was to take place.

22 Q   Okay.  Now before you did that, did you do anything

23   else?

24 A   Yes.  I was given the keys to the confidential

25   informant's vehicle and told to go out to the vehicle,

**Page 445**

1   which was parked in front of the police station and to

2   search that vehicle.

3 Q   Okay.  And did you do that?

4 A   Yes, I did.

5 Q   How throughly did you search the car?

6 A   Well, when I search the car, I look underneath the

7   seats and the ashtrays.  If there's a -- a VHS film

8   box, I'll open it up.  Cigarette packs over the visors,

9   just everywhere inside the vehicle, I search.  I look

10   for money, because we only want him to have our money.

11   Controlled substances, weapons, anything that might be

12   considered illegal or contraband.

13 Q   Did you find any contraband in his car?

14 A   No, I did not.

15 Q   Okay.  And now what was our role in the surveillance?

16 A   Well, as part of the surveillance, I went to the area

17   in Muldoon near the Pancake House, which I was told was

18   where it was going to transpire.  And after I -- I got

19   there, I could hear on our portable radios, they were

20   telling me pretty much what was going on, that when the

21   confidential informant got in and got out of the

22   vehicle, and then they told me that the vehicle was

23   parked at an oriental restaurant just south of the

24   Pancake House and gave me a description of the vehicle

25   and the license plate.  And as the informant got out of

**Page 446**

1   the vehicle, I drove into the parking lot along with

2   Officer LeBlanc.  Officer LeBlanc was in a marked

3   vehicle with, you know, police symbols and lights on

4   the top.  And we subsequently arrested the suspect, had

5   him removed in the vehicle, placed in handcuffs and

6   impounded the vehicle.

7 Q   Okay.  So were you in a different car than Officer

8   LeBlanc?

9 A   Yes, I was.  I was in an unmarked car.

10 Q   All right.  And what about -- what happened after the

11   defendant was arrested?

12 A   Well, Officer LeBlanc took him and processed him, I

13   believe took him to jail and then, you know, conducted

14   a bail hearing.  And the vehicle, like I said, was

15   impounded.

16 Q   Okay.  And was there anyone in the car besides him?

17 A   No.

18 Q   All right.  And what did you do when you got back to

19   APD?

20 A   Well, when we got back to APD, the controlled

21   substances that were purchased from the defendant were

22   taken, and I field tested them with a Beck and

23   Dickinson (ph) test kit for cocaine, and it was

24   positive.

25 Q   Okay.  And did you search the car again?

**Page 447**

1 A   Yes, sub -- after the vehicle had been removed to

2   secure storage, subsequent to a search warrant, we went

3   and searched the vehicle.

4 Q   Okay.  Let me ask you a different way.  Did you search

5   Mr. Fish's car when you got back to the police station?

6 A   Oh, yes.  I'm sorry.  Yes, absolutely.

7 Q   Okay.

8 A   Prior to and after the controlled purchase, I -- I had

9   searched the confidential informant's vehicle.  And on

10   the second one, I did the same thing that I did on the

11   first one, went through every -- all the little boxes

12   and everything else, and again found nothing that was

13   contraband or illegal.

14 Q   Okay.  And you said that you took control of the -- the

15   crack that had been purchased?

16 A   Well, I think Officer Johnstone and I processed it.  He

17   filled out the P and E, and I did the field test.

18 Q   Okay.  And let me just approach you with something

19   that's previously been marked as state's exhibit 4.  Do

20   you recognize this?

21 A   Yes, I do.

22 Q   What is it?

23 A   Well, it's a drug envelope that contains crack cocaine.

24   And the sealing tape has my initials and the date on

25   it.

1 Q Okay. Could you just tell me about this sealing tape a
2   little bit? What -- you called it sealing tape, is
3   that some special kind of tape?
4 A Well, it's tamper proof. If the envelope had been
5   opened at any time and that would have been damaged, it
6   would indicate that because you can't reseal it.
7 MS. BRADY: Okay. And at this time, I move to admit
8 state's exhibit 4.
9 THE COURT: Number 4, Mr. James?
10 MR. JAMES: No objection.
11 THE COURT: Number 4 is admitted.
12 Q Okay. Now did you do anything else with regard to the
13   investigation of this case?
14 A I searched the vehicle at indoor secure.....
15 MR. JAMES: Asked and answered.
16 THE COURT: Overruled.
17 Q Okay. And was any -- you searched the defendant's car?
18 A Yes.
19 Q Okay.
20 A Correct.
21 Q And was anything seized during that search?
22 A Yes, a cell phone and a battery to it.
23 Q Okay. And let me just approach you with what I've
24   previously marked as state's exhibits 12 and 22. Do
25   you recognize those items?

Page 448

1 A Yes, I do.
2 Q Can you please explain to the jury what item number 12
3   is?
4 A Item number 12. Yeah. This is a cell phone and it --
5   when we get cell phones and batteries, we have to
6   separate the two because they're serial number items,
7   and so we list both of them separately on the P and E.
8   So this is a part of the same phone. Both of them, the
9   battery and the cell phone.
10 Q Okay. And I'm glad you mentioned that serial number.
11   Does it have a serial number on it?
12 A Yes, they do.
13 Q And what is the serial number that's on it?
14 A Oh, gees. 003 Kilo 04702 is the phone. And I think
15   I'm going to need my glasses, which I didn't bring with
16   me, to read the one on the battery.
17 Q That's okay. I don't even need the one the battery.
18 MS. BRADY: At this time, I move to admit state's 12
19 and 22.
20 THE COURT: Mr. James?
21 MR. JAMES: No objection.
22 THE COURT: 12 and 22 are admitted.
23       (Plaintiff's exhibits 12 and 22 admitted)
24 MS. BRADY: Okay. And that's all I have for this
25 witness, Your Honor.

Page 449

1 THE COURT: Mr. James?
2      SOMERSET JONES
3 testified as follows on:
4         CROSS EXAMINATION
5 BY MR. JAMES:
6 Q Officer Jones, you were involved on the 28th, and
7   that's all, correct?
8 A The 28th and the 1st, yes.
9 Q 28th and the 1st.....
10 A That's correct.
11 Q .....which is the rollover? There are 28 days in.....
12 A Yeah. Right. That's correct.
13 Q Okay. And you were part of a surveillance team, is
14   that correct, at the Pancake House on Muldoon?
15 A Yes.
16 Q Okay. All right. And when did you arrive there?
17 A It was shortly before the confidential informant
18   arrived in the area.
19 Q And did you see the confidential informant?
20 A No, I did not.
21 Q Okay. Where were you?
22 A I was in -- in streets adjacent to the area. I did not
23   want to be in -- in plain view. I was part of the
24   takedown team, so I just stayed out of sight until I
25   was told that the confidential informant was leaving

Page 450

1   the suspect's vehicle by those that were -- had what we
2   call the eye, able to see what was going on.
3 Q Why don't you, if you would, flip over -- turn around,
4   please and flip over to a clean sheet of paper, if you
5   would, please? And if you can, and without going into
6   great deal of detail, kind of give us a rough sketch of
7   where this took place and where you were.
8 A Well, maybe. Okay. Let's see. Muldoon Road. And the
9   Pancake House is back here. Here's a street here. I
10   don't remember the name of it. I think it's -- not
11   Duben but Peck, maybe. And then there is a street sign
12   right about here. And then there's an entrance into
13   the parking lot right about here. And then there's --
14   I think there's a little strip mall back here. And the
15   defendant's vehicle was parked here facing towards the
16   street.
17 Q Okay.
18 A And I was riding the streets in here. There's an alley
19   here, back in here. So I was back in this area. I
20   wasn't stationary all the time.
21 Q Okay. So there's no location that you can say I was
22   there? You were kind of a rover, is that correct?
23 A I just -- you know, I -- as things progressed, because
24   they was told it was going to go down here, I moved my
25   vehicle when I knew that the vehicle was about here.

Page 451

**Page 472**

1  THE CLERK: Please raise your right hand.

2  (Oath administered)

3  MR. LAPORTE: I do.

4      MARK LAPORTE

5 called as a witness on behalf of the plaintiff, testified as

6 follows on:

7      DIRECT EXAMINATION

8  THE CLERK: Please be seated. For the record, sir,

9 will you state your full name, and spell your last?

10 A  Mark William LaPorte, L-a-P-o-r-t-e.

11  THE CLERK: Thank you.

12  THE COURT: Go ahead, Ms. Brady.

13 BY MS. BRADY:

14 Q  How long have you been an APD officer, Officer LaPorte?

15 A  For five and a half years now.

16 Q  And what did you do before becoming an APD officer?

17 A  I was a police officer for about two and a half years

18  in Texas.

19 Q  Okay. And have you ever had any training or experience

20  in detection, identification and investigation of cases

21  involving controlled substances?

22 A  I have. I've had numerous schools to include Drug

23  Enforcement Administration's basic narcotics

24  investigator school.

25 Q  About how many investigations -- or -- that you've

**Page 473**

1  conducted, or cases you've worked on that involve

2  cocaine?

3 A  Working informants in larger scale cases such as this,

4  probably a dozen.

5 Q  Are you assigned to a particular unit?

6 A  I am.

7 Q  And what is that unit?

8 A  It's a special assignment unit.

9 Q  Is that the same unit you were assigned to during the

10  investigation of this case?

11 A  Yes, it was.

12 Q  Okay. And are you familiar with Jeremy Fish?

13 A  I am.

14 Q  How did you become assigned to work with Mr. Fish?

15 A  I received a call from Officer Bushue and Detective

16  Pernue. They had conducted a debriefing with Mr. Fish

17  at the request of district attorney Phil Moberly.

18  Detective Pernue could not use Mr. Fish as an informant

19  because she had other cases.

20  MR. JAMES: I'm objecting. He's -- it's hearsay, and

21 he's talking about.....

22  THE COURT: Yeah. Yeah. Just -- the objection is

23 sustained.

24 Q  Let's just go on to Mr. Fish's deal. Did Mr. Fish have

25  a deal to work as an informant?

**Page 474**

1 A  He did. He was to work as an informant, and there were

2  two targets that he had identified. And part of that

3  deal, he had a burglary charge out of Nome that was

4  going to be mitigated or dismissed.

5 Q  Okay. And how many people was he supposed to be

6  targeting in order to get that deal?

7 A  There were two subjects that he had identified he could

8  purchase cocaine from.

9 Q  And did he make the buys that he agreed to make?

10 A  Yes, he did.

11 Q  Okay. And what happened to the other case?

12  MR. JAMES: Objection. Relevance.

13  THE COURT: The -- can I have a bench conference,

14 please?

15  (Bench conference as follows:)

16  THE COURT: What's the answer to the question?

17  MS. BRADY: Where I'm trying to go is that the other

18 case is over, and it was going on at the same time as this

19 case. That's all I'm.....

20  THE COURT: Well, no. the question you asked is what

21 happened. Were you asking.....

22  MS. BRADY: That it's over.....

23  THE COURT: .....to say.....

24  MS. BRADY: That it's over.

25  THE COURT: You can say it's over. You can.....

**Page 475**

1  MR. JAMES: I still -- I don't -- I'm going to strongly

2 object. I'm saying it right on the record right now, if

3 she's trying to work in by the backdoor the credibility of

4 Jeremy Fish, by saying, yeah, that one was pled out or.....

5  THE COURT: That's why I called a bench conference.....

6  MS. BRADY: Can I ask a leading -- can I ask a leading

7 question that says is that case over now?

