**Page 619**

1    this buy?
2 A   Yes, I did.
3 Q   Okay. And did you participate in the surveillance?
4 A   Yes, I did.
5 Q   What was your assignment in the surveillance?
6 A   For the February 8th buy, I was assigned what we call
7     the close in surveillance. It was my job to be in
8     position where I could watch the informant get out of
9     his vehicle and go into the suspects house, or actually
10    make contact with the suspect if it was going to be
11    outside.
12 Q  All right. Now, we have heard other officers testify
13    that someone has the eye. Is this the position that
14    they are talking about?
15 A  Correct. When.....
16 Q  So you had the eye?
17 A  I would have the eye at the moment of the contact, and
18    then I would pass it off to another officer as --
19    basically as the -- as the informant would drive into
20    the area it would be passed to me, and I would watch
21    him make the contact, and then watch him leave, and
22    pass it to somebody else as he is leaving the area.
23 Q  All right. And I think that behind you is a diagram
24    that Officer LaPorte started to draw of the Grand Larry
25    area?

**Page 620**

1 A   Okay.
2 Q   Is that a true and accurate representation of the Grand
3     Larry area?
4 A   It is pretty accurate. Muldoon is of course to the
5     west. Grand Larry runs -- it is a north-south street.
6     202 is actually a part of a duplex. It is 202 and 200.
7     They're -- they are joined, but they have their own
8     separate addresses.
9 Q   Okay. So why don't you make a line, and separate
10    those. Make it accurate. Okay. Now, is that a true
11    and accurate representation of the Grand Larry layout?
12 A   Yes.
13 Q   Okay.
14 A   But it is not to scale, of course.
15 Q   Fair enough.
16    MS. BRADY: And we are going to mark that as state 26.
17 Okay. And at this time I move to admit state's 26.
18    MR. JAMES: No objection.
19    THE COURT: 26 is admitted.
20        (Plaintiff's exhibit 26 admitted)
21 Q   Okay. Now, why don't you show the members of the jury
22    where you were at?
23 A   I was parked across the street basically to the east,
24    kind of kitty corner. There is -- directly across the
25    street there is a large multi-unit building, like a

**Page 621**

1    six-plex, or an eight-plex, and next to that is another
2    similar building, a six-plex, or an eight-plex, and I
3    was parked at the -- kind of, I guess, would be the
4    north end of that property. I believe there was like a
5    dumpster that was here at the time, and I was kind of
6    parked next to the dumpster, almost into the road, but
7    not quite into the road.
8 Q   All right. And do you know how far that is from the
9    residence?
10 A  Yes, I do.
11 Q  And how do you know that?
12 A  Actually I went by there with my laser range finder,
13    and shot a line of sight measurement. And it was 45
14    and a half yards.
15 Q  Okay.
16 A  And that would be from where I was sitting to the door
17    that was used, which is on the -- kind of on the back
18    side, the south side of the building more towards the
19    west of the -- of the building.
20 Q  Okay. And how long were you there prior to Fish
21    arriving?
22 A  A short while. A matter of minutes. I would say
23    probably five minutes or more.
24 Q  Okay. And what happened when Fish arrived?
25 A  On this particular buy, referring to my report, he

**Page 622**

1    walked up to the door, he knocked. After several
2    seconds a subject answered the door. I could tell that
3    it was a black male with shorter -- short hair or bald,
4    but I couldn't make out any facial features, because he
5    was more or less backlit. Of course, he was in the
6    doorway, and it was -- it was later at night, so it was
7    dark.
8 Q   What else did you observe to happen?
9 A   I watched the informant step into the doorway, and then
10    he returned to his car. After going off to his car and
11    getting in his car for just a second he went back, and
12    went back inside the house. He went inside the
13    residence. Closed the door. Looks like about 10
14    minutes later he came back out of the house, and
15    returned to the vehicle, and left the area to the
16    north.
17 Q   When he left the area to the north, then what did you
18    do?
19 A   I watched him as he drove, and I passed the eye off to
20    another surveillance officer.
21 Q   Okay. And then did you participate in the case after
22    the informant returned to APD?
23 A   I believe after there, I conducted the post-buy search
24    of his vehicle, and then that would be the end of my
25    involvement on that buy.

**Page 631**

1  participate in this case on that day?
2  A  Yes, I did.
3  Q  And what was your assignment that day?
4  A  I was assigned to be the -- the marked police unit that
5     was going to conduct the takedown, or wh -- the actual
6     arrest of the suspect, and what we call the buy bust.
7  Q  Okay.  So where were you at?
8  A  Actually I was hiding, I believe, west of Mul --
9     Muldoon on Duben.  I kind of went west on Duben and
10    parked in a little cubby hole there off the side of the
11    road.
12 Q  Okay.  So -- and you couldn't be seen from what was
13    going on at the scene?
14 A  Correct.
15 Q  You couldn't see the scene, they couldn't see you?
16 A  Correct.
17 Q  Okay.  Then how did you know when to go?
18 A  Basically listening to a bug radio which monitors the
19    wire, but mainly relying on the other officers over the
20    radio.
21 Q  Okay.  And then what did you do when you were put into
22    action?
23 A  Basically I drove into the area.  They had described
24    the vehicle and where it was at.  Once I spotted it I
25    blocked it in with my patrol car with my lights on, and

**Page 632**

1  made contact with the suspect.
2  Q  Was anyone in the car with him?
3  A  No.
4  Q  Okay.  And what happened once you contacted him?
5  A  Basically he was placed under arrest.
6  Q  Okay.  What -- was he still inside the car?
7  A  He was.
8  Q  Okay.  And was the car running?
9  A  I believe it was running when I initially stopped.  Of
10    course I would have told him to turn it off.  Of course
11    I told him to show me his hands.  I remember that his
12    hands were up initially, and then he put them back
13    down, so I drew my -- my handgun, and then his hands
14    went back up, and I had him step out of the vehicle.
15    At that time, of course, everybody else was arriving,
16    too.  And he was placed in -- placed under arrest.
17 Q  Okay.  Now, once you placed him under arrest, what did
18    you do?
19 A  I conducted a search of him.
20 Q  Okay.  And could you just please describe to the
21    members of the jury what kind of search you conducted?
22 A  Basically I -- a pat search.  My primary concern, of
23    course, would be weapons.  In this case also I was
24    looking for some evidence, money or drugs.  Of course,
25    being that it is outside and it is dark, it is a lot

**Page 633**

1  easier to do that once you are inside.  Do a more
2  thorough search inside.
3  Q  Okay.  Did you find anything on him?
4  A  No.
5  Q  All right.  Then were you surprised that you didn't
6     find the buy funds?
7  A  No.
8  Q  Why not?
9  A  I actually expected it to be in the vehicle.
10 Q  All right.  And did you search the vehicle right then
11    and there?
12 A  No.
13 Q  All right.  So then what did you do with the defendant
14    after he was in your car?
15 A  I believe I -- I went took him to the magistrate's
16    office where Officer LaPorte had gone enroute, and got
17    the appropriate bail paperwork, and warrant paperwork
18    signed.  And once I got that paperwork from him, I took
19    him over to Cook Inlet Pretrial where he was processed
20    in under the charges.
21 Q  All right.  Now, let me ask you what happened at CIPT.
22    Had you been told to ask anybody at CIPT to do
23    something?
24 A  Well, typically in drugs cases we want the defendant to
25    be searched -- strip searched at the jail by

**Page 634**

1  corrections, so, of course, I asked them to strip
2  search him for drugs or money.
3  Q  Do you recall which officer you asked?
4  A  No, I don't.
5  Q  Okay.  Did you see the witness that was here before
6     you?
7  A  I saw the corrections officer that was leaving, yes.
8  Q  Did you -- do you recognize him from having anything to
9     do with this case?
10 A  I recognize him from CIPT, but I -- I couldn't tell you
11    if he was the corrections officer that was working that
12    night or not.
13 Q  Okay.  And so you don't recall who you asked?
14 A  Correct.  Whoever the booking officer was at that
15    night, that -- that processed that prisoner, that is
16    the person who I asked.
17 Q  Okay.  And do you recall whether or not more than one
18    booking officer was working that night?
19 A  There is always several kind of wandering around.  I'm
20    not exactly sure how they work, if one books this one,
21    and the next guy that comes in the other does it, or if
22    one person does it for a whole hour.  There is always
23    several corrections officers around the booking area.
24 Q  Okay.  So did you verify that the person you were
25    talking to was the booking officer for this defendant?

**Page 675**

1 Q   Did you only search the vehicle in the first buy?

2 A   I believe I searched the vehicle the first and the

3     second buy.

4 Q   Okay.

5 A   I would suspect it was probably the first time,

6     because, of course, I would have told him not to bring

7     the puppy again, either.  And I can't see even Jeremy

8     bringing a puppy after I told him to clean his car out

9     after the first buy.

10 Q   All right.  And even though you couldn't see what Fish

11     was doing inside of his car, could you hear what was

12     going on?

13 A   Yes.

14 Q   And Mr. James asked you how long you ran the wire, and

15     you responded one minute.  What were you talking about

16     when you answered that question?

17 A   That is how long the recording was running, and that

18     was on the very last.....

19 Q   Okay.

20 A   .....very last buy.

21 Q   And.....

22 A   Not the very last buy, but the -- the one before the

23     buy bust.

24 Q   Okay.  And when you arrested Mr. Davis, did you know

25     the jail was going to do a search on him?

**Page 676**

1 A   Yes.

2 Q   Okay.

3     MS. BRADY:  That's all the questions I have for this

4 witness, Your Honor.

5     THE COURT:  You can step down.  Your next witness, Ms.

6 Brady?

7     MS. BRADY:  My next witness is Jack Hurd.

8     (Oath administered)

9     MR. HERD:  I do.

10             JACK HURD

11 called as a witness on behalf of the plaintiff, testified as

12 follows on:

13        DIRECT EXAMINATION

14     THE CLERK:  You can have a seat.  State for the record

15 your full name, and spell your last name.

