FILE COPY

## IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ROBERT O. DAVIS III,              )
                                  )
            Appellant,            )
                                  )
      vs.                         )        Court of Appeals No. A-8308
                                  )
STATE OF ALASKA,                  )
                                  )
            Appellee.             )
_____      )
Superior Court No. 3AN-S01-1717 Cr.

APPEAL FROM THE SUPERIOR COURT
THIRD JUDICIAL DISTRICT AT ANCHORAGE
THE HONORABLE DAN A. HENSLEY, JUDGE

BRIEF OF APPELLEE

GREGG D. RENKES
ATTORNEY GENERAL
Timothy W. Terrell (9011117)
Assistant Attorney General
Office of Special Prosecutions
   and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501

Telephone: (907) 269-6250
Facsimile: (907) 269-6270

Filed in the Court of Appeals
of the State of Alaska
January _9_, 2004

MARILYN MAY, CLERK OF
THE APPELLATE COURTS

Deputy Clerk

VRA CERTIFICATION. I certify that this
document and its attachments do not contain (1)
the name of a victim of a sexual offense listed in
AS 12.61.140 or (2) a residence or business address
or telephone number of a victim or witness to any
crime unless it is an address used to identify the
place of the crime or it is an address or telephone
number in a transcript of a court proceeding and
disclosure of the information was ordered by the
court.

Exhibit C – 1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

AUTHORITIES RELIED UPON.......................................................................................v

ISSUES PRESENTED FOR REVIEW ............................................................................1

STATEMENT OF THE CASE.........................................................................................2

    Facts ...........................................................................................................................2

           1.    *The February 8, 2001 Buy*.............................................4

           2.    *Truncated Buy Attempts on February 13th and 15th, 2001* ............................................................7

           3.    *The February 20, 2001 Buy*...........................................7

           4.    *The February 21, 2001 Buy*...........................................9

           5.    *The February 28, 2001 Buy and Arrest*.....................10

    Course of Proceedings ...........................................................................................12

ARGUMENT...................................................................................................................13

    I.    THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE ...........................................................13

Exhibit C – 2

      A.    Standard of Review ........................................................... 13

      B.    Discussion ......................................................................... 14

II.    THE TRIAL JUDGE DID NOT ERR IN DECLINING TO ALLOW OFFICER BENNETT TO TESTIFY TELEPHONICALLY OR IN FAILING TO REQUIRE THE STATE TO PAY FOR HIS TRANSPORT TO ANCHORAGE, AND ANY CLAIMED ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT GIVEN FISH'S TESTIMONY ....................................................... 18

      A.    Standard of Review ........................................................... 18

      B.    Discussion ......................................................................... 18

CONCLUSION ................................................................................ 29

Exhibit C – 3

## TABLE OF AUTHORITIES

<u>Cases</u>

*Babcock v. State,*
    685 P.2d 721 (Alaska App. 1984)..................................................................28

*Brown v. Anchorage,*
    680 P.2d 100 (Alaska App. 1984)..................................................................13

*Charles v. State,*
    780 P.2d 377 (Alaska App. 1989)..................................................................28

*Cornwall v. State,*
    915 P.2d 640 (Alaska App. 1996)..............................................................20, 21

*Dailey v. State,*
    65 P.3d 891 (Alaska App. 2003)....................................................................23

*Dorman v. State,*
    622 P.2d 448 (Alaska 1981) .........................................................................13

*Eben v. State,*
    599 P.2d 700 (Alaska 1979) .........................................................................13

*Johnson v. State,*
    889 P.2d 1076 (Alaska App. 1995)................................................................28

*Kitchens v. State,*
    898 P.2d 443 (Alaska App. 1995)..................................................................28

*Mahan v. State,*
    51 P.3d 962 (Alaska App. 2002)..............................................................20, 21

*Myers v. Alaska Housing Finance Corp.,*
    68 P.3d 386 (Alaska 2003) .........................................................................18

*People v. Amor,*
    12 Cal.3d 20, 114 Cal.Rptr. 765, 523 P.2d 1174 (1974) .......................22

*Ratliff v. State,*
    798 P.2d 1288 (Alaska App. 1990)................................................................13

*Ross v. State,*
    586 P.2d 616 (Alaska 1978) ...................................................... 13

*Sheldon v. State,*
    796 P.2d 831 (Alaska App. 1990) ............................................... 13

*Snyder v. State,*
    661 P.2d 638 (Alaska App. 1983) ............................................... 13

*State v. Albert,*
    899 P.2d 103 (Alaska 1995) ...................................................... 22

*State v. Jones,*
    759 P.2d 558 (Alaska App. 1988) ............................................... 22

*Taylor v. Illinois,*
    484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) .................... 20

*United States v. Nobles,*
    422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) ................... 20

*Waters v. State,*
    64 P.3d 169 (Alaska App. 2003) ................................................ 28

*Whiteside v. Dep't of Public Safety,*
    20 P.3d 1130 (Alaska 2001) ...................................................... 20

## Rules

Alaska Rule of Professional Conduct 1.8(e)(1)-(2) .............................. 22

## Constitutional Provisions

Alaska Constitution article I, section 11 ...................................... 18, 21

Sixth Amendment, United States Constitution ................................. 18, 20

## AUTHORITIES RELIED UPON

### Constitutional Provisions

United States Constitution, Sixth Amendment provides:

### RIGHT TO SPEEDY TRIAL, WITNESSES, ETC.

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusations; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

United States Constitution, Fourteenth Amendment provides in relevant part:

### § 1.  CITIZENSHIP RIGHTS NOT TO BE ABRIDGED BY STATES.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.  No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Alaska Constitution article I, section 7 provides:

### SECTION 7.  DUE PROCESS.

No person shall be deprived of life, liberty, or property, without due process of law.  The right of all persons to fair

and just treatment in the course of legislative and executive investigations shall not be infringed.

