3AN-01-1717 CR

State v. Robert Davis
November 15, 2001

**Page 250**

1  officers that you could make buys, did you tell them
2  that you could buy.....
3  MR. JAMES: I'm going to object. She's leading him all
4  over the place.
5  THE COURT: You -- I'll sustain leading objections. I
6  don't know if the next question was leading or not.
7  MS. BRADY: Okay.
8 Q  Did you know what -- his name was Robert Davis, or did
9  you know him as something else?
10 A  I knew him as Rico.
11 Q  Okay. And did you know him by any other name, other
12  than Rico, when you said that you could make buys?
13 A  No, I did not.
14 Q  Okay. And has your Nome case now been dismissed?
15 A  I don't know.
16 Q  Okay. Now, were you supposed to be making buys from
17  anybody besides him?
18  MR. JAMES: Objection. Relevance.
19  THE COURT: Overruled.
20 A  Yeah.
21 Q  Okay. And, in fact, did you make buys from anyone
22  besides him?
23 A  Yeah.
24 Q  Okay. Now, what happened when you first got to APD,
25  the very first time you went there to make -- make your

**Page 252**

1 A  February 8th, yes.
2 Q  Okay. And where did you meet with him at?
3 A  On February 8th?
4 Q  Uh-huh. (Affirmative)
5 A  At the police station.
6 Q  And what happened when you got to the police station?
7 A  I think I was -- I was searched and I can't remember.
8 Q  Did they ask you to call Rico.....
9 A  Yeah.
10 Q  .....the person you knew as Rico?
11 A  Yeah.....
12  MR. JAMES: Leading.
13  THE COURT: Sustained.
14  We did make phone calls.
15 Q  You made phone calls?
16 A  Yes.
17 Q  Who did you make a phone call to?
18 A  To Rico.
19 Q  Okay. Did you know his number right off the top of his
20  -- right off your.....
21 A  Yeah.
22  MR. JAMES: Objection. Leading.
23  THE COURT: That was not leading. The objection is
24  overruled.
25 A  Yes, I did.

**Page 251**

1  deal?
2 A  The very first time I went there?
3 Q  Uh-huh. (Affirmative)
4 A  Well, the very first time I went there and talked, they
5  searched me and stuff. And when they searched me, they
6  searched my car and they found some pot. I -- you
7  know, they found some pot and they found a marijuana
8  pipe. And the told me, don't bring it back to the
9  station or, you know, they'll discontinue working with
10  me, so.....
11 Q  Okay. Did they talk to you about who you could make
12  buys from?
13 A  Yeah. I said Rico.
14 Q  Okay.
15 A  I don't know.
16 Q  Then did they tell you a time to come back after that?
17 A  I -- I can't remember. It was a while ago.
18 Q  Okay.
19 A  But it was -- it was definitely we were going to, you
20  know, be on a weekly basis.
21 Q  Okay. Did you -- let me direct your attention to
22  February 8th, which would be a day that's important to
23  this case. So just -- I want you to concentrate on
24  this particular case. Did you meet with Officer
25  Johnstone that day? Oh, he just left.

**Page 253**

1 Q  Okay. What was the number?
2 A  727-9465.
3 Q  Okay. Now, did you make an arrangement to go buy some
4  cocaine from Mr. Davis?
5 A  Yes, I did.
6 Q  Okay. And how much cocaine were you going to buy?
7 A  I believe the first time it was $150 worth.
8 Q  Did you ask for $150.....
9 A  No, I -- I asked for a ball, but he said he didn't have
10  it. I believe he said he didn't have it. And he said
11  he had a buck 50 he could do something with or
12  something.
13 Q  Okay. Now in -- when you were asking him for a ball,
14  what you were asking him for?
15 A  I was asking him for coke or crack.
16 Q  And was there a specific amount? Is a ball an amount?
17 A  Well, usually a ball is like 3.2 to 2.9, I don't know.
18 Q  3.2 to 2.9.....
19 A  Yeah. Like.....
20 Q  .....what?
21 A  Grams.
22 Q  Okay. And he -- and then when you said, he said a buck
23  50, what does that mean?
24 A  $150.
25 Q  Okay. So was it arranged for you to meet him somewhere

3AN-01-1717 CR

**Page 258**

1 A Coke.

2 Q Okay. Now, did you -- and you gave it Officer
3 Johnstone at the church, is that.....

4 A Yeah.

5 Q And then what happened -- where did you go after that?

6 A Then we went back to the -- to the station. And I was
7 searched. And the car was searched. And then we
8 scheduled the next appointment, when I would come and
9 see him.

10 Q Did they interview you?

11 A Yeah, I got a debrief.

12 Q Did they tape record that?

13 A Yes, they did.

14 Q All right. And did you know that both you and your car
15 were going to be searched again once you left?

16 A Yeah. That was just a mandatory thing, routine.

17 Q Now, did you get the amount of cocaine that you were
18 expecting to get?

19 A Well, the first time, it -- it was kind of shallow. I
20 mean, it wasn't as much as he usually gives me. But
21 that first time was the -- that was just the first
22 time, because that was the first time I had bought dope
23 off him in a while, because I had just got back from
24 Nome. And he said $150, and that's just what he gave
25 me for what he got.

**Page 259**

1 Q Okay. What did -- when -- when you got back and you
2 were talking to the officers, what did you do after
3 talking to the officer?

4 A I called Rico back and told him it was a little shy,
5 and he agreed, and said he would make it up to me next
6 time.

7 Q Did you call the same number?

8 A Yes.

9 Q Okay. And -- now, did you meet with Officer LaPorte on
10 February 13th?

11 A Yes, I did.

12 Q And did you make an calls that day?

13 A I can't really remember.

14 Q Okay. Do you remember when you met with Officer
15 LaPorte if your conversations were being recorded?

16 A The ones that I made to -- to Rico?

17 Q The conversation that you had with Officer LaPorte.

18 A Yeah.

19 Q Okay. Now you listened to some tapes with regard to
20 this case. If I tell you that I have a tape right here
21 that is an identical copy of the tape that you received
22 that said 2/13 on it, would you know what's on this
23 tape?

24 A Not right offhand.

25 Q Okay. If I play small portion of it.....

**Page 260**

1 A Yeah.

2 Q .....would you be able to recognize it?

3 A Yes, I would.

4 THE COURT: Exhibit number?

5 MS. BRADY: Let me just -- this is exhibit number 5,
6 Your Honor.

7 THE COURT: Thank you.

8 10:3631

9 (Audio tape played for jury)

10 10:3644

11 Q Do you remember this tape now?

12 A Not really. You've got to.....

13 Q Not yet?

14 A No.

15 Q You listened to this tape though, right?

16 A Yeah.

17 Q Okay.

18 A Yeah, I remember it. I remember now.

19 Q You remember it now?

20 A Yeah.

21 Q Okay. Is the -- is the recording that's contained on
22 this tape a true and accurate representation of the
23 conversations that you had by calling Mr. Davis?

24 A Yes.

25 MS. BRADY: Okay. At this time, I would move for

**Page 261**

1 admission of this portion. I'm going to play it, Your
2 Honor.

3 THE COURT: Number 5, Mr. James?

4 MR. JAMES: I'd like to -- I'm going to object, because
5 given the testimony.....

6 THE COURT: We'll have a bench conference.

7 MR. JAMES: Yes.

8 THE COURT: Hold on a second, please.

9 (Bench conference as follows:)

10 THE COURT: The objection is?

11 MR. JAMES: Okay. I'm going to object to it on the
12 foundation. Fish is bouncing around here saying well, he
13 didn't remember, now, he says he does remember. I seriously
14 question whether he's listened to that tape, and if it is a
15 true and accurate representation of what transpired of
16 another tape. So I'm -- it's on the foundation is what I'm
17 objecting to.

18 THE COURT: Well, there -- there's a sufficient
19 threshold foundation for admission based on his testimony
20 that he remembered, that it is the tape that he listened to
21 the other day. I mean, you can always challenge his
22 credibility, but that's the -- finally, a jury decision.
23 You made two objections though. The first one is overruled.
24 The second one is whether you seriously doubt whether the
25 copy is a true and accurate copy, and that's really

3AN-01-1717 CR

State v. Robert Davis
November 15, 2001

1   MS. BRADY: I am, Your Honor. And I'm.....
2   THE COURT: Player.
3   MS. BRADY: .....about ready to hit play.
4   THE COURT: Go ahead. Our jury out.
5   11:2207
6   (Audio tape played)
7   11:2817
8   THE COURT: That's the end? That's 6?
9   MS. BRADY: That's 6.
10  THE COURT: All right. We'll take a very short
11  restroom break for everybody, and then we'll get the jury.
12  MS. BRADY: Okay.
13  THE COURT: I'm talking about as quickly as you can,
14  please.
15  (Off record)
16  THE COURT: Have a seat, everybody. Are we back on
17  record, Ms. McKewin?
18  THE CLERK: We are, uh-huh.
19  THE COURT: We want to -- our jury is back. Thanks,
20  folks. Do you want to continue, Ms. Brady?
21  MS. BRADY: Yes, Your Honor.
22          DIRECT EXAMINATION CONTINUED
23  BY MS. BRADY:
24  Q   Now, you met with Officer LaPorte on February 21st, is
25      that right?

Page 278

1   A   Yes.
2   Q   Did you call the defendant that day?
3   A   Yes, I did.
4   Q   And was that conversation recorded?
5   A   Yes.
6   Q   And did it lead to setting up a buy that day?
7   A   Yes.
8   Q   And was that also recorded?
9   A   Yes.
10  Q   And is that what's contained on this tape?
11  A   Yes.
12  Q   Is the tape a true and accurate representation of both
13      your conversation and the buy that was made?
14  A   Yes.
15  MS. BRADY: Okay. At this time, I move to admit
16  state's exhibit 6.
17  THE COURT: Number 6, Mr. James?
18  MR. JAMES: Yes, sir. No objection.
19  THE COURT: Number 6 is admitted.
20  (Plaintiff's exhibit 6 admitted)
21  Q   Now let's play a little bit of it, then I'm going to
22      ask you some questions.
23  11:3449
24  (Audio tape played for jury)
25  11:3743

Page 279

1   Q   Let me stop this for just a second, and I want to ask
2       you a question. When he says, I don't have anything
3       but hard stuff, what's he talking about?
4   A   Crack.
5   Q   Okay.
6   11:3756
7   (Audio tape played for jury)
8   11:3904
9   Q   Okay. Now once the call was made, what happens next?
10  A   Then search -- they searched my car and they searched
11      me. And they go get the money, come back and put the
12      wire on. They put the wire on me. And we go.
13  Q   Okay. How much money did they give you?
14  A   $200.
15  Q   Okay. And when we're talking about they, who are we
16      talking about?
17  A   The -- the investigators.
18  Q   Okay. And when you're talking about putting the wire
19      on, explain what you're talking about.
20  A   Wire. The -- it's on a strap.
21  Q   Uh-huh.
22  A   Talking about the thing that records everything.
23  Q   Okay. And is it over your clothes, under your clothes?
24  A   Yeah, it's under my clothes and on my shoulder.
25  Q   Okay. And we'll go ahead and play the wire now.

