1 Q  Now, when you weighed -- you have one or -- how many of
2    those did you -- were involved in of yourself, of those
3    four items that you've got?
4 A  Three, I believe. Yes, three of them.
5 Q  Okay. What -- let's go from the -- from your right to
6    your left, okay? Is that the first one?
7 A  That is the buy on the 28th.
8 Q  Is that your -- are you involved -- initial is in that?
9 A  No, sir.
10 Q Okay. Set that one aside. Move to the next one your
11   right, which would be one in from the 28th.
12 A That was the buy on the 8th, which I did not place any
13   drugs at that time either.
14 Q Okay. That's off to the side. Go to the next one,
15   please.
16 A I was not involved in that, two other officers.
17 Q Okay. And what -- can we identify that date on that
18   one, for the record?
19 A That I was involved in, that was February 21st of 2001.
20 Q Okay. So other than 2000 -- February 21st is the only
21   one you were involved?
22 A As far as.....
23 Q As initials go.
24 A As far as placing the drugs in the envelope, yes.
25 Q All right. So anybody else then, if they testify would

Page 520

1    talk about the others, you can only testify as to what
2    -- as far as your initials and the custody and control
3    of the 21st?
4 A  Yes.
5 Q  Okay. Now -- and how much did that one weight?
6 A  Tar weight, meaning the amount of the drugs I wrote in
7    is .155, and I dated it February 21st, 2001. 1.55
8    grams, I'm sorry.
9 Q  All right. So -- now how did that come to you?
10 A The drugs?
11 Q Yeah.
12 A I received the drugs from the informant.
13 Q And was it in something, in a container, in a package,
14   in a -- you understand my question?
15 A I do understand the question and I'm going to check the
16   property and evidence sheet to recall my recollection
17   here.
18 Q Sure.
19 A Because I don't remember if it was actually packaged in
20   an item or not. Suspected crack cocaine in a baggie.
21 Q Do you have recollection now, looking at your evidence,
22   how it was -- how it came -- you understand -- you said
23   bag, but like in a baggie, a plastic baggie, or --
24   that's what I'm asking is.....
25 A The description is written by Officer Johnstone who

Page 521

1    filled out the P and E, but we can open it up if you
2    would like to look, sir.
3 Q  Yeah, why don't you open it up?
4 A  Okay.
5 Q  With the court's permission.
6 A  I just.....
7    THE COURT: That's fine.
8 A  Yeah. The scissors, please. Okay.
9    MR. JAMES: (Indiscernible). If I may approach?
10 Q So what we've got there is a -- is a baggie, a plastic
11   baggie, right?
12 A Correct.
13 Q Okay. Now, did you weigh the baggie and what's in the
14   baggie, or did you take it out and weigh it or.....
15 A No, it did not come to us in the baggie.
16 Q Oh, okay, I'm sorry. That's -- my question is how did
17   you get it, I guess?
18 A Oh. He handed it to me. How did I get the baggie?
19 Q No. No. I'm not asking my question correctly.
20 A Okay. I'm sorry.
21 Q Did it come in just -- here's my pen, or here's my pen
22   in a -- in a package? Do you understand my question?
23 A I do.
24 Q Okay.
25 A It came just in the form of rock cocaine. It was

Page 522

1    wrapped in nothing.
2 Q  Nothing? Okay. So just -- okay. That's -- all right.
3    Now you testified that -- now in relationship to your
4    own now, after you sealed it in the manilla envelope --
5    well, you -- you put it in the plastic bag, correct?
6 A  Yes. Because if it was just in the manilla envelope,
7    you can see there's crumbs. We don't want to lose
8    anything, so I placed it in a plastic bag.
9 Q  Okay. So the plastic bag is yours, you put the plastic
10   bag in the manilla envelope and sealed it with all the
11   tapes that you've earlier testified to. I think you
12   called them evidence tapes?
13 A Yes, sir.
14 Q Okay. Now, who vacuum packs that?
15 A Property and evidence technicians.
16 Q You have nothing to do with that then?
17 A No control, whatsoever.
18 Q Okay. So as soon as you put it into what I believe you
19   earlier testified was a lock box or (indiscernible) or
20   do you -- box the correct term or.....
21 A A locker is, I believe what I used.
22 Q A locker? Okay. Then it's out of your control?
23 A Yes.
24 Q You don't know what happened to it -- whoops, let me
25   try that again. You do not know what happens to it

Page 523

1 You are still under oath.
2    MR. LAPORTE: Yes, sir.
3    THE COURT: And Mr. James, you can continue your cross
4 examination.
5    MR. JAMES: Thank you, Your Honor. If I may approach?
6            MARK LAPORTE
7 previously sworn, called as a witness on behalf of the
8 plaintiff, testified as follows on:
9        CROSS EXAMINATION CONTINUED
10 BY MR. JAMES:
11 Q Officer, when we left last -- yesterday, I was going to
12   say last night. It wasn't last night. You had, I
13   believe, behind you there, you had -- flip up to where
14   you drew a diagram. Do you recall that?
15 A I didn't draw a diagram.
16 Q You didn't draw a diagram? Flip up to kind of the last
17   -- last one if you would, please?
18 A This one?
19 Q Yeah. Well, just flip up to the next page since you
20   didn't draw that one. Let's just go to one that's --
21   if you could very briefly give me a quick diagram of
22   Grand Larry as you recall it? And the two side street
23   -- are they -- yeah, they are two streets,
24   intersecting streets.
25 A Okay.

Page 579

1 Q Okay. Okay, we got 202. Am I correct to say that that
2   is a duplex?
3 A Yes.
4 Q Okay. Which side is 202?
5 A I couldn't tell you.
6 Q Okay.
7 A I never -- as I testified before, once the informant
8   would turn off onto Grand Larry, from either direction
9   I had someone that was close in -- is a close in high,
10  and I would not follow them further down the street, so
11  -- so many vehicles wouldn't be driving down the
12  street.
13 Q All right. The incidents at Grand Larry took place at
14   night, correct?
15 A Correct.
16 Q Okay. And that was about -- a ballpark, it was about
17   10:30, that time frame?
18 A A ballpark, yes, sir.
19 Q Okay. What are the lighting conditions like on Grand
20   -- excuse me, Grand Larry and Duben and Peck? Well,
21   first of all, let me -- Duben and Grand Peck [sic], are
22   they the two horizontal streets in between Grand Larry
23   where we were talking about?
24 A Yes.
25 Q Okay. Do you -- what are the lighting street -- oh,

