IN THE SUPREME COURT OF THE STATE OF ALASKA

ROBERT O. DAVIS III, )
 )
 Petitioner, )
 )
vs. ) Supreme Court No. S-11597
 )
STATE OF ALASKA, )
 )
 Respondent. )
_____)
Superior Court No. 3AN-S01-1717 Cr.

## RESPONSE TO PETITION FOR HEARING

VRA CERTIFICATION. The undersigned certifies that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

DOMESTIC VIOLENCE OFFENSES Per AS 18.66.990 (3) and (5)
[ ] ALL COUNTS        [X] NONE        [ ] SPECIFIED BELOW

A.  Introduction

Robert Davis was convicted of four counts of third-degree misconduct involving a controlled substance, based on four controlled drug buys where Anchorage police informant Jeremy Fish purchased cocaine from Davis on February 8, 20, 21, and 28, 2001. His conviction was upheld by the court of appeals in *Davis v. State*, Memorandum Opinion & Judgment No. 4899 (Alaska App., August 4, 2004).

Davis now petitions this court for hearing, raising two claims. First, he argues that there was insufficient evidence to convict him, because Fish's credibility was allegedly so suspect that no reasonable juror could believe him. Second, he argues that the trial court erred in declining

Exhibit H – 1

to pay the expenses of Nome Police Officer Daniel Bennett to testify at his trial. Neither claim has merit nor warrants this court's review.

B.   Discussion

1.   *Sufficiency of the Evidence*

As to Davis's first claim, it is helpful to keep in mind basic principles of review for sufficiency-of-the-evidence claims. When this court reviews whether a conviction is supported by sufficient evidence, it "consider[s] only those facts in the record most favorable to the prosecution and such reasonable inferences as a jury may have drawn from them." *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981). The court does not weigh the evidence or decide issues of witness credibility. *Ratliff v. State*, 798 P.2d 1288, 1291 (Alaska App. 1990). When determining whether sufficient evidence supports a conviction, the court should uphold the verdict if any reasonable juror could have concluded that there was no reasonable doubt about the defendant's guilt. *Ross v. State*, 586 P.2d 616, 618 (Alaska 1978).

Examining Davis's claim in light of these principles, there was sufficient evidence to convict him. Davis notes that none of the police officers testified that they saw him with cocaine, and says that the state's case thus rests on the testimony of Fish. [Pet.Hrg. at 4] Davis recognizes that witness credibility is normally a jury issue, but says Fish's credibility

Exhibit H – 2

was so suspect that no reasonable juror could have believed him. *Id.* Davis is in error. Reasonable jurors could have believed Fish and found Davis guilty based on his testimony and the other evidence presented.

Davis does not question the evidence of identity. Fish testified that he had known Davis for about three years and had bought drugs from him and been to his house. Two buys took place at Davis's house, and there were many recorded buy calls made to Davis's cellphone. Besides identity, neither does Davis question that the drugs recovered by the police from Fish actually were cocaine. The drug samples all field-tested positive as cocaine and then later retested positive at the state crime lab. Davis also ignores the general pattern of conduct used to ensure the integrity of the investigation – *i.e.*, that the police strip-searched Fish before and after each buy, that the police searched his car before and after each buy, that teams of police officers followed him to and from the buy sites and watched the buy sites, and that the drugs were recovered from him quickly by the police. *See* mem. op. at 4. Davis in essence argues that because the police officers did not go with Fish into Davis's house and vehicles during the various buys, one cannot rule out the possibility that Fish really got the drugs somewhere else and cannot convict Davis because Fish was not credible. The argument is without merit.

Davis offers nothing to suggest that Fish got the drugs elsewhere. Fish's testimony was corroborated by the tapes of the drug-buy calls and the tapes from Fish's body wires, which were played for the jury. Mem. op. at 4. Davis points to no real inconsistencies in Fish's testimony. Davis simply argues that Fish's lifestyle and character render him incredible as a witness. Fish was far from exemplary – he and other witnesses testified to criminal conduct he had engaged in, criminal convictions, drug use, and other unsavory things. But this is not uncommon in the criminal milieu, and does not render a witness *per se* incredible. Reasonable jurors could believe Fish's testimony, particularly when considered against the mosaic of corroborating testimony from the police officers and the evidence from the recorded conversations.

2. *Telephonic Testimony/Payment of Travel Expenses of Officer Bennett*

Davis's second claim is that the trial court erred in declining to allow Nome Police Officer Bennett to testify telephonically, or alternatively that the court should have paid for Officer Bennett's travel expenses so that he could appear in person. Criminal Rule 38.1 requires consent of the opposing party to present a witness telephonically. The state objected to Officer Bennett appearing telephonically, but Davis claims that the trial court should have exercised its discretion under Criminal Rule 53 and relaxed the requirement of Criminal Rule 38.1

Exhibit H – 4

regarding consent of the other party. However, the ability to relax the rules under Criminal Rule 53 is not boundless. *See, e.g., State v. Tinsley*, 928 P.2d 1220, 1223 (Alaska App. 1996); *Plate v. State*, 925 P.2d 1057, 1061-62 (Alaska App. 1996) (both finding that trial court abused its discretion in attempting to relax the criminal rules via Rule 53). Also, this court has placed high value on having witnesses testify in person. *See, e.g., Whitesides v. Dep't of Public Safety*, 20 P.3d 1130, 1136-37 (Alaska 2001) (discussing historical recognition of the value of in-person testimony). Even if the trial court could have relaxed the consent requirement of Criminal Rule 38.1, it is nonetheless impossible to say that the trial court abused its discretion in declining to allow Officer Bennett to appear telephonically.

