assignment that day?

A  Once again, I was assigned to assist in the surveillance, and I -- on this occasion I didn't search the informant's car. It was assigned to somebody else.

Q  Okay. And what was -- your assignment was surveillance. That was -- where was the meeting at?

A  This time it occurred at the Chevron, International and Old Seward.

Q  Okay. And I'm going to ask you to flip over 23 and 24. And I'll ask you to just diagram, roughly, what your recollections are of the meeting at the Chevron.

A  (Witness drawing diagram.)

Q  Is that depiction a true and accurate representation of what -- the observations that you made on February 21st at the Chevron station?

A  Yes, it is.

Q  Okay. At this time I'm going to ask you to mark it. State's 25.

A  Thank you.

MS. BRADY:  And at this time I would move to admit State's 25.

THE COURT:  Twenty-five, Mr. James?

---

you saw because I interrupted you.

A  On this day I was parked over here in the parking lot of the restaurant where I could look back and see the Suburban parked with its parking lights on. I couldn't -- it's kind of dark in this part of the parking lot and I couldn't see who was in the car, how many people were in the car, et cetera. And then when the informant's vehicle arrived, if I recall correctly he came in off of Old Seward, and then came up and met with the green Suburban.

Q  Could you see the informant get out of his car?

A  No, I couldn't actually see that.

Q  Okay.

A  I could see the -- the top of the Suburban.

Q  Okay. And then what happened after the meeting was over?

A  After the -- the buy occurred we followed the green Suburban when it left and went down Old Seward to approximately 45th and stopped at a residence, I believe it's on 45th, just east of Old Seward.

Q  And did you follow it anywhere else?

A  Then after that we followed it back to his -- the residence at 202 Grand Larry.

---

MR. JAMES:  I have no objections, Your Honor. Thank you.

THE COURT:  Twenty-five is admitted.

(State's Exhibit 25 admitted)

Q  Okay. Where were you at?

A  During this transaction I was parked in the restaurant parking lot just south of the location where I could see the green Chevy Suburban. I think the plate was DSA 413. I don't have it in my notes.

Q  Okay. Now you -- you've drawn something that looks like a box with a triangle on top of it, and it's in green, and it's facing toward the top of the page, and that represents you?

A  Correct.

Q  Okay. And then you've drawn another thing and you have something written on it but I can't see what it says from here.

A  This one?

Q  Yeah.

A  I wrote the plate of what the green Suburban was. As I said, I think it's DSA 413.

Q  Okay. So that mark indicates the Suburban?

A  Yes, ma'am.

Q  Okay. And -- now go ahead and just explain what

---

Q  Okay. And did you have any other involvement with this case?

A  No, that was it.

Q  Okay. And have you had any contacts since this case with Mr. Fish?

A  Yes, I have.

Q  And what were those contacts?

A  I ran into him at his place of employment, which was Subway, when I went there to get a sandwich.

Q  Okay. Anything else?

A  No, ma'am.

Q  Thank you.

MS. BRADY:  That's all I have for this witness.

THE COURT:  Mr. James?

MR. JAMES:  Thank you, Your Honor.

STEVEN FRANK HAAS

testified as follows on:

CROSS EXAMINATION

BY MR. JAMES:

Q  Turn around and take a look at your diagram, Officer, please.

A  Yes, sir.

Q  The Chevron station that we're referring to, what's the name of it; do you know off the top of your head? The Chevron.....

A   The Chevron?

Q   Yeah.  The International and Old Seward has been there forever, right?

A   As long as I've been here.

Q   Okay.  What restaurant are you referring to?  Are you referring to.....

A   Roadrunner's I believe.

Q   Roadrunners, okay.

A   Yes, sir.

Q   All right.  Now where -- alert me to the right hand side of your diagram, is that Old Seward, International, what are we talking?

A   No, sir, this is Old Seward Highway.  Actually I drew -- I guess drew it upside down with south being at the top of the page, the north being at the bottom.

Q   That's fine.

A   This is International Airport Road, and this is a little alleyway that runs over to the parking lot of the Roadrunner.

THE COURT:  Can you all see over there, Mr. Iverson?

MR. JAMES:  Okay.

Q   All right.  And what's between -- there's some woods and stuff that -- in the Roadrunner complex, isn't there?  I mean the creek goes through it

AURORA COURT REPORTING

250

of the woods?

A   Yes.

Q   And you've indicated that it was dark and you couldn't tell what was going on in there, other than the fact that you were assigned to show up there and follow the Suburban wherever it went?

A   That's correct.

Q   Okay.  And it went to where, please?

A   202 -- well, first it went to a residence on 45th Avenue.

Q   Uh-huh (affirmative).

A   I don't recall if he picked somebody up or dropped somebody off, but there was some contact with another individual, and then it went to 202 Grand Larry.

Q   Okay.  Now on the 8th you testified that you made a photocopy of the money, I believe that's your exhibit, whatever number.....

A   Yes, sir.

Q   Whatever number that is, 24?

A   Exhibit number 8.

Q   Eight.  I'm sorry.  Thank you.  And you said you gave that to Jeremy Fish?

A   Yes, sir.

Q   Okay.  Okay.  Bear with me just a minute, please.

AURORA COURT REPORTING

252

and.....

A   That's on the south side of.....

Q   Okay.

A   .....the restaurant, that's where the creek runs through and there's a green belt.

Q   All right.  And what, if any -- well, first of all, how was the Suburban pointed?  You've got yourself pointed south which would be toward the restaurant, correct?

A   That's correct.

Q   Okay.  And how was the Suburban pointed?

A   It was pointed, if I recall, to the -- to the west.

Q   Okay.  And so you were kind of -- if you were in the driver's seat of your car -- was anybody else with you?

A   No, I was in the car by myself.

Q   Okay.  So you were -- you would have had to been looking over.....

A   Over my shoulder.  That -- that's correct.

Q   Kind -- over your shoulder, right.  And how far away, approximately, is the -- your car from the Suburban?

A   It was probably about 70 yards, give or take.

Q   So that would be 210 feet, somewhere in that neck

AURORA COURT REPORTING

253

(Pause)  Have you had an opportunity to -- you didn't generate any police reports in this, right?

A   Yes, I did.

Q   You did?

A   The paperwork I have before me.

Q   Oh, okay.  Right.  On 2-28, your report of 2-28.

A   I don't have a report for that day, sir.

Q   Date written 2-20 -- I'm sorry, 2-8, excuse me.  I'm sorry.

A   No problem, sir.  I have one dated.....

Q   Got it?

A   .....February 8th, 2001.

Q   Right, okay.  It starts off information?

A   That's correct.

Q   Okay.  1-2-3, line three down on that.  On line two and on line three, I photocopied $150.00 in buy money and gave the money and the photocopies to Officer Johnstone, that's not correct?

A   That could be.  I thought I had given the money to -- to Jeremy Fish, but I could have given it to Officer Johnstone, who gave it to him.

Q   In your police training, part of your training was when you testify to testify accurately, correct?

A   Yes, it is.

Q   And you've had these police reports with you, is

AURORA COURT REPORTING

that correct?

A I got them when I showed up to court today.

Q Okay. Did you talk about this case while you were outside with the other officers?

A Yes, I did.

Q What did you talk about?

A We just talked about how little my involvement was in it. Wasn't sure what I was supposed to be here to testify to.

Q Okay. What did you talk about with Officer Bushue?

A We talked about some other issues that had gone on at the police department.

Q Okay. Nothing about this case?

A I don't recall. I'm -- I'm trying to remember. I think we just talked about how short our involvement was and how Officer Johnstone and Officer LaPort did the majority of the work.

Q All right. We're talking about perhaps a half hour ago, and you don't recall?

A That's not what I said.

Q Okay. Tell me what you.....

A I'm trying to remember the extent of our conversation and I believe we just talked about how short our involvement was.

AURORA COURT REPORTING

254

THE COURT: Thank you.

Q Twenty-four. All right. Where were you physically located?

A On that day I was watching the residence and we were expecting the green Suburban but it didn't show up, and we were attempting to locate that.

Q So you weren't on Muldoon?

A No, sir, I was over off.....

Q Oh, okay.

A .....Dubin, watching Grand Larry.

Q Oh.

A I -- I didn't actually see anything that transpired over here until it was all over.

Q So you had nothing to do with what went down there, you were at another location that.....

A That's correct. I -- I was over off of Dubin and Grand Larry. I couldn't even see this location from where I was at.

Q Did you generate a police report on that? Okay.

A No, I -- I did not.

Q All right. From your location, going back to the 8th, if you would, please, and you can flip back to the chart, please, that's.....

A Back to Exhibit 23?

Q Yes, please. Thank you. Could you describe the

AURORA COURT REPORTING

256

Q All right. You had nothing to do with the 28th -- 28th, slash, 1st.....

THE COURT: Can't hear you, Mr. James.

Q You had nothing to do with the -- now I'm yelling. You had nothing to do with the 28th? That -- the only two you were involved was the 8th and the 20th, right?

A That's not correct.

Q I'm sorry. And the 21st, I'm sorry.

A I was also there on the -- I don't recall the exact date, but for the buy/bust.

