DISKETTE ENCLOSED

A-8306

1      IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

2             THIRD JUDICIAL DISTRICT

3 STATE OF ALASKA,       )
                     )

4        Plaintiff,    )
                     )

5   vs.              )
                     )

6 ROBERT DAVIS,        )
                     )

7        Defendant.    )
                     )

8 ——————————————————————

9 Case No. 3AN-01-1717 CR

10                 VOLUME I

11         TRANSCRIPT OF PROCEEDINGS

12     October 29, 2001  - Pages 02 through  17

13     November 09, 2001  - Pages 18 through  38

14     November 13, 2001  - Pages 39 through  44

15     November 14, 2001  - Pages 45 through  193

16     November 15, 2001  - Pages 194 through  359

17     November 19, 2001  - Pages 360 through  574

18     November 20, 2001  - Pages 575 through  775

19     November 21, 2001  - Pages 776 through  846

20

21

22

23                 DISCLAIMER

        Transcripts Prepared for the Alaska Court System

24 The Alaska Court System has accepted this transcript based on either review of a random sample or without review because the transcriber's work consistently met court system standards. Because it is possible that this transcript may

25 contain some errors, the court system encourages parties to listen to the tapes of critical portions of the proceedings and to bring any significant errors to the ACS Transcript Coordinator's attention immediately.

RECEIVED
DEPARTMENT OF LAW
NOV 2 0 2002
OFFICE OF SPECIAL PROSECUTIONS
AND APPEALS
ANCHORAGE, ALASKA

1                              TABLE OF CONTENTS

2    PRETRIAL CONFERENCE:                                      Page 02

3    STATUS HEARING:                                           Page 18

4    TRIAL BY JURY (EXCERPT):                                  Page 39

5    OPENING STATEMENT BY DEFENDANT:                           Page 698

6    WITNESSES:          VOL    DIRECT   CROSS    REDIRECT   RECROSS

7    FOR THE PLAINTIFF:

| 8  | Kathleen Bushue  | I | 47  | 60      | 97  | -- |
|----|------------------|---|-----|---------|-----|----|
| 9  | James Triplett   | I | 101 | 104     | --  | -- |
| 10 | Steven Haas      | I | 110 | 122     | --  | -- |
| 11 | Grant Johnstone  | I | 131 | 162/211 | 216 | -- |
| 12 | Cam Lampman      | I | 228 | 231     | --  | -- |
| 13 | Jeremy Fish      | I | 245 | 298     | 439 | -- |
| 14 | Somerset Jones   | I | 443 | 450     | --  | -- |
| 15 | Mark LaPorte     | I | 472 | 518     | 595 | -- |
| 16 | Ted Garcia       | I | 600 | 606     | 613 | 616 |
| 17 | Roy LeBlanc      | I | 616 | 637     | 672 | -- |
| 18 | Jack Hurd        | I | 676 | 689     | 696 | -- |

19

20   FOR THE DEFENDANT:

| 21 | Darryl Cash    | I | 700 | 707 | 711 | -- |
|----|----------------|---|-----|-----|-----|----|
| 22 | Brandon May    | I | 713 | 725 | 734 | -- |
| 23 | Mildred Healy  | I | 735 | 743 | --  | -- |
| 24 | Athena Soder   | I | 744 | 751 | 755 | -- |
| 25 | Buena Epeagba  | I | 755 | 759 | 760 | -- |

-i-

TABLE OF CONTENTS (CONT'D)

EXHIBITS:                                                    ADMITTED

FOR THE PLAINTIFF:

        1 - cocaine                                            54

        2 - cocaine                                            55

        3 - cocaine                                           498

        5 - audio tape                                        266

        6 - audio tape                                        279

        7 - audio tape                                        286

        8 - photocopy, buy funds                              113

        9 - photocopy, buy funds                              624

        10 - photocopy, buy funds                             628

        11 - photocopy, buy funds                             193

        12 - cell phone                                       449

        13 - $100 bill                                        516

        14 - AK DigiTel Subscriber info                       231

        15 - photograph                                       487

        16 - photo line up                                    485

        17 - CIPT booking record                              602

        18 - lab report                                       689

        19 - buy check-off list                               220

        20 - registration                                     511

        21 - audio tape                                       289

        22 - cell phone battery                               449

-ii-

Exhibit K – 3

1    TABLE OF CONTENTS (CONT'D)

2    EXHIBITS:                                        ADMITTED

3    FOR THE PLAINTIFF:

4        23 - diagram                                    99

5        24 - diagram                                    99

6        25 - diagram                                   119

7        26 - diagram                                   620

8

9    FOR THE DEFENDANT:

10        C - letter to DA                              184

11        E, F, G and H - diagrams                      570

12        I and J - receipts                        725/774

13

14   OPENING ARGUMENT BY PLAINTIFF:                Page 783

15   ARGUMENT BY DEFENDANT:                        Page 796

16   CLOSING ARGUMENT BY PLAINTIFF:               Page 816

17   VERDICT:                                      Page 843

18

19

20

21

22

23

24

25

-iii-

Exhibit K – 4

---

PRETRIAL CONFERENCE

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
October 29, 2001
11:01 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
                      Assistant District Attorney
                      310 K Street
                      Anchorage, Alaska

FOR THE DEFENDANT:    DANIEL L. LOWERY
                      Assistant Public Defender
                      900 West Fifth Avenue
                      Anchorage, Alaska

*Page 2*

---

1 indicated she's going to get me those reports. There's a
2 June theft case involving him, which I understand was also
3 dismissed. There may be an ID problem, but I would like to
4 see those police reports. There is a possession of
5 marijuana in, I want to say it was in August, but I can be
6 specific. There's no court record because, as Ms. Brady
7 informed me, there's routinely dismissed under a
8 (indiscernible), but I would like to see those -- that
9 information.
10    And also, I'd like a copy of his juvenile records under
11 Joshua Davis for in-camera and inspection, because we
12 believe he has a long history of theft. And the reason this
13 is important is, as written to the DA's office earlier, we
14 have reason to believe that Mr. Fish made the statement to
15 Athena Sudor [sic] -- Soder, not Sudor [sic] but Soder, that
16 he would do anything in his power to put Jeremy -- or excuse
17 me, put Mr. Davis away. And we believe that there's a
18 substantial bias on -- that we're going to develop here.
19 And given that information, I don't believe we have ready at
20 this point, we're certainly awfully close to trial, but we
21 would request that information.
22    THE COURT: Can we break it down a little bit?
23 Ms. Brady has agreed to give you some things?
24    MR. JAMES: It's my understand, the Nome information is
25 going to be made available. It's my understanding that at

*Page 4*

---

P R O C E E D I N G S

2 3AN-42-1649
3 11:01:17
4    THE COURT: This is State versus Robert O. Davis, III.
5 It's Anchorage case 01-1717. Mr. Davis is here with his
6 counsel, Mr. James. Ms. Brady is here for the state. I
7 wanted to call this up for trial tomorrow, but my secretary
8 indicated there may be some problem doing that, so I'd like
9 to hear from the lawyers. Ms. Brady, are you ready for
10 trial?
11    MS. BRADY: Yes, Your Honor.
12    THE COURT: Mr. James?
13    MR. JAMES: Yes, Your Honor. We've asked for some
14 discovery on the confidential informant. We know who -- I
15 guess it's okay to call his name, right? Jeremy Fish is who
16 it is.
17    THE COURT: It's.....
18    MR. JAMES: Jeremy Fish is the confidential informant,
19 and he is 19 right now. There's a Nome case outstanding --
20 excuse me, it's been dismissed. I shouldn't say it's
21 outstanding.
22    I got the log notes here. I spoke with Officer Bennett
23 up in Nome regarding getting the police reports. He
24 referred me to the DA's office, which is standard procedure
25 and understandable. I've talked with Ms. Brady. S, she's

*Page 3*

---

1 least tentatively the auto theft will be made available.
2 There may be an issue about whether or not they had an
3 improper charging of that individual. I'd like to see the
4 information on the possession of under a pound.
5    THE COURT: You can do that, Ms. Brady?
6    MS. BRADY: Yes, Your Honor.
7    THE COURT: Okay.
8    MS. BRADY: I'll do all of those things.
9    MR. JAMES: There's -- in talking with Ms. Brady,
10 apparently there's -- we need a court order to get the
11 juvenile records, which under Joshua Davis, I believe that
12 we're certainly entitled to at least an in-camera and review
13 by the court to see whether there's -- whether there are
14 other impeachable offences. And I think that's our
15 stumbling block.
16    THE COURT: So there are two issues? One is you need
17 to get stuff from the state, and Ms. Brady is going to give
18 that to you? You also are asking me to make an in-camera
19 review of juvenile files to determine whether any of that
20 information should be disclosed to either party?
21    MR. JAMES: Yes, sir.
22    THE COURT: So you're not ready -- so we're really not
23 ready for trial?
24    MR. JAMES: No, sir, we're not ready for trial. But I
25 just -- I had prepared another motion, and my records show

