**Page 65**

1     answer that.
2 Q   Do you have any knowledge of any deal of Jeremy Fish?
3 A   No.
4 Q   Zero?
5 A   No.
6 Q   Okay. Do you know an Officer Cross?
7 A   Jim Cross? There's -- we've had a Ken Cross, and we've
8     got a James Cross.
9 Q   I'll have to get you the -- the number. DSN 1397?
10 A   I don't know what their DSN's are. I would guess
11     that's James Cross, but I -- I don't know.
12 Q   Calling your attention to September 4th, 2001, did you
13     have any contact with Jeremy Fish in the area of Medfra
14     and Mountain View? I believe Medfra, Medfra?
15 A   I don't believe so, no, not that I -- I can recall.
16 Q   Based upon your seven years experience, if you would
17     have someone that you find with cocaine in their
18     possession, what would you do?
19 A   Cocaine in their possession?
20 Q   Uh-huh. (Affirmative)
21 A   They would be arrested.
22 Q   All right. Now behind you is an easel.....
23 A   Uh-huh. (Affirmative)
24 Q   .....and would you please diagram, to the best of your
25     ability, and no one -- no one expects you to be an

**Page 66**

1     artist, but the area of Grand Larry and where you were
2     staked out on the 8th?
3 A   This is Muldoon running north and south. This is Peck.
4     And this is Grand Larry. I recall that we were parked
5     over here, and the target residence was right in here.
6 Q   Is there a driveway into the -- into the residence?
7     What is the residence address?
8 A   202.
9 Q   Okay. Is there a driveway into 202, in other words,
10     off-street parking?
11 A   I believe there is.
12 Q   Would you please indicate that? Okay. How far does
13     that go in?
14 A   I -- I couldn't tell you.
15 Q   All right. Is it -- is there a garage or carport, or
16     is it just a drive -- perhaps paved or driveway type of
17     parking area, off-street.....
18 A   I don't recall. I couldn't even tell you what the
19     front of the house looked -- the front of the residence
20     looks like.
21 Q   I'm sorry?
22 A   I couldn't tell you, I don't recall what it looks like.
23 Q   You have no idea if it's a flat roof, peaked.....
24 A   No.
25 Q   .....the color of it?

**Page 67**

1 A   No. I couldn't tell you.
2 Q   All right. And how many times were you over there?
3 A   I think I was over there two times, or maybe three
4     times.
5 Q   Okay. And you indicated there's a box up by the north
6     side, by peck there?
7 A   There's a what?
8 Q   A box on your diagram.
9 A   No, this is a vehicle.
10 Q   Okay.
11 A   This is what I was sitting in.
12 Q   Oh, okay.
13 A   This is a surveillance vehicle.
14 Q   I just.....
15 A   And that's -- that's where I was.
16 Q   Okay. And you're pointed towards.....
17 A   The west.
18 Q   The west? All right.
19 A   I wasn't actually looking at the house. My job wasn't
20     to look at the house. It was to follow the informant
21     once he left the house, or see him turn into the street
22     of Grand Larry.
23 Q   You're pointed west?
24 A   Correct. North, south, west and east.
25 Q   Okay. Indicate west to the left then of you?

**Page 68**

1 A   This is west.
2 Q   Okay. All right. That's fine. I'm just -- now, what
3     -- you arrived there at a specific time?
4 A   Correct.
5 Q   And that time was what, please?
6 A   On which date are you talking about?
7 Q   I'm talking about the 8th, I'm sorry.
8 A   On the 8th at 2206 hours.
9 Q   Okay. When did Mr. Fish arrive there?
10 A   2207 hours.
11 Q   Okay. So you were not following him then, is that
12     correct, you had.....
13 A   No, I was not following him.
14 Q   All right. And how long was he in the house?
15 A   He was -- surveillance advised that he was coming out
16     at 2216, so he was in the area at 2207, and he was
17     coming out of the residence at 2216.
18 Q   So he was in there for -- is it 2207 or 2007? 2207.
19 A   2207.
20 Q   I'm sorry. Okay. So we've got about 10 minutes?
21 A   Uh-huh. (Affirmative)
22 Q   All right. How many -- do you know how many entrances
23     there are to that house?
24 A   No, I wasn't looking at the house, so I couldn't tell
25     you.

1 Q  You weren't looking at the house on the 8th?
2 A  No.
3 Q  What were you looking at as you were parked?
4 A  I was -- I was to pick up the informant as he came out
5    of here and follow him back.
6 Q  So you don't know what, if anything, happened in the
7    vicinity of the house, you were just waiting for him
8    to.....
9 A  Correct.
10 Q  .....come out that.....
11 A  Correct.
12 Q  .....Grand Larry and then proceed?
13 A  Uh-huh.  (Affirmative)
14 Q  Okay.  All right.  Now, you were a participant in the
15    debriefing, or were you not a participant?
16 A  I was not a participant in the.....
17 Q  Okay.  So you don't know what Mr. Fish told the police
18    officers?
19 A  No.
20 Q  Okay.  Were you a participant in the pre-briefing, if
21    there is such a word as pre-briefing or.....
22 A  No.
23 Q  No?  All right.  When you left -- excuse me.  When you
24    observed Mr. Fish leave the vehicle, depart the area at
25    2216, how did you know it was Mr. Fish leaving?

Page 69

1 A  I know -- I don't -- I couldn't swear to it until I got
2    back to the station.
3 Q  Okay.
4 A  But it -- whoever was leaving, was driving his car, and
5    then when I got back to the station, he was behind the
6    wheel of the car.
7 Q  How did you know it was his car?
8 A  Because we had been briefed on what he was driving, and
9    I actually went out and looked at his car prior to us
10    going on the buy.
11 Q  Okay.  But you didn't have any contact with Jeremy
12    Fish, you just went out and looked at the car before
13    the buy?
14 A  Correct.
15 Q  Okay.  All right.  And then you became the evidence
16    custodian, is that correct?
17 A  For the cocaine, correct.
18 Q  For the cocaine, all right.
19    MR. JAMES:  If I may approach, Your Honor?
20 Q  And that's exhibit 1, correct?
21 A  Correct.
22 Q  Okay.  And was -- it indicates a baggie of suspected
23    powder cocaine, is that -- am I reading that correct?
24 A  Uh-huh.  (Affirmative)
25 Q  You said it's a baggie?  There's a baggie in there.....

Page 70

1 A  Correct.
2 Q  .....which we would know as a sandwich baggie or
3    something like that?
4 A  Correct.
5 Q  Okay.  Did you have that printed?
6 A  We put in a request to have it printed, yes.
7 Q  And what was the result of that?
8 A  I don't know.  I can't tell you.
9 Q  Okay.  And what you fill out on the front of that sheet
10    is -- is correct to the best of your knowledge, based
11    on your seven year's experience as a police officer,
12    right?
13 A  On the front of what sheet?
14 Q  The.....
15 A  Property and evidence?
16 Q  .....exhibit 1.  The evidence.
17 A  Yes.
18    MR. JAMES:  If I may approach?
19 Q  I'm not trying to.....
20 A  No, I don't actually have it with me here.  I don't
21    have a copy.
22 Q  I'm talking about.....
23 A  Oh, absolutely.  Yes.  Yes.
24 Q  So that's -- we can take that information to the bank
25    then?

Page 71

1 A  This actually -- this writing on the front of this?
2 Q  Yeah.
3 A  This is not mine.  This is Officer Simms'.
4 Q  Okay.
5 A  This is my initials and my DSN right here.
6 Q  So you didn't fill that out?
7 A  Correct.  Officer Simms filled.....
8 Q  Did you check it?
9 A  Yes, I did.
10 Q  And you know it -- it's correct then?
11 A  Yes.
12 Q  And you would take that to the bank, right?
13 A  Yes.
14 Q  How about looking at 2?
15 A  This one?
16 Q  Exhibit 2.  Yeah.
17 A  This is my writing on the front of this one.
18 Q  That is your writing?  Okay.
19 A  Yes, it is.
20 Q  And that's correct, and you would take that to the bank
21    too, right?
22 A  Yes.
23 Q  Okay.  How many grams of cocaine is indicated there?
24 A  On Exhibit 2 or 1?
25 Q  Yes, ma'am.

Page 72

1 A   Exhibit 2, 11.8.
2 Q   Okay. How much is that, volume-wise, I mean, not --
3      11.2 grams, of course, yeah, but I mean volume-wise? I
4      don't know.
5 A   It's a -- well, you can kind of see, it's a small
6      amount.
7 Q   And that would be what you submitted to the crime lab?
8 A   A request for that is submitted to the crime lab.
9 Q   Okay. And that would -- the crime lab would get that
10     and weigh whatever.....
11 A  Correct.
12 Q  .....there and conform -- confirm the crack that you
13     had down?
14 A  Correct. Uh-huh.
15 Q  It says 11.2 grams.....
16 A  11.8.
17 Q  Excuse me. How did you know it was 11.8?
18 A  We weighed it on our scale.
19 Q  Okay. And the other is 1?
20 A  1.0.
21 Q  1.0. All right. Okay. Now, one of those -- I believe
22     the first one you indicated was, it tested positive.
23     It was white powder, is that right?
24 A  Uh-huh. (Affirmative)
25 Q  All right. And the only knowledge you have of where

Page 73

1      Mr. Fish got that is based upon what Mr. Fish said,
2      correct?
3 A   And the fact that we searched him prior.
4 Q   Okay.
5 A   We search him and his vehicle prior to him going on the
6      buy.
7 Q   Do you have a checklist you use to search to ensure
8      that you have consistency and accuracy in your
9      searches?
10 A  Searching of the person or a vehicle?
11 Q  Let's start with the person.
12 A  No, we do not have a checklist.
13 Q  All right. How about a vehicle?
14 A  No.
15 Q  And you -- and then doing this for at least how many
16     years?
17 A  Seven years.
18 Q  Okay. And there's other people that work on your team,
19     is that right?
20 A  Correct.
21 Q  Okay. And there's other people that work in metro and
22     you worked in metro, correct?
23 A  Uh-huh. (Affirmative)
24 Q  And that's all part of APD now?
25 A  Correct.

Page 74

1 Q   Okay And so the search is strictly a subjective search
2      then, you rely upon what someone else said as to how
3      that search was conducted?
4 A   Correct.
5 Q   And there's no checks and balances? There's no
6      objective testing that says, yeah, there's a check
7      mark, just like -- have you ever done a DWI arrest?
8 A   Yes, I have.
9 Q   Okay. And there's a -- APD has a checklist, doesn't
10     it? Have you been drinking? How much have you had to
11     drink? Assuming the person is going to talk with you.
12     When was your last drink? Have you taken any medicine?
13     What type of medicine? Do you have any problems? Any
14     seeing problems?
15 A  It's a questionnaire.
16 Q  Okay.
17 A  Yes, there is a questionnaire.
18 Q  Then you fill it out and there's a checklist, right?
19 A  Uh-huh. (Affirmative)
20 Q  Okay. When you do the Breathalyzer test, there's a
21     checklist too, isn't there?
22 A  There's procedures. We don't have a checklist, per se.
23     There are procedures to follow.
24 Q  Okay. And they're written procedures, aren't they?
25 A  Yes, they are.

