happened when he left the station and when he got to
the location where he was going in this case, 202 Grand
Larry, what he saw when he was in there, who else might
have been in the -- in the residence, and where the --
the drugs came from. If they pulled them out of a
draw, that's very important for search warrant
purposes. Who he handed the money to, who seemed to be
kind of in charge at the location. And then coming
back to the station, you know, who did he turn over the
drugs too. Just a complete and detailed description of
the events as they transpired, regardless of whether or
not I was all ready there and saw some of this stuff.

How close in time to the actual event does this debrief
occur?

It occurs immediately. Once -- once we get back to the
station, and the first thing we do if we've not
obtained the product is obtain that. The second thing
we do is do the strip-search. The next thing we do is
the debrief. Because it's very important that there
are minute details that we want to retrieve that they
may forget at -- as time goes on.

All right. And are -- debriefs are tape recorded?

Yes, they are.

Okay. And you put the tape in evidence?

Correct.

Page 149

1 Q  Is an eight ball associated with other drugs besides
2    cocaine, or.....
3 A  It can be, yeah. I think it's associated also with
4    heroin.
5 Q  Okay. Now, once the -- once the buy had been set up,
6    what happened next?
7 A  I conducted the strip-search of Mr. Fish again, same
8    manner as before, and he was provided with $200 in U.S.
9    currency, photocopied. The purchase was to occur at
10   the Chevron at Old Seward and International Airport
11   Road. And Officer LaPorte and myself, again, followed
12   Mr. Fish to that location.
13 Q  Now let me stop you for just a second. Did you
14   actually see him pull in the parking lot of that
15   Chevron sation?
16 A  Oh, yes.
17 Q  And then you -- did you break off and go somewhere
18   else, or.....
19 A  We actually -- directly on the east side of Internat
20   -- correction, of Old Seward, is the Peanut Farm
21   showboat, show club parking area. We parked in a row,
22   I think it was the first row right on the curb facing
23   the Chevron station so that we could see what was going
24   on. The -- Jeremy and the -- he made contact with a --
25   a newer model Suburban, I don't know what year it was,

Page 151

All right. Now, what's your -- what was your next
involvement in this case?

On the 21st of February, we again had Jeremy come into
the station, and he attempted a call to Mr. Davis, left
a message on the cellular telephone -- the number that
-- or left a message on a phone that he had called,
asking him to call back in a little bit. That was
approximately 1854. We tried again at 1904 hours,
about 10 minutes later, received no answer. At about
8:05, Jeremy called and spoke with Mr. Davis about
getting a ball, which is a term of -- of the size of
drugs.

Okay. Now wait, let me stop you right there. Is that
-- what does the term signify to you? What
specifically is that talking about, and could you just
describe that to the members of the jury?

An -- an eight ball, if this is what he was referring
to, again, I didn't hear the word eight, I just heard a
ball, but if he's referring to an eight ball, it is a
-- it is size or a rock or baggie of cocaine that's
about the size of a medium size marble. And when
people talk to each other on the street in -- in that
particular lingo, there's a lot of terms that they use
to describe certain amounts, and an eight ball is one
of them.

Page 150

1    but that was on the -- the east side of Chevron. So
2    from where we were sitting, we could see the Suburban,
3    and see the passenger side of the Suburban.
4 Q  All right. And what did you see happen?
5 A  Jeremy pulled in, into the parking lot at about 2023
6    hours, and got out of his vehicle, and then climbed
7    into the passenger side of the Suburban, the front
8    passenger side of the Suburban.
9 Q  All right. And without telling me what was said, you
10   could hear the conversation inside the suburban over
11   the wire, is that right?
12 A  That is correct.
13 Q  All right. And then what happened once Fish got out of
14   the Suburban?
15 A  He got out of the Suburban, got back in his vehicle.
16   Myself and Officer LaPorte followed him back to APD. I
17   conducted a strip-search of him again. And I also at
18   that -- on that particular occasion -- occasion also
19   searched his vehicle and did a debrief with him.
20 Q  Now when you searched his vehicle, could you just
21   please describe for the members, why search his vehicle
22   afterward?
23 A  On some occasions, we have had the unfortunate
24   circumstances of having an informant who is -- who will
25   remove part of the -- the drugs that he purchases and

Page 152

1  hide them in locations of the vehicle. And so we
2  search the vehicle before to determine if -- if there's
3  any contraband in the vehicle, and after to determine
4  if they have taken some what they purchased in an
5  attempt to hide it.
6 Q  So just describe what you do to conduct that search to
7     the members of the jury.
8 A  Where -- from the driver's seat, I actually sit in the
9     driver's seat of the vehicle, and I search everything
10    that can be opened, ashtrays, consoles, everything
11    within an arm's reach or so of -- of where the driver
12    is sitting. I search underneath the seat. I search in
13    between the seat cushions. If they have a seat cover
14    on, I pull that off. If their seats are the style that
15    you can actually unzip and remove the foam, I unzip the
16    seat, stick my hands in there, search all through that.
17    Anyplace that can be opened relatively easily, I
18    search.
19 Q  Under floor mats?
20 A  Under floor mats. The mat pockets. I do go as far as
21    to check the dash to make sure that the dash is
22    fastened down. There's been circumstances where the
23    dash has actually been loose enough for the purpose of
24    stuffing things underneath. And so we check the dash
25    to make sure that it is, it is secure.

Page 153

1 Q  What was your next involvement in this investigation?
2 A  My next involvement was on February 28th/March 1st.
3     And again, at approximately 1810 hours, Jeremy made a
4     call to Mr. Davis and arranged a purchase of cocaine
5     again.
6 Q  Okay. Now, there were several calls made, but the
7     actual call arranging the purchase wasn't made until
8     later, isn't that right?
9 A  Right. We tried at 1810, that was the first one. And
10    then we tried at 1910. We tried at 1938, at 1950, at
11    2000. And then finally at 2345 we were able to make
12    contact with -- with Mr. Davis.
13 Q  All right. And a buy was arranged?
14 A  That is correct.
15 Q  And so what happened once the buy had been arranged?
16 A  It was arranged to occur at a location called the
17    Pancake House, which is on Muldoon, and it was to be in
18    approximately 20 minutes or so. I notified other
19    units, other units were out and about on other
20    investigations, so I notified them that we were going
21    to have this purchase in approximately 20 minutes. I
22    obtained $200 in U.S. currency, and I photocopied and
23    gave that to -- to Jeremy.
24 Q  Now, let me stop you right there. I'm going to
25    approach you with a document that was previously marked

Page 154

1  as state's exhibit 11. Do you recognize this document?
2 A  It is a photocopy of some U.S. currency, and it has my
3     signature along with the date and the case number
4     written on it.
5 Q  All right. And is that the photocopy, is that a true
6     and accurate representation of the photocopy that you
7     made of the money that you gave to Mr. Fish?
8 A  Yes.
9 Q  How much money did you give to Mr. Fish?
10 A  $200.
11 Q  What were the denominations?
12 A  Five $20's and one $100.
13    MS. BRADY: All right. And at this time, I move to
14 admit state's exhibit 11.
15    MR. JAMES: Could I just look at that quick?
16    THE COURT: Sure.
17    MR. JAMES: May I voir dire on the dates, Your Honor?
18    THE COURT: On cross. I'll reserve admission.
19    MR. JAMES: Thank you.
20    THE COURT: I'll reserve ruling on admission until
21 after cross.
22    MS. BRADY: Okay. And I couldn't hear what was said up
23 there.
24    MR. JAMES: I asked if I could voir dire on the dates,
25 and the judge said I could cross. Reserve admission.

Page 155

1    MS. BRADY: Okay.
2        DIRECT EXAMINATION CONTINUED
3 BY MS. BRADY:
4 Q  All right. Is the APD case number anywhere on that
5     document?
6 A  Yes, it is.
7 Q  And your initials are on there?
8 A  That is correct.
9 Q  And the date of the buy is on there?
10 A  Yes.
11 Q  Okay. And did you document the fact that you
12    photocopied these buy funds in your report?
13 A  Yes, I did.
14 Q  Okay. And was your report prepared close in time to
15    the -- to when this happened?
16 A  It was prepared afterwards, yes.
17 Q  All right. And did you also conduct the pre-buy strip-
18    search?
19 A  Yes, I did.
20 Q  All right. And again, how through was that search?
21 A  It was again, the same, taking all clothing off,
22    searching all aspects of their person and clothing.
23 Q  All right. And did you document searching Mr. Fish in
24    your report?
25 A  Yes, I did.

Page 156

| | |
|---|---|
| Q  Did you find any contraband? | 1  Q  Where did that search occur? |
| A  No. | 2  A  In the APD indoor secure storage area. |
| Q  Did you also document that in your report? | 3  Q  Okay. So what happened once you did the search? |
| A  Yes. | 4  A  The only we recovered in the search was a cellular |
| Q  And did attach the wire to Mr. Fish this day? | 5  telephone. The buy money was not located. I notified |
| A  Yes. | 6  Officer LaPorte of that and -- so at that point, he |
| Q  All right. And did you document that in your report as | 7  made -- he decided to pursue another angle, possibly |
| well? | 8  checking with CIPT. And at that point, we discovered |
| A  Yes. | 9  that he had -- Mr. Davis had come in with money to |
| Q  What happened once you arrived at the scene? | 10  CIPT. I obtained a search warrant to go through all |
| A  Prior to that, I told Jeremy that once the purchase was | 11  the cash that they have. They pile it like a general |
| made, he was to meet me south of the location, at -- | 12  fund, and so I obtained a search warrant for them to go |
| there's Shuck's Auto Supply at Muldoon and 16th, and I | 13  through that in attempt to -- they had the pre- |
| wanted him to drive away from the area, and he was to | 14  recorded buy fund serial numbers and they had to go |
| meet me down there and turn over what he had purchased | 15  through all of that to find the money that we had used |
| at that time. So once Jeremy pulled off, I followed | 16  in the buy. |
| him from the station to the area of the Pancake House. | 17  Q  All right. And did you do anything else with regard to |
| And once he pulled into the lot, I then continued north | 18  the investigation of this case? |
| and turned around so that -- so that I could pick him | 19  A  I don't think so, aside from just doing the return of |
| up as he came southbound, because he was going to have | 20  the search warrants, that's all. |
| cross traffic, and we don't want to deal with a lot of | 21  Q  All right. Now let's talk about Mr. Fish for a second. |
| traffic issues. So I just wanted to be able to jump | 22  A  Okay. |
| out right behind him, as he was going southbound on | 23  Q  Did you run into Mr. Fish again later? |
| Muldoon. | 24  A  Yes. Actually, I haven't -- since this time, I have |
| Q  Was Officer LaPorte in the car with you on this date? | 25  not personally had contact with Mr. Fish, but I have |
| Page 157 | Page 159 |

