**3AN-01-1717 CR**

**Page 230**

1  information for that account, is that correct?
2  A  Correct.
3  Q  And could you just please explain to the members of the
4  jury what subscriber information is?
5  A  Subscriber information will be their name, address,
6  social security number, date of birth, and employer, if
7  known.
8  Q  Okay.  And what is the subscriber information that you
9  have for that telephone number?
10  A  We have Robert Davis at 732 Pearl Drive, Anchorage,
11  Alaska, 99518.  And then his social security number,
12  date of birth, and his Alaska driver's license numbers.
13  Q  Okay.  And is the -- now you were also asked to bring
14  the records for the phone that was being used on that
15  account, is that right?
16  A  Correct.
17  Q  And what kind of phone was being used on that account?
18  A  It was a Lucky Goldstar.
19  Q  Okay.  And the serial number is on there?
20  A  Yes, commonly referred to as the ESN.  There's two
21  different formats.  One is a decimal version, one is a
22  hex format.  I think on the phone itself, the hex
23  format was Charlie 9 Delta 01 Bravo 92.
24  Q  Okay.  And that information is on the document in front
25  of you?

**Page 231**

1  A  Yes, it is.
2  MS. BRADY:  Okay.  And at this time, I move to admit
3  that as state's exhibit 14.
4  THE COURT:  Number 14, Mr. James?
5  MR. JAMES:  No objection.
6  THE COURT:  14 is admitted.
7  (Plaintiff's exhibit 14 admitted)
8  MS. BRADY:  That's all the questions I have for this
9  witness.
10  THE COURT:  Mr. James?
11  CAM LAMPMAN
12  testified as follows on:
13  CROSS EXAMINATION
14  BY MR. JAMES:
15  Q  Ms. Cam Lampman?
16  A  Uh-huh.  (Affirmative)
17  Q  You brought a whole packet that shows different, I
18  guess a telephone log, isn't it, would that be a
19  correct statement?
20  A  All records.
21  Q  Yeah.
22  A  Yes.
23  Q  Okay.  Does that reflect oncoming -- incoming and
24  outgoing calls, is that what that was?
25  A  Correct.

**Page 232**

1  Q  Okay.  Okay.  So anytime then that that phone was --
2  okay, well -- and do you have those records in front of
3  you?
4  A  I do not.  Well, I have my own copy.
5  Q  Well, that's what I meant.
6  A  Yes.
7  Q  Okay.  It's -- is this.....
8  A  Yes.
9  Q  .....multi-page?  All right.  I'm not going to go into
10  a lot of detail.  I just want to get a few items
11  cleared, if I may.  So this would reflect all activity,
12  according to your records on that phone.....
13  A  Correct.
14  Q  .....for the -- for the period that you have supplied?
15  A  Correct.
16  MR. JAMES:  Okay.  All right.  Okay.  Thank you.  Thank
17  you.
18  A  You're welcome.
19  THE COURT:  Redirect, Ms. Brady?
20  MS. BRADY:  I don't have any redirect, Your Honor.
21  THE COURT:  All right.  Thank you.  You can step down.
22  Do you have the marked exhibit?
23  A  It's right here.
24  THE COURT:  Thank you very much.  And I understand we
25  need to take a break before we -- before the next witness,

**Page 233**

1  is that correct?
2  MS. BRADY:  That is correct, Your Honor.
3  THE COURT:  I'm going to ask you to take another break,
4  folks.  And again, I appreciate your patience.
5  (Jury excused)
6  MS. BRADY:  He was waiting downstairs, so Detective
7  Johnstone went to go get him, and he's not back yet.
8  THE COURT:  We'll go off record, but everybody can stay
9  in the courtroom, and as soon as he gets back, we will bring
10  Mr. Fish in and make very limited inquiry, and then move
11  back with the jury.
12  MR. JAMES:  Understood.  Thank you.
13  THE COURT:  Deal with while we're waiting for Detective
14  Johnstone to get back with Mr. Fish, Ms. Brady?
15  MS. BRADY:  I don't have any, Your Honor.
16  THE COURT:  Mr. James?
17  MR. JAMES:  I -- I can't think of any right at the
18  moment, Judge.
19  THE COURT:  All right.  Then we'll go off record.
20  (Off record)
21  (Jury not present)
22  THE COURT:  .....record.  Let's do some housekeeping
23  work while we're -- while we have the time to do that.
24  First of all, you all have an agreement regarding exhibit
25  number -- what was the exhibit that was just admitted?

1    MS. BRADY: 14.
2    THE COURT: 14, and that is to edit out the fax
3 reference, attention Judge Hensley, is that correct?
4    MR. JAMES: Yes, sir.
5    MS. BRADY: That's correct, Your Honor.
6    THE COURT: All right. So I'll rely on you folks to
7 make the agreeable -- agreed upon edit and then substitute
8 the exhibit, and unless I hear further objection, then --
9 then I'll assume that you've agreed on what it says and it
10 will go to the jury. I had four police reports that were
11 given to me as part of the other evidentiary disputes that
12 we had this morning, why don't we get those marked with
13 exhibit stickers, and since they won't be admitted into
14 evidence, let's use some numbers that aren't likely to.....
15    MS. BRADY: Why don't.....
16    THE COURT: .....foul up somebody's.....
17    MS. BRADY: Why don't we use EH1, 2, 3, like -- and so
18 on?
19    THE COURT: EH?
20    MS. BRADY: Yeah.
21    THE COURT: That's fine with me.
22    MR. JAMES: What's EH stand for?
23    THE COURT: Evidentiary hearing.
24    MR. JAMES: Oh, evidentiary hearing.....
25    MS. BRADY: Yeah.....

Page 234

1    THE COURT: Although I have some of them marked with --
2 otherwise, but we'll go ahead and do that. And so we'll
3 mark the 9/29 report EH1.
4    THE CLERK: Here you go. Why don't you just go ahead
5 and do it (indiscernible).....
6    THE COURT: Actually, let me -- yeah, it doesn't -- I
7 guess that doesn't have to be chronological. We'll mark the
8 3/29 report EH2. We'll mark the 7/26 report EH3. We'll
9 make, although I didn't use it again today, the report
10 involving Redwine auto case, which is July 3rd as EH4. Get
11 some more, Ms. Brady.
12    MS. BRADY: Okay.
13    THE COURT: We will remark exhibits which were marked
14 yesterday, the Mumford burglary April 4 will be remarked as
15 EH5.
16    THE CLERK: What was it previously marked?
17    THE COURT: Previously marked as exhibit C. The June,
18 2001 vehicle theft, previously marked as 22, we will remark
19 as EH6. And the previously marked exhibit B, which is the
20 car stereo, 7/13, July 13, 01, will be remarked as exhibit
21 -- evidentiary hearing 7, EH7. So that gets all of those in
22 the record for whoever else wants to look at them later.
23 And it will give us a record to refer to if we need to later
24 in the trial. And we can go off record now and wait for
25 Mr. Fish.

Page 235

1    MS. BRADY: I'm going to go downstairs and see if I can
2 find out what's going on.
3    THE COURT: I'd appreciate that. Thanks.
4    (Off record)
5    THE CLERK: On record.
6    THE COURT: We're on record. We have parties, counsel,
7 our jury is not here, and I'm assuming that you are Jeremy
8 Fish in the witness box, is that right?
9    MR. FISH: Yes, sir.
10    THE COURT: All right. Now, if you will stand up, sir,
11 Ms. McKewin is going to swear you in, and I'm going to give
12 the lawyers an opportunity to ask you a few questions before
13 we continue with the trial.
14    THE CLERK: Please raise your right hand.
15    (Oath administered)
16    MR. FISH: Yes, I do.
17          JEREMY FISH
18 called as a witness on behalf of the plaintiff, testified as
19 follows on:
20          VOIR DIRE EXAMINATION
21    THE CLERK: Please be seated. Sir, for the record,
22 will you state your full name and spell your last?
23 A    Jeremy Joel Fish, F-i-s-h.
24    THE CLERK: Thank you.
25    THE COURT: That's a pretty hot mike. You don't have

Page 236

1 to lean into it.
2 A    Sorry about that.
3    THE COURT: It will pick you up, as long as you're
4 reasonably close. Mr. James?
5 BY MR. JAMES:
6 Q    Thank you, Mr. Fish. Just for clarification, do you --
7    well, are you under -- have you used any drugs in the
8    last 24 hours?
9 A    Yes, I have.
10 Q    What have used?
11 A    Marijuana.
12 Q    When is the last time you used it?
13 A    Probably yesterday.
14 Q    When?
15 A    Evening time, probably about 7:00 o'clock.
16 Q    Okay. How about when is the last time you used
17    cocaine?
18 A    I don't know, a while. It's been a long time.
19 Q    Like what?
20 A    About -- I don't know, like eight months.
21 Q    All right. Now, you're under oath, and is there
22    anything about your use of drugs that you feel may
23    cloud your memory at this time?
24 A    No, I do not.
25 Q    What we're talking about here, what we're going to be

Page 237

1    talking about is subsequent police contacts after
2    March 1 of 2000. Okay? Okay. Now, you apparently
3    pawned a -- some type of stereo system?
4  A  Sega Saturn.
5  Q  Pardon, please?
6    THE COURT: All right. Just a second, Mr. Fish, before
7  we get into these subjects, and -- I'm going to tell you
8  that although you're not under arrest or you're not.....
9  A  Right.
10    THE COURT: .....you are subpoenaed here by the
11  district attorney's office, I assume. Some of the questions
12  may relate to some potential liability. I don't really
13  know, because I'm not in charge of investigating and
14  prosecuting crimes. But some of the questions may relate to
15  outstanding crimes, and you have a right not to answer the
16  questions. You have a right to ask for an attorney before
17  you answer the questions, to consult with an attorney before
18  you answer the questions, and most importantly, if you
19  answer the questions, you're on tape here and everything is
20  being recorded, and your answers may be used against you
21  later on if -- if some of these police investigations turn
22  out to -- to pursue you. So you need to know that. You're
23  not -- nobody is going to force you to answer the questions
24  that we're talking about now in front of the jury. And so I
25  want to make sure that you understand that and ask if you --

Page 238

1  if you're willing to answer the questions?
2  A  Yeah, I'm willing to answer them.
3    THE COURT: All right.
4  Q  Okay. With those admonitions, Mr. Fish, now you
5    indicated that -- when I was talking about a pawning of
6    a stereo, you indicated it was a Sega?
7  A  Yeah, that's the only thing I pawned.
8  Q  Okay. What -- what did you pawn?
9  A  It was a Play Station.
10  Q  Play Station?
11  A  Yes. It was something like that.
12  Q  Okay. Where did that come from?
13  A  It came from Liz Redwine.
14  Q  Okay. How did you get it?
15    THE COURT: Mr. James, the question isn't.....
16    MR. JAMES: All right.
17    THE COURT: The.....
18    MR. JAMES: All right.
19    THE COURT: The area of inquiry isn't -- isn't what
20  happened, it's this witness' knowledge. Now, there are more
21  than one way to get there, but -- but for purposes of this
22  trial, I want you to focus on the knowledge of potential
23  repercussions and not whether a particular crime was
24  committed.
25  Q  Did you have -- did the police contact you regarding

