1 done just, you know, within a very short period of time
2 before we go out to make the buy. When the informant
3 returns, the first thing he must do is we get the
4 contraband or the drugs from the informant. One
5 officer tests it while the other officer goes and does
6 a search of the person immediately once we return to
7 the station, and the vehicle.
8     A debrief is conducted on each buy. Even though
9 we have a search warrant to record conversation, and we
10 can hear that conversation to know what's going on, we
11 conduct a debrief with the informant. There's lots of
12 other information that we find out that you don't hear
13 from the wire, because, you know, a lot of this is done
14 in kind of code, very quiet. It's hard to tell
15 sometimes exactly what's going on. So a debrief takes
16 place. And then after that point in time, then he is
17 released from that controlled buy.
18 Q   Okay. Now do CI's generally know the -- and by CI, I'm
19 talking about confidential informants, do they
20 generally know the locations o the officers while the
21 buy is going on?
22 A   No. They don't very much information with the
23 officers. Specifically, the reason is is we use a lot
24 of the same cars. I work undercover, personally. I've
25 purchased drugs undercover, as many of the officers in

Page 480

1 this unit. We don't want them to know the other
2 officers in the unit. We don't want them to know what
3 they look like. We don't want them to know the cars
4 they're driving, where they are. All the informant
5 knows is someone will always have an eye on you.
6 That's called, as Somerset Jones, Officer Jones
7 mentioned, the eye. Someone always has an eye on the
8 informant, always a control to see what's going on.
9 And the other -- the other officers are used for
10 surveillance and control of the area.
11 Q   Ever had a confidential informant lie to you before?
12 A   Yes, I have.
13 Q   Ever had one steal drugs?
14 A   Yes, I have.
15 Q   Now let's talk about your first contact with Jeremy
16 Fish with regards to this case.
17 A   Okay.
18 Q   When did that happen?
19 A   On the 8th of February, this year.
20 Q   Okay. And what happened on the 8th of February?
21 A   He met with us at the station. Again, I was training
22 Officer Grant Johnstone on how to run the case. So I
23 was assisting him, but letting Grant attempt to run it.
24 Where he ran into problems or issues or questions, then
25 I took care of that. Mr. Fish made a phone call and

Page 481

1 the person that he was calling, he identified that he
2 was known to him as Rico, and he made a phone call to
3 purchase cocaine.
4 Q   Okay. And then once he made the phone call, what
5 happened?
6 A   Once he made the phone call, again a strip-search was
7 conducted, it was for $150, which was going to be the
8 buy. After the strip-search and the vehicle search, he
9 was given $150 of buy money, which had also been pre-
10 recorded. Since this was the first time we were making
11 a buy with Rico, we did not have enough evidence to
12 obtain a search warrant to record the conversation, so
13 this buy was not wired, which would -- means the
14 conversation is recorded.
15 Q   Okay. And now, had you ever checked to see if
16 Mr. Fish's license was suspended?
17 A   Yes. I -- I recalled that time because he was driving
18 his own vehicle, to make sure he had a valid license.
19 And I recall that I done that, and just to reconfirm
20 today, I requested an APSIN check, which has his
21 driving history, and it was not suspended at that time
22 during the buys.
23 Q   Okay. And then what happened after you left the
24 station?
25 A   After I left the station, prior to us leaving the

Page 482

1 station, I had the other surveillance units set up in
2 the area. We knew we were going to 202 Grand Larry.
3 And I had somebody positioned to have a close in eye so
4 they could see the door of where Mr. Fish would enter.
5 Myself and Officer Johnstone rode in the same car and
6 we followed Mr. Fish from the police station to the
7 area of 202 Grand Larry, just before he turned onto
8 Grand Larry, we continued straight, so we -- you know,
9 it was not obvious to somebody who may be watching that
10 we followed them all the way up. Once we turned -- he
11 turned onto Grand Larry, we turned off and stayed in
12 the area because there was officers on Grand Larry that
13 could actually see him drive up to the address and
14 enter into the residence.
15 Q   Okay. So then -- and what happened after the buy?
16 A   After the buy, I was told by the radio that he was
17 leaving the residence, and that he had got in his car
18 was leaving on Grand Larry. I was at the -- the next
19 street. I got in behind him, myself and Officer
20 Johnstone. Because it was the first buy, because
21 Mr. Fish was deemed a difficult informant, I had not
22 gathered a lot of trust for him at that time. I wanted
23 the controls to be even tighter. So waiting until he
24 drove to the police station for him to give us the
25 drugs, I had him meet me at the church to give them to

Page 483

**Page 484**

1 me immediately. And that's what we did. And then we
2 drove to the police station and followed him to the
3 police station. Which at that time, a strip-search
4 again was conducted of him and a post-buy vehicle
5 search, and then a debrief.
6 Q  How long of a period of time elapsed from the time he
7 left the residence until you guys arrived at the
8 church?
9 A  Oh, I think we had to stop for the red light at Duben
10 and -- Duben and Muldoon, but a minute, a very short
11 period of time.
12 Q  Okay. And then what happened -- was that the end of
13 your involvement on that day with this case?
14 A  On that day, yes.
15 Q  Okay. And then let me direct your attention to
16 February 13th. Did you have any contact with Mr. Fish
17 that day?
18 A  Yes, I did.
19 Q  And did you know that who Rico was at that time?
20 A  At that time, we did not -- not until that day, but
21 prior to that we, we did not. We believed we had
22 identified him. We identified him through two
23 different sources, but until February 13th, when I
24 showed the informant a photo lineup, that was the
25 positive identification.

**Page 485**

1 Q  Okay. And let me just approach with something that's
2 been previously marked as state's exhibit 16. Do you
3 recognize this?
4 A  Yes. This is a photograph -- a photographic lineup
5 that has the defendant in one of the six positions.
6 There were six photographs that -- that I showed the
7 informant.
8 Q  Is this the actual photographic lineup that you showed
9 to Mr. Fish?
10 A  Yes, it is.
11 Q  Does it truly and accurately depict the defendant and
12 five other people randomly selected?
13 A  Yes, it does.
14 MS. BRADY: Okay. At this time, I move to admit
15 state's exhibit 16.
16 MR. JAMES: No objection.
17 THE COURT: 16 is admitted.
18 (Plaintiff's exhibit 16 admitted)
19 Q  Can you explain to the members of the jury exactly how
20 a photo lineup is prepared?
21 A  Yes. You give to DMV, there's a contact person that
22 you give the name and the identification or driver's
23 license number that you want in the photo lineup. And
24 then they pick the other five persons that look
25 reasonably close to the person that you're trying to

**Page 486**

1 identify. And once I showed it to -- excuse me. Once
2 I showed it Officer [sic] Fish, I had -- or, I'm sorry,
3 Informant Fish, I have him actually circle who he
4 identified as the person being Rico and initial that.
5 Q  Okay. So the markings on that were made by Mr. Fish?
6 A  Yes.
7 Q  In your presence?
8 A  Yes.
9 Q  Okay. And where was the photograph obtained from, did
10 you say?
11 A  DMV.
12 Q  And how does DMV obtain photographs?
13 A  Well, Department of Motor Vehicles.....
14 MR. JAMES: Objection. He's talking outside his area.
15 It's hearsay. He's asking for opinion as to how other
16 people obtain stuff.
17 THE COURT: Common knowledge. Objection is overruled.
18 A  Department of Motor Vehicles, of course, has copies of
19 all our pictures that we take on the driver's license.
20 And they have descriptions of -- they have groups of
21 descriptions of persons. So if it's a white female
22 with black hair in the ages of 40, they've got a
23 category of groups of meeting that description, and
24 they just pull those copies of licenses, and that's how
25 they do each photo. Of course, they view to make sure

**Page 487**

1 they -- they look reasonably -- nothing looks out of
2 the ordinary so it's not glaringly obvious who the
3 person is. They all look very similar in the six
4 photos.
5 Q  Okay. And at this time -- so when you get the photo
6 lineups, do they also give you a picture of the
7 defendant's -- I mean of a driver's license to go along
8 with it?
9 A  They do. They give you three things, six pictures that
10 -- that equal the photo lineup. And I'll show -- you
11 can see -- see the size of the pictures, each one. And
12 then they give you another sheet that has all six
13 persons in the smaller format, but of their entire
14 driver's license. And then the third item they give
15 you is the individual that you requested for a photo
16 lineup, they give you a large copy of -- of his
17 driver's license or ID.
18 Q  Okay. And is that that's been marked state's exhibit
19 15 a true and accurate representation of the
20 defendant's driver's license?
21 A  Yes, it is.
22 MS. BRADY: At this time, I move to admit 15.
23 MR. JAMES: No objection.
24 THE COURT: 15 is admitted.
25 (Plaintiff's exhibit 15 admitted)

3AN-01-1717 CR

---

1  Q  Now did you have Mr. Fish make any calls on February
2      13th?
3  A  I did.  Oh, I'm sorry, the 13th?
4  Q  Uh-huh.  (Affirmative)
5  A  Yes, I did.
6  Q  And who -- what number did he call?
7  A  He called again the same number as he did before, 727-
8      9465.
9  Q  Did you dial the phone?
10 A  No, he dialed the phone, but part of the control of
11     that is I actually have to watch him dial the numbers
12     to make sure he is dialing the numbers that he gave me.
13 Q  And was that call recorded?
14 A  That call was recorded, yes.
15 Q  And what happened during the call?
16 A  He spoke with a subject that Mr. Fish identified as
17     Rico.  And they spoke for a minute.  Rico told him that
18     he didn't have anything that night, but he would have
19     something tomorrow.  And the informant explained to me
20     that meant he did not have any cocaine, so we would try
21     another night.
22 Q  Did you try another night?
23 A  We did.
24 Q  Did you try on the 15th of February?
25 A  We did.

Page 488

---

1  Q  Okay.  And could you just explain what your contact
2      with Mr. Fish was on that day?
3  A  Again, he came to the police station to conduct a
4      controlled buy.  Again, he called the phone number,
5      727-9465.  This time we knew, confirmed to be
6      Mr. Davis.  And we set up a purchase of two balls,
7      meaning an eight-ball.  That was going to cost $200.
8      Rico originally said $225 and the informant talked him
9      down said, oh, come on, let's do it for $200 and Rico
10     agreed.  We were getting set up ready to go make the
11     buy, and I got a call from Lieutenant Holloway (ph),
12     which at the time was the lieutenant of the
13     metropolitan drug unit, which the special assignment
14     unit is -- works within the chain of command.  And
15     they needed our unit for a higher-level drug operation.
16     So that took precedence, and I had to put this buy off.
17 Q  Okay.  And then what was the next -- what was done to
18     call the buy off?
19 A  I'm sorry?
20 Q  What was done to call the buy off?
21 A  Basically, we -- I had the informant recall and he got
22     voice mail.  And he just left a message saying that his
23     girlfriend got sick, and that he would call him back,
24     his girlfriend had to go the hospital.
25 Q  All right.  Now let me direct your attention to

Page 489

---

1      February 20th, did you have any contact with Mr. Fish
2      that day?
3  A  I did.  He was assigned to come into the police
4      department again and conduct a controlled cocaine buy.
5  Q  What number was called?
6  A  Again, the number was called 727-9465.
7  Q  And what happened during the call?
8  A  There was an agreement to be made to purchase $200
9      worth of cocaine.
10 Q  Okay.  Now you mentioned eight-ball a few minutes ago.
11     Is that a common term?
12 A  It is.  It's a street term for a certain amount of
13     cocaine.
14 Q  What's the amount?
15 A  Generally, it's about $200 is the going rate.
16 Q  Is there a weight of cocaine that that also describes,
17     or is it just for the money?
18 A  Well, it's supposed to be an eighth of an ounce, that's
19     the term.  But it's never exact.  Generally, it falls
20     on the lower side of that eighth of an ounce for profit
21     margin purposes.
22 Q  Okay.  And did a buy result from that call?
23 A  Yes, it did.
24 Q  Where was the buy arranged to occur?
25 A  Again, at the -- his apartment, which was at 202 Grand

