**Page 812**

1 bank to lend you money? Would you even think about that?
2 Say, well, I don't have a profit and loss statement for the
3 last few years. I didn't write it down. But I'll tell you
4 about it. Just trust me. I'll take (indiscernible). I
5 didn't have the house inspector to see whether it had any
6 problem structurally with it. But I know the house, so you
7 just trust me. Do you think the bank would lend you money
8 on the mortgage? Would you buy a house in that respect?
9 Would you buy a car, a used car, without taking it to a
10 mechanic who you trust and say, George, check it out for me.
11 Go through it throughly and tell me your opinion, and tell
12 me what you did. So you'd go back to the mechanic, and he
13 says these are the items I did. I checked this, checkpoint.
14 I checked this, checkpoint. You got that information. You
15 know it was done.
16     Some of you work in the medical community. You pick up
17 a file. You don't know anything about the file. You review
18 the file. What do you look for? Work procedures
19 documented. What was done? Where does it say it was done?
20 You don't have that here. Why not? Because if they had
21 made such a checklist, it would be subject to scrutiny. And
22 if you don't have the piece of paper, then you have to rely
23 upon other people's representations. This is a felony case.
24 This.....
25     MS. BRADY: Objection, Your Honor.

**Page 813**

1    THE COURT: Overruled.
2    MR. JAMES: .....decision, your decision is going to
3 affect Robert Davis's life. Can you rely on the evidence
4 that you've heard to say that the State of Alaska has proven
5 each and every element beyond a reasonable doubt, erasing
6 all other reasonable doubts? Can you say that? Where is
7 the documentation that leads this nice trail down to the
8 comfort zone? There is question. There's a question about
9 every one of these incidents. And the biggest question is
10 the reliance upon an admitted liar, thief and burglar who
11 not only did it once before, lied to him in the courtroom,
12 and in fact, continues to deal.
13    THE COURT: You asked for a time warning. This is it.
14    MR. JAMES: Thank you. That means I got five minutes.
15 We've asked for those warnings. I'm not going to speak to
16 you again because the rules are the state goes first because
17 they got this big burden, remember the scales? I get to
18 talk to you, and they get to come back. And you can expect
19 they're going to respond to all these questions that I've
20 raised. It's here's -- he's blowing smoke at you. I'm
21 talking facts that you heard. Talking facts.
22    Has the scale been tipped? Have they got it to each of
23 you's satisfaction that they're right-off, basically almost
24 touching the ground on the other side? This isn't golly,
25 gee, we don't know, so we're going to give it to the state.

**Page 814**

1 You are not them. We are the people. We are the final
2 decision makers. You people have been entrusted with that
3 decision. The court doesn't have it. I don't have it.
4 They don't have it. You have it. Would you be satisfied
5 with quality of the proof that puts this scale from way down
6 here all the way to here? Or were the things that they told
7 you that you can pluck off, that raises them, that raises
8 that to take away beyond a reasonable doubt? And that's
9 what we're talking about.
10    Think of the fish stew. Would you eat the rest of it?
11 Because that's what it is. It might sound hokey. But
12 that's exactly what it is. If they brought up big bowls to
13 you and said well there's all kinds of different pieces in
14 it when they put it together, it makes the stew. You take a
15 bite, yuck. And you keep eating, you take another bite,
16 yuck. The bluffs are Jeremy Fish, there's no money, there's
17 no tape that says here is 200 bucks, here's the crack. Here
18 200 bucks, here's the cocaine. It's not on there because it
19 didn't happen. You've got a hateful, vindictive person who
20 has somehow got APD under his thumb. Nothing happens to
21 this kid. They keep on turning him loose on us. Yet you're
22 to believe him?
23    We brought forth the witnesses. None of them were
24 impeached. I suggest (indiscernible) impeached every
25 witness other than the chemist who said, hey, I just caught

**Page 815**

1 stuff, we don't know where it came from, but I tested it and
2 this is matched up numbers. I'm not questioning the
3 chemist. It's the people who are involved that we question.
4 They're stories don't match up when you start picking at
5 them. And if you can't match up your stories, I submit to
6 you they have not proven their case beyond a reasonable
7 doubt. If you rely on Fish, I think it's rotten. If you
8 rely upon, oh, trust us, this money -- if it happened, they
9 would have got them with the money. Fish kept the money,
10 and it got back in circulation in CIPD. Because that's
11 where they keep felons, right? And you think that Fish
12 doesn't have some communication with some folks that perhaps
13 are there, that have been brought in afterwards? You heard
14 Garcia. He did his job. Zero, zero, zero, zero. You know
15 what? There's no place he could have put the money because
16 they had it. There's absolutely no place. Because he never
17 had the money. The smoke in the mirrors is the state. We
18 pointed them out.
19    We ask you to return a fair and just verdict, given the
20 facts of this case. And that verdict is not guilty. And
21 you can walk out of here with pride and say you didn't do
22 it. Maybe you should get your act together. Don't come in
23 with this kind of trash again. Don't force somebody to
24 offend themselves based upon your incompetence, and you
25 bring in liars in front of us. If you're going to bring a

