Timothy W. Terrell
Assistant Attorney General
State of Alaska, Dept. of Law
Office of Special Prosecutions & Appeals
310 K St., Suite 308
Anchorage, Alaska 99501

Telephone: (907) 269-6250
Facsimile: (907) 269-6270

Attorney for Respondent Frank Luna

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ROBERT O. DAVIS III,          ) | |
| ) | |
| Petitioner,    ) | |
| ) | |
| vs.                          ) | Case No. A05-255 Civil (TMB) |
| ) | |
| FRANK LUNA, Warden of the    ) | <u>MOTION FOR SUMMARY</u> |
| Red Rock Correctional Center, ) | <u>JUDGMENT AS TO REMAINING</u> |
| ) | <u>SUFFICIENCY-OF-THE</u> |
| Respondent.   ) | <u>EVIDENCE CLAIM</u> |
| ) | |

    A.    <u>Introduction</u>

This court directed respondent Luna to file by January 12, 2007, any dispositive motion that he wished to file regarding petitioner Davis's remaining unadjudicated claim set out in his habeas petition, *i.e.*, that his conviction in state court was not supported by sufficient evidence. Docket No. 53. Respondent Luna now moves for summary judgment of that claim.

B. Facts

Davis's conviction stems from four controlled drug buys made by Anchorage police informant Jeremy Fish on February 8, 20, and 21, 2001 and March 1, 2001.

Fish agreed to make the buys to work his way out of criminal charges in Nome. In January 2001, Fish was living in Nome and burglarized an apartment, taking a small amount of money. [Ex. C at 39, 55 (Tr. 246-47, 310-12)] Nome Police Officer Daniel Bennett questioned him about the burglary and Fish told him that he would just give the victim her money back, but Officer Bennett declined this resolution. [Ex. C at 39 (Tr. 247)] He asked Fish to instead make some controlled drug buys for the Nome police. [Ex. C at 39, 55-56 (Tr. 247, 310-14)] Officer Bennett clarified that he did not have the authority to dismiss charges, but that he could make recommendations to the Nome District Attorney regarding the issue. [Ex. C at 56-57 (Tr. 314, 317-18)] Fish agreed to make the drug buys, only to surreptitiously leave Nome and return to Anchorage without doing so. [Ex. C at 39, 54, 56 (Tr. 247-48, 308-09, 314, 316-17)]

Shortly after returning to Anchorage, Fish learned that the Nome authorities had reconsidered their prior leniency regarding the burglary. [Ex. C at 39, 57-58 (Tr. 248, 319-22)] He then voluntarily turned himself in at an Anchorage police station on a pending arrest warrant. [Ex. C at 39, 57-

58 (Tr. 248, 319-22)] Fish met with Anchorage Police Department Officers Pam Pernue, Kathleen Bushue, and another unidentified female officer. [Ex. C at 4-5 (Tr. 60-64)] He told them about the type of drug-buy arrangement that he had with the Nome Police Department, and was apparently told that the officers would check with the Anchorage District Attorney's office to see if a similar deal would be appropriate. [Ex. C at 4-5, 18, 30, 39, 58, 61 (Tr. 60-64, 133-34, 212, 249, 323-25, 337)] Anchorage Assistant District Attorney Phil Moberly had asked Officer Pernue to speak to Fish to see if he could be used as an informant. [Ex. C at 82 (Tr. 473)] Fish was then remanded to custody at the Cook Inlet Pre-Trial Facility. [Ex. C at 58 (Tr. 323-25)]

