DISKETTE ENCLOSED

A-8308

1              IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

2                       THIRD JUDICIAL DISTRICT

3    STATE OF ALASKA,            )
                                 )
4              Plaintiff,        )
                                 )
5       vs.                      )
                                 )
6    ROBERT DAVIS,               )
                                 )
7              Defendant.        )
     _____)

8
     Case No. 3AN-01-1717 CR
9

10                         VOLUME 1

11                  TRANSCRIPT OF PROCEEDINGS

12          October 29, 2001  - Pages 02 through  17

13          November 09, 2001 - Pages 18 through  38

14          November 13, 2001 - Pages 39 through  44

15          November 14, 2001 - Pages 45 through  193

16          November 15, 2001 - Pages 194 through 359

17          November 19, 2001 - Pages 360 through 574

18          November 20, 2001 - Pages 575 through 775

19          November 21, 2001 - Pages 776 through 846

20

21

22

RECEIVED

DEPARTMENT OF LAW

NOV 2 0 2002

OFFICE OF SPECIAL PROSECUTIONS
AND APPEALS
ANCHORAGE, ALASKA

23                         DISCLAIMER
                  Transcripts Prepared for the Alaska Court System
24   The Alaska Court System has accepted this transcript based on either review of a random sample or without review
     because the transcriber's work consistently met court system standards. Because it is possible that this transcript may
25   contain some errors, the court system encourages parties to listen to the tapes of critical portions of the proceedings and
     to bring any significant errors to the ACS Transcript Coordinator's attention immediately.

                         Exhibit C – 1

**Page 49**

1    unit; what is that?

2 A  It's a small unit consisting of -- depending on our

3    manning from six to seven officers that work in plain

4    clothes, drive unmarked vehicles. We work -- we target

5    street-level crimes, which include prostitution and

6    drug cases.

7 Q  Okay. And were you assigned to a particular unit when

8    -- during the investigation of this case?

9 A  Yes, I was. I was assigned to the special assignment

10    unit.

11 Q  Okay. And how did you become involved in this case?

12 A  I became involved in this case as just another one of

13    the officers in the unit. I working surveillance for

14    this particular case. Each officer developed cases,

15    developed informants and whoever was case officer for

16    that particular person, the rest of the unit would act

17    in support capacity for that -- for that particular

18    operation. In this particular operation, I usually was

19    involved with surveillance.

20 Q  All right. And let me direct your attention to

21    February 8th, 2001. With regard to that particular

22    day, did you have -- what was your assignment?

23 A  My assignment on that particular day was surveillance

24    before, during, and after an under-cover drug buy using

25    an informant.

**Page 50**

1 Q  Were you with anyone?

2 A  Yes. I was with Officer Chris Simms.

3 Q  Okay. And what happened -- just explain what you did

4    from the very beginning.

5 A  What I did, we would have a briefing in our office, and

6    we would go over what was to happen during the buy.

7    Officer Simms and I were assigned to surveillance, so

8    we parked north of the location where the buy was to

9    occur at 2002 Grand Larry, and our job was to sit

10    there, watch the informant drive in, watch him park,

11    and stay there during the whole buy, watch him drive

12    away until he was picked up by another officer, and

13    follow him back to the station. That occurred -- do

14    you want me to go into the details of that?

15 Q  Please.

16 A  We arrived just north of the location, and we parked on

17    Peck Street. The buy was to occur at 202 Grand Larry.

18    We arrived there at 2206 hours, surveillance advised

19    that the informant, P0106, was in the area at 2207.

20    They then advised that he, P0106, was coming out of the

21    residence. Officer Simms and I then followed him and

22    Officer Johnstone back to the police station. So once

23    there, Officer Johnstone handed me a small Baggie of

24    suspected powder cocaine, and I tested the cocaine and

25    put into property and evidence.

**Page 51**

1 Q  Okay. Now you say you tested the cocaine, let me just

2    back you up for a couple of minutes.

3 A  Okay.

4 Q  P0106, who is that?

5 A  Jeremy Fish.

6 Q  Okay. And could you explain why you're using a number?

7 A  We use a number to protect the -- the informant's

8    identity throughout all the police reports. We do that

9    for a number of reasons. We do that to protect any

10    retaliation against him. We do that from anybody else

11    reading these reports so they wouldn't have any idea

12    who it is. And we protect his identity throughout the

13    entire investigation. And so he is always assigned a

14    number. He is always referred to as a number. In

15    police reports, you say he/she, so people don't even

16    know his identity if they were to -- if records clerks

17    or anybody would read that report, they wouldn't know

18    who it was.

19 Q  All right. Now you say that you tested the cocaine,

20    what kind of test did you use?

21 A  A Scott (ph) reagent test type G.....

22 Q  Okay.

23 A  .....for cocaine.

24 Q  Could you just explain to the members, it's called a

25    field test, is that right?

**Page 52**

1 A  Correct. It's called the field test. It's a little

2    kit that we carry in our -- in our property and

3    evidence kits, our search kits. And it's just a small

4    little kit, and you just put a very small amount of

5    cocaine in it and pop three different vials, and it

6    will give you a positive or negative for cocaine.

7 Q  All right. Now, when you -- when something like drugs

8    is seized, what do you do with it?

9 A  We take a small amount of it and field test it, and be

10    it positive or negative, it is then -- the drugs are

11    then sealed in a property and evidence envelope with

12    two officers present. It is taped, evidence taped, and

13    is placed into our property and evidence. And that's

14    the last contact that we have with it.

15 Q  With regard to this particular cocaine, did it field

16    test positive?

17 A  Yes, it did.

18 Q  Okay. Let me just approach you with two items, and

19    they'll be starting with state's exhibit 1. Do you

20    recognize what state's exhibit 1 is?

21 A  Yes, it is. It's a Baggie of suspected powder cocaine.

22 Q  How do you know that that's what it is?

23 A  Because it says it on the envelope. I submitted and

24    sealed it. These are my initials. Chris Simms

25    witnessed and verified it.

1 Q   Is it dated?

2 A   Yes, it is. It's dated 2/8/2001.

3 Q   Okay. And is there -- now is there a number on that
4      somewhere?

5 A   There's a number in the upper right-hand corner, and
6      that's our tag number. Each one of these envelopes is
7      numbered, and that's the number that goes on our
8      property and evidence form when it's put in. It's a
9      number unique to this envelope.

10 Q   Okay. So is the number called anything?

11 A   It's called a tag number.

12 Q   Or a P and E number?

13 A   Or a P and E number.

14 Q   Okay. And could you just explain to the members of the
15      jury how P and E numbers work?

16 A   This particular number is tracked. Once -- once you
17      use this envelope and you take that number and you put
18      it onto a P and E, or a property and evidence form,
19      that -- this number is tracked on the property and
20      evidence form. It's also tracked when it's logged into
21      property and evidence, and anytime anyone does anything
22      with this envelope, removes it from property and
23      evidence, they use that number to track it.

24 Q   Okay. So -- and that -- you know that that is the
25      cocaine that was given you to by Detective Johnstone?

                                                          Page 53

1      cocaine, which I again field tested and got a positive
2      result.

3 Q   Did you assign a P and E number to that cocaine?

4 A   I did. And that was on the 20th. And that one is
5      505551.

6 Q   Okay. And how do you know that that P and E number,
7      505551 is the cocaine that you seized on February 20th?

8 A   This is my handwriting on this -- on the outside of
9      this envelope. It's dated on 2/20/01, and it has my
10      initials that I submitted and sealed it, and my DSN.

11      MS. BRADY:  Okay. At this time, I move to admit

12 state's exhibit 2.

13      THE COURT:  Number 2?

14      MR. JAMES:  I've seen it. Thank you. No objection.

15      THE COURT:  Number 2 is admitted.

16          (Plaintiff's exhibit 2 admitted)

17 Q   Okay. And let me direct your attention to February
18      21st, with regard to this case, did you have a
19      particular assignment on that day?

20 A   I did. I, again, was assigned to surveillance, and
21      this time, I was -- I believe I was with Sergeant
22      Stevens and I, and the buy on this day was to occur at
23      Old Seward and International at the Chevron parking
24      lot. I arrived in the area at 2018 hours. At 2021
25      hours, the informant arrived to meet with the suspect

                                                          Page 55

1 A   Yes.

2      MS. BRADY:  Okay. At this time, I move to admit

3 state's exhibit 1.

4      MR. JAMES:  May I look at it?

5      THE COURT:  Yes. You can approach the witness and look

6 at it.

7      MR. JAMES:  I'm sorry?

8      MS. BRADY:  I should have showed it to you.

9      (Whispered conversation)

10      THE COURT:  Exhibit number 1 is admitted.

11          (Plaintiff's exhibit 1 admitted)

12 Q   Okay. And what is the P and E number for exhibit 1?

13 A   It is 503125.

14 Q   Okay. Now let me direct your attention to February
15      20th, with regard to this case, did you have a
16      particular assignment on that day?

17 A   I did, and again, it was surveillance. Officer Simms
18      and I were riding together, we arrived in the area of
19      Peck and Grand Larry at 2205 hours on the 20th. The
20      informant, P0106, arrived a minute later and went
21      inside the residence. At 2210 hours, he advised he
22      was -- surveillance advised he was coming out of the
23      residence and he got back into his vehicle. And at
24      that point, we handed -- we went back to the police
25      station and Officer LaPorte handed me the suspected

                                                          Page 54

1      who was in a '97 green Suburban, Alaska license DSA914.
2      A few minutes later, the informant left the area and
3      surveillance and I -- I was with Sergeant Stevens as
4      the time, we followed the vehicle. We followed it
5      first to Juneau and 45th where it stopped. The suspect
6      met with someone for a few minutes, and then we
7      followed the vehicle back to 202 Grand Larry where it
8      stayed for a few minutes, and at that point, we broke
9      off surveillance.

10 Q   Okay. And why were you following the Suburban?

11 A   We were following the Suburban because that's what the
12      suspect was in for this buy, and so we were following
13      it to find out where it went after the buy.

14 Q   All right. And let me direct your attention to
15      February 28th, with regard to this particular case, did
16      you have a particular assignment on that day as well?

17 A   I did. I was assigned to close and cover during the
18      buy, and I was assigned to run the wire recording,
19      pursuant to a glass warrant.

20 Q   Okay. And could you explain to the members of the jury
21      what close and cover is for a start?

22 A   Close and cover is where I'm assigned to have what we
23      call the eye. I'm assigned to be -- usually, close and
24      cover is there prior to the suspect and the informant
25      arriving, and your assignment is to be as -- to be the

                                                          Page 56

1 closest person to have the eye to let all the rest of
2 the surveillance know what is happening during the buy.
3 Q Now you're also assigned to run the wire?
4 A Correct.
5 Q Could you explain to the members of the jury what
6 exactly that entails?
7 A Running the wire is we receive a glass warrant to do a
8 recording of the conversation. The informant wears a
9 body wire that we put on the informant. We all have
10 bug radios so we can listen to the conversation,
11 anything the informant says, we can hear it, and we can
12 hear who the informant is talking to. I activate the
13 wire recording when the informant gets out of the car,
14 when the informant gets in the area, I start recording
15 at that point. You hear all the conversation that goes
16 on when the informant leaves the suspect, and I stop
17 the recording. And that was also my duty for this
18 particular buy.
19 Q Where was the buy supposed to occur at?
20 A The buy was supposed -- was supposed to occur at the
21 Pancake, and I can't remember the name of it, the
22 Pancake House, I think, is where it was supposed to
23 occur. Sergeant Stevens and I again, when -- when
24 you're going to run the wire recording, usually have
25 two people in the vehicle. We arrived in the area and

Page 57

1 we parked just to the north of the location. When they
2 pulled up a little bit after midnight, I saw the
3 informant pull into the parking lot of the Northern
4 China restaurant, which was just a little bit to the
5 south. This Pancake House is a little bit further
6 north, and this Northern China restaurant where they --
7 it actually occurred was still within our sight. We
8 could still see this whole thing happening from where
9 we were parked.
10    I saw the informant pull up behind a silver pickup
11 truck, and that plate was DVE 272. The informant got
12 out of his vehicle and walked up to the pickup truck.
13 I activated the recording at that time. At 0004 hours,
14 I saw the informant get out of the pickup truck and get
15 into the back of his vehicle, get back into his
16 vehicle. I turned off the tape recording at that time
17 and.....
18 Q Now let me stop you right there.
19 A Okay.
20 Q Can -- does the informant have any control over when
21 you guys are tape recording what's going on?
22 A No, the informant has no control, whatsoever. He --
23 the wire is placed on him, we can hear that the wire is
24 working before we ever get to the buy. He -- he can't
25 even take it off if he wanted to when the buy is

Page 58

1 happening. And we can hear any conversation, but he
2 doesn't have any control over whether we record it or
3 whether we hear it or not.
4 Q What happened once the meeting was over?
5 A Once the meeting was over, we had Office LeBlanc pull
6 into the parking lot, and he was in a marked patrol
7 vehicle. He activated his lights. We had also pulled
8 in right behind the suspect vehicle. And at that
9 point, they took the defendant Davis out of the vehicle
10 and he was arrested.
11 Q Was anybody in the car with him?
12 A I recall -- I don't have it in my report here, but I
13 recall there was someone else in the car. I think
14 there was someone in the right passenger seat.
15 Q And you don't know who that was?
16 A I don't.
17 Q Okay. And did you have anything else to do with this
18 case?
19 A No.
20 Q Okay. Now did you subsequently run into Mr. Fish
21 again?
22 A Yes, I did.
23 Q And did you have a contact with him where you found
24 marijuana in his car?
25 A Yes.

Page 59

1 Q What was the date of that?
2 A The date of that was July 13th, 2001.
3 Q And about how much marijuana did you find in his car?
4 A Well, it was a small baggie of marijuana, and actually,
5 Officer Daily took it and put it into evidence, and I
6 don't have it here. It was -- it was one small baggie.
7 Q Okay. And what did you do as a result of finding him
8 with marijuana?
9 A We arrested him.....
10 Q Okay. Now when.....
11 A .....for the possession of marijuana, and we -- what we
12 typically do with marijuana possession is it's called a
13 site release. They're basically arrested and released
14 with a court date, a 30-day court date.
15 Q Okay. So in layman's terms, you gave him a ticket?
16 A Correct.
17 MS. BRADY: Okay. That's all the questions I have for
18 this witness.
19 THE COURT: Mr. James?
20 MR. JAMES: Thank you.
21        KATHLEEN BUSHUE
22 testified as follows on:
23        CROSS EXAMINATION
24 BY MR. JAMES:
25 Q Do you know Jeremy Fish?

