**Page 177**

1 A    Yes, I did.
2 Q    Now, you also obtained a search warrant for CIPT, which
3        is Cook Inlet, isn't it?
4 A    That is correct, yes, sir.
5 Q    And is it not -- did you have anything to do with the
6        booking process?
7 A    No, sir, I did not.
8 Q    And the search of Cook Inlet.....
9 A    Uh-huh.
10 A    .....that's a common front for everybody's money,
11        right, as you understand it?
12 A    That is my understand, yes, sir.
13 Q    All right.  So if 100 people come into Cook Inlet and
14        they each have X number of dollars on them, it goes
15        into this pot, no one knows whose money is whose,
16        right?
17 A    That's my understanding, yes.
18 Q    So it's kind of like going in the bank and putting in
19        money and withdrawing money, they just.....
20 A    You're not -- you probably won't get the same out.
21 Q    You won't get the same back, okay.  And you don't know
22        who put that money in there, do you?  I mean, you can
23        subject, but do you know yourself who put the money in
24        there?
25 A    I do not.

**Page 178**

1 Q    All right.  When you marked your money, did you -- you
2        know, like banks, they have the powder?
3 A    We don't mark it.  All we do is just take the photocopy
4        of the serial numbers.
5 Q    Is there -- what effort is there to put this powder
6        that if you put under an infrared light that shows up
7        that you touched the -- the -- whatever the product is?
8 A    We don't do that.
9 Q    Okay.  Is there any effort involved, or do you have any
10        knowledge of it?
11 A    I have no knowledge of that, whatsoever.
12 Q    The judge told me that I could ask about this.....
13 A    Sure.
14 Q    .....and this here.  My -- my questions.....
15 A    Uh-huh.
16 Q    .....these are your initials, correct?
17 A    Correct.
18 Q    And it's dated 3/1, right?
19 A    Right.
20 Q    Okay.  So that's when you dated this?
21 A    That's when I dated that money, yes.
22 Q    Okay.
23 A    That was the date of the buy.
24 Q    But the money was distributed by you on 2/28, wasn't
25        it, just before midnight?

**Page 179**

1 A    Just before midnight, yes.
2 Q    Okay.  So you made a photocopy, why didn't you date it
3        right then?
4 A    Because we had a lot of activity going on.  We were
5        being very rushed.  I made the photocopy, initialed it,
6        put it in our office, locked it, and when I got back,
7        since the buy had occurred on the 1st, I dated the
8        money as the 1st.
9 Q    You were just too busy to photo -- date it as it came
10        off the copy.....
11 A    Well, since -- since we had the buy occur on the 1st,
12        it would create confusion within the channels if the
13        money was photocopied as 02/28, and attached to a buy
14        that was dated March 1st.  There would -- that create
15        confusion both with in the channels with the DA, with
16        the person who makes the entry into the system with the
17        -- with the money, and so I dated it as the 3/1 when
18        the buy actually occurred.
19 Q    So I understand, you make a photocopy of the money.....
20 A    Uh-huh.
21 Q    .....on the 28th, you give it to Jeremy Fish on the
22        28th, but so that none of these professional people get
23        confused, you date it the 1st?
24 A    Yes.
25 Q    Okay.  Why did you then date it the second?

**Page 180**

1 A    Date what the second?
2 Q    There's a 3/2 date there.
3 A    Yeah, that's from the clerk of our metro division.  She
4        enters all the photocopied money into a single database
5        to track -- APD is given a certain amount of funds, and
6        she enters all that money into a database to track
7        where those funds are going out.  And the initials on
8        here are from 3/2.  This is Clerk Patty Rhea (ph).  It
9        says, entered 3/2/01.....
10 Q    Yeah.
11 A    .....by Patty Rhea (ph), that's when she entered the
12        money into -- as being used into the computer database.
13 Q    Okay.  What was the deal you made with Jeremy?
14 A    I didn't make a deal with Jeremy.
15 Q    You were his handler, weren't you?
16 A    That's a -- yeah, I guess you could say that.  I was --
17        I was actually under the -- working under the umbrella
18        of Mark LaPorte.  Mark was very -- had done this many
19        times.  I was -- he was -- I guess you would call him
20        my field training officer in this one.  Whatever
21        arrangements he talked to the district attorney about,
22        I -- I am not aware of.  He just said, I'm going to
23        have you work with me on this case, and he turned over
24        more of the responsibility to me as the case went
25        along.

1 Q  Did you know that Jeremy Fish had pending burglary
2     charges against him?
3 A  Yes, I did know that.
4 Q  Did you inquire as to what was going down there?
5 A  No.
6 Q  You didn't care what you were dealing with?
7 A  I knew that he had pending burglary charges against
8     him.
9 Q  You were the striker for LeBlanc then, you were under
10    his training, is that the idea?
11 A  I was the what?
12 Q  We called them strikers in the Navy, the trainer, you
13    were being trained?
14 A  He was overseeing -- yeah.
15 Q  Okay.  And -- but you're commissioned police officer,
16    you have.....
17 A  That is correct.
18 Q  .....six years under your belt, or five years, whatever
19    it is, so.....
20 A  Yes.  I had -- the reason that he was assisting me with
21    this is I had never worked an informant from start to
22    finish on my own.
23 Q  You have no knowledge of what deal was cut.....
24    MS. BRADY: Objection, Your Honor, asked and answered.
25    THE COURT: Sustained.

Page 181

1     MR. JAMES: All right.
2 Q  Were you interested in what deal was cut?
3     THE COURT: Objection, asked and answered.
4     MR. JAMES: I didn't ask that.
5     THE COURT: Sustained.
6     MR. JAMES: All right.
7 Q  The -- what did the house at 202 Grand Larry look like?
8 A  I never saw it.
9 Q  Did you ever drive by it?
10 A  No.
11 Q  How do you know that Fish went in there?
12 A  Because the other officers that were there conducting
13    the surveillance of him going into the residence said
14    so on the radio.
15 Q  All right.
16 A  And I called him once while he was inside the house.
17 Q  What number did you call?
18 A  He had a cell phone with him, and I don't remember what
19    that number was.
20 Q  Okay.  What did you talk about?
21 A  I asked him when he was coming out, if he was almost
22    done, and he says, yes, he's on his way out now.
23 Q  All right.  Weren't you concerned about his well being,
24    here you -- APD makes a phone call to somebody that's
25    supposedly in the midst of a buy?

Page 182

1 A  Yes, which is why we put so many officers out there to
2     monitor.
3     MR. JAMES: Okay.  Your Honor, if I may, could I move
4     exhibit D marked to C rather than D?
5     THE COURT: You want to change?
6 A  I think he took it back.
7     THE COURT: You want to change the marking on exhibit D
8     to exhibit C?
9     MR. JAMES: Yeah, I had some pre-marked, and I'm just
10    going to get this all goofed up if I don't stay with it.
11    THE COURT: That's fine.
12    MS. BRADY: I don't object.
13    THE COURT: That's fine.  It hasn't been admitted, it
14    can be changed from.....
15    MR. JAMES: No, sir, it hasn't.....
16    THE COURT: .....D to C.
17    MR. JAMES: It's right here.  I'm going to cross out D
18    and move in C.  I would ask that this be admitted now.
19    MS. BRADY: No objection.
20 Q  I'm going to hand you what's been.....
21    THE COURT: You're offering C?
22    MR. JAMES: I'm offering C.
23    THE COURT: And.....
24    MS. BRADY: I'm not objecting.
25    THE COURT: C is admitted.

Page 183

1     (Defendant's exhibit C admitted)
2     MR. JAMES: I moved.....
3     THE COURT: Okay.
4     THE COURT: .....C to D and D to C.
5 A  Sure.
6     MR. JAMES: I just need a couple minutes, or, I mean a
7     moment judge.
8     (Pause)
9 Q  The -- did you field test the product on the 1st?
10    THE.....
11 A  March 1st?
12 Q  March 1st.
13 A  I don't think I did any of the field tests.
14 Q  Okay.  What's the procedure, as you understand it, what
15    happens to the contraband, the -- so I can set the
16    stage for you, you receive contraband from somebody or
17    take it from somebody, okay, it's now in a particular
18    officer's possession.  That individual either field
19    tested it themselves or passes it on to somebody, and
20    there's a chain at that particular juncture?
21 A  That is correct.
22 Q  Okay.  At some point in time then, like Officer Bushue
23    talked about, is that consistent on the outside of the
24    manilla envelope that the -- in this particular case, I
25    believe it's 1 and 2 are marked, there's a weight and a

Page 184

1   time and who -- who handled it?
2 A   Yes, that is correct, sir.
3 Q   Okay. All right. Then -- what happens to it then?
4 A   After it's put into the envelope?
5 Q   Right. I mean, it's -- not it's in a sealed -- if I
6    may approach so we're talking the same -- we've got 1
7    and 2.....
8 A   Yes.
9 Q   .....that have blue marking evidence, apparently
10    they're sealed?
11 A   Correct.
12 Q   Now they look like they're in a -- one of those air
13    suction bags.....
14 A   Uh-huh. (Affirmative)
15 Q   .....that seal it up. Who does that?
16 A   Property and evidence does the -- does the bags. We do
17    the -- the brown manilla folder. We do, as officers,
18    we do the evidence tape around the seams, initial it
19    and date it. And then property and evidence, when it
20    comes to them, they seal it into these bags, into the
21    clear plastic bags.
22 Q   Okay. And then what happens to it after property and
23    evidence?
24 A   If there is no lab request that is done to test the
25    product, it is held at our property and evidence
Page 185

1   section until the case goes to trial, and at that
2    point, they may request the lab -- the lab to test it.
3    If.....
4 Q   Assume it goes to the lab.
5 A   Then I don't have any idea what happens from that
6    point. I know it goes to the lab, it's tested and it
7    comes back. I don't know what their handling procedure
8    are there.
9 Q   All right. Do you know who -- how it gets from -- you
10    take to it evidence?
11 A   Correct.
12 Q   Okay. Somebody then, and I take it from your
13    testimony, not you or of your group, would take it from
14    wherever it's sealed into evidence.....
15 A   Uh-huh.
16 Q   .....to the next step, which could possibly be the lab?
17 A   The state -- the lab -- yeah, our lab does not test the
18    cocaine, it's the state of Alaska.....
19 Q   I'm talking about the state lab.
20 A   Yeah, right.
21 Q   Do you have any idea -- I mean, do you -- can you tell
22    me who takes it from your evidence to state lab?
23 A   I don't know the person's name, no. I believe it's --
24    they work in -- I believe that the property and
25    evidence technicians do a run, so to speak, over to the
Page 186

1   state lab. We send things over there often, and they
2    will take them over and then bring them back, once
3    they're completed testing.
4 Q   Once you put the blue seal on the manilla envelope.....
5 A   Evidence tape.
6 Q   The evidence tape, does that seal that envelope to
7    prevent anybody from accessing it?
8 A   Yes.
9 Q   Do you watch the evidence people put the clear plastic
10    around it?
11 A   No, I've never seen them do that.
12 Q   But you just know it's done because of your experience?
13 A   Yeah.
14 Q   I mean, looking at those two, but it's -- it's the way
15    it happens?
16 A   Right.
17 Q   Okay. All right. And one of those has one gram in it,
18    I think one, and the other has 11.-something grams in
19    it?
20 A   11.8, yes.
21 Q   All right. Those two do not -- those deal with number
22    -- the 8th and the 20th, is that correct?
23 A   Yeah, the one gram is the 8th. The 11.8 is the 20th.
24 Q   20th? All right.
25 A   Yes.
Page 187

1 Q   So the 21st and the 22nd are not accountable?
2 A   They're not right here.
3 Q   Right there. Right there. I mean.....
4 A   That's correct.
5 Q   Okay. We haven't seen those yet? Is there a tracking
6    mechanism on those forms, or those manilla sheets that
7    says this piece of evidence, by some type of a number
8    system, matches this piece -- this item that was
9    tested? In other words, do you have like 501217, and
10    that is a particular piece of evidence, and if the lab
11    tests 501217, that should be the same?
12 A   You're talking about the state lab?
13 Q   Yes.
14 A   Okay. When we send the requests to the state lab, we
15    actually fill out the request form with our tag number
16    as -- and I'll use the case of the one from the 20th,
17    we fill out our tag number as 505551 on their lab
18    request form. That form goes with the evidence, it is
19    then returned with the results matching that tag
20    number.
21 Q   Okay. So -- and that should dove -- everything should
22    dovetail then?
23 A   Yes.
24    MR. JAMES: All right. Your Honor, I'm going to be a
25 few more minutes, and I just.....
Page 188

Page 210

1  was my first introduction to Mr. Fish.
2    THE COURT: If you don't have anything more than that,
3  Mr. James, the evidence is not relevant to Mr. -- to the
4  detective's credibility, because you haven't shown any
5  suggestion that he knew about the juvenile convictions, and
6  therefore you can't show that he withheld them from the
7  magistrate.
8    MR. JAMES: I -- well, obviously another issue gone
9  upstairs, if we get upstairs. Thank you.
10   THE COURT: Ready for the jury?
11   MR. JAMES: Right.
12   THE COURT: Assuming they're all here. We'll go off
13  record. I'm not sure they're all here, but if the are,
14  we'll get rolling.
15   (Off record)
16   THE COURT: All right. Have a seat, everybody. We are
17  back on record in state versus Davis. We have all of our
18  jurors here, and we have parties and counsel. Good morning,
19  everybody.
20   THE JURY: Good morning.
21   THE COURT: Are you doing all right this morning?
22  Good.
23   UNIDENTIFIED JUROR: Uh-huh. (Affirmative)
24   THE COURT: When we broke yesterday, we had Detective
25  Johnstone in the witness stand. And Mr. James, your cross

Page 211

1  examination, you want to continue, please?
2    MR. JAMES: Yes, sir. Thank you.
3         GRANT JOHNSTONE
4  previously sworn, called as a witness on behalf of the
5  plaintiff, testified as follows on:
6       CROSS EXAMINATION CONTINUED
7  BY MR. JAMES:
8  Q   Officer Johnstone, just very briefly, sir, yesterday
9     when we left, we were talking about affidavits, do you
10    remember that?
11 A   Yes.
12 Q   Okay. And we had been talking about the March
13    affidavits. All right. Now there was another
14    affidavit that was done by you on February 13th,
15    correct? Does that.....
16 A   Let me check the date to be sure of that. Yes, that is
17    correct, for a glass warrant.
18 Q   Okay. And number 12 of that affidavit.....
19 A   I don't have that one in front of me.
20   MR. JAMES: Okay. If I may approach the bench, please?
21  For the record, Your Honor, I've marked as D for the
22  record.....
23   UNIDENTIFIED VOICE: Okay. Pardon me?
24   MR. JAMES: D as in Delta.
25 Q   Okay. And (indiscernible).

