1 will you state your full name and spell your last?
2 A   Somerset L. Jones, III. J-o-n-e-s.
3   THE CLERK: Thank you.
4   THE COURT: Go ahead, Ms. Brady.
5 BY MS. BRADY:
6 Q   How long have you been an APD officer?
7 A   About six and a half years.
8 Q   Okay. And are you assigned to a particular unit?
9 A   Well, I'm assigned to the special assignment unit.
10 Q   All right. And is that the same assignment unit you
11   were assigned to during this case?
12 A   Yes.
13 Q   All right. And how did you become involved with this
14   case?
15 A   Well, being on the team, I was told that they were
16   going to have a controlled purchase and Officer LaPorte
17   provided a briefing of that controlled purchase. And
18   -- and assigned me to conduct surveillance and to
19   assist in the arrest of the suspect. And so I, you
20   know, I went to the area where the controlled purchase
21   was to take place.
22 Q   Okay. Now before you did that, did you do anything
23   else?
24 A   Yes. I was given the keys to the confidential
25   informant's vehicle and told to go out to the vehicle,

Page 444

1   the vehicle, I drove into the parking lot along with
2   Officer LeBlanc. Officer LeBlanc was in a marked
3   vehicle with, you know, police symbols and lights on
4   the top. And we subsequently arrested the suspect, had
5   him removed in the vehicle, placed in handcuffs and
6   impounded the vehicle.
7 Q   Okay. So were you in a different car than Officer
8   LeBlanc?
9 A   Yes, I was. I was in an unmarked car.
10 Q   All right. And what about -- what happened after the
11   defendant was arrested?
12 A   Well, Officer LeBlanc took him and processed him, I
13   believe took him to jail and then, you know, conducted
14   a bail hearing. And the vehicle, like I said, was
15   impounded.
16 Q   Okay. And was there anyone in the car besides him?
17 A   No.
18 Q   All right. And what did you do when you got back to
19   APD?
20 A   Well, when we got back to APD, the controlled
21   substances that were purchased from the defendant were
22   taken, and I field tested them with a Beck and
23   Dickinson (ph) test kit for cocaine, and it was
24   positive.
25 Q   Okay. And did you search the car again?

Page 446

1   which was parked in front of the police station and to
2   search that vehicle.
3 Q   Okay. And did you do that?
4 A   Yes, I did.
5 Q   How throughly did you search the car?
6 A   Well, when I search the car, I look underneath the
7   seats and the ashtrays. If there's a -- a VHS film
8   box, I'll open it up. Cigarette packs over the visors,
9   just everywhere inside the vehicle, I search. I look
10   for money, because we only want him to have our money.
11   Controlled substances, weapons, anything that might be
12   considered illegal or contraband.
13 Q   Did you find any contraband in his car?
14 A   No, I did not.
15 Q   Okay. And now what was our role in the surveillance?
16 A   Well, as part of the surveillance, I went to the area
17   in Muldoon near the Pancake House, which I was told was
18   where it was going to transpire. And after I -- I got
19   there, I could hear on our portable radios, they were
20   telling me pretty much what was going on, that when the
21   confidential informant got in and got out of the
22   vehicle, and then they told me that the vehicle was
23   parked at an oriental restaurant just south of the
24   Pancake House and gave me a description of the vehicle
25   and the license plate. And as the informant got out of

Page 445

1 A   Yes, sub -- after the vehicle had been removed to
2   secure storage, subsequent to a search warrant, we went
3   and searched the vehicle.
4 Q   Okay. Let me ask you a different way. Did you search
5   Mr. Fish's car when you got back to the police station?
6 A   Oh, yes. I'm sorry. Yes, absolutely.
7 Q   Okay.
8 A   Prior to and after the controlled purchase, I -- I had
9   searched the confidential informant's vehicle. And on
10   the second one, I did the same thing that I did on the
11   first one, went through every -- all the little boxes
12   and everything else, and again found nothing that was
13   contraband or illegal.
14 Q   Okay. And you said that you took control of the -- the
15   crack that had been purchased?
16 A   Well, I think Officer Johnstone and I processed it. He
17   filled out the P and E, and I did the field test.
18 Q   Okay. And let me just approach you with something
19   that's previously been marked as state's exhibit 4. Do
20   you recognize this?
21 A   Yes, I do.
22 Q   What is it?
23 A   Well, it's a drug envelope that contains crack cocaine.
24   And the sealing tape has my initials and the date on
25   it.

Page 447

1 Q  Okay. Could you just tell me about that sealing tape a
2     little bit? What -- you called it sealing tape, is
3     that some special kind of tape?
4 A  Well, it's tamper proof. If the envelope had been
5     opened at any time and that would have been damaged, it
6     would indicate that because you can't reseal it.
7     MS. BRADY: Okay. And at this time, I move to admit
8 state's exhibit 4.
9     THE COURT: Number 4, Mr. James?
10    MR. JAMES: No objection.
11    THE COURT: Number 4 is admitted.
12 Q  Okay. Now did you do anything else with regard to the
13    investigation of this case?
14 A  I searched the vehicle at indoor secure.....
15    MR. JAMES: Asked and answered.
16    THE COURT: Overruled.
17 Q  Okay. And was any -- you searched the defendant's car?
18 A  Yes.
19 Q  Okay.
20 A  Correct.
21 Q  And was anything seized during that search?
22 A  Yes, a cell phone and a battery to it.
23 Q  Okay. And let me just approach you with what I've
24    previously marked as state's exhibits 12 and 22. Do
25    you recognize those items?
Page 448

1 A  Yes, I do.
2 Q  Can you please explain to the jury what item number 12
3     is?
4 A  Item number 12. Yeah. This is a cell phone and it --
5     when we get cell phones and batteries, we have to
6     separate the two because they're serial number items,
7     and so we list both of them separately on the P and E.
8     So this is a part of the same phone. Both of them, the
9     battery and the cell phone.
10 Q  Okay. And I'm glad you mentioned that serial number.
11    Does it have a serial number on it?
12 A  Yes, they do.
13 Q  And what is the serial number that's on it?
14 A  Oh, gees. 003 Kilo 04702 is the phone. And I think
15    I'm going to need my glasses, which I didn't bring with
16    me, to read the one on the battery.
17 Q  That's okay. I don't even need the one the battery.
18    MS. BRADY: At this time, I move to admit state's 12
19 and 22.
20    THE COURT: Mr. James?
21    MR. JAMES: No objection.
22    THE COURT: 12 and 22 are admitted.
23        (Plaintiff's exhibits 12 and 22 admitted)
24    MS. BRADY: Okay. And that's all I have for this
25 witness, Your Honor.
Page 449

1     THE COURT: Mr. James?
2         SOMERSET JONES
3 testified as follows on:
4         CROSS EXAMINATION
5 BY MR. JAMES:
6 Q  Officer Jones, you were involved on the 28th, and
7     that's all, correct?
8 A  The 28th and the 1st, yes.
9 Q  28th and the 1st.....
10 A  That's correct.
11 Q  .....which is the rollover? There are 28 days in.....
12 A  Yeah. Right. That's correct.
13 Q  Okay. And you were part of a surveillance team, is
14    that correct, at the Pancake House on Muldoon?
15 A  Yes.
16 Q  Okay. All right. And when did you arrive there?
17 A  It was shortly before the confidential informant
18    arrived in the area.
19 Q  And did you see the confidential informant?
20 A  No, I did not.
21 Q  Okay. Where were you?
22 A  I was in -- in streets adjacent to the area. I did not
23    want to be in -- in plain view. I was part of the
24    takedown team, so I just stayed out of sight until I
25    was told that the confidential informant was leaving
Page 450

1     the suspect's vehicle by those that were -- had what we
2     call the eye, able to see what was going on.
3 Q  Why don't you, if you would, flip over -- turn around,
4     please and flip over to a clean sheet of paper, if you
5     would, please? And if you can, and without going into
6     great deal of detail, kind of give us a rough sketch of
7     where this took place and where you were.
8 A  Well, maybe. Okay. Let's see. Muldoon Road. And the
9     Pancake House is back here. Here's a street here. I
10    don't remember the name of it. I think it's -- not
11    Duben but Peck, maybe. And then there is a street sign
12    right about here. And then there's an entrance into
13    the parking lot right about here. And then there's --
14    I think there's a little strip mall back here. And the
15    defendant's vehicle was parked here facing towards the
16    street.
17 Q  Okay.
18 A  And I was riding the streets in here. There's an alley
19    here, back in here. So I was back in this area. I
20    wasn't stationary all the time.
21 Q  Okay. So there's no location that you can say I was
22    there? You were kind of a rover, is that correct?
23 A  I just -- you know, I -- as things progressed, because
24    they was told it was going to go down here, I moved my
25    vehicle when I knew that the vehicle was about here.
Page 451

3AN-01-1717 CR

State v. Robert Davis
November 19, 2001

---

**Page 452**

1  So -- and -- and this being north. So as things
2  progressed, I changed my position as time went on.
3 Q  Okay. Could we perhaps just put M for Muldoon and
4  either P with a question mark for Peck, because you
5  didn't know if that was Peck or not?
6 A  Yeah, I don't know exactly. I'd have to get a map.
7 Q  Okay. I'm not holding you to Peck.
8 A  Okay.
9 Q  All right. All right. Now -- go ahead and have a
10  seat, if you would, please. All right. So this -- did
11  you observe Jeremy Fish leave?
12 A  No, I did not.
13 Q  Okay. You were monitoring this on radio, I.....
14 A  Yes.
15  .....I assume? Okay. All right. How many officers
16  were there?
17 A  About five or six of us, I believe. I could look it
18  up. I have it -- all the names written in my report.
19  I just don't recall off the top of my head.
20 Q  You generated your own report on this?
21 A  Of course. Okay. One, two, three, four, five.....
22 Q  You've got it with you?
23 A  Six of us. Seven counting me. Seven of us.
24 Q  Now -- I'd like to see your report in just a minute, if
25  I may. But to continue on here, so -- somebody must

---

**Page 453**

1  have told you that it was time?
2 A  Yes.
3 Q  All right. And who was that?
4 A  I don't know. I believe it was Officer LaPorte, but
5  I'm not absolutely certain at this time. And the
6  reason I believe it was him is because it was his case
7  file. He was the one that was controlling what was
8  going on. And so I believe he would have been the one
9  that would have said it's time now, because he's lead.
10 Q  Okay. And after he said it's time, how long were you
11  there -- how long did it take you to get there?
12 A  Oh, a matter of seconds, maybe five, 10 seconds.
13 Q  Okay. So you were, boom, right there?
14 A  Yeah. Oh, yeah.
15 Q  All right. And when you got there, was Officer LeBlanc
16  there or.....
17 A  He -- he pulled in the same time I did.
18 Q  All right.
19 A  We both stopped our cars, got out, opened our doors at
20  the same time.
21 Q  Okay. And you were in a.....
22 A  Unmarked vehicle.
23 Q  .....unmarked vehicle? Is that -- never mind, it's
24  unmarked. So did LeBlanc have his lights on and that
25  kind of stuff? He was in a police car, right?

---

**Page 454**

1 A  Yes, he was.
2 Q  Okay. Did he have.....
3 A  Yes. Yes.
4 Q  .....the whole rigamarole.....
5 A  It was a -- you know, what we call a felony traffic
6  stop. At this point, we were arresting somebody for
7  committing a felony offense.
8 Q  All right. And who approached Mr. Davis' car?
9 A  Neither one of us approached it. What we did was call
10  him out of the vehicle. And then after he got out of
11  the vehicle, when he -- then we approached him and
12  placed him in handcuffs and then put him in the back of
13  the patrol car.
14 Q  All right. So you guys said, okay, whoever you are, or
15  called him by name, come out of the car, or words to
16  that effect?
17 A  Yes.
18 Q  You had your guns drawn and the -- all right. Now he
19  got out of the car, right?
20 A  Correct.
21 Q  All right. And did you have him put his hands up on
22  the car like the movies show and pat him down?
23 A  No. No, that's not the way we do it.
24 Q  All right. I don't -- how do you do it?
25 A  Well, we ask him to walk backwards towards us.

---

**Page 455**

1 Q  Okay.
2 A  And then we have him put his hands behind his back and
3  we put him handcuffs while one officer watches him and
4  the other one controls him.
5 Q  All right.
6 A  And then he's patted down and then placed in the patrol
7  car.
8 Q  Okay. And did you have him empty his -- turn his
9  pockets inside out?
10 A  Well, I wasn't the one that searched him. Officer
11  LeBlanc was the one that patted him down for weapons.
12 Q  Did you see LeBlanc search him?
13 A  Yeah. I saw him pat him down.
14 Q  Did he empty his pockets.....
15 A  I believe he pulled some things out of his pockets, but
16  I don't remember.....
17 Q  Okay.
18 A  .....what that was. There was a wallet and some
19  stuff.....
20 Q  And so Mr. Davis has got his hands behind him, so he's
21  obviously not doing any pulling, right?
22 A  No.
23 Q  Okay. So this is the police that are doing the search?
24 A  Right.
25 Q  Which would be, to your recollection, Officer LeBlanc?