8  THE COURT: Yes, you may.

9  MS. BRADY: And then we'll go.....

10  THE COURT: And that will avoid that.

11  MS. BRADY: Right.

12  THE COURT: And the reason I overruled your earlier

13 objection is because you asked -- actually, both lawyers

14 inquired into Mr. Fish working the other case during

15 questioning earlier. And you made a relevance objection

16 about that. But it was already on the table. But you can't

17 bolster his credibility by saying that we got a conviction

18 in that case, which is where I thought you were going.

19  MS. BRADY: Okay.

20  THE COURT: So you can avoid it by asking the leading

21 question, is that other case over.

22  MR. JAMES: I think too, Judge, the witness had got to

23 instruct -- be instructed the answer is yes or no, not

24 anything -- explanation about what happened, because that

25 pulls it right in the door and I don't want that to happen.

**Page 476**

1  THE COURT: Well, you can do it one way or the other.
2  You can just make it as leading as possible. And tell him I
3  don't want.....
4  MR. JAMES: Just ask him for a yes or no answer.
5  THE COURT: Well.....
6  MR. JAMES: You could say.....
7  THE COURT: Wait a second. I get.....
8  MR. JAMES: I'm sorry.
9  THE COURT: I get to do that.
10  MR. JAMES: I'm sorry. I'm sorry.
11  THE COURT: That's all right. If you're confident that
12  he won't say anything inappropriate, you can ask a leading
13  question and make it as leading as possible. If you think
14  you need to do something else then.....
15  MS. BRADY: If he starts going into anything other than
16  yes or no, I'll just stop him.....
17  THE COURT: That's fine.
18  MS. BRADY: .....and redirect his attention.
19  THE COURT: That's fine.
20  MR. JAMES: I'm trying to decide if you want it on
21  here, because we're not going to -- this case is not going
22  to go on that.
23  (End of bench conference.)
24  THE COURT: Rephrase your question, Ms. Brady.
25          DIRECT EXAMINATION CONTINUED

**Page 477**

1  BY MS. BRADY:
2  Q  Is that other case over?
3  A  Yes, it is.
4  Q  Okay. And to the best of your knowledge, has
5  Mr. Fish's burglary case from Nome now been dismissed?
6  A  Yes, it has.
7  Q  Okay. And does Mr. Fish have any other deals with
8  regard to any other cases or any other charges that
9  could come against him, or anything along those lines?
10  A  No, he does not.
11  Q  Okay. And were you the case officer assigned to this
12  case?
13  A  Yes. I was the case officer, and I was instructing or
14  mentoring Officer Grant Johnstone in how to work an
15  informant controlled case.
16  Q  Was there a reason that you were assisting Officer
17  Johnstone?
18  A  Yes. He did not have the experience I did. And I had
19  worked numerous cases in other types of drugs just
20  besides cocaine. And so I was basically the lead in
21  making sure he understood how the investigation carried
22  forth, everything he needed to do. Excuse me.
23  Q  Is Mr. Fish considered an easy informant to work with
24  or a hard informant to work with?
25  A  He was considered a difficult informant to work with.

**Page 478**

1  And that's another reason why I was assigned.
2  Q  All right. And let me just approach you with something
3  that's been previously admitted into evidence, state's
4  19. Can you just explain what this is?
5  A  Yes. When I began working drug cases, these go on for
6  some time, you make multiple buys. And to make sure
7  the information is clear and concise for me personally,
8  in my case file, I developed this. It's called a buy
9  check off list. And basically, it's -- it's got the
10  dates of each buy, and I put the person's name and what
11  their task was specifically on the controls that we
12  have on every buy. Because sometimes when officer
13  writes their paperwork or something, we do this so
14  often and so regular, they may forget to list that they
15  did a strip-search or list that. And -- and this helps
16  me as a case officer to know who did what job,
17  especially months later because it goes to court so
18  many months later. And this is just something, it's
19  not APD standard. It's my standard to try and make my
20  cases more efficient and for me to keep track of them.
21  Q  Okay. Now you talked about controlled buys, can you
22  just explain to the members of the jury what a
23  controlled buy is?
24  A  Yes. We -- we have controls, because when you're using
25  informants, understandably, the problems that you can

**Page 479**

1  have with informants, we -- there are several controls
2  that you have to have on each buy. Specifically, all
3  the money that is used to purchase the drugs is all
4  pre-recorded. It's all xeroxed, and that's kept.
5  Also, the informant is not allowed to take his or her
6  own money for the buys. It's only the police
7  department's money. The informant is strip-searched.
8  What I mean by a strip-search is the informant is
9  completely unclothed. All the clothing is gone
10  through, sock, pockets, everything the informant has
11  and is wearing on the buy, and he is searched. He has
12  to open his mouth. He has to pull his scrotum up,
13  check the front and back to make sure he has no other
14  money, no other controlled substances, no contraband.
15  If the informant drives their own vehicle, that
16  vehicle is also searched throughly. And for both the
17  person search and the vehicle search, I use, as often
18  as I can, the same person, because that person knows
19  how things are placed in the car, what's in the car,
20  and does the exact same search before and after. And I
21  just think that's a good thing to use. Also, the
22  conversations, we conduct debriefs after each search.
23  And let me back up. There must be a search before and
24  after each buy. And it's done in very close proximity.
25  The search of the vehicle, the search of the person is

**Page 480**

1 done just, you know, within a very short period of time
2 before we go out to make the buy.  When the informant
3 returns, the first thing we must do is we get the
4 contraband or the drugs from the informant.  One
5 officer tests it while the other officer goes and does
6 a search of the person immediately once we return to
7 the station, and the vehicle.
8     A debrief is conducted on each buy.  Even though
9 we have a search warrant to record conversation, and we
10 can hear that conversation to know what's going on, we
11 conduct a debrief with the informant.  There's lots of
12 other information that we find out that you don't hear
13 from the wire, because, you know, a lot of this is done
14 in kind of code, very quiet.  It's hard to tell
15 sometimes exactly what's going on.  So a debrief takes
16 place.  And then after that point in time, then he is
17 released from that controlled buy.
18 Q  Okay.  Now do CI's generally know the -- and by CI, I'm
19 talking about confidential informants, do they
20 generally know the locations o the officers while the
21 buy is going on?
22 A  No.  They don't very much information with the
23 officers.  Specifically, the reason is is we use a lot
24 of the same cars.  I work undercover, personally.  I've
25 purchased drugs undercover, as many of the officers in

**Page 481**

1 this unit.  We don't want them to know the other
2 officers in the unit.  We don't want them to know what
3 they look like.  We don't want them to know the cars
4 they're driving, where they are.  All the informant
5 knows is someone will always have an eye on him.
6 That's called, as Somerset Jones, Officer Jones
7 mentioned, the eye.  Someone always has an eye on the
8 informant, always a control to see what's going on.
9 And the other -- the other officers are used for
10 surveillance and control of the area.
11 Q  Ever had a confidential informant lie to you before?
12 A  Yes, I have.
13 Q  Ever had one steal drugs?
14 A  Yes, I have.
15 Q  Now let's talk about your first contact with Jeremy
16 Fish with regards to this case.
17 A  Okay.
18 Q  When did that happen?
19 A  On the 8th of February, this year.
20 Q  Okay.  And what happened on the 8th of February?
21 A  He met with us at the station.  Again, I was training
22 Officer Grant Johnstone on how to run the case.  So I
23 was assisting him, but letting Grant attempt to run it.
24 Where he ran into problems or issues or questions, then
25 I took care of that.  Mr. Fish made a phone call and

**Page 482**

1 the person that he was calling, he identified that he
2 was known to him as Rico, and he made a phone call to
3 purchase cocaine.
4 Q  Okay.  And then once he made the phone call, what
5 happened?
6 A  Once he made the phone call, again a strip-search was
7 conducted, it was for $150, which was going to be the
8 buy.  After the strip-search and the vehicle search, he
9 was given $150 of buy money, which had also been pre-
10 recorded.  Since this was the first time we were making
11 a buy with Rico, we did not have enough evidence to
12 obtain a search warrant to record the conversation, so
13 this buy was not wired, which would -- means the
14 conversation is recorded.
15 Q  Okay.  And now, had you ever checked to see if
16 Mr. Fish's license was suspended?
17 A  Yes.  I -- I recalled that time because he was driving
18 his own vehicle, to make sure he had a valid license.
19 And I recall that I done that, and just to reconfirm
20 today, I requested an APSIN check, which has his
21 driving history, and it was not suspended at that time
22 during the buys.
23 Q  Okay.  And then what happened after you left the
24 station?
25 A  After I left the station, prior to us leaving the

**Page 483**

1 station, I had the other surveillance units set up in
2 the area.  We knew we were going to 202 Grand Larry.
3 And I had somebody positioned to have a close in eye so
4 they could see the door of where Mr. Fish would enter.
5 Myself and Officer Johnstone rode in the same car and
6 we followed Mr. Fish from the police station to the
7 area of 202 Grand Larry, just before he turned onto
8 Grand Larry, we continued straight, so we -- you know,
9 it was not obvious to somebody who may be watching that
10 we followed them all the way up.  Once we turned -- he
11 turned onto Grand Larry, we turned off and stayed in
12 the area because there was officers on Grand Larry that
13 could actually see him drive up to the address and
14 enter into the residence.
15 Q  Okay.  So then -- and what happened after the buy?
16 A  After the buy, I was told by the radio that he was
17 leaving the residence, and that he had got in his car
18 was leaving on Grand Larry.  I was at the -- the next
19 street.  I got in behind him, myself and Officer
20 Johnstone.  Because it was the first buy, because
21 Mr. Fish was deemed a difficult informant, I had not
22 gathered a lot of trust for him at that time.  I wanted
23 the controls to even be tighter.  So waiting until he
24 drove to the police station for him to give us the
25 drugs, I had him meet me at the church to give them to

**Page 484**

1    me immediately. And that's what we did. And then we
2    drove to the police station and followed him to the
3    police station. Which at that time, a strip-search
4    again was conducted of him and a post-buy vehicle
5    search, and then a debrief.
6 Q   How long of a period of time elapsed from the time he
7    left the residence until you guys arrived at the
8    church?
9 A   Oh, I think we had to stop for the red light at Duben
10    and -- Duben and Muldoon, but a minute, a very short
11    period of time.
12 Q  Okay. And then what happened -- was that the end of
13    your involvement on that day with this case?
14 A  On that day, yes.
15 Q  Okay. And then let me direct your attention to
16    February 13th. Did you have any contact with Mr. Fish
17    that day?
18 A  Yes, I did.
19 Q  And did you know that who Rico was at that time?
20 A  At that time, we did not -- not until that day, but
21    prior to that we, we did not. We believed we had
22    identified him. We identified him through two
23    different sources, but until February 13th, when I
24    showed the informant a photo lineup, that was the
25    positive identification.