16 A   My full name is Jack Hurd, H-u-r-d.

17     THE COURT:  Go ahead, Ms. Brady.

18 BY MS. BRADY:

19 Q   Who do you work for, Mr. Hurd?

20 A   I work for the state of Alaska, the crime lab.

21 Q   And where is the crime lab at?

22 A   5500 east Tudor Road.

23 Q   How long have you worked there?

24 A   Since 1995.

25 Q   What kind of work do you do there?

**Page 677**

1 A   Basically I analyze drugs.

2 Q   And where did you work previously?

3 A   I worked for a company called Analytical Technologies,

4     Inc. and we analyzed petroleum hydrocarbons, gasoline,

5     diesel, other fossil fuels, and soil and water.

6 Q   How long did you do that for?

7 A   I did that for about a year?

8 Q   All right.  And what kind of education do you have that

9     -- what is your specific occupation with the crime lab?

10 A   My specific title is criminalist in the controlled

11     substance section.

12 Q   What type of education do you have that qualifies you

13     to be a criminalist?

14 A   I have a bachelor's of science degree in chemistry.

15 Q   And have you instructed or trained others?

16 A   I have.

17 Q   And have you done testing for the presence of

18     controlled substances including cocaine?

19 A   I have.

20 Q   About how many times have you done testing for cocaine?

21 A   Thousands of times.

22 Q   All right.  And have you testified in court before

23     regarding that kind of testing?

24 A   I have.

25 Q   About how many times?

**Page 678**

1 A   As far as cocaine, about 20 times with cocaine.  40

2     times altogether in controlled substances.

3 Q   Have you ever been qualified to testify as an expert

4     and give an opinion as to whether or not a substance is

5     cocaine before?

6 A   Yes.

7 Q   In courts in the state of Alaska?

8 A   Yes.

9 Q   About how often?

10 A   How often do I testify?

11 Q   How often has you been -- have you been accepted as an

12     expert in courts of the state of Alaska?

13 A   It is over 40 times.  I have lost count.

14 Q   All right.  And let's just talk about this particular

15     case, now.  First, let's talk in general about the

16     procedures at the crime lab for chain of custody.

17     Could just explain to the members of the jury what the

18     procedure is for items that are received at the crime

19     lab?

20 A   Sure.  Items are received at the crime lab one of two

21     ways.  They are either sent to the crime lab via the

22     registered mail system, or they are hand delivered by

23     an officer, or a custodian.  They -- we do have two

24     evidence custodians at the state crime lab, and they

25     receive the evidence.  And upon receipt of the

**Page 679**

1  evidence, before they sign on the chain of custody,
2  they will examine the evidence to make sure that it is
3  properly packaged, and that it is properly identified,
4  that the agency case number is on the packaging, the
5  item number, et cetera. They then will sign for it on
6  an internal chain of custody. After receiving that
7  evidence, then they will log that evidence into the
8  database at the computer -- or at the state crime lab,
9  and assign it a unique laboratory number. Then that
10  evidence is basically stored within the evidence room,
11  which is a building within a building. It has its own
12  unique security system, unique to that of the lab.
13  Those that are -- have access to it are the evidence
14  custodians and their supervisor.
15 Q  Okay. Now, what happens once it makes it into that
16  secured room. If it -- like, say, you want to take it
17  out and test it, what do you have to do?
18 A  First of all, each section is given notice that the
19  evidence is there and ready to be worked. We are given
20  a copy of the chain of custody. When it becomes to my
21  attention that there is evidence to work, then I will
22  proceed to check it out. I have to request it from the
23  evidence custodian, and then again as he or she gives
24  me the evidence, there is going to be an exchange of
25  signatures. I sign for the evidence, and then I do the

**Page 680**

1  same thing the evidence custodian did originally. I
2  look at the evidence, is it properly packaged, is it
3  properly identified. And then I will proceed to work
4  it.
5 Q  And when you work it, what do you do to make sure it
6  doesn't get mixed up with other evidence or -- how do
7  you -- what is the procedure that you use for that?
8 A  We analyze evidence one -- one sample at a time so that
9  we avoid cross contamination issues.
10 Q  All right. And what do you do when you are done with
11  it, after you have tested it?
12 A  After we are done testing the evidence, I repackage it,
13  reseal it, and then I check it back into the evidence
14  custodian, and then I issue a report to the submitting
15  agency.
16 Q  Okay. And what are these procedures all designed to
17  ensure?
18 A  Basically to maintain the integrity of the evidence.
19 Q  Okay. And let's talk about testing cocaine. What
20  kinds.....
21  MR. JAMES: I'm going to object. She has never offered
22  him as a witness.
23  THE COURT: The objection is overruled.
24 Q  What kinds of tests do you perform on cocaine?
25 A  Basically when I receive evidence, and I have an idea

**Page 681**

1  whether it is cocaine or not, I use two types of
2  methods to determine if it is cocaine or not. The
3  first method is -- it is what is called a gold chloride
4  test. It is very simple. We take a glass slide -- a
5  microscope slide. We take a representative sample of
6  the suspect substance and apply it to the glass slide.
7  And then we have a chemical called gold chloride, and
8  we add it to mix it up with the unknown sample. And
9  gold chloride does something that is unique to cocaine.
10  When it combines with cocaine, it forms this really
11  quite beautiful crystalline structure, looks kind of
12  like a cross, or a snowflake. And we examine that
13  underneath a microscope. That is the first test. The
14  second test is much more specific. We are actually
15  able to look, in essence, at the molecular structure
16  of the unknown substance. We run it on an instrument
17  called a gas chromatography. And that allows us to
18  actually -- to look at the molecular structure to
19  identify cocaine as such.
20 Q  Are these common methods that are accepted among your
21  colleagues for testing controlled substances that
22  contain cocaine?
23 A  Yes.
24 Q  Okay. And in your experience and opinion, is the --
25  the GCMS is which of the two tests that you were

**Page 682**

1  talking about?
2 A  The instrumental test.
3 Q  The instrumental test. Is that test accurate?
4 A  Yes, it is.
5  MR. JAMES: I'm renewing my objection.
6  THE COURT: Could we have a bench conference please?
7  (Bench conference as follows:)
8  (Inaudible)
9  (End of bench conference)
10  THE COURT: Go ahead, Ms. Brady.
11 Q  In your experience and opinion, is the GCMS test
12  accurate?
13 A  Yes, it is accurate.
14 Q  And how many times have you performed this kind of
15  test?
16 A  Thousands, if not tens of thousands of times.
17 Q  What about the gold chloride test, accurate?
18 A  Yes.
19 Q  And how many times have you performed that test?
20 A  Same amount. Thousands of times.
21 Q  Okay. Now, let's talk about the testing that you did
22  in this case, and I'm going to put some exhibits in
23  front of you, and I'm going to have you look at the
24  item that is marked state's exhibit 1.
25 A  Okay.

1 Q   Now, did you do the testing in APD case number 017273?
2 A   Yes, I did.
3 Q   Okay. And do you recognize that is in front of you?
4 A   I do.
5 Q   Did you test -- and what is the P and E number for that
6     item?
7 A   P and E number is not familiar with me.
8 Q   Okay. Is there an item -- is there a number on that
9     somewhere that identifies that?
10 A   Yes.
11 Q   So that you know what you are testing? Okay, what is
12     that?
13 A   Yes, there is. Item number 503125.
14 Q   And is that the item you tested?
15 A   Yes, it is.
16 Q   How do you recognize it?
17 A   When I first receive the package, I will apply our
18     laboratory number, the item number, my initials, and
19     then the date that I opened it up.
20 Q   Okay. And when you tested that item, what were you
21     testing it for?
22 A   Well, I was -- on the request for laboratory services
23     form, it said suspect -- or something to that effect,
24     crack cocaine, or cocaine, so I was looking for
25     cocaine.

Page 683

1     onto the scale. Bef -- actually, back up. Before we
2     do that, we do a procedure called taring, which takes
3     into account the weight of the weigh boat. So
4     obviously we are not going to include the weight of the
5     weigh boat in the final weight of the substance. So we
6     will pour the contents into the weigh boats after it is
7     tared, and weigh that substance out.
8 Q   Do you leave it in the packaging material when you
9     weigh it, or do you take it out of any packaging
10     material it may be in?
11 A   We re -- we removed it from its packaging.
12 Q   All right. And so that weight that have you just told
13     me, with regard to that particular piece of evidence,
14     represents only the weight of the cocaine?
15 A   Correct.
16 Q   All right. And now, when you are testing items such as
17     this -- these items in this case, how do you make sure
18     that these items do not contaminate each other then?
19 A   I will open this package. I will go through all the
20     testing on this package. And once I am done with it, I
21     will seal the packaging up, and then I will proceed to
22     the next one.
23 Q   All right. So let's talk about exhibit number 2 now.
24 A   Okay.
25 Q   Did you test an item marked P and E number 505551?

Page 685

1 Q   And what procedures did you use on that item?
2 A   I used the two procedures that we talked about earlier.
3     The gold chloride and the instrumental test.
4 Q   And as a result of your testing on that item, did you
5     form any opinions?
6 A   I did.
7 Q   And what was your opinion?
8 A   This evidence tested positive for cocaine.
9 Q   Okay. And in your testing of this item, did you also
10     weigh the item?
11 A   I did.
12 Q   And how much did this particular item weigh?
13 A   I would have to refer to my notes. I don't commit that
14     to memory.
15 Q   Would you like to refer to your notes?
16 A   0.8 grams.
17 Q   Okay. Now, when you take an item out of the lab and
18     weigh it, could you just explain to the members of the
19     jury what the procedure is that you go through?
20 A   Yes. That is actually the first thing that we do
21     before we actually analyze it is we weigh the product
22     out. So we have a laboratory scale -- a digital scale,
23     and we have weigh boats that are disposable that are
24     only used once so they are clean. And we, in essence,
25     pour the contents into the weigh boats and place it

Page 684

1 A   I did.
2 Q   And is that what that is?
3 A   Yes, it is.
4 Q   Is that the item you tested?
5 A   Yes, it is.
6 Q   How do you know that?
7 A   Again, when I checked this out, before I opened it up,
8     I applied the lab number, the item number, my initials
9     and the date, which I see right here.
10 Q   Okay. And were you testing that for the same kinds of
11     things?
12 A   Yes.
13 Q   What test did you use on that?
14 A   The gold chloride and the instrumental test.
15 Q   All right. And as a result of your testing, did you
16     form an opinion?
17 A   I did.
18 Q   And what was your opinion?
19 A   This evidence tested positive for cocaine.
20 Q   Did you also weigh that object?
21 A   I did.
22 Q   And what was the weight that it had?
23 A   Again, referring to my notes, I recorded 3.1 grams.
24 Q   All right. And let's move on to exhibit number 3. Did
25     you test an item marked P and E number 430515?