Alaska Constitution article I, section 11 provides:

## SECTION 11.  RIGHTS OF ACCUSED.

In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury of twelve, except that the legislature may provide for a jury of not more than twelve nor less than six in courts not of record. The accused is entitled to be informed of the nature and cause of the accusation; to be released on bail, except for capital offenses when the proof is evident or the presumption great; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

<u>Statutes</u>

Alaska Statute 11.71.030 (2002) provides:

## MISCONDUCT INVOLVING A CONTROLLED SUBSTANCE IN THE THIRD DEGREE.

(a) Except as authorized in AS 17.30, a person commits the crime of misconduct involving a controlled substance in the third degree if the person

(1) under circumstances not proscribed under AS 11.71.020(a)(2)—(4), manufactures or delivers any amount of a schedule IIA or IIIA controlled substance or possesses any amount of a schedule IIA or IIIA controlled substance with intent to manufacture or deliver;

(2) delivers any amount of a schedule IVA, VA, or VIA controlled substance to a person 19 years of age who is at least three years younger than the person delivering the substance; or

(3) possesses any amount of a schedule IA or IIA controlled substance

(A) with reckless disregard that the possession occurs

(i) on or within 500 feet of school grounds; or

(ii) at or within 500 feet of a recreation or youth center; or

(B) on a school bus.

(b)  It is an affirmative defense to a prosecution under (a)(3)(A) of this section that the prohibited conduct took place entirely within a private residence located within 500 feet of the school grounds or recreation or youth center, and that the prohibited conduct did not involve distributing, dispensing, or possessing with the intent to distribute or dispense a controlled substance for profit.  Nothing in this subsection precludes a prosecution under any other provision of this section or any other section of this chapter.

(c) Misconduct involving a controlled substance in the third degree is a class B felony.

## Rules

Rule 29(a) of the Alaska Rules of Criminal Procedure provides:

### MOTION FOR ACQUITTAL.    (A)    MOTIONS FOR JUDGMENT OF ACQUITTAL.

Motions for directed verdict shall not be used and motions for judgment of acquittal shall be used in their place.  The court, on motion of a defendant or on its own motion, shall enter judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.  If a defendant's motion for judgment of acquittal at the close of the state's

case is not granted, the defendant may offer evidence without having reserved that right.

Rule 38.1 of the Alaska Rules of Criminal Procedure provides:

### TELEPHONIC PARTICIPATION IN CRIMINAL CASES.

(a) In any proceeding at which the defendant's presence is required under Criminal Rule 38(a), as modified by Rule 38.2, the defendant may waive the right to be present and request to participate by telephone. The defendant's waiver of the right to be present may be obtained orally on the record or in writing. The court may allow telephonic participation of one or more parties, counsel or the judge at any proceeding in its discretion. The court may allow telephonic participation of witnesses at bail hearings, omnibus hearings, probation revocation hearings or at trial with the consent of the prosecution and the defendant. The court may allow telephonic participation of witnesses at other hearings in its discretion.

(b) The provisions of AS 12.35.015 shall govern the issuance of search warrants by telephone.

(c) The provisions of Criminal Rule 6(u) govern telephonic participation in grand jury proceedings.

## ISSUES PRESENTED FOR REVIEW

Robert Davis was convicted of four counts of third-degree misconduct involving a controlled substance, based on controlled drug buys made by police informant Jeremy Fish. This appeal presents the questions:

(1)    Whether the jury's verdict was supported by sufficient evidence, due to Fish's alleged lack of credibility as a witness.

(2)    Whether Davis's right to compulsory process required that he be allowed to present a witness telephonically over the state's objection.

(3)    Whether Davis had a right to have the state or the court system pay for a witness to be transported to testify in person, after the court denied Davis's request for the witness to testify telephonically.

## STATEMENT OF THE CASE

Facts

Davis's conviction stems from four controlled drug buys made by Anchorage police informant Jeremy Fish on February 8, 20, 21, and 28, 2001.

Fish agreed to make the buys to work his way out of criminal charges in Nome. In January 2001, Fish was living in Nome and burglarized an apartment, taking a small amount of money. [Exc. 39, 110 (Tr. 310-12, 246-47)] Nome Police Officer Daniel Bennett questioned him about the burglary and Fish told him that he would just give the victim her money back, but Officer Bennett declined this resolution. [Exc. 110 (Tr. 247)] He asked Fish to instead make some controlled drug buys for the Nome police. [Exc. 39-40, 110 (Tr. 310-14, 247)] Officer Bennett clarified that he did not have the authority to dismiss charges, but that he could make recommendations to the Nome District Attorney regarding the issue. [Exc. 40-41 (Tr. 314, 317-18)] Fish agreed to make the drug buys, only to surreptitiously leave Nome and return to Anchorage without doing so. [Exc. 38, 40, 110 (Tr. 308-09, 314, 316-17, 247-48)]

Shortly after returning to Anchorage, Fish learned that the Nome authorities had reconsidered their prior leniency regarding the burglary. [Exc. 41-42, 110 (Tr. 319-22, 248)] He then voluntarily turned himself in at

an Anchorage police station on a pending arrest warrant. [Exc. 41-42, 110 (Tr. 319-22, 248)]  Fish met with Anchorage Police Department Officers Pam Pernue, Kathleen Bushue, and another unidentified female officer. [Exc. 14, 92 (Tr. 60-64)]  He told them about the type of drug-buy arrangement that he had with the Nome Police Department, and was apparently told that the officers would check with the Anchorage District Attorney's office to see if a similar deal would be appropriate. [Exc. 14, 42, 45, 92, 101, 107, 110 (Tr. 60, 323-25, 337, 61-64, 133-34, 212, 249)]  Anchorage Assistant District Attorney Phil Moberly had asked Officer Pernue to speak to Fish to see if he could be used as an informant. [Exc. 53 (Tr. 473)]  Fish was then remanded to custody at the Cook Inlet Pre-Trial Facility. [Exc. 42 (Tr. 323-25)]