Page 280

1   11:4009
2   (Audio tape played for jury)
3   11:4059
4   Q   Okay. Now let me stop you for just a second, and stop
5       the tape for just a second. What's going on right
6       there?
7   A   He's -- he's -- we're talking about -- we're talking.
8   Q   Where are you talking at?
9   A   In his car.
10  Q   And what car is that?
11  A   I believe that's in his -- yeah, that's in his Jeep.
12  Q   Okay. And.....
13  A   It's not a Jeep. It's a Suburban, green Suburban.
14  Q   Okay. And could you -- on the tape, it sounded like
15      there was a ringing?
16  A   Yeah.
17  Q   What was going on then?
18  A   He got a phone call.
19  Q   Okay. And so it was on cell phone?
20  A   Yeah.
21  Q   Okay. And you said -- there was something said about
22      him living at his mom's, is that right?
23  A   Yeah. I asked him where he was staying. And he said
24      he was living with his mom. And he basically said he
25      still had the same cell phone number.

Page 281

1 Q  When you say, is it cool, what are you referring to?
2 A  I was just like, is it cool?  And then he was like, no,
3    you can't come over there.
4 Q  Okay.
5 A  So he thought I was meaning, you know, come over for
6    dope or something.
7 Q  Okay.
8 11:4204
9    (Audio tape played for jury)
10 11:4232
11 Q  Now when the music is playing, you're in his car, is
12    that right?
13 A  Right.
14 Q  And then after there's no music anymore, where are you
15    at?
16 A  In my car.
17 Q  Okay.
18 11:4243
19    (Audio tape played or jury)
20 11:4306
21 Q  The tape goes on, but nothing else is said on the tape,
22    is that right?
23 A  That's right.
24    MS. BRADY:  Okay.  Then we'll stop it there.  And that
25    takes me to the next tape.

Page 282

1    MR. JAMES:  All right.  Well, then I think we have to
2 play the whole thing, because otherwise.....
3    MS. BRADY:  Okay.
4    MR. JAMES:  .....you're only hearing.....
5    THE COURT:  Why?  Why do they have to play the whole
6 thing?
7    MR. JAMES:  Well, it.....
8    THE COURT:  What rules requires that?
9    MR. JAMES:  They're going to take it into evidence, and
10 we're only going to play a portion of it, then that's the
11 portion they should take into evidence.
12    THE COURT:  Is there a rule that requires that it be
13 played?  The jury can listen to it in the jury room?
14    MR. JAMES:  I can't think of the rule right off the top
15 of my head.  But logically speaking, I mean, what he's
16 testified to is what the -- now what's out of the presence
17 of the jury to be played.  Now, if you want to talk, I'm not
18 going to play it.  It probably would set the stage, but
19 that's.....
20    THE COURT:  You can have the witness describe what's on
21 the tape.  You're not required to play.....
22    MS. BRADY:  Okay.
23    THE COURT:  You can play whatever portions of the tape
24 you want.
25    (Pause)

Page 284

1    THE COURT:  We need to take another break, folks.  What
2 we're doing during the breaks, if you haven't figured it
3 out, is Mr. -- is the witness listening to the exhibit so
4 that he can testify about it, so.....
5    (Jury excused)
6    MS. BRADY:  My suggestion, Your Honor, these are both
7 very short, would be to do the next two together.
8    THE COURT:  That would be fine.  What are you starting
9 with?
10    MS. BRADY:  I'm starting with state's 7.
11    THE COURT:  All right.  That's good.
12 11:4410
13    (Audiotape played for court)
14 11:5348
15    MS. BRADY:  What I would suggest, I don't want to have
16 any allegation I altered the tape, I'll just cue it to the
17 place where it starts with Detective Johnstone, and only
18 play that for the jury.  If that's all right?
19    THE COURT:  That's not my call.  I don't understand
20 what you mean.  You want to offer number 7, but you don't
21 necessarily want to play the whole thing, is that correct?
22    MS. BRADY:  Right.
23    MR. JAMES:  But then if you're going to offer it, then
24 it's -- do you plan on having that admitted as evidence?
25    MS. BRADY:  Uh-huh.  (Affirmative)

Page 283

1    MS. BRADY:  Okay.  That's cued.  That's state's.  And
2 state's 21 is only about three or four minutes.
3 11:5828
4    (Audiotape played for court)
5 11:5943
6    MS. BRADY:  That's it.
7    THE COURT:  We'll get the jury.
8    (Jury summoned)
9    THE COURT:  Everybody have a seat, please.  And are we
10 back on record?
11    THE CLERK:  Yes.
12    THE COURT:  All right.  We have everybody back.
13 Ms. Brady, do you want to continue?
14    MS. BRADY:  I do you, Your Honor.
15        DIRECT EXAMINATION CONTINUED
16 BY MS. BRADY:
17 Q  Did you meet with Officer LaPorte on February 28th?
18 A  Yes, I did.
19 Q  Okay.  And did you call the defendant that day?
20 A  Yes, we did.
21 Q  And were those calls recorded?
22 A  Yes, they were.
23 Q  Did you make several calls?
24 A  Yes, I did.
25 Q  Okay.  Then did you keep trying on into the night?

Page 285

1 A   Yes, I did.
2 Q   Okay.  Then did you meet with Detective Johnstone later
3      that night?
4 A   Yes.
5 Q   And did you call Mr. Davis again?
6 A   Yes, I did.
7 Q   And was that call recorded?
8 A   Yes, it was.
9 Q   And you've listened to the tape marked state's exhibit
10     7, is that a true and accurate representation of the
11     call you made?
12 A  Yes, it is.
13     MS. BRADY:  Okay.  At this time, I move to admit 7.
14     THE COURT:  Mr. James?
15     MR. JAMES:  No objection.
16     THE COURT:  7 is admitted
17                (Plaintiff's exhibit 7 admitted)
18     MS. BRADY:  I'm going to play that for the jury.
19 12:0141
20     (Audio tape played for jury)
21 12:0249
22 Q  So let me just ask you a question.  When he says it's
23     ready, what is he talking about?
24 A  He's talking about his crack.
25 Q  Okay.  And when you say, I've got two, what are you

Page 286

1      talking about?
2 A   I'm talking about I got $200.
3 Q   Okay.
4 12:03:05
5      (Audio tape played for jury)
6 12:03:55
7 3
8 Q   All right.  And then after you make that call.....
9      THE COURT:  Hold on a second, Ms. Brady.  You need to
10     explain to the jury through the witness that you didn't play
11     all of exhibit number 7.
12     MS. BRADY:  Oh, okay.
13 Q   Now, that tape has a lot of calls on it, is that right?
14 A   Yes.
15 Q   Okay.  And we cued it to the point where you actually
16     go a hold of Mr. Davis, is that right?
17 A   Right.
18 Q   What's going on on the tape for several minutes prior
19     to the place where we actually get to the call that you
20     had to him?
21     What's going on before all that?
22 Q   Yeah.
23 A   We just kept calling and calling and calling.  And he
24     -- he wasn't answering his phone.  I -- I left like
25     three messages, he wasn't calling me back.  So we went

Page 287

1      and got something to eat, and then we -- we came back.
2      I went and got a Snickers bar and a soda pop and then I
3      came back and he answered his phone.
4 Q   Okay.  Now let me ask you about what happened after
5      that call was made.  Where were you at when you made
6      the call?
7 A   I said I was at Tudor.
8 Q   Pardon me?
9 A   The police station over there on Tudor.
10 Q  Okay.  And so the call gets made, and then what happens
11     immediately after that?
12 A  Immediately after that, they go search my car.  They
13     search me.  They put a wire on me, and we go.
14 Q  Okay.  Now when you say those things, is it the same
15     kinds of things that you've been talking about before?
16 A  Yeah, it's all -- it's routine.
17 Q  Okay.
18 A  The same thing.
19 Q  And did the wire record what happened in your meeting?
20 A  Yes, it did.
21 Q  Okay.  And you previously listened to this tape, which
22     is marked state's 21.  Do you know what's on this tape?
23 A  Yes, I do.
24 Q  Is this a true and accurate representation of the wire
25     from March 1st?

Page 288

1 A   Yes, it is.
2      MS. BRADY:  Okay.  And at this time, I would move to
3      admit and publish to the jury.
4      THE COURT:  21, Mr. James?
5      MR. JAMES:  No objection.
6      THE COURT:  21 is admitted.
7                (Plaintiff's exhibit 21 admitted)
8 12:0547
9      (Audio tape played for jury)
10 12:0631
11 Q  All right.  Let me stop it for just a second.  Where
12     are you at when this is going on?
13 A  Where am I at right then?
14 Q  Uh-huh.  (Affirmative)
15 A  I'm inside of his truck.
16 Q  Okay.  And so you guys were sitting inside of his truck
17     talking?
18 A  Yeah.
19 Q  When the music is playing?
20 A  Right.
21 Q  Then the music stops, and where are you at?
22 A  Probably outside of my car.  I'm getting out of his
23     car.  I'm getting out of his car.
24 Q  Okay.
25 12:0651

Page 289

Page 290

```
 1      (Audio tape played for jury)
 2   12:07:07
 3 Q   Now what did you just say?
 4 A   I said gray Toyota, DVD 272, which is the license plate
 5     number and the make of his car.
 6 Q   Okay.  And you were instructed to -- who were you
 7     talking to when you say that?
 8 A   I was talking with police.
 9 Q   Okay.
10 A   Because they thought he was going to come in a
11     different car.  And it was -- it was different.  It was
12     all different, and I wanted them to be aware of what
13     was going on.
14 Q   So what happens after -- after you say that on the
15     wire?
16 A   I go to the -- I go to Tudor, and he gets arrested.
17 Q   Okay.  But let's back up.  You're still at the -- in
18     the parking lot at the Pancake House, is.....
19 A   Right.
20 Q   .....that right?  Okay.  So do you get in your car?
21 A   Yeah.
22 Q   And then once you get in your car, where did you go to?
23 A   I go to Tudor.  I go back to the police station.
24 Q   Okay.  And what happens when you get back?  Did you
25     stop somewhere on the way?
```

Page 291

```
 1 A   I don't believe so.
 2 Q   Okay.  Did you turn over the cocaine to an officer?
 3 A   Okay.  Yeah.  Okay.  I remember now.  I'm sorry.  It
 4     was -- it was a long -- I stopped at -- I think it was
 5     at Schuck's, or something.  We might have stopped.  I
 6     can't really remember.  It was either there or at the
 7     -- at the church.
 8 Q   Okay.  So you stopped somewhere and you turned the
 9     cocaine over to the officer?
10 A   Yeah.  Crack.
11 Q   Okay.  And then what happens -- what do you do next?
12     Where do you go?
13 A   Rode to the police station.
14 Q   And then what happens when you get to the police
15     station?
16 A   I get searched.  And my car gets searched.  And they
17     tell me that they'll get in contact with me.
18 Q   Okay.  And now you're debriefed after every single time
19     you make a buy, is that right?
20 A   Right.
21 Q   Okay.  And are all those recorded?
22 A   Yes, they are.
23 Q   Okay.  So let's talk about -- that's -- is that the end
24     of you involvement in this case?
25 A   Yes.
```