Page 580

1   excuse me, what are the lighting conditions like on
2   Grand Larry?
3 A I couldn't tell you, sir. As I said, I -- I didn't
4   drive down into the buys.
5 Q Okay.
6 A I never went by and did surveillance after that.
7 Q Okay.
8 A I didn't deem it necessary.
9 Q All right. Now, I'm going to call your attention to
10  page 16 of the document I gave you.
11 A Okay.
12 Q Do you recall the gr -- telling the grand jury, on July
13   the 2nd, that the informant didn't have a cell phone?
14 A I'm sorry, what was the question again, sir?
15 Q Do you recall telling the grand jury, on July 2nd, that
16   the -- excuse me, Jeremy Fish did not have a cell
17   phone?
18 A That is correct.
19 Q Okay. (Pause) Okay, turn to page 21, please. The
20   last paragraph where it starts off mark report
21 A Okay.
22 Q Not the last one, but do you understand what I'm
23   talking about there?
24 A I do.
25 Q Okay. Did you tell the grand jury at the Cook Inlet

Page 581

1   Pretrial where a search was conducted there?
2 A I did.
3 Q Okay. Turn to page 22, please.
4 A Okay.
5 Q Up on the second paragraph where it says Mark LaPorte?
6 A Yes.
7 Q Okay. Do you recall telling the grand jury words -- or
8   that -- well, we are going to hear from Office -- you
9   are talking about Officer LeBlanc here, aren't you?
10 A Yes, sir.
11 Q Okay. Do you remember telling the grand jury you were
12   in a hurry to get back with the drugs and get that
13   under control?
14 A Yes.
15 Q Okay. You had -- to your information, now, you had
16   Jeremy Fish under visual observation, and at some point
17   in time, you folks obtained from him the product,
18   right, at that -- we're talking -- I'm talking now
19   about the 28th/1st?
20 A The last buy?
21 Q The last buy, right.
22 A Yes.
23 Q Okay, so we are not confused, and I'm not trying to
24   confuse you. You were in a hurry to get back with the
25   drugs and get that under control. Did you tell the

Page 582

**Page 587**

1 Q   All right.
2 A   I never saw him actually have a business at his
3     mother's house. I never did surveillance on his
4     mother's residence.
5 Q   So that supposition is based upon -- at least part on
6     what Jeremy Fish told you?
7 A   Correct.
8 Q   Okay. And in July, when you were testifying before the
9     grand jury, were you aware that Jeremy Fish has a
10    problem telling the truth?
11 A  In July?
12 Q  Yes, when you testified before the grand jury?
13 A  I had received notice from detectives that there was a
14    locate for Mr. Fish about being involved in some other
15    activities.
16 Q  I guess -- the question that I have is, in July when
17    you testified before the grand jury, were you aware
18    that Jeremy Fish had a problem telling the truth?
19 A  No. I had not spoken with him about any of the other
20    activities he was suspected in, so I can't say one way
21    or the other.
22 Q  Okay. You were aware that he -- out of Nome, was
23    charged with burglary, right?
24 A  Yes, that was part of the deal agreement with the
25    district attorney for becoming an informant to purchase

**Page 588**

1     cocaine for the special assignment unit.
2 Q   All right. And did you see any type of written
3     agreement with Jeremy Fish rela -- relating to what he
4     was going to do, and what APD, or the DA's office was
5     going to do in return?
6 A   No. We don't set forth written agreements. It is a
7     gentleman effect. We keep our word, and we expect them
8     to keep their word as far as their agreements. When
9     they don't, the deal is off. The department and the
10    DA's office has an excellent reputation for that. That
11    is why defense attorney's call the metro drug unit, or
12    the special assignment unit when they think their
13    clients can be of assistance to us, because they know
14    Phil Moberly and other DAs at the metro -- or at the
15    drug unit always keep their word.
16 Q  That assumes also that Jeremy Fish would keep his word
17    and do what he said, and not lie to you folks, right?
18 A  Well, that's -- that was an assumption. He did keep
19    his word. He made the four buys with two different
20    targets that he.....
21 Q  Okay. I.....
22 A  .....agreed to, and.....
23 Q  Officer, I'm asking.....
24    THE COURT: He gets to finish his answer, Mr. James.
25    MR. JAMES: Thank you.

**Page 589**

1 A   And one of the cases is -- we are currently here, and
2     the other case is finished.
3 Q   All right. It is your belief that he kept his word,
4     right, in all aspects of this case?
5 A   In aspects of this case, yes. He made the four buys
6     that he agreed to, and on the previous case.
7 Q   One moment please. (Pause) Officer Johnstone, now he
8     was your striker at this particular point? Do you know
9     what I mean by striker?
10 A  No, sir.
11 Q  You were training him?
12 A  I'm sorry?
13 Q  You were training him?
14 A  Yes, I was training him.....
15 Q  Okay.
16 A  .....in this case.
17 Q  And subsequent to that time, does he still work with
18    your special unit?
19 A  No, he has relocated. He is a detective with the
20    detect division.
21 Q  Okay. So based upon your dealings subsequent to that
22    time, did you rely upon his opinion?
23 A  On Officer Johnstone?
24 Q  Right.
25 A  Yes.

**Page 590**

1 Q   Okay. Did you, during this buy, do anything to --
2     well, specifically what I'm asking, and I have -- I'm
3     going to set a little stage. Banks sometimes powder
4     their money, put some kind of a powder on it so that if
5     someone handles the money you can put their hands under
6     flourescent light, or some kind of a lighting system
7     and it will show up, that, in fact, whoever touched it,
8     touched it. Did you do that with this -- any of this
9     buy money?
10 A  No. We don't have that capability. We xerox our buy
11    money.
12 Q  Okay. And did you attempt to lift any prints off of
13    any of the buy money, or the containers it was in when
14    it was given to you by Jeremy Fish?
15 A  The containers what buy money was in?
16 Q  I'm sorry, the drugs. I'm sorry. Excuse me. Let me
17    rephrase. Let me re-ask the question. Did you attempt
18    to print -- lift prints off any of the packages that
19    the items that Jeremy Fish gave you during these
20    incidents?
21 A  No. As you saw, the crack cocaine just came in a rock
22    and nothing else. You can't obtain prints from the
23    crack cocaine rock. I think on the two occasions where
24    it was powdered cocaine, it was folded up in a very
25    small newspaper or paper type, but that was small. I

**Page 623**

1 Q Okay. Let me direct your attention to February 20th.
2   Were you participating in this case on that day as
3   well?
4 A Yes, I was.
5 Q What was your assignment that day?
6 A I was assigned to operate the wire. Basically which is
7   what -- the term we use for the recording device that
8   we use to record the conversations between the
9   informants and the suspects.
10 Q Okay. And did you have any other assignment?
11 A Just for close in surveillance at the residence during
12   the buy, and I believe also that I withdrew some of our
13   buy funds and made photocopies of them.
14 Q Okay. I am going to approach you with two documents,
15   and I want to direct your attention to nine for right
16   now. Do you recognize this document?
17 A I do.
18 Q What is that document?
19 A This appears to be a photocopy of the photocopy of buy
20   funds that I made.
21 Q Okay. And how do you know that is what it is?
22 A Because I initialed it.
23 Q Okay. It is a true and accurate representation of the
24   photocopy you made of the buy funds you withdrew?
25 A It appears to be, yes.