Davis alternatively claims that the trial court should have paid Officer Bennett's travel expenses so that he could appear in person. The court of appeals rejected this claim, noting that Davis had provided no information demonstrating that he was unable to pay these costs. Mem. op. at 7. Davis claims that he did present such information, but in fact all he presented was a conclusory claim that he was unable to pay, with no specifics as to his financial situation. Given that Davis was represented by experienced private counsel who undoubtedly was capable of presenting such information if it existed and was favorable to Davis's claim of

indigence, the trial court did not err in declining to pay Officer Bennett's travel expenses.

The court of appeals clearly did not err in upholding the trial court's decisions not to allow Officer Bennett to testify telephonically and not to pay for his travel expenses. But assuming purely for the sake of argument that (1) it was error not to allow Officer Bennett to appear telephonically or to pay for his transport to Anchorage, and that (2) Davis's claimed right to have Bennett appear in person was of constitutional dimension, it was still harmless beyond a reasonable doubt. Fish admitted to everything that Davis wanted to establish through Officer Bennett's testimony and there was no reasonable possibility that the lack of Officer Bennett's testimony affected the result. *See Dailey v. State*, 65 P.3d 891, 896 (Alaska App. 2003) (applying constitutional harmless error standard).

Davis first requested to have Officer Bennett appear telephonically, prior to Fish taking the stand. In his offer of proof, Davis's attorney stated that he wanted to call Officer Bennett so that he could impeach Fish if Fish denied having an agreement with the Nome police to make controlled drug buys. Counsel stated:

> Basically, Your Honor, I don't know what Mr. Fish is going to testify to, but we have an extensive police report, three page, from Dan – Officer Dan Bennett, Nome Police Department,

Exhibit H – 6

> relating to the sequences of events. One of those issues that I wish to explore is that he had – he, being Fish, had agreed to meet with Bennett. There was supposed to – he was supposed to participate in some buys up in Nome was what this all came down – it originally came down to. He was to meet with him, he – the 31st, I believe, and he departed unbeknownst to Bennett on the 27th, which activated – this January now, of this year – activated the arrest warrant issued by Judge Ben Esch up in Fairbanks – excuse me, Nome, which resulted in his arrest down here on the 6th of February.
>
> And if he denies that he had any kind of agreement, or that, in fact, he lied to the police – just denies he lied to the police, I think I'm entitled to establish that, A, he lied to his – the police there.

Davis's motion for payment of Officer Bennett's travel costs reiterated that his "testimony in regards to the situation in Nome may be vital to impeach the testimony of Jeremy Fish." However, Fish admitted in his own testimony everything that Davis was trying to establish through calling Officer Bennett, and so not allowing Bennett to appear telephonically or paying for his transport was harmless beyond a reasonable doubt.

In his testimony on direct examination, Fish admitted burglarizing an apartment in Nome in January 2001. He admitted the same thing on cross-examination. He told the jury about being questioned about the burglary by Officer Bennett, and about having a deal with Officer Bennett to seek dismissal of burglary charges in exchange for

Exhibit H – 7

making controlled drug buys. Fish told the jury that he lied to Officer Bennett just to make a deal, and that he really did not know anyone in Nome to buy drugs from. He stated, "And then I lied to the guy and told him that I did (have drug contacts in Nome). And I was – I – I lied pretty much a lot to that guy. And then he expected something from me that I couldn't deliver to him, so I left." Counsel followed up, "Okay. So you lied to the cop?" Fish replied, "Yeah."

Fish admitted to falsely implicating three persons in drug dealing. With regard to one person, he stated, for example, "I told him I bought dope off of him. I never bought dope off the kid. He's just – he was just a punk, and everybody thought he was a punk. So I made him think that everybody was right about the kid." Fish admitted to meeting with Officer Bennett on January 26, 2001, and lying to him about a drug shipment coming into Nome on January 28, 2001. Fish admitted that he met with Officer Bennett on January 27, 2001, and lied and stated he was moving to a new apartment, when in fact he was preparing to skip town on the midnight flight. Calling Officer Bennett was not necessary to impeach Fish's credibility.