Q Okay. And.....

A But I didn't witness anything, it wasn't -- didn't do anything significant on that day.

Q Who were you with that day?

A I was in a car by myself.

Q In a car by yourself?

A Yes.

Q Could you flip over which is probably the one behind that, please.

A The one reference Muldoon?

Q Yes. Yeah. Okay, we're on the same.....

THE COURT: It's got an evidence sticker on it. Maybe you can give me that number.

A Exhibit number 24, sir.

AURORA COURT REPORTING

residence at 202 Grand Larry?

A It's a single story, and I believe it's a zero lot line; that there's two houses -- two places right next to each other. And if I recall, 202 is the one that's on the north side.

Q Okay. Is that like a duplex for visuals?

A Yes, sir.

Q Side-by-side duplex?

A Yes, sir.

Q Okay. So it would be like a side-by-side ranch duplex, would that be the kind of.....

A Correct.

Q All right. What is the parking facilities there?

A I don't recall if it's a carport or just a driveway, but I don't believe there's a garage.

Q Okay. Where did Mr. Fish pull in, if he did pull in? Where did.....

A Okay. He pulled into the driveway.

Q All right. And did you have a good observation of him during the entire period he was there?

A No, I did not. As I said before, I could just see the tailend of the car. I -- I really couldn't even see the front door to the house.

Q Was there other cars there?

A I don't recall.

AURORA COURT REPORTING

257

Exhibit J – 66

Q   So you have no idea how he entered the car --
entered the structure, is that.....

A   No, I couldn't see.

Q   Okay. And was his -- (coughing) Excuse me. Was
his car sticking out kind of to what would be
considered the sidewalk, driving area?

A   It -- it was at the -- the far edge of the
driveway near the road.

Q   Far edge. Thank you for your words. I was
looking for those. All right. And -- okay. And
on the 20th you were  -- going to the 20th, sir.
You were listening to the radio, you saw him turn
in. Were you basically the same position seeing
the same thing?

A   No, sir, on this occasion I was parked to the west
of Grand Larry. I could not even see the
driveway.

Q   Okay.

A   There's really not a lot of good places to park on
Dubin in that area.

Q   So you had no visual of what was in that driveway,
you didn't see him drive into it. It's your
basically there to pick up at the end and.....

A   That's correct, sir.

Q   .....follow.....

AURORA COURT REPORTING

258

---

MS. BRADY: Okay, thank you. If I could just have one
moment, Your Honor.

BY MS. BRADY:

Q   How long have you been an APD officer?

A   A little over six years.

Q   Okay. And what is -- what's your title?

A   I'm a detective with the Burglary Unit.

Q   How long have you been doing that?

A   Since September of this year.

Q   Okay. And have you had any training or experience
in the detection and identification and
investigation of controlled substances?

A   Yes, I have.

Q   Okay. And could you just explain to the members
of the jury what that was?

A   I've attended numerous classes on domestic drug
interdiction of highways, rave and counter-culture
drugs, I spent six months in the Metropolitan Drug
Enforcement Unit of the APD Detective Division,
and have gone to several clandestine style
laboratory dismantling courses through the Drug
Enforcement Agency.

Q   Okay. And now is -- you said that you're with the
Burglary Unit right now. Is that the same unit
you were with during the investigation of this

AURORA COURT REPORTING

260

---

A   I believe it was Officer LaBlanc was the one
assigned to have the -- the close-in eye.

Q   Okay. Okie dokey. One moment, please, sir.

MR. JAMES: (Indiscernible - mumbling). (Pause) Thank
you, sir, that's all the questions I have.

THE COURT: Thank you, Mr. James. Redirect, Ms. Brady?

MS. BRADY: I don't have any redirect, Your Honor,
thank you.

THE COURT: Thank you, Officer, you can step down.

A   Thank you, sir.

THE COURT: Your next witness, Ms. Brady.

MS. BRADY: Your Honor, the state calls Officer
Johnstone. Detective Johnstone.

(Witness summoned)

(Oath administered)

DETECTIVE JOHNSTONE: I do.

THE CLERK: Please be seated.

GRANT JOHNSTONE

called as a witness on behalf of the plaintiff, testified as
follows on:

DIRECT EXAMINATION

THE CLERK: For the record, sir, will you state your
full name and spell your last.

A   Grant Johnstone, J-o-h-n-s-t-o-n-e.

THE COURT: Go ahead, Ms. Brady.

AURORA COURT REPORTING

25

---

case?

A   No, during the investigation of this case I was
with the Special Assignment Unit of the Patrol
Division.

Q   Okay. And how did you become involved in this
case?

A   I was contacted by Officer LaPort who was
contacted by now Sergeant Bushue and Detective
Perrue(ph) of the Metropolitan Drug Enforcement
Unit stating that they had an informant that we
could use to purchase some cocaine, and Officer
LaPort contacted me. This would have been my --
the first time I had actually conducted an
investigation utilizing an informant, and -- on my
own; and so he contacted me and asked me to sit in
with him while he talked to the informant
initially before our first purchase, and then to
step into a more in-depth role as the case
developed.

Q   Okay. So ordinarily there would be one case
officer, but in this particular case would it be
fair to say that he was sort of teaching you how
to conduct one of these kind of.....

A   Yeah.

Q   .....inves -- okay. And why don't you just tell -

AURORA COURT REPORTING

261

- describe for the members of the jury what your first contact with Mr. Fish was?

A    I believe it was on February 8th at 2000 -- 2001, this year. Mr. Fish came to the front counter of APD and I went up to -- to meet with him and to talk with him. We took him into a closed interview room and asked him what -- what he could do for us. And he stated that he had a friend that he knew he could buy cocaine from, and that -- that the person's name was Ricco. He wasn't sure of his entire name, but he knew him as Ricco, and he had another friend who had a phone number of Ricco and he says I can get that phone number and call him and we can see if we can arrange some sort of drug transaction.

Q    Did he do that?

A    Yes, he did.

Q    Okay. What number did he give you as Ricco's number?

A    He was given a -- a cell phone number and I have that number written down in here. It was the number of 727-9465.

Q    Okay. And did Mr. Fish make any calls to 727-9465 that day?

A    Yes -- yes, he did.

Q    Okay. And who dialed the number when he called it?

A    He dials the number. The -- there's a telephone sitting in front of the -- well, there's a little -- there's a little table and telephone right there. He sits here, I sit here. He dials the number, and I watch him dial the number.

Q    All right. And was that call recorded?

A    No, it was not.

Q    All right. And is that normal procedure?

A    The first time that we make a purchase the call is not recorded because we have to develop the necessary evidence to obtain a Glass warrant in order to recall the -- in order to record those conversations.

Q    All right. And what happened during that call?

A    During the call Ricco stated to Mr. Fish that he was going to be at his residence. He gave the residence of 202 Grand Larry.

MR. JAMES: I'm going to object, hearsay.

THE COURT: Just a second.

MR. JAMES: Hearsay.

THE COURT: Hearsay objection.

MS. BRADY: This is an overview. The witness is going to be.....

THE COURT: Take a -- we'll take a bench conference, please.

MS. BRADY: Okay.

(Bench conference as follows:)

THE COURT: All right, the objection is hearsay.

MS. BRADY: I'm sorry, I thought you were directing me to respond.    THE COURT: I was, but based on the response I thought we ought to take it -- at a bench conference, and that's where we are.

MS. BRADY: Okay. It's not offered to prove the truth of the matter asserted, Your Honor. This is offered simply to show what the informant was saying, and it's not offered for the truth.

MR. JAMES: Well it would be offered for any other reason. I mean we're saying that this is what we're going to -- this is what's happened. I mean it is offered for the truth. Arguably -- I mean I can understand their argument, but it's not the way the impact was happening.

THE COURT: What's the answer going to be?

MS. BRADY: I forgot what the question was.

THE COURT: What did the officer hear on the other end of the line from Ricco.

MS. BRADY: No, he -- it's what he heard from -- he could only hear what Fish was saying. He couldn't hear what Ricco was saying, so he heard Ri -- Fish say, do you have a

ball, when can we meet, 20 minutes, that kind of thing.

THE COURT: All right.

MS. BRADY: That's roughly what he's going to say. And then as a result of that it caused him to take action. They started their procedures, it's just offered to show the affect on him, that they believed that there was a buy set up. And Mr. Fish will be testifying.

THE COURT: You -- the objection is sustained. You can ask the witness whether based on what he heard from Mr. Fish he -- did he become suspicious of cocaine sales, or something like that.

MS. BRADY: Okay.

THE COURT: But you can't go into the details.

MR. JAMES: Right; I mean that's where we were heading. I felt we were heading, and that's why the objection was made. Thank you.

(End of bench conference)

THE COURT: The objection is sustained.

Q    Okay. Based on the conversation that you could hear, did you become suspicious that a cocaine sale might be about to occur?

A    I -- based upon the conversation I believed that we could make a cocaine purchase from Ricco.

Q    Did you know how much it was going to be for?

A    From what Jeremy Fish stated that it was going to

be for approximately $150.00.

Q  Okay. And where was it going to be at?

A  It was going to occur at 202 Grand Larry, which was the defendant's residence.