*Page 5*

---

1 that we served the DA back in July on this stuff and
2 Ms. Brady informed me that Friday she looked at the court
3 file and found out that they had -- the request was that was
4 previously given to them, they didn't have in their records.
5 So I think.....
6    THE COURT: Are you requesting a continuance,
7 Mr. James?
8    MR. JAMES: Yes, sir. Yes, sir. That's.....
9    THE COURT: And.....
10    MR. JAMES: That's the bottom line, right.
11    THE COURT: And give me -- assuming you get the
12 information from Ms. Brady reasonably soon, when will you be
13 ready for trial? How much time?
14    MR. JAMES: I think we can go next week, the week
15 thereafter, whatever is the court's convenient. The rule 45
16 issues is not really mass critical, I've checked the court
17 file. Obviously, we would like to -- both sides would like
18 to get this resolved, so -- as would the court like to get
19 it off its docket.
20    THE COURT: I have a rule 45 expiration date calculated
21 at December 31st.....
22    MR. JAMES: Yeah, we waive.
23    THE COURT: Is that correct?
24    MR. JAMES: I have no dispute with that, sir.
25    THE COURT: And a request for continuance would toll

Page 6

1    Now, if everything else goes away, then you would be
2 called up. I have a hunch that it's not going to go away,
3 so you might be in line for a couple or three weeks before
4 you actually get called up. Ms. Brady, you said you have a
5 potential witness problem. Can you give me more
6 information?
7    MS. BRADY: The confidential informant in this case,
8 Mr. Fish, is having difficulty maintaining a place to live
9 in the city, Your Honor. He's been moving around. He's
10 difficult at times to get a hold of. And I'm concerned that
11 we're going to lose him if it goes on too long. He's
12 difficult to keep track of, so.....
13    THE COURT: All right.
14    MS. BRADY: And has indicated a desire to leave the
15 state. So I'm -- I'm concerned that he will and then that
16 will be a significant problem for my case.
17    THE COURT: All right. Well, what do you suggest that
18 I do?
19    MS. BRADY: I -- I'll non-oppose production of the
20 records, the juvenile records. We'll need to have an order,
21 I can't get the without an order.
22    THE COURT: Well, I have to look at them and decide
23 whether they should be disclosed to either one of you first.
24    MS. BRADY: Right.
25    THE COURT: And I'll do that, I'll pull the file today.

Page 8

1 that -- all right. Let -- Ms. Brady, do you object to a
2 continuance?
3    MS. BRADY: No, Your Honor, I don't object to a short
4 continuance. I do have a civilian witness in this case who
5 does want to leave, and I can lose him if we continue this
6 too long. So I don't want to continue it very long, just
7 long enough to get whatever it is that Mr. James needs to
8 get ready to go to trial.
9    THE COURT: All right. Well, I don't know how that's
10 going to affect my calendar. I have cases in the next two
11 or three weeks that have rule 45 dates that cause more
12 problems than this one, so they may have to go sooner if I
13 don't get this case tried this week. But let's get the
14 calendar and take a look, and I'll give you a realistic
15 notion of what's going to happen once we actually set it
16 again. So let me get my calendar. We'll go off record for
17 a second.
18    (Off record)
19    THE COURT: I can put you on next week, but I can't --
20 you're really not likely to go next week. And I don't know
21 what's going to happen. As with all of our cases, we set
22 several each week, and we call them up usually in priority
23 order with the soonest rule 45, the earliest rule 45
24 expiration, and yours is going to be at the back of the
25 list.

Page 7

1 But even if I do that and if you produce the records, I'm
2 hearing that the soonest we can get this case to trial is
3 next Monday, and then I can't guarantee you that I can get
4 your case to trial next Monday. Let me ask you another
5 question; how long will the case take to try?
6    MS. BRADY: From the state's perspective, approximately
7 one day of jury selection and two days of trial.....
8    THE COURT: All right.
9    MS. BRADY: .....is what I anticipate my case to be.
10    THE COURT: Mr. James?
11    MR. JAMES: Yes.....
12    THE COURT: You don't have to tell me what you're
13 planning on doing, but I'd like a guess as to.....
14    MR. JAMES: Yeah, I would think that given the -- the
15 magnitude of the police officers, magnitude meaning the
16 number, that this is going to take a -- it could -- our side
17 of the fence should -- could take, including my cross
18 examination of these different officers, could take a couple
19 of days, depending upon how things click. I mean, I -- I'm
20 looking at a week here, Judge, total, you know. In fairness
21 of the court, I'd like to say three or four days, but I miss
22 and you've scheduled something then.....
23    THE COURT: Right. Ms. Brady, when you can produce the
24 things that you've agreed up, or agreed to produce?
25    MS. BRADY: I can produce -- I have already requested

Page 9

1 the police reports from the Nome burglary, I will have those
2 later today. They're being faxed to me. And the rest of
3 the records should be in my office and I will be able to
4 produce them as soon as I leave here today, unless they're
5 not there for some reason. So I should be able to get the
6 -- everything today.
7     THE COURT: Why don't we pick a jury on Thursday? If
8 you got your information tomorrow, Mr. James, assuming there
9 wasn't anything in there that caused additional delay.
10     MR. JAMES: We can do that too.
11     THE COURT: We pick a jury on Thursday, we don't have
12 trial on Friday, we start trial on Monday.
13     MR. JAMES: Could we, perhaps, if the court is
14 indulgent, maybe have a status hearing late Wednesday or
15 something so that we're not marching in here on Thursday and
16 then saying we're not going to -- to go? I'm just trying
17 to.....
18     THE COURT: No, I think that's a good idea. Why don't
19 we shoot for picking a jury on -- for starting the trial on
20 Thursday, and we'll have a status hearing Wednesday, late
21 Wednesday morning? I'm going to have to go back and look at
22 the calendar again and give you a time, so.....
23     MS. BRADY: Okay.
24     MR. JAMES: I mean, I think that might be the realistic
25 situation.

Page 10

1 calendar, because I'll just do it wrong. So I'm going to
2 bring the -- have the calendar brought in here.
3     MR. JAMES: Your Honor, while waiting for the calendar,
4 my client has asked if the court would consider releasing
5 his third-party. I spoke with Ms. Brady, she's indicated
6 the state opposes it.
7     THE COURT: If you want a bail hearing, you can call
8 Judge Andrews and set it on. Or if you give the state more
9 notice, I'll take it up on Thursday.
10     MR. JAMES: Thank you, sir.
11     THE COURT: I need to -- what we're going to do is
12 continue the trial for one week, put it on the normal
13 trailing calendar, but I need a -- I think I'll set a status
14 hearing for Thursday of this week, assuming.....
15     THE CLERK: So.....
16     THE COURT: Yeah.
17     THE CLERK: Okay. So you just want me to add it to the
18 2:30's?
19     THE COURT: Oh, I can -- what are those, pretrial's
20 or.....
21     THE CLERK: Uh-huh. (Affirmative)
22     THE COURT: ......adjudications?
23     THE CLERK: Pretrial's. Or you could do it.....
24     THE COURT: What else do I have?
25     THE CLERK: .....just before.

Page 12

1     THE COURT: All right. All right. So I'll be right
2 back with the calendar.
3     (Off record)
4     THE CLERK: We're on record.
5     THE COURT: I'm not going to do that. I just checked
6 the calendar again. I have a date certain trial starting on
7 Monday that has no rule 45 play to it, so I have to start
8 that trial on Monday, unless something happens between now
9 and then. I'm going to set your trial for Monday as well.
10 I think we'll still have a status conference, but we'll make
11 it Thursday.
12     And, Ms. Brady, I'm not -- based on your representation
13 now, I'm not going to give you a date certain, but if you
14 can give me more information which warrants giving you a
15 fixed date so that you don't have witness problems, I may
16 consider that, in which case, we may try to find another
17 judge, or at least you'll get better priority than you have
18 right now.
19     MS. BRADY: Okay.
20     THE COURT: And I'll also know or have more idea
21 Thursday as to whether my date certain trial is really going
22 to go, and I may have an idea of whether there are other
23 judges available who might be able to try your case.
24     MR. JAMES: So what time on Thursday, sir?
25     THE COURT: I don't want to leave again and look at the

Page 11

1     THE COURT: Why don't we -- why don't we do it at 200
2 o'clock on.....
3     MR. JAMES: 2:00 o'clock on Thursday?
4     THE COURT: .....Thursday. That's right before the
5 pretrial hearings at 2:30. Does that cause.....
6     MS. BRADY: the only problem with that, Your Honor, is
7 that I don't know what pretrial conference that I have in
8 front of Judge Wolverton this week, but he does his at 1:30,
9 and I don't -- I can't guarantee that I could be out of
10 there by.....
11     THE COURT: Do you have other cases with me on -- 230
12 on -- next week?
13     MS. BRADY: I believe I do, but I'm not certain.
14     THE COURT: Do you want to look?
15     MR. JAMES: This week rather, not next week, wasn't it?
16     MS. BRADY: Right.
17     MR. JAMES: You said next week, Judge.....
18     THE COURT: No, this week, 2:30. Do you want to look?
19 We have the -- she can just look at these names.
20     MS. BRADY: Yeah.
21     THE COURT: We'll put it on at 2:30 on Thursday.
22     MS. BRADY: Okay.
23     MR. JAMES: 2:30 on Thursday?
24     THE COURT: Mr. James, I hold pretrial conferences for
25 probably 10 cases at that time, but Ms. Brady is likely to