Page 75

1 Q   Okay. So as you go through on those type of cases, you
2      know that you're supposed to fill out a specific thing,
3      because someone is going to come back and look at it
4      and see that you did it correctly, correct?
5 A   Correct.
6 Q   All right. That doesn't exist in your unit, is that
7      correct?
8 A   A -- for specific things, it might, but for a pre-
9      search, no, it doesn't.
10 Q  Okay. What specific thing might it exist for?
11     You.....
12 A  My unit does -- that unit also does DWI's. It does a
13     lot of other crimes as well, but, no, we don't -- we
14     don't have very many checklists or anything. We have
15     procedures that need to follow.
16 Q  Okay. And those are written procedures?
17 A  Well, we have a P -- what's called our PI, our policies
18     and procedures.
19 Q  Okay.
20 A  That covers most things.
21 Q  And who promulgates that?
22 A  The department.
23 Q  All right. Is that part of your training manual?
24 A  Yes.
25 Q  All right. And when you -- okay. So I understand, and

Page 76

**Page 77**

1  Q  I'm not going to belabor it, there is no written
2     checklist to ensure accuracy?
3  A  There is no written checklist.
4  Q  Now you indicated that you were running the wire,
5     that's the glass warrant, correct?
6  A  Correct.
7  Q  Okay. And that was on the 20th, correct?
8  A  No.
9  Q  No? All right. When was that, please?
10 A  That was on the 1st of March.
11 Q  March 1?
12 A  Correct.
13 Q  Okay. Did you -- now the opening statement indicates
14    that you allege that cocaine was sold on the 8th, on
15    the 20th and on the 21st, and then the 28th/1st, would
16    you agree with that?
17 A  On the 8th, the 20th, the 21st and the 1st.
18 Q  Okay. 28th/1st. Okay. Your involve- -- you had
19    involvement on the 8th, correct?
20 A  Correct.
21 Q  Okay. And you had involvement on the 20th?
22 A  Correct.
23 Q  Okay. You did not run the wire on the 20th?
24 A  Correct.
25 Q  Okay. What was your involvement on the 20th?

**Page 78**

1  A  Surveillance.
2  Q  Surveillance?
3  A  Uh-huh. (Affirmative)
4  Q  Where did you park that time, please?
5  A  In the same place, Peck and Grand Larry, right about
6     where this shows right here.
7  Q  Okay. So that's the same basic location for both the
8     8th and the 20th, correct?
9  A  All right.
10 Q  And who was with you?
11 A  On which day?
12 Q  The 8th. Is that Simms?
13 A  On the 8th was Office Simms.
14 Q  And on the 20th?
15 A  Was Officer Simms.
16 Q  Okay. Do you work as a team?
17 A  It just kind of depends on who gets into whose car at
18    the time.
19 Q  Okay. All right. And then so your view of 202 Grand
20    Larry was the same on the 20 -- excuse me -- on the 8th
21    as it was on the 20th?
22 A  Yes.
23 Q  All right. Did you observe Mr. Fish on the 8th go into
24    the...
25 A  No.

**Page 79**

1  Q  Okay. So you didn't observe him exit either then?
2  A  No.
3  Q  Okay. How about on the 20th?
4  A  No.
5  Q  All right. Either way, in or out?
6  A  No.
7  Q  All right. Now, there -- you indicated that on the
8     21st, there was a surveillance involving a Suburban, is
9     that correct?
10 A  Correct.
11 Q  Okay. And what was your involvement in that, please?
12 A  I was surveillance, and on the 21st. Yeah, I just did
13    surveillance on the 21st.
14 Q  Could you tell me what you mean by surveillance?
15 A  I was assigned to be in the area where the buy was to
16    occur, and to assist in following the suspect vehicle
17    when it left the buy area.
18 Q  Okay. And describe that vehicle to me.
19 A  It's a '97 green Suburban, Alaska license DSA 914.
20 Q  Okay. Does it have dark windows, other than the
21    driver's window?
22 A  I recollect that it had tinted windows, but I couldn't
23    swear to which windows were tinted.
24 Q  Okay. Could you see inside the vehicle?
25 A  From where I was, no, I could not.

**Page 80**

1  Q  So you have no knowledge of how many people were in
2     that vehicle?
3  A  No.
4  Q  Okay. Now, did you do the strip-search on Jeremy Fish
5     on the 8th?
6  A  Jeremy Fish is a male, and females don't strip-search
7     males.
8  Q  So it would be fair to say that you did not participate
9     in any of the strip-searches?
10 A  Correct.
11 Q  Okay. I wasn't baiting you, I just wanted to make
12    sure. Now, did you participate in the search of the
13    vehicle on the 8th, 20th......
14 A  No.
15 Q  .....21st or 1st?
16 A  No.
17 Q  Okay. All right. So as a sergeant, are you in some
18    type of administrative capacity? Are you in charge of
19    this organization?
20 A  No. I was not a sergeant when I was in this unit.
21 Q  Okay.
22 A  I transferred out of the unit before being promoted.
23 Q  And when did you do that?
24 A  I transferred out of the unit in May, May 1st.
25 Q  All right. And then I assume -- what do you do now?

1 A   I'm a patrol sergeant on swing shift.
2 Q   Okay.  So you were there when the arrest of Mr. Davis
3       took place, is that right, on the 28th/1st?
4 A   Correct.
5 Q   Okay.  Where were you physically?  Could you flip over
6       and draw us another picture of that, please?
7 A   There were several businesses along here.  I don't know
8       their names.  This is, again, Muldoon, and this is
9       north, and there was the -- there was a sign, a tall
10     sign here that said Northern -- Northern China
11     Restaurant.  The defendant had pulled in this way in a
12     pickup truck, and I was parked -- Sergeant Stevens and
13     I were parked over here.  And the informant, I believe
14     pulled in behind the pickup truck, but I couldn't swear
15     to that.  This is where the defendant was, was in this
16     vehicle.
17 Q   Okay.
18 A   And I was right here.
19 Q   You're X?
20 A   Yes.
21 Q   Okay.  And how far away is X from the defendant's
22     vehicle, Mr. Davis' vehicle?
23 A   I guess about 75 yards, maybe.
24 Q   Okay.  And you've indicated, I believe the arrow on
25     Mr. Davis' vehicle is pointing toward Muldoon?

Page 81

1       and take me from there.  Were you already there at the
2       scene?
3 A   I was already there.
4 Q   How did you know to be there?
5 A   Because that's where the buy was to occur.
6 Q   Okay.  And who were you with at that time, was that
7       Simms again?
8 A   Sergeant Stevens I was with.
9 Q   Stevens, okay.  And what happened -- you arrived at the
10     scene?
11 A   I arrived and parked and waited until surveillance
12     advised that the informant was pulling into the parking
13     lot, and they advised he was pulling into the parking
14     lot, and at that point, I looked up and could see him
15     pull up next to the defendant's vehicle, or near the
16     defendant's vehicle.
17 Q   Okay.
18 A   And, actually, I say he pulled up behind the silver
19     pickup truck that the defendant was in.
20 Q   Uh-huh.  Okay.  Like T-bone or is that parallel or.....
21 A   I couldn't tell you.
22 Q   And what happened at that particular juncture?
23 A   The informant got out of his vehicle and walked up to
24     the pickup truck.
25 Q   Okay.

Page 83

1 A   Correct.
2 Q   Is that immediate access out to Muldoon, is there a
3       barrier there?
4 A   Well, there -- yeah, there's driveways all along here,
5       and I couldn't tell you specifically if there was one
6       right in front of him.  I don't think there was.  There
7       was one -- they came in this way.  There's driveways
8       all along these businesses in the strip mall.
9 Q   All right.  Now your -- what was the building behind
10     Mr. Davis' car?
11 A   I don't know.
12 Q   All right.
13 A   I just know he was -- that there was a sign here that
14     said Northern China Restaurant, and they were parked
15     pretty much under it was my recollection.
16 Q   Okay.  Are you sure that vehicle, Mr. Davis' vehicle
17     was pointed toward Muldoon rather than in the opposite
18     direction?
19 A   That's my recollection at this point.
20 Q   Okay.
21 A   It was Muldoon.
22 Q   Okay.  And your recollection is there was a second
23     person in the vehicle?
24 A   I believe so.
25 Q   Okay.  Now, what happened?  Mr. Jeremy Fish drives in

Page 82

1 A   And then he got out of the pickup truck and got back
2       into his vehicle.
3 Q   Okay.  And how long did this take?
4       THE COURT:  Mr. James, I can't hear you.
5       MR. JAMES:  I'm sorry.  Excuse me.  I apologize, jury,
6 I told you I would do this.  I didn't mean to.  I've got to
7 stay next to the mike.
8 Q   How long did that take?
9 A   He pulled into the parking lot at 0003 hours.  At 0004
10     hours, he got back into his pickup truck, or got back
11     into his vehicle, the informant did.
12 Q   Okay.  And then.....
13 A   So less than -- it looks like about a minute.
14 Q   All right.  What happened then?  Take me through it.
15 A   Then the informant pulled out and Officer LeBlanc
16     pulled into the parking lot, activated his overhead
17     lights and at that point, we took Mr. Davis into
18     custody.
19 Q   Okay.  Set me the stage.  Fish pulls out, LeBlanc pulls
20     in?
21 A   Yes.
22 Q   Boom, boom?
23 A   Yes.
24 Q   Instantaneous, not -- sequentially, it happened boom,
25     boom, is that correct?