| | |
|---|---|
| A  No, he was not. | 1  had dealings with him because of my position as a |
| Q  All right. And what happened after Mr. Fish left the | 2  burglary detective. |
| Pancake House parking lot? | 3  Q  Okay. So what you're saying is you didn't run into him |
| A  Once he left there, I followed him from that point to | 4  because of this case, you ran into him because of |
| the Shuck's Auto Body. I obtained -- he handed me the | 5  something that he was doing that you were |
| -- the product, and I obtained that and we went back to | 6  investigating? |
| the station. | 7  A  That is correct. |
| Q  Did you notify anybody that you had obtained product? | 8  Q  All right. And did you have a contact with him on |
| A  Oh, yes. | 9  September 5th? |
| Q  All right. And what happened at the station? | 10  A  I -- I have not had personal contact with him at all |
| A  We did another debrief, another strip-search, another | 11  since this case. I was assigned a burglary case where |
| search of his car. | 12  an officer had stopped Mr. Fish. I have not had -- |
| Q  Okay. And did you do anything else with regard to the | 13  personally had any contact with him since this case. |
| investigation in this case? | 14  Q  Okay. So you didn't personally contact him, but you |
| A  Yes. On the 2nd of March, I became aware that there | 15  did end up referring another case over to the district |
| had been a problem in the recovery of the -- of the buy | 16  attorney's office as a result of that contact? |
| funds used from Mr. Davis. The funds were not found in | 17  A  That is correct. |
| a search of the vehicle. Oh, that's right, I also | 18  Q  All right. Can you just tell us about that case, what |
| searched his vehicle. I think it was Officer LaPorte | 19  happened? |
| had obtained a search warrant for his vehicle and we | 20  A  Mr. Fish was stopped outside of a residence for -- as |
| were expecting to find in the vehicle the buy funds | 21  part of an investigation of a burglary by a patrol |
| since we had not recovered them on Mr. Davis. | 22  officer. During the course of talking with Mr. Fish, |
| Q  All right. Now let me stop you right there. You | 23  the patrol officer requested permission to -- from |
| participated in a search of the vehicle? | 24  Mr. Fish to search the vehicle, which Mr. Fish granted. |
| A  Uh-huh. (Affirmative) | 25  Inside the vehicle was -- was a -- if I'm remembering |
| Page 158 | Page 160 |

**3AN-01-1717 CR**                          **State v. Robert Davis**
                                            **November 14, 2001**

**Page 161**

1   correctly, was a box. Mr. Fish said the box was his.
2   The patrol officer opened the box. Inside was
3   Mr. Fish's ID, and I believe it was five small bags of
4   cocaine, all individually packaged, along with some --
5   some currency. Mr. Fish denied ownership of the
6   cocaine, but did say that the currency and the ID was
7   his. I took that case and forwarded it to the district
8   attorney's officer for charges of Mr. Fish for
9   possession and distribution of cocaine.
10 Q   And as far as you're aware of, that case is still
11   pending?
12 A   That is correct.
13 Q   Okay. And have you had any occasion to charge Mr. Fish
14   with anything else, or had any further contacts with
15   him, beside that 9 -- that September 5th incident?
16 A   I have not had any further contacts, or have charged
17   him within anything else.
18   MS. BRADY: All right. That's all the questions I
19 have.
20   THE COURT: Hold on a second, Mr. James. We're going
21 to go to 1:30, if anybody wants to take a break, maybe now
22 would be a good time to do it. If you're all -- can forge
23 through until 1:30, then we won't take a break. Anybody
24 need a break? Nobody? Okay. Mr. James? That applies to
25 the lawyers too.

**Page 162**

1   MR. JAMES: Thanks, Judge.
2   THE COURT: Go ahead, Mr. James.
3   MR. JAMES: You weren't looking at me when you said
4 that though, not the first offer.
5       GRANT JOHNSTONE
6 testified as follows on:
7       CROSS EXAMINATION
8 BY MR. JAMES:
9 Q   Officer Johnstone, going to the cocaine, let's get that
10   kind of squared away here.
11 A   I'm sorry, sir, I can't hear you.
12 Q   Excuse me. Going to the cocaine.....
13 A   Okay.
14 Q   .....September.....
15 A   Okay.
16 Q   Do recall if that was Officer Cross?
17 A   Yes, that is correct, sir.
18 Q   Okay. And to your knowledge, after Officer Cross made
19   the stop.....
20 A   Uh-huh. (Affirmative)
21 Q   .....and discovered the cocaine, who was next on the
22   scene, or did you understand was next on the scene, if
23   anybody?
24 A   Without looking at the report, I don't know -- who else
25   had responded. I'm sure Officer Cross had someone else

**Page 163**

1   respond, but I don't recall who that might have been.
2 Q   Do you know if Mr. Fish was arrested?
3 A   For that contact, no, he was not arrested.
4 Q   Is it -- you've heard -- you were here when Officer
5   Bushue testified, you were sitting -- were you here --
6   sometimes you're in and out, so.....
7 A   Was that -- if that's in regards to the marijuana, I
8   had stepped out. I don't remember.
9 Q   No, it had to do with someone based upon her experience
10   as a police officer.....
11 A   No.
12 Q   Well, based upon your experience.....
13 A   Okay.
14 Q   Okay. You come -- someone with five bags of cocaine,
15   do you arrest them or not arrest him?
16 A   I would have arrested him.
17 Q   All right.
18 A   Which is why I charged him with what.....
19 Q   I'm sorry, please?
20 A   Which is why I charged him with what I did. When I got
21   the case, I charged him with the possession so --
22   because I would have arrested him on the spot.
23 Q   So there is a criminal charge out there that says the
24   State of Alaska versus Jeremy Fish, Count I, possession
25   or -- of cocaine for purpose of distribution?

**Page 164**

1 A   I sent the case to the district attorney, Phil Moberly.
2   I spoke to him on the phone prior to sending it over,
3   and he said to send it over with the charging
4   documents. I don't know what the status of that case
5   is currently.
6 Q   Okay. Okay. And that's your letter of September 10th,
7   is that correct?
8 A   That is correct.
9 Q   All right. You have that in front of you, sir?
10 A   I do not.
11   MR. JAMES: Could I have a D, please, Madam clerk?
12   THE CLERK: A D?
13   MR. JAMES: If I may approach? A D, Delta. I'm sorry.
14 Q   I'm going to hand you what's marked for identification,
15   and show you.....
16   MR. JAMES: If I may approach, Your Honor?
17 Q   .....what's been marked for identification. Is that a
18   photocopy of the letter you sent with it?
19 A   Yes.
20   THE COURT: What's this, exhibit D, is that correct?
21 A   Yes.
22   THE COURT: Does it have an exhibit sticker on it?
23 A   D, Delta, yes.
24   THE COURT: Thank you.
25 Q   Okay. Take a look at it, have you had a chance?

**Page 165**

1 A   Yes, I have.
2 Q   And did you get a lab report back on it?
3 A   To date, I have not received that, no.
4 Q   When did you send that in?
5 A   It would have -- I sent it in at the same time --
6     actually, I think I sent it in a little earlier than I
7     sent the case over to the -- Mr. Moberly, because I
8     wanted to get that going, just because it is evidence,
9     so -- but I have not received that yet, that back.  It
10    usually takes them a little while to get things back to
11    me for some reason.
12 Q   Two months?
13 A   Yeah.
14 Q   Okay.
15 A   Usually if there's not a rush put on something by an
16    outside agency, such as the district attorney's office,
17    or, you know, DEA, or whoever is using it, they take it
18    as they get to it.
19 Q   So as of right now, the 14th of November, no lab
20    reports have been done by the state?
21 A   As of the 13th.  I haven't been able to check my
22    mailbox at the station today.
23 Q   As of the.....
24 A   So as of the 13th, it had not been returned to me.
25 Q   Okay.  And you had, other than your course -- your

**Page 166**

1     communication with Mr. Moberly, telephone
2     communication, your letter that is the -- that's the
3     end of the Jeremy Fish case, as far as your involvement
4     on the September 4th, case?
5 A   Yes, that is correct.
6 Q   So that's just kind nothing has happened in it in two
7     months?
8 A   I don't know what has happened at the district
9     attorney's office in two months.
10 Q   Have you done anything to stir the pot?
11 A   On that -- on that particular case?  No.
12 Q   On that particular case.
13 A   No, I have been working on my other cases.
14 Q   And am I correct that this case rises and falls on
15    Jeremy Fish?
16 A   The case that.....
17 Q   We're here.
18 A   Mr. Davis?
19 Q   We're here.
20 A   He is the informant that was able to purchase the
21    products, yes, sir.
22 Q   All right.  Now, you indicated -- you did a search
23    warrant, correct?
24 A   I -- yes.
25 Q   An affidavit for a search warrant?

**Page 167**

1 A   Yes, I did.
2 Q   Okay.  And how many of those did you do?  Do you have
3     all of your stuff in front of you?
4 A   How many affidavits, or how many search warrants?
5 Q   Well, each affidavit would be for each search warrant,
6     would it not?
7 A   I only have -- I have one affidavit in front of me that
8     references a second affidavit as well, or a second
9     warrant.  Do you have this in front of you also?
10 Q   Well, you're going to have to.....
11 A   It is my affidavit, do you have that in front?
12 Q   The affidavit that I'm referring to is in search
13    warrant 8 -- 882.
14 A   Okay.  Referencing 9/12, it states that I obtained a
15    glass warrant from Magistrate Nolan, which means that
16    there had been a second affidavit prepared that is not
17    attached to this one.  This affidavit is for Mr. Davis'
18    vehicle that he drove the morning of March 1st.  There
19    will also have been another affidavit for -- and a
20    search warrant for the Alaska Digitel Records.
21 Q   All right.
22 A   So I believe that would be a total of three.
23 Q   And this one is for the car, is that correct, 884.....
24 A   Yes, this is for Mr. Davis', I think it's a Toyota
25    pickup, in trying to locate the money that had been

**Page 168**

1     used in the purchase.
2 Q   Where in the search warrant, and maybe you can find it,
3     because I'm looking for it, does it say that Mr. Davis
4     was searched at the scene, and at the jail, if it does
5     say that, in support of the search warrant that that's
6     why you suspect the money to be in the car?
7 A   Let's see.....
8 Q   I might just be looking right over the top of it.
9 A   Number 16, is says the money used for the purchase was
10    not recovered from Davis' person.
11 Q   Number 16?
12 A   Yeah, paragraph 16.
13 Q   Mine ends at 13.
14 A   Okay.  Then you're missing the last -- actually, the
15    last two pages with paragraphs.....
16 Q   Okay.
17 A   .....14, 15, 16, 17.....
18 Q   I just -- I just flipped through another one.  Thank
19    you, Officer.  I have two of them.  It wasn't -- so
20    you're swearing that money was not recovered from
21    Davis' person on the 16th?
22 A   At the time of the stop, the money was not recovered
23    from him.
24 Q   And this was issued on the 2nd -- or excuse me, you
25    swore this on the 2nd of March, correct?