Page 239

1    that?
2  A  No, they have not.
3  Q  All right.
4  A  I contacted them. I contacted Officer Triplett and
5    told him to the best of my knowledge everything that
6    was behind that. That's -- I never heard anything back
7    on it.
8  Q  All right. Now, to your knowledge, was that stolen
9    from Liz Redblood [sic]?
10  A  Not to my knowledge, or I wouldn't have pawned it.
11  Q  All right.
12    THE COURT: What's the date on this one, Mr.....
13    MR. JAMES: This is the -- this is the 4/14, it's.....
14    THE COURT: 4/10?
15    MR. JAMES: 4/10, right.
16    THE COURT: Okay. Ms. Brady's position was that if the
17  witness had any idea that the police were interested in the
18  case, the evidence was admissible.
19    MR. JAMES: Right.
20    THE COURT: Is that still your position, Ms. Brady?
21    MS. BRADY: Yeah, Your Honor.
22    THE COURT: Then the evidence, based on this testimony,
23  you can go into that subject at trial.
24    MR. JAMES: Okay. Thank you.
25  Q  Moving along here, calling your attention to the

Page 240

1    forgery involving a Colleen Hensley, where you received
2    two checks were written out to you, one for $275 and
3    one for $250?
4  A  It wasn't involving me.
5  Q  Did you receive those checks?
6  A  No, I did no.
7  Q  You didn't cash a check for.....
8  A  No, I did not.
9  Q  Let me finish the question, if I may.
10  A  Sorry.
11    THE COURT: Mr. -- Mr. James, the issue isn't guilt or
12  innocence, it's knowledge of repercussions.
13    MR. JAMES: All right.
14  Q  No, there is no -- there is no police investigation
15    involving you involving these checks?
16  A  No. No.
17  Q  All right. Did a Mr. James Cage from MBA/Wells Fargo
18    contact you?
19  A  No.
20  Q  Just a moment, sir. On 9/29, were you contacted by the
21    police regarding a banishment of a weapon, gun?
22    MS. BRADY: I all ready agreed that could come in.
23    MR. JAMES: Okay.
24    MS. BRADY: The only one's that left is the 9/2 threat.
25    MR. JAMES: Threat, right.

Page 241

1 Q  Mr. Fish, on 9/2, that's September 2nd, were you
2    contacted, or are you aware of a police investigation
3    involving a threat involving a Mr. -- I believe it's
4    Milky (ph)?
5 A  No.
6 Q  You was going to burn down his -- were you going to
7    burn down his house?
8 A  No, I wasn't.
9 Q  All right.
10   (Whispered conversation)
11   MR. JAMES:  Well, I guess we've covered the ground
12 then, Judge that.....
13   THE COURT:  I can't hear you.
14   MR. JAMES:  I'm sorry.
15   (Whispered conversation)
16   MR. JAMES:  We've covered that, the forgery and the
17 threat.  Those are in all ready.  Do we have those -- oh,
18 you've got the list up there, Judge?
19   THE COURT:  Would you like them?
20   MR. JAMES:  Yeah, great.
21   THE COURT:  I have the -- the reports.  Right.  That's
22 fine.  I'm missing one page here, or something.
23   (Pause)
24   (Whispered conversation)
25   MR. JAMES:  So we've got -- marijuana is in.  I'm just

Page 242

1 -- banishing, that's in.  The -- alluding, that's in, coke
2 is in.  These are -- I think we've covered all the issues.
3 I just wanted to make sure that we've covering the ones
4 that.....
5    THE COURT:  Do you want to ask any questions,
6 Ms. Brady?
7    MR. JAMES:  Here's the.....
8    MS. BRADY:  Of this witness, no, Your Honor.  But I do
9 want to clarify for purposes of the protective order, the
10 relevant line of inquiry with regard to these acts is only
11 witness bias.  It's what he thinks may or may not happen as
12 a result.  I mean, I think limited inquiry into the facts is
13 appropriate, but not.....
14   THE COURT:  Well, what may happen as a result may in
15 part turn on how serious the events are, and so it's kind of
16 hard to put parentheses around it, or narrow it down.  But
17 if.....
18   MS. BRADY:  Okay.
19   THE COURT:  .....it gets cumulative, or if the
20 questioning gets in -- begins to the point where we're
21 talking about more propensity than bias, I'll hear --
22 entertain objections.
23   MS. BRADY:  Okay.  And I'm ready to go.
24   THE COURT:  All right.  Are you ready to go, Mr. James?
25   MR. JAMES:  Yes, sir.

Page 243

1    THE COURT:  All right.  Mr. Fish, just keep your seat.
2 We're going to go get the jury.
3 A  Okay.
4    THE COURT:  When the jury comes in, you can -- we all
5 stand up when they come in.
6 A  All right.
7    (Jury summoned)
8    MS. BRADY:  You listened to all the tapes, right?  So
9 if I say to you, this tape is the tape that you have that's
10 marked 2/28, do you know what's on this tape, what would you
11 say?
12 A  No.
13   MS. BRADY:  It's a copy of what -- the tape that was
14 given to you.....
15 A  I mean, I know -- I don't know them in order.
16   MS. BRADY:  Okay.
17 A  I don't know what's on the 28th.  But I know if you
18   start -- start it, I can finish it.
19   MS. BRADY:  Okay.
20   (Pause)
21   THE COURT:  Have a seat, everybody.  We are back on
22 record.  We have all the jurors back.  Thanks again for your
23 patience, everybody.  We have another witness in the witness
24 box.  Sir, if you would stand up, we will swear you in.
25   THE CLERK:  Please raise your right hand.

Page 244

1    (Oath administered)
2    MR. FISH:  Yes, I do.
3           JEREMY FISH
4 called as a witness on behalf of the plaintiff, testified as
5 follows on:
6           DIRECT EXAMINATION
7    THE CLERK:  Please be seated.  For the record, sir,
8 will you state your full name, and spell your last?
9 A  Jeremy Joel Fish, F-i-s-h.
10   THE CLERK:  Thank you.
11   THE COURT:  Go ahead, Ms. Brady.
12 BY MS. BRADY:
13 Q  How old are you, Mr. Fish?
14 A  I just turned 19.
15 Q  All right.  And how far did you go in school?
16 A  Probably about tenth grade, ninth grade.
17 Q  Have drugs affected your life?
18 A  Yeah.
19 Q  How?
20 A  They've always been a part of it.
21 Q  Did your parents use drugs?
22 A  Yeah.
23 Q  And so you've been aware of the drug community since
24   you were very young?
25 A  Yeah.

Page 245

| | |
|---|---|
| 1 Q When you were a juvenile, did you get into criminal | 1 A Yeah. |
| 2    trouble? | 2 Q Okay. Now, let me stop you for just a second. When |
| 3 A Yeah. | 3    you were talking to the Nome police officer, did he |
| 4 Q Were you adjudicated two times as a juvenile of crimes | 4    tell you what you could be charged with as a result of |
| 5    involving dishonesty? | 5    what you had done? |
| 6 A Yes, I was. | 6 A I can't remember. |
| 7 Q Okay. And did there -- was there a time when you -- | 7 Q Burglary in the first degree? |
| 8    have you always lived in Anchorage? | 8 A Right. Burglary. |
| 9 A Yeah. | 9 Q Okay. And when you got here, did you get arrested? |
| 10 Q Okay. Did there come a time when you moved away from | 10 A No, I did not. |
| 11    Anchorage? | 11 Q Okay. How did it come to pass that you ended up being |
| 12 A Yeah. | 12    in contact with APD? |
| 13 Q Where did you move to? | 13 A Well, I have a girlfriend and a baby, and they told me |
| 14 A Nome, Alaska. | 14    -- you know, they got a hold of my girlfriend because |
| 15 Q What did you do in Nome? | 15    my girlfriend's dad is a major, he's a trooper. And |
| 16 A I worked. | 16    they told him that -- they told me that if I didn't |
| 17 Q How long were you there for? | 17    turn myself in, that they were going to arrest my |
| 18 A Probably about four and a half months. | 18    girlfriend for being an accomplice with me and put my |
| 19 Q Okay. And you got in trouble in Nome as well, isn't | 19    daughter in DFYS. So I turned myself in. |
| 20    that right? | 20 Q Okay. And when you turned yourself in, did you tell |
| 21 A Yes, I did. | 21    anybody that you could -- that you wanted to work on a |
| 22 Q Okay. Why don't you just explain to the jurors what | 22    deal? |
| 23    you were doing on January 25th of this year, 2001, at | 23 A Well, in Nome, the guy told me that -- what they wanted |
| 24    the AC apartments? | 24    to see was a drug bust in Nome. And I didn't know |
| 25 A I was -- I was under the influence of alcohol and we | 25    nobody in Nome who dealt with dope. So I came to where |
| Page 246 | Page 248 |

| | |
|---|---|
| 1    were just -- I was with a couple of other people, and | 1    I knew somebody who dealt with dope. And I offered to |
| 2    there really -- we were just walking around and | 2    give -- give up some people who sold dope, if I could |
| 3    knocking on doors and I opened this one door, I opened | 3    just go on with my life. |
| 4    the door and there was some money laying on a table, | 4 Q Did you come -- did you reach an agreement where your |
| 5    $7, I took $7 and I walked out. | 5    Nome burglary case would be dismissed..... |
| 6 Q Okay. Now, as a result of that, Nome police officers | 6 A Right. Yes. |
| 7    came and contacted you, right? | 7 Q .....in exchange for making buys here in Anchorage? |
| 8 A Yes, they did. | 8 A Yes. |
| 9 Q Okay. And what happened when the Nome police officers | 9 Q Okay. And was that agreement written down anywhere |
| 10    came and talked to you? | 10    or..... |
| 11 A He came and talked to me, and he told me that the | 11 A No. It was just a -- it was like a talk, you know. |
| 12    people I was with already told them it was me. And so | 12 Q Who was the person that you talked with? |
| 13    he asked me, you know, what did I want to do about it. | 13 A I think it was -- like I can't remember, but it was |
| 14    And I -- I told him that I wanted to make grievance, I | 14    police departments. |
| 15    wanted to go back and tell the lady I'm sorry and give | 15 Q And APD officer? |
| 16    her back her seven bucks. It was -- it was stupid of | 16 A Yeah. They were special investigators, I believe. |
| 17    me. And he told me that -- that, you know, I couldn't | 17 Q Was it a many or a woman? |
| 18    go back over there and talk to the lady, that we would | 18 A It was a woman. The first person I talked to was a |
| 19    have to try to work something out. And he thought I | 19    woman. |
| 20    knew somebody who sold dope, which is coke or | 20 Q Okay. And was that Detective Pernue, Pam Pernue? |
| 21    something, in Nome, and I didn't. That's why I moved | 21 A Yes. |
| 22    away from Anchorage, to get away from all this. And so | 22 Q Okay. Now, was Mr. Davis one of the people that you |
| 23    I told him that I -- I did know somebody, and then I | 23    said that you could make buys from? |
| 24    just came back here. | 24 A Yes, it was. |
| 25 Q You left in the middle of the night? | 25 Q Okay. And when you first started -- when you told the |
| Page 247 | Page 249 |