Page 490

---

1      Larry.
2  Q  Okay.  And did that address, 202 Grand Larry have any
3      significance?
4  A  Yes.  Prior to when we were trying to identify who Rico
5      was, I requested a computer search within the police
6      department for that address.  And attached to that
7      address was a name of Robert Davis.  And also Officer
8      Johnstone, I requested for him to obtain a search
9      warrant after we made the first buy for the cell phone
10     number that we were calling.  So he obtained a search
11     warrant, it was granted.  And the person who owned that
12     cell phone was Robert Davis, which was the same full
13     name as the computer had listed attached to that
14     address.  So that was -- that was how we knew to
15     identify him and obtain a photo line up for Mr. Davis.
16 Q  Okay.  Now, the fact that someone is listed in the
17     computer doesn't mean that they've ever done anything
18     wrong, it just means that they've, at some point in
19     time, given that address to a police officer as a
20     victim of a crime or as any number of things, is that
21     right?
22 A  Oh, that's correct.  If you've been involved in an
23     accident, or a victim, it's -- all it is, is an address
24     that you gave once, and that's how it's listed.
25 Q  Okay.  And now prior to that buy, was Mr. Fish

Page 491

---

1    searched?
2 A   Yes, he was.
3 Q   And how thorough was the search?
4 A   Again, it was a strip-search, as protocol.
5 Q   Now did you conduct that search?
6 A   I was there for the search.  Actually, I did conduct
7     that search.  Let me check my notes.  Yes, I did
8     conduct that pre-buy strip-search.
9 Q   Okay.  And could you describe what you did during the
10    search for the members of the jury?
11 A  Okay.  As I had showed Officer Johnstone in the same
12    manner of which I learned, they completely unclothe.
13    I'll check the pockets of the shirt and actually take
14    the sleeve and squeeze all the way down all the
15    clothing to make sure nothing is hidden in the sleeve.
16    The pockets, all the pockets through the clothing of
17    the coat, the shoes.  I pick the shoes up, hit them,
18    look inside, make sure nothing is hidden in the shoes.
19    The socks, I turn them inside out and squeeze the socks
20    out.  The pants, all the pants are pulled inside out.
21    I pat down through each of the legs of the pants, and
22    then have him open his mouth.  He's a male, he pulled
23    up his scrotum, turned around, bent over, make sure he
24    had no contraband or anything else.
25 Q  Okay.  And was any contraband found?

Page 492

1 A   No.
2 Q   All right.  And what happened after he was searched?
3 A   After the search, he was given $200 of pre -- I'm
4     sorry?  I thought you said something.
5 Q   No, I didn't say anything.
6 A   He was given $200 of pre-recorded buy money, and his
7     vehicle was searched.
8 Q   Okay.  Now you could hear over the wire what was
9     transpiring when Mr. Fish was in the house, is that
10    right?
11 A  Yes.
12 Q  Okay.  And, actually, I got a little ahead of myself.
13    What happened after that?
14 A  After that, again, I set up assisting surveillance
15    units in the area.  We knew where we were going.  It
16    was the same place as the previous buy.  And myself
17    and Officer Johnstone again followed the informant to
18    the location.
19 Q  Okay.  And now could you hear over the wire when
20    somebody indicated something about getting a pot for
21    cooking?
22 A  I could.
23 Q  What is the significance of that?
24 A  To make powdered cocaine into crack cocaine, powdered
25    cocaine is what's called hydrochloric acid, the

Page 493

1     version.  And crack cocaine is cocaine base.  You have
2     to take it from one product to the other.  And you have
3     -- it's called -- the street term is cooking it up.
4     The recipe is approximately one-part cocaine to two-
5     thirds part, give or take, baking soda is the most
6     common way to cook it up.  You put it in a pot of
7     water, and you boil it.  And you put both substances in
8     and it bonds together and it becomes rock-like.  That's
9     why you hear it called rock cocaine.  It becomes hard.
10    That way, it's no longer a powder.  And it transitions
11    it from the cocaine hydrochloric acid to what's called
12    base cocaine.
13 Q  Okay.  And what happened after Mr. Fish left the
14    defendant's residence?
15 A  Well, initially, he came out and got in his car, we
16    thought he was leaving.  Of course, I did not witness
17    this.  I heard it over it over the radio.  Someone is
18    always giving an updated -- the person with the eye
19    gives an updated status of what is occurring so
20    everyone else knows, so it's on the police radio.  He
21    came out and got in his car.  We thought he was
22    leaving.  He just backed up.  These people said they
23    were going to get a pot to cook it up, got in a car and
24    left.  He pulled back in and parked and then went back
25    inside the house.

Page 494

1 Q   And did he come out again?
2 A   Yes.  He came out, just moments later, got in his car.
3     This time with the -- with the previous buy, based on
4     his reliability that I had dealt with him that far, we
5     drove to the police station, and that's where we took
6     the cocaine, which later tested positive from him.  A
7     post-buy vehicle search was done, a post-strip search
8     was done on his person and then a taped debrief.
9 Q   Okay.  And did you have any other -- did you
10    participate any further with the investigation of this
11    case on that day?
12 A   On that day, no, I did not.
13 Q   Okay.  Then let me direct your attention to February
14    21st.
15 A   Okay.
16 Q   What happened that day?
17 A   Again, the informant met us at the police station and
18    -- to do another controlled buy.  Again, he called the
19    same number, 757-9465.  The second, and this is the
20    third buy, they were recorded, meaning not only the
21    phone conversation, but also the wire when he went
22    inside.  That was recorded and first he got a message,
23    the -- and he said -- he told Rico that he would call
24    him back later, there was voice mail.  So we had to
25    call back a couple of times before we actually spoke

Page 495

**Page 496**

1 with him, or before the informant actually spoke with
2 him. And an agreement was made for $200. This time,
3 it was specifically said over the phone, hard, all he
4 had was hard. And all that is is street term for crack
5 cocaine or rock cocaine when it's hard. If the term
6 soft is used, that means it's powdered cocaine.
7 Q  Where was the buy arranged to occur?
8 A  It was arranged to occur at the Chevron at Old Seward
9 and International.
10 Q  Did you follow Jeremy Fish to the meeting place?
11 A  I did. Again, I sent my surveillance units out earlier
12 after we conducted a briefing. Myself and Officer
13 Johnstone followed the informant there. He was given
14 pre-recorded buy money. Again, he was strip searched.
15 His vehicle was searched prior to the buy. Once he got
16 in the area, I was notified by other officers that
17 there was there all ready a green Suburban, excuse me,
18 in the parking lot on the east side of the Chevron all
19 ready there. It had tinted windows. It was dark. So
20 we were not sure if that was him, because we had never
21 seen him a vehicle. But once the informant arrived in
22 the parking lot, he parked right beside of him and got
23 out and got into the Suburban with Mr. Davis.
24 Q  Okay. And did you subsequently verify who the owner of
25 the car was?

**Page 497**

1 A  I did.
2 Q  And who was that?
3 A  I can't remember her name, through the -- through the
4 wire, he said it was his mother's car. But the
5 registered owner of the vehicle did not have the last
6 name of Davis. So the wire said it was his mother's
7 car -- Mr. Davis said it was his mother's car, but the
8 registered owner didn't say Davis. So I don't know if
9 she has a different name or a maiden name. So that was
10 the information I had.
11 Q  Okay. And how long did that meeting last?
12 A  That was -- that was a very short period of time, to
13 give you the exact -- that lasted approximately two
14 minutes.
15 Q  And what happened after the meeting?
16 A  He got in his car and drove back to the police station.
17 Myself and Officer Johnstone followed him back to the
18 police station. He gave the drugs to me and Officer
19 Johnstone did the debrief with him. At -- this time,
20 the third buy, Officer Johnstone was becoming much more
21 comfortable in the way a controlled buy went. So
22 Officer Johnstone conducted the debriefing and I field
23 tested the drugs, which I received a positive result
24 for the presence of cocaine.
25 Q  Okay. Now let me just approach you with something that

**Page 498**

1 I have previously marked as state's exhibit 3. Do you
2 recognize that?
3 A  I do. This is an APD drug evidence envelope. And I
4 filled out the -- the P and E sheet, detailed
5 description. It's crack cocaine. An estimated tar
6 weight is 1.55 grams. It has the date of February 21st
7 of 2001, and it has my initials.
8 MS. BRADY: Okay. And at this time, I move to admit
9 state's exhibit 3.
10 THE COURT: Number 3?
11 MR. JAMES: No objection.
12 THE COURT: Number 3 is admitted.
13      (Plaintiff's exhibit 3 admitted)
14 Q  Okay. Now let's talk about evidence handling for just
15 a second. Can you just describe to the members of the
16 jury what happens once you put it in the envelope, what
17 happens to sensitive evidence like drugs?
18 MR. JAMES: I'm going to object, unless we're talking
19 about what his personal knowledge is, or refuting a
20 standard. I'm objecting to whether it's personal knowledge
21 or what.
22 THE COURT: The -- you can qualify regarding personal
23 knowledge, or he can explain his institutional knowledge
24 based on training. But you need to tell us which.
25 MS. BRADY: At this time I was inquiring into the

**Page 499**

1 officer's institutional knowledge.
2 Q  So I'm just asking in general, Officer LaPorte, what
3 happens with sensitive items like drugs or.....
4 A  Well, there's explicit.....
5 MR. JAMES: I'm going to objection.
6 THE COURT: Overruled.
7 MR. JAMES: Okay.
8 A  There's explicit written policy in how evidence is
9 handled, specifically sensitive evidence such as drugs.
10 There is a drug envelope, as you can see, two person
11 control, submitted and sealed by, that's my initials,
12 and my DSN, or badge number, witness and verified,
13 that's a second officer who must initial it and date to
14 see that I weigh the drugs, I put the drugs in the
15 envelope. And then it's sealed with tamper-proof tape.
16 These are all the seams of the envelope. Again, my
17 initials and the date, which matches the date on front.
18 Once property and evidence gets it, of course, they
19 confirm it, and then they put it in an vacuum bag,
20 which it is further sealed. And then they have their
21 procedure, which I'm not aware of. I'm just aware of
22 the officer's handling procedure.
23 Q  Okay. So once you put it in the envelope, what do you
24 do with it at the police department?
25 A  We have a secure area that has double security

Page 500

1 measures. Number one, we have to have a special key to
2 get into this secured area. And then there are
3 lockers. The evidence is put in the locker with what
4 is called a property and evidence form and is filled
5 out, and a copy of that form is placed with the
6 evidence, and then the locker is locked. Once that
7 locker is locked, I have no access to it.
8 Q   Once the -- who can get into it once it's in the
9     locker?
10 A   Once it's in the locker, the only access is the
11     property and evidence technicians, which take over
12     custody from there. And that keeps the chain of
13     custody secure.
14 Q   Okay. And -- so let me just -- did you have any
15     further involvement on the 21st?
16 A   I did not.
17 Q   Okay. Then let me direct your attention to February
18     28th. What happened on that day?
19 A   This was a day that we were going to do what we term as
20     the buy bust, another controlled buy, but an arrest
21     will take place after that.
22 Q   Okay. And so when you say buy bust, what specifically
23     are you talking about?
24 A   What I mean is we'll conduct a controlled buy, and we
25     -- prior to this date, arrest warrants are obtained for

Page 501

1 the three previous buys. So the defendant, Mr. Davis,
2 had -- had received that day three arrest warrants for
3 delivery or control of a controlled substance,
4 misconduct involving a controlled substance is the
5 charge. And we were to serve those arrest warrants
6 after we did the buy. The reason for the buy bust is
7 that we want to show after the buy is done that the
8 informant was in the vehicle, that he was arrested,
9 that that was him. And if he does have anymore drugs
10 on him and we find those, and also, we're looking for
11 the buy money that was used and pre-recorded in that
12 buy.
13 Q   Okay. So let's talk about that day. Did Mr. Fish make
14     any calls that day?
15 A   Again, yes. He called the same number 727-9465 and
16     spoke with Rico. And this was -- this was recorded
17     pursuant to the warrant that we had.
18 Q   Okay. And was a buy set up during the call?
19 A   A buy was set up. What had happened is he came to the
20     station earlier in the day and made a call, we did not
21     get him -- so -- we did two buy busts that day. So
22     speaking to this specifically, he made a call earlier
23     during the day, and we did not get Rico until later
24     that evening where a -- a delivery was set up at the
25     Pancake House on Muldoon Road.