## Page 816

1 liar in front of us, at least have him get his story
2 straight. Thank you very much for your time.
3    THE COURT: Thank you, Mr. James. Ms. Brady, your
4 rebuttal argument.
5    MS. BRADY: Okay. I'm going to start off by saying
6 that we dispute that Officer Johnstone said that this case
7 rises and falls on Jeremy Fish. What happened was Mr. James
8 asked him the question, I objected, he never answered. That
9 wasn't said.
10    So Mr. James, as he told you, I get to come back and
11 talk a second time because the state has the burden of
12 proof. It's the way the system works. And also the way the
13 system works is that we use juries to determine guilt or
14 innocence. And you know why we use juries? Because the
15 test is one of reason, common sense and collective life
16 experience. We want -- we expect juries to use their
17 reason, common sense and collective life experience when
18 they decide cases.
19    Now, I'm going to show you an instruction that you're
20 going to see. This is the same instruction the judge is
21 going to give you. And this is paragraph -- it's in
22 paragraph 2 of the instruction. It's the instruction that
23 talks about reasonable doubt. This isn't the whole
24 instruction. It's just a part of it. And this is what it
25 says.

## Page 817

1    This last mentioned requirement that you be satisfied
2 beyond a reasonable doubt of the defendant's guilt is what's
3 called the burden of proof. It is not required that the
4 prosecution prove guilt beyond all possible doubt, for it's
5 rarely possible to prove anything to an absolute certainty.
6 Rather, the test is one of reasonable doubt. A reasonable
7 doubt is a doubt based on reason and common sense. What is
8 that instruction telling you? You don't have to check your
9 common sense at the door when you go in to deliberate. You
10 take your common sense with you.
11    Now, Mr. James did a very thorough job of painting
12 Jeremy Fish as a liar and a bad person, unreliable. And you
13 knew that was coming. Everybody knew that was coming. The
14 police knew that was coming when Jeremy Fish walked in the
15 door of APD. If this whole thing was a setup, and the cops
16 were outwitted by Jeremy Fish, then Jeremy Fish, the person
17 who test -- criminal mastermind. Okay. He didn't just
18 outwit Officer LaPorte, he outwitted the entire special
19 assignment unit, seasoned officers outwitted by Jeremy Fish,
20 criminal mastermind.
21    Now, Mr. James made a big deal about what's not on the
22 buy tapes. Apparently he expects Jeremy Fish when he's
23 doing a cocaine buy for APD to say to the defendant, excuse
24 me, sir, but might I purchase a bit of your good cocaine for
25 my $200? Into his shirt? I mean, come on. Don't you think

## Page 818

1 that if he's saying I need your cocaine, I need the cocaine,
2 that he's going to get a little bit suspicious about what's
3 going on? Mr. Davis isn't stupid. He would be completely
4 suspicious if Jeremy Fish started acting in a way that was
5 very different from the way Jeremy Fish usually acts when
6 he's wandering around in the criminal milieu and swimming
7 around with people like Mr. Davis, the people that he knows
8 he can go buy cocaine from.
9    Now, spent a lot of time talking about the buy funds,
10 and how they weren't there and the defendant didn't go to
11 CIPT with them, but the defendant -- Mr. Garcia, Officer
12 Garcia didn't remember this case. He remembered nothing
13 about it. He told you that. But what he did know was
14 somewhere he knows that Mr. Davis came into CIPT with $180
15 with him.
16    Now, was there some kind of snafu? Yeah. They thought
17 the buy funds were in the truck. They couldn't search it
18 without a search warrant. They asked if the money was
19 found. No. Mr. Davis was checked in at 1:00 o'clock.
20 Mr. Davis was booked in at 3:01. Officer LaPorte told you
21 that he left within about 15 minutes. He said it couldn't
22 have been longer than maybe 15 minutes. And during that
23 time, he asked him if they found any money. They said no.
24 Maybe it was in the jacket. Maybe it was in the cap. I --
25 we don't know what happened to it. But obviously it got to

## Page 819

1 CIPT somehow, and when he arrived, he had $180 with him.
2    Now, let's take a look at another instruction that
3 you're going to see. This talks about the difference
4 between direct and circumstantial evidence. And it tells
5 you what this is. A fact may be proven by direct evidence,
6 by circumstantial evidence, or both. And direct evidence is
7 given when a witness testifies, and circumstantial evidence
8 is when a witness testifies to the facts in which the jury
9 may infer other and connected facts which usually and
10 reasonably follow from the facts testified to according to
11 the common experience of mankind. That's law talk for this.
12    Here's what circumstantial evidence is. Circumstantial
13 evidence is when you see things that you can use your
14 collective life experience to draw from to know that
15 something happened. So here's a good example of
16 circumstantial evidence. If you look out in the morning and
17 you see moose tracks leading up to your porch, and you see a
18 steaming pile of moose dung sitting on your doorstep and
19 moose tracks leading away and maybe something even nibbled
20 on, and more moose tracks leading off into the distance.
21 You might conclude that a moose had been near your porch.
22 Somebody could tell you, your neighbor could say, direct
23 evidence, somebody could say, I looked at your porch, and I
24 saw that there was no moose. That would be direct. But the
25 circumstantial evidence might outweigh it in that case.