Fish was released on his own recognizance a day later. [Ex. C at 58-59 (Tr. 325-26)] Pursuant to instructions from the police officers that he had earlier talked to, Fish reported to police headquarters on Tudor Road and spoke to Officers Grant Johnstone and Mark LaPorte about making drug buys for the Anchorage police. [Ex. C at 18, 40, 59-61, 84 (Tr. 133-34, 251-52, 329-33, 336, 481)] Officer LaPorte was training Officer Johnstone how to make controlled drug buys using informants. [Ex. C at 18, 28, 84 (Tr. 133-34, 181, 481)] The officers made an oral agreement with Fish that if he cooperated and made the buys, the Nome burglary charges would not be pursued. [Ex. C at 39, 60-61, 82-83, 100 (Tr. 249, 333-34, 474, 477, 587-88)] Fish told them that he knew two people that he could make drug buys from,

one being a person that he knew by the nickname of "Rico." [Ex. C at 18, 39-40, 82 (Tr. 134, 249-50, 474)]  (Davis's mother later testified that his father had given Davis that nickname in early childhood.  [Ex. C at 128 (Tr. 756)]) Fish had known "Rico" for about three years and had both bought drugs from him and been to his house before.  [Ex. C at 66, 68 (Tr. 355, 372-73)]

   1.   *The February 8, 2001 Buy*

On February 8, 2001, Fish called Davis's cellphone number from police headquarters and made arrangements to buy cocaine from him.[1]  [Ex. C at 18, 40 (Tr. 134-35, 252-53)]  Fish asked Davis for a "ball," which he described as 2.9 to 3.2 grams, approximately an eighth of an ounce.  [Ex. C at 40, 86 (Tr. 253, 490)]  Davis said that he did not have this amount but could sell Fish $150 worth of cocaine.  [Ex. C at 19, 40 (Tr. 137, 253)]  Fish and Davis agreed to meet at Davis's house.  [Ex. C at 19, 41 (Tr. 137-38, 254)]

The buy took place that same date, and followed a general pattern that was the same for each of the subsequent controlled buys.  Officer Roy LeBlanc searched Fish's car, and Officer Johnstone strip-searched Fish, to ensure that Fish did not have any drugs on him prior to making the buy.

---

   [1]   Officer Johnstone got a warrant for the subscriber information regarding Davis's cellphone number, 727-9465, and found it registered to a Robert O. Davis III at 202 Grand Larry in Anchorage.  [Ex. C at 20 (Tr. 143)] An Alaska Digitel employee testified this was Davis's cellphone number.  [Ex. C at 34-35 (Tr. 229-30)]

*Davis v. Luna,* Case No. A05-255 Civil (TMB), Motion for Summary Judgment as to Remaining Sufficiency-of-the-Evidence Claim, Page 4 of 19

[Ex. C at 8, 19, 41, 103 (Tr. 74, 138, 254-55, 618)] Officer LeBlanc found marijuana in Fish's car; the marijuana was removed. [Ex. C at 40, 103-04, 108-09 (Tr. 251, 618-19, 641, 643)] Fish was given $150 in buy money, which was copied and recorded by Officer Steven Haas so it could be tracked. [Ex. C at 12, 16, 19, 41 (Tr. 112, 125-26, 139, 254-55)] Fish then proceeded to Davis's house, followed by Officers Johnstone and LaPorte. [Ex. C at 19, 41, 84 (Tr. 139, 254-56, 483)]

Before Fish and Officers Johnstone and LaPorte left the police station, other officers went to Davis's house and took up surveillance positions in the area. [Ex. C at 19, 84 (Tr. 139, 482-83)] Officers were stationed so as to be able to track Fish's vehicle regardless of which street direction he used to go towards or away from Davis's house. [Ex. C at 99 (Tr. 580)] Officers Kathleen Bushue and Chris Simms were watching for Fish's approach to and departure from Davis's house, but were not positioned so they could see him actually go in and out of the house. [Ex. C at 2, 6-7, 9 (Tr. 49-50, 67, 69, 78-79)] Officer Haas was stationed in another vehicle watching Fish's approach to the house. [Ex. C at 13 (Tr. 114-15)] Officer LeBlanc was in a separate vehicle and could actually see Fish enter into and exit from the house. [Ex. C at 13, 19, 104 (Tr. 115, 139-40, 619, 621-22)]