Page 60

1 A   Yes, I do.  I know him after -- I -- actually, the
2     first time I met him was when he was working as an
3     informant.
4 Q   When did you first meet Jeremy Fish?
5 A   I probably met him -- we started this case in February,
6     I would guess I met him a couple of days prior to the
7     start of the case.
8 Q   And what were the circumstances that you met him?
9 A   I was -- sat in on his original debrief.
10 Q   Okay.  And when was that?
11 A   Probably a couple of days before we started the case,
12     so I couldn't tell you the exact date.
13 Q   You don't keep police reports on that?
14 A   No.
15 Q   So the case started on the 8th, so you started the
16     debrief on the 6th, would that be correct?
17 A   I couldn't tell you when the debrief was, I didn't -- I
18     did write it down, I don't know.  And I wasn't the case
19     officer for this case.  I just sat in on the original
20     debrief.
21 Q   Okay.  Where was the original debrief at?
22 A   At the police station.
23 Q   Okay.  How did you originate contact with Jeremy Fish?
24 A   I didn't originate contact with him.  One of the other
25     detectives said they had an informant they were going

Page 61

1     that you just testified earlier that was on the 8th,
2     but I want to start your contact was, please.
3 A   And I don't remember whether it was two days or a week
4     before the buy, but Detective Pernue (ph) had an
5     informant that she was going to debrief.  She had
6     another officer that was with her in training.  She
7     asked me if I wanted to sit in on the debrief.  I said,
8     sure.
9 Q   Who was the other in training?
10 A   I believe that she had Officer Herrad (ph) with her.
11 Q   So did you keep any notes of the debrief?
12 A   I did not.
13 Q   And based upon your testimony on direct, the contacts,
14     at least in the police reports indicate the activity
15     started on the 8th of February, correct?
16 A   Correct.
17 Q   Okay.  But that's incorrect, because the activity
18     started a couple of days before now, isn't that
19     correct?
20 A   The debrief did, yes, that's correct.
21 Q   All right.
22 A   There's -- it's standard to debrief an informant prior
23     to having the informant work for you.  You sit down and
24     you talk about who they can buy from, and whether
25     you're going to use them as an informant.

Page 63

1     to debrief, and asked me if I wanted to sit in on it.
2 Q   And who was that, please?
3 A   That was Detective Pam Pernue (ph).
4 Q   Payne [sic] Pernue (ph)?
5 A   Pam Pernue (ph).
6 Q   Pam Pernue (ph)?  And Detective Pam Pernue (ph), the
7     reason I'm pronouncing her name is she's new to us in
8     this case, but tell me what happened then.  Well, first
9     off, who is Pam Pernue (ph)?  I mean, you said she's a
10     detective?
11 A   She's a detective in the metro drug unit.
12 Q   Okay.  Metro, all right.  That's different than --
13 A   That's different --
14 Q   -- special forces, or.....
15 A   A special assignment unit.
16 Q   A special.....
17 A   Correct.
18 Q   .....assignment.  Okay.  And that -- just so everybody
19     knows, metro is a combination AST, APD, it stands for
20     metropolitan drug something or other, correct?
21 A   Right.  But actually, metro is strictly an APD unit.
22 Q   Oh, okay.  You guys have taken over, all right, fine.
23     I'm not trying to cut you off, but historically, it
24     was, but -- tell me about Pam Pernue (ph), how did you
25     get contact with Jeremy Fish two days before the buy

Page 62

1 Q   Okay.  So -- but in the police reports, there's nothing
2     mentioned of that?
3 A   In mine there isn't.  I'm sure in somebody's there is.
4 Q   Okay.  Who would that somebody be, based upon.....
5 A   Probably the case officer.
6 Q   And that would be?
7 A   I believe it's Johnstone, is it?  I'm not sure who the
8     case officer is.
9 Q   You.....
10 A   It's either Johnstone or LaPorte, I would guess.
11 Q   Okay.  All right.  Now, to your knowledge, how did this
12     confidential information come into the possession of
13     APD?
14 A   I don't know.
15 Q   You don't know?
16 A   I don't know.
17 Q   You know nothing about Nome?
18 A   I don't know the circumstances about how he became an
19     informant, no, I don't.
20 Q   What was the deal?
21 A   What was what deal?
22 Q   Did you make a deal -- did APD make a deal with Jeremy
23     Fish relating to him providing alleged buy
24     opportunities?
25 A   I didn't make any deal with Jeremy Fish, so I can't

Page 64

| | |
|---|---|
| 1  answer that. | 1 A No. I couldn't tell you. |
| 2 Q Do you have any knowledge of any deal of Jeremy Fish? | 2 Q All right. And how many times were you over there? |
| 3 A No. | 3 A I think I was over there two times, or maybe three |
| 4 Q Zero? | 4  times. |
| 5 A No. | 5 Q Okay. And you indicated there's a box up by the north |
| 6 Q Okay. Do you know an Officer Cross? | 6  side, by peck there? |
| 7 A Jim Cross? There's -- we've had a Ken Cross, and we've | 7 A There's a what? |
| 8  got a James Cross. | 8 Q A box on your diagram. |
| 9 Q I'll have to get you the -- the number. DSN 1397? | 9 A No, this is a vehicle. |
| 10 A I don't know what their DSN's are. I would guess | 10 Q Okay. |
| 11  that's James Cross, but I -- I don't know. | 11 A This is what I was sitting in. |
| 12 Q Calling your attention to September 4th, 2001, did you | 12 Q Oh, okay. |
| 13  have any contact with Jeremy Fish in the area of Medfra | 13 A This is a surveillance vehicle. |
| 14  and Mountain View? I believe Medfra, Medfra? | 14 Q I just..... |
| 15 A I don't believe so, no, not that I -- I can recall. | 15 A And that's -- that's where I was. |
| 16 Q Based upon your seven years experience, if you would | 16 Q Okay. And you're pointed towards..... |
| 17  have someone that you find with cocaine in their | 17 A The west. |
| 18  possession, what would you do? | 18 Q The west? All right. |
| 19 A Cocaine in their possession? | 19 A I wasn't actually looking at the house. My job wasn't |
| 20 Q Uh-huh. (Affirmative) | 20  to look at the house. It was to follow the informant |
| 21 A They would be arrested. | 21  once he left the house, or see him turn into the street |
| 22 Q All right. Now behind you is an easel..... | 22  of Grand Larry. |
| 23 A Uh-huh. (Affirmative) | 23 Q You're pointed west? |
| 24 Q .....and would you please diagram, to the best of your | 24 A Correct. North, south, west and east. |
| 25  ability, and no one -- no one expects you to be an | 25 Q Okay. Indicate west to the left then of you? |
| Page 65 | Page 67 |

| | |
|---|---|
| 1  artist, but the area of Grand Larry and where you were | 1 A This is west. |
| 2  staked out on the 8th? | 2 Q Okay. All right. That's fine. I'm just -- now, what |
| 3 A This is Muldoon running north and south. This is Peck. | 3  -- you arrived there at a specific time? |
| 4  And this is Grand Larry. I recall that we were parked | 4 A Correct. |
| 5  over here, and the target residence was right in here. | 5 Q And that time was what, please? |
| 6 Q Is there a driveway into the -- into the residence? | 6 A On which date are you talking about? |
| 7  What is the residence address? | 7 Q I'm talking about the 8th, I'm sorry. |
| 8 A 202. | 8 A On the 8th at 2206 hours. |
| 9 Q Okay. Is there a driveway into 202, in other words, | 9 Q Okay. When did Mr. Fish arrive there? |
| 10  off-street parking? | 10 A 2207 hours. |
| 11 A I believe there is. | 11 Q Okay. So you were not following him then, is that |
| 12 Q Would you please indicate that? Okay. How far does | 12  correct, you had..... |
| 13  that go in? | 13 A No, I was not following him. |
| 14 A I -- I couldn't tell you. | 14 Q All right. And how long was he in the house? |
| 15 Q All right. Is it -- is there a garage or carport, or | 15 A He was -- surveillance advised that he was coming out |
| 16  is it just a drive -- perhaps paved or driveway type of | 16  at 2216, so he was in the area at 2207, and he was |
| 17  parking area, off-street..... | 17  coming out of the residence at 2216. |
| 18 A I don't recall. I couldn't even tell you what the | 18 Q So he was in there for -- is it 2207 or 2007? 2207. |
| 19  front of the house looked -- the front of the residence | 19 A 2207. |
| 20  looks like. | 20 Q I'm sorry. Okay. So we've got about 10 minutes? |
| 21 Q I'm sorry? | 21 A Uh-huh. (Affirmative) |
| 22 A I couldn't tell you, I don't recall what it looks like. | 22 Q All right. How many -- do you know how many entrances |
| 23 Q You have no idea if it's a flat roof, peaked..... | 23  there are to that house? |
| 24 A No. | 24 A No, I wasn't looking at the house, so I couldn't tell |
| 25 Q .....the color of it? | 25  you. |
| Page 66 | Page 68 |

| | |
|---|---|
| 1 Q | You weren't looking at the house on the 8th? |
| 2 A | No. |
| 3 Q | What were you looking at as you were parked? |
| 4 A | I was -- I was to pick up the informant as he came out |
| 5 | of here and follow him back. |
| 6 Q | So you don't know what, if anything, happened in the |
| 7 | vicinity of the house, you were just waiting for him |
| 8 | to..... |
| 9 A | Correct. |
| 10 Q | .....come out that..... |
| 11 A | Correct. |
| 12 Q | .....Grand Larry and then proceed? |
| 13 A | Uh-huh.  (Affirmative) |
| 14 Q | Okay.  All right.  Now, you were a participant in the |
| 15 | debriefing, or were you not a participant? |
| 16 A | I was not a participant in the..... |
| 17 Q | Okay.  So you don't know what Mr. Fish told the police |
| 18 | officers? |
| 19 A | No. |
| 20 Q | Okay.  Were you a participant in the pre-briefing, if |
| 21 | there is such a word as pre-briefing or..... |
| 22 A | No. |
| 23 Q | No?  All right.  When you left -- excuse me.  When you |
| 24 | observed Mr. Fish leave the vehicle, depart the area at |
| 25 | 2216, how did you know it was Mr. Fish leaving? |

Page 69

| | |
|---|---|
| 1 A | I know -- I don't -- I couldn't swear to it until I got |
| 2 | back to the station. |
| 3 Q | Okay. |
| 4 A | But it -- whoever was leaving, was driving his car, and |
| 5 | then when I got back to the station, he was behind the |
| 6 | wheel of the car. |
| 7 Q | How did you know it was his car? |
| 8 A | Because we had been briefed on what he was driving, and |
| 9 | I actually went out and looked at his car prior to us |
| 10 | going on the buy. |
| 11 Q | Okay.  But you didn't have any contact with Jeremy |
| 12 | Fish, you just went out and looked at the car before |
| 13 | the buy? |
| 14 A | Correct. |
| 15 Q | Okay.  All right.  And then you became the evidence |
| 16 | custodian, is that correct? |
| 17 A | For the cocaine, correct. |
| 18 Q | For the cocaine, all right. |
| 19 | MR. JAMES:  If I may approach, Your Honor? |
| 20 Q | And that's exhibit 1, correct? |
| 21 A | Correct. |
| 22 Q | Okay.  And was -- it indicates a baggie of suspected |
| 23 | powder cocaine, is that -- am I reading that correct? |
| 24 A | Uh-huh.  (Affirmative) |
| 25 Q | You said it's a baggie?  There's a baggie in there..... |

Page 70

| | |
|---|---|
| 1 A | Correct. |
| 2 Q | .....which we would know as a sandwich baggie or |
| 3 | something like that? |
| 4 A | Correct. |
| 5 Q | Okay.  Did you have that printed? |
| 6 A | We put in a request to have it printed, yes. |
| 7 Q | And what was the result of that? |
| 8 A | I don't know.  I can't tell you. |
| 9 Q | Okay.  And what you fill out on the front of that sheet |
| 10 | is -- is correct to the best of your knowledge, based |
| 11 | on your seven year's experience as a police officer, |
| 12 | right? |
| 13 A | On the front of what sheet? |
| 14 Q | The..... |
| 15 A | Property and evidence? |
| 16 Q | .....exhibit 1.  The evidence. |
| 17 A | Yes. |
| 18 | MR. JAMES:  If I may approach? |
| 19 Q | I'm not trying to..... |
| 20 A | No, I don't actually have it with me here.  I don't |
| 21 | have a copy. |
| 22 Q | I'm talking about..... |
| 23 A | Oh, absolutely.  Yes.  Yes. |
| 24 Q | So that's -- we can take that information to the bank |
| 25 | then? |

Page 71

| | |
|---|---|
| 1 A | This actually -- this writing on the front of this? |
| 2 Q | Yeah. |
| 3 A | This is not mine.  This is Officer Simms'. |
| 4 Q | Okay. |
| 5 A | This is my initials and my DSN right here. |
| 6 Q | So you didn't fill that out? |
| 7 A | Correct.  Officer Simms filled..... |
| 8 Q | Did you check it? |
| 9 A | Yes, I did. |
| 10 Q | And you know it -- it's correct then? |
| 11 A | Yes. |
| 12 Q | And you would take that to the bank, right? |
| 13 A | Yes. |
| 14 Q | How about looking at 2? |
| 15 A | This one? |
| 16 Q | Exhibit 2.  Yeah. |
| 17 A | This is my writing on the front of this one. |
| 18 Q | That is your writing?  Okay. |
| 19 A | Yes, it is. |
| 20 Q | And that's correct, and you would take that to the bank |
| 21 | too, right? |
| 22 A | Yes. |
| 23 Q | Okay.  How many grams of cocaine is indicated there? |
| 24 A | On Exhibit 2 or 1? |
| 25 Q | Yes, ma'am. |

Page 72

Case 3:05-cv-00255-TMB-JDR    Document 54-4    Filed 01/12/2007    Page 8 of 26
Multi-Page™
State v. Robert Davis
November 14, 2001