Page 212

1 A   Okay.
2 Q   Okay. Just take a quick look at that and see if that's
3     the one that I'm referring to that you're assigned to?
4 A   Yes, sir.
5 Q   Okay. Now, part 12 indicates that assisting Anchorage
6     Police Department at the discretion of the district
7     attorney's office, is that right?
8 A   Yeah, that's correct.
9 Q   Okay. So is it your understanding as to this affidavit
10    that the DA's office was orchestrating Mr. Fish rather
11    than APD as far as any agreements that were being
12    instituted?
13 A   As I had stated yesterday, I am not aware of any of the
14    agreements that were made. All I know is that he was
15    assisting us to -- as it says, to mitigate an
16    outstanding charge. What that mitigation is, I do no
17    know.
18 Q   Okay. Now, yesterday and we discussed, you had certain
19    jobs that you did, correct.....
20 A   That is correct.
21 Q   .....during this entire procedure?
22 A   Yes, sir.
23 Q   All right. And other people had other jobs, right?
24 A   That is correct.
25 Q   Okay. And so everybody had to do their right job

Page 213

1    correctly in order to ensure that as you proceed, the
2    situation developed to the police's satisfaction, is
3    that correct?
4 A   That is correct, yes, sir.
5 Q   Were you -- turning to Grand Larry, which is behind you
6     there.....
7 A   Yes, sir.
8 Q   And I believe you're orange, aren't you?
9 A   I'm.....
10 Q   The color orange?
11 A   Are you talking about on her?
12 Q   Yeah, gold, orange.
13 A   This is Officer Haas here.
14 Q   Oh, okay. Were you a part of the stakeout on Grand
15    Larry?
16 A   When Mr. Fish would turn onto Grand Larry, we would not
17    watch the residence. We would obtain a position
18    usually up in this area and, actually at one point,
19    I believe were across Muldoon, and allow the other
20    units to conduct the surveillance. Our main function
21    was as he left this area, we were to fall in behind him
22    and follow him back to the station.
23 Q   So you, yourself, and when you say our.....
24 A   Officer LaPorte was with me on.....
25 Q   Okay.

1  A    .....at least one occasion.

2  Q    All right.  You didn't have any view of who could come
3        and go as far as the residence at Grand Larry?

4  A    I did not see anybody.  I could not see the residence
5        on Grand Larry.

6  Q    And if Officer LaPorte was with you, would he be in the
7        same position you would have, as far as observation?

8  A    Yeah, on at least on occasion, neither one of us would
9        have been able to see the residence.

10 Q    Okay.  And is there another occasion where you could?

11 A    No.  We -- I have never -- during -- when -- when the
12       products were purchased from the Grand Larry location,
13       at no point during that did I see the residence.

14 Q    So you have no independent knowledge as to who was
15       there or what Jeremy Fish did while in or out of the
16       residence?

17 A    Just what was heard on the transmission.

18       MR. JAMES:  One moment, please.

19 Q    You indicated that yesterday you took possession on the
20       9th -- excuse me, February 28th/March 1?

21 A    That's correct.

22 Q    Okay.  When was it tested?

23 A    It was tested when we returned to the -- to APD.

24 Q    By you?

25 A    I don't believe I did the field test on that, but let

Page 214

1        me refer to my report real quick.  No, it was turned
2        over to Officer Somerset Jones, who conducted the field
3        test.

4  Q    And after you turned it over to Officer Somerset Jones,
5        is that the last contact you had.....

6        THE COURT:  Can you move closer to the mike, Mr. James?

7        MR. JAMES:  I'm sorry.  Again, I apologize.

8        THE COURT:  Thank you.

9  Q    After -- after you turned it over to Officer Somerset
10       Jones.....

11 A    Yes.

12 Q    .....is that the last contact you had with it?

13 A    That I had with the -- with the cocaine?

14 Q    Yeah.

15 A    I may have, after it was weighed and in the package
16       that it is currently in.  I may have looked at the
17       weight of it, but I never handled the actual product
18       from that point on.

19 Q    Okay.  So you have -- yourself, have no personal
20       knowledge whether it was not cocaine?

21 A    I was told.

22 Q    I understand, but.....

23 A    Yeah.

24 Q    .....without hearsay?

25 A    I did not field test.  I did not see the results of the

Page 215

1        field test.

2  Q    Okay.  That's all I have.  Oh, wait a minute.  Just a
3        couple more.  Did you field test any of the others?  We
4        know that Bushue, according to her testimony, and I'm
5        not -- but she -- she was involved in the field tests
6        of a couple?

7  A    I don't -- let me refer to all these -- where we did
8        all of this.  I don't believe that I did conduct a
9        field test on these, on the -- Officer -- or Sergeant
10       Bushue conducted one.  Officer Somerset Jones conducted
11       one.  I don't believe that I participated in any of the
12       field tests of the cocaine.

13 Q    So is it fair to say to your own personal knowledge,
14       you don't know whether what was received from Jeremy
15       Fish was, in fact, cocaine?

16 A    I was told that the tests were positive.

17 Q    I understand, but your own personal knowledge, that's
18       what I'm asking.....

19 A    I didn't see the tests.

20 Q    All right.

21 A    You're correct.

22       MR. JAMES:  Thank you, sir.  Thank you.

23       THE COURT:  Redirect, Ms. Brady?

24              GRANT JOHNSTONE

25 testified as follows on:

Page 216

1              REDIRECT EXAMINATION

2  BY MS. BRADY:

3  Q    Detective Johnstone, does it frequently occur that
4        police officers don't make arrests in cases, and they
5        send them off to Detectives pending further
6        investigation?

7  A    Quite frequently, yes.

8  Q    Okay.  And I'm going to ask you, what's an ATN?

9  A    It is a -- it is a criminal intake disposition form,
10       which means that we -- it was what the district
11       attorney and the court system needs in order to -- to
12       view all the charges.  We complete ATN's and forward
13       them over to the district attorney's officer, or the
14       municipal prosecutor's office.  When we have cases that
15       we want to charge, we send the ATN over, because they
16       won't screen the case for charging until that is
17       attached to it.  So we send that form out that's all
18       filled out over to them with the charges that we would
19       like to see on this particular person.  They then take
20       it from there with our police reports and -- and the
21       charging documents.

22 Q    Now, is that a single sheet form, or are there several
23       copies, or how -- could you just explain that to the
24       jury?

25 A    It's a multiple -- multiple copy form, and I don't -- I

Page 217

1    think there's at least three copies to the form.
2    And.....
3    MR. JAMES: I'm going to object. This is beyond the
4    scope of cross.
5    THE COURT: The objection is overruled.
6 A  It is again sent over and then distributed. I don't --
7    I'm not aware of the distribution channels, but it's a
8    multiple copy form.
9 Q  Do you get a copy back when the case is closed?
10 A I don't know.
11 Q Okay.
12 A I haven't been a detective long enough to get one of
13   those back yet, so.....
14 Q Okay. Fair enough.
15 A .....I don't know.
16 Q And let me just approach with something I have marked
17   state's exhibit 19. Do you recognize this document?
18 A Yes, I do.
19 Q Can you explain to the members of the jury what it is?
20 A This document was developed actually by Officer Mark
21   LaPorte and.....
22 Q Before you show it to them, we haven't -- we can't show
23   it to them until after it's admitted into evidence.....
24 A Oh.
25 Q .....so I just want you to just to.....

Page 218

1 Q  And you didn't initial it?
2 A  That is correct.
3 Q  Okay. Why didn't you initial it?
4 A  I don't know.
5 Q  But you did.....
6 A  I was -- I was -- that actually was Officer LaPorte
7    filled this particular part out and so I don't under --
8    I don't know why it was not initialed.
9 Q  Okay. And -- but all the other places where your name
10   appears and your initials are below it, you did that?
11 A Yes.
12 Q Okay. And you indicated that you did those things in
13   your report, is that correct?
14 A That is correct.
15   MS. BRADY: Okay. At this time, I move to admit
16 state's 19.
17   THE COURT: 19, Mr. James?
18   MR. JAMES: Could I just look at it again, Your Honor?
19   THE COURT: Sure.
20   (Pause)
21   THE COURT: I'm not going to object. I'm not going to
22 object, Your Honor.
23   THE COURT: All right 19 is admitted.
24           (Plaintiff's exhibit 19 admitted)
25 Q All right. And my final question for you, Detective,

Page 220

1 A  Okay.
2 Q  .....tell me that you recognize what it is.
3 A  I do. It is a buy check-off list form developed by
4    Officer Mark LaPorte for each of the buys, as they
5    progress, there's a spot for the date, who copied the
6    -- the money, who conducted the strip-searches both
7    before and after, who conducted the vehicle search both
8    before and after, and who did the field test on whatever
9    drug it might have been, and what the results of that
10   test were. The officers write their name in and
11   initial it. And under each one of those is -- under
12   each of the dates of the buy. So you can look at say
13   buy number 1, it has the date, and then the officers'
14   names and initials of who conducted all those tests.
15 Q And is that the report -- is that the buy checkoff list
16   that was filled out in this case involving Mr. Davis?
17 A Yes, it is.
18 Q All right. And I'm going to direct your attention to
19   the last buy, which is February 28th.....
20 A Uh-huh.
21 Q .....and it has a place for buy money copied and pre-
22   buy strip-search and post-buy strip search?
23 A Right.
24 Q And then it indicates your name for those three items?
25 A Uh-huh. (Affirmative)

Page 219

1    is one of the maps that Detective Bushue drew, I think
2    it's the Grand Larry map, is -- is -- or is it the
3    Chevron.....
4 A  It's the -- it's the last purchase map, near the China
5    Garden, or whatever the.....
6 Q  All right. What exhibit is that, for the record?
7 A  Excuse me? 24.
8 Q  State's 24?
9 A  Yes.
10 Q Is north facing the right direction that map?
11 A No, actually, the arrow that she has indicated as the
12   direction of north, south is actually in this
13   direction, and north would be towards the bottom of the
14   page.
15   MS. BRADY: Thank you. That's all I have.
16   THE COURT: You can step down, Detective. Are you
17 ready with another witness, Ms. Brady?
18   MS. BRADY: I am, Your Honor. Can we approach Your
19 Honor?
20   THE COURT: Yes. We'll take a bench conference,
21 please.
22   (Bench conference as follows:)
23   THE COURT: Ms. Brady, we're at bench conference.
24   MS. BRADY: My next witness is Cam Lampman. I've used
25 her several times before. She's a record's custodian. She

Page 221

1 must be running late. She's supposed to be here by now and
2 she's not outside. That's my next witness. I need a break
3 until she gets here.

4    THE COURT: All right. Is Mr. Fish here?

5    MS. BRADY: No, he's going to be here at 10:00.

6    THE COURT: All right. Well, Mr. James?

7    MR. JAMES: Nothing we can do.....

8    THE COURT: Nothing we can do.

9    MR. JAMES: .....until we get a witness. I mean.....

10    THE COURT: All right. I'll tell them.....

11    MR. JAMES: .....I could ask for a judgement of
12 acquittal, but I don't think you're going to give it to me.

13    THE COURT: I'll tell them to cool their heels for a
14 while until your witness gets here. Maybe you can check on
15 her when we send the jury out?

16    MS. BRADY: Okay. Yeah, I'll wait outside for her.

17    THE COURT: Thank you.

18    (End of bench conference)

19    THE COURT: We're going to have to take a little break.
20 We're waiting for a witness, it shouldn't be too long, so I
21 could ask you to step out of the courtroom, go your jury
22 room, and we'll come and get you when we're ready. And
23 thanks for your patience.

24    (Jury excused)

25    THE COURT: Any other work -- our jury has departed,

Page 222

1 any other work we can do while we're waiting for the
2 witness?

3    MR. JAMES: I just want to -- yes, there is. I think I
4 -- and I'm not trying to beat this. You indicated -- let's
5 see here -- that 9/29 -- or let's see, the 2/10 and the 4 --
6 excuse the 9/2 and the 2/10, this is on the Jeremy police
7 report, those are subject invest- -- proceed- -- let me try
8 it again, out of jury voir dire of Mr. Fish.....

9    THE COURT: 3/29, 9/2 -- let's put them in
10 chronological order.

11    MR. JAMES: I'm sorry. I just want to get to get
12 right, Judge.

13    THE COURT: 3/29, 4.....

14    MR. JAMES: 3.....

15    THE COURT: 4/10, 9/2.

16    MR. JAMES: 9/2. Those are the ones that are available
17 for examination out of the jury?

18    THE COURT: We'll talk to Mr. Fish.

19    MR. JAMES: Yes, sir. That's what I.....

20    THE COURT: You may -- you may talk to Mr. Fish afer
21 you all talk to -- when I say that, we'll probably do it on
22 the record. After I hear from Mr. Fish, I'll make a
23 determination as to whether reasonable jurors could infer
24 that he may have something to fear from the state or the
25 police arising out of those incidents.