---

1  THE CLERK:  Please raise your right hand.
2    (Oath administered)
3  MR. LAPORTE:  I do.
4        MARK LAPORTE
5 called as a witness on behalf of the plaintiff, testified as
6 follows on:
7        DIRECT EXAMINATION
8    THE CLERK:  Please be seated.  For the record, sir,
9 will you state your full name, and spell your last?
10 A  Mark William LaPorte, L-a-P-o-r-t-e.
11  THE CLERK:  Thank you.
12  THE COURT:  Go ahead, Ms. Brady.
13 BY MS. BRADY:
14 Q  How long have you been an APD officer, Officer LaPorte?
15 A  For five and a half years now.
16 Q  And what did you do before becoming an APD officer?
17 A  I was a police officer for about two and a half years
18    in Texas.
19 Q  Okay.  And have you ever had any training or experience
20    in detection, identification and investigation of cases
21    involving controlled substances?
22 A  I have.  I've had numerous schools to include Drug
23    Enforcement Administration's basic narcotics
24    investigator school.
25 Q  About how many investigations -- or -- that you've

Page 472

1    conducted, or cases you've worked on that involve
2    cocaine?
3 A  Working informants in larger scale cases such as this,
4    probably a dozen.
5 Q  Are you assigned to a particular unit?
6 A  I am.
7 Q  And what is that unit?
8 A  It's a special assignment unit.
9 Q  Is that the same unit you were assigned to during the
10    investigation of this case?
11 A  Yes, it was.
12 Q  Okay.  And are you familiar with Jeremy Fish?
13 A  I am.
14 Q  How did you become assigned to work with Mr. Fish?
15 A  I received a call from Officer Bushue and Detective
16    Pernue.  They had conducted a debriefing with Mr. Fish
17    at the request of district attorney Phil Moberly.
18    Detective Pernue could not use Mr. Fish as an informant
19    because she had other cases.....
20  MR. JAMES:  I'm objecting.  He's -- it's hearsay, and
21 he's talking about.....
22  THE COURT:  Yeah.  Yeah.  Just -- the objection is
23 sustained.
24 Q  Let's just go on to Mr. Fish's deal.  Did Mr. Fish have
25    a deal to work as an informant?

Page 473

1 A  He did.  He was to work as an informant, and there were
2    two targets that he had identified.  And part of that
3    deal, he had a burglary charge out of Nome that was
4    going to be mitigated or dismissed.
5 Q  Okay.  And how many people was he supposed to be
6    targeting in order to get that deal?
7 A  There were two subjects that he had identified he could
8    purchase cocaine from.
9 Q  And did he make the buys that he agreed to make?
10 A  Yes, he did.
11 Q  Okay.  And what happened to the other case?
12  MR. JAMES:  Objection.  Relevance.
13  THE COURT:  The -- can I have a bench conference,
14 please?
15    (Bench conference as follows:)
16  THE COURT:  What's the answer to the question?
17  MS. BRADY:  Where I'm trying to go is that the other
18 case is over, and it was going on at the same time as this
19 case.  That's all I'm.....
20  THE COURT:  Well, no.  the question you asked is what
21 happened.  Were you asking.....
22  MS. BRADY:  That it's over.....
23  THE COURT:  .....to say.....
24  MS. BRADY:  That it's over.
25  THE COURT:  You can say it's over.  You can.....

Page 474

1  MR. JAMES:  I still -- I don't -- I'm going to strongly
2 object.  I'm saying it right on the record right now, if
3 she's trying to work in by the backdoor the credibility of
4 Jeremy Fish, by saying, yeah, that one was pled out or.....
5  THE COURT:  That's why I called a bench conference.....
6  MS. BRADY:  Can I ask a leading -- can I ask a leading
7 question that says is that case over now?
8  THE COURT:  Yes, you may.
9  MS. BRADY:  And then we'll go.....
10  THE COURT:  And that will avoid that.
11  MS. BRADY:  Right.
12  THE COURT:  And the reason I overruled your earlier
13 objection is because you asked -- actually, both lawyers
14 inquired into Mr. Fish working the other case during
15 questioning earlier.  And you made a relevance objection
16 about that.  But it was already on the table.  But you can't
17 bolster his credibility by saying that we got a conviction
18 in that case, which is where I thought you were going.
19  MS. BRADY:  Okay.
20  THE COURT:  So you can avoid it by asking the leading
21 question, is that other case over.
22  MR. JAMES:  I think too, Judge, the witness had got to
23 instruct -- be instructed the answer is yes or no, not
24 anything -- explanation about what happened, because that
25 pulls it right in the door and I don't want that to happen.

Page 475

1   THE COURT: Well, you can do it one way or the other.
2 You can just make it as leading as possible. And tell him I
3 don't want.....
4   MR. JAMES: Just ask him for a yes or no answer.
5   THE COURT: Well.....
6   MR. JAMES: You could say.....
7   THE COURT: Wait a second. I get.....
8   MR. JAMES: I'm sorry.
9   THE COURT: I get to do that.
10  MR. JAMES: I'm sorry. I'm sorry.
11  THE COURT: That's all right. If you're confident that
12 he won't say anything inappropriate, you can ask a leading
13 question and make it as leading as possible. If you think
14 you need to do something else then.....
15  MS. BRADY: If he starts going into anything other than
16 yes or no, I'll just stop him.....
17  THE COURT: That's fine.
18  MS. BRADY: .....and redirect his attention.
19  THE COURT: That's fine.
20  MR. JAMES: I'm trying to decide if you want it on
21 here, because we're not going to -- this case is not going
22 to go on that.
23  (End of bench conference)
24  THE COURT: Rephrase your question, Ms. Brady.
25          DIRECT EXAMINATION CONTINUED

Page 476

1 BY MS. BRADY:
2 Q   Is that other case over?
3 A   Yes, it is.
4 Q   Okay. And to the best of your knowledge, has
5     Mr. Fish's burglary case from Nome now been dismissed?
6 A   Yes, it has.
7 Q   Okay. And does Mr. Fish have any other deals with
8     regard to any other cases or any other charges that
9     could come against him, or anything along those lines?
10 A  No, he does not.
11 Q  Okay. And were you the case officer assigned to this
12    case?
13 A  Yes. I was the case officer, and I was instructing or
14    mentoring Officer Grant Johnstone in how to work an
15    informant controlled case.
16 Q  Was there a reason that you were assisting Officer
17    Johnstone?
18 A  Yes. He did not have the experience I did. And I had
19    worked numerous cases in other types of drugs just
20    besides cocaine. And so I was basically the lead in
21    making sure he understood how the investigation carried
22    forth, everything he needed to do. Excuse me.
23 Q  Is Mr. Fish considered an easy informant to work with
24    or a hard informant to work with?
25 A  He was considered a difficult informant to work with.

Page 477

1    And that's another reason why I was assigned.
2 Q  All right. And let me just approach you with something
3    that's been previously admitted into evidence, state's
4    19. Can you just explain what this is?
5 A  Yes. When I began working drug cases, these go on for
6    some time, you make multiple buys. And to make sure
7    the information is clear and concise for me personally,
8    in my case file, I developed this. It's called a buy
9    check off list. And basically, it's -- it's got the
10   dates of each buy, and I put the person's name and what
11   their task was specifically on the controls that we
12   have on every buy. Because sometimes when officer
13   writes their paperwork or something, we do this so
14   often and so regular, they may forget to list that they
15   did a strip-search or list that. And -- and this helps
16   me as a case officer to know who did what job,
17   especially months later because it goes to court so
18   many months later. And this is just something, it's
19   not APD standard. It's my standard to try and make my
20   cases more efficient and for me to keep track of them.
21 Q  Okay. Now you talked about controlled buys, can you
22   just explain to the members of the jury what a
23   controlled buy is?
24 A  Yes. We -- we have controls, because when you're using
25   informants, understandably, the problems that you can

Page 478

1    have with informants, we -- there are several controls
2    that you have to have on each buy. Specifically, all
3    the money that is used to purchase the drugs is all
4    pre-recorded. It's all xeroxed, and that's kept.
5    Also, the informant is not allowed to take his or her
6    own money for the buys. It's only the police
7    department's money. The informant is strip-searched.
8    What I mean by a strip-search is the informant is
9    completely unclothed. All the clothing is gone
10   through, sock, pockets, everything the informant has
11   and is wearing on the buy, and he is searched. He has
12   to open his mouth. He has to pull his scrotum up,
13   check the front and back to make sure he has no other
14   money, no other controlled substances, no contraband.
15      If the informant drives their own vehicle, that
16   vehicle is also searched throughly. And for both the
17   person search and the vehicle search, I use, as often
18   as I can, the same person, because that person knows
19   how things are placed in the car, what's in the car,
20   and does the exact same search before and after. And I
21   just think that's a good thing to use. Also, the
22   conversations, we conduct debriefs after each search.
23   And let me back up. There must be a search before and
24   after each buy. And it's done in very close proximity.
25   The search of the vehicle, the search of the person is

Page 479

Exhibit C – 83

Page 480

1   done just, you know, within a very short period of time
2   before we go out to make the buy. When the informant
3   returns, the first thing he must do is we get the
4   contraband or the drugs from the informant. One
5   officer tests it while the other officer goes and does
6   a search of the person immediately once we return to
7   the station, and the vehicle.
8       A debrief is conducted on each buy. Even though
9   we have a search warrant to record conversation, and we
10  can hear that conversation to know what's going on, we
11  conduct a debrief with the informant. There's lots of
12  other information that we find out that you don't hear
13  from the wire, because, you know, a lot of this is done
14  in kind of code, very quiet. It's hard to tell
15  sometimes exactly what's going on. So a debrief takes
16  place. And then after that point in time, then he is
17  released from that controlled buy.
18 Q  Okay. Now do CI's generally know the -- and by CI, I'm
19     talking about confidential informants, do they
20     generally know the locations o the officers while the
21     buy is going on?
22 A  No. They don't very much information with the
23     officers. Specifically, the reason is is we use a lot
24     of the same cars. I work undercover, personally. I've
25     purchased drugs undercover, as many of the officers in

Page 481

1   this unit. We don't want them to know the other
2   officers in the unit. We don't want them to know what
3   they look like. We don't want them to know the cars
4   they're driving, where they are. All the informant
5   knows is someone will always have an eye on you.
6   That's called, as Somerset Jones, Officer Jones
7   mentioned, the eye. Someone always has an eye on the
8   informant, always a control to see what's going on.
9   And the other -- the other officers are used for
10  surveillance and control of the area.
11 Q  Ever had a confidential informant lie to you before?
12 A  Yes, I have.
13 Q  Ever had one steal drugs?
14 A  Yes, I have.
15 Q  Now let's talk about your first contact with Jeremy
16     Fish with regards to this case.
17 A  Okay.
18 Q  When did that happen?
19 A  On the 8th of February, this year.
20 Q  Okay. And what happened on the 8th of February?
21 A  He met with us at the station. Again, I was training
22     Officer Grant Johnstone on how to run the case. So I
23     was assisting him, but letting Grant attempt to run it.
24     Where he ran into problems or issues or questions, then
25     I took care of that. Mr. Fish made a phone call and

Page 482

1   the person that he was calling, he identified that he
2   was known to him as Rico, and he made a phone call to
3   purchase cocaine.
4 Q  Okay. And then once he made the phone call, what
5      happened?
6 A  Once he made the phone call, again a strip-search was
7      conducted, it was for $150, which was going to be the
8      buy. After the strip-search and the vehicle search, he
9      was given $150 of buy money, which had also been pre-
10     recorded. Since this was the first time we were making
11     a buy with Rico, we did not have enough evidence to
12     obtain a search warrant to record the conversation, so
13     this buy was not wired, which would -- means the
14     conversation is recorded.
15 Q  Okay. And now, had you ever checked to see if
16     Mr. Fish's license was suspended?
17 A  Yes. I -- I recalled that time because he was driving
18     his own vehicle, to make sure he had a valid license.
19     And I recall that I done that, and just to reconfirm
20     today, I requested an APSIN check, which has his
21     driving history, and it was not suspended at that time
22     during the buys.
23 Q  Okay. And then what happened after you left the
24     station?
25 A  After I left the station, prior to us leaving the