**Page 485**

1 Q   Okay. And let me just approach with something that's
2    been previously marked as state's exhibit 16. Do you
3    recognize this?
4 A   Yes. This is a photograph -- a photographic lineup
5    that has the defendant in one of the six positions.
6    There were six photographs that -- that I showed the
7    informant.
8 Q   Is this the actual photographic lineup that you showed
9    to Mr. Fish?
10 A  Yes, it is.
11 Q  Does it truly and accurately depict the defendant and
12    five other people randomly selected?
13 A  Yes, it does.
14    MS. BRADY: Okay. At this time, I move to admit
15    state's exhibit 16.
16    MR. JAMES: No objection.
17    THE COURT: 16 is admitted.
18    (Plaintiff's exhibit 16 admitted)
19 Q  Can you explain to the members of the jury exactly how
20    a photo lineup is prepared?
21 A  Yes. You give to DMV, there's a contact person that
22    you give the name and the identification or driver's
23    license number that you want in the photo lineup. And
24    then they pick the other five persons that look
25    reasonably close to the person that you're trying to

**Page 486**

1    identify. And once I showed it to -- excuse me. Once
2    I showed it Officer [sic] Fish, I had -- or, I'm sorry,
3    Informant Fish, I have him actually circle who he
4    identified as the person being Rico and initial that.
5 Q   Okay. So the markings on that were made by Mr. Fish?
6 A   Yes.
7 Q   In your presence?
8 A   Yes.
9 Q   Okay. And where was the photograph obtained from, did
10    you say?
11 A  DMV.
12 Q  And how does DMV obtain photographs?
13 A  Well, Department of Motor Vehicles.....
14    MR. JAMES: Objection. He's talking outside his area.
15    It's hearsay. He's asking for opinion as to how other
16    people obtain stuff.
17    THE COURT: Common knowledge. Objection is overruled.
18 A  Department of Motor Vehicles, of course, has copies of
19    all our pictures that we take on the driver's license.
20    And they have descriptions of -- they have groups of
21    descriptions of persons. So if it's a white female
22    with black hair in the ages of 40, they've got a
23    category of groups of meeting that description, and
24    they just pull those copies of licenses, and that's how
25    they do each photo. Of course, they view to make sure

**Page 487**

1    they -- they look reasonably -- nothing looks out of
2    the ordinary so it's not glaringly obvious who the
3    person is. They all look very similar in the six
4    photos.
5 Q   Okay. And at this time -- so when you get the photo
6    lineups, do they also give you a picture of the
7    defendant's -- I mean of a driver's license to go along
8    with it?
9 A   They do. They give you three things, six pictures that
10    -- that equal the photo lineup. And I'll show -- you
11    can see -- see the size of the pictures, each one. And
12    then they give you another sheet that has all six
13    persons in the smaller format, but of their entire
14    driver's license. And then the third item they give
15    you is the individual that you requested for a photo
16    lineup, they give you a large copy of -- of his
17    driver's license or ID.
18 Q  Okay. And is that that's been marked state's exhibit
19    15 a true and accurate representation of the
20    defendant's driver's license?
21 A  Yes, it is.
22    MS. BRADY: At this time, I move to admit 15.
23    MR. JAMES: No objection.
24    THE COURT: 15 is admitted.
25    (Plaintiff's exhibit 15 admitted)

**Page 488**

1 Q   Now did you have Mr. Fish make any calls on February
2     13th?
3 A   I did.  Oh, I'm sorry, the 13th?
4 Q   Uh-huh.  (Affirmative)
5 A   Yes, I did.
6 Q   And who -- what number did he call?
7 A   He called again the same number as he did before, 727-
8     9465.
9 Q   Did you dial the phone?
10 A  No, he dialed the phone, but part of the control of
11    that is I actually have to watch him dial the numbers
12    to make sure he is dialing the numbers that he gave me.
13 Q  And was that call recorded?
14 A  That call was recorded, yes.
15 Q  And what happened during the call?
16 A  He spoke with a subject that Mr. Fish identified as
17    Rico.  And they spoke for a minute.  Rico told him that
18    he didn't have anything that night, but he would have
19    something tomorrow.  And the informant explained to me
20    that meant he did not have any cocaine, so we would try
21    another night.
22 Q  Did you try another night?
23 A  We did.
24 Q  Did you try on the 15th of February?
25 A  We did.

**Page 489**

1 Q   Okay.  And could you just explain what your contact
2     with Mr. Fish was on that day?
3 A   Again, he came to the police station to conduct a
4     controlled buy.  Again, he called the phone number,
5     727-9465.  This time we knew, confirmed to be
6     Mr. Davis.  And we set up a purchase of two balls,
7     meaning an eight-ball.  That was going to cost $200.
8     Rico originally said $225 and the informant talked him
9     down said, oh, come on, let's do it for $200 and Rico
10    agreed.  We were getting set up ready to go make the
11    buy, and I got a call from Lieutenant Holloway (ph),
12    which at the time was the lieutenant of the
13    metropolitan drug unit, which the special assignment
14    unit is -- works under in the chain of command.  And
15    they needed our unit for a higher-level drug operation.
16    So that took precedence, and I had to put this buy off.
17 Q  Okay.  And then what was the next -- what was done to
18    call the buy off?
19 A  I'm sorry?
20 Q  What was done to call the buy off?
21 A  Basically, we -- I had the informant recall and he got
22    voice mail.  And he just left a message saying that his
23    girlfriend got sick, and that he would call him back,
24    his girlfriend had to go the hospital.
25 Q  All right.  Now let me direct your attention to

**Page 490**

1     February 20th, did you have any contact with Mr. Fish
2     that day?
3 A   I did.  He was assigned to come into the police
4     department again and conduct a controlled cocaine buy.
5 Q   What number was called?
6 A   Again, the number was called 727-9465.
7 Q   And what happened during the call?
8 A   There was an agreement to be made to purchase $200
9     worth of cocaine.
10 Q  Okay.  Now you mentioned eight-ball a few minutes ago.
11    Is that a common term?
12 A  It is.  It's a street term for a certain amount of
13    cocaine.
14 Q  What's the amount?
15 A  Generally, it's about $200 is the going rate.
16 Q  Is there a weight of cocaine that that also describes,
17    or is it just for the money?
18 A  Well, it's supposed to be an eighth of an ounce, that's
19    the term.  But it's never exact.  Generally, it falls
20    on the lower side of that eighth of an ounce for profit
21    margin purposes.
22 Q  Okay.  And did a buy result from that call?
23 A  Yes, it did.
24 Q  Where was the buy arranged to occur?
25 A  Again, at the -- his apartment, which was at 202 Grand

**Page 491**

1     Larry.
2 Q   Okay.  And did that address, 202 Grand Larry have any
3     significance?
4 A   Yes.  Prior to when we were trying to identify who Rico
5     was, I requested a computer search within the police
6     department for that address.  And attached to that
7     address was a name of Robert Davis.  And also Officer
8     Johnstone, I requested for him to obtain a search
9     warrant after we made the first buy for the cell phone
10    number that we were calling.  So he obtained a search
11    warrant, it was granted.  And the person who owned that
12    cell phone was Robert Davis, which was the same full
13    name as the computer had listed attached to that
14    address.  So that was -- that was how we knew to
15    identify him and obtain a photo line up for Mr. Davis.
16 Q  Okay.  Now, the fact that someone is listed in the
17    computer doesn't mean that they've ever done anything
18    wrong, it just means that they've, at some point in
19    time, given that address to a police officer as a
20    victim of a crime or as any number of things, is that
21    right?
22 A  Oh, that's correct.  If you've been involved in an
23    accident, or a victim, it's -- all it is, is an address
24    that you gave once, and that's how it's listed.
25 Q  Okay.  And now prior to that buy, was Mr. Fish

1    searched?

2 A    Yes, he was.

3 Q    And how thorough was the search?

4 A    Again, it was a strip-search, as protocol.

5 Q    Now did you conduct that search?

6 A    I was there for the search. Actually, I did conduct
7      that search. Let me check my notes. Yes, I did
8      conduct that pre-buy strip-search.

9 Q    Okay. And could you describe what you did during the
10     search for the members of the jury?

11 A   Okay. As I had showed Officer Johnstone in the same
12     manner of which I learned, they completely unclothe.
13     I'll check the pockets of the shirt and actually take
14     the sleeve and squeeze all the way down all the
15     clothing to make sure nothing is hidden in the sleeve.
16     The pockets, all the pockets through the clothing of
17     the coat, the shoes. I pick the shoes up, hit them,
18     look inside, make sure nothing is hidden in the shoes.
19     The socks, I turn them inside out and squeeze the socks
20     out. The pants, all the pants are pulled inside out.
21     I pat down through each of the legs of the pants, and
22     then have him open his mouth. He's a male, he pulled
23     up his scrotum, turned around, bent over, make sure he
24     had no contraband or anything else.

25 Q   Okay. And was any contraband found?

Page 492

1 A    No.

2 Q    All right. And what happened after he was searched?

3 A    After the search, he was given $200 of pre -- I'm
4      sorry? I thought you said something.

5 Q    No, I didn't say anything.

6 A    He was given $200 of pre-recorded buy money, and his
7      vehicle was searched.

8 Q    Okay. Now you could hear over the wire what was
9      transpiring when Mr. Fish was in the house, is that
10     right?

11 A   Yes.

12 Q   Okay. And, actually, I got a little ahead of myself.
13     What happened after that?

14 A   After that, again, I set up assisting surveillance
15     units in the area. We knew where we were going. It
16     was the same place as the previous buy. And myself
17     and Officer Johnstone again followed the informant to
18     the location.

19 Q   Okay. And now could you hear over the wire when
20     somebody indicated something about getting a pot for
21     cooking?

22 A   I could.

23 Q   What is the significance of that?

24 A   To make powdered cocaine into crack cocaine, powdered
25     cocaine is what's called hydrochloric acid, the

Page 493

1      version. And crack cocaine is cocaine base. You have
2      to take it from one product to the other. And you have
3      -- it's called -- the street term is cooking it up.
4      The recipe is approximately one-part cocaine to two-
5      thirds part, give or take, baking soda is the most
6      common way to cook it up. You put it in a pot of
7      water, and you boil it. And you put both substances in
8      and it bonds together and it becomes rock-like. That's
9      why you hear it called rock cocaine. It becomes hard.
10     That way, it's no longer a powder. And it transitions
11     it from the cocaine hydrochloric acid to what's called
12     base cocaine.

13 Q   Okay. And what happened after Mr. Fish left the
14     defendant's residence?

15 A   Well, initially, he came out and got in his car, we
16     thought he was leaving. Of course, I did not witness
17     this. I heard it over it over the radio. Someone is
18     always giving an updated -- the person with the eye
19     gives an updated status of what is occurring so
20     everyone else knows, so it's on the police radio. He
21     came out and got in his car. We thought he was
22     leaving. He just backed up. These people said they
23     were going to get a pot to cook it up, got in a car and
24     left. He pulled back in and parked and then went back
25     inside the house.

Page 494

1 Q    And did he come out again?

2 A    Yes. He came out, just moments later, got in his car.
3      This time with the -- with the previous buy, based on
4      his reliability that I had dealt with him that far, we
5      drove to the police station, and that's where we took
6      the cocaine, which later tested positive from him. A
7      post-buy vehicle search was done, a post-strip search
8      was done on his person and then a taped debrief.

9 Q    Okay. And did you have any other -- did you
10     participate any further with the investigation of this
11     case on that day?

12 A   On that day, no, I did not.

13 Q   Okay. Then let me direct your attention to February
14     21st.

15 A   Okay.

16 Q   What happened that day?

17 A   Again, the informant met us at the police station and
18     -- to do another controlled buy. Again, he called the
19     same number, 757-9465. The second, and this is the
20     third buy, they were recorded, meaning not only the
21     phone conversation, but also the wire when he went
22     inside. That was recorded and first he got a message,
23     the -- and he said -- he told Rico that he would call
24     him back later, there was voice mail. So we had to
25     call back a couple of times before we actually spoke

Page 495

1 with him. And before the informant actually spoke with
2 him. And an agreement was made for $200. This time,
3 it was specifically said over the phone, hard, all he
4 had was hard. And all that is is street term for crack
5 cocaine or rock cocaine when it's hard. If the term
6 soft is used, that means it's powdered cocaine.
7 Q  Where was the buy arranged to occur?
8 A  It was arranged to occur at the Chevron at Old Seward
9    and International.
10 Q  Did you follow Jeremy Fish to the meeting place?
11 A  I did. Again, I sent my surveillance units out earlier
12    after we conducted a briefing. Myself and Officer
13    Johnstone followed the informant there. He was given
14    pre-recorded buy money. Again, he was strip searched.
15    His vehicle was searched prior to the buy. Once he got
16    in the area, I was notified by other officers that
17    there was there all ready a green Suburban, excuse me,
18    in the parking lot on the east side of the Chevron all
19    ready there. It had tinted windows. It was dark. So
20    we were not sure if that was him, because we had never
21    seen him a vehicle. But once the informant arrived in
22    the parking lot, he parked right beside of him and got
23    out and got into the Suburban with Mr. Davis.
24 Q  Okay. And did you subsequently verify who the owner of
25    the car was?