Page 686

1  A   Can you repeat the number? It is covered up here, so I
2      can't see it in the packaging.
3  Q   Why don't we go ahead and open it. I think there is
4      two in there anyway. That way you'll be able to take a
5      look at it. The number I said was 430515.
6  A   Yes, I did.
7  Q   And is that the item you tested?
8  A   Yes.
9  Q   And how do you recognize it?
10 A   Same reason I recognized the other two.
11 Q   What procedures did you use?
12 A   Same procedures I analyzed the other two.
13 Q   Okay. And as a result of your testing of that item,
14     did you come to any conclusions?
15 A   I did.
16 Q   What was your conclusion?
17 A   This evidence tested positive for cocaine.
18 Q   In your testing did you weigh it?
19 A   I did.
20 Q   And what was the weight of that one?
21 A   1.4 grams.
22 Q   Thank you. And then I ask you to direct your attention
23     to exhibit 4, and did you test an item marked P and E
24     number 413245?
25 A   I did.

                                                         Page 687

1  Q   Okay. Is that the item you tested?
2  A   It is.
3  Q   How do you know that?
4  A   I know that because of the same reason I knew the other
5      three, the lab number, the item, my initials and the
6      date applied to the packaging.
7  Q   When you tested that item, what were you testing.it
8      for?
9  A   For cocaine.
10 Q   Okay. And did you use the same procedures?
11 A   I did.
12 Q   As a result of your testing on that item, did you form
13     any opinions?
14 A   I did.
15 Q   What conclusion did you reach?
16 A   This evidence also tested positive for cocaine.
17 Q   All right. And did you weigh that object as a part of
18     your test?
19 A   I did.
20 Q   And what was the weight of that particular item?
21 A   It weighed 1.2 grams.
22 Q   Okay. And did you submit a report that contained your
23     conclusions? I'm going to approach with state's
24     exhibit 18.
25 A   Yes, I did.

                                                         Page 688

1  Q   Do you recognize that document?
2  A   This looks like a copy of the report that I submitted
3      to the agency that submitted the evidence.
4  Q   Is that a fair and accurate copy of your report?
5  A   Yes, it looks like it.
6      MS. BRADY: Okay. At this time I move to exhibits --
7  move to admit state's exhibit 18.
8      MR. JAMES: No objection.
9      THE COURT: 18 is admitted.
10            (Plaintiff's exhibit 18 admitted)
11     MS. BRADY: Thank you. That's all the questions I have
12 for this witness.
13     THE COURT: All right. Thank you. Mr. James, your
14 questions?
15            JACK HURD
16 testified as follows on:
17            CROSS EXAMINATION
18 BY MR. JAMES:
19 Q   Mr. Hurd, we talked -- is there a different between
20     crack and cocaine?
21 A   There is a difference between crack and cocaine
22     hydrochloride, or powdered cocaine, yes.
23 Q   Okay. And what is the difference there?
24 A   When you look at it, usually there is a difference, but
25     basically hydrochloride, or powdered cocaine is water

                                                         Page 689

1      soluble. And the significance of that is that it can
2      be absorbed into the mucous membranes of the body.
3      That means you can toot it up your nose, you can eat
4      it, you can inject it into the body. But you usually
5      wouldn't smoke it, because the melting point of it is
6      too high, and so the psychoactive effect would -- would
7      be negligible there. Crack cocaine, on the other hand,
8      is not water soluble, but it has a low melting point,
9      so you usually smoke crack cocaine. And that is the
10     difference.
11 Q   Okay. And when you test crack cocaine versus -- you
12     described how you test cocaine, is there a difference
13     in the test between crack cocaine and -- and cocaine?
14 A   Well, again, crack cocaine is cocaine, but I think you
15     are referring to cocaine hydrochloride, the powdered
16     form.
17 Q   Right, I'm -- yes.
18 A   We can distinguish the two, and there is a procedure
19     that we can test for coc -- or crack cocaine. We
20     usually don't do that unless it is a federal case,
21     because it is a moot point in the state of Alaska. The
22     state of Alaska doesn't -- it doesn't matter to them if
23     it is crack cocaine or powdered cocaine, it is all
24     cocaine. So unless we are specifically asked to
25     distinguish the two, we don't usually do so. But we

                                                         Page 690

| | |
|---|---|
| 1 submitted to you for analysis? | 1 Q Which of the exhibit numbers I -- let's start with |
| 2 A No, sir. | 2   exhibit I. Was that water soluble? |
| 3 Q Okay. | 3 A I'll have to refer back to my notes here. |
| 4   MR. JAMES: If I may approach the..... | 4   MR. JAMES: I'm going to object. This is beyond the -- |
| 5 Q And I call your attention to exhibit 2, sir? | 5 this is beyond cross, I mean..... |
| 6 A Okay. | 6   THE COURT: No, overruled. |
| 7 Q All right? | 7   MR. JAMES: Fine. That's fine. |
| 8 A Uh-hum. (Affirmative) | 8 Q Exhibit number 1 is 503125. |
| 9 Q And I pointed it out to you. That's what I was doing | 9 A Okay. 503125 was water soluble. |
| 10   over there, right? | 10 Q So that means it is not crack, is that right? |
| 11 A Sure. | 11 A That is correct. |
| 12 Q Okay. How much does that say was there? What was | 12 Q Okay. And..... |
| 13   submitted, according to the envelope? | 13 A Probably means that. |
| 14 A On the packaging it says 11.8 grams. | 14 Q Pardon me? |
| 15 Q Okay. Do you have any idea what those 11.8 grams | 15 A It probably means that. |
| 16   represent? | 16 Q Okay. |
| 17 A I have..... | 17 A It's a pretty good -- yeah. |
| 18   MS. BRADY: Objection, Your Honor. This has been asked | 18 Q And for exhibit number 2, was that water soluble? |
| 19 and answered. | 19 A This was water soluble as well, yes. |
| 20   THE COURT: Overruled. | 20 Q Okay. And what about exhibit number 3? |
| 21 Q All right. The answer is no? | 21 A Exhibit number 3 was not water soluble. |
| 22 A I have no idea, no. | 22 Q Meaning it is probably crack? |
| 23 Q All right. Do you use both tests -- the gold chloride | 23 A Correct. |
| 24   and the gas test on both of them, or do you pick and | 24 Q Okay. And what about exhibit number 4? |
| 25   choose based on your own discretion? | 25 A And exhibit number 4 was also not water soluble. |
| Page 695 | Page 697 |

| | |
|---|---|
| 1 A We use two tests to be able to report out a controlled | 1 Q Thank you. |
| 2   substance for just about every controlled substance | 2   MS. BRADY: That's all the questions I have for this |
| 3   that comes into the lab. So for every item that I | 3 witness. |
| 4   report out cocaine, I have performed two tests on | 4   THE COURT: Any other questions on that subject, |
| 5   it..... | 5 Mr. James? |
| 6 Q Okay. | 6   MR. JAMES: No, Your Honor. Thank you. |
| 7 A .....at a minimum. | 7   THE COURT: All right. Thank you, sir. You can step |
| 8 Q Okay. How much is a gram? I mean, can you give me a | 8 down. Ms. Brady, your next witness? |
| 9   visual, so..... | 9   MS. BRADY: Your Honor, the state rests. |
| 10 A Sure. If you -- if you think about the contents of a | 10   THE COURT: All right. That means the state is not |
| 11   package of sweet and low, that is about a gram. | 11 going to present any additional witnesses. Let me confer |
| 12 Q Okay. The little individual packages? | 12 with the lawyers for a moment. Are you all ready for a |
| 13 A Yes, sir. | 13 break or -- I'm having head shaking no, so hold on a second. |
| 14 Q Okay. One moment, please. Thank you, Mr. Hurd. | 14   (Bench conference as follows:) |
| 15   THE COURT: Redirect, Ms. Brady? | 15   (Inaudible) |
| 16      JACK HURD | 16   (End of bench conference) |
| 17 testified as follows on: | 17   THE COURT: If you remember back, folks, to the -- to |
| 18      REDIRECT EXAMINATION | 18 the road map of the trial that I gave you. The next stage |
| 19 BY MS. BRADY: | 19 of the case is the defendant may put on evidence if he |
| 20 Q Mr. Hurd, did you actually distinguish between the | 20 chooses to do so. And since defense counsel reserved his |
| 21   samples of -- as far as water solubility in this case? | 21 right to make opening statement, if you recall, he has an |
| 22 A I did. | 22 opportunity to make an opening statement before he presents |
| 23 Q Okay. Did you determine that s -- determine that some | 23 evidence, now. And then he can present his evidence. |
| 24   of those were water soluble and some of them weren't? | 24 Mr. James, are you ready with your opening statement? |
| 25 A I did. | 25   MR. JAMES: If I may have just one minute. I'm trying |
| Page 696 | Page 698 |

**Page 699**

1  to take care of one item here, please.  Thank you.
2      Ladies and gentlemen of the jury, you have heard quite
3  a bit of testimony, and quite a bit from Mr. Fish.  And you
4  have heard quite a bit of testimony from different officers,
5  most of which was relied -- relayed from Mr. Fish.
6  Specifically, he talks about what happened on February 20th.
7      I intend to present two witnesses who were there.  And
8  I think, when you get done listening to them, you are going
9  to feel more uncomfortable.  I intend to present Robert
10  Davis' mother, who is going to clarify some of these
11  statements made by Officer LaPorte.  I intend to present
12  Athena Soder, the mother of Jeremy Fish's daughter.  And I
13  intend to, if time permits, present Officer Healy, from
14  CIPT.  She is going to be the records custodian.  And the
15  records custodian is the person, as she will testify, is --
16  they keep all the records.  When someone goes to CIPT, it is
17  -- it is kind of like a file is opened up on them, and
18  everything is documented to the best of their ability as a
19  trans -- until they leave CIPT.  So theoretically, those
20  records would reflect the entire of an individual in CIPT.
21      Now, the reason we are presenting this testimony is to
22  establish -- to show you that, in fact, what the state
23  alleges has great holes in it.  And the holes are such.....
24      MS. BRADY:  Objection, Your Honor.  This is argument.
25      THE COURT:  Just the facts at this point.  No argument,

**Page 700**

1  please.
2      MR. JAMES:  That the witnesses are going to relay their
3  own observations, and in -- of course, in question of Mr. --
4  Ms. Healy -- she is a lady -- what the documentation is in
5  CIPT.  And that is pretty much it.  So with that, I would
6  like to call my first witness.
7      THE COURT:  You may call your first witness, Mr. James.
8      MS. BRADY:  Your Honor, may I approach and clear the
9  witness bench?
10      THE COURT:  That would be good.  You may do that.
11      (Pause)
12      MR. JAMES:  Darryl, would you come forward and go up to
13  that chair up there?  You have to walk around the
14  (indiscernible).  Would you remain standing please?
15      MR. CASH:  Okay.
16      THE COURT:  This lady is going to swear you in.
17      (Oath administered)
18      MR. CASH:  I do.
19          DARRYL CASH
20  called as a witness on behalf of the defendant, testified as
21  follows on:
22      DIRECT EXAMINATION
23      THE CLERK:  Thank you.  You may be seated.  For the
24  court record, please state your name, spelling your last
25  name.