Fish was released on his own recognizance a day later. [Exc. 42-43 (Tr. 325-26)]  Pursuant to instructions from the police officers that he had earlier talked to, Fish reported to police headquarters on Tudor Road and spoke to Officers Grant Johnstone and Mark LaPorte about making drug buys for the Anchorage police. [Exc. 43-45, 55, 101, 111 (Tr. 329-33, 336, 481, 133-34, 251-52)]  Officer LaPorte was training Officer Johnstone how to make controlled drug buys using informants. [Exc. 55, 101, 105 (Tr. 481, 133-34, 181)]  The officers made an oral agreement with Fish that if he cooperated and made the buys, the Nome burglary charges would not be pursued. [Exc. 44-45, 53-54, 110, 134 (Tr. 333-34, 474, 477, 249, 587-88)]  Fish told them

that he knew two people that he could make drug buys from, one being a person that he knew by the nickname of "Rico." [Exc. 53, 101, 110-11 (Tr. 474, 134, 249-50)] (Davis's mother later testified that his father had given Davis that nickname in early childhood. [Exc. 86 (Tr. 756)]) Fish had known "Rico" for about three years and had both bought drugs from him and been to his house before. [Exc. 50, 119 (Tr. 355, 372-73)]

### 1.    *The February 8, 2001 Buy*

On February 8, 2001, Fish called Davis's cellphone number from police headquarters and made arrangements to buy cocaine from him.[1] [Exc. 101, 111 (Tr. 134-35, 252-53)] Fish asked Davis for a "ball," which he described as 2.9 to 3.2 grams, approximately an eighth of an ounce. [Exc. 57, 111 (Tr. 490, 253)] Davis said that he did not have this amount but could sell Fish $150 worth. [Exc. 19, 111 (Tr. 137, 253)] Fish and Davis agreed to meet at Davis's house. [Exc. 19, 31 (Tr. 137-38, 254)]

The buy took place that same date, and followed a general pattern that was the same for each of the subsequent controlled buys. Officer Roy LeBlanc searched Fish's car, and Officer Johnstone strip-searched Fish,

---

[1]    Officer Johnstone got a warrant for the subscriber information related to Davis's cellphone number, 727-9465, and found it was registered to a Robert O. Davis III at 202 Grand Larry in Anchorage. [Exc. 20 (Tr. 143)] An Alaska Digitel employee testified this was his cellphone number, but gave a different (presumably because current) address. [Exc. 26-27 (Tr. 229-30)]

to ensure that Fish did not have any drugs on him prior to making the buy. [Exc. 19, 31, 70, 95 (Tr. 138, 254-55, 618, 74)]   Officer LeBlanc found marijuana in Fish's car; the marijuana was removed. [Exc. 70-71, 111, 137-38 (Tr. 618-19, 251, 641, 643)]  Fish was given $150 in buy money, which was copied and recorded by Officer Steven Haas so it could be tracked. [Exc. 17, 19, 31, 99 (Tr. 112, 139, 254-55, 125-26)]  Fish then proceeded to Davis's house, followed by Officers Johnstone and LaPorte. [Exc. 19, 31, 55 (Tr. 139, 254-56, 483)]

Before Fish and Officers Johnstone and LaPorte left the police station, other officers went to Davis's house and took up surveillance positions in the area. [Exc. 19, 55 (Tr. 139, 482-83)]  Officers were stationed so as to be able to track Fish's vehicle regardless of which street direction he used to go towards or away from Davis's house. [Exc. 133 (Tr. 580)]  Officers Kathleen Bushue and Chris Simms were watching for Fish's approach to and departure from Davis's house, but were not positioned so they could see him actually go in and out of the house. [Exc. 12, 15, 93-94 (Tr. 49-50, 78-79, 67, 69)]  Officer Haas was stationed in another vehicle watching Fish's approach to the house. [Exc. 97 (Tr. 114-15)]  Officer LeBlanc was in a separate vehicle and could actually see Fish enter into and exit from the house. [Exc. 19, 71, 97 (Tr. 139-40, 619, 621-22, 115)]

Upon arrival, Fish went inside the house, came back out and briefly got into his car, went back in and remained for about ten minutes, where he purchased a gram of cocaine from Davis. [Exc. 12, 19, 31, 71, 93-95, 97, 106 (Tr. 50, 140, 256-57, 622, 68, 71-73, 115, 187)] Fish testified that only he and Davis were present, although he recollected that a woman might have also been there. [Exc. 49, 120-21 (Tr. 352, 383-84)] While Fish was inside the house, Officer Johnstone became concerned that he was taking too long, and called Fish on his cellphone, and Fish told them he was coming out. [Exc. 19, 105 (Tr. 140, 182)]

Officers Bushue and Simms followed Fish as he left the house. [Exc. 12 (Tr. 50)] Pursuant to a prearranged plan, Fish then met Officers Johnstone and LaPorte behind a nearby church and turned the drugs over to Officer Johnstone. [Exc. 20, 31, 55-56, 112, 121 (Tr. 141, 257, 483-84, 258, 385)] Officers Bushue, Johnstone, LaPorte, and Simms then followed Fish back to the police station, where Officer Johnstone strip-searched Fish and Officer LeBlanc searched his car, again to ensure that Fish had not kept any of the drugs for himself. [Exc. 12, 20, 71, 97, 112, 139 (Tr. 50, 141, 622, 115-16, 258, 648)] At the station Officer Bushue also field-tested the drugs, which tested positive as cocaine. [Exc. 12 (Tr. 50-52)]

2.  *Truncated Buy Attempts on February 13th and 15th, 2001*

On February 13, 2001, Fish made another call to Davis to arrange a drug buy. [Exc. 32, 57 (Tr. 265, 488)]  This phone call was recorded, as the police had obtained a *Glass* warrant to record Fish's phone calls and conversations with Davis based on the results of the February 8, 2001 buy. [Exc. 20, 32, 57 (Tr. 143-44, 265, 488)]  Davis told him that he did not have any drugs available for sale. [Exc. 33, 57 (Tr. 266-67, 488)]  Fish called Davis again on February 15, 2001, and asked to buy cocaine, and a meeting was set up but then had to be cancelled when the police officers working Davis's case had to deal with a higher priority matter. [Exc. 33, 57 (Tr. 268-69, 489)]  Fish called Davis and left him a voicemail message saying that he "wasn't going to do nothing tonight" and would contact him later. [Exc. 33, 57 (Tr. 269, 489)]