Page 292

```
 1 Q   Okay.  Let's talk about some things that happened after
 2     those buys were over on March 1st.
 3 A   Okay.
 4 Q   Now, on July 26th, you were contacted by some APD
 5     officers who were investigating a truck that were
 6     involved in damaging some cars outside an apartment on
 7     Mumford, is that right?
 8 A   Yes.
 9 Q   Okay.  And your truck was seized, is that right?
10 A   It was not my truck.
11 Q   It wasn't your truck?
12 A   No.
13 Q   Whose truck was it?
14 A   My friend's.
15 Q   Okay.  And in the bed of the truck, there was a bunch
16     of stereo equipment, right?  And that was also seized?
17 A   Yeah.
18 Q   Were you ever charged with anything as a result of that
19     police contact?
20 A   No, I was not.
21 Q   Okay.  Has your testimony here today been influenced in
22     anyway by your thought or perception that you could be
23     charged or that you may have something to worry about
24     there?
25 A   No.
```

Page 293

```
 1 Q   Okay.  And has anyone offered you any kind of deal,
 2     that if you testify in this case, that that case will
 3     be dismissed or it won't be filed on, or anything.....
 4 A   No.
 5 Q   .....along those lines?  Okay.  And as far as you know,
 6     that case could be prosecuted if the police decide they
 7     want to make a case, is that.....
 8 A   Right.
 9 Q   .....right?  Okay.  Do you hope that by cooperating and
10     testifying that you'll be helping yourself in that
11     case?
12 A   Well, I hope.  I hope I'll be helping my -- no, I don't
13     -- I don't think I'll help myself in that case.  I
14     mean, if I -- if they think I'm guilty, I'm -- I'm
15     guilty.
16 Q   Okay.  And let's talk about September 5th.  Now, an APD
17     officer contacted you on that day, and you consented to
18     having your car searched, is that right?
19 A   Yeah.
20 Q   Okay.  And inside your car, the officer found a box?
21 A   Right.
22 Q   What was in the box?
23 A   Well, my -- my ID was in the box.  There was some coke
24     in the box, and there was some money in the box.  But
25     there was my friend that was in the car, and he wasn't
```

3AN-01-1717 CR

---

**Page 294**

1  in the car when I got stopped. Because I -- I pulled
2  into my house and they -- they thought I -- they just
3  -- they thought I -- they thought I had something to do
4  with some pills being taken. But I had nothing to do
5  with the pills be taken. So I told the cop, you know,
6  I have nothing to do with this, so you can search my
7  car, because I know there's not no pills. And then you
8  can search my house, because I know there's not no
9  pills in my house. I haven't done anything wrong. And
10  when he searched my car, I gave my friend my ID, and he
11  put it in his box. And in the box, I guess he put his
12  dope in the box. So then my ID was in the box, was in
13  the dope, so I got kind of, you know, messed up.
14 Q  Okay. Now, did you -- did you tell that to the
15  officer?
16 A  Yes, I did.
17 Q  Okay. And has any law enforcement agency offered you
18  any deal so that if you testify in this case that any
19  charges that could be coming from that contact won't be
20  prosecuted or anything like that?
21 A  No.
22 Q  Okay. So you're just on your own, there's no deals?
23 A  That's right.
24 Q  As far as you know, that case may still be being
25  prosecuted?

---

**Page 295**

1 A  Right.
2 Q  Okay. And are you hoping that by cooperating and
3  testifying, as you promised you would to get your
4  burglary dismissed, that you're going to help yourself
5  somehow in that case?
6 A  If I -- if they think I'm guilty, I'm guilty. They're
7  going to.....
8 Q  Okay. And you don't expect that that case would be
9  dismissed if it were filed because of your testimony
10  here today?
11 A  No.
12 Q  Okay. And then a couple of weeks later on September
13  30th, you were contacted by APD officers again and your
14  car was searched twice that day, is that right?
15 A  Yeah.
16 Q  Okay. And they were searching your car with regard to
17  a drive-by shooting, is that right?
18 A  Yeah, that's what they told me.
19 Q  Okay. And the first time they searched your car, did
20  they find anything?
21 A  No.
22 Q  Okay. And then the second time they came back and
23  searched your car -- did you give them consent to
24  search your car?
25 A  Yes, I did.

---

**Page 296**

1 Q  Okay. And then the second time they came back, did
2  they find anything that time?
3 A  Well, they -- they searched the car one thoroughly for
4  -- for the gun. And then they searched it again
5  thoroughly again, and then they found something. And
6  then -- they said they found a casing off of -- of a
7  gun that was used in the shooting. But, you know, I
8  don't know, man. It's not my car. And my -- the car
9  was -- was -- it was took previously that day by my
10  friend, Jeff, and he put a full tank of gas in it. I
11  went and got my car back, and the next thing I know, I
12  got pulled over. And I -- I got pulled over and I gave
13  them consent to search my vehicle because, you know, I
14  -- I didn't know what was happening. And then after
15  they told me what was going on, then I said, yeah, you
16  guys can search my car because there's -- there's
17  nothing going on, and I didn't do that. And then they
18  -- me and my friend were getting in an argument about
19  why my car just got searched, and they came up on us
20  again and they searched my car again for the same
21  thing, so.....
22 Q  And that's when they found the.....
23 A  Yeah.
24 Q  .....nine millimeter casing?
25 A  And they impounded -- they impounded the car. It -- it

---

**Page 297**

1  wasn't my car. It was my girlfriend's. I was getting
2  it back for her. I don't have a license. I'm not
3  supposed to be driving. So my girlfriend didn't want
4  to go to the kid and get her car back, so I went and
5  got her car back.
6 Q  Okay. And so did they seize that car?
7 A  It was seized, but my girlfriend just got -- she got --
8  she got -- it's out of impound.
9 Q  Okay. Has your testimony here today been influenced in
10  anyway by the thought that you could be charged as a
11  result of that?
12 A  No, it has not.
13 Q  Okay. And any deals in that case? Have you talked to
14  anyone in law enforcement that you'll testify here, and
15  that there's something should happen with that case?
16 A  No, there's -- no.
17 Q  Okay. Are you aware of whether any charges have been
18  filed?
19 A  No, I'm not.
20 Q  Okay. Do you expect -- are you hoping that by
21  cooperating and testifying that you could help yourself
22  in that case?
23 A  No. I don't know.
24 Q  Okay. And if that case were to be filed, you wouldn't
25  expect that case to be dismissed because of your

---

EXC. 117    Exhibit D – 28

3AN-01-1717 CR

State v. Robert Davis
November 19, 2001

---

10    TRIAL BY JURY, CONTINUED (EXCERPT)

11    BEFORE THE HONORABLE DAN A. HENSLEY
              Superior Court Judge

12        Anchorage, Alaska
13        November 19, 2001
          8:47 o'clock a.m.
14

APPEARANCES:

15
    FOR THE PLAINTIFF:    KERIANN BRADY
16                        Assistant District Attorney
                          310 K Street
17                        Anchorage, Alaska

18    FOR THE DEFENDANT:  DENNIS PATRICK JAMES
                          Attorney at Law
19                        1500 West 33rd Avenue
                          Anchorage, Alaska
20

Page 360

---

P R O C E E D I N G S

2   3AN-42-1663

3   8:47:13

4      THE COURT: Have a seat everybody. Are we on record?

5      THE CLERK: Yes.

6      THE COURT: We're back on record, and we have parties
7   and counsel, all of our jurors. Good morning, everybody.

8      THE JURY: Good morning.

9      THE COURT: When we stopped on Thursday, Mr. Fish was
10  in the witness stand, Mr. James was questioning him.
11  Mr. Fish, you're still under oath. And Mr. James, you can
12  continue your questioning.

13     MR. JAMES: Thank you.

14             JEREMY FISH

15  previously sworn, called as a witness on behalf of the
16  plaintiff, testified as follows on:

17     CROSS EXAMINATION CONTINUED

18  BY MR. JAMES:

19  Q   On Thursday, you indicated that Amy Bohman (ph) was
20      your girlfriend, and you mentioned a Major Bohman (ph),
21      who's Major Bohman (ph)?

22  A   Her dad. Her dad.

23  Q   What's he do?

24  A   I believe he's a trooper.

25  Q   Okay. You talked about a Dave Dooley (ph). Where does

Page 361

---

1   Mr. -- do you remember Dave Dooley (ph)?

2   A   Yeah.

3   Q   Okay. Where does Mr. Dooley (ph) live?

4   A   Muldoon.

5   Q   Do you have an address on him?

6   A   Turpin.

7   Q   Do you have a better address than Muldoon and Turpin?

8   A   On Ninth, I believe.

9   Q   Do you have a street address?

10  A   No, I don't.

11  Q   Phone number?

12  A   He got his phone number changed.

13  Q   Do you know how to reach him?

14  A   No.

15  Q   How old is he?

16  A   Like 38, 36.

17  Q   What does he look like?

18  A   Skinny white guy.

19  Q   Skinny white guy?

20  A   Yeah. Kind of short.

21  Q   Okay. And how did you get to know him?

22  A   He -- through the Redwine's.

23  Q   Okay. And the car that he took back, how much did you
24      pay for that car?

25  A   $1,000.

Page 362

---

1   Q   Okay. And had you paid for it?

2   A   Huh? No.

3   Q   No?

4   A   No.

5   Q   Had you paid anything for it?

6   A   Yeah.

7   Q   How much had you paid?

8   A   $500.

9   Q   What was the agreement relating to the other $500?

10  A   I don't know. It -- it was payments. But he just took
11      it back. He just.....

12  Q   Were you current with your payments?

13  A   Yeah.

14  Q   What were the payments?

15  A   I -- my girl paid him like $300 and then we paid him
16      $150. And then I went and paid him $50. And then the
17      next morning, he took the car.

18  Q   Okay. So your girlfriend paid him $300, you paid $150,
19      then one day you paid him $50, and the next day he took
20      the car?