**Page 624**

1 Q Okay. And is the date anywhere on that document?
2 A It is.
3 Q Is the case number on the document?
4 A Yes, it is.
5 Q What are those things?
6 A The case number is 01-7273, and the date would be 2-20
7   of 2000 and one.
8   MS. BRADY: Okay. At this time I move to admit state's
9   9?
10   THE COURT: Number 9, Mr. James?
11   MR. JAMES: No objection. No objection.
12   THE COURT: 9 is admitted.
13          (Plaintiff's exhibit 9 admitted)
14 Q Okay. And what else did you do besides the buy funds?
15   You had mentioned other things, ran the wire?
16 A Oh, yes. I ran the wire, and I also was the close in
17   surveillance again on that.
18 Q Okay. Now, did you prepare the wire?
19 A Actually I don't believe I did. I believe Officer
20   LaPorte prepared the tape for that one. If you give me
21   a second I'll re -- yes, he had.
22 Q Okay.
23 A And basically what that means is, he makes a little
24   pre-announcement on the tape giving the case number,
25   the date, and the fact that it is going to be an

**Page 625**

1   attempted controlled buy of cocaine.
2 Q Okay. And when you say you ran the wire then, what are
3   you talking about?
4 A Basically as the informant pulls into the area I
5   activate the recording, and then once he leaves the
6   area I stop the recording. Part of that is to make
7   sure that it works, make sure it is fitted on him
8   properly. You have to make sure, of course, it is
9   hidden, and then you want to make sure that it is put
10   on the clothes so we don't get a lot of static. The
11   microphones on those are so sensitive that any little
12   bit of rubbing on clothes creates an ungodly amount of
13   static that makes it real difficult to understand.
14 Q Okay. And once -- did you attend the briefing?
15 A Yes, I did.
16 Q And did you participate in the surveillance?
17 A Yes, I did.
18 Q What was your role in the surveillance?
19 A I was the close in surveillance again. Get in a
20   position where I could watch the -- the contact he
21   made.
22 Q Okay. And where did you position yourself this time?
23 A This would have been the exact same place as last time.
24   This one occurred at 202 Grand Larry. I parked in the
25   same place I did last time. It had the best advantage

**Page 626**

1   view of the doorway and the building itself.
2 Q Okay. So you could actually see Fish enter the
3   residence at 202 Grand Larry on both occasions?
4 A Correct.
5 Q Okay. And what happened with Mr. Fish got there this
6   time?
7 A I have to refer to my report because on this one it was
8   a little different. I watched him drive into the
9   area, of course, and park, and he entered the
10   residence. After a short amount of time he came out
11   and moved his car, which allowed another vehicle that
12   was in the driveway to leave, and then re-parked his
13   car and then went back in.
14 Q Okay. And how long on this time were you there prior
15   to Fish arriving?
16 A A matter of maybe five minutes again.
17 Q Okay. And how long was he in after he moved his car
18   and went back in?
19 A It looks like he was in there for about five minutes
20   total, and I want to say that he was in there for less
21   than a minute when he went in the first time, before he
22   moved his car, so probably about three minutes, I would
23   say.
24 Q Okay. And what happened after he left the residence?
25 A After he left the residence, he left the area

### Page 627

1 southbound.
2 Q And did you have any further participation in this case
3 that day?
4 A I passed off the eye, and that was about it.
5 Q Okay. Now let me direct your attention to February
6 21st. Actually on the 21st, what was your assignment
7 that day?
8 A I was assigned to operate the wire.
9 Q Okay. And were you assigned anything else at the
10 station before it happened?
11 A I don't believe so. I believe that was all that I was
12 assigned to do.
13 Q Do you wish to read your report and see if that
14 refreshes your recollection?
15 A I'm looking through it right now, yes. Looking through
16 my report, it looks we decided at some point that we
17 were going attempt to follow the suspect after the buy,
18 but I don't know if that was an impromptu thing we
19 decided, or if that was decided initially.
20 Q Okay. Let me just approach you with something that has
21 been previously marked as state's exhibit 19, and see
22 if this helps you refresh your recollection? Does that
23 refresh your recollection about something else you did
24 on the 21st?
25 A It appears that I must have been the one who

### Page 628

1 photocopied the buy money.
2 Q Okay. Now, I have set a document in front of you
3 marked state's 10.
4 A Uh-huh. (Affirmative)
5 Q It is in front of you, upside down.....
6 A Oh.
7 Q .....marked state's 10. Do you recognize that
8 document?
9 A This would be the buy money from the buy on the 21st.
10 Q And how do you know that is what it is?
11 A Because I initialed it, and photocopied it, and wrote
12 the date, and page 1 of 1 like I normally do when I
13 photocopy buy money.
14 Q Is the case number on there?
15 A The case number is.
16 Q Okay. And is that a true and accurate representation
17 of the photocopy that you made of the buy funds?
18 A Yes, it is.
19 MS. BRADY: Okay. I move to admit state's 10.
20 THE COURT: Number 10, Mr. James?
21 MR. JAMES: No objection.
22 THE COURT: 10 is admitted.
23         (Plaintiff's exhibit 10 admitted)
24 Q Okay. And what else did you do that day, Officer
25 LeBlanc?

### Page 629

1 A I believe that is all.
2 Q Did you participate in the surveillance?
3 A Yes.
4 Q Okay. And where did this buy happen?
5 A This buy happened at a different location. It was in
6 the area of International Airport Ave and Old Seward
7 Highway.
8 Q Okay. Was it at a business of some sort?
9 A I don't act -- actually recall what business it was at.
10 If I remember correctly on this one, I actually didn't
11 have eyes on anything. I was just in the area making
12 sure I was in a position where I could monitor the
13 wire.
14 Q Okay. So is that what you were doing, was just
15 monitoring the wire?
16 A Correct. I was -- my job was to operate the wire and
17 the recording.
18 Q Okay. And so you were relying on what other officers
19 were telling you to turn it on and turn it off?
20 A Correct.
21 Q Okay.
22 A Plus I mean, I could hear over the wire, so I could
23 hear as -- you know, in the vehicle, because we monitor
24 it continuously. We just record it during the -- the
25 aspects that are pertinent to the case. So I could