Other testimony also buttressed this negative information about Fish. In terms of Fish's potential bias in favor of the state caused by his deal with the Anchorage police regarding working off the Nome

Exhibit H – 8

burglary charges by making controlled buys, Anchorage Police Officer Mark LaPorte testified that there was such an agreement. In terms of Fish's alleged bias against Davis, Fish's former girlfriend (and mother of what both she and Fish assumed to be his child) testified that she and Davis were friends, that Fish was jealous of Davis because Davis would sometimes supply her and the child with material things, and that Fish had told her that he "would do anything he could to get Rico [Davis] in trouble."

As far as Fish's credibility in general, both Fish and other witnesses offered a wealth of information about Fish's prior conduct, criminal and otherwise. Fish, who was only 19, admitted that he had two juvenile adjudications of crimes involving dishonesty. Fish admitted to longtime drug use, although he memorably clarified the extent of his current usage, stating in response to counsel's questioning, "I don't use cocaine, dude. I smoke crack." Fish stated that he had dropped out of high school in ninth or tenth grade. Fish admitted that he did not support Athena Soder's child, which he assumed was his. Athena Soder testified that he tried to sell her marijuana when she was pregnant. Fish admitted to showing up for his first controlled buy with marijuana present in his vehicle. Officer LaPorte characterized Fish as a "difficult informant to work with." Officer LaPorte described being sent to a "disturbance" at

Fish's apartment. Fish admitted that in July 2001 he had been investigated by the police as a result of an incident where a truck (which he stated was his friend's) was used to damage other vehicles. Fish admitted that he was cited for possessing marijuana in July 2001. Fish admitted that in September 2001 he was stopped outside a house as part of a burglary investigation, and that a search of his vehicle turned up cocaine and currency, resulting in pending drug charges. Anchorage Police Officer Grant Johnstone corroborated this. Fish admitted that he had been investigated by the police in late September 2001 in connection with a drive-by shooting where a bullet casing was found in his car, then claimed the car was his girlfriend's, and then claimed the car was owned by a third person. Fish admitted to driving without a license, and to having five vehicles which were titled in his girlfriend's name. Fish admitted to getting paid "under the table" on a construction job.

Considering the trial testimony as a whole, failing to obtain Officer Bennett's testimony was harmless beyond a reasonable doubt. Officer Bennett had no knowledge of the facts of the actual drug buys that Davis was charged with, and thus could only testify as to collateral matters that led to Fish's contact with the Anchorage police. Calling Officer Bennett to repeat Fish's testimony about these collateral matters would not have affected the jury's verdict. Alaska's appellate courts have

upheld the exclusion or limitation of questioning of witnesses as harmless beyond a reasonable doubt in similar situations. *See, e.g., Charles v. State*, 780 P.2d 377, 379-81 (Alaska App. 1989) (precluding defense from questioning victim about his own pending murder charge for killing defendant's relative; state's case was overwhelming, parties knew each other and identity was not at issue, victim's testimony was corroborated by testimony and evidence, and defendant was able to show victim's bias).

Similarly, the court of appeals has upheld the limitation of cross-examination to certain matters where the jury had already received sufficient information to evaluate a witness's bias. *See, e.g., Waters v. State*, 64 P.3d 169, 172-73 (Alaska App. 2003) (exclusion of evidence regarding witness's 1989 conviction did not require reversal, where cross-examination made clear that witness had deal with the state to testify, so jury could evaluate witness's motives); *Johnson v. State*, 889 P.2d 1076, 1080 (Alaska App. 1995) (exclusion of bias evidence upheld when defense had already established witness's bias). *See also Kitchens v. State*, 898 P.2d 443, 451-52 (Alaska App. 1995) (limitation of questioning of sexual assault victim's boyfriend regarding her demeanor upon returning to state after assault was harmless beyond reasonable doubt – defense was able to ask victim these questions directly, issue was not particularly probative, defense had numerous other bases to impeach, and state had strong

STATE OF ALASKA
DEPARTMENT OF LAW
OFFICE OF SPECIAL PROSECUTIONS AND APPEALS
310 K STREET, SUITE 308
ANCHORAGE, ALASKA 99501
(907) 269-6250

evidence, including tape-recorded conversations); *Babcock v. State*, 685 P.2d 721, 727-28 (Alaska App. 1984) (exclusion of defendant's stepfather testimony on absence of birthmark referred to by police officer was harmless beyond reasonable doubt; defendant was exhibited to jury, photo of chest was shown to jury, witness testified they examined her and found no birthmark, officer's identification of defendant was corroborated by other officer, and other evidence linked defendant to drug transaction).

C.  Conclusion

Davis's petition fails to demonstrate that the court of appeals erred or that this case presents any significant issues warranting this court's review. There was sufficient evidence to support his conviction and the trial court did not abuse its discretion in declining to allow Officer Bennett to appear telephonically or in denying Davis's request to pay Officer Bennett's travel fees. Accordingly, his petition for hearing should be denied.

Dated this 20th day of September, 2004, at Anchorage, Alaska.

GREGG D. RENKES
ATTORNEY GENERAL

By: ___Timothy W. Terrell___
Timothy W. Terrell (#9011117)
Assistant Attorney General

Exhibit H – 12