Q  Okay. Now once the conversation was over, and it was decided that this was going to happen, what did you do next?

A  I requested --- there's several things that we have to do. First we have to obtain the -- the money that's going to be used during the -- during the transaction, and that all has to be photocopied to document serial numbers. So I requested -- or had somebody withdraw the money, $150.00 worth, and had that photocopied. Officer LaBlanc then searched Jeremy's car, and I strip searched Jeremy.

Q  Okay. Now strip searched Jeremy. What do you mean exactly by you strip searched Jeremy? Could you -- I want you to describe for the members of the jury exactly what you do when you strip search someone.

A  Okay. We have them in a closed door, in a closed area. We have them remove all of their clothing, socks, shoes, underwear, everything. And once they do that then we conduct a search on them of

---

their person, and then also go through all their shoes, go through all their clothing, check the -- the elastic bands of their underwear, check all their socks, just to make sure that there's nothing in their shoes, that they don't have a false bottom on their shoe, and check everything. Pockets of pants, pockets of shirts. Any -- any item of clothing that they may have on them we go through it to make sure there's nothing on it or in it at the time.

Q  Do you check every orifice of their body, too?

A  Yes, we do.

Q  Okay. Now what are some of the things that you'd be looking for when you're doing this kind of search?

A  Well, first and foremost we'd be looking for any contraband. Drugs, drug paraphernalia. We'd also be looking for any additional money that they may have on them because we don't want to confuse our money that we have photocopied and given to them with any of their funds that they al -- that they may already have.

Q  Okay. And did you find any contraband on Mr. Fish at all?

A  No.

---

Q  Okay. Then what happened after he was searched?

A  Once he was searched he was given the $150.00 in prerecorded buy funds and I followed -- Officer LaBlanc left the station ahead of time and went and took up a position around 202 Grand Larry, I don't know exactly where he was, but where he could actually see the residence. I then followed....

MR. JAMES: I'm going to object to what he's telling about Officer LaBlanc. He's clearly said that he.....

THE COURT: Ms. Brady, you asked the officer what he did next? So.....

MS. BRADY: Right.

A  Okay. Jeremy left the -- the station and I followed him to the area of Dubin and Grand Larry. Once he made the turn onto Grand Larry I continued on and Officer LaBlanc took up the surveillance at that point.

Q  Okay. And so do you know how long Mr. Fish was inside the address at Grand Larry?

A  Approximately ten minutes.

Q  Okay. And did you have reason to call him once he was inside?

A  Yeah, it -- in just chatting with him he said that normally he -- he and Ricco will chat a little

---

bit. We -- we prefer that things not go on for an extended period of time so I called him on his cell phone after several minutes and asked him when he would be done. He said he was on his way out at that time.

Q  What happened once he left the residence?

A  Once he left the residence Officer LaBlanc told everybody via radio that he was leaving the residence and that he was going -- headed northbound on Grand Larry to Peck Avenue, and once he turned west onto Peck I was in a position where I could then pick up his vehicle and I followed him back to the station.

Q  Okay. And what happened.....

A  Actually I take that back. We had decided that prior to going to the station we were going to meet at a predetermined location. There's a -- I don't know what denomination church it is, but there's a large red church on Muldoon and our meeting point was to be immediately behind that church on the west side, and so we met there. I retrieved the product from him, and then followed him back to the station.

Q  All right. Then what happened once he got to APD?

A  Once he got to the headquarters he was taken back

Exhibit J – 69

into the same interview room. The same strip
search that we conducted before the buy was done
again. The same -- of his person. Also his car
was searched again, and then I conducted a debrief
with him of how the buy had transpired.

Q   Okay. Now why do you do a strip search after the
buy is over?

A   Because it has happened in the past where an
informant has purchased whatever and has stashed
it on their person, in their clothing somewhere,
and so we conduct a strip search to make sure that
has not happened.

Q   Was any contraband found?

A   No.

Q   All right. And now did -- did Mr. Fish turn over
the amount of cocaine that you were expecting to
get?

A   No, it was less than -- than what I had expected
for $150.00 worth.

Q   And so what did you direct him to do as a result
of your observation?

A   Well, I told him that this -- this was a short
amount of -- of product for the money that we had
given him and I asked him to contact Ricco again
and tell him that, hey, this was a little short,

A   Okay. The next ac -- the next involvement that I
had was I obtained a search warrant for -- I
determined that the -- that the phone number that
Jeremy was calling 727-9465 was a prefix to Alaska
Digitel cellular phone numbers, so I obtained a
search warrant to get the subscriber information
of that particular phone number, since we wanted
to make positive identification of who Ricco was.

Q   Whose phone was it?

A   The phone was registered to a Robert Davis, the
Third, and Alaska Digitel had an address of 202
Grand Larry for him.

Q   What was your next involvement in this case?

A   On the 20th Jeremy arrived at the station and we
were going to be making phone calls to purchase
drugs again.

Q   All right. Now let me stop you. And did somebody
-- somebody obtained a Glass warrant though in the
meantime, right?

A   Yes.

Q   Okay. Could you just briefly describe for the
members of the jury what a Glass warrant is?

A   A Glass warrant is once you've established that,
in this case, you can make a purchase of a drug
from -- from a person, a Glass warrant is

can you make up the difference at another time.

Q   Now when he placed that call you were sitting
there in front of him?

A   Correct.

Q   Did -- who dialed the number?

A   He did.

Q   Was it the same number that was dialed initially
to make the buy?

A   Yes.

Q   Okay. And -- okay, what did you do next in
investigating this case?

A   That was the end. After we made the initial call
Ricco said that he could get him some more
tomorrow.....

MR. JAMES:  Objection.

THE COURT:  What's the objection?

MR. JAMES:  Hearsay.

Q   Let me just direct your attention.....

A   Okay.

Q   .....to the next.....

THE COURT:  Just a second. The hearsay objection is
sustained, disregard the last answer, and your next
question, Ms. Brady.

Q   Let me direct your attention to the next activity
you conducted in the investigation of this case.

necessary in order to record the conversations
then that the informant is going to have with the
supplier, or suppliers. And it allows us to
record that contact, whether it's by telephone or
in person.

Q   Okay. And -- okay, so what happened when Mr. Fish
arrived at APD on the 20th?

A   We -- myself and Officer LaPort, again, made
several phone calls to attempt to purchase
products. Officer LaPort began that. I was out
of the room. He began that. I came in as Jeremy
was on the phone, I believe to Mr. Davis. We
listened to the telephone conversation and it was
who he had talked -- who he described as Ricco.

Q   Okay.

A   At any rate, Jeremy was heard to ask if he could
get a -- an eight ball and then it -- then the
next one was in about 20 minutes.

Q   All right. And now what happened once the buy was
arranged?

A   Once the buy was arranged, since we had the Glass
warrant, it was then necessary to put an
electronic monitoring device on Jeremy. And so I
retrieved that and -- and set that up on his --
set it up so that it would be ready to go and

Officer LaPort placed it on him. And the strip search of Jeremy was done. It was done at the beginning -- on all the buys that we do. He was always strip searched before and after. His vehicle was searched and.....

MR. JAMES: I'm going to object, if he has personal knowledge, Your Honor.

THE COURT: The objection is overruled.

Q     And then what happened after.....

A     After he was set up with the -- with the electronic monitoring device I escorted him to his vehicle. Officer LaPort then brought out the -- the money, and we gave it to him and we followed him, again, to 202 Grand Larry.

Q     Okay. Now were you in a car with Officer LaPort? Are we in a separate car?

A     Officer LaPort and I were in the same vehicle.

Q     Okay. And you followed Mr. Fish. Do you recall what kind of car Mr. Fish was driving?

A     He was driving a dark color -- I think it was alm-- really dark blue or black Chrysler. I think it's a LeBaron. It's an older model four-door sedan.

Q     All right. And now you said that he was wired?

A     Uh-huh (affirmative).

just sat and if memory serves me correctly I think we were across the street from the Williams at Sixth and Muldoon, but I -- I'm not certain. At any rate, we sat up there just to listen to the radio and see what transpired on the wire.

Q     Okay. So you could hear everything that was going on on the wire. All right. And did you assist any further in this case that day?

A     When we returned to the police headquarters I escorted Jeremy into the same interview room and he had a torn piece of newspaper that he placed on the table and unwrapped it and there was a white block of powder about the size of a small marble inside. I turned that over to Officer LaPort and then I conducted the strip search of Mr. Fish again.

Q     How thorough was the strip search that you conducted of him after the buy was over?

A     It's the same as we do -- I mean clothing, all done. They take all the clothing off, search the shoes, the elastic -- every -- all the clothing. Any -- any place on clothing where something could be hidden we search, and any place on the body, with the exception of stomach contents, we search.

Q     So you look in people's hair, in their ears, and

Q     Just as -- describe briefly for the members of the jury what exactly that means?

A     It means that the electronic monitoring device is turned on and we have radios that we can hear what is being said, what is going on inside the vehicle. One member of our team will have an actual recording device that records. The signal comes in and actually makes a tape of everything that goes on. In this case Officer LaPort and I just had the radio. Somebody else was going to be recording the conversation, we just had a radio so that we could listen to what was going on.