Page 13

1  be here anyway. If you are here five minutes before 2:30, I
2  assume we don't have to have a lengthy hearing in this case,
3  I could probably get you done before they bring the folks
4  who were in custody up to do their pretrial hearings. If --
5  if it's going to be a lengthy hearing, or if you get here
6  about the same time, if you all get here about the same time
7  the custody folks get here, I have to take the custody cases
8  first. So even if they -- they may not take a long period
9  of time, we'll set it for 2:30, but if you and Ms. Brady are
10 here, and your client, a little before, we might be able to
11 get you out of the way and you won't have to wait.
12     MR. JAMES: Okay. Your Honor, in relationship to that,
13 would it be acceptable to the court if my client were not
14 present for the status hearing? I haven't talked to the DA
15 about it, but we've been here for everything else. I think
16 -- there's nothing going to happen other than, yea, we're
17 going to trial on Monday, no, we're not going to trial on
18 Monday.
19     THE COURT: If your client waives his presence, and
20 directly to me, and tells me that he doesn't wish to be
21 there, then I don't have any objection. But if the state
22 has objection, I'll hear it.
23     MS. BRADY: I don't have any objection.
24     THE COURT: All right. Mr. Davis, you have a right --
25 you have a right to be present at every stage of your trial,

Page 14

1  going to have a trial, I'll tell him we're not going to have
2  a trial. I'll tell him that it may be reassigned to a new
3  judge for trial. All those things potentially could happen.
4  And so you need to know that, and you still -- if you're not
5  here, it's okay if I go ahead, is that right?
6      MR. DAVIS: Yes. Yes, sir.
7      THE COURT: All right. So 2:30, Mr. James.
8      MR. JAMES: All Right. Thank you, Your Honor.
9      THE COURT: Thursday. Ms. Brady, Thursday. And I'll
10 pull the juvenile file. Did anybody give me case number, or
11 do I just look under Fish?
12     MR. JAMES: I have no case number. I have no way of
13 getting into that system.
14     MS. BRADY: Right. And I don't have a case number
15 either, Your Honor. I have just an APSIN that shows his
16 name as Jeremy Joel Fish. I can give you an APSIN number if
17 that would help you.....
18     THE COURT: That's all right. We don't keep them under
19 APSIN numbers.
20     MS. BRADY: Okay.
21     THE COURT: But I'll see if there's a juvenile -- were
22 actual juvenile proceedings conducted, or was he just
23 informally.....
24     MS. BRADY: My under -- my understanding is there has
25 been.....

Page 16

1  and that includes everything from the trial to scheduling
2  and other matters that may not appear quite as important,
3  but are still, in the big scheme, important. Your lawyer
4  says that you don't wish to be present on Thursday of this
5  week for the status hearing, where I'm going to find out
6  whether -- I'm going to let you know whether we're going to
7  trial, and.....
8      MR. DAVIS: Okay. What's a status hearing?
9      THE COURT: .....or not. So I want to know, is that
10 right, you don't wish to be present?
11     MR. JAMES: Do you understand? The status hearing is
12 like what we're doing right now.
13     MR. DAVIS: Yeah. Okay. Well, I would like to leave
14 it open, just -- just in case.....
15     THE COURT: Well, you're always entitled to be present.
16 Unless you tell me you don't want to be there, and if you're
17 not here, I can't go forward without you. So I can't have a
18 hearing without you unless you tell me it's okay.
19     MR. DAVIS: Yeah, it will be okay, but if I do come,
20 will it be okay?
21     THE COURT: If you do come, it's okay as well.
22     MR. DAVIS: All right.
23     THE COURT: All right. And the -- I can't tell you
24 what will happen at that hearing, but the various things
25 that may happen include I'll tell your lawyer that we're

Page 15

1      THE COURT: A petition?
2      MS. BRADY: An adjudication, so.....
3      THE COURT: I'll pull that, whatever we have, and
4  review that with an eye towards discoverability for both of
5  you.
6      MS. BRADY: Okay. Thank you, Your Honor.
7      THE COURT: Thank you.
8      MR. JAMES: Your Honor, just before we go off record,
9  Mr. Davis is going to be with me. We're going to have to do
10 some stuff, and so he's going to be out of his third-party,
11 but the court has already granted permission with me or the
12 third-party.
13     THE COURT: That's fine with me, as long as you turn
14 him over to his third-party once.....
15     MR. JAMES: Right. I mean, it will be a hand off.
16     THE COURT: .....once you're finished. That's all
17 right.
18     MR. JAMES: Thank you, sir.
19     (Off record)
20 11:22:23
21
22
23
24
25

Page 17

**State v. Robert Davis**
**November 9, 2001**

```
                    STATUS HEARING

            BEFORE THE HONORABLE DAN A. HENSLEY
                  Superior Court Judge

                   Anchorage, Alaska
                   November 9, 2001
                   12:56 o'clock p.m.

APPEARANCES:

    FOR THE PLAINTIFF:    KERIANN BRADY
                          Assistant District Attorney
                          310 K Street
                          Anchorage, Alaska

    FOR THE DEFENDANT:    DANIEL L. LOWERY
                          Assistant Public Defender
                          900 West Fifth Avenue
                          Anchorage, Alaska
```

Page 18

---

1 apologize. I'll notify Judge Link's office. I was down in
2 Kenai yesterday and I have a change of plea set on for the
3 14th at 2:30 down there. But I suspect that should not be a
4 problem setting over, given the fact it's a change of plea,
5 it's not a sentencing.
6     THE COURT: All right. How many days do you anticipate
7 the trial to take, Ms. Brady?
8     MS. BRADY: I think a day of jury selection and a
9 couple of days of testimony from the state.
10     THE COURT: Mr. James, you don't have to tell me what
11 witnesses you're planning on calling, or what your strategy
12 is, but I need to the tell the jury how long they're likely
13 to be here so that we don't get anybody who has to leave in
14 the middle of the trial. So can you.....
15     MR. JAMES: Yes, sir, I understand. Given the fact
16 that they figure three days, that would put us into
17 Thursday, counting the jury selection, we assume we can get
18 it all done in one day. We anticipated, you know, at least
19 one day tentatively right now. I will -- I know I'll be
20 totally bound by it depending on the development of the
21 state's case, but.....
22     THE COURT: I should tell them that they.....
23     MR. JAMES: Could look.....
24     THE COURT: .....we'll probably use them for five or
25 six days, which would mean of next week, Tuesday, Wednesday,

Page 20

---

## P R O C E E D I N G S

2 3AN-42-1658
3 12:56:19
4     THE COURT: This is State versus Robert Davis.
5 Mr. Davis is here. His counsel, Mr. James, is here.
6 Ms. Brady his here for the state. I want to call this up
7 for trial on Tuesday. I just want to check signals with you
8 all to make sure that we're going to trial, and if so, to
9 make sure that we have all the issues resolved so that we
10 can pick our jury Tuesday and get going on Tuesday. Are you
11 ready for trial, Ms. Brady?
12     MS. BRADY: I am, Your Honor.
13     THE COURT: Mr. James?
14     MR. JAMES: Yes, Your Honor. We -- the only thing we
15 need, which I'm sure we'll be supplied, is the plaintiff's
16 -- the state's witnesses. We know we've got the experts.
17 Ms. Brady has indicated she'll run me a new (indiscernible)
18 or something on Mr. Fish. And other than that, I can't
19 think of any reason. I'll notify Judge Link's office
20 in.....
21     THE CLERK: Can you pull the mike closer to you,
22 Mr. James.....
23     MR. JAMES: I'm sorry, sir.
24     THE CLERK: .....I can't hear you.
25     MR. JAMES: I'm sorry. I mumble too, Judge. I

Page 19

---

1 Thursday, we don't have trial on Friday, and then of the
2 following week, Monday, Tuesday, maybe Wednesday?
3     MR. JAMES: I think that would be.....
4     THE COURT: And that that's a conservative estimate.
5 Is that -- that fair?
6     MR. JAMES: I think that's fair, Judge.
7     THE COURT: All right.
8     MR. JAMES: That way, at least they've got a heads-up.
9     THE COURT: Right.
10     MR. JAMES: You know, if we go shorter, hallelujah.
11     THE COURT: Okay. Let's talk about jury selection
12 method. I like to use the group jury selection method.
13 Ms. Brady, you have done that, but I don't think in my
14 courtroom. And, Mr. James, I'm sure you've done that
15 elsewhere, but I -- haven't done it here in my courtroom. I
16 put 18 chairs in the jury box, that's the most I can get in
17 the jury box. We'll call up the 18 jurors, they'll each
18 answer the general questions that we have on a cardboard,
19 and then you'll each have about 55 minutes to talk with that
20 group of 18.
21     The state goes first, uses up the entire time, you can
22 ask questions in order, you can ask questions by group, you
23 can jump around. When you're finished, the defense gets the
24 same period of time with the same group. After that, I'll
25 give you a written -- well, I'll -- first of all, after