Page 84

Multi-Page™

State v. Robert Davis
November 14, 2001

3AN-01-1717 CR

| 1 A | Fish pulled out and the patrol vehicle pulled in is my |
|---|---|
| 2 | recollection. |
| 3 Q | So nothing could happen from a practical point of |
| 4 | view..... |
| 5 A | The suspect vehicle did not move. |
| 6 Q | Okay. And it was going, click, click, so that this |
| 7 | Mr. Davis, who was arrested, didn't get out of his |
| 8 | vehicle, correct? |
| 9 A | Correct, as far as I know, he didn't get out of his |
| 10 | vehicle. |
| 11 Q | All right. And he was -- as soon as Fish left, Officer |
| 12 | LeBlanc pulled up, so it was a boom, boom, anything |
| 13 | that was going down was -- the police should have been |
| 14 | able to find, right? |
| 15 A | Correct. |
| 16 Q | All right. Now what did you do at that point in time? |
| 17 A | I got out of my car when they pulled up and took |
| 18 | Mr. Davis into custody. I didn't have any other |
| 19 | involvement, other than the fact that I -- Sergeant |
| 20 | Stevens drove Mr. Davis' vehicle back to indoor secure |
| 21 | storage, and I followed her in the vehicle that I was |
| 22 | in. |
| 23 Q | Okay. |
| 24 A | After he was arrested, then I -- then she got into the |
| 25 | truck and took it back to indoor secure storage and I |

Page 85

| 1 | followed. |
|---|---|
| 2 Q | Okay. Tell me about the arrest, please. You -- were |
| 3 | you the one that arrested him, said..... |
| 4 A | No. |
| 5 Q | .....get out of the car..... |
| 6 A | No. |
| 7 Q | .....or whatever? |
| 8 A | No, I didn't participate in the arrest. |
| 9 Q | All right. What did you do? |
| 10 A | I just stood there maintaining perimeter. |
| 11 Q | Okay. What did you see? Who -- first of all, let me |
| 12 | ask you this; who did the arrest? |
| 13 A | I couldn't tell you that. |
| 14 Q | Okay. How many people -- how many officers were there? |
| 15 A | I couldn't tell you that either. |
| 16 Q | Okay. Well, we know Stevens was there? |
| 17 A | Stevens was there, I was there. |
| 18 Q | Okay. |
| 19 A | Officer LeBlanc was there. |
| 20 Q | Okay. |
| 21 A | And I don't recall who else was there. |
| 22 Q | And we know Stevens, she drove the truck to the indoor |
| 23 | storage? |
| 24 A | Correct. |
| 25 Q | Okay. So that's the truck. And am I correct that you |

Page 86

| 1 | drove Mr. Davis? |
|---|---|
| 2 A | No. |
| 3 Q | No? |
| 4 A | I drove my vehicle..... |
| 5 Q | Okay. |
| 6 A | .....following Sergeant Stevens. |
| 7 Q | Oh, okay. I'm sorry. I knew that -- okay. That was |
| 8 | after Mr. Davis was arrested? |
| 9 A | Correct. |
| 10 Q | Okay. How far are you -- how far away were you when |
| 11 | whoever did the arrest did the arrest? |
| 12 A | I was probably within a car's length of it. |
| 13 Q | Okay. And car is about 20 feet, isn't it, 18, 20 feet? |
| 14 A | I'll take your word for it. I don't know. |
| 15 Q | A regular car, not a mini-car or something..... |
| 16 A | You know, I can't swear to exactly where I was |
| 17 | standing..... |
| 18 Q | Okay. |
| 19 A | .....when he was arrested. I know I was present. I |
| 20 | was in the area. It was pretty dynamic, and I couldn't |
| 21 | swear to exactly where I was standing or exactly how |
| 22 | far away I was. |
| 23 Q | Okay. Did you have a clear view of what went down? |
| 24 A | I don't recall the arrest, so probably not. I might |
| 25 | have been standing on the other side of the car, from |

Page 87

| 1 | where I had my car positioned, maybe I was walking |
|---|---|
| 2 | around the car. I -- I don't recall the specifics of |
| 3 | the arrest. |
| 4 Q | During an arrest of a drug buy, based upon your |
| 5 | experience, is there generally backup right there for |
| 6 | the arresting officer? In other words, if I can set |
| 7 | kind of a mental stage, if I'm the arresting officer, |
| 8 | my partner or my backup is right there visually so that |
| 9 | if something happens, that person has a good visual so |
| 10 | that they can respond? |
| 11 A | Correct. |
| 12 Q | All right. All right. So who was -- was there a |
| 13 | backup? |
| 14 A | Sergeant Stevens was probably closer than I was since |
| 15 | she got out of the passenger side of my car and I was |
| 16 | driving my car. She was probably closer. Officer |
| 17 | LeBlanc was there, and I don't know who else was there. |
| 18 | I just don't recall who else was there. I'm sure there |
| 19 | were other officers there, but I don't -- I couldn't |
| 20 | tell you exactly who was where. |
| 21 Q | Now, did -- you hadn't -- you didn't touch Mr. Davis, |
| 22 | right? |
| 23 A | No. |
| 24 Q | Okay. Did you observe the search incident to arrest? |
| 25 A | Not that I recall. |

Page 88

3AN-01-1717 CR

---

**Page 89**

1 Q  Okay. Did -- when did you depart the area following
2     Officer/Sergeant Stevens?
3 A  I didn't note the time.
4 Q  Okay.
5 A  So I couldn't tell you exactly.
6 Q  Was it before or after somebody transported Mr. Davis?
7 A  I would guess that it was after, but I couldn't --
8     somebody else took Mr. Davis, so I didn't have
9     Mr. Davis, so I couldn't tell you exactly when he left.
10    I'm going to guess that we took the vehicle after he
11    had left.
12 Q  Okay. And you've had a chance to go through your -- at
13    least your police reports, is that correct?
14 A  Just my reports.
15 Q  Right. Okay. And the.....
16    MR. JAMES: I'm going to show you.....
17 Q  So there's only one police report from you on --
18    relating to the 2/8 incident, one page, is that
19    correct?
20 A  Relating to which incident?
21 Q  2/8, February 8?
22 A  Yes.
23 Q  One page?
24 A  Correct.
25 Q  Okay. And there is one page relating to you on the

---

**Page 90**

1     February 20th incident?
2 A  Correct.
3 Q  And.....
4     MR. JAMES: If I may approach, Your Honor?
5 Q  Is that your signature?
6 A  No.
7 Q  Okay. And February 21 has one page from you.....
8 A  Correct.
9 Q  .....is that correct? So on -- there was two at the
10    house, at 202 that you were involved in in
11    surveillance, and then you did one surveillance on the
12    21st where you followed Mr. -- the green Suburban.....
13 A  Correct.
14 Q  .....back to 202?
15 A  Correct.
16 Q  Okay. And then on your -- the report dated 3/1, is the
17    last incident, is that correct?
18 A  Correct.
19 Q  Okay. And that's a one-pager also?
20 A  Correct.
21 Q  Okay. And that's all that you generated.....
22 A  Correct.
23 Q  .....on that day also? Okay. Now you told us that --
24    on direct that you -- did you put the wire on Mr.....
25 A  No.

---

**Page 91**

1 Q  .....Jeremy?
2 A  Because he's a male, no.
3 Q  Okay. Did you see it put on?
4 A  No.
5 Q  All right. How do you know it couldn't be taken off?
6 A  Because it's -- it could be taken off.....
7 Q  Okay.
8 A  .....if he took all his clothes, it could be taken off.
9 Q  Okay. So your statement on direct is qualified now?
10 A  I said he couldn't take the wire off without us knowing
11    it. We would hear him trying to take his clothes off.
12 Q  Okay. All right. And where's the wire kept? I mean,
13    where did they put the wire?
14 A  Where did they put it on his body?
15 Q  Yeah. I mean, generally speaking, I mean, you
16    weren't.....
17 A  It goes.....
18 Q  .....there to know how.....
19 A  It's a harness, and it goes through the arm, and
20    there's a -- part of it wraps around the back, around
21    the shoulder, it goes across the back, wraps around
22    this shoulder, and it's usually hung under one arm,
23    under clothing.
24 Q  Okay.
25 A  And sometimes it's even taped to the body to keep it

---

**Page 92**

1     from.....
2 Q  Kind of like a shoulder holster?
3 A  Exactly.
4 Q  All right. So you were the one that determines when
5     you're going to turn it on and you're going to turn it
6     off?
7 A  Correct.
8 Q  Okay. And you can hear movement going on with the
9     wire, if someone's got the wire, you can hear them.....
10 A  Uh-huh. (Affirmative)
11 Q  .....shuffling around or.....
12 A  You can hear them walking in snow. You can hear them
13    knocking on the door.
14 Q  .....or things like that.....
15 A  Uh-huh. (Affirmative)
16 Q  .....and moving around in cars and that kind of stuff?
17 A  Uh-huh. (Affirmative)
18 Q  All right. So you don't know what Jeremy Fish was
19    doing while he was in the car before you turned the
20    wire on, do you?
21 A  I could hear it. I wasn't recording it, but I can hear
22    it.
23 Q  Okay. Why would you not record what you could here so
24    that if it came up later on you would have the best
25    evidence, which would have been the recording?

---

**Page 93**

1 A  Because standard practice is to -- turn on the
2    recording prior to them meeting the suspect.
3 Q  Okay. Is that written down someplace?
4 A  I couldn't tell you whether it was or wasn't.
5 Q  Okay. Okay. And the -- you didn't have anything to do
6    with the control of the -- anything that came off of
7    Jeremy, other than the two dates you've indicated up
8    there, 1 and 2, exhibits 1 and 2?
9 A  Correct.
10 Q  Okay. I'm just -- so -- okay. And these police
11    reports were made contemporaneous with the -- the
12    incident that happens, is that correct?
13 A  Usually, we write them as soon as we get back to the
14    station.
15 Q  Okay.
16 A  As soon as the buy is over with.
17 Q  And as part of your training at APD, they're -- they
18    are to be as truthful and correct as possible, isn't
19    that true?
20 A  Correct.
21 Q  Okay. Just like if you're going to do a search warrant
22    or anything else, based on your training, you would put
23    in there everything that you know for the benefit of
24    whoever was going to read that?
25 A  Correct.

**Page 94**

1 Q  All right. The marijuana that -- Officer Daily (ph)
2    was the one that actually did all the work, isn't
3    it......
4 A  Correct.
5 Q  .....on the marijuana deal? And that went away, right,
6    bye-bye?
7 A  I don't know.
8 Q  You don't know?
9 A  No. When you say it went away, what do you mean?
10 Q  Dismissed, hasta la vista.
11 A  I couldn't tell you. I couldn't tell you whether it
12    did or not.
13 Q  Okay. And just so I've got this clear, and I'm not --
14    I'm going to do what I'm going to do. You had contact
15    of some type with Fish, Jeremy Fish, a couple of days
16    before the 8th, as part of a metro interview?
17 A  Correct.
18 Q  All right. There's no police reports or anything
19    relating to those contacts?
20 A  I couldn't tell you whether there was or not.
21 Q  Okay. From your......
22 A  From......
23 Q  From your personal knowledge?
24 A  No. I didn't write one. We don't write one for
25    debriefs unless you're the case officer. I was not the

**Page 95**

1    case officer.
2 Q  Well, a debrief would be after something happened, a
3    pre-brief or something would be before, wouldn't it?
4 A  When you first meet an informant, it's called a
5    debrief, when you find out what they know. If you're
6    going to continue to work with them, and it's going to
7    go forward, you usually write in your report what the
8    debrief consisted of, what happened during the debrief,
9    what the informant told you during the debrief.
10 Q  Okay. So if this case is going to go forward, then you
11    would have retrospectively brought it back in the
12    debrief?
13 A  You take notes during the debrief if you're the case
14    officer, and you would use that in your police report
15    if you're going to use the informant, correct.
16 Q  Okay. So you being a member of this task group would
17    not have -- and been involved in from the 8th, would
18    not have retroed back and mentioned the fact that you
19    had been involved with Mr. Fish on the -- approximately
20    on the 6th?
21 A  Correct, I would not have written.
22 Q  All right. And you believe that was at APD?
23 A  I know it was at APD, but I don't know it was the 6th.
24 Q  Okay. All right. I'm referring to a couple of days,
25    8, 6th, and I'm not locking you into that, all right.