1  A  Yes.
2  Q  Okay. All right.
3  A  I wrote it on the first, but.....
4  Q  Okay.
5  A  Actually, according to the -- to the -- do you have the
6     pages with the signatures?
7  Q  Yes, sir.
8  A  Okay.
9  Q  Yeah.
10  A  It -- I obtained it from.....
11  Q  Cole?
12  A  .....I don't know who this person is, on the 1st of
13     March. I don't know the signature.
14  Q  Well, wait a minute. I think it's probably fair to say
15     that we used -- you used the same format for two search
16     warrants, one dated the 1st, one dated the 2nd?
17  A  Well, I got two search warrants.
18  Q  Right.
19  A  One for the vehicle and then a second for CIPT.
20  Q  Okay. The reason I'm asking is, is I have one that's
21     signed on the 2nd that has the 16 on it.....
22  A  Okay.
23  Q  .....that references.....
24  A  Yeah, the.....
25  Q  .....the one on the first I had, does not have that

Page 169

1     page, so.....
2  A  Yeah.
3  Q  .....I'm just trying to get it clarified in my mind,
4     but -- so we're talking the same.....
5  A  The -- the format of the affidavits will be very
6     similar.
7  Q  Okay. All right. And in it, your information under 16
8     is that -- that you believe that there was a small
9     black box observed to the right of Davis was sitting,
10     and that's kind of the impetus to say if it wasn't on
11     his person, then maybe it was in the black box adjacent
12     to where he was sitting?
13  A  Yeah. And that was observed, I believe by.....
14  Q  LeBlanc?
15  A  .....LeBlanc or Sergeant Stevens, one of the officers
16     involved with the -- with the arrest.
17  Q  All right. And -- and you didn't -- you weren't there
18     at the scene, right?
19  A  No, I was not.
20  Q  Okay.
21  A  The last -- the only thing I saw of it was in my
22     rearview mirror, it was dark, and I could see police
23     lights, and that was it.
24  Q  Okay. So when -- you've been -- were you here when
25     Sergeant Bushue said that she believed there was two

Page 170

1     people in the car?
2  A  Yes, I did hear that.
3  Q  Okay.
4  A  I have no idea.....
5  Q  You have no.....
6  A  .....who was in the car.
7  Q  .....one way or the other?
8  A  No.
9  Q  All right. Now, were you the author of the search
10     warrant affidavit that indicated that Mr. Fish had a
11     pending burglary charge in front of him? Or is that
12     another one?
13  A  That one does not.....
14  Q  I believe it had to do with the glass warrant.
15  A  I did obtain a glass warrant from Magistrate Nolan, but
16     I would have to go over the entire affidavit
17     referencing that. And that -- where it says I obtained
18     the glass warrant is on number 12.
19  Q  Yeah, that's -- the one I -- what I'm asking for, and
20     if it's not you, that's fine, but you're -- because
21     you're going to be leaving us, aren't you here,
22     shortly, your plan?
23  A  Hopefully when everybody else does.
24  Q  I mean, you're not going to be sitting at counsel
25     table?

Page 171

1  A  I'll be back tomorrow.
2  Q  Tomorrow? All right. I was under some impression that
3     you were going to be.....
4  A  No, not until next week.
5  Q  All right. What I'm looking for is the -- the
6     affidavit relating to securing the glass warrant where
7     it indicates that the -- they identify the individual,
8     P01-06, whatever, how it was -- how he was identified,
9     but that there was pending burglary charges against
10     him. That was the only -- and that the had run a --
11     run a records check on him.
12  A  Okay.
13  Q  Did you do that one?
14  A  I don't recall if that was -- I would have to look at
15     the affidavit to see if that was something I did.
16  Q  Okay. Well, we're not going to belabor that right at
17     the moment since you're going to be around. The -- I
18     lost my train of thought. Did you use a checklist on
19     any of these searches?
20  A  Are you referring to the strip-searches and the search
21     of the vehicle?
22  Q  Yes. I mean, we talked -- those are the ones you've
23     done we've talked about today?
24  A  Right. Right. I don't have a checklist that I write
25     out. Mentally, I know that there are certain areas

Page 172

1    that I have to search, otherwise, there is a -- a
2    possibility that something might get by.
3 Q   As -- to your knowledge, are there checklists for like
4    DWI and other things to make sure that everything is
5    done, is that correct?
6 A   There have been -- someone within APD has developed a
7    checklist of the field sobriety tests, so as you're
8    doing those tests, you can mark them off. One of them
9    is fairly extensive, and it's difficult to remember all
10    the clues that you might see.
11 Q   Okay. And that's just a checks and balance to make
12    sure everything is done, right?
13 A   It's just so that you can remember all the -- all the
14    things that you saw as, you know, for you bail hearing
15    or whatever it might be.
16 Q   Okay. And you did not do the vehicle searches in this
17    particular -- all of the vehicle searches, correct?
18 A   No, I think I -- if I remember correctly, I only
19    participated in one.
20 Q   All right. And did you do all of the strip-searches?
21 A   I did the majority. I think there might have been one
22    where I did not. But we do have a -- a checklist of
23    what officers did what things after each -- after each
24    -- before and after each transaction, and so I could
25    refer to that and tell you what I did and what I didn't

Page 173

1    do.
2 Q   And do you have that with you?
3 A   I think Ms. Brady is digging it out of the file right
4    now.
5 Q   Okay. The checklist that you have?
6 A   Right.
7 Q   Now, so do you have certain checklists to make sure
8    certain things are done?
9 A   One of the officers just developed that so that we know
10    what happened, and we've come across a lot of efforts
11    being duplicated. And so with somebody saying, okay, I
12    did this, and initialing it, we know that it got done.
13 Q   Okay. And do you do a digital inspection when you do
14    your strip-search?
15 A   I do not insert my finger or anything like that.
16 Q   Okay.
17 A   If that's what you're referring to.
18 Q   That's what I'm referring to.
19 A   Okay.
20 Q   And -- okay. You took control of the possession of
21    what Jeremy Fish had on the 28th/1st?
22 A   Yes, sir.
23 Q   And you weren't involved -- did not see what happened
24    at the time that -- you watched that vehicle leave
25    the.....

Page 174

1 A   Mr.....
2 Q   .....parking lot?
3 A   Mr. Fish's vehicle?
4 Q   Yes.
5 A   Yes, sir. Did you see him get in the vehicle?
6 Q   Okay. Did you see him get in the vehicle?
7 A   No.
8 Q   So you watched the vehicle, which you rendezvoused up
9    at Shuck's or.....
10 A   Yes. They advised me that the vehicle was pulling out,
11    at that time, I just jumped on Muldoon and waited for
12    him to pull in front of me, and then I followed him to
13    the Shucks' Auto Supply.
14 Q   Okay. How far away is that?
15 A   It -- that is at 16th and Muldoon, and the Pancake
16    House is -- or where the -- the other -- Northern China
17    is located at 353 Muldoon. So it's about 13 -- a
18    little under 13 blocks.
19 Q   Okay. Did you have him constantly in your view?
20 A   Yes, I did.
21 Q   Okay. Was there any concern of -- about -- let me
22    withdraw that question. Approximately how was it from
23    the time that he left the parking lot until you made
24    contact with him and secured what he had, Jeremy Fish?
25 A   One minute, if that.

Page 175

1 Q   Okay. So -- and then once you had the product.....
2 A   Uh-huh. (Affirmative)
3 Q   .....did you have physical possession of the product
4    then?
5 A   Yes, I did.
6 Q   Okay. And so what happened at that particular
7    juncture?
8 A   Then we left from where we were, the other officer, the
9    other people involved were taking care of Mr. Davis and
10    we left.
11 Q   All right. When you say we.....
12 A   Myself and Jeremy. I followed him.
13 Q   All right. So you left in two cars?
14 A   Right.
15 Q   You didn't search him at that point in time?
16 A   I did not search -- strip-search him or the vehicle at
17    that time, no.
18 Q   And at the end, did you -- were the strip-searcher and
19    the searcher of the vehicle at that time, on the
20    28th/1st?
21 A   I was the strip-searcher. I'll have to refer and see
22    if I actually -- if I scratched the vehicle. No,
23    Officer Summerset Jones searched the vehicle once we
24    got -- once we returned to APD.
25 Q   And -- but you did the strip-search?

Page 176

**Page 177**

1 A    Yes, I did.

2 Q    Now, you also obtained a search warrant for CIPT, which

3       is Cook Inlet, isn't it?

4 A    That is correct, yes, sir.

5 Q    And is it not -- did you have anything to do with the

6       booking process?

7 A    No, sir, I did not.

8 Q    And the search of Cook Inlet.....

9 A    Uh-huh.

10 Q   .....that's a common front for everybody's money,

11      right, as you understand it?

12 A   That is my understanding, yes, sir.

13 Q   All right. So if 100 people come into Cook Inlet and

14      they each have X number of dollars on them, it goes

15      into this pot, no one knows whose money is whose,

16      right?

17 A   That's my understanding, yes.

18 Q   So it's kind of like going in the bank and putting in

19      money and withdrawing money, they just.....

20 A   You're not -- you probably won't get the same out.

21 Q   You won't get the same back, okay. And you don't know

22      who put that money in there, do you? I mean, you can

23      subject, but do you know yourself who put the money in

24      there?

25 A   I do not.

**Page 178**

1 Q    All right. When you marked your money, did you -- you

2       know, like banks, they have the powder?

3 A    We don't mark it. All we do is just take the photocopy

4       of the serial numbers.

5 Q    Is there -- what effort is there to put this powder

6       that if you put under an infrared light that shows up

7       that you touched the -- the -- whatever the product is?

8 A    We don't do that.

9 Q    Okay. Is there any effort involved, or do you have any

10      knowledge of it?

11 A   I have no knowledge of that, whatsoever.

12 Q   The judge told me that I could ask about this.....

13 A   Sure.

14 Q   .....and this here. My -- my questions.....

15 A   Uh-huh.

16 Q   .....these are your initials, correct?

17 A   Correct.

18 Q   And it's dated 3/1, right?

19 A   Right.

20 Q   Okay. So that's when you dated this?

21 A   That's when I dated that money, yes.

22 Q   Okay.

23 A   That was the date of the buy.

24 Q   But the money was distributed by you on 2/28, wasn't

25      it, just before midnight?

**Page 179**

1 A    Just before midnight, yes.

2 Q    Okay. So you made a photocopy, why didn't you date it

3       right then?

4 A    Because we had a lot of activity going on. We were

5       being very rushed. I made the photocopy, initialed it,

6       put it in our office, locked it, and when I got back,

7       since the buy had occurred on the 1st, I dated the

8       money as the 1st.

9 Q    You were just too busy to photo -- date it as it came

10      off the copy.....

11 A   Well, since -- since we had the buy occur on the 1st,

12      it would create confusion within the channels if the

13      money was photocopied as 02/28, and attached to a buy

14      that was dated March 1st. There would -- that create

15      confusion both with in the channels with the DA, with

16      the person who makes the entry into the system with the

17      -- with the money, and so I dated it as the 3/1 when

18      the buy actually occurred.

19 Q   So I understand, you make a photocopy of the money.....

20 A   Uh-huh.

21 Q   .....on the 28th, you give it to Jeremy Fish on the

22      28th, but so that none of these professional people get

23      confused, you date it the 1st?