1  officers that you could make buys, did you tell them
2  that you could buy....
3  MR. JAMES: I'm going to object. She's leading him all
4  over the place.
5  THE COURT: You -- I'll sustain leading objections. I
6  don't know if the next question was leading or not.
7  MS. BRADY: Okay.
8 Q  Did you know what -- his name was Robert Davis, or did
9  you know him as something else?
10 A  I knew him as Rico.
11 Q  Okay. And did you know him by any other name, other
12  than Rico, when you said that you could make buys?
13 A  No, I did not.
14 Q  Okay. And has your Nome case now been dismissed?
15 A  I don't know.
16 Q  Okay. Now, were you supposed to be making buys from
17  anybody besides him?
18  MR. JAMES: Objection. Relevance.
19  THE COURT: Overruled.
20 A  Yeah.
21 Q  Okay. And, in fact, did you make buys from anyone
22  besides him?
23 A  Yeah.
24 Q  Okay. Now, what happened when you first got to APD,
25  the very first time you went there to make -- make your

Page 250

1 A  February 8th, yes.
2 Q  Okay. And where did you meet with him at?
3 A  On February 8th?
4 Q  Uh-huh. (Affirmative)
5 A  At the police station.
6 Q  And what happened when you got to the police station?
7 A  I think I was -- I was searched and I can't remember.
8 Q  Did they ask you to call Rico.....
9 A  Yeah.
10 Q  .....the person you knew as Rico?
11 A  Yeah.....
12  MR. JAMES: Leading.
13  THE COURT: Sustained.
14 A  We did make phone calls.
15 Q  You made phone calls?
16 A  Yes.
17 Q  Who did you make a phone call to?
18 A  To Rico.
19 Q  Okay. Did you know his number right off the top of his
20  -- right off your.....
21 A  Yeah.
22  MR. JAMES: Objection. Leading.
23  THE COURT: That was not leading. The objection is
24  overruled.
25 A  Yes, I did.

Page 252

1  deal?
2 A  The very first time I went there?
3 Q  Uh-huh. (Affirmative)
4 A  Well, the very first time I went there and talked, they
5  searched me and stuff. And when they searched me, they
6  searched my car and they found some pot. I -- you
7  know, they found some pot and they found a marijuana
8  pipe. And the told me, don't bring it back to the
9  station or, you know, they'll discontinue working with
10  me, so.....
11 Q  Okay. Did they talk to you about who you could make
12  buys from?
13 A  Yeah. I said Rico.
14 Q  Okay.
15 A  I don't know.
16 Q  Then did they tell you a time to come back after that?
17 A  I -- I can't remember. It was a while ago.
18 Q  Okay.
19 A  But it was -- it was definitely we were going to, you
20  know, be on a weekly basis.
21 Q  Okay. Did you -- let me direct your attention to
22  February 8th, which would be a day that's important to
23  this case. So just -- I want you to concentrate on
24  this particular case. Did you meet with Officer
25  Johnstone that day? Oh, he just left.

Page 251

1 Q  Okay. What was the number?
2 A  727-9465.
3 Q  Okay. Now, did you make an arrangement to go buy some
4  cocaine from Mr. Davis?
5 A  Yes, I did.
6 Q  Okay. And how much cocaine were you going to buy?
7 A  I believe the first time it was $150 worth.
8 Q  Did you ask for $150.....
9 A  No, I -- I asked for a ball, but he said he didn't have
10  it. I believe he said he didn't have it. And he said
11  he had a buck 50 he could do something with or
12  something.
13 Q  Okay. Now in -- when you were asking him for a ball,
14  what you were asking him for?
15 A  I was asking him for coke or crack.
16 Q  And was there a specific amount? Is a ball an amount?
17 A  Well, usually a ball is like 3.2 to 2.9, I don't know.
18 Q  3.2 to 2.9.....
19 A  Yeah. Like.....
20 Q  .....what?
21 A  Grams.
22 Q  Okay. And he -- and then when you said, he said a buck
23  50, what does that mean?
24 A  $150.
25 Q  Okay. So was it arranged for you to meet him somewhere

Page 253

**Page 254**

1  to buy cocaine?
2 A  Yes.
3 Q  Where was -- where was the arrangement made for?
4 A  At his old house.
5 Q  Okay.  And what happened once he agreed to meet with
6    you?
7 A  I just -- then we -- I don't think -- well, the first
8    -- the first time, we just -- they all followed me over
9    there, we went there, and I went inside.  And I bought
10   the dope and.....
11 Q  Okay.  I'm still back at the police station though.  I
12   want to know, you hang up the phone, and you say okay,
13   we're going to meet.....
14 A  Okay.  I hang up the phone, then I think it was Officer
15   LaPorte went and got the money to go -- or somebody
16   went to go get the money, and he was hooking me up with
17   a wire.
18 Q  Okay.  The first time.....
19 A  The first -- first time, there wasn't a wire.  It was
20   just -- there wasn't a wire.  It was just a buy.
21 Q  Were you searched?
22 A  Yes, I was.
23 Q  Can you explain to the members of the jury how that
24   search is done?
25 A  Yeah.  There's -- he tells me to take off all my

**Page 256**

1 A  Off of Muldoon on Grand Larry.
2 Q  Okay.  And how did you get there?
3 A  I drove there.
4 Q  Which route did you take?
5 A  I take -- take Tudor to -- go to -- go down Tudor until
6    it hits like Totem Theater, Totem -- where Tudor turns
7    into Muldoon.  Right?  I believe it's Tudor that turns
8    into Muldoon.  You go all the way down Tudor, wraps
9    around, and you just go all the way down the Muldoon
10   Road, all the way down, by Ramada Inn and then turn.
11 Q  Okay.  And what happened once you got to Mr. Davis'
12   house?
13 A  When I got there, I went in and bought some dope.
14 Q  Okay.  Where -- I want you to just tell the members of
15   the jury what you're seeing.  Where did he get the
16   cocaine from?
17 A  He usually.....
18 MR. JAMES:  Objection.  There's no indication of
19 cocaine.
20 A  Like every time that I went.....
21 THE COURT:  The objection is overruled.
22 A  Sorry.
23 THE COURT:  Go ahead.
24 A  Go ahead.
25 THE COURT:  The question, please.

**Page 255**

1  clothes.  I take off all clothes, including my shoes,
2  my socks, my underwear.  They go through my socks.
3  They go through my shoes.  They go through my pant
4  pockets.  They, you know, make me bend over, like bend
5  down.  And then I get back up, and if I'm clean, I put
6  all my clothes back on.
7 Q  Was your car searched also?
8 A  Yeah.
9 Q  Okay.  And did you know ahead of time that both you and
10   your car were going to be searched?
11 A  Yeah.
12 Q  Okay.  And you were given money?
13 A  Right.
14 Q  How much money were you given?
15 A  $150.
16 Q  Okay.  And then when you -- when you left the police
17   station, were you driving?
18 A  Yes, I was.
19 Q  What car were you driving?
20 A  A 1986 Plymouth -- Plymouth Reliant.
21 Q  Is that your car?
22 A  Yes.
23 Q  All right.  And did you know where Mr. Davis lived?
24 A  Yes, I did.
25 Q  Where was that at?

**Page 257**

1 A  Okay.  When you -- every -- every time I walked in
2    house, you walk in house, and there's like -- there's
3    -- there's like a bar table where there should be seats
4    wrapped around.  And then there -- if you turn around,
5    if you look straight, he's looking at me, there's a
6    barstool and then there's like a drawer right here.
7    But then usually his dope would be up in his cabinet
8    right above his stove.  You open his cabinet and it's
9    usually right there.  It's a bag.  Usually, probably a
10   half once to an ounce at a time.  And just pulled it
11   out of his cabinet, a little black scale.  Put a piece
12   of paper down, usually you put a piece of a paper down,
13   like a little piece of paper, and just start pouring
14   dope on there until it measured up.  And he put it in a
15   bag for me, and be it.
16 Q  How long were you inside Mr. Davis' house that day?
17 A  Probably 10 minutes.
18 Q  Okay.  And what happened when you left the apartment?
19 A  I left the apartment and then I pulled out.  And I went
20   behind a church, I believe, that was the first time.
21   We went behind a church and I gave him the dope.
22 Q  You gave who the dope?
23 A  I gave Officer Johnstone.
24 Q  Okay.  Now, when you said the dope, are you talking
25   about.....

1 A    Coke.

2 Q    Okay. Now, did you -- and you gave it Officer

3    Johnstone at the church, is that.....

4 A    Yeah.

5 Q    And then what happened -- where did you go after that?

6 A    Then we went back to the -- to the station. And I was

7    searched. And the car was searched. And then we

8    scheduled the next appointment, when I would come and

9    see him.

10 Q    Did they interview you?

11 A    Yeah, I got a debrief.

12 Q    Did they tape record that?

13 A    Yes, they did.

14 Q    All right. And did you know that both you and your car

15    were going to be searched again once you left?

16 A    Yeah. That was just a mandatory thing, routine.

17 Q    Now, did you get the amount of cocaine that you were

18    expecting to get?

19 A    Well, the first time, it -- it was kind of shallow. I

20    mean, it wasn't as much as he usually gives me. But

21    that first time was the -- that was just the first

22    time, because that was the first time I had bought dope

23    off him in a while, because I had just got back from

24    Nome. And he said $150, and that's just what he gave

25    me for what he got.

Page 258

1 Q    Okay. What did -- when -- when you got back and you

2    were talking to the officers, what did you do after

3    talking to the officer?

4 A    I called Rico back and told him it was a little shy,

5    and he agreed, and said he would make it up to me next

6    time.

7 Q    Did you call the same number?

8 A    Yes.

9 Q    Okay. And -- now, did you meet with Officer LaPorte on

10    February 13th?

11 A    Yes, I did.

12 Q    And did you make an calls that day?

13 A    I can't really remember.

14 Q    Okay. Do you remember when you met with Officer

15    LaPorte if your conversations were being recorded?

16 A    The ones that I made to -- to Rico.

17 Q    The conversation that you had with Officer LaPorte.

18 A    Yeah.

19 Q    Okay. Now you listened to some tapes with regard to

20    this case. If I tell you that I have a tape right here

21    that is an identical copy of the tape that you received

22    that said 2/13 on it, would you know what's on this

23    tape?