Page 502

1 Q   Okay. And -- now, did Mr. Fish know prior to making
2     the calls that he was making that this was the day
3     planned for the buy bust?
4 A   We generally don't tell the informants that bust is
5     going to happen. Specifically, they're worried for
6     their own safety. They're worried for what may
7     happen.....
8     MR. JAMES: Objection. He's not being responsive to
9 the question.
10     THE COURT: The question was directed at what Mr. Fish
11 knew that day, not -- not generally.
12 A   Oh. I'm sorry.
13     THE COURT: So can you answer that specific question,
14 please?
15 A   Okay. No, I don't believe that he knew a buy bust was
16     occurring that day.
17 Q   Thank you. Did you conduct a briefing to plan how the
18     buy bust would go down?
19 A   Yes, I did.
20 Q   And where was it arranged that the buy was going to
21     occur?
22 A   At the Pancake House in the 300 block of Muldoon Road.
23 Q   Okay. And when was it supposed to occur?
24 A   He told us it was going to occur -- it occurred almost
25     around midnight. It was late in the evening.

Page 503

1 Q   What happened after the meeting was set up?
2 A   The briefing, Mr. Fish was at the police station with
3     Officer Johnstone, and the other officers, we had just
4     finished up execution of another warrant unrelated to
5     this. So I conducted a briefing at the location of
6     where that warrant was being served, which was in close
7     proximity of Muldoon Road. And Mr. Fish was at the
8     police station. Officer Johnstone and another officer,
9     I don't recall who, because I wasn't there, recorded
10     the buy money, conducted the strip-search, conducted
11     the.....
12     MR. JAMES: I'm going to object. This is all hearsay.
13 He just said he wasn't there.
14 Q   Officer LaPorte, let me just direct your attention to
15     your involvement on that night.
16     THE COURT: All right. I want you to disregard the
17 last portion of the answer, only that portion that was
18 responsive to the specific question. And your next
19 question, Ms. Brady?
20 Q   What was your next specific involvement in this case
21     that night?
22 A   Okay. I conducted a briefing with the assisting
23     officers in the special assignment unit about where the
24     buy was going to occur and everyone's responsibility of
25     that buy.

Exhibit K – 132

1 Q  Okay.  And what happened after -- did you then go to
2 where the buy was supposed to occur?
3 A  Yes, we did.  I did not have a radio at the time,
4 because of my prior duties.  So I was on the phone with
5 Officer Bushue, who had the wire and was recording the
6 wire.  And the surveillance units were set up in the
7 area of the Pancake House, because we had one officer,
8 Officer LeBlanc, who was in a marked police vehicle, to
9 come in and conduct a takedown to make the arrest.
10 Q  Okay.  And was that done?
11 A  Yes, it was.
12 Q  Okay.  And did you subsequently determine who the
13 registered owner was of the car the defendant was in
14 that night?
15 A  I don't recall who it was.  I remember that we ran the
16 license plate, but I don't recall who the owner was.
17 Q  Okay.  Let me approach you with something I have marked
18 as state's exhibit 20.  Do you recognize this?
19    MR. JAMES:  I'm going to object to foundation, Your
20 Honor, at this particular junction.  He said he didn't --
21 take a look at the exhibit.
22    THE COURT:  I need to look at number 20.  And are you
23 showing him this document to see if you can refresh his
24 recollection?
25    MS. BRADY:  I am, Your Honor.

Page 504

1    THE COURT:  Do that.
2 A  Okay.
3 Q  Do you recognize what that document is?
4 A  I do.
5 Q  What is it?
6    THE COURT:  No.  Wait a second.  We're going to have a
7 bench conference, please.  Excuse us.
8    (Bench conference as follows:)
9    THE COURT:  The objection was foundation.  I'm not sure
10 how that relates to this specific document.
11    MR. JAMES:  Okay.  He.....
12    THE COURT:  And then I told you that you -- I asked
13 you, Ms. Brady, whether you were showing him the document to
14 refresh his recollection, you told me yes.
15    MS. BRADY:  Uh-huh.  (Affirmative)
16    THE COURT:  But then you launched into a series of
17 questions which appeared to me like you were going to ask
18 him to tell the jury what the document was, rather than
19 asking him if you -- if it refreshed it's recollection.  So
20 that's why we're -- that's why we're back here.
21    MS. BRADY:  Okay.
22    THE COURT:  So let's figure out where you're going and
23 see if there's an objection.
24    MR. JAMES:  He.....
25    THE COURT:  Just a second.

Page 505

1    MR. JAMES:  I'm sorry.
2    THE COURT:  We're going to -- I'm going to make the
3 state start over here, Mr. Davis [sic].  What -- what do you
4 -- what is your next question, and then we'll see if there's
5 an objection?
6    MS. BRADY:  Okay.  My next question is what is that,
7 that's the registration.  He testified that he couldn't
8 recall who the registered owner was.  Did you learn who the
9 -- who's the registered owner of the truck?  Is that the
10 truck that was used in the 2/28 buy?  I have my questions
11 written down out there, so I'm not positive exactly.....
12    THE COURT:  You're going to ask him to identify the
13 registration and.....
14    MS. BRADY:  I am, uh-huh.
15    THE COURT:  All right.  So that's that not a refreshing
16 of recollection.  That's actually to put the registration in
17 evidence.  Is that correct?
18    MS. BRADY:  Right.  I was.....
19    THE COURT:  All right.  Mr.....
20    MS. BRADY:  .....letting him use that to refresh his
21 recollection, but I intend on putting it into evidence.
22    THE COURT:  Mr. James?
23    MR. JAMES:  There's no testimony, whatsoever, about --
24 from Officer LeBlant [sic], regarding the license plate, or
25 the ownership of that car.  He said there's absolutely

Page 506

1 nothing in this testimony, saying this is DYS 221 or
2 whatever, I'm making up a license plate now, but there's --
3 it's void.  So it's -- there's no foundation laid.  And
4 they're attempting to bootstrap through the backdoor what
5 they can't get in the front door.  He says he doesn't know
6 who the car belongs to, period.  So I think that's where it
7 lies.
8    THE COURT:  Well, it's not where it lies.  So you can
9 refresh -- you can use any piece of paper to refresh
10 someone's recollection, even if the piece of paper is not
11 admissible.  And if that's where you're going, then -- then
12 -- and the officer can actually testify that his
13 recollection is refreshed, you can do that.....
14    MS. BRADY:  Okay.
15    THE COURT:  .....then.  To the extent there's an
16 objection to that, that's overruled.  Now the next question
17 is whether you're going to -- whether you can get the piece
18 of paper in.  Ms. Brady, can you respond to that objection?
19    MS. BRADY:  Okay.  What's the objection for the piece
20 of paper?
21    THE COURT:  No foundation, that the officer can't
22 testify that that -- how he got that piece of paper or --
23 or.....
24    MS. BRADY:  Well, I haven't got that far in my direct
25 examination yet.  I will be asking him if he -- if he knows

Page 507

1 -- he said that he ran the truck plate for the truck that
2 the defendant was in. And if that's the truck plate for the
3 -- I don't remember the license plate number of the truck.
4 But did you run it? Yes, I did. It was registered to the
5 defendant.
6     THE COURT: Before you tell the jury what the piece of
7 paper is, you need to lay a better foundation. I don't know
8 whether there will be another objection or not.
9     MS. BRADY: Okay.
10     THE COURT: But before you tell them that he's looking
11 at the -- before you tell the jury that he's looking at that
12 registration printout, you have to ask foundation questions
13 about what he did to get that.
14     MS. BRADY: Okay.
15     THE COURT: So you've got two different issues,
16 refreshing recollection.....
17     MS. BRADY: Right.
18     THE COURT: .....and whether you can mention that he's
19 looking at registration. And each had a different ruling.
20     MS. BRADY: Okay.
21     THE COURT: All right.
22     (End of bench conference)
23     THE COURT: Ms. Brady, why don't you restate your
24 question, please?
25          DIRECT EXAMINATION CONTINUED

Page 508

1 BY MS. BRADY:
2 Q    Okay. Now, Officer LaPorte, you stated that you did
3     run the plate of the truck that was -- the defendant
4     was in on the night of that buy, is that right?
5 A    Yes.
6 Q    Okay. And what kind of car was the defendant in?
7 A    He was in a Toyota truck.
8 Q    And what was the license plate number of the truck?
9 A    It was Delta Victor Echo 272.
10 Q    Okay. Now you stated that you didn't recall who the
11     registered owner of the car was, did that document that
12     I handed you refresh your recollection?
13 A    Yes.....
14     MR. JAMES: Your Honor, I'm going to object. Is this
15 his personal knowledge he's testifying to?
16     THE COURT: Have a bench conference, please.
17     (Bench conference as follows:)
18     THE COURT: Is that a hearsay objection, Mr. James?
19     MR. JAMES: Yes, Your Honor. I object, pure and
20 simple.
21     MS. BRADY: This is a business record. If I need to
22 get a DMV person in here to lay a foundation for it, I will.
23 He ran the defendant's truck, and that's how he learned.....
24     THE COURT: The objection is overruled. The officers
25 are entitled to rely on his business records to run -- to

Page 509

1 run a records check.
2     MR. JAMES: In grand jury, his testimony was he was not
3 there at the scene. So this is all hearsay on his part.
4 He's relying.....
5     THE COURT: I just made a ruling that it's -- that the
6 -- that the -- as an exception to the hearsay rule, the
7 officer is entitled to rely on other -- on business record
8 available to him to -- to get -- which includes police
9 reports, to get -- to run a license, rather than requiring
10 -- he can ask other sources what's the license plate and so
11 forth. And -- and you can challenge the reliability of that
12 information, that he -- but he's -- as an exception to the
13 hearsay rule.....
14     MR. JAMES: I understand.
15     THE COURT: .....he's entitled to rely on that.
16     MR. JAMES: I understand the exception, Judge. I just
17 want it clear that he was -- okay. I'll go into it on
18 regular cross exam.
19     THE COURT: Right.
20     MR. JAMES: Thank you. That's.....
21     (End of bench conference)
22     THE COURT: The objection is overruled. Do you
23 remember the question, Officer?
24 A    Yes, sir. The owner of the vehicle is Robert Davis.
25 Q    Okay. And does -- is there an address provided on that

Page 510

1     document as well?
2 A    There is.
3 Q    What's the address?
4 A    It's 202 Grand Larry Street.
5     MS. BRADY: Okay. And at this time, I move to admit
6 state's exhibit 20.
7     THE COURT: Number 20, Mr. James?
8     MS. BRADY: Your Honor, based upon the court's ruling,
9 I have a continuing objection to this.
10     THE COURT: All right. Number 20 is admitted.
11     (Plaintiff's exhibit 20 admitted)
12 Q    Okay. Now were you aware that the night that this
13     happened, that the buy funds were not found on the
14     defendant?
15 A    Yes, I was.
16 Q    What did you think happened to them?
17 A    I just assumed as is -- has happened in the past, many
18     times, the money is in the vehicle. So I expected to
19     find it in the vehicle when we executed a search
20     warrant on the vehicle.
21 Q    And did you participate in the execution of the search
22     warrant on the vehicle?
23 A    I did.
24 Q    And what as found inside the car?
25 A    A cell phone, but no money.