1  Now, it tells you neither is automatically to be given
2  more weight. But you can decide what weight the evidence
3  deserves. And the circumstantial evidence in this case is
4  incredibly strong. Because if you think about it, either
5  this guy sitting right over here is the unluckiest guy in
6  the world, or he's the guiltiest. Think about what happened
7  in this case, and the amazing string of -- the only common
8  thread in this entire case is him.
9  Now, if he's innocent, what happened? Okay. Well,
10 Fish had to target him by going to his house and using his
11 cell phone that he kept with him. The cops followed Fish to
12 his house and watched him go in and out, and from somewhere
13 without being heard -- oh, not the first buy. He's able to
14 produce cocaine from somewhere and give it to the cops.
15 He's able to outwit the seasoned officers who searched his
16 car, he's able to outwit the seasoned officers who
17 strip-searched him, and he's able to produce this cocaine
18 from somewhere.
19 Now, on the next -- this is just a very short time
20 later because the next tape happens on February 13th. So
21 five days later someone with a voice identical to his is
22 having conversations with Fish. And on the -- this evil
23 twin is such a good deceiver that he actually talks to
24 Mr. Fish, whoever Mr. Fish has hired to portray Mr. Davis
25 about Athena, and putting him on child support, all this
Page 820

1  stuff that these guys know about and these guys are talking
2  about. And this evil twin impersonates him so effectively
3  that Fish can tell it's him. They talk about the same
4  things and he tells -- this is part of Fish's master plan
5  now, he says it's no good tonight. So then in the next
6  conversation on the 15th, evil twin again is answering his
7  cell phone and says you can get two balls if I've got it.
8  Now, maybe it's not an evil twin, maybe it's him. And
9  this is just a totally unfortunate circumstance that he has
10 some other balls that he's talking about that he's going to
11 be selling for $200. Maybe that's what's going on.
12 Now, if Jeremy Fish lies, I mean on the next buy --
13 we're talking 2/20, and says his apartment is empty, it's a
14 fortuitous circumstance that he happened to move out the
15 next day. And Jeremy Fish could predict that that was going
16 to happen, and that Fish is lying about seeing the gun and
17 he's lying about seeing the marijuana, and Mr. James is
18 telling that on the tape is something about a mong bong
19 (ph). Oh, what's a bong for? A bong is something you smoke
20 marijuana with. So I can tell you that probably if Jeremy
21 Fish saw a big pile of marijuana, he might well be asking
22 where the bong was because Jeremy Fish might well want to
23 smoke some of that marijuana that was in the big giant pile,
24 and he needed a bong to do it. So he -- now, he brings in
25 witnesses that testified that there were no guns and no
Page 821

1  marijuana.
2  And I'm not going to spend a lot of time talking to you
3  about how obviously patently false their testimony was, but
4  it just so happens, and yet another incredible coincidence
5  in this chain of events, Mr. Mays (ph) had a friend that was
6  doing a report on marijuana, and he saw this marijuana in
7  this book 15 years ago, so a good thing, because he knows
8  from that, what marijuana looks like. And in the second
9  edition of that same book he saw crack or cocaine. That was
10 his testimony. I mean come on. Get real. Defendant moves
11 to his mother's house, and where is the next buy? It's
12 blocks from his mother's house. What kind of car is he
13 driving in the buy? He's driving his mother's car. Was it
14 him or was it this evil twin using -- now they're not only
15 using his apartment and his -- they've got his mother
16 involved and they're using the mother's car. And they're
17 going to places that are near the mother's house. And the
18 officers are following. They're seeing Jeremy Fish get into
19 this car, they're seeing what's going on. And Fish is only
20 in there for a few minutes. And what's going on, on the
21 wire? Can you hear the clothes rustling around where Jeremy
22 Fish is getting cocaine out from his clothing somewhere or
23 something? Can you hear on the wire any of that kind of
24 stuff going on? Do you hear him rustling around in his car
25 to dig into a secret compartment to pull this stuff out?
Page 822

1  You can't hear any of that. It's not on the wires. It's
2  not on the wires because it didn't happen.
3  Now, after that, in the most -- yet, the most
4  unfortunate twist of circumstance, that evil twin, or him --
5  uses that cell phone and 20 minutes later that same cell
6  phone and him both show up to the last buy. Now, he's all
7  alone in the try on that. Think of the sequence of events
8  that was testified to. Jeremy Fish goes up to the truck, he
9  gets in. You can hear what goes on in the wired buy. It's
10 real quick. It is a short period of time. And Jeremy Fish
11 is walking back to his car saying it's DUE, giving the
12 license plate of the truck. It happens very quickly. And
13 he and his cell phone are still in the truck when the cops
14 show up.
15 Now, he just happened to have $180 on him when he went
16 to CIPT. Now, the defense has said maybe Jeremy Fish got
17 the money to CIPT somehow. But the problem with that is, if
18 Jeremy Fish is really framing him -- I mean, let's think
19 about this for a second. Because they're saying on one hand
20 Jeremy Fish is very smart, but if Jeremy Fish is very smart
21 and he's framing the defendant, and he took the money to
22 CIPT, wouldn't he have taken all the money to CIPT? Don't
23 you think he would have taken the whole $200 up there? The
24 reason the $100 was there was Officer LaPorte told you the
25 money goes into the drawer, twenties are handed out faster
Page 823

than hundreds. When they went back and served the search warrant on the drawer, the $100 bill was still there. This is not a big mystery. This probably doesn't go in our favor as great evidence for him and that's why I didn't list it on the -- when I was telling you what the evidence was. It's just a mistake that happened. But it certainly doesn't go against them either. Buy funds are not required. We don't have to find buy funds in order to conclude that when Jeremy Fish hops into a car with him in front a whole group full of officers, and he comes out of that, he didn't have any cocaine when he got in the car, he comes out of the car and within minutes now, Officer Johnstone I think is the one that told you Schuck's Auto Supply, minutes away. Officer LaPorte, they went to a place very close. He didn't have a lot of time to be producing it from somewhere or anything else like that. And within minutes, he turns over the crack that he didn't have before, and they stop him in the truck with the same cell phone that was used in all the buys. That's very compelling evidence about what's going on here. And there's a simple explanation. He used his cell phone, he set up all the deals, and you know what? Then he did the buys. And it was the same person on the last buy as it was on the third buy and the second buy and the first buy.