Upon arrival, Fish went inside the house, came back out and briefly got into his car, and then went back in and remained for about ten

minutes, where he purchased a gram of cocaine from Davis. [Ex. C at 2, 6-8, 13, 19, 29, 41, 104 (Tr. 50, 68, 71-73, 115, 140, 187, 256-57, 622)] Fish testified that only he and Davis were present, although he recollected that a woman might have also been there. [Ex. C at 65, 69-70 (Tr. 352, 383-84)] While Fish was inside the house, Officer Johnstone became concerned that he was taking too long and called Fish on Fish's cellphone, and Fish told them he was coming out. [Ex. C at 19, 28 (Tr. 140, 182)]

Officers Bushue and Simms followed Fish as he left the house. [Ex. C at 2 (Tr. 50)] Pursuant to a prearranged plan, Fish then met Officers Johnstone and LaPorte behind a nearby church and turned the cocaine over to Officer Johnstone. [Ex. C at 20, 41-42, 70, 84-85 (Tr. 141, 257-58, 385, 483-84)] Officers Bushue, Johnstone, LaPorte, and Simms then followed Fish back to the police station, where Officer Johnstone strip-searched Fish and Officer LeBlanc searched his car, again to ensure that Fish had not kept any of the drugs for himself. [Ex. C at 2, 13, 20, 42, 104, 110 (Tr. 50, 115-16, 141, 258, 622, 648)] At the station Officer Bushue also field-tested the drugs, which tested positive as cocaine. [Ex. C at 2 (Tr. 50-52)]

2.  *Truncated Buy Attempts on February 13 and 15, 2001*

On February 13, 2001, Fish made another call to Davis to arrange a drug buy. [Ex. C at 43, 86 (Tr. 265, 488)] This phone call was

recorded, as the police had obtained a *Glass* warrant to record Fish's phone calls and conversations with Davis based on the results of the February 8, 2001 buy. [Ex. C at 20, 43, 86 (Tr. 143-44, 265, 488)] Davis told him that he did not have any drugs available for sale. [Ex. C at 44, 86 (Tr. 266-67, 488)] Fish called Davis again on February 15, 2001, and asked to buy cocaine, and a meeting was set up but then had to be cancelled when the police officers working Davis's case had to deal with a higher priority matter. [Ex. C at 44, 86 (Tr. 268-69, 489)] Fish called Davis and left him a voicemail message saying that he "wasn't going to do nothing tonight" and would contact him later. [Ex. C at 44, 86 (Tr. 269, 489)]

3.   *The February 20, 2001 Buy*

On February 20, 2001, Fish made another recorded phone call to Davis. [Ex. C at 20-21, 45, 86 (Tr. 144-45, 270, 490)] Fish arranged to meet again at Davis's house and purchase a "ball" of cocaine. [Ex. C at 45 (Tr. 270-71)] Officer LaPorte strip-searched Fish and Officer Haas searched his car. [Ex. C at 13, 21, 45, 87 (Tr. 116, 145, 271, 492)] Officer LeBlanc recorded $200 in buy money and Officer LaPorte gave it to Fish. [Ex. C at 21, 45, 105 (Tr. 145, 271-72, 623)] Fish was also outfitted with a body wire to record his contact with Davis. [Ex. C at 45 (Tr. 271)]

Officers Johnstone and LaPorte followed Fish to Davis's house, and then broke off and left the observation to in-place surveillance teams.[2] [Ex. C at 21, 45, 87 (Tr. 145-46, 271, 493)]  Fish went inside Davis's house, where he found Davis and several other people inside.  [Ex. C at 45-46, 72 (Tr. 273-74, 404)]  Davis was in the process of moving out of the house.  [Ex. C at 46, 73, 76 (Tr. 274, 276, 414-15, 425)]  The people with Davis were preparing to go to the store to get some plastic sandwich bags, and Davis asked them to also get a pot so that he could make a batch of crack cocaine.  [Ex. C at 46, 73, 87 (Tr. 274, 413, 493)]  Fish had parked behind their car, so he briefly went outside, moved his car, and then came back in.  [Ex. C at 46, 73, 87, 105 (Tr. 274, 413, 494, 626)]  Fish purchased 11.8 grams of cocaine from Davis and left.  [Ex. C at 3, 29, 46 (Tr. 54-55, 187, 276)]