3AN-01-1717 CR

| | |
|---|---|
| 1  A   Exhibit 2, 11.8. | 1  Q   Okay   And so the search is strictly a subjective search |
| 2  Q   Okay.  How much is that, volume-wise, I mean, not -- | 2       then, you rely upon what someone else said as to how |
| 3       11.2 grams, of course, yeah, but I mean volume-wise?  I | 3       that search was conducted? |
| 4       don't know. | 4  A   Correct. |
| 5  A   It's a -- well, you can kind of see, it's a small | 5  Q   And there's no checks and balances?  There's no |
| 6       amount. | 6       objective testing that says, yeah, there's a check |
| 7  Q   And that would be what you submitted to the crime lab? | 7       mark, just like -- have you ever done a DWI arrest? |
| 8  A   A request for that is submitted to the crime lab. | 8  A   Yes, I have. |
| 9  Q   Okay.  And that would -- the crime lab would get that | 9  Q   Okay.  And there's a -- APD has a checklist, doesn't |
| 10      and weigh whatever..... | 10      it?  Have you been drinking?  How much have you had to |
| 11 A   Correct. | 11      drink?  Assuming the person is going to talk with you. |
| 12 Q   .....there and conform -- confirm the crack that you | 12      When was your last drink?  Have you taken any medicine? |
| 13      had down? | 13      What type of medicine?  Do you have any problems?  Any |
| 14 A   Correct.  Uh-huh. | 14      seeing problems? |
| 15 Q   It says 11.2 grams..... | 15 A   It's a questionnaire. |
| 16 A   11.8. | 16 Q   Okay. |
| 17 Q   Excuse me.  How did you know it was 11.8? | 17 A   Yes, there is a questionnaire. |
| 18 A   We weighed it on our scale. | 18 Q   Then you fill it out and there's a checklist, right? |
| 19 Q   Okay.  And the other is 1? | 19 A   Uh-huh.  (Affirmative) |
| 20 A   1.0. | 20 Q   Okay.  When you do the Breathalyzer test, there's a |
| 21 Q   1.0.  All right.  Okay.  Now, one of those -- I believe | 21      checklist too, isn't there? |
| 22      the first one you indicated was, it tested positive. | 22 A   There's procedures.  We don't have a checklist, per se. |
| 23      It was white powder, is that right? | 23      There are procedures to follow. |
| 24 A   Uh-huh.  (Affirmative) | 24 Q   Okay.  And they're written procedures, aren't they? |
| 25 Q   All right.  And the only knowledge you have of where | 25 A   Yes, they are. |
| Page 73 | Page 75 |

| | |
|---|---|
| 1       Mr. Fish got that is based upon what Mr. Fish said, | 1  Q   Okay.  So as you go through on those type of cases, you |
| 2       correct? | 2       know that you're supposed to fill out a specific thing, |
| 3  A   And the fact that we searched him prior. | 3       because someone is going to come back and look at it |
| 4  Q   Okay. | 4       and see that you did it correctly, correct? |
| 5  A   We search him and his vehicle prior to him going on the | 5  A   Correct. |
| 6       buy. | 6  Q   All right.  That doesn't exist in your unit, is that |
| 7  Q   Do you have a checklist you use to search to ensure | 7       correct? |
| 8       that you have consistency and accuracy in your | 8  A   A -- for specific things, it might, but for a pre- |
| 9       searches? | 9       search, no, it doesn't. |
| 10 A   Searching of the person or a vehicle? | 10 Q   Okay.  What specific thing might it exist for? |
| 11 Q   Let's start with the person. | 11      You..... |
| 12 A   No, we do not have a checklist. | 12 A   My unit does -- that unit also does DWI's.  It does a |
| 13 Q   All right.  How about a vehicle? | 13      lot of other crimes as well, but, no, we don't -- we |
| 14 A   No. | 14      don't have very many checklists or anything.  We have |
| 15 Q   And you -- and then doing this for at least how many | 15      procedures that we need to follow. |
| 16      years? | 16 Q   Okay.  And those are written procedures? |
| 17 A   Seven years. | 17 A   Well, we have a P -- what's called our PI, our policies |
| 18 Q   Okay.  And there's other people that work on your team, | 18      and procedures. |
| 19      is that right? | 19 Q   Okay. |
| 20 A   Correct. | 20 A   That covers most things. |
| 21 Q   Okay.  And there's other people that work in metro and | 21 Q   And who promulgates that? |
| 22      you worked in metro, correct? | 22 A   The department. |
| 23 A   Uh-huh.  (Affirmative) | 23 Q   All right.  Is that part of your training manual? |
| 24 Q   And that's all part of APD now? | 24 A   Yes. |
| 25 A   Correct. | 25 Q   All right.  And when you -- okay.  So I understand, and |
| Page 74 | Page 76 |

1  I'm not going to belabor it, there is no written
2    checklist to ensure accuracy?
3  A  There is no written checklist.
4  Q  Now you indicated that you were running the wire,
5    that's the glass warrant, correct?
6  A  Correct.
7  Q  Okay.  And that was on the 20th, correct?
8  A  No.
9  Q  No?  All right.  When was that, please?
10 A  That was on the 1st of March.
11 Q  March 1?
12 A  Correct.
13 Q  Okay.  Did you -- now the opening statement indicates
14   that you allege that cocaine was sold on the 8th, on
15   the 20th and on the 21st, and then the 28th/1st, would
16   you agree with that?
17 A  On the 8th, the 20th, the 21st and the 1st.
18 Q  Okay.  28th/1st.  Okay.  Your involve- -- you had
19   involvement on the 8th, correct?
20 A  Correct.
21 Q  Okay.  And you had involvement on the 20th?
22 A  Correct.
23 Q  Okay.  You did not run the wire on the 20th?
24 A  Correct.
25 Q  Okay.  What was your involvement on the 20th?

Page 77

1  Q  Okay.  So you didn't observe him exit either then?
2  A  No.
3  Q  Okay.  How about on the 20th?
4  A  No.
5  Q  All right.  Either way, in or out?
6  A  No.
7  Q  All right.  Now, there -- you indicated that on the
8    21st, there was a surveillance involving a Suburban, is
9    that correct?
10 A  Correct.
11 Q  Okay.  And what was your involvement in that, please?
12 A  I was surveillance, and on the 21st.  Yeah, I just did
13   surveillance on the 21st.
14 Q  Could you tell me what you mean by surveillance?
15 A  I was assigned to be in the area where the buy was to
16   occur, and to assist in following the suspect vehicle
17   when it left the buy area.
18 Q  Okay.  And describe that vehicle to me.
19 A  It's a '97 green Suburban, Alaska license DSA 914.
20 Q  Okay.  Does it have dark windows, other than the
21   driver's window?
22 A  I recollect that it had tinted windows, but I couldn't
23   swear to which windows were tinted.
24 Q  Okay.  Could you see inside the vehicle?
25 A  From where I was, no, I could not.

Page 79

1  A  Surveillance.
2  Q  Surveillance?
3  A  Uh-huh.  (Affirmative)
4  Q  Where did you park that time, please?
5  A  In the same place, Peck and Grand Larry, right about
6    where this shows right here.
7  Q  Okay.  So that's the same basic location for both the
8    8th and the 20th, correct?
9  A  All right.
10 Q  And who was with you?
11 A  On which day?
12 Q  The 8th.  Is that Simms?
13 A  On the 8th was Office Simms.
14 Q  And on the 20th?
15 A  Was Officer Simms.
16 Q  Okay.  Do you work as a team?
17 A  It just kind of depends on who gets into whose car at
18   the time.
19 Q  Okay.  All right.  And then so your view of 202 Grand
20   Larry was the same on the 20 -- excuse me -- on the 8th
21   as it was on the 20th?
22 A  Yes.
23 Q  All right.  Did you observe Mr. Fish on the 8th go into
24   the.....
25 A  No.

Page 78

1  Q  So you have no knowledge of how many people were in
2    that vehicle?
3  A  No.
4  Q  Okay.  Now, did you do the strip-search on Jeremy Fish
5    on the 8th?
6  A  Jeremy Fish is a male, and females don't strip-search
7    males.
8  Q  So it would be fair to say that you did not participate
9    in any of the strip-searches?
10 A  Correct.
11 Q  Okay.  I wasn't baiting you, I just wanted to make
12   sure.  Now, did you participate in the search of the
13   vehicle on the 8th, 20th.....
14 A  No.
15 Q  .....21st or 1st?
16 A  No.
17 Q  Okay.  All right.  So as a sergeant, are you in some
18   type of administrative capacity?  Are you in charge of
19   this organization?
20 A  No.  I was not a sergeant when I was in this unit.
21 Q  Okay.
22 A  I transferred out of the unit before being promoted.
23 Q  And when did you do that?
24 A  I transferred out of the unit in May, May 1st.
25 Q  All right.  And then I assume -- what do you do now?

Page 80

| | |
|---|---|
| 1 A | I'm a patrol sergeant on swing shift. |
| 2 Q | Okay. So you were there when the arrest of Mr. Davis |
| 3 | took place, is that right, on the 28th/1st? |
| 4 A | Correct. |
| 5 Q | Okay. Where were you physically? Could you flip over |
| 6 | and draw us another picture of that, please? |
| 7 A | There were several businesses along here. I don't know |
| 8 | their names. This is, again, Muldoon, and this is |
| 9 | north, and there was the -- there was a sign, a tall |
| 10 | sign here that said Northern -- Northern China |
| 11 | Restaurant. The defendant had pulled in this way in a |
| 12 | pickup truck, and I was parked -- Sergeant Stevens and |
| 13 | I were parked over here. And the informant, I believe |
| 14 | pulled in behind the pickup truck, but I couldn't swear |
| 15 | to that. This is where the defendant was, was in this |
| 16 | vehicle. |
| 17 Q | Okay. |
| 18 A | And I was right here. |
| 19 Q | You're X? |
| 20 A | Yes. |
| 21 Q | Okay. And how far away is X from the defendant's |
| 22 | vehicle, Mr. Davis' vehicle? |
| 23 A | I guess about 75 yards, maybe. |
| 24 Q | Okay. And you've indicated, I believe the arrow on |
| 25 | Mr. Davis' vehicle is pointing toward Muldoon? |

Page 81

| | |
|---|---|
| 1 | and take me from there. Were you already there at the |
| 2 | scene? |
| 3 A | I was already there. |
| 4 Q | How did you know to be there? |
| 5 A | Because that's where the buy was to occur. |
| 6 Q | Okay. And who were you with at that time, was that |
| 7 | Simms again? |
| 8 A | Sergeant Stevens I was with. |
| 9 Q | Stevens, okay. And what happened -- you arrived at the |
| 10 | scene? |
| 11 A | I arrived and parked and waited until surveillance |
| 12 | advised that the informant was pulling into the parking |
| 13 | lot, and they advised he was pulling into the parking |
| 14 | lot, and at that point, I looked up and could see him |
| 15 | pull up next to the defendant's vehicle, or near the |
| 16 | defendant's vehicle. |
| 17 Q | Okay. |
| 18 A | And, actually, I say he pulled up behind the silver |
| 19 | pickup truck that the defendant was in. |
| 20 Q | Uh-huh. Okay. Like T-bone or is that parallel or..... |
| 21 A | I couldn't tell you. |
| 22 Q | And what happened at that particular juncture? |
| 23 A | The informant got out of his vehicle and walked up to |
| 24 | the pickup truck. |
| 25 Q | Okay. |

Page 83

| | |
|---|---|
| 1 A | Correct. |
| 2 Q | Is that immediate access out to Muldoon, is there a |
| 3 | barrier there? |
| 4 A | Well, there -- yeah, there's driveways all along here, |
| 5 | and I couldn't tell you specifically if there was one |
| 6 | right in front of him. I don't think there was. There |
| 7 | was one -- they came in this way. There's driveways |
| 8 | all along these businesses in the strip mall. |
| 9 Q | All right. Now your -- what was the building behind |
| 10 | Mr. Davis' car? |
| 11 A | I don't know. |
| 12 Q | All right. |
| 13 A | I just know he was -- that there was a sign here that |
| 14 | said Northern China Restaurant, and they were parked |
| 15 | pretty much under it was my recollection. |
| 16 Q | Okay. Are you sure that vehicle, Mr. Davis' vehicle |
| 17 | was pointed toward Muldoon rather than in the opposite |
| 18 | direction? |
| 19 A | That's my recollection at this point. |
| 20 Q | Okay. |
| 21 A | It was Muldoon. |
| 22 Q | Okay. And your recollection is there was a second |
| 23 | person in the vehicle? |
| 24 A | I believe so. |
| 25 Q | Okay. Now, what happened? Mr. Jeremy Fish drives in |

Page 82

| | |
|---|---|
| 1 A | And then he got out of the pickup truck and got back |
| 2 | into his vehicle. |
| 3 Q | Okay. And how long did this take? |
| 4 | THE COURT: Mr. James, I can't hear you. |
| 5 | MR. JAMES: I'm sorry. Excuse me. I apologize, jury, |
| 6 | I told you I would do this. I didn't mean to. I've got to |
| 7 | stay next to the mike. |
| 8 Q | How long did that take? |
| 9 A | He pulled into the parking lot at 0003 hours. At 0004 |
| 10 | hours, he got back into his pickup truck, or got back |
| 11 | into his vehicle, the informant did. |
| 12 Q | Okay. And then..... |
| 13 A | So less than -- it looks like about a minute. |
| 14 Q | All right. What happened then? Take me through it. |
| 15 A | Then the informant pulled out and Officer LeBlanc |
| 16 | pulled into the parking lot, activated his overhead |
| 17 | lights and at that point, we took Mr. Davis into |
| 18 | custody. |
| 19 Q | Okay. Set me the stage. Fish pulls out, LeBlanc pulls |
| 20 | in? |
| 21 A | Yes. |
| 22 Q | Boom, boom? |
| 23 A | Yes. |
| 24 Q | Instantaneous, not -- sequentially, it happened boom, |
| 25 | boom, is that correct? |