Page 223

1    MR. JAMES: And then the -- the 7/26 and 9/29, I can
2 ask if he's aware of -- I mean, he is aware of those,
3 because he was contacted.....

4    THE COURT: There's no objection to those, so.....

5    MR. JAMES: Yeah.

6    THE COURT: .....you may ask about those.

7    MR. JAMES: All right. I just wanted to take advantage
8 of the time so we don't.....

9    THE COURT: Yeah. All right.

10    MS. BRADY: I have something we can take up, Your
11 Honor. Mr. James indicated yesterday he was going to be
12 calling witnesses telephonically, and I am going to be
13 objecting to that. So we can take that up right now if you
14 want to.

15    MR. JAMES: We.....

16    THE COURT: I think where we left it was I said you
17 need to make a motion.....

18    MR. JAMES: Right.

19    THE COURT: .....and I suppose we'll count yesterday as
20 your motion so.....

21    MR. JAMES: All right. Basically, Your Honor, I don't
22 know what Mr. Fish is going to testify to, but we have an
23 extensive police report, three page, from Dan -- Officer Dan
24 Bennett, Nome Police Department, relating to the sequences
25 of events. One of those issues that I wish to explore is

Page 224

1 that he had -- he, being Fish, had agreed to meet with
2 Bennett. There was supposed to -- he was supposed to
3 participate in some buys up in Nome was what this all came
4 down -- it originally came down to. He was to meet with
5 him, he -- the 31st, I believe, and he departed unbeknownst
6 to Bennett on the 27th, which activated -- this January now,
7 of this year -- activated the arrest warrant issued by Judge
8 Ben Esch up in Fairbanks -- excuse me, Nome, which resulted
9 in his arrest down here on the 6th of February.

10    And if he denies that he had any kind of agreement, or
11 that, in fact, he lied to the police -- just denies he lied
12 to the police, I think I'm entitled to establish that, A, he
13 lied to his -- the police there.

14    As far as Ted Garcia, who is the CIP officer -- CIPT
15 officer, my last communication with him was is he was under
16 doctor's orders at home, had just come off of his pain pump,
17 and -- now, that was two days ago. And I don't know whether
18 he's going to be physically able to come. Now he is the one
19 that is really -- not Gonzales, but Garcia is the booking
20 officer. And those are the two that I -- I wish to
21 telephonic -- I don't know whether I'm going to use Bennett
22 or not, to be honest with you, because I don't know what
23 Fish is going to say. But Garcia, obviously -- and, of
24 course, as we progress here, his -- I hope his condition
25 improves. He's just went over rotator cuff surgery. And

Page 225

1 Bennett is 400 miles away, I think.
2    THE COURT: Ms. Brady?
3    MS. BRADY: The rule pertaining to telephonic testimony
4 says that both parties have to agree in order to have
5 telephonic testimony. And I don't agree to that. I think
6 the jury should be able to see -- I may agree to it for
7 Mr. Garcia if it becomes -- if there's some sort offer of
8 proof that shows testimony will be relevant, I may go ahead
9 and agree to that. But as far as Officer Bennett, he should
10 be here if he's going to testify. There's no reason for him
11 not to be here. That's why I brought it up now so there
12 would be plenty of notice, just in case Mr. James needs to
13 get him here. And he can take the stand like any other
14 witness and testify, and the jury can view him, there's
15 reason why.....
16    THE COURT: Which rule?
17    MS. BRADY: Pardon me?
18    THE COURT: Which rule?
19    MS. BRADY: It's -- I think it's.....
20    THE COURT: 38.1.
21    MS. BRADY: Thank you.
22    THE COURT: With the consent of the prosecution and the
23 defendant. Mr. James?
24    MR. JAMES: Yes, Your Honor. Obviously, it's -- it's
25 strictly economics. I mean, I don't have any reason, when I

                                                    Page 226

1 talked to Bennett, of course, this was before the trial, and
2 I -- Officer Bennett, there was no indication that he would
3 no be available and be a willing participant. We're talking
4 $500, $600 bucks to bring him down here. I think, you know,
5 that at some point in time the economics of it certainly
6 have to come into play and the court has discretion under --
7 to relax the rules under -- since you're -- we're citing the
8 criminal rules.
9    THE COURT: All right.
10    MR. JAMES: I don't think it's an unreasonable request.
11    THE COURT: Because the state objects to Mr. Bennett
12 testifying telephonically, under criminal rule 38.1, which
13 is designed to protect both sides' right to a fair trial,
14 and recognize the importance of the actual presence of
15 witnesses so that the jury can -- can view them and make a
16 credibility determination based not only on what they hear,
17 but what the see, the application for telephonic testimony
18 is denied. And exceptional circumstances, even if I had the
19 authority to relax this particular rule, it's not clear I
20 do, but even if I did the -- I don't have exceptional
21 circumstances warranting that. We'll wait and see what
22 happens with Mr. Gonzales, and Ms. Brady indicated she may
23 -- may agree to that one.
24    MR. JAMES: Okay.
25    THE COURT: Why don't you check on your witness,

                                                    Page 227

1 Ms. Brady, and maybe telephonically and out in the hall?
2 We'll go off record.
3    (Off record)
4    THE COURT: Everybody have a seat, please. And are we
5 back on record, Madam clerk?
6    THE CLERK: We are.
7    THE COURT: We are back on record. We have our jury.
8 Thanks for your patience, folks. Ms. Brady, are you ready
9 with your next witness?
10    MS. BRADY: I am, Your Honor. The state calls Cam
11 Lampman.
12    THE COURT: Stand up, ma'am, and we will swear you in.
13    THE CLERK: Please raise your raise your right hand.
14    (Oath administered)
15    MS. LAMPMAN: I do.
16                      CAM LAMPMAN
17 called as a witness on behalf of the plaintiff, testified as
18 follows on:
19              DIRECT EXAMINATION
20    THE COURT: Please be seated. Ma'am, for the record,
21 will you state your full name, and spell your last? Yes,
22 spell your last.
23 A   My name is Cam Lampman, L-a-m-p-m-a-n.
24    THE CLERK: And how do you spell your first name?
25 A   C-a-m.

                                                    Page 228

1    THE CLERK: Thank you.
2    THE COURT: Go ahead, Ms. Brady.
3 BY MS. BRADY:
4 Q   Who do you work for?
5 A   Alaska DigiTel.
6 Q   And you're here -- are you here as a record's custodian
7      on their behalf?
8 A   Yes, I am.
9 Q   All right. And you were asked to bring some records
10      pertaining to a cell phone used by one of your
11      customers?
12 A   Correct.
13 Q   And are those records that are kept in the usual course
14      of Alaska DigiTel's business?
15 A   Yes.
16 Q   And are they relied on, the kind of records that are
17      relied on by Alaska DigiTel in the course of its
18      business?
19 A   Yes.
20 Q   Were they prepared in anticipation of litigation?
21 A   No.
22 Q   Okay. What's the phone number on the account for the
23      records?
24 A   It is 7 -- 907-727-9465.
25 Q   Okay. And you were asked to bring the subscriber

                                                    Page 229

3AN-01-1717 CR

1   information for that account, is that correct?
2 A   Correct.
3 Q   And could you just please explain to the members of the
4   jury what subscriber information is?
5 A   Subscriber information will be their name, address,
6   social security number, date of birth, and employer, if
7   known.
8 Q   Okay.  And what is the subscriber information that you
9   have for that telephone number?
10 A   We have Robert Davis at 732 Pearl Drive, Anchorage,
11   Alaska, 99518.  And then his social security number,
12   date of birth, and his Alaska driver's license numbers.
13 Q   Okay.  And is the -- now you were also asked to bring
14   the records for the phone that was being used on that
15   account, is that right?
16 A   Correct.
17 Q   And what kind of phone was being used on that account?
18 A   It was a Lucky Goldstar.
19 Q   Okay.  And the serial number is on there?
20 A   Yes, commonly referred to as the ESN.  There's two
21   different formats.  One is a decimal version, one is a
22   hex format.  I think on the phone itself, the hex
23   format was Charlie 9 Delta 01 Bravo 92.
24 Q   Okay.  And that information is on the document in front
25   of you?

Page 230

1 Q   Okay.  Okay.  So anytime then that that phone was --
2   okay, well -- and do you have those records in front of
3   you?
4 A   I do not.  Well, I have my own copy.
5 Q   Well, that's what I meant.
6 A   Yes.
7 Q   Okay.  It's -- is this.....
8 A   Yes.
9 Q   .....multi-page?  All right.  I'm not going to go into
10   a lot of detail.  I just want to get a few items
11   cleared, if I may.  So this would reflect all activity,
12   according to your records on that phone.....
13 A   Correct.
14 Q   .....for the -- for the period that you have supplied?
15 A   Correct.
16   MR. JAMES:  Okay.  All right.  Okay.  Thank you.  Thank
17 you.
18 A   You're welcome.
19   THE COURT:  Redirect, Ms. Brady?
20   MS. BRADY:  I don't have any redirect, Your Honor.
21   THE COURT:  All right.  Thank you.  You can step down.
22 Do you have the marked exhibit?
23 A   It's right here.
24   THE COURT:  Thank you very much.  And I understand we
25 need to take a break before we -- before the next witness,

Page 232

1 A   Yes, it is.
2   MS. BRADY:  Okay.  And at this time, I move to admit
3 that as state's exhibit 14.
4   THE COURT:  Number 14, Mr. James?
5   MR. JAMES:  No objection.
6   THE COURT:  14 is admitted.
7         (Plaintiff's exhibit 14 admitted)
8   MS. BRADY:  That's all the questions I have for this
9 witness.
10   THE COURT:  Mr. James?
11         CAM LAMPMAN
12 testified as follows on:
13         CROSS EXAMINATION
14 BY MR. JAMES:
15 Q   Ms. Cam Lampman?
16 A   Uh-huh.  (Affirmative)
17 Q   You brought a whole packet that shows different, I
18   guess a telephone log, isn't it, would that be a
19   correct statement?
20 A   All records.
21 Q   Yeah.
22 A   Yes.
23 Q   Okay.  Does that reflect oncoming -- incoming and
24   outgoing calls, is that what that was?
25 A   Correct.

Page 231

1 is that correct?
2   MS. BRADY:  That is correct, Your Honor.
3   THE COURT:  I'm going to ask you to take another break,
4 folks.  And again, I appreciate your patience.
5   (Jury excused)
6   MS. BRADY:  He was waiting downstairs, so Detective
7 Johnstone went to go get him, and he's not back yet.
8   THE COURT:  We'll go off record, but everybody can stay
9 in the courtroom, and as soon as he gets back, we will bring
10 Mr. Fish in and make very limited inquiry, and then move
11 back with the jury.
12   MR. JAMES:  Understood.  Thank you.
13   THE COURT:  Deal with while we're waiting for Detective
14 Johnstone to get back with Mr. Fish, Ms. Brady?
15   MS. BRADY:  I don't have any, Your Honor.
16   THE COURT:  Mr. James?
17   MR. JAMES:  I -- I can't think of any right at the
18 moment, Judge.
19   THE COURT:  All right.  Then we'll go off record.
20   (Off record)
21   (Jury not present)
22   THE COURT:  .....record.  Let's do some housekeeping
23 work while we're -- while we have the time to do that.
24 First of all, you all have an agreement regarding exhibit
25 number -- what was the exhibit that was just admitted?

Page 233

1    MS. BRADY: 14.
2    THE COURT: 14, and that is to edit out the fax
3 reference, attention Judge Hensley, is that correct?
4    MR. JAMES: Yes, sir.
5    MS. BRADY: That's correct, Your Honor.
6    THE COURT: All right. So I'll rely on you folks to
7 make the agreeable -- agreed upon edit and then substitute
8 the exhibit, and unless I hear further objection, then --
9 then I'll assume that you've agreed on what it says and it
10 will go to the jury. I had four police reports that were
11 given to me as part of the other evidentiary disputes that
12 we had this morning, why don't we get those marked with
13 exhibit stickers, and since they won't be admitted into
14 evidence, let's use some numbers that aren't likely to.....
15    MS. BRADY: Why don't.....
16    THE COURT: .....foul up somebody's.....
17    MS. BRADY: Why don't we use EH1, 2, 3, like -- and so
18 on?
19    THE COURT: EH?
20    MS. BRADY: Yeah.
21    THE COURT: That's fine with me.
22    MR. JAMES: What's EH stand for?
23    THE COURT: Evidentiary hearing.
24    MR. JAMES: Oh, evidentiary hearing.....
25    MS. BRADY: Yeah.....

Page 234

1    MS. BRADY: I'm going to go downstairs and see if I can
2 find out what's going on.
3    THE COURT: I'd appreciate that. Thanks.
4    (Off record)
5    THE CLERK: On record.
6    THE COURT: We're on record. We have parties, counsel,
7 our jury is not here, and I'm assuming that you are Jeremy
8 Fish in the witness box, is that right?
9    MR. FISH: Yes, sir.
10    THE COURT: All right. Now, if you will stand up, sir,
11 Ms. McKewin is going to swear you in, and I'm going to give
12 the lawyers an opportunity to ask you a few questions before
13 we continue with the trial.
14    THE CLERK: Please raise your right hand.
15    (Oath administered)
16    MR. FISH: Yes, I do.
17                JEREMY FISH
18 called as a witness on behalf of the plaintiff, testified as
19 follows on:
20                VOIR DIRE EXAMINATION
21    THE CLERK: Please be seated. Sir, for the record,
22 will you state your full name and spell your last?
23 A  Jeremy Joel Fish, F-i-s-h.
24    THE CLERK: Thank you.
25    THE COURT: That's a pretty hot mike. You don't have

Page 236

1    THE COURT: Although I have some of them marked with --
2 otherwise, but we'll go ahead and do that. And so we'll
3 mark the 9/29 report EH1.
4    THE CLERK: Here you go. Why don't you just go ahead
5 and do it (indiscernible).....
6    THE COURT: Actually, let me -- yeah, it doesn't -- I
7 guess that doesn't have to be chronological. We'll mark the
8 3/29 report EH2. We'll mark the 7/26 report EH3. We'll
9 make, although I didn't use it again today, the report
10 involving Redwine auto case, which is July 3rd as EH4. Get
11 some more, Ms. Brady.
12    MS. BRADY: Okay.
13    THE COURT: We will remark exhibits which were marked
14 yesterday, the Mumford burglary April 4 will be remarked as
15 EH5.
16    THE CLERK: What was it previously marked?
17    THE COURT: Previously marked as exhibit C. The June,
18 2001 vehicle theft, previously marked as 22, we will remark
19 as EH6. And the previously marked exhibit B, which is the
20 car stereo, 7/13, July 13, 01, will be remarked as exhibit
21 -- evidentiary hearing 7, EH7. So that gets all of those in
22 the record for whoever else wants to look at them later.
23 And it will give us a record to refer to if we need to later
24 in the trial. And we can go off record now and wait for
25 Mr. Fish.