Page 483

1   station, I had the other surveillance units set up in
2   the area. We knew we were going to 202 Grand Larry.
3   And I had somebody positioned to have a close in eye so
4   they could see the door of where Mr. Fish would enter.
5   Myself and Officer Johnstone rode in the same car and
6   we followed Mr. Fish from the police station to the
7   area of 202 Grand Larry, just before he turned onto
8   Grand Larry, we continued straight, so we -- you know,
9   it was not obvious to somebody who may be watching that
10  we followed them all the way up. Once we turned -- he
11  turned onto Grand Larry, we turned off and stayed in
12  the area because there was officers on Grand Larry that
13  could actually see him drive up to the address and
14  enter into the residence.
15 Q  Okay. So then -- and what happened after the buy?
16 A  After the buy, I was told by the radio that he was
17     leaving the residence, and that he had got in his car
18     was leaving on Grand Larry. I was at the -- next
19     street. I got in behind him, myself and Officer
20     Johnstone. Because it was the first buy, because
21     Mr. Fish was deemed a difficult informant, I had not
22     gathered a lot of trust for him at that time. I wanted
23     the controls to be even tighter. So waiting until he
24     drove to the police station for him to give us the
25     drugs, I had him meet me at the church to give them to

| | |
|---|---|
| 1 me immediately. And that's what we did. And then we | 1 identify. And once I showed it to -- excuse me. Once |
| 2 drove to the police station and followed him to the | 2 I showed it Officer [sic] Fish, I had -- or, I'm sorry, |
| 3 police station. Which at that time, a strip-search | 3 Informant Fish, I have him actually circle who he |
| 4 again was conducted of him and a post-buy vehicle | 4 identified as the person being Rico and initial that. |
| 5 search, and then a debrief. | 5 Q Okay. So the markings on that were made by Mr. Fish? |
| 6 Q How long of a period of time elapsed from the time he | 6 A Yes. |
| 7 left the residence until you guys arrived at the | 7 Q In your presence? |
| 8 church? | 8 A Yes. |
| 9 A Oh, I think we had to stop for the red light at Duben | 9 Q Okay. And where was the photograph obtained from, did |
| 10 and -- Duben and Muldoon, but a minute, a very short | 10 you say? |
| 11 period of time. | 11 A DMV. |
| 12 Q Okay. And then what happened -- was that the end of | 12 Q And how does DMV obtain photographs? |
| 13 your involvement on that day with this case? | 13 A Well, Department of Motor Vehicles..... |
| 14 A On that day, yes. | 14 MR. JAMES: Objection. He's talking outside his area. |
| 15 Q Okay. And then let me direct your attention to | 15 It's hearsay. He's asking for opinion as to how other |
| 16 February 13th. Did you have any contact with Mr. Fish | 16 people obtain stuff. |
| 17 that day? | 17 THE COURT: Common knowledge. Objection is overruled. |
| 18 A Yes, I did. | 18 A Department of Motor Vehicles, of course, has copies of |
| 19 Q And did you know that who Rico was at that time? | 19 all our pictures that we take on the driver's license. |
| 20 A At that time, we did not -- not until that day, but | 20 And they have descriptions of -- they have groups of |
| 21 prior to that we, we did not. We believed we had | 21 descriptions of persons. So if it's a white female |
| 22 identified him. We identified him through two | 22 with black hair in the ages of 40, they've got a |
| 23 different sources, but until February 13th, when I | 23 category of groups of meeting that description, and |
| 24 showed the informant a photo lineup, that was the | 24 they just pull those copies of licenses, and that's how |
| 25 positive identification. | 25 they do each photo. Of course, they view to make sure |
| Page 484 | Page 486 |

| | |
|---|---|
| 1 Q Okay. And let me just approach with something that's | 1 they -- they look reasonably -- nothing looks out of |
| 2 been previously marked as state's exhibit 16. Do you | 2 the ordinary so it's not glaringly obvious who the |
| 3 recognize this? | 3 person is. They all look very similar in the six |
| 4 A Yes. This is a photograph -- a photographic lineup | 4 photos. |
| 5 that has the defendant in one of the six positions. | 5 Q Okay. And at this time -- so when you get the photo |
| 6 There were six photographs that -- that I showed the | 6 lineups, do they also give you a picture of the |
| 7 informant. | 7 defendant's -- I mean of a driver's license to go along |
| 8 Q Is this the actual photographic lineup that you showed | 8 with it? |
| 9 to Mr. Fish? | 9 A They do. They give you three things, six pictures that |
| 10 A Yes, it is. | 10 -- that equal the photo lineup. And I'll show -- you |
| 11 Q Does it truly and accurately depict the defendant and | 11 can see -- see the size of the pictures, each one. And |
| 12 five other people randomly selected? | 12 then they give you another sheet that has all six |
| 13 A Yes, it does. | 13 persons in the smaller format, but of their entire |
| 14 MS. BRADY: Okay. At this time, I move to admit | 14 driver's license. And then the third item they give |
| 15 state's exhibit 16. | 15 you is the individual that you requested for a photo |
| 16 MR. JAMES: No objection. | 16 lineup, they give you a large copy of -- of his |
| 17 THE COURT: 16 is admitted. | 17 driver's license or ID. |
| 18 (Plaintiff's exhibit 16 admitted) | 18 Q Okay. And is that that's been marked state's exhibit |
| 19 Q Can you explain to the members of the jury exactly how | 19 15 a true and accurate representation of the |
| 20 a photo lineup is prepared? | 20 defendant's driver's license? |
| 21 A Yes. You give to DMV, there's a contact person that | 21 A Yes, it is. |
| 22 you give the name and the identification or driver's | 22 MS. BRADY: At this time, I move to admit 15. |
| 23 license number that you want in the photo lineup. And | 23 MR. JAMES: No objection. |
| 24 then they pick the other five persons that look | 24 THE COURT: 15 is admitted. |
| 25 reasonably close to the person that you're trying to | 25 (Plaintiff's exhibit 15 admitted) |
| Page 485 | Page 487 |

1 Q   Now did you have Mr. Fish make any calls on February
2      13th?
3 A   I did.  Oh, I'm sorry, the 13th?
4 Q   Uh-huh.  (Affirmative)
5 A   Yes, I did.
6 Q   And who -- what number did he call?
7 A   He called again the same number as he did before, 727-
8      9465.
9 Q   Did you dial the phone?
10 A  No, he dialed the phone, but part of the control of
11     that is I actually have to watch him dial the numbers
12     to make sure he is dialing the numbers that he gave me.
13 Q  And was that call recorded?
14 A  That call was recorded, yes.
15 Q  And what happened during the call?
16 A  He spoke with a subject that Mr. Fish identified as
17     Rico.  And they spoke for a minute.  Rico told him that
18     he didn't have anything that night, but he would have
19     something tomorrow.  And the informant explained to me
20     that meant he did not have any cocaine, so we would try
21     another night.
22 Q  Did you try another night?
23 A  We did.
24 Q  Did you try on the 15th of February?
25 A  We did.
                                                    Page 488

1 Q   Okay.  And could you just explain what your contact
2      with Mr. Fish was on that day?
3 A   Again, he came to the police station to conduct a
4      controlled buy.  Again, he called the phone number,
5      727-9465.  This time we knew, confirmed to be
6      Mr. Davis.  And we set up a purchase of two balls,
7      meaning an eight-ball.  That was going to cost $200.
8      Rico originally said $225 and the informant talked him
9      down said, oh, come on, let's do it for $200 and Rico
10     agreed.  We were getting set up ready to go make the
11     buy, and I got a call from Lieutenant Holloway (ph),
12     which at the time was the lieutenant of the
13     metropolitan drug unit, which the special assignment
14     unit is -- works under in the chain of command.  And
15     they needed our unit for a higher-level drug operation.
16     So that took precedence, and I had to put this buy off.
17 Q  Okay.  And then what was the next -- what was done to
18     call the buy off?
19 A  I'm sorry?
20 Q  What was done to call the buy off?
21 A  Basically, we -- I had the informant recall and he got
22     voice mail.  And he just left a message saying that his
23     girlfriend got sick, and that he would call him back,
24     his girlfriend had to go the hospital.
25 Q  All right.  Now let me direct your attention to
                                                    Page 489

1      February 20th, did you have any contact with Mr. Fish
2      that day?
3 A   I did.  He was assigned to come into the police
4      department again and conduct a controlled cocaine buy.
5 Q   What number was called?
6 A   Again, the number was called 727-9465.
7 Q   And what happened during the call?
8 A   There was an agreement to be made to purchase $200
9      worth of cocaine.
10 Q  Okay.  Now you mentioned eight-ball a few minutes ago.
11     Is that a common term?
12 A  It is.  It's a street term for a certain amount of
13     cocaine.
14 Q  What's the amount?
15 A  Generally, it's about $200 is the going rate.
16 Q  Is there a weight of cocaine that that also describes,
17     or is it just for the money?
18 A  Well, it's supposed to be an eighth of an ounce, that's
19     the term.  But it's never exact.  Generally, it falls
20     on the lower side of that eighth of an ounce for profit
21     margin purposes.
22 Q  Okay.  And did a buy result from that call?
23 A  Yes, it did.
24 Q  Where was the buy arranged to occur?
25 A  Again, at the -- his apartment, which was at 202 Grand
                                                    Page 490

1      Larry.
2 Q   Okay.  And did that address, 202 Grand Larry have any
3      significance?
4 A   Yes.  Prior to when we were trying to identify who Rico
5      was, I requested a computer search within the police
6      department for that address.  And attached to that
7      address was a name of Robert Davis.  And also Officer
8      Johnstone, I requested for him to obtain a search
9      warrant after we made the first buy for the cell phone
10     number that we were calling.  So he obtained a search
11     warrant, it was granted.  And the person who owned that
12     cell phone was Robert Davis, which was the same full
13     name as the computer had listed attached to that
14     address.  So that was -- that was how we knew to
15     identify him and obtain a photo line up for Mr. Davis.
16 Q  Okay.  Now, the fact that someone is listed in the
17     computer doesn't mean that they've ever done anything
18     wrong, it just means that they've, at some point in
19     time, given that address to a police officer as a
20     victim of a crime or as any number of things, is that
21     right?
22 A  Oh, that's correct.  If you've been involved in an
23     accident, or a victim, it's -- all it is, is an address
24     that you gave once, and that's how it's listed.
25 Q  Okay.  And now prior to that buy, was Mr. Fish
                                                    Page 491

3AN-01-1717 CR

1 searched?

2 A  Yes, he was.

3 Q  And how thorough was the search?

4 A  Again, it was a strip-search, as protocol.

5 Q  Now did you conduct that search?

6 A  I was there for the search. Actually, I did conduct
7  that search. Let me check my notes. Yes, I did
8  conduct that pre-buy strip-search.

9 Q  Okay. And could you describe what you did during the
10  search for the members of the jury?

11 A  Okay. As I had showed Officer Johnstone in the same
12  manner of which I learned, they completely unclothe.
13  I'll check the pockets of the shirt and actually take
14  the sleeve and squeeze all the way down all the
15  clothing to make sure nothing is hidden in the sleeve.
16  The pockets, all the pockets through the clothing of
17  the coat, the shoes. I pick the shoes up, hit them,
18  look inside, make sure nothing is hidden in the shoes.
19  The socks, I turn them inside out and squeeze the socks
20  out. The pants, all the pants are pulled inside out.
21  I pat down through each of the legs of the pants, and
22  then have him open his mouth. He's a male, he pulled
23  up his scrotum, turned around, bent over, make sure he
24  had no contraband or anything else.

25 Q  Okay. And was any contraband found?

Page 492

1 A  No.

2 Q  All right. And what happened after he was searched?

3 A  After the search, he was given $200 of pre -- I'm
4  sorry? I thought you said something.

5 Q  No, I didn't say anything.

6 A  He was given $200 of pre-recorded buy money, and his
7  vehicle was searched.

8 Q  Okay. Now you could hear over the wire what was
9  transpiring when Mr. Fish was in the house, is that
10  right?

11 A  Yes.

12 Q  Okay. And, actually, I got a little ahead of myself.
13  What happened after that?

14 A  After that, again, I set up assisting surveillance
15  units in the area. We knew where we were going. It
16  was the same place as the previous buy. And myself
17  and Officer Johnstone again followed the informant to
18  the location.

19 Q  Okay. And now could you hear over the wire when
20  somebody indicated something about getting a pot for
21  cooking?

22 A  I could.

23 Q  What is the significance of that?

24 A  To make powdered cocaine into crack cocaine, powdered
25  cocaine is what's called hydrochloric acid, the

Page 493

1  version. And crack cocaine is cocaine base. You have
2  to take it from one product to the other. And you have
3  -- it's called -- the street term is cooking it up.
4  The recipe is approximately one-part cocaine to two-
5  thirds part, give or take, baking soda is the most
6  common way to cook it up. You put it in a pot of
7  water, and you boil it. And you put both substances in
8  and it bonds together and it becomes rock-like. That's
9  why you hear it called rock cocaine. It becomes hard.
10  That way, it's no longer a powder. And it transitions
11  it from the cocaine hydrochloric acid to what's called
12  base cocaine.

13 Q  Okay. And what happened after Mr. Fish left the
14  defendant's residence?

15 A  Well, initially, he came out and got in his car, we
16  thought he was leaving. Of course, I did not witness
17  this. I heard it over it over the radio. Someone is
18  always giving an updated -- the person with the eye
19  gives an updated status of what is occurring so
20  everyone else knows, so it's on the police radio. He
21  came out and got in his car. We thought he was
22  leaving. He just backed up. These people said they
23  were going to get a pot to cook it up, got in a car and
24  left. He pulled back in and parked and then went back
25  inside the house.

Page 494

1 Q  And did he come out again?

2 A  Yes. He came out, just moments later, got in his car.
3  This time with the -- with the previous buy, based on
4  his reliability that I had dealt with him that far, we
5  drove to the police station, and that's where we took
6  the cocaine, which later tested positive from him. A
7  post-buy vehicle search was done, a post-strip search
8  was done on his person and then a taped debrief.

9 Q  Okay. And did you have any other -- did you
10  participate any further with the investigation of this
11  case on that day?