Page 496

1 A  I did.
2 Q  And who was that?
3 A  I can't remember her name, through the -- through the
4    wire, he said it was his mother's car. But the
5    registered owner of the vehicle did not have the last
6    name of Davis. So the wire said it was his mother's
7    car -- Mr. Davis said it was his mother's car, but the
8    registered owner didn't say Davis. So I don't know if
9    she has a different name or a maiden name. So that was
10    the information I had.
11 Q  Okay. And how long did that meeting last?
12 A  That was -- that was a very short period of time, to
13    give you the exact -- that lasted approximately two
14    minutes.
15 Q  And what happened after the meeting?
16 A  He got in his car and drove back to the police station.
17    Myself and Officer Johnstone followed him back to the
18    police station. He gave the drugs to me and Officer
19    Johnstone did the debrief with him. At -- this time,
20    the third buy, Officer Johnstone was becoming much more
21    comfortable in the way a controlled buy went. So
22    Officer Johnstone conducted the debriefing and I field
23    tested the drugs, which I received a positive result
24    for the presence of cocaine.
25 Q  Okay. Now let me just approach you with something that

Page 497

1    I have previously marked as state's exhibit 3. Do you
2    recognize that?
3 A  I do. This is an APD drug evidence envelope. And I
4    filled out the -- the P and E sheet, detailed
5    description. It's crack cocaine. An estimated tar
6    weight is 1.55 grams. It has the date of February 21st
7    of 2001, and it has my initials.
8    MS. BRADY: Okay. And at this time, I move to admit
9 state's exhibit 3.
10    THE COURT: Number 3?
11    MR. JAMES: No objection.
12    THE COURT: Number 3 is admitted.
13              (Plaintiff's exhibit 3 admitted)
14 Q  Okay. Now let's talk about evidence handling for just
15    a second. Can you just describe to the members of the
16    jury what happens once you put it in the envelope, what
17    happens to sensitive evidence like drugs?
18    MR. JAMES: I'm going to object, unless we're talking
19 about what his personal knowledge is, or refuting a
20 standard. I'm objecting to whether it's personal knowledge
21 or what.
22    THE COURT: The -- you can qualify regarding personal
23 knowledge, or he can explain his institutional knowledge
24 based on training. But you need to tell us which.
25    MS. BRADY: At this time I was inquiring into the

Page 498

1 officer's institutional knowledge.
2 Q  So I'm just asking in general, Officer LaPorte, what
3    happens with sensitive items like drugs or.....
4 A  Well, there's explicit.....
5    MR. JAMES: I'm going to objection.
6    THE COURT: Overruled.
7    MR. JAMES: Okay.
8 A  There's explicit written policy in how evidence is
9    handled, specifically sensitive evidence such as drugs.
10    There is a drug envelope, as you can see, two person
11    control, submitted and sealed by, that's my initials,
12    and my DSN or badge number, witness and verified,
13    that's a second officer who must initial it and date to
14    see that I weigh the drugs, I put the drugs in the
15    envelope. And then it's sealed with tamper-proof tape.
16    These are all the seams of the envelope. Again, my
17    initials and the date, which matches the date on front.
18    Once property and evidence gets it, of course, they
19    confirm it, and then they put it in a vacuum bag,
20    which it is further sealed. And then they have their
21    procedure, which I'm not aware of. I'm just aware of
22    the officer's handling procedure.
23 Q  Okay. So once you put it in the envelope, what do you
24    do with it at the police department?
25 A  We have a secure area that has double security

Page 499

**Page 500**

1 measures. Number one, we have to have a special key to
2 get into this secured area. And then there are
3 lockers. The evidence is put in the locker with what
4 is called a property and evidence form and is filled
5 out, and a copy of that form is placed with the
6 evidence, and then the locker is locked. Once that
7 locker is locked, I have no access to it.
8 Q  Once the -- who can get into it once it's in the
9    locker?
10 A  Once it's in the locker, the only access is the
11    property and evidence technicians, which take over
12    custody from there. And that keeps the chain of
13    custody secure.
14 Q  Okay. And -- so let me just -- did you have any
15    further involvement on the 21st?
16 A  I did not.
17 Q  Okay. Then let me direct your attention to February
18    28th. What happened on that day?
19 A  This was a day that we were going to do what we term as
20    the buy bust, another controlled buy, but an arrest
21    will take place after that.
22 Q  Okay. And so when you say buy bust, what specifically
23    are you talking about?
24 A  What I mean is we'll conduct a controlled buy, and we
25    -- prior to this date, arrest warrants are obtained for

**Page 501**

1 the three previous buys. So the defendant, Mr. Davis,
2 had -- had received that day three arrest warrants for
3 delivery or control of a controlled substance,
4 misconduct involving a controlled substance is the
5 charge. And we were to serve those arrest warrants
6 after we did the buy. The reason for the buy bust is
7 that we want to show after the buy is done that the
8 informant was in the vehicle, that he was arrested,
9 that that was him. And if he does have anymore drugs
10 on him and we find those, and also, we're looking for
11 the buy money that was used and pre-recorded in that
12 buy.
13 Q  Okay. So let's talk about that day. Did Mr. Fish make
14    any calls that day?
15 A  Again, yes. He called the same number 727-9465 and
16    spoke with Rico. And this was -- this was recorded
17    pursuant to the warrant that we had.
18 Q  Okay. And was a buy set up during the call?
19 A  A buy was set up. What had happened is he came to the
20    station earlier in the day and made a call, we did not
21    get him -- so -- we did two buy busts that day. So
22    speaking to this specifically, he made a call earlier
23    during the day, and we did not get Rico until later
24    that evening where a -- a delivery was set up at the
25    Pancake House on Muldoon Road.

**Page 502**

1 Q  Okay. And -- now, did Mr. Fish know prior to making
2    the calls that he was making that this was the day
3    planned for the buy bust?
4 A  We generally don't tell the informants that bust is
5    going to happen. Specifically, they're worried for
6    their own safety. They're worried for what may
7    happen.....
8    MR. JAMES:  Objection. He's not being responsive to
9 the question.
10    THE COURT:  The question was directed at what Mr. Fish
11 knew that day, not -- not generally.
12 A  Oh. I'm sorry.
13    THE COURT:  So can you answer that specific question,
14 please?
15 A  Okay. No, I don't believe that he knew a buy bust was
16    occurring that day.
17 Q  Thank you. Did you conduct a briefing to plan how the
18    buy bust would go down?
19 A  Yes, I did.
20 Q  And where was it arranged that the buy was going to
21    occur?
22 A  At the Pancake House in the 300 block of Muldoon Road.
23 Q  Okay. And when was it supposed to occur?
24 A  He told us it was going to occur -- it occurred almost
25    around midnight. It was late in the evening.

**Page 503**

1 Q  What happened after the meeting was set up?
2 A  The briefing, Mr. Fish was at the police station with
3    Officer Johnstone, and the other officers, we had just
4    finished up execution of another warrant unrelated to
5    this. So I conducted a briefing at the location of
6    where that warrant was being served, which was in close
7    proximity of Muldoon Road. And Mr. Fish was at the
8    police station. Officer Johnstone and another officer,
9    I don't recall who, because I wasn't there, recorded
10    the buy money, conducted the strip-search, conducted
11    the.....
12    MR. JAMES:  I'm going to object. This is all hearsay.
13 He just said he wasn't there.
14 Q  Officer LaPorte, let me just direct your attention to
15    your involvement on that night.
16    THE COURT:  All right. I want you to disregard the
17 last portion of the answer, only that portion that was
18 responsive to the specific question. And your next
19 question, Ms. Brady?
20 Q  What was your next specific involvement in this case
21    that night?
22 A  Okay. I conducted a briefing with the assisting
23    officers in the special assignment unit about where the
24    buy was going to occur and everyone's responsibility of
25    that buy.

1  Q  Okay. And what happened after -- did you then go to
2     where the buy was supposed to occur?
3  A  Yes, we did. I did not have a radio at the time,
4     because of my prior duties. So I was on the phone with
5     Officer Bushue, who had the wire and was recording the
6     wire. And the surveillance units were set up in the
7     area of the Pancake House, because we had one officer,
8     Officer LeBlanc, who was in a marked police vehicle, to
9     come in and conduct a takedown to make the arrest.
10 Q  Okay. And was that done?
11 A  Yes, it was.
12 Q  Okay. And did you subsequently determine who the
13    registered owner was of the car the defendant was in
14    that night?
15 A  I don't recall who it was. I remember that we ran the
16    license plate, but I don't recall who the owner was.
17 Q  Okay. Let me approach you with something I have marked
18    as state's exhibit 20. Do you recognize this?
19    MR. JAMES: I'm going to object to foundation, Your
20 Honor, at this particular junction. He said he didn't --
21 take a look at the exhibit.
22    THE COURT: I need to look at number 20. And are you
23 showing him this document to see if you can refresh his
24 recollection?
25    MS. BRADY: I am, Your Honor.

Page 504

1     THE COURT: Do that.
2  A  Okay.
3  Q  Do you recognize what that document is?
4  A  I do.
5  Q  What is it?
6     THE COURT: No. Wait a second. We're going to have a
7  bench conference, please. Excuse us.
8     (Bench conference as follows:)
9     THE COURT: The objection was foundation. I'm not sure
10 how that relates to this specific document.
11    MR. JAMES: Okay. He.....
12    THE COURT: And then I told you that you -- I asked
13 you, Ms. Brady, whether you were showing him the document to
14 refresh his recollection, you told me yes.
15    MS. BRADY: Uh-huh. (Affirmative)
16    THE COURT: But then you launched into a series of
17 questions which appeared to me like you were going to ask
18 him to tell the jury what the truth was, rather than
19 asking him if you -- if it refreshed it's recollection. So
20 that's why we're -- that's why we're back here.
21    MS. BRADY: Okay.
22    THE COURT: So let's figure out where you're going and
23 see if there's an objection.
24    MR. JAMES: He.....
25    THE COURT: Just a second.