**Page 701**

1  A  Darryl Cash, C-a-s-h.
2      THE CLERK:  Okay.  And what was the first name?
3  A  Darryl.
4      THE CLERK:  Thank you.
5  BY MR. JAMES:
6  Q  Okay.  Mr. Cash, do you know Robert Davis?
7  A  Yes, I do.
8  Q  All right.  How long have you known Mr. Davis?
9  A  Two years.
10  Q  All right.  And are you familiar with 202 Grand Larry?
11  A  Yes.  Yes, sir.
12  Q  And why are you familiar -- how are familiar with that?
13  A  I used to -- I live right down the street -- I used to
14  live right down the street from him, until he moved.
15  Q  All right.  Have you.....
16  A  I used to be over there every day -- just about every
17  day.
18  Q  All right.  And calling your attention to February 20th
19  -- the evening of February 20th?
20  A  Uh-hum.  (Affirmative)
21  Q  Were you over there that evening?
22  A  Yes, I was.
23  Q  All right.  And was there anything that focuses your
24  mind on February 20th?
25  A  I was just watching TV.  In front of the set -- it was

**Page 702**

1  -- I was just watching TV.
2  Q  Okay.  Was anything planned to happen on February 21st?
3  A  February 21st?
4  Q  The next day?
5  A  We was supposed to move.
6  Q  I'm sorry?
7  A  We was supposed to move that day.
8  Q  February 21st?
9  A  Uh-hum.  (Affirmative)
10  Q  All right.  When we say we were supposed to move, were
11  you moving someplace?
12  A  I wasn't.
13  Q  Who was?
14  A  Rico.
15  Q  All right.  And Rico is Robert?
16  A  Right.
17  Q  All right.  And how long were you there on February
18  20th?
19  A  I'm usually over there just 'til about 12:00 o'clock
20  every night.
21  Q  All right.  About what time do you get over there?
22  A  About 8:00.  Just about 8:00 o'clock.
23  Q  All right.  And you indicated there was going to be a
24  move on the 21st.  What were you doing on the 20th?
25  Were you doing anything in anticipation of the move?

**Page 703**

1 A  We was just picking up little things here, putting
2    little things there.
3 Q  Are you familiar with the layout of the house?
4 A  Yeah.
5 Q  All right.  What is in the kitchen?
6 A  The kitchen is -- you got a couple of bar stools, and
7    you got the counter, and then there is the
8    refrigerator, and then there is the stove.
9 Q  Okay.  Do you know if there is -- are you familiar with
10   any type of surveillance camera?  Do you know what that
11   means -- or you know -- do you know what I'm talking
12   about?
13 A  Uh-hum.  (Affirmative)
14 Q  Do you ever see one of those over there?
15 A  I never did.
16 Q  All right.  And what was in the front room, if
17   anything?
18 A  There was two couches, an entertainment center, TV and
19   a couple of little electronic things, like stereo
20   equipment.
21 Q  Is that -- had you been over there prior to February
22   20th?
23 A  Uh-hum.  (Affirmative)
24 Q  Were the items the same in there at that time.....
25 A  Yes.

**Page 704**

1 Q  .....as prior time?
2 A  Uh-hum.  (Affirmative)
3 Q  Okay.  Were the bar stools still in the kitchen area?
4 A  Bar stools.
5 Q  All right.  Are you familiar with marijuana?
6 A  I am.  I know what it is, but as far as -- I don't me
7    -- I don't do it.
8 Q  All right.  Did you see any marijuana over there that
9    evening.....
10 A  No, sir.
11 Q  .....on the 20th?
12 A  Unh-unh.  (Negative)
13 Q  Are you familiar with hand guns?
14 A  Yes, sir.
15 Q  All right.  Pistols and revolvers?
16 A  Uh-hum.  (Affirmative)
17 Q  Okay.  Did you see any hand guns over there on February
18   20th?
19 A  No, sir.  I never did.
20 Q  Were you in a position to observe Robert Davis that
21   evening?
22 A  Yes.
23 Q  Okay.  How were you able to see him?
24 A  Well, he was -- you know, he walked back and forth.  I
25   was sitting down.  He'll come in the front room, he'll

**Page 705**

1    stay in the kitchen.
2 Q  Okay.  Were you ever in the kitchen?
3 A  Uh-hum.  (Affirmative)
4 Q  All right.  Did you see anything unusual in the
5    kitchen, marijuana or anything?  Did you ever see
6    Mr. Davis packing a gun?
7 A  No, I never did.
8 Q  That evening?
9 A  No, I didn't.
10 Q  Prior to that?
11 A  No, sir.
12 Q  All right.  Other than yourself, do you know how many
13   people were there on the 20th?
14 A  About four, mostly family.
15 Q  Okay.  Do you know a Jeremy Fish?
16 A  I never heard of him.
17 Q  All right.  Were there white people as well as -- you
18   are black, for the record.....
19 A  Uh-hum.  (Affirmative)
20 Q  .....right?  African-American.  Were there any white
21   people over there, as well as yourself and Mr. Davis,
22   of course, is African.
23 A  Well, he had friends.  He had -- he had white friends.
24   They would come over once in a while.
25 Q  Did you know all his friends?

**Page 706**

1 A  I knew them, yes.
2 Q  All right.  Did you ever see Mr. Davis deal any drugs
3    with anybody that evening?
4 A  No, sir.
5 Q  What kind of car does he have?
6 A  Oh, man.
7 Q  Do you have a.....
8 A  He got a couple cars.
9 Q  Okay.  Does he have a pickup?
10 A  Yeah.
11 Q  What kind of pickup is it?
12 A  It is a -- like a gray Toyota.
13 Q  All right.  One of those little Toyotas, a big Toyota?
14 A  It's a little small one.
15 Q  A small one?  Okay.  Were you in a -- were in a
16   position that evening, on February 20th, to see what
17   was going on in that house -- or that apar -- that unit
18   -- it's a duplex, isn't it?
19 A  Uh-hum.  (Affirmative)
20 Q  Two houses there?  But in the house that you were in?
21 A  Uh-hum.  (Affirmative)
22 Q  Yes, no?
23 A  Yes.
24 Q  All right.  Did anything unusual happen to your
25   observation?

| | |
|---|---|
| 1 A  No, sir. | 1    packing up the next day. |
| 2 Q  All right.  Do you do drugs? | 2 Q  Okay.  So if you said everything was out on the 22nd, |
| 3 A  No, sir. | 3    then would the night you have been there -- you were |
| 4 Q  Do you associate with people who do drugs? | 4    there, would that have been the 21st? |
| 5 A  No.  Thank you.  You can -- no. | 5 A  Right.  I was there the 20th, 21st, and -- I was there. |
| 6    THE COURT:  Hold on. | 6 Q  Not sure? |
| 7 Q  Stay seat..... | 7 A  I was there. |
| 8    THE COURT:  A few more questions. | 8 Q  You were there which night? |
| 9 Q  Stay seated. | 9 A  The 20th and the 21st.  I -- I helped move all the days |
| 10   THE COURT:  Are you finished with direct? | 10   I was there. |
| 11   MR. JAMES:  Yes, I am.  Thank you. | 11 Q  Okay.  So when Mr. James was asking you questions about |
| 12   THE COURT:  Cross examination, Ms. Brady? | 12   seeing marijuana on a specific night, would it be fair |
| 13              DARRYL CASH | 13   to say that you are saying that you have just never |
| 14 testified as follows on: | 14   seen marijuana at Mr. Davis' house, or do you have a |
| 15              CROSS EXAMINATION | 15   specific recollection about a specific night? |
| 16 BY MS. JAMES: | 16 A  I never did.  I never -- never saw any marijuana at his |
| 17 Q  What is your date of birth, Mr. Cash? | 17   house. |
| 18 A  10/30/67. | 18 Q  Okay.  So based on the fact that you never saw it, that |
| 19 Q  Okay.  And now, you testified on direct that the night | 19   is how you are answering his question about not seeing |
| 20   that Mr. James is asking you about, February 20th, you | 20   marijuana, is that right? |
| 21   know that it was February 20th because Ricco was moving | 21 A  Well, I'm be -- I mean, I was over there every |
| 22   the next day.  Is that right? | 22   day.  I have never -- like I said, I'll be over there |
| 23 A  Right.  We got out on the 22nd. | 23   just about every day, and I never ever seen any drugs |
| 24 Q  Okay.  And wait -- and you said that that night nothing | 24   or anything. |
| 25   was packed in boxes, is that right? | 25 Q  Okay.  And you said you are familiar with marijuana? |
| Page 707 | Page 709 |