3.  *The February 20, 2001 Buy*

On February 20, 2001, Fish made another recorded phone call to Davis. [Exc. 20-21, 34, 57 (Tr. 144-45, 270, 490)]  Fish arranged to meet again at Davis's house and purchase a "ball" of cocaine. [Exc. 34 (Tr. 270-71)] Officer LaPorte strip-searched Fish and Officer Haas searched his car. [Exc. 21, 34, 58, 97 (Tr. 145, 271, 492, 116)]  Officer LeBlanc recorded $200 in buy money and Officer LaPorte gave it to Fish. [Exc. 21, 34, 135 (Tr. 145, 271-72,

623)]  Fish was also outfitted with a body wire to record his contact with Davis. [Exc. 34 (Tr. 271)]

Officers Johnstone and LaPorte followed Fish to Davis's house, and then broke off and left the observation to in-place surveillance teams.[2] [Exc. 21, 34, 58 (Tr. 145-46, 271, 493)]  Fish went inside Davis's house, where he found Davis and several other people inside the house. [Exc. 34-35, 123 (Tr. 273-74, 404)]  Davis was in the process of moving out of the house. [Exc. 35, 124, 127 (Tr. 274, 276, 414-15, 425)]  The people with Davis were preparing to go to the store to get some plastic sandwich bags, and Davis asked them to also get a pot so that he could make a batch of crack cocaine. [Exc. 35, 58, 124 (Tr. 274, 493, 413)]  Fish had parked behind their car, so he briefly went outside, moved his car, and then came back in. [Exc. 35, 58, 124, 135 (Tr. 274, 494, 413, 626)]  Fish purchased 11.8 grams of cocaine from Davis and left. [Exc. 13, 35, 106 (Tr. 54-55, 276, 187)]

Fish returned to the police station and gave the cocaine to Officer Johnstone, who turned it over to Officer LaPorte. [Exc. 21, 35, 127 (Tr. 147, 276, 425)]  Fish was strip-searched and Officer Haas searched his car. [Exc. 18, 21, 35, 58 (Tr. 118, 147, 276, 495)]  Officer Bushue field-tested the drugs

---

[2]     Officers Bushue, Simms, and Haas were watching Fish's approach to Davis's house, in two separate patrol cars, and Officer LeBlanc was watching Fish actually come in and go out of the house. [Exc. 13, 97, 100, 135, 139 (Tr. 54, 116, 129-31, 623, 626, 649)]

at the station and they tested positive as cocaine. [Exc. 13, 58 (Tr. 54-55, 495)]

4. *The February 21, 2001 Buy*

The next day, on February 21, 2001, Fish met Officers Johnstone and LaPorte and then called Davis to purchase some crack cocaine. [Exc. 22, 35, 58-59, 113, 125 (Tr. 150, 276, 495-96, 278-79, 416)] The call was recorded. [Exc. 113 (Tr. 279)] Davis agreed to meet Fish at a Chevron station at the intersection of the Old Seward Highway and International Airport Road. [Exc. 22, 59, 113 (Tr. 151, 496, 279)] The Chevron station was only a short distance from Davis's mother's house, where Davis was staying at the time. [Exc. 144 (Tr. 759)] Officer Johnstone strip-searched Fish and his car was searched. [Exc. 22, 113 (Tr. 151, 280)] Officer LeBlanc recorded $200 in buy money and then gave it to him. [Exc. 22, 113, 136 (Tr. 151, 280, 627-28)] Officer LeBlanc also outfitted Fish with a wire to record his conversations with Davis. [Exc. 113, 128, 140 (Tr. 280, 430, 659)]

Fish then proceeded to the Chevron station, followed by Officers Johnstone and LaPorte. [Exc. 59 (Tr. 496)] Other officers were already staked out as in-place surveillance teams.[3] At the Chevron station Fish got

---

[3]    Officers Bushue and Stevens were in one vehicle. [Exc. 13, 15 (Tr. 55, 79)] Officer Haas was watching from a separate vehicle in the parking lot of a nearby restaurant, the Arctic Roadrunner. [Exc. 98 (Tr. 122-
(footnote continued . . .)

out of his car and got into a green Chevrolet Suburban with tinted windows that Davis was driving. [Exc. 13, 15, 22, 113-14, 125 (Tr. 55-56, 79, 151-52, 281-82, 418)] (Davis's mother later testified that she owned a Suburban with tinted windows. [Exc. 86 (Tr. 757)]) Davis stated that he was staying at his mother's house, but still had the same cellphone number. [Exc. 113, 127 (Tr. 281, 424)] Fish purchased 1.55 grams of cocaine and went back to his own car. [Exc. 13, 22, 59, 114, 126, 132 (Tr. 55-56, 152, 498, 282, 423, 521)] After the purchase Fish drove back to the police station, followed by Officers Johnstone and LaPorte, and gave them the drugs, which field-tested positive as cocaine. [Exc. 22, 59, 132 (Tr. 152, 497, 521)] Officer Johnstone strip-searched Fish and also searched his car. [Exc. 22 (Tr. 152)]

5.   *The February 28, 2001 Buy and Arrest*

The final drug buy took place on the evening of February 28 – March 1, 2001. Fish met Officers Johnstone and LaPorte at the police station on February 28, 2001, and made several unsuccessful calls to Davis's number, attempting to set up a buy, but he finally made contact with Davis. [Exc. 23, 114-15 (Tr. 154, 285-88)] The call was recorded. [Exc. 115 (Tr. 286)]

---

(. . . footnote continued)
23)] Officers Johnstone and LaPorte were across the street in the parking lot of a bar, The Peanut Farm. [Exc. 22 (Tr. 151) Officer LeBlanc was in the area monitoring transmissions from Fish's body wire. [Exc. 136 (Tr. 629)]