21  A   Yeah.

22  Q   Okay. Now, Athena Soder, do you know her?

23  A   Yeah.

24  Q   Okay. And she's the mother of your daughter?

25  A   I don't know for sure.

Page 363

---

**3AN-01-1717 CR**

| | |
|---|---|
| 1 Q  Which Alaska Club? | 1  -- what is that, that box with..... |
| 2 A  The one right over there.  Right over here on the end | 2 A  This? |
| 3     of the corner right here, she dropped me off. | 3 Q  .....the circle on it?  Yes. |
| 4 Q  The one on Fourth Avenue? | 4 A  That's Rico's house. |
| 5 A  Right. | 5 Q  All right.  And you've indicated it's a duplex? |
| 6 Q  Okay.  During the tapes we listened to, we've heard hit | 6 A  Yeah. |
| 7     me up, does that mean call me back? | 7 Q  All right.  And there's two entrances, I believe you |
| 8 A  Hit me up? | 8     indicated there? |
| 9 A  Yeah.  Yeah. | 9 A  Yeah. |
| 10 A  Yeah. | 10 Q  Which entrance did you use? |
| 11 Q  Yes, that means call me back?  That's just..... | 11 A  This one. |
| 12 A  Just hit me up later.  Yeah. | 12 Q  Okay.  And that's the one on the bottom? |
| 13 Q  Does that -- but I'm understanding, is that you | 13 A  Right. |
| 14     understanding, hit me up is return a phone call or have | 14 Q  Okay.  Could you put an E right there so we know which |
| 15     to do with telephones? | 15     entrance it is?  Okay.  Now, is there off-street |
| 16 A  Yeah. | 16     parking there, or do you have to park on the street? |
| 17 Q  That's just a term that's used to call me back?  If I | 17 A  Yeah.  I used to park right there. |
| 18     said call me back and you say hit me up, we're talking | 18 Q  Okay.  How many widths is that parking?  How many cars, |
| 19     the same thing?  Right? | 19     side by side..... |
| 20 A  Yeah. | 20 A  One. |
| 21 Q  Yes?  Okay. | 21 Q  .....could you get in there? |
| 22 A  Yes. | 22 A  One. |
| 23 Q  All right.  Now how long had you known Mr. Davis? | 23 Q  One? |
| 24 A  About three years. | 24 A  Yeah. |
| 25 Q  Okay.  And you were familiar -- or were you familiar | 25 Q  Okay  There's no extra parking on the side there? |
| Page 372 | Page 374 |

| | |
|---|---|
| 1     with 202 Grand Larry before 8, February? | 1 A  No. |
| 2 A  Yes, I was. | 2 Q  I'm sorry? |
| 3 Q  Okay.  You had been there before? | 3 A  No.  There's not supposed to be. |
| 4 A  Yes, I had. | 4 Q  All right. |
| 5 Q  Okay.  With the court's permission, behind you is a | 5 A  There's a driveway. |
| 6     blank piece of paper.  And I believe someplace up there | 6 Q  Is there extra parking there, whether there's supposed |
| 7     is a black marking pen, blue marking pen, some kind of | 7     to be or not? |
| 8     a marking pen.  Would you give us a diagram of Grand | 8 A  Yeah, you can park another car over here. |
| 9     Larry from Peck to -- is it Dubrell (ph)? | 9 Q  You could park some more cars over there? |
| 10 A  Yeah.  Okay.  Here is Muldoon Road.  Here's Ramada Inn. | 10 A  Yeah. |
| 11     There's -- there's a little liquor store, and then | 11 Q  All right.  How deep is that driveway? |
| 12     there's a strip mall right there.  There's a street | 12 A  What do you mean, deep? |
| 13     that goes like that.  This is Muldoon Road right here. | 13 Q  Well, how far does it go from the street -- is there |
| 14     And then you turn like this.  This is the first street. | 14     something behind 202 Grand Larry that would prevent you |
| 15     It was like house, house, house, and there was like a | 15     from driving through into the next yard? |
| 16     duplex, a carport, and the door, and then the door | 16 A  Yeah.  It's fenced. |
| 17     right there.  That's his house. | 17 Q  A fence there? |
| 18 Q  Okay.  Now, which way is north?  Do you got any idea | 18 A  Yeah. |
| 19     which way is north? | 19 Q  Why don't you indicate where the fence is, would you, |
| 20 A  North is this way. | 20     please?  Okay.  All right.  Can you go up to the fence? |
| 21 Q  Would you put an arrow and an N which way you believe | 21     Can you drive up to the fence? |
| 22     is north?  Up on top, perhaps.  Okay.  So north is up | 22 A  No. |
| 23     on top? | 23 Q  All right. |
| 24 A  Right. | 24 A  I don't think so.  I can't really remember. |
| 25 Q  All right.  Now down on the right-hand corner, is that | 25 Q  All right.  Now, on the 8th, it was about what time |
| Page 373 | Page 375 |

**3AN-01-1717 CR**

| | |
|---|---|
| 1   that's not on the map, how many streetlights are on | 1   all a wrap-around table like this. And then right here |
| 2   Grand Larry? | 2   is his stove. And there's cabinets up here. There's |
| 3 A   I can't remember. | 3   the fridge. And then there's a break, and there's a |
| 4 Q   There's none, correct? | 4   door. There's a bathroom. You can kind of see the |
| 5 A   Right. Yeah. I don't think there is any. | 5   bathroom, kind of see a bedroom. There's a stereo, his |
| 6 Q   All right. So are you comfortable with there's none, | 6   TV. You have a couch like this, windows. There's a |
| 7   zero? | 7   door, I think. And then the couch -- and there's a |
| 8 A   Well, there might have been one. I can't really | 8   couch right here. And there's a lamp. But I was |
| 9   remember. | 9   always right in this area. |
| 10 Q   Okay. Now, where did you park on the 8th of February? | 10 Q   Okay. Now you drew a vertical line there, is that -- |
| 11 A   Right there. | 11   that's open, isn't it? |
| 12 Q   Okay. Would you please put a J where you parked, | 12 A   Which..... |
| 13   please, standing for Jeremy? Okay. Was there any cars | 13 Q   Between the kitchen area and the rest of the living |
| 14   in front of you toward the fence that you've drawn up? | 14   area? |
| 15 A   Yes. | 15 A   Right here? |
| 16 Q   And how many cars were in front of you towards the | 16 Q   Yes. Where you've..... |
| 17   fence? | 17 A   Yeah. This is all open. |
| 18 A   One. | 18 Q   Okay. So if you're in the kitchen, then you can see |
| 19 Q   All right. And is there a carport there? | 19   into the living room area? |
| 20 A   Yeah. | 20 A   Well, yeah, if you -- you know, if you would walk right |
| 21 Q   All right. Was the car in the carport, or was it | 21   here, you could see right in here. |
| 22   toward the fence more and you were part in the carport | 22 Q   Oh, okay. So it's kind of open apartment -- was it |
| 23   or out of the..... | 23   open duplex -- it's a duplex to save time, right? |
| 24 A   I can't really remember. | 24 A   Yeah. |
| 25 Q   You can't? Okay. Now, on the 8th, could you just flip | 25 Q   Okay. Kind of open? Do you understand what my |
|                             Page 380 |                             Page 382 |
| 1   that over and give me -- are you -- are you familiar | 1   question is? |
| 2   with the residence, the inside of the residence? | 2 A   Is it big? |
| 3 A   Of his house? | 3 Q   Well, how big -- well..... |
| 4 Q   Yes. | 4 A   Open. |
| 5 A   Yes. | 5 Q   Well, there's not a lot of walls, are there, in between |
| 6 Q   Okay. Flip that over, would you, and just draw out the | 6   the kitchen and the living area? That's my question. |
| 7   -- a schematic of the residence, if you would. | 7 A   No, there's no walls. |
| 8 A   Okay. Do what? | 8 Q   Now walls? Excuse me. Now which entrance did you |
| 9 Q   Draw out a picture of the residence. | 9   always use, or did you use a specific entrance? |
| 10 A   Of his...... | 10 A   Right there. |
| 11 Q   I said a schematic..... | 11 Q   Okay. And that's off the carport? |
| 12 A   Of the inside? | 12 A   Yeah. |
| 13 Q   Inside, right. | 13 Q   All right. Is there lights out in the carport? |
| 14 A   Okay. | 14 A   Yeah. |
| 15 Q   Be generous with the paper. Use kind of the whole | 15 Q   All right. How many and where are they? |
| 16   paper, would you? | 16 A   Like two big ones. |
| 17 A   I can't really -- I'm not really a good drawer. | 17 Q   Where are they? And now when you went in the first |
| 18 Q   Well, if you want to start again and just..... | 18   time, how many people were there? |
| 19 A   Yeah. | 19 A   Here's -- there might have been -- there was me, and |
| 20 Q   .....work on that piece? Whatever you feel comfortable | 20   maybe there was a girl in there. I can't.-- I can't |
| 21   with, Mr. Fish. | 21   really remember. |
| 22 A   All I know, you walk in his house, there's his door. | 22 Q   Well, yesterday..... |
| 23   And then you walk in and he has a -- there's a bar | 23 A   It might have just been..... |
| 24   table like that. Okay? And there's drawers like this. | 24 Q   I'm sorry, please? |
| 25   He usually is right there. There's a sink. This is | 25 A   .....me and him. I think it was just me and him the |
|                             Page 381 |                             Page 383 |

State v. Robert Davis
November 19, 2001

3AN-01-1717 CR

1  first time.
2 Q  Okay.  And that's consistent with what you said on
3  Thursday, right?
4 A  I believe so.
5 Q  Okay.  Now, do you remember talking to the police
6  afterwards, what they call a debrief?
7 A  Yes, I do.
8 Q  All right.
9  THE COURT:  Move up that.....
10 A  Sorry.
11  THE COURT:  Move your chair back up, please.  Thank
12 you.
13 Q  Okay.  And we left on Thursday, and now it's Monday.
14  We left the trial here on Thursday of last week.  Did
15  you talk to anybody between Thursday and today?
16 A  About this case?
17 Q  About this case.
18 A  No, I have not.
19 Q  Okay.  All right.  Do you remember having a debrief
20  afterwards?
21 A  Yes, I do.
22 Q  Okay.  And during that debrief, do you remember telling
23  the officers that there were three women, plus Robert
24  Davis, plus you in the house?
25 A  On the 8th?

Page 384

1 A  Probably about three or four blocks.
2 Q  Okay.  Okay.  Now on the 8th, who did you talk with
3  when you got debriefed?
4 A  I think it was Officer LaPorte.
5 Q  Okay.  Anybody else?
6 A  I think Officer Johnstone might have came in, but he
7  was -- it was like in and out, I believe.
8 Q  Okay.  All right.  During this time frame, did
9  Mr. Davis think that -- or at least your impression
10  that he thought that you were his friend?
11 A  Yeah.
12 Q  Okay.  And you got out of police custody before the 8th
13  at some point in time, right?  You got -- the judge let
14  you go?  Remember, we talked about that on Thursday?
15 A  Yeah.
16 Q  All right.  And how long were you out before the
17  evening of the 8th?
18 A  I don't know.  It was probably like a week, probably.
19 Q  Okay.
20 A  I can't remember.
21 Q  And you weren't in police custody -- I mean, you and
22  the police weren't together all that time, were you?  I
23  mean, you weren't in sight/sound of the police, were
24  you?  Do you know what I mean by sight/sound?
25 A  No, I was not in sight/sound.

Page 386

1 Q  Yes.
2 A  No.
3 Q  Okay.  Now, what kind of car or vehicle did Mr. --
4  well, what kind of vehicle was in front of you when you
5  pulled in on the 8th?
6 A  I can't remember.
7 Q  Okay.  Was it a passenger car or pickup car, or a big
8  pickup, little pickup, Suburban?  I'm giving you
9  different choices here.  A sedan.....
10 A  I can't remember.
11 Q  Okay.  What happened after you left -- did you stay in
12  the house all the time on the 8th?
13 A  Yeah.
14 Q  Okay.  What happened after you left?
15 A  I went in and -- I went and gave them the dope, and
16  then we went back to the -- to the police station and
17  got searched and debriefed.
18 Q  Okay.  When you said you gave them the dope, where did
19  you give them the dope?
20 A  Behind the church.
21 Q  Which church?
22 A  Muldoon church, I think.  It's the red church there on
23  Muldoon Road.
24 Q  Okay.  How far away from Grand Larry is the red church
25  on Muldoon Road?