### Page 630

1 hear as Jeremy was driving to the scene, listening to
2 his radio, and as he was stopping at stop signs, and
3 stuff like that. You could hear the car sounds and
4 everything. So I could tell when he was driving, when
5 he was stopped, and you can pretty much understand what
6 is going on just by listening.
7 Q Okay. And then -- so what happened after Jeremy got
8 out of the suburban? Did you do anything there?
9 A After the buy was done, you mean?
10 Q Uh-huh.
11 A After the buy was done we attempted to follow the
12 suspect away from the area, unsuccessfully.
13 Q Okay. So you never found out where he was going that
14 day?
15 A Actually what I did was I drove back to 202 Grand
16 Larry.....
17 Q Uh-huh.
18 A .....and waited, hoping that maybe he would come back
19 there. And the vehicle did show up there for a very
20 brief period of time. I don't know if he ever went in
21 the house or not. All I know is that the vehicle
22 pulled in the driveway, the lights were on, and after a
23 few minutes it left again.
24 Q All right. Thank you. Let me direct your attention to
25 February 28th going into March 1st. Did you

**Page 639**

1  A  Correct.
2  Q  All right. Going to Grand Larry, behind you, the
3     diagram that is now there, okay. You are about 45 and
4     a half yards by your beamer -- or, some kind of a
5     distance.....
6  A  Correct.
7  Q  .....calculator?
8  A  Uh-hum. (Affirmative)
9  Q  Okay. And what is the lighting conditions on -- well,
10    first of all, let's go to the 8th and tell me when that
11    happened? When were you there?
12 A  It was at night. It was dark.
13 Q  All right. And about what time of night was it?
14 A  About 8:10.
15 Q  Okay. And what are the lighting conditions on Grand
16    Larry?
17 A  It is a pretty dark street. There is a few street
18    lights, I believe, but it is fairly dark.
19 Q  Okay. Could you tell me where -- you have been out
20    there because you measured this apparently?
21 A  Correct.
22 Q  Okay. Could you tell me where the street lights are
23    located?
24 A  I don't -- I know -- I believe that there is one at
25    each end. I'm not sure if there is any in between this

**Page 640**

1     span of block at all, or not.
2  Q  Okay.
3  A  I don't believe so.
4  Q  Is it a wide street?
5  A  No, it is a fairly narrow street.
6  Q  And if you can recall, what was the car layout at 202
7     Grand Larry?
8  A  I'm not sure I understand what you mean by car layout.
9  Q  I kind of figured you weren't, because I thought to
10    myself I didn't understand it myself. Is there a
11    driveway at Grand Larry?
12 A  There is.
13 Q  All right.
14 A  Actually.....
15 Q  Where is the driveway?
16 A  .....there is a driveway.....
17 Q  I m -- excuse me, a parking area. Not a driveway, but
18    a.....
19 A  I would call it a driveway.
20 Q  Okay. I'll go with you.
21 A  Basically right here, and the back -- I'd say maybe the
22    back third of the residence has a small little carport.
23 Q  Okay.
24 A  Maybe big enough -- maybe big enough for one car to be
25    under.

**Page 641**

1  Q  All right.
2  A  That would be like right -- right here. This door is
3     actually under the carport.
4  Q  And that's the door that you were observing?
5  A  Correct. Actually, I could see both doors for where --
6     where I was at, but the only one that was used, in this
7     case, would have been this one.
8  Q  All right.
9  A  The other door would have been right about here. There
10    is a door, and there is a window on each side of the
11    door, and the other half is basically a copy of that.
12 Q  Uh-huh. Now, when you -- on the 8th now, we're
13    talking, okay?
14 A  Okay.
15 Q  Excuse me. When you did your search of the vehicle
16    before -- this happened at the police department,
17    right?
18 A  Correct.
19 Q  Okay. Did you report the finding of the marijuana?
20 A  Report it to?
21 Q  Somebody?
22 A  Yes.
23 Q  Okay. Who did you report it to?
24 A  I reported it back to the unit, of course.
25 Q  Okay.

**Page 642**

1  A  I believe Officer LaPorte was the one who went in and
2     had a long come-to-God talk with the informant.
3  Q  Okay. And where do -- you have your police reports in
4     front of you, right?
5  A  Yes, I have the police report from this case.
6  Q  That's what I meant, yeah.
7  A  Yes.
8  Q  And does it have any indication there that you found
9     contraband during your search?
10 A  No.
11 Q  And would you agree, as a five and a half year police
12    officer -- I think it is five and a half years, isn't
13    it?
14 A  Five -- a little over five years.
15 Q  Okay. I'll give you another six months -- that it is
16    important to put in information relating to --
17    especially contraband, in that type of situation when
18    you are -- you are doing such a search?
19 A  Well, I don't think that that is actually indicative of
20    the defendant's guilt or innocence in this case. It is
21    more indicative of the informant's guilt of innocence.
22    And I don't know that specifically the search where the
23    marijuana was found was for this case, or for one of
24    the other cases we used him for. Because, like I said,
25    we did many cases with this -- or several cases with

**Page 643**

1  this informant. It may very well have been this one.
2  I do believe it was the first search we did, because I
3  do recall that his car was quite messy, and it took a
4  long time to search the first time. And I -- my talk
5  with him was that he needed to clean out his car so
6  that it didn't take so long.
7 Q And what kind of car was this -- what kind of car was
8  this?
9 A It was an old beater station wagon.
10 Q All right. And if someone had testified that on th --
11  during the search marijuana was found in relationship
12  -- we are talking about this case, now.
13 A Okay.
14 Q Would you have put it in your report?
15 A Probably not, no.
16 Q Why not?
17 A Because it is not -- it doesn't have anything to do
18  with the defendant or the subject of this case.
19 Q But it has to do with the fact you did a thorough
20  search, and what you found?
21 A Correct. And there was no contraband in the car when
22  this case proceeded.
23 Q So you found some but -- so -- you use selective
24  reporting, then, correct?
25 A No, I wouldn't call it selective reporting. It would

**Page 644**

1  just be handled as a separate incident.
2 Q And do you know whether or not the incident was
3  prosecuted?
4 A I would take -- I would suspect that it wasn't.
5 Q All right. Okay. Who was involved in that one? Go
6  ahead and have some water, but watch the pitcher. I
7  think that is the drippy one. Who was part of the team
8  at that time?
9 A At that time it was myself, Officer LaPorte, Officer
10  Johnstone, Officer Steve Haas, Officer -- now Sergeant
11  Bushue. She was an officer back then, and Officer
12  Sims. I'm not sure if he was on leave at the time, or
13  if he was involved at all.
14 Q Okay.
15 A And Officer Somerset Jones, as well.
16 Q Uh-huh. When you saw -- okay, you arrived about five
17  minutes early, I believe, to the scene, is that
18  correct? You were there.....
19 A Approximately, correct, yes.
20 Q Okay. And -- and that was about -- calling your
21  attention to your report dated 2/9/2001, down at the
22  bottom there, do you see it?
23 A Yes.
24 Q Okay. That was about 10:10 hours?
25 A I'm sorry?