Q     Okay. And how close did you get to the 202 Grand Larry address on this occasion, when you were following Mr. Fish?

A     I don't know how close we were proximity-wise. The radios will only work within about a two to three block radius of the location, and we were within range where we could hear what was going on. So I don't know where our exact position was.

Q     Okay. And what happened once he went inside? Where did you go?

A     We -- when -- when Jeremy went inside the residence we took up a position where we could pick up his vehicle as it was leaving and so we

in their noses, all that kind of stuff?

A     In their -- yeah; in their mouths, rectum, every -- everywhere.

Q     Okay. And was any contraband found?

A     No.

Q     Okay. Now what was your next involvement with this case? What's the next thing you did?

A     That day or the next time?

Q     That day.

A     That -- I did a debrief of Jeremy referencing the -- the buy.

Q     Okay. Now when you say you did a debrief, could you just explain to the members of the jury what it is that you're talking about when you do a debrief?

A     What we do is go over the entire situation that just transpired. I talk to him about what was said on the telephone conversation even though I was there I still want him to tell me everything that was said. I talk with him about who gave him the money to purchase the -- the product. I talk with him about what happened when he left the station and when he got to the location where he was going. In this case 202 Grand Larry. What he saw when he was in there, who else might have been

Exhibit J – 71

in the -- in the residence.  And where the -- the
drugs came from, if they pulled them out of a
drawer, that's very important for search warrant
purposes.  Who he handed the money to, who seemed
to be kind of in charge at the location.  And then
coming back to the station, you know, who did he
turn over the drugs to.  Just a complete and
detailed description of the events as they
transpired regardless of whether or not I was
already there and saw some of the stuff.

Q  How close in time to the actual event does this
debrief occur?

A  It occurs immediately.  Once -- once we get back
to the station and the first thing we do, if we've
not obtained the -- the product, is obtain that.
The second thing we do is do the strip search.
The -- the next thing we do is the debrief because
it's very important that -- there are minute
details that we want to retrieve that they may
forget at -- as time goes on.

Q  All right.  And are debriefs tape recorded?

A  Yes, they are.

Q  Okay.  And you put the tape in evidence?

A  Correct.

Q  All right.  Now what's your -- what was your next

---

Q  Is an eight ball associated with other drugs
besides cocaine or?

A  It can be, yeah.  I -- I think it's associated
also with heroin.

Q  Okay.  Now once the buy had been set up, what
happened next?

A  I conducted the strip search of Mr. Fish, again,
the same manner as before, and he was provided
with $200.00 in U.S. currency, photocopied.  The
purchase was to occur at the Chevron at Old Seward
and International Airport Road.  And Officer
LaPort and myself, again, followed Mr. Fish to
that location.

Q  Now let me stop you for just a second.  Did you
actually see him pull in the parking lot of that
Chevron station?

A  Oh, yes.

Q  And then you -- did you break off and go somewhere
else or?

A  We actually -- directly on the east side of Old --
of Internation -- correction, of Old Seward, is
the -- the Peanut Farm Showboat, show club parking
area.  We parked in a row -- I think it was the
first row right on the curb, facing the Chevron
station so that we could see what was going on.

---

involvement in this case?

A  On the 21st of February we again had Jeremy come
into the station and he attempted a call to Mr.
Davis.  Left a message on the cellular telephone.
The -- the number that he left a message on a
phone that he had called, asking him to call back
in a little bit.  That was at approximately 1854.
We tried again at 1904 hours, about ten minutes
later, received no answer.  At about 8:05 Jeremy
called and spoke with Mr. Davis about getting a
ball.  Which is a term of -- of the size of --
drugs.

Q  Okay.  Now wait, let me stop you right there.  Is
that -- what does the term signify to you?  What
specifically is that talking about, and could you
just describe that to the members of the jury.

A  An -- an eight ball, if this was what he was
referring to, again, I didn't hear the word eight,
I just heard a ball.  But if he's referring to an
eight ball it is a size -- it as a rock or a
baggie of cocaine that's about the size of a
medium sized marble.  And when people talk to each
other on the street in that particular lingo,
there's a lot of terms that they use to describe
certain amounts, and eight ball is one of them.

---

The -- Jeremy and the -- he made contact with a
newer model Suburban.  I don't know what year it
was.  But that was on the -- the east side of the
Chevron.  So from where we were sitting we could
see the -- the Suburban, and see the passenger
side of the Suburban.

Q  All right.  And what did you see happen?

A  Jeremy pulled in -- into the parking lot at about
2023 hours and got out of his vehicle and then
climbed into the passenger side of the Suburban,
the front passenger side of the Suburban.

Q  All right.  And without telling me what was said,
you could hear the conversation inside the
Suburban over the wire, is that right?

A  That is correct.

Q  All right.  And then what happened once Fish got
out of the Suburban?

A  He got out of the Suburban, got back in his
vehicle.  Myself and Officer LaPort followed him
back to APD.  I conducted a strip search of him
again, and I also at that -- on that particular
occas -- occasion, also searched his vehicle.  And
did a debrief with him.

Q  Now when you searched his vehicle, could you just
please describe for the members, why search his

vehicle afterward?

A  On some occasions we have had the unfortunate circumstances of having an informant who is -- who will remove part of the -- the drugs that he purchases, and hide them in locations of the vehicle. And so we search the vehicle before to determine if -- if there's any contraband in the vehicle, and after to determine if they have taken some from what they purchased in -- in an attempt to hide it.

Q  So just describe what you do to conduct that search to the members of the jury.

A  Where -- from the driver's seat -- I actually sit in the driver's seat of the vehicle and I search everything that can be opened, ashtrays, consoles, everything within an arm's reach or so of -- of -- of where the driver is sitting. I search underneath the seat, I search in between the seat cushions. If they have a seat cover on I pull that off. If there seats are the style that you can actually unzip and remove the foam, I unzip the seats, stick my hands in there, search all through that. Any place that can be opened relatively easily I search.

Q  Under floormats?

---

called the Pancake House which is on Muldoon, and it was to be in approximately 20 minutes or so. I notified other units. Other units were out and about on -- on other investigations, so I notified them that we were going to have this purchase in approximately 20 minutes. I obtained $200.00 in U.S. currency and I photocopied that and gave that to -- to Jeremy.

Q  Okay. Let me stop you right there. I'm going to approach you with a document that was previously marked as State's Exhibit 11. Do you recognize this document?

A  It is a photocopy of some U.S. currency and it has my signature along with the -- the date and the case number written on it.

Q  All right. And is that the photocopy? Is that a true and accurate representation of the photocopy that you made of the money that you gave to Mr. Fish?

A  Yes.

Q  How much money did you give to Mr. Fish?

A  $200.00.

Q  What were the denominations?

A  Five 20's and one 100.

Q  All right.

---

A  Under floormats, the map pockets. I -- I do go as far as to check the dash, to make sure that the dash is fastened down. There's been circumstances where the dash has actually been loose enough for the purpose of stuffing things underneath and so we -- we check the dash to make sure that it is -- it is secure.

Q  What was your next involvement in this investigation?

A  My next involvement was on February 28th, slash, March 1st. And, again, at approximately 1810 hours Jeremy made a call to Mr. Davis and arranged a -- a purchase of cocaine again.

Q  Okay. Now there were several calls made, but the actual call arranging the purchase wasn't made until later, isn't that right?

A  Right. We tried at 1810, that was the first one. Then we tried at 1910, we tried at 1938, at 1950. At 2000, and then finally at 2345 we were able to make contact with -- with Mr. Davis.

Q  All right. And a buy was arranged?

A  That is correct.

Q  And so what happened once the buy had been arranged?

A  It was arranged to occur at -- at a location

---

MS. BRADY:  And at this time I'd move to admit State's Exhibit 11.

MR. JAMES:  Could I just look at that for a quick second?

THE COURT:  Sure.

MR. JAMES:  May I voir dire on the dates, Your Honor?

THE COURT:  On cross. I'll reserve admission.

MR. JAMES:  Thank you.

THE COURT:  Reserve ruling on admission until after cross.

MS. BRADY:  I'm -- okay, I couldn't hear what was said up there.

MR. JAMES:  I asked if I could voir dire on the dates and the judge said I could cross on the exhibit.....

MS. BRADY:  Okay.

Q  All right. Is the APD case number anywhere on that document?

A  Yes, it is.

Q  And your initials are on there?

A  That is correct.

Q  And the date of the buy is on there?

A  Yes.

Q  Okay. And did you document the fact that you photocopied these buy funds in your report?

A  Yes, I did.

Q   Okay.  And was your report prepared close in time
to the -- to when this happened?

A   It was prepared afterwards, yes.

Q   All right.  And did you also conduct the pre-buy
strip search?

A   Yes, I did.

Q   All right.  And, again, how thorough was that
search?

A   It was, again, the same -- taking all clothing
off, searching all aspects of their person and
clothing.

Q   All right.  And did you document searching Mr.
Fish in your report?

A   Yes, I did.

Q   Did you find any contraband?

A   No.

Q   Did you also document that in your report?