Page 21

1  that, I'll ask for challenges for cause. You don't have to
2  make challenges for cause. For example, Ms. Brady, after
3  your questioning, because Mr. James won't have had a chance
4  to question as well. So you don't have to make challenges
5  for cause until you've both done your questioning, you can,
6  if you want. But after you've both done your questioning,
7  I'll ask for challenges for cause, and I'll give you a form
8  to exercise your preempts, exercise them in bulk as to that
9  group of 18 in writing. I'll excuse however many you all
10  want to excuse, up to your limit, of course. I'll fill the
11  box, and we'll start over. I'll take two alternates.
12  They'll be blind alternates, meaning we'll pick them at
13  random at the end of the case, rather than designating them
14  as alternates at the beginning of the case.
15  MR. JAMES: Okay. So you have 14 in the box, of which
16  12 will serve and two until the end won't know if
17  they're.....
18  THE COURT: Right.
19  MR. JAMES: .....on or not? Okay.
20  THE COURT: Any questions regarding jury selection
21  method, Ms. Brady?
22  MS. BRADY: No, Your Honor.
23  THE COURT: Mr. James?
24  MR. JAMES: No, it sounds clear to me at this time.
25  THE COURT: All right. A couple of -- just some other

Page 22

1  The witness box is designed so that witnesses have room
2  to use charts, graphs, demonstrative things in the box,
3  rather than get out of the witness box. So unless there's
4  some reason why your witness can work from the witness box,
5  they should stay there. Anybody going to use videos or
6  audios?
7  MS. BRADY: Yes, Your Honor.
8  THE COURT: Okay. Clean them up, please, before trial.
9  If there are portions of them that are objectionable or that
10  -- if there are portions of them that the defense thinks are
11  objectionable, you need to resolve that ahead of time so we
12  don't have to wait for them to be edited. And I'm not going
13  to send a tape back to the jury that isn't edited, if there
14  are portions that need to be deleted. And if you want to
15  use your own equipment, that would be great. If you want to
16  use ours, you're welcome to, but you need to ask ahead of
17  time. I don't know how many spare tape players we have
18  around here.
19  MS. BRADY: Well, I can tell Your Honor right now that
20  I intend on introducing -- these are wired buys, I plan on
21  introducing the tapes, the wires. I don't know if there are
22  objections or not.....
23  THE COURT: Right.
24  MS. BRADY: .....so.....
25  THE COURT: Mr. James, the ball is now in your court on

Page 24

1  rules that I would like to take care of now. No speaking
2  objections. You'll -- I'll give you all the opportunity in
3  the world to make evidentiary objections. We'll take a
4  bench conference if necessary, but we're not going to argue
5  evidentiary issues in front of the jury. So make your
6  objection, you can state the concept, hearsay, foundation,
7  something like that. If the answer is obvious to me, I
8  might just rule, but if you want a bench conference, all you
9  have to do is ask, and I may have one even if you don't ask.
10   If you have evidentiary issues that you can anticipate,
11  including subject areas, exhibits. Then unless there's an
12  absolute strategic reason why you can't raise them early,
13  like today, or during a break in the trial, or at the end of
14  the trial day, then you've got to do it that way. I don't
15  -- once we get our jury here, I don't really -- I'm going to
16  work very hard to make sure that they don't have to sit back
17  in the jury room while we deal with important evidentiary
18  issues, 30, 45 minutes, an hour, that we could deal with at
19  the end of the trial day or -- or at the beginning of the
20  trial day.
21   So that we -- and my goal is to use these people's time
22  wisely and not make them sit around while we're doing things
23  that we could have done at another time. That would include
24  marking exhibits before trial, rather than in the middle of
25  trial at the -- on the jury's time.

Page 23

1  those. If you have objections, they need be raised in a --
2  soon enough so that we can get the tapes cleaned up, if I
3  grant any of your objections.
4  MR. JAMES: Okay. Well.....
5  THE COURT: Anybody going to use experts?
6  MS. BRADY: Yes, Your Honor.
7  THE COURT: All right. Mr. James?
8  MR. JAMES: Am I going to use any experts?
9  THE COURT: Yeah.
10  MR. JAMES: No.
11  THE COURT: The -- I think the evidence -- different
12  judges deal with this different ways, I don't believe that
13  the evidence rules contemplate me certifying someone to the
14  jury as an expert. I think that the proponent of the
15  expert's testimony has an obligation to establish a
16  foundation. If it meets the threshold foundation, and
17  there's no foundation objection, then it goes to the jury
18  and the jury can evaluate the foundation and evaluate the
19  credibility of the expert's testimony. If there's a
20  foundation objection, I'll take it up outside the presence
21  of the jury, but don't ask me to certify someone as an
22  expert in X subject or Y, because I'll decline to do that in
23  front of the jury.
24   I ordinarily don't allow recross unless the redirect is
25  beyond the scope, and then only if an objection is made that

Page 2

1 it's beyond the scope. Or if fairness requires, and
2 fairness might require if a point just briefly developed on
3 direct was explored at length in redirect, and it might be
4 fair to allow a little more cross on that subject. If you
5 want to recross, then I guess at least for the first part of
6 the case, Mr. James, this would apply to you, if you want to
7 recross, you have to make application and tell me the
8 subject matters, when the -- the same rule applies to
9 everybody, though.
10   MR. JAMES: Okay.
11   THE COURT: That's all I have on my list of things.....
12   MR. JAMES: Do you have a copy of your list.....
13   THE COURT: .....that have come up.
14   MR. JAMES: .....that we can.....
15   THE COURT: Not.....
16   MR. JAMES: .....or is that.....
17   THE COURT: Not really.....
18   MR. JAMES: .....that's your working copy.....
19   THE COURT: It's not really readable, and I haven't
20 ever put it in -- in a form to give to people.
21   MR. JAMES: No, that's fine.
22   THE COURT: Any other housekeeping issues, procedural
23 questions?
24   MR. JAMES: The only thing I would ask, we've got a
25 list of tentative experts, which consists of eight, nine, 10

Page 26

1 potentials. Have you refined that down? And if you haven't
2 maybe you can call it in this afternoon with a list of your
3 -- your witnesses so I can get anybody that you're missing
4 subpoenaed that I feel might be necessary.....
5   MS. BRADY: The expert notices with the exception of
6 the notice from Mr. Hurd are so that I can call people if
7 issues arise that require expert opinions. I don't -- I
8 don't intend on calling them in my case in chief, and the
9 only expert I intend on calling in my case in chief is
10 Mr. Hurd. The other notices are just in case issues arise
11 that I need expert testimony to sort of explain or.....
12   MR. JAMES: Okay. No, I'm just trying to -- this is
13 housekeeping so.....
14   THE COURT: Yeah.
15   MR. JAMES: .....we're just trying to.....
16   THE COURT: This is the time to resolve those so we
17 don't have to deal with it later. That's why I put this on.
18 Any other.....
19   MR. JAMES: Do we have a list of the state's witnesses
20 that you intend to call?
21   MR. BRADY: All the witnesses that are in the police
22 reports are people that could be called. In addition, I
23 have somebody from CIPT. I'm not sure exactly who is going
24 to be sent, that can talk about the money in the cash drawer
25 and that kind of thing. I believe it's going to be

Page 27

1 Davenport, but I'm not sure if it's going to be him. And
2 there's a records custodian, I think, from somewhere.....
3   MR. JAMES: Is that Downs (ph) or Healy from CIPT?
4   MS. BRADY: Let's see. Oh, that was for the other -- I
5 said -- the clerk to talk about the tape for the misdemeanor
6 case.
7   MR. JAMES: You're over my head. I lost you on that
8 one. I know of -- I know of the misdemeanor trial.....
9   MS. BRADY: A different case.
10   MR. JAMES: Oh, okay.
11   MS. BRADY: Right.
12   MR. JAMES: All right. We're having -- the plan is,
13 Judge, and I don't -- is that after we concluded the felony
14 case, there is this trailing misdemeanor case, and were just
15 going to roll right into that one.
16   THE CLERK: A new jury?
17   MR. JAMES: No.
18   THE CLERK: Same jury?
19   MR. JAMES: Same jury, just -- just keep rolling.
20   THE COURT: Put it all on at once or.....
21   MR. JAMES: I'd rather not put it all on at once,
22 because they're -- they're separate issues, I mean, it has
23 to do with whether or not.....
24   THE COURT: If we're going to do the same jury,
25 we'll.....

Page 28

1   MR. JAMES: Why not put it all on.....
2   THE COURT: Why not put it all on at once, but tell
3 them that -- but do whatever cautionary instructions are
4 necessary?
5   MR. JAMES: I'd really prefer not to -- they're two
6 different issues and I -- I'm not sure whether you're
7 totally up on.....
8   THE COURT: I'm not on that.....
9   MR. JAMES: Oh, okay. What happened, the
10 allegation.....
11   THE COURT: It was a failure to appear charge, right?
12   MR. JAMES: No, it's violation of third-party.
13   THE COURT: I mean, violation of release?
14   MR. JAMES: Third-party is what it is.
15   THE COURT: Okay. And you would like to try that with
16 the same jury, but not tell them that you're going to try
17 that with them until after we finish the felony charges?
18   MR. JAMES: Yes, sir. Well, Ms. Brady and I talked
19 about it, and that was her suggestion, it takes.....
20   THE COURT: Are you willing to do that?
21   MR. JAMES: .....logical -- she's the suggestor, I'm
22 willing to go along.
23   THE COURT: Are you willing -- is that what you want to
24 do, Ms. Brady?
25   MS. BRADY: Yes, Your Honor.