**Page 96**

1    All right. You have no knowledge of any deals that
2    were made with Jeremy Fish relating to him......
3 MS. BRADY:  Objection, Your Honor. Asked and answered.
4 MR. JAMES:  Okay.
5 THE COURT:  Sustained.
6 MR. JAMES:  Thank you.
7 Q  The police reports and your testimony given today, are
8    they the totality of your knowledge and your
9    involvement with Jeremy Fish?
10 A  With the exception of the debrief, correct. I don't
11    have a police report of my involvement with the
12    debrief.
13 Q  Let me -- let me say it again. The police reports and
14    your testimony today, which is broader than your police
15    report, okay, are they the totality of your involvement
16    in any manner with Jeremy Fish?
17 A  I can't -- I can't say that. Working as a patrol
18    officer, I could have had contact with Jeremy Fish at
19    another time and date that I'm -- I don't recall, or
20    could be in a police report somewhere. To the best of
21    my knowledge, those are the only contacts I've had with
22    Jeremy Fish, but I couldn't swear to it.
23 Q  From February 8th, 2001, the police reports and your
24    testimony today as to your contacts with Jeremy Fish,
25    is that the totality of your contacts.....

**Page 97**

1  MS. BRADY: Objection, Your Honor. Asked and answered.

2  THE COURT: Sustained.

3 Q  Have you had any contacts with Jeremy Fish, from May,

4  2001 to today, other than what you testified today?

5  MS. BRADY: Objection, Your Honor. Asked and answered.

6  THE COURT: Sustained.

7  MR. JAMES: If I may just have a minute, Your Honor?

8  (Pause)

9  MR. JAMES: I think that that's all the questions I

10  have at this time, Officer Bushue. Thank you.

11  THE COURT: Thank you. How long is your redirect going

12  to be? I want to give the jury a break.

13  MS. BRADY: I have about 10 questions. It's not very

14  long:

15  THE COURT: Go ahead.

16                KATHLEEN BUSHUE

17  testified as follows on:

18           REDIRECT EXAMINATION

19 BY MS. BRADY:

20 Q  What is a debrief?

21 A  A debrief is where you bring a potential informant in

22  and you talk to them about who they know in the drug

23  community, who they can possibly buy from, how much

24  they normally buy, what car they drive, where do they

25  live, what's their -- their name, everything that they

**Page 98**

1  know about the potential person that they're going to

2  buy from.

3 Q  Okay. When you weighed in the cocaine in the two

4  exhibits that are before you.....

5 A  Uh-huh. (Affirmative)

6 Q  .....exhibit 1 and exhibit 2, do you take the cocaine

7  out of the packing material?

8 A  No.

9 Q  So that weight that you indicated on there is the

10  cocaine and any packaging material it happened to be in

11  at the time?

12 A  Correct.

13 Q  Okay. And let me just approach, and I would like you

14  to mark your initial diagram, state's 23, and that

15  other one, state's 24. Okay. And that is state's 23?

16 A  Correct.

17 Q  And is that the -- is that a true and accurate

18  depiction of the buys that you were -- the 2/8 buy that

19  you were involved in at 202 Grand Larry?

20 A  To the best of my knowledge, correct.

21  MS. BRADY: Okay. At this time, I would move to admit

22  state's 23.

23  THE COURT: 23, Mr. James?

24  MR. JAMES: No objection.

25  THE COURT: 23 is admitted.

**Page 99**

1           (Plaintiff's exhibit 23 admitted)

2 Q  Okay. And let's go to state's 24. Is that diagram a

3  true and accurate depiction of the buy that occurred

4  near the Pancake House on February 28th and March 1st?

5 A  Yes.

6 Q  A true and accurate depiction?

7 A  To the best of my knowledge, correct.

8  MS. BRADY: I move to admit state's 24, Your Honor.

9  MR. JAMES: No objection.

10  THE COURT: 24 is admitted.

11           (Plaintiff's exhibit 24 admitted)

12 Q  What time was that buy, that buy that is diagramed

13  right there, about what time did that occur?

14 A  That happened, I believe, a couple moments after

15  midnight.

16 Q  Okay. And what is indoor secure storage?

17 A  Indoor secure storage is a -- basically a building

18  where we keep vehicles for evidence. They're towed

19  there with an officer following them, or driven in this

20  case. They're placed in indoor secure. A tag is put

21  on them, saying the case number and why it's there.

22  And the only people that have keys to indoor secure are

23  supervisors or above.

24 Q  All right. So once the vehicle goes in there, can

25  anybody take anything out of it?

**Page 100**

1 A  No. The vehicle is not touched until the case officer

2  releases the vehicle.

3 Q  Can anybody put anything into it?

4 A  Only other officers could, if they had the key to it

5  and they had access to indoor secure, only police

6  officers have access.

7  MS. BRADY: Okay. That's all the questions I have, Your

8  Honor.

9  THE COURT: Thank you, Ms. Brady. Why don't we take a

10  break, folks? We'll take about 10 minutes, and we'll come

11  and get you when we're ready to start again. And we'll all

12  take a break.

13  (Off record)

14  THE CLERK: On record.

15  THE COURT: We're on record. We have parties and

16  counsel. Our jury is not here. You had an issue you wanted

17  to take up?

18  MS. BRADY: I do, Your Honor. This is Detective

19  Triplett. He's here solely for the vehicle theft case.

20  THE COURT: All right.

21  MS. BRADY: And I just wanted to let him go, so if we

22  could talk to him, it's going to be just a few minutes, and

23  then he can leave.

24  THE COURT: All right.

25  MS. BRADY: He's been outside waiting to testify.

1  THE COURT: All right.

2  MS. BRADY: Do you want me to.....

3  THE COURT: Let's just swear him in.

4  MS. BRADY: Okay.

5  (Oath administered)

6  MR. TRIPLETT: I do.

7          JAMES TRIPLETT

8  called as a witness on behalf of the plaintiff, testified as

9  follows on:

10         DIRECT EXAMINATION

11  THE CLERK: Please be seated. For the record, sir,

12  will you state your full name, and spell your last?

13  A  James Triplett, T-r-i-p-l-e-t-t.

14  THE CLERK: Thank you.

15  BY MS. BRADY:

16  Q  How did you become involved in investigating the

17     vehicle theft case?

18  A  I was investigating a burglary involving another

19     individual, and upon talking with the victim of that

20     particular crime, I had learned information that that

21     the individual I was investigating's girlfriend

22     allegedly had been hurt during the vehicle theft.

23  Q  Okay. Now let me stop you. Let's name some names.....

24  A  Okay.

25  Q  .....just for clarity. Okay. You were investigating a

Page 101

1  burglary that was targeting what person?

2  A  The individual by the name of John Redwine.

3  Q  And what's John Redwine's girlfriend's name?

4  A  Elizabeth Smith.

5  Q  Okay. And you learned as a result of your

6     investigation that?

7  A  That from the victim of the burglary, who happened to

8     be John Redwine's sister.....

9  Q  Uh-huh.

10  A  .....who had told me that Elizabeth Smith was injured

11     in an accident or a stolen vehicle. So I started going

12     through the computer system to try to find those report

13     numbers. And once I found those report numbers, I

14     would learn that a warrant was obtained for Jeremy Fish

15     for the stolen vehicle.

16  Q  Okay.

17  A  And after that, and personal knowledge of talking to

18     other officers, that the family has a tendency to cover

19     for John Redwine.

20  Q  Okay.

21  A  So when I was trying to locate John Redwine for

22     investigation of the burglary, I had talked with Jeremy

23     Fish and John Redwine's sister, who learned that

24     Elizabeth Smith was at the Redwine residence. So I

25     said, okay. I went to meet with them and I got a

Page 102

1  couple of other officers with me, and we went to the

2  residence to, in fact, try to contact John Redwine, so

3  I could continue my investigation.

4  Q  Okay.

5  A  Once there, I spoke with Elizabeth Smith. She assured

6  me that John wasn't there. I believe it's his

7  grandmother, it's kind of like a split-type house,

8  where upstairs is one unit and downstairs is another,

9  and the Redwine's father and mom live in the lower

10  level, and the mother of, I believe it's the father, so

11  it's his grandmother's house, live on the other side.

12  They all said that he wasn't there. They, in fact, let

13  us search the house and, in fact, he wasn't there. I

14  started inquiring to Elizabeth, because my gut feeling

15  was telling me that Jeremy Fish wasn't involved with

16  the stolen vehicle, so I started pressing the issue to

17  see what she had to say. She, in fact, told me that,

18  no, she ended up covering for John, and that it wasn't

19  Jeremy Fish who stole the vehicle, that it was John.

20  So Officer Chavers, who took the original report, I

21  summoned him to come over, because I figured he should

22  follow up on it, and which he did. And he did, in

23  fact, do a report of that conversation in another

24  interview with Elizabeth Smith.

25  MS. BRADY: Okay. And we've already given that to you,

Page 103

1  you have the police reports, Your Honor.

2  Q  So -- and the thing that we didn't have was John

3     Redwine charged with anything after Officer Chavers

4     talked to Ms. Smith?

5  A  Yeah. After the conclusion of the follow-up interview

6     with Elizabeth Smith, Officer Chavers contacted the

7     DA's office and let them know of the new information.

8     And in turn, there were charges for John Redwine for --

9     he was a juvenile at the time, so the charges at that

10     time for him were reckless driving and driving -- and

11     driving in violation of an -- without an instruction

12     permit.

13  Q  Okay. And now John Redwine is a juvenile?

14  A  He's an adult now, but he was at that time.

15  Q  Okay. And what was Fish originally charged with; what

16     were all the charges?

17  A  Vehicle theft, reckless endangerment and reckless

18     driving.

19  MS. BRADY: Okay. That's all the questions I have,

20  Your Honor.

21  THE COURT: Mr. James, do you have any questions for

22  Officer Triplett?

23          JAMES TRIPLETT

24  testified as follows on:

25          CROSS EXAMINATION

Page 104

BY MR. JAMES:

1. Q   When did this investigation go down with you, what was
2.     the date, the date.....
3. A   From which aspect?
4. Q   Okay.  You indicated that you were investigating a
5.     burglary?
6. A   That's correct.
7. Q   Okay.  And based upon that investigation of the
8.     burglary, you went over to Redwine's residence, where
9.     is that residence?
10. A   That is at 501 Togiak.
11. Q   Where's that?
12. A   That's in midtown.
13. Q   Okay.
14. A   Just south of the Lowe's, Eagle -- old Eagle Hardware.
15. Q   Okay.  And when -- when was this?  Can you set the time
16.     stage, that's what I'm interested in.
17. A   Of the original stolen vehicle report?
18. Q   The original stolen vehicle report was the 22nd or 23rd
19.     of June?
20. A   That's correct.
21. Q   I'm talking about the time you're involved.
22. A   When Officer Chavers was with me?
23. Q   Well, I assume that was the same day, wasn't it?
24. A   No, that was not the same day.