24 A   Yes.

25 Q   Okay. Why did you then date it the second?

**Page 180**

1 A    Date what the second?

2 Q    There's a 3/2 date there.

3 A    Yeah, that's from the clerk of our metro division. She

4       enters all the photocopied money into a single database

5       to track -- APD is given a certain amount of funds, and

6       she enters all that money into a database to track

7       where those funds are going out. And the initials on

8       here are from 3/2. This is Clerk Patty Rhea (ph). It

9       says, entered 3/2/01.....

10 Q   Yeah.

11 A   .....by Patty Rhea (ph), that's when she entered the

12      money into -- as being used into the computer database.

13 Q   Okay. What was the deal you made with Jeremy?

14 A   I didn't make a deal with Jeremy.

15 Q   You were his handler, weren't you?

16 A   That's a -- yeah, I guess you could say that. I was --

17      I was actually under the -- working under the umbrella

18      of Mark LaPorte. Mark was very -- had done this many

19      times. I was -- he was -- I guess you would call him

20      my field training officer in this one. Whatever

21      arrangements he talked to the district attorney about,

22      I -- I am not aware of. He just said, I'm going to

23      have you work with me on this case, and he turned over

24      more of the responsibility to me as the case went

25      along.

1 Q  Did you know that Jeremy Fish had pending burglary
2    charges against him?
3 A  Yes, I did know that.
4 Q  Did you inquire as to what was going down there?
5 A  No.
6 Q  You didn't care what you were dealing with?
7 A  I knew that he had pending burglary charges against
8    him.
9 Q  You were the striker for LeBlanc then, you were under
10   his training, is that the idea?
11 A  I was the what?
12 Q  We called them strikers in the Navy, the trainer, you
13   were being trained?
14 A  He was overseeing -- yeah.
15 Q  Okay.  And -- but you're commissioned police officer,
16   you have.....
17 A  That is correct.
18 Q  .....six years under your belt, or five years, whatever
19   it is, so.....
20 A  Yes.  I had -- the reason that he was assisting me with
21   this is I had never worked an informant from start to
22   finish on my own.
23 Q  You have no knowledge of what deal was cut.....
24   MS. BRADY:  Objection, Your Honor, asked and answered.
25   THE COURT:  Sustained.

Page 181

1    MR. JAMES:  All right.
2 Q  Were you interested in what deal was cut?
3    THE COURT:  Objection, asked and answered.
4    MR. JAMES:  I didn't ask that.
5    THE COURT:  Sustained.
6    MR. JAMES:  All right.
7 Q  The -- what did the house at 202 Grand Larry look like?
8 A  I never saw it.
9 Q  Did you ever drive by it?
10 A  No.
11 Q  How do you know that Fish went in there?
12 A  Because the other officers that were there conducting
13   the surveillance of him going into the residence said
14   so on the radio.
15 Q  All right.
16 A  And I called him once while he was inside the house.
17 Q  What number did you call?
18 A  He had a cell phone with him, and I don't remember what
19   that number was.
20 Q  Okay.  What did you talk about?
21 A  I asked him when he was coming out, if he was almost
22   done, and he says, yes, he's on his way out now.
23 Q  All right.  Weren't you concerned about his well being,
24   here you -- APD makes a phone call to somebody that's
25   supposedly in the midst of a buy?

Page 182

1 A  Yes, which is why we put so many officers out there to
2    monitor.
3    MR. JAMES:  Okay.  Your Honor, if I may, could I move
4    exhibit D marked to C rather than D?
5    THE COURT:  You want to change?
6 A  I think he took it back.
7    THE COURT:  You want to change the marking on exhibit D
8    to exhibit C?
9    MR. JAMES:  Yeah, I had some pre-marked, and I'm just
10   going to get this all goofed up if I don't stay with it.
11   THE COURT:  That's fine.
12   MS. BRADY:  I don't object.
13   THE COURT:  That's fine.  It hasn't been admitted, it
14   can be changed from.....
15   MR. JAMES:  No, sir, it hasn't.....
16   THE COURT:  .....D to C.
17   MR. JAMES:  It's right here.  I'm going to cross out D
18   and move in C.  I would ask that this be admitted now.
19   MS. BRADY:  No objection.
20 Q  I'm going to hand you what's been.....
21   THE COURT:  You're offering C?
22   MR. JAMES:  I'm offering C.
23   THE COURT:  And.....
24   MS. BRADY:  I'm not objecting.
25   THE COURT:  C is admitted.

Page 183

1    (Defendant's exhibit C admitted)
2    MR. JAMES:  I moved.....
3    THE COURT:  Okay.
4    THE COURT:  .....C to D and D to C.
5 A  Sure.
6    MR. JAMES:  I just need a couple minutes, or, I mean a
7    moment judge.
8    (Pause)
9 Q  The -- did you field test the product on the 1st?
10   The.....
11 A  March 1st?
12 Q  March 1st.
13 A  I don't think I did any of the field tests.
14 Q  Okay.  What's the procedure, as you understand it, what
15   happens to the contraband, the -- so I can set the
16   stage for you, you receive contraband from somebody or
17   take it from somebody, okay, it's now in a particular
18   officer's possession.  That individual either field
19   tested it themselves or passes it on to somebody, and
20   there's a chain at that particular juncture?
21 A  That is correct.
22 Q  Okay.  At some point in time then, like Officer Bushue
23   talked about, is that consistent on the outside of the
24   manilla envelope that the -- in this particular case, I
25   believe it's 1 and 2 are marked, there's a weight and a

Page 184

**Page 185**

1  time and who -- who handled it?
2 A  Yes, that is correct, sir.
3 Q  Okay. All right. Then -- what happens to it then?
4 A  After it's put into the envelope?
5 Q  Right. I mean, it's -- not it's in a sealed -- if I
6  may approach so we're talking the same -- we've got 1
7  and 2.....
8 A  Yes.
9 Q  .....that have blue marking evidence, apparently
10  they're sealed?
11 A  Correct.
12 Q  Now they look like they're in a -- one of those air
13  suction bags.....
14 A  Uh-huh. (Affirmative)
15 Q  .....that seal it up. Who does that?
16 A  Property and evidence does the -- does the bags. We do
17  the -- the brown manilla folder. We do, as officers,
18  we do the evidence tape around the seams, initial it
19  and date it. And then property and evidence, when it
20  comes to them, they seal it into these bags, into the
21  clear plastic bags.
22 Q  Okay. And then what happens to it after property and
23  evidence?
24 A  If there is no lab request that is done to test the
25  product, it is held at our property and evidence

**Page 186**

1  section until the case goes to trial, and at that
2  point, they may request the lab -- the lab to test it.
3  If.....
4 Q  Assume it goes to the lab.
5 A  Then I don't have any idea what happens from that
6  point. I know it goes to the lab, it's tested and it
7  comes back. I don't know what their handling procedure
8  are there.
9 Q  All right. Do you know who -- how it gets from -- you
10  take to it evidence?
11 A  Correct.
12 Q  Okay. Somebody then, and I take it from your
13  testimony, not you or of your group, would take it from
14  wherever it's sealed into evidence.....
15 A  Uh-huh.
16 Q  .....to the next step, which could possibly be the lab?
17 A  The state -- the lab -- yeah, our lab does not test the
18  cocaine, it's the state of Alaska.....
19 Q  I'm talking about the state lab.
20 A  Yeah, right.
21 Q  Do you have any idea -- I mean, do you -- can you tell
22  me who takes it from your evidence to state lab?
23 A  I don't know the person's name, no. I believe it's --
24  they work in -- I believe that the property and
25  evidence technicians do a run, so to speak, over to the

**Page 187**

1  state lab. We send things over there often, and they
2  will take them over and then bring them back, once
3  they're completed testing.
4 Q  Once you put the blue seal on the manilla envelope.....
5 A  Evidence tape.
6 Q  The evidence tape, does that seal that envelope to
7  prevent anybody from accessing it?
8 A  Yes.
9 Q  Do you watch the evidence people put the clear plastic
10  around it?
11 A  No, I've never seen them do that.
12 Q  But you just know it's done because of your experience?
13 A  Yeah.
14 Q  I mean, looking at those two, but it's -- it's the way
15  it happens?
16 A  Right.
17 Q  Okay. All right. And one of those has one gram in it,
18  I think one, and the other has 11.-something grams in
19  it?
20 A  11.8, yes.
21 Q  All right. Those two do not -- those deal with number
22  -- the 8th and the 20th, is that correct?
23 A  Yeah, the one gram is the 8th. The 11.8 is the 20th.
24 Q  20th? All right.
25 A  Yes.

**Page 188**

1 Q  So the 21st and the 22nd are not accountable?
2 A  They're not right here.
3 Q  Right there. Right there. I mean.....
4 A  That's correct.
5 Q  Okay. We haven't seen those yet? Is there a tracking
6  mechanism on those forms, or those manilla sheets that
7  says this piece of evidence, by some type of a number
8  system, matches this piece -- this item that was
9  tested? In other words, do you have like 501217, and
10  that is a particular piece of evidence, and if the lab
11  tests 501217, that should be the same?
12 A  You're talking about the state lab?
13 Q  Yes.
14 A  Okay. When we send the requests to the state lab, we
15  actually fill out the request form with our tag number
16  as -- and I'll use the case of the one from the 20th,
17  we fill out our tag number as 505551 on their lab
18  request form. That form goes with the evidence, it is
19  then returned with the results matching that tag
20  number.
21 Q  Okay. So -- and that should dove -- everything should
22  dovetail then?
23 A  Yes.
24    MR. JAMES: All right. Your Honor, I'm going to be a
25 few more minutes, and I just.....

THE COURT: We're going to stop for the day, but I'm going to consult with the lawyers for a moment before I can tell you a little bit more about schedule, so bear with me for just a moment.

(Bench conference as follows:)

THE COURT: We're at bench conference. For when -- when should I tell them to come back tomorrow, 8:30, or do we have work to do before they come in?

MR. JAMES: I -- the only thing I want to know, Judge, is Ms. Brady brought up -- got -- I think there's some more police reports, weren't there, that.....

MS. BRADY: I have them.

MR. JAMES: Are those the ones.....

MS. BRADY: He brought them back, yeah.

MR. JAMES: Are those the ones.....

MS. BRADY: I had copies made.

MR. JAMES: Did you share those with me all ready or not?

MS. BRADY: No. They're sitting on the counsel table.

MR. JAMES: Okay.

MS. BRADY: He brought them in during.....

MR. JAMES: I know. That's when -- I don't -- to answer your question, I don't know (indiscernible).....

THE COURT: Well, why don't I send the jury home and you can look at them, and then we'll make a decision.

Page 189

MR. JAMES: Send the jury home when?

THE COURT: Today. Well, that doesn't help, does it?

MR. JAMES: No, that doesn't help, and I was going to bring that up.

THE COURT: Why don't I have them come in at quarter of 9:00 and have you come in at 8:15?

MR. JAMES: Your Honor, it's very difficult for me to make it at 8:15 with the way I drop off my son. I really, really put a special effort into doing that today, but I have to drop him off really early and it's very difficult for me to do that.

THE COURT: All right. How are we doing on the schedule witness wise, are you behind?

MS. BRADY: I'm behind.

THE COURT: All right.

MS. BRADY: Not -- I think that I can still finish my case tomorrow though.

THE COURT: All right.

MS. BRADY: Depending on what happens.