24 A    Not right offhand.

25 Q    Okay. If I play small portion of it.....

Page 259

1 A    Yeah.

2 Q    .....would you be able to recognize it?

3 A    Yes, I would.

4    THE COURT: Exhibit number?

5    MS. BRADY: Let me just -- this is exhibit number 5,

6    Your Honor.

7    THE COURT: Thank you.

8 10:3631

9    (Audio tape played for jury)

10 10:3644

11 Q    Do you remember this tape now?

12 A    Not really. You've got to.....

13 Q    Not yet?

14 A    No.

15 Q    You listened to this tape though, right?

16 A    Yeah.

17 Q    Okay.

18 A    Yeah, I remember it. I remember now.

19 Q    You remember it now?

20 A    Yeah.

21 Q    Okay. Is the -- is the recording that's contained on

22    this tape a true and accurate representation of the

23    conversations that you had by calling Mr. Davis?

24 A    Yes.

25    MS. BRADY: Okay. At this time, I would move for

Page 260

1 admission of this portion. I'm going to play it, Your

2 Honor.

3    THE COURT: Number 5, Mr. James?

4    MR. JAMES: I'd like to -- I'm going to object, because

5 given the testimony.....

6    THE COURT: We'll have a bench conference.

7    MR. JAMES: Yes.

8    THE COURT: Hold on a second, please.

9    (Bench conference as follows:)

10    THE COURT: The objection is?

11    MR. JAMES: Okay. I'm going to object to it on the

12 foundation. Fish is bouncing around here saying well, he

13 didn't remember, now, he says he does remember. I seriously

14 question whether he's listened to that tape, and if it is a

15 true and accurate representation of what transpired of

16 another tape. So I'm -- it's on the foundation is what I'm

17 objecting to.

18    THE COURT: Well, there -- there's a sufficient

19 threshold foundation for admission based on his testimony

20 that he remembered, that it is the tape that he listened to

21 the other day. I mean, you can always challenge his

22 credibility, but that's the -- finally, a jury decision.

23 You made two objections though. The first one is overruled.

24 The second one is whether you seriously doubt whether the

25 copy is a true and accurate copy, and that's really

Page 261

1 challenging Ms. Brady as to whether she copied the tape, the
2 same tape that Mr. Fish listened to.
3    MR. JAMES: Well, I don't know that he listened to that
4 tape that she intends to introduce. He does say he's --
5 had a tape, but I -- that tape there, I don't -- he has
6 never said that issue, that I listened to that tape.
7    THE COURT: Ms. Brady?
8    MS. BRADY: What I -- the question I asked him was if
9 he had received a copy of a tape that was marked February
10 13th, and if I represented to him that that was an exact
11 duplicate of that tape, would he know what was on there, and
12 he answered yes.
13    MR. JAMES: Okay. Well.....
14    THE COURT: So what's the objection?
15    MR. JAMES: The objection is is the tape that he is
16 listening -- the representations of Ms. Brady are not the
17 testimony of Mr. Fish.
18    THE COURT: So you're challenging Ms. Brady's -- you're
19 not willing to accept Ms. Brady's representations?
20    MR. JAMES: That's correct, at this time.
21    THE COURT: All right. Then we'll excuse the jury, and
22 we'll let Mr. Fish listen to the entire tape, and we'll do
23 that with everyone.
24    MR. JAMES: Okay. And I think that's probably to save
25 time, Judge.

Page 262

1    THE COURT: No, that doesn't save time, Mr. James, but
2 that's what we'll do.
3    MR. JAMES: All right.
4    (End of bench conference)
5    THE COURT: All right, folks. I have to excuse you.
6 It will be 10 or 15 minutes, I think, so -- and I again
7 thank you for your patience.
8    (Jury excused)
9    THE COURT: All right. Ms. Brady, do you want to play
10 -- we'll stay on record. We'll play exhibit number 5 for
11 Mr. Fish and then we will bring the jury back in and you can
12 follow up with your questioning.
13 10:4035
14    (Audio tape played for court)
15 10:4911
16    THE COURT: All right. I told the jury it was going to
17 take about 10 minutes, because I thought we were going to
18 listen to the phone conversations as the tape as well.
19 Ms. Brady?
20    MS. BRADY: What I thought I would do, Your Honor,
21 since I'm going to be using this tape for several things,
22 rather than have the jury come in and out and in and out, if
23 the objection is that I have altered the tape in some way,
24 let's play the tape, let him listen to it, and then we won't
25 have them coming in and out. This is maybe three more

Page 263

1 minutes for this tape. There are total of four tapes. The
2 rest of them are not as long as this.
3    THE COURT: All right.
4    MS. BRADY: And maybe we should just let them.....
5    THE COURT: Do you want to play them all?
6    MS. BRADY: I -- my preference would be to play them
7 all now, if that's the objection, that I've altered them,
8 and we'll see whether or not Mr. James agrees they're not
9 altered, and then we'll play them for the jury.
10    THE COURT: All right. How long are the tapes?
11    MS. BRADY: They're probably five minute -- they're
12 between five and eight minutes a piece, the reminders.
13    THE COURT: Can you tailor your questioning to this
14 tape?
15    MS. BRADY: It is tailored to this tape. We can stop
16 after this tape. It's.....
17    THE COURT: Can you tailor your -- the next bit of
18 questioning to this tape.....
19    MS. BRADY: I sure can.
20    THE COURT: .....so that we can then use non-jury time
21 to listen to the rest of the tapes?
22    MS. BRADY: Sure.
23    THE COURT: To have Mr. Fish listen to the rest of the
24 tapes?
25 A    I know the rest of them.

Page 264

1    THE COURT: Well, that is -- you have to stay out of
2 this, Mr. Fish.
3 A    I'm sorry.
4    MS. BRADY: Okay. Sure.
5    MS. BRADY: Can you do that?
6    MS. BRADY: Yeah.
7    THE COURT: All right. Then finish this tape.
8    MS. BRADY: Okay.
9 10:5035
10    (Audiotape played)
11 10:5522
12    THE COURT: Let's bring the jury back in.
13    (Jury summoned)
14    THE COURT: All right. Everybody have a seat, please.
15 Are we back on record, Ms. McKewin? Thanks again for your
16 patience, folks. Ms. Brady, your next question?
17    DIRECT EXAMINATION CONTINUED
18 BY MS. BRADY:
19 Q  Mr. Fish, you've listened to this tape, right?
20 A  Yes.
21 Q  Is this tape a true and accurate representation of the
22    phone calls that you made on February 13th, February
23    15th and February 20th?
24 A  Yes.
25 Q  Does it include a copy of the wire that was done on the

Page 265

1 February 20th buy?
2 A Yes.
3 MS. BRADY: At this time, I move to admit state's
4 exhibit 5, Your Honor.
5 THE COURT: Exhibit number 5?
6 MR. JAMES: No objection.
7 THE COURT: Number 5 is admitted.
8 (Plaintiff's exhibit 5 admitted)
9 Q Okay. We're going to deal with this in portions, so
10 let's just play a portion of it.
11 10:57:12
12 (Audio tape played for jury)
13 10:59:58
14 MS. BRADY: Okay. I'm going to stop it right there.
15 Q All right. I'm going to ask you some questions about
16 that portion of the tape. Now, whose voice is that
17 that -- one of the voices is yours obviously. Who's
18 the other voice?
19 A Rico.
20 Q And who is Rico?
21 A That guy right there, Robert Davis the III.
22 MS. BRADY: Let the record reflect that the defendant
23 -- I mean the witness had identified the defendant.
24 Q Now, what did Mr. Davis mean when he said it was no
25 good on that end?

Page 266

1 A He had no dope, had none for sale.
2 Q Who is Athena?
3 A That's -- that's my baby's mother.
4 Q Does she know Mr. Davis?
5 A Yeah.
6 Q What did he mean when he said put you on child support?
7 A Well, it's like Athena -- it's like it's either mine,
8 or it's a Josh's, or it's some guy named Ryan. So --
9 and we haven't had a paternity test or nothing yet. So
10 we don't know for sure whose it is.
11 Q When you say it, you're talking about Athena's child?
12 A Yeah.
13 Q That you might be the father of?
14 A Right.
15 Q Okay. And Mr. Davis knows you well enough to know
16 about all of this stuff?
17 A He knows Athena well enough to know about all this
18 stuff.
19 Q Okay. And let's go ahead and we'll move on to February
20 12th. You -- is the conversation contained on that
21 tape a true and accurate representation of a
22 conversation that you had with the defendant on that
23 day?
24 A Yes.
25 MS. BRADY: Okay. I'm going to go ahead and play that

Page 267

1 portion.
2 11:01:45
3 (Audio tape played for jury)
4 11:03:57
5 MS. BRADY: I'll just stand here and hold the
6 microphone next to it.
7 11:04:09
8 (Audio tape played for jury)
9 11:05:12
10 Q I'll just ask you some questions about that portion of
11 the tape now. What was going on during that phone
12 call?
13 A What do you -- I don't know.
14 Q Okay. Let me ask you a more specific question. When
15 he says that he's at his shop, what's he talking about?
16 A He's at work.
17 Q And where does he work?
18 A He's a mechanic, fixes cars.
19 Q All right. And when you asked for two balls, what are
20 you talking about?
21 A I'm talking about coke. I'm talking about like 3.0
22 each.
23 Q Okay. And when -- now you guys had a little
24 negotiation there, what was going on during that
25 negotiation?

Page 268

1 A I asked him how much a ball cost and he said two. I
2 asked him how much should I bring. He said how much --
3 I asked him how much it was going to be for a ball, and
4 he said $200 and then he said $225. And I said -- I
5 said I got $200.
6 Q Is that a lot, $225?
7 A $225, yeah.
8 Q Okay. And then did that cancelled, that buy that you
9 set up with him?
10 A Yeah.
11 Q Do you know why it got cancelled?
12 A Right. Because there was something else going on with
13 the officers I was working with. So they postponed it
14 and they went along with what they had planned or
15 something.
16 Q Did you call him back then?
17 A Yes, I did.
18 Q And what happened when you called him back?
19 A I just told him that we got to reschedule it. That --
20 when I -- when I called him back, I didn't get his -- I
21 didn't get him. I got his voice mail. So I left a
22 message saying that I -- that I wasn't going to do
23 nothing tonight, and that I was taking the weekend off
24 and that I would see him like on Monday or something.
25 Q Okay. And that was tape recorded?

Page 269

1  A  Right.
2  Q  And is that on that tape?
3  A  Yeah.
4  Q  Okay.
5  11:0705
6     (Audiotape played for jury)
7  11:0756
8  Q  Okay. Now did you meet with Officer LaPorte again on
9     February 20th?
10  A  Yeah.
11  Q  Okay. And was that -- did you make a telephone call to
12     Mr. Davis?
13  A  Yes, I did.
14  Q  Was that call recorded?
15  A  Yes, it was.
16  Q  Is that recording contained on this tape?
17  A  Yes, it is.
18     MS. BRADY: Okay. I'm going to publish that to the
19  jury.
20  11:0811
21     (Audio tape played for jury)
22  11:1009
23  Q  All right. Now, when he says come on by the house,
24     what does he mean?
25  A  Come by his house.