Page 511

1 Q   So once you realized that there was no money in the
2      car, what did you do?
3 A   Well, excuse me, I spoke with Officer LeBlanc who had
4      transported Mr. Davis to jail. And he said that.....
5 MR. JAMES: Objection. Hearsay.
6 THE COURT: Mr. Davis -- Ms. Brady?
7 MS. BRADY: It's not offered to prove the truth of the
8 matter asserted, of what Mr.....
9 THE COURT: All right. The objection is overruled.
10 A   He told me that the defendant didn't have any money on
11     him. To reconfirm that, I contacted Cook Inlet
12     Pretrial facility where the defendant was being held.
13     I spoke with them. They pulled up his record and told
14     me that when the defendant was placed into custody,
15     that he had $180 on his person. And I asked them if
16     that money was kept separate as his own personal money.
17     And I learned that, no, when someone is brought to
18     jail, that that money is put into a till with everyone
19     else's money. It's just documented the amount. So
20     it's not kept separate.
21 Q   Now, let me stop you right there. What day was this
22     going on on?
23 A   Well, he was booked in the early morning of the 28th --
24     or I'm sorry, the 29th. The buy conducted on the 28th
25     and then the 29th of March.

Page 512

1 Q   No, there's no 29th.....
2 A   February, I'm sorry.
3 Q   There's no 29th of February.....
4 A   Oh.....
5 Q   .....in this year, so it would have been.....
6 A   Sorry. March 1st.
7 Q   Okay. And so then -- and what -- what day did you
8      actually do the search -- serve the search warrant on
9      the defendant's car?
10 A   The search warrant of the defendant's car was on the
11     1st, the next day. Or I'm -- yeah, correct, on March
12     1st, 2001.
13 Q   Okay. So how much time elapsed between the time that
14     the defendant was booked in, roughly, and the time the
15     search warrant was served? I'm not asking you for
16     minutes. I'm just asking for a rough idea.
17 A   About two days.
18 Q   Okay. And did you -- what, if anything, did you do as
19     a result of learning that the defendant had brought
20     money to CIPT?
21 A   And I -- I test--- prior to that, I testified before
22     it was served on the 1st. I'm sorry, it was actually
23     served on the second. I just saw that in my report.
24     So let me retract the exact date. It was served on
25     March 2nd. I'm sorry.

Page 513

1 Q   Okay. So what if anything.....
2 THE COURT: Just move the mike -- point that mike at
3 you a little bit.
4 A   Oh, I'm sorry.
5 Q   What did -- what, if anything, did you do once you
6      learned that the defendant had been checked into to
7      CIPT with the money?
8 A   Well, to -- to view the money in Cook Inlet Pretrial, I
9      needed a search warrant. So I contacted Officer
10     Johnstone, who had written the search warrants, and
11     instructed him to write a search warrant to search the
12     cash till at Cook Inlet Pretrial. And I drove to Cook
13     Inlet Pretrial with the copies of the buy money from
14     the last controlled buy and awaited for a call from
15     Officer Johnstone until he told me that a search
16     warrant had been granted.
17 Q   Okay. And once the search warrant was granted, did you
18     look through the money?
19 A   I did. There were several thousand dollars there. The
20     money was in a denomination of one $100 bill as -- and
21     five 20's. The only money that I found was the $100
22     bill. The serial number, of course, matched the pre-
23     recorded buy money. And over the two days, I was told
24     that, you know, 20's are the most frequently turned
25     over denomination of bill is what Cook Inlet Pretrial

Page 514

1      told me.
2 Q   Okay. Let me stop you right there. Do you recognize
3      state's exhibit 13?
4 A   I do.
5 Q   What is that?
6 A   It is a sensitive envelope for currency and jewelry for
7      Anchorage Police Department.
8 Q   Okay. And do you know what's inside of it?
9 A   I do.
10 Q   How do you know that?
11 A   On the outside, it says it is -- a detailed description
12     is $100. And I've also written on there buy money.
13     And it says one $100 bill for a total of $100. It has
14     my signature and another officer's signature. And
15     there are the three evidence sealed tapes of the
16     sealings. And on -- two months later, someone else has
17     opened this up, and they resealed it again with the
18     date that they resealed this.
19 Q   Okay. And did you date the envelope when you put it
20     in?
21 A   I did.
22 Q   What was the date?
23 A   March 2nd, 2001.
24 Q   And was it assigned a P and E number?
25 A   It was.

Page 515

Multi-Page™

Page 516

1  Q  What was the P and E number assigned to it?
2  A  01 -- oh, I'm sorry, that's the case number.  The P and
3     E number is 418864.
4     MS. BRADY:  And at this time, I move to admit state's
5  exhibit 13.
6     MR. JAMES:  Objection, Your Honor.  There's no showing
7  that -- based on the officer's testimony, that thing has
8  been opened once after it left his hands.
9     THE COURT:  Overruled.  13 is admitted.
10         (Plaintiff's exhibit 13 admitted)
11 Q  Would you please open state's 13?
12 A  Sure.  Could I have some scissors, please?  Do you have
13    -- thank you.
14 Q  And I'm going to approach you with what's been
15    previously admitted as state's exhibit 11.  Do you know
16    what that is?
17 A  Yes.  It's a pre-recorded copy of the buy money used on
18    the buy for the 28th of February.  It's dated March
19    1st.  Case Officer LaPorte, and it's signed and
20    initialed by, it looks like Officer Grant Johnstone's
21    initials.
22    MS. BRADY:  Okay.  And at this time, I'm going to move
23 to show the jury the $100 bill and the state's exhibit 11.
24    THE COURT:  All right.  You can do that.  Are you going
25 to pass it around?

Page 517

1     MS. BRADY:  Yes.
2     THE COURT:  Thank you.  Officer, we'll just let the
3  jury look at it.
4  A  I'm sorry.
5     (Pause)
6     THE COURT:  Do you want to retrieve that, Ms. Brady?
7     MS. BRADY:  Yes.
8  Q  Okay.  Now, Officer LaPorte, did Mr. Fish ever tell you
9     that the defendant had gone to his work at Subway?
10 A  He did.
11 Q  Do you recall about when that was?
12 A  The first couple days of April of this year.
13 Q  Okay.  And did you have any involvement with Mr. Fish,
14    other than that, that we've just mentioned, since that
15    period of time?
16 A  Yes, I have.
17 Q  Okay.  And what was that?
18 A  Besides keeping track of -- trying to keep track of
19    where he lived and his jobs, one time I was sent to a
20    disturbance at the -- at the apartment that he was
21    living at in Mountain View.  And I spoke with him on
22    that occasion.
23    MS. BRADY:  Okay.  That's all the questions I have for
24 this witness, Your Honor.
25    THE COURT:  All right.  Mr. James?

Page 518

1     MR. JAMES:  Thank you.
2         MARK LAPORTE
3  testified as follows on:
4         CROSS EXAMINATION
5  BY MR. JAMES:
6  Q  Officer, now as I understand it.....
7     MR. JAMES:  If I may approach, Your Honor?
8  Q  .....the two items that (indiscernible - away from
9     microphone) on that in the manilla envelopes, is -- is
10    my understand of the sequence of events based upon
11    police written procedures is one of you weighs them, or
12    checks it or something, there's someone else there;
13    it's a two person control, right, at that juncture?
14 A  Yes, when the drugs are placed in the envelope, there
15    are two officers, and they must both sign an initial
16    verification of the drugs placed in the envelope.
17 Q  Okay.  And then are they weighed?  Do you have a scale
18    or something that you use?  I notice there's weights on
19    there?
20 A  Yes, it's an approximate weight.  We do have a scale,
21    and the drugs are weighed, either separately or with
22    the packaging that they're contained in, generally the
23    packaging.
24 Q  Well, is there consistency there, I mean, do we know
25    what that package, if it represents the packaging and

Page 519

1     the drug, or just the drug by looking at the package?
2  A  Well, it depends on the package.  It could be plastic.
3     It could be newspaper.  A different weights.  The
4     confirmed weight that is used will come back from the
5     state crime lab upon analysis.
6  Q  Now what's in the package is what you've -- you put in
7     the package, or it should have been put in the package,
8     if it is followed correct procedures, correct police
9     procedures, correct?
10 A  I'm not sure I understand your question, sir.
11 Q  That's fine.  The manilla envelope belongs to the
12    Anchorage Police Department, that particular -- those
13    particular manilla envelopes, correct?
14 A  Yes.
15 Q  Okay.  You get something you want to put in the manilla
16    envelope, whatever you've got in the manilla envelope,
17    is that the weight that is on the outside of the
18    manilla envelope?
19 A  That's an approximate weight, sir.  It's not exact.
20 Q  How do you weigh the item?
21 A  I have a scale, and as again, it's approximate weight.
22    I weigh the packaging that the drugs come in because
23    many people package the drugs in various items.  But
24    the exact weight of the drugs only is conducted at the
25    state crime lab where analysis is conducted.

AN-01-1717 CR

**Page 520**

1 Q  Now, when you weighed -- you have one or -- how many of
2    those did you -- were involved in of yourself, of those
3    four items that you've got?
4 A  Three, I believe. Yes, three of them.
5 Q  Okay. What -- let's go from the -- from your right to
6    your left, okay? Is that the first one?
7 A  That is the buy on the 28th.
8 Q  Is that your -- are you involved -- initial is in that?
9 A  No, sir.
10 Q  Okay. Set that one aside. Move to the next one your
11    right, which would be one in from the 28th.
12 A  That was the buy on the 8th, which I did not place any
13    drugs at that time either.
14 Q  Okay. That's off to the side. Go to the next one,
15    please.
16 A  I was not involved in that, two other officers.
17 Q  Okay. And what -- can we identify that date on that
18    one, for the record?
19 A  That I was involved in, that was February 21st of 2001.
20 Q  Okay. So other than 2000 -- February 21st is the only
21    one you were involved?
22 A  As far as.....
23 Q  As initials go.
24 A  As far as placing the drugs in the envelope, yes.
25 Q  All right. So anybody else then, if they testify would

**Page 521**

1    talk about the others, you can only testify as to what
2    -- as far as your initials and the custody and control
3    of the 21st?
4 A  Yes.
5 Q  Okay. Now -- and how much did that one weight?
6 A  Tar weight, meaning the amount of the drugs I wrote in
7    is .155, and I dated it February 21st, 2001. 1.55
8    grams, I'm sorry.
9 Q  All right. So -- now how did that come to you?
10 A  The drugs?
11 Q  Yeah.
12 A  I received the drugs from the informant.
13 Q  And was it in something, in a container, in a package,
14    in a -- you understand my question?
15 A  I do understand the question and I'm going to check the
16    property and evidence sheet to recall my recollection
17    here.
18 Q  Sure.
19 A  Because I don't remember if it was actually packaged in
20    an item or not. Suspected crack cocaine in a baggie.
21 Q  Do you have recollection now, looking at your evidence,
22    how it was -- how it came -- you understand -- you said
23    bag, but like in a baggie, a plastic baggie, or --
24    that's what I'm asking is.....
25 A  The description is written by Officer Johnstone who

**Page 522**

1    filled out the P and E, but we can open it up if you
2    would like to look, sir.
3 Q  Yeah, why don't you open it up?
4 A  Okay.
5 Q  With the court's permission.
6 A  I just.....
7    THE COURT:  That's fine.
8 A  Yeah. The scissors, please. Okay.
9    MR. JAMES:  (Indiscernible). If I may approach?
10 Q  So what we've got there is a -- is a baggie, a plastic
11    baggie, right?
12 A  Correct.
13 Q  Okay. Now, did you weigh the baggie and what's in the
14    baggie, or did you take it out and weigh it or.....
15 A  No, it did not come to us in the baggie.
16 Q  Oh, okay, I'm sorry. That's -- my question is how did
17    you get it, I guess?
18 A  Oh. He handed it to me. How did I get the baggie?
19 Q  No. No. I'm not asking my question correctly.
20 A  Okay. I'm sorry.
21 Q  Did it come in just -- here's my pen, or here's my pen
22    in a -- in a package? Do you understand my question?
23 A  I do.
24 Q  Okay.
25 A  It came just in the form of rock cocaine. It was