Now, Mr. James spent a lot of time talking about checklists, and APD has developed this checklist but they

Page 824

don't have a checklist to check off that they checked off the checklist. And he wants a checklist for that. And he wants a checklist for this. Well, he asked you to think of medical documentation, he asked you to think of all kinds of things. And think about that. I know that one of you at least is a retired nurse. And I know from -- that medical documentation, if you don't put things on the medical thing, on the documentation like went to waiting room and retrieved patient, and -- but all of that still happens. You chart things like gave patient injection. You don't chart every single thing. And patient said to receptionist, how are you today? You don't chart any of that stuff. It's not important. You don't need to chart something that you do -- that happens -- and it obviously happens. These officers wrote police reports. He talked to every officer about all of their police reports. The officers testified they wrote their police reports immediately following each of these incidents.

Do you think for one second that if these officers would have started making stuff up that wasn't in their police reports that they wrote -- talk about documentation, police reports written immediately after these things happen, that he would have said, well, that's not in your report -- that's -- he asked officers that. That's not in your report, is it? These officers wrote down what happened

Page 825

immediately after it happened and they put it in their police reports, and he has their police reports to ask them about it.

Now, what does your reason, common sense and collective life experience tell you about which of the two possibilities that you have, unluckiest or guiltiest, happened here? Your reason, common sense and collective life experience can surely leave you with only one -- there's only one reasonable conclusion here. He's a cocaine dealer and he's guilty of all four counts. Thank you.

THE COURT: Thank you, Ms. Brady. The next step in the process, folks, I'm going to instruct you on the law. That's going to take about 20, 25 minutes. And why don't we take a 10 minute break before we do that? Well, maybe slightly less than 10 minutes, but a short break, anyway.

(Off record)
(Jury not present)

THE COURT: Mr. Davis, you signaled me -- we're back on record in -- excuse me, Mr. James, in State versus Davis. We took a break. You were signaling me as if you wanted to raise something, but I really needed to take a break, so.....

MR. JAMES: I understood. I was just concerned.....

THE COURT: I want to come back and give you an opportunity to raise whatever you want to raise while the

Page 826

jury is not back.

MR. JAMES: I was just concerned that I mentioned to Ms. Brady about -- you know, we talked earlier about telling the jury that they were not going to be deliberating on this thing and.....

THE COURT: It.....

MR. JAMES: .....I guess my thought was -- is the evidence was closed. Have we -- I just wanted to remind you at some point.....

THE COURT: I have a note on the last jury instruction, number 24, to tell them I told you, you were going to make two decisions. You're not going to make two decisions. You'll just be asked to make the decisions covered by these instructions. Will that work?

MR. JAMES: That's fine. I was just -- my only concern was that so we didn't (indiscernible).....

THE COURT: Leave them hanging. All right. Is that -- what I just said, is that adequate to cover that issue, Ms. Brady? I told you you were going to make.....

MS. BRADY: Can you read it one more time?

THE COURT: I told you you were going to make two decisions, but you're not going to make two decisions, you'll just make the decisions covered by these instructions.

MS. BRADY: Okay.

Page 827

**Page 828**

1  MR. JAMES: Yeah, that's fine, Judge.
2  THE COURT: Will that work? Okay.
3  MR. JAMES: No. I was just -- no, I'm fine.
4  THE COURT: All right.
5  MR. JAMES: Just housekeeping as well as.....
6  THE COURT: No, I appreciate you reminding me of that,
7  and I told them 10 minutes. Let's -- if they're ready,
8  let's get them back in here and we'll instruct them. And
9  after they leave, I'll talk to you and your client,
10 Mr. James, about playbacks, jury questions, and evidence
11 viewing. So....
12   MR. JAMES: Okay.
13   THE COURT: Are we on record?
14   THE CLERK: Yes.
15   THE COURT: Mr. -- you can sit down, Mr. Davis. Or
16 you're welcome to stand up too, I don't -- it makes no
17 difference to me. Whatever is comfortable for you.
18 Mr. James, Ms. Brady, on evidence viewing, we keep the money
19 and the cocaine in the courtroom. If they want to look at
20 it, they're welcome to do that. They don't have to ask my
21 permission, but it has to be done with the bailiff, and I'll
22 simply tell them that if they choose to come in the
23 courtroom and look at that evidence, they can't deliberate
24 while they're doing it, and the bailiff and maybe other
25 court personnel will be in the courtroom while they're doing