Fish returned to the police station and gave the cocaine to Officer Johnstone, who turned it over to Officer LaPorte.  [Ex. C at 21, 46, 76 (Tr. 147, 276, 425)]  Fish was strip-searched and Officer Haas searched his car.  [Ex. C at 14, 21, 46, 87 (Tr. 118, 147, 276, 495)]  Officer Bushue field-tested the drugs at the station and they tested positive as cocaine.  [Ex. C at 3, 87 (Tr. 54-55, 495)]

---

[2] Officers Bushue, Simms, and Haas were watching Fish's approach to Davis's house, in two separate patrol cars, and Officer LeBlanc was watching Fish actually come in and go out of the house.  [Ex. C at 3, 13, 17, 105, 110 (Tr. 54, 116, 129-31, 623, 626, 649)]

4.   *The February 21, 2001 Buy*

The next day, on February 21, 2001, Fish met Officers Johnstone and LaPorte and then called Davis to purchase some crack cocaine. [Ex. C at 22, 46-47, 74, 87-88 (Tr. 150, 276, 278-79, 416, 495-96)] The call was recorded. [Ex. C at 47 (Tr. 279)] Davis agreed to meet Fish at a Chevron station at the intersection of the Old Seward Highway and International Airport Road. [Ex. C at 22, 47, 88 (Tr. 151, 279, 496)] The Chevron station was only a short distance from Davis's mother's house; Davis was temporarily keeping his possessions there and frequently using her car. [Ex. C at 129 (Tr. 759-60)] Officer Johnstone strip-searched Fish and his car was searched. [Ex. C at 22, 47 (Tr. 151, 280)] Officer LeBlanc recorded $200 in buy money and then gave it to him. [Ex. C at 22, 47, 106 (Tr. 151, 280, 627-28)] Officer LeBlanc also outfitted Fish with a wire to record his conversations with Davis. [Ex. C at 47, 77, 111 (Tr. 280, 430, 659)]

Fish then proceeded to the Chevron station, followed by Officers Johnstone and LaPorte. [Ex. C at 88 (Tr. 496)] Other officers were already staked out as in-place surveillance teams.[3] At the Chevron station Fish got

---

[3]    Officers Bushue and Stevens were in one vehicle. [Ex. C at 3, 9 (Tr. 55, 79)] Officer Haas was watching from a separate vehicle in the parking lot of a nearby restaurant. [Ex. C at 15 (Tr. 122-23)] Officers Johnstone and LaPorte were across the street in the parking lot of a bar. [Ex. C at 22 (Tr. 151] Officer LeBlanc was in the area monitoring transmissions from Fish's body wire. [Ex. C at 106 (Tr. 629)]

out of his car and into a green Chevrolet Suburban with tinted windows that Davis was driving. [Ex. C at 3, 9, 22, 47-48, 74 (Tr. 55-56, 79, 151-52, 281-82, 418)] (Davis's mother later testified that she owned a Suburban with tinted windows. [Ex. C at 128 (Tr. 757)]) Davis stated that he was staying at his mother's house, but still had the same cellphone number. [Ex. C at 47, 76 (Tr. 281, 424)] Fish purchased 1.55 grams of cocaine from Davis and went back to his own car. [Ex. C at 3, 22, 48, 75, 88, 94 (Tr. 55-56, 152, 282, 423, 498, 521)] After the purchase Fish drove back to the police station, followed by Officers Johnstone and LaPorte, and gave them the cocaine, which field-tested positive as cocaine. [Ex. C at 22, 88, 94 (Tr. 152, 497, 521)] Officer Johnstone strip-searched Fish and searched his car. [Ex. C at 22 (Tr. 152)]