Page 84

1  THE COURT: All right.
2  MS. BRADY: Do you want me to.....
3  THE COURT: Let's just swear him in.
4  MS. BRADY: Okay.
5  (Oath administered)
6  MR. TRIPLETT: I do.
7            JAMES TRIPLETT
8  called as a witness on behalf of the plaintiff, testified as
9  follows on:
10          DIRECT EXAMINATION
11  THE CLERK: Please be seated. For the record, sir,
12  will you state your full name, and spell your last?
13 A  James Triplett, T-r-i-p-l-e-t-t.
14  THE CLERK: Thank you.
15 BY MS. BRADY:
16 Q  How did you become involved in investigating the
17     vehicle theft case?
18 A  I was investigating a burglary involving another
19     individual, and upon talking with the victim of that
20     particular crime, I had learned information that that
21     the individual I was investigating's girlfriend
22     allegedly had been hurt during the vehicle theft.
23 Q  Okay. Now let me stop you. Let's name some names.....
24 A  Okay.
25 Q  .....just for clarity. Okay. You were investigating a
                                              Page 101

1  couple of other officers with me, and we went to the
2  residence to, in fact, try to contact John Redwine, so
3  I could continue my investigation.
4 Q  Okay.
5 A  Once there, I spoke with Elizabeth Smith. She assured
6  me that John wasn't there. I believe it's his
7  grandmother, it's kind of like a split-type house,
8  where upstairs is one unit and downstairs is another,
9  and the Redwine's father and mom live in the lower
10  level, and the mother of, I believe it's the father, so
11  it's his grandmother's house, live on the other side.
12  They all said that he wasn't there. They, in fact, let
13  us search the house and, in fact, he wasn't there. I
14  started inquiring to Elizabeth, because my gut feeling
15  was telling me that Jeremy Fish wasn't involved with
16  the stolen vehicle, so I started pressing the issue to
17  see what she had to say. She, in fact, told me that,
18  no, she ended up covering for John, and that it wasn't
19  Jeremy Fish who stole the vehicle, that it was John.
20  So Officer Chavers, who took the original report, I
21  summoned him to come over, because I figured he should
22  follow up on it, and which he did. And he did, in
23  fact, do a report of that conversation in another
24  interview with Elizabeth Smith.
25  MS. BRADY: Okay. And we've already given that to you,
                                              Page 103

1  burglary that was targeting what person?
2 A  The individual by the name of John Redwine.
3 Q  And what's John Redwine's girlfriend's name?
4 A  Elizabeth Smith.
5 Q  Okay. And you learned as a result of your
6  investigation that?
7 A  That from the victim of the burglary, who happened to
8  be John Redwine's sister.....
9 Q  Uh-huh.
10 A  .....who had told me that Elizabeth Smith was injured
11  in an accident or a stolen vehicle. So I started going
12  through the computer system to try to find those report
13  numbers. And once I found those report numbers, I
14  would learn that a warrant was obtained for Jeremy Fish
15  for the stolen vehicle.
16 Q  Okay.
17 A  And after that, and personal knowledge of talking to
18  other officers, that the family has a tendency to cover
19  for John Redwine.
20 Q  Okay.
21 A  So when I was trying to locate John Redwine for
22  investigation of the burglary, I had talked with Jeremy
23  Fish and John Redwine's sister, who learned that
24  Elizabeth Smith was at the Redwine residence. So I
25  said, okay. I went to meet with them and I got a
                                              Page 102

1  you have the police reports, Your Honor.
2 Q  So -- and the thing that we didn't have was John
3  Redwine charged with anything after Officer Chavers
4  talked to Ms. Smith?
5 A  Yeah. After the conclusion of the follow-up interview
6  with Elizabeth Smith, Officer Chavers contacted the
7  DA's office and let them know of the new information.
8  And in turn, there were charges for John Redwine for --
9  he was a juvenile at the time, so the charges at that
10  time for him were reckless driving and driving -- and
11  driving in violation of an -- without an instruction
12  permit.
13 Q  Okay. And now John Redwine is a juvenile?
14 A  He's an adult now, but he was at that time.
15 Q  Okay. And what was Fish originally charged with; what
16  were all the charges?
17 A  Vehicle theft, reckless endangerment and reckless
18  driving.
19  MS. BRADY: Okay. That's all the questions I have,
20  Your Honor.
21  THE COURT: Mr. James, do you have any questions for
22  Officer Triplett?
23          JAMES TRIPLETT
24  testified as follows on:
25          CROSS EXAMINATION
                                              Page 104

1    subjects in the lineup, but if he were to guess, it
2    would be -- would have been number 5. Bennett states
3    he didn't get a real good look at the driver because he
4    was following his vehicle. He states he could only see
5    the driver through the side mirror, when the female was
6    on the ground, the vehicle fled the scene.
7 Q  Okay. And what number was Redwine?
8 A  I don't have that with me.
9 Q  And to your knowledge, there was no follow up that
10   Bennett either could or could not identify Jeremy Fish
11   after the 3rd of July?
12 A To my knowledge, that's correct.
13 Q Okay. And there was no photo lineup involving Jeremy
14   Fish.....
15   THE COURT: You just asked -- you asked that question
16 already.
17   MR. JAMES: Prior the 3rd of July.
18   THE COURT: You've already asked that.
19   MR. JAMES: All right. Thank you.
20   THE COURT: Do you know what happened with the charges
21 against Mr. Redwine, what the disposition is?
22 A I do not, sir.
23   THE COURT: All right. Anybody else with questions for
24 Officer Triplett?
25   MS. BRADY: No, that's it.
                                                    Page 109

1    MR. JAMES: No.
2    THE COURT: Thank you very much. Ready for your next
3 witness, Ms. Brady?
4    MS. BRADY: I am, Your Honor.
5    THE COURT: Shall we get the jury? Shall we get the
6 jury, Ms. Brady?
7    MS. BRADY: Yes, Your Honor.
8    (Pause)
9    THE COURT: All right. Everybody have a seat, please.
10 Are we back on record?
11   THE CLERK: We are.
12   THE COURT: And you have another witness, Ms. Brady?
13   MS. BRADY: I do, Your Honor.
14   THE COURT: All right. We'll swear this witness in.
15   THE CLERK: Please raise your right hand.
16   (Oath administered)
17   MR. HAAS: I do.
18          STEVEN HAAS
19 called as a witness on behalf of the plaintiff, testified as
20 follows on:
21      DIRECT EXAMINATION
22   THE CLERK: Please be seated.
23 A Thank you.
24   THE CLERK: For the record, sir, will you state your
25 full name and spell your last?
                                                    Page 110

1    Steven Frank Haas, H-a-a-s.
2    THE CLERK: Thank you.
3    THE COURT: Go ahead, Ms. Brady.
4 BY MS. BRADY:
5 Q  How long have you been an APD officer?
6 A  Since May, 1996.
7 Q  Okay. And do you have -- are you assigned to a special
8    unit?
9 A  Currently I'm assigned to the special assignment unit.
10 Q Is that the same assignment that you had during the
11   investigation of this case?
12 A Yes, it is.
13 Q All right. And have you had any training or experience
14   in the detection and identification and investigation
15   of cases involving controlled substances?
16 A Yes, I have.
17 Q Could you just explain to the members of the jury what
18   that is?
19 A I attended the police academy that was put on by the
20   Anchorage Police Department here at the Jewel Lake
21   training center. I have attended a DEA clandestine lab
22   school, and then other field training that I've done.
23   I've been the case officer on cases, I've assisted in
24   cases and the testing of drugs, the identification of
25   drugs, et cetera.
                                                    Page 111

1 Q  How did you become involved in this case?
2 A  Officer LaPorte and Officer Johnstone had acquired an
3    informant, and I was just assisting in the surveillance
4    of the case.
5 Q  Okay. And let me direct your attention to February
6    8th. Did you have a particular assignment with regard
7    to this case on that day?
8 A  Yes, I did.
9 Q  What.....
10 A I'm sorry. Go ahead.
11 Q What was your assignment?
12 A On that day, I was assigned to assist in surveillance,
13   and I photocopied the money prior to the buy.
14 Q Okay. And how much money did you give the informant on
15   that day?
16 A $150.
17 Q Let me approach you with a document. This document has
18   previously been marked state's exhibit 8.
19 A Thank you.
20 Q Do you recognize that document?
21 A That would be the photocopied buy money.
22 Q Okay.
23 A With my initials right below the date on it.
24 Q All right. And you anticipated my questions. What --
25   there -- it has a number on it that says 017273, what
                                                    Page 112

Page 113

1    is that number?
2 A  That's our APD case number that we assigned to a case.
3 Q  Can you explain to the members of the jury what a case
4    number is?
5 A  Every time we generate a report, it's assigned a case
6    number.  And in this case, it's 01, for the year 2001,
7    followed by the sequential number for when the case is
8    assigned.
9 Q  Okay.  And so you know that that's the photocopy of the
10   buy funds that you made because of what reasons?
11 A  Because that case number is the same number that's on
12   my report.
13 Q  And are your initials on it?
14 A  Yes.
15 Q  Okay.  And is that document a true and accurate
16   representation of the photocopy you made of the buy
17   funds that you gave to Mr. Fish?
18 A  Yes.
19   MS. BRADY:  Okay.  I move to admit state's 8 at this
20 time.
21   THE COURT:  8?
22   MR. JAMES:  No objection.
23   THE COURT:  State's 8 is admitted.
24       (Plaintiff's exhibit 8 admitted)
25 Q  Okay.  And did you assist any further with this case

Page 114

1    that day?
2 A  On that particular day, just reviewing my report here
3    real quick, I just basically assisted with
4    surveillance, and that was pretty much it.
5 Q  Okay.  And directing your attention to what's been
6    marked as, I think, state's 23, which is right behind
7    you, there's a diagram, do you recognize what that
8    diagram is of?
9 A  This would be a diagram of the area in which the buy
10   occurred on that day.
11 Q  Okay.  And I'm going to ask you to take a different
12   colored marker than what's already been used on that,
13   and just show the members of the jury where you were
14   and tell us what you observed.  Okay.  I'm going to ask
15   you not to use a highlighter, because we won't be able
16   to see that, so get something red or.....
17 A  Orange?
18 Q  Orange is fine.
19 A  Let's see, on the 8th of February of this year, I was
20   assigned to be on Duben, south of the residence, and
21   Duben is down here, Grand Larry continues down to
22   Duben, which runs out to Muldoon.  There's the -- the
23   Mapco right at the corner of Muldoon and Duben, and I
24   sat on Duben, south of the residence.  If I recall, I
25   believe I sat somewhere down here, because I could look

Page 115

1    down this way and see -- just see the car, but I
2    couldn't see the actual residence.
3 Q  Okay.  And what were you doing while you were sitting
4    there?
5 A  Listening to the radio.  We were all on the same
6    channel, and I was listening to traffic, that Officer
7    Johnstone was telling me when the informant's vehicle
8    was coming into the area.
9 Q  Okay.  And what were you supposed to be doing when the
10   informant's vehicle came in the area?
11 A  Just watch it and watch it go up to the residence.
12 Q  Okay.  And did you -- do you know if the informant's
13   vehicle went up to the residence?
14 A  I saw the vehicle come down onto Grand Larry, go north
15   on Grand Larry, and pull up to where I believe about
16   the house was, but I couldn't see the actual house
17   numbers.
18 Q  Okay.  Then what happened after the -- could you hear
19   on the radio the informant was leaving?
20 A  I heard Officer LeBlanc advise that he could see the
21   informant go inside the house, go back to his car, and
22   then go back inside.  And then after a few minutes,
23   Officer LeBlanc advises again when the informant went
24   to his car and left the area.
25 Q  Okay.  And then what did you do after he left?

Page 116

1 A  I just advised that I could see the vehicle leaving,
2    going -- if I recall correctly, he came back out to
3    Duben, and left that way, and I believe Officer LaPorte
4    and Officer Johnstone followed the informant back to
5    the police station.
6 Q  Okay.  Now let me direct your attention to February
7    20th, did you have a particular assignment on that day?
8 A  Once again, we were continuing the investigation of
9    this case, I was assigned to search the informant's
10   vehicles to make sure that there was no contraband or
11   money in the vehicle.  I did so, didn't find anything
12   in the car, and once again, I was assigned to park
13   south of the location on Grand Larry.  And this
14   particular time, I arrived and parked west of Grand
15   Larry on Duben.
16 Q  Okay.  Now let me stop you for just a second, because I
17   failed to make a record of -- you have been marking in
18   orange on what's previously been marked as state's
19   exhibit 23, when you were talking about the 2/8 buy, is
20   that right?
21 A  That's correct, ma'am.
22 Q  Okay.  Now let me talk about -- we'll go back to 2/20,
23   and you said that you did a search of the informant's
24   car?
25 A  That's correct.

1 Q  Is that a typical kind of thing that you do when you
2      work with informants?
3 A  Yes. If we're sending the informant in and they're
4      driving their own vehicle, we always search the
5      informant's car before and after to make sure that they
6      don't already have any contraband, drugs, money, et
7      cetera in their car. And then we check it afterwards
8      and make sure that they didn't conceal anything in
9      their car.
10 Q  What kind of car was it?
11      THE COURT: Can I get you to move back in front of the
12 microphone?
13 A  Oh, I'm sorry, sir.
14      THE COURT: Thank you.
15 A  If I recall correctly, he was driving a station wagon,
16      but I think he -- he drove two different cars during
17      this.
18 Q  Okay.
19 A  I don't recall what the other car was.
20 Q  How thorough was the search that you did?
21 A  It's pretty thorough. It probably takes me maybe five
22      to 10 minutes to search the car, and I start where the
23      driver sits and search everything that they can reach,
24      could possibly get to, and then work my way back.
25 Q  So you look in the ash trays?