Page 235

1 to lean into it.
2 A  Sorry about that.
3    THE COURT: It will pick you up, as long as you're
4 reasonably close. Mr. James?
5 BY MR. JAMES:
6 Q  Thank you, Mr. Fish. Just for clarification, do you --
7    well, are you under -- have you used any drugs in the
8    last 24 hours?
9 A  Yes, I have.
10 Q  What have used?
11 A  Marijuana.
12 Q  When is the last time you used it?
13 A  Probably yesterday.
14 Q  When?
15 A  Evening time, probably about 7:00 o'clock.
16 Q  Okay. How about when is the last time you used
17    cocaine?
18 A  I don't know, a while. It's been a long time.
19 Q  Like what?
20 A  About -- I don't know, like eight months.
21 Q  All right. Now, you're under oath, and is there
22    anything about your use of drugs that you feel may
23    cloud your memory at this time?
24 A  No, I do not.
25 Q  What we're talking about here, what we're going to be

Page 237

1  talking about is subsequent police contacts after
2  March 1 of 2000. Okay? Okay. Now, you apparently
3  pawned a -- some type of stereo system?
4  A  Sega Saturn.
5  Q  Pardon, please?
6  THE COURT: All right. Just a second, Mr. Fish, before
7  we get into these subjects, and -- I'm going to tell you
8  that although you're not under arrest or you're not.....
9  A  Right.
10  THE COURT: .....you are subpoenaed here by the
11  district attorney's office, I assume. Some of the questions
12  may relate to some potential liability. I don't really
13  know, because I'm not in charge of investigating and
14  prosecuting crimes. But some of the questions may relate to
15  outstanding crimes, and you have a right not to answer the
16  questions. You have a right to ask for an attorney before
17  you answer the questions, to consult with an attorney before
18  you answer the questions, and most importantly, if you
19  answer the questions, you're on tape here and everything is
20  being recorded, and your answers may be used against you
21  later on if -- if some of these police investigations turn
22  out to -- to pursue you. So you need to know that. You're
23  not -- nobody is going to force you to answer the questions
24  that we're talking about now in front of the jury. And so I
25  want to make sure that you understand that and ask if you --
Page 238

1 if you're willing to answer the questions?
2 A  Yeah, I'm willing to answer them.
3  THE COURT: All right.
4 Q  Okay. With those admonitions, Mr. Fish, now you
5  indicated that -- when I was talking about a pawning of
6  a stereo, you indicated it was a Sega?
7 A  Yeah, that's the only thing I pawned.
8 Q  Okay. What -- what did you pawn?
9 A  It was a Play Station.
10 Q  Play Station?
11 A  Yes. It was something like that.
12 Q  Okay. Where did that come from?
13 A  It came from Liz Redwine.
14 Q  Okay. How did you get it?
15  THE COURT: Mr. James, the question isn't.....
16  MR. JAMES: All right.
17  THE COURT: The.....
18  MR. JAMES: All right.
19  THE COURT: The area of inquiry isn't -- isn't what
20 happened, it's this witness' knowledge. Now, there are more
21 than one way to get there, but -- but for purposes of this
22 trial, I want you to focus on the knowledge of potential
23 repercussions and not whether a particular crime was
24 committed.
25 Q  Did you have -- did the police contact you regarding
Page 239

1  that?
2 A  No, they have not.
3 Q  All right.
4 A  I contacted them. I contacted Officer Triplett and
5  told him to the best of my knowledge everything that
6  was behind that. That's -- I never heard anything back
7  on it.
8 Q  All right. Now, to your knowledge, was that stolen
9  from Liz Redblood [sic]?
10 A  Not to my knowledge, or I wouldn't have pawned it.
11 Q  All right.
12  THE COURT: What's the date on this one, Mr.....
13  MR. JAMES: This is the -- this is the 4/14, it's.....
14  THE COURT: 4/10?
15  MR. JAMES: 4/10, right.
16  THE COURT: Okay. Ms. Brady's position was that if the
17 witness had any idea that the police were interested in the
18 case, the evidence was admissible.
19  MR. JAMES: Right.
20  THE COURT: Is that still your position, Ms. Brady?
21  MS. BRADY: Yeah, Your Honor.
22  THE COURT: Then the evidence, based on this testimony,
23 you can go into that subject at trial.
24  MR. JAMES: Okay. Thank you.
25 Q  Moving along here, calling your attention to the
Page 240

1  forgery involving a Colleen Hensley, where you received
2  two checks were written out to you, one for $275 and
3  one for $250?
4 A  It wasn't involving me.
5 Q  Did you receive those checks?
6 A  No, I did no.
7 Q  You didn't cash a check for.....
8 A  No, I did not.
9 Q  Let me finish the question, if I may.
10 A  Sorry.
11  THE COURT: Mr. -- Mr. James, the issue isn't guilt or
12 innocence, it's knowledge of repercussions.
13  MR. JAMES: All right.
14 Q  No, there is no -- there is no police investigation
15  involving you involving these checks?
16 A  No. No.
17 Q  All right. Did a Mr. James Cage from MBA/Wells Fargo
18  contact you?
19 A  No.
20 Q  Just a moment, sir. On 9/29, were you contacted by the
21  police regarding a banishment of a weapon, gun?
22  MS. BRADY: I all ready agreed that could come in.
23  MS. BRADY: Okay.
24  MS. BRADY: The only one's that left is the 9/2 threat.
25  MR. JAMES: Threat, right.
Page 241

1 Q  Mr. Fish, on 9/2, that's September 2nd, were you
2     contacted, or are you aware of a police investigation
3     involving a threat involving a Mr. -- I believe it's
4     Milky (ph)?
5 A  No.
6 Q  You was going to burn down his -- were you going to
7     burn down his house?
8 A  No, I wasn't.
9 Q  All right.
10    (Whispered conversation)
11    MR. JAMES:  Well, I guess we've covered the ground
12 then, Judge that.....
13    THE COURT:  I can't hear you.
14    MR. JAMES:  I'm sorry.
15    (Whispered conversation)
16    MR. JAMES:  We've covered that, the forgery and the
17 threat.  Those are in all ready.  Do we have those -- oh,
18 you've got the list up there, Judge?
19    THE COURT:  Would you like them?
20    MR. JAMES:  Yeah, great.
21    THE COURT:  I have the -- the reports.  Right.  That's
22 fine.  I'm missing one page here, or something.
23    (Pause)
24    (Whispered conversation)
25    MR. JAMES:  So we've got -- marijuana is in.  I'm just

Page 242

1     THE COURT:  All right.  Mr. Fish, just keep your seat.
2 We're going to go get the jury.
3 A  Okay.
4     THE COURT:  When the jury comes in, you can -- we all
5 stand up when they come in.
6 A  All right.
7     (Jury summoned)
8     MS. BRADY:  You listened to all the tapes, right?  So
9 if I say to you, this tape is the tape that you have that's
10 marked 2/28, do you know what's on this tape, what would you
11 say?
12 A  No.
13    MS. BRADY:  It's a copy of what -- the tape that was
14 given to you.....
15 A  I mean, I know -- I don't know them in order.
16    MS. BRADY:  Okay.
17 A  I don't know what's on the 28th.  But I know if you
18    start -- start it, I can finish it.
19    MS. BRADY:  Okay.
20    (Pause)
21    THE COURT:  Have a seat, everybody.  We are back on
22 record.  We have all the jurors back.  Thanks again for your
23 patience, everybody.  We have another witness in the witness
24 box.  Sir, if you would stand up, we will swear you in.
25    THE CLERK:  Please raise your right hand.

Page 244

1 -- banishing, that's in.  The -- alluding, that's in, coke
2 is in.  These are -- I think we've covered all the issues.
3 I just wanted to make sure that we're covering the ones
4 that.....
5     THE COURT:  Do you want to ask any questions,
6 Ms. Brady?
7     MR. JAMES:  Here's the.....
8     MS. BRADY:  Of this witness, no, Your Honor.  But I do
9 want to clarify for purposes of the protective order, the
10 relevant line of inquiry with regard to these acts is only
11 witness bias.  It's what he thinks may or may not happen as
12 a result.  I mean, I think limited inquiry into the facts is
13 appropriate, but not.....
14    THE COURT:  Well, what may happen as a result may in
15 part turn on how serious the events are, and so it's kind of
16 hard to put parentheses around it, or narrow it down.  But
17 if.....
18    MS. BRADY:  Okay.
19    THE COURT:  .....it gets cumulative, or if the
20 questioning gets in -- begins to the point where we're
21 talking about more propensity than bias, I'll hear --
22 entertain objections.
23    MS. BRADY:  Okay.  And I'm ready to go.
24    THE COURT:  All right.  Are you ready to go, Mr. James?
25    MR. JAMES:  Yes, sir.

Page 243

1     (Oath administered)
2     MR. FISH:  Yes, I do.
3                 JEREMY FISH
4 called as a witness on behalf of the plaintiff, testified as
5 follows on:
6              DIRECT EXAMINATION
7     THE CLERK:  Please be seated.  For the record, sir,
8 will you state your full name, and spell your last?
9 A  Jeremy Joel Fish, F-i-s-h.
10    THE CLERK:  Thank you.
11    THE COURT:  Go ahead, Ms. Brady.
12 BY MS. BRADY:
13 Q  How old are you, Mr. Fish?
14 A  I just turned 19.
15 Q  All right.  And how far did you go in school?
16 A  Probably about tenth grade, ninth grade.
17 Q  Have drugs affected your life?
18 A  Yeah.
19 Q  How?
20 A  They've always been a part of it.
21 Q  Did your parents use drugs?
22 A  Yeah.
23 Q  And so you've been aware of the drug community since
24    you were very young?
25 A  Yeah.

Page 245

1 Q   When you were a juvenile, did you get into criminal
2     trouble?
3 A   Yeah.
4 Q   Were you adjudicated two times as a juvenile of crimes
5     involving dishonesty?
6 A   Yes, I was.
7 Q   Okay. And did there -- was there a time when you --
8     have you always lived in Anchorage?
9 A   Yeah.
10 Q  Okay. Did there come a time when you moved away from
11    Anchorage?
12 A  Yeah.
13 Q  Where did you move to?
14 A  Nome, Alaska.
15 Q  What did you do in Nome?
16 A  I worked.
17 Q  How long were you there for?
18 A  Probably about four and a half months.
19 Q  Okay. And you got in trouble in Nome as well, isn't
20    that right?
21 A  Yes, I did.
22 Q  Okay. Why don't you just explain to the jurors what
23    you were doing on January 25th of this year, 2001, at
24    the AC apartments?
25 A  I was -- I was under the influence of alcohol and we

Page 246

1     were just -- I was with a couple of other people, and
2     there really -- we were just walking around and
3     knocking on doors and I opened this one door, I opened
4     the door and there was some money laying on a table,
5     $7, I took $7 and I walked out.
6 Q   Okay. Now, as a result of that, Nome police officers
7     came and contacted you, right?
8 A   Yes, they did.
9 Q   Okay. And what happened when the Nome police officers
10    came and talked to you?
11 A  He came and talked to me, and he told me that the
12    people I was with already told them it was me. And so
13    he asked me, you know, what did I want to do about it.
14    And I -- I told him that I wanted to make grievance, I
15    wanted to go back and tell the lady I'm sorry and give
16    her back her seven bucks. It was -- it was stupid of
17    me. And he told me that -- that, you know, I couldn't
18    go back over there and talk to the lady, and we would
19    have to try to work something out. And he thought I
20    knew somebody who sold dope, which is coke or
21    something, in Nome, and I didn't. That's why I moved
22    away from Anchorage, to get away from all this. And so
23    I told him that I -- I did know somebody, and then I
24    just came back here.
25 Q  You left in the middle of the night?