12 A  On that day, no, I did not.

13 Q  Okay. Then let me direct your attention to February
14  21st.

15 A  Okay.

16 Q  What happened that day?

17 A  Again, the informant met us at the police station and
18  -- to do another controlled buy. Again, he called the
19  same number, 757-9465. The second, and this is the
20  third buy, they were recorded, meaning not only the
21  phone conversation, but also the wire when he went
22  inside. That was recorded and first he got a message,
23  the -- and he said -- he told Rico that he would call
24  him back later, there was voice mail. So we had to
25  call back a couple of times before we actually spoke

Page 495

| | |
|---|---|
| 1 with him, or before the informant actually spoke with | 1 I have previously marked as state's exhibit 3. Do you |
| 2 him. And an agreement was made for $200. This time, | 2 recognize that? |
| 3 it was specifically said over the phone, hard, all he | 3 A I do. This is an APD drug evidence envelope. And I |
| 4 had was hard. And all that is is street term for crack | 4 filled out the -- the P and E sheet, detailed |
| 5 cocaine or rock cocaine when it's hard. If the term | 5 description. It's crack cocaine. An estimated tar |
| 6 soft is used, that means it's powdered cocaine. | 6 weight is 1.55 grams. It has the date of February 21st |
| 7 Q Where was the buy arranged to occur? | 7 of 2001, and it has my initials. |
| 8 A It was arranged to occur at the Chevron at Old Seward | 8 MS. BRADY: Okay. And at this time, I move to admit |
| 9 and International. | 9 state's exhibit 3. |
| 10 Q Did you follow Jeremy Fish to the meeting place? | 10 THE COURT: Number 3? |
| 11 A I did. Again, I sent my surveillance units out earlier | 11 MR. JAMES: No objection. |
| 12 after we conducted a briefing. Myself and Officer | 12 THE COURT: Number 3 is admitted. |
| 13 Johnstone followed the informant there. He was given | 13 (Plaintiff's exhibit 3 admitted) |
| 14 pre-recorded buy money. Again, he was strip searched. | 14 Q Okay. Now let's talk about evidence handling for just |
| 15 His vehicle was searched prior to the buy. Once he got | 15 a second. Can you just describe to the members of the |
| 16 in the area, I was notified by other officers that | 16 jury what happens once you put it in the envelope, what |
| 17 there was there all ready a green Suburban, excuse me, | 17 happens to sensitive evidence like drugs? |
| 18 in the parking lot on the east side of the Chevron all | 18 MR. JAMES: I'm going to object, unless we're talking |
| 19 ready there. It had tinted windows. It was dark. So | 19 about what his personal knowledge is, or refuting a |
| 20 we were not sure if that was him, because we had never | 20 standard. I'm objecting to whether it's personal knowledge |
| 21 seen him a vehicle. But once the informant arrived in | 21 or what. |
| 22 the parking lot, he parked right beside of him and got | 22 THE COURT: The -- you can qualify regarding personal |
| 23 out and got into the Suburban with Mr. Davis. | 23 knowledge, or he can explain his institutional knowledge |
| 24 Q Okay. And did you subsequently verify who the owner of | 24 based on training. But you need to tell us which. |
| 25 the car was? | 25 MS. BRADY: At this time I was inquiring into the |
| Page 496 | Page 498 |
| 1 A I did. | 1 officer's institutional knowledge. |
| 2 Q And who was that? | 2 Q So I'm just asking in general, Officer LaPorte, what |
| 3 A I can't remember her name, through the -- through the | 3 happens with sensitive items like drugs or..... |
| 4 wire, he said it was his mother's car. But the | 4 A Well, there's explicit..... |
| 5 registered owner of the vehicle did not have the last | 5 MR. JAMES: I'm going to objection. |
| 6 name of Davis. So the wire said it was his mother's | 6 THE COURT: Overruled. |
| 7 car -- Mr. Davis said it was his mother's car, but the | 7 MR. JAMES: Okay. |
| 8 registered owner didn't say Davis. So I don't know if | 8 A There's explicit written policy in how evidence is |
| 9 she has a different name or a maiden name. So that was | 9 handled, specifically sensitive evidence such as drugs. |
| 10 the information I had. | 10 There is a drug envelope, as you can see, two person |
| 11 Q Okay. And how long did that meeting last? | 11 control, submitted and sealed by, that's my initials, |
| 12 A That was -- that was a very short period of time, to | 12 and my DSN, or badge number, witness and verified, |
| 13 give you the exact -- that lasted approximately two | 13 that's a second officer who must initial it and date to |
| 14 minutes. | 14 see that I weigh the drugs, I put the drugs in the |
| 15 Q And what happened after the meeting? | 15 envelope. And then it's sealed with tamper-proof tape. |
| 16 A He got in his car and drove back to the police station. | 16 These are all the seams of the envelope. Again, my |
| 17 Myself and Officer Johnstone followed him back to the | 17 initials and the date, which matches the date on front. |
| 18 police station. He gave the drugs to me and Officer | 18 Once property and evidence gets it, of course, they |
| 19 Johnstone did the debrief with him. At -- this time, | 19 confirm it, and then they put it in an vacuum bag, |
| 20 the third buy, Officer Johnstone was becoming much more | 20 which it is further sealed. And then they have their |
| 21 comfortable in the way a controlled buy went. So | 21 procedure, which I'm not aware of. I'm just aware of |
| 22 Officer Johnstone conducted the debriefing and I field | 22 the officer's handling procedure. |
| 23 tested the drugs, which I received a positive result | 23 Q Okay. So once you put it in the envelope, what do you |
| 24 for the presence of cocaine. | 24 do with it at the police department? |
| 25 Q Okay. Now let me just approach you with something that | 25 A We have a secure area that has double security |
| Page 497 | Page 499 |

1   measures. Number one, we have to have a special key to
2   get into this secured area. And then there are
3   lockers. The evidence is put in the locker with what
4   is called a property and evidence form and is filled
5   out, and a copy of that form is placed with the
6   evidence, and then the locker is locked. Once that
7   locker is locked, I have no access to it.
8 Q  Once the -- who can get into it once it's in the
9   locker?
10 A  Once it's in the locker, the only access is the
11   property and evidence technicians, which take over
12   custody from there. And that keeps the chain of
13   custody secure.
14 Q  Okay. And -- so let me just -- did you have any
15   further involvement on the 21st?
16 A  I did not.
17 Q  Okay. Then let me direct your attention to February
18   28th. What happened on that day?
19 A  This was a day that we were going to do what we term as
20   the buy bust, another controlled buy, but an arrest
21   will take place after that.
22 Q  Okay. And so when you say buy bust, what specifically
23   are you talking about?
24 A  What I mean is we'll conduct a controlled buy, and we
25   -- prior to this date, arrest warrants are obtained for

Page 500

1 Q  Okay. And -- now, did Mr. Fish know prior to making
2   the calls that he was making that this was the day
3   planned for the buy bust?
4 A  We generally don't tell the informants that bust is
5   going to happen. Specifically, they're worried for
6   their own safety. They're worried for what may
7   happen.....
8   MR. JAMES: Objection. He's not being responsive to
9  the question.
10   THE COURT: The question was directed at what Mr. Fish
11  knew that day, not -- not generally.
12 A  Oh. I'm sorry.
13   THE COURT: So can you answer that specific question,
14  please?
15 A  Okay. No, I don't believe that he knew a buy bust was
16   occurring that day.
17 Q  Thank you. Did you conduct a briefing to plan how the
18   buy bust would go down?
19 A  Yes, I did.
20 Q  And where was it arranged that the buy was going to
21   occur?
22 A  At the Pancake House in the 300 block of Muldoon Road.
23 Q  Okay. And when was it supposed to occur?
24 A  He told us it was going to occur -- it occurred almost
25   around midnight. It was late in the evening.

Page 502

1   the three previous buys. So the defendant, Mr. Davis,
2   had -- had received that day three arrest warrants for
3   delivery or control of a controlled substance,
4   misconduct involving a controlled substance is the
5   charge. And we were to serve those arrest warrants
6   after we did the buy. The reason for the buy bust is
7   that we want to show after the buy is done that the
8   informant was in the vehicle, that he was arrested,
9   that that was him. And if he does have anymore drugs
10   on him and we find those, and also, we're looking for
11   the buy money that was used and pre-recorded in that
12   buy.
13 Q  Okay. So let's talk about that day. Did Mr. Fish make
14   any calls that day?
15 A  Again, yes. He called the same number 727-9465 and
16   spoke with Rico. And this was -- this was recorded
17   pursuant to the warrant that we had.
18 Q  Okay. And was a buy set up during the call?
19 A  A buy was set up. What had happened is he came to the
20   station earlier in the day and made a call, we did not
21   get him -- so -- we did two buy busts that day. So
22   speaking to this specifically, he made a call earlier
23   during the day, and we did not get Rico until later
24   that evening where a -- a delivery was set up at the
25   Pancake House on Muldoon Road.

Page 501

1 Q  What happened after the meeting was set up?
2 A  The briefing, Mr. Fish was at the police station with
3   Officer Johnstone, and the other officers, we had just
4   finished up execution of another warrant unrelated to
5   this. So I conducted a briefing at the location of
6   where that warrant was being served, which was in close
7   proximity of Muldoon Road. And Mr. Fish was at the
8   police station. Officer Johnstone and another officer,
9   I don't recall who, because I wasn't there, recorded
10   the buy money, conducted the strip-search, conducted
11   the.....
12   MR. JAMES: I'm going to object. This is all hearsay.
13  He just said he wasn't there.
14 Q  Officer LaPorte, let me just direct your attention to
15   your involvement on that night.
16   THE COURT: All right. I want you to disregard the
17  last portion of the answer, only that portion that was
18  responsive to the specific question. And your next
19  question, Ms. Brady?
20 Q  What was your next specific involvement in this case
21   that night?
22 A  Okay. I conducted a briefing with the assisting
23   officers in the special assignment unit about where the
24   buy was going to occur and everyone's responsibility of
25   that buy.

Page 503

**Page 504**

1 Q   Okay. And what happened after -- did you then go to
2     where the buy was supposed to occur?
3 A   Yes, we did. I did not have a radio at the time,
4     because of my prior duties. So I was on the phone with
5     Officer Bushue, who had the wire and was recording the
6     wire. And the surveillance units were set up in the
7     area of the Pancake House, because we had one officer,
8     Officer LeBlanc, who was in a marked police vehicle, to
9     come in and conduct a takedown to make the arrest.
10 Q   Okay. And was that done?
11 A   Yes, it was.
12 Q   Okay. And did you subsequently determine who the
13     registered owner was of the car the defendant was in
14     that night?
15 A   I don't recall who it was. I remember that we ran the
16     license plate, but I don't recall who the owner was.
17 Q   Okay. Let me approach you with something I have marked
18     as state's exhibit 20. Do you recognize this?
19     MR. JAMES: I'm going to object to foundation, Your
20 Honor, at this particular junction. He said he didn't --
21 take a look at the exhibit.
22     THE COURT: I need to look at number 20. And are you
23 showing him this document to see if you can refresh his
24 recollection?
25     MS. BRADY: I am, Your Honor.

**Page 505**

1     THE COURT: Do that.
2 A   Okay.
3 Q   Do you recognize what that document is?
4 A   I do.
5 Q   What is it?
6     THE COURT: No. Wait a second. We're going to have a
7 bench conference, please. Excuse us.
8     (Bench conference as follows:)
9     THE COURT: The objection was foundation. I'm not sure
10 how that relates to this specific document.
11     MR. JAMES: Okay. He.....
12     THE COURT: And then I told you that you -- I asked
13 you, Ms. Brady, whether you were showing him the document to
14 refresh his recollection, you told me yes.
15     MS. BRADY: Uh-huh. (Affirmative)
16     THE COURT: But then you launched into a series of
17 questions which appeared to me like you were going to ask
18 him to tell the jury what the document was, rather than
19 asking him if you -- if it refreshed it's recollection. So
20 that's why we're -- that's why we're back here.
21     MS. BRADY: Okay.
22     THE COURT: So let's figure out where you're going and
23 see if there's an objection.
24     MR. JAMES: He.....
25     THE COURT: Just a second.

**Page 506**

1     MR. JAMES: I'm sorry.
2     THE COURT: We're going to -- I'm going to make the
3 state start over here, Mr. Davis [sic]. What -- what do you
4 -- what is your next question, and then we'll see if there's
5 an objection?
6     MS. BRADY: Okay. My next question is what is that,
7 that's the registration. He testified that he couldn't
8 recall who the registered owner was. Did you learn who the
9 -- who's the registered owner of the truck? Is that the
10 truck that was used in the 2/28 buy? I have my questions
11 written down out there, so I'm not positive exactly.....
12     THE COURT: You're going to ask him to identify the
13 registration and.....
14     MS. BRADY: I am, uh-huh.
15     THE COURT: All right. So that's that not a refreshing
16 of recollection. That's actually to put the registration in
17 evidence. Is that correct?
18     MS. BRADY: Right. I was.....
19     THE COURT: All right. Mr.....
20     MS. BRADY: .....letting him use that to refresh his
21 recollection, but I intend on putting it into evidence.
22     THE COURT: Mr. James?
23     MR. JAMES: There's no testimony, whatsoever, about --
24 from Officer LeBlant [sic], regarding the license plate, or
25 the ownership of that car. He said there's absolutely

**Page 507**

1 nothing in this testimony, saying this is DYS 221 or
2 whatever, I'm making up a license plate now, but there's --
3 it's void. So it's -- there's no foundation laid. And
4 they're attempting to bootstrap through the backdoor what
5 they can't get in the front door. He says he doesn't know
6 who the car belongs to, period. So I think that's where it
7 lies.
8     THE COURT: Well, it's not where it lies. So you can
9 refresh -- you can use any piece of paper to refresh
10 someone's recollection, even if the piece of paper is not
11 admissible. And if that's where you're going, then -- then
12 -- and the officer can actually testify that his
13 recollection is refreshed, you can do that.....
14     MS. BRADY: Okay.
15     THE COURT: .....then. To the extent there's an
16 objection to that, that's overruled. Now the next question
17 is whether you're going to -- whether you can get the piece
18 of paper in. Ms. Brady, can you respond to that objection?
19     MS. BRADY: Okay. What's the objection for the piece
20 of paper?
21     THE COURT: No foundation, that the officer can't
22 testify that that -- how he got that piece of paper or --
23 or.....
24     MS. BRADY: Well, I haven't got that far in my direct
25 examination yet. I will be asking him if he -- if he knows