Page 505

1     MR. JAMES: I'm sorry.
2     THE COURT: We're going to -- I'm going to make the
3  state start over here, Mr. Davis [sic]. What -- what do you
4  -- what is your next question, and then we'll see if there's
5  an objection?
6     MS. BRADY: Okay. My next question is what is that,
7  that's the registration. He testified that he couldn't
8  recall who the registered owner was. Did you learn who the
9  -- who's the registered owner of the truck? Is that the
10 truck that was used in the 2/28 buy? I have my questions
11 written down out there, so I'm not positive exactly.....
12    THE COURT: You're going to ask him to identify the
13 registration and.....
14    MS. BRADY: I am, uh-huh.
15    THE COURT: All right. So that's that not a refreshing
16 of recollection. That's actually to put the registration in
17 evidence. Is that correct?
18    MS. BRADY: Right. I was.....
19    THE COURT: All right. Mr.....
20    MS. BRADY: .....letting him use that to refresh his
21 recollection, but I intend on putting it into evidence.
22    THE COURT: Mr. James?
23    MR. JAMES: There's no testimony, whatsoever, about --
24 from Officer LeBlant [sic], regarding the license plate, or
25 the ownership of that car. He said there's absolutely

Page 506

1  nothing in this testimony, saying this is DYS 221 or
2  whatever, I'm making up a license plate now, but there's --
3  it's void. So it's -- there's no foundation laid. And
4  they're attempting to bootstrap through the backdoor what
5  they can't get in the front door. He says he doesn't know
6  who the car belongs to, period. So I think that's where it
7  lies.
8     THE COURT: Well, it's not where it lies. So you can
9  refresh -- you can use any piece of paper to refresh
10 someone's recollection, even if the piece of paper is not
11 admissible. And if that's where you're going, then -- then
12 -- and the officer can actually testify that his
13 recollection is refreshed, you can do that.....
14    MS. BRADY: Okay.
15    THE COURT: .....then. To the extent there's an
16 objection to that, that's overruled. Now the next question
17 is whether you're going to -- whether you can get the piece
18 of paper in. Ms. Brady, can you respond to that objection?
19    MS. BRADY: Okay. What's the objection for the piece
20 of paper?
21    THE COURT: No foundation, that the officer can't
22 testify that that -- how he got that piece of paper or --
23 or.....
24    MS. BRADY: Well, I haven't got that far in my direct
25 examination yet. I will be asking him if he -- if he knows

Page 507

**Page 508**

1  -- he said that he ran the truck plate for the truck that
2  the defendant was in. And if that's the truck plate for the
3  -- I don't remember the license plate number of the truck.
4  But did you run it? Yes, I did. It was registered to the
5  defendant.
6      THE COURT: Before you tell the jury what the piece of
7  paper is, you need to lay a better foundation. I don't know
8  whether there will be another objection or not.
9      MS. BRADY: Okay.
10     THE COURT: But before you tell them that he's looking
11 at the -- before you tell the jury that he's looking at that
12 registration printout, you have to ask foundation questions
13 about what he did to get that.
14     MS. BRADY: Okay.
15     THE COURT: So you've got two different issues,
16 refreshing recollection.....
17     MS. BRADY: Right.
18     THE COURT: .....and whether you can mention that he's
19 looking at registration. And each had a different ruling.
20     MS. BRADY: Okay.
21     THE COURT: All right.
22     (End of bench conference)
23     THE COURT: Ms. Brady, why don't you restate your
24 question, please?
25         DIRECT EXAMINATION CONTINUED

**Page 509**

1 BY MS. BRADY:
2 Q   Okay. Now, Officer LaPorte, you stated that you did
3     run the plate of the truck that was -- the defendant
4     was in on the night of that buy, is that right?
5 A   Yes.
6 Q   Okay. And what kind of car was the defendant in?
7 A   He was in a Toyota truck.
8 Q   And what was the license plate number of the truck?
9 A   It was Delta Victor Echo 272.
10 Q  Okay. Now you stated that you didn't recall who the
11    registered owner of the car was, did that document that
12    I handed you refresh your recollection?
13 A  Yes.....
14     MR. JAMES: Your Honor, I'm going to object. Is this
15 his personal knowledge he's testifying to?
16     THE COURT: Have a bench conference, please.
17     (Bench conference as follows:)
18     THE COURT: Is that a hearsay objection, Mr. James?
19     MR. JAMES: Yes, Your Honor. I object, pure and
20 simple.
21     MS. BRADY: This is a business record. If I need to
22 get a DMV person in here to lay a foundation for it, I will.
23 He ran the defendant's truck, and that's how he learned.....
24     THE COURT: The objection is overruled. The officers
25 are entitled to rely on his business records to run -- to

**Page 510**

1     run a records check.
2      MR. JAMES: In grand jury, his testimony was he was not
3  there at the scene. So this is all hearsay on his part.
4  He's relying.....
5      THE COURT: I just made a ruling that it's -- that the
6  -- that the -- as an exception to the hearsay rule, the
7  officer is entitled to rely on other -- on business record
8  available to him to -- to get -- which includes police
9  reports, to get -- to run a license, rather than requiring
10 -- he can ask other sources what's the license plate and so
11 forth. And -- and you can challenge the reliability of that
12 information, that he -- but he's -- as an exception to the
13 hearsay rule.....
14     MR. JAMES: I understand.
15     THE COURT: .....he's entitled to rely on that.
16     MR. JAMES: I understand the exception, Judge. I just
17 want it clear that he was -- okay. I'll go into it on
18 regular cross exam.
19     THE COURT: Right.
20     MR. JAMES: Thank you. That's.....
21     (End of bench conference)
22     THE COURT: The objection is overruled. Do you
23 remember the question, Officer?
24 A  Yes, sir. The owner of the vehicle is Robert Davis.
25 Q  Okay. And does -- is there an address provided on that

**Page 511**

1     document as well?
2 A   There is.
3 Q   What's the address?
4 A   It's 202 Grand Larry Street.
5      MS. BRADY: Okay. And at this time, I move to admit
6 state's exhibit 20.
7      THE COURT: Number 20, Mr. James?
8      MS. BRADY: Your Honor, based upon the court's ruling,
9 I have a continuing objection to this.
10     THE COURT: All right. Number 20 is admitted.
11         (Plaintiff's exhibit 20 admitted)
12 Q   Okay. Now were you aware that the night that this
13    happened, that the buy funds were not found on the
14    defendant?
15 A  Yes, I was.
16 Q  What did you think happened to them?
17 A  I just assumed as is -- has happened in the past, many
18    times, the money is in the vehicle. So I expected to
19    find it in the vehicle when we executed a search
20    warrant on the vehicle.
21 Q  And did you participate in the execution of the search
22    warrant on the vehicle?
23 A  I did.
24 Q  And what as found inside the car?
25 A  A cell phone, but no money.

**Page 512**

1 Q   So once you realized that there was no money in the
2       car, what did you do?
3 A   Well, excuse me, I spoke with Officer LeBlanc who had
4       transported Mr. Davis to jail. And he said that.....
5       MR. JAMES: Objection. Hearsay.
6       THE COURT: Mr. Davis -- Ms. Brady?
7       MS. BRADY: It's not offered to prove the truth of the
8 matter asserted, of what Mr.....
9       THE COURT: All right. The objection is overruled.
10 A  He told me that the defendant didn't have any money on
11      him. To reconfirm that, I contacted Cook Inlet
12      Pretrial facility where the defendant was being held.
13      I spoke with them. They pulled up his record and told
14      me that when the defendant was placed into custody,
15      that he had $180 on his person. And I asked them if
16      that money was kept separate as his own personal money.
17      And I learned that, no, when someone is brought to
18      jail, that that money is put into a till with everyone
19      else's money. It's just documented the amount. So
20      it's not kept separate.
21 Q  Now, let me stop you right there. What day was this
22      going on on?
23 A  Well, he was booked in the early morning of the 28th --
24      or I'm sorry, the 29th. The buy conducted on the 28th
25      and then the 29th of March.

**Page 513**

1 Q   No, there's no 29th.....
2 A   February, I'm sorry.
3 Q   There's no 29th of February.....
4 A   Oh.....
5 Q   .....in this year, so it would have been.....
6 A   Sorry. March 1st.
7 Q   Okay. And so then -- and what -- what day did you
8       actually do the search -- serve the search warrant on
9       the defendant's car?
10 A  The search warrant of the defendant's car was on the
11      1st, the next day. Or I'm -- yeah, correct, on March
12      1st, 2001.
13 Q  Okay. So how much time elapsed between the time that
14      the defendant was booked in, roughly, and the time the
15      search warrant was served? I'm not asking you for
16      minutes. I'm just asking for a rough idea.
17 A  About two days.
18 Q  Okay. And did you -- what, if anything, did you do as
19      a result of learning that the defendant had brought
20      money to CIPT?
21 A  And I -- I test- -- prior to that, I testified before
22      it was served on the 1st. I'm sorry, it was actually
23      served on the second. I just saw that in my report.
24      So let me retract the exact date. It was served on
25      March 2nd. I'm sorry.

**Page 514**

1 Q   Okay. So what if anything.....
2       THE COURT: Just move the mike -- point that mike at
3 you a little bit.
4 A   Oh, I'm sorry.
5 Q   What did -- what, if anything, did you do once you
6       learned that the defendant had been checked into to
7       CIPT with the money?
8 A   Well, to -- to view the money in Cook Inlet Pretrial, I
9       needed a search warrant. So I contacted Officer
10      Johnstone, who had written the search warrants, and
11      instructed him to write a search warrant to search the
12      cash till at Cook Inlet Pretrial. And I drove to Cook
13      Inlet Pretrial with the copies of the buy money from
14      the last controlled buy and awaited for a call from
15      Officer Johnstone until he told me that a search
16      warrant had been granted.
17 Q  Okay. And once the search warrant was granted, did you
18      look through the money?
19 A  I did. There were several thousand dollars there. The
20      money was in a denomination of one $100 bill as -- and
21      five 20's. The only money that I found was the $100
22      bill. The serial number, of course, matched the pre-
23      recorded buy money. And over the two days, I was told
24      that, you know, 20's are the most frequently turned
25      over denomination of bill is what Cook Inlet Pretrial

**Page 515**

1       told me.
2 Q   Okay. Let me stop you right there. Do you recognize
3       state's exhibit 13?
4 A   I do.
5 Q   What is that?
6 A   It is a sensitive envelope for currency and jewelry for
7       Anchorage Police Department.
8 Q   Okay. And do you know what's inside of it?
9 A   I do.
10 Q  How do you know that?
11 A  On the outside, it says it is -- a detailed description
12      is $100. And I've also written on there buy money.
13      And it says one $100 bill for a total of $100. It has
14      my signature and another officer's signature. And
15      there are the three evidence sealed tapes of the
16      sealings. And on -- two months later, someone else has
17      opened this up, and they resealed it again with the
18      date that they resealed this.
19 Q  Okay. And did you date the envelope when you put it
20      in?
21 A  I did.
22 Q  What was the date?
23 A  March 2nd, 2001.
24 Q  And was it assigned a P and E number?
25 A  It was.

1 that doesn't mess up anybody Thanksgiving cooking or I think
2 there's a couple of basketball games on Wednesday afternoon.
3 But I'm just giving you a fair warning ahead of time. And
4 I'll let you go, see you in the morning at 8:30.
5     MS. BRADY: At what time?
6     MR. JAMES: What time?
7     THE COURT: 8:30.
8     MR. JAMES: Oh, okay.
9     (Jury excused)
10     THE COURT: All right. I need to take up a couple
11 issues with you all, but I need to take a really short
12 break. And so why don't we do that and then we'll come back
13 and work for 10 minutes or so, and then you call take off
14 for the rest -- until we come back at 2:45 to jury
15 instructions.
16     MR. JAMES: You're going to make it so we're not going
17 to get out of this room, Judge.
18     THE COURT: Actually, why don't we just deal with our
19 issues at jury instruction time.
20     MR. JAMES: Okay. All right. That's fine. I'll stick
21 around.....
22     THE COURT: And I'll let everybody go.
23     MR. JAMES: I was just, you know.....
24     THE COURT: So we'll see you -- no, you make sense.
25     MR. JAMES: Okay.