| | |
|---|---|
| 1 A  We was getting ready.  We was loading stuff up. | 1 A  Sure. |
| 2 Q  You were loading stuff up? | 2 Q  Seen it before? |
| 3 A  We was getting ready. | 3 A  I mean, I seen it before.  I never -- you know, I never |
| 4 Q  But you said everything that was in the apartment -- it | 4    messed with it.  I mean, back in New Jersey when I was |
| 5    was all still there, is that right? | 5    in -- you know, when I was younger. |
| 6 A  Uh-hum.  (Affirmative) | 6 Q  Okay.  So I'm sorry, is it your testimony that you have |
| 7 Q  Couches hadn't been moved out, nothing had been moved | 7    seen it before, or you haven't? |
| 8    out? | 8 A  I mean, I have seen it -- you know, back in New Jersey, |
| 9 A  Right. | 9    a while ago, when I was, you know, 16 or younger. |
| 10 Q  Okay.  So what had -- what had been done to prepare for | 10 Q  Okay.  So if you were born in 1967, when you were 16, |
| 11   this move the next day? | 11   that would have been about 20 years ago? |
| 12 A  Well, we -- the next day -- I know everything was out | 12 A  A little bit. |
| 13   on the 22nd.  He got out on the 22nd. | 13 Q  Okay.  And you haven't seen it since? |
| 14 Q  Okay.  So the night that you are talking about could | 14 A  I haven't seen it. |
| 15   have been the 21st, is that right? | 15 Q  Okay.  So are you sure you know what it looks like? |
| 16 A  Well, I was there..... | 16 A  Of course, yeah. |
| 17 Q  If you moved the next day? | 17 Q  Okay.  And did you -- on -- now, we are back to the |
| 18 A  I was there the 20th. | 18   night of the 20th, do you recall anything about leaving |
| 19 Q  How do you know it was the 20th? | 19   to go get a pot? |
| 20 A  Ev -- everything was still there. | 20 A  Unh-unh.  (Negative) |
| 21 Q  Everything was still there on the 20th.  That is not | 21 Q  Do you recall leaving that night from Mr. Davis' |
| 22   the question I'm asking you, though.  I'm asking you | 22   apartment? |
| 23   how do you know the night that you were there was the | 23 A  Unh-unh.  (Negative)  I didn't leave.  I was over there |
| 24   20th? | 24   until like 12:00 o'clock. |
| 25 A  Well, I know, because we was supposed to pack.  We was | 25 Q  Okay.  And did anybody else leave from Mr. Davis' |
| Page 708 | Page 710 |

Exhibit B – 83

1    coming over to see what -- did we need any help, and
2    back and forth.  So -- so me, Darryl and Robert --
3    basically the main movers.
4  Q  Did you see Jeremy Fish that evening?
5  A  I did.
6  Q  Okay.  About what time and where did you see him?
7  A  Around what time you said?
8  Q  Yeah, about what time?
9  A  Around rightish.
10 Q  Okay.  And where did you see him?
11 A  He was in the kitchen.
12 Q  All right.  Of 2-0.....
13 A  202 Grand Rot -- Grand Larry.
14 Q  All right.  What was he doing?
15 A  Well, just running the mouth like always.
16 Q  And were you in the kitchen?
17 A  Not at the time, no.
18 Q  How do you know he was in the kitchen?
19 A  Because you could see -- when you first walk in the
20    living room section, you could see in the kitchen.  So
21    right when you first walk in the living room you don't
22    have -- you can just basically see right into the
23    kitchen right then, if you pass the wall.
24 Q  Do you do any marijuana or any drugs?
25 A  No.

Page 719

1  Q  Are you familiar with marijuana?
2  A  I do.
3  Q  And calling your attention to the 20th, did you see a
4     big pile of marijuana on the kitchen counter?
5  A  No.
6  Q  Okay.  Would you have been in a position to tell
7     whether there was a big pile of marijuana on the
8     kitchen counter?
9  A  Yes.
10 Q  All right.  I'm talking about all evening, did you ever
11    see any?
12 A  I never seen any marijuana, no.
13 Q  All right.  Are you familiar with handguns?
14 A  I do.
15 Q  Did you see Robert Davis that evening?
16 A  Yes.
17 Q  Okay.  And was that on a -- was that intermittently,
18    fairly continuously, how would you describe that?
19 A  I really couldn't hear the question good.
20 Q  Okay.  Was it intermittently, continuously -- I mean,
21    how would you describe your interrelationship with
22    Robert Davis that evening?
23 A  That evening?  Well, we were always by each other that
24    evening anyway, because we were getting ready to, you
25    know, plan on packing little things up.  So we was

Page 720

1    always kept in contact and eye contact, before I left.
2  Q  All right.  And did you see him have a conversation
3     with Jeremy Fish?
4  A  Jeremy Fish?  Maybe a light sl -- light conversation,
5     or whatever.  So I wasn't directly in the kitchen, so I
6     really weren't concerned on what they was doing.
7  Q  Did you see any firearms in that house that evening?
8  A  No.
9  Q  Specifically, did you see a 40 -- do -- do you know the
10    difference between a revolver and a pistol?
11 A  I do know the difference between a handgun and a
12    revolver.  So.....
13 Q  All right.  Did you see any revolvers there?
14 A  No.
15 Q  Did you see any guns stuck in Mr. Davis' waistband, or
16    on a holster, or on his person in any way?
17 A  No.
18 Q  Is there anything that could have -- that he was
19    wearing that would have covered up such a weapon?
20 A  No.
21 Q  Okay.  Are you comfortable with that statement?
22 A  Sure.
23 Q  Now, you have earlier testi -- you have indicated you
24    have a key to the place?
25 A  Sure.

Page 721

1  Q  Do you have free reign of the place?
2  A  For.....
3  Q  In other words, do you have free reign -- can you go
4     where you want to in the apartment?
5  A  Sure.
6  Q  Okay.  And have you ever seen a handgun in that
7     apartment?
8  A  No.
9  Q  Have you had the opportunity to look in the apartment
10    so if one was there you would have seen it?
11 A  I would have.  Well, I have a opportunity to look all
12    over, but that wasn't my choice to do.  But I never
13    seen any handgun there.
14 Q  How long did -- to your knowledge, did Jeremy Fish stay
15    there?
16 A  Maybe about f -- no longer than 20 minutes, I know.
17 Q  All right.
18 A  So maybe 15 minutes.  So 15, 18 minutes.  Around that
19    time.  So.....
20 Q  Was anybody else coming and going in during this time
21    period?
22 A  Not at that time.
23 Q  Okay.  Did anybody leave, and -- do you know?
24 A  Yeah.  One person left out.  So.....
25 Q  All right.  And you know why they left?

Page 722

1  MR. JAMES: I got one fairly quick one, then, if you
2  want to take a break.....
3     THE COURT: All right.
4     MR. JAMES: .....because that would be Officer Healy.
5  So.....
6     THE COURT: All right.
7     MR. JAMES: Please put your coat down, and if you would
8  come forward, and go up to the witness chair, there, and
9  remain standing, and Madam Clerk will swear you in, please.
10    (Oath administered)
11    MS. HEALY: I do.
12              MILDRED HEALY
13 called as a witness on behalf of the defendant, testified as
14 follows on:
15          DIRECT EXAMINATION
16    THE CLERK: Thank you. You can be seated. For the
17 court record, please state you name, spelling your last
18 name.
19 A  Mildred Healy, H-e-a-l-y.
20    THE CLERK: Thank you.
21    THE COURT: Go ahead.
22 BY MR. JAMES:
23 Q  Officer Healy, you are in uniform, and is that a CI --
24    department of corrections uniform?
25 A  Yes, it is.

Page 735

1 A  I have the records, and a copy of the records.
2 Q  Okay. And I asked you to bring the records and a copy,
3    so that we could leave one here, if necessary, and you
4    could take the originals back with you?
5 A  Yes.
6 Q  Okay. And is the copy an exact duplication of the
7    records that you have?
8 A  Yes.
9 Q  Okay. And you made that yourself, or.....
10 A  This morning.
11 Q  .....had that made? Okay. Could you open up your
12    package, please? And they are both in bound -- did you
13    bind that?
14 A  Yes, I did.
15 Q  Okay. One is a copy bound, and the other is the -- the
16    original?
17 A  Yeah.
18 Q  Correct?
19 A  Yeah. I brought a binder so that I could separate it
20    the way it was separated in our folder.
21 Q  Okay. Could you go through the folder, and tell me --
22    you separated it in different areas, is there areas
23    that are separated, and the reason they are separated?
24 A  The first area is the court paperwork, remand slips,
25    criminal history.

Page 737

1 Q  Okay. And do you work for Cook Inlet Pretrial?
2 A  Yes, I do.
3 Q  Okay. And how long have you worked there, ma'am?
4 A  Since January of '99.
5 Q  All right. And so were you employed on or about
6    March 1 of 2001.....
7 A  Yes.
8 Q  .....at the facility?
9 A  Yes, I was.
10 Q  And what do you do at the facility?
11 A  Now I am a correc -- corrections records officer.
12 Q  And as part of your duties as corrections off --
13    records corrections officer, do you keep the records of
14    individuals who are -- are kept at Cook Inlet, as far
15    as when they arrive, what happens when they are there,
16    and when they depart -- up to the point they depart?
17 A  Yes, I do. And sometimes after they depart.
18 Q  After they depart? Okay. And pursuant to my request,
19    did I ask you to bring the records relating to a Robert
20    Davis from about February 1 -- excuse me, February 28
21    slash March 1, which would have been that -- that
22    morning, up and through the 2nd or 3rd of March of
23    2001?
24 A  Yes, I did.
25 Q  Okay. And you have those with you, ma'am?

Page 736

1 Q  All right.
2 A  The second is the paperwork with his booking, and
3    transfers, and releases.
4 Q  All right.
5 A  Then the third page -- which there is nothing there,
6    that is classification and time accounting when they
7    are sentenced. And then this is any copouts, or any
8    other extra paperwork that comes in. It is in
9    chronological order.
10 Q  All right. Going to the first page, ma'am, is there an
11    indication when Mr. Davis arrived at CIPT?
12 A  Mr. Davis arrived on March 1st, 2001, at 1:00 a.m.
13 Q  Okay. And is there indication as to -- do you have a
14    booking officer in the normal procedures, is that how
15    it works, a CIPT officer?
16 A  We have one booking -- we have a booking -- one booking
17    officer at Cook Inlet. Occasionally another officer
18    might help, but we have one -- one officer on duty that
19    is considered the booking officer.
20 Q  All right. And does your records reflect who the
21    booking officer was?
22 A  Well, it is kind of hard to tell, but I think it was
23    Ted Garcia.
24 Q  Okay. And does that booking indicate what was on
25    Mr. Davis' person at that time?