Fish and Davis arranged to meet in the parking lot of a pancake restaurant along Muldoon Road. [Exc. 14, 23 (Tr. 57, 154)] Officer Johnstone recorded $200 in buy money and gave it to Fish. [Exc. 23, 104 (Tr. 154, 179)] Officer Johnstone strip-searched Fish and Officer Somerset Jones searched his car, and Fish was outfitted with a body wire to record his conversations with Davis. [Exc. 13, 23, 51, 109, 115 (Tr. 56, 156, 445, 219, 288)]

Fish then drove to the prearranged location shortly after midnight (*i.e.*, on March 1st) and found Davis in the parking lot of a Chinese restaurant near the pancake restaurant, where Officers Bushue and Stevens were staked out doing surveillance. [Exc. 13-14, 96, 115-16 (Tr. 56-58, 81, 288-90)] Officer Jones was also in the nearby area. [Exc. 52 (Tr. 451)] Fish got out of his car and into Davis's truck and purchased cocaine. [Exc. 14, 115-16, 129 (Tr. 58, 289-90, 433)] Fish got out of Davis's truck about a minute later and spoke into his body wire, telling the officers the make and license plate number of Davis's truck, and Officer LeBlanc then moved in and arrested Davis. [Exc. 14, 72, 96, 116, 129-30 (Tr. 58, 631-32, 84, 290, 433, 452-53)] Fish met Officer Johnstone in the parking lot of a nearby auto supply store and turned over the cocaine to him. [Exc. 24, 103, 116 (Tr. 157-58, 175, 290-91)] Fish then returned to the police station and Officer Johnstone strip-searched him and Officer Jones searched his car. [Exc. 24, 51, 103, 109, 116 (Tr. 158, 447, 176, 219, 290-91)] Officer Jones also field-

tested the drugs at the police station, which tested positive as cocaine. [Exc. 51, 108 (Tr. 446, 214-15)]

Course of Proceedings

Davis was charged with four counts of third-degree misconduct involving a controlled substance. [Exc. 1-3] During the trial, Davis requested to have Nome Police Officer Daniel Bennett testify telephonically from Nome about his arrangement with Fish to seek dismissal of burglary charges in exchange for Fish's making controlled drug buys, and Fish's reneging on that arrangement. [Exc. 25-26 (Tr. 224-27)] The prosecutor objected to Officer Bennett appearing telephonically, and the court denied Davis's request. [Exc. 26 (Tr. 226-27)] Davis did not subsequently call Officer Bennett as a witness. After the close of evidence, Davis moved for a judgment of acquittal, claiming that Fish was a "liar" whose testimony was completely incredible, such that there was insufficient evidence for reasonable jurors to convict. [Exc. 87-88 (Tr. 766-67)] The court denied the motion. [Exc. 88 (Tr. 767)] The jury then found Davis guilty on all four counts. [Exc. 89]

Davis now appeals.

## ARGUMENT

I.   THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE

A.   Standard of Review

Davis first argues that his conviction is not supported by sufficient evidence because Fish's testimony was supposedly not credible. [At.Br. at 14-16] When this court reviews whether a conviction is supported by sufficient evidence, it "consider[s] only those facts in the record most favorable to the prosecution and such reasonable inferences as a jury may have drawn from them." *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981). The court does not weigh the evidence or decide issues of witness credibility. *Ratliff v. State*, 798 P.2d 1288, 1291 (Alaska App. 1990); *Brown v. Anchorage*, 680 P.2d 100, 104 (Alaska App. 1984). When determining whether sufficient evidence supports a conviction, the court should uphold the verdict if any reasonable juror could have concluded that there was no reasonable doubt about the defendant's guilt. *Sheldon v. State*, 796 P.2d 831, 839 (Alaska App. 1990) (citing *Ross v. State*, 586 P.2d 616, 618 (Alaska 1978)). The court's duty is the same regardless of whether the evidence presented is direct or circumstantial. *See Snyder v. State*, 661 P.2d 638, 641 (Alaska App. 1983); *Eben v. State*, 599 P.2d 700, 704 (Alaska 1979).

B.    Discussion

Davis notes that none of the police officers testified that they saw him with cocaine, and says that the state's case thus rests on the testimony of Fish. [At.Br. at 15] Davis points out that Fish's former girlfriend testified to his poor character and drug use, and that two defense witnesses -- friends of Davis -- testified that they were with Davis on the evening of the February 20, 2001 buy and did not see any drugs. [At.Br. at 16] Davis recognizes that witness credibility is normally a jury issue, but says that in this case Fish's credibility was so suspect that no reasonable juror could have believed him. [At.Br. at 16] Davis is in error. Reasonable jurors could have believed Fish and found Davis guilty based on his testimony and the other evidence presented.

Davis does not question the state's evidence of identity. Fish testified that he had known Davis for about three years and had both bought drugs from him and been to his house before. [Exc. 50, 119 (Tr. 355, 372-73)] The first two buys took place at Davis's house, and there were numerous recorded buy calls made to Davis's cellphone. In addition to identity, neither does Davis question that the drugs recovered by the police from Fish actually were cocaine, a prudent decision given the testimony that the drug samples all field-tested positive as cocaine and then later retested positive as cocaine at the state crime lab. [Exc. 12-13, 51, 58-59, 75-76, 108 (Tr. 50, 52, 55, 446,

495, 497, 683-89, 214-15)] Davis also ignores the general pattern of conduct used to ensure the integrity of the investigation – *i.e.*, that Fish was strip-searched before and after each buy, his car was searched before and after, that teams of police officers followed him to and from the buy sites and watched the buy sites, and that the drugs were recovered from him quickly by the police. *See above* at pp. 4-11. Davis in essence argues that because the police officers did not physically go with Fish into Davis's house and vehicles during the various buys, one cannot rule out the possibility that Fish really got the drugs somewhere else and cannot convict Davis because Fish was not credible. [At.Br. at 14-16] The argument is without merit.