Page 385

1 Q  Do you know what I mean?
2 A  Yes.
3 Q  Okay.  So as far as you know, the police had no contact
4  with you from the time you were released until you
5  rendevoused on the 8th, correct?
6 A  No.  I -- I had to call when I got out, and I had to
7  set up, I don't know, it might have been -- I had to go
8  there once before then.  And then -- I had to go to the
9  station before we did a buy and I talked to them.
10 Q  Okay.  You said once before that you had to go to the
11  police station?
12 A  Yeah, I believe so.
13 Q  When was that?
14 A  I can't really remember.  I don't have a good memory.
15 Q  When is the first time you had contact with a Officer
16  LeBlanc?  Well, first of all, do you know an Officer
17  LeBlanc?  No?
18 A  No.  No.
19 Q  All right.  Who do you know -- can you give me the
20  names of the people that you remember that were
21  involved with you during this time?
22 A  Officer LaPorte.
23 Q  Okay.
24 A  And Officer Johnstone.
25 Q  Anybody else?

Page 387

1    Athena was kind of wild.
2 Q  What do you mean she was kind of wild?
3 A  She's wild. There's a reason why, you know, I don't
4    want -- I just don't want to be around her, you know.
5    She's not really -- I don't know, she's a liar and
6    stuff.
7 Q  She's a liar?
8 A  Yeah.
9 Q  Okay. And that's why you don't want to be around her?
10 A  Well, she just -- it's a whole -- it's a whole bunch of
11    stuff. She's young, you know.
12 Q  Okay. How old is Athena?
13 A  Well, I don't know, she's probably like 16 now.
14 Q  Okay. And you said she's a liar?
15 A  Yeah. I was -- I was trying to, you know, get a -- be
16    a part of her life. And then I went there and she said
17    she had been talking to Rico and she said a whole bunch
18    of stuff. And then I went out to her house out there
19    in Wasilla. And she didn't want me to go up to the
20    door. And I went up to the door, and her mom was
21    drunk. And I was -- and I was wanting to talk to her
22    mom because her mom is the one, you know, who was
23    taking -- who was actually taking care of Ariana
24    and.....
25 Q  Who is Ariana?

Page 392

1 A  That's my baby.
2 Q  All right.
3 A  And, I don't know, I went up there, and she said that
4    -- you know, she said a whole bunch of stuff, that she
5    hadn't been going to Rico. She hadn't been kicking it.
6    And then when I talked to her mom, her mom said she had
7    been out, you know, kicking it with Rico, being.....
8 Q  What do you mean, kicking it?
9 A  Kicking it, drinking, smoking.
10 Q  Okay. And was this before or after the 8th of
11    February?
12 A  Just all the time, man.
13 Q  Okay. Well, can we be a little.....
14 A  Well, on the tape, he said -- he said that she was over
15    here the other night and we were kicking it, drinking,
16    smoking, had a real nice time.
17 Q  Okay. Well, my -- I'm trying to get to -- you
18    apparently went over to her mom's house in Wasilla?
19 A  Yeah.
20 Q  Right?
21 A  That was before.
22 Q  Before? All right.
23 A  That was before I left from Nome.
24 Q  Oh, okay. That's what I'm -- I'm trying to focus on
25    the sequences. So did you -- you had a conversation,

Page 393

1    and you had Athena's number, right? You got the number
2    during that conversation?
3 A  Yeah, I got her number.
4 Q  Okay. Now is she still out in Wasilla?
5 A  No.
6 Q  Where is she at?
7 A  She got pregnant again, and she's wherever she's at.
8 Q  Okay. Do you remember getting a phone number during
9    this conversation?
10 A  Yes, I do.
11 Q  Okay. And that was a 688 number?
12 A  Yes, it was.
13 Q  Okay. 688 is.....
14 A  5771, I think.
15 Q  Okay. You have that kind of memorized?
16 A  Yeah. I'm good with numbers.
17 Q  Oh, okay. 688, is that an Eagle River number?
18 A  Yeah. I believe so. Eagle River.
19 Q  So she doesn't live in Wasilla then, does she?
20 A  Oh, yeah. Eagle -- yeah, she don't. Eagle River. I
21    drove out to Peter's Creek. It's -- it's not really
22    Eagle River. It's a little bit further than Eagle
23    River.
24 Q  Why did you tell us it was Wasilla?
25 A  Because -- I don't know. I only went out there once,

Page 394

1    and it was a pretty long drive.
2 Q  Do you know the difference between Peter's Creek and
3    Wasilla?
4 A  Yeah. I messed up. I'm sorry.
5 Q  Okay. Okay. Now on the 20th, did you go back on the
6    -- I'm talking February now.
7 A  Okay.
8 Q  All right. Did you go back to Grand Larry?
9 A  I believe so.
10 Q  Okay. And did you go -- return the same way? In other
11    words, did you travel there the same way?
12 A  Yeah.
13 Q  Okay. And -- excuse me -- was that from the police
14    station?
15 A  Yeah. Well, the -- the first time, we went -- we
16    went.....
17 Q  Down -- go ahead. Maybe you can flip it back.....
18 A  Yeah.
19    .....to the other one if -- we're talking about.
20 A  I missed -- I'm wrong again, man. We went a different
21    way. We went -- the second time.....
22 Q  Hold it. Hold it. Hold it. We've got to talk into
23    the mike or you're going.....
24 A  The second time, I drove the other road. I down this
25    -- this next street. I made a right and then a left.

Page 395

1    the duplex then?
2 A   When I first walked in, there was already a
3     conversation taking place, and it was who was going to
4     run and go get a pan and go get sandwich baggies.
5 Q   Okay. And you indicated there were a car full of
6     people?
7 A   Yes.
8 Q   And do you know if -- what color they were? Were they
9     white, black, Asian?
10 A  There was two black guys and black girl, and then one
11    of them was kind of tan.
12 Q  All right. Now you got in there, and you saw -- did
13    you ask Rico what he was doing with this big gun
14    sticking in his waist band?
15 A  No. I asked him if he would sell it.
16 Q  If he would sell it?
17 A  Yeah.
18 Q  Okay. Do you like guns?
19 A  No. I was just -- I was just talking.
20 Q  All right. And how much was it -- were you offering to
21    buy it for?
22 A  $100. I said, do you want to sell it for $100? And he
23    said, no, and he laughed.
24 Q  Okay. Well, a gun is worth more than -- a .44 is worth
25    more than $100, isn't it?

Page 404

1 A   Yeah.
2 Q   All right. Now you said that Rico's pickup -- what
3     kind of pickup is this?
4 A   Well, I don't know if it was his. He's got a lot of
5     cars.
6 Q   Okay. What kind of pickup did you see?
7 A   It was a gray truck.
8 Q   What kind of truck?
9 A   A Toyota, I believe, maybe a Toyota.
10 Q  A little one, big one? Toyotas.....
11 A  Dakota, maybe. It was a small pickup truck.
12 Q  All right. One of the little -- little ones?
13 A  Right. Like the size of, you know, a S-10, something
14    like that.
15 Q  Okay.
16 A  It was more like a Toyota, an old Toyota one, though.
17 Q  Do you think it was a Toyota?
18 A  Yeah.
19 Q  All right.
20 A  Something like that, in that body shape.
21 Q  All right. What color was it?
22 A  It was gray.
23 Q  Gray? All right. All right. Then did you look around
24    the house?
25 A  Yeah. There was nothing in his house.

Page 406

1 A   I don't know. I don't own a gun.
2 Q   All right. Did you stay in the house?
3 A   Well, the conversation was somebody had to go -- when I
4     pulled in, there was all ready a car there. And.....
5 Q   Okay. Let me stop you right -- how many cars were in
6     there, when you pulled in?
7 A   There was -- I think Rico's truck was pulled up, pulled
8     on the side where you're not supposed to park. His
9     truck might -- I believe is truck was pulled up right
10    here. And then there's his -- his carport. There
11    wasn't a car pulled into his carport, and the car was
12    like right before his carport. So I pulled in right be
13    -- right behind that car. And when I walked in, they
14    were all ready having a conversation about who was
15    going to leave and get it.
16 Q  So.....
17 A  So I had to leave.
18 Q  .....we're clear on this, there was no car in the
19    carport, but there was one on the.....
20 A  Right before......
21 Q  .....right before......
22 A  .....you get into the carport, right.
23 Q  And then you pulled in behind that car off the street?
24 A  Yes.
25 Q  So then you would get three cars deep there?

Page 405

1 Q   Zero?
2 A   Well, there was -- I mean, there was stuff in his
3     house. There was just -- it was nothing, really. All
4     he had was his stereo in there. His -- like an
5     entertainment center.
6 Q   That was it?
7 A   Yeah.
8 Q   Any couches?
9 A   No.
10 Q  All right. Any lamps?
11 A  He might have had a lamp.
12 Q  All right. How about any -- any beds?
13 A  No. I don't -- he didn't have none of that stuff in
14    there.
15 Q  Did you look?
16 A  Well, I could see -- you could kind of see in -- in the
17    bedroom when -- when you go walk in his house. There's
18    like -- there's no walls, so you can like see all
19    through it without even walking through his house. It
20    was empty.
21 Q  All right. So there was no furniture, other than this
22    stereo set?
23 A  I believe that that's right.
24 Q  Okay. And how big is this stereo set?
25 A  I don't know. Probably -- probably as tall as that

Page 407

**Page 412**

1 A  No. It was -- I mean, I was -- I was free as -- as,
2  you know -- as -- I wasn't really free until I did what
3  I did. And when I finished what I did then, you know,
4  I still -- unless -- I don't know. I'm not really -- I
5  wasn't really free. I had to check in with the
6  officers, like call them every, you know, two days, two
7  and -- you know, I always had to keep -- I always had
8  to let them know where I was and I always had to give
9  them my phone number and make sure they could get a
10  hold of me. I always had to do that.
11 Q  Okay. I just wanted to -- something just crossed -- on
12  the 8th, when you were -- when you went to the police
13  station on the 8th, did you testify on Thursday that
14  they found a bag of marijuana in your car?
15 A  Yeah, they found a bag of marijuana.
16 Q  Okay. That was the first time you were.....
17 A  Yeah. That was like a 20 sack.
18 Q  I'm sorry, please?
19 A  It was like a 20 sack.
20 Q  A 20 sec?
21 A  A 20 sack of bud.
22 Q  A 20 sack of bud?
23 A  Yeah.
24 Q  Okay.
25 A  It was a little bag of weed.