**Page 645**

1 Q That was about 10:10 hours?
2 A Actually, it was about 20:10 hours. That is just a
3  typo.
4 Q Okay, I mean -- but 10 -- 10:00 p.m. is what you are
5  talking about, then? All right. I'm sorry, excuse me.
6 A 8:00. That would be 8:00.
7 Q 8:00. Okay. So.....
8 A 8:10. Correct.
9 Q All right. So the one should be a two?
10 A Correct.
11 Q You are talking military time then?
12 A Correct.
13 Q Okay. All right. Okay. And was there any cars -- how
14  many cars were in the driveway, which is part of the
15  carport?
16 A I don't recall.
17 Q All right.
18 A If I remember correctly, there was something under the
19  carport. It just kind of looked like it was abandoned
20  there, but I don't remember if there were anything el
21  -- was anything else in the driveway.
22 Q All right. Is there parking to the left, if you turn
23  in -- when you are facing 202 from Grand Larry?
24 A Uh-hum. (Affirmative)
25 Q You have already diagramed in a parking driveway?

**Page 646**

1 A Correct.
2 Q Is there parking available on the left of that?
3 A Here?
4 Q Yeah.
5 A What you are referring to?
6 Q Yes.
7 A I don't exactly remember. I believe it is kind of wide
8  enough for two rows of cars, but I'm not positive. I
9  don't think I could -- could say for sure.
10 Q Did -- where did Mr. Jeremy Fish's -- where did he
11  park?
12 A Each time.....
13 Q Excuse me, I'm talking about the 8th, now.
14 A The 8th?
15 Q Uh-huh.
16 A He pulled right in.
17 Q Okay. Behind.....
18 A Whatever else was in the driveway.
19 Q Okay. And you indicated that he got out and he went
20  in, then came back out, then went back in?
21 A Correct.
22 Q Okay. And this -- according to your report basically
23  was about a 10 minute from arrival to departure?
24 A Correct.
25 Q Okay. Now, do you know if anybody else was in the

**Page 647**

1  house -- in 202 at that time?
2  A  Other than the one other subject?
3  Q  Right. You saw -- according to the police report, you
4     saw someone open the door?
5  A  Correct.
6  Q  And then you -- obviously Jeremy Fish was there.....
7  A  Correct.
8  Q  .....because you saw him go in and go out? Anybody
9     else?
10 A  I -- I don't know.
11 Q  All right. Okay. After Jeremy Fish left -- got back
12    in the car, what happened then?
13 A  After he left?
14 Q  Well, he got back in the car and then someth -- he
15    obviously.....
16 A  He left.
17 Q  He left. Okay.
18 A  Correct. And I passed surveillance off to another
19    unit.
20 Q  And who was that?
21 A  I don't recall.
22 Q  All right. And are you folks talking to each other on
23    radios, or something during this time?
24 A  Correct.
25 Q  Okay. Okay. Then that was the totality of your

**Page 648**

1  involvement on the 9th, correct?
2  A  Actually it was on the 8th.
3  Q  I'm sorry, the 8th. I was looking at the.....
4  A  After Jeremy got back to the station, I conducted the
5     post-buy search of his vehicle, as well.
6  Q  Okay. Did you -- had you disturbed anything in the
7     vehicle from the time that -- by removing anything
8     other than the marijuana out of his -- you said it was
9     pretty messy, right?
10 A  Correct.
11 Q  Did you take anything -- clean the car out for him?
12 A  I didn't clean the car out. I do believe he had a
13    steak knife under his seat that I put way in the back,
14    but I wasn't going to clean his car for him.
15 Q  Okay. All right. And so the -- there is no mention in
16    your search about finding the steak knife either, is
17    there?
18 A  No.
19 Q  All right. And when you did the post search, is it
20    fair to assume that the interior of the vehicle was
21    basically how you had left it after the pre-search?
22 A  Correct.
23 Q  Okay. What was in the vehicle?
24 A  As far as the trash that was in it?
25 Q  Yeah. Yes.

**Page 649**

1  A  I don't really recall exact trash. I mean, I believe
2     there was some fast food stuff, dirt, lots of rocks,
3     and gravel on the floorboards.
4  Q  Okay. Did you search all the fast food stuff?
5  A  I looked through everything, yes. And in the back, I
6     believe, he had a baby car seat, and some other -- some
7     clothes, and some other things.
8  Q  Okay. Now, going to the 20th. That is the next time
9     you had any involvement in this, is that correct?
10 A  Correct.
11 Q  Okay. And the -- you were again assigned to the eye,
12    is that.....
13 A  The close in surveillance, yeah.
14 Q  Surveillance, okay. And where were you that time?
15 A  Same splace [sic].
16 Q  Same spot? So -- okay. Was -- what time was this?
17 A  Looks like the informant showed up at about 8:09.
18 Q  Okay. And were the lighting conditions the same?
19 A  It would have been. It actually would have been a
20    little bit lighter, because it was a little bit later
21    in the month, but at this time of night it would have
22    been the same probably.
23 Q  Okay. 8:00 at night, that time frame?
24 A  Correct. Yes.
25 Q  Okay. And Grand Larry still very dark -- the street

**Page 650**

1  itself?
2  A  Correct.
3  Q  Okay. And you started the recording -- when did you
4     start the recording?
5  A  As he drove into the area.
6  Q  Okay. What did you hear on the recording when he was
7     driving into the area?
8  A  Well, referring to my report, what I heard was, I heard
9     several people talking.....
10 Q  No, let me stop you, if I may.
11 A  Okay.
12 Q  What did you hear when you -- you turned on the
13    recorder, right?
14 A  Correct.
15 Q  As he was driving in?
16 A  Uh-hum. (Affirmative)
17 Q  What did you hear?
18 A  I don't remember.
19 Q  Okay. And then he pulls in. Where did he pull in?
20 A  I believe it was pretty much the same place, only on
21    this occasion there was other vehicles to where he
22    couldn't pull in all the way.
23 Q  All right. How many vehicles were there?
24 A  Several.
25 Q  Okay. Did you know how many people were in the house?