A   Yes.

Q   And did you attach the wire to Mr. Fish this day?

A   Yes.

Q   All right.  And did you document that in your
report as well?

A   Yes.

Q   And what happened once you arrived at the scene?

A   Prior to that I told Jeremy that once the purchase

A   Oh, yes.

Q   All right.  And what happened at the station?

A   We did another debrief, another strip search,
another search of his car.

Q   Okay.  And did you do anything else with regard to
the investigation in this case?

A   Yes.  On the 2nd of March I became aware that
there had been a problem in the recovery of the --
of the buy funds used from Mr. Davis.  The funds
were not found in a search of the vehicle -- oh,
that's right, I also searched his vehicle.  I
think it was Officer LaPort had obtained a search
warrant for his vehicle, and we were expecting to
find in the vehicle the buy funds since we had not
recovered them on Mr. Davis.

Q   All right.  Now let me stop you right there.  You
participated in the search of the vehicle?

A   Uh-huh (affirmative).

Q   Where did that search occur?

A   At the APD indoor secure storage area.

Q   Okay.  And so what happened when you guys did the
search?

A   The only thing we recovered in the search was a --
a cellular telephone.  The buy -- the buy money
was not located.  I notified Officer LaPort of

was made he was to meet me south of the location
at -- there's a Schuck's Auto Supply at Muldoon
and 16th, and I wanted him to drive away from the
area, and he was to meet me down there and -- and
turn over what he had purchased at that time.  So
once Jeremy pulled -- I followed him from the
station to the area of the Pancake House, and once
he pulled into the lot I then continued north and
turned around so that -- so that I could pick him
up as he came southbound because he was going to
have to cross traffic and we don't want to deal
with a lot of traffic issues so I just wanted to
be able to jump out right behind him as he was
going southbound on Muldoon.

Q   Now was Officer LaPort in the car with you this
day?

A   No, he was not.

Q   All right.  And what happened after Mr. Fish left
the Pancake House parking lot?

A   Once he left there I followed him from that point
to the Schuck's Autobody.  I obtained -- he handed
me the -- the product and I obtained that and we
went back to the station.

Q   Did you notify anybody that you had obtained
product?

that, and so at that point he made -- he decided
to pursue another angle.  Possibly checking with
CIPT and at that point we discovered that he had -
- Mr. Davis had come in with money to CIPT.  I
obtained a search warrant to go through all the
cash that they have.  It's -- they pile it in like
a general fund.  And so I obtained a search
warrant for them to go through that and attempt to
-- they had the -- the pre-recorded buy fund
serial numbers and they had to go through all that
to  -- to find the money that we had used in the
buy.

Q   All right.  And did you do anything else with
regard to the investigation of this case?

A   I don't think so.  Aside from just doing the
return of the search warrants, that's all.

Q   All right.  Now let's talk about Mr. Fish for a
second.  Did you run into Mr. Fish again later?

A   Yes.  Actually I haven't -- since this time I have
not personally had contact with Mr. Fish, but I
have had dealings with him because of my position
as burglary detective.

Q   Okay.  So he -- what you're saying is that you
didn't run into him because of this case, you ran
into him because of something that he was doing

that you were investigating?

A  That is correct.

Q  All right.  And did you have a contact with him on September 5th?

A  I -- I have not con -- had personal contact with him at all, since this case.  I was assigned a burglary case where an officer had stopped Mr. Fish.  I have not, personally, had any contact with him since this case.

Q  I see.  Okay, so you didn't personally contact him but you did end up referring another case over to the district attorney's office as a result of that contact?

A  That is correct.

Q  All right.  Can you just tell us about that case.  What happened?

A  Mr. Fish was stopped outside of a residence for -- as part of an investigation of a burglary by a patrol officer.  During the course of talking with Mr. Fish the patrol officer requested permission to -- from Mr. Fish to search the vehicle which Mr. Fish granted.  Inside the vehicle was -- was a -- if I remember -- if I'm remembering correctly, was a box.  Mr. Fish said the box was his.  The patrol officer opened the box.  Inside was Mr.

290

---

Fish's ID and I believe it was five small bags of cocaine, all individually packaged, along with some -- some currency.  Mr. Fish denied ownership of the cocaine but did say that the currency and the ID was his.  I took that case and forwarded it to the district attorney's office for charges of Mr. Fish for possession and distribution of cocaine.

Q  And as far as you're aware that case is still pending?

A  That is correct.

Q  Okay.  And have you had any occasion to charge Mr. Fish with anything else or had any further contacts with him besides that 9 -- that September 5th incident?

A  I have not had any further contacts or have charged him with anything else.

Q  All right.

MS. BRADY:  That's all the questions I have.

THE COURT:  Hold on a second, Mr. James.  We're going to go until 1:30.  If anybody wants to take a break, maybe now would be a good time to do it.  If you're all -- can forge through until 1:30 then we won't take break.  Anybody need to take a break?  Nobody, okay.  Mr. James.  That applies to the lawyers, too?

291

---

MR. JAMES:  Oh, I -- I pay attention (indiscernible).

THE COURT:  Go ahead, cross examination.

MR. JAMES:  You weren't looking at me when you said that though.  Not the first offer.

GRANT JOHNSTONE

testified as follows on:

CROSS EXAMINATION

BY MR. JAMES:

Q  Officer Johnstone, going to the cocaine, let's get that kind of squared away here.

A  I'm -- I'm sorry, sir, I can't hear you.

Q  Excuse me.  Going to the cocaine.

A  Okay.

Q  September.

A  Okay.

Q  All right.  (Pause)  Do you recall if that was Officer Cross?

A  Yes, that is correct, sir.

Q  Okay.  And to your knowledge, after Officer Cross made the stop and discovered the cocaine, who was next on the scene or who did you understand was next on the scene, if anybody?

A  Without looking at the report I -- I don't know who -- who else had responded.  I'm sure Officer Cross had someone else respond but I don't recall

292

---

who that might have been.

Q  Do you know if Mr. Fish was arrested?

A  For that contact, no, he was not arrested.

Q  Is it -- you've heard -- you were here when Officer Bushue testified?  You were sit -- were you here?  I -- sometimes you're in and out so.....

A  Was that -- if that's in regards to the marijuana I -- I had -- had stepped out, I don't remember......

Q  No, it has to do with where someone, based upon her experience as a police officer.  Well, based upon your experience.  We've got.....

A  Okay.

Q  I -- I -- you come on someone with five bags of cocaine, do you arrest them or not arrest them?

A  I would have arrested him.  Which is why I charged him with what I.....

Q  I'm sorry, please?

A  Which is why I charged him with what I did.  When I got the case I charged him with -- for the possession and that's why I did that, because I would have arrested him on the -- on the spot.

Q  So there is a criminal charge out there that says the State of Alaska versus Jeremy Fish, Count I,

293

possession of -- or -- of cocaine for purpose of distribution?

A   I sent the case to the district attorney, Phil Moberly. I spoke to him on the phone prior to sending it over and he said to send it over with the charging documents. I don't know what the status of that case is currently.

Q   Okay. Okay, and that's your letter of September 10th, is that correct?

A   That is correct.

Q   All right. Do you have that in front of you, sir?

A   I do not.

(Pause)

MR. JAMES: Could I have a D, please, madam clerk. If I may approach. A D, delta. I'm sorry. I'm going to hand you what's marked for identification -- I'll show -- if I may approach, Your Honor.

Q   What's been marked for identification. Is that a photocopy of the letter you sent to the.....

A   Yes.

Q   Okay.

THE COURT: This is Exhibit D, is that correct?

A   Yes.

THE COURT: The exhibit sticker on it.

A   D, delta, yes.

---

THE COURT: Thank you.

Q   Take a look at it. Have you had a chance to.....

A   Yes, I have.

Q   All right. And did you get a lab report back on it?

A   To date I have not received that, no.

Q   When did you send that in?

A   It would have -- I sent it in the same time -- actually I think I sent it in a little earlier than I sent the case over to Mr. Moberly because I wanted to get that going, just because it is evidence, so -- but I have not received that back. It usually takes a little while for them to get things back to me for some reason.

Q   Two months?

A   Yeah.

Q   Okay.

A   Usually if there's not a rush put on something by an outside agency such as the district attorney's office, or, you know, DEA, whoever is using it, they take it as they get to it.

Q   So as of right now the 14th of November, no lab reports have been done by the state?

A   As of the 13th -- I haven't been able to check my mailbox at the station today.....

---

Q   As of the 13th.....

A   .....so as of the 13th it had not been returned to me.

Q   Okay. And you have -- other than your -- of course, your communication with Mr. Moberly, telephone communication and your letter, that is the -- that's the end of the Jeremy Fish case as far as your involvement on the September 4th case?

A   Yeah, that is correct.

Q   So that's just kind of -- nothing is happening in two months?

A   I don't know what has happened at the district attorney's office in two months.

Q   Have you done anything to stir the pot? Get activity?

A   On that -- on -- on that particular case, no.

Q   On that particular case?

A   No, I have been working on my other cases.

Q   All right. And am I correct that this case rises and falls on Jeremy Fish?

A   The case that Mr. Davis.....