Page 29

1    THE COURT: Is that what you want to do Mr. James?

2    MR. JAMES: Yes, I've talked to Mr. Robert Davis, and

3 you understand what we're going to do and you have no

4 problem with that?

5    THE COURT: And......

6    MR. JAMES: No.

7    THE COURT: .....Mr. James, would you contemplate

8 telling the jury what we were going to do before we did it?

9    MR. JAMES: No.

10    THE COURT: Ms. Brady?

11    MS. BRADY: I think we could tell them a period of time

12 that would encompass that going on, but we don't necessary

13 need to tell them there are more charges coming or anything

14 like that. We could just tell them that......

15    THE COURT: What happens if one of our jurors has to --

16 had a close friend who's been charged with failure to appear

17 and doesn't think he or she could be fair, or failure --

18 violation of bail conditions or otherwise has some issue

19 related to the second charges? That -- that means that we

20 would lose -- I can't imagine what would happen, but

21 what.....

22    MS. BRADY: Well, for misdemeanor, we only need six

23 jurors, so we could -- in the event -- in the unlikely event

24 that we lost a juror from our felony people that were left,

25 the 12 people, we could then randomly select six jurors of

Page 30

1 the people who had already deliberated, and seat them in the

2 box for a misdemeanor trial.

3    THE COURT: All right. Mr. James?

4    MS. BRADY: That would by my suggestion.

5    MR. JAMES: We can do that.

6    THE COURT: And you all agree that whatever jury

7 selection you do leading up to picking the jury for the

8 felony case will be adequate for picking a jury for the

9 misdemeanor case?

10    MR. JAMES: Yes, sir. I see no reason that it

11 shouldn't be, given the fact we've got 14 and we're going

12 down to seven as a rule, you know, usually there's one extra

13 for a misdemeanor.....

14    THE COURT: All right. And do you agree on how to go

15 down from 12 to seven?

16    MR. JAMES: Not a problem. Randomly.

17    THE COURT: Random?

18    MR. JAMES: If we don't have a good jury for a felony,

19 it's -- you know what I mean, we hope that we've got.....

20    THE COURT: All right.

21    MR. JAMES: I mean, I'm just not being factitious, I'm

22 just saying.....

23    MS. BRADY: I agree with that.

24    THE COURT: All right.

25    MR. JAMES: You know, that I think.....

Page 31

1    THE COURT: I'm just -- I want to make sure that --

2 that there isn't a disagreement about this method later,

3 which -- which -- so I'd like to get -- make sure we have it

4 all resolved now.

5    MR. JAMES: No, I understood it perfectly. And I just

6 think that.....

7    THE COURT: But even this whole ball of wax is going to

8 take the same amount of time you guessed earlier, is that

9 right?

10    MR. JAMES: Yeah, I don't think we're going to be done

11 until next week, Judge.....

12    MS. BRADY: My -- my initial case, the initial felony

13 case is one day of jury selection and approximately two days

14 of trial. Then I think that we'll need one day after for

15 the misdemeanor case, once the felony case is resolved. I

16 think we can do that in one day, including deliberation and

17 everything.

18    THE COURT: And may I tell -- do you agree with all

19 that?

20    MR. JAMES: Yeah.

21    THE COURT: And may I tell them that they're going to

22 consider two cases.....

23    MR. JAMES: No.

24    THE COURT: .....one after the other?

25    MR. JAMES: I would prefer you didn't.

Page 32

1    THE COURT: Let me you why, from a trial judge's

2 perspective, I think it might be important. If they think

3 they're finished after they deliberate on the first charge

4 and return a verdict and we tell them they have to stay for

5 another day, we may have some problems with them, either in

6 terms of them feeling that they haven't been given adequate

7 information, or in terms of them actually making

8 arrangements to do something else. But more -- well, both

9 of those are important, and equally important.

10    MR. JAMES: But my problem with that is that if we tell

11 them that, okay, once you get done with this, then we're

12 going to -- we're going to make you do another one, the same

13 people, then that -- I think that there's a tendency to --

14 of tainting their analysis on the first case.

15    If we tell them that the realities are that you're not

16 going to get out of here for two weeks, we hope we can get

17 out earlier, but the reality is if you plan on two weeks,

18 I'm talking about the week of next week and then into the

19 week thereafter, that they're looking at eight -- eight

20 days, potentially eight days of trial, then if they get out

21 earlier, hallelujah. And I understand what your thinking

22 is, is okay.....

23    THE COURT: What if I.....

24    MR. JAMES: .....well, let's get this done.

25    THE COURT: .....tell them that they make a divided

Page 33

Page 34

1 decision in this case, so they're going to be sent to
2 deliberate twice, without telling them why they have to make
3 a divided decision, or without telling them that they're
4 dealing with two cases?
5    MR. JAMES: I would really just as soon not tell them
6 anything, but, of course, it's -- I think the court's.....
7    THE COURT: I'm not -- Mr. James, I'm just.....
8    MR. JAMES: No, I know, you're thinking out loud.....
9    THE COURT: .....I'm -- as we sit here, I'm not
10 inclined to -- to spring a surprise on these people.
11    MR. JAMES: No, I understand, you're thinking out loud,
12 and saying.....
13    THE COURT: Yeah.
14    MR. JAMES: .....no, they need to have some kind of a
15 warning. I think we can live with a divided case. They're
16 going to wonder what's going on, but at least they'll have a
17 little notice that once they finish with this, they may not
18 be done, and they may be done.
19    THE COURT: Ms. Brady?
20    MS. BRADY: I'm willing to do with whatever the defense
21 is willing to do in this case, Your Honor.
22    THE COURT: Okay.
23    MR. JAMES: How about a dismissal?
24    THE COURT: At a minium, Mr. James, aside from you all
25 -- what you all agree, I feel like I have an obligation to

Page 35

1 tell the jurors that they're going to be making a divided
2 decision, so they'll be sent to the jury room twice. They
3 won't be finished after the first decision, and that will --
4 but I'm not -- but I won't -- I won't tell them that there
5 are two separate cases.
6    MR. JAMES: I think we can live with that, Your Honor.
7 I think it's fair to the jury for them to have at least a
8 head's up that something has happened.
9    THE COURT: All right.
10    MR. JAMES: While we're still here, it's our intent,
11 when Mr. Jeremy [sic] takes the stand, based upon the
12 release of the records the court supplied us, and also
13 subsequent contacts, we're going to impeachment on Mr. Fish,
14 so -- and I'm sure the state is well aware of that we're --
15 we're going in that direction.
16    MS. BRADY: Well then, Your Honor, my application at
17 this time would be that there's a specific rule, 404, that
18 requires prior application to the court anytime anybody is
19 going to be using a prior bad act of a witness, and I would
20 just ask that the court holds the defense to that prior
21 application requirement, and that they not be allowed to ask
22 the witness about anything they haven't previously made an
23 application and been approved by the court to do.
24    MR. JAMES: All right. Well, we can -- without --
25 Monday after jury selection then, we'll make our

Page 36

1 applications then.....
2    THE COURT: Well.....
3    MR. JAMES: .....I think, is that fair to the court?
4    THE COURT: .....you can do that, but there -- but I
5 would prefer you do it two steps, I want you to give notice
6 to the state of what you intend to do, if -- if it's obvious
7 that what you intend to do is appropriate, then I don't -- I
8 don't have -- you don't have to file a motion. You just
9 have to have an agreement. And, Ms. Brady, just -- just
10 because the rule requires prior application to the court, if
11 you consider what the defense intends to do and determine
12 that it's obvious that I'm going to let him do it, then --
13 then you all just reach an agreement and it's done.
14    MS. BRADY: Right, and I won't be acting in bad faith
15 or trying to.....
16    THE COURT: No. But I'm just saying.....
17    MS. BRADY: .....continue.....
18    THE COURT: .......do it that way, rather than.....
19    MS. BRADY: Right.
20    THE COURT: .....than motion practice to the court. A
21 two-step process. If there's disagreement, then that's what
22 I'm here for.
23    MS. BRADY: Right. And I'm not saying it can't even be
24 oral. I just wanted -- I just want to know where we're
25 going.....