Page 105

1. Q   Okay.  I guess you made contact at Redwine's residence
2.     on a specific -- that's the date I'm interested in.
3. A   Yeah, July 5th.
4. Q   Okay.  Is that the day that Officer Chavers also.....
5. A   That is correct.
6. Q   And so do you know why Redwine wasn't charged with
7.     vehicle theft?
8. A   He's -- he was a juvenile and my understanding is that
9.     that particular charge has to go through the juvenile
10.     system.  And so he was in turn charged with driving
11.     offenses that can be charged to minors, but that
12.     particular offense, I'm not sure what the process or
13.     what the status of that went, but my understanding was
14.     it was all sent over to NYC intake for the charges.
15. Q   Okay.  Do you know, there was a Mr. Bennett, who was
16.     the victim in that?
17. A   That's correct.
18. Q   Do you know anything about the photo lineup?
19. A   Yeah, I do.  I showed Mr. Bennett.....
20. Q   You were the one?
21. A   I was the one.
22. Q   Okay.
23. A   And it's in my supplement.
24. Q   All right.  And, please.....
25. A   And the photo lineup I showed him, which was a lineup

Page 106

1.     of John Redwine, he did not pick Mr. Redwine out.
2. Q   Okay.  How about Fish, did you show him.....
3. A   At that point in time, I didn't have a photo lineup of
4.     Jeremy Fish, and I never showed a photo lineup of
5.     Jeremy Fish.
6. Q   So your knowledge as of right now is you don't know,
7.     other than an Officer Chavesers [sic].....
8. A   Chavers.
9. Q   .....Chavers contacted the DA's office, you don't know
10.     whether Bennett, Mr. Bennett identified Fish.....
11. A   That's correct.
12. Q   .....or not?
13. A   That's correct.
14. Q   Okay.  And you don't know -- you do know that he didn't
15.     identify Redwine?
16. A   That's correct.
17. Q   So Elizabeth Smith telling you Redwine was the driver
18.     doesn't match up with what Bennett saw?
19. A   I don't know that.
20. Q   Okay.
21. A   I can only go by what Elizabeth Smith told me.
22. Q   My question is, I guess this, you showed Bennett,
23.     Mr. Bennet, a photo lineup of one of the persons was
24.     Redwine, John Redwine?
25. A   That's correct.

Page 107

1. Q   Okay.  He did not identify John Redwine?
2. A   Correct.
3. Q   Okay.  The information, if I'm correct, that you had at
4.     the time was is that he saw the person behind the
5.     vehicle of -- driving the car, that was his car that
6.     was taken?
7. A   I can only assume what's in the report.
8. Q   I mean, but the information you had at that time, was
9.     that your understanding?
10. A   Well, I can read you my report as to what he told me
11.     when I showed him that.
12. Q   Okay.  Well, why don't you just read it and then just
13.     quickly.....
14. A   Okay.
15. Q   We're not trying -- I'm not trying to draw this thing
16.     out.  I just want to make sure we're talking about.....
17. A   My report written on July 3rd in reference to the
18.     stolen vehicle was on July, 7/3/2001, approximately
19.     1411 hours, I had the victim/witness Bennett, respond
20.     to APD to attempt to identify the suspect/defendant
21.     regarding this case.  The interview with Bennett,
22.     Bennett was advised, as well as read the preview and
23.     advisement with regards to the photo lineup he viewed.
24.     He then signed the advisement, when he turned the
25.     lineup over, he stated he didn't recognize any of the

Page 108

subjects in the lineup, but if he were to guess, it
would be -- would have been number 5. Bennett states
he didn't get a real good look at the driver because he
was following his vehicle. He states he could only see
the driver through the side mirror, when the female was
on the ground, the vehicle fled the scene.

Q   Okay. And what number was Redwine?

A   I don't have that with me.

Q   And to your knowledge, there was no follow up that
Bennett either could or could not identify Jeremy Fish
after the 3rd of July?

A   To my knowledge, that's correct.

Q   Okay. And there was no photo lineup involving Jeremy
Fish.....

THE COURT: You just asked -- you asked that question
already.

MR. JAMES: Prior the 3rd of July.

THE COURT: You've already asked that.

MR. JAMES: All right. Thank you.

THE COURT: Do you know what happened with the charges
against Mr. Redwine, what the disposition is?

A   I do not, sir.

THE COURT: All right. Anybody else with questions for
Officer Triplett?

MS. BRADY: No, that's it.

1    MR. JAMES: No.
2    THE COURT: Thank you very much. Ready for your next
3 witness, Ms. Brady?
4    MS. BRADY: I am, Your Honor.
5    THE COURT: Shall we get the jury? Shall we get the
6 jury, Ms. Brady?
7    MS. BRADY: Yes, Your Honor.
8    (Pause)
9    THE COURT: All right. Everybody have a seat, please.
0 Are we back on record?
1    THE CLERK: We are.
2    THE COURT: And you have another witness, Ms. Brady?
3    MS. BRADY: I do, Your Honor.
4    THE COURT: All right. We'll swear this witness in.
5    THE CLERK: Please raise your right hand.
6    (Oath administered)
7    MR. HAAS: I do.
8             STEVEN HAAS
9 called as a witness on behalf of the plaintiff, testified as
0 follows on:
1             DIRECT EXAMINATION
2    THE CLERK: Please be seated.
3 A   Thank you.
4    THE COURT: For the record, sir, will you state your
5 full name and spell your last?

1 A   Steven Frank Haas, H-a-a-s.
2    THE CLERK: Thank you.
3    THE COURT: Go ahead, Ms. Brady.
4 BY MS. BRADY:
5 Q   How long have you been an APD officer?
6 A   Since May, 1996.
7 Q   Okay. And do you have -- are you assigned to a special
8    unit?
9 A   Currently I'm assigned to the special assignment unit.
10 Q   Is that the same assignment that you had during the
11    investigation of this case?
12 A   Yes, it is.
13 Q   All right. And have you had any training or experience
14    in the detection and identification and investigation
15    of cases involving controlled substances?
16 A   Yes, I have.
17 Q   Could you just explain to the members of the jury what
18    that is?
19 A   I attended the police academy that was put on by the
20    Anchorage Police Department here at the Jewel Lake
21    training center. I have attended a DEA clandestine lab
22    school, and then other field training that I've done.
23    I've been the case officer on cases, I've assisted in
24    cases and the testing of drugs, the identification of
25    drugs, et cetera.

1 Q   How did you become involved in this case?
2 A   Officer LaPorte and Officer Johnstone had acquired an
3    informant, and I was just assisting in the surveillance
4    of the case.
5 Q   Okay. And let me direct your attention to February
6    8th. Did you have a particular assignment with regard
7    to this case on that day?
8 A   Yes, I did.
9 Q   What.....
10 A   I'm sorry. Go ahead.
11 Q   What was your assignment?
12 A   On that day, I was assigned to assist in surveillance,
13    and I photocopied the money prior to the buy.
14 Q   Okay. And how much money did you give the informant on
15    that day?
16 A   $150.
17 Q   Let me approach you with a document. This document has
18    previously been marked state's exhibit 8.
19 A   Thank you.
20 Q   Do you recognize that document?
21 A   That would be the photocopied buy money.
22 Q   Okay.
23 A   With my initials right below the date on it.
24 Q   All right. And you anticipated my questions. What --
25    there -- it has a number on it that says 017273, what

1   is that number?
2 A  That's our APD case number that we assigned to a case.
3 Q  Can you explain to the members of the jury what a case
4    number is?
5 A  Every time we generate a report, it's assigned a case
6    number. And in this case, it's 01, for the year 2001,
7    followed by the sequential number for when the case is
8    assigned.
9 Q  Okay. And so you know that that's the photocopy of the
10   buy funds that you made because of what reasons?
11 A  Because that case number is the same number that's on
12   my report.
13 Q  And are your initials on it?
14 A  Yes.
15 Q  Okay. And is that document a true and accurate
16   representation of the photocopy you made of the buy
17   funds that you gave to Mr. Fish?
18 A  Yes.
19   MS. BRADY: Okay. I move to admit state's 8 at this
20 time.
21   THE COURT: 8?
22   MR. JAMES: No objection.
23   THE COURT: State's 8 is admitted.
24       (Plaintiff's exhibit 8 admitted)
25 Q  Okay. And did you assist any further with this case

Page 113

1   that day?
2 A  On that particular day, just reviewing my report here
3    real quick, I just basically assisted with
4    surveillance, and that was pretty much it.
5 Q  Okay. And directing your attention to what's been
6    marked as I, think, state's 23, which is right behind
7    you, there's a diagram, do you recognize what that
8    diagram is of?
9 A  This would be a diagram of the area in which the buy
10   occurred on that day.
11 Q  Okay. And I'm going to ask you to take a different
12   colored marker than what's already been used on that,
13   and just show the members of the jury where you were
14   and tell us what you observed. Okay. I'm going to ask
15   you not to use a highlighter, because we won't be able
16   to see that, so get something red or.....
17 A  Orange?
18 Q  Orange is fine.
19 A  Let's see, on the 8th of February of this year, I was
20   assigned to be on Duben, south of the residence, and
21   Duben is down here, Grand Larry continues down to
22   Duben, which runs out to Muldoon. There's the --
23   Mapco right at the corner of Muldoon and Duben, and I
24   sat on Duben, south of the residence. If I recall, I
25   believe I sat somewhere down here, because I could look

Page 114

1   down this way and see -- just see the car, but I
2    couldn't see the actual residence.
3 Q  Okay. And what were you doing while you were sitting
4    there?
5 A  Listening to the radio. We were all on the same
6    channel, and I was listening to traffic, that Officer
7    Johnstone was telling me when the informant's vehicle
8    was coming into the area.
9 Q  Okay. And what were you supposed to be doing when the
10   informant's vehicle came in the area?
11 A  Just watch it and watch it go up to the residence.
12 Q  Okay. And did you -- do you know if the informant's
13   vehicle went up to the residence?
14 A  I saw the vehicle come down onto Grand Larry, go north
15   on Grand Larry, and pull up to where I believe about
16   the house was, but I couldn't see the actual house
17   numbers.
18 Q  Okay. Then what happened after the -- could you hear
19   on the radio the informant was leaving?
20 A  I heard Officer LeBlanc advise that he could see the
21   informant go inside the house, go back to his car, and
22   then go back inside. And then after a few minutes,
23   Officer LeBlanc advises again when the informant went
24   to his car and left the area.
25 Q  Okay. And then what did you do after he left?

Page 115

1 A  I just advised that I could see the vehicle leaving,
2    going -- if I recall correctly, he came back out to
3    Duben, and left that way, and I believe Officer LaPorte
4    and Officer Johnstone followed the informant back to
5    the police station.
6 Q  Okay. Now let me direct your attention to February
7    20th, did you have a particular assignment on that day?
8 A  Once again, we were continuing the investigation of
9    this case, I was assigned to search the informant's
10   vehicles to make sure that there was no contraband or
11   money in the vehicle. I did so, didn't find anything
12   in the car, and once again, I was assigned to park
13   south of the location on Grand Larry. And this
14   particular time, I arrived and parked west of Grand
15   Larry on Duben.
16 Q  Okay. Now let me stop you for just a second, because I
17   failed to make a record of -- you have been marking in
18   orange on what's previously been marked as state's
19   exhibit 23, when you were talking about the 2/8 buy, is
20   that right?
21 A  That's correct, ma'am.
22 Q  Okay. Now let me talk about -- we'll go back to 2/20,
23   and you said that you did a search of the informant's
24   car?
25 A  That's correct.