THE COURT: All right. Even if we start at 9:00?

MS. BRADY: Even if we start at 9:00.

THE COURT: All right. I'll tell them to come in at 9:00, and we -- if we can spend five minutes after I send the jury home, and -- working on those things today, then we'll take care of the rest of it tomorrow.

Page 190

MS. BRADY: Okay.

MR. JAMES: Thank you.

(End of bench conference)

THE COURT: All right. Excuse me, folks. See if I can talk to you here. There we go. We're going to stop for the day. We'll start again at 9:00 tomorrow morning, rather than 8:30. Please remember what I told you yesterday. Don't speak with anyone that concludes -- about the case, and that would include don't talk among yourselves, don't talk to anyone else, don't do any research or investigation on your own.

We want -- and that's for two reasons. One, we want you to not start actually forming hard opinions in this case until you hear everything, and you haven't heard everything yet. And second, we certainly don't want you to -- to have your final decision influenced by something you might hear or see outside the courtroom. We'll see you tomorrow at 9:00. We'll run from 9:00 until 1:30, and I will tell you then -- I'll give you a lot better fix on what next week's schedule will be.

Can I answer any -- any -- I'll try to answer questions, if you have them, otherwise, you're free to take off.

UNIDENTIFIED JUROR: I have a question.

THE COURT: Yes, ma'am.

Page 191

UNIDENTIFIED JUROR: The day after Thanksgiving is a Friday. We're probably not going that.....

THE COURT: We're not going to go that long. I think we can tell you that.

UNIDENTIFIED JUROR: Next week is Thanksgiving?

THE COURT: Next week is Thanksgiving. All right. Good night. And we'll see you tomorrow morning..

(Jury excused)

THE COURT: All right. We're still on record. The jury has departed for the day. We're going to take up with the jury at 9:00. We will take up evidence issues at 8:30, sharp. And, Ms. Brady, you're giving police reports to Mr. James now of the police reports that Detective Johnstone retrieved today based on our earlier.....

MS. BRADY: I am, Your Honor.

THE COURT: All right. And why don't you just check? I don't want to go into argument, but I want to check to see that you got what you asked for, Mr. James.

MR. JAMES: All right.

MS. BRADY: (Indiscernible).

UNIDENTIFIED VOICE: There's two copies. She's got.....

THE COURT: On 11? And I need to -- I reserved ruling on exhibit number 11 pending cross. Do you still have an objection to that? That's the photocopied money, Mr. James.

Page 192

Multi-Page™

State v. Robert Davis
November 14, 2001

```
 1    MR. JAMES: No, Your Honor. Thank you.
 2    THE COURT: All right.
 3    MR. JAMES: No. No -- that's.....
 4    THE COURT: So 11 is admitted.
 5            (Plaintiff's exhibit 11 admitted)
 6    THE COURT: We'll go off record for just a second. All
 7  I wanted -- the only other thing I want to accomplish today
 8  is for you, Mr. James, to look and see that you got what you
 9  think you were asking for so I don't have to take up, I want
10  more stuff tomorrow. We may have to take up other issues,
11  but I don't want to take up I need more, more information.
12    MR. JAMES: Yeah. If we could just go off record.....
13    THE COURT: So we'll do that, and unless you ask me to
14  go back on record, I'll assume that that isn't the case,
15  so.....
16    MR. JAMES: Yeah. That's -- that's fine, Judge. I
17  don't -- yeah. Thank you.
18    (Off record)
19  1:25:24
20
21
22
23
24
25
```

Page 193

TRIAL BY JURY, CONTINUED (EXCERPT)

BEFORE THE HONORABLE DAN A. HENSLEY
Superior Court Judge

Anchorage, Alaska
November 15, 2001
8:40 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    KERIANN BRADY
                      Assistant District Attorney
                      310 K Street
                      Anchorage, Alaska

FOR THE DEFENDANT:    DENNIS PATRICK JAMES
                      Attorney at Law
                      1500 West 33rd Avenue
                      Anchorage, Alaska

Page 194

---

P R O C E E D I N G S

2  42I-660
3  8:4007
4      THE COURT: Back on record in state versus Davis. We
5  have parties and counsel. Our jurors are not here. Having
6  reviewed -- having received and reviewed additional police
7  reports regarding Mr. Fish, are there any additional
8  evidence disputes between the parties?
9      MR. JAMES: Yes, Your Honor. I would like to -- and I
10 know the court has all ready ruled on the one issue. I would
11 like to renew it for the record on the.....
12     THE COURT: Do that in writing. We're not going to do
13 it now.
14     MR. JAMES: Okay. These new reports that I received
15 yesterday. Again, there's no prosecutions going on, but on
16 9/10, we have a report of a burglary where the -- Mr. Fish
17 is identified as an individual involved in it, with no
18 follow up, of course. There's no conviction -- let's see
19 here. A forgery where he's the recipient of a $250 check
20 from a burglary that was on 3 -- the check that he received
21 was 03/29/01, again, no follow up. On 4/14, theft involving
22 Jeremy Fish, according to his sister, said to her, so what
23 -- basically, there's nothing he could do about it. He was
24 involved.....
25     THE COURT: You're getting -- you're getting ahead of

Page 195

---

1  me.
2      MR. JAMES: I'm sorry, sir.
3      THE COURT: I have a police report from 3/29 about a
4  forgery, victim, Colleen Hensley?
5      MR. JAMES: Yes, sir.
6      THE COURT: And there -- once again, are the parties
7  satisfied that I can rely on the police reports to make
8  decisions this morning, Mr.....
9      MR. JAMES: As far as the defense goes, that's all
10 we've got.
11     THE COURT: Ms. Brady?
12     MS. BRADY: Yes, Your Honor.
13     THE COURT: All right. And the police report in that
14 case, we'll mark it for the record, indicates that Mr. Fish
15 had two checks in his name.
16     MS. BRADY: Your Honor, perhaps the most expedient way
17 for us to do this would be to go through the reports one at
18 a time here, each set on that particular report and then
19 move to the next one.
20     THE COURT: All right. Do you object to discussing the
21 Colleen Hensley forgery?
22     MS. BRADY: Yes, Your Honor, I do, and I'll tell you
23 why.
24     THE COURT: All right.
25     MS. BRADY: The issue that's before the court is

Page 196

---

1  whether or not the witness is potentially biased because of
2  this. There's no indication he knows anything about it all.
3  The check was made out to him. There's no indication he
4  knows APD is aware that the checks were made out to him.
5  There's no indication of anything, and it -- it doesn't
6  reveal anything about the witness' potential bias or motive
7  to lie. If he knew there were charges, or he knew something
8  was going on, or he knew there was an investigation,
9  perhaps, but nothing, whatsoever, indicates that.
10     THE COURT: Mr. James?
11     MR. JAMES: Your Honor, I cannot force APD to
12 investigate cases. All I can do is rely upon the police
13 reports that identify him as the recipient of a stolen
14 check.
15     THE COURT: Is Ms. Brady right that the real issue
16 isn't what APD does, but what Mr. Fish thinks APD may or may
17 not do?
18     MR. JAMES: I think that's correct.
19     THE COURT: All right.
20     MR. JAMES: And I think he's well aware that he's out
21 there hanging in the wind.
22     THE COURT: All right. Well, when -- you can ask
23 Mr. Fish that question out of the presence of the jury. If
24 Mr. Fish.....
25     MS. BRADY: He'll be here, Your Honor, at -- I need to

Page 197

---

1 talk to him ahead of time anyway. I was going to ask for a
2 recess. And I think that we could do that. The person.....
3     THE COURT: All right. I mean, he may -- he may
4 exercise his -- his fifth amendment rights, which -- which
5 -- and we'll see what happens when we get to that one. But
6 if Mr. Fish, based on this police report, Ms. Brady.....
7     MS. BRADY: Yes.
8     THE COURT: .....if Mr. Fish has an inkling that he may
9 be in trouble because of this, then it's relevant, and the
10 question is whether it's more prejudicial than probative.
11    MS. BRADY: I agree. And I'm not -- if he knows about
12 it, I think that Mr. James should be able to ask him about
13 it.
14    THE COURT: So I don't have to make the balance if
15 Mr. Fish knows about it?
16    MS. BRADY: That's right.
17    THE COURT: All right. Turning to the next one.
18 Mr. James?
19    MR. JAMES: Yes, sir. Let's see -- which one do you
20 got there, do you have the 9/10 or the 4/14, sir? I mean,
21 which is the first one you have?
22    THE COURT: I have 7/26 and I have.....
23    MR. JAMES: 7/26, that's the theft.....
24    THE COURT: And I have the Redwine.....
25    MR. JAMES: Okay. The.....

Page 198

1     THE COURT: But it's more on Redwine, that we talked
2 about yesterday.
3     MR. JAMES: No, this is another one.
4     THE COURT: Well, I'm telling you what I have.
5     MR. JAMES: Oh, no, know, sir, I.....
6     THE COURT: I have a 7/26, eluding and theft.
7     MR. JAMES: Okay. That particular one involved.....
8     MS. BRADY: And let me just say for the record,
9 Mr. Fish is aware of that, I think that it's fair game for
10 Mr. James to ask him about that.
11    THE COURT: All right.
12    MR. JAMES: 7/26?
13    THE COURT: All right. The next one?
14    MR. JAMES: Please tell me what your date is.....
15    THE COURT: Well, the only other police report that you
16 have given me, or at least that I can see up here is the
17 Redwine.....
18    MS. BRADY: Your Honor, there was -- right. There was
19 a paper jam, and Karen is finishing making the copies.
20    UNIDENTIFIED VOICE: I've got it right here.
21    MS. BRADY: Okay.
22    UNIDENTIFIED VOICE: (Indiscernible)
23    THE COURT: All right. While we're waiting for sorting
24 out, on -- I didn't give you a ruling on the -- what we'll
25 call the early July auto theft. Based on the evidence that

Page 199

1 Mr. Redwine was actually charged, under evidence rule 403,
2 I'm going to exclude that as offered for bias.
3     MR. JAMES: For the record, without proof that he was
4 actually charged, I would object to your ruling, Your Honor.
5     THE COURT: Excuse me, you're correct. Based on the
6 evidence that it was forward -- actually, he was actually
7 charged by the police for the driving, for the driving
8 offences, because the police can charge him as a juvenile
9 for driving offenses. He wasn't charged for the theft
10 offenses. But based on the evidence that the police have
11 turned their attention to Mr. Redwine and away from
12 Mr. Fish, and fairly strong evidence on that, I am going to
13 exclude that.
14    MR. JAMES: Thank you, just.....
15    THE COURT: Now, what else do we got?
16    MR. JAMES: .....noted it for the record, thank you.
17    THE COURT: All right. September 2?
18    MS. BRADY: That's a one-page report.
19    THE COURT: Threats?
20    MR. JAMES: That involved a car -- that's the one with
21 Milky (ph) on it?
22    THE COURT: Yes.
23    MR. JAMES: It -- where -- I think it, again, it shows
24 follow up, none, case closed. I believe that it also goes
25 to the fact that he is bias again, no charges, even though

Page 200

1 the statement was made he's going to burn down their
2 house.....
3     THE COURT: What's your position, Ms. Brady?
4     MS. BRADY: The state is opposed. There's no
5 indication that Mr. Fish knows anything about this threat
6 report being called in, or anything else. There's no
7 indication he would be attempting to tailor his testimony to
8 avoid any kind of criminal liability in this case. The
9 issue isn't whether or not he did it. The issue is whether
10 or not he knows APD would be pursuing an investigation on
11 this. And there's nothing to indicate he knows that. This
12 is just a call in where somebody called in and said he
13 said.....
14    THE COURT: All right. And what if Mr. Fish has --
15 knows about it?
16    MS. BRADY: If Mr. Fish knows that APD is investigating
17 this, then fine, he should be asked about it.
18    THE COURT: All right. We'll reserve that for when
19 Mr. Fish gets here. The next one I have is 9/29,
20 brandishing.
21    MS. BRADY: I think that that's fair game.
22    THE COURT: All right.
23    MS. BRADY: He was contacted about that, and I -- I
24 think it's fair game.
25    THE COURT: All right. Are there others, Mr. James?