Page 270

1  one who stays in the room, you know, you take off all
2  your clothes, every piece, your underwear, your socks,
3  shoes. And they look through everything. Your socks,
4  empty out your socks. Empty out, shake it all out.
5  And then you put -- and that's it. A complete search.
6  Q  Okay. And you were -- were you given money?
7  A  Yeah.
8  Q  How much?
9  A  $200.
10  Q  Okay. Andy you said that you put on a wire, or
11  something, what do you mean?
12  A  Yeah. It's like a strap goes around your shoulder.
13  And it just goes like -- I don't know, just put it on
14  you, and then you put your clothes over it.
15  Q  Did an officer put it on you?
16  A  Yeah.
17  Q  Okay.
18  A  Oh.
19  Q  Now, did you know that the wire was going to make --
20  was going to record everything that was going on?
21  A  Yes.
22  Q  Okay. And let's just play -- is a copy of the wire
23  that you made that day contained on that tape?
24  A  Yes, it is.
25     MS. BRADY: It's loud at the beginning, so I'm going to

Page 272

1  Q  Okay. And how much were you going to buy?
2  A  A ball.
3  Q  Okay. And what -- when he says come on by his house,
4     is there an address?
5  A  Yeah. I don't -- I can't remember his address. I know
6     what street it's on.
7  Q  What street is it on?
8  A  Grand Larry.
9  Q  Okay. And how much were you supposed to bring with
10     you?
11  A  $200.
12  Q  All right. And once that phone call was completed,
13     what happened -- where were you at?
14  A  I was at the police station.
15  Q  Okay. So the phone call is completed, then what
16     happens immediately after that?
17  A  Then they went out and searched my car. They searched
18     me. They set me up me up a wire. Then we drove and they
19     followed me to his house.
20  Q  Okay. Now let me -- let me stop you for a second. All
21     right. You said your car was searched, they searched
22     you, what -- tell the jury what the search -- what you
23     mean by the searched me.
24  A  The searched me. There's usually two officers talking
25     to you, and then one goes and searches your car and the

Page 271

1  turn it down a little bit.
2  11:1217
3     (Audio tape played for jury)
4  11:1301
5  Q  Okay. Let me stop the tape for a second. What's going
6     on here, on the tape? What are you doing while this
7     being recorded?
8  A  I'm driving to his house.
9  Q  And how do you know that?
10  A  Because that's my music.
11  Q  Okay.
12  11:1314
13     (Audio tape played for jury)
14  11:1347
15  Q  Now let me stop the tape right there. Are you talking
16     with him at that time?
17  A  No.
18  Q  Okay.
19  A  He just opened the door.
20  Q  Okay. Now what is -- what is that on the tape then?
21     Is that Mr. Davis' voice?
22  A  There's -- there's like -- I believe that was a time
23     when I walked in there and there was -- there was only
24     -- there was four people in there, including Mr. Davis.
25     That was including everybody, there was four people.

Page 273

1  And they were asking for sandwich baggies, because he
2  was cleaning out his house. And when I walked in, he
3  had nothing in there. They were looking for some
4  baggies, so they -- they were going to run to the store
5  and get some baggies. And then he asked for a pot,
6  which is a pot to make a ball of dope, to cook some
7  dope.
8  Q  When he means a pot, does he mean like a pot you cook
9     in?
10 A  Yeah, like a pot, pan.
11 Q  Okay.
12 11:1442
13    (Audio tape played for jury)
14 11:1515
15 Q  Now are you still inside the house at this time?
16 A  No, because they were leaving and I -- I pulled up
17    right behind the car. So -- and they opened the door.
18    I had to let them -- I had to move my car so I could
19    let them out.
20 Q  Okay.
21 11:1526
22    (Audio tape played for jury)
23 11:1600
24 Q  Okay. Now that's your voice?
25 A  Right.

Page 274

1  could on the tape for the cops, that way they could get
2  a clear view of what was going on there. And then when
3  he -- I don't know. If -- if -- it was the gun, and
4  then there was the bud. And then that was all I was
5  commenting on.....
6  Q  Was there any -- was his apartment furnished or.....
7  A  No, it was all cleaned out. The only thing he had left
8     there was a stereo.
9  Q  Okay.
10 A  That's why he didn't have a pot.
11 Q  Okay.
12 11:1837
13    (Audio tape played for jury)
14 11:1933
15 Q  Okay. And did you -- where did you go once you left
16    his apartment or the house?
17 A  I went right -- I went back to the station.
18 Q  What happened when you got back to the police station?
19 A  I gave him the dope. As soon as I got out of my car, I
20    gave them the dope, and then they searched my car. And
21    I was followed back into the police station, and then I
22    was searched.
23 Q  Okay. And did you meet with Officer LaPorte again the
24    next day?
25 A  Yes, I did.

Page 276

1  Q  Who are you talking to?
2  A  I was talking to the police.
3  Q  Okay.
4  11:1606
5     (Audio tape played for jury)
6  11:1714
7  Q  What are you talking about right there?
8  A  A gun.
9  Q  A gun?
10 A  Yeah.
11 Q  Okay.
12 11:1720
13    (Audio tape played for jury)
14 11:1746
15 Q  Okay. Now what are you commenting on there?
16    THE COURT: Ms. Brady, can you move?
17    MS. BRADY: Oh.
18    THE COURT: So the jury can -- thank you.
19 A  Well, there's a couple -- the first thing I was -- it
20    was -- it was chronic. It was the weed. And he had a
21    whole bunch of weed on his counter, like a pile of bud.
22    And -- and then there was -- there with the .45, that's
23    what I was commenting on. He said -- I asked him how
24    much he -- I asked him if he would take a bill for it,
25    just to -- because I was supposed to get everything I

Page 275

1     MS. BRADY: Okay. And that is a different tape.
2     THE COURT: Let's take a bench conference, please.
3     MS. BRADY: Okay.
4     (Bench conference as follows:)
5     THE COURT: How long is that tape?
6     MS. BRADY: My recollection is it's between five and
7  eight minutes.
8     THE COURT: All right. We'll -- same objections,
9  Mr. James?
10    MR. JAMES: Yes, sir.
11    THE COURT: All right. We'll stand down and let him
12 listen to it.
13    MR. JAMES: Could I use the (indiscernible) before
14 we.....
15    THE COURT: We'll take a break in a little bit.
16    MR. JAMES: Okay. So we're going to listen to tapes
17 and then take a break?
18    (End of bench conference)
19    THE COURT: I need to excuse for about 10 minutes,
20 folks. And I again appreciate your patience and
21 understanding in bouncing back and forth in here like this.
22    (Jury excused)
23    MS. BRADY: State 6.
24    THE COURT: We're still on record. You are putting
25 state's exhibit number 6 into the tape recorder?

Page 277

| | |
|---|---|
| 1  MS. BRADY: I am, Your Honor. And I'm..... | 1 Q Let me stop this for just a second, and I want to ask |
| 2  THE COURT: Player. | 2    you a question. When he says, I don't have anything |
| 3  MS. BRADY: .....about ready to hit play. | 3    but hard stuff, what's he talking about? |
| 4  THE COURT: Go ahead. Our jury out. | 4 A Crack. |
| 5 11:2207 | 5 Q Okay. |
| 6  (Audio tape played) | 6 11:3756 |
| 7 11:2817 | 7  (Audio tape played for jury) |
| 8  THE COURT: That's the end? That's 6? | 8 11:3904 |
| 9  MS. BRADY: That's 6. | 9 Q Okay. Now once the call was made, what happens next? |
| 10  THE COURT: All right. We'll take a very short | 10 A Then search -- they searched my car and they searched |
| 11 restroom break for everybody, and then we'll get the jury. | 11    me. And they go get the money, come back and put the |
| 12  MS. BRADY: Okay. | 12    wire on. They put the wire on me. And we go. |
| 13  THE COURT: I'm talking about as quickly as you can, | 13 Q Okay. How much money did they give you? |
| 14 please. | 14 A $200. |
| 15  (Off record) | 15 Q Okay. And when we're talking about they, who are we |
| 16  THE COURT: Have a seat, everybody. Are we back on | 16    talking about? |
| 17 record, Ms. McKewin? | 17 A The -- the investigators. |
| 18  THE CLERK: We are, uh-huh. | 18 Q Okay. And when you're talking about putting the wire |
| 19  THE COURT: We want to -- our jury is back. Thanks, | 19    on, explain what you're talking about. |
| 20 folks. Do you want to continue, Ms. Brady? | 20 A Wire. The -- it's on a strap. |
| 21  MS. BRADY: Yes, Your Honor. | 21 Q Uh-huh. |
| 22    DIRECT EXAMINATION CONTINUED | 22 A Talking about the thing that records everything. |
| 23 BY MS. BRADY: | 23 Q Okay. And is it over your clothes, under your clothes? |
| 24 Q Now, you met with Officer LaPorte on February 21st, is | 24 A Yeah, it's under my clothes and on my shoulder. |
| 25    that right? | 25 Q Okay. And we'll go ahead and play the wire now. |
| Page 278 | Page 280 |
| 1 A Yes. | 1 11:4009 |
| 2 Q Did you call the defendant that day? | 2  (Audio tape played for jury) |
| 3 A Yes, I did. | 3 11:4059 |
| 4 Q And was that conversation recorded? | 4 Q Okay. Now let me stop you for just a second, and stop |
| 5 A Yes. | 5    the tape for just a second. What's going on right |
| 6 Q And did it lead to setting up a buy that day? | 6    there? |
| 7 A Yes. | 7 A He's -- he's -- we're talking about -- we're talking. |
| 8 Q And was that also recorded? | 8 Q Where are you talking at? |
| 9 A Yes. | 9 A In his car. |
| 10 Q And is that what's contained on this tape? | 10 Q And what car is that? |
| 11 A Yes. | 11 A I believe that's in his -- yeah, that's in his Jeep. |
| 12 Q Is the tape a true and accurate representation of both | 12 Q Okay. And..... |
| 13    your conversation and the buy that was made? | 13 A It's not a Jeep. It's a Suburban, green Suburban. |
| 14 A Yes. | 14 Q Okay. And could you -- on the tape, it sounded like |
| 15  MS. BRADY: Okay. At this time, I move to admit | 15    there was a ringing? |
| 16 state's exhibit 6. | 16 A Yeah. |
| 17  THE COURT: Number 6, Mr. James? | 17 Q What was going on then? |
| 18  MR. JAMES: Yes, sir. No objection. | 18 A He got a phone call. |
| 19  THE COURT: Number 6 is admitted. | 19 Q Okay. And so it was on cell phone? |
| 20    (Plaintiff's exhibit 6 admitted) | 20 A Yeah. |
| 21 Q Now let's play a little bit of it, then I'm going to | 21 Q Okay. And you said -- there was something said about |
| 22    ask you some questions. | 22    him living at his mom's, is that right? |
| 23 11:3449 | 23 A Yeah. I asked him where he was staying. And he said |
| 24  (Audio tape played for jury) | 24    he was living with his mom. And he basically said he |
| 25 11:3743 | 25    still had the same cell phone number. |
| Page 279 | Page 281 |

1 Q  When you say, is it cool, what are you referring to?
2 A  I was just like, is it cool?  And then he was like, no,
3     you can't come over there.
4 Q  Okay.
5 A  So he thought I was meaning, you know, come over for
6     dope or something.
7 Q  Okay.
8  11:4204
9     (Audio tape played for jury)
10 11:4232
11 Q  Now when the music is playing, you're in his car, is
12    that right?
13 A  Right.
14 Q  And then after there's no music anymore, where are you
15    at?
16 A  In my car.
17 Q  Okay.
18 11:4243
19    (Audio tape played or jury)
20 11:4306
21 Q  The tape goes on, but nothing else is said on the tape,
22    is that right?
23 A  That's right.
24    MS. BRADY:  Okay.  Then we'll stop it there.  And that
25 takes me to the next tape.