**Page 523**

1    wrapped in nothing.
2 Q  Nothing? Okay. So just -- okay. That's -- all right.
3    Now you testified that -- now in relationship to your
4    own now, after you sealed it in the manilla envelope --
5    well, you -- you put it in the plastic bag, correct?
6 A  Yes. Because if it was just in the manilla envelope,
7    you can see there's crumbs. We don't want to lose
8    anything, so I placed it in a plastic bag.
9 Q  Okay. So the plastic bag is yours, you put the plastic
10    bag in the manilla envelope and sealed it with all the
11    tapes that you've earlier testified to. I think you
12    called them evidence tapes?
13 A  Yes, sir.
14 Q  Okay. Now, who vacuum packs that?
15 A  Property and evidence technicians.
16 Q  You have nothing to do with that then?
17 A  No control, whatsoever.
18 Q  Okay. So as soon as you put it into what I believe you
19    earlier testified was a lock box or (indiscernible) or
20    do you -- box the correct term or.....
21 A  A locker is, I believe what I used.
22 Q  A locker? Okay. Then it's out of your control?
23 A  Yes.
24 Q  You don't know what happened to it -- whoops, let me
25    try that again. You do not know what happens to it

| | |
|---|---|
| 1  until such time as apparently report must come back | 1 Q  You were physically at the arrest? |
| 2  from the crime lab as part of your record, is that | 2 A  I was. |
| 3  right? | 3 Q  Okay.  And who did the arrest? |
| 4 A  That's correct.  I -- I don't know their policy. | 4 A  I did not see -- oh, I'm sorry, I saw the defendant in |
| 5 Q  Okay.  So do you have any access to that after the time | 5  custody.  When I arrived, he was all ready in handcuffs |
| 6  it leaves it your hands the first time until it -- | 6  by Officer LeBlanc when I arrived. |
| 7  well, until you've checked it out -- I assume someone | 7 Q  Okay.  So you arrived probably shortly thereafter the |
| 8  checked it out to bring it to court? | 8  arrest, but you weren't there when the actual arrest |
| 9 A  To receive access to it, I had to submit a request with | 9  went down? |
| 10  the property department.  And there is a control sheet | 10 A  I wasn't there when he was placed in handcuffs. |
| 11  that I will actually check out the drugs.  My name will | 11 Q  Okay.  Where were you? |
| 12  be assigned to it to keep the chain of custody intact. | 12 A  When he was placed in handcuffs? |
| 13 Q  Did you check out your particular one? | 13 Q  Well, yeah, because if you weren't there, where were |
| 14 A  I did not. | 14  you? |
| 15 Q  Okay.  All right.  Now, were you present when the other | 15 A  I was driving to that location. |
| 16  three items were weighed by members of your team? | 16 Q  All right.  Where had you come from? |
| 17 A  In the exact presence, no, I'm sure. | 17 A  From a close distance just across the street.  I was |
| 18 Q  Okay.  Okay.  Now you developed a checklist that you | 18  waiting for traffic to clear. |
| 19  earlier testified to, which is there someplace, I know. | 19 Q  And you were present when Officer Jones testified, |
| 20 A  Right here. | 20  correct? |
| 21 Q  Right.  That's your -- okay.  Now did you develop a | 21 A  Correct. |
| 22  checklist to ensure that the vehicle searches were done | 22 Q  Right here?  All right. |
| 23  in a standardized manner? | 23 A  I was. |
| 24 A  No, not in a standardized manner, just who conducted | 24 Q  And you don't have any dispute that he was there, |
| 25  the vehicle search. | 25  correct? |
| Page 524 | Page 526 |

| | |
|---|---|
| 1 Q  Okay.  And your checklist there says who did what. | 1 A  I don't. |
| 2  Checked the vehicle, strip-search, just the names and | 2 Q  Okay.  Who else was there, when you arrived on the |
| 3  probably a date or something there, correct, the | 3  scene? |
| 4  initials? | 4 A  Officer LeBlanc, and I remember Sergeant Caroline |
| 5 A  It -- it does. | 5  Stevens.  And Officer Bushue, I remember I spoke with |
| 6 Q  Okay.  Now my question is, given the fact that you | 6  -- well, Officer Bushue. |
| 7  developed that -- and that's your product, right? | 7 Q  Okay.  So Bushue, Stevens, LeBlanc and Jones? |
| 8 A  It is. | 8 A  Yes. |
| 9 Q  Mark LaPorte's product? | 9 Q  Okay.  But Johnson [sic] wasn't there? |
| 10 A  It is. | 10 A  No.  He was with the informant. |
| 11 Q  Okay.  Given that fact, and given your experience, did | 11 Q  Okay.  So did you see -- you heard Officer -- well, let |
| 12  you, Mark LaPorte, Officer Mark LaPorte, develop | 12  me see -- did you see Officer LeBlanc put his hands in |
| 13  another checklist for vehicle searches? | 13  Mr. Davis' pockets at the scene? |
| 14 A  I did not. | 14 A  I did not. |
| 15 Q  Okay.  Is there such a checklist in existence, to your | 15 Q  Okay.  Did you see Officer LeBlanc put Mr. Davis in a |
| 16  knowledge? | 16  car? |
| 17 A  None. | 17 A  I did. |
| 18 Q  All right.  So it's dependent upon each individual | 18 Q  Did? |
| 19  person who does the search as to what is checked or | 19 A  I did. |
| 20  what is not checked? | 20 Q  Okay.  And would you agree with Officer Jones that that |
| 21 A  Based on the training they received as a police | 21  was a marked police car? |
| 22  officer, yes. | 22 A  Yes, it was. |
| 23 Q  Okay.  Now you were not physically at the arrest -- or | 23 Q  Okay.  Now you indicated on the money, the $100 bill |
| 24  were -- or were you physically at the arrest? | 24  that there was another person's initial -- excuse me -- |
| 25 A  I was. | 25  date up on there, do you recall? |
| Page 525 | Page 527 |

1 A  I do.
2 Q  Okay.  And when was that date?
3 A  It was March 1st.
4 Q  No.  No.  No.  I guess I'm -- do we have your -- do you
5     still have all your little pieces?
6 A  Yeah, right here.
7 Q  I'm interested in this, if I may.....
8 A  Oh, I'm sorry.
9 Q  .....approach, just kind of (indiscernible) it forward
10    there?
11 A  Oh, on the actual.....
12 Q  Yeah.
13 A  .....sensitive envelope?
14 Q  Yeah, I'm sorry.
15 A  I thought you meant the copy of the buy money.  Sorry.
16 Q  I didn't explain myself properly.
17 A  Okay.
18 Q  I'm talking about the -- the envelope, okay?  You
19    indicated that you placed it in -- after seizing it, I
20    believe, the para -- you know, around the 2nd of March
21    -- on the 2nd of March, if your search warrant was
22    about 4:30, 4:45, somewhere in that neck of the woods,
23    right?
24 A  Yes.
25 Q  Up on top, there is a 5/4, it appears to be date,

Page 528

1     correct?
2 A  Yes.  That's what I would say it is.
3 Q  All right.  What happened to that envelope -- well,
4     after you put the envelope, sealed the envelope with
5     tape or what -- okay.  Does that same -- does it go
6     into the secure evidence locker as you earlier
7     described with the manilla envelopes?
8 A  It does.
9 Q  A similar one?
10 A  It does.
11 Q  Okay.  All right.  So did you take it out on the 5th of
12    -- May 5th, or May 4th, I'm sorry?
13 A  I did not.
14 Q  Do you have any idea given that, the documentation,
15    what happened on May 4th, or whatever the date is up on
16    top there?
17 A  I have some idea.  The person with DSN 13 -- or I'm
18    sorry, 1222, which off the top of my head, I don't know
19    who 1222 is, but whoever has DSN 1222 is the person who
20    opened this envelope because they sealed it back and
21    they initialed it and dated the date.
22 Q  Okay.
23 A  I don't recognize the initials.
24 Q  All right.  And that's 12/22 you say?
25 A  12/22, I don't know who has badge number or ID number

Page 529

1     1222, but that's easily found out.
2 Q  So at least as far as you know, you had nothing to do
3     with it on May 5, or May 4, I'm sorry?
4 A  No.
5 Q  Okay.  And can you find out for us who 1222 is?
6 A  In a matter of minutes.
7 Q  Okay.
8 A  I just have to call dispatch and find out who ID 1222
9     is.
10 Q  Okay.  Now, so you arrived at -- when Mr. Davis had his
11    hands behind his back in cuffs, is that correct?
12 A  Yes.
13 Q  How was he dressed?
14 A  I don't recall the exact clothing description.
15 Q  All right.  Did you see Officer LeBlanc going through
16    his pockets?
17 A  I did not.
18 Q  Okay.
19 A  I testified to that before.
20 Q  All right.  When you arrived on the scene, was
21    Mr. Davis standing, sitting, kneeling, face down, in
22    the patrol car, what did you -- what did you see?
23 A  He was standing by the patrol car with Officer LeBlanc
24    behind him.
25 Q  All right.  And from the time that you arrived on the

Page 530

1     scene until the time that Officer LeBlanc took him in
2     the patrol car to wherever they take him, did you ever
3     see Mr. Davis on the ground?
4 A  I didn't.
5 Q  Okay.  Do you recall testifying on July 2nd before the
6     grand jury?
7 A  Yes.
8 Q  Okay.  And -- well, let me ask you, at the scene APD
9     did not ever find any buy money, did they?
10 A  At the scene, no.
11 Q  Okay.  And I would assume, am I not correct, that that
12    was one of the focal points of at least four of you
13    were -- the officers that were present at the scene
14    that had not -- well that were present at the scene
15    was to find the buy money?
16 A  Yes, I expect to find the buy money either on the
17    defendant, or in his vehicle.
18 Q  Okay.  And it was not found on the defendant or in his
19    vehicle, was it?
20 A  No, it was not.
21 Q  Okay.  And based on that, did you contact -- now --
22    Officer LeBlanc and ask he to have the jail do a
23    thorough search of Mr. Davis at the booking process to
24    see if they could find the buy money?
25 A  I believe my conversation with him was.....

Page 531

Multi-Page™

State v. Robert Davis
November 19, 2001

1 Q   Him being LeBlanc now, right?
2 A   Office LeBlanc, yes.
3 Q   Okay.
4 A   Was to do a thorough search. I don't know if I
5     specifically said the jail or not, but to do a thorough
6     search, of course, because we're looking for the buy
7     money.
8 Q   Was it your impression that a thorough search had been
9     done?
10 A  I wasn't there. It was my impression.
11 Q  Okay. Now the -- excuse me -- I just lost it. You had
12    -- your group, not you, but your group, based upon your
13    instructions, had Mr. Fish under observation from the
14    time that the last -- he left on what was your last buy
15    until he turned over the -- whatever it is he -- the
16    product, whatever you want to call it, correct?
17 A  Yes.
18 Q  Okay. And that was Johnstone, Officer Johnstone, was
19    he.....
20 A  Officer Johnstone and Officer -- I believe it was
21    Officer Haas, correct.
22 Q  Haas?
23 A  They followed.....
24 Q  Okay.
25 A  .....him back to the police station.

Page 532

1 Q   Okay. So you had two people watching him?
2 A   Yes.
3 Q   Okay. And do you remember telling the grand jury that
4     the -- let me just get to the right thing here -- that
5     it was a takedown arrest and it got, $20 may have got
6     lost or blown away?
7 A   Yes, I recall telling them that.
8 Q   Okay. There was no takedown arrest, was there?
9 A   Well, I guess I would have to understand what your
10    definition of takedown arrest was.
11 Q  Okay. Well, tell me what your definition of takedown
12    arrest is. You're the one that testified before the
13    grand jury so.....
14 A  My definition is when we're doing a buy bust, we call
15    it a takedown. He's being taken into custody, and
16    that's a takedown. Officer LeBlanc pulled up in his
17    police car. He was brought out at gunpoint, and
18    Mr. Davis was arrested. Is just a terminology we use,
19    a takedown or a bust?
20 Q  Okay. I'm just looking here for a particular item,
21    Officer. Just bear with me just a moment. Do you
22    recall testifying before the grand jury that the -- you
23    were concerned about securing the product or the -- and
24    that was your -- that was your team's focus, or at
25    least your focus point on that?