**Page 829**

1  it, but the lawyers won't.
2   MR. JAMES: All right.
3   THE COURT: We'll talk about playbacks and jury
4  questions later. I'm not going to tell them anything about
5  that now, but.....
6   UNIDENTIFIED VOICE: (Indiscernible).
7   THE COURT: Any problem with that? And do you know if
8  we have any smokers?
9   THE CLERK: No.
10  THE COURT: All right.
11  THE CLERK: (Indiscernible)
12  THE COURT: If we have smokers, my anticipation -- my
13 inclination would be to tell them that they can take breaks,
14 that smokers can go outside and smoke, they must be
15 accompanied by the bailiff. Or people can go outside and
16 get fresh air, they must be accompanied by the bailiff.
17 Those who don't want to go be accompanied by the bailiff
18 have to stay in the jury room and that they can't
19 deliberate. Either group of people can't deliberate until
20 they're all back together again. Any objection to that?
21 Ms. Brady?
22  MS. BRADY: No, Your Honor.
23  MR. JAMES: No.
24  THE COURT: Mr. James? And I'll wait on that if the
25 question comes up. I have a standard instruction for that,

**Page 830**

1  but if it comes up, I'll tell them.
2   MR. JAMES: What about if they want to.....
3   THE COURT: Actually I'll just tell the bailiff that --
4  pardon me?
5   MR. JAMES: What if they're not smokers but want to get
6  a breath of fresh air?
7   THE COURT: Same thing.
8   MR. JAMES: I mean, are you going to give that
9  instruction just as -- I have no problem giving the
10 instruction.
11  THE COURT: All right. I don't -- okay. I think I
12 have it -- not in writing, but I have it. If you don't
13 object if I just read it to them? Would that give it.....
14  MR. JAMES: I have no problem.
15  THE COURT: All right.
16  MR. JAMES: Yeah.
17  THE COURT: All right. Let's go get the jury. Well,
18 I'll just -- (indiscernible) I'll tell you what it says.
19 Why don't you -- just one minute.
20    Jurors may leave the jury room to smoke or for fresh
21 air. The following procedures apply. Any jurors leaving
22 the jury room must be accompanied by the bailiff. When the
23 jury is separated, no jurors may discuss the case with
24 anyone or engage in deliberations. Your discussions and
25 deliberations may only occur when you are all together in

**Page 831**

1  the jury room. Ms. Brady?
2   MS. BRADY: Fine with the state.
3   MR. JAMES: Yeah, I don't have any problem with that.
4  It -- my only question would be, okay, the bailiff takes
5  Mr. Jones out to have a cigarette, and then Ms. Smith says,
6  gees, I'd like to -- do they understand they're stuck there
7  unless they go with bailiff?
8   THE COURT: It says any jurors leaving the jury room
9  must be accompanied by the bailiff.
10  MR. JAMES: Okay. I'm just -- I understand what it --
11 I hear you, but.....
12  THE COURT: Yeah.
13  MR. JAMES: .....you know how human nature is.
14  THE COURT: I'll make -- Mr. Wright will enforce that.
15  THE BAILIFF: Yes. I believe I do, Judge.
16  THE COURT: All right. Let's get the jury.
17  (Pause)
18  (Jury present)
19  THE COURT: Let's all have a seat, please. All right.
20 Are we back on record?
21  THE CLERK: We are.
22  THE COURT: We are back on record. We have all of our
23 jurors here, and parties and counsel. I'm going to instruct
24 you on the law that applies to your job here. You have
25 copies of the jury instructions on your chairs. I'm

**Page 832**

1 required to read them to you, but you're also welcome to
2 follow along if that helps you absorb and remember them. Or
3 you can set them aside if you can absorb and remember by
4 listening, you can -- you'll take these original
5 instructions and your copies into the jury room so you'll
6 have them in there to review and discuss as well.
7  10:0639
8  (Court reads jury instructions and excuses jury for
9   deliberations)
10 10:2900
11     THE COURT: Any additional instructions I need to give
12 the jury before we send them off? Ms. Brady?
13     MS. BRADY: Nothing from the state.
14     MR. JAMES: No, Your Honor.
15     THE COURT: All right.
16  (Jury not present)
17     THE COURT: Have a seat, folks. Let's stay on record.
18 Mr. James, if we have playbacks, does your client wish to be
19 here?
20     MR. JAMES: Robert -- I didn't go over this with him,
21 Judge.
22     THE COURT: All right.
23     MR. JAMES: Robert:....
24     THE COURT: Why don't you discuss that with him, and
25 also jury questions, and I'll go talk to the alternates, and

**Page 833**

1 then I'll come back and we'll do that on record, and you can
2 also check the exhibits while you're doing that.
3     MR. JAMES: Before you go off record, the tapes, I
4 don't know, did you leave the recorder, Judge?
5     UNIDENTIFIED VOICE: Yes.
6     MR. JAMES: Because I -- the use of the recorder?
7 There's tapes, there's.....
8     THE COURT: Yes. I intended to send a tape recorder in
9 with them.
10     MR. JAMES: Oh, okay. I don't know if you have one
11 or.....
12     THE COURT: Well, I intended to send the state's tape
13 recorder in with them.
14     MS. BRADY: That's fine.
15     MR. JAMES: Okay. I just -- I thought.....
16     MS. BRADY: I'm not going to be using it.
17     THE COURT: All right.
18     MR. JAMES: I found the tapes, Your Honor, so I.....
19     THE COURT: All right. So why don't you all talk about
20 playbacks and jury questions, and I'll go deal with the
21 alternates so they can go home and then we'll come back in
22 and finish that up?
23     MS. BRADY: And Your Honor, are you going to tell the
24 alternates it's all right for them to discuss things?
25     THE COURT: Yep.