   5.   *The March 1, 2001 Buy and Arrest*

The final drug buy took place on the evening of February 28 – March 1, 2001. Fish met Officers Johnstone and LaPorte at the police station on February 28, 2001, and made several unsuccessful calls to Davis's number, attempting to set up a buy, but he finally made contact with Davis. [Ex. C at 23, 48-49 (Tr. 154, 285-88)] The call was recorded. [Ex. C at 49 (Tr. 286)] Fish and Davis arranged to meet in the parking lot of a pancake restaurant along Muldoon Road. [Ex. C at 4, 23 (Tr. 57, 154)] Officer Johnstone recorded $200 in buy money and gave it to Fish. [Ex. C at 23, 27

(Tr. 154, 179)]  Officer Johnstone strip-searched Fish and Officer Somerset Jones searched his car, and Fish was outfitted to record his conversations with Davis.  [Ex. C at 3, 23, 32, 49, 79 (Tr. 56, 156, 219, 288, 445)]

Fish then drove to the prearranged location shortly after midnight (*i.e.,* on March 1st) and found Davis in the parking lot of a Chinese restaurant near the pancake restaurant, where Officers Bushue and Stevens were staked out doing surveillance.  [Ex. C at 3-4, 10, 49-50 (Tr. 56-58, 81, 288-90)]  Officer Jones was also nearby.  [Ex. C at 80 (Tr. 451)]  Fish got out of his car and into Davis's truck and purchased cocaine from Davis.  [Ex. C at 4, 49-50, 78 (Tr. 58, 289-90, 433)]  Fish got out of Davis's truck about a minute later and spoke into his body wire, telling the officers the make and license plate number of Davis's truck, and Officer LeBlanc then moved in and arrested Davis.  [Ex. C at 4, 10, 50, 78, 81 (Tr. 58, 84, 90, 433, 452-53, 631-32)]  Fish met Officer Johnstone in the parking lot of a nearby auto supply store and turned over the cocaine to him.  [Ex. C at 24, 26, 50 (Tr. 157-58, 175, 290-91)]  Fish then returned to the police station and Officer Johnstone strip-searched him and Officer Jones searched his car.  [Ex. C at 24, , 26, 32, 50, 79 (Tr. 158, 176, 219, 290-91, 447)]  Officer Jones also field-tested the cocaine at the police station, which tested positive as cocaine.  [Ex. C at 31, 79 (Tr. 214-15, 446)]

C.  Course of Proceedings

Davis was charged in Alaska Superior Court with four counts of third-degree misconduct involving a controlled substance in violation of AS 11.71.030, based on the cocaine buys on February 8th, 20th, and 21st of 2001 and the buy on March 1, 2001. [Ex. A at 1-3]  Davis was tried by a jury and the witnesses generally testified as set out above.  After the close of evidence, Davis moved for a judgment of acquittal, claiming that Fish was a "liar" whose testimony was completely incredible, such that there was insufficient evidence for reasonable jurors to convict. [Ex. C at 130-31 (Tr. 766-67)]  The court denied the motion. [Ex. C at 131 (Tr. 767)]  The jury then found Davis guilty on all four counts. [Ex. B at 1-3]

Davis appealed his conviction to the Alaska Court of Appeals, which rejected his sufficiency-of-the-evidence claim. *See Davis v. State,* Memorandum Opinion & Judgment No. 4899, at 4-5, 2004 WL 1737546, at *2 (Alaska App., August 4, 2004).  Davis also raised the sufficiency-of-the-evidence claim in his petition for hearing to the Alaska Supreme Court, which was denied on November 26, 2004.  *See* Exs. G & I to Respondent Luna's Partial Motion to Dismiss Petition for Writ of Habeas Corpus.

Davis timely filed a petition for a writ of habeas corpus in this court on October 26, 2005. Docket No. 1. That petition raised three claims, *i.e.*, that: (1) his Sixth Amendment right to compulsory process gave him the

right to have a witness (Nome Police Officer Daniel Bennett) testify telephonically, over the state's objection, (2) alternatively, the right to compulsory process required the state to pay Officer Bennett's transportation costs so that he could testify in person, and (3) there was insufficient evidence to support his conviction. Docket No. 1. The court has already granted respondent's motion to dismiss the first two claims. Docket No. 44. Appointed counsel has since appeared for Davis and clarified that Davis intends to stand on his sufficiency-of-the-evidence claim essentially as it was argued in the Alaska Court of Appeals. Docket No. 51. Respondent now moves for summary judgment of Davis's remaining claim.