Page 117

1 A  Once again, I was assigned to assist in the
2      surveillance. And I -- on this occasion, I didn't
3      search the informant's car, it was assigned to somebody
4      else.
5 Q  Okay. And what was -- your assignment was
6      surveillance, that was -- where was the meeting at?
7 A  This time it occurred at the Chevron, International and
8      Old Seward.
9 Q  Okay. And I'm going to ask you to flip over 23 and 24,
10      and I want you to just diagram roughly what your
11      recollections are of the meeting at the Chevron.
12      (Pause) Is that depiction a true and accurate
13      representation of what the observations that you made
14      on February 21st at the Chevron station?
15 A  Yes, it is.
16 Q  Okay. At this time, I'm going to ask you to mark it
17      state's 25.
18      MS. BRADY: And at this time, I would move to admit
19 state's 25.
20      THE COURT: 25, Mr. James?
21      MR. JAMES: I have no objections, Your Honor.
22      THE COURT: 25 is admitted.
23              (Plaintiff's exhibit 25 admitted)
24 Q  Okay. Where were you at?
25 A  During this transaction, I was parked in the restaurant

Page 119

1 A  Ash tray, floor mats, seats, sun visor, door panels,
2      any nook and cranny where you could hide the type of
3      items we're dealing with.
4 Q  Okay. And what happened after you searched Fish's car?
5 A  After I searched his car, we all proceeded over to the
6      area of 202 Grand Larry, and as I stated before, I
7      parked on Duben, west of Grand Larry this time.
8 Q  Okay. And then did you have any further involvement
9      with the case after Fish left Grand Larry that day?
10 A  Yes. Let me just review and make sure I cover
11      everything here. I assisted in following the informant
12      back to the police station. Once back at the police
13      station, I searched his car again.
14 Q  Now -- okay, you searched the car before, so why do you
15      need to search it afterward?
16 A  To make sure that they didn't conceal anything in the
17      car, and after the drug transaction, drugs, money, et
18      cetera.
19 Q  Was any contraband found?
20 A  No.
21 Q  Okay. And did you do anything else with regard to this
22      case on that day?
23 A  No, I did not.
24 Q  Okay. Then let me direct your attention to February
25      21st, did you have a particular assignment that day?

Page 118

1      parking lot just south of the location where I could
2      see the green Chevy Suburban, and I think the plate was
3      DSA 413. I don't have it in my notes marked.
4 Q  Okay. Now, you've drawn something, it looks like a box
5      with a triangle on top of it, and it's in green, and
6      it's facing toward the top of the page, and that
7      represents you?
8 A  Correct.
9 Q  Okay. And then you've drawn another thing, and you
10      have something written on it, but I can't see what it
11      says from here.
12 A  This one?
13 Q  Yeah.
14 A  I wrote the plate of what the green Suburban was. And
15      I said, I think it's DSA 413, but I.....
16 Q  Okay. So that mark indicates the Suburban?
17 A  Yes, ma'am.
18 Q  Okay. And now go ahead and just explain what you saw,
19      because I interrupted you.
20 A  On this day, I was parked over here in the parking lot
21      of the restaurant, where I could look back and see the
22      Suburban parked with its parking lights on. I couldn't
23      -- it's kind of dark in this corner of the parking lot,
24      I couldn't see who was in the car, or how many people
25      were in the car, et cetera. And then when the

Page 120

Exhibit C – 14

**Page 121**

1  informant's vehicle arrived, if I recall correctly, he
2  came in off of Old Seward and then came up and met with
3  the green Suburban.
4 Q  Could you see the informant get out of his car?
5 A  No, I couldn't actually see that.
6 Q  Okay.
7 A  I could just see the top of the Suburban.
8 Q  Okay.  And then what happened after the meeting was
9  over?
10 A  After the -- the buy occurred, we followed the green
11  Suburban when it left, and went down Old Seward to
12  approximately 45th and stopped a residence, I believe
13  it's on 45th, just east of Old Seward.
14 Q  And did you follow it anywhere else?
15 A  Then after that, we followed it back to his -- the
16  residence at 202 Grand Larry.
17 Q  Okay.  And did you have any other involvement with this
18  case?
19 A  No, that was it.
20 Q  Okay.  And have you had any contacts since this case
21  with Mr. Fish?
22 A  Yes, I have.
23 Q  And what -- what were those contacts?
24 A  I ran into him at his place of employment, which was
25  Subway, when I went there to get a sandwich.

**Page 122**

1 Q  Okay.  Anything else?
2 A  No, ma'am.
3  MS. BRADY:  Thank you.  That's all I have for this
4  witness.
5  THE COURT:  Mr. James?
6  MR. JAMES:  Thank you, Your Honor.
7  STEVEN HAAS
8  testified as follows on:
9  CROSS EXAMINATION
10 BY MR. JAMES:
11 Q  Turn around and take a look at your diagram, Officer,
12  please.
13 A  Yes, sir.
14 Q  The Chevron station that we're referring to, what's the
15  name of it, do you know off the top of your head, the
16  Chevron.....
17 A  The Chevron?
18 Q  Yeah.  The International and Old Seward, it's been
19  there forever, right?
20 A  As long as I've been here.
21 Q  Okay.  What restaurant are you referring to?  Are you
22  referring to.....
23 A  Road Runner's.
24 Q  .....Road Runner's?  Okay.
25 A  Yes, sir.

**Page 123**

1 Q  All right.  Now, where -- alert me to -- to the right
2  hand side of your diagram, is that Old Seward,
3  International, what are we.....
4 A  No, this is Old Seward Highway.  I actually drew -- I
5  guess drew it upside down with south being at the top
6  of the page and north being at.....
7 Q  That's fine.
8 A  .....the bottom.  This is the International Airport
9  Road, and this is the little alleyway that runs over to
10  the parking lot of the Road Runner.
11  THE COURT:  Can you all see over there, Mr. Iverson?
12  UNIDENTIFIED VOICE:  Yes.
13  THE COURT:  Okay.
14 Q  I -- and what's between -- there's some woods and stuff
15  that -- in the Road Runner complex, is in there, I
16  mean, the creek goes through it and the.....
17 A  That's on the south side.....
18 Q  Okay.
19 A  .....of the restaurant.  That's where the creek runs
20  through and there's a green belt.
21 Q  All right.  And what, if any -- well, first of all, how
22  is the Suburban pointed?  You've got yourself pointed
23  south, which would be toward the restaurant, correct?
24 A  That's correct.
25 Q  Okay.  And how was the suburban pointed?

**Page 124**

1 A  It was pointed, if I recall, to the -- to the west.
2 Q  Okay.  And so you were kind of -- if you were in the
3  driver's seat of your car -- was anybody else with you?
4 A  No, I was in the car by myself.
5 Q  Okay.  So you were -- you would have had to have been
6  looking over.....
7 A  Over my shoulder.....
8 Q  .....over your shoulder, all right.  And how far away,
9  approximately, is the -- your car from the Suburban?
10 A  It was probably about 70 yards, give or take.
11 Q  Okay.  So that would be 210 feet, somewhere in that
12  neck of the woods?
13 A  Yes.
14 Q  I get to do my math.  And you've indicated that it was
15  dark and you couldn't tell what was going on in there,
16  other than the fact that you were assigned to show up
17  there, and follow the Suburban wherever it went?
18 A  That's correct.
19 Q  Okay.  And it went to where, please?
20 A  202 -- well, first it went to a residence on 45th
21  Avenue.
22 Q  Uh-huh.
23 A  And I don't recall if he picked somebody up or dropped
24  somebody off, but there was some contact with another
25  individual, and then it went to 202 Grand Larry.

**Page 125**

1 Q Okay. Now on the 8th, you testified you made a
2 photocopy of the money, and I believe that's your
3 exhibit.....
4 A Yes, sir.
5 Q .....whatever number that is, 24?
6 A Exhibit number 8.
7 Q 8? I'm sorry. Thank you. And then you said you gave
8 that to Jeremy Fish?
9 A Yes, sir.
10 Q Okay. Bear with me just a minute, please. I'm looking
11 for something. Have you had an opportunity to -- you
12 didn't generate any police reports in this, right?
13 A Yes, I did.
14 Q You did?
15 A The report I have before me.
16 Q Oh, okay. On 2/28, your report of 2/28?
17 A I don't have a report for that day, sir.
18 Q The date written, 2/2- -- I'm sorry, 2/8, excuse me,
19 I'm sorry.
20 A No problem, sir. I have one dated February 8th, 2001.
21 Q Right. Okay. It starts off, information?
22 A That's correct.
23 Q Okay. One, 2, 3, line 3 down on that, line 2 and line
24 3, I photocopied $150 in buy money and gave the money
25 and the photocopies to Officer Johnson [sic], that's

**Page 126**

1 not correct?
2 A That could be. I thought I had given the money to --
3 to Jeremy Fish, but I could have given it to Officer
4 Johnstone, who gave it to him.
5 Q In your police training, part of your training was to
6 -- when you testify, to testify accurately, correct?
7 A Yes, it is.
8 Q And you've had these police reports with you, is that
9 not true?
10 A I got them when I showed up to court today.
11 Q Okay. Did you talk about this case while you were
12 outside with the other officers?
13 A Yes, I did.
14 Q What did you talk about?
15 A We just talked about how little my involvement was, and
16 I wasn't sure what I was supposed to here to testify
17 to.
18 Q Okay. What did you talk about with Officer Bushue?
19 A We had talked about some other issues that had gone
20 around at the police department.
21 Q Okay. Nothing about this case?
22 A I don't recall. I'm trying to remember. I think we
23 just talked about how short our involvement was, and
24 how Officer Johnstone and Officer LaPorte did the
25 majority of the work.

**Page 127**

1 Q All right. We're talking about perhaps a half hour
2 ago, and you don't recall?
3 A That's not what I said.
4 Q Okay. Tell me.....
5 A I'm trying to remember the extent of our conversation,
6 and I believe we just talked about how short our
7 involvement was.
8 Q All right. You had nothing to do with the 28th, is that
9 -- 28th.....
10 THE COURT: I can't hear you, Mr. James.
11 Q You had nothing to do with the -- now I'm yelling --
12 you had nothing to do with the 28th, that one? The
13 only two you were involved with was the 8th and the
14 20th, right?
15 A That's not correct.
16 Q I'm sorry, and the 21st, I'm sorry.
17 A I was also there on the -- I don't recall the exact
18 date, but for the buy bust.
19 Q Okay. And.....
20 A But I didn't witness anything and wasn't -- didn't do
21 anything significant on that day.
22 Q Who were you with on that day?
23 A I was in a car by myself.
24 Q In a car by yourself?
25 A Yes.

**Page 128**

1 Q Could you flip over, which is probably the one behind
2 that, please?
3 A The one reference Muldoon?
4 Q Yes. Yeah. Okay. We're on.....
5 THE COURT: It's got an evidence sticker on it, maybe
6 you can give me that number?
7 A Exhibit number 24, sir.
8 THE COURT: Thank you.
9 Q 24. All right. Where were you physically located?
10 A On that day, I was watching the residence, and we were
11 expecting the green Suburban, but it didn't show up,
12 and we were attempting to locate that.
13 Q So you weren't on Muldoon?
14 A No, sir.
15 Q Oh, okay.
16 A I was over off Duben and watching Grand Larry.
17 Q Oh.....
18 A I didn't actually see anything that transpired over
19 here until it was all over.
20 Q All right. So you had nothing to do with what went
21 down there, you were at another location and.....
22 A That's correct. I was over off of Duben and Grand
23 Larry, and I couldn't even see this location from where
24 I was at.
25 Q Did you generate a police report on that?

1 A   No, I did not.

2 Q   All right. From your location, going back to the 8th,
3   if you would, please, and you can flip back to the
4   chart, please.

5 A   Back to exhibit 23?

6 Q   Yes, please. Thank you. Could you describe the
7   residence at 202 Grand Larry?

8 A   It's a single story, and I believe it's a zero lot
9   line. There's two houses, two places right next to
10   each other, and if I recall, 202 is the one that's on
11   the north side.

12 Q   Okay. Is that like a duplex, for visuals?

13 A   Yes, sir.

14 Q   A side by side duplex?

15 A   Yes, sir.

16 Q   Okay. So it would be like a side by side ranch duplex,
17   would that be kind of.....

18 A   Right.

19 Q   All right. What is the parking facilities there?

20 A   I don't recall if it's a carport or just a driveway,
21   but I don't believe there's a garage.

22 Q   Okay. Where did Mr. Fish pull in, if he did pull in?

23 A   He pulled into the driveway.

24 Q   Okay. And did you have a good observation of him
25   during the entire period he was there?

Page 129

1 A   No, I did not. As I said before, I could just see the
2   tail end of the car. I really couldn't even see the
3   front door to the house.

4 Q   Was there other cars there?

5 A   I don't recall.

6 Q   So you have no idea of how he entered the structure
7   itself?

8 A   No, I couldn't see.

9 Q   Okay. And was his -- excuse me, was his car sticking
10   out kind of to what would be considered the sidewalk
11   driving area?

12 A   It was at the far edge of the driveway, near the road.

13 Q   Far edge, thank you for your words. I was looking for
14   those. All right. And -- okay. And on the 20th, you
15   were -- going to the 20th, sir, you were listening to
16   the radio, you saw him turn in, were you basically in
17   the same position seeing the same thing?

18 A   No, sir. This occasion, I was parked to the west of
19   Grand Larry. I could not even see the driveway.

20 Q   Okay.

21 A   There's really not a lot of good places to park on
22   Duben at that area.

23 Q   Okay. So you had no visual of what was in that
24   driveway, didn't see him drive into it, it's -- you're
25   basically there to pick up at the end and.....

Page 130

1 A   That's correct, sir.

2 Q   .....follow.....

3 A   I believe it was Officer LeBlanc was the one assigned
4   to have the close end eye.

5 Q   Okay. Okay dokey. One moment, please, sir. If the
6   court will permit me.

7   MR. JAMES: Thank you, sir. That's all the
8 questions.....

9   THE COURT: Thank you, Mr. James. Redirect, Ms. Brady?

10   MS. BRADY: I don't have any redirect, Your Honor.
11 Thank you.

12   THE COURT: Thank you, Officer. You can step down.

13 A   Thank you, sir.

14   THE COURT: Your next witness, Ms. Brady?

15   MS. BRADY: The state calls Officer Johnstone,
16 Detective Johnstone.

17   THE CLERK: Would you raise your right hand?

18   (Oath administered)

19   MR. JOHNSTONE: I do.

20        GRANT JOHNSTONE
21 called as a witness on behalf of the plaintiff, testified as
22 follows on:

23        DIRECT EXAMINATION

24   THE CLERK: Please be seated. For the record, sir,
25 will you state your full name, and spell your last?

Page 131

1 A   Grant Johnstone, J-o-h-n-s-t-o-n-e.

2   THE CLERK: Thank you.

3   THE COURT: Go ahead, Ms. Brady.

4   MS. BRADY: If I could just have one moment, Your
5 Honor?

6 BY MS. BRADY:

7 Q   How long have you been an APD officer?

8 A   A little over six years.

9 Q   Okay. And what is -- what's your title?

10 A   I'm a detective with the burglary unit.

11 Q   How long have you been doing that?

12 A   Since September of this year.

13 Q   Okay. And have you had any training or experience in
14   the detection and identification and investigation of
15   controlled substances?