Page 247

1 A   Yeah.
2 Q   Okay. Now, let me stop you for just a second. When
3     you were talking to the Nome police officer, did he
4     tell you what you could be charged with as a result of
5     what you had done?
6 A   I can't remember.
7 Q   Burglary in the first degree?
8 A   Right. Burglary.
9 Q   Okay. And when you got here, did you get arrested?
10 A  No, I did not.
11 Q  Okay. How did it come to pass that you ended up being
12    in contact with APD?
13 A  Well, I have a girlfriend and a baby, and they told me
14    -- you know, they got a hold of my girlfriend because
15    my girlfriend's dad is a major, he's a trooper. And
16    they told him that -- they told me that if I didn't
17    turn myself in, that they were going to arrest my
18    girlfriend for being an accomplice with me and put my
19    daughter in DFYS. So I turned myself in.
20 Q  Okay. And when you turned yourself in, did you tell
21    anybody that you could -- that you wanted to work on a
22    deal?
23 A  Well, in Nome, the guy told me that -- what they wanted
24    to see was a drug bust in Nome. And I didn't know
25    nobody in Nome who dealt with dope. So I came to where

Page 248

1     I knew somebody who dealt with dope. And I offered to
2     give -- give up some people who sold dope, if I could
3     just go on with my life.
4 Q   Did you come -- did you reach an agreement where your
5     Nome burglary case would be dismissed.....
6 A   Right. Yes.
7 Q   .....in exchange for making buys here in Anchorage?
8 A   Yes.
9 Q   Okay. And was that agreement written down anywhere
10    or.....
11 A  No. It was just a -- it was like a talk, you know.
12 Q  Who was the person that you talked with?
13 A  I think it was -- like I can't remember, but it was
14    police departments.
15 Q  And APD officer?
16 A  Yeah. They were special investigators, I believe.
17 Q  Was it a many or a woman?
18 A  It was a woman. The first person I talked to was a
19    woman.
20 Q  Okay. And was that Detective Pernue, Pam Pernue?
21 A  Yes.
22 Q  Okay. Now, was Mr. Davis one of the people that you
23    said that you could make buys from?
24 A  Yes, it was.
25 Q  Okay. And when you first started -- when you told the

Page 249

1 officers that you could make buys, did you tell them
2 that you could buy.....
3 MR. JAMES: I'm going to object. She's leading him all
4 over the place.
5 THE COURT: You -- I'll sustain leading objections. I
6 don't know if the next question was leading or not.
7 MS. BRADY: Okay.
8 Q Did you know what -- his name was Robert Davis, or did
9 you know him as something else?
10 A I knew him as Rico.
11 Q Okay. And did you know him by any other name, other
12 than Rico, when you said that you could make buys?
13 A No, I did not.
14 Q Okay. And has your Nome case now been dismissed?
15 A I don't know.
16 Q Okay. Now, were you supposed to be making buys from
17 anybody besides him?
18 MR. JAMES: Objection. Relevance.
19 THE COURT: Overruled.
20 A Yeah.
21 Q Okay. And, in fact, did you make buys from anyone
22 besides him?
23 A Yeah.
24 Q Okay. Now, what happened when you first got to APD,
25 the very first time you went there to make -- make your

Page 250

1 A February 8th, yes.
2 Q Okay. And where did you meet with him at?
3 A On February 8th?
4 Q Uh-huh. (Affirmative)
5 A At the police station.
6 Q And what happened when you got to the police station?
7 A I think I was -- I was searched and I can't remember.
8 Q Did they ask you to call Rico.....
9 A Yeah.
10 Q .....the person you knew as Rico?
11 A Yeah.....
12 MR. JAMES: Leading.
13 THE COURT: Sustained.
14 A We did make phone calls.
15 Q You made phone calls?
16 A Yes.
17 Q Who did you make a phone call to?
18 A To Rico.
19 Q Okay. Did you know his number right off the top of his
20 -- right off your.....
21 A Yeah.
22 MR. JAMES: Objection. Leading.
23 THE COURT: That was not leading. The objection is
24 overruled.
25 A Yes, I did.

Page 252

1 deal?
2 A The very first time I went there?
3 Q Uh-huh. (Affirmative)
4 A Well, the very first time I went there and talked, they
5 searched me and stuff. And when they searched me, they
6 searched my car and they found some pot. I -- I was
7 you know, they found some pot and they found a marijuana
8 pipe. And the told me, don't bring it back to the
9 station or, you know, they'll discontinue working with
10 me, so.....
11 Q Okay. Did they talk to you about who you could make
12 buys from?
13 A Yeah. I said Rico.
14 Q Okay.
15 A I don't know.
16 Q Then did they tell you a time to come back after that?
17 A I -- I can't remember. It was a while ago.
18 Q Okay.
19 A But it was -- it was definitely we were going to, you
20 know, be on a weekly basis.
21 Q Okay. Did you -- let me direct your attention to
22 February 8th, which would be a day that's important to
23 this case. So just -- I want you to concentrate on
24 this particular case. Did you meet with Officer
25 Johnstone that day? Oh, he just left.

Page 251

1 Q Okay. What was the number?
2 A 727-9465.
3 Q Okay. Now, did you make an arrangement to go buy some
4 cocaine from Mr. Davis?
5 A Yes, I did.
6 Q Okay. And how much cocaine were you going to buy?
7 A I believe the first time it was $150 worth.
8 Q Did you ask for $150.....
9 A No, I -- I asked for a ball, but he said he didn't have
10 it. I believe he said he didn't have it. And he said
11 he had a buck 50 he could do something with or
12 something.
13 Q Okay. Now in -- when you were asking him for a ball,
14 what you were asking him for?
15 A I was asking him for coke or crack.
16 Q And was there a specific amount? Is a ball an amount?
17 A Well, usually a ball is like 3.2 to 2.9, I don't know.
18 Q 3.2 to 2.9.....
19 A Yeah. Like.....
20 Q .....what?
21 A Grams.
22 Q Okay. And he -- and then when you said, he said a buck
23 50, what does that mean?
24 A $150.
25 Q Okay. So was it arranged for you to meet him somewhere

Page 253

1  to buy cocaine?
2 A  Yes.
3 Q  Where was -- where was the arrangement made for?
4 A  At his old house.
5 Q  Okay.  And what happened once he agreed to meet with
6     you?
7 A  I just -- then we -- I don't think -- well, the first
8     -- the first time, we just -- they all followed me over
9     there, we went there, and I went inside.  And I bought
10    the dope and.....
11 Q  Okay.  I'm still back at the police station though.  I
12    want to know, you hang up the phone, and you say okay,
13    we're going to meet.....
14 A  Okay.  I hang up the phone, then I think it was Officer
15    LaPorte went and got the money to go -- or somebody
16    went to go get the money, and he was hooking me up with
17    a wire.
18 Q  Okay.  The first time.....
19 A  The first -- first time, there wasn't a wire.  It was
20    just -- there wasn't a wire.  It was just a buy.
21 Q  Were you searched?
22 A  Yes, I was.
23 Q  Can you explain to the members of the jury how that
24    search is done?
25 A  Yeah.  There's -- he tells me to take off all my

                                           Page 254

1     clothes.  I take off all clothes, including my shoes,
2     my socks, my underwear.  They go through my socks.
3     They go through my shoes.  They go through my pant
4     pockets.  They, you know, make me bend over, like bend
5     down.  And then I get back up, and if I'm clean, I put
6     all my clothes back on.
7 Q  Was your car searched also?
8 A  Yeah.
9 Q  Okay.  And did you know ahead of time that both you and
10    your car were going to be searched?
11 A  Yeah.
12 Q  Okay.  And you were given money?
13 A  Right.
14 Q  How much money were you given?
15 A  $150.
16 Q  Okay.  And then when you -- when you left the police
17    station, were you driving?
18 A  Yes, I was.
19 Q  What car were you driving?
20 A  A 1986 Plymouth -- Plymouth Reliant.
21 Q  Is that your car?
22 A  Yes.
23 Q  All right.  And did you know where Mr. Davis lived?
24 A  Yes, I did.
25 Q  Where was that at?

                                           Page 255

1 A  Off of Muldoon on Grand Larry.
2 Q  Okay.  And how did you get there?
3 A  I drove there.
4 Q  Which route did you take?
5 A  I take -- take Tudor to -- go to -- go down Tudor until
6     it hits like Totem Theater, Totem -- where Tudor turns
7     into Muldoon.  Right?  I believe it's Tudor that turns
8     into Muldoon.  You go all the way down Tudor, wraps
9     around, and you just go all the way down the Muldoon
10    Road, all the way down, by Ramada Inn and then turn.
11 Q  Okay.  And what happened once you got to Mr. Davis'
12    house?
13 A  When I got there, I went in and bought some dope.
14 Q  Okay.  Where -- I want you to just tell the members of
15    the jury what you're seeing.  Where did he get the
16    cocaine from?
17 A  He usually.....
18    MR. JAMES:  Objection.  There's no indication of
19 cocaine.
20 A  Like every time that I went.....
21    THE COURT:  The objection is overruled.
22 A  Sorry.
23    THE COURT:  Go ahead.
24 A  Go ahead.
25    THE COURT:  The question, please.

                                           Page 256

1 A  Okay.  When you -- every -- every time I walked in
2     house, you walk in house, and there's like -- there's
3     -- there's like a bar table where there should be seats
4     wrapped around.  And then there -- if you turn around,
5     if you look straight, he's looking at me, there's a
6     barstool and then there's like a drawer right here.
7     But then usually his dope would be up in his cabinet
8     right above his stove.  You open his cabinet and it's
9     usually right there.  It's a bag.  Usually, probably a
10    half once to an ounce at a time.  And just pulled it
11    out of his cabinet, a little black scale.  Put a piece
12    of paper down, usually you put a piece of a paper down,
13    like a little piece of paper, and just start pouring
14    dope on there until it measured up.  And he put it in a
15    bag for me, and be it.
16 Q  How long were you inside Mr. Davis' house that day?
17 A  Probably 10 minutes.
18 Q  Okay.  And what happened when you left the apartment?
19 A  I left the apartment and then I pulled out.  And I went
20    behind a church, I believe, that was the first time.
21    We went behind a church and I gave him the dope.
22 Q  You gave who the dope?
23 A  I gave Officer Johnstone.
24 Q  Okay.  Now, when you said the dope, are you talking
25    about.....

                                           Page 257

| | |
|---|---|
| 1 A  Coke. | 1 A  Yeah. |
| 2 Q  Okay. Now, did you -- and you gave it Officer | 2 Q  .....would you be able to recognize it? |
| 3    Johnstone at the church, is that..... | 3 A  Yes, I would. |
| 4 A  Yeah. | 4    THE COURT:  Exhibit number? |
| 5 Q  And then what happened -- where did you go after that? | 5    MS. BRADY:  Let me just -- this is exhibit number 5, |
| 6 A  Then we went back to the -- to the station. And I was | 6    Your Honor. |
| 7    searched. And the car was searched. And then we | 7    THE COURT:  Thank you. |
| 8    scheduled the next appointment, when I would come and | 8 10:3631 |
| 9    see him. | 9    (Audio tape played for jury) |
| 10 Q  Did they interview you? | 10 10:3644 |
| 11 A  Yeah, I got a debrief. | 11 Q  Do you remember this tape now? |
| 12 Q  Did they tape record that? | 12 A  Not really. You've got to..... |
| 13 A  Yes, they did. | 13 Q  Not yet? |
| 14 Q  All right. And did you know that both you and your car | 14 A  No. |
| 15    were going to be searched again once you left? | 15 Q  You listened to this tape though, right? |
| 16 A  Yeah. That was just a mandatory thing, routine. | 16 A  Yeah. |
| 17 Q  Now, did you get the amount of cocaine that you were | 17 Q  Okay. |
| 18    expecting to get? | 18 A  Yeah, I remember it. I remember now. |
| 19 A  Well, the first time, it -- it was kind of shallow. I | 19 Q  You remember it now? |
| 20    mean, it wasn't as much as he usually gives me. But | 20 A  Yeah. |
| 21    that first time was the -- that was just the first | 21 Q  Okay. Is the -- is the recording that's contained on |
| 22    time, because that was the first time I had bought dope | 22    this tape a true and accurate representation of the |
| 23    off him in a while, because I had just got back from | 23    conversations that you had by calling Mr. Davis? |
| 24    Nome. And he said $150, and that's just what he gave | 24 A  Yes. |
| 25    me for what he got. | 25    MS. BRADY:  Okay. At this time, I would move for |
| Page 258 | Page 260 |

| | |
|---|---|
| 1 Q  Okay. What did -- when -- when you got back and you | 1 admission of this portion. I'm going to play it, Your |
| 2    were talking to the officers, what did you do after | 2 Honor. |
| 3    talking to the officer? | 3    THE COURT:  Number 5, Mr. James? |
| 4 A  I called Rico back and told him it was a little shy, | 4    MR. JAMES:  I'd like to -- I'm going to object, because |
| 5    and he agreed, and said he would make it up to me next | 5 given the testimony..... |
| 6    time. | 6    THE COURT:  We'll have a bench conference. |
| 7 Q  Did you call the same number? | 7    MR. JAMES:  Yes. |
| 8 A  Yes. | 8    THE COURT:  Hold on a second, please. |
| 9 Q  Okay. And -- now, did you meet with Officer LaPorte on | 9    (Bench conference as follows:) |
| 10    February 13th? | 10    THE COURT:  The objection is? |
| 11 A  Yes, I did. | 11    MR. JAMES:  Okay. I'm going to object to it on the |
| 12 Q  And did you make an calls that day? | 12 foundation. Fish is bouncing around here saying well, he |
| 13 A  I can't really remember. | 13 didn't remember, now, he says he does remember. I seriously |
| 14 Q  Okay. Do you remember when you met with Officer | 14 question whether he's listened to that tape, and if it is a |
| 15    LaPorte if your conversations were being recorded? | 15 true and accurate representation of what transpired of |
| 16 A  The ones that I made to -- to Rico? | 16 another tape. So I'm -- it's on the foundation is what I'm |
| 17 Q  The conversation that you had with Officer LaPorte. | 17 objecting to. |
| 18 A  Yeah. | 18    THE COURT:  Well, there -- there's a sufficient |
| 19 Q  Okay. Now you listened to some tapes with regard to | 19 threshold foundation for admission based on his testimony |
| 20    this case. If I tell you that I have a tape right here | 20 that he remembered, that it is the tape that he listened to |
| 21    that is an identical copy of the tape that you received | 21 the other day. I mean, you can always challenge his |
| 22    that said 2/13 on it, would you know what's on this | 22 credibility, but that's the -- finally, a jury decision. |
| 23    tape? | 23 You made two objections though. The first one is overruled. |
| 24 A  Not right offhand. | 24 The second one is whether you seriously doubt whether the |
| 25 Q  Okay. If I play small portion of it..... | 25 copy is a true and accurate copy, and that's really |
| Page 259 | Page 261 |

1 challenging Ms. Brady as to whether she copied the tape, the
2 same tape that Mr. Fish listened to.
3    MR. JAMES: Well, I don't know that he listened to that
4 tape that she intends to introduce. He does say he's -- he
5 had a tape, but I -- that tape there, I don't -- he has
6 never said that issue, that I listened to that tape.
7    THE COURT: Ms. Brady?
8    MS. BRADY: What I -- the question I asked him was if
9 he had received a copy of a tape that was marked February
10 13th, and if I represented to him that that was an exact
11 duplicate of that tape, would he know what was on there, and
12 he answered yes.
13    MR. JAMES: Okay. Well.....
14    THE COURT: So what's the objection?
15    MR. JAMES: The objection is is the tape that he is
16 listening -- the representations of Ms. Brady are not the
17 testimony of Mr. Fish.
18    THE COURT: So you're challenging Ms. Brady's -- you're
19 not willing to accept Ms. Brady's representations?
20    MR. JAMES: That's correct, at this time.
21    THE COURT: All right. Then we'll excuse the jury, and
22 we'll let Mr. Fish listen to the entire tape, and we'll do
23 that with everyone.
24    MR. JAMES: Okay. And I think that's probably to save
25 time, Judge.