1 -- he said that he ran the truck plate for the truck that
2 the defendant was in. And if that's the truck plate for the
3 -- I don't remember the license plate number of the truck.
4 But did you run it? Yes, I did. It was registered to the
5 defendant.
6     THE COURT: Before you tell the jury what the piece of
7 paper is, you need to lay a better foundation. I don't know
8 whether there will be another objection or not.
9     MS. BRADY: Okay.
10    THE COURT: But before you tell them that he's looking
11 at the -- before you tell the jury that he's looking at that
12 registration printout, you have to ask foundation questions
13 about what he did to get that.
14    MS. BRADY: Okay.
15    THE COURT: So you've got two different issues,
16 refreshing recollection.....
17    MS. BRADY: Right.
18    THE COURT: .....and whether you can mention that he's
19 looking at registration. And each had a different ruling.
20    MS. BRADY: Okay.
21    THE COURT: All right.
22    (End of bench conference)
23    THE COURT: Ms. Brady, why don't you restate your
24 question, please?
25        DIRECT EXAMINATION CONTINUED

Page 508

1 run a records check.
2     MR. JAMES: In grand jury, his testimony was he was not
3 there at the scene. So this is all hearsay on his part.
4 He's relying.....
5     THE COURT: I just made a ruling that it's -- that the
6 -- that the -- as an exception to the hearsay rule, the
7 officer is entitled to rely on other -- on business record
8 available to him to -- to get -- which includes police
9 reports, to get -- to run a license, rather than requiring
10 -- he can ask other sources what's the license plate and so
11 forth. And -- and you can challenge the reliability of that
12 information, that he -- but he's -- as an exception to the
13 hearsay rule.....
14    MR. JAMES: I understand.
15    THE COURT: .....he's entitled to rely on that.
16    MR. JAMES: I understand the exception, Judge. I just
17 want it clear that he was -- okay. I'll go into it on
18 regular cross exam.
19    THE COURT: Right.
20    MR. JAMES: Thank you. That's.....
21    (End of bench conference)
22    THE COURT: The objection is overruled. Do you
23 remember the question, Officer?
24 A  Yes, sir. The owner of the vehicle is Robert Davis.
25 Q  Okay. And does -- is there an address provided on that

Page 510

1 BY MS. BRADY:
2 Q  Okay. Now, Officer LaPorte, you stated that you did
3    run the plate of the truck that was -- the defendant
4    was in on the night of that buy, is that right?
5 A  Yes.
6 Q  Okay. And what kind of car was the defendant in?
7 A  He was in a Toyota truck.
8 Q  And what was the license plate number of the truck?
9 A  It was Delta Victor Echo 272.
10 Q  Okay. Now you stated that you didn't recall who the
11    registered owner of the car was, did that document that
12    I handed you refresh your recollection?
13 A  Yes.....
14    MR. JAMES: Your Honor, I'm going to object. Is this
15 his personal knowledge he's testifying to?
16    THE COURT: Have a bench conference, please.
17    (Bench conference as follows:)
18    THE COURT: Is that a hearsay objection, Mr. James?
19    MR. JAMES: Yes, Your Honor. I object, pure and
20 simple.
21    MS. BRADY: This is a business record. If I need to
22 get a DMV person in here to lay a foundation for it, I will.
23 He ran the defendant's truck, and that's how he learned.....
24    THE COURT: The objection is overruled. The officers
25 are entitled to rely on his business records to run -- to

Page 509

1    document as well?
2 A  There is.
3 Q  What's the address?
4 A  It's 202 Grand Larry Street.
5    MS. BRADY: Okay. And at this time, I move to admit
6 state's exhibit 20.
7    THE COURT: Number 20, Mr. James?
8    MS. BRADY: Your Honor, based upon the court's ruling,
9 I have a continuing objection to this.
10    THE COURT: All right. Number 20 is admitted.
11    (Plaintiff's exhibit 20 admitted)
12 Q  Okay. Now were you aware that the night that this
13    happened, that the buy funds were not found on the
14    defendant?
15 A  Yes, I was.
16 Q  What did you think happened to them?
17 A  I just assumed as is -- has happened in the past, many
18    times, the money is in the vehicle. So I expected to
19    find it in the vehicle when we executed a search
20    warrant on the vehicle.
21 Q  And did you participate in the execution of the search
22    warrant on the vehicle?
23 A  I did.
24 Q  And what as found inside the car?
25 A  A cell phone, but no money.

Page 511

1  Q  So once you realized that there was no money in the
2     car, what did you do?
3  A  Well, excuse me, I spoke with Officer LeBlanc who had
4     transported Mr. Davis to jail. And he said that.....
5  MR. JAMES: Objection. Hearsay.
6  THE COURT: Mr. Davis -- Ms. Brady?
7  MS. BRADY: It's not offered to prove the truth of the
8  matter asserted, of what Mr.....
9  THE COURT: All right. The objection is overruled.
10 A  He told me that the defendant didn't have any money on
11    him. To reconfirm that, I contacted Cook Inlet
12    Pretrial facility where the defendant was being held.
13    I spoke with them. They pulled up his record and told
14    me that when the defendant was placed into custody,
15    that he had $180 on his person. And I asked them if
16    that money was kept separate as his own personal money.
17    And I learned that, no, when someone is brought to
18    jail, that that money is put into a till with everyone
19    else's money. It's just documented the amount. So
20    it's not kept separate.
21 Q  Now, let me stop you right there. What day was this
22    going on on?
23 A  Well, he was booked in the early morning of the 28th --
24    or I'm sorry, the 29th. The buy conducted on the 28th
25    and then the 29th of March.

Page 512

1  Q  Okay. So what if anything.....
2  THE COURT: Just move the mike -- point that mike at
3  you a little bit.
4  A  Oh, I'm sorry.
5  Q  What did -- what, if anything, did you do once you
6     learned that the defendant had been checked into to
7     CIPT with the money?
8  A  Well, to -- to view the money in Cook Inlet Pretrial, I
9     needed a search warrant. So I contacted Officer
10    Johnstone, who had written the search warrants, and
11    instructed him to write a search warrant to search the
12    cash till at Cook Inlet Pretrial. And I drove to Cook
13    Inlet Pretrial with the copies of the buy money from
14    the last controlled buy and awaited for a call from
15 .  Officer Johnstone until he told me that a search
16    warrant had been granted.
17 Q  Okay. And once the search warrant was granted, did you
18    look through the money?
19 A  I did. There were several thousand dollars there. The
20    money was in a denomination of one $100 bill as -- and
21    five 20's. The only money that I found was the $100
22    bill. The serial number, of course, matched the pre-
23    recorded buy money. And over the two days, I was told
24    that, you know, 20's are the most frequently turned
25    over denomination of bill is what Cook Inlet Pretrial

Page 514

1  Q  No, there's no 29th.....
2  A  February, I'm sorry.
3  Q  There's no 29th of February.....
4  A  Oh.....
5  Q  .....in this year, so it would have been.....
6  A  Sorry. March 1st.
7  Q  Okay. And so then -- and what -- what day did you
8     actually do the search -- serve the search warrant on
9     the defendant's car?
10 A  The search warrant of the defendant's car was on the
11    1st, the next day. Or I'm -- yeah, correct, on March
12    1st, 2001.
13 Q  Okay. So how much time elapsed between the time that
14    the defendant was booked in, roughly, and the time the
15    search warrant was served? I'm not asking you for
16    minutes. I'm just asking for a rough idea.
17 A  About two days.
18 Q  Okay. And did you -- what, if anything, did you do as
19    a result of learning that the defendant had brought
20    money to CIPT?
21 A  And I -- I test- -- prior to that, I testified before
22    it was served on the 1st. I'm sorry, it was actually
23    served on the second. I just saw that in my report.
24    So let me retract the exact date. It was served on
25    March 2nd. I'm sorry.

Page 513

1     told me.
2  Q  Okay. Let me stop you right there. Do you recognize
3     state's exhibit 13?
4  A  I do.
5  Q  What is that?
6  A  It is a sensitive envelope for currency and jewelry for
7     Anchorage Police Department.
8  Q  Okay. And do you know what's inside of it?
9  A  I do.
10 Q  How do you know that?
11 A  On the outside, it says it is -- a detailed description
12    is $100. And I've also written on there buy money.
13    And it says one $100 bill for a total of $100. It has
14    my signature and another officer's signature. And
15    there are the three evidence sealed tapes of the
16    sealings. And on -- two months later, someone else has
17    opened this up, and they resealed it again with the
18    date that they resealed this.
19 Q  Okay. And did you date the envelope when you put it
20    in?
21 A  I did.
22 Q  What was the date?
23 A  March 2nd, 2001.
24 Q  And was it assigned a P and E number?
25 A  It was.

Page 515

Exhibit C – 92

1 Q  What was the P and E number assigned to it?

2 A  01 -- oh, I'm sorry, that's the case number.  The P and

3     E number is 418864.

4     MS. BRADY:  And at this time, I move to admit state's

5 exhibit 13.

6     MR. JAMES:  Objection, Your Honor.  There's no showing

7 that -- based on the officer's testimony, that thing has

8 been opened once after it left his hands.

9     THE COURT:  Overruled.  13 is admitted.

10            (Plaintiff's exhibit 13 admitted)

11 Q  Would you please open state's 13?

12 A  Sure.  Could I have some scissors, please?  Do you have

13    -- thank you.

14 Q  And I'm going to approach you with what's been

15    previously admitted as state's exhibit 11.  Do you know

16    what that is?

17 A  Yes.  It's a pre-recorded copy of the buy money used on

18    the buy for the 28th of February.  It's dated March

19    1st.  Case Officer LaPorte, and it's signed and

20    initialed by, it looks like Officer Grant Johnstone's

21    initials.

22    MS. BRADY:  Okay.  And at this time, I'm going to move

23 to show the jury the $100 bill and the state's exhibit 11.

24    THE COURT:  All right.  You can do that.  Are you going

25 to pass it around?

Page 516

---

1     MS. BRADY:  Yes.

2     THE COURT:  Thank you.  Officer, we'll just let the

3 jury look at it.

4 A  I'm sorry.

5     (Pause)

6     THE COURT:  Do you want to retrieve that, Ms. Brady?

7     MS. BRADY:  Yes.

8 Q  Okay.  Now, Officer LaPorte, did Mr. Fish ever tell you

9     that the defendant had gone to his work at Subway?

10 A  He did.

11 Q  Do you recall about when that was?

12 A  The first couple days of April of this year.

13 Q  Okay.  And did you have any involvement with Mr. Fish,

14    other than that, that we've just mentioned, since that

15    period of time?

16 A  Yes, I have.

17 Q  Okay.  And what was that?

18 A  Besides keeping track of -- trying to keep track of

19    where he lived and his jobs, one time I was sent to a

20    disturbance at the -- at the apartment that he was

21    living at in Mountain View.  And I spoke with him on

22    that occasion.

23    MS. BRADY:  Okay.  That's all the questions I have of

24 this witness, Your Honor.

25    THE COURT:  All right.  Mr. James?

Page 517

---

1     MR. JAMES:  Thank you.

2              MARK LAPORTE

3 testified as follows on:

4          CROSS EXAMINATION

5 BY MR. JAMES:

6 Q  Officer, now as I understand it.....

7     MR. JAMES:  If I may approach, Your Honor?

8 Q  .....the two items that (indiscernible - away from

9     microphone) on that in the manilla envelopes, is -- is

10    my understand of the sequence of events based upon

11    police written procedures is one of you weighs them, or

12    checks it or something, there's someone else there,

13    it's a two person control, right, at that juncture?

14 A  Yes, when the drugs are placed in the envelope, there

15    are two officers, and they must both sign an initial

16    verification of the drugs placed in the envelope.

17 Q  Okay.  And then are they weighed?  Do you have a scale

18    or something that you use?  I notice there's weights on

19    there?

20 A  Yes, it's an approximate weight.  We do have a scale,

21    and the drugs are weighed, either separately or with

22    the packaging that they're contained in, generally the

23    packaging.

24 Q  Well, is there consistency there, I mean, do we know

25    what that package, if it represents the packaging and

Page 518

---

1     the drug, or just the drug by looking at the package?

2 A  Well, it depends on the package.  It could be plastic.

3     It could be newspaper.  A different weights.  The

4     confirmed weight that is used will come back from the

5     state crime lab upon analysis.

6 Q  Now what's in the package is what you've -- you put in

7     the package, or it should have been put in the package,

8     if it is followed correct procedures, correct police

9     procedures, correct?

10 A  I'm not sure I understand your question, sir.

11 Q  That's fine.  The manilla envelope belongs to the

12    Anchorage Police Department, that particular -- those

13    particular manilla envelopes, correct?

14 A  Yes.

15 Q  Okay.  You get something you want to put in the manilla

16    envelope, whatever you've got in the manilla envelope,

17    is that the weight that is on the outside of the

18    manilla envelope?

19 A  That's an approximate weight, sir.  It's not exact.

20 Q  How do you weigh the item?

21 A  I have a scale, and as again, it's approximate weight.

22    I weigh the packaging that the drugs come in because

23    many people package the drugs in various items.  But

24    the exact weight of the drugs only is conducted at the

25    state crime lab where analysis is conducted.