Page 544

1     THE COURT: 2:45 tomorrow -- or this afternoon, excuse
2 me. Yes, sir?
3     UNIDENTIFIED VOICE: Do you know, lots of times you'll
4 have evidence tape back here and I can seal all this back up
5 (indiscernible).....
6     THE COURT: We have some -- some drugs and money open,
7 so we need to do whatever -- and they're admitted.
8     MS. BRADY: It should be in here.
9     UNIDENTIFIED VOICE: (Indiscernible).
10     (Off record)
11 1:2046
12     (This portion not requested)
13 2:4053
14     THE COURT: .....Davis. Our jury isn't here, but I do
15 have Mr. Davis here with his lawyer, Mr. James, and Ms.
16 Brady. We're going to do jury instructions. And let's work
17 on that for a while and we'll take up other issues. Ms.
18 Brady, you have a 3:30?
19     MS. BRADY: I do, Your Honor. And, actually, I have a
20 very quick issue that I would like to take up first.
21     THE COURT: Before jury instructions?
22     MS. BRADY: Before jury instructions.
23     THE COURT: All right.
24     MS. BRADY: This morning when Mr. Fish was late and I
25 called my office, and I think I might have disclosed this to

Page 545

1     Madam clerk. I don't ....
2 2:4124
3     (Corrupted audio)
4 2:4130
5     .....going on, she did. She said that Ms. Bohman (ph)
6 said that he had just dropped off her off and that he should
7 be here shortly, and then probably 15 minutes later is when
8 he finally showed up. And that's it.
9     THE COURT: All right. All right. Jury instructions.
10 I have the state's proposed instructions. They're not
11 numbered, so I'm just going to go through them in the order
12 that they were filed. I'll refer to them by subject matter.
13 And since the state proposed them, unless I have a question
14 about them, I'll just turn to you, Mr. James, and ask you
15 whether you object or not.
16     MR. JAMES: Understood.
17     THE COURT: I may ask both of you why I need an
18 instruction, even if it's proposed by the state and not
19 opposed. My general view in instructing juries is less than
20 better is more. I don't see why I need to be redundant.
21 And I don't see why I need to instruct the jury on -- on
22 common sense, so -- or at least more than once. So I may
23 raise those issues as we're going through this. So let's
24 just start. The evidence has now been presented?
25     MR. JAMES: Fine.

Page 546

1     THE COURT: The presumption of innocence and burden of
2 proof?
3     MR. JAMES: It was can, thank you.
4     THE COURT: Pardon me?
5     MR. JAMES: Yes. I said it was can. Thank you.
6     THE COURT: Yes. All right.
7     MR. JAMES: I'm sorry. I didn't.....
8     THE COURT: Fact may be proved by direct or
9 circumstantial evidence?
10     MR. JAMES: Could we go back and visit the other one?
11 I don't believe -- never mind. Never mind. I'm sorry. Go
12 ahead.
13     THE COURT: Facts may -- direct or circumstantial
14 evidence?
15     MR. JAMES: Yeah. That's -- okay. Yes.
16     THE COURT: No objection?
17     MR. JAMES: No. That's can.
18     THE COURT: All right. The next one is the old pattern
19 instruction. Every person who testifies under oath is a
20 witness. I've all ready read to the jury new pattern 1.10.
21 I read it at the beginning of the case. I would be inclined
22 to put this one in the back of the jury -- put the new
23 pattern one in, which is shorter than this proposed
24 instruction, in the back of the jury instructions. Tell
25 them it's there. Tell them it's important, but not read it

Page 547

1 any rule.

2    MR. JAMES: That's just the -- no, I don't have an

3 objection to that. That's.....

4    THE COURT: It's the duty of the attorney on each side

5 to object. I instructed them on that in detail at the

6 beginning of the case. I used new pattern 1.09. And I

7 would like to just stick new pattern 1.09 at the end of the

8 packet and tell them I've already instructed them on it and

9 tell them that I'm not going to read it again, but it's an

10 important instruction.

11    MS. BRADY: I don't have any objection to that, Your

12 Honor.

13    MR. JAMES: No, that's.....

14    THE COURT: All right. How about anything I've said or

15 done has suggested what I think?

16    MR. JAMES: No, Your Honor.

17    THE COURT: Meaning no objection?

18    MR. JAMES: No. No objection, Your Honor. It's --

19 it's standard.

20    THE COURT: Attitude and conduct of the jurors?

21    MR. JAMES: That's just -- no objection. It's telling

22 them to.....

23    THE COURT: Verdict must be unanimous.....

24    MR. JAMES: That's.....

25    THE COURT: .....consider the judgement of each juror?

Page 560

1    MR. JAMES: Has to be. No objection.

2    THE COURT: All right. The next one is a -- bailiff

3 will be appointed?

4    MR. JAMES: No objections.

5    THE COURT: And the last one is you were accepted as

6 jurors in reliance upon your answers. But this may be a

7 pattern from someplace, Ms. Brady, but it's redundant with

8 some other stuff. And I'm trying to remember where it is.

9 Because I ran into it the other day when I read it. Each of

10 your verdicts must be unanimous, one, two, three, four

11 paragraph down is redundant. Maybe that's it.

12    MS. BRADY: Okay. So you want me to take each of your

13 verdicts must be unanimous out of there?

14    THE COURT: Well, yes, because I've just -- well, I've

15 just said it two instructions before.

16    MS. BRADY: Okay.

17    THE COURT: Mr. James?

18    MR. JAMES: Yes, Your Honor. I think that's proper.

19 And I don't have any objections. This is the sequence of

20 events in the jury room.

21    THE COURT: Right. I think that's it, in terms of

22 redundance. And then we have four verdict forms?

23    MS. BRADY: Your Honor, I proposed an instruction for

24 whether the defendant taking the stand as well.....

25    THE COURT: Yes, you did. I didn't know who proposed

Page 561

1 that.

2    MS. BRADY: It was.....

3    THE COURT: And I have -- do you have that, Mr. James?

4    MR. JAMES: Yes. That's a back one. The last one.

5 Defendant has testified in this case.

6    THE COURT: And if the defendant chooses to testify,

7 can I use that one instead of the other one?

8    MR. JAMES: Yes.

9    THE COURT: All right. I have that. It must still be

10 on my desk, but I do have it. How about the verdict forms,

11 Mr. James?

12    MR. JAMES: Pretty cut and dry. I don't see a reason

13 to object, Judge.

14    THE COURT: All right. If you have instructions that

15 you want me to give, Mr. James, they need to be -- I would

16 like to say they should be in by the end of the day, but

17 that's getting pretty close. So could you bring them in

18 tomorrow morning?

19    MR. JAMES: Yes, sir.

20    THE COURT: All right. And.....

21    MR. JAMES: Okay.

22    THE COURT: .....we'll take whatever time is necessary

23 to do that. Let's talk a little bit -- well, you filed a

24 motion asking me to order either pay for transport of a

25 witness, or order the state to pay for transport of the

Page 562

1 witness. I haven't asked for an opposition, but I'm going

2 to deny the motion. Mr. James, there's no legal authority

3 that I'm aware of for me to do that. The public defendant

4 statute, title 18, section 85 implements the state's

5 obligation to provide counsel for indigents at state

6 expense. And that statute says that if a person can't

7 afford the cost of defense, which could include counsel or

8 pay for witness transport, that he can apply for appointment

9 of counsel. And if he shows indigency, he gets counsel

10 appointed and all the things that go along with it,

11 including witness transport costs.

12    It doesn't provide for a hybrid kind of repre -- kind

13 of state-funded expense that allows the state to fund some

14 aspects of the defense, but allows him to pay for a private

15 lawyer. And I'm not aware of any case law that that says

16 that -- required to do that in this case. I also don't have

17 a showing of indigency. And I don't have a showing of --

18 and I'll leave it at that. So the request is denied.

19    Let's talk about tomorrow. Assuming that we finish mid

20 to late morning, I'm not inclined to cram in -- to try to

21 cram in closing statements and send the jury out at 2:30 or

22 3:00 in the afternoon, in part because I have to get the

23 instructions ready. And in part because I have other cases

24 starting at 2:00 o'clock. If we finish earlier than that,

25 then -- then we might be able to accomplish that. So I

Page 563

1 that doesn't mess up anybody Thanksgiving cooking or I think
2 there's a couple of basketball games on Wednesday afternoon.
3 But I'm just giving you a fair warning ahead of time. And
4 I'll let you go, see you in the morning at 8:30.
5    MS. BRADY: At what time?
6    MR. JAMES: What time?
7    THE COURT: 8:30.
8    MR. JAMES: Oh, okay.
9    (Jury excused)
10    THE COURT: All right. I need to take up a couple
11 issues with you all, but I need to take a really short
12 break. And so why don't we do that and then we'll come back
13 and work for 10 minutes or so, and then you call take off
14 for the rest -- until we come back at 2:45 to jury
15 instructions.
16    MR. JAMES: You're going to make it so we're not going
17 to get out of this room, Judge.
18    THE COURT: Actually, why don't we just deal with our
19 issues at jury instruction time.
20    MR. JAMES: Okay. All right. That's fine. I'll stick
21 around.....
22    THE COURT: And I'll let everybody go.
23    MR. JAMES: I was just, you know.....
24    THE COURT: So we'll see you -- no, you make sense.
25    MR. JAMES: Okay.

Page 544

1    THE COURT: 2:45 tomorrow -- or this afternoon, excuse
2 me. Yes, sir?
3    UNIDENTIFIED VOICE: Do you know, lots of times you'll
4 have evidence tace back here and I can seal all this back up
5 (indiscernible).....
6    THE COURT: We have some -- some drugs and money open,
7 so we need to do whatever -- and they're admitted.
8    MS. BRADY: It should be in here.
9    UNIDENTIFIED VOICE: (Indiscernible).
10    (Off record)
11 1:2046
12    (This portion not requested)
13 2:4053
14    THE COURT: .....Davis. Our jury isn't here, but I do
15 have Mr. Davis here with his lawyer, Mr. James, and Ms.
16 Brady. We're going to do jury instructions. And let's work
17 on that for a while and we'll take up other issues. Ms.
18 Brady, you have a 3:30?
19    MS. BRADY: I do, Your Honor. And, actually, I have a
20 very quick issue that I would like to take up first.
21    THE COURT: Before jury instructions?
22    MS. BRADY: Before jury instructions.
23    THE COURT: All right.
24    MS. BRADY: This morning when Mr. Fish was late and I
25 called my office, and I think I might have disclosed this to

Page 545

1 Madam clerk. I don't ....
2 2:4124
3    (Corrupted audio)
4 2:4130
5    .....going on, she did. She said that Ms. Bohman (ph)
6 said that he had just dropped off her off and that he should
7 be here shortly, and then probably 15 minutes later is when
8 he finally showed up. And that's it.
9    THE COURT: All right. All right. Jury instructions.
10 I have the state's proposed instructions. They're not
11 numbered, so I'm just going to go through them in the order
12 that they were filed. I'll refer to them by subject matter.
13 And since the state proposed them, unless I have a question
14 about them, I'll just turn to you, Mr. James, and ask you
15 whether you object or not.
16    MR. JAMES: Understood.
17    THE COURT: I may ask both of you why I need an
18 instruction, even if it's proposed by the state and not
19 opposed. My general view in instructing juries is less than
20 better is more. I don't see why I need to be redundant.
21 And I don't see why I need to instruct the jury on -- on
22 common sense, so -- or at least more than once. So I may
23 raise those issues as we're going through this. So let's
24 just start. The evidence has now been presented?
25    MR. JAMES: Fine.