Page 738

**Page 739**

1 A   No.
2 Q   All right.
3 A   That would be on the booking.....
4 Q   Another place?
5 A   Booking sheet.
6 Q   All right. Going to the booking sheet, is there
7     indication as to what was in his pers -- or on his
8     person, or in his person -- on his person, I guess.....
9 A   Yes.
10 Q  .....would be the proper -- what did he have?
11 A  He was booked in with 180 dollars, a blue ball cap, a
12    black wallet, a pair of black jeans, a black coat, a
13    pair of black shorts, a white T-shirt, white socks, one
14    ear stud with a clear stone, one silver-like chain
15    necklace, one gold-colored necklace with a medal.
16 Q  Okay. And is that signed by what you believe to be
17    possibly.....
18 A  It's -- it is Ted Garcia?
19 Q  .....the same signature?
20 A  Uh-hum. (Affirmative)
21 Q  All right. And Mr. Davis also signed that, is that
22    correct, acknowledging that was.....
23 A  Yes, he did. He signed it in two places. One that
24    acknowledges the list of personal property, and one
25    that acknowledges that he was given the opportunity to

**Page 740**

1     make phone calls.
2 Q   Okay. Now, the -- do you have records about if anybody
3     brought any money into Mr. Davis?
4 A   The records for money, because Mr. -- are not
5     available. We can only go back two months.
6 Q   Okay.
7 A   I think there is a way to go back further, but I think
8     it is done by some administrator. I tried, and could
9     not get it, so we have no records for that date. Our
10    -- you know, we don't have any -- he is gone, so it
11    doesn't bring it up.
12 Q  All right. How about any type of medical treatment?
13 A  Medicals -- medical.....
14    MS. BRADY: Objection, Your Honor, relevance.
15    THE COURT: Rel.....
16    MR. JAMES: If it is part of that record. I'm just
17 asking is it part.....
18    THE COURT: Relevance?
19 A  No, it's not.
20    THE COURT: No, just a second.
21    MR. JAMES: I'm -- excuse -- the rel.....
22    THE COURT: The answer is no? You don't have any?
23 A  No.
24    MR. JAMES: All right.
25    THE COURT: Then never mind.

**Page 741**

1 Q   Okay. All right. Now, how much was Mr. Davis -- when
2     did -- when did Mr. Davis leave?
3 A   3/2/2001, at 19:20 hours.
4 Q   Okay. And that is 7:20 in the evening?
5 A   Yes.
6 Q   All right. And what did he leave with?
7 A   90 dollars.
8 Q   All right.
9 A   And all of his property.
10 Q  Okay. And you have what is called -- you indicated
11    there is a cop section, c-o-p, is that what it is?
12 A  Yes.
13 Q  What is -- is there -- is cop mean something?
14 A  Copout. Well, it is actually a request for interview,
15    but everybody calls it a copout.
16 Q  All right. Is there anything in that file relating to
17    the time period he was there?
18 A  Well, there is a monetary disbursement.
19 Q  Okay.
20 A  And a -- the release of records that -- permission that
21    you sent to me earlier. He disbursed 100 dollars to
22    APD.
23 Q  He did, or you did, or.....
24 A  We did it because of a warrant.
25 Q  All right.

**Page 742**

1 A   And I don't know who verified it, because I don't -- I
2     can't even begin to see who that is.
3 Q   Would you know when that disbursement was made?
4 A   The 2nd of March. It doesn't give a time.
5 Q   All right. And is that it, other than the release that
6     you mentioned before?
7 A   Yes.
8 Q   Okay.
9 A   That's it. And that.....
10 Q  Is that the totality of the file?
11 A  Well, there is a booking sheet, the chart, the warrant
12    -- the warrant for the money, and then the release
13    sheet, and pictures.
14 Q  All right. Relating to in, out, or the money, have you
15    covered everything in your testimony that relates to
16    the documentation that CIPT has?
17 A  Yes.
18 Q  All right. If another officer, based on your
19    experience, had been the booking officer, or had
20    assisted in the booking officer, would you expect their
21    signature to appear in some of the intake materials?
22 A  No.
23 Q  No?
24 A  If there had been two there, no.
25 Q  Okay. Just one?

**Page 743**

1 A   Yeah.

2 Q   Okay.

3 A   The primary booking officer is the one that signs it --

4     usually signs it.

5 Q   Okay.  That's all I got.  Thank you, Ms. Healy.

6     THE COURT:  Ms. Brady?

7              MILDRED HEALY

8 testified as follows on:

9         CROSS EXAMINATION

10 BY MS. BRADY:

11 Q   Ms. Healy, if Mr. Davis arrived with 180 dollars,

12    right?

13 A   Uh-hum.  (Affirmative)

14 Q   And a search warrant seized -- seized $100, is that

15    right?

16 A   Uh-hum.  (Affirmative)

17 Q   And he was given $90?

18 A   Yes.  I -- I can -- I said I could have access to the

19    monetary records, but somehow he got another $10 on his

20    books, it would seem.

21 Q   Okay.  So it.....

22    MS. BRADY:  That's all the questions I have, Your

23 Honor.  Thank you.

24    THE COURT:  Re -- anything else?

25    MR. JAMES:  No.

**Page 744**

1     THE COURT:  Thank you, ma'am.  You are free to go.

2     MR. JAMES:  Thank you, Ms. Healy.

3 A   Do you need these files?

4     MR. JAMES:  No, ma'am.  Not -- you testified.

5     THE COURT:  Why don't we take 10 minutes, folks.  And

6 then we will come back and continue on.

7     (Off record)

8     THE COURT:  Have a seat, please.  And are we on record?

9     THE CLERK:  We are.

10    THE COURT:  All right.  We are back on record, and we

11 have all of our jurors back, and you have -- this is your

12 next witness.....

13    MR. JAMES:  Yes, sir.

14    THE COURT:  .....Mr James?  You want to stand up ma'am,

15 and we will swear you in?

16    (Oath administered)

17    MS. SODER:  Yeah.

18           ATHENA SODER

19 called as a witness on behalf of the defendant, testified as

20 follows on:

21         DIRECT EXAMINATION

22    THE CLERK:  You can have a seat.  State your full name,

23 for the record, and spell your last name.

24 A   Athena Jo Soder, S-o-d-e-r.

25    THE CLERK:  Thank you.

**Page 745**

1     THE COURT:  Go ahead, Mr. James.

2     MR. JAMES:  All right.

3 BY MR. JAMES:

4 Q   Athena -- may I call you Athena?

5 A   Yeah.

6 Q   All right.  Have you ever been in and testified before?

7 A   No.

8 Q   All right.  So if you don't und -- like I told you

9     outside, if you don't understand something, you ask,

10    all right?

11 A   All right.

12 Q   Okay.  Do you know Jeremy Fish?

13 A   Yes.

14 Q   How do you know Jeremy Fish?

15 A   He is the father of my daughter.

16 Q   All right.  And.....

17 A   We used to date.

18 Q   I'm sorry?

19 A   We used to date.

20 Q   Okay.  And calling your attention to April of 2001.....

21 A   Uh-hum.  (Affirmative)

22 Q   .....that month.  Did you see Jeremy Fish?

23 A   Yeah.  I saw him on April 1st.

24 Q   Why do you know it was April 1st?

25 A   Because it was April fool's day.

**Page 746**

1 Q   Why did you go see him -- or did you go see him, or you

2     saw him?

3 A   Yeah.  I went and saw him at Subway.  He was working

4     there.  And I went there just to see if he wanted to,

5     you know, see his daughter, or whatever, because her

6     birthday was the following month.

7 Q   All right.

8 A   Uh-hum.  (Affirmative)

9 Q   And when the following month is her birth.....

10 A   May 3rd.

11 Q   All right.  Did you have a conversation with Jeremy

12    Fish regarding Robert Davis?

13 A   Yes.

14 Q   Okay.  Did you ask?

15 A   Huh?

16 Q   Did you ask Jeremy Fish anything?

17 A   Yeah.  I asked him why he turned in Rico -- Robert.

18    And at first he denied doing it.  And then he said --

19    he started getting mad.....

20    MS. BRADY:  Objection, Your Honor.  This is hearsay.

21    MR. JAMES:  Okay.

22    THE COURT:  The objection is overruled.

23    MR. JAMES:  Thank you.

24 Q   That means you can go ahead and answer.

25 A   Oh, he started to get mad, and then he said that he

3AN-01-1717 CR

**Page 747**

1  would do anything he could to get Rico in trouble --
2  Robert, Rico. And -- and then, after he said that, he
3  started crying and acting -- saying he had AIDS -- him
4  and his girlfriend had AIDS.
5 Q  Did you see him.....
6 A  And that was.....
7 Q  Did you see him after that date?
8 A  Yeah. I saw him May 3rd.
9 Q  Why did you see him May 3rd?
10 A  That was our daughter's birthday.
11 Q  All right.
12 A  And I saw him at the Diamond Mall for about 15, 20
13  minutes.
14 Q  All right. Did you see him after May 3rd?
15 A  I saw him September 11th.
16 Q  Why do you -- why are you comfortable with September
17  11th?
18 A  Because I was staying at his sister's house for a
19  couple of days. And that morning the news was on about
20  the terrorist attacks. And that evening we ran into
21  him on the road. And he pulled over behind us, and he
22  got out of the car, and our daughter was eating a
23  sucker, and he took the sucker from her and he at it.
24  And then he went back to his car, and he came back to
25  his sister's car, which is where I was, and he had a

**Page 748**

1  big gallon size bag of weed with him, and he asked me
2  if I wanted to buy any from him. I told him no, I'm
3  pregnant. And then his sister told him to give her
4  some. So he gave her about a bowl, but -- and then he
5  left. And then about 30 minutes later he showed up at
6  her house, because he had forgotten his cell phone in
7  his sister's car. And he came inside, and he was
8  smoking weed with his sister's boyfriend, and then he
9  left. But in the -- when he left, he left weed there,
10  like a eighth of weed. And so he returned again. And
11  that time Jared had took the weed that he left -- Jared
12  is his sister's boyfriend, and he hid it. And he was
13  going to keep it. And Jeremy was mad saying, you know,
14  give me my weed back. And Jared was like, I don't got
15  it. And then Jeremy wanted to fight Jared. And so
16  Jared -- or Jeremy went down to his car, and I was
17  watching him through the window, and he opened his car
18  door, and he bent over and he pulled his seat down, and
19  he took a gun out. And he told Jared to go down there,
20  and he was going to shoot him. And then Tamara -- that
21  is his sister, told Jeremy that she was going to call
22  the cops, so Jeremy got in the car and left. And we
23  called the cops, but they said they couldn't do
24  anything about it.
25 Q  Okay. Is that the last time you saw Jeremy?