First, Davis offers nothing to suggest that Fish got the drugs elsewhere. Second, Fish's testimony was corroborated by the tapes of all the drug buy calls and the tapes from Fish's body wires, which were played for the jury. [Exc. 33-35, 112-16 (Tr. 260, 266-91)] Davis points to no real inconsistencies in Fish's testimony. Davis simply argues that Fish's past lifestyle and character render him incredible as a witness. Fish's life and character were far from exemplary – he and other witnesses testified to other criminal conduct he had engaged in, criminal convictions, drug use, and other unsavory things. [Exc. 24, 30, 36, 85, 102, 110, 116-17 (Tr. 160, 245, 298, 747-48, 161, 246-48, 292-97)] But this is not uncommon in the criminal milieu, and does not render a witness per se incredible. Reasonable jurors

were more than justified in believing Fish's testimony, particularly when considered against the mosaic of corroborating testimony from the police officers and the evidence from the recorded conversations.

Davis's claim that the sufficiency of the state's evidence was fatally undercut by the testimony of two of his friends that they were with him on the evening of February 20, 2001, and did not see any drugs, is likewise without merit. First and most obvious, the testimony does nothing to rebut the state's evidence regarding the other three buys. Second, reasonable jurors could find these individuals' testimony not credible, and in some instances downright laughable. Brandon May, for example, stated that he was familiar with marijuana but that his familiarity stemmed from looking at a book that he or his friends had "rented" in high school regarding drugs, which they had done because "[w]e just basically want to know everything, what is going on. We don't want to get on – you know, start using things that we can't get off of, and cause crimes and problems in this world." [Exc. 141 (Tr. 727)] Similarly, May's testimony that no one left Davis's house on February 20, 2001, to go to the store was contradicted by the police officers' observations of Fish going out to move his car to let Davis's friends leave and by statements recorded on Fish's body wire. [Exc. 34-35, 58, 124, 135, 142 (Tr. 273-74, 494, 413, 626, 732)] Reasonable jurors could reject the testimony of May and Davis's other friend, Darryl Cash.

This case presents nothing more than a garden-variety credibility issue, and reasonable jurors could believe Fish and disbelieve testimony offered in support of Davis. Considering Fish's testimony in conjunction with the police officers' testimony and the recorded conversations, reasonable jurors could find that Davis provided cocaine to Fish, and Davis's argument that there was insufficient evidence to convict should be rejected.

II.   THE TRIAL JUDGE DID NOT ERR IN DECLINING TO ALLOW OFFICER BENNETT TO TESTIFY TELEPHONICALLY OR IN FAILING TO REQUIRE THE STATE TO PAY FOR HIS TRANSPORT TO ANCHORAGE, AND ANY CLAIMED ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT GIVEN FISH'S TESTIMONY

A.   Standard of Review

The issue of whether Davis's right to compulsory process guaranteed him the ability to present witnesses telephonically, or conversely required the state to pay for the personal appearance of such witnesses if it objected to their telephonic appearance, is a constitutional issue. Alaska's appellate courts review constitutional issues *de novo*. *Myers v. Alaska Housing Finance Corp.*, 68 P.3d 386, 389 (Alaska 2003) (citing cases).

B.   Discussion

Davis claims that his right to compulsory process, as set out in the Sixth Amendment to the United States Constitution and article I, section 11 of the Alaska Constitution guarantees him the right to present witnesses telephonically. [At.Br. at 16-17] Alternatively, he argues that these same provisions mandate that the state or the court system be required to pay for the transport of a defense witness if the option of telephonic testimony is rejected. [At.Br. at 18-20] Accordingly, he claims that the trial court erred in denying his request to have Nome Police Officer Daniel Bennett testify

telephonically, or in not having the state pay for Officer Bennett to be transported to Anchorage. [At.Br. at 16-20] These claims fail on the merits, but it is not necessary to reach the merits because (1) Davis has waived the claims through conclusory briefing, (2) Davis failed to show an inability to pay Officer Bennett's transport costs, and (3) any alleged error is harmless beyond a reasonable doubt in that Fish testified to everything that Davis sought to establish through Officer Bennett's testimony.

First, Davis's claim that his right to compulsory process required that he be allowed to present witnesses telephonically over the state's objection should be rejected because it was inadequately preserved, both below and before this court. In his oral remarks to the trial court, Davis's counsel cited no legal authority supporting this claim. [Exc. 25-26 (Tr. 224-27)] In his brief before this court, Davis is equally conclusory. His legal analysis consists of two separate sentences, stating that "In criminal trials, the accused has the right to have compulsory process for obtaining witnesses in his favor" (and citing the United States and Alaska Constitutions) and that "Even though the State of Alaska objected to Officer Bennett's telephonic testimony, Mr. Davis's constitutional right to call witnesses carries more weight than the State of Alaska's ability to object to the Alaska Criminal Rules." [At.Br. at 16-17] A claim presented in this conclusory a fashion must be deemed waived. *Mahan v. State*, 51 P.3d 962, 966 & n.8 (Alaska App.

2002) (waiver through inadequate appellate briefing); *Cornwall v. State*, 915 P.2d 640, 653 n.11 (Alaska App. 1996) (waiver through failure to adequately address in the trial courts).

Second, Davis's claim that his right to compulsory process guarantees him the right to present telephonic testimony fails to comport with the core purpose of this right – to have a legally coercive mechanism for bringing witnesses or documents *into court* to testify. Davis provides no authority for the proposition that the right to compulsory process guarantees the right to have someone testify from a remote location. As the Supreme Court noted, "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *Taylor v. Illinois*, 484 U.S. 400, 412-13, 108 S.Ct. 646, 655, 98 L.Ed.2d 798 (1988) (citing *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975)). The jury's ability to observe in-person the demeanor credibility of witnesses is one of those legitimate demands of the adversarial system. *Cf. Whiteside v. Dep't of Public Safety*, 20 P.3d 1130, 1136-37 (Alaska 2001) (noting significance of in-person testimony). Davis's novel and unsupported argument should be rejected.