**Page 414**

1  when I came back in, there was still somebody there.
2 Q  Okay. Well, you've told us that there were two black
3  guys, one black girl and one tan girl?
4 A  Yeah.
5 Q  Okay. It was one of the girls were still there when I
6  went back in. I can't remember which one.
7 A  Okay.
8 Q  So the two guys and a girl left and the girl was still
9  there?
10 A  Yeah.
11 Q  And was that the black girl or the tan girl?
12 A  I can't remember.
13 Q  Okay. Did you take any of the bud with you when you
14  left?
15 A  No, I did not.
16 Q  Okay. Do you know why the house was empty on the
17  second time you were there?
18 A  Yeah, because people were -- I -- he told me that the
19  people were complaining about his music.
20 Q  And he told you that evening?
21 A  No. But he told me that like the day, I don't know,
22  the next buy, he told me that. That's why he got
23  kicked out or something. That's why he's moving.
24 Q  Okay. So the next one, the third one, he told you at
25  some point between when you were -- he and you were

**Page 413**

1 Q  Okay. Were was that?
2 A  I don't know. It was like on my -- it was like in my
3  -- it was either in my glove box or on my seat.
4 Q  All right. Okay. Now going back to the 20th, I just
5  want -- so you're there, what happens when you're
6  there? You've already told us there's a big foot wide
7  pile of marijuana on the counter, nothing in the house.
8  He's packing this .45. You go in.....
9 A  I go in, and I hear the conversation about the -- the
10  sandwich baggies and the pan. And then I hear somebody
11  say that they needed to get -- I remember that they
12  said -- they said that -- that Rico wanted a 7-Up.
13  And then they were like -- they were going to go and
14  then they -- they walked out the door and I needed to
15  move my car. So I had to get out -- go out and move my
16  car and then come back in.
17 Q  So someone was going to go out and get Rico a 7-Up?
18 A  No, and -- yeah, 7-Up, some sandwich baggies and a pot.
19 Q  Okay. Does he have a microwave in there, or did he?
20 A  I don't think he did when I -- when I went in there.
21 Q  The first time, second time?
22 A  I can't really remember.
23 Q  Okay. All right. Now who left?
24 A  I think it was two guys, two guys and a girl. There
25  was -- still somebody there when I -- after those --

**Page 415**

1  together that the reason he had to move was his
2  music.....
3 A  Yeah. He said the people were complaining about his
4  music.
5 Q  Okay. Now how long were you in there the second time?
6 A  Probably about 10, 16 minutes.
7 Q  Okay. And you went outside and then moved the car I
8  believe is what you testified to.
9 A  Yeah.
10 Q  Then you came back in. How long were you there after
11  you came back in?
12 A  I was there altogether, probably about 15 minutes
13  altogether.
14 Q  All right.
15 A  So it was -- it was in and out.
16 Q  My questions is, after you moved the car, how long were
17  you in there?
18 A  I don't know, like five minutes.
19 Q  All right. All right. Now, the 21st, do you remember
20  that?
21 A  Yeah.
22 Q  What happened -- did you rendevous with the police
23  department on the 21st?
24 A  Yes.
25 Q  Okay. I'm talking February.

Case 3:05-cv-00255-TMB-JDR   Document 19-10   Filed 03/06/2006   Page 15 of 21
Multi-Page                                                    State v. Robert Davis
                                                             November 19, 2001

3AN-01-1717 CR

**Page 416**

1  A  Right.
2  Q  All right. And where did you meet?
3  A  At the police station.
4  Q  Okay. And who did you meet with on the 21st?
5  A  Officer LaPorte, I believe.
6  Q  All right. And about what time was that?
7  A  I can't really remember.
8  Q  Okay. And was that when you had the conversation
9     involving the move and the noise?
10 A  Yeah. That was -- it was the time when we were at
11    Chevron.
12 Q  Chevron?
13 A  Yeah.
14 Q  And that's Hansen Chevron, is that right?
15 A  Hansen's?
16 Q  Is that the one on International and Old.....
17 A  No.
18 Q  .....Seward?
19 A  No.
20 Q  What's the name of that Chevron?
21 A  Chevron.
22 Q  Do you know, does it have a name besides Chevron?
23 A  No. Chevron.
24 Q  It's not called Hansen's -- it's not Hansen's Chevron?
25    MS. BRADY: Objection, Your Honor. Asked and answered.

**Page 417**

1     THE COURT: Sustained.
2  Q  Okay. When did you go to Chevron?
3  A  At -- what do you mean, at night.
4  Q  What is at night? Okay. What time of night was it?
5  A  Probably about 7:30, 8:30.
6  Q  Okay. Okay. And that particular time, was anybody
7     else with you?
8  A  In my car?
9  Q  Yes.
10 A  No.
11 Q  Okay. And was this the same Plymouth Reliant that you
12    earlier testified that got torched?
13 A  Yeah.
14 Q  All right. Okay.
15 A  I did -- I did everything in that Plymouth.
16 Q  You did everything in the Plymouth?
17 A  Yeah, I -- I drove all the -- all the time. Every --
18    every dope deal we made was -- I was driving my car.
19 Q  In the Plymouth?
20 A  Yeah.
21 Q  Okay. Okay. And how long had you had the Plymouth?
22 A  I think a while.
23 Q  Had you had it before you went to Nome?
24 A  Huh? Yeah. It was at a friend's, and then.....
25 Q  All right. Now during these times that you were

**Page 418**

1     driving, did the police ever ask if you had a driver's
2     license?
3  A  No.
4  Q  Okay. Now you met, according to your testimony, you
5     met Mr. Davis at the Chevron station, right?
6  A  Right.
7  Q  Okay. And what kind of car was that that.....
8  A  It was his mom's car, I think.
9  Q  All right. Could you describe that car for us, please?
10 A  Yeah. It was a green GMC. It's a Suburban.
11 Q  All right. Does it have smoke windows on it or.....
12 A  Tinted windows?
13 Q  Tinted windows?
14 A  Yeah.
15 Q  So you can't see in, right?
16 A  Well, the front two aren't tinted.
17 Q  Okay. That would -- the front as in.....
18 A  The driver and passenger side.
19 Q  All right. All right. And the back is tinted though?
20 A  Yeah. All of -- all of the rest of them are tinted.
21 Q  Okay. And how did you get to the Chevron station?
22 A  I drove.
23 Q  All right. How did you -- what route did you use?
24 A  Tudor to Old Seward. And then Old Seward to Chevron.
25 Q  Okay. Where did you park?

**Page 419**

1  A  Chevron parking lot.
2  Q  Could you flip over to a clean page and indicate, if
3     you can, a layout of the Chevron and where you parked?
4     THE COURT: Actually, before you do that, I want to
5  take about a 10 minute break, please. And we'll come back
6  and get you all in about 10 minutes.
7     (Off record)
8     THE COURT: You all can have a seat, please. Are we
9  back on record?
10    THE CLERK: Yes.
11    THE COURT: On record. We have all of our jurors here.
12 Do you want to continue, Mr. James?
13    MR. JAMES: Thank you, your Honor.
14 Q  Going back to the 20th, very briefly, you offered to
15    buy this gun for $100. What if he had sold it to you
16    for $100, how much money did you have on you?
17 A  I wouldn't have bought it.
18 Q  You were just playing games?
19 A  Yeah.
20 Q  Okay. Now the 20th, you were wired, the 21st you were
21    wired, correct? You had a -- they had a recorder on
22    you?
23 A  I can't really remember.
24 Q  Okay. Well, let's put it in sequences of the first
25    time that you were there, you didn't have any kind of

3AN-01-1717 CR

1  recorder on you, right?
2 A  Right.
3 Q  Correct?  Am I right there?  Okay.  After that, you say
4  -- you claim there was four buys, correct?
5 A  Yeah.  Three -- three were wired, one was -- wasn't.
6 Q  Okay.  So number 1, number 2 was wired, number 3 was
7  wired and number 4 was wired?  All right.  So -- and
8  you have -- did you have control over the wire?  In
9  other words, could you control what time to turn it on,
10  turn it off, that type of situation?
11 A  No.  They turned it off.  I mean, they turned it on at
12  the station, and they didn't turn it off until I got
13  back to the station.
14 Q  Okay.  Now how do you know that?  Is there a little --
15  sometime that tells you it's on or off?
16 A  Well, they were -- they test it.  Like when I put it
17  on, they would be like, you know, speak into, check it.
18  And, you know, I would be like, okay.  And then they
19  would tell me, okay, it's good.  And then when I got
20  back to the station, they would take it off of me.  So
21  I don't know if they turned it off, or if they just
22  kept going, but they took it off of me, so.  When they
23  -- when they did the search on me, it came off with
24  everything else.
25 Q  Okay.  So you have no idea yourself when it was turned

Page 420

1  on, if it -- and when it was turned on?
2 A  Well, it was turned on as soon as like we walked
3  outside.  They would be like, you know, they would be
4  like speak into the -- just talk, and I would talk and
5  they would tell me it's all good.  They would talk back
6  to me.
7 Q  Okay.  So you -- am I correct that you presumed from
8  the time you walked outside of the police station until
9  you got back, the wire was on.....
10 A  Right.  I was recording.
11 Q  .....as far as you knew?
12 A  Yeah.
13 Q  All right.  And so anything that happened during that
14  time period would have been recorded on that wire,
15  right?
16 A  Yeah.
17 Q  All right.  And you had a conversation with Mr. Davis
18  at some time about him having to leave because of loud
19  music?
20 A  Yeah.
21 Q  And that would have been recorded, right?
22 A  Yeah.
23 Q  Okay.  The offer to buy the gun would have been
24  recorded, right?
25 A  Yeah.

Page 421

1 Q  And you talked about a gun, right?  Did you -- did you
2  say, how much is the gun?
3 A  No, I did not.
4 Q  What did you say?  I mean.....
5 A  I said, I'll buy it off of you for $100.
6 Q  Buy what?
7 A  I was like that's nice.  And he was like, yeah.  And he
8  said something.  I was like, I'll buy off of you for
9  $100, and he said -- and he laughed.
10 Q  Okay.  So that's -- there's no talk about a gun though
11  from you, correct?
12  MS. BRADY:  Objection, Your Honor.  Asked and answered.
13  THE COURT:  Sustained.
14  MR. JAMES:  All right.
15 Q  So the wire will tell us everything?
16 A  Yeah.
17 Q  All right.  Now you were going to draw the diagram
18  before we took a recess, do you remember?
19 A  Yeah.
20 Q  Okay.  Why don't you get a clean of piece of paper with
21  the court's permission and draw me the diagram I
22  requested?
23  (Pause)
24  THE COURT:  Are you finished?
25 A  Yes, I am.

Page 422

1  THE COURT:  All right.
2 Q  Okay.  Why don't you describe that diagram for us,
3  please?
4 A  This is Old Seward.  Here is a car dealership and a car
5  dealership.  And then there's Showboat's.  And this is
6  the road International, right here.  And there's a
7  Chevron right on the corner of Old Seward and
8  International.  And there -- there's the gas station.
9  And there's this little spot right here that has
10  like a spot for air and water and a spot for your
11  phone.  And then there's like -- you know, right here.
12  And that's where we -- he was already -- he was already
13  parked there when I -- when I was right here, he was
14  already parked.  So I pulled in right next to him.
15 Q  And to your knowledge, that was all recorded too,
16  wasn't it?
17 A  Yes, it was.
18 Q  Okay.  What happened that -- what -- you got there,
19  what did you do?
20 A  I got in his car.  He was drinking some alcohol, and I
21  bought some dope from him.  He only had.....
22 Q  Okay.
23 A  .....he only -- he had crack, so I bought it.  He
24  didn't give me a baggie or nothing.  He just gave it to
25  me in his hand, in my hand.