**Page 659**

1  A   I was to operate the wire -- record the conversation.
2  Q   All right. And where were you on the 21st -- I mean,
3      first of all, let me ask you this. That's an unfair
4      question. On the 21st your job was assigned the wire.
5      All right. What happened after you got your assignment
6      to operate the wire?
7  A   I set it up to make sure it works, test it, and put a
8      tape in it.
9  Q   All right. And then did you put the wire on Jeremy
10     Fish?
11 A   I don't know if I put it on him that day. I'm sure I
12     would have double checked to make sure it was on right,
13     make sure it worked right.
14 Q   Okay. And -- all right. Now, at about 8:30, according
15     to your report here, you arrived at what location?
16     8:24 to be specific?
17 A   Oh, International Airport Ave and Old Seward Highway.
18 Q   Okay. And where were you parked?
19 A   I don't remember exactly where I was parked at.
20 Q   All right. And after -- you had a job to do after
21     running the wire. How long did you run the wire?
22 A   Looks like about a minute.
23 Q   Okay. And what kind of vehicle was Jeremy driving that
24     day, same one?
25 A   I don't remember.

**Page 660**

1  Q   Okay. What kind of vehicle was at the location of Old
2      Seward and International, other that -- well, first of
3      all, did Jeremy make -- who did you see when Jeremy
4      arrived at International and Seward?
5  A   I didn't see anything.
6  Q   Okay. Now, you were assigned to do something after you
7      turned off the wire?
8  A   Correct.
9  Q   Okay. What were you assigned to do?
10 A   Our -- the remaining members of our unit, those that
11     weren't following Jeremy back to the station, were
12     going to attempt to follow the suspect.
13 Q   Okay.
14 A   And I don't recall if that was an -- an assignment that
15     we decided on at our briefing, or if it is something
16     that we decided on later on.
17 Q   Okay.
18     THE COURT: Move that mike a little closer to you,
19 would you? That's good.
20 Q   Who -- you were a part of that group, correct?
21 A   The group to follow the suspect, yes.
22 Q   Yeah. All right. And who else was involved in that?
23 A   I don't recall which.....
24 Q   Okay.
25 A   .....which members.

**Page 661**

1  Q   When did -- you had testified earlier that you returned
2      to 202 Grand Larry that day?
3  A   Correct.
4  Q   Okay. When did -- what was the suspect vehicle driving
5      at that time?
6  A   He was in a large sport utility. I believe it was a
7      Durango -- like a Dodge Durango, or something similar.
8  Q   Okay. And that information had to have been supplied
9      to you from some other source if you didn't see
10     anything at the scene?
11 A   Correct.
12 Q   Okay. How long ago was that? How long after the --
13     that you departed International that you saw the
14     vehicle arrive at -- the described vehicle that you
15     were to watch for?
16 A   I don't remember. We tried following it around for a
17     while, and then once we lost it I basically made a
18     beeline for that address just with the hopes that it
19     might show back up there.
20 Q   Okay. Okay. And that is -- does that finish off your
21     involvement on the 21st?
22 A   Once I back -- got back to the police station, I turned
23     over the tape of the recording to Officer LaPorte.
24 Q   Okay.
25 A   And that would end.....

**Page 662**

1  Q   That was the end?
2  A   Yes.
3  Q   Okay. Going to the 28th/1st, you were in a marked
4      police car at this time?
5  A   Yes.
6  Q   Prior times, were you in a marked police car?
7  A   No.
8  Q   Okay. So this is the first time you were in a cop car?
9  A   Yes.
10 Q   Marked.....
11 A   Right.
12 Q   .....police car? Okay. And you were assigned to make
13     the arrest, is that correct?
14 A   Correct.
15 Q   Okay. And were you running any wire at that time?
16 A   No. I had a bug radio which monitors the wire but no
17     recording device.
18 Q   Okay. All right. And at that particular juncture,
19     what kind of car was Mr. Davis -- or, excuse me,
20     Mr. Jeremy driving then?
21 A   I don't recall. I imagine probably the same one he has
22     been driving the whole time.
23 Q   Okay. You were not involved in any more searches other
24     than the -- the ones you previously described of the
25     vehicle?

**Page 727**

1 Q How is it that you are familiar with marijuana?
2 A How familiar? Well, basically when I was in school,
3  they give you a picture of everything, crack, and
4  marijuana, pcp, and all that type of stuff. So I'm
5  well educated on that. So.....
6 Q Okay. So when you were in school they showed you what
7  different drugs look like?
8 A Yeah. You can rent a book that show you things like
9  that. So.....
10 Q What school were you going to that you.....
11 A Lamiere (ph) High in Montgomery, Alabama.
12 Q Okay. And you rent books that.....
13 A Uh-hum. (Affirmative)
14 Q .....tell you -- and, just out of curiosity, why would
15  you want a book about.....
16 A Because most of the time people do reports on things
17  like that.
18 Q Did you do a report on marijuana?
19 A I didn't. So.....
20 Q Okay. So why did you rent a book about marijuana?
21 A Well, I didn't say I rented one. My couple friends
22  rented one. We just basically want to know everything,
23  what is going on. We don't want to get on -- you know,
24  start using things that we can't get off of, and cause
25  crimes and problems in this world. So.....

**Page 728**

1 Q Okay.
2 A So I like to know things before I started to do things.
3  So.....
4 Q And so any familiarity that you have with cocaine or
5  crack, would that have come from the same book?
6 A That one -- you may had the second edition on that if
7  -- if went down to crack.
8 Q Okay. So if I understand the testimony, books were
9  rented two times. There was second edition. Is that
10  what you just said?
11 A Yes. It's different drugs, and whatever. They don't
12  have all of them related on the same book.
13 Q So you have never seen marijuana in person in real
14  life?
15 A Yeah, I have seen it in person, too.
16 Q Oh, okay. When was that?
17 A Years ago.
18 Q Many years ago?
19 A Yes.
20 Q How many?
21 A Maybe six years ago.
22 Q Okay. And what about crack?
23 A Crack? I know what crack look like. It is a white
24  substance, but I never been too close to it. So.....
25 Q Have you ever seen it in person?