Q   We're here. We're here.

A   He is the informant that was able to purchase the products, yes, sir.

Q   All right. Now you indicated -- you did a search

---

warrant, correct?

A   I -- yes.....

Q   An affidavit for a search warrant?

A   Yes, I did.

Q   Okay. And how many of those did you do? Do you have all your stuff in front of you?

A   How many affidavits or how many search warrants?

Q   Well, each affidavit would be for each search warrant, would it not?

A   I only -- I have one affidavit in front of me that references a second affidavit as well. Or a second warrant. Do you have this in front of you also?

Q   You're going to have to.....

A   It is my affidavit. Do you have that in front.....

Q   The affidavit that I'm referring to is in search warrant 882. Do you have that?

A   Okay. Referencing line 12 it states that I obtained a Glass warrant from Magistrate Knowland which means that there would have been a second affidavit prepared that is not attached to this one. This affidavit is for Mr. Davis' vehicle that he drove the morning of March 1st. There will also have been another affidavit for -- and a

search warrant for the Alaska Digitel records.

Q  All right.

A  So I believe that would be a total of three.

Q  Okay, now this one is for the car, is that correct? 882.....

A  Yeah, this is -- this is for Mr. Davis' -- I think it's a Toyota pickup. In trying to locate the -- the money that had been used in the purchase.

Q  Where in this search warrant, and maybe you can find it because I'm looking for it, does it say that Mr. Davis was searched at the scene and at the jail, if it does say that in support of the search warrant, that that's why you suspect the money to be in the car?

A  Let's see.

Q  I might be just looking right over the top of it.

A  Number 16, it says the money used for the purchase was not recovered from Davis' person.

Q  Number 16?

A  Yeah. Paragraph 16.

Q  Mine ends at 13.

Q  Okay, then you're missing the last -- actually the last two pages with paragraphs 14, 15, 16, 17.

Q  Okay. I just flipped to another one. Thank you, Officer. I have two of them. Okay, wasn't -- so

298

Q  Okay. The reason I'm asking is, is I have one that's signed on the 2nd that has the 16th on it.....

A  Okay.

Q  .....that references.

A  Yeah, the form is.....

Q  The one on the 1st I have does not have that page, so I'm just trying to get it clarified.....

A  Yeah.

Q  .....in my mind that -- so we're talking the same.....

A  The -- the format of the affidavits will be very similar.

Q  Okay. All right. And in it your information is, under 16 is that you believe that there was a small black box observed to the right of where Davis was sitting, so that's kind of the impetus to say if it wasn't on his person then maybe it's in the black box adjacent to where he was sitting?

A  Yeah; and that was observed, I believe, by.....

Q  LaBlanc?

A  .....LaBlanc or Sergeant Stevens. One of the officers involved with the -- with the arrest.

Q  Okay. All right. And -- all right. And you didn't -- you weren't there at the scene, right?

300

you're swearing that the money was not recovered from Davis' person on 16?

A  At the time of the stop the money was not recovered from him.

Q  Okay. And this was issued on the 2nd. Or excuse me, you swore this on the 2nd of March, correct?

A  Yes.

Q  Okay. All right.

A  I wrote it on the 1st but.....

Q  Okay.

A  Actually according to the -- to the -- do you have the page with the signatures?

Q  Yes, sir. Yeah.

A  Okay. It -- I obtained it from -- I don't know who this person is, on.....

Q  Cole(ph).....

A  .....the 1st of March. I don't know the signature.

Q  Well, wait a minute. I think it's probably fair to say that we use -- you use the same format for two search warrants. One dated the 1st, one dated the 2nd?

A  Well, I got two search warrants.

Q  Right.

A  One for the vehicle and then a second for CIPT.

A  No, I was not.

Q  Okay.

A  The la -- the only thing I saw of it was in my rearview mirror, it was dark, and I could see police lights, and that was it.

Q  Okay. So when -- you've been -- were you here when Sergeant Bushue said that she believed there was two people in the car?

A  Yes, I did hear that.

Q  Okay. So no,.....

A  I have no idea who was in the car.

Q  .....idea one way or the other?

A  No.

Q  All right. Now were you the author of the search warrant affidavit that indicated that Mr. Fish had a pending burglary charge in front of him? Or was that another?

A  That one does not.....

Q  I believe it had to do with a Glass warrant.

A  I did obtain a Glass warrant from Magistrate Knowland, but I would have to go over the entire affidavit referencing that. And that -- where it says I obtained the Glass warrant is on number 12.

Q  Yeah, that's -- the one I -- what I'm asking for, and if it's not you, that's fine, what you're --

301

Exhibit J – 77

1     because you're going to be leaving us aren't you,
2     here shortly, your plan?
3 A   Hopefully when everybody else does.
4 Q   I mean you're not going to be sitting at counsel
5     table?
6 A   I'll be back tomorrow.
7 Q   Tomorrow, all right. I was under some impression
8     that you were going to.....
9 A   No, not until next week.
10 Q   All right. What I'm looking for is the affidavit
11     relating to securing the Glass warrant where it
12     indicates that they identify the individual, P01-
13     06, whatever; how he was identified, but that
14     there was pending burglary charges against him.
15     That was the only -- and you had run a records
16     check on him.
17 A   Okay.
18 Q   Did you do that one?
19 A   I don't recall if that was -- I would have to look
20     at the affidavit to see if that was something I
21     did.
22 Q   Okay. Well, we're not going to belabor that right
23     at the moment since you're going to be around.
24     The -- now I lost my train of thought. Did you
25     use a checklist at -- on any of these searches?

AURORA COURT REPORTING

302

---

1     particular -- all of the vehicle searches,
2     correct?
3 A   No, I think I -- if I remember correctly, only
4     participated in one.
5 Q   Right. And did you do all the strip searches?
6 A   I did the majority. I think there might have been
7     one where I did not, but we do have a -- a
8     checklist of what officers did what things after
9     each -- after each -- before and after each
10     transaction, and so I could refer to that and tell
11     you what I did and what I didn't do.
12 Q   Do you have that with you?
13 A   I think Ms. Brady is digging it out of the file
14     right now.
15 Q   Okay. The checklist that you have -- all right.
16     Now -- so you do have certain checklists to make
17     sure certain things are done?
18 A   One of the officers just developed that so that we
19     know what happened. And we've come across a lot
20     of efforts being duplicated, and so with somebody
21     saying, okay, I did this and initialing it, we
22     know that it got done.
23 Q   Okay. And do you do a digit inspection when you
24     do your strip search?
25 A   I do not insert my finger or anything like that.

AURORA COURT REPORTING

30

---

1 A   Are you referring to the strip searches and the
2     search of the vehicle?
3 Q   Yes, sir. I mean we talked -- that's with the
4     ones you've done, we talked about today.
5 A   Right, right. I don't have a checklist that I
6     write out. Mentally I know that there are certain
7     areas that I have to search, otherwise there is a
8     -- a possibility that something might get by.
9 Q   Okay. As -- to your knowledge are there
10     checklists for like DWI and other things to make
11     sure everything is done, is that correct?
12 A   There have been de -- someone within APD has
13     developed a checklist of the field sobriety tests,
14     so.....
15 Q   Uh-huh (affirmative).
16 A   .....as you're doing those tests you can mark them
17     off. One of them is fairly extensive and it's
18     difficult to remember all the clues that you might
19     see.
20 Q   Okay. And that's just a checks and balance to
21     make sure everything is done, right?
22 A   It's just so that you can remember all the -- all
23     the things that you saw as, you know, for your
24     bail hearing or whatever it might be.
25 Q   And you did not do the vehicle searches in this

AURORA COURT REPORTING

301

---

1 Q   All right.
2 A   If that's what you're referring to.
3 Q   That's what I'm referring to.
4 A   Okay.
5 Q   And -- okay. You took control of the possession
6     of what Jeremy Fish had on the 28th, slash, 1st?
7 A   Yes, sir.
8 Q   Okay. And you weren't involved -- did not see
9     what happened at the time but you watched that
10     vehicle leave the parking lot.....
11 A   Mr. -- Mr. Fish's vehicle?
12 Q   Yes.
13 A   Yes, sir.
14 Q   Okay. Did you see him get in the vehicle?
15 A   No.
16 Q   So you watched the vehicle which you rendezvoused
17     up with at Schuck's or.....
18 A   Yes, they advised me that the vehicle was pulling
19     out. At that time I just jumped on Muldoon and
20     waited for him to pull in front of me and then I
21     followed him up to the Schuck's Auto Supply.
22 Q   Okay. How far away is that?
23 A   It -- that is at 16th and Muldoon, and the Pancake
24     House is -- or where the -- the other -- Northern
25     China is located at 353 Muldoon, so it's about 13

AURORA COURT REPORTING

30

Exhibit J – 78

-- a little under 13 blocks.

Q  Okay. Did you have him constantly in your view?

A  Yes, I did.

Q  Okay. Was there any concern about -- that -- well, let me withdraw that question. Approximately how long was it from the time that he left the parking lot until you made contact with him and secured what he had, Jeremy Fish?

A  One minute, if that.

Q  Okay. So -- and then once you had the product,.....