Page 37

1    THE COURT: All right.
2    MS. BRADY: .....since I'm entitled to know.
3    THE COURT: All right. So anything else?
4    MR. JAMES: Well, I can tell her where we're going on
5 the record right now, or afterwards. Whatever -- I know
6 you've got.....
7    THE COURT: You can.....
8    MR. JAMES: .....other things going on.
9    THE COURT: You can do it off record.
10    MR. JAMES: All right. Thank you, Judge.
11    THE COURT: So when I call in the jurors on Tuesday
12 morning, we'll be ready right off the bat to start picking a
13 jury?
14    MR. JAMES: As far as.....
15    THE COURT: We may get a jury before the end of the
16 morning, so at least Ms. Brady, you should -- it's not clear
17 to me that we'll get a jury in time for both of you to make
18 opening statements, but, Ms. Brady, you might want to at
19 least think about being ready to make your opening
20 statement.
21    MS. BRADY: I'm using -- I anticipate using Power Point
22 at this point, Your Honor, which takes a while to set up, so
23 I'll be ready to do my opening, but I wasn't anticipating
24 having witnesses available to be called.
25    THE COURT: I don't think we'll get -- unless something

**3AN-01-1717 CR**

1 really amazing happens, I don't think we'll get our jury --
2 get your opening and get witnesses done, so even if it does,
3 we'll just -- we'll call it a day after opening, assuming we
4 can get opening it.
5    MS. BRADY: Okay.
6    THE COURT: All right.
7    MR. JAMES: What is this Power Point?
8    MS. BRADY: It's a computer program.
9    MR. JAMES: I know that much. I mean, I'm not being
10 factitious, but what.....
11    THE COURT: Well, I'll see you.....
12    MR. JAMES: I've never seen it.
13    THE COURT: You all can talk.....
14    MR. JAMES: We'll talk it out.
15    THE COURT: 8:30 Tuesday morning. Please be.....
16    MR. JAMES: 8:30 Tuesday morning.
17    THE COURT: .....be ready to go then.
18    MR. JAMES: All right. Thank you, Your Honor.
19    THE COURT: Thank you.
20    MR. JAMES: Appreciate your time.
21    THE CLERK: Please rise. The court is in recess. Off
22 record.
23    (Off record)
24 1:17:43
25

Page 38

3AN-01-1717 CR

1    TRIAL BY JURY (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 13, 2001
8:30 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
Assistant District Attorney
310 K Street
Anchorage, Alaska

FOR THE DEFENDANT:    DANIEL L. LOWERY
Assistant Public Defender
900 West Fifth Avenue
Anchorage, Alaska

Page 39

---

1 that he continues to use illicit drugs.
2    THE COURT: All right.
3    MR. JAMES: And I think it's relevant.
4    THE COURT: And you're filing a motion for me to make a
5 witness take a urinalysis?
6    MR. JAMES: Yes, Your Honor.
7    THE COURT: What's the basis for it?
8    MR. JAMES: Your Honor, it's our information, and
9 it.....
10    THE COURT: What's the legal basis for it?
11    MR. JAMES: Well, I think it goes to the credibility,
12 and if the individual is under the influence of any type of
13 drugs, it goes to his ability to testify truthfully.
14    THE COURT: Would I have the authority in a -- in any
15 case then if I thought a witness was taking some substance
16 that might effect their ability to observe, to simply order
17 them to comply with the invasive procedure of giving a
18 urinalysis? Is that right? I'm curious about my legal
19 authority to do that.
20    MR. JAMES: Well, Your Honor, this -- it's just -- is a
21 threshold issue. I think if the court has inherent
22 authority to ensure that every witness testifies truthfully.
23 The court may want to consider that or give me an
24 opportunity while we're picking the jury here. I don't
25 think we're going to go any farther today, but.....

Page 41

---

1    P R O C E E D I N G S
2 3AN-42-1659
3 8:29:57
4    (Jury not present)
5    THE COURT: We're on record in state verus Robert Davis
6 at the time set for trial. Ms. Brady, are you ready for
7 trial?
8    MS. BRADY: Yes, Your Honor.
9    THE COURT: Mr. James, ready?
10    MR. JAMES: Yes, sir.
11    THE COURT: Any other issues we need to take up, or can
12 we get our jury?
13    MS. BRADY: Just briefly, Your Honor. We had discussed
14 doing openings today. Mr. James and I discussed the 404(b)
15 stuff. I'd like to have that cleared up before we do
16 openings. So what my request would be is to pick a jury. I
17 think it's going to take us about a half an hour to hammer
18 out what exactly is allowed in and what is not allowed in.
19 I can't -- I'm objecting to some of what he's requesting.
20    THE COURT: All right. Well, we'll see how we do.
21 Mr. James, do you have any issues?
22    MR. JAMES: I've mentioned to Ms. Brady that -- on
23 Friday, that I was going to ask the court to compel Mr. Fish
24 to take a urinalysis. And I don't know whether the court is
25 prepared to rule on that. I -- we have reason to believe

Page 40

---

1    THE COURT: All right.
2    MR. JAMES: .....than the jury.
3    THE COURT: All right. I'm not going to hear argument.
4 You're going to have to show me something that gives me,
5 Mr......
6    MR. JAMES: I understand.
7    THE COURT: .....James, because my inclination is is
8 that although you may have the right to cross examine the
9 witness about things which effect his ability to perceive
10 and recall, I, likely, don't have the legal authority to
11 order that kind of invasive procedure for a witness. So I'm
12 open to be educated on it, but my inclination is is that I
13 don't have the authority to do that, even if -- even if I
14 had strong evidence that suggested some kind of drug use.
15    MR. JAMES: I understand, Your Honor, just -- we've got
16 to ask.
17    THE COURT: I understand. Anything else?
18    MR. JAMES: Not at this time, sir.
19    THE COURT: All right. Lawyers.....
20    MR. JAMES: Do we have a list of the jurors?
21    THE COURT: It will be coming up with the jurors.
22    MR. JAMES: Oh.....
23    THE COURT: Lawyers, we -- and, Mr. Davis, we start at
24 8:30. Rolling in at 25 till and saying I'm ready isn't --
25 doesn't cut it. We start at 8:30, which means that you need

Page 42

---

1 to be here ready to go.  Mr. James, you were here ready to
2 go, but -- but, it's kind of like this just kind of a
3 relaxed procedure, we'll get started when everybody is
4 ready, and that's not the way it works.  We start at 8:30 on
5 the nose.  I'm going to tell the jury to be here ready to go
6 at 8:30 and I'm going to expect the lawyers and Mr. Davis to
7 be here ready to go at 8:30.  Which means if you have to be
8 here a little early so you can be ready to go, then you have
9 to be here a little early.
10    MR. JAMES:  Judge, before we go off the record, or it
11 doesn't matter whether we're on record, Mr. Davis' mother
12 and his third-party, Mr. Davenport are present here.  And I
13 don't know -- I assume we're going to have a full galley.
14 Is there any particular place you would -- is it okay if
15 they stay right there where they are?
16    THE COURT:  I have no problem with them sitting in a
17 jury box.  This is an open proceeding.
18    MR. JAMES:  I understand.  I understand.
19    THE COURT:  Anybody associated with the case, I'm going
20 to tell the jury not to have any contact with anybody that
21 they see associated with the case, and you might want to
22 talk with your -- with people associated with your case
23 about what they can and can't do in terms of talking to the
24 jury.  But other than that, that's -- they're welcome to sit
25 wherever they want.

Page 43

1    MR. JAMES:  Okay.  And also we would invoke the
2 exclusionary rule during the trial.
3    THE COURT:  Well -- all right.  I'll rely on the
4 lawyers to -- to implement that.
5    MR. JAMES:  And I would explain to the people -- I will
6 explain to my own people.
7    THE COURT:  All right.  Let's get the jury.
8    (Off record)
9 8:34:54
10    (This portion not requested)
11 12:49:26
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 44

TRIAL BY JURY, CONTINUED (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 14, 2001
10:01 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
                      Assistant District Attorney
                      310 K Street
                      Anchorage, Alaska

FOR THE DEFENDANT:    DANIEL L. LOWERY
                      Assistant Public Defender
                      900 West Fifth Avenue
                      Anchorage, Alaska

Page 45

---

**PROCEEDINGS**

42-1649
10:01:42

THE COURT: .....not going to happen.

MR. JAMES: I can't see it causing it at this time, Judge. And I'm -- you know, things -- it depends on what they say, I mean that's.....

THE COURT: All right.

MR. JAMES: I mean, that's.....

MS. BRADY: And I don't know what they say, so.....

THE COURT: All right. So let's get the jury back in, let's send Officer Johnstone off to get what you need.

MS. BRADY: Okay. Now -- and just while we're on the record, the report that you're requesting are mentioned in the theft.....

MR. JAMES: Okay. Let me just go through and -- right down your line here. Okay. There's -- we've got the weapons banishment one on 9/12, mentioned in the theft; on 9/2, suspect with theft -- a threat; 8/30 mentioned burglary; 7/26 suspect vehicle tampering; 4/14 suspect burglary, that's the same one, I believe, yeah. And the others are -- oh, on suspect forgery on 3/29. And these others, I believe, are all juvies.

THE COURT: All right. Well, Officer Johnstone is going to get the report. We'll call in our jury. We'll

Page 46

---

1 continue taking evidence. We'll take a break if we have to
2 and deal with these other issues again later this morning.
3 I have a -- if you want, I have typed jury maps for you, so
4 you know who is sitting where. And are we -- we've got the
5 jury?
6     THE CLERK: We're still on record.
7     MS. BRADY: I'm going to go out and call my first
8 witness.
9     THE COURT: All right. (Pause) All right. The jury
10 is back in, everybody have a seat, please. Thanks for your
11 patience. Just a little word about courtroom etiquette,
12 when you all come in, we stand, because you are the most
13 important people here, so when you come in, go ahead and sit
14 down, and we'll sit down after you do. That's the way we do
15 that. Swear this witness in.
16     THE CLERK: Please raise your right hand.
17     (Oath administered)
18     MS. BUSHUE: Yes, I do.
19           KATHLEEN BUSHUE
20 called as a witness on behalf of the plaintiff, testified as
21 follows on:
22           DIRECT EXAMINATION
23     THE CLERK: Please be seated. Ma'am, for the record,
24 will you state your full name and spell your last?
25 A Kathleen Bushue, B-u-s-h-u-e.