Page 116

Q Is that a typical kind of thing that you do when you work with informants?

A Yes. If we're sending the informant in and they're driving their own vehicle, we always search the informant's car before and after to make sure that they don't already have any contraband, drugs, money, et cetera in their car. And then we check it afterwards and make sure that they didn't conceal anything in their car.

Q What kind of car was it?

THE COURT: Can I get you to move back in front of the microphone?

A Oh, I'm sorry, sir.

THE COURT: Thank you.

A If I recall correctly, he was driving a station wagon, but I think he -- he drove two different cars during this.

Q Okay.

A I don't recall what the other car was.

Q How thorough was the search that you did?

A It's pretty thorough. It probably takes me maybe five to 10 minutes to search the car, and I start where the driver sits and search everything that they can reach, could possibly get to, and then work my way back.

Q So you look in the ash trays?

Page 117

A Ash tray, floor mats, seats, sun visor, door panels, any nook and cranny where you could hide the type of items we're dealing with.

Q Okay. And what happened after you searched Fish's car?

A After I searched his car, we all proceeded over to the area of 202 Grand Larry, and as I stated before, I parked on Duben, west of Grand Larry this time.

Q Okay. And then did you have any further involvement with the case after Fish left Grand Larry that day?

A Yes. Let me just review and make sure I cover everything here. I assisted in following the informant back to the police station. Once back at the police station, I searched his car again.

Q Now -- okay, you searched the car before, so why do you need to search it afterward?

A To make sure that they didn't conceal anything in the car, and after the drug transaction, drugs, money, et cetera.

Q Was any contraband found?

A No.

Q Okay. And did you do anything else with regard to this case on that day?

A No, I did not.

Q Okay. Then let me direct your attention to February 21st, did you have a particular assignment that day?

Page 118

A Once again, I was assigned to assist in the surveillance. And I -- on this occasion, I didn't search the informant's car, it was assigned to somebody else.

Q Okay. And what was -- your assignment was surveillance, that was -- where was the meeting at?

A This time it occurred at the Chevron, International and Old Seward.

Q Okay. And I'm going to ask you to flip over 23 and 24, and I want you to just diagram roughly what your recollections are of the meeting at the Chevron. (Pause) Is that depiction a true and accurate representation of what the observations that you made on February 21st at the Chevron station?

A Yes, it is.

Q Okay. At this time, I'm going to ask you to mark it state's 25.

MS. BRADY: And at this time, I would move to admit state's 25.

THE COURT: 25, Mr. James?

MR. JAMES: I have no objections, Your Honor.

THE COURT: 25 is admitted.

(Plaintiff's exhibit 25 admitted)

Q Okay. Where were you at?

A During this transaction, I was parked in the restaurant

Page 119

parking lot just south of the location where I could see the green Chevy Suburban, and I think the plate was DSA 413. I don't have it in my notes marked.

Q Now, you've drawn something, it looks like a box with a triangle on top of it, and it's in green, and it's facing toward the top of the page, and that represents you?

A Correct.

Q Okay. And then you've drawn another thing, and you have something written on it, but I can't see what it says from here.

A This one?

Q Yeah.

A I wrote the plate of what the green Suburban was. And I said, I think it's DSA 413, but I.....

Q Okay. So that mark indicates the Suburban?

A Yes, ma'am.

Q Okay. And now go ahead and just explain what you saw, because I interrupted you.

A On this day, I was parked over here in the parking lot of the restaurant, where I could look back and see the Suburban parked with its parking lights on. I couldn't -- it's kind of dark in this corner of the parking lot, I couldn't see who was in the car, or how many people were in the car, et cetera. And then when the

Page 120

3AN-01-1717 CR

**Page 121**

1  informant's vehicle arrived, if I recall correctly, he
2  came in off of Old Seward and then came up and met with
3  the green Suburban.
4 Q  Could you see the informant get out of his car?
5 A  No, I couldn't actually see that.
6 Q  Okay.
7 A  I could just see the top of the Suburban.
8 Q  Okay. And then what happened after the meeting was
9  over?
10 A  After the -- the buy occurred, we followed the green
11  Suburban when it left, and went down Old Seward to
12  approximately 45th and stopped a residence, I believe
13  it's on 45th, just east of Old Seward.
14 Q  And did you follow it anywhere else?
15 A  Then after that, we followed it back to his -- the
16  residence at 202 Grand Larry.
17 Q  Okay. And did you have any other involvement with this
18  case?
19 A  No, that was it.
20 Q  Okay. And have you had any contacts since this case
21  with Mr. Fish?
22 A  Yes, I have.
23 Q  And what -- what were those contacts?
24 A  I ran into him at his place of employment, which was
25  Subway, when I went there to get a sandwich.

**Page 122**

1 Q  Okay. Anything else?
2 A  No, ma'am.
3  MS. BRADY: Thank you. That's all I have for this
4 witness.
5  THE COURT: Mr. James?
6  MR. JAMES: Thank you, Your Honor.
7  STEVEN HAAS
8 testified as follows on:
9  CROSS EXAMINATION
10 BY MR. JAMES:
11 Q  Turn around and take a look at your diagram, Officer,
12  please.
13 A  Yes, sir.
14 Q  The Chevron station that we're referring to, what's the
15  name of it, do you know off the top of your head, the
16  Chevron.....
17 A  The Chevron?
18 Q  Yeah. The International and Old Seward, it's been
19  there forever, right?
20 A  As long as I've been here.
21 Q  Okay. What restaurant are you referring to? Are you
22  referring to.....
23 A  Road Runner's.
24 Q  .....Road Runner's? Okay.
25 A  Yes, sir.

**Page 123**

1 Q  All right. Now, where -- alert me to -- to the right
2  hand side of your diagram, is that Old Seward,
3  International, what are we.....
4 A  No, this is Old Seward Highway. I actually drew -- I
5  guess drew it upside down with south being at the top
6  of the page and north being at.....
7 Q  That's fine.
8 A  .....the bottom. This is the International Airport
9  Road, and this is the little alleyway that runs over to
10  the parking lot of the Road Runner.
11  THE COURT: Can you all see over there, Mr. Iverson?
12  UNIDENTIFIED VOICE: Yes.
13  THE COURT: Okay.
14 Q  I -- and what's between -- there's some woods and stuff
15  that -- in the Road Runner complex, is in there, I
16  mean, the creek goes through it and the.....
17 A  That's on the south side.....
18 Q  Okay.
19 A  .....of the restaurant. That's where the creek runs
20  through and there's a green belt.
21 Q  All right. And what, if any -- well, first of all, how
22  is the Suburban pointed? You've got yourself pointed
23  south, which would be toward the restaurant, correct?
24 A  That's correct.
25 Q  Okay. And how was the suburban pointed?

**Page 124**

1 A  It was pointed, if I recall, to the -- to the west.
2 Q  Okay. And so you were kind of -- if you were in the
3  driver's seat of your car -- was anybody else with you?
4 A  No, I was in the car by myself.
5 Q  Okay. So you were -- you would have had to have been
6  looking over.....
7 A  Over my shoulder.....
8 Q  .....over your shoulder, all right. And how far away,
9  approximately, is the -- your car from the Suburban?
10 A  It was probably about 70 yards, give or take.
11 Q  Okay. So that would be 210 feet, somewhere in that
12  neck of the woods?
13 A  Yes.
14 Q  I get to do my math. And you've indicated that it was
15  dark and you couldn't tell what was going on in there,
16  other than the fact that you were assigned to show up
17  there, and follow the Suburban wherever it went?
18 A  That's correct.
19 Q  Okay. And it went to where, please?
20 A  202 -- well, first it went to a residence on 45th
21  Avenue.
22 Q  Uh-huh.
23 A  And I don't recall if he picked somebody up or dropped
24  somebody off, but there was some contact with another
25  individual, and then it went to 202 Grand Larry.

1 Q Okay. Now on the 8th, you testified you made a
2   photocopy of the money, and I believe that's your
3   exhibit.....
4 A Yes, sir.
5 Q .....whatever number that is, 24?
6 A Exhibit number 8.
7 Q 8? I'm sorry. Thank you. And then you said you gave
8   that to Jeremy Fish?
9 A Yes, sir.
0 Q Okay. Bear with me just a minute, please. I'm looking
1   for something. Have you had an opportunity to -- you
2   didn't generate any police reports in this, right?
3 A Yes, I did.
4 Q You did?
5 A The report I have before me.
6 Q Oh, okay. On 2/28, your report of 2/28?
7 A I don't have a report for that day, sir.
8 Q The date written, 2/2- -- I'm sorry, 2/8, excuse me,
9   I'm sorry.
20 A No problem, sir. I have one dated February 8th, 2001.
21 Q Right. Okay. It starts off, information?
22 A That's correct.
23 Q Okay. One, 2, 3, line 3 down on that, line 2 and line
24   3, I photocopied $150 in buy money and gave the money
25   and the photocopies to Officer Johnson [sic], that's

Page 125

1   not correct?
2 A That could be. I thought I had given the money to --
3   to Jeremy Fish, but I could have given it to Officer
4   Johnstone, who gave it to him.
5 Q In your police training, part of your training was to
6   -- when you testify, to testify accurately, correct?
7 A Yes, it is.
8 Q And you had these police reports with you, is that
9   not true?
10 A I got them when I showed up to court today.
11 Q Okay. Did you talk about this case while you were
12   outside with the other officers?
13 A Yes, I did.
14 Q What did you talk about?
15 A We just talked about how little my involvement was, and
16   I wasn't sure what I was supposed to here to testify
17   to.
18 Q Okay. What did you talk about with Officer Bushue?
19 A We had talked about some other issues that had gone
20   around at the police department.
21 Q Okay. Nothing about this case?
22 A I don't recall. I'm trying to remember. I think we
23   just talked about how short our involvement was, and
24   how Officer Johnstone and Officer LaPorte did the
25   majority of the work.

Page 126

1 Q All right. We're talking about perhaps a half hour
2   ago, and you don't recall?
3 A That's not what I said.
4 Q Okay. Tell me.....
5 A I'm trying to remember the extent of our conversation,
6   and I believe we just talked about how short our
7   involvement was.
8 Q All right. You had nothing to do with the 28th, is that
9   -- 28th.....
10   THE COURT: I can't hear you, Mr. James.
11 Q You had nothing to do with the -- now I'm yelling --
12   you had nothing to do with the 28th, that one? The
13   only two you were involved with was the 8th and the
14   20th, right?
15 A That's not correct.
16 Q I'm sorry, and the 21st, I'm sorry.
17 A I was also there on the -- I don't recall the exact
18   date, but for the buy bust.
19 Q Okay. And.....
20 A But I didn't witness anything and wasn't -- didn't do
21   anything significant on that day.
22 Q Who were you with on that day?
23 A I was in a car by myself.
24 Q In a car by yourself?
25 A Yes.