Page 201

1  MR. JAMES: I have a 4/10, Your Honor.
2  THE COURT: Well, I don't have it, tell me about it.
3  MR. JAMES: Okay. This is the one involving where he
4  pawned a video game system that had been previously reported
5  stolen from Redwine's -- John Redwine's sister's residence.
6  Again, nothing happened about it. There was numerous stereo
7  -- or video equipment, I shouldn't use stereo but video
8  equipment that was taken from a residence, and she
9  identified the black Plymouth Reliant station wagon as
10  leaving. Basically, the statement, according to the police
11  report, the narrative, indicates that according to Tamara
12  (ph), that's his sister, she talked to Jeremy and told him
13  that -- and -- that she knows, E. Redwine, which is the
14  woman, knows that he ripped her off and he replied there's
15  nothing they could do about it.
16  THE COURT: Ms. Brady?
17  MS. BRADY: The state's position is the same, Your
18  Honor. If Mr. Fish -- has he been talked to in that case?
19  Is that the case you're doing?
20  UNIDENTIFIED VOICE: No. That's.....
21  MS. BRADY: That's the case that Detective Triplett is
22  doing and.....
23  THE COURT: That's a separate case from the auto theft
24  case that Detective Triplett was doing?
25  MS. BRADY: Detective Triplett started off with a

Page 202

1  burglary investigation, and then he wound up investigating,
2  realizing that -- so the case that he was investigating is
3  that burglary case. And what the evidence in the case is is
4  that Mr. Fish was hanging around with another little
5  criminal, and I -- Redwine, and Redwine's sister was
6  burglarized. And Redwine's sister lost a Sega and some
7  other stuff, and she knew that her brother knew where she
8  kept her money and where her key was, and the key was
9  missing. And she said that she had seen Redwine and Fish in
10  the area, but that was it. Then later, Fish pawned some
11  things that were in the house, and Fish's girlfriend was
12  talked to, and she said Redwine gave her -- Fish stuff to
13  pawn and paid him to pawn it. So, again, there's no
14  indication -- there's no reason for Fish to believe that he
15  is anyway potentially suffering some kind of criminal
16  liability. If he does, then it comes in for his bias, if he
17  doesn't, it's not relevant.
18  THE COURT: All right. I technically agree with you,
19  but I think the standard on what Mr. Fish may or may not
20  believe is pretty -- before it comes in is pretty low. He
21  doesn't have to actual -- in my view, he doesn't have to
22  have actual knowledge that the police are interested in him.
23  He may just have to be worried that the police are
24  interested in him, and may find out that he did it later,
25  even if they haven't pinpointed him now. That's all it takes

Page 203

1  in his mind. It seems to me that reasonable jurors could
2  infer that even if he was worried about it, but didn't know
3  that the police were on to him, that that would be enough
4  for him to curry favor with the state by testifying today.
5  A juror could draw that conclusion. So the threshold is
6  pretty low. The question that I'm thinking about as we're
7  sitting here is how do I determine how -- what Mr. Fish
8  knows. And I guess we'll cross that bridge when we come to
9  it. I'm not sure how to ask that question, but I guess
10  that's not my responsibility.
11  MS. BRADY: Okay. I think that that takes care of all
12  the police.....
13  THE COURT: Okay. Mr.....
14  MS. BRADY: .....reports and suggest.....
15  THE COURT: .....James, that takes care of them?
16  MR. JAMES: Yeah -- excuse me, I didn't mean to say
17  yeah. Yes. As far -- as of right now.
18  THE COURT: All right. So 7/26....
19  MR. JAMES: Who knows -- 7/26.
20  THE COURT: .....and 9/29 are admissible. 3/29 and 9/2
21  and 4/10, we'll take some more proceedings outside the
22  presence of the jury when Mr. Fish gets here and make a
23  determination as to whether they're admissible. If Mr. Fish
24  has some reasonable reason to fear police repercussions,
25  they become admissible, but we don't know that. I can't

Page 204

1  determine that from these -- from the paperwork that -- from
2  the evidence that you all have submitted to me so far, but
3  will make that determination. A last point is that I don't
4  want to stop and do it now, but I would -- in order to make
5  the record accurate and complete, I want to make sure that
6  the police reports you have given me get marked somehow and
7  get identified in the record. But let's get -- assuming our
8  jury is here, let's get back to work with jury stuff.
9  MS. BRADY: Your Honor, I left my shoes downstairs at
10  the x-ray, and I need to go get them before the jury comes
11  in. I have my boots on.
12  THE COURT: Yes, you do. All right.
13  MS. BRADY: But I left my shoes down there.
14  THE COURT: All right. We'll tell the jury that we'll
15  be -- do we have anything else we need to take up?
16  MR. JAMES: Just what's our sequence of events for
17  today, do you know, witness-wise?
18  MS. BRADY: We're going to start with Officer
19  Johnstone, Detective Johnstone.
20  MR. JAMES: Right.
21  MS. BRADY: And then I have a records custodian, and
22  then I have police witnesses that I'm going to be juggling
23  around to accommodate schedules.
24  THE COURT: All right. Mr. Davis, we need to start on
25  time. We had to wait for you this morning.

Page 205

**State v. Robert Davis**
**November 15, 2001**

3AN-01-1717 CR

---

1 MR. JAMES: When do we expect Mr. Fish's.....
2 THE COURT: I'm trying to use this jury's time wisely.
3 So I'm just reminding you you need to be here.
4 MR. JAMES: Judge, when do we expect Mr. Fish? I've
5 got the idea that Mr. Johnstone is on first and we're
6 finishing up with and then the record's custodian and then
7 APD is going to be a shuffle?
8 MS. BRADY: After the record's custodian.
9 MR. JAMES: Before the cops, the rest of the cops?
10 MS. BRADY: Uh-huh. (Affirmative)
11 MR. JAMES: Okay.
12 THE COURT: All right. Let's -- I'm going to --
13 Ms. Brady, I'm going to tell the jury we'll take up in about
14 five minutes, and when you're ready, we'll -- we won't have
15 any further proceedings, we'll bring them in.
16 MS. BRADY: Thank you.
17 (Off record)
18 THE COURT: .....seat. Are we back on record, Madam
19 clerk?
20 THE CLERK: We are.
21 MR. JAMES: Thank you, Your Honor.....
22 THE COURT: Just a second.
23 MR. JAMES: I'm sorry.
24 THE COURT: We're still on record. Our jury is not
25 here. Do you have another issue we need to deal with?

Page 206

---

1 MR. JAMES: Yes, sir. I thought it would be faster to
2 do this before we take -- this is going to objectable [sic],
3 I understand. I intend -- I have the March 13th -- excuse
4 me, the February 13th affidavit from Officer Johnstone
5 relating to the glass warrant. I intend to ask him, and I
6 previously asked him, the part 12 says 06 is currently
7 charged with burglary in the first degree and assisting the
8 Anchorage Police Department at the discretion of district
9 attorney to mitigate the outstanding charges. APSIN/NCIC
10 reports no criminal convictions for him. I want to ask him,
11 did he bother -- not did he bother -- did he check and
12 report to the magistrate involving juvenile crimes involving
13 dishonesty and reporting, and why didn't he put them in the
14 affidavit.
15 THE COURT: Ms. Brady?
16 MS. BRADY: Your Honor, the police can't check on that.
17 You have to have a court order to get into juvenile records
18 at all, and -- for a start. And what I was told that he was
19 going to do is introduce the affidavit. I object to that.
20 I think it's hearsay, and it's not admissible. And in
21 addition, it goes to the search warrant. It doesn't go to
22 an issue that's on trial right now.
23 THE COURT: What is that relevant to, Mr.....
24 MR. JAMES: Well.....
25 THE COURT: .....the fact that he didn't check the

Page 207

---

1 juvenile records, what is the relevance?
2 MR. JAMES: It means he withheld -- potentially
3 withheld information from the court.
4 THE COURT: Do you have any information that he had --
5 had that.
6 MR. JAMES: Well, I've got right here is their
7 printout.
8 THE COURT: Do you have any information that the
9 officer knew about it?
10 MR. JAMES: He didn't check, I don't believe he
11 checked.
12 THE COURT: Okay. But you're challenging -- because as
13 I understand, you're offering the evidence to challenge the
14 officer's credibility, correct?
15 MR. JAMES: Correct.
16 THE COURT: Then you would have to show that he knew
17 about it and didn't tell the magistrate.
18 MR. JAMES: Well, I think I can also show that he
19 didn't bother to check to see that it was, because I've got
20 an APD printout that shows the juvenile activity.
21 THE COURT: Unless you have some evidence that the
22 officer knew about it and withheld -- or some way to develop
23 an inference that he knew about it and withheld, then the
24 objection is sustained. You can challenge.....
25 MR. JAMES: Can I ask.....