Page 282

1     MR. JAMES:  All right.  Well, then I think we have to
2 play the whole thing, because otherwise.....
3     MS. BRADY:  Okay.
4     MR. JAMES:  .....you're only hearing.....
5     THE COURT:  Why?  Why do they have to play the whole
6 thing?
7     MR. JAMES:  Well, it.....
8     THE COURT:  What rules requires that?
9     MR. JAMES:  They're going to take it into evidence, and
10 we're only going to play a portion of it, then that's the
11 portion they should take into evidence.
12    THE COURT:  Is there a rule that requires that it be
13 played?  The jury can listen to it in the jury room?
14    MR. JAMES:  I can't think of the rule right off the top
15 of my head.  But logically speaking, I mean, what he's
16 testified to is what the -- now what's out of the presence
17 of the jury to be played.  Now, if you want to talk, I'm not
18 going to play it.  It probably would set the stage, but
19 that's.....
20    THE COURT:  You can have the witness describe what's on
21 the tape.  You're not required to play.....
22    MS. BRADY:  Okay.
23    THE COURT:  You can play whatever portions of the tape
24 you want.
25    (Pause)

Page 284

1     THE COURT:  We need to take another break, folks.  What
2 we're doing during the breaks, if you haven't figured it
3 out, is Mr. -- is the witness is listening to the exhibit so
4 that he can testify about it, so.....
5     (Jury excused)
6     MS. BRADY:  My suggestion, Your Honor, these are both
7 very short, would be to do the next two together.
8     THE COURT:  That would be fine.  What are you starting
9 with?
10    MS. BRADY:  I'm starting with state's 7.
11    THE COURT:  All right.  That's good.
12 11:4410
13    (Audiotape played for court)
14 11:5348
15    MS. BRADY:  What I would suggest, I don't want to have
16 any allegation I altered the tape, I'll just cue it to the
17 place where it starts with Detective Johnstone, and only
18 play that for the jury.  If that's all right?
19    THE COURT:  That's not my call.  I don't understand
20 what you mean.  You want to offer number 7, but you don't
21 necessarily want to play the whole thing, is that correct?
22    MS. BRADY:  Right.
23    MR. JAMES:  But then if you're going to offer it, then
24 it's -- do you plan on having that admitted as evidence?
25    MS. BRADY:  Uh-huh.  (Affirmative)

Page 283

1     MS. BRADY:  Okay.  That's cued.  That's state's.  And
2 state's 21 is only about three or four minutes.
3  11:5828
4     (Audiotape played for court)
5  11:5943
6     MS. BRADY:  That's it.
7     THE COURT:  We'll get the jury.
8     (Jury summoned)
9     THE COURT:  Everybody have a seat, please.  And are we
10 back on record?
11    THE CLERK:  Yes.
12    THE COURT:  All right.  We have everybody back.
13 Ms. Brady, do you want to continue?
14    MS. BRADY:  I do you, Your Honor.
15            DIRECT EXAMINATION CONTINUED
16 BY MS. BRADY:
17 Q  Did you meet with Officer LaPorte on February 28th?
18 A  Yes, I did.
19 Q  Okay.  And did you call the defendant that day?
20 A  Yes, we did.
21 Q  And were those calls recorded?
22 A  Yes, they were.
23 Q  Did you make several calls?
24 A  Yes, I did.
25 Q  Okay.  Then did you keep trying on into the night?

Page 285

1 A   Yes, I did.

2 Q   Okay. Then did you meet with Detective Johnstone later

3     that night?

4 A   Yes.

5 Q   And did you call Mr. Davis again?

6 A   Yes, I did.

7 Q   And was that call recorded?

8 A   Yes, it was.

9 Q   And you've listened to the tape marked state's exhibit

10    7, is that a true and accurate representation of the

11    call you made?

12 A  Yes, it is.

13    MS. BRADY: Okay. At this time, I move to admit 7.

14    THE COURT: Mr. James?

15    MR. JAMES: No objection.

16    THE COURT: 7 is admitted

17           (Plaintiff's exhibit 7 admitted)

18    MS. BRADY: I'm going to play that for the jury.

19  12:0141

20    (Audio tape played for jury)

21  12:0249

22 Q  So let me just ask you a question. When he says it's

23    ready, what is he talking about?

24 A  He's talking about his crack.

25 Q  Okay. And when you say, I've got two, what are you

                                              Page 286

1     talking about?

2 A   I'm talking about I got $200.

3 Q   Okay.

4  12:03:05

5     (Audio tape played for jury)

6  12:03:55

7  3

8 Q   All right. And then after you make that call.....

9     THE COURT: Hold on a second, Ms. Brady. You need to

10    explain to the jury through the witness that you didn't play

11    all of exhibit number 7.

12    MS. BRADY: Oh, okay.

13 Q  Now, that tape has a lot of calls on it, is that right?

14 A  Yes.

15 Q  Okay. And we cued it to the point where you actually

16    go a hold of Mr. Davis, is that right?

17 A  Right.

18 Q  What's going on on the tape for several minutes prior

19    to the place where we actually get to the call that you

20    had to him?

21 A  What's going on before all that?

22 Q  Yeah.

23 A  We just kept calling and calling and calling. And he

24    -- he wasn't answering his phone. I -- I left like

25    three messages, he wasn't calling me back. So we went

                                              Page 287

1     and got something to eat, and then we -- we came back.

2     I went and got a Snickers bar and a soda pop and then I

3     came back and he answered his phone.

4 Q   Okay. Now let me ask you about what happened after

5     that call was made. Where were you at when you made

6     the call?

7 A   I said I was at Tudor.

8 Q   Pardon me?

9 A   The police station over there on Tudor.

10 Q  Okay. And so the call gets made, and then what happens

11    immediately after that?

12 A  Immediately after that, they go search my car. They

13    search me. They put a wire on me, and we go.

14 Q  Okay. Now when you say those things, is it the same

15    kinds of things that you've been talking about before?

16 A  Yeah, it's all -- it's routine.

17 Q  Okay.

18 A  The same thing.

19 Q  And did the wire record what happened in your meeting?

20 A  Yes, it did.

21 Q  Okay. And you previously listened to this tape, which

22    is marked state's 21. Do you know what's on this tape?

23 A  Yes, I do.

24 Q  Is this a true and accurate representation of the wire

25    from March 1st?

                                              Page 288

1 A   Yes, it is.

2     MS. BRADY: Okay. And at this time, I would move to

3     admit and publish to the jury.

4     THE COURT: 21, Mr. James?

5     MR. JAMES: No objection.

6     THE COURT: 21 is admitted.

7           (Plaintiff's exhibit 21 admitted)

8  12:0547

9     (Audio tape played for jury)

10  12:0631

11 Q  All right. Let me stop it for just a second. Where

12    are you at when this is going on?

13 A  Where am I at right then?

14 Q  Uh-huh. (Affirmative)

15 A  I'm inside of his truck.

16 Q  Okay. And so you guys were sitting inside of his truck

17    talking?

18 A  Yeah.

19 Q  When the music is playing?

20 A  Right.

21 Q  Then the music stops, and where are you at?

22 A  Probably outside of my car. I'm getting out of his

23    car. I'm getting out of his car.

24 Q  Okay.

25  12:0651

                                              Page 289

1   (Audio tape played for jury)
2   12:07:07
3 Q Now what did you just say?
4 A I said gray Toyota, DVD 272, which is the license plate
5     number and the make of his car.
6 Q Okay. And you were instructed to -- who were you
7     talking to when you say that?
8 A I was talking with police.
9 Q Okay.
10 A Because they thought he was going to come in a
11     different car. And it was -- it was different. It was
12     all different, and I wanted them to be aware of what
13     was going on.
14 Q So what happens after -- after you say that on the
15     wire?
16 A I go to the -- I go to Tudor, and he gets arrested.
17 Q Okay. But let's back up. You're still at the -- in
18     the parking lot at the Pancake House, is.....
19 A Right.
20 Q .....that right? Okay. So do you get in your car?
21 A Yeah.
22 Q And then once you get in your car, where did you go to?
23 A I go to Tudor. I go back to the police station.
24 Q Okay. And what happens when you get back? Did you
25     stop somewhere on the way?

Page 290

1 A I don't believe so.
2 Q Okay. Did you turn over the cocaine to an officer?
3 A Okay. Yeah. Okay. I remember now. I'm sorry. It
4     was -- it was a long -- I stopped at -- I think it was
5     at Schuck's, or something. We might have stopped. I
6     can't really remember. It was either there or at the
7     -- at the church.
8 Q Okay. So you stopped somewhere and you turned the
9     cocaine over to the officer?
10 A Yeah. Crack.
11 Q Okay. And then what happens -- what do you do next?
12     Where do you go?
13 A Rode to the police station.
14 Q And then what happens when you get to the police
15     station?
16 A I get searched. And my car gets searched. And they
17     tell me that they'll get in contact with me.
18 Q Okay. And now you're debriefed after every single time
19     you make a buy, is that right?
20 A Right.
21 Q Okay. And are all those recorded?
22 A Yes, they are.
23 Q Okay. So let's talk about -- that's -- is that the end
24     of you involvement in this case?
25 A Yes.