Page 533

1 A   Securing the product.....
2 Q   Product.
3 A   .....or the money?
4 Q   No, the -- the stuff. The product, the dope.
5 A   Of -- my focus when, at -- at the last buy, at any.....
6 Q   Yes. Yeah.
7 A   .....buy I conduct, the last buy like any other buy,
8     that's a priority, you have to take the evidence into
9     custody, to keep the chain of custody.
10 Q  All right. And you had two of your people, and one of
11    them being Johnson [sic]?
12 A  Johnstone, yes, sir.
13 Q  I'm sorry, Johnstone, on the -- in control of that
14    situation, right?
15 A  Yes.
16 Q  Okay. And so you -- there should have been no concern
17    on your part then, since Johnstone was running the
18    operation under your tutelage that the control of the
19    product was basically in your hands, visually or
20    physically?
21 A  Is the question.....
22    MS. BRADY: Objection, Your Honor. Is this a question?
23 Q  Yeah. I mean, there was no concern in your part, was
24    there? Let me rephrase.....
25    THE COURT: The objection is sustained. You need to

Page 534

1     ask a question.
2 Q   All right. Let me ask the question again. I got it.
3     Johnstone, Officers Johnstone and Haas are following
4     Mr. Fish, right?
5 A   Yes.
6 Q   Okay. And did you have concern as to the security of
7     the product from the time that Officers Johnstone and
8     Haas took visual of Fish through the time that they
9     took the product off, from which I believe you
10    testified was APD?
11 A  No, I had no real concern.
12 Q  Okay. When you arrived on the scene, do you remember
13    telling the grand jury -- and I -- to a question from
14    Ms. Brady, yes, Cook Inlet Pretrial, he actually came
15    in with $180, and that's $20 short of what we gave him?
16    What happened when the officers rushed up, it was a big
17    scene. It was -- he was laid out on the ground, as you
18    may be aware, or not aware; there's lots of people
19    running around?
20 A  I recall that, yes.
21 Q  What's laid out on the ground if it's not Mr. Davis?
22 A  Well, in many high-risk traffic stops or felony traffic
23    stops, when they're exited from the vehicle and.....
24 Q  No, I'm talking about Mr. Davis now, please.
25 A  Yes. If he was brought back to the police car, he

Page 535

Exhibit K – 140

3AN-01-1717 CR

**Page 536**

1  could be proned out on the ground and taken into
2  custody.
3 Q  He wasn't thrown out the ground and taken into
4  custody?
5 A  You know, I just don't recall. I just don't recall.
6 Q  You heard Officer Somerset Jones testify, right?
7 A  I heard his testimony, yes.
8 Q  Okay. And he was six feet away from him?
9 A  Yes, I heard his testimony.
10 Q  Okay. So there was no throwing on the ground?
11 A  I don't recall anyone saying someone was thrown on the
12  ground.
13 Q  All right. It was laid out on the ground. As you may
14  be aware or not aware, there was a lot of people
15  running around. What's it if it's not Mr. Davis, what
16  is it laid out on the ground?
17 A  I would have to read the entire statement. On what
18  you've paraphrased, I would presume that I'm talking
19  about Mr. Davis, but.....
20 Q  Okay. I'm going to refer you to what's been marked as
21  page 23 of 28, but you can look through the whole thing
22  if you're more comfortable doing that. I'm not trying
23  to.....
24 A  Well, that's fine.
25 Q  .....hook you into a statement here.

**Page 537**

1 A  Which paragraph, sir?
2 Q  It says -- if you go down to about -- well, almost --
3  like to a little beyond halfway.
4 A  Oh, okay. I see.
5 Q  Yeah. It says, report colon. Do you see there on page
6  23?
7 A  Uh-huh. (Affirmative)
8 Q  Okay. And you can, of course, read up as Ms. Brady is
9  asking you a question.
10 A  Okay.
11 Q  Okay. And my question is, it, what's it was laid out
12  on the ground?
13 A  I'm not really sure. It's not a very well spoken
14  sentence. Just reading it, I initially felt it may be
15  Mr. Davis. But I'm not sure what it was laid out on
16  the ground. I'm not exactly sure what I was trying to
17  say here to be perfectly honest with you.
18 Q  All right.
19 A  I'm presuming, based on its context and the whole
20  sentence, that Mr. Davis was -- I believe that
21  Mr. Davis was laid out on the ground the way we'll do a
22  high-risk traffic stop. But I'm not completely sure.
23 Q  And that's why you go on, you can look through that if
24  you want to, that the money, some of the money may have
25  gotten blown away?

**Page 538**

1 A  That was just a guesstimate that I -- that I had. I
2  have no idea what happened to the other $20.
3 Q  So that's just pure speculation on your part?
4 A  Yes.
5 Q  Okay. Now going to -- you've got a search warrant and
6  you've all ready testified on direct examination that
7  you had to go into the common till. That's like a
8  bank, isn't it? I mean, the other -- it's the bank,
9  the CIPT bank, if you want to think in terms of it, the
10  money bank?
11 A  Yes.
12 Q  Okay. So you booked -- not you, I'm sorry, Officer
13  LeBlanc booked Mr. Davis sometime in the -- around 1:00
14  o'clock in the morning or something on the 1st,
15  correct?
16 A  Yes.
17 Q  Okay. And you testified in grand jury that you went
18  through over $8,000 in money on the 2nd?
19 A  Correct. The money at Cook Inlet Pretrial.
20 Q  Okay. And that was everybody's money, right?
21 A  Yes.
22 Q  Okay. And how many people had been booked in CIPT,
23  which is Cook Inlet Pretrial, which is where Mr. Davis
24  was taken, where you got the money from? How many
25  people had been booked there from the time that

**Page 539**

1  Mr. Davis was booked in until the time you did the
2  search warrant?
3  MS. BRADY: Objection, Your Honor. This witness has no
4  basis to know that.
5  THE COURT: Well, do.....
6  MR. JAMES: It's a perfectly.....
7  THE COURT: .....you have no basis to know that,
8 Officer?
9 A  I have no idea.
10 Q  This was on a Friday night?
11 A  I'm not sure the day of the week exactly. I'd have to
12  look at the calendar. It's been some time.
13 Q  Well, I really do have a calendar.....
14 A  He was booked after -- after midnight, early.....
15 Q  It was after midnight? Okay. We'll go along with
16  that. Okay. All right. And -- well, so we're not
17  playing games with you.....
18  MR. JAMES: If I may just approach, Your Honor?
19 Q  I'm going to represent that -- I'm going to represent I
20  -- I made a photocopy of a calendar with the year 2000
21  on it. Do you see there March 1 is Thursday, isn't it?
22 A  Yes, it is.
23 Q  Okay. That's right. All right. And is there quite
24  bit of -- to your knowledge, if you know, is there
25  quite a bit of activity in the booking processing over

Multi-Page™

3AN-01-1717 CR

**Page 540**

1   the -- the weekend, you know, the latter part of the
2   week and into the weekend regarding folks getting
3   booked into CIPT?
4 A I guess it depends on the -- how many arrests are made.
5   I -- that's.....
6 Q Okay.
7 A .....kind of a general question. I don't think I can
8   answer that.
9 Q All right. That's fair. Well, all right. Now for
10  clarification, you did not do any of the searches
11  yourself, other than the search of the money, at the
12  scene, excuse me -- let me strike that and start again.
13  Relating to Mr. Davis, you did not do any, personally,
14  did not do any physical searching of Mr. Davis,
15  correct?
16 A I did not.
17 Q Okay. Do you have -- okay. And you heard Officer
18  Jones testify earlier today, correct?
19 A I did.
20 Q All right. Do you have any reason to dispute any of
21  his testimony, based upon what you personally observed
22  as to what happened that early morning, late, late
23  night, early morning of the 28th/1st?
24 A I do not.
25 Q And did you direct the officers of your team to get the

**Page 541**

1   search warrant for the car?
2 A Yes, I did.
3 Q Okay. And as part of that search warrant, there was an
4   affidavit that was created, was there not?
5 A Yes.
6 Q Okay. Part of that affidavit was in support of the
7   search of the vehicle was is they -- APD could not find
8   any buy money on Mr. Davis, correct?
9 A That's correct.
10 Q Okay. Let's see. Now.....
11  THE COURT: We need to stop here. I need to consult
12  with you all.....
13  MR. JAMES: Oh, okay.
14  THE COURT: .....about scheduling. And we have one
15  juror who has some travel issues, so I need to consult with
16  you all first. So let's take a short bench conference,
17  please.
18  (Bench conference as follows:)
19  UNIDENTIFIED VOICE: Ma'am, do you have any evidence
20  tape? Sometimes you guys have some other evidence tape here
21  so we can seal it back up.
22  UNIDENTIFIED VOICE: I don't have an answer to that
23  (indiscernible).
24  UNIDENTIFIED VOICE: Okay.
25  (Pause)

**Page 542**

1   (End of bench conference)
2   THE COURT: All right. Folks, it looks like that
3   you're going to get the case for deliberation either late
4   tomorrow or first thing Wednesday morning. I had one of the
5   jurors, and I'm trying to remember who it was, that had to
6   leave. Was that you, Mr. Hughes? Mr. Iverson?
7   MR. IVERSON: At 1:00 -- at 1:30 on Wednesday.
8   THE COURT: You have to leave at 1:30 on Wednesday?
9   MR. IVERSON: I'll try to confirm that today, to be at
10  another courthouse.
11  THE COURT: To be at another courthouse, that's
12  correct.
13  MR. IVERSON: Next door.
14  THE COURT: And that's here?
15  MR. IVERSON: It's in -- I think it's next door.
16  THE COURT: All right. All right. Mr. Iverson, if --
17  what I would like you to do is confirm that.....
18  MR. IVERSON: Okay.
19  THE COURT: .....before tomorrow morning.
20  MR. IVERSON: Okay.
21  THE COURT: And then we'll ask you about it tomorrow
22  morning. My experience is that many cases are set and then
23  they get moved around at the last minute and it's -- if you
24  -- we promised you that you wouldn't have to miss that to be
25  on jury duty, and so I would like you to check and see if

**Page 543**

1   it's still scheduled for 1:30, what the likelihood of it
2   actually going is, and then we'll ask you about that
3   tomorrow.
4   MR. IVERSON: Okay.
5   THE COURT: And if -- if you're absolutely going to
6   have to be there, then I'll talk with the lawyers, we
7   may.....
8   MR. IVERSON: I -- I -- on Friday, I had information
9   that that's when it scheduled, but it -- it gets not --
10  maybe not postponed but delayed, you know, waiting.
11  THE COURT: All right. Well, could you get it -- you
12  may not be able to get terribly accurate information, but
13  get what you can.
14  MR. IVERSON: Okay.
15  THE COURT: And then we'll ask you about it tomorrow.
16  If you're -- if the case is submitted to you on Wednesday,
17  folks, we'll ask you to stay on Wednesday, until you've
18  reached a verdict, which may be after 1:30. Once the case
19  is submitted to you, we'll ask you to stay during the
20  regular business hours, until 4:30, or later if you choose
21  yourselves. But we want you at least until 4:30, and then
22  it's up to you. So you should probably plan, I don't know
23  what's going to happen actually in terms of the schedule,
24  but you should probably plan on being here a full day on
25  Wednesday. And if you need to make arrangements, I hope

1 that doesn't mess up anybody Thanksgiving cooking or I think
2 there's a couple of basketball games on Wednesday afternoon.
3 But I'm just giving you a fair warning ahead of time. And
4 I'll let you go, see you in the morning at 8:30.
5     MS. BRADY: At what time?
6     MR. JAMES: What time?
7     THE COURT: 8:30.
8     MR. JAMES: Oh, okay.
9     (Jury excused)
10     THE COURT: All right. I need to take up a couple
11 issues with you all, but I need to take a really short
12 break. And so why don't we do that and then we'll come back
13 and work for 10 minutes or so, and then you call take off
14 for the rest -- until we come back at 2:45 to jury
15 instructions.
16     MR. JAMES: You're going to make it so we're not going
17 to get out of this room, Judge.
18     THE COURT: Actually, why don't we just deal with our
19 issues at jury instruction time.
20     MR. JAMES: Okay. All right. That's fine. I'll stick
21 around.....
22     THE COURT: And I'll let everybody go.
23     MR. JAMES: I was just, you know.....
24     THE COURT: So we'll see you -- no, you make sense.
25     MR. JAMES: Okay.