**Page 834**

1     MS. BRADY: Thank you.
2  (Off record)
3     THE COURT: All right. We're back on record in State
4 versus Davis. Our jury has been sent to deliberate, and
5 they have the exhibits, is that right, Madam clerk?
6     THE CLERK: That is correct, Your Honor.
7     THE COURT: And they've ordered lunch, I can tell you
8 folks that. Playbacks. We'll start with playbacks. If the
9 jury asks for a playback, Mr. James, does your client want
10 to be there?
11     MR. JAMES: No. We've discussed it, and he understands
12 that if we are not there, no one is there, and that
13 satisfactory.
14     THE COURT: All right. I need to talk with him
15 directly. Mr. Davis, you have a right to be -- I think you
16 and I have actually talked about this before on other
17 subjects, but you have a right to be present at every stage
18 of your trial, and that starts at arraignment, and also
19 includes if the jury wants to listen to playbacks of
20 evidence. You also have a right to waive being present.
21 Your lawyer tells me you want to waive being present, is
22 that right?
23     MR. DAVIS: Yes.
24     THE COURT: All right. If we have playbacks, then I'll
25 simply, if the jury requests a playback, they'll do it in

**Page 835**

1 writing. I will give it to the clerk. The clerk will find
2 that portion of the testimony that the jury wants to hear.
3 I'll send them a note back telling them to come into the
4 courtroom and they can listen to the playback. The note
5 will say do not deliberate while you're in the courtroom,
6 and as soon as they've finished listening to what they want
7 to listen to, they can go back to the jury room and commence
8 deliberations. I won't be here, neither one of the lawyers
9 will be here. We may give the lawyers a call and tell them
10 what they're up to, but I'll go ahead and start the playback
11 at the same time. Ms. Brady, Mr. James, is that procedure
12 adequate?
13     MR. JAMES: Yes.
14     THE COURT: All right. Jury questions. We may get
15 jury questions. Mr. James?
16     MR. JAMES: I discussed that with my client, and he
17 knows that the court may respond, a written request to the
18 written response or come back in oral -- in court if we're
19 in oral -- in court then we're all present. He communicated
20 to me he does not wish to be present for that, but would be
21 satisfied with written responses, knowing the court would
22 advise us of the question, and we will help formulate the
23 response or note an objection to the response.
24     THE COURT: All right. So Mr. Davis, the jury
25 sometimes asks questions. They can range from simple

**Page 836**

1 questions that -- that with easy answers to hard questions
2 about the law, and there may be a lot of difference of
3 opinion about that. Regardless of what question is asked, I
4 can't answer it unless I call the lawyers, go on record, ask
5 them what they want me to do. If they agree, then I'm
6 likely to do what they want me to do. If they disagree,
7 I'll make a decision as to what I should do. I'll send a
8 written response back to the jury. You're telling me that
9 you don't wish to be present during that legal discussion?
10    MR. DAVIS: Yes.
11    THE COURT: All right. You waive your right to present
12 for that?
13    MR. DAVIS: (Inaudible reply)
14    THE COURT: All right. Anything else I need to do
15 procedurally? Ms. Brady?
16    MS. BRADY: Nothing from the state, Your Honor.
17    MR. JAMES: I can't think of anything, Your Honor.
18    THE COURT: All right. The last thing before we go, I
19 need -- I've already told the lawyers this, but Mr. Davis,
20 if I get a verdict, we want to not make the jury wait a long
21 period of time while we're rounding everybody up, so you
22 need to stay in immediate contact with your lawyer so that
23 when I call him, he can call you and you all can get over
24 here in just a very few minutes. All right? The same, of
25 course, goes for the lawyers. I need to be able to find

**Page 837**

1 you. All right. So we'll go off record, and when everybody
2 is here for the next case, we'll get started.
3    THE CLERK: Please rise. This court is adjourned.
4    (Off record)
5 10:5036
6    (Other matters)
7 12:1131
8    THE COURT: All right. We're on record in State versus
9 Davis. This is Judge Hensley. I'm in the courtroom. I
10 have Ms. Brady by telephone?
11    MS. BRADY: Yes, Your Honor.
12    THE COURT: Mr. James by telephone.
13    MR. JAMES: Yes, Your Honor.
14    THE COURT: I have a note from the jury. I'd like to
15 proceed telephonically if you all don't object. Ms. Brady,
16 do you object?
17    MS. BRADY: No objections.
18    THE COURT: Mr. James?
19    MR. JAMES: No objection.
20    THE COURT: Okay. The note says is there any recording
21 -- actually it says is these any recording, but I'm --
22 that's a typo or an error. Is there any recording of the
23 phone conversations between Fish and Davis that took place
24 on 2/8/01. We seem to remember hearing this, but we have no
25 tapes dated the 8th. Signed by Gary D. Ross, Jury