### D. Standard for Evaluating Sufficiency-of-the-Evidence Claims

28 U.S.C. § 2254(d) provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A claim that a state-court conviction was supported by insufficient evidence is reviewed under 28 U.S.C. § 2254(d)(1)'s "contrary to" or "unreasonable application of clearly established Federal law" standard, the clearly established federal law being *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781 (1979). *Juan H. v. Allen,* 408 F.3d 1262, 1274-75 & n.13 (9th Cir. 2005). *Jackson* established that a federal habeas court may review a state-court conviction to ascertain that there was sufficient evidence to support the conviction under the beyond-a-reasonable-doubt standard commanded by the right to due process. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Under that standard, a habeas court considers only those facts in the record most favorable to the prosecution and the reasonable inferences a jury may have drawn from them, and should uphold the verdict if any rational juror could have concluded that there was no reasonable doubt about the defendant's guilt. *Jackson, id., quoted in Juan H.,* 408 F.3d at 1274. The court does not weigh the evidence or decide issues of witness credibility.

Finally, owing to the enactment of the Anti-Terrorism and Effective Death Penalty Act in 1996, federal habeas courts now apply the holding of *Jackson* "with an additional layer of deference," asking whether the state court's decision regarding the sufficiency of the evidence "reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case." *Juan H.,* 408 F.3d at 1274-75 (referring to *In re Winship*, 397 U.S. 358,

90 S.Ct. 1068 (1970), the primary case holding that the reasonable-doubt standard is compelled as a matter of due process).

### E. Discussion

Summary judgment is appropriate because there are no disputed issues of fact as to what evidence was presented at the state-court trial. Rule 56 of the Federal Rules of Civil Procedure, which provides for summary judgment, applies to habeas proceedings via Habeas Rule 11. *Allen v. Newsome,* 795 F.2d 934, 938 n.11 (11th Cir. 1986). Summary judgment in respondent Luna's favor is appropriate because it is apparent upon reviewing the state-court trial record that rational jurors could conclude that there was sufficient credible evidence to conclude that Davis was guilty of the charged counts of misconduct involving a controlled substance.

Davis argues that the state's case rests on the testimony of Jeremy Fish. Memorandum in Support of Habeas Petition ("Memorandum") at 3 (this memorandum is an attachment to the habeas petition at Docket 1). Davis argues that Fish's testimony cannot be considered trustworthy because the police used coercive tactics to obtain Fish's testimony, because Fish was biased against Davis, and because Fish's testimony showed that he was a dishonest person who could not be believed and that fair-minded jurors could not have believed Fish. Memorandum at 3-9. Davis is in error. Reasonable

jurors could have believed Fish and found Davis guilty based on his testimony and all the other evidence presented.

Davis does not question the state's evidence of identity. Fish testified that he had known Davis for about three years and had both bought drugs from him and been to his house before. [Ex. C at 66, 68 (Tr. 355, 372-73)] The first two buys took place at Davis's house, and there were numerous recorded buy calls made to Davis's cellphone. In addition to identity, neither does Davis question that the drugs recovered by the police from Fish actually were cocaine, a prudent decision given the testimony that the drug samples all field-tested positive as cocaine and then later retested positive as cocaine at the state crime lab. [Ex. C at 2-3, 31, 79, 87-88, 114-15 (Tr. 50, 52, 55, 214-15, 446, 495, 497, 683-89)] Davis also ignores the general pattern of conduct used to ensure the integrity of the investigation – *i.e.*, Fish was strip-searched before and after each buy, his car was searched before and after, teams of police officers followed him to and from the buy sites and watched the buy sites, and the drugs were recovered from him quickly by the police. Davis in essence argues that because the police officers did not physically go with Fish into Davis's house and the vehicles Fish used during the various buys, one cannot rule out the possibility that Fish really got the drugs somewhere else and cannot convict Davis because Fish was not credible. *See* Davis's Alaska Court of Appeals Appellant's Brief at 14-16 (attached as

Exhibit A to Respondent Luna's Partial Motion to Dismiss Habeas Petition). The argument is without merit.