16 A   Yes, I have.

17 Q   Okay. And could you just explain to the members of the
18   jury what that was?

19 A   I've attended numerous classes on domestic drug
20   interdiction of highways, rave and counter-culture
21   drugs. I spent six months in the metropolitan drug
22   enforcement unit of the APD detective division, and
23   have gone to several clandestine-style laboratory
24   dismantling courses through the drug enforcement
25   agency.

Page 132

Exhibit C – 17

Q Okay. And now is -- you said that with you're with the
burglary unit right now, is that the same unit you were
with during the investigation of this case?

A No. During the investigation of this case, I was with
the special assignment unit of the patrol division.

Q Okay. And how did you become involved in this case?

A I was contacted by Officer LaPorte, who was contacted
by now Sergeant Bushue and Detective Pernue (ph) of the
metropolitan drug enforcement unit stating that they
had an informant that we could use to purchase some
cocaine. And Officer LaPorte contacted me, this would
have been my -- the first time I had actually conducted
an investigation utilizing an informant, and -- on my
own. And so he contacted me and asked me to sit in
with him while he talked to the informant initially,
before our first purchase, and then to step into a more
in-depth role as the case developed.

Q Okay. So ordinarily there would be one case officer,
but in this particular case, would it be fair to say
that he was sort of teaching you how to conduct one of
these kind of.....

A Yes.

Q Okay. And why don't you just tell -- describe for the
members of the jury what your first contact with
Mr. Fish was.

Page 133

A I believe it was on February 8th at 2000 -- 2001, this
year. Mr. Fish came to the front counter of APD, and I
went up to -- to meet with him and to talk with him.
We took him into a closed interview room and asked him
what -- what he could do for us. And he stated that
he had a friend that he could buy cocaine from,
and that the person's name was Rico. He wasn't sure of
his entire name, but he knew him as Rico. And he had
another friend who had a phone number of Rico, and he
says, I can get that phone number and call him and we
can see if we can arrange some sort of drug
transaction.

Q Did he do that?

A Yes, he did.

Q Okay. What number did he give you as Rico's number?

A He was given a cell phone number, and I have that
number written down in here. It was a number of 727-
9465.

Q Okay. And did Mr. Fish make any calls to 727-9465 that
day?

A Yes, he did.

Q Okay. And who dialed the number when he called it?

A He dials the number. The -- there's a telephone
sitting in front of the -- there's a little table and
telephone right there. He sits here. I sit here. He

Page 134

dials the number. I watch him dial the number.

Q All right. And was that call recorded?

A No, it was not.

Q All right. And is that normal procedure?

A The first time that we make a purchase, the call is not
recorded because we have to develop the necessary
evidence to obtain a glass warrant in order to recall
-- in order to record those conversations.

Q All right. And what happened during that call?

A During the call, Rico stated to Mr. Fish that he was
going to be at his residence. He gave the residence of
202 Grand Larry.....

MR. JAMES: I'm going to object. Hearsay.

THE COURT: Just a second.

MR. JAMES: It's hearsay.

THE COURT: Hearsay objection.

MS. BRADY: This is an overview. The witness is going
to be.....

THE COURT: We'll take a bench conference, please.

MS. BRADY: Okay.

(Bench conference as follows:)

THE COURT: All right. The objection is hearsay?

MS. BRADY: I'm sorry. I thought you were directing me
to respond.

THE COURT: I was, but -- but based on the response, I

Page 135

thought we ought to take it at bench conference.....

MS. BRADY: Okay.

THE COURT: .....and that's where we are.

MS. BRADY: It's not offered to prove the truth of the
matter asserted, Your Honor. This is offered simply to show
what the informant was saying, it's -- and it's not offered
for the truth.

MR. JAMES: I don't think it can be offered for any
other reason. I mean, he's saying that this is what we're
going to -- this is what's happening. I mean, it is
offered for the truth, arguably, I mean, I an understand
their argument, but it's not the way the impact is
happening.

THE COURT: What's the answer going to be?

MS. BRADY: I forgot what the question was.

THE COURT: What did the officer hear on the other end
of the line from Rico?

MS. BRADY: No, it's what he heard from -- he could
only hear what Fish was saying. He couldn't hear what Rico
was saying, so he heard Fish say, do you have a ball, when
can I meet, 20 minutes, that kind of thing.

THE COURT: All right.

MS. BRADY: That's roughly what he's going to say. And
then as a result of that, it caused him to take action.
They started their procedures. It's just offered to show

Page 136

Case 3:05-cv-00255-TMB-JDR    Document 54-4    Filed 01/12/2007    Page 19 of 26
Multi-Page™
State v. Robert Davis
November 14, 2001

3AN-01-1717 CR

1 the effect on him, that they believed that there was a buy
2 set up. And Mr. Fish will be testifying.
3    THE COURT: You -- the objection is sustained. You can
4 ask the witness whether based on what he heard from
5 Mr. Fish, did he become suspicious of cocaine sales or
6 something like that.
7    MS. BRADY: Okay.
8    THE COURT: But you can't go into the details.
9    MR. JAMES: I mean, that's where we were heading, I
10 felt we were heading, and that's why the objection was made.
11 Thank you.
12    (End of bench conference)
13    THE COURT: The objection is sustained.
14       DIRECT EXAMINATION CONTINUED
15 BY MS. BRADY:
16 Q   Okay. Based on the conversation that you could hear,
17    did you become suspicious that a cocaine sale might be
18    about to occur?
19 A   I -- based upon the conversation, I believed that we
20    could make a cocaine purchase from Rico.
21 Q   Did you know how much it was going to be for?
22 A   From what Jeremy Fish stated, that it was going to be
23    for approximately $150.
24 Q   Okay. And where was it going to be at?
25 A   It was going to occur at 202 Grand Larry, which was the

Page 137

1    everything, pockets of pants, pockets of shirts. Any
2    item of clothing that they may have on them, we go
3    through it to make sure there's nothing on it, or in it
4    at the time.
5 Q   You check every orifice of their body too?
6 A   Yes, we do.
7 Q   Now, what are some of things that you would be looking
8    for when you're doing this kind of search?
9 A   Well, first and foremost, we would be looking for any
10    contraband, drugs, drug paraphernalia. We also would
11    be looking for any additional money that they may have
12    on them, because we don't want to confuse our money
13    that we have photocopied and given to them with any of
14    their funds that they -- that they may all ready have.
15 Q   Okay. And did you find any contraband on Mr. Fish at
16    all?
17 A   No.
18 Q   Okay. Then what happened after he was searched?
19 A   Once he was searched, he was given him $150 in pre-
20    recorded buy funds. And I followed -- Officer LeBlanc
21    left the station a head of time and went and took up a
22    position around 202 Grand Larry. I don't knew where --
23    exactly where he was, but where he could actually see
24    the residence. I then followed.....
25    MR. JAMES: I'm going to object to what he's telling

Page 139

1 defendant's residence.
2 Q   Okay. Now, once the conversation was over, and it was
3    decided that this was going to happen, what did you do
4    next?
5 A   I requested -- there's several things we have to do.
6    First, we have to obtain the -- the money that's going
7    to be use during the -- during the transaction, and
8    that all has to be photocopied to document serial
9    numbers. So I requested -- or had somebody withdraw the
10    money, $150 worth, and had that photocopied. Officer
11    LeBlanc then searched Jeremy's car, and I strip-
12    searched Jeremy.
13 Q   Okay. Now, strip-searched Jeremy, what do you mean
14    exactly by you strip-searched Jeremy? Could you -- I
15    want you to describe for the members of the jury
16    exactly what you do when you strip-search someone.
17 A   Okay. We have them in a closed door -- in a closed
18    area. We have them remove all of their clothing,
19    socks, shoes, underwear, everything. And once they do
20    that, then we conduct a search on them of their person.
21    And then also go through all their shoes, go through
22    all their clothing, check the -- the elastic bands of
23    their underwear, check all their socks, just to make
24    sure that there's nothing in their shoes, that they
25    don't have a false bottom on their shoe, and check

Page 138

1 about Officer LeBlanc. He clearly said that he.....
2    THE COURT: Ms. Brady, you asked the officer what he
3 did next.
4    MS. BRADY: Right.
5    THE COURT: Why don't you.....
6 A   Okay. Jeremy left the -- the station, and I followed
7    him to the area of Duben and Grand Larry. Once he made
8    the turn onto Grand Larry, I continued on and Officer
9    LeBlanc took up the surveillance at that point.
10 Q   Okay. And so do you know how long Mr. Fish was inside
11    the address at Grand Larry?
12 A   Approximately 10 minutes.
13 Q   Okay. And did you have reason to call him once he was
14    inside?
15 A   Yeah, it -- in just chatting with him, he said that
16    normally he and Rico will chat a little bit, we prefer
17    that things not going on for an extended period of
18    time, so I called him on his cell phone after several
19    minutes and asked him when he would be done, and he
20    said he was on his way out at that time.
21 Q   What happened once he left the residence?
22 A   Once he left the residence, Officer LeBlanc told
23    everybody via radio that he was leaving the residence,
24    and that he was going -- headed northbound on Grand
25    Larry to Peck Avenue. And once he turned west onto

Page 140

1  Peck, I was in a position where I could then pick up
2  his vehicle, and I followed him back to the station.
3 Q  Okay.  And what happened.....
4 A  Actually, I take that back.  We had decided at -- prior
5  to going to the station, we were going to meet at a
6  pre-determined location.  There is a -- I don't know
7  what denomination church it is, but there is a large
8  red church on Muldoon, and our meeting point was to be
9  immediately behind that church on the west side, and so
10  we met there.  I retrieved the product from him and
11  then followed him back to the station.
12 Q  All right.  Then what happened once he got to APD?
13 A  Once he got to headquarters, he was taken back in
14  the same interview room, the same strip-search that we
15  conducted before the buy was done again, same -- of his
16  person.  Also, his car was searched again, and then I
17  conducted a debrief with him of how the buy had
18  transpired.
19 Q  Okay.  Now why do you do a strip-search after the buy
20  is over?
21 A  Because it has happened in the past where an informant
22  has purchased whatever and has stashed it on their
23  person, in their clothing, somewhere.  And so we
24  conduct a strip-search to make sure that has not
25  happened.
                                        Page 141

1 Q  Was any contraband found?
2 A  No.
3 Q  All right.  Now, did -- did Mr. Fish turn over the
4  amount of cocaine that you were expecting to get?
5 A  No.  It was less than -- than what I had expected for
6  $150 worth.
7 Q  And what did you direct him to do as a result of your
8  observation?
9 A  Well, I told him that this -- this was a short amount
10  of product for the money that we had given him, and I
11  asked him to contact Rico again and tell him that, hey,
12  this was a little short, can you make up the difference
13  at another time.
14 Q  Now, when -- when he placed that call, you were sitting
15  there in front of him?
16 A  Correct.
17 Q  Did -- who dialed the number?
18 A  He did.
19 Q  Was the it the same number that was dialed initially to
20  make the buy?
21 A  Yes.
22 Q  Okay.  And -- okay.  What did you do next in
23  investigating this case?
24 A  That was the end -- after we made the initial call,
25  Rico said that he could get him some more tomorrow.
                                        Page 142

1  MR. JAMES:  Objection.
2  THE COURT:  What's the objection?
3  MR. JAMES:  Hearsay.
4 Q  Let me just direct your attention.....
5 A  Okay.
6 Q  .....to the next.....
7  THE COURT:  Just a second.  The hearsay objection is
8  sustained.  Disregard the last answer.  And your next
9  question, Ms. Brady?
10 Q  Let me direct your attention to the next activity you
11  conducted in the investigation of this case.
12 A  Okay.
13 Q  The next -- the next involvement that I had was I
14  obtained a search warrant for -- I determined that the
15  phone number that Jeremy was calling 727-9465 was a
16  prefix to Alaska Digitel cellular phone numbers.  So I
17  obtained a search warrant to get the subscriber
18  information of that particular phone number, since we
19  wanted to make positive identification of who Rico was.
20 Q  Whose phone was it?
21 A  The phone was registered to a Robert Davis, III.  And
22  they -- Alaska Digitel had an address of 202 Grand
23  Larry for him.
24 Q  What was your next involvement in this case?
25 A  On the 20th, Jeremy arrived at the station and we were
                                        Page 143