Page 262

1 minutes for this tape. There are total of four tapes. The
2 rest of them are not as long as this.
3    THE COURT: All right.
4    MS. BRADY: And maybe we should just let them.....
5    THE COURT: Do you want to play them all?
6    MS. BRADY: I -- my preference would be to play them
7 all now, if that's the objection, that I've altered them,
8 and we'll see whether or not Mr. James agrees they're not
9 altered, and then we'll play them for the jury.
10    THE COURT: All right. How long are the tapes?
11    MS. BRADY: They're probably five minute -- they're
12 between five and eight minutes a piece, the reminders.
13    THE COURT: Can you tailor your questioning to this
14 tape?
15    MS. BRADY: It is tailored to this tape. We can stop
16 after this tape. It's.....
17    THE COURT: Can you tailor your -- the next bit of
18 questioning to this tape.....
19    MS. BRADY: I sure can.
20    THE COURT: .....so that we can then use non-jury time
21 to listen to the rest of the tapes?
22    MS. BRADY: Sure.
23    THE COURT: To have Mr. Fish listen to the rest of the
24 tapes?
25 A   I know the rest of them.

Page 264

1    THE COURT: No, that doesn't save time, Mr. James, but
2 that's what we'll do.
3    MR. JAMES: All right.
4    (End of bench conference)
5    THE COURT: All right, folks. I have to excuse you.
6 It will be 10 or 15 minutes, I think, so -- and I again
7 thank you for your patience.
8    (Jury excused)
9    THE COURT: All right. Ms. Brady, do you want to play
10 -- we'll stay on record. We'll play exhibit number 5 for
11 Mr. Fish and then we will bring the jury back in and you can
12 follow up with your questioning.
13 10:4035
14    (Audio tape played for court)
15 10:4911
16    THE COURT: All right. I told the jury it was going to
17 take about 10 minutes, because I thought we were going to
18 listen to the phone conversations as the tape as well.
19 Ms. Brady?
20    MS. BRADY: What I thought I would do, Your Honor,
21 since I'm going to be using this tape for several things,
22 rather than have the jury come in and out and in and out, if
23 the objection is that I have altered the tape in some way,
24 let's play the tape, let him listen to it, and then we won't
25 have them coming in and out. This is maybe three more

Page 263

1    THE COURT: Well, that is -- you have to stay out of
2 this, Mr. Fish.
3 A   I'm sorry.
4    MS. BRADY: Okay. Sure.
5    THE COURT: Can you do that?
6    MS. BRADY: Yeah.
7    THE COURT: All right. Then finish this tape.
8    MS. BRADY: Okay.
9 10:5035
10    (Audiotape played)
11 10:5522
12    THE COURT: Let's bring the jury back in.
13    (Jury summoned)
14    THE COURT: All right. Everybody have a seat, please.
15 Are we back on record, Ms. McKewin? Thanks again for your
16 patience, folks. Ms. Brady, your next question?
17    DIRECT EXAMINATION CONTINUED
18 BY MS. BRADY:
19 Q   Mr. Fish, you've listened to this tape, right?
20 A   Yes.
21 Q   Is this tape a true and accurate representation of the
22    phone calls that you made on February 13th, February
23    15th and February 20th?
24 A   Yes.
25 Q   Does it include a copy of the wire that was done on the

Page 265

1    February 20th buy?
2 A  Yes.
3    MS. BRADY:  At this time, I move to admit state's
4 exhibit 5, Your Honor.
5    THE COURT:  Exhibit number 5?
6    MR. JAMES:  No objection.
7    THE COURT:  Number 5 is admitted.
8             (Plaintiff's exhibit 5 admitted)
9 Q  Okay.  We're going to deal with this in portions, so
10   let's just play a portion of it.
11   10:5712
12   (Audio tape played for jury)
13   10:5958
14   MS. BRADY:  Okay.  I'm going to stop it right there.
15 Q  All right.  I'm going to ask you some questions about
16   that portion of the tape.  Now, whose voice is that
17   that -- one of the voices is yours obviously.  Who's
18   the other voice?
19 A  Rico.
20 Q  And who is Rico?
21 A  That guy right there, Robert Davis the III.
22   MS. BRADY:  Let the record reflect that the defendant
23   -- I mean the witness had identified the defendant.
24 Q  Now, what did Mr. Davis mean when he said it was no
25   good on that end?

Page 266

1 A  He had no dope, had none for sale.
2 Q  Who is Athena?
3 A  That's -- that's my baby's mother.
4 Q  Does she know Mr. Davis?
5 A  Yeah.
6 Q  What did he mean when he said put you on child support?
7 A  Well, it's like Athena -- it's like it's either mine,
8    or it's a Josh's, or it's some guy named Ryan.  So --
9    and we haven't had a paternity test or nothing yet.  So
10   we don't know for sure whose it is.
11 Q  When you say it, you're talking about Athena's child?
12 A  Yeah.
13 Q  That you might be the father of?
14 A  Right.
15 Q  Okay.  And Mr. Davis knows you well enough to know
16   about all of this stuff?
17 A  He knows Athena well enough to know about all this
18   stuff.
19 Q  Okay.  And let's go ahead and we'll move on to February
20   12th.  You -- is the conversation contained on that
21   tape a true and accurate representation of a
22   conversation that you had with the defendant on that
23   day?
24 A  Yes.
25   MS. BRADY:  Okay.  I'm going to go ahead and play that

Page 267

1    portion.
2    11:01:45
3    (Audio tape played for jury)
4    11:03:57
5    MS. BRADY:  I'll just stand here and hold the
6    microphone next to it.
7    11:04:09
8    (Audio tape played for jury)
9    11:05:12
10 Q  I'll just ask you some questions about that portion of
11   the tape now.  What was going on during that phone
12   call?
13 A  What do you -- I don't know.
14 Q  Okay.  Let me ask you a more specific question.  When
15   he says that he's at his shop, what's he talking about?
16 A  He's at work.
17 Q  And where does he work?
18 A  He's a mechanic, fixes cars.
19 Q  All right.  And when you asked for two balls, what are
20   you talking about?
21 A  I'm talking about coke.  I'm talking about like 3.0
22   each.
23 Q  Okay.  And when -- now you guys had a little
24   negotiation there, what was going on during that
25   negotiation?

Page 268

1 A  I asked him how much a ball cost and he said two.  I
2    asked him how much should I bring.  He said how much --
3    I asked him how much it was going to be for a ball, and
4    he said $200 and then he said $225.  And I said -- I
5    said I got $200.
6 Q  Is that a lot, $225?
7 A  $225, yeah.
8 Q  Okay.  And then did that cancelled, that buy that you
9    set up with him?
10 A  Yeah.
11 Q  Do you know why it got cancelled?
12 A  Right.  Because there was something else going on with
13   the officers I was working with.  So they postponed it
14   and they went along with what they had planned or
15   something.
16 Q  Did you call him back then?
17 A  Yes, I did.
18 Q  And what happened when you called him back?
19 A  I just told him that we got to reschedule it.  That --
20   when I -- when I called him back, I didn't get his -- I
21   didn't get him.  I got his voice mail.  So I left a
22   message saying that I -- that I wasn't going to do
23   nothing tonight, and that I was taking the weekend off
24   and that I would see him like on Monday or something.
25 Q  Okay.  And that was tape recorded?

Page 269

1  A  Right.
2  Q  And is that on that tape?
3  A  Yeah.
4  Q  Okay.
5  11:0705
6     (Audiotape played for jury)
7  11:0756
8  Q  Okay.  Now did you meet with Officer LaPorte again on
9     February 20th?
10 A  Yeah.
11 Q  Okay.  And was that -- did you make a telephone call to
12    Mr. Davis?
13 A  Yes, I did.
14 Q  Was that call recorded?
15 A  Yes, it was.
16 Q  Is that recording contained on this tape?
17 A  Yes, it is.
18    MS. BRADY:  Okay.  I'm going to publish that to the
19 jury.
20 11:0811
21    (Audio tape played for jury)
22 11:1009
23 Q  All right.  Now, when he says come on by the house,
24    what does he mean?
25 A  Come by his house.

Page 270

1  Q  Okay.  And how much were you going to buy?
2  A  A ball.
3  Q  Okay.  And what -- when he says come on by his house,
4     is there an address?
5  A  Yeah.  I don't -- I can't remember his address.  I know
6     what street it's on.
7  Q  What street is it on?
8  A  Grand Larry.
9  Q  Okay.  And how much were you supposed to bring with
10    you?
11 A  $200.
12 Q  All right.  And once that phone call was completed,
13    what happened -- where were you at?
14 A  I was at the police station.
15 Q  Okay.  So the phone call is completed, then what
16    happens immediately after that?
17 A  Then they went out and searched my car.  They searched
18    me.  They set up me up a wire.  Then we drove and they
19    followed me to his house.
20 Q  Okay.  Now let me -- let me stop you for a second.  All
21    right.  You said your car was searched, they searched
22    you, what -- tell the jury what the search -- what you
23    mean by the searched me.
24 A  The searched me.  There's usually two officers talking
25    to you, and then one goes and searches your car and the

Page 271

1     one who stays in the room, you know, you take off all
2     your clothes, every piece, your underwear, your socks,
3     shoes.  And they look through everything.  Your socks,
4     empty out your socks.  Empty out, shake it all out.
5     And then you put -- and that's it.  A complete search.
6  Q  Okay.  And you were -- were you given money?
7  A  Yeah.
8  Q  How much?
9  A  $200.
10 Q  Okay.  Andy you said that you put on a wire, or
11    something, what do you mean?
12 A  Yeah.  It's like a strap goes around your shoulder.
13    And it just goes like -- I don't know, just put it on
14    you, and then you put your clothes over it.
15 Q  Did an officer put it on you?
16 A  Yeah.
17 Q  Okay.
18 A  Oh.
19 Q  Now, did you know that the wire was going to make --
20    was going to record everything that was going on?
21 A  Yes.
22 Q  Okay.  And let's just play -- is a copy of the wire
23    that you made that day contained on that tape?
24 A  Yes, it is.
25    MS. BRADY:  It's loud at the beginning, so I'm going to

Page 272

1  turn it down a little bit.
2  11:1217
3     (Audio tape played for jury)
4  11:1301
5  Q  Okay.  Let me stop the tape for a second.  What's going
6     on here, on the tape?  What are you doing while this
7     being recorded?
8  A  I'm driving to his house.
9  Q  And how do you know that?
10 A  Because that's my music.
11 Q  Okay.
12 11:1314
13    (Audio tape played for jury)
14 11:1347
15 Q  Now let me stop the tape right there.  Are you talking
16    with him at that time?
17 A  No.
18 Q  Okay.
19 A  He just opened the door.
20 Q  Okay.  Now what is -- what is that on the tape then?
21    Is that Mr. Davis' voice?
22 A  There's -- there's like -- I believe that was a time
23    when I walked in there and there was -- there was only
24    -- there was four people in there, including Mr. Davis.
25    That was including everybody, there was four people.

Page 273

Page 274

1    And they were asking for sandwich baggies, because he
2    was cleaning out his house. And when I walked in, he
3    had nothing in there. They were looking for some
4    baggies, so they -- they were going to run to the store
5    and get some baggies. And then he asked for a pot,
6    which is a pot to make a ball of dope, to cook some
7    dope.
8  Q  When he means a pot, does he mean like a pot you cook
9    in?
10 A  Yeah, like a pot, pan.
11 Q  Okay.
12 11:1442
13    (Audio tape played for jury)
14 11:1515
15 Q  Now are you still inside the house at this time?
16 A  No, because they were leaving and I -- I pulled up
17    right behind the car. So -- and they opened the door.
18    I had to let them -- I had to move my car so I could
19    let them out.
20 Q  Okay.
21 11:1526
22    (Audio tape played for jury)
23 11:1600
24 Q  Okay. Now that's your voice?
25 A  Right.

Page 276

1    could on the tape for the cops, that way they could get
2    a clear view of what was going on there. And then when
3    he -- I don't know. If -- if -- it was the gun, and
4    then there was the bud. And then that was all I was
5    commenting on.
6  Q  Was there any -- was his apartment furnished or.....
7  A  No, it was all cleaned out. The only thing he had left
8    there was a stereo.
9  Q  Okay.
10 A  That's why he didn't have a pot.
11 Q  Okay.
12 11:1837
13    (Audio tape played for jury)
14 11:1933
15 Q  Okay. And did you -- where did you go once you left
16    his apartment or the house?
17 A  I went right -- I went back to the station.
18 Q  What happened when you got back to the police station?
19 A  I gave him the dope. As soon as I got out of my car, I
20    gave them the dope, and then they searched my car. And
21    I was followed back into the police station, and then I
22    was searched.
23 Q  Okay. And did you meet with Officer LaPorte again the
24    next day?
25 A  Yes, I did.