Page 519

1 Q   Now, when you weighed -- you have one or -- how many of
2    those did you -- were involved in of yourself, of those
3    four items that you've got?
4 A   Three, I believe. Yes, three of them.
5 Q   Okay. What -- let's go from the -- from your right to
6    your left, okay? Is that the first one?
7 A   That is the buy on the 28th.
8 Q   Is that your -- are you involved -- initial is in that?
9 A   No, sir.
10 Q   Okay. Set that one aside. Move to the next one your
11    right, which would be one in from the 28th.
12 A   That was the buy on the 8th, which I did not place any
13    drugs at that time either.
14 Q   Okay. That's off to the side. Go to the next one,
15    please.
16 A   I was not involved in that, two other officers.
17 Q   Okay. And what -- can we identify that date on that
18    one, for the record?
19 A   That I was involved in, that was February 21st of 2001.
20 Q   Okay. So other than 2000 -- February 21st is the only
21    one you were involved?
22 A   As far as.....
23 Q   As initials go.
24 A   As far as placing the drugs in the envelope, yes.
25 Q   All right. So anybody else then, if they testify would

Page 520

1    talk about the others, you can only testify as to what
2    -- as far as your initials and the custody and control
3    of the 21st?
4 A   Yes.
5 Q   Okay. Now -- and how much did that one weight?
6 A   Tar weight, meaning the amount of the drugs I wrote in
7    is .155, and I dated it February 21st, 2001. 1.55
8    grams, I'm sorry.
9 Q   All right. So -- now how did that come to you?
10 A   The drugs?
11 Q   Yeah.
12 A   I received the drugs from the informant.
13 Q   And was it in something, in a container, in a package,
14    in a -- you understand my question?
15 A   I do understand the question and I'm going to check the
16    property and evidence sheet to recall my recollection
17    here.
18 Q   Sure.
19 A   Because I don't remember if it was actually packaged in
20    an item or not. Suspected crack cocaine in a baggie.
21 Q   Do you have recollection now, looking at your evidence,
22    how it was -- how it came -- you understand -- you said
23    bag, but like in a baggie, a plastic baggie, or --
24    that's what I'm asking is.....
25 A   The description is written by Officer Johnstone who

Page 521

1    filled out the P and E, but we can open it up if you
2    would like to look, sir.
3 Q   Yeah, why don't you open it up?
4 A   Okay.
5 Q   With the court's permission.
6 A   I just.....
7    THE COURT: That's fine.
8 A   Yeah. The scissors, please. Okay.
9    MR. JAMES: (Indiscernible). If I may approach?
10 Q   So what we've got there is a -- is a baggie, a plastic
11    baggie, right?
12 A   Correct.
13 Q   Okay. Now, did you weigh the baggie and what's in the
14    baggie, or did you take it out and weigh it or.....
15 A   No, it did not come to us in the baggie.
16 Q   Oh, okay, I'm sorry. That's -- my question is how did
17    you get it, I guess?
18 A   Oh. He handed it to me. How did I get the baggie?
19 Q   No. No. I'm not asking my question correctly.
20 A   Okay. I'm sorry.
21 Q   Did it come in just -- here's my pen, or here's my pen
22    in a -- in a package? Do you understand my question?
23 A   I do.
24 Q   Okay.
25 A   It came just in the form of rock cocaine. It was

Page 522

1    wrapped in nothing.
2 Q   Nothing? Okay. So just -- okay. That's -- all right.
3    Now you testified that -- now in relationship to your
4    own now, after you sealed it in the manilla envelope --
5    well, you -- you put it in the plastic bag, correct?
6 A   Yes. Because if it was just in the manilla envelope,
7    you can see there's crumbs. We don't want to lose
8    anything, so I placed it in a plastic bag.
9 Q   Okay. So the plastic bag is yours, you put the plastic
10    bag in the manilla envelope and sealed it with all the
11    tapes that you've earlier testified to. I think you
12    called them evidence tapes?
13 A   Yes, sir.
14 Q   Okay. Now, who vacuum packs that?
15 A   Property and evidence technicians.
16 Q   You have nothing to do with that then?
17 A   No control, whatsoever.
18 Q   Okay. So as soon as you put it into what I believe you
19    earlier testified was a lock box or (indiscernible) or
20    do you -- box the correct term or.....
21 A   A locker is, I believe what I used.
22 Q   A locker? Okay. Then it's out of your control?
23 A   Yes.
24 Q   You don't know what happened to it -- whoops, let me
25    try that again. You do not know what happens to it

Page 523

1 that doesn't mess up anybody Thanksgiving cooking or I think
2 there's a couple of basketball games on Wednesday afternoon.
3 But I'm just giving you a fair warning ahead of time. And
4 I'll let you go, see you in the morning at 8:30.
5     MS. BRADY: At what time?
6     MR. JAMES: What time?
7     THE COURT: 8:30.
8     MR. JAMES: Oh, okay.
9     (Jury excused)
10     THE COURT: All right. I need to take up a couple
11 issues with you all, but I need to take a really short
12 break. And so why don't we do that and then we'll come back
13 and work for 10 minutes or so, and then you call take off
14 for the rest -- until we come back at 2:45 to jury
15 instructions.
16     MR. JAMES: You're going to make it so we're not going
17 to get out of this room, Judge.
18     THE COURT: Actually, why don't we just deal with our
19 issues at jury instruction time.
20     MR. JAMES: Okay. All right. That's fine. I'll stick
21 around.....
22     THE COURT: And I'll let everybody go.
23     MR. JAMES: I was just, you know.....
24     THE COURT: So we'll see you -- no, you make sense.
25     MR. JAMES: Okay.

Page 544

1     THE COURT: 2:45 tomorrow -- or this afternoon, excuse
2 me. Yes, sir?
3     UNIDENTIFIED VOICE: Do you know, lots of times you'll
4 have evidence tape back here and I can seal all this back up
5 (indiscernible).....
6     THE COURT: We have some -- some drugs and money open,
7 so we need to do whatever -- and they're admitted.
8     MS. BRADY: It should be in here.
9     UNIDENTIFIED VOICE: (Indiscernible).
10     (Off record)
11 1:2046
12     (This portion not requested)
13 2:4053
14     THE COURT: .....Davis. Our jury isn't here, but I do
15 have Mr. Davis here with his lawyer, Mr. James, and Ms.
16 Brady. We're going to do jury instructions. And let's work
17 on that for a while and we'll take up other issues. Ms.
18 Brady, you have a 3:30?
19     MS. BRADY: I do, Your Honor. And, actually, I have a
20 very quick issue that I would like to take up first.
21     THE COURT: Before jury instructions?
22     MS. BRADY: Before jury instructions.
23     THE COURT: All right.
24     MS. BRADY: This morning when Mr. Fish was late and I
25 called my office, and I think I might have disclosed this to

Page 545

1     Madam clerk. I don't ....
2 2:4124
3     (Corrupted audio)
4 2:4130
5     .....going on, she did. She said that Ms. Bohman (ph)
6 said that he had just dropped off her off and that he should
7 be here shortly, and then probably 15 minutes later is when
8 he finally showed up. And that's it.
9     THE COURT: All right. All right. Jury instructions.
10 I have the state's proposed instructions. They're not
11 numbered, so I'm just going to go through them in the order
12 that they were filed. I'll refer to them by subject matter.
13 And since the state proposed them, unless I have a question
14 about them, I'll just turn to you, Mr. James, and ask you
15 whether you object or not.
16     MR. JAMES: Understood.
17     THE COURT: I may ask both of you why I need an
18 instruction, even if it's proposed by the state and not
19 opposed. My general view in instructing juries is less than
20 better is more. I don't see why I need to be redundant.
21 And I don't see why I need to instruct the jury on -- on
22 common sense, so -- or at least more than once. So I may
23 raise those issues as we're going through this. So let's
24 just start. The evidence has now been presented?
25     MR. JAMES: Fine.

Page 546

1     THE COURT: The presumption of innocence and burden of
2 proof?
3     MR. JAMES: It was can, thank you.
4     THE COURT: Pardon me?
5     MR. JAMES: Yes. I said it was can. Thank you.
6     THE COURT: Yes. All right.
7     MR. JAMES: I'm sorry. I didn't.....
8     THE COURT: Fact may be proved by direct or
9 circumstantial evidence?
10     MR. JAMES: Could we go back and visit the other one?
11 I don't believe -- never mind. Never mind. I'm sorry. Go
12 ahead.
13     THE COURT: Facts may -- direct or circumstantial
14 evidence?
15     MR. JAMES: Yeah. That's -- okay. Yes.
16     THE COURT: No objection?
17     MR. JAMES: No. That's can.
18     THE COURT: All right. The next one is the old pattern
19 instruction. Every person who testifies under oath is a
20 witness. I've all ready read to the jury new pattern 1.10.
21 I read it at the beginning of the case. I would be inclined
22 to put this one in the back of the jury -- put the new
23 pattern one in, which is shorter than this proposed
24 instruction, in the back of the jury instructions. Tell
25 them it's there. Tell them it's important, but not read it

Page 547

1 any rule.

2    MR. JAMES: That's just the -- no, I don't have an
3 objection to that. That's.....

4    THE COURT: It's the duty of the attorney on each side
5 to object. I instructed them on that in detail at the
6 beginning of the case. I used new pattern 1.09. And I
7 would like to just stick new pattern 1.09 at the end of the
8 packet and tell them I've already instructed them on it and
9 tell them that I'm not going to read it again, but it's an
10 important instruction.

11    MS. BRADY: I don't have any objection to that, Your
12 Honor.

13    MR. JAMES: No, that's.....

14    THE COURT: All right. How about anything I've said or
15 done has suggested what I think?

16    MR. JAMES: No, Your Honor.

17    THE COURT: Meaning no objection?

18    MR. JAMES: No. No objection, Your Honor. It's --
19 it's standard.

20    THE COURT: Attitude and conduct of the jurors?

21    MR. JAMES: That's just -- no objection. It's telling
22 them to.....

23    THE COURT: Verdict must be unanimous.....

24    MR. JAMES: That's.....

25    THE COURT: .....consider the judgement of each juror?

Page 560

1    MR. JAMES: Has to be. No objection.

2    THE COURT: All right. The next one is a -- bailiff
3 will be appointed?

4    MR. JAMES: No objections.

5    THE COURT: And the last one is you were accepted as
6 jurors in reliance upon your answers. But this may be a
7 pattern from someplace, Ms. Brady, but it's redundant with
8 some other stuff. And I'm trying to remember where it is.
9 Because I ran into it the other day when I read it. Each of
10 your verdicts must be unanimous, one, two, three, four
11 paragraph down is redundant. Maybe that's it.

12    MS. BRADY: Okay. So you want me to take each of your
13 verdicts must be unanimous out of there?

14    THE COURT: Well, yes, because I've just -- well, I've
15 just said it two instructions before.

16    MS. BRADY: Okay.

17    THE COURT: Mr. James?

18    MR. JAMES: Yes, Your Honor. I think that's proper.
19 And I don't have any objections. This is the sequence of
20 events in the jury room.

21    THE COURT: Right. I think that's it, in terms of
22 redundance. And then we have four verdict forms?

23    MS. BRADY: Your Honor, I proposed an instruction for
24 whether the defendant taking the stand as well.....

25    THE COURT: Yes, you did. I didn't know who proposed

Page 561

1 that.

2    MS. BRADY: It was.....

3    THE COURT: And I have -- do you have that, Mr. James?

4    MR. JAMES: Yes. That's a back one. The last one.

5 Defendant has testified in this case.

6    THE COURT: And if the defendant chooses to testify,
7 can I use that one instead of the other one?

8    MR. JAMES: Yes.

9    THE COURT: All right. I have that. It must still be
10 on my desk, but I do have it. How about the verdict forms,
11 Mr. James?

12    MR. JAMES: Pretty cut and dry. I don't see a reason
13 to object, Judge.

14    THE COURT: All right. If you have instructions that
15 you want me to give, Mr. James, they need to be -- I would
16 like to say they should be in by the end of the day, but
17 that's getting pretty close. So could you bring them in
18 tomorrow morning?

19    MR. JAMES: Yes, sir.

20    THE COURT: All right. And.....

21    MR. JAMES: Okay.

22    THE COURT: .....we'll take whatever time is necessary
23 to do that. Let's talk a little bit -- well, you filed a
24 motion asking me to order either pay for transport of a
25 witness, or order the state to pay for transport of the

Page 562

1 witness. I haven't asked for an opposition, but I'm going
2 to deny the motion. Mr. James, there's no legal authority
3 that I'm aware of for me to do that. The public defendant
4 statute, title 18, section 85 implements the state's
5 obligation to provide counsel for indigents at state
6 expense. And that statute says that if a person can't
7 afford the cost of defense, which could include counsel or
8 pay for witness transport, that he can apply for appointment
9 of counsel. And if he shows indigency, he gets counsel
10 appointed and all the things that go along with it,
11 including witness transport costs.

12    It doesn't provide for a hybrid kind of repre -- kind
13 of state-funded expense that allows the state to fund some
14 aspects of the defense, but allows him to pay for a private
15 lawyer. And I'm not aware of any case law that that says
16 that -- required to do that in this case. I also don't have
17 a showing of indigency. And I don't have a showing of --
18 and I'll leave it at that. So the request is denied.