Page 546

1    THE COURT: The presumption of innocence and burden of
2 proof?
3    MR. JAMES: It was can, thank you.
4    THE COURT: Pardon me?
5    MR. JAMES: Yes. I said it was can. Thank you.
6    THE COURT: Yes. All right.
7    MR. JAMES: I'm sorry. I didn't.....
8    THE COURT: Fact may be proved by direct or
9 circumstantial evidence?
10    MR. JAMES: Could we go back and visit the other one?
11 I don't believe -- never mind. Never mind. I'm sorry. Go
12 ahead.
13    THE COURT: Facts may -- direct or circumstantial
14 evidence?
15    MR. JAMES: Yeah. That's -- okay. Yes.
16    THE COURT: No objection?
17    MR. JAMES: No. That's can.
18    THE COURT: All right. The next one is the old pattern
19 instruction. Every person who testifies under oath is a
20 witness. I've all ready read to the jury new pattern 1.10.
21 I read it at the beginning of the case. I would be inclined
22 to put this one in the back of the jury -- put the new
23 pattern one in, which is shorter than this proposed
24 instruction, in the back of the jury instructions. Tell
25 them it's there. Tell them it's important, but not read it

Page 547

**Page 564**

1 think you all need to consult and see if that's likely to
2 happen.
3    MR. JAMES: Okay. In conjunction with that, is -- do
4 you plan on calling Officer Garcia, Greg Garcia?
5    MS. BRADY: No.
6    MR. JAMES: Okay. I -- we earlier talked about -- I
7 advised the court that he was -- had just had surgery. And
8 the issue was whether or not he wold be able to -- excuse me
9 -- testify telephonically. And we were kind of up in the
10 air as far as the state's position went in relationship to
11 that. I need to get a readout.
12    THE COURT: Ms. Brady?
13    MS. BRADY: I indicated that I may not oppose if I know
14 the substance of the testimony, as I can not oppose
15 something in a vacuum. So if you want to tell me what the
16 substance of the testimony is.....
17    MR. JAMES: Yeah. Basically, it's my -- in talking
18 with Officer Garcia, he was the booking officer. And that's
19 based upon the fact of his signing the stuff.
20    THE COURT: Uh-huh. (Affirmative)
21    MR. JAMES: The police reports from Officer LeBlanc
22 says that -- and we haven't heard from Officer LeBlanc yet,
23 but says that he asked the CIPT, I think is the terms he
24 used, I can grab the right terminology to search for the
25 money. And they did and no money was found. In conjunction

**Page 565**

1 with that, the -- I just want to establish that, in fact,
2 CIP did -- CIP did, in fact, search for the money and no
3 money was found. Because, obviously, the issue here, as
4 testified by Officer LaPorte, is they found the money in the
5 common fund of some $8,000 is -- according to what my
6 recollection of it is. Consequently, if it was not found on
7 his person, not found, and this is not a secret, so, wasn't
8 found on his person, wasn't found during the search at CIPT
9 and then was found later on in a common fund, as to how -- I
10 just want to get this clarified that he did, in fact do
11 that. I intend to call -- and I don't know, do you intend
12 to call someone from the office -- excuse me, from records
13 from CIPT?
14    MS. BRADY: Uh-huh. (Affirmative)
15    MR. JAMES: Okay. Who are you going to call?
16    MS. BRADY: Davenport.
17    MR. JAMES: Okay. Is he going to bring all the
18 records? Because I've got a subpoena ready for Healy, which
19 I believe works for -- I think her name is Esther Healy, who
20 is a -- who works for CIPT in the records department to
21 bring all the records. But if he's going to bring all the
22 records, including the medical records, and any money, or
23 trans -- visitors or transactions relating to the file --
24 the way I understand CIPT, Judge, is if you bring money into
25 a person that's incarcerated there, it's logged in. If you

**Page 566**

1 visit a person that's incarcerated in there, it's logged in.
2 And in talking with Officer Healy, it's my understanding
3 that Officer Davenport is really the computer man who has
4 all this stuff in the machine. And if you hit the right
5 buttons, and out it comes. But if we're going to be -- if
6 all of the records are going to be brought in by Davenport,
7 then that's going to alleviate Healy. If they're not going
8 to be brought in by Davenport, then I'm going to bring -- I
9 would want to have a subpoena issued for Healy. Am I making
10 myself kind of clear?
11    THE COURT: You are.
12    MR. JAMES: I'm babbling, but.....
13    THE COURT: Right. But what about Garcia?
14    MR. JAMES: Oh. Well, I mean -- oh, that's what my
15 purpose in calling Garcia is, is that did he conduct the
16 search according to their procedures at the request of APD,
17 and did he find.....
18    THE COURT: A search of?
19    MR. JAMES: Of Mr.....
20    THE COURT: After he was booked?
21    MR. JAMES: In the booking process. He's the booking
22 officer.
23    THE COURT: All right.
24    MR. JAMES: So the way I understand the sequence of
25 events is arresting officer bring someone in there. There's

**Page 567**

1 a booking process where they put somebody in a holding cell
2 while they're processing the paperwork. They then do a
3 booking search and the inventory, at which one of the things
4 that he did was list his personal items. And then this is
5 where the $180 comes in in the computer printout. If the
6 search was done by Officer Garcia at that time, utilizing
7 normal procedures and nothing was found, and he reported
8 that according to Officer LeBlanc of APD, then I think we've
9 established that Mr. Davis did not have any money in -- on
10 his person that related to this particular buy money.
11    THE COURT: But -- but Garcia was the -- the actual
12 booking officer at Cook Inlet who booked in Mr. Davis?
13    MR. JAMES: That's according to what he -- I -- I faxed
14 him over.....
15    THE COURT: All right.
16    MR. JAMES: .....the sheet, and that's what he told me,
17 yes.
18    THE COURT: All right. Ms. Brady?
19    MS. BRADY: Can I indicate to the court in the morning?
20 I want to do some checking myself this afternoon, and then
21 I'll tell the court first thing in the morning tomorrow if
22 I'm going to object. But it sounds at this point like I'm
23 not going to, but before I agree, I just want to check
24 something.
25    THE COURT: All right. And Garcia is ill and can't

**Page 568**

1 come to court?

2    MR. JAMES: My office talked to him today, Judge. And

3 he's -- he's still -- according -- and I have not talked to

4 him today. But according to Keri McClure (ph) of my office,

5 he's still down and cannot come.

6    THE COURT: While you're deciding whether you object,

7 you need -- I mean, it seems to me that there's a

8 significant difference between choosing not to pay to bring

9 somebody and not being able to bring somebody because of

10 illness. And the only other answer would be to wait until

11 the guy is capable to come to court, which might cause -- at

12 least be grounds for requesting a continuance.

13    MS. BRADY: I agree, and that's -- I was just going to

14 call him and find out what he thought about coming and that

15 kind of thing so that I can decide whether or not.....

16    THE COURT: All right.

17    MS. BRADY: .....I should continue objecting. If he's

18 sick, I'm not going to make him come to court. I'll not

19 oppose that.

20    THE COURT: All right.

21    MR. JAMES: Well, I need to get a subpoena to him.

22 That's my situation, is if he's -- he's willing to testify,

23 but he would like to testify telephonically. If.....

24    THE COURT: Why don't you get a subpoena to him and --

25 but also tell them that we're -- you're trying to convince

**Page 569**

1 me to allow him to testify telephonically.

2    MR. JAMES: All right.

3    THE COURT: And then you'll be covered.

4    MR. JAMES: I understand. But we've got a little bit

5 of time-wise here. I think he lives in Eagle River, a 694

6 number. So I just feel kind of.....

7    THE COURT: Well, I'm going to give Ms. Brady the

8 opportunity to check and the representation that he's not

9 physically capable of coming to court. And we'll take that

10 up first thing in the morning.

11    MR. JAMES: All right. That -- I mean, I understand

12 what you're saying, I just -- I don't want to get in the

13 position of saying, hay, I've got to have some more time to

14 get him here. I mean, I understand the court would like to

15 keep this thing rolling, and I'm trying to get my ducks

16 lined up now so that if we're going to roll -- you know, to

17 roll, rather than end up in a situation of saying, well,

18 we're going to take an hour, I picked it out of the sky.....

19    THE COURT: No, I understand that. And I -- I hear Ms.

20 Brady saying that if she really believes that he's ill,

21 she's not going to object to telephonic testimony. If he's

22 capable of coming in, she's going to ask you to bring him

23 in. And I think that's a wise -- in terms of not objecting

24 if he's really ill, that's probably a good idea. And that

25 -- so.....

**Page 570**

1    MR. JAMES: All right. Well, okay. Well, I guess

2 we're kind of up in the air at this particular juncture.

3 Now, I don't know. Do I need to subpoena -- I guess that's

4 my call on Healy, right? Healy is the records -- one of the

5 records ladies. So if that's.....

6    THE COURT: I'm going to stay out of that one.

7    MR. JAMES: All right. Well, I can talk to.....

8    THE COURT: All right.

9    MR. JAMES: .....Ms. Brady on that.

10    THE COURT: All right.

11    MR. JAMES: A couple of other housekeeping. Now I

12 never moved to admit any of the diagrams that Jeremy Fish

13 drew.

14    MS. BRADY: I have no objection to their admission.

15    MR. JAMES: Okay. Well, that's fine. I'm just doing

16 some housekeeping.

17    THE COURT: Are you moving them in now?

18    MR. JAMES: Yeah, I move to move -- I would move to

19 have them admitted now and I think.....

20    THE COURT: All right. Let's just -- let's just do it.

21 And those are E, F, G and H. And those are admitted.

22        (Defendant's exhibits E, F, G and H admitted)

23    MR. JAMES: All right.

24    THE COURT: And do we have another issue, or did we

25 resolve that our self?

**Page 571**

1    THE CLERK: We resolved it.

2    THE COURT: All right.

3    MR. JAMES: Do we have any other -- while you're still

4 there, do any other ones that are admitted, Madam clerk,

5 that we have.....

6    THE CLERK: I show defendant exhibit D as a report.

7 But I don't have it.

8    UNIDENTIFIED VOICE: I think that was changed to an EH

9 number.

10    THE CLERK: Okay. All right. Yeah. You're probably

11 right. Then so the only one I have is defendant's exhibit

12 C, which is a letter to the DA and the diagrams.

13    THE COURT: The only other defense exhibits admitted?

14    THE CLERK: Right.

15    THE COURT: All right.

16    THE CLERK: C, E, F, G and H.

17    MR. JAMES: Do you have any objection to the letter

18 that we talked about?

19    MS. BRADY: I think it's all ready been admitted.

20    MR. JAMES: I thought.....

21    THE COURT: C was admitted.

22    MR. JAMES: C was admitted? Okay. I'm sorry. I just.

23    THE COURT: All right. So if we're going -- if it's

24 likely, and I'm not -- if you're going to finish with the

25 evidence by 11:30 or 12:00, then I'm likely to require you

---

**Page 599**

1   MS. BRADY: My next witness is due to be here at 9:15,
2   Your Honor.
3   MR. JAMES: May I approach the witness stand and
4   retrieve that paper that is not in evidence?
5   THE COURT: All right. Why don't you all take a
6   stretch, and we will call you back in when the next witness
7   is here. (Pause) Ms. Brady, get the rest of your witnesses
8   here. I don't want to wait for any more witnesses.
9   Seems.....
10   MS. BRADY: The rest of them are here, Your Honor.
11   THE COURT: All right.
12   MS. BRADY: It's just this one.....
13   THE COURT: Well, let's take.....
14   MS. BRADY: .....couldn't be left sitting around
15   because of his medical condition, and so I told him to be
16   here at 9:15, figuring that was the soonest we would get to
17   him.
18   THE COURT: Well, we're running on borrowed time, now.
19   I don't want to wait for witnesses anymore. So.....
20   MS. BRADY: There won't be any other wait.
21   (Pause)
22   (Jury present)
23   THE COURT: Everybody have a seat. Are we on record,
24   Madam clerk?
25   THE CLERK: We're on record.