**Page 749**

1 A  Yes.
2 Q  Okay. Now, are you familiar with cocaine, and crack
3  cocaine, and marijuana?
4 A  Like, what do you mean?
5 Q  Do you know what it is.....
6 A  Yeah.
7 Q  .....when you see it?
8 A  Yeah. Yeah.
9 Q  All right. When you were with Jeremy before, this
10  year, did you see Jeremy with any cocaine?
11 A  Yes, I did.
12 Q  I'm -- you know I'm talking cocaine. I'm not
13  talking.....
14 A  Yes.
15 Q  .....crack?
16 A  Cocaine, yeah. Powder.
17 Q  The powder?
18 A  Uh-hum. (Affirmative)
19 Q  When was that?
20 A  That was the end of July, or the beginning of August
21  2000. And I ran into him downtown Anchorage, fifth
22  avenue mall, and it was out -- outside by that grass,
23  and me and Jeremy were talking, and it was a couple of
24  months after I had my baby, and I had lost of lot of
25  weight, so I don't know if he thought I was doing coke,

**Page 750**

1  or whatever, but he took it out of his pocket, and he
2  was like, do you want to -- you know, do you want to do
3  some? And I told him, no, you know. And then he put
4  it back in his pocket, and then he never said anything
5  else about it.
6 Q  How do you know it was cocaine?
7 A  Because I saw it. I mean, I know what it is. I have
8  done it before, years ago.
9 Q  All right.
10 A  Before I got pregnant.
11 Q  Okay. Now, do you do drugs -- do any drugs now?
12 A  No.
13 Q  Do you know why Jeremy would be mad, or make a
14  statement that he would do anything he could to get
15  Rico?
16 A  Yeah. Because he -- he knows how Rico would, like --
17  during my pregnancy, Rico would give me rides to the
18  doctor's, and he would buy my daughter diapers and
19  wipes and food. And Jeremy never bought anything for
20  his daughter. And so he was mad, and jealous, or
21  something, I guess.
22 Q  Did you have a relationship with Robert Davis -- a
23  sexual relationship?
24 A  No. Never.
25 Q  Okay. Now, have you ever been over to 202 Grand Larry?

**Page 755**

1  Your Honor.
2              ATHENA SODER
3  testified as follows on:
4              REDIRECT EXAMINATION
5  BY MR. JAMES:
6  Q   You were asked if you smoked cocaine or crack before.
7      Do you smoke anything else?
8  A   Have I what?
9  Q   Do you smoke?
10 A   Yeah.  I smoke cigarettes.
11 Q   All right.  Thank you.
12     THE COURT:  Thank you.  You can step down. ma'am.  Your
13 next witness?
14     MR. JAMES:  What I would like you to do, please, is if
15 you kind of weave your way around, and there is a seat up
16 there, would you just remain standing?
17     MS. EPEAGBA:  All right.
18     MR. JAMES:  And Madam clerk will swear you in.
19     (Oath administered)
20     MS. EPEAGBA:  Yes.
21              BUENA EPEAGBA
22 called as a witness on behalf of the defendant, testified as
23 follows on:
24              DIRECT EXAMINATION
25     THE CLERK:  You can have a seat.  Please state, for the

**Page 756**

1  record, your full name, and spell your last name.
2  A   My name is Buena Epeagba.  E-p-e-a-g-b-a is my last
3      name.  B-u-e-n-a is my first name.
4      THE CLERK:  Can you spell your last name again, I'm
5  sorry.
6  A   E-p-e-a-g-b-a.  B as in boy.
7      THE CLERK:  Thank you.
8  BY MR. JAMES:
9  Q   Mrs. Epeagba, you are the mother of Robert Davis,
10     right?
11 A   Yes.
12 Q   Okay.  The name Rico has come up.  You know how --
13     where that name comes from?
14 A   Well, his father is Robert.  And his dad didn't want
15     two Roberts, you know.  So he named him Rico before he
16     was born.
17 Q   And he has always been known -- is that his nickname?
18 A   Always.
19 Q   All right.  Okay.  Now, what does your son do for a
20     living, what does he work at?
21 A   Right now he is an auto mechanic.  He works on Old
22     Seward and 72nd.  He has a shop there.
23 Q   Okay.  So he is self employed, is that right?
24 A   Yes. he is self employed.
25 Q   Okay.  And how long has that -- how long has he had the

**Page 757**

1  shop, to your knowledge, at East side?
2  A   I think since, maybe, October or November of '99.
3  Q   Okay.  During February of 2001, was he running a
4      business out of your house?
5  A   No.  He left -- he did have a business there in maybe
6      June or July of '99 until October of '99, because the
7      storage building that he was using does not have heat.
8      So it was mainly like a garage.
9  Q   Now, do you have a suburban?
10 A   Yes.
11 Q   Is that your car?
12 A   Yes.
13 Q   All right.  And does it have twin -- tinted windows?
14 A   Yes.
15 Q   Which windows are tinted?
16 A   All the windows, except the two windows on the side in
17     the front, and the windshield.  The rest of the windows
18     are a dark tint.
19 Q   Can you sit -- see in that vehicle, in the back portion
20     of the vehicle?
21 A   No.  You can't -- you can't see in there.  You can see
22     in the front.  You can see if a passenger is in the
23     front, but you can't see the back and the sides.
24 Q   Okay.  All right.  Calling your attention to February
25     2001 -- that time frame, February, march 2001, okay?

**Page 758**

1  A   Uh-hum.  (Affirmative)
2  Q   Were you in Anchorage in that time?
3  A   Yes.
4  Q   Okay.  Do you recall whether the weather conditions
5      were -- was it getting towards break up, was it still
6      heavy winter, do you know?
7  A   No, it was muddy.  Freezing and thawing out.  It was
8      really muddy.
9  Q   All right.  In regards to your vehicle, do you have a
10     schedule about washing it, or.....
11 A   Well, during break up, I don't -- I don't worry about
12     washing it, you know.  I might take the hose and spray
13     it down, but I don't -- because I live on an alley.  My
14     -- my carport is on the alley, and the alley is just
15     dirt and gravel, and there is lots of holes, and there
16     is no point in washing it.
17 Q   Okay.  Now, have you known your son, Robert, to ever
18     own a firearm -- a handgun?
19 A   No.  I have never known him to -- to own a gun.  Even
20     as a child, I never bought him a gun
21     MR. JAMES:  All right.  One moment, please.  (Pause)
22 That's all I've got.  Thank you.  You can ask some
23 questions.
24 A   That's it?
25     THE COURT:  Thank you, Mr. James.  Ms. Brady,

1    Can I answer any procedure or scheduling kind of
2 questions?
3    UNIDENTIFIED JUROR: Is there a lunch break? If we go
4 in deliberation at 10:30, then what happens to lunch?
5    THE COURT: We'll buy you lunch tomorrow. And the
6 bailiff will -- you'll have a bailiff who you'll be assigned
7 to. The bailiff will give you menus. You'll be given the
8 option of whether to go out to lunch or whether to order
9 lunch in and have a working power lunch. So it's your
10 choice. And all of that will be handled tomorrow. Yes,
11 sir?
12    UNIDENTIFIED JUROR: You mentioned instructing us in
13 the law. Will you be instructing us as to the exact charges
14 and then also the exact parts of the law that were applied?
15    THE COURT: Yes, sir. I will.
16    UNIDENTIFIED JUROR: Okay. Thank you.
17    THE COURT: And I'll warn you now, I'm required by law
18 to read them to you, but I'll also give you a copy to follow
19 along so if it helps you to absorb information, you can
20 follow along with your copy, and then you'll also have the
21 original instructions and your copies in the jury room to
22 refer to as you begin to deliberate and talk about the case.
23 And -- yes, sir?
24    UNIDENTIFIED JUROR: What time are we to be back here
25 again tomorrow?

Page 763

1 if she can wrap things up, and if so, then they probably use
2 that time to just dispense of matters and come to agreement.
3 Otherwise it would just be a confirming a court date or
4 something like that. But she -- she would know during the
5 course of -- she should know by the end of today she said,
6 and of course, the morning is gone, but she had planned to
7 be in her office all morning this morning. But that's the
8 situation.
9    THE COURT: All right. Well, either way, it's
10 important for you to be there. And here's what I would like
11 you to do. I'd like you to show up for us tomorrow morning.
12    MR. IVERSON: Okay.
13    THE COURT: I'll take a head count and make sure that
14 everybody is feeling well.
15    MR. IVERSON: Uh-hum. (Affirmative)
16    THE COURT: If everybody is feeling well, then we'll
17 talk about cutting you loose tomorrow morning so that you
18 can make sure -- so that you're not involved here. If
19 something happens and we lose a couple of jurors tonight we
20 may ask you to stay on the jury, but we'll give you a break
21 to take care of your other personal business.
22    MR. IVERSON: Yeah, and any case, she didn't feel it
23 would be a long duration, and I'm willing to do whatever.
24    THE COURT: All right. Well, why don't we check with
25 -- then come back with everybody else tomorrow at 8:30, and

Page 765

1    THE COURT: 8:30 tomorrow.
2    UNIDENTIFIED JUROR: 8:30?
3    THE COURT: Yes. All right. Let me just remind you
4 again we're getting near the end, and it's as important as
5 ever that you not speak with one another. Even though
6 you've heard all the evidence now, you still haven't heard
7 the closing instruction -- the closing arguments that tie it
8 together, and you haven't heard the instructions on the law.
9 So it's premature to begin talking with one another about
10 how you might decide the case, and of course, it's always
11 premature and inappropriate to talk with anybody else about
12 deciding the case. So don't do any investigation or
13 research on your own and please just remember not to speak
14 with anyone else about the case. And Mr. Iverson, could you
15 stick around? We'll ask you about your schedule after I let
16 everybody else go. We'll see you tomorrow, folks.
17    (Jury excused)
18    THE COURT: All right. Everybody have a seat. Mr.
19 Iverson, what's your schedule for tomorrow? Do you know any
20 more than you knew yesterday?
21    MR. IVERSON: No, sir. My son's attorney, Sid
22 Billingslea, I spoke to her on the phone late yesterday
23 afternoon. The pretrial conference is scheduled at 1:30 in
24 the building next door. She has been attempting to work
25 with the juvenile I guess and probation officer to determine