Third, Davis's alternative claim, that his right to compulsory process required the state to pay for Officer Bennett's transport, should be rejected because it was not adequately preserved or presented below or before this court. Davis's counsel's oral remarks in support of the request cited no legal authority. [Exc. 25-26 (Tr. 224-27)] Counsel later filed a written motion seeking Officer Bennett's transport, and the legal analysis consisted of the sentence, "Mr. Davis relies upon the Alaska Constitution Article I, section 11 to wit 'to have compulsory process for obtaining witnesses in his favor . . . .'" [Exc. 5] Davis's analysis before this court is equally sparse, consisting of a few pages of discussion with some case citations related to uncontroverted points not directly controlling the issue at hand. In these circumstances this claim should be deemed waived. *Mahan v. State*, 51 P.3d 962, 966 & n.8 (Alaska App. 2002); *Cornwall v. State*, 915 P.2d 640, 653 n.11 (Alaska App. 1996).

Fourth, Davis's claim that the state should have paid Officer Bennett's transport costs was properly rejected because Davis failed to make an adequate showing of indigency. In his oral request, Davis's counsel stated that "it's strictly economics" but provided no more specific showing of Davis's financial situation, nor did he request to have an evidentiary hearing on the matter. [Exc. 26 (Tr. 226-27)] In the affidavit in support of his written motion, Davis stated simply, "I do not have the funds of $616.00 to bring

Officer Bennett, plus per diem costs here to Anchorage to testify." [Exc. 7] Davis did not at all expand on his current financial situation, discuss his assets, liabilities, *etc.*, and it is not facially apparent why a defendant who could afford private counsel could not afford the costs of a single witness transport, or why counsel could not advance the costs and add that to Davis's bill, as allowed by Alaska Rule of Professional Conduct 1.8(e)(1)-(2).

Fifth, in the absence of a showing of indigency, it is valid that Davis have to take into account economic considerations in determining how best to present his case and which witnesses are important enough to justify paying necessary costs. *Cf. State v. Albert*, 899 P.2d 103, 113 (Alaska 1995) (quoting *People v. Amor*, 12 Cal.3d 20, 26-27, 114 Cal.Rptr. 765, 768, 523 P.2d 1174, 1176 (1974)) (noting that technically non-indigent defendant may still have limited resources such that economic considerations impact decision whether to plead guilty or go to trial, but being faced with this choice does not unconstitutionally infringe on the right to counsel); *State v. Jones*, 759 P.2d 558, 572 (Alaska App. 1988) (right to effective assistance of counsel – defendant not entitled to millionaire's counsel who leaves "not a single stone unturned," but rather to basic fairness; "in the real world, expenditure of time and effort is dependent on a reasonable indication of materiality").

The sixth and most important reason that Davis's substantive claims should be rejected is that, assuming purely for the sake of argument

that it was error not to allow Officer Bennett to appear telephonically or to pay for his transport to Anchorage, it was still harmless beyond a reasonable doubt because Fish admitted to everything that Davis wanted to establish through Officer Bennett's testimony and there was no reasonable possibility that it affected the result. *See Dailey v. State*, 65 P.3d 891, 896 (Alaska App. 2003) (applying constitutional harmless error standard).

Davis first requested to have Officer Bennett appear telephonically, prior to Fish taking the stand. In his offer of proof, Davis's attorney stated:

> Basically, Your Honor, I don't know what Mr. Fish is going to testify to, but we have an extensive police report, three page, from Dan – Officer Dan Bennett, Nome Police Department, relating to the sequences of events. One of those issues that I wish to explore is that he had – he, being Fish, had agreed to meet with Bennett. There was supposed to – he was supposed to participate in some buys up in Nome was what this all came down – it originally came down to. He was to meet with him, he – the 31st, I believe, and he departed unbeknownst to Bennett on the 27th, which activated – this January now, of this year – activated the arrest warrant issued by Judge Ben Esch up in Fairbanks – excuse me, Nome, which resulted in his arrest down here on the 6th of February.

> And if he denies that he had any kind of agreement, or that, in fact, he lied to the police – just denies he lied to the police, I think I'm entitled to establish that, A, he lied to his – the police there.

Exhibit C – 32

[Exc. 25 (Tr. 224-25)]  The next day, Davis filed a written motion seeking payment of Bennett's travel costs that did not expand in any way on his basis for needing Bennett's testimony, stating only that his "testimony in regards to the situation in Nome may be vital to impeach the testimony of Jeremy Fish." [Exc. 4] On appeal Davis is equally conclusory, stating that he wanted to call Officer Bennett to impeach Fish's credibility.  [At.Br. at 17-18] But Fish admitted in his own testimony everything that Davis was trying to establish through calling Officer Bennett, and so not allowing Bennett to appear telephonically or paying for his transport was harmless beyond a reasonable doubt.

In his testimony on direct examination, Fish admitted burglarizing an apartment in Nome in January 2001. [Exc. 110 (Tr. 246-47)] He admitted the same thing on cross-examination. [Exc. 39 (Tr. 310-12)] He told the jury about being questioned about the burglary by Officer Bennett, and about having a deal with Officer Bennett to seek dismissal of burglary charges in exchange for making controlled drug buys. [Exc. 39-40, 110 (Tr. 310-14, 247)] Fish told the jury that he lied to Officer Bennett just to make a deal, and that he really did not know anyone in Nome to buy drugs from. [Exc. 40 (Tr. 314)] He stated, "And then I lied to the guy and told him that I did (have drug contacts in Nome).  And I was – I – I lied pretty much a lot to that guy.  And then he expected something from me that I couldn't deliver to

him, so I left." [Exc. 40 (Tr. 314)]  Counsel followed up, "Okay.  So you lied to

the cop?"  [Exc. 40 (Tr. 314)]  Fish replied, "Yeah."  [Exc. 40 (Tr. 314)]

Fish admitted to falsely implicating three persons in drug

dealing.  [Exc. 40 (Tr. 315-16)]  With regard to one person, he stated, for

example, that "I told him I bought dope off of him.  I never bought dope off

the kid.  He's just – he was just a punk, and everybody thought he was a

punk.  So I made him think that everybody was right about the kid." [Exc. 40

(Tr. 315)]  Fish admitted to meeting with Officer Bennett on January 26,

2001, and lying to him about a drug shipment coming into Nome on January

28, 2001.  [Exc. 40 (Tr. 316-17)]  Fish admitted that he met with Officer

Bennett on January 27, 2001, and lied and stated he was moving to a new

apartment, when he in fact was preparing to skip town on the midnight

flight.  [Exc. 38, 40, 110 (Tr. 308, 317, 247-48)]  Calling Officer Bennett was

not necessary to impeach Fish's credibility.