Page 423

3AN-01-1717 CR

```
 1 Q   Did you -- what was he drinking?
 2 A   He was drinking a Corona.
 3 Q   Did you ask him for one?
 4 A   No.
 5 Q   Okay.  Do you drink beer?
 6 A   No.
 7 Q   All right.  And what was your conversation in the car?
 8 A   It was brief.  I asked him where he was staying.  He
 9      said with his mom.  I asked him if his cell phone
10      number would be the same.  He said yes.  And that's it.
11 Q   Did you engage him in any conversation regarding that
12      -- here's the $200 -- was -- how much did you pay?
13 A   $200.
14 Q   Okay.  Did you engage him in any conversation regarding
15      here's the $200, how much am I going to get?
16 A   No.
17 Q   All right.
18 A   I gave him -- I mean, it was already known why -- we --
19      we went there to meet to -- for me to buy dope off of
20      him.
21 Q   So at this time, you were still under the impression
22      that he thought you were his friend?
23 A   Yeah.
24 Q   Okay.  And you didn't engage him in any other
25      conversation, other than what you've just testified to,
```
Page 424

```
 1      where are you staying, the same phone number?
 2 A   Right.
 3 Q   Do you remember the denominations of the bills?  I
 4      assume it was bills?
 5 A   Yeah.  Probably $100 and five $20's, maybe.
 6 Q   Okay.  Is that when you had the conversation regarding
 7      having to leave because of the loud noise?
 8 A   No, I -- that when I -- I asked him where he was
 9      staying.  And he said with his mom.  And he said he --
10      I was -- I was like what happened or something and I --
11      I can't remember how -- how it came up, but he said
12      that he got kicked out because of the noise.
13 Q   He said he got kicked out?
14 A   Or he's leaving because of a complaint or something,
15      people were complaining about the music.
16 Q   Okay.  This was on one of the times that you were
17      wired, this.....
18 A   No.  I -- I believe it was -- it was on that third one.
19 Q   Okay.  And what happened then?
20 A   Then I -- after I got my dope, I got back in my car and
21      drove off.
22 Q   Where did you go?
23 A   Back to the police station.
24 Q   Directly back there?
25 A   Yeah.
```
Page 425

```
 1 Q   No stops?
 2 A   Unh-unh.  (Negative)
 3 Q   I'm sorry, please?
 4 A   No.
 5 Q   All right.  And who did you talk with then?
 6 A   In what?
 7 Q   Who did you talk with then?  You went back to the
 8      police station you testified?
 9 A   Yeah.
10 Q   All right.
11 A   I went back to the police station, and then I got
12      debriefed by either Officer Johnstone or Officer
13      LaPorte.
14 Q   Okay.  Then do you know how many people or how many
15      officers were -- or if any officers were around you at
16      the Chevron station?
17 A   I didn't know where they were, but they were definitely
18      there.
19 Q   How do you know that?
20 A   I just know.  I just -- I just knew because of previous
21      -- how it -- how it happened.
22 Q   Well, did someone tell you that there were going to be
23      X number of people around?
24 A   No.  There was -- I mean, it was told that, you know,
25      they were -- they were around.
```
Page 426

```
 1 Q   Okay.  Who told you they were around?
 2 A   Officer Johnstone and officer LaPorte.
 3 Q   Okay.  The -- the diagrams that you've driven [sic] --
 4      drawn for me, now I know they're not artist diagrams,
 5      but is that true and correct to the best of your
 6      recollection now?
 7 A   Yes, they are.
 8      MR. JAMES:  Okay.  Your Honor, I would like to have
 9      marked for exhibits E, F and G. I believe are my next
10      numbers, starting with the diagram of.....
11      THE COURT:  Why don't you get the -- do you have
12      stickers marked?  Why don't you put them on the -- and then
13      tell me what you put them on and then.....
14      MR. JAMES:  I can (indiscernible).
15      THE COURT:  .....we'll know which ones we're talking
16      about here.  You can go back to -- that's fine.
17      MR. JAMES:  Okay.  Madam clerk, I'm going to mark the
18      first one, which is the -- we marked the first one, which is
19      the diagram that has -- that depicts Grand Larry E.  I'm
20      going to mark the diagram that depicts the interior of the
21      duplex as F.  That's the -- F is the one without the
22      interior layout.  D, I'm going to mark as another diagram of
23      the interior, which reflects the stove and the counter with
24      a circle on it.  And H. I'm going to mark as the Chevron.
25 Q   Okay.  Now on the 20th, how much did you get?  How much
```
Page 427

Page 424 - Page 427

EXC. 127          Exhibit D – 38

| | |
|---|---|
| 1   -- you said dope. How much did you get? Could you | 1  Q  An inch, two inches? But you held up your hand? |
| 2   tell me? | 2  A  Right. I mean, it was a ball, man. |
| 3 A  (Indiscernible). | 3  Q  All right. Well, tell me..... |
| 4 Q  Okay. Is that -- you're holding up a -- your fingers, | 4  A  It was a ball. I don't know for sure. |
| 5   is that like an inch and a half in diameter? | 5  Q  Take a look at your hand that you held up..... |
| 6 A  Yeah. | 6  A  Like an inch. |
| 7 Q  What..... | 7  Q  Inch diameter? |
| 8 A  Yes. | 8  A  Yeah. |
| 9 Q  Yes? Okay. And Did you receive a ball that size? | 9  Q  All right. But you're comfortable with the size that |
| 10 A  Yeah, it was a ball. | 10   you held up as the quantity received? |
| 11 Q  A ball that size? | 11  A  Yeah, I believe so. |
| 12 A  Right. | 12  Q  Now on the 28th/1st of March, the 28th, you also were |
| 13 Q  Okay. And how much was that, based on your experience? | 13   wearing a right? |
| 14 A  A ball. | 14  A  Yeah. Yes. |
| 15 Q  What -- give me some kind of a weight on it. | 15  Q  Okay. So anything in that wire -- would have -- any of |
| 16 A  I don't know, anywhere from like, you know, I don't | 16   your conversation would have been recorded on that |
| 17   know. I really don't know the gram size, you know, but | 17   wire? |
| 18   it was -- it was worth money. You look at dope, I | 18  A  Right. |
| 19   could see it was worth it. | 19  Q  And again, am I correct in assuming you did not control |
| 20 Q  Okay. Do you remember telling us on Thursday that a | 20   turning it on or turning it off..... |
| 21   ball was about 2.8 or 3.2 grams, somewhere in that | 21  A  Right. |
| 22   neighborhood? | 22  Q  .....that date? Okay. All right. Do you smoke? |
| 23 A  Right. It was -- it was -- it was between there. It | 23  A  Yeah. |
| 24   was between that. | 24  Q  And I mean not coke, crack, I'm talking cigarettes? |
| 25 Q  Okay. So a ball is about a -- you held up your | 25  A  Cigarettes. |
| Page 428 | Page 430 |
| 1   fingers, was that about an inch and a half diameter? | 1  Q  Now where did you go on the 28th? You met with the |
| 2 A  Yeah. | 2   police, I assume, that's a fair assumption, correct? |
| 3 Q  Take a look, sir. Please. | 3  A  Yeah. I don't know if we did a buy that day, I'm not |
| 4 A  Right. Huh? | 4   sure. |
| 5 Q  How much is..... | 5  Q  All right. So how many buys did you do? |
| 6 A  Yeah, it's like that. | 6  A  I did four buys all together. |
| 7 Q  Okay. How much is that? If you could describe in | 7  Q  When was the last buy? |
| 8   diameter? What's the diameter of that? It's a ball | 8  A  The last time I did it. |
| 9 A  Width? | 9  Q  What day? |
| 10 Q  Okay. Well, the radius, diameter, whatever you want, | 10  A  I'm not for sure. |
| 11   it's a ball? | 11  Q  Okay. You have no idea when the date or the day was? |
| 12 A  Right. | 12   In other words, there's days in a week, and there's |
| 13 Q  So a ball would theoretically be circle? | 13   dates in a month. |
| 14 A  Right. | 14  A  Right. Yeah. I don't know. |
| 15 Q  Okay. So it has a diameter, it has a radius? | 15  A  Okay. Where -- you met..... |
| 16 A  Yeah. | 16  A  Muldoon -- oh, never mind. Sorry. |
| 17 Q  And you held up your hands. What I'm interested in | 17  Q  You met at where? Where did this thing start? |
| 18   knowing is what's the distance between the diameter, | 18  A  It -- the last buy? |
| 19   which is a straight line..... | 19  Q  Yes. |
| 20 A  I don't know for sure. | 20  A  I met at the police station on Tudor. Then we went to |
| 21 Q  Well, take a look. You're the one that held up your | 21   Muldoon, the Pancake House. |
| 22   hand. | 22  Q  Okay. And what, if any amount of money did they give |
| 23 A  Right. Well, I don't for sure, you know..... | 23   you? They being the cop -- the police. |
| 24 Q  Inch? | 24  A  $200. |
| 25 A  I haven't seen -- I haven't seen the dope in a while. | 25  Q  Okay. And how was that money laid out? In other |
| Page 429 | Page 431 |

3AN-01-1717 CR

| | |
|---|---|
| 1   words, how much..... | 1 A   No.  I didn't look behind me. |

---

**Page 432**

```
1    words, how much.....
2 A  Maybe $50's.  I think it was $50's.
3 Q  $50's?
4 A  I believe so.
5 Q  Okay.
6 A  I'm not sure.
7 Q  And so you go to the -- what happens after you leave
8    the police station?
9 A  I -- I drive to the Pancake House in Muldoon.  He was
10   already there.
11 Q All right.  What happened then?
12 A What happened then is I pulled up and he was in a
13   different car.  I thought he was going to be in the
14   green truck, and he wasn't in the green truck, he was
15   in a gray truck.
16 Q Is that the gray truck you had seen earlier?
17 A Right.
18 Q All right.  And that's the Toyota, or whatever that
19   size car -- truck?
20 A Yeah.
21 Q All right.  All right.  So is that -- is that a club
22   cab, or.....
23 A Single.
24 Q Single?
25 A Yeah.
                                        Page 432
```

---

**Page 434**

```
1 A  No.  I didn't look behind me.
2 Q  Okay.  And what did you get this time, if anything?
3 A  What did I get?
4 Q  If anything, what did you get?
5 A  What do you mean, what did I get?
6 Q  Okay.
7 A  As far as dope?
8 Q  Right.
9 A  I got -- it might have been, I think it was soft.  I'm
10   not sure.  Or, no, it might have been hard.  I'm not
11   sure.  But it was, you know, the same size as usual.
12 Q Same size?
13 A Yeah.
14 Q So everything should have been consistent.....
15 A Yeah.
16 Q .....the weights?
17 A Well, you know, I just eyed it out man, I just took it.
18   I really didn't care.  I was just trying to get the
19   dope and get out as quick as I could.
20 Q Okay.  So that was your -- your last contact with -- in
21   regards to these events, correct?
22 A Yes, it was.
23 Q Okay.  And the first buy, was that crack or coke?
24 A Coke.
25 Q Coke?  Powder coke?
                                        Page 434
```