**Page 729**

1 A Yes.
2 Q Where would that be of at -- where would that have been
3  at?
4 A In another state.
5 Q In another state?
6 A Yes.
7 Q Okay. What state?
8 A Atlanta, Georgia.
9 Q Okay. And how was it that you came about seeing the
10  crack?
11 A Oh, a couple of friends had it, and they was trying to
12  tell me what was that, and then I say, okay, and get
13  rid of that, because I didn't want to involve myself in
14  that.
15 Q What about powdered cocaine, have you ever seen that?
16 A Yes. It's a powder substance. Something like baby
17  powder, basically. So.....
18 Q Okay. Have you ever seen it in person?
19 A In person? Yeah.
20 Q And when would that have been?
21 A Around the same time.
22 Q Okay. And do you know how to make crack from cocaine?
23 A I don't, no.
24 Q Okay. And on those occasions that you have been over
25  to Mr. Davis' house with a key when he wasn't there,

**Page 730**

1  and you have looked around in his house, have you ever
2  seen any crack cocaine in this house?
3 A No, ma'am.
4 Q Have you ever seen any powder cocaine in this house?
5 A No, ma'am.
6 Q Have you ever seen any white powder substances at all
7  at Mr. Davis' house?
8 A No, ma'am.
9 Q No baking soda?
10 A Well, baking soda might be in the freezer for -- to
11  keep food fresh. So.....
12 Q Okay. So that is a white powdery substance, right?
13 A Yeah.
14 Q Okay. And you testified that when Mr. Fish was talking
15  to Mr. Davis, you weren't concerned with they were
16  doing, is that right?
17 A I didn't say I wasn't concerned, but I was just in
18  there if he need to ask me some things, and make sure
19  we got the court dates, and everything taken care of.
20  So.....
21 Q Okay. When Mr. Fish was talking to Mr. Davis on the
22  20th -- I think I misdirected you. You said you
23  weren't concerned with what they were doing, is that
24  right?
25 A I was concerned because I'm -- I'm on trial and so I

```
 1  need to know what is going on.
 2 Q You are on trial?
 3 A Well, I'm up here testifying, that is what I'm saying.
 4    So.....
 5 Q Okay. And I was directing your attention to February
 6    20th.....
 7 A Uh-hum. (Affirmative)
 8 Q .....when Mr. Fish and Mr. Davis were talking in the
 9    kitchen, you said on direct, when Mr. James was talking
10    to you.....
11 A Oh, Mr. F -- okay. Okay.
12 Q .....that you weren't too concerned with what they were
13    doing, is that right?
14 A I got the name mixed up. It's Mr. Fish, that's Jeremy
15    Fish, okay. We can start there. I know what you are
16    talking about now.
17 Q Okay.
18 A So I really -- I was thinking you was talking about
19    the.....
20 Q I could tell you were misunderstanding me, and that's
21    why I kept asking you.....
22 A Yeah, so that is what I'm talking about. The names and
23    all that, I do know the person, and the names I'm
24    really kind of lost on. So.....
25 Q Okay. Now, when Jeremy Fish was there -- when
```
Page 731

```
 1    Mr. James was asking you questions, you said you
 2    weren't too concerned with what he was doing with
 3    Mr. Davis in the kitchen?
 4 A I wasn't. I was in the living room, at the time.
 5 Q Okay. Excellent. Now, did you -- do you know what
 6    they discussed -- if they discussed anything?
 7 A No, ma'am.
 8 Q Okay. Did -- while Mr. Fish was there, now, who was in
 9    the apartment at that time?
10 A Me, Darryl and maybe two other people.
11 Q Who is the -- who were those other people?
12 A Just a couple of friends, Heather, and Woogie (ph).
13 Q Oh, the -- is Woogie (ph) a male person, or a female
14    person?
15 A It's a male -- it's a female and a male, so it's
16    basically three male -- three males and one female.
17 Q Okay. And did someone leave to go buy a pot?
18 A No, I had no one -- no.
19 Q Or to go get a pot?
20 A No.
21 Q Did -- you know nothing about anybody being sent for a
22    pot?
23 A Well, I was there until 11:00, so I know no one came
24    back with a pot. So most likely they haven't left to
25    get a pot. So.....
```
Page 732

```
 1 Q What about a 7-up?
 2 A 7-up, no.
 3 Q Okay. And now, let me ask you this. You testified
 4    that you followed Mr. Fish from the courthouse
 5    yesterday?
 6 A I didn't follow him there. I was sitting right outside
 7    the courtroom. You can see everything on the top
 8    floor.
 9 Q Oh, so you were just watching him?
10 A Yeah.
11 Q Where was he parked at?
12 A He was parked in the Anchorage Youth facility across
13    from the courthouse.
14 Q He was parked where?
15 A The little youth -- youth court.
16 Q Youth court?
17 A Youth court, I guess. So.....
18 Q Okay. And you could see that from where you were?
19 A Yes, ma'am.
20 Q All right. And have you ever seen Mr. Fish at
21    Mr. Davis' house on any other occasion?
22 A No.
23 Q Okay. Did you -- were you aware that Mr. Dish and --
24    Mr. Davis and Mr. Fish were friends?
25 A Maybe hello and hi and all that type of stuff. Not
```
Page 733

```
 1    just like me and him are. So.....
 2 Q Okay. So they are not as good of friends as.....
 3 A No.
 4 Q .....you guys are but are you.....
 5 A Maybe hello, how you doing, or whatever like that, you
 6    know. Basically seeing someone you greet them hello.
 7    So.....
 8    MS. BRADY: That's all I have, Your Honor.
 9    THE COURT: Redirect, Mr. James?
10         BRANDON MAY
11 testified as follows on:
12         REDIRECT EXAMINATION
13 BY MR. JAMES:
14 Q When you were in the living room, could you see in the
15    kitchen?
16 A Yeah, you basically can see just a little distance in
17    the living room. You couldn't see the whole living
18    room.
19 Q Could you see Robert in the -- in the kitchen?
20 A Yes.
21 Q Okay. So, thank you.
22    THE COURT: Thank you, sir. You can step down.
23 A Thank you.
24    THE COURT: How we doing? Anybody need a break from
25 the jury? Nobody? Let me know. Next witness?
```
Page 734

**Page 751**

1  A  Yes.
2  Q  All right. And have you ever seen any drugs over
3     there?
4  A  No.
5  Q  And how many times you been over there?
6  A  I don't know.
7  Q  Okay.
8  A  Quite a few times.
9  Q  All right. Did you ever see any guns -- any -- in the
10    possession of Mr. Davis?
11 A  No.
12 Q  Thank you. Like I told you out there, the other side
13    gets to ask questions, too.
14    THE COURT: Cross examination, Ms. Brady?
15                ATHENA SODER
16 testified as follows on:
17                CROSS EXAMINATION
18 BY MS. BRADY:
19 Q  Okay. So you used to date Mr. Fish, is that right?
20 A  Right, yeah.
21 Q  How long did you date him for?
22 A  For about a couple of weeks.
23 Q  A couple of weeks?
24 A  Yes.
25 Q  Okay. So during that couple of weeks, how many times

**Page 752**

1     did you sleep with him?
2  A  Two times.
3  Q  Two times? Okay. So.....
4  A  No, excuse me. Three times.
5  Q  Okay.
6  A  Three.
7  Q  Did you sleep with anybody else around the same time?
8  A  No.
9  Q  Okay. Does Mr. Fish have any way of knowing that?
10 A  That -- knowing that I haven't?
11 Q  Yeah.
12 A  I don't -- I don't know.
13 Q  Okay. Have you ever had a paternity test to establish,
14    then, that he is the father of your daughter?
15 A  No.
16 Q  Okay. Has Mr. Fish asked you to?
17 A  No.
18 Q  Okay. Now, you said that on one time Jeremy Fish left
19    behind an eighth of weed, is that right?
20 A  Right.
21 Q  How do you know it was an eighth?
22 A  Because Jared said so. I saw it. It was in a baggie
23    about that big, and it was filled about that much with
24    weed -- across.
25 Q  Would you recognize an eighth of weed?