A  Uh-huh (affirmative).

Q  .....did you have physical possession of the product then?

A  Yes, I did.

Q  Okay. And so what happened at that particular juncture?

A  Then we left from where we were, the other officer, the other people involved were taking care of Mr. Davis, and we left.

Q  Right. And you say we?

A  Myself and Jeremy. I followed him.

Q  All right. So you left in two cars?

A  Right.

Q  You didn't search him at that point in time?

AURORA COURT REPORTING

306

---

money is whose, right?

A  That's my understanding, yes.

Q  Okay. So it's kind of like going into the bank and putting in money and withdrawing money, they just.....

A  You're not -- you probably won't get the same out.

Q  You won't get the same back, okay. And you don't know who put that money in there do you? I mean you can subject, but do you know yourself who put the money in there?

A  I do not.

Q  All right. When you marked your money did you -- you know, like banks, they have the powder.

A  We -- we don't mark it. All we do is just take the photocopy of the serial numbers.

Q  Is there -- what effort is there to put this powder that you put under an infra red light that shows up that you've touched the -- whatever the product is?

A  We don't do that.

Q  Okay. Is there any effort involved in it, or do you know any knowledge of it?

A  I have no knowledge of that whatsoever.

Q  The judge told me to -- I could ask about this.

A  Sure.

AURORA COURT REPORTING

308

---

A  I did not search -- strip search him or the vehicle at that time, no.

Q  And at the end did you -- at the -- were you the strip searcher and the searcher of the vehicle at that time, on the 28th, slash, 1st?

A  I was the strip searcher. I'll have to refer and see if I actually -- if I searched the vehicle. No, Officer Summerset Jones searched the vehicle once we got -- once we returned to APD.

Q  Okay. And -- but you did the strip search?

A  Yes, I did.

Q  Now you also obtained a search warrant for CIPT, which is Cook Inlet, isn't it?

A  That is correct, yes.

Q  Okay. And is it not -- did you have anything to do with the booking process at CIPT?

A  No, sir, I did not.

Q  Okay. And the search of Cook Inlet,......

A  Uh-huh (affirmative).

Q  .....that's a common fund full of -- everybody's money, right? As you understand it?

A  That is my understanding, yes, sir.

Q  All right. So if a hundred people come into Cook Inlet and they each have X number of dollars on them, it goes into this pot. No one knows whose

AURORA COURT REPORTING

---

Q  This here. My questions.....

A  Uh-huh (affirmative).

Q  These are your initials, correct?

A  Correct.

Q  Okay. And it's dated 3-1, right?

A  Right.

Q  So that's when you dated this?

A  That's when I dated the -- that money, yes.

Q  Okay.....

A  That was the -- date of the buy.

Q  But the money was distributed by you on 2-28, wasn't it, just before midnight?

A  Just before midnight, yes.

Q  Okay. So you made a photocopy, why didn't you date it right then?

A  Because we had a lot of activity going on. We were being very rushed, I made the photocopy, initialed it, put it in our office, locked it, and when I got back, since the buy had occurred on the 1st I dated the money as the 1st.

Q  You were just too busy to photocop -- date it as it came off the.....

A  Well, since -- since we had the buy occur on the 1st, it would create confusion within the channels if the money was photocopied as 2-28 and attached

AURORA COURT REPORTING

309

to a buy that was dated March 1st. There would --
that would create confusion both within the
channels with the DA, with the person who makes
the entry into the system with -- with the money,
and so I dated it as the 3-1 when the buy actually
occurred.

Q   So I understand, you make a photocopy of the money
on the 28th,.....

A   Uh-huh (affirmative).

Q   .....you give it to Jeremy Fish on the 28th, but
so that none of these professional people get
confused you date it the 1st?

A   Yes.

Q   Okay. Why did you then date it the 2nd?

Q   Date what the 2nd?

A   There's a 3-2 date there.

Q   Yeah, that's from the clerk of Metro Division.
She enters all the photocopied money into a single
data base to track. APD is give -- given a
certain amount of funds and she enters all that
money into a data base to track where those funds
are going out. And the initials on here are from
3-2, this is clerk Patty Raya(ph). It says
entered 3-2-01.....

Q   Yeah.

Q   under his training, is that the idea?

A   I was the what?

Q   We called them strikers in the Navy, the trainer?
You were being trained?

A   He was overseeing, yeah.

Q   Okay. But you're a commissioned police officer,
you're.....

A   That is correct.

Q   .....six years under your belt, or five years,
whatever it is, so you're not.....

A   Yes. I had -- the reason that he was assisting me
with this is I had never worked an informant from
start to finish on my own.

Q   Okay. You have no knowledge of what deal was cut?
MS. BRADY: Objection, Your Honor, asked and answered
THE COURT: Sustained.
MR. JAMES: All right.

Q   Were you interested in what deal was cut?
MS. BRADY: Objection, asked and answered.
MR. JAMES: I didn't ask that.
THE COURT: Sustained.
MR. JAMES: All right.

Q   The -- what did the house at 202 Grand Larney(ph)
look like?

A   Never saw it.

A   .....by Patty Raya(ph), that's when she entered
the money into -- as being used, into the computer
data base.

Q   Okay. What was the deal you made with Jeremy?

A   I didn't make a deal with Jeremy.

Q   You were his handler, weren't you?

A   That's a -- yeah, I guess you could say that. I
was -- I was actually under the -- working under
the umbrella of Mark LaPort. Mark was very fami -
- had done this many times. I was -- he was -- I
guess you'd call him my field training officer in
this one. Whatever arrangements he talked to the
district attorney about I -- I am not aware of.
He just said I'm going to have you work with me on
this case, and he turned over more of the
responsibility to me as the case went along.

Q   Did you know that Jeremy Fish had pending burglary
charges against him?

A   Yes, I did know that.

Q   Did you inquire as to what was going down there?

A   Nope.

Q   You didn't care what you were dealing with?

A   I knew that he had pending burglary charges
against him.

Q   You were the striker for LaBlanc then, you were

Q   Did you ever drive by it?

A   No.

Q   How do you know that Fish went in there?

A   Because the other officers that were there
conducting the surveillance of him going into the
residence said so on the radio. And I called him
once while he was inside the house.

Q   What number did you call?

A   He had a cell phone with him and I don't remember
what that number was.

Q   Okay. What did you talk about?

A   I asked him when he was coming out. If he was
almost done. He says, yes, he's on his way out
now.

Q   All right. Weren't you concerned about his well
being? Here you -- APD makes a phone call to
somebody that's supposedly in the midst of a buy?

A   Yes, which is why we put so many officers out
there to monitor.

Q   Okay.
MR. JAMES: Your Honor, if I may, could I move Exhi
D, marking to C rather than D?
THE COURT: You want that changed.

A   I think he took it back.
MR. JAMES: I think that.....

THE COURT: You want to change the marking on Exhibit D to Exhibit C?

MR. JAMES: Yeah, I had some premarked and I'm just going to get this all goofed up if I don't.....

THE COURT: That's fine.

MR. JAMES: .....stay with the.....

MS. BRADY: I don't object.

THE COURT: That's fine. It hasn't been admitted. It can be changed from D to C.

MR. JAMES: No, sir, it hasn't. It's right here. I'm going to cross out D and move in C. I'm going to ask that this be admitted now.

MS. BRADY: No objection.

Q    I'm going to hand you what's been.....

THE COURT: You're offering C?

MR. JAMES: I'm offering C.

THE COURT: And?

MS. BRADY: I'm not objecting.

THE COURT: C is admitted.

(Defendant's Exhibit C admitted)

A    Okay.

MR. JAMES: I'd move C to D, or D to C.

A    Sure.

Q    All right.

MR. JAMES: I just need a couple minutes here. I mean

AURORA COURT REPORTING

314

---

I may approach so we're all talking the same. We've got one and two.....

A    Yes.

Q    .....that have blue marking evidence, they're sealed.

A    Correct.

Q    And now they look like they're in a -- one of those air suction bags that seal it up.

A    Uh-huh (affirmative).

Q    Who does that?

A    Property and Evidence does the -- does the bags. We do the -- the brown Manila folder. We do -- as officers, or -- we do the evidence tape around the seams, initial it and date it, and then Property and Evidence, when it comes to them, they seal it into these bags, into the clear plastic bags.

Q    Okay. And it's sent -- then what happens to it after Property and Evidence?

A    If there's no lab requests that is done to test the product, it is held at our Property and Evidence section until the case goes to trial and at that point they may request the lab -- the lab to test it. It.....

Q    Assume it goes to the lab.

A    Then I don't have any idea what happens from that

AURORA COURT REPORTING

316

---

a moment, Judge. (Pause)

Q    The -- did you field test the product on the 1st?

A    March 1st?

Q    March 1st.

A    I don't think I did any of the field tests.

Q    Okay. What's the procedure, as you understand it, what happens to the contraband, the -- so I can set the stage for you. You receive contraband from somebody or take it from somebody, okay. It's in -- now in a particular officer's possession. That individual either field tests it themselves or pass it on to somebody and there's a chain at that particular juncture.

A    That is correct.