Page 47

---

1     THE CLERK: B-u-s-h.....
2 A .....u-e.
3     THE CLERK: Thank you.
4     THE COURT: Go ahead, Ms. Brady.
5 BY MS. BRADY:
6 Q Good morning, Officer Bushue.
7 A Good morning.
8 Q How long have you been an APD officer?
9 A Seven years.
10 Q Okay. And have you had any training or experience in
11    the detection and identification of crimes involving
12    controlled substances?
13 A Yes, I have.
14 Q Could you just describe what that was for the members
15    of the jury?
16 A I had your basic training in the police academy, your
17    basic drug classes on detection, identification of
18    drugs. And I had spent eight months assigned TDY to
19    the metro drug unit, specifically working informants
20    and drug cases. I have seven years experience as a
21    patrol officer on the street. I'm currently a sergeant
22    with the Anchorage Police Department. And I also spent
23    a little more than a year in the special assignment
24    unit targeting street-level drug crimes.
25 Q All right. Now, you mentioned the special assignment

Page 48

1    unit; what is that?
2  A  It's a small unit consisting of -- depending on our
3    manning from six to seven officers that work in plain
4    clothes, drive unmarked vehicles.  We work -- we target
5    street-level crimes, which include prostitution and
6    drug cases.
7  Q  Okay.  And were you assigned to a particular unit when
8    -- during the investigation of this case?
9  A  Yes, I was.  I was assigned to the special assignment
10    unit.
11  Q  Okay.  And how did you become involved in this case?
12  A  I became involved in this case as just another one of
13    the officers in the unit.  I working surveillance for
14    this particular case.  Each officer developed cases,
15    developed informants and whoever was case officer for
16    that particular person, the rest of the unit would act
17    in support capacity for that -- for that particular
18    operation.  In this particular operation, I usually was
19    involved with surveillance.
20  Q  All right.  And let me direct your attention to
21    February 8th, 2001.  With regard to that particular
22    day, did you have -- what was your assignment?
23  A  My assignment on that particular day was surveillance
24    before, during, and after an under-cover drug buy using
25    an informant.

Page 49

1  Q  Were you with anyone?
2  A  Yes.  I was with Officer Chris Simms.
3  Q  Okay.  And what happened -- just explain what you did
4    from the very beginning.
5  A  What I did, we would have a briefing in our office, and
6    we would go over what was to happen during the buy.
7    Officer Simms and I were assigned to surveillance, so
8    we parked north of the location where the buy was to
9    occur at 2002 Grand Larry, and our job was to sit
10    there, watch the informant drive in, watch him park,
11    and stay there during the whole buy, watch him drive
12    away until he was picked up by another officer, and
13    follow him back to the station.  That occurred -- do
14    you want me to go into the details of that?
15  Q  Please.
16  A  We arrived just north of the location, and we parked on
17    Peck Street.  The buy was to occur at 202 Grand Larry.
18    We arrived there at 2206 hours, surveillance advised
19    that the informant, P0106, was in the area at 2207.
20    They then advised that he, P0106, was coming out of the
21    residence.  Officer Simms and I then followed him and
22    Officer Johnstone back to the police station.  Once
23    there, Officer Johnstone handed me a small Baggie of
24    suspected powder cocaine, and I tested the cocaine and
25    put into property and evidence.

Page 50

1  Q  Okay.  Now you say you tested the cocaine, let me just
2    back you up for a couple of minutes.
3  A  Okay.
4  Q  P0106, who is that?
5  A  Jeremy Fish.
6  Q  Okay.  And could you explain why you're using a number?
7  A  We use a number to protect the -- the informant's
8    identity throughout all the police reports.  We do that
9    for a number of reasons.  We do that to protect any
10    retaliation against him.  We do that from anybody else
11    reading these reports so they wouldn't have any idea
12    who it is.  And we protect his identity throughout the
13    entire investigation.  And so he is always assigned a
14    number.  He is always referred to as a number.  In
15    police reports, you say he/she, so people don't even
16    know his identity if they were to -- if records clerks
17    or anybody would read that report, they wouldn't know
18    who it was.
19  Q  All right.  Now you say that you tested the cocaine,
20    what kind of test did you use?
21  A  A Scott (ph) reagent test type G.....
22  Q  Okay.
23  A  .....for cocaine.
24  Q  Could you just explain to the members, it's called a
25    field test, is that right?

Page 51

1  A  Correct.  It's called the field test.  It's a little
2    kit that we carry in our -- in our property and
3    evidence kits, our search kits.  And it's just a small
4    little kit, and you just put a very small amount of
5    cocaine in it and pop three different vials, and it
6    will give you a positive or negative for cocaine.
7  Q  All right.  Now, when you -- when something like drugs
8    is seized, what do you do with it?
9  A  We take a small amount of it and field test it, and be
10    it positive or negative, it is then -- the drugs are
11    then sealed in a property and evidence envelope with
12    two officers present.  It is taped, evidence taped, and
13    is placed into our property and evidence.  And that's
14    the last contact that we have with it.
15  Q  With regard to this particular cocaine, did it field
16    test positive?
17  A  Yes, it did.
18  Q  Okay.  Let me just approach you with two items, and
19    they'll be starting with state's exhibit 1.  Do you
20    recognize what state's exhibit 1 is?
21  A  Yes, it is.  It's a Baggie of suspected powder cocaine.
22  Q  How do you know that that's what it is?
23  A  Because it says it on the envelope.  I submitted and
24    sealed it.  These are my initials.  Chris Simms
25    witnessed and verified it.

Page 52

Q  Is it dated?

A  Yes, it is.  It's dated 2/8/2001.

Q  Okay.  And is there -- now is there a number on that somewhere?

A  There's a number in the upper right-hand corner, and that's our tag number.  Each one of these envelopes is numbered, and that's the number that goes on our property and evidence form when it's put in.  It's a number unique to this envelope.

Q  Okay.  So is the number called anything?

A  It's called a tag number.

Q  Or a P and E number?

A  Or a P and E number.

Q  Okay.  And could you just explain to the members of the jury how P and E numbers work?

A  This particular number is tracked.  Once -- once you use this envelope and you take that number and you put it onto a P and E, or a property and evidence form, that -- this number is tracked on the property and evidence form.  It's also tracked when it's logged into property and evidence, and anytime anyone does anything with this envelope, removes it from property and evidence, they use that number to track it.

Q  Okay.  So -- and that -- you know that that is the cocaine that was given you to by Detective Johnstone?

Page 53

A  Yes.

MS. BRADY:  Okay.  At this time, I move to admit state's exhibit 1.

MR. JAMES:  May I look at it?

THE COURT:  Yes.  You can approach the witness and look at it.

MR. JAMES:  I'm sorry?

MS. BRADY:  I should have showed it to you.

(Whispered conversation)

THE COURT:  Exhibit number 1 is admitted.

(Plaintiff's exhibit 1 admitted)

Q  Okay.  And what is the P and E number for exhibit 1?

A  It is 503125.

Q  Okay.  Now let me direct your attention to February 20th, with regard to this case, did you have a particular assignment on that day?

A  I did, and again, it was surveillance.  Officer Simms and I were riding together, we arrived in the area of Peck and Grand Larry at 2205 hours on the 20th.  The informant, P0106, arrived a minute later and went inside the residence.  At 2210 hours, he advised he was -- surveillance advised he was coming out of the residence and he got back into his vehicle.  And at that point, we handed -- we went back to the police station and Officer LaPorte handed me the suspected

Page 54

cocaine, which I again field tested and got a positive result.

Q  Did you assign a P and E number to that cocaine?

A  I did.  And that was on the 20th.  And that one is 505551.

Q  Okay.  And how do you know that that P and E number, 505551 is the cocaine that you seized on February 20th?

A  This is my handwriting on this -- on the outside of this envelope.  It's dated on 2/20/01, and it has my initials that I submitted and sealed it, and my DSN.

MS. BRADY:  Okay.  At this time, I move to admit state's exhibit 2.

THE COURT:  Number 2?

MR. JAMES:  I've seen it.  Thank you.  No objection.

THE COURT:  Number 2 is admitted.

(Plaintiff's exhibit 2 admitted)

Q  Okay.  And let me direct your attention to February 21st, with regard to this case, did you have a particular assignment on that day?

A  I did.  I, again, was assigned to surveillance, and this time, I was -- I believe I was with Sergeant Stevens and I, and the buy on this day was to occur at Old Seward and International at the Chevron parking lot.  I arrived in the area at 2018 hours.  At 2021 hours, the informant arrived to meet with the suspect

Page 55

who was in a '97 green Suburban, Alaska license DSA914.  A few minutes later, the informant left the area and surveillance and I -- I was with Sergeant Stevens as the time, we followed the vehicle.  We followed it first to Juneau and 45th where it stopped.  The suspect met with someone for a few minutes, and then we followed the vehicle back to 202 Grand Larry where it stayed for a few minutes, and at that point, we broke off surveillance.

Q  Okay.  And why were you following the Suburban?