Page 127

1 Q Could you flip over, which is probably the one behind
2   that, please?
3 A The one reference Muldoon?
4 Q Yes. Yeah. Okay. We're on.....
5   THE COURT: It's got an evidence sticker on it, maybe
6   you can give me that number?
7 A Exhibit number 24, sir.
8   THE COURT: Thank you.
9 Q 24. All right. Where were you physically located?
10 A On that day, I was watching the residence, and we were
11   expecting the green Suburban, but it didn't show up,
12   and we were attempting to locate that.
13 Q So you weren't on Muldoon?
14 A No, sir.
15 Q Oh, okay.
16 A I was over off Duben and watching Grand Larry.
17 Q Oh.....
18 A I didn't actually see anything that transpired over
19   here until it was all over.
20 Q All right. So you had nothing to do with what went
21   down there, you were at another location and.....
22 A That's correct. I was over off of Duben and Grand
23   Larry, and I couldn't even see this location from where
24   I was at.
25 Q Did you generate a police report on that?

Page 128

**Page 129**

1 A  No, I did not.
2 Q  All right. From your location, going back to the 8th,
3  if you would, please, and you can flip back to the
4  chart, please.
5 A  Back to exhibit 23?
6 Q  Yes, please. Thank you. Could you describe the
7  residence at 202 Grand Larry?
8 A  It's a single story, and I believe it's a zero lot
9  line. There's two houses, two places right next to
10  each other, and if I recall, 202 is the one that's on
11  the north side.
12 Q  Okay. Is that like a duplex, for visuals?
13 A  Yes, sir.
14 Q  A side by side duplex?
15 A  Yes, sir.
16 Q  Okay. So it would be like a side by side ranch duplex,
17  would that be kind of.....
18 A  Right.
19 Q  All right. What is the parking facilities there?
20 A  I don't recall if it's a carport or just a driveway,
21  but I don't believe there's a garage.
22 Q  Okay. Where did Mr. Fish pull in, if he did pull in?
23 A  He pulled into the driveway.
24 Q  Okay. And did you have a good observation of him
25  during the entire period he was there?

**Page 130**

1 A  No, I did not. As I said before, I could just see the
2  tail end of the car. I really couldn't even see the
3  front door to the house.
4 Q  Was there other cars there?
5 A  I don't recall.
6 Q  So you have no idea of how he entered the structure
7  itself?
8 A  No, I couldn't see.
9 Q  Okay. And was his -- excuse me, was his car sticking
10  out kind of to what would be considered the sidewalk
11  driving area?
12 A  It was at the far edge of the driveway, near the road.
13 Q  Far edge, thank you for your words. I was looking for
14  those. All right. And -- okay. And on the 20th, you
15  were -- going to the 20th, sir, you were listening to
16  the radio, you saw him turn in, were you basically in
17  the same position seeing the same thing?
18 A  No, sir. This occasion, I was parked to the west of
19  Grand Larry. I could not even see the driveway.
20 Q  Okay.
21 A  There's really not a lot of good places to park on
22  Duben in that area.
23 Q  Okay. So you had no visual of what was in that
24  driveway, didn't see him drive into it, it's -- you're
25  basically there to pick up at the end and.....

**Page 131**

1 A  That's correct, sir.
2 Q  .....follow.....
3 A  I believe it was Officer LeBlanc was the one assigned
4  to have the close end eye.
5 Q  Okay. Okay dokey. One moment, please, sir. If the
6  court will permit me.
7  MR. JAMES: Thank you, sir. That's all the
8  questions.....
9  THE COURT: Thank you, Mr. James. Redirect, Ms. Brady?
10  MS. BRADY: I don't have any redirect, Your Honor.
11  Thank you.
12  THE COURT: Thank you, Officer. You can step down.
13 A  Thank you, sir.
14  THE COURT: Your next witness, Ms. Brady?
15  MS. BRADY: The state calls Officer Johnstone,
16  Detective Johnstone.
17  THE CLERK: Would you raise your right hand?
18  (Oath administered)
19  MR. JOHNSTONE: I do.
20  GRANT JOHNSTONE
21  called as a witness on behalf of the plaintiff, testified as
22  follows on:
23  DIRECT EXAMINATION
24  THE CLERK: Please be seated. For the record, sir,
25  will you state your full name, and spell your last?

**Page 132**

1 A  Grant Johnstone, J-o-h-n-s-t-o-n-e.
2  THE CLERK: Thank you.
3  THE COURT: Go ahead, Ms. Brady.
4  MS. BRADY: If I could just have one moment, Your
5  Honor?
6  BY MS. BRADY:
7 Q  How long have you been an APD officer?
8 A  A little over six years.
9 Q  Okay. And what is -- what's your title?
10 A  I'm a detective with the burglary unit.
11 Q  How long have you been doing that?
12 A  Since September of this year.
13 Q  Okay. And have you had any training or experience in
14  the detection and identification and investigation of
15  controlled substances?
16 A  Yes, I have.
17 Q  Okay. And could you just explain to the members of the
18  jury what that?
19 A  I've attended numerous classes on domestic drug
20  interdiction of highways, rave and counter-culture
21  drugs. I spent six months in the metropolitan drug
22  enforcement unit of the APD detective division, and
23  have gone to several clandestine-style laboratory
24  dismantling courses through the drug enforcement
25  agency.

Q   Okay. And now is -- you said that with you're with the
burglary unit right now, is that the same unit you were
with during the investigation of this case?

A   No. During the investigation of this case, I was with
the special assignment unit of the patrol division.

Q   Okay. And how did you become involved in this case?

A   I was contacted by Officer LaPorte, who was contacted
by now Sergeant Bushue and Detective Pernue (ph) of the
metropolitan drug enforcement unit stating that they
had an informant that we could use to purchase some
cocaine. And Officer LaPorte contacted me, this would
have been my -- the first time I had actually conducted
an investigation utilizing an informant, and -- on my
own. And so he contacted me and asked me to sit in
with him while he talked to the informant initially,
before our first purchase, and then to step into a more
in-depth role as the case developed.

Q   Okay. So ordinarily there would be one case officer,
but in this particular case, would it be fair to say
that he was sort of teaching you how to conduct one of
these kind of.....

A   Yes.

Q   Okay. And why don't you just tell -- describe for the
members of the jury what your first contact with
Mr. Fish was.

Page 133

A   I believe it was on February 8th at 2000 -- 2001, this
year. Mr. Fish came to the front counter of APD, and I
went up to -- to meet with him and to talk with him.
We took him into a closed interview room and asked him
what -- what he could do for us. And he stated that
he had a friend that he knew he could buy cocaine from,
and that the person's name was Rico. He wasn't sure of
his entire name, but he knew him as Rico. And he had
another friend who had a phone number of Rico, and he
says, I can get that phone number and call him and we
can see if we can arrange some sort of drug
transaction.

Q   Did he do that?

A   Yes, he did.

Q   Okay. What number did he give you as Rico's number?

A   He was given a cell phone number, and I have that
number written down in here. It was a number of 727-
9465.

Q   Okay. And did Mr. Fish make any calls to 727-9465 that
day?

A   Yes, he did.

Q   Okay. And who dialed the number when he called it?

A   He dials the number. The -- there's a telephone
sitting in front of the -- there's a little table and
telephone right there. He sits here. I sit here. He

Page 134

1   dials the number. I watch him dial the number.

2 Q   All right. And was that call recorded?

3 A   No, it was not.

4 Q   All right. And is that normal procedure?

5 A   The first time that we make a purchase, the call is not

6       recorded because we have to develop the necessary

7       evidence to obtain a glass warrant in order to recall

8       -- in order to record those conversations.

9 Q   All right. And what happened during that call?

10 A   During the call, Rico stated to Mr. Fish that he was

11       going to be at his residence. He gave the residence of

12       202 Grand Larry.....

13       MR. JAMES: I'm going to object. Hearsay.

14       THE COURT: Just a second.

15       MR. JAMES: It's hearsay.

16       THE COURT: Hearsay objection.

17       MS. BRADY: This is an overview. The witness is going

18 to be.....

19       THE COURT: We'll take a bench conference, please.

20       MS. BRADY: Okay.

21       (Bench conference as follows:)

22       THE COURT: All right. The objection is hearsay?

23       MS. BRADY: I'm sorry. I thought you were directing me

24 to respond.

25       THE COURT: I was, but -- but based on the response, I

Page 135

1 thought we ought to take it at bench conference.....

2       MS. BRADY: Okay.

3       THE COURT: .....and that's where we are.

4       MS. BRADY: It's not offered to prove the truth of the

5 matter asserted, Your Honor. This is offered simply to show

6 what the informant was saying, it's -- and it's not offered

7 for the truth.

8       MR. JAMES: I don't think it can be offered for any

9 other reason. I mean, he's saying that this is what we're

10 going to -- this is what's happening. I mean, it is

11 offered for the truth, arguably, I mean, I an understand

12 their argument, but it's not the way the impact is

13 happening.

14       THE COURT: What's the answer going to be?

15       MS. BRADY: I forgot what the question was.

16       THE COURT: What did the officer hear on the other end

17 of the line from Rico?

18       MS. BRADY: No, it's what he heard from -- he could

19 only hear what Fish was saying. He couldn't hear what Rico

20 was saying, so he heard Fish say, do you have a ball, when

21 can we meet, 20 minutes, that kind of thing.

22       THE COURT: All right.

23       MS. BRADY: That's roughly what he's going to say. And

24 then as a result of that, it caused him to take action.

25 They started their procedures. It's just offered to show

Page 136

State v. Robert Davis
November 14, 2001

3AN-01-1717 CR

1  the effect on him, that they believed that there was a buy
2  set up. And Mr. Fish will be testifying.
3      THE COURT: You -- the objection is sustained. You can
4  ask the witness whether based on what he heard from
5  Mr. Fish, did he become suspicious of cocaine sales or
6  something like that.
7      MS. BRADY: Okay.
8      THE COURT: But you can't go into the details.
9      MR. JAMES: I mean, that's where we were heading, I
10 felt we were heading, and that's why the objection was made.
11 Thank you.
12     (End of bench conference)
13     THE COURT: The objection is sustained.
14         DIRECT EXAMINATION CONTINUED
15 BY MS. BRADY:
16 Q  Okay. Based on the conversation that you could hear,
17    did you become suspicious that a cocaine sale might be
18    about to occur?
19 A  I -- based upon the conversation, I believed that we
20    could make a cocaine purchase from Rico.
21 Q  Did you know how much it was going to be for?
22 A  From what Jeremy Fish stated, that it was going to be
23    for approximately $150.
24 Q  Okay. And where was it going to be at?
25 A  It was going to occur at 202 Grand Larry, which was the

Page 137

1  defendant's residence.
2  Q  Okay. Now, once the conversation was over, and it was
3     decided that this was going to happen, what did you do
4     next?
5  A  I requested -- there's several things we have to do.
6     First, we have to obtain the -- the money that's going
7     to be used during the -- during the transaction, and
8     that all has to be photocopied to document serial
9     numbers. So I requested -- or had somebody withdraw the
10    money, $150 worth, and had that photocopied. Officer
11    LeBlanc then searched Jeremy's car, and I strip-
12    searched Jeremy.
13 Q  Okay. Now, strip-searched Jeremy, what do you mean
14    exactly by you strip-searched Jeremy? Could you -- I
15    want you to describe for the members of the jury
16    exactly what you do when you strip-search someone.
17 A  Okay. We have them in a closed door -- in a closed
18    area. We have them remove all of their clothing,
19    socks, shoes, underwear, everything. And once they do
20    that, then we conduct a search on them of their person.
21    And then also go through all their shoes, go through
22    all their clothing, check the -- the elastic bands of
23    their underwear, check all their socks, just to make
24    sure that there's nothing in their shoes, that they
25    don't have a false bottom on their shoe, and check