Page 208

---

1 THE COURT: .....the officer's credibility, but you
2 can't -- but you have to -- you have to offer evidence that
3 actually goes to his credibility.
4 MR. JAMES: Can I ask whether or not he did -- he check
5 a hit on Jeremy Fish before he prepared the affidavit?
6 THE COURT: Ask him right now. He's still under oath.
7 You're still under oath, Officer Johnstone.
8 MR. JOHNSTONE: Okay.
9 GRANT JOHNSTONE
10 previously sworn, testified as follows on:
11 VOIR DIRE EXAMINATION
12 BY MR. JAMES:
13 A Did I do what?
14 Q Did you do an APD hit similar to what you provided us
15 relating to the -- or the subsequent police
16 reports.....
17 MS. BRADY: I provided that in the (indiscernible).
18 MR. JAMES: Okay.
19 THE COURT: Wait a second. We're -- this is question
20 and answer at this point.
21 A What I did when I prepared the affidavit was pull
22 Mr. Fish's criminal convictions while he was an adult.
23 Q Did you -- did you check on his juvenile record, given
24 the facts that you know about Mr. Fish?
25 A I knew no facts about Mr. Fish. Mr. Fish was -- this

Page 209

---

**Page 210**

1  was my first introduction to Mr. Fish.
2  THE COURT: If you don't have anything more than that,
3  Mr. James, the evidence is not relevant to Mr. -- to the
4  detective's credibility, because you haven't shown any
5  suggestion that he knew about the juvenile convictions, and
6  therefore you can't show that he withheld them from the
7  magistrate.
8  MR. JAMES: I -- well, obviously another issue gone
9  upstairs, if we get upstairs. Thank you.
10  THE COURT: Ready for the jury?
11  MR. JAMES: Right.
12  THE COURT: Assuming they're all here. We'll go off
13  record. I'm not sure they're all here, but if the are,
14  we'll get rolling.
15  (Off record)
16  THE COURT: All right. Have a seat, everybody. We are
17  back on record in state versus Davis. We have all of our
18  jurors here, and we have parties and counsel. Good morning,
19  everybody.
20  THE JURY: Good morning.
21  THE COURT: Are you doing all right this morning?
22  Good.
23  UNIDENTIFIED JUROR: Uh-huh. (Affirmative)
24  THE COURT: When we broke yesterday, we had Detective
25  Johnstone in the witness stand. And Mr. James, your cross

**Page 211**

1  examination, you want to continue, please?
2  MR. JAMES: Yes, sir. Thank you.
3  GRANT JOHNSTONE
4  previously sworn, called as a witness on behalf of the
5  plaintiff, testified as follows on:
6  CROSS EXAMINATION CONTINUED
7  BY MR. JAMES:
8  Q  Officer Johnstone, just very briefly, sir, yesterday
9  when we left, we were talking about affidavits, do you
10  remember that?
11  A  Yes.
12  Q  Okay. And we had been talking about the March
13  affidavits. All right. Now there was another
14  affidavit that was done by you on February 13th,
15  correct? Does that.....
16  A  Let me check the date to be sure of that. Yes, that is
17  correct, for a glass warrant.
18  Q  Okay. And number 12 of that affidavit.....
19  A  I don't have that one in front of me.
20  MR. JAMES: Okay. If I may approach the bench, please?
21  For the record, Your Honor, I've marked as D for the
22  record.....
23  UNIDENTIFIED VOICE: Okay. Pardon me?
24  MR. JAMES: D as in Delta.
25  Q  Okay. And (indiscernible).

**Page 212**

1  A  Okay.
2  Q  Okay. Just take a quick look at that and see if that's
3  the one that I'm referring to that you're assigned to?
4  A  Yes, sir.
5  Q  Okay. Now, part 12 indicates that assisting Anchorage
6  Police Department at the discretion of the district
7  attorney's office, is that right?
8  A  Yeah, that's correct.
9  Q  Okay. So is it your understanding as to this affidavit
10  that the DA's office was orchestrating Mr. Fish rather
11  than APD as far as any agreements that were being
12  instituted?
13  A  As I had stated yesterday, I am not aware of any of the
14  agreements that were made. All I know is that he was
15  assisting us to -- as it says, to mitigate an
16  outstanding charge. What that mitigation is, I do no
17  know.
18  Q  Okay. Now, yesterday and we discussed, you had certain
19  jobs that you did, correct.....
20  A  That is correct.
21  Q  .....during this entire procedure?
22  A  Yes, sir.
23  Q  All right. And other people had other jobs, right?
24  A  That is correct.
25  Q  Okay. And so everybody had to do their right job

**Page 213**

1  correctly in order to ensure that as you proceed, the
2  situation developed to the police's satisfaction, is
3  that correct?
4  A  That is correct, yes, sir.
5  Q  Were you -- turning to Grand Larry, which is behind you
6  there.....
7  A  Yes, sir.
8  Q  And I believe you're orange, aren't you?
9  A  I'm.....
10  Q  The color orange?
11  A  Are you talking about on her?
12  Q  Yeah, gold, orange.
13  A  This is Officer Haas here.
14  Q  Oh, okay. Were you a part of the stakeout on Grand
15  Larry?
16  A  When Mr. Fish would turn onto Grand Larry, we would not
17  watch the residence. We would obtain a position
18  usually up in this area and, and actually at one point,
19  I believe were across Muldoon, and allow the other
20  units to conduct the surveillance. Our main function
21  was as he left this area, we were to fall in behind him
22  and follow him back to the station.
23  Q  So you, yourself, and when you say our.....
24  A  Officer LaPorte was with me on.....
25  Q  Okay.

1 A  .....at least one occasion.
2 Q  All right.  You didn't have any view of who could come
3    and go as far as the residence at Grand Larry?
4 A  I did not see anybody.  I could not see the residence
5    on Grand Larry.
6 Q  And if Officer LaPorte was with you, would he be in the
7    same position you would have, as far as observation?
8 A  Yeah, on at least on occasion, neither one of us would
9    have been able to see the residence.
10 Q  Okay.  And is there another occasion where you could?
11 A  No.  We -- I have never -- during -- when -- when the
12    products were purchased from the Grand Larry location,
13    at no point during that did I see the residence.
14 Q  So you have no independent knowledge as to who was
15    there or what Jeremy Fish did while in or out of the
16    residence?
17 A  Just what was heard on the transmission.
18    MR. JAMES:  One moment, please.
19 Q  You indicated that yesterday you took possession on the
20    9th -- excuse me, February 28th/March 1?
21 A  That's correct.
22 Q  Okay. When was it tested?
23 A  It was tested when we returned to the -- to APD.
24 Q  By you?
25 A  I don't believe I did the field test on that, but let

Page 214

1    field test.
2 Q  Okay.  That's all I have.  Oh, wait a minute.  Just a
3    couple more.  Did you field test any of the others?  We
4    know that Bushue, according to her testimony, and I'm
5    not -- but she -- she was involved in the field tests
6    of a couple?
7 A  I don't -- let me refer to all these -- where we did
8    all of this.  I don't believe that I did conduct a
9    field test on these, on the -- Officer -- or Sergeant
10    Bushue conducted one.  Officer Somerset Jones conducted
11    one.  I don't believe that I participated in any of the
12    field tests of the cocaine.
13 Q  So is it fair to say to your own personal knowledge,
14    you don't know whether what was received from Jeremy
15    Fish was, in fact, cocaine?
16 A  I was told that the tests were positive.
17 Q  I understand, but your own personal knowledge, that's
18    what I'm asking.....
19 A  I didn't see the tests.
20 Q  All right.
21 A  You're correct.
22    MR. JAMES:  Thank you, sir.  Thank you.
23    THE COURT:  Redirect, Ms. Brady?
24              GRANT JOHNSTONE
25 testified as follows on:

Page 216

1    me refer to my report real quick.  No, it was turned
2    over to Officer Somerset Jones, who conducted the field
3    test.
4 Q  And after you turned it over to Officer Somerset Jones,
5    is that the last contact you had.....
6    THE COURT:  Can you move closer to the mike, Mr. James?
7    MR. JAMES:  I'm sorry.  Again, I apologize.
8    THE COURT:  Thank you.
9 Q  After -- after you turned it over to Officer Somerset
10    Jones.....
11 A  Yes.
12 Q  .....is that the last contact you had with it?
13 A  That I had with the -- with the cocaine?
14 Q  Yeah.
15 A  I may have, after it was weighed and in the package
16    that it is currently in.  I may have looked at the
17    weight of it, but I never handled the actual product
18    from that point on.
19 Q  Okay.  So you have -- yourself, have no personal
20    knowledge whether it was not cocaine?
21 A  I was told.
22 Q  I understand, but.....
23 A  Yeah.
24 Q  .....without hearsay?
25 A  I did not field test.  I did not see the results of the

Page 215

1              REDIRECT EXAMINATION
2 BY MS. BRADY:
3 Q  Detective Johnstone, does it frequently occur that
4    police officers don't make arrests in cases, and they
5    send them off to Detectives pending further
6    investigation?
7 A  Quite frequently, yes.
8 Q  Okay.  And I'm going to ask you, what's an ATN?
9 A  It is a -- it is a criminal intake disposition form,
10    which means that we -- it was what the district
11    attorney and the court system needs in order to -- to
12    view all the charges.  We complete ATN's and forward
13    them over to the district attorney's officer, or the
14    municipal prosecutor's office.  When we have cases that
15    we want to charge, we send the ATN over, because they
16    won't screen the case for charging until that is
17    attached to it.  So we send that form out that's all
18    filled out over to them with the charges that we would
19    like to see on this particular person.  They then take
20    it from there with our police reports and -- and the
21    charging documents.
22 Q  Now, is that a single sheet form, or are there several
23    copies, or how -- could you just explain that to the
24    jury?
25 A  It's a multiple -- multiple copy form, and I don't -- I

Page 217

1  think there's at least three copies to the form.
2  And.....
3  MR. JAMES: I'm going to object. This is beyond the
4  scope of cross.
5  THE COURT: The objection is overruled.
6 A  It is again sent over and then distributed. I don't --
7  I'm not aware of the distribution channels, but it's a
8  multiple copy form.
9 Q  Do you get a copy back when the case is closed?
10 A  I don't know.
11 Q  Okay.
12 A  I haven't been a detective long enough to get one of
13  those back yet, so.....
14 Q  Okay. Fair enough.
15 A  .....I don't know.
16 Q  And let me just approach with something I have marked
17  state's exhibit 19. Do you recognize this document?
18 A  Yes, I do.
19 Q  Can you explain to the members of the jury what it is?
20 A  This document was developed actually by Officer Mark
21  LaPorte and.....
22 Q  Before you show it to them, we haven't -- we can't show
23  it to them until after it's admitted into evidence.....
24 A  Oh.
25 Q  .....so I just want you to just to.....