Page 291

1 Q Okay. Let's talk about some things that happened after
2     those buys were over on March 1st.
3 A Okay.
4 Q Now, on July 26th, you were contacted by some APD
5     officers who were investigating a truck that were
6     involved in damaging some cars outside an apartment on
7     Mumford, is that right?
8 A Yes.
9 Q Okay. And your truck was seized, is that right?
10 A It was not my truck.
11 Q It wasn't your truck?
12 A No.
13 Q Whose truck was it?
14 A My friend's.
15 Q Okay. And in the bed of the truck, there was a bunch
16     of stereo equipment, right? And that was also seized?
17 A Yeah.
18 Q Were you ever charged with anything as a result of that
19     police contact?
20 A No, I was not.
21 Q Okay. Has your testimony here today been influenced in
22     anyway by your thought or perception that you could be
23     charged or that you may have something to worry about
24     there?
25 A No.

Page 292

1 Q Okay. And has anyone offered you any kind of deal,
2     that if you testify in this case, that that case will
3     be dismissed or it won't be filed on, or anything.....
4 A No.
5 Q .....along those lines? Okay. And as far as you know,
6     that case could be prosecuted if the police decide they
7     want to make a case, is that.....
8 A Right.
9 Q .....right? Okay. Do you hope that by cooperating and
10     testifying that you'll be helping yourself in that
11     case?
12 A Well, I hope. I hope I'll be helping my -- no, I don't
13     -- I don't think I'll help myself in that case. I
14     mean, if I -- if they think I'm guilty, I'm -- I'm
15     guilty.
16 Q Okay. And let's talk about September 5th. Now, an APD
17     officer contacted you on that day, and you consented to
18     having your car searched, is that right?
19 A Yeah.
20 Q Okay. And inside your car, the officer found a box?
21 A Right.
22 Q What was in the box?
23 A Well, my -- my ID was in the box. There was some coke
24     in the box, and there was some money in the box. But
25     there was my friend that was in the car, and he wasn't

Page 293

1 in the car when I got stopped. Because I -- I pulled
2 into my house and they -- they thought I -- they just
3 -- they thought I -- they thought I had something to do
4 with some pills being taken. But I had nothing to do
5 with the pills be taken. So I told the cop, you know,
6 I have nothing to do with this, so you can search my
7 car, because I know there's not no pills. And then you
8 can search my house, because I know there's not no
9 pills in my house. I haven't done anything wrong. And
10 when he searched my car, I gave my friend my ID, and he
11 put it in his box. And in the box, I guess he put his
12 dope in the box. So then my ID was in the box, was in
13 the dope, so I got kind of, you know, messed up.
14 Q Okay. Now, did you -- did you tell that to the
15 officer?
16 A Yes, I did.
17 Q Okay. And has any law enforcement agency offered you
18 any deal so that if you testify in this case that any
19 charges that could be coming from that contact won't be
20 prosecuted or anything like that?
21 A No.
22 Q Okay. So you're just on your own, there's no deals?
23 A That's right.
24 Q As far as you know, that case may still be being
25 prosecuted?

Page 294

1 A Right.
2 Q Okay. And are you hoping that by cooperating and
3 testifying, as you promised you would to get your
4 burglary dismissed, that you're going to help yourself
5 somehow in that case?
6 A If I -- if they think I'm guilty, I'm guilty. They're
7 going to.....
8 Q Okay. And you don't expect that that case would be
9 dismissed if it were filed because of your testimony
10 here today?
11 A No.
12 Q Okay. And then a couple of weeks later on September
13 30th, you were contacted by APD officers again and your
14 car was searched twice that day, is that right?
15 A Yeah.
16 Q Okay. And they were searching your car with regard to
17 a drive-by shooting, is that right?
18 A Yeah, that's what they told me.
19 Q Okay. And the first time they searched your car, did
20 they find anything?
21 A No.
22 Q Okay. And then the second time they came back and
23 searched your car -- did you give them consent to
24 search your car?
25 A Yes, I did.

Page 295

1 Q Okay. And then the second time they came back, did
2 they find anything that time?
3 A Well, they -- they searched the car one thoroughly for
4 -- for the gun. And then they searched it again
5 thoroughly again, and then they found something. And
6 then -- they said they found a casing off of -- of a
7 gun that was used in the shooting. But, you know, I
8 don't know, man. It's not my car. And my -- the car
9 was -- was -- it was took previously that day by my
10 friend, Jeff, and he put a full tank of gas in it. I
11 went and got my car back, and the next thing I know, I
12 got pulled over. And I -- I got pulled over and I gave
13 them consent to search my vehicle because, you know, I
14 -- I didn't know what was happening. And then after
15 they told me what was going on, then I said, yeah, you
16 guys can search my car because there's -- there's
17 nothing going on, and I didn't do that. And then they
18 -- me and my friend were getting in an argument about
19 why my car just got searched, and they came up on us
20 again and they searched my car again for the same
21 thing, so.....
22 Q And that's when they found the.....
23 A Yeah.
24 Q .....nine millimeter casing?
25 A And they impounded -- they impounded the car. It -- it

Page 296

1 wasn't my car. It was my girlfriend's. I was getting
2 it back for her. I don't have a license. I'm not
3 supposed to be driving. So my girlfriend didn't want
4 to go to the kid and get her car back, so I went and
5 got her car back.
6 Q Okay. And so did they seize that car?
7 A It was seized, but my girlfriend just got -- she got --
8 she got -- it's out of impound.
9 Q Okay. Has your testimony here today been influenced in
10 anyway by the thought that you could be charged as a
11 result of that?
12 A No, it has not.
13 Q Okay. And any deals in that case? Have you talked to
14 anyone in law enforcement that you'll testify here, and
15 that there's something should happen with that case?
16 A No, there's -- no.
17 Q Okay. Are you aware of whether any charges have been
18 filed?
19 A No, I'm not.
20 Q Okay. Do you expect -- are you hoping that by
21 cooperating and testifying that you could help yourself
22 in that case?
23 A No. I don't know.
24 Q Okay. And if that case were to be filed, you wouldn't
25 expect that case to be dismissed because of your

Page 29

1  testimony here today, is that right?
2 A  Yeah.
3 Q  Okay. And let me just talk to you about -- all of
4    those things that happened, every time the police
5    contacted you, that was after you involvement in this
6    case, right?
7 A  Yes.
8    MS. BRADY: Okay. That's all the questions I have for
9 this witness.
10   THE COURT: Cross examination?
11   MR. JAMES: Yes. Thank you.
12        JEREMY FISH
13 testified as follows on:
14        CROSS EXAMINATION
15 BY MR. JAMES:
16 Q  Let's go to the coke issue, which was, I believe,
17   September the 4th. Whose car was that?
18 A  George Redwine's, Redwine's Towing.
19 Q  All right. And that was your box though, right?
20 A  Yes.
21 Q  All right. And who was the officer that did the arrest
22   or stopped you -- I'm sorry, did the stop?
23 A  I -- it -- it was no stop. I.....
24 Q  Who contacted you?
25 A  I don't -- I can't remember.

Page 298

1 Q  A uniformed officer?
2 A  Yes.
3 Q  All right. Any other officers show up?
4 A  One other uniformed officer.
5 Q  Who was that?
6 A  I can't remember.
7 Q  What did he look like? He or she?
8 A  Both guys.
9 Q  Both guys? All right. No -- just the two officers in
10   uniforms?
11 A  Yeah.
12 Q  Now we're talking about the September 4th, are we not?
13   Are we focused on that one?
14 A  September 4th, that's the one where -- that's the only
15   coke issue I've had so, yeah.
16 Q  With the five bags of coke?
17 A  Right.
18 Q  All right. And do you recall telling the officer you
19   acknowledged the ownership of the three $20's, dollars,
20   the -- your ID, but that the five bags of coke had been
21   planted? Do you recall making that statement to the
22   officer?
23 A  I didn't say that they were planted on me. I said I
24   had a friend in the car, and I didn't know, you know,
25   if he put them in there or not, but they didn't know if

Page 299

1    it was coke then. They didn't tell me it was coke
2    until later. They didn't run no test on it or nothing.
3    I didn't know what it was. But they told me later it
4    was coke, and I acknowledged that the money was mine,
5    yes, but.....
6 Q  You didn't -- when you looked at it, you had not
7    realization it was coke and.....
8 A  They didn't know what it was either.
9 Q  I asked you.
10 A  No, I -- I did not.
11 Q  They were in clear baggies?
12 A  Excuse me?
13 Q  Clear baggies?
14 A  Yes.
15 Q  You're not familiar with cocaine?
16 A  I'm very familiar with cocaine.
17 Q  Okay. Okay. Now, when the -- you were stopped another
18   time involving, which Ms. Brady already discussed with
19   you very briefly, involving finding -- well, drive-by
20   shooting where they found a case, a round in the -- in
21   your vehicle, is that right?
22 A  Not my vehicle.
23 Q  Okay. Your girlfriend's vehicle?
24 A  It's not my girlfriend's vehicle.
25 Q  Whose is it?

Page 300

1 A  George Redwine's.
2 Q  Okay. So we're talking about the same -- the same
3    vehicle, the one that was involved with the coke?
4 A  Yes, sir.
5 Q  Okay. And were you driving that vehicle?
6 A  Yes, I was.
7 Q  All right. So you would have controlled where it was
8    going?
9 A  No. I went and picked up the vehicle.
10 Q  After you picked up the vehicle, you're driving the
11   vehicle?
12 A  I was driving it to my girlfriend's, yes, I was.
13 Q  So you were controlling where it was going?
14 A  Yes, I was.
15 Q  Okay. All right. Now, another time you were -- in
16   July, July 13th, specifically, you were cited by
17   Officer Daily for possession of marijuana, is that
18   correct?
19 A  Yes.
20 Q  And nothing has ever happened in that case, is that
21   correct?
22 A  That's right.
23 Q  All right. Now, nothing has ever happened to the cocaine
24   case, correct?
25 A  I believe so. I don't know. They haven't -- it's all

Page 301

**Page 302**

1   under investigation. That's what the police have told
2   me.
3 Q   To your knowledge, nothing has happened to that?
4 A   Well, it's under investigation.
5 Q   Okay. And that was in September, and here we are in
6   November, correct?
7 A   Correct.
8 Q   All right. The drive-by shooting where the casing was
9   found, anything happen with that case?
10 A   Well, it's -- it's all under investigation.
11 Q   Everything is under investigation?
12 A   Yeah.
13 Q   All right. But you -- you don't expect anything to
14   happen with regard -- in regards to you from any of
15   those investigations?
16 A   Excuse me?
17 Q   You do not expect anything to happen to you regarding
18   those investigations?
19 A   To me?
20 Q   Correct.
21 A   It matters -- it matters what the investigators, you
22   know, if the investigators think I'm guilty, then I'll
23   probably have to go to court and prove myself innocent.
24 Q   All right. So they do matter to you?
25 A   Yes, they matter to me.