Page 544

1     THE COURT: 2:45 tomorrow -- or this afternoon, excuse
2 me. Yes, sir?
3     UNIDENTIFIED VOICE: Do you know, lots of times you'll
4 have evidence tape back here and I can seal all this back up
5 (indiscernible).....
6     THE COURT: We have some -- some drugs and money open,
7 so we need to do whatever -- and they're admitted.
8     MS. BRADY: It should be in here.
9     UNIDENTIFIED VOICE: (Indiscernible).
10     (Off record)
11     1:2046
12     (This portion not requested)
13     2:4053
14     THE COURT: .....Davis. Our jury isn't here, but I do
15 have Mr. Davis here with his lawyer, Mr. James, and Ms.
16 Brady. We're going to do jury instructions. And let's work
17 on that for a while and we'll take up other issues. Ms.
18 Brady, you have a 3:30?
19     MS. BRADY: I do, your Honor. And, actually, I have a
20 very quick issue that I would like to take up first.
21     THE COURT: Before jury instructions?
22     MS. BRADY: Before jury instructions.
23     THE COURT: All right.
24     MS. BRADY: This morning when Mr. Fish was late and I
25 called my office, and I think I might have disclosed this to

Page 545

1     Madam clerk. I don't ....
2     2:4124
3     (Corrupted audio)
4     2:4130
5     .....going on, she did. She said that Ms. Bohman (ph)
6 said that he had just dropped off her off and that he should
7 be here shortly, and then probably 15 minutes later is when
8 he finally showed up. And that's it.
9     THE COURT: All right. All right. Jury instructions.
10 I have the state's proposed instructions. They're not
11 numbered, so I'm just going to go through them in the order
12 that they were filed. I'll refer to them by subject matter.
13 And since the state proposed them, unless I have a question
14 about them, I'll just turn to you, Mr. James, and ask you
15 whether you object or not.
16     MR. JAMES: Understood.
17     THE COURT: I may ask both of you why I need an
18 instruction, even if it's proposed by the state and not
19 opposed. My general view in instructing juries is less than
20 better is more. I don't see why I need to be redundant.
21 And I don't see why I need to instruct the jury on -- on
22 common sense, so -- or at least more than once. So I may
23 raise those issues as we're going through this. So let's
24 just start. The evidence has now been presented?
25     MR. JAMES: Fine.

Page 546

1     THE COURT: The presumption of innocence and burden of
2 proof?
3     MR. JAMES: It was can, thank you.
4     THE COURT: Pardon me?
5     MR. JAMES: Yes. I said it was can. Thank you.
6     THE COURT: Yes. All right.
7     MR. JAMES: I'm sorry. I didn't.....
8     THE COURT: Fact may be proved by direct or
9 circumstantial evidence?
10     MR. JAMES: Could we go back and visit the other one?
11 I don't believe -- never mind. Never mind. I'm sorry. Go
12 ahead.
13     THE COURT: Facts may -- direct or circumstantial
14 evidence?
15     MR. JAMES: Yeah. That's -- okay. Yes.
16     THE COURT: No objection?
17     MR. JAMES: No. That's can.
18     THE COURT: All right. The next one is the old pattern
19 instruction. Every person who testifies under oath is a
20 witness. I've all ready read to the jury new pattern 1.10.
21 I read it at the beginning of the case. I would be inclined
22 to put this one in the back of the jury -- put the new
23 pattern one in, which is shorter than this proposed
24 instruction, in the back of the jury instructions. Tell
25 them it's there. Tell them it's important, but not read it

Page 547

1 again. So, Ms. Brady, you proposed that, is that -- do you
2 have any objection to that?
3    MS. BRADY: Yes, Your Honor. I would ask the court to
4 give the one that I proposed. I don't like the new pattern
5 instruction. I don't think that it's as clear as this one
6 is. And that's the reason that I literally proposed this
7 one.
8    THE COURT: Mr. James?
9    MR. JAMES: Well, Your Honor, I think that the pattern
10 jury instructions, this court should give deference to
11 those, what is she specifically referring to that -- what is
12 she specifically -- I'm sorry.....
13    THE COURT: I don't know what she's referring to. I'm
14 going to give new pattern 1.10, and I'm not going to read it
15 again.
16    MR. JAMES: Okay.
17    THE COURT: Witness may be impeached?
18    MR. JAMES: That's fine. That's fine.
19    THE COURT: Not bound to decide in conformity with
20 greater number of witnesses?
21    MR. JAMES: Yeah. That's can.
22    THE COURT: Expert witnesses. There's a new pattern
23 that's substantially shorter than this and clearer than this
24 that I prefer. 1. -- new pattern 1.11.
25    MR. JAMES: We haven't heard any experts as of right

Page 548

1 now. Do we have experts?
2    THE COURT: Are you going to have somebody from the
3 crime lab, Ms. Brady?
4    MS. BRADY: Yes, Your Honor.
5    MR. JAMES: Okay. So that's fine if you're going to
6 use the 1.1.
7    THE COURT: I'm going to use new -- Ms. Brady, new
8 1.11?
9    MS. BRADY: I'm not familiar with that, but can I
10 reserve raising that again tomorrow if I have some
11 objection? I don't think I will, but I'm not familiar with
12 the new one.
13    THE COURT: All right. Well, I -- that's fine. Not --
14 it's a constitutional right. I don't know -- we haven't
15 determined whether the defendant is going to take the stand,
16 so I'll reserve ruling on whether -- on which instruction I
17 should give regarding the defendant's testimony. But, Mr.
18 James, if the defendant does not take the stand, is the
19 state's proposed instruction adequate?
20    MR. JAMES: Yes. That's pattern instruction.
21    THE COURT: The next instruction, a statement made by a
22 defendant is an admission or confession. I don't -- I
23 don't like this instruction. It's not required -- it's --
24 what happened is that there -- there's a -- the Supreme
25 Court approved a very brief instruction on an admission, and

Page 549

1 before we knew it, then lawyers tacked on lots of other
2 things to it. The -- finally, we got some sanity on this
3 jury instruction, and new patter 1.27 says -- well, I'll
4 tell you what it says. It says the second paragraph of the
5 state's proposed and the fourth paragraph, the first
6 sentence of the fourth paragraph of the state's proposed.
7 And the first sentence of the last paragraph. And not all
8 this other stuff about confessions and so forth.
9    MR. JAMES: I have problems with the confessions and
10 the so forth.
11    THE COURT: Ms. Brady?
12    MS. BRADY: It says -- it starts off with.....
13    THE COURT: I'll just read it. An admission is a
14 statement made by a defendant other than at his trial that
15 tends to prove the defendant's guilt when considered with
16 the rest of the evidence. You are the exclusive judges as
17 to whether the defendant made an admission, whether it was
18 reported accurately and whether it is true in whole or in
19 part. Evidence of an oral admission of a defendant should
20 be viewed with caution.
21    MS. BRADY: That's fine with the state.
22    THE COURT: That's new 1.27 for future reference.
23    MS. BRADY: I'll put that in my packet.
24    THE COURT: Mr. James?
25    MR. JAMES: Well, Your Honor, I have a problem with the

Page 550

1 issue of admissions. I don't believe that -- we've got
2 discussions, and the courts can rule. But I don't believe
3 we have any admissions, per se.
4    THE COURT: How about the telephone conversation?
5    MR. JAMES: I understand the telephone conversations.
6 I don't agree that those are admissions. So I would object
7 to that. And I know you're going to give an instruction on
8 it, so.....
9    THE COURT: All right.
10    MR. JAMES: .....I'm on the record.
11    THE COURT: All right.
12    MR. JAMES: Moving on.
13    THE COURT: I believe that, that there's evidence of
14 tape recorded and non-tape recorded statements of the
15 defendant that -- that are properly considered admissions.
16 The jury may not construe them that way, but they may, or
17 they may not. As to the non-tape recorded ones, they may
18 not believe the reporter, but I'm going to give -- I believe
19 there's enough evidence to consider them admissions if the
20 jury wants to. So I'm going to give new 1.27. The
21 indictment is a mere accusation. I've all ready that once.
22 Do I need to give this one again?
23    MR. JAMES: I don't see why.....
24    MS. BRADY: No.
25    THE COURT: Mr. James?

Page 551

1   MR. JAMES: I don't see a reason, sir. All right.
2   THE COURT: The next one is the four counts.
3   MR. JAMES: It's the four counts. That's the
4 indictment.
5   THE COURT: All right. The next four are identical
6 except for the date. Is there any reason why we can't have
7 one consolidated instruction?
8   MS. BRADY: That's fine with the state.
9   MR. JAMES: I don't see a reason, it couples right in
10 with the one prior to that, so.....
11   THE COURT: May I suggest that you strike the first
12 paragraph? That at the end of the of the third paragraph,
13 you put in all the dates and the counts? Where you have on
14 or about February 8, for Count -- and have for Count I, on
15 or about February, for Count II and so forth. And then
16 where you have second.....
17   MS. BRADY: Uh-huh. (Affirmative)
18   THE COURT: .....insert for each count. And then
19 before you get to the last two boilerplate language, you put
20 in you must consider each count separately.
21   MR. JAMES: Okay. Do you understand what he's saying
22 there?
23   MR. DAVIS: Yeah.
24   MR. JAMES: Okay.
25   MS. BRADY: So this -- it would read, the second, for

Page 552

1 each count that Robert Davis knowingly delivered any amount
2 of cocaine, you must consider each count separately, if you
3 find from your consideration......
4   THE COURT: Yes. Mr. James, is that consolidated.....
5   MR. JAMES: Yeah, I -- that's fine, Judge, because.....
6   THE COURT: Can you redo that one, Ms. Brady?
7   MS. BRADY: I can, Your Honor.
8   THE COURT: All right. The next one then would be a
9 joint operation of an act or conduct and culpable mental
10 state. Mr. James?
11   MR. JAMES: I think that that's the proper statement of
12 the law, Judge.
13   THE COURT: All right. Someday, we'll figure out how
14 to say it in English, but.....
15   MR. JAMES: Right.....
16   THE COURT: .....for now, it's the proper statement of
17 the law.
18   MR. JAMES: It's the mumble-jumble, but it's still.....
19   THE COURT: Definition of knowingly?
20   MR. JAMES: (Indiscernible - lowers voice). That's a
21 proper statement.
22   THE COURT: Do I need to include the intoxicated
23 language in there? Is there any evidence of intoxication?
24 Well, that's two separate questions.
25   MR. JAMES: I.....