**Page 838**

1 Foreperson. I think I have -- before I hear from you, it
2 seems to me like I have two or three options. We could just
3 leave them confused and tell them they have all the
4 evidence. I could give you all opportunity to make three
5 minute additional closing arguments to tell them about the
6 evidence. You all could agree on what I should tell them
7 about the evidence. Those are several of the options.
8 Ms. Brady, what do you suggest?
9    MS. BRADY: My suggestion would be, Your Honor, that
10 you just tell them that there were no tapes of the February
11 8th conversation. That those were not taped. All the tapes
12 there are, are in evidence, or something along those lines.
13    THE COURT: Mr. James?
14    MR. JAMES: My feeling is, is they have the evidence,
15 and that's the evidence.
16    THE COURT: Do you object to the state's proposal?
17    MR. JAMES: Yes, Your Honor, because it didn't -- it's
18 not part of the evidence. I don't believe there was any
19 testimony relating to that.
20    THE COURT: My recollection is, is that there was
21 testimony that there were no tapes. The real question is
22 whether I just leave them in the dark or whether I give you
23 folks an opportunity to help them get out of the dark. I
24 can't comment on the evidence unless you all agree, but I
25 could make you come over here and give you each two minutes

**Page 839**

1 to address the jury on that subject.
2    MS. BRADY: I'd be happy to do that.
3    THE COURT: Mr. James?
4    MR. JAMES: Okay. My options are -- what would you
5 say? What would you -- excuse me. What would be your
6 proposed statement to the jury, Judge?
7    THE COURT: I don't have a proposed statement. If you
8 all want to agree as to what the evidence was and tell them,
9 I'll do that. I can't make you do that, and I wouldn't make
10 you do that.
11    MR. JAMES: Could you read that question? Not that
12 there was recordings of any, but....
13    THE COURT: Is there any recording of the phone
14 conversations between Fish and Davis that took place on
15 2/8/01. We seem to remember hearing this, but we have no
16 tapes dated the 8th.
17    MR. JAMES: How about no.
18    THE COURT: Or there are no tapes of 2/8/01
19 conversations?
20    MR. JAMES: Well, isn't the question, is there a tape?
21 Wouldn't the answer just be no?
22    THE COURT: The answer could be no. Ms. Brady?
23    MS. BRADY: I think that you should say -- clarify a
24 little bit so that the jury isn't left in the dark. I don't
25 see any reason to leave them in the dark wondering. So I

1 would suggest something like, no, there are no tapes of that
2 conversation. Something along those lines.
3    THE COURT: Mr. James?
4    MR. JAMES: What about, no, there are no -- there is no
5 tape, period?
6    THE COURT: Ms. Brady, there is no tape?
7    MS. BRADY: I think that it should say there is no tape
8 of the 2/8 conversation.
9    THE COURT: Well, if you guys are going to disagree,
10 why don't you be over here in 10 minutes and we'll let you
11 argue to the jury?
12   MS. BRADY: That's fine.
13   MR. JAMES: All right. I got to find the client, then,
14 Judge.
15   THE COURT: Well.....
16   MR. JAMES: I mean he was.....
17   THE COURT: You got -- this is silly. The answer is
18 clear. I'm not going to leave the jury in the dark. You
19 all ought to be able to agree on the answer because there --
20 you don't disagree as to what the evidence is. So.....
21   MS. BRADY: Right.
22   THE COURT: If you can't agree then, then I'm going to
23 let you tell the jury what you remember the evidence is, so
24 at least they're not in the dark.
25   MR. JAMES: All right. What did you propose again,

Page 840

1 Keri?
2    MS. BRADY: My proposal is, no, there are no tapes of
3 the 2/8 conversation.
4    MR. JAMES: All right.
5    THE COURT: You, Mr.....
6    MR. JAMES: That's with, no, there are no tapes of the
7 2/8 conversation?
8    THE COURT: I'll tell them that.
9    MR. JAMES: No, there are no.....
10   THE COURT: How about just, there are no tapes?
11   MR. JAMES: That's fine with me. I don't have.....
12   THE COURT: I'm just making a grammatical suggestion.
13 There are no tapes of the 2/8/01 conversation.
14   MS. BRADY: That's fine.
15   MR. JAMES: All right. Yes.
16   THE COURT: Do you agree with that, Mr. James?
17   MR. JAMES: Yes. There are no tape -- tapes or tape?
18   THE COURT: There are no tapes.....
19   MR. JAMES: Of.....
20   THE COURT: .....the 2/8/01 conversation.
21   MR. JAMES: Of the 2/8/01 conversation. All right..
22   THE COURT: Everybody agrees? Ms. Brady?
23   MS. BRADY: Yes, Your Honor.
24   THE COURT: Mr. James?
25   MR. JAMES: Yes.

Page 841

1    THE COURT: All right. Thank you. I'll send that in
2 right now.
3    MS. BRADY: Thank you.
4    MR. JAMES: Thank you.
5    THE COURT: And we'll be in touch. We'll hang up on
6 you.
7    (Off record)
8    12:16:44
9    (Other matters)
10   2:13:25
11   THE COURT: And are we on record?
12   THE CLERK: (Indiscernible).
13   THE COURT: All right. We're on record in State versus
14 Davis. The note from the jury that they've reached a
15 verdict. Are you all ready for me to go get the jury?
16 Ms. Brady?
17   MS. BRADY: Yes, Your Honor.
18   THE COURT: Mr. James?
19   MR. JAMES: Yes.
20   THE COURT: Why don't you all have seats and we'll go
21 get the jury?
22   (Pause)
23   (Jury present)
24   THE COURT: All right. Have a seat, everybody. We're
25 on record in State versus Davis. And we have our parties