First, Davis offers nothing to suggest that Fish got the drugs elsewhere. Second, Fish's testimony was corroborated by the tapes of all the drug buy calls and the tapes from Fish's body wires, which were played for the jury. [Ex. C at 42, 44-50 (Tr. 260, 266-91)] Davis points to no real inconsistencies in Fish's testimony. Davis simply argues that Fish's past lifestyle and character render him incredible as a witness. Fish's life and character were far from exemplary – he and other witnesses testified to other criminal conduct he had engaged in and his criminal convictions, drug use, and other unsavory things. [Ex. C at 24-25, 38-39, 50-52, 126 (Tr. 160-61, 245-48, 292-98, 747-48)] But this is not uncommon in the criminal milieu. None of those things – including Fish's lies to Nome police and his incentive to work out a deal regarding his then-pending legal troubles – renders Fish as a witness per se incredible. Reasonable jurors were more than justified in believing Fish's testimony, particularly when considered against the mosaic of corroborating testimony from the police officers and the evidence from the recorded conversations.

Davis's claim that the sufficiency of the state's evidence was fatally undercut by the testimony of two of his friends that they were with him on the evening of February 20, 2001 and did not see any drugs is

likewise without merit.  *See* Docket No. 51 (relying on Davis's Alaska Court of Appeals Appellant's Brief at 14-15).  First and most obvious, the testimony does nothing to rebut the state's evidence regarding the other three buys.  Second, reasonable jurors could find these individuals' testimony not credible, and in some instances downright laughable.  Brandon May, for example, stated that he was familiar with marijuana but that his familiarity stemmed from looking at a book that he or his friends had "rented" in high school regarding drugs, which they had done because "[w]e just basically want to know everything, what is going on.  We don't want to get on – you know, start using things that we can't get off of, and cause crimes and problems in this world."  [Ex. C at 121 (Tr. 727)]  Similarly, May's testimony that no one left Davis's house on February 20, 2001, to go to the store was contradicted by the police officers' observations of Fish going out to move his car to let Davis's friends leave and by statements recorded on Fish's body wire.  [Ex. C at 45-46, 73, 87, 105, 122 (Tr. 273-74, 413, 494, 626, 732)]  Reasonable jurors could reject the testimony of May and Davis's other friend, Darryl Cash.

This case presented nothing more than a garden-variety credibility issue, and reasonable jurors could believe Fish and disbelieve the testimony offered in support of Davis.  Considering Fish's testimony in conjunction with the police officers' testimony and the recorded conversations, reasonable jurors could find that Davis provided cocaine to

Fish, and Davis's argument that there was insufficient evidence to convict was properly rejected by the Alaska state courts, whose decisions therefore do not constitute an unreasonable application of clearly established federal law.

F.   Conclusion

For the reasons stated above, this court should grant summary judgment as to Davis's sufficiency-of-the-evidence claim.

Dated this 12th day of January, 2007, at Anchorage, Alaska.

TALIS J. COLBERG
ATTORNEY GENERAL

s/ Timothy W. Terrell
   Assistant Attorney General
   State of Alaska, Dept. of Law
   Office of Special Prosecutions
      and Appeals
   310 K St., Suite 308
   Anchorage, Alaska 99501
   Telephone: (907) 269-6250
   Facsimile: (907) 269-6270
   e-mail: Tim_Terrell@law.state.ak.us
   Alaska Bar. No. (9011117)

**Certificate of Service**

I certify that on January 12, 2007, a copy of the foregoing Motion for Summary Judgment as to Remaining Sufficiency-of-the-Evidence Claim was served electronically on John Pharr.

s/ Timothy W. Terrell