1  going to be making phone calls to purchase drugs again.
2 Q  All right.  Now let me -- let me stop you, and did
3  somebody -- somebody obtained a glass warrant though in
4  the meantime, right?
5 A  Yes.
6 Q  Okay.  Could you just briefly describe for the members
7  of the jury what a glass warrant is?
8 A  A glass warrant is once you've established that, in
9  this case, you can make a purchase of a drug from a
10  person.  A glass warrant is necessary in order to
11  record the conversations then that the informant is
12  going to have with the supplier or suppliers.  And it
13  allows us to record that contact, whether it's by
14  telephone or in person.
15 Q  Okay.  And -- okay.  So what happened when Mr. Fish
16  arrived at APD on the 20th?
17 A  We, myself and Officer LaPorte, again made several
18  phone calls to attempt to purchase products.  Officer
19  LaPorte began that.  I was out of the room.  He began
20  that, and I came in as Jeremy was on the phone, I
21  believe to Mr. Davis.  We listened to the telephone
22  conversation, and it was who he -- who he described as
23  Rico.
24 Q  Okay.
25 A  At any rate, Jeremy was heard to ask if he could get an
                                        Page 144

| | |
|---|---|
| 1 eight ball and then the next one was in about 20 | 1 of where we could hear what was going on. So I don't |
| 2 minutes. | 2 know where our exact position was. |
| 3 Q  All right. And now what happened once the buy was | 3 Q  Okay. And what happened once he went inside, where did |
| 4 arranged? | 4 you go? |
| 5 A  Once the buy was arranged, since we had the glass | 5 A  We -- when Jeremy went inside the residence, we took up |
| 6 warrant, it was then necessary to put an electronic | 6 a position where we could pick up his vehicle as it was |
| 7 monitoring device on Jeremy. And so I retrieved that | 7 leaving, and so we just sat. And if memory serves me |
| 8 and set that up on his -- set it up so that it would be | 8 correctly, I think we were across the street from the |
| 9 ready to go when Officer LaPorte placed it on him. And | 9 Williams at 6th and Muldoon, but I -- I'm not certain. |
| 10 the strip-search of Jeremy was done. It was done at | 10 At any rate, we set up there just to listen to the |
| 11 the beginning -- on all the buys that we do. He was | 11 radio and see what transpired on the wire. |
| 12 always strip-searched before and after. His vehicle | 12 Q  Okay. So you could hear everything that was going on |
| 13 was searched again. | 13 on the wire? All right. And did you assist any |
| 14 MR. JAMES: I'm going to object based on personal | 14 further in this case that day? |
| 15 knowledge. | 15 A  When we returned to the police headquarters, I escorted |
| 16 THE COURT: The objection is overruled. | 16 Jeremy into the same interview room, and he had a torn |
| 17 Q  And then what happened after..... | 17 piece of newspaper that he placed on the table and |
| 18 A  After he was set up with the -- with the electronic | 18 unwrapped it, and there was a white block of powder |
| 19 monitoring device, I escorted him to his vehicle. | 19 about the size of small marble inside. I turned that |
| 20 Officer LaPorte then brought out the -- the money. And | 20 over to Officer LaPorte, and then I conducted the |
| 21 we gave it to him and we followed him again to 202 | 21 strip-search of Mr. Fish again. |
| 22 Grand Larry. | 22 Q  How thorough was the strip-search that you conducted of |
| 23 Q  Okay. Now, were you in a car with Officer LaPorte, or | 23 him after the buy was over? |
| 24 were you in a separate car? | 24 A  It's the same as we do -- I mean, clothing, all done, |
| 25 A  Officer LaPorte and I were in the same vehicle. | 25 you take all the clothing off, search the shoes, the |
| Page 145 | Page 147 |

| | |
|---|---|
| 1 Q  Okay. And you followed Mr. Fish. Do you recall what | 1 elastic, every -- all the clothing. Any -- anyplace on |
| 2 kind of car Mr. Fish was driving? | 2 the clothing where something could be hidden, we |
| 3 A  He was driving a dark color, I think it was a really | 3 search. And anyplace on the body, with the exception |
| 4 dark blue or black, a Chrysler, I think it's a LeBaron. | 4 of stomach contents, we search. |
| 5 It's an older model four-door sedan. | 5 Q  So you look in people's hair, and in their ears, and in |
| 6 Q  All right. And now you said that he was wired? | 6 their noses and all that kind of stuff? |
| 7 A  Uh-huh. (Affirmative) | 7 A  In their hat, yeah, in their mouths, rectum, every -- |
| 8 Q  Just describe briefly for the members of the jury what | 8 everywhere. |
| 9 exactly that means. | 9 Q  Okay. And was any contraband found? |
| 10 A  It means that the electronic monitoring device is | 10 A  No. |
| 11 turned on, and we have radios that we can hear what is | 11 Q  Okay. Now what was your next involvement with this |
| 12 being said, what is going on inside the vehicle. One | 12 case? What's the next thing you did? |
| 13 member of our team will have an actual recording device | 13 A  That day or the next time? |
| 14 that records, the signal comes in and it actually makes | 14 Q  That day. |
| 15 a tape of everything that goes on. In this case, | 15 A  That -- I did a debrief of Jeremy, referencing the -- |
| 16 Officer LaPorte and I just had the radio. Somebody | 16 the buy. |
| 17 else was going to be recording the conversation. We | 17 Q  Okay. Now when you say you did a debrief, could you |
| 18 just had a radio so that we could listen to what was | 18 just explain to the members of the jury what it is that |
| 19 going on. | 19 you're talking about when you do a debrief? |
| 20 Q  Okay. And how close did you get to the 202 Grand Larry | 20 A  What we do is go over the entire situation that just |
| 21 address on this occasion, when you were following | 21 transpired. I talk to him about what was said on the |
| 22 Mr. Fish? | 22 telephone conversation, even though I was there, I |
| 23 A  I don't know how close we were proximity wise. The | 23 still want him to tell me everything that was said. I |
| 24 radios will only work within about at two to three | 24 talk with him about who gave him the money to purchase |
| 25 block radius of the location, and we were within range | 25 the -- the product. I talk with him about what |
| Page 146 | Page 148 |

| | |
|---|---|
| 1 | happened when he left the station and when he got to |
| 2 | the location where he was going in this case, 202 Grand |
| 3 | Larry, what he saw when he was in there, who else might |
| 4 | have been in the -- in the residence, and where the -- |
| 5 | the drugs came from. If they pulled them out of a |
| 6 | draw, that's very important for search warrant |
| 7 | purposes. Who he handed the money to, who seemed to be |
| 8 | kind of in charge at the location. And then coming |
| 9 | back to the station, you know, who did he turn over the |
| 10 | drugs too. Just a complete and detailed description of |
| 11 | the events as they transpired, regardless of whether or |
| 12 | not I was all ready there and saw some of this stuff. |
| 13 Q | How close in time to the actual event does this debrief |
| 14 | occur? |
| 15 A | It occurs immediately. Once -- once we get back to the |
| 16 | station, and the first thing we do if we've not |
| 17 | obtained the product is obtain that. The second thing |
| 18 | we do is do the strip-search. The next thing we do is |
| 19 | the debrief. Because it's very important that there |
| 20 | are minute details that we want to retrieve that they |
| 21 | may forget at -- as time goes on. |
| 22 Q | All right. And are -- debriefs are tape recorded? |
| 23 A | Yes, they are. |
| 24 Q | Okay. And you put the tape in evidence? |
| 25 A | Correct. |

Page 149

| | |
|---|---|
| 1 Q | Is an eight ball associated with other drugs besides |
| 2 | cocaine, or..... |
| 3 A | It can be, yeah. I think it's associated also with |
| 4 | heroin. |
| 5 Q | Okay. Now, once the -- once the buy had been set up, |
| 6 | what happened next? |
| 7 A | I conducted the strip-search of Mr. Fish again, same |
| 8 | manner as before, and he was provided with $200 in U.S. |
| 9 | currency, photocopied. The purchase was to occur at |
| 10 | the Chevron at Old Seward and International Airport |
| 11 | Road. And Officer LaPorte and myself, again, followed |
| 12 | Mr. Fish to that location. |
| 13 Q | Now let me stop you for just a second. Did you |
| 14 | actually see him pull in the parking lot of that |
| 15 | Chevron sation? |
| 16 A | Oh, yes. |
| 17 Q | And then you -- did you break off and go somewhere |
| 18 | else, or..... |
| 19 A | We actually -- directly on the east side of Internat |
| 20 | -- correction, of Old Seward, is the Peanut Farm |
| 21 | showboat, show club parking area. We parked in a row, |
| 22 | I think it was the first row right on the curb facing |
| 23 | the Chevron station so that we could see what was going |
| 24 | on. The -- Jeremy and the -- he made contact with a -- |
| 25 | a newer model Suburban, I don't know what year it was, |

Page 151

| | |
|---|---|
| 1 Q | All right. Now, what's your -- what was your next |
| 2 | involvement in this case? |
| 3 A | On the 21st of February, we again had Jeremy come into |
| 4 | the station, and he attempted a call to Mr. Davis, left |
| 5 | a message on the cellular telephone -- the number that |
| 6 | -- or left a message on a phone that he had called, |
| 7 | asking him to call back in a little bit. That was |
| 8 | approximately 1854. We tried again at 1904 hours, |
| 9 | about 10 minutes later, received no answer. At about |
| 10 | 8:05, Jeremy called and spoke with Mr. Davis about |
| 11 | getting a ball, which is a term of -- of the size of |
| 12 | drugs. |
| 13 Q | Okay. Now wait, let me stop you right there. Is that |
| 14 | -- what does the term signify to you? What |
| 15 | specifically is that talking about, and could you just |
| 16 | describe that to the members of the jury? |
| 17 A | An -- an eight ball, if this is what he was referring |
| 18 | to, again, I didn't hear the word eight, I just heard a |
| 19 | ball, but if he's referring to an eight ball, it is a |
| 20 | -- it is size or a rock or baggie of cocaine that's |
| 21 | about the size of a medium size marble. And when |
| 22 | people talk to each other on the street in -- in that |
| 23 | particular lingo, there's a lot of terms that they use |
| 24 | to describe certain amounts, and an eight ball is one |
| 25 | of them. |

Page 150

| | |
|---|---|
| 1 | but that was on the -- the east side of Chevron. So |
| 2 | from where we were sitting, we could see the Suburban, |
| 3 | and see the passenger side of the Suburban. |
| 4 Q | All right. And what did you see happen? |
| 5 A | Jeremy pulled in, into the parking lot at about 2023 |
| 6 | hours, and got out of his vehicle, and then climbed |
| 7 | into the passenger side of the Suburban, the front |
| 8 | passenger side of the Suburban. |
| 9 Q | All right. And without telling me what was said, you |
| 10 | could hear the conversation inside the suburban over |
| 11 | the wire, is that right? |
| 12 A | That is correct. |
| 13 Q | All right. And then what happened once Fish got out of |
| 14 | the Suburban? |
| 15 A | He got out of the Suburban, got back in his vehicle. |
| 16 | Myself and Officer LaPorte followed him back to APD. I |
| 17 | conducted a strip-search of him again. And I also at |
| 18 | that -- on that particular occasion -- occasion also |
| 19 | searched his vehicle and did a debrief with him. |
| 20 Q | Now when you searched his vehicle, could you just |
| 21 | please describe for the members, why search his vehicle |
| 22 | afterward? |
| 23 A | On some occasions, we have had the unfortunate |
| 24 | circumstances of having an informant who is -- who will |
| 25 | remove part of the -- the drugs that he purchases and |

Page 152

1   hide them in locations of the vehicle.  And so we
2   search the vehicle before to determine if -- if there's
3   any contraband in the vehicle, and after to determine
4   if they have taken some what they purchased in an
5   attempt to hide it.
6 Q  So just describe what you do to conduct that search to
7   the members of the jury.
8 A  Where -- from the driver's seat, I actually sit in the
9   driver's seat of the vehicle, and I search everything
10  that can be opened, ashtrays, consoles, everything
11  within an arm's reach or so of -- of where the driver
12  is sitting.  I search underneath the seat.  I search in
13  between the seat cushions.  If they have a seat cover
14  on, I pull that off.  If their seats are the style that
15  you can actually unzip and remove the foam, I unzip the
16  seat, stick my hands in there, search all through that.
17  Anyplace that can be opened relatively easily, I
18  search.
19 Q  Under floor mats?
20 A  Under floor mats.  The mat pockets.  I do go as far as
21  to check the dash to make sure that the dash is
22  fastened down.  There's been circumstances where the
23  dash has actually been loose enough for the purpose of
24  stuffing things underneath.  And so we check the dash
25  to make sure that it is, it is secure.

Page 153

1 Q  What was your next involvement in this investigation?
2 A  My next involvement was on February 28th/March 1st.
3   And again, at approximately 1810 hours, Jeremy made a
4   call to Mr. Davis and arranged a purchase of cocaine
5   again.
6 Q  Okay.  Now, there were several calls made, but the
7   actual call arranging the purchase wasn't made until
8   later, isn't that right?
9 A  Right.  We tried at 1810, that was the first one.  And
10  then we tried at 1910.  We tried at 1938, at 1950, at
11  2000.  And then finally at 2345 we were able to make
12  contact with -- with Mr. Davis.
13 Q  All right.  And a buy was arranged?
14 A  That is correct.
15 Q  And so what happened once the buy had been arranged?
16 A  It was arranged to occur at a location called the
17  Pancake House, which is on Muldoon, and it was to be in
18  approximately 20 minutes or so.  I notified other
19  units, other units were out and about on other
20  investigations, so I notified them that we were going
21  to have this purchase in approximately 20 minutes.  I
22  obtained $200 in U.S. currency, and I photocopied and
23  gave that to -- to Jeremy.
24 Q  Now, let me stop you right there.  I'm going to
25  approach you with a document that was previously marked

Page 154

1   as state's exhibit 11.  Do you recognize this document?
2 A  It is a photocopy of some U.S. currency, and it has my
3   signature along with the date and the case number
4   written on it.
5 Q  All right.  And is that the photocopy, is that a true
6   and accurate representation of the photocopy that you
7   made of the money that you gave to Mr. Fish?
8 A  Yes.
9 Q  How much money did you give to Mr. Fish?
10 A  $200.
11 Q  What were the denominations?
12 A  Five $20's and one $100.
13    MS. BRADY:  All right.  And at this time, I move to
14 admit state's exhibit 11.
15    MR. JAMES:  Could I just look at that quick?
16    THE COURT:  Sure.
17    MR. JAMES:  May I voir dire on the dates, Your Honor?
18    THE COURT:  On cross.  I'll reserve admission.
19    MR. JAMES:  Thank you.
20    THE COURT:  I'll reserve ruling on admission until
21 after cross.
22    MS. BRADY:  Okay.  And I couldn't hear what was said up
23 there.
24    MR. JAMES:  I asked if I could voir dire on the dates,
25 and the judge said I could cross.  Reserve admission.

Page 155

1    MS. BRADY:  Okay.
2         DIRECT EXAMINATION CONTINUED
3 BY MS. BRADY:
4 Q  All right.  Is the APD case number anywhere on that
5   document?
6 A  Yes, it is.
7 Q  And your initials are on there?
8 A  That is correct.
9 Q  And the date of the buy is on there?
10 A  Yes.
11 Q  Okay.  And did you document the fact that you
12  photocopied these buy funds in your report?
13 A  Yes, I did.
14 Q  Okay.  And was your report prepared close in time to
15  the -- to when this happened?
16 A  It was prepared afterwards, yes.
17 Q  All right.  And did you also conduct the pre-buy strip-
18  search?
19 A  Yes, I did.
20 Q  All right.  And again, how through was that search?
21 A  It was again, the same, taking all clothing off,
22  searching all aspects of their person and clothing.
23 Q  All right.  And did you document searching Mr. Fish in
24  your report?
25 A  Yes, I did.