Page 275

1  Q  Who are you talking to?
2  A  I was talking to the police.
3  Q  Okay.
4  11:1606
5    (Audio tape played for jury)
6  11:1714
7  Q  What are you talking about right there?
8  A  A gun.
9  Q  A gun?
10 A  Yeah.
11 Q  Okay.
12 11:1720
13    (Audio tape played for jury)
14 11:1746
15 Q  Okay. Now what are you commenting on there?
16    THE COURT: Ms. Brady, can you move?
17    MS. BRADY: Oh.
18    THE COURT: So the jury can -- thank you.
19 A  Well, there's a couple -- the first thing I was -- it
20    was -- it was chronic. It was the weed. And he had a
21    whole bunch of weed on his counter, like a pile of bud.
22    And -- and then there was -- there with the .45, that's
23    what I was commenting on. He said -- I asked him how
24    much he -- I asked him if he would take a bill for it,
25    just to -- because I was supposed to get everything I

Page 277

1    MS. BRADY: Okay. And that is a different tape.
2    THE COURT: Let's take a bench conference, please.
3    MS. BRADY: Okay.
4    (Bench conference as follows:)
5    THE COURT: How long is that tape?
6    MS. BRADY: My recollection is it's between five and
7  eight minutes.
8    THE COURT: All right. We'll -- same objections,
9  Mr. James?
10    MR. JAMES: Yes, sir.
11    THE COURT: All right. We'll stand down and let him
12 listen to it.
13    MR. JAMES: Could I use the (indiscernible) before
14 we.....
15    THE COURT: We'll take a break in a little bit.
16    MR. JAMES: Okay. So we're going to listen to tapes
17 and then take a break?
18    (End of bench conference)
19    THE COURT: I need to excuse for about 10 minutes,
20 folks. And I again appreciate your patience and
21 understanding in bouncing back and forth in here like this.
22    (Jury excused)
23    MS. BRADY: State 6.
24    THE COURT: We're still on record. You are putting
25 state's exhibit number 6 into the tape recorder?

1    MS. BRADY: I am, Your Honor. And I'm.....
2    THE COURT: Player.
3    MS. BRADY: .....about ready to hit play.
4    THE COURT: Go ahead. Our jury out.
5 11:2207
6    (Audio tape played)
7 11:2817
8    THE COURT: That's the end? That's 6?
9    MS. BRADY: That's 6.
10   THE COURT: All right. We'll take a very short
11 restroom break for everybody, and then we'll get the jury.
12   MS. BRADY: Okay.
13   THE COURT: I'm talking about as quickly as you can,
14 please.
15   (Off record)
16   THE COURT: Have a seat, everybody. Are we back on
17 record, Ms. McKewin?
18   THE CLERK: We are, uh-huh.
19   THE COURT: We want to -- our jury is back. Thanks,
20 folks. Do you want to continue, Ms. Brady?
21   MS. BRADY: Yes, Your Honor.
22        DIRECT EXAMINATION CONTINUED
23 BY MS. BRADY:
24 Q  Now, you met with Officer LaPorte on February 21st, is
25   that right?

Page 278

1  A  Yes.
2  Q  Did you call the defendant that day?
3  A  Yes, I did.
4  Q  And was that conversation recorded?
5  A  Yes.
6  Q  And did it lead to setting up a buy that day?
7  A  Yes.
8  Q  And was that also recorded?
9  A  Yes.
10 Q  And is that what's contained on this tape?
11 A  Yes.
12 Q  Is the tape a true and accurate representation of both
13    your conversation and the buy that was made?
14 A  Yes.
15   MS. BRADY: Okay. At this time, I move to admit
16 state's exhibit 6.
17   THE COURT: Number 6, Mr. James?
18   MR. JAMES: Yes, sir. No objection.
19   THE COURT: Number 6 is admitted.
20        (Plaintiff's exhibit 6 admitted)
21 Q  Now let's play a little bit of it, then I'm going to
22    ask you some questions.
23 11:3449
24   (Audio tape played for jury)
25 11:3743

Page 279

1  Q  Let me stop this for just a second, and I want to ask
2     you a question. When he says, I don't have anything
3     but hard stuff, what's he talking about?
4  A  Crack.
5  Q  Okay.
6 11:3756
7    (Audio tape played for jury)
8 11:3904
9  Q  Okay. Now once the call was made, what happens next?
10 A  Then search -- they searched my car and they searched
11    me. And they go get the money, come back and put the
12    wire on. They put the wire on me. And we go.
13 Q  Okay. How much money did they give you?
14 A  $200.
15 Q  Okay. And when we're talking about they, who are we
16    talking about?
17 A  The -- the investigators.
18 Q  Okay. And when you're talking about putting the wire
19    on, explain what you're talking about.
20 A  Wire. The -- it's on a strap.
21 Q  Uh-huh.
22 A  Talking about the thing that records everything.
23 Q  Okay. And is it over your clothes, under your clothes?
24 A  Yeah, it's under my clothes and on my shoulder.
25 Q  Okay. And we'll go ahead and play the wire now.

Page 280

1 11:4009
2    (Audio tape played for jury)
3 11:4059
4  Q  Okay. Now let me stop you for just a second, and stop
5     the tape for just a second. What's going on right
6     there?
7  A  He's -- he's -- we're talking about -- we're talking.
8  Q  Where are you talking at?
9  A  In his car.
10 Q  And what car is that?
11 A  I believe that's in his -- yeah, that's in his Jeep.
12 Q  Okay. And.....
13 A  It's not a Jeep. It's a Suburban, green Suburban.
14 Q  Okay. And could you -- on the tape, it sounded like
15    there was a ringing?
16 A  Yeah.
17 Q  What was going on then?
18 A  He got a phone call.
19 Q  Okay. And so it was on cell phone?
20 A  Yeah.
21 Q  Okay. And you said -- there was something said about
22    him living at his mom's, is that right?
23 A  Yeah. I asked him where he was staying. And he said
24    he was living with his mom. And he basically said he
25    still had the same cell phone number.

Page 281

**3AN-01-1717 CR**

| | |
|---|---|
| 1 Q When you say, is it cool, what are you referring to? | 1 MR. JAMES: All right. Well, then I think we have to |
| 2 A I was just like, is it cool? And then he was like, no, | 2 play the whole thing, because otherwise..... |
| 3 you can't come over there. | 3 MS. BRADY: Okay. |
| 4 Q Okay. | 4 MR. JAMES: .....you're only hearing..... |
| 5 A So he thought I was meaning, you know, come over for | 5 THE COURT: Why? Why do they have to play the whole |
| 6 dope or something. | 6 thing? |
| 7 Q Okay. | 7 MR. JAMES: Well, it..... |
| 8 11:4204 | 8 THE COURT: What rules requires that? |
| 9 (Audio tape played for jury) | 9 MR. JAMES: They're going to take it into evidence, and |
| 10 11:4232 | 10 we're only going to play a portion of it, then that's the |
| 11 Q Now when the music is playing, you're in his car, is | 11 portion they should take into evidence. |
| 12 that right? | 12 THE COURT: Is there a rule that requires that it be |
| 13 A Right. | 13 played? The jury can listen to it in the jury room? |
| 14 Q And then after there's no music anymore, where are you | 14 MR. JAMES: I can't think of the rule right off the top |
| 15 at? | 15 of my head. But logically speaking, I mean, what he's |
| 16 A In my car. | 16 testified to is what the -- now what's out of the presence |
| 17 Q Okay. | 17 of the jury to be played. Now, if you want to talk, I'm not |
| 18 11:4243 | 18 going to play it. It probably would set the stage, but |
| 19 (Audio tape played or jury) | 19 that's..... |
| 20 11:4306 | 20 THE COURT: You can have the witness describe what's on |
| 21 Q The tape goes on, but nothing else is said on the tape, | 21 the tape. You're not required to play..... |
| 22 is that right? | 22 MS. BRADY: Okay. |
| 23 A That's right. | 23 THE COURT: You can play whatever portions of the tape |
| 24 MS. BRADY: Okay. Then we'll stop it there. And that | 24 you want. |
| 25 takes me to the next tape. | 25 (Pause) |
| Page 282 | Page 284 |

| | |
|---|---|
| 1 THE COURT: We need to take another break, folks. What | 1 MS. BRADY: Okay. That's cued. That's state's. And |
| 2 we're doing during the breaks, if you haven't figured it | 2 state's 21 is only about three or four minutes. |
| 3 out, is Mr. -- is the witness is listening to the exhibit so | 3 11:5828 |
| 4 that he can testify about it, so..... | 4 (Audiotape played for court) |
| 5 (Jury excused) | 5 11:5943 |
| 6 MS. BRADY: My suggestion, Your Honor, these are both | 6 MS. BRADY: That's it. |
| 7 very short, would be to do the next two together. | 7 THE COURT: We'll get the jury. |
| 8 THE COURT: That would be fine. What are you starting | 8 (Jury summoned) |
| 9 with? | 9 THE COURT: Everybody have a seat, please. And are we |
| 10 MS. BRADY: I'm starting with state's 7. | 10 back on record? |
| 11 THE COURT: All right. That's good. | 11 THE CLERK: Yes. |
| 12 11:4410 | 12 THE COURT: All right. We have everybody back. |
| 13 (Audiotape played for court) | 13 Ms. Brady, do you want to continue? |
| 14 11:5348 | 14 MS. BRADY: I do you, Your Honor. |
| 15 MS. BRADY: What I would suggest, I don't want to have | 15 DIRECT EXAMINATION CONTINUED |
| 16 any allegation I altered the tape, I'll just cue it to the | 16 BY MS. BRADY: |
| 17 place where it starts with Detective Johnstone, and only | 17 Q Did you meet with Officer LaPorte on February 28th? |
| 18 play that for the jury. If that's all right? | 18 A Yes, I did. |
| 19 THE COURT: That's not my call. I don't understand | 19 Q Okay. And did you call the defendant that day? |
| 20 what you mean. You want to offer number 7, but you don't | 20 A Yes, we did. |
| 21 necessarily want to play the whole thing, is that correct? | 21 Q And were those calls recorded? |
| 22 MS. BRADY: Right. | 22 A Yes, they were. |
| 23 MR. JAMES: But then if you're going to offer it, then | 23 Q Did you make several calls? |
| 24 it's -- do you plan on having that admitted as evidence? | 24 A Yes, I did. |
| 25 MS. BRADY: Uh-huh. (Affirmative) | 25 Q Okay. Then did you keep trying on into the night? |
| Page 283 | Page 285 |

1 A   Yes, I did.

2 Q   Okay.  Then did you meet with Detective Johnstone later

3     that night?

4 A   Yes.

5 Q   And did you call Mr. Davis again?

6 A   Yes, I did.

7 Q   And was that call recorded?

8 A   Yes, it was.

9 Q   And you've listened to the tape marked state's exhibit

10    7, is that a true and accurate representation of the

11    call you made?

12 A   Yes, it is.

13    MS. BRADY:  Okay.  At this time, I move to admit 7.

14    THE COURT:  Mr. James?

15    MR. JAMES:  No objection.

16    THE COURT:  7 is admitted

17              (Plaintiff's exhibit 7 admitted)

18    MS. BRADY:  I'm going to play that for the jury.

19 12:0141

20    (Audio tape played for jury)

21 12:0249

22 Q   So let me just ask you a question. When he says it's

23    ready, what is he talking about?

24 A   He's talking about his crack.

25 Q   Okay.  And when you say, I've got two, what are you

Page 286

1     talking about?

2 A   I'm talking about I got $200.

3 Q   Okay.

4 12:03:05

5     (Audio tape played for jury)

6 12:03:55

7 3

8 Q   All right.  And then after you make that call.....

9     THE COURT:  Hold on a second, Ms. Brady.  You need to

10    explain to the jury through the witness that you didn't play

11    all of exhibit number 7.

12    MS. BRADY:  Oh, okay.

13 Q   Now, that tape has a lot of calls on it, is that right?

14 A   Yes.

15 Q   Okay.  And we cued it to the point where you actually

16    go a hold of Mr. Davis, is that right?

17 A   Right.

18 Q   What's going on on the tape for several minutes prior

19    to the place where we actually get to the call that you

20    had to him?

21 A   What's going on before all that?

22 Q   Yeah.

23 A   We just kept calling and calling and calling.  And he

24    -- he wasn't answering his phone. I -- I left like

25    three messages, he wasn't calling me back.  So we went

Page 287

1     and got something to eat, and then we -- we came back.

2     I went and got a Snickers bar and a soda pop and then I

3     came back and he answered his phone.

4 Q   Okay.  Now let me ask you about what happened after

5     that call was made.  Where were you at when you made

6     the call?

7 A   I said I was at Tudor.

8 Q   Pardon me?

9 A   The police station over there on Tudor.

10 Q   Okay.  And so the call gets made, and then what happens

11    immediately after that?

12 A   Immediately after that, they go search my car.  They

13    search me.  They put a wire on me, and we go.

14 Q   Okay.  Now when you say those things, is it the same

15    kinds of things that you've been talking about before?

16 A   Yeah, it's all -- it's routine.

17 Q   Okay.

18 A   The same thing.

19 Q   And did the wire record what happened in your meeting?

20 A   Yes, it did.

21 Q   Okay.  And you previously listened to this tape, which

22    is marked state's 21.  Do you know what's on this tape?

23 A   Yes, I do.

24 Q   Is this a true and accurate representation of the wire

25    from March 1st?

Page 288

1 A   Yes, it is.

2     MS. BRADY:  Okay.  And at this time, I would move to

3     admit and publish to the jury.

4     THE COURT:  21, Mr. James?

5     MR. JAMES:  No objection.

6     THE COURT:  21 is admitted.

7              (Plaintiff's exhibit 21 admitted)

8 12:0547

9     (Audio tape played for jury)

10 12:0631

11 Q   All right.  Let me stop it for just a second.  Where

12    are you at when this is going on?