19    Let's talk about tomorrow. Assuming that we finish mid
20 to late morning, I'm not inclined to cram in -- to try to
21 cram in closing statements and send the jury out at 2:30 or
22 3:00 in the afternoon, in part because I have to get the
23 instructions ready. And in part because I have other cases
24 starting at 2:00 o'clock. If we finish earlier than that,
25 then -- then we might be able to accomplish that. So I

Page 563

1 think you all need to consult and see if that's likely to
2 happen.
3    MR. JAMES: Okay. In conjunction with that, is -- do
4 you plan on calling Officer Garcia, Greg Garcia?
5    MS. BRADY: No.
6    MR. JAMES: Okay. I -- we earlier talked about -- I
7 advised the court that he was -- had just had surgery. And
8 the issue was whether or not he wold be able to -- excuse me
9 -- testify telephonically. And we were kind of up in the
10 air as far as the state's position went in relationship to
11 that. I need to get a readout.
12    THE COURT: Ms. Brady?
13    MS. BRADY: I indicated that I may not oppose if I know
14 the substance of the testimony, as I can not oppose
15 something in a vacuum. So if you want to tell me what the
16 substance of the testimony is.....
17    MR. JAMES: Yeah. Basically, it's my -- in talking
18 with Officer Garcia, he was the booking officer. And that's
19 based upon the fact of his signing the stuff.
20    THE COURT: Uh-huh. (Affirmative)
21    MR. JAMES: The police reports from Officer LeBlanc
22 says that -- and we haven't heard from Officer LeBlanc yet,
23 but says that he asked the CIPT, I think is the terms he
24 used, I can grab the right terminology to search for the
25 money. And they did and no money was found. In conjunction

Page 564

1 visit a person that's incarcerated in there, it's logged in.
2 And in talking with Officer Healy, it's my understanding
3 that Officer Davenport is really the computer man who has
4 all this stuff in the machine. And if you hit the right
5 buttons, and out it comes. But if we're going to be -- if
6 all of the records are going to be brought in by Davenport,
7 then that's going to alleviate Healy. If they're not going
8 to be brought in by Davenport, then I'm going to bring -- I
9 would want to have a subpoena issued for Healy. Am I making
10 myself kind of clear?
11    THE COURT: You are.
12    MR. JAMES: I'm babbling, but.....
13    THE COURT: Right. But what about Garcia?
14    MR. JAMES: Oh. Well, I mean -- oh, that's what my
15 purpose in calling Garcia is, is that did he conduct the
16 search according to their procedures at the request of APD,
17 and did he find.....
18    THE COURT: A search of?
19    MR. JAMES: Of Mr.....
20    THE COURT: After he was booked?
21    MR. JAMES: In the booking process. He's the booking
22 officer.
23    THE COURT: All right.
24    MR. JAMES: So the way I understand the sequence of
25 events is arresting officer bring someone in there. There's

Page 566

1 with that, the -- I just want to establish that, in fact,
2 CIP did -- CIP did, in fact, search for the money and no
3 money was found. Because, obviously, the issue here, as
4 testified by Officer LaPorte, is they found the money in the
5 common fund of some $8,000 is -- according to what my
6 recollection is -- Consequently, if it was not found on
7 his person, not found, and this is not a secret, so, wasn't
8 found on his person, wasn't found during the search at CIPT
9 and then was found later on in a common fund, as to how -- I
10 just want to get this clarified that he did, in fact do
11 that. I intend to call -- and I don't know, do you intend
12 to call someone from the office -- excuse me, from records
13 from CIPT?
14    MS. BRADY: Uh-huh. (Affirmative)
15    MR. JAMES: Okay. Who are you going to call?
16    MS. BRADY: Davenport.
17    MR. JAMES: Okay. Is he going to bring all the
18 records? Because I've got a subpoena ready for Healy, which
19 I believe works for -- I think her name is Esther Healy, who
20 is a -- who works for CIPT in the records  department to
21 bring all the records. But if he's going to bring all the
22 records, including the medical records, and any money, or
23 trans -- visitors or transactions relating to the file --
24 the way I understand CIPT, Judge, is if you bring money into
25 a person that's incarcerated in there, it's logged in. If you

Page 565

1 a booking process where they put somebody in a holding cell
2 while they're processing the paperwork. They then do a
3 booking search and the inventory, at which one of the things
4 that he did was list his personal items. And then this is
5 where the $180 comes in in the computer printout. If the
6 search was done by Officer Garcia at that time, utilizing
7 normal procedures and nothing was found, and he reported
8 that according to Officer LeBlanc of APD, then I think we've
9 established that Mr. Davis did not have any money in -- on
10 his person that related to this particular buy money.
11    THE COURT: But -- but Garcia was the -- the actual
12 booking officer at Cook Inlet who booked in Mr. Davis?
13    MR. JAMES: That's according to what he -- I -- I faxed
14 him over.....
15    THE COURT: All right.
16    MR. JAMES: .....the sheet, and that's what he told me,
17 yes.
18    THE COURT: All right. Ms. Brady?
19    MS. BRADY: Can I indicate to the court in the morning?
20 I want to do some checking myself this afternoon, and then
21 I'll tell the court first thing in the morning tomorrow if
22 I'm going to object. But it sounds at this point like I'm
23 not going to, but before I agree, I just want to check
24 something.
25    THE COURT: All right. And Garcia is ill and can't

Page 567

1 come to court?

2    MR. JAMES: My office talked to him today, Judge. And
3 he's -- he's still -- according -- and I have not talked to
4 him today. But according to Keri McClure (ph) of my office,
5 he's still down and cannot come.

6    THE COURT: While you're deciding whether you object,
7 you need -- I mean, it seems to me that there's a
8 significant difference between choosing not to pay to bring
9 somebody and not being able to bring somebody because of
10 illness. And the only other answer would be to wait until
11 the guy is capable to come to court, which might cause -- at
12 least be grounds for requesting a continuance.

13    MS. BRADY: I agree, and that's -- I was just going to
14 call him and find out what he thought about coming and that
15 kind of thing so that I can decide whether or not.....

16    THE COURT: All right.

17    MS. BRADY: .....I should continue objecting. If he's
18 sick, I'm not going to make him come to court. I'll not
19 oppose that.

20    THE COURT: All right.

21    MR. JAMES: Well, I need to get a subpoena to him.
22 That's my situation, is if he's -- he's willing to testify,
23 but he would like to testify telephonically. If.....

24    THE COURT: Why don't you get a subpoena to him and --
25 but also tell them that we're -- you're trying to convince

Page 568

1    MR. JAMES: All right. Well, okay. Well, I guess
2 we're kind of up in the air at this particular juncture.
3 Now, I don't know. Do I need to subpoena -- I guess that's
4 my call on Healy, right? Healy is the records -- one of the
5 records ladies. So if that's.....

6    THE COURT: I'm going to stay out of that one.

7    MR. JAMES: All right. Well, I can talk to.....

8    THE COURT: All right.

9    MR. JAMES: .....Ms. Brady on that.

10    THE COURT: All right.

11    MR. JAMES: A couple of other housekeeping. Now I
12 never moved to admit any of the diagrams that Jeremy Fish
13 drew.

14    MS. BRADY: I have no objection to their admission.

15    MR. JAMES: Okay. Well, that's fine. I'm just doing
16 some housekeeping.

17    THE COURT: Are you moving them in now?

18    MR. JAMES: Yeah, I move to move -- I would move to
19 have them admitted now and I think.....

20    THE COURT: All right. Let's just -- let's just do it.
21 And those are E, F, G and H. And those are admitted.

22        (Defendant's exhibits E, F, G and H admitted)

23    MR. JAMES: All right.

24    THE COURT: And do we have another issue, or did we
25 resolve that our self?

Page 570

1 me to allow him to testify telephonically.

2    MR. JAMES: All right.

3    THE COURT: And then you'll be covered.

4    MR. JAMES: I understand. But we've got a little bit
5 of time-wise here. I think he lives in Eagle River, a 694
6 number. So I just feel kind of.....

7    THE COURT: Well, I'm going to give Ms. Brady the
8 opportunity to check and the representation that he's not
9 physically capable of coming to court. And we'll take that
10 up first thing in the morning.

11    MR. JAMES: All right. That -- I mean, I understand
12 what you're saying, I just -- I don't want to get in the
13 position of saying, hay, I've got to have some more time to
14 get him here. I mean, I understand the court would like to
15 keep this thing rolling, and I'm trying to get my ducks
16 lined up now so that if we're going to roll -- you know, to
17 roll, rather than end up in a situation of saying, well,
18 we're going to take an hour, I picked it out of the sky.....

19    THE COURT: No, I understand that. And I -- I hear Ms.
20 Brady saying that if she really believes that he's ill,
21 she's not going to object to telephonic testimony. If he's
22 capable of coming in, she's going to ask you to bring him
23 in. And I think that's a wise -- in terms of not objecting
24 if he's really ill, that's probably a good idea. And that
25 -- so.....

Page 569

1    THE CLERK: We resolved it.

2    THE COURT: All right.

3    MR. JAMES: Do we have any other -- while you're still
4 there, do any other ones that are admitted, Madam clerk,
5 that we have.....

6    THE CLERK: I show defendant exhibit D as a report.
7 But I don't have it.

8    UNIDENTIFIED VOICE: I think that was changed to an EH
9 number.

10    THE CLERK: Okay. All right. Yeah. You're probably
11 right. Then so the only one I have is defendant's exhibit
12 C, which is a letter to the DA and the diagrams.

13    THE COURT: The only other defense exhibits admitted?

14    THE CLERK: Right.

15    THE COURT: All right.

16    THE CLERK: C, E, F, G and H.

17    MR. JAMES: Do you have any objection to the letter
18 that we talked about?

19    MS. BRADY: I think it's all ready been admitted.

20    MR. JAMES: I thought.....

21    THE COURT: C was admitted.

22    MR. JAMES: C was admitted? Okay. I'm sorry. I just.

23    THE COURT: All right. So if we're going -- if it's
24 likely, and I'm not -- if you're going to finish with the
25 evidence by 11:30 or 12:00, then I'm likely to require you

Page 571

1 You are still under oath.

2     MR. LAPORTE: Yes, sir.

3     THE COURT: And Mr. James, you can continue your cross

4 examination.

5     MR. JAMES: Thank you, Your Honor. If I may approach?

6                 MARK LAPORTE

7 previously sworn, called as a witness on behalf of the

8 plaintiff, testified as follows on:

9         CROSS EXAMINATION CONTINUED

10 BY MR. JAMES:

11 Q    Officer, when we left last -- yesterday, I was going to

12     say last night. It wasn't last night. You had, I

13     believe, behind you there, you had -- flip up to where

14     you drew a diagram. Do you recall that?

15 A    I didn't draw a diagram.

16 Q    You didn't draw a diagram? Flip up to kind of the last

17     -- last one if you would, please?

18 A    This one?

19 Q    Yeah. Well, just flip up to the next page since you

20     didn't draw that one. Let's just go to one that's --

21     if you could very briefly give me a quick diagram of

22     Grand Larry as you recall it? And the two side street

23     -- are they -- yeah, they are two streets,

24     intersecting streets.

25 A    Okay.

Page 579

1 Q    Okay. Okay, we got 202. Am I correct to say that that

2     is a duplex?

3 A    Yes.

4 Q    Okay. Which side is 202?

5 A    I couldn't tell you.

6 Q    Okay.

7 A    I never -- as I testified before, once the informant

8     would turn off onto Grand Larry, from either direction

9     I had someone that was close in -- is a close in high,

10     and I would not follow them further down the street, so

11     -- so many vehicles wouldn't be driving down the

12     street.

13 Q    All right. The incidents at Grand Larry took place at

14     night, correct?

15 A    Correct.

16 Q    Okay. And that was about -- a ballpark, it was about

17     10:30, that time frame?

18 A    A ballpark, yes, sir.

19 Q    Okay. What are the lighting conditions like on Grand

20     -- excuse me, Grand Larry and Du'ben and Peck? Well,

21     first of all, let me -- Duben and Grand Peck [sic], are

22     they the two horizontal streets in between Grand Larry

23     where we were talking about?

24 A    Yes.

25 Q    Okay. Do you -- what are the lighting street -- oh,

Page 580

1     excuse me, what are the lighting conditions like on

2     Grand Larry?

3 A    I couldn't tell you, sir. As I said, I -- I didn't

4     drive down into the buys.

5 Q    Okay.

6 A    I never went by and did surveillance after that.

7 Q    Okay.

8 A    I didn't deem it necessary.

9 Q    All right. Now, I'm going to call your attention to

10     page 16 of the document I gave you.

11 A    Okay.

12 Q    Do you recall the gr -- telling the grand jury, on July

13     the 2nd, that the informant didn't have a cell phone?

14 A    I'm sorry, what was the question again, sir?

15 Q    Do you recall telling the grand jury, on July 2nd, that

16     the -- excuse me, Jeremy Fish did not have a cell

17     phone?

18 A    That is correct.

19 Q    Okay. (Pause) Okay, turn to page 21, please. The

20     last paragraph where it starts off mark report

21 A    Okay.

22 Q    Not the last one, but do you understand what I'm

23     talking about there?

24 A    I do.

25 Q    Okay. Did you tell the grand jury at the Cook Inlet

Page 581

1     Pretrial where a search was conducted there?

2 A    I did.

3 Q    Okay. Turn to page 22, please.

4 A    Okay.

5 Q    Up on the second paragraph where it says Mark LaPorte?

6 A    Yes.

7 Q    Okay. Do you recall telling the grand jury words -- or

8     that -- well, we are going to hear from Office -- you

9     are talking about Officer LeBlanc here, aren't you?

10 A    Yes, sir.

11 Q    Okay. Do you remember telling the grand jury you were

12     in a hurry to get back with the drugs and get that

13     under control?

14 A    Yes.

15 Q    Okay. You had -- to your information, now, you had

16     Jeremy Fish under visual observation, and at some point

17     in time, you folks obtained from him the product,

18     right, at that -- we're talking -- I'm talking now

19     about the 28th/1st?