---

**Page 600**

1   THE COURT: And this is your next witness, Ms. Brady?
2   MS. BRADY: It is, Your Honor.
3   THE COURT: Sir, we are going to have to ask you to
4   stand up to swear you in.
5   (Oath administered)
6   MR. GARCIA: I do.
7   TED GARCIA
8   called as a witness on behalf of the plaintiff, testified as
9   follows on:
10   DIRECT EXAMINATION
11   THE CLERK: You can have a seat. For the record,
12   please state your full name and spell your last name.
13 A   Ted L. Garcia, G-a-r-c-i-a.
14   THE COURT: Thank you. Go ahead.
15 BY MS. BRADY:
16 Q   Who do you work for, Mr. Garcia.
17 A   State of Alaska, department of corrections.
18 Q   Okay. And how long have you been working for them?
19 A   A little over seven years.
20 Q   Okay. And specifically what part of the department of
21   corrections do you work in right now?
22 A   I work in the home arrest surveillance officer.
23 Q   Is that the same office that you were working in
24   on March 1st of this year?
25 A   No, I wasn't.

---

**Page 601**

1 Q   What were you doing on March 1st of this year?
2 A   I was a booking officer at Cook Inlet Pretrial.
3 Q   Okay. And I'm just going to approach you with
4   something I have previously marked as state's exhibit
5   17, and I want to ask you if you recognize this
6   document?
7 A   That's a booking record -- last page of the booking
8   record -- booking sheet.
9 Q   Does your signature appear on it?
10 A   Yes, it does, as booking officer.
11 Q   Okay. The date?
12 A   Of the document was 3/1/01.
13 Q   Okay. And the time?
14 A   03:01:26.
15 Q   Okay. Now, there is two times on there, is there not?
16 A   Yes, there is.
17 Q   What's the 301 time, and then the other time, what is
18   that?
19 A   Well, the -- time is -- 1:00 o'clock is the other
20   time. That is the time that the inmate was admitted
21   into the correctional facility, and the 301 is the time
22   that he was actually booked.
23 Q   Okay. And are these booking record just kept in the
24   usual course of CIPT's business?
25 A   Yes, they are.

---

**Page 602**

1 Q   Are they the kind of records that are relied on by
2   CIPT?
3 A   To my knowledge, yes.
4 Q   Okay.
5   MS. BRADY: At this time, I move to admit state's
6   exhibit 17.
7   MR. JAMES: No objection.
8   THE COURT: 17 is admitted.
9   (Plaintiff's exhibit 17 admitted)
10 Q   Okay. Now, do you recall anything in particular -- is
11   that your -- your signature is on that document, right?
12 A   Yes, it is.
13 Q   Do you recall anything in particular about this
14   booking?
15 A   No, I can't say I do.
16 Q   Okay. Now, let me just ask you, then, what normally
17   happens when an officer brings someone in for booking
18   at CIPT?
19 A   When an officer brings somebody in, we meet him at the
20   back door. The person being brought in is normally
21   handcuffed. At that time we glance over the paperwork,
22   making sure that he is being brought in as a felony --
23   on a felony charge. We search the individual by just
24   going over his pockets and his hands, make sure he
25   doesn't have a weapon on him that the officer might

**Page 603**

1  have missed. We try to get the handcuffs off him as
2  soon as possible and get the officer out of there,
3  because normally the inmate is -- or, the person at
4  that time is considered an inmate, is upset with the
5  officer. So we try.....
6 Q  Okay. Let me stop you right there. That first search
7  that you conduct, is that -- is there another search
8  coming?
9 A  Yes. The initial search is a pat down search just to
10  ensure that there aren't any large weapons of some kind
11  sticking out on -- on this individual. We go kind of
12  lean him up against the wall, and pat him down, and
13  empty their pockets, and take out everything at that
14  time.
15 Q  Okay. Then, what happens -- you said you try to get
16  the officer out of there?
17 A  We get the handcuffs off and return those to the
18  officer, then I take the individual and place him into
19  a holding cell directly in front me, usually, so I can
20  sign the paperwork for the officer, get him out of
21  there -- the remand slip.
22 Q  Okay. And then, what is the next thing that you do?
23 A  Then I pull the individual out. I had already emptied
24  his pockets on the previous search by taking everything
25  out of his coat, or his pants, or whatever the case may

**Page 604**

1  be. Then I take him back to a room -- dress out room,
2  where we strip him down and take his clothing away from
3  him, put those into a matching bag with a number on it
4  to match his previous bag that we put his pocket items
5  into.
6 Q  Okay. Now, let me stop you right there, because you
7  said previous bag. Are -- is the stuff that comes out
8  of the pockets put into a bag?
9 A  Yes. When an individual comes in, we have two bags.
10  One is a laundry bag that is rolled up and placed into
11  a large plastic bag -- plastic bag being approximately
12  10 inches high. They both have numbers --
13  corresponding numbers to match the two with each other.
14  The smaller bag is -- is his pocket items and jewelry,
15  things of that nature that would go into a box for
16  security, and his other bag is naturally his clothing
17  bag -- his boots and clothes could go into -- a much
18  larger bag. Now, once we strip him out and put his
19  clothing into the other bag, and we bring him back into
20  booking area, we then take the individual to a
21  telephone room and put him in for -- so he can start
22  making his phone calls to try to make bail, if
23  possible.
24 Q  Okay. And if somebody has money, is that -- do they
25  get to keep the money, or how does that work?

**Page 605**

1 A  No, no, no. No, everything is taken off that
2  individual at that time on the -- usually in the
3  initial search. Sometimes people have money in their
4  socks or underwear, things of that nature, but
5  initially we take all their money off, put it into the
6  initial plastic bag, the first bag, even if we find
7  money later on, we put it into that plastic bag.
8 Q  Okay. And in this particular case, did Mr. Davis come
9  in with any money?
10 A  180 dollars.
11 Q  Okay. And then, when is the booking record filled out
12  in this process?
13 A  At -- with this particular case, it was filled out at
14  3:00 in the morning when he was booked.
15 Q  Okay. And does the person who is being booked have to
16  sign that form?
17 A  Yes, he does.
18 Q  Why is that?
19 A  That he has gone over everything that has been
20  inventoried, all of his clothing and items that were on
21  him is correct.
22 Q  Okay. And once money is taken away from someone, where
23  does that go?
24 A  It goes into the till, which is a draw that the booking
25  officer is the only one has a key to, and it is kept at

**Page 606**

1  his front desk. It is mounted to the desk like a
2  drawer -- like a cash drawer.
3 Q  So if I were being booked, and I had money, then it
4  would go into the till with everybody else's money?
5 A  That is correct.
6 Q  Okay. And as far as you are aware, did you have
7  anything else to do with this defendant, or this case,
8  after this booking?
9 A  Not to my knowledge, no.
10    MS. BRADY: That's all the questions I have for this
11  witness, Your Honor.
12    THE COURT: Mr. James?
13        TED GARCIA
14  testified as follows on:
15      CROSS EXAMINATION
16 BY MR. JAMES:
17 Q  Mr. Garcia, we talked before, right?
18 A  Yes, we have, sir.
19 Q  Okay. And how long have you been -- how long had you
20  been working as a booking officer for Cook Inlet?
21 A  Prior to this incident?
22 Q  Yeah. Yes.
23 A  I would say a couple of years.
24 Q  Okay. And is there any type of standard procedure that
25  you utilize, as far as -- if an officer were to ask you

**Page 615**

1  right?
2  A  Right.
3  Q  Okay. Do officers frequently ask you to look for money
4  when they bring in people?
5  A  Not frequently, no.
6  Q  Okay. When you find money at -- if -- when you find
7  money after an officer leaves, do you call the officer
8  and tell the officer?
9  A  No.
10  Q  So even if an officer would have said, we are looking
11  for money, the money wasn't found initially and it was
12  found later, would you then call the officer?
13  A  Yes, we would then. If he makes it known the he is
14  looking for something specific, then we -- we would
15  notify him that we found something specific, if we did
16  find something later.
17  Q  Okay.
18  A  We would call him back to see if he wants to add
19  charges, or things of that nature, or see what he wants
20  to do about it. But not unless we are asked, we don't.
21  Q  Thank you very much.
22  MS. BRADY: That's all the questions I have.
23  THE COURT: You can step down, sir. Mr. James,
24  anything else?
25  MR. JAMES: I just -- I would like a couple follow ups

**Page 616**

1  on this, if I may please?
2  THE COURT: Well, we'll have a bench conference.
3  (Bench conference as follows:)
4  (Inaudible)
5  (End of bench conference)
6  THE COURT: Go ahead, Mr. James.
7  TED GARCIA
8  testified as follows on:
9  RECROSS EXAMINATION
10  BY MR. JAMES:
11  Q  Based upon your -- the documentation that you have in
12  front of you, did anybody else help you on this
13  particular booking?
14  A  Based on this documentation, I have no way of knowing
15  that.
16  Q  All right. Thank you.
17  THE COURT: All right, thanks. Thanks Mr. Garcia, you
18  can step down. Ms. Brady, your next witness?
19  MS. BRADY: Okay. Can you get the -- the state is
20  calling Officer Roy LeBlanc, and Officer LaPorte went out to
21  get him.
22  (Pause)
23  (Oath administered)
24  MR. LEBLANC: I do.
25  ROY LEBLANC

**Page 617**

1  called as a witness on behalf of the plaintiff, testified as
2  follows on:
3  DIRECT EXAMINATION
4  THE CLERK: Have a seat. For the record, please state
5  your full name, and spell your last name?
6  A  Roy B. LeBlanc. Last name is spelled L-e-B-l-a-n-c.
7  THE CLERK: Thank you.
8  THE COURT: Go ahead, Ms. Brady.
9  BY MS. BRADY:
10  Q  How long have you been an APD officer?
11  A  A little bit over five years.
12  Q  Okay. And are you assigned to a particular unit?
13  A  Currently I am assigned to the patrol division.
14  Q  Okay. And is that the same assignment that you had
15  when this case was going on?
16  A  No, it is not.
17  Q  What assignment did you have then?
18  A  Back then I was assigned to the special assignment
19  unit.
20  Q  All right. And how did you become involved with this
21  case?
22  A  Basically, our unit focused primarily on vice crimes,
23  street level drugs, prostitution, gambling. I believe
24  Officer Johnstone had acquired an informant, and we
25  used the informant to make several cases against drug

**Page 618**

1  dealers.
2  Q  Let me direct your attention to February 8th. Did you
3  conduct the pre-buy and post-buy searches of Mr. Fish's
4  car?
5  A  Yes, I did.
6  Q  How thorough were these searches?
7  A  Quite thorough.
8  Q  Could you just explain what you do when you do a car
9  search, to the members of the jury?
10  A  Basically I look in every nook and cranny in the
11  vehicle, check in the crack between the seats, under
12  the seats, open all the compartments. Basically an
13  interior search. I don't take apart anything in the
14  vehicle. I don't open the hood. Usually the informant
15  wouldn't have any reason to get underneath his hood.
16  Basically we are concerned with the area that is under
17  the control of the informant to make sure that there is
18  nothing hidden before or after the buy.
19  Q  And did you find any contraband on February 8th?
20  A  I believe I did. I'm not sure if it was actually for
21  this case, or another case we worked, because we worked
22  several cases, kind of at the same time. I do know
23  that on one of the searches of Mr. Fish's vehicle, I
24  did find a small amount of marijuana.
25  Q  All right. And then, did you attend a briefing about