Page 764

1 we'll make a decision then if you're not -- if you're going
2 to end up not serving, you don't necessarily have to stick
3 around, but I need to -- if I lost two jurors tonight
4 through pneumonia or a broken leg or something, then I would
5 be hurting, and so why don't we see tomorrow?
6    MR. IVERSON: All right.
7    THE COURT: All right. Good night. Thank you. All
8 right. The rest of our jurors have departed. Let's take
9 care of any additional substantive procedural issues that we
10 can. Mr. James, you wanted to make a motion for.....
11    MR. JAMES: Oh, yeah.
12    THE COURT: .....judgment of acquittal, and I asked you
13 to reserve it until we took a break, without, of course,
14 waiving your right to do that. So.....
15    MR. JAMES: Understood. Your Honor, at this time I
16 make judgement -- my motion. Basically, as the testimony
17 has indicated, this case rises or falls on Jeremy Fish. And
18 I think we've established more than adequate evidence on his
19 direct examination, cross examin -- excuse me, his cross
20 examination testimony that Jeremy Fish is a complete liar.
21 And given that, I don't think reasonable minds can differ
22 that he is a liar and he's totally unbelievable. And the
23 officers who testified, including Officer Johnstone, said he
24 did acknowledge it rises and fall -- Johnstone said that,
25 Officer Johnstone. And without Jeremy Fish, they don't have

Page 766

1 a case, and I think he's -- we certainly have established
2 that this should not go to the jury  And that's just it in
3 a nutshell.  I mean you've heard all the testimony, so.....
4       THE COURT:  Motion is denied.  Reasonable minds can
5 differ on whether the state has presented sufficient
6 evidence to convict Mr. Davis on each of the counts.
7 It's not my de -- I don't get to decide how strong the
8 evidence is.  I just have to decide whether there's enough
9 evidence to get past the motion for judgment of acquittal,
10 and there clearly is.  Any other procedural issues?
11      MS. BRADY:  Yes, Your.....
12      THE COURT:  Ms. Brady?
13      MS. BRADY:  .....Your Honor.  This morning I returned
14 the jury instructions that you asked me to correct, and when
15 I was correcting the count instruction.....
16      THE COURT:  Let me get mine.
17      MS. BRADY:  Okay.
18      THE COURT:  I'll just step out for a second.
19      (Pause)
20      THE COURT:  All right.  Go ahead, Ms. Brady.
21      MS. BRADY:  The way Your Honor asked me to do it, the
22 way it was decided during our discussions of jury
23 instructions is on the first page.  It has each individual
24 date that on or about February 8th, February 20th.  When I
25 did that, it looked kind of cumbersome.  I did the second

Page 767

1 one that says on or about the date specified in the count,
2 in that same place.  I don't have a strong preference as to
3 which one.  I just thought I'd bring them both and we can
4 use whichever.  I -- I don't care.  I just thought that that
5 was a bit cumbersome, so I wanted to bring that to your
6 attention.
7       THE COURT:  Mr. James, do you have a preference as to
8 which one of these we use?
9       MR. JAMES:  No, Your Honor.  Ms. Brady brought it to my
10 attention earlier this morning.  I don't -- I don't care.
11 Probably the -- I'm kind of inclined to agree if she's
12 suggesting the one -- the count rather than the -- the
13 repeat of the dates.  But it matters not to us.  I mean,
14 quite honestly.
15      THE COURT:  On or about the date specified in each
16 count then, rather than.....
17      MR. JAMES:  I mean either way.  Whatever.
18      THE COURT:  That's fine.
19      MR. JAMES:  I mean we all know what we're talking about
20 I think, comfortably.
21      THE COURT:  All right.  We'll use the on or about the
22 date specified in each count.
23      MS. BRADY:  Okay.
24      THE COURT:  Anything else?
25      MS. BRADY:  You reserved ruling on a couple of jury

Page 768

1 instructions.
2       THE COURT:  On one, I think.  And that one is -- I
3 didn't reser -- I don't think I reserved ruling.  I
4 indicated that I wasn't going to give it until -- unless I
5 heard a reason to give it, but now I don't remember which
6 one it was.
7       MS. BRADY:  That was based on our arguments of counsel.
8       THE COURT:  That's closing arguments, yes.
9       MS. BRADY:  Right.  And then there was also the expert
10 witness one that was discussed, and you said that.....
11      THE COURT:  I was going to give the pattern, the new
12 pattern.
13      MS. BRADY:  Right.  My notes indicated that Mr. James
14 said that no expert had testified.....
15      THE COURT:  Well, but one has, and I have the new
16 pattern 1.11 in your packet.
17      MS. BRADY:  Thank you.
18      THE COURT:  You just wanted to make sure it was there?
19      MS. BRADY:  Right.
20      THE COURT:  All right.  And we'll give the defendant
21 has not testified instruction rather.....
22      MR. JAMES:  Right.
23      THE COURT:  .....than the defendant has testified
24 instruction.  Do I need -- and I'll hold out the arguments
25 of counsel until after hearing arguments of counsel.  Are

Page 769

1 there any other instruction issues?  Ms. Brady?
2       MS. BRADY:  Not from me, Your Honor.
3       THE COURT:  Mr. Brady?
4       MR. JAMES:  Can we get a packet of those today?
5       THE COURT:  They'll be done later this afternoon.  I
6 need to double-check them one more time, then I'll have them
7 numbered, and we'll call your office when they're ready.
8       MR. JAMES:  Okay.  Yeah.  That would be great.  Because
9 we got to -- Madam clerk, is she going to call or.....
10      THE COURT:  My secretary will call.
11      MR. JAMES:  Okay.  We got a voice machine, so if it
12 clicks into voice machine, we'll be monitoring.  But.....
13      THE COURT:  Right.  We'll leave a message for you.
14      MR. JAMES:  Yeah, yeah.  Thank you.
15      THE COURT:  How much time for your closing?  Ms. Brady?
16      MS. BRADY:  Forty-five minutes.
17      THE COURT:  Forty-five?
18      MS. BRADY:  Uh-hum.  (Affirmative)
19      THE COURT:  Mr. James?
20      MR. JAMES:  Forty-five.
21      THE COURT:  All right.  You can both have 45.  I'll
22 give you warnings.  Do you want a warning?
23      MS. BRADY:  I want a five minute warning.  On the first
24 at 20 minutes, I want a five minute warning, so I can save
25 the rest for rebuttal.

Page 770

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,

        Plaintiff,

vs.

ROBERT O. DAVIS III,

        Defendant.

Case No. 3AN-S01-1717 CR

DOB: 1-28-68
ID No: 6361752
ATN: 103-002-696

## JUDGMENT AND COMMITMENT

Defendant has been convicted upon a verdict of guilty

| DV Offense Per AS 18.66.990(3) & (5) - No |
|---|

| Count | Date of Offense | Offense | Statute Violated |
|---|---|---|---|
| I | 2-8-01 | Misconduct Involving a Controlled Substance 3rd | AS 11-71-030(a)(1) |
| II | 2-20-01 | Misconduct Involving a Controlled Substance 3rd | AS 11-71-030(a)(1) |
| III | 2-21-01 | Misconduct Involving a Controlled Substance 3rd | AS 11-71-030(a)(1) |
| IV | 3-1-01 | Misconduct Involving a Controlled Substance 3rd | AS 11-71-030(a)(1) |

Defendant came before the court on April 17, 2002 with counsel, Dennis James, and the District Attorney present.

IT IS ORDERED that the defendant is hereby committed to the care and custody of the Commissioner of the Department of Corrections for the following period(s).

State of Alaska v. Robert O. Davis, III
Case No. 3AN-01-1717 CR
Page 1 of 3

Exhibit B – 92

AS 12.55.090-.110
Crim. R. 32
App. R. 215

00089

Count I – Four (4) years – presumptive
Count II – Four (4) years – presumptive
Count III – Four (4) years – presumptive
Count IV – Four (4) years – presumptive

Time to be served concurrent.

Defendant to remand on April 26, 2002 if appeal is not filed.

SURCHARGE.  IT IS ORDERED that the defendant pay the following surcharge within 10 days

| Count | Surcharge Amount |
|-------|------------------|
| I – IV | $100 |

Upon application, the court may allow a defendant who is unable to pay the surcharge required, to perform community work service under AS 12.55.055(c) in lieu of the surcharge.

Any appearance bond in this case is:
___    exonerated.
_X_    exonerated when defendant reports to the jail to serve the sentence.

_____          _____
Effective Date                  Dan A. Hensley
                                Superior Court Judge

### NOTICE TO DEFENDANT

Sentence Appeal.  If you are ordered to serve more than two years in jail, you may appeal the sentence tot the court of appeals on the ground that it is excessive.  Your appeal must be filed within 30 days of the date of distribution stated below.  If you are sentenced to serve two years or less in jail, you may seek review o f your sentence by filing a petition for review in the Supreme Court.  To do this, you must file a notice of intent to file a petition for sentence review within 10 days of the date of distribution stated below.  See Appellate Rules 215 and 403(h) for more information on time limits, procedures and possible consequences of seeking review of your sentence.

State of Alaska          Robert O. Davis     Exhibit B – 93          AS 12.55.090-.110
Case No. 3AN-                17 CR                                      Crim. R. 32
Page 2 of 3                                                            App. R. 215      00090

I certify that on _____
a copy of this judgment was sent to:

___ K. Brady
___ D. James
___ DOC

_____
Secretary/Clerk

I certify that on _____
a copy of this judgment was sent to:

___ Jail            ___ Probation Officer
___ DOC             ___ DPS-Juneau
___ Data            ___ DPS-Fingerprint Sec.
___ Term.           ___ Defendant,
___ Off. Loc.           through _____
___ Exhibit Clerk

_____
Clerk

State of Alaska v. Robert O. Davis, III
Case No. 3AN-01-1717 CR            Exhibit B – 94
Page 3 of 3

AS 12.55.090-.110
Crim. R. 32
App. R. 215

00091