Other testimony also buttressed this negative information about

Fish.  In terms of Fish's potential bias in favor of the state caused by his deal

with the Anchorage police regarding working off the Nome burglary charges

by making controlled buys, Officer LaPorte testified that there was such an

agreement.  [Exc. 53, 54, 134 (Tr. 473-74, 477, 587-88)]  In terms of Fish's

alleged bias against Davis, Fish's former girlfriend (and mother of what both

she and Fish assumed to be his child) testified that she and Davis were

friends, that Fish was jealous of Davis because Davis would sometimes supply her and the child with material things, and that Fish had told her that he "would do anything he could to get Rico (Davis) in trouble." [Exc. 84-85, 122, 143 (Tr. 745-47, 750, 392-93, 751-52)]

As far as Fish's credibility in general, both Fish and other witnesses offered a wealth of information about Fish's prior conduct, criminal and otherwise. Fish, who was only 19, admitted that he had two juvenile adjudications of crimes involving dishonesty. [Exc. 30, 110 (Tr. 245-46)] Fish admitted to long-time drug use, although he memorably clarified the extent of his current usage, stating, "I don't use cocaine, dude. I smoke crack." [Exc. 30, 50 (Tr. 245, 355)] Fish stated that he had dropped out of high school in ninth or tenth grade. [Exc. 30 (Tr. 245)] Fish admitted that he did not support Athena Soder's child, which he assumed was his. [Exc. 118, 122 (Tr. 363, 392-93)] Athena Soder testified that he tried to sell her marijuana when she was pregnant. [Exc. 85 (Tr. 747-48)] Fish admitted to showing up for his first controlled buy with marijuana present in his vehicle. [Exc. 111 (Tr. 251)] Officer LaPorte characterized Fish as a "difficult informant to work with." [Exc. 54 (Tr. 477)] Officer LaPorte described being sent to a "disturbance" at Fish's apartment. [Exc. 131 (Tr. 517)] Fish admitted that in July 2001, he had been investigated by the police as a result of an incident where a truck (which he stated was his friend's) was used to damage other

vehicles. [Exc. 116 (Tr. 292)]  Fish admitted that he was cited for possessing marijuana in July 2001. [Exc. 36 (Tr. 301)]  Fish admitted that in September 2001 he was stopped outside a house as part of a burglary investigation, and that a search of his vehicle turned up cocaine and currency, resulting in pending drug charges.  [Exc. 116-17 (Tr. 293-94)]  Officer Johnstone corroborated this. [Exc. 24, 102 (Tr. 160-61)]  Fish admitted that he had been investigated by the police in late September 2001, in connection with a drive-by shooting where a bullet casing was found in his car, then claimed the car was his girlfriend's, and then claimed the car was owned by a third person. [Exc. 36, 117 (Tr. 300-01, 295-97)]  Fish admitted to driving without a license, and to having five vehicles which were titled in his girlfriend's name.  [Exc. 47 (Tr. 343-44)]  Fish admitted to getting paid "under the table" on a construction job.  [Exc. 37 (Tr. 303)]

Considering the trial testimony as a whole, failing to obtain Officer Bennett's testimony was harmless beyond a reasonable doubt.  Officer Bennett had no knowledge of the facts of the actual drug buys that Davis was charged with, and thus could only testify as to collateral matters that led to Fish's contact with the Anchorage police.  Calling Officer Bennett to repeat Fish's testimony about these collateral matters would not have affected the jury's verdict.  This court has upheld the exclusion or limitation of questioning of witnesses as harmless beyond a reasonable doubt in similar

situations. *See, e.g., Charles v. State*, 780 P.2d 377, 379-81 (Alaska App. 1989) (precluding defense from questioning victim about his own pending murder charge for killing defendant's relative; state's case was overwhelming, parties knew each other and identity was not at issue, victim's testimony was corroborated by testimony and evidence, defendant was able to establish victim's bias against him).[4] It should do so in this case as well.

---

[4]    Similarly, this court has upheld the limitation of cross-examination to certain matters where the jury had already received sufficient information to evaluate a witness's bias. *See, e.g., Waters v. State*, 64 P.3d 169, 172-73 (Alaska App. 2003) (exclusion of evidence regarding witness's 1989 conviction did not require reversal, where cross-examination made clear that witness had deal with the state to testify, jury could evaluate witness's motives); *Johnson v. State*, 889 P.2d 1076, 1080 (Alaska App. 1995) (exclusion of bias evidence upheld when defense had already established witness's bias). *See also Kitchens v. State*, 898 P.2d 443, 451-52 (Alaska App. 1995) (limitation of questioning of sexual assault victim's boyfriend regarding her demeanor upon returning to state after assault was harmless beyond reasonable doubt – defense was able to ask victim these questions directly, issue was not particularly probative, defense had numerous other bases to impeach, state had strong evidence, including tape-recorded conversations); *Babcock v. State*, 685 P.2d 721, 727-28 (Alaska App. 1984) (exclusion of defendant's stepfather to testify to absence of birthmark referred to by police officer was harmless beyond reasonable doubt; defendant was exhibited to jury, photo of chest was shown to jury, witness testified they examined her and found no birthmark, officer's identification of defendant was corroborated by other officer, other evidence linked defendant to drug transaction).

## CONCLUSION

For the reasons stated above, this court should affirm Davis's conviction.

Dated this 9th day of January, 2004, at Anchorage, Alaska.

GREGG D. RENKES
ATTORNEY GENERAL

By: _Timothy W. Terrell_
Timothy W. Terrell (#9011117)
Assistant Attorney General