---

**Page 433**

```
1 Q  All right.  So what happened then?
2 A  I got in his car, bought some dope, asked him where he
3    was staying.  He said he was staying at a hotel.  And I
4    said, all right.  I got back in my car and drove off.
5 Q  Okay.  And that was recorded?
6 A  Yeah.  And I told the cops what kind of car he was in
7    and a license plate number.
8 Q  Okay.  What did you -- now, after you got in your car,
9    what happened?
10 A After I got in my car, I told the police the license
11   plate number.
12 Q Did you tell them after you got in your car or before
13   you got in the car?
14 A When I got in my car.
15 Q In your car?  Okay.
16 A I told them the license plate number and make of the
17   vehicle, and I drove back to the -- it might have been
18   to the church, or that buy, I think it was back to the
19   station.
20 Q Okay.  Did you make any stops?
21 A No, I don't think so.
22 Q All right.  Did you leave immediately, or did you stick
23   around?
24 A Yeah, I left.
25 Q Did you see anything happen as you were leaving?
                                        Page 433
```

---

**Page 435**

```
1 A  Yeah.
2 Q  All right.  All right.  Now you've all ready testified
3    you don't do coke, you do crack, why would you buy
4    coke?
5 A  I don't do nothing now.  I've done dope.  But it's
6    because that's what he had.  It's -- it's the same
7    thing, man.  Crack and coke are the same thing.
8 Q  Okay.  And the second one, was that crack or coke?
9 A  The rest of them were crack.
10 Q Crack?  All right.
11 A I believe.
12 Q All right.  Now no one was with you when these alleged
13   buys went down, correct?
14 A No one was with me?
15 Q Correct.  You were by yourself?
16 A Yeah.
17 Q All right.  And you were using your Plymouth Reliant
18   vehicle that you've had for a period of time, at least
19   six, eight months before -- we'll, how long have you
20   had that car?
21 A A while.  A couple of years.
22 Q A couple of years?  Okay.  A couple of years.  So you
23   were using the same car all the time?
24 A Huh?
25 Q You were.....
                                        Page 435
```

1   So -- and -- and this being north. So as things
2   progressed, I changed my position as time went on.
3 Q   Okay. Could we perhaps just put M for Muldoon and
4   either P with a question mark for Peck, because you
5   didn't know if that was Peck or not?
6 A   Yeah, I don't know exactly. I'd have to get a map.
7 Q   Okay. I'm not holding you to Peck.
8 A   Okay.
9 Q   All right. All right. Now -- go ahead and have a
10   seat, if you would, please. All right. So this -- did
11   you observe Jeremy Fish leave?
12 A   No, I did not.
13 Q   Okay. You were monitoring this on radio, I.....
14 A   Yes.
15 Q   .....I assume? Okay. All right. How many officers
16   were there?
17 A   About five or six of us, I believe. I could look it
18   up. I have it -- all the names written in my report.
19   I just don't recall off the top of my head.
20 Q   You generated your own report on this?
21 A   Of course. Okay. One, two, three, four, five.....
22 Q   You've got it with you?
23 A   Six of us. Seven counting me. Seven of us.
24 Q   Now -- I'd like to see your report in just a minute, if
25   I may. But to continue on here, so -- somebody must

Page 452

1 A   Yes, he was.
2 Q   Okay. Did he have.....
3 A   Yes. Yes.
4 Q   .....the whole rigamarole.....
5 A   It was a -- you know, what we call a felony traffic
6   stop. At this point, we were arresting somebody for
7   committing a felony offense.
8 Q   All right. And who approached Mr. Davis' car?
9 A   Neither one of us approached it. What we did was call
10   him out of the vehicle. And then after he got out of
11   the vehicle, when he -- then we approached him and
12   placed him in handcuffs and then put him in the back of
13   the patrol car.
14 Q   All right. So you guys said, okay, whoever you are, or
15   called him by name, come out of the car, or words to
16   that effect?
17 A   Yes.
18 Q   You had your guns drawn and the -- all right. Now he
19   got out of the car, right?
20 A   Correct.
21 Q   All right. And did you have him put his hands up on
22   the car like the movies show and pat him down?
23 A   No. No, that's not the way we do it.
24 Q   All right. I don't -- how do you do it?
25 A   Well, we ask him to walk backwards towards us.

Page 454

1   have told you that it was time?
2 A   Yes.
3 Q   All right. And who was that?
4 A   I don't know. I believe it was Officer LaPorte, but
5   I'm not absolutely certain at this time. And the
6   reason I believe it was him is because it was his case
7   file. He was the one that was controlling what was
8   going on. And so I believe he would have been the one
9   that would have said it's time now, because he's lead.
10 Q   Okay. And after he said it's time, how long were you
11   there -- how long did it take you to get there?
12 A   Oh, a matter of seconds, maybe five, 10 seconds.
13 Q   Okay. So you were, boom, right there?
14 A   Yeah. Oh, yeah.
15 Q   All right. And when you got there, was Officer LeBlanc
16   there or.....
17 A   He -- he pulled in the same time I did.
18 Q   All right.
19 A   We both stopped our cars, got out, opened our doors at
20   the same time.
21 Q   Okay. And you were in a.....
22 A   Unmarked vehicle.
23 Q   .....unmarked vehicle? Is that -- never mind, it's
24   unmarked. So did LeBlanc have his lights on and that
25   kind of stuff? He was in a police car, right?

Page 453

1 Q   Okay.
2 A   And then we have him put his hands behind his back and
3   we put him handcuffs while one officer watches him and
4   the other one controls him.
5 Q   All right.
6 A   And then he's patted down and then placed in the patrol
7   car.
8 Q   Okay. And did you have him empty his -- turn his
9   pockets inside out?
10 A   Well, I wasn't the one that searched him. Officer
11   LeBlanc was the one that patted him down for weapons.
12 Q   Did you see LeBlanc search him?
13 A   Yeah. I saw him pat him down.
14 Q   Did he empty his pockets.....
15 A   I believe he pulled some things out of his pockets, but
16   I don't remember.....
17 Q   Okay.
18 A   .....what that was. There was a wallet and some
19   stuff.....
20 Q   And so Mr. Davis has got his hands behind him, so he's
21   obviously not doing any pulling, right?
22 A   No.
23 Q   Okay. So this is the police that are doing the search?
24 A   Right.
25 Q   Which would be, to your recollection, Officer LeBlanc?

Page 455

1 Q   What was the P and E number assigned to it?

2 A   01 -- oh, I'm sorry, that's the case number. The P and

3     E number is 418864.

4     MS. BRADY:  And at this time, I move to admit state's

5 exhibit 13.

6     MR. JAMES:  Objection, Your Honor.  There's no showing

7 that -- based on the officer's testimony, that thing has

8 been opened once after it left his hands.

9     THE COURT:  Overruled.  13 is admitted.

10        (Plaintiff's exhibit 13 admitted)

11 Q   Would you please open state's 13?

12 A   Sure.  Could I have some scissors, please?  Do you have

13    -- thank you.

14 Q   And I'm going to approach you with what's been

15    previously admitted as state's exhibit 11.  Do you know

16    what that is?

17 A   Yes.  It's a pre-recorded copy of the buy money used on

18    the buy for the 28th of February.  It's dated March

19    1st.  Case Officer LaPorte, and it's signed and

20    initialed by, it looks like Officer Grant Johnstone's

21    initials.

22    MS. BRADY:  Okay.  And at this time, I'm going to move

23 to show the jury the $100 bill and the state's exhibit 11.

24    THE COURT:  All right.  You can do that.  Are you going

25 to pass it around?

1     MS. BRADY:  Yes.

2     THE COURT:  Thank you.  Officer, we'll just let the

3 jury look at it.

4 A   I'm sorry.

5     (Pause)

6     THE COURT:  Do you want to retrieve that, Ms. Brady?

7     MS. BRADY:  Yes.

8 Q   Okay.  Now, Officer LaPorte, did Mr. Fish ever tell you

9     that the defendant had gone to his work at Subway?

10 A   He did.

11 Q   Do you recall about when that was?

12 A   The first couple days of April of this year.

13 Q   Okay.  And did you have any involvement with Mr. Fish,

14    other than that, that we've just mentioned, since that

15    period of time?

16 A   Yes, I have.

17 Q   Okay.  And what was that?

18 A   Besides keeping track of -- trying to keep track of

19    where he lived and his jobs, one time I was sent to a

20    disturbance at the -- at the apartment that he was

21    living at in Mountain View.  And I spoke with him on

22    that occasion.

23    MS. BRADY:  Okay.  That's all the questions I have for

24 this witness, Your Honor.

25    THE COURT:  All right.  Mr. James?

1     MR. JAMES:  Thank you.

2           MARK LAPORTE

3 testified as follows on:

4           CROSS EXAMINATION

5 BY MR. JAMES:

6 Q   Officer, now as I understand it.....

7     MR. JAMES:  If I may approach, Your Honor?

8 Q   .....the two items that (indiscernible - away from

9     microphone) on that in the manilla envelopes, is -- is

10    my understanding of the sequence of events based upon

11    police written procedures is one of you weighs them, or

12    checks it or something, there's someone else there,

13    it's a two person control, right, at that juncture?

14 A   Yes, when the drugs are placed in the envelope, there

15    are two officers, and they must both sign an initial

16    verification of the drugs placed in the envelope.

17 Q   Okay.  And then are they weighed?  Do you have a scale

18    or something that you use?  I notice there's weights on

19    there?

20 A   Yes, it's an approximate weight.  We do have a scale,

21    and the drugs are weighed, either separately or with

22    the packaging that they're contained in, generally the

23    packaging.

24 Q   Well, is there consistency there, I mean, do we know

25    what that package, if it represents the packaging and

1     the drug, or just the drug by looking at the package?

2 A   Well, it depends on the package.  It could be plastic.

3     It could be newspaper.  A different weights.  The

4     confirmed weight that is used will come back from the

5     state crime lab upon analysis.

6 Q   Now what's in the package is what you've -- you put in

7     the package, or it should have been put in the package,

8     if it is followed correct procedures, correct police

9     procedures, correct?

10 A   I'm not sure I understand your question, sir.

11 Q   That's fine.  The manilla envelope belongs to the

12    Anchorage Police Department, that particular -- those

13    particular manilla envelopes, correct?

14 A   Yes.

15 Q   Okay.  You get something you want to put in the manilla

16    envelope, whatever you've got in the manilla envelope,

17    is that the weight that is on the outside of the

18    manilla envelope?

19 A   That's an approximate weight, sir.  It's not exact.

20 Q   How do you weigh the item?

21 A   I have a scale, and as again, it's approximate weight.

22    I weigh the packaging that the drugs come in because

23    many people package the drugs in various items.  But

24    the exact weight of the drugs only is conducted at the

25    state crime lab where analysis is conducted.