**Page 753**

1  A  Yeah.
2  Q  Okay. So you know what that amount of marijuana.....
3  A  Right.
4  Q  .....looks like? You smoked it before?
5  A  To an extent. Yeah.
6  Q  Still smoke it?
7  A  No.
8  Q  When was the last time you smoked it?
9  A  July.
10 Q  Okay. And have you ever smoked marijuana with
11    Mr. Davis?
12 A  No.
13 Q  Never?
14 A  No.
15 Q  So if Mr. Davis said you did, he would be lying?
16 A  Right.
17 Q  Okay. And who is the father of your baby that you are
18    pregnant with now?
19 A  Josh.
20 Q  Okay.
21 A  I have been dating him for about two years, ever since
22    me and Jeremy broke up.
23 Q  When, specifically, did you date Jeremy?
24 A  August of -- August 1st of '99. That's when we dated.
25    That's when we started going out.

**Page 754**

1  Q  And you finished going out on the 15th of '99 -- August
2     of '99?
3  A  Somewhere around there, the middle of August.
4  Q  Okay. Now, you testified that you know what crack and
5     cocaine are?
6  A  Right.
7  Q  How do you know that?
8  A  Well, because I used to do cocaine back when I was
9     dating Jeremy.
10 Q  Okay. So you haven't done it for two years?
11 A  Right.
12 Q  Is that your testimony?
13 A  Right.
14 Q  Okay. And what about crack? You ever smoked crack?
15 A  No.
16 Q  Okay. Then, how do you know what that looks like?
17 A  Because I have seen it before.
18 Q  Under what circumstances have you seen it?
19 A  Jeremy has had it before, and my friend's have had it,
20    and I have seen it.
21 Q  Have you ever seen Mr. Davis with crack?
22 A  No.
23 Q  Ever seen him with cocaine?
24 A  Okay. And.....
25    MS. BRADY: Okay. I don't have any further questions,

**Page 759**

1 questions?
2          BUENA EPEAGBA
3 testified as follows on:
4          CROSS EXAMINATION
5 BY MS. BRADY:
6 Q  How far is it from your house to International and Old
7    Seward?
8 A  Maybe a mile. Could.....
9 Q  Okay. How long would it take you to drive there,
10   about?
11 A  Five minutes.
12 Q  Okay. And was your son living with you on February
13   21st, 22nd, around there?
14 A  He was living at a hotel, but he was -- his -- most of
15   his clothes were at my house.
16 Q  Okay. So when he was moving out of 202 Grand Larry,
17   did he move his stuff to your house -- a lot of it?
18 A  He moved his personal things, like his clothing, his
19   stereo, and his small items. He put them in the -- the
20   storage shed.
21 Q  All right. And was he driving your car?
22 A  Yes.
23 Q  Okay. Did he frequently drive your car?
24 A  Yes.
25 Q  So how do you know he was driving your car on February

**Page 760**

1    21st?
2 A  If I didn't drive it, his sister didn't drive the car
3    -- we have the large car because we have a large
4    family, and we can all fit in the car. So there are
5    three people, other than myself, that will drive my
6    car.
7 Q  Okay.
8 A  So if I didn't have the car, and the car was gone, they
9    all have keys. I don't fuss over it, long as they
10   leave me a vehicle to drive.
11 Q  You have other cars?
12 A  Yes.
13 Q  What other kinds of cars do you have?
14 A  There is a Montero Sports SUV. It is not actually my
15   car. It is in my name. It is my daughter's car. So
16   if they drive my car, they leave a car available for
17   me. They leave their car.
18 Q  I see.
19 A  With the keys in the car, because if I come outside and
20   my car is gone, then I use whatever car is available.
21   MS. BRADY: Thank you. That's all the questions I
22   have.
23 A  Uh-hum. (Affirmative)
24   THE COURT: Mr. James, redirect?
25          BUENA EPEAGBA

**Page 761**

1 testified as follows on:
2          REDIRECT EXAMINATION
3 BY MR. JAMES:
4 Q  You said the little items were kept at your house.
5    Where were the big items?
6 A  In the storage.
7 Q  All right. And on February 21, you don't know who was
8    driving the car if you weren't driving the car,
9    correct?
10 A  No.
11 Q  All right. Could -- thank you.
12   THE COURT: All right, ma'am. Thank you very much.
13 You can step down. Mr. James?
14   MR. JAMES: Could I just have one minute? (Pause) If
15 I may just have one second, I want to check and see if I
16 have another witness out there? (Pause) Thank you, Your
17 Honor. At this time we will rest, sir.
18   THE COURT: I need to have a bench conference with you
19 all first, please.
20   MR. JAMES: Before I rest?
21   THE COURT: Uh-hum. (Affirmative)
22   MR. JAMES: Fine.
23   (Bench conference as follows:)
24   (Inaudible)
25   (End of bench conference)

**Page 762**

1    THE COURT: All right. Mr. James?
2    MR. JAMES: Yes, Your Honor. At this time, we rest.
3    THE COURT: All right. The defense rests, means the
4 defense won't be presenting any additional witnesses. If
5 you remember back to the beginning of the trial, I indicated
6 that the state may have the opportunity to present limited
7 rebuttal evidence. Ms. Brady, any rebuttal evidence?
8    MS. BRADY: No, Your Honor.
9    THE COURT: All right. All right. You've received all
10 the evidence you're going to receive. The next step in the
11 case is for the lawyers to make closing arguments or
12 summations. Then I will instruct you on the law. After we
13 do all that I'll check everybody's health, and assuming
14 everybody is healthy, and we have too many jurors, I'll draw
15 a couple of names by random to winnow you down to 12, and
16 we'll send the 12 of you in to begin deliberations.
17   I expect deliberations will begin between 10:30 and
18 11:00 tomorrow. And I'll ask you to be -- I don't know how
19 long it will take you to make whatever decision you make,
20 but I'll ask you to plan on being here the full day. And
21 with that, I'm going to send you home. We're not going to
22 do closing arguments now. And one of the things that I have
23 to do is check with the lawyers to -- double-check that the
24 instructions on the law are accurate. And I'm going to
25 spend the rest of our trial time now doing that.