Q    Okay. At some point in time then, like Officer Bushue talked about, is that consistent on the outside of the Manila envelope that the -- in this particular case I believe it's one and two are marked, there's a weight and a time and who handled it?

A    Yes, that is correct, sir.

Q    Okay. All right. There -- what happens to it then?

A    After it's put into the envelope?

Q    Right. I mean it's -- now it's in a sealed -- if

AURORA COURT REPORTING

---

point. I know it goes to the lab, it's tested and it comes back. I don't know what their handling procedures are there.

Q    Right. Do you know who -- how it gets from -- you take it to Evidence?

A    Correct.

Q    Okay. Somebody then -- and I take it from your testimony, not you or of your group would take it from wherever it's sealed into evidence.....

A    Uh-huh (affirmative).

Q    .....to the next step which could possibly be the lab?

A    The state -- the lab -- yeah, our lab does not test the cocaine,.....

Q    Right, I'm talking about.....

A    .....it's the State of Alaska.

Q    .....the state lab, right.

A    Yeah, right.

Q    Do you have any idea -- I mean do you -- can you tell me who takes it from your evidence to state lab?

A    I don't know the person's name, no. I believe it's -- they work in -- I believe that the Property and Evidence technicians do a run, so to speak, over to the state lab. We send things over

AURORA COURT REPORTING

317

there often and they will take them over, and then
bring them back, once they're completed testing.

Q   Once you put the blue seal on the Manila
envelope.....

A   The evidence tape.

Q   The evidence tape.  Excuse me.  Does that seal
that envelope to prevent anybody from accessing
it?

A   Yes.

Q   Do you watch the evidence people put the clear
plastic around it?

A   Nope, I've never seen them do that.

Q   But you just know it's done because your
experience?

A   And -- yeah.

Q   I mean looking at those two, but it's the way it
happens?

A   Right.

Q   Okay.  All right.  And one of those has one gram
in it, I think one.  And the other has 11 point
something grams in it?

A   11.8, yes.

Q   All right.  Those two do not -- those deal with
number -- the 8th and the 20th, is that correct?

A   Yeah, the one gram is the 8th.  The 11.8 is the

AURORA COURT REPORTING

318

---

number.

Q   Okay.  So that should dove -- everything should
dovetail in?

A   Yes.

Q   All right.

MR. JAMES:  Your Honor, I'm going to be a few more
minutes and I just -- I.....

THE COURT:  We're going to stop for today, but I'm
going to consult with the lawyers for a moment before I can
tell you a little bit more about the schedule, so bear with
me for just a moment.

(Bench conference as follows:)

THE COURT:  Excuse me.  We're at bench conference.
When should I tell them to come back tomorrow?  8:30 or do
we have work to do before they come in?

MR. JAMES:  I -- the only thing I want to know, Judge,
is Ms. Brady brought up -- got, I think -- there's some more
police reports weren't there?

MS. BRADY:  I have them.

MR. JAMES:  Are those the ones?

MS. BRADY:  He brought them back, yeah.

MR. JAMES:  Are those the ones you gave.....

MS. BRADY:  I have copies made.

MR. JAMES:  Did you share those with me already or not?

MS. BRADY:  No, they're sitting on the counsel table,

AURORA COURT REPORTING

32

---

20th.

Q   The 20th, all right.

A   Yes.

Q   So the 21st and the 22nd are not accountable?

A   They're not right here.

Q   I mean right there.  Right there.  I mean.....

A   That's correct.

Q   Okay.  We haven't seen those yet.  Is there a
tracking mechanism on those forms?  Are those
Manila sheets that says this piece of evidence by
some type of a numbering system matches this
piece, this item that was tested?  In other words,
do you have like 505 da -- 217, and that is a
particular piece of evidence, and if the lab tests
501217, that should be the same?

A   You're talking about the state lab?

Q   Yes.

A   Okay.  When we send the request to the state lab
we actually fill out the request form with our tag
number as -- and I'll use the case of the one from
the -- the 20th.  We fill out  -- our tag number
is 505551.  On their req -- their lab request
form.

That form goes with the evidence.  It is then
returned with the results matching that tag

AURORA COURT REPORTING

---

he brought them in during.....

MR. JAMES:  I know, that's what -- I don't -- to answer
your question, I don't know that (indiscernible -
simultaneous speech).....

THE COURT:  Well, why don't I send the jury home and
you can look at them and then we'll make a decision.

MR. JAMES:  Send the jury home when?

THE COURT:  Today.  Well, that doesn't help, does it?

MR. JAMES:  No, that doesn't help.  And I was going to
bring that up.

THE COURT:  Why don't I have them come in at quarter of
9:00 and have you come in at 8:15.

MS. BRADY:  Your Honor, it's very difficult for me to
make it at 8:15 with the way I drop off my son.  I really,
really put a special effort into doing that today, but I
have to drop him off really early and it's very difficult
for me to do that.

THE COURT:  How are we doing on the schedule, witness-
wise?  Are you behind?

MS. BRADY:  I'm behind.

THE COURT:  All right.

MS. BRADY:  Not -- I think that I can still finish my
case tomorrow though, depending on what happens.

THE COURT:  All right.  Even if we start at 9:00?

MS. BRADY:  Even if we start at 9:00.

AURORA COURT REPORTING

---

3

THE COURT: All right, I'll tell them to come in at 9:00, and we -- if we could spend five minutes after I send the jury home and working on those things today then we'll take care of the rest of it tomorrow.

MS. BRADY: Okay.

MR. JAMES: Thank you.

(End of bench conference)

THE COURT: All right. See if I can talk to you -- there we go. We're going to stop for the day. We'll start again at 9:00 tomorrow morning rather than 8:30. Please remember what I told you yesterday. Don't speak with anyone, that includes -- about the case, and that would include don't talk among yourselves, don't talk to anyone else, don't do any research or investigation on your own. We want -- and that's for two reasons. One, we want you to not start actually forming hard opinions in the case until you hear everything and you haven't heard everything yet. And second, we certainly don't want you to have your final decision influenced by something you might hear or see outside the courtroom. We'll see you tomorrow at 9:00. We'll run from 9:00 to 1:30, and I will tell you then -- I'll give you a lot better fix on what next week's schedule will be. Can I answer any -- I'll try to answer questions if you have them, otherwise you're free to take off.

JUROR: I have question.

AURORA COURT REPORTING

322

MR. JAMES: There's two copies. She's got a set.

THE COURT: (Indiscernible - simultaneous speech). On 11. And I need to -- I reserved ruling on Exhibit number 11, pending cross. Do you still have an objection to that? That's the photocopied money. Mr. James?

MR. JAMES: No, Your Honor, thank you.

THE COURT: All right. So.....

MR. JAMES: No, that's -- it's.....

THE COURT: Eleven is admitted.

(State's Exhibit 11 admitted)

THE COURT: We'll go off record for just a second. I -- all I wanted -- the only other thing I want to accomplish today is for you, Mr. James, to let them see that you got what you think you were asking for so that we don't have to take up I want more stuff tomorrow.

MR. JAMES: I understand.

THE COURT: I may have to take up other issues, but I don't want to take up I need more information.

MR. JAMES: Yeah. We can just go off record and.....

THE COURT: So we'll do that and -- unless you ask me to go back on record I'll assume that that isn't the case, so -- but.....

MR. JAMES: Yeah, that's fine, Judge. I don't -- yeah, thank you.

MS. BRADY: Oh, I'll do that on redirect.

AURORA COURT REPORTING

324

THE COURT: Yes, ma'am.

JUROR: The day after Thanksgiving is a Friday. We probably won't.....

THE COURT: We're not going to go that long. I think I can tell you that.

MR. JAMES: Next week is Thanksgiving?

THE COURT: Next week is Thanksgiving. All right, good night, we'll see you tomorrow morning.

(Jury excused)

A    Does the evidence stay here or do I need to take it back?

MS. BRADY: Yes, take it back.....

THE COURT: All right, have a seat. We're still on record. The jury has departed for the day. We're going to take up with the jury at 9:00. We will take up evidence issues 8:30 sharp, and Ms. Brady you're giving police reports to Mr. James now of the police reports that Detective Johnstone retrieved today based on our earlier.....

MS. BRADY: I am, Your Honor.

THE COURT: All right. And why don't you just check. I don't want to go into argument, but I want you to check to see that you've got what you asked for, Mr. James.

MR. JAMES: All right.

(Whispered conversation)

AURORA COURT REPORTING

(Court recessed)

1:36:18

END OF REQUESTED PORTION

AURORA COURT REPORTING

325

Exhibit J – 83

## TRANSCRIBER'S CERTIFICATE

1

2

3

4      I, Audrey Krovchuk, hereby certify that the foregoing

5  pages numbered 2 through 325 are a true, accurate, and

6  complete transcript of proceedings in Case No.3AN-01-01717

7  CR, State of Alaska versus Robert O. Davis, transcribed by

8  me from a copy of the electronic sound recording to the best

9  of my knowledge and ability.

10

11

12

13  7- 9- 03                              Audrey Krovchuk, Transcriber
    Date                                 Audrey Krovchuk, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25

AURORA COURT REPORTING

326

Exhibit J – 84