A  We were following the Suburban because that's what the suspect was in for this buy, and so we were following it to find out where it went after the buy.

Q  All right.  And let me direct your attention to February 28th, with regard to this particular case, did you have a particular assignment on that day as well?

A  I did.  I was assigned to close and cover during the buy, and I was assigned to run the wire recording, pursuant to a glass warrant.

Q  Okay.  And could you explain to the members of the jury what close and cover is for a start?

A  Close and cover is where I'm assigned to have what we call the eye.  I'm assigned to be -- usually, close and cover is there prior to the suspect and the informant arriving, and your assignment is to be as -- to be the

Page 56

**Page 57**

1  closest person to have the eye to let all the rest of
2  the surveillance know what is happening during the buy.
3 Q  Now you're also assigned to run the wire?
4 A  Correct.
5 Q  Could you explain to the members of the jury what
6  exactly that entails?
7 A  Running the wire is we receive a glass warrant to do a
8  recording of the conversation. The informant wears a
9  body wire that we put on the informant. We all have
10  bug radios so we can listen to the conversation,
11  anything the informant says, we can hear it, and we can
12  hear who the informant is talking to. I activate the
13  wire recording when the informant gets out of the car,
14  when the informant gets in the area, I start recording
15  at that point. You hear all the conversation that goes
16  on when the informant leaves the suspect, and I stop
17  the recording. And that was also my duty for this
18  particular buy.
19 Q  Where was the buy supposed to occur at?
20 A  The buy was supposed -- was supposed to occur at the
21  Pancake, and I can't remember the name of it, the
22  Pancake House, I think, is where it was supposed to
23  occur. Sergeant Stevens and I again, when -- when
24  you're going to run the wire recording, usually have
25  two people in the vehicle. We arrived in the area and

**Page 58**

1  we parked just to the north of the location. When they
2  pulled up a little bit after midnight, I saw the
3  informant pull into the parking lot of the Northern
4  China restaurant, which was just a little bit to the
5  south. This Pancake House is a little bit further
6  north, and this Northern China restaurant where they --
7  it actually occurred was still within our sight. We
8  could still see this whole thing happening from where
9  we were parked.
10     I saw the informant pull up behind a silver pickup
11  truck, and that plate was DVE 272. The informant got
12  out of his vehicle and walked up to the pickup truck.
13  I activated the recording at that time. At 0004 hours,
14  I saw the informant get out of the pickup truck and get
15  into the back of his vehicle, get back into his
16  vehicle. I turned off the tape recording at that time
17  and.....
18 Q  Now let me stop you right there.
19 A  Okay.
20 Q  Can -- does the informant have any control over when
21  you guys are tape recording what's going on?
22 A  No, the informant has no control, whatsoever. He --
23  the wire is placed on him, we can hear that the wire is
24  working before we ever get to the buy. He -- he can't
25  even take it off if he wanted to when the buy is

**Page 59**

1  happening. And we can hear any conversation, but he
2  doesn't have any control over whether we record it or
3  whether we hear it or not.
4 Q  What happened once the meeting was over?
5 A  Once the meeting was over, we had Office LeBlanc pull
6  into the parking lot, and he was in a marked patrol
7  vehicle. He activated his lights. We had also pulled
8  in right behind the suspect vehicle. And at that
9  point, they took the defendant Davis out of the vehicle
10  and he was arrested.
11 Q  Was anybody in the car with him?
12 A  I recall -- I don't have it in my report here, but I
13  recall there was someone else in the car. I think
14  there was someone in the right passenger seat.
15 Q  And you don't know who that was?
16 A  I don't.
17 Q  Okay. And did you have anything else to do with this
18  case?
19 A  No.
20 Q  Okay. Now did you subsequently run into Mr. Fish
21  again?
22 A  Yes, I did.
23 Q  And did you have a contact with him where you found
24  marijuana in his car?
25 A  Yes.

**Page 60**

1 Q  What was the date of that?
2 A  The date of that was July 13th, 2001.
3 Q  And about how much marijuana did you find in his car?
4 A  Well, it was a small baggie of marijuana, and actually,
5  Officer Daily took it and put it into evidence, and I
6  don't have it here. It was -- it was one small baggie.
7 Q  Okay. And what did you do as a result of finding him
8  with marijuana?
9 A  We arrested him.....
10 Q  Okay. Now when.....
11 A  .....for the possession of marijuana, and we -- what we
12  typically do with marijuana possession is it's called a
13  site release. They're basically arrested and released
14  with a court date, a 30-day court date.
15 Q  Okay. So in layman's terms, you gave him a ticket?
16 A  Correct.
17     MS. BRADY: Okay. That's all the questions I have for
18 this witness.
19     THE COURT: Mr. James?
20     MR. JAMES: Thank you.
21         KATHLEEN BUSHUE
22 testified as follows on:
23     CROSS EXAMINATION
24 BY MR. JAMES:
25 Q  Do you know Jeremy Fish?

Page 61

1 A  Yes, I do. I know him after -- I -- actually, the
2  first time I met him was when he was working as an
3  informant.
4 Q  When did you first meet Jeremy Fish?
5 A  I probably met him -- we started this case in February,
6  I would guess I met him a couple of days prior to the
7  start of the case.
8 Q  And what were the circumstances that you met him?
9 A  I was -- sat in on his original debrief.
10 Q  Okay. And when was that?
11 A  Probably a couple of days before we started the case,
12  so I couldn't tell you the exact date.
13 Q  You don't keep police reports on that?
14 A  No.
15 Q  So the case started on the 8th, so you started the
16  debrief on the 6th, would that be correct?
17 A  I couldn't tell you when the debrief was, I didn't -- I
18  did write it down, I don't know. And I wasn't the case
19  officer for this case. I just sat in on the original
20  debrief.
21 Q  Okay. Where was the original debrief at?
22 A  At the police station.
23 Q  Okay. How did you originate contact with Jeremy Fish?
24 A  I didn't originate contact with him. One of the other
25  detectives said they had an informant they were going

Page 62

1  to debrief, and asked me if I wanted to sit in on it.
2 Q  And who was that, please?
3 A  That was Detective Pam Pernue (ph).
4 Q  Payne [sic] Pernue (ph)?
5 A  Pam Pernue (ph).
6 Q  Pam Pernue (ph)? And Detective Pam Pernue (ph), the
7  reason I'm pronouncing her name is she's new to us in
8  this case, but tell me what happened then. Well, first
9  off, who is Pam Pernue (ph)? I mean, you said she's a
10  detective?
11 A  She's a detective in the metro drug unit.
12 Q  Okay. Metro, all right. That's different than --
13 A  That's different --
14 Q  -- special forces, or.....
15 A  A special assignment unit.
16 Q  A special.....
17 A  Correct.
18 Q  .....assignment. Okay. And that -- just so everybody
19  knows, metro is a combination AST, APD, it stands for
20  metropolitan drug something or other, correct?
21 A  Right. But actually, metro is strictly an APD unit.
22 Q  Oh, okay. You guys have taken over, all right, fine.
23  I'm not trying to cut you off, but historically, it
24  was, but -- tell me about Pam Pernue (ph), how did you
25  get contact with Jeremy Fish two days before the buy

Page 63

1 Q  that you just testified earlier that was on the 8th,
2  but I want to start your contact was, please.
3 A  And I don't remember whether it was two days or a week
4  before the buy, but Detective Pernue (ph) had an
5  informant that she was going to debrief. She had
6  another officer that was with her in training. She
7  asked me if I wanted to sit in on the debrief. I said,
8  sure.
9 Q  Who was the other in training?
10 A  I believe she had Officer Herrad (ph) with her.
11 Q  So did you keep any notes of the debrief?
12 A  I did not.
13 Q  And based upon your testimony on direct, the contacts,
14  at least in the police reports indicate the activity
15  started on the 8th of February, correct?
16 A  Correct.
17 Q  Okay. But that's incorrect, because the activity
18  started a couple of days before now, isn't that
19  correct?
20 A  The debrief did, yes, that's correct.
21 Q  All right.
22 A  There's -- it's standard to debrief an informant prior
23  to having the informant work for you. You sit down and
24  you talk about who they can buy from, and whether
25  you're going to use them as an informant.

Page 64

1 Q  Okay. So -- but in the police reports, there's nothing
2  mentioned of that?
3 A  In mine there isn't. I'm sure in somebody's there is.
4 Q  Okay. Who would that somebody be, based upon.....
5 A  Probably the case officer.
6 Q  And that would be?
7 A  I believe it's Johnstone, is it? I'm not sure who the
8  case officer is.
9 Q  You.....
10 A  It's either Johnstone or LaPorte, I would guess.
11 Q  Okay. All right. Now, to your knowledge, how did this
12  confidential information come into the possession of
13  APD?
14 A  I don't know.
15 Q  You don't know?
16 A  I don't know.
17 Q  You know nothing about Nome?
18 A  I don't know the circumstances about how he became an
19  informant, no, I don't.
20 Q  What was the deal?
21 A  What was what deal?
22 Q  Did you make a deal -- did APD make a deal with Jeremy
23  Fish relating to him providing alleged buy
24  opportunities?
25 A  I didn't make any deal with Jeremy Fish, so I can't