Page 138

1  everything, pockets of pants, pockets of shirts. Any
2  item of clothing that they may have on them, we go
3  through it to make sure there's nothing on it, or in it
4  at the time.
5  Q  You check every orifice of their body too?
6  A  Yes, we do.
7  Q  Now, what are some of things that you would be looking
8     for when you're doing this kind of search?
9  A  Well, first and foremost, we would be looking for any
10    contraband, drugs, drug paraphernalia. We also would
11    be looking for any additional money that they may have
12    on them, because we don't want to confuse our money
13    that we have photocopied and given to them with any of
14    their funds that they -- that they may all ready have.
15 Q  Okay. And did you find any contraband on Mr. Fish at
16    all?
17 A  No.
18 Q  Okay. Then what happened after he was searched?
19 A  Once he was searched, he was given then $150 in pre-
20    recorded buy funds. And I followed -- Officer LeBlanc
21    left the station a head of time and went and took up a
22    position around 202 Grand Larry. I don't knew where --
23    exactly where he was, but where he could actually see
24    the residence. I then followed.....
25     MR. JAMES: I'm going to object to what he's telling

Page 139

1  about Officer LeBlanc. He clearly said that he.....
2      THE COURT: Ms. Brady, you asked the officer what he
3  did next.
4      MS. BRADY: Right.
5      THE COURT: Why don't you.....
6  A  Okay. Jeremy left the -- the station, and I followed
7     him to the area of Duben and Grand Larry. Once he made
8     the turn onto Grand Larry, I continued on and Officer
9     LeBlanc took up the surveillance at that point.
10 Q  Okay. And so do you know how long Mr. Fish was inside
11    the address at Grand Larry?
12 A  Approximately 10 minutes.
13 Q  Okay. And did you have reason to call him once he was
14    inside?
15 A  Yeah, it -- in just chatting with him, he said that
16    normally he and Rico will chat a little bit, we prefer
17    that things not going on for an extended period of
18    time, so I called him on his cell phone after several
19    minutes and asked him when he would be done, and he
20    said he was on his way out at that time.
21 Q  What happened once he left the residence?
22 A  Once he left the residence, Officer LeBlanc told
23    everybody via radio that he was leaving the residence,
24    and that he was going -- headed northbound on Grand
25    Larry to Peck Avenue. And once he turned west onto

Page 140

N-01-1717 CR

Peck, I was in a position where I could then pick up his vehicle, and I followed him back to the station.

Q Okay. And what happened.....

A Actually, I take that back. We had decided at -- prior to going to the station, we were going to meet at a pre-determined location. There is a -- I don't know what denomination church it is, but there is a large red church on Muldoon, and our meeting point was to be immediately behind that church on the west side, and so we met there. I retrieved the product from him and then followed him back to the station.

Q All right. Then what happened once he got to APD?

A Once he got to the headquarters, he was taken back in the same interview room, the same strip-search that we conducted before the buy was done again, same -- of his person. Also, his car was searched again, and then I conducted a debrief with him of how the buy had transpired.

Q Okay. Now why do you do a strip-search after the buy is over?

A Because it has happened in the past where an informant has purchased whatever and has stashed it in their person, in their clothing, somewhere. And so we conduct a strip-search to make sure that has not happened.

Page 141

Q Was any contraband found?

A No.

Q All right. Now, did -- did Mr. Fish turn over the amount of cocaine that you were expecting to get?

A No. It was less than -- than what I had expected for $150 worth.

Q And what did you direct him to do as a result of your observation?

A Well, I told him that this -- this was a short amount of product for the money that we had given him, and I asked him to contact Rico again and tell him that, hey, this was a little short, can you make up the difference at another time.

Q Now, when -- when he placed that call, you were sitting there in front of him?

A Correct.

Q Did -- who dialed the number?

A He did.

Q Was the it same number that was dialed initially to make the buy?

A Yes.

Q Okay. And -- okay. What did you do next in investigating this case?

A That was the end -- after we made the initial call, Rico said that he could get him some more tomorrow.

Page 142

1 MR. JAMES: Objection.
2 THE COURT: What's the objection?
3 MR. JAMES: Hearsay.
4 Q Let me just direct your attention.....
5 A Okay.
6 Q .....to the next.....
7 THE COURT: Just a second. The hearsay objection is
8 sustained. Disregard the last answer. And your next
9 question, Ms. Brady?
10 Q Let me direct your attention to the next activity you
11 conducted in the investigation of this case.
12 A Okay.
13 Q The next -- the next involvement that I had was I
14 obtained a search warrant for -- I determined that the
15 phone number that Jeremy was calling 727-9465 was a
16 prefix to Alaska Digitel cellular phone numbers. So I
17 obtained a search warrant to get the subscriber
18 information of that particular phone number, since we
19 wanted to make positive identification of who Rico was.
20 Q Whose phone was it?
21 A The phone was registered to a Robert Davis, III. And
22 they -- Alaska Digitel had an address of 202 Grand
23 Larry for him.
24 Q What was your next involvement in this case?
25 A On the 20th, Jeremy arrived at the station and we were

Page 143

1 going to be making phone calls to purchase drugs again.
2 Q All right. Now let me -- let me stop you, and did
3 somebody -- somebody obtained a glass warrant though in
4 the meantime, right?
5 A Yes.
6 Q Okay. Could you just briefly describe for the members
7 of the jury what a glass warrant is?
8 A A glass warrant is once you've established that, in
9 this case, you can make a purchase of a drug from a
10 person. A glass warrant is necessary in order to
11 record the conversations then that the informant is
12 going to have with the supplier or suppliers. And it
13 allows us to record that contact, whether it's by
14 telephone or in person.
15 Q Okay. And -- okay. So what happened when Mr. Fish
16 arrived at APD on the 20th?
17 A We, myself and Officer LaPorte, again made several
18 phone calls to attempt to purchase products. Officer
19 LaPorte began that. I was out of the room. He began
20 that, and I came in as Jeremy was on the phone, I
21 believe to Mr. Davis. We listened to the telephone
22 conversation, and it was who he -- who he described as
23 Rico.
24 Q Okay.
25 A At any rate, Jeremy was heard to ask if he could get an

Page 144

**Page 145**

1    eight ball and then the next one was in about 20

2    minutes.

3 Q  All right. And now what happened once the buy was

4    arranged?

5 A  Once the buy was arranged, since we had the glass

6    warrant, it was then necessary to put an electronic

7    monitoring device on Jeremy. And so I retrieved that

8    and set that up on his -- set it up so that it would be

9    ready to go when Officer LaPorte placed it on him. And

10    the strip-search of Jeremy was done. It was done at

11    the beginning -- on all the buys that we do. He was

12    always strip-searched before and after. His vehicle

13    was searched again.

14    MR. JAMES: I'm going to object based on personal

15 knowledge.

16    THE COURT: The objection is overruled.

17 Q  And then what happened after.....

18 A  After he was set up with the -- with the electronic

19    monitoring device, I escorted him to his vehicle.

20    Officer LaPorte then brought out the -- the money. And

21    we gave it to him and we followed him again to 202

22    Grand Larry.

23 Q  Okay. Now, were you in a car with Officer LaPorte, or

24    were you in a separate car?

25 A  Officer LaPorte and I were in the same vehicle.

**Page 146**

1 Q  Okay. And you followed Mr. Fish. Do you recall what

2    kind of car Mr. Fish was driving?

3 A  He was driving a dark color, I think it was a really

4    dark blue or black, a Chrysler, I think it's a LeBaron.

5    It's an older model four-door sedan.

6 Q  All right. And now you said that he was wired?

7 A  Uh-huh. (Affirmative)

8 Q  Just describe briefly for the members of the jury what

9    exactly that means.

10 A  It means that the electronic monitoring device is

11    turned on, and we have radios that we can hear what is

12    being said, what is going on inside the vehicle. One

13    member of our team will have an actual recording device

14    that records, the signal comes in and it actually makes

15    a tape of everything that goes on. In this case,

16    Officer LaPorte and I just had the radio. Somebody

17    else was going to be recording the conversation. We

18    just had a radio so that we could listen to what was

19    going on.

20 Q  Okay. And how close did you get to the 202 Grand Larry

21    address on this occasion, when you were following

22    Mr. Fish?

23 A  I don't know how close we were proximity wise. The

24    radios will only work within about at two to three

25    block radius of the location, and we were within range

**Page 147**

1    of where we could hear what was going on. So I don't

2    know where our exact position was.

3 Q  Okay. And what happened once he went inside, where did

4    you go?

5 A  We -- when Jeremy went inside the residence, we took up

6    a position where we could pick up his vehicle as it was

7    leaving, and so we just sat. And if memory serves me

8    correctly, I think we were across the street from the

9    Williams at 6th and Muldoon, but I -- I'm not certain.

10    At any rate, we set up there just to listen to the

11    radio and see what transpired on the wire.

12 Q  Okay. So you could hear everything that was going on

13    on the wire? All right. And did you assist any

14    further in this case that day?

15 A  When we returned to the police headquarters, I escorted

16    Jeremy into the same interview room, and he had a torn

17    piece of newspaper that he placed on the table and

18    unwrapped it, and there was a white block of powder

19    about the size of small marble inside. I turned that

20    over to Officer LaPorte, and then I conducted the

21    strip-search of Mr. Fish again.

22 Q  How thorough was the strip-search that you conducted of

23    him after the buy was over?

24 A  It's the same as we do -- I mean, clothing, all done,

25    you take all the clothing off, search the shoes, the

**Page 148**

1    elastic, every -- all the clothing. Any -- anyplace on

2    the clothing where something could be hidden, we

3    search. And anyplace on the body, with the exception

4    of stomach contents, we search.

5 Q  So you look in people's hair, and in their ears, and in

6    their noses and all that kind of stuff?

7 A  In their hat, yeah, in their mouths, rectum, every --

8    everywhere.

9 Q  Okay. And was any contraband found?

10 A  No.

11 Q  Okay. Now what was your next involvement with this

12    case? What's the next thing you did?

13 A  That day or the next time?

14 Q  That day.

15 A  That -- I did a debrief of Jeremy, referencing the --

16    the buy.

17 Q  Okay. Now when you say you did a debrief, could you

18    just explain to the members of the jury what it is that

19    you're talking about when you do a debrief?

20 A  What we do is go over the entire situation that just

21    transpired. I talk to him about what was said on the

22    telephone conversation, even though I was there, I

23    still want him to tell me everything that was said. I

24    talk with him about who gave him the money to purchase

25    the -- the product. I talk with him about what