Page 218

1 A  Okay.
2 Q  .....tell me that you recognize what it is.
3 A  I do. It is a buy check-off list form developed by
4  Officer Mark LaPorte for each of the buys, as they
5  progress, there's a spot for the date, who copied the
6  -- the money, who conducted the strip-searches both
7  before and after, who conducted the vehicle search both
8  before and afer, and who did the field test on whatever
9  drug it might have been, and what the results of that
10  test were. The officers write their name in and
11  initial it. And under each one of those is -- under
12  each of the dates of the buy. So you can look at say
13  buy number 1, it has the date, and then the officers'
14  names and initials of who conducted all those tests.
15 Q  And is that the report -- is that the buy checkoff list
16  that was filled out in this case involving Mr. Davis?
17 A  Yes, it is.
18 Q  All right. And I'm going to direct your attention to
19  the last buy, which is February 28th.....
20 A  Uh-huh.
21 Q  .....and it has a place for buy money copied and pre-
22  buy strip-search and post-buy strip search?
23 A  Right.
24 Q  And then it indicates your name for those three items?
25 A  Uh-huh. (Affirmative)

Page 219

1 Q  And you didn't initial it?
2 A  That is correct.
3 Q  Okay. Why didn't you initial it?
4 A  I don't know.
5 Q  But you did.....
6 A  I was -- I was -- that actually was Officer LaPorte
7  filled this particular part out and so I don't under --
8  I don't know why it was not initialed.
9 Q  Okay. And -- but all the other places where your name
10  appears and your initials are below it, you did that?
11 A  Yes.
12 Q  Okay. And you indicated that you did those things in
13  your report, is that correct?
14 A  That is correct.
15  MS. BRADY: Okay. At this time, I move to admit
16 state's 19.
17  THE COURT: 19, Mr. James?
18  MR. JAMES: Could I just look at it again, Your Honor?
19  THE COURT: Sure.
20  (Pause)
21  THE COURT: I'm not going to object. I'm not going to
22 object, Your Honor.
23  THE COURT: All right 19 is admitted.
24           (Plaintiff's exhibit 19 admitted)
25 Q  All right. And my final question for you, Detective,

Page 220

1  is one of the maps that Detective Bushue drew, I think
2  it's the Grand Larry map, is -- is -- or is it the
3  Chevron.....
4 A  It's the -- it's the last purchase map, near the China
5  Garden, or whatever the.....
6 Q  All right. What exhibit is that, for the record?
7 A  Excuse me? 24.
8 Q  State's 24?
9 A  Yes.
10 Q  Is north facing the right direction that map?
11 A  No, actually, the arrow that she has indicated as the
12  direction of north, south is actually in this
13  direction, and north would be towards the bottom of the
14  page.
15  MS. BRADY: Thank you. That's all I have.
16  THE COURT: You can step down, Detective. Are you
17 ready with another witness, Ms. Brady?
18  MS. BRADY: I am, Your Honor. Can we approach Your
19 Honor?
20  THE COURT: Yes. We'll take a bench conference,
21 please.
22  (Bench conference as follows:)
23  THE COURT: Ms. Brady, we're at bench conference.
24  MS. BRADY: My next witness is Cam Lampman. I've used
25 her several times before. She's a record's custodian. She

Page 221

Exhibit K – 61

1 must be running late. She's supposed to be here by now and
2 she's not outside. That's my next witness. I need a break
3 until she gets here.
4    THE COURT: All right. Is Mr. Fish here?
5    MS. BRADY: No, he's going to be here at 10:00.
6    THE COURT: All right. Well, Mr. James?
7    MR. JAMES: Nothing we can do.....
8    THE COURT: Nothing we can do.
9    MR. JAMES: .....until we get a witness. I mean.....
10    THE COURT: All right. I'll tell them.....
11    MR. JAMES: .....I could ask for a judgement of
12 acquittal, but I don't think you're going to give it to me.
13    THE COURT: I'll tell them to cool their heels for a
14 while until your witness gets here. Maybe you can check on
15 her when we send the jury out?
16    MS. BRADY: Okay. Yeah, I'll wait outside for her.
17    THE COURT: Thank you.
18    (End of bench conference)
19    THE COURT: We're going to have to take a little break.
20 We're waiting for a witness, it shouldn't be too long, so I
21 could ask you to step out of the courtroom, go your jury
22 room, and we'll come and get you when we're ready. And
23 thanks for your patience.
24    (Jury excused)
25    THE COURT: Any other work -- our jury has departed,

Page 222

1 any other work we can do while we're waiting for the
2 witness?
3    MR. JAMES: I just want to -- yes, there is. I think I
4 -- and I'm not trying to beat this. You indicated -- let's
5 see here -- that 9/29 -- or let's see, the 2/10 and the 4 --
6 excuse the 9/2 and the 2/10; this is on the Jeremy police
7 report, those are subject invest-- -- proceed-- -- let me try
8 it again, out of jury voir dire of Mr. Fish.....
9    THE COURT: 3/29, 9/2 -- let's put them in
10 chronological order.
11    MR. JAMES: I'm sorry. I just want to get to get
12 right, Judge.
13    THE COURT: 3/29, 4.....
14    MR. JAMES: 3.....
15    THE COURT: 4/10, 9/2.
16    MR. JAMES: 9/2. Those are the ones that are available
17 for examination out of the jury?
18    THE COURT: We'll talk to Mr. Fish.
19    MR. JAMES: Yes, sir. That's what I.....
20    THE COURT: You may -- you may talk to Mr. Fish afer
21 you all talk to -- when I say that, we'll probably do it on
22 the record. After I hear from Mr. Fish, I'll make a
23 determination as to whether reasonable jurors can infer
24 that he may have something to fear from the state or the
25 police arising out of those incidents.

Page 223

1    MR. JAMES: And then the -- the 7/26 and 9/29, I can
2 ask if he's aware of -- I mean, he is aware of those,
3 because he was contacted.....
4    THE COURT: There's no objection to those, so.....
5    MR. JAMES: Yeah.
6    THE COURT: .....you may ask about those.
7    MR. JAMES: All right. I just wanted to take advantage
8 of the time so we don't.....
9    THE COURT: Yeah. All right.
10    MS. BRADY: I have something we can take up, Your
11 Honor. Mr. James indicated yesterday he was going to be
12 calling witnesses telephonically, and I am going to be
13 objecting to that. So we can take that up right now if you
14 want to.
15    MR. JAMES: We.....
16    THE COURT: I think where we left it was I said you
17 need to make a motion.....
18    MR. JAMES: Right.
19    THE COURT: .....and I suppose we'll count yesterday as
20 your motion so.....
21    MR. JAMES: All right. Basically, Your Honor, I don't
22 know what Mr. Fish is going to testify to, but we have an
23 extensive police report, three page, from Dan -- Officer Dan
24 Bennett, Nome Police Department, relating to the sequences
25 of events. One of those issues that I wish to explore is

Page 224

1 that he had -- he, being Fish, had agreed to meet with
2 Bennett. There was supposed to -- he was supposed to
3 participate in some buys up in Nome was what this all came
4 down -- it originally came down to. He was to meet with
5 him, he -- the 31st, I believe, and he departed unbeknownst
6 to Bennett on the 27th, which activated -- this January now,
7 of this year -- activated the arrest warrant issued by Judge
8 Ben Esch up in Fairbanks -- excuse me, Nome, which resulted
9 in his arrest down here on the 6th of February.
10    And if he denies that he had any kind of agreement, or
11 that, in fact, he lied to the police -- just denies he lied
12 to the police, I think I'm entitled to establish that, A, he
13 lied to his -- the police there.
14    As far as Ted Garcia, who is the CIP officer -- CIPT
15 officer, my last communication with him was is he was under
16 doctor's orders at home, had just come off of his pain pump,
17 and -- now, that was two days ago. And I don't know whether
18 he's going to be physically able to come. Now he is the one
19 that is really -- not Gonzales, but Garcia is the booking
20 officer. And those are the two that I -- I wish to
21 telephonic -- I don't know whether I'm going to use Bennett
22 or not, to be honest with you, because I don't know what
23 Fish is going to say. But Garcia, obviously -- and, of
24 course, as we progress here, his -- I hope his condition
25 improves. He's just went over rotator cuff surgery. And

Page 225

**3AN-01-1717 CR**                                              **State v. Robert Davis**
                                                               **November 15, 2001**

1 Bennett is 400 miles away, I think.
2     THE COURT: Ms. Brady?
3     MS. BRADY: The rule pertaining to telephonic testimony
4 says that both parties have to agree in order to have
5 telephonic testimony. And I don't agree to that. I think
6 the jury should be able to see -- I may agree to it for
7 Mr. Garcia if it becomes -- if there's some sort offer of
8 proof that shows testimony will be relevant, I may go ahead
9 and agree to that. But as far as Officer Bennett, he should
10 be here if he's going to testify. There's no reason for him
11 not to be here. That's why I brought it up now so there
12 would be plenty of notice, just in case Mr. James needs to
13 get him here. And he can take the stand like any other
14 witness and testify, and the jury can view him, there's
15 reason why.....
16     THE COURT: Which rule?
17     MS. BRADY: Pardon me?
18     THE COURT: Which rule?
19     MS. BRADY: It's -- I think it's.....
20     THE COURT: 38.1.
21     MS. BRADY: Thank you.
22     THE COURT: With the consent of the prosecution and the
23 defendant. Mr. James?
24     MR. JAMES: Yes, Your Honor. Obviously, it's -- it's
25 strictly economics. I mean, I don't have any reason, when I

Page 226

1 talked to Bennett, of course, this was before the trial, and
2 I -- Officer Bennett, there was no indication that he would
3 no be available and be a willing participant. We're talking
4 $500, $600 bucks to bring him down here. I think, you know,
5 that at some point in time the economics of it certainly
6 have to come into play and the court has discretion under --
7 to relax the rules under -- since you're -- we're citing the
8 criminal rules.
9     THE COURT: All right.
10     MR. JAMES: I don't think it's an unreasonable request.
11     THE COURT: Because the state objects to Mr. Bennett
12 testifying telephonically, under criminal rule 38.1, which
13 is designed to protect both sides' right to a fair trial,
14 and recognize the importance of the actual presence of
15 witnesses so that the jury can -- can view them and make a
16 credibility determination based not only on what they hear,
17 but what the see, the application for telephonic testimony
18 is denied. And exceptional circumstances, even if I had the
19 authority to relax this particular rule, it's not clear I
20 do, but even if I did the -- I don't have exceptional
21 circumstances warranting that. We'll wait and see what
22 happens with Mr. Gonzales, and Ms. Brady indicated she may
23 -- may agree to that one.
24     MR. JAMES: Okay.
25     THE COURT: Why don't you check on your witness,

Page 227

1 Ms. Brady, and maybe telephonically and out in the hall?
2 We'll go off record.
3     (Off record)
4     THE COURT: Everybody have a seat, please. And are we
5 back on record, Madam clerk?
6     THE CLERK: We are.
7     THE COURT: We are back on record. We have our jury.
8 Thanks for your patience, folks. Ms. Brady, are you ready
9 with your next witness?
10     MS. BRADY: I am, Your Honor. The state calls Cam
11 Lampman.
12     THE COURT: Stand up, ma'am, and we will swear you in.
13     THE CLERK: Please raise your raise your right hand.
14     (Oath administered)
15     MS. LAMPMAN: I do.
16              CAM LAMPMAN
17 called as a witness on behalf of the plaintiff, testified as
18 follows on:
19         DIRECT EXAMINATION
20     THE CLERK: Please be seated. Ma'am, for the record,
21 will you state your full name, and spell your last? Yes,
22 spell your last.
23 A   My name is Cam Lampman, L-a-m-p-m-a-n.
24     THE CLERK: And how do you spell your first name?
25 A   C-a-m.

Page 228

1     THE CLERK: Thank you.
2     THE COURT: Go ahead, Ms. Brady.
3 BY MS. BRADY:
4 Q   Who do you work for?
5 A   Alaska DigiTel.
6 Q   And you're here -- are you here as a record's custodian
7     on their behalf?
8 A   Yes, I am.
9 Q   All right. And you were asked to bring some records
10     pertaining to a cell phone used by one of your
11     customers?
12 A   Correct.
13 Q   And are those records that are kept in the usual course
14     of Alaska DigiTel's business?
15 A   Yes.
16 Q   And are they relied on, the kind of records that are
17     relied on by Alaska DigiTel in the course of its
18     business?
19 A   Yes.
20 Q   Were they prepared in anticipation of litigation?
21 A   No.
22 Q   Okay. What's the phone number on the account for the
23     records?
24 A   It is 7 -- 907-727-9465.
25 Q   Okay. And you were asked to bring the subscriber

Page 229