**Page 303**

1 Q   All right. Now let's go back to Nome, if we may. You
2   indicated that -- I'm sorry I'm stepping away from the
3   mike -- you indicated -- we're going back to Nome, all
4   right?
5 A   Okay.
6 Q   Okay. You indicated that you had been to Nome for
7   about four months, right?
8 A   Right.
9 Q   Okay. What were you doing in Nome?
10 A   I was working.
11 Q   Doing what?
12 A   I was working under -- under the table construction. I
13   also worked at Carrs. And I also worked at the Glue
14   Pot. And I also worked at Twin Dragon.
15 Q   Okay.
16 A   I held two -- two jobs for over two and a half months.
17 Q   I kind of want to -- you're moving a little a faster
18   than my hand is writing.
19 A   Okay.
20 Q   All right. You worked construction?
21 A   Yes, I did.
22 Q   What kind of construction did you work?
23 A   It's clean up, construction clean up.
24 Q   Okay. How much were you making an hour?
25 A   I was only making $10 underneath the table.

**Page 304**

1 Q   So you were not paying any taxes on that?
2 A   No, I was not.
3 Q   All right. Now, you indicated another place you were
4   working?
5 A   Yes.
6 Q   Okay. I'm sorry, let me stop there, how long did you
7   work for this under the table at $10.....
8 A   That was only two months.
9 Q   Two months? How much did you make?
10 A   I don't know.
11 Q   You don't know -- any idea how much money you made,
12   it's.....
13   MS. BRADY: Objection, Your Honor. Relevance?
14   THE COURT: Overruled.
15 Q   My question is how much money you made at the
16   construction job working under the table at $10 an
17   hour? You worked for two months?
18 A   Right. I don't know. I probably pulled about maybe
19   $1,000.
20 Q   Total?
21 A   Yeah.
22 Q   So in two months, you worked 100 hours, if you worked
23   $10 an hour?
24 A   Yeah.
25 Q   Okay.

**Page 305**

1 A   It was part-time.
2 Q   All right. You indicated another place you worked,
3   please, Carrs, I believe......
4 A   At Hansen's.
5 Q   Hansen's?
6 A   Yeah.
7 Q   Okay. Hansen's, let's deal with Hansen's. What is
8   Hansen's?
9 A   It's Carrs.
10 Q   Carrs? All right. And what did you do there, please?
11 A   I was a stocker.
12 Q   Stocker? All right. And how long did you work there?
13 A   Probably about three and a half months.
14 Q   Okay. All right. And how much do you -- were you paid
15   an hour there?
16 A   $8.50.
17 Q   Was that union that was -- was that a union job? Do
18   they -- are they union?
19 A   Excuse me?
20 Q   Are they union?
21 A   I don't know.
22 Q   All right. But that was on top of the table money,
23   right?
24 A   Yeah. I got taxed.
25 Q   All right. The next job you had, please?

| | | | | |
|---|---|---|---|---|
| 1 | A | Twin Dragon. | | |

1 A Twin Dragon.
2 Q And what is the Twin Dragon?
3 A Dishwasher. It's a food place.
4 Q Okay. And how much were you making there?
5 A $10.
6 Q All right. Were you paid on top of the table?
7 A Yeah.
8 Q All right. How long did you work there?
9 A Probably about a month.
10 Q Okay. Let me -- how much did you make with them?
11 A I don't know, probably about $700.
12 Q Okay. How much did you make with Carrs, going back to
13 Carrs?
14 A Probably about $1,800.
15 Q Okay. And I believe there was a fourth place?
16 A Yeah. Glue Pot (ph).
17 Q Glue Pot (ph)?
18 A I was a cook. I made $10 an hour.
19 Q All right. And how long did you work for them?
20 A Probably about a month.
21 Q And how much did you make?
22 A $10 an hour.
23 Q I mean.....
24 A Total? I don't know, probably about 500 bucks. I
25 didn't work too much. It was only nights, on Fridays

Page 306

1 you have a child, you have a legal obligation generally
2 to support that child.....
3 MS. BRADY: Objection, Your Honor. This calls for a
4 legal conclusion.
5 THE COURT: Just ask the conclusion.
6 Q All right. Do you have a -- do you understand a legal
7 obligation? Can someone make you pay to support that
8 child?
9 A No.
10 Q And how old is that child?
11 A She just turned two.
12 Q Two?
13 A Yeah.
14 Q All right.
15 A She was only almost a year old when we were -- when we
16 were in Nome.
17 Q All right. Okay. Going back to Nome, now we were up
18 there for about four and a half months, correct? All
19 right. You left the 27th of January, would you agree
20 with that.....
21 A Yeah.
22 Q .....on the night, the midnight flight, or the night
23 flight?
24 A Yeah.
25 Q Okay. So that would mean that you were there in

Page 308

1 and Saturdays.
2 Q All right. Where did you live in Nome?
3 A I lived with my girlfriend's mother, and then I got my
4 own place.
5 Q When did you get your own place?
6 A Probably about two months after we had enough money to
7 be saved up and all that. I was the only one working.
8 Q Okay. So you were the sole supporter of you and your
9 girlfriend?
10 A And your daughter.
11 Q Okay. Is that your daughter?
12 A Yeah.
13 Q By.....
14 A Not my blood, but that's my daughter.
15 Q Do you have a legal obligation.....
16 A Yeah.
17 Q Okay. Are you married, is that how you have.....
18 A No. What do you mean, legal?
19 Q Okay. My question is, if it's not your blood.....
20 A Right.
21 Q .....all right, and you're not married, and you say
22 it's your daughter?
23 A Yeah.
24 Q And I asked you if you have a legal obligation and you
25 said yeah, or yes, the law, and I'm not going to -- if

Page 307

1 January, December, November, October, and possibly some
2 of September, would you agree with that?
3 A Yeah. We left September like 30th.
4 Q Left where, please?
5 A Left Anchorage.
6 Q Okay. So you were there from September 30 through
7 January 27? Approximately September 30?
8 A Yeah.
9 Q Okay. And during that time, we've covered all the
10 places that you worked, which would have been under the
11 table, you made $1,000? You think you made about
12 $1,800.....
13 MS. BRADY: Objection, Your Honor. Asked and answered.
14 THE COURT: I don't know what the question is.
15 MR. JAMES: I'm just getting a total of the.....
16 Q How much did you make total?
17 THE COURT: The objection is.....
18 A I don't know.
19 THE COURT: .....is sustained.
20 MR. JAMES: Thank you.
21 Q How much money did you make, total?
22 THE COURT: The objection is sustained.
23 Q How much did you pay for rent?
24 A I don't know. I -- I gave her mother probably -- like
25 I gave her $400 when we left her house. But we, you

Page 309

| | |
|---|---|
| 1    know, we put groceries in and stuff. And then for rent | 1 A    No, I did not. |
| 2    over at the other place, it was $850 a month. | 2 Q    You didn't? Okay. And he called you a couple of times |
| 3 Q    $850? And how long did you live at the other place, | 3    to come on into the officer before you actually came |
| 4    please? | 4    in, correct? |
| 5 A    Probably about two months. | 5 A    He called me and I came in. |
| 6 Q    Okay. So that -- all right. And how much did you pay | 6 Q    Okay. You came in and he confronted after you -- you |
| 7    for groceries? How much..... | 7    made the denials. He confronted you with the facts, |
| 8 A    It's pretty expensive. It's expensive there. | 8    and you then admitted to the burglary, right? |
| 9 Q    All right. Would you please tell me how much you paid | 9 A    Right. He asked me who all was involved. I told him |
| 10    for groceries? | 10    it was me and another guy. |
| 11 A    I don't know how much I paid for groceries. | 11 Q    And who is a juvenile, which we can't mention here, |
| 12 Q    Okay. Do you know how much a month you paid for | 12    correct? |
| 13    groceries? | 13 A    Right. It was a juvenile. |
| 14 A    No, I don't. I ate -- I worked at -- I mean, my | 14 Q    All right. So..... |
| 15    girlfriend and my daughter would eat food, but I -- I | 15 A    He was a white guy. |
| 16    worked at fast food restaurants. I mean, I worked at, | 16 Q    All right. And when you were going out of the |
| 17    you know, I don't know -- and I worked at places where | 17    apartment, you ran out of that apartment building, |
| 18    I could eat. So I really didn't eat too much. | 18    didn't you, because the landlady said, hey, that's |
| 19 Q    Okay. Now, on the 25th of January, as you went in -- | 19    going on, and you responded, we didn't go in your place |
| 20    did you live in the AC apartments? | 20    or something to that effect? |
| 21 A    No, I did not. | 21 A    Right. I didn't run out. I just told her that -- that |
| 22 Q    You had no business being in there, did you? | 22    -- I didn't say that, I didn't go in the place. I |
| 23 A    No, I did not. | 23    think it was the guy who was with me said he didn't go |
| 24 Q    All right. So you went in the AC apartments and | 24    in the place. |
| 25    started checking doors to see if they were locked, | 25 Q    All right. So Officer Bennett then contacts you, and |
| Page 310 | Page 312 |

| | |
|---|---|
| 1    correct? | 1    you tell him that you had nothing to do with it? |
| 2 A    Yes. | 2    MS. BRADY: Objection. Asked and answered. |
| 3 Q    All right. And, unfortunately, or one of those doors | 3    THE COURT: Sustained. |
| 4    was unlocked, correct? | 4 Q    All right. And he confronts you..... |
| 5 A    Yes. | 5    MS. BRADY: Objection. Asked and answered. |
| 6 Q    All right. You then entered that apartment, didn't | 6    MR. JAMES: She doesn't even know what I've confronted |
| 7    you? | 7 him with yet. |
| 8 A    Yeah. | 8    THE COURT: Okay. Ask the question. |
| 9 Q    All right. And you entered that apartment and you | 9 Q    Confronted you with facts, and you admitted to the |
| 10    stole the money that was -- that you could see there, | 10    burglary, correct? |
| 11    didn't you? | 11 A    Yes. |
| 12 A    Yes. | 12 Q    All right. And then you wanted to make a deal, you |
| 13 Q    All right. Now you were contacted -- do you know | 13    asked -- as asked in direct, to contact the victim to |
| 14    Officer Daniel Bennett? | 14    see if you could get out of it right? |
| 15 A    Yes, I do. | 15 A    I asked if -- if I could talk to the lady, because she |
| 16 Q    All right. And he works for the Nome Police | 16    said it was $100 that was taken, and there was only $7 |
| 17    Department, does he not? | 17    taken off the table. I felt I was -- I was -- I was |
| 18 A    Yes, he does. | 18    under the influence of alcohol, so I wanted to make my |
| 19 Q    All right. And he contacted you, right? | 19    grievance with the lady. |
| 20 A    Yes, he did. | 20 Q    So you thought you were getting ripped off as far as |
| 21 Q    Okay. And you told him you had nothing to do with it, | 21    the amount that you stole? |
| 22    right? | 22 A    Which -- which she said I stole, yes. I felt like she |
| 23 A    Yes, I did. | 23    was lying. |
| 24 Q    All right. And then you tried to put it on to some | 24 Q    You did steal money though, right? |
| 25    Native fellow, right? | 25 A    Yes, I did. |
| Page 311 | Page 313 |