Page 553

1   THE COURT: Is there any evidence of intoxication? And
2 even if there is, and do I need to include that?
3   MR. JAMES: I don't believe there's any evidence of
4 intoxication, at least from -- no, I don't believe
5 there's.....
6   THE COURT: Ms. Brady?
7   MS. BRADY: That's fine. We can delete that.
8   THE COURT: All right. Thank you. On or about is the
9 next.....
10   MS. BRADY: Just a second, Your Honor. Do you want me
11 to delete that, or are you going to.....
12   THE COURT: I would ask if you would delete that
13 please. Can you do that?
14   MS. BRADY: Uh-huh. So so far, I'm only changing two?
15   THE COURT: Right.
16   MS. BRADY: Okay.
17   THE COURT: I had better write that down. On or about,
18 Mr. James?
19   MR. JAMES: No. That's -- that's valid.
20   THE COURT: Is that -- is there an objection to that?
21   MR. JAMES: I think the allegations are that on the
22 specific dates. I don't know why we're going to on or
23 about. I understand that that's part of the legal jumble,
24 but we are dealing with specific dates.
25   THE COURT: Except for the last count, which occurred

Page 554

1 at right around midnight.
2   MR. JAMES: Right. I don't think there's any.....
3   THE COURT: If it happened.
4   MR. JAMES: I don't think there's any confusion as to
5 the turnover of the clock.
6   THE COURT: Ms. Brady?
7   MS. BRADY: This is a standard pattern instruction,
8 Your Honor. I'm going to ask that we give this. There's a
9 potential for confusion among the jurors, and I would just
10 ask.....
11   THE COURT: Just because it's a standard is not a good
12 reason to give it. I mean, but because at least as to one
13 count, some jurors could decide -- let's see, what's it
14 allege, the 1st or the 28th?
15   MS. BRADY: It's alleged the 1st.
16   THE COURT: Some jurors could decide that something
17 happened on the 28th and then get hung up on that. So I
18 think it's necessary. State of mind by circumstantial
19 evidence?
20   MR. JAMES: What's -- I don't believe that we've heard
21 any circumstantial evidence relating to the state of mind.
22   THE COURT: The state has to prove that Mr. Davis knew
23 -- delivered cocaine and knew it was cocaine, and knew he
24 was delivering it.
25   MR. JAMES: But I don't see where -- I understand that

Page 555

1 -- the duty of the state. My -- I just have a problem here.
2 We're talking about circumstantial evidence. That goes to
3 flow more in terms of where the state has established, say
4 there's three counts or -- in something, and they've got one
5 and they're -- they're arguing that there's a flow to here.
6 If you believe Mr. Fish, that's direct evidence. I don't
7 see where there's circumstantial -- my problem, I don't see
8 where there's circumstantial evidence, Judge.
9      THE COURT: Ms. Brady?
10     MS. BRADY: There's lots of circumstantial evidence in
11 this case, Your Honor. And to prove that the defendant knew
12 that it was cocaine, they're talking in this little cocaine
13 code. I mean, Mr. Fish can't testify as to what was in Mr.
14 Davis' mind.
15     THE COURT: I'm going to give this instruction.
16     MR. JAMES: All right. Thank you.
17     THE COURT: Cocaine is a schedule 2A controlled
18 substance?
19     MR. JAMES: As far as I know, it is.
20     THE COURT: Definition of delivery. Do we need the
21 whether or not there is an agency relationship?
22     MS. BRADY: No. Would you like me to take that out?
23     MR. JAMES: I don't see why it should be in there.
24     THE COURT: I would -- I would like you to take that
25 out. There has been evidence that persons other than the

Page 556

1 defendant have been witnesses?
2     MR. JAMES: I object to this. There may have been
3 involved witnesses to, and it goes on to whether or not they
4 have been or will be prosecuted. What.....
5     THE COURT: I don't know why -- why we need that one,
6 Ms.....
7     MS. BRADY: That's fine. We can take it out.
8     THE COURT: Okay. Don't be influenced by passion or
9 prejudice?
10     MR. JAMES: That's can.
11     THE COURT: Does that mean no objection?
12     MR. JAMES: No, obj -- I'm sorry, yes. I mean....
13     THE COURT: I've got to make a record here.
14     MR. JAMES: I understand, Judge.
15     THE COURT: Counsel argued the case to you. Do I need
16 that one?
17     MR. JAMES: Didn't you give one prior to the intro?
18     THE COURT: Similar to that. Not -- not exactly the
19 same. The general subject that arguments of lawyers aren't
20 evidence. But is there any -- is there a reason I would
21 need to give this one here?
22     MR. JAMES: I don't see a reason myself, Judge. Just I
23 -- I'll listen to the state.
24     THE COURT: Ms. Brady?
25     MS. BRADY: I don't recall what the instruction was

Page 557

1 that you gave them. If you instructed them that arguments
2 are not -- if you have, that's fine with me. Although, I
3 would still ask that you put it in the packet and put it
4 behind that other instruction you're also not going to read.
5     THE COURT: Oh, I don't know if I -- I instructed them
6 only vaguely on this concept. I think I'll reserve this
7 one. If somebody wants me to give it after we hear
8 arguments of counsel, if they think it's really necessary,
9 based on the arguments of counsel, then I'll -- then you can
10 ask me to give it.
11     MS. BRADY: That's fine.
12     THE COURT: Don't be swayed by penalty or punishment?
13     MR. JAMES: I -- if the court -- I intend to argue that
14 this is a felony, and it's a serious life effector. I mean,
15 it doesn't go to.....
16     THE COURT: Pardon me?
17     MR. JAMES: I intend to argue, absent the court telling
18 me not to, that this -- this is a felony charge and it
19 carries great ramifications in a person's life. I don't --
20 you know, it doesn't go directly to the penalty or
21 punishment issue. But most certainly, it does go to what I
22 believe the weight that the jury should consider all the
23 evidence as to what's going to happen with Mr. Davis.
24 So.....
25     THE COURT: Well, let's do one at a time. Let's talk

Page 558

1 about the instruction.
2     MR. JAMES: Okay. Well, I've set myself up for a big
3 objection if I agree to this instruction.
4     THE COURT: Does he, Ms. Brady?
5     MS. BRADY: Especially if he's going to argue the way
6 that he just told the court that he was going to. That is
7 inviting nullification, and it's telling them that they
8 should be considering the ramifications of a felony
9 conviction on Mr. Davis.
10     MR. JAMES: That's why I'm bringing it up today.
11     THE COURT: All right. I'm going to give this
12 instruction. We'll talk again about the proper scope of
13 argument. Certainly, a defendant can argue that this is a
14 serious matter and that the jury should take their
15 responsibility seriously and that it will have a significant
16 impact on -- their decision will have a significant impact
17 on the defendant's life. It may be one of the most
18 important decision they ever make about someone else.
19 Anything all in that range is absolutely appropriate, more
20 detail about the nature of the impact then becomes -- begins
21 to invite nullification. But we'll -- I'm going to give the
22 instruction, because I think it's appropriate in almost any
23 case. We'll see about the scope of the argument later.
24     MR. JAMES: All right.
25     THE COURT: How about the next one? If I've repeated

Page 559

**Multi-Page™**

| | |
|---|---|
| 1 any rule. | 1 that. |
| 2  MR. JAMES: That's just the -- no, I don't have an | 2  MS. BRADY: It was..... |
| 3 objection to that. That's..... | 3  THE COURT: And I have -- do you have that, Mr. James? |
| 4  THE COURT: It's the duty of the attorney on each side | 4  MR. JAMES: Yes. That's a back one. The last one. |
| 5 to object. I instructed them on that in detail at the | 5 Defendant has testified in this case. |
| 6 beginning of the case. I used new pattern 1.09. And I | 6  THE COURT: And if the defendant chooses to testify, |
| 7 would like to just stick new pattern 1.09 at the end of | 7 can I use that one instead of the other one? |
| 8 the packet and tell them I've already instructed them on it and | 8  MR. JAMES: Yes. |
| 9 tell them that I'm not going to read it again, but it's an | 9  THE COURT: All right. I have that. It must still be |
| 10 important instruction. | 10 on my desk, but I do have it. How about the verdict forms, |
| 11  MS. BRADY: I don't have any objection to that, Your | 11 Mr. James? |
| 12 Honor. | 12  MR. JAMES: Pretty cut and dry. I don't see a reason |
| 13  MR. JAMES: No, that's..... | 13 to object, Judge. |
| 14  THE COURT: All right. How about anything I've said or | 14  THE COURT: All right. If you have instructions that |
| 15 done has suggested what I think? | 15 you want me to give, Mr. James, they need to be -- I would |
| 16  MR. JAMES: No, Your Honor. | 16 like to say they should be in by the end of the day, but |
| 17  THE COURT: Meaning no objection? | 17 that's getting pretty close. So could you bring them in |
| 18  MR. JAMES: No. No objection, Your Honor. It's -- | 18 tomorrow morning? |
| 19 it's standard. | 19  MR. JAMES: Yes, sir. |
| 20  THE COURT: Attitude and conduct of the jurors? | 20  THE COURT: All right. And..... |
| 21  MR. JAMES: That's just -- no objection. It's telling | 21  MR. JAMES: Okay. |
| 22 them to..... | 22  THE COURT: .....we'll take whatever time is necessary |
| 23  THE COURT: Verdict must be unanimous..... | 23 to do that. Let's talk a little bit -- well, you filed a |
| 24  MR. JAMES: That's..... | 24 motion asking me to order either pay for transport of a |
| 25  THE COURT: .....consider the judgement of each juror? | 25 witness, or order the state to pay for transport of the |
| Page 560 | Page 562 |
| 1  MR. JAMES: Has to be. No objection. | 1 witness. I haven't asked for an opposition, but I'm going |
| 2  THE COURT: All right. The next one is a -- bailiff | 2 to deny the motion. Mr. James, there's no legal authority |
| 3 will be appointed? | 3 that I'm aware of for me to do that. The public defendant |
| 4  MR. JAMES: No objections. | 4 statute, title 18, section 85 implements the state's |
| 5  THE COURT: And the last one is you were accepted as | 5 obligation to provide counsel for indigents at state |
| 6 jurors in reliance upon your answers. But this may be a | 6 expense. And that statute says that if a person can't |
| 7 pattern from someplace, Ms. Brady, but it's redundant with | 7 afford the cost of defense, which could include counsel or |
| 8 some other stuff. And I'm trying to remember where it is. | 8 pay for witness transport, that he can apply for appointment |
| 9 Because I ran into it the other day when I read it. Each of | 9 of counsel. And if he shows indigency, he gets counsel |
| 10 your verdicts must be unanimous, one, two, three, four | 10 appointed and all the things that go along with it, |
| 11 paragraph down is redundant. Maybe that's it. | 11 including witness transport costs. |
| 12  MS. BRADY: Okay. So you want me to take each of your | 12  It doesn't provide for a hybrid kind of repre -- kind |
| 13 verdicts must be unanimous out of there? | 13 of state-funded expense that allows the state to fund some |
| 14  THE COURT: Well, yes, because I've just -- well, I've | 14 aspects of the defense, but allows him to pay for a private |
| 15 just said it two instructions before. | 15 lawyer. And I'm not aware of any case law that that says |
| 16  MS. BRADY: Okay. | 16 that -- required to do that in this case. I also don't have |
| 17  THE COURT: Mr. James? | 17 a showing of indigency. And I don't have a showing of -- |
| 18  MR. JAMES: Yes, Your Honor. I think that's proper. | 18 and I'll leave it at that. So the request is denied. |
| 19 And I don't have any objections. This is the sequence of | 19  Let's talk about tomorrow. Assuming that we finish mid |
| 20 events in the jury room. | 20 to late morning, I'm not inclined to cram in -- to try to |
| 21  THE COURT: Right. I think that's it, in terms of | 21 cram in closing statements and send the jury out at 2:30 or |
| 22 redundance. And then we have four verdict forms? | 22 3:00 in the afternoon, in part because I have to get the |
| 23  MS. BRADY: Your Honor, I proposed an instruction for | 23 instructions ready. And in part because I have other cases |
| 24 whether the defendant taking the stand as well..... | 24 starting at 2:00 o'clock. If we finish earlier than that, |
| 25  THE COURT: Yes, you did. I didn't know who proposed | 25 then -- then we might be able to accomplish that. So I |
| Page 561 | Page 563 |