Page 842

1 and counsel, and we have all of our jurors here. And I
2 received a note from Mr. Ross indicating we have reached a
3 verdict on all four counts. Is that right, Mr. Ross?
4    THE FOREPERSON: That's correct, sir.
5    THE COURT: Would you please hand the verdict forms to
6 the bailiff, and I'll take those, Mr. Bailiff. Thank you.
7    All right. I'm going to publish the verdicts. Verdict
8 number 1, we, the jury, find the defendant, Robert O. Davis
9 the III, guilty of misconduct involving controlled substance
10 in the third degree as charged in Count I.
11   Verdict number 2. We, the jury, find the defendant
12 guilty of misconduct involving controlled substances in the
13 third degree as charged in Count II.
14   Verdict number 3. We, the jury, find the defendant,
15 guilty of misconduct involving a controlled substance in the
16 third degree as charged in Count III.
17   Verdict number 4. We, the jury, find the defendant
18 guilty of misconduct involving a controlled substance in the
19 third degree as charged in Count IV.
20   Would you like me to poll the jury? Ms. Brady?
21   MS. BRADY: No, Your Honor.
22   MR. JAMES: Please.
23   THE COURT: Mr. James, I'm going to -- you want me to
24 poll the jury, sir?
25   MR. JAMES: Please.

Page 843

**Page 844**

1  THE COURT: All right. I'm going to ask each one of
2  you individually whether the verdict just read is your
3  verdict.
4  (Court polls jury)
5  THE COURT: All right. Any additional questions I
6  should ask the jury?
7  MS. BRADY: Nothing from the state, Your Honor.
8  MR. JAMES: (Inaudible reply).
9  THE COURT: May I discharge the jury? Ms. Brady?
10  MS. BRADY: Yes, Your Honor.
11  THE COURT: Mr. James, may I discharge the jury?
12  MR. JAMES: Yes, sir.
13  THE COURT: Members of the jury, you're discharged from
14  your duties as jurors in this case. Thank you very much for
15  the time and effort and your patience in this case. I know
16  we went longer than we expected. I really appreciate your
17  patience and your time and your commitment to serving as
18  jurors in an important case.
19  Remember everyday I told you that you couldn't talk to
20  anybody? Well, you can talk to anybody that you want now.
21  And I actually would encourage you to do that. Serving --
22  I've been told by many jurors that serving on a jury and
23  having to keep your mouth shut for days on end is very
24  stressful, and probably talking about it might be a good
25  idea, just to relieve some of that stress.

**Page 845**

1  You're entitled to talk to anyone. That could include
2  the lawyers. The lawyers may wish to talk to you about the
3  case, about the process. There's nothing wrong with them
4  asking. Constructive criticism or feedback is something we
5  all appreciate from time to time. If the lawyers ask you,
6  there's nothing wrong with them doing that. You can either
7  talk to them or not talk to them. These are both
8  professionals, and if you tell them you don't wish to talk
9  to them, they will honor that request. If you want to talk
10  to them, have at it. It's your choice. And again, I want
11  to thank you very much for your service as jurors in this
12  case. I wish you a nice Thanksgiving holiday, and Mr. Ross,
13  I need you to stick around for a few minutes to return the
14  exhibits back to Ms. Richardson, the clerk.
15  Ordinarily I would stick around and talk with you folks
16  and try to answer your questions if you have them, but I'm
17  in the middle of another hearing this afternoon so I can't
18  do that. But you all have my phone number, and you're free
19  to call my chambers if you have any questions or any
20  comments that you'd like me to know. I'd be happy to talk
21  with you. And with that, you're free to go. Thank you very
22  much.
23  Mr. Ross, Ms. Richardson will be in, in just a second
24  to get the exhibits back from you.
25  (Jury excused)

**Page 846**

1  THE COURT: Have a seat. Going to set a sentencing
2  date, order a presentence report, and then we will be in
3  recess. I need to get that date. Just a moment.
4  Sentencing March 18, 3:30 I'm going to order a full
5  presentence report. And I'll send a presentence report
6  order to you, Mr. James, in the mail today or Monday.
7  Anything else?
8  MR. JAMES: March 18th, 3:30?
9  THE COURT: March 18, 3:30.
10  MS. BRADY: Nothing from the state, Your Honor.
11  MR. JAMES: I think the state conditions remain the
12  same, whether.....
13  THE COURT: Bail conditions, Mr. Davis, remain the same
14  as they have during the pendency of these proceedings unless
15  there's some other court order to the contrary.
16  MR. JAMES: Thanks, Judge. Thank you. May we be
17  excused then?
18  THE COURT: Yes. We'll go off record. Off record.
19  (Off record)
20  2:23:05

END OF REQUESTED PORTION

```
 1                    TRANSCRIBER'S CERTIFICATE
 2        I, Shirley Cohen, hereby certify that the foregoing
 3   pages numbered 01 through 846  are a true, accurate, and
 4   complete transcript of proceedings in Case Number
 5   3AN-01-1717 CR, State of Alaska versus Robert Davis,
 6   transcribed by me from a copy of the electronic sound
 7   recording to the best of my knowledge and ability.
 8
 9   11-4-02                          [signature]
     Date                       SHIRLEY COHEN, Transcriber
10
```