Page 156

| | |
|---|---|
| 1 Q Did you find any contraband? | 1 Q Where did that search occur? |
| 2 A No. | 2 A In the APD indoor secure storage area. |
| 3 Q Did you also document that in your report? | 3 Q Okay. So what happened once you did the search? |
| 4 A Yes. | 4 A The only we recovered in the search was a cellular |
| 5 Q And did attach the wire to Mr. Fish this day? | 5 telephone. The buy money was not located. I notified |
| 6 A Yes. | 6 Officer LaPorte of that and -- so at that point, he |
| 7 Q All right. And did you document that in your report as | 7 made -- he decided to pursue another angle, possibly |
| 8 well? | 8 checking with CIPT. And at that point, we discovered |
| 9 A Yes. | 9 that he had -- Mr. Davis had come in with money to |
| 10 Q What happened once you arrived at the scene? | 10 CIPT. I obtained a search warrant to go through all |
| 11 A Prior to that, I told Jeremy that once the purchase was | 11 the cash that they have. They pile it like a general |
| 12 made, he was to meet me south of the location, at -- | 12 fund, and so I obtained a search warrant for them to go |
| 13 there's Shuck's Auto Supply at Muldoon and 16th, and I | 13 through that in attempt to -- they had the pre- |
| 14 wanted him to drive away from the area, and he was to | 14 recorded buy fund serial numbers and they had to go |
| 15 meet me down there and turn over what he had purchased | 15 through all of that to find the money that we had used |
| 16 at that time. So once Jeremy pulled off, I followed | 16 in the buy. |
| 17 him from the station to the area of the Pancake House. | 17 Q All right. And did you do anything else with regard to |
| 18 And once he pulled into the lot, I then continued north | 18 the investigation of this case? |
| 19 and turned around so that -- so that I could pick him | 19 A I don't think so, aside from just doing the return of |
| 20 up as he came southbound, because he was going to have | 20 the search warrants, that's all. |
| 21 cross traffic, and we don't want to deal with a lot of | 21 Q All right. Now let's talk about Mr. Fish for a second. |
| 22 traffic issues. So I just wanted to be able to jump | 22 A Okay. |
| 23 out right behind him, as he was going southbound on | 23 Q Did you run into Mr. Fish again later? |
| 24 Muldoon. | 24 A Yes. Actually, I haven't -- since this time, I have |
| 25 Q Was Officer LaPorte in the car with you on this date? | 25 not personally had contact with Mr. Fish, but I have |
| Page 157 | Page 159 |

| | |
|---|---|
| 1 A No, he was not. | 1 had dealings with him because of my position as a |
| 2 Q All right. And what happened after Mr. Fish left the | 2 burglary detective. |
| 3 Pancake House parking lot? | 3 Q Okay. So what you're saying is you didn't run into him |
| 4 A Once he left there, I followed him from that point to | 4 because of this case, you ran into him because of |
| 5 the Shuck's Auto Body. I obtained -- he handed me the | 5 something that he was doing that you were |
| 6 -- the product, and I obtained that and we went back to | 6 investigating? |
| 7 the station. | 7 A That is correct. |
| 8 Q Did you notify anybody that you had obtained product? | 8 Q All right. And did you have a contact with him on |
| 9 A Oh, yes. | 9 September 5th? |
| 10 Q All right. And what happened at the station? | 10 A I -- I have not had personal contact with him at all |
| 11 A We did another debrief, another strip-search, another | 11 since this case. I was assigned a burglary case where |
| 12 search of his car. | 12 an officer had stopped Mr. Fish. I have not had -- |
| 13 Q Okay. And did you do anything else with regard to the | 13 personally had any contact with him since this case. |
| 14 investigation in this case? | 14 Q Okay. So you didn't personally contact him, but you |
| 15 A Yes. On the 2nd of March, I became aware that there | 15 did end up referring another case over to the district |
| 16 had been a problem in the recovery of the -- of the buy | 16 attorney's office as a result of that contact? |
| 17 funds used from Mr. Davis. The funds were not found in | 17 A That is correct. |
| 18 a search of the vehicle. Oh, that's right, I also | 18 Q All right. Can you just tell us about that case, what |
| 19 searched his vehicle. I think it was Officer LaPorte | 19 happened? |
| 20 had obtained a search warrant for his vehicle and we | 20 A Mr. Fish was stopped outside of a residence for -- as |
| 21 were expecting to find in the vehicle the buy funds | 21 part of an investigation of a burglary by a patrol |
| 22 since we had not recovered them on Mr. Davis. | 22 officer. During the course of talking with Mr. Fish, |
| 23 Q All right. Now let me stop you right there. You | 23 the patrol officer requested permission to -- from |
| 24 participated in a search of the vehicle? | 24 Mr. Fish to search the vehicle, which Mr. Fish granted. |
| 25 A Uh-huh. (Affirmative) | 25 Inside the vehicle was -- was a -- if I'm remembering |
| Page 158 | Page 160 |

| | |
|---|---|
| 1 | correctly, was a box. Mr. Fish said the box was his. |
| 2 | The patrol officer opened the box. Inside was |
| 3 | Mr. Fish's ID, and I believe it was five small bags of |
| 4 | cocaine, all individually packaged, along with some -- |
| 5 | some currency. Mr. Fish denied ownership of the |
| 6 | cocaine, but did say that the currency and the ID was |
| 7 | his. I took that case and forwarded it to the district |
| 8 | attorney's officer for charges of Mr. Fish for |
| 9 | possession and distribution of cocaine. |
| 10 Q | And as far as you're aware of, that case is still |
| 11 | pending? |
| 12 A | That is correct. |
| 13 Q | Okay. And have you had any occasion to charge Mr. Fish |
| 14 | with anything else, or had any further contacts with |
| 15 | him, beside that 9 -- that September 5th incident? |
| 16 A | I have not had any further contacts, or have charged |
| 17 | him within anything else. |
| 18 | MS. BRADY: All right. That's all the questions I |
| 19 | have. |
| 20 | THE COURT: Hold on a second, Mr. James. We're going |
| 21 | to go to 1:30, if anybody wants to take a break, maybe now |
| 22 | would be a good time to do it. If you're all -- can forge |
| 23 | through until 1:30, then we won't take a break. Anybody |
| 24 | need a break? Nobody? Okay. Mr. James? That applies to |
| 25 | the lawyers too. |

Page 161

| | |
|---|---|
| 1 | respond, but I don't recall who that might have been. |
| 2 Q | Do you know if Mr. Fish was arrested? |
| 3 A | For that contact, no, he was not arrested. |
| 4 Q | Is it -- you've heard -- you were here when Officer |
| 5 | Bushue testified, you were sitting -- were you here -- |
| 6 | sometimes you're in and out, so..... |
| 7 A | Was that -- if that's in regards to the marijuana, I |
| 8 | had stepped out. I don't remember. |
| 9 Q | No, it had to do with someone based upon her experience |
| 10 | as a police officer..... |
| 11 A | No. |
| 12 Q | Well, based upon your experience..... |
| 13 A | Okay. |
| 14 Q | Okay. You come -- someone with five bags of cocaine, |
| 15 | do you arrest them or not arrest him? |
| 16 A | I would have arrested him. |
| 17 Q | All right. |
| 18 A | Which is why I charged him with what..... |
| 19 Q | I'm sorry, please? |
| 20 A | Which is why I charged him with what I did. When I got |
| 21 | the case, I charged him with the possession so -- |
| 22 | because I would have arrested him on the spot. |
| 23 Q | So there is a criminal charge out there that says the |
| 24 | State of Alaska versus Jeremy Fish, Count I, possession |
| 25 | or -- of cocaine for purpose of distribution? |

Page 163

| | |
|---|---|
| 1 | MR. JAMES: Thanks, Judge. |
| 2 | THE COURT: Go ahead, Mr. James. |
| 3 | MR. JAMES: You weren't looking at me when you said |
| 4 | that though, not the first offer. |
| 5 | GRANT JOHNSTONE |
| 6 | testified as follows on: |
| 7 | CROSS EXAMINATION |
| 8 | BY MR. JAMES. |
| 9 Q | Officer Johnstone, going to the cocaine, let's get that |
| 10 | kind of squared away here. |
| 11 A | I'm sorry, sir, I can't hear you. |
| 12 Q | Excuse me. Going to the cocaine..... |
| 13 A | Okay. |
| 14 Q | .....September..... |
| 15 A | Okay. |
| 16 Q | Do recall if that was Officer Cross? |
| 17 A | Yes, that is correct, sir. |
| 18 Q | Okay. And to your knowledge, after Officer Cross made |
| 19 | the stop..... |
| 20 A | Uh-huh. (Affirmative) |
| 21 Q | .....and discovered the cocaine, who was next on the |
| 22 | scene, or did you understand was next on the scene, if |
| 23 | anybody? |
| 24 A | Without looking at the report, I don't know -- who else |
| 25 | had responded. I'm sure Officer Cross had someone else |

Page 162

| | |
|---|---|
| 1 A | I sent the case to the district attorney, Phil Moberly. |
| 2 | I spoke to him on the phone prior to sending it over, |
| 3 | and he said to send it over with the charging |
| 4 | documents. I don't know what the status of that case |
| 5 | is currently. |
| 6 Q | Okay. Okay. And that's your letter of September 10th, |
| 7 | is that correct? |
| 8 A | That is correct. |
| 9 Q | All right. You have that in front of you, sir? |
| 10 A | I do not. |
| 11 | MR. JAMES: Could I have a D, please, Madam clerk? |
| 12 | THE CLERK: A D? |
| 13 | MR. JAMES: If I may approach? A D, Delta. I'm sorry. |
| 14 Q | I'm going to hand you what's marked for identification, |
| 15 | and show you..... |
| 16 | MR. JAMES: If I may approach, Your Honor? |
| 17 Q | .....what's been marked for identification. Is that a |
| 18 | photocopy of the letter you sent with it? |
| 19 A | Yes. |
| 20 | THE COURT: What's this, exhibit D, is that correct? |
| 21 A | Yes. |
| 22 | THE COURT: Does it have an exhibit sticker on it? |
| 23 A | D, Delta, yes. |
| 24 | THE COURT: Thank you. |
| 25 Q | Okay. Take a look at it, have you had a chance? |

Page 164

**Page 173**

1   that I have to search, otherwise, there is a -- a
2   possibility that something might get by.
3 Q  As -- to your knowledge, are there checklists for like
4   DWI and other things to make sure that everything is
5   done, is that correct?
6 A  There have been -- someone within APD has developed a
7   checklist of the field sobriety tests, so as you're
8   doing those tests, you can mark them off.  One of them
9   is fairly extensive, and it's difficult to remember all
10  the clues that you might see.
11 Q  Okay.  And that's just a checks and balance to make
12  sure everything is done, right?
13 A  It's just so that you can remember all the -- all the
14  things that you saw as, you know, for you bail hearing
15  or whatever it might be.
16 Q  Okay.  And you did not do the vehicle searches in this
17  particular -- all of the vehicle searches, correct?
18 A  No, I think I -- if I remember correctly, I only
19  participated in one.
20 Q  All right.  And did you do all of the strip-searches?
21 A  I did the majority.  I think there might have been one
22  where I did not.  But we do have a -- a checklist of
23  what officers did what things after each -- after each
24  -- before and after each transaction, and so I could
25  refer to that and tell you what I did and what I didn't

**Page 174**

1   do.
2 Q  And do you have that with you?
3 A  I think Ms. Brady is digging it out of the file right
4   now.
5 Q  Okay.  The checklist that you have?
6 A  Right.
7 Q  Now, so do you have certain checklists to make sure
8   certain things are done?
9 A  One of the officers just developed that so that we know
10  what happened, and we've come across a lot of efforts
11  being duplicated.  And so with somebody saying, okay, I
12  did this, and initialing it, we know that it got done.
13 Q  Okay.  And do you do a digital inspection when you do
14  your strip-search?
15 A  I do not insert my finger or anything like that.
16 Q  Okay.
17 A  If that's what you're referring to.
18 Q  That's what I'm referring to.
19 A  Okay.
20 Q  And -- okay.  You took control of the possession of
21  what Jeremy Fish had on the 28th/1st?
22 A  Yes, sir.
23 Q  And you weren't involved -- did not see what happened
24  at the time that -- you watched that vehicle leave
25  the.....

**Page 175**

1 A  Mr.....
2 Q  .....parking lot?
3 A  Mr. Fish's vehicle?
4 Q  Yes.
5 A  Yes, sir.
6 Q  Okay.  Did you see him get in the vehicle?
7 A  No.
8 Q  So you watched the vehicle, which you rendezvoused up
9   at Shuck's or.....
10 A  Yes.  They advised me that the vehicle was pulling out,
11  at that time, I just jumped on Muldoon and waited for
12  him to pull in front of me, and then I followed him to
13  the Shucks' Auto Supply.
14 Q  Okay.  How far away is that?
15 A  It -- that is at 16th and Muldoon, and the Pancake
16  House is -- or where the -- the other -- Northern China
17  is located at 353 Muldoon.  So it's about 13 -- a
18  little under 13 blocks.
19 Q  Okay.  Did you have him constantly in your view?
20 A  Yes, I did.
21 Q  Okay.  Was there any concern of -- about -- let me
22  withdraw that question.  Approximately how was it from
23  the time that he left the parking lot until you made
24  contact with him and secured what he had, Jeremy Fish?
25 A  One minute, if that.

**Page 176**

1 Q  Okay.  So -- and then once you had the product.....
2 A  Uh-huh.  (Affirmative)
3 Q  .....did you have physical possession of the product
4   then?
5 A  Yes, I did.
6 Q  Okay.  And so what happened at that particular
7   juncture?
8 A  Then we left from where we were, the other officer, the
9   other people involved were taking care of Mr. Davis and
10  we left.
11 Q  All right.  When you say we.....
12 A  Myself and Jeremy.  I followed him.
13 Q  All right.  So you left in two cars?
14 A  Right.
15 Q  You didn't search him at that point in time?
16 A  I did not search -- strip-search him or the vehicle at
17  that time, no.
18 Q  And at the end, did you -- were the strip-searcher and
19  the searcher of the vehicle at that time, on the
20  28th/1st?
21 A  I was the strip-searcher.  I'll have to refer and see
22  if I actually -- if I scratched the vehicle.  No,
23  Officer Summerset Jones searched the vehicle once we
24  got -- once we returned to APD.
25 Q  And -- but you did the strip-search?