13 A   Where am I at right then?

14 Q   Uh-huh.  (Affirmative)

15 A   I'm inside of his truck.

16 Q   Okay.  And so you guys were sitting inside of his truck

17    talking?

18 A   Yeah.

19 Q   When the music is playing?

20 A   Right.

21 Q   Then the music stops, and where are you at?

22 A   Probably outside of my car.  I'm getting out of his

23    car.  I'm getting out of his car.

24 Q   Okay.

25 12:0651

Page 289

State v. Robert Davis
November 15, 2001

| | |
|---|---|
| 1 | (Audio tape played for jury) |
| 2 | 12:07:07 |
| 3 Q | Now what did you just say? |
| 4 A | I said gray Toyota, DVD 272, which is the license plate |
| 5 | number and the make of his car. |
| 6 Q | Okay. And you were instructed to -- who were you |
| 7 | talking to when you say that? |
| 8 A | I was talking with police. |
| 9 Q | Okay. |
| 10 A | Because they thought he was going to come in a |
| 11 | different car. And it was -- it was different. It was |
| 12 | all different, and I wanted them to be aware of what |
| 13 | was going on. |
| 14 Q | So what happens after -- after you say that on the |
| 15 | wire? |
| 16 A | I go to the -- I go to Tudor, and he gets arrested. |
| 17 Q | Okay. But let's back up. You're still at the -- in |
| 18 | the parking lot at the Pancake House, is..... |
| 19 A | Right. |
| 20 Q | .....that right? Okay. So do you get in your car? |
| 21 A | Yeah. |
| 22 Q | And then once you get in your car, where did you go to? |
| 23 A | I go to Tudor. I go back to the police station. |
| 24 Q | Okay. And what happens when you get back? Did you |
| 25 | stop somewhere on the way? |

Page 290

| | |
|---|---|
| 1 Q | Okay. Let's talk about some things that happened after |
| 2 | those buys were over on March 1st. |
| 3 A | Okay. |
| 4 Q | Now, on July 26th, you were contacted by some APD |
| 5 | officers who were investigating a truck that were |
| 6 | involved in damaging some cars outside an apartment on |
| 7 | Mumford, is that right? |
| 8 A | Yes. |
| 9 Q | Okay. And your truck was seized, is that right? |
| 10 A | It was not my truck. |
| 11 Q | It wasn't your truck? |
| 12 A | No. |
| 13 Q | Whose truck was it? |
| 14 A | My friend's. |
| 15 Q | Okay. And in the bed of the truck, there was a bunch |
| 16 | of stereo equipment, right? And that was also seized? |
| 17 A | Yeah. |
| 18 Q | Were you ever charged with anything as a result of that |
| 19 | police contact? |
| 20 A | No, I was not. |
| 21 Q | Okay. Has your testimony here today been influenced in |
| 22 | anyway by your thought or perception that you could be |
| 23 | charged or that you may have something to worry about |
| 24 | there? |
| 25 A | No. |

Page 292

| | |
|---|---|
| 1 A | I don't believe so. |
| 2 Q | Okay. Did you turn over the cocaine to an officer? |
| 3 A | Okay. Yeah. Okay. I remember now. I'm sorry. It |
| 4 | was -- it was a long -- I stopped at -- I think it was |
| 5 | at Schuck's, or something. We might have stopped. I |
| 6 | can't really remember. It was either there or at the |
| 7 | -- at the church. |
| 8 Q | Okay. So you stopped somewhere and you turned the |
| 9 | cocaine over to the officer? |
| 10 A | Yeah. Crack. |
| 11 Q | Okay. And then what happens -- what do you do next? |
| 12 | Where do you go? |
| 13 A | Rode to the police station. |
| 14 Q | And then what happens when you get to the police |
| 15 | station? |
| 16 A | I get searched. And my car gets searched. And they |
| 17 | tell me that they'll get in contact with me. |
| 18 Q | Okay. And now you're debriefed after every single time |
| 19 | you make a buy, is that right? |
| 20 A | Right. |
| 21 Q | Okay. And are all those recorded? |
| 22 A | Yes, they are. |
| 23 Q | Okay. So let's talk about -- that's -- is that the end |
| 24 | of you involvement in this case? |
| 25 A | Yes. |

Page 291

| | |
|---|---|
| 1 Q | Okay. And has anyone offered you any kind of deal, |
| 2 | that if you testify in this case, that that case will |
| 3 | be dismissed or it won't be filed on, or anything..... |
| 4 A | No. |
| 5 Q | .....along those lines? Okay. And as far as you know, |
| 6 | that case could be prosecuted if the police decide they |
| 7 | want to make a case, is that..... |
| 8 A | Right. |
| 9 Q | .....right? Okay. Do you hope that by cooperating and |
| 10 | testifying that you'll be helping yourself in that |
| 11 | case? |
| 12 A | Well, I hope. I hope I'll be helping my -- no, I don't |
| 13 | -- I don't think I'll help myself in that case. I |
| 14 | mean, if I -- if they think I'm guilty, I'm -- I'm |
| 15 | guilty. |
| 16 Q | Okay. And let's talk about September 5th. Now, an APD |
| 17 | officer contacted you on that day, and you consented to |
| 18 | having your car searched, is that right? |
| 19 A | Yeah. |
| 20 Q | Okay. And inside your car, the officer found a box? |
| 21 A | Right. |
| 22 Q | What was in the box? |
| 23 A | Well, my -- my ID was in the box. There was some coke |
| 24 | in the box, and there was some money in the box. But |
| 25 | there was my friend that was in the car, and he wasn't |

Page 293

Case 3:05-cv-00255-TMB-JDR    Document 54-5    Filed 01/12/2007    Page 25 of 26
Multi-Page™
State v. Robert Davis
November 15, 2001

3AN-01-1717 CR

**Page 294**

1  in the car when I got stopped. Because I -- I pulled
2  into my house and they -- they thought I -- they just
3  -- they thought I -- they thought I had something to do
4  with some pills being taken. But I had nothing to do
5  with the pills be taken. So I told the cop, you know,
6  I have nothing to do with this, so you can search my
7  car, because I know there's not no pills. And then you
8  can search my house, because I know there's not no
9  pills in my house. I haven't done anything wrong. And
10  when he searched my car, I gave my friend my ID, and he
11  put it in his box. And in the box, I guess he put his
12  dope in the box. So then my ID was in the box, was in
13  the dope, so I got kind of, you know, messed up.
14 Q  Okay. Now, did you -- did you tell that to the
15  officer?
16 A  Yes, I did.
17 Q  Okay. And has any law enforcement agency offered you
18  any deal so that if you testify in this case that any
19  charges that could be coming from that contact won't be
20  prosecuted or anything like that?
21 A  No.
22 Q  Okay. So you're just on your own, there's no deals?
23 A  That's right.
24 Q  As far as you know, that case may still be being
25  prosecuted?

**Page 295**

1 A  Right.
2 Q  Okay. And are you hoping that by cooperating and
3  testifying, as you promised you would to get your
4  burglary dismissed, that you're going to help yourself
5  somehow in that case?
6 A  If I -- if they think I'm guilty, I'm guilty. They're
7  going to.....
8 Q  Okay. And you don't expect that that case would be
9  dismissed if it were filed because of your testimony
10  here today?
11 A  No.
12 Q  Okay. And then a couple of weeks later on September
13  30th, you were contacted by APD officers again and your
14  car was searched twice that day, is that right?
15 A  Yeah.
16 Q  Okay. And they were searching your car with regard to
17  a drive-by shooting, is that right?
18 A  Yeah, that's what they told me.
19 Q  Okay. And the first time they searched your car, did
20  they find anything?
21 A  No.
22 Q  Okay. And then the second time they came back and
23  searched your car -- did you give them consent to
24  search your car?
25 A  Yes, I did.

**Page 296**

1 Q  Okay. And then the second time they came back, did
2  they find anything that time?
3 A  Well, they -- they searched the car one thoroughly for
4  -- for the gun. And then they searched it again
5  thoroughly again, and then they found something. And
6  then -- they said they found a casing off of -- of a
7  gun that was used in the shooting. But, you know, I
8  don't know, man. It's not my car. And my -- the car
9  was -- was -- it was took previously that day by my
10  friend, Jeff, and he put a full tank of gas in it. I
11  went and got my car back, and the next thing I know, I
12  got pulled over. And I -- I got pulled over and I gave
13  them consent to search my vehicle because, you know, I
14  -- I didn't know what was happening. And then after
15  they told me what was going on, then I said, yeah, you
16  guys can search my car because there's -- there's
17  nothing going on, and I didn't do that. And then they
18  -- me and my friend were getting in an argument about
19  why my car just got searched, and they came up on us
20  again and they searched my car again for the same
21  thing, so.....
22 Q  And that's when they found the.....
23 A  Yeah.
24 Q  .....nine millimeter casing?
25 A  And they impounded -- they impounded the car. It -- it

**Page 297**

1  wasn't my car. It was my girlfriend's. I was getting
2  it back for her. I don't have a license. I'm not
3  supposed to be driving. So my girlfriend didn't want
4  to go to the kid and get her car back, so I went and
5  got her car back.
6 Q  Okay. And so did they seize that car?
7 A  It was seized, but my girlfriend just got -- she got --
8  she got -- it's out of impound.
9 Q  Okay. Has your testimony here today been influenced in
10  anyway by the thought that you could be charged as a
11  result of that?
12 A  No, it has not.
13 Q  Okay. And any deals in that case? Have you talked to
14  anyone in law enforcement that you'll testify here, and
15  that there's something should happen with that case?
16 A  No, there's -- no.
17 Q  Okay. Are you aware of whether any charges have been
18  filed?
19 A  No, I'm not.
20 Q  Okay. Do you expect -- are you hoping that by
21  cooperating and testifying that you could help yourself
22  in that case?
23 A  No. I don't know.
24 Q  Okay. And if that case were to be filed, you wouldn't
25  expect that case to be dismissed because of your

3AN-01-1717 CR

1  testimony here today, is that right?
2 A  Yeah.
3 Q  Okay. And let me just talk to you about -- all of
4  those things that happened, every time the police
5  contacted you, that was after you involvement in this
6  case, right?
7 A  Yes.
8  MS. BRADY: Okay. That's all the questions I have for
9 this witness.
10  THE COURT: Cross examination?
11  MR. JAMES: Yes. Thank you.
12  JEREMY FISH
13 testified as follows on:
14  CROSS EXAMINATION
15 BY MR. JAMES:
16 Q  Let's go to the coke issue, which was, I believe,
17  September the 4th. Whose car was that?
18 A  George Redwine's, Redwine's Towing.
19 Q  All right. And that was your box though, right?
20 A  Yes.
21 Q  All right. And who was the officer that did the arrest
22  or stopped you -- I'm sorry, did the stop?
23 A  I -- it -- it was no stop. I.....
24 Q  Who contacted you?
25 A  I don't -- I can't remember.

Page 298

1 Q  A uniformed officer?
2 A  Yes.
3 Q  All right. Any other officers show up?
4 A  One other uniformed officer.
5 Q  Who was that?
6 A  I can't remember.
7 Q  What did he look like? He or she?
8 A  Both guys.
9 Q  Both guys? All right. No -- just the two officers in
10  uniforms?
11 A  Yeah.
12 Q  Now we're talking about the September 4th, are we not?
13  Are we focused on that one?
14 A  September 4th, that's the one where -- that's the only
15  coke issue I've had, so, yeah.
16 Q  With the five bags of coke?
17 A  Right.
18 Q  All right. And do you recall telling the officer you
19  acknowledged the ownership of the three $20's, dollars,
20  the -- your ID, but that the five bags of coke had been
21  planted? Do you recall making that statement to the
22  officer?
23 A  I didn't say that they were planted on me. I said I
24  had a friend in the car, and I didn't know, you know,
25  if he put them in there or not, but they didn't know if

Page 299

1  it was coke then. They didn't tell me it was coke
2  until later. They didn't run no test on it or nothing.
3  I didn't know what it was. But they told me later it
4  was coke, and I acknowledged that the money was mine,
5  yes, but.....
6 Q  You didn't -- when you looked at it, you had not
7  realization it was coke and.....
8 A  They didn't know what it was either.
9 Q  I asked you.
10 A  No, I -- I did not.
11 Q  They were in clear baggies?
12 A  Excuse me?
13 Q  Clear baggies?
14 A  Yes.
15 Q  You're not familiar with cocaine?
16 A  I'm very familiar with cocaine.
17 Q  Okay. Okay. Now, when the -- you were stopped another
18  time involving, which Ms. Brady already discussed with
19  you very briefly, involving finding -- well, drive-by
20  shooting where they found a case, a round in the -- in
21  your vehicle, is that right?
22 A  Not my vehicle.
23 Q  Okay. Your girlfriend's vehicle?
24 A  It's not my girlfriend's vehicle.
25 Q  Whose is it?

Page 300

1 A  George Redwine's.
2 Q  Okay. So we're talking about the same -- the same
3  vehicle, the one that was involved with the coke?
4 A  Yes, sir.
5 Q  Okay. And were you driving that vehicle?
6 A  Yes, I was.
7 Q  All right. So you would have controlled where it was
8  going?
9 A  No. I went and picked up the vehicle.
10 Q  After you picked up the vehicle, you're driving the
11  vehicle?
12 A  I was driving it to my girlfriend's, yes, I was.
13 Q  So you were controlling where it was going?
14 A  Yes, I was.
15 Q  Okay. All right. Now, another time you were -- in
16  July, July 13th, specifically, you were cited by
17  Officer Daily for possession of marijuana, is that
18  correct?
19 A  Yes.
20 Q  And nothing has ever happened in that case, is that
21  correct?
22 A  That's right.
23 Q  All right. Nothing has ever happened to the cocaine
24  case, correct?
25 A  I believe so. I don't know. They haven't -- it's all

Page 301