20 A    The last buy?

21 Q    The last buy, right.

22 A    Yes.

23 Q    Okay, so we are not confused, and I'm not trying to

24     confuse you. You were in a hurry to get back with the

25     drugs and get that under control. Did you tell the

Page 582

State v. Robert Davis
November 20, 2001

1 Q   All right.

2 A   I never saw him actually have a business at his

3     mother's house.  I never did surveillance on his

4     mother's residence.

5 Q   So that supposition is based upon -- at least part on

6     what Jeremy Fish told you?

7 A   Correct.

8 Q   Okay.  And in July, when you were testifying before the

9     grand jury, were you aware that Jeremy Fish has a

10    problem telling the truth?

11 A   In July?

12 Q   Yes, when you testified before the grand jury?

13 A   I had received notice from detectives that there was a

14    locate for Mr. Fish about being involved in some other

15    activities.

16 Q   I guess -- the question that I have is, in July when

17    you testified before the grand jury, were you aware

18    that Jeremy Fish had a problem telling the truth?

19 A   No.  I had not spoken with him about any of the other

20    activities he was suspected in, so I can't say one way

21    or the other.

22 Q   Okay.  You were aware that he -- out of Nome, was

23    charged with burglary, right?

24 A   Yes, that was part of the deal agreement with the

25    district attorney for becoming an informant to purchase

Page 587

1 A   And one of the cases is -- we are currently here, and

2     the other case is finished.

3 Q   All right.  It is your belief that he kept his word,

4     right, in all aspects of this case?

5 A   In aspects of this case, yes.  He made the four buys

6     that he agreed to, and on the previous case.

7 Q   One moment please.  (Pause)  Officer Johnstone, now he

8     was your striker at this particular point?  Do you know

9     what I mean by striker?

10 A   No, sir.

11 Q   You were training him?

12 A   I'm sorry?

13 Q   You were training him?

14 A   Yes, I was training him.....

15 Q   Okay.

16 A   .....in this case.

17 Q   And subsequent to that time, does he still work with

18    your special unit?

19 A   No, he has relocated.  He is a detective with the

20    detect division.

21 Q   Okay.  So based upon your dealings subsequent to that

22    time, did you rely upon his opinion?

23 A   On Officer Johnstone?

24 Q   Right.

25 A   Yes.

Page 589

1     cocaine for the special assignment unit.

2 Q   All right.  And did you see any type of written

3     agreement with Jeremy Fish rela -- relating to what he

4     was going to do, and what APD, or the DA's office was

5     going to do in return?

6 A   No.  We don't set forth written agreements.  It is a

7     gentleman effect.  We keep our word, and we expect them

8     to keep their word as far as their agreements.  When

9     they don't, the deal is off.  The department and the

10    DA's office has an excellent reputation for that.  That

11    is why defense attorney's call the metro drug unit, or

12    the special assignment unit when they think their

13    clients can be of assistance to us, because they know

14    Phil Moberly and other DAs at the metro -- or at the

15    drug unit always keep their word.

16 Q   That assumes also that Jeremy Fish would keep his word

17    and do what he said, and not lie to you folks, right?

18 A   Well, that's -- that was an assumption.  He did keep

19    his word.  He made the four buys with two different

20    targets that he.....

21 Q   Okay.  I.....

22 A   .....agreed to and.....

23 Q   Officer, I'm asking.....

24    THE COURT:  He gets to finish his answer, Mr. James.

25    MR. JAMES:  Thank you.

Page 588

1 Q   Okay.  Did you, during this buy, do anything to --

2     well, specifically what I'm asking, and I have -- I'm

3     going to set a little stage.  Banks sometimes powder

4     their money, put some kind of a powder on it so that if

5     someone handles the money you can put their hands under

6     flourescent light, or some kind of a lighting system

7     and it will show up, that, in fact, whoever touched it,

8     touched it.  Did you do that with this -- any of this

9     buy money?

10 A   No.  We don't have that capability.  We xerox our buy

11    money.

12 Q   Okay.  And did you attempt to lift any prints off of

13    any of the buy money, or the containers it was in when

14    it was given to you by Jeremy Fish?

15 A   The containers what buy money was in?

16 Q   I'm sorry, the drugs.  I'm sorry.  Excuse me.  Let me

17    rephrase.  Let me re-ask the question.  Did you attempt

18    to print -- lift prints off any of the packages that

19    the items that Jeremy Fish gave you during these

20    incidents?

21 A   No.  As you saw, the crack cocaine just came in a rock

22    and nothing else.  You can't obtain prints from the

23    crack cocaine rock.  I think on the two occasions where

24    it was powdered cocaine, it was folded up in a very

25    small newspaper or paper type, but that was small.  I

Page 590

| | |
|---|---|
| 1  MS. BRADY: My next witness is due to be here at 9:15,<br>2 Your Honor.<br>3  MR. JAMES: May I approach the witness stand and<br>4 retrieve that paper that is not in evidence?<br>5  THE COURT: All right. Why don't you all take a<br>6 stretch, and we will call you back in when the next witness<br>7 is here. (Pause) Ms. Brady, get the rest of your witnesses<br>8 here. I don't want to wait for any more witnesses.<br>9 Seems.....<br>10  MS. BRADY: The rest of them are here, Your Honor.<br>11  THE COURT: All right.<br>12  MS. BRADY: It's just this one.....<br>13  THE COURT: Well, let's take.....<br>14  MS. BRADY: .....couldn't be left sitting around<br>15 because of his medical condition, and so I told him to be<br>16 here at 9:15, figuring that was the soonest we would get to<br>17 him.<br>18  THE COURT: Well, we're running on borrowed time, now.<br>19 I don't want to wait for witnesses anymore. So.....<br>20  MS. BRADY: There won't be any other wait.<br>21  (Pause)<br>22  (Jury present)<br>23  THE COURT: Everybody have a seat. Are we on record,<br>24 Madam clerk?<br>25  THE CLERK: We're on record.<br><div align="right">Page 599</div> | 1 Q  What were you doing on March 1st of this year?<br>2 A  I was a booking officer at Cook Inlet Pretrial.<br>3 Q  Okay. And I'm just going to approach you with<br>4   something I have previously marked as state's exhibit<br>5   17, and I want to ask you if you recognize this<br>6   document?<br>7 A  That's a booking record -- last page of the booking<br>8   record -- booking sheet.<br>9 Q  Does your signature appear on it?<br>10 A  Yes, it does, as booking officer.<br>11 Q  Okay. The date?<br>12 A  Of the document was 3/1/01.<br>13 Q  Okay. And the time?<br>14 A  03:01:26.<br>15 Q  Okay. Now, there is two times on there, is there not?<br>16 A  Yes, there is.<br>17 Q  What's the 301 time, and then the other time, what is<br>18   that?<br>19 A  Well, the -- the time is -- 1:00 o'clock is the other<br>20   time. That is the time that the inmate was admitted<br>21   into the correctional facility, and the 301 is the time<br>22   that he was actually booked.<br>23 Q  Okay. And are these booking record just kept in the<br>24   usual course of CIPT's business?<br>25 A  Yes, they are.<br><div align="right">Page 601</div> |
| 1  THE COURT: And this is your next witness, Ms. Brady?<br>2  MS. BRADY: It is, Your Honor.<br>3  THE COURT: Sir, we are going to have to ask you to<br>4 stand up to swear you in.<br>5  (Oath administered)<br>6  MR. GARCIA: I do.<br>7      TED GARCIA<br>8 called as a witness on behalf of the plaintiff, testified as<br>9 follows on:<br>10    DIRECT EXAMINATION<br>11  THE CLERK: You can have a seat. For the record,<br>12 please state your full name and spell your last name.<br>13 A  Ted L. Garcia, G-a-r-c-i-a.<br>14  THE COURT: Thank you. Go ahead.<br>15 BY MS. BRADY:<br>16 Q  Who do you work for, Mr. Garcia.<br>17 A  State of Alaska, department of corrections.<br>18 Q  Okay. And how long have you been working for them?<br>19 A  A little over seven years.<br>20 Q  Okay. And specifically what part of the department of<br>21   corrections do you work in right now?<br>22 A  I work in the home arrest surveillance officer.<br>23 Q  Okay. Is that the same office that you were working in<br>24   on March 1st of this year?<br>25 A  No, I wasn't.<br><div align="right">Page 600</div> | 1 Q  Are they the kind of records that are relied on by<br>2   CIPT?<br>3 A  To my knowledge, yes.<br>4 Q  Okay.<br>5  MS. BRADY: At this time, I move to admit state's<br>6 exhibit 17.<br>7  MR. JAMES: No objection.<br>8  THE COURT: 17 is admitted.<br>9      (Plaintiff's exhibit 17 admitted)<br>10 Q  Okay. Now, do you recall anything in particular -- is<br>11   that your -- your signature is on that document, right?<br>12 A  Yes, it is.<br>13 Q  Do you recall anything in particular about this<br>14   booking?<br>15 A  No, I can't say I do.<br>16 Q  Okay. Now, let me just ask you, then, what normally<br>17   happens when an officer brings someone in for booking<br>18   at CIPT?<br>19 A  When an officer brings somebody in, we meet him at the<br>20   back door. The person being brought in is normally<br>21   handcuffed. At that time we glance over the paperwork,<br>22   making sure that he is being brought in as a felony --<br>23   on a felony charge. We search the individual by just<br>24   going over his pockets and his hands, make sure he<br>25   doesn't have a weapon on him that the officer might<br><div align="right">Page 602</div> |

**Page 603**

1  have missed. We try to get the handcuffs off him as
2  soon as possible and get the officer out of there,
3  because normally the inmate is -- or, the person at
4  that time is considered an inmate, is upset with the
5  officer. So we try.....
6 Q  Okay. Let me stop you right there. That first search
7  that you conduct, is that -- is there another search
8  coming?
9 A  Yes. The initial search is a pat down search just to
10  ensure that there aren't any large weapons of some kind
11  sticking out on -- on this individual. We go kind of
12  lean him up against the wall, and pat him down, and
13  empty their pockets, and take out everything at that
14  time.
15 Q  Okay. Then, what happens -- you said you try to get
16  the officer out of there?
17 A  We get the handcuffs off and return those to the
18  officer, then I take the individual and place him into
19  a holding cell directly in front me, usually, so I can
20  sign the paperwork for the officer, get him out of
21  there -- the remand slip.
22 Q  Okay. And then, what is the next thing that you do?
23 A  Then I pull the individual out. I had already emptied
24  his pockets on the previous search by taking everything
25  out of his coat, or his pants, or whatever the case may

**Page 604**

1  be. Then I take him back to a room -- dress out room,
2  where we strip him down and take his clothing away from
3  him, put those into a matching bag with a number on it
4  to match his previous bag that we put his pocket items
5  into.
6 Q  Okay. Now, let me stop you right there, because you
7  said previous bag. Are -- is the stuff that comes out
8  of the pockets put into a bag?
9 A  Yes. When an individual comes in, we have two bags.
10  One is a laundry bag that is rolled up and placed into
11  a large plastic bag -- plastic bag being approximately
12  10 inches high. They both have numbers --
13  corresponding numbers to match the two with each other.
14  The smaller bag is -- is his pocket items and jewelry,
15  things of that nature that would go into a box for
16  security, and his other bag is naturally his clothing
17  bag -- his boots and clothes could go into -- a much
18  larger bag. Now, once we strip him out and put his
19  clothing into the other bag, and we bring him back into
20  booking area, we then take the individual to a
21  telephone room and put him in for -- so he can start
22  making his phone calls to try to make bail, if
23  possible.
24 Q  Okay. And if somebody has money, is that -- do they
25  get to keep the money, or how does that work?

**Page 605**

1 A  No, no, no. No, everything is taken off that
2  individual at that time on the -- usually in the
3  initial search. Sometimes people have money in their
4  socks or underwear, things of that nature, but
5  initially we take all their money off, put it into the
6  initial plastic bag, the first bag, even if we find
7  money later on, we put it into that plastic bag.
8 Q  Okay. And in this particular case, did Mr. Davis come
9  in with any money?
10 A  180 dollars.
11 Q  Okay. And then, when is the booking record filled out
12  in this process?
13 A  At -- with this particular case, it was filled out at
14  3:00 in the morning when he was booked.
15 Q  Okay. And does the person who is being booked have to
16  sign that form?
17 A  Yes, he does.
18 Q  Why is that?
19 A  That he has gone over everything that has been
20  inventoried, all of his clothing and items that were on
21  him is correct.
22 Q  Okay. And once money is taken away from someone, where
23  does that go?
24 A  It goes into the till, which is a draw that the booking
25  officer is the only one has a key to, and it is kept at

**Page 606**

1  his front desk. It is mounted to the desk like a
2  drawer -- like a cash drawer.
3 Q  So if I were being booked, and I had money, then it
4  would go into the till with everybody else's money?
5 A  That is correct.
6 Q  Okay. And as far as you are aware, did you have
7  anything else to do with this defendant, or this case,
8  after this booking?
9 A  Not to my knowledge, no.
10  MS. BRADY: That's all the questions I have for this
11 witness, Your Honor.
12  THE COURT: Mr. James?
13      TED GARCIA
14 testified as follows on:
15      CROSS EXAMINATION
16 BY MR. JAMES:
17 Q  Mr. Garcia, we talked before, right?
18 A  Yes, we have, sir.
19 Q  Okay. And how long have you been -- how long had you
20  been working as a booking officer for Cook Inlet?
21 A  Prior to this incident?
22 Q  Yeah. Yes.
23 A  I would say a couple of years.
24 Q  Okay. And is there any type of standard procedure that
25  you utilize, as far as -- if an officer were to ask you