1 right?
2 A  Right.
3 Q  Okay.  Do officers frequently ask you to look for money
4    when they bring in people?
5 A  Not frequently, no.
6 Q  Okay.  When you find money at -- if -- when you find
7    money after an officer leaves, do you call the officer
8    and tell the officer?
9 A  No.
10 Q  So even if an officer would have said, we are looking
11    for money, the money wasn't found initially and it was
12    found later, would you then call the officer?
13 A  Yes, we would then.  If he makes it known the he is
14    looking for something specific, then we -- we would
15    notify him that we found something specific, if we did
16    find something later.
17 Q  Okay.
18 A  We would call him back to see if he wants to add
19    charges, or things of that nature, or see what he wants
20    to do about it.  But not unless we are asked, we don't.
21 Q  Thank you very much.
22    MS. BRADY:  That's all the questions I have.
23    THE COURT:  You can step down, sir.  Mr. James,
24 anything else?
25    MR. JAMES:  I just -- I would like a couple follow ups

Page 615

1 on this, if I may please?
2    THE COURT:  Well, we'll have a bench conference.
3    (Bench conference as follows:)
4    (Inaudible)
5    (End of bench conference)
6    THE COURT:  Go ahead, Mr. James.
7         TED GARCIA
8 testified as follows on:
9         RECROSS EXAMINATION
10 BY MR. JAMES:
11 Q  Based upon your -- the documentation that you have in
12    front of you, did anybody else help you on this
13    particular booking?
14 A  Based on this documentation, I have no way of knowing
15    that.
16 Q  All right.  Thank you.
17    THE COURT:  All right, thanks.  Thanks Mr. Garcia, you
18 can step down.  Ms. Brady, your next witness?
19    MS. BRADY:  Okay.  Can you get the -- the state is
20 calling Officer Roy LeBlanc, and Officer LaPorte went out to
21 get him.
22    (Pause)
23    (Oath administered)
24    MR. LEBLANC:  I do.
25         ROY LEBLANC

Page 616

1 called as a witness on behalf of the plaintiff, testified as
2 follows on:
3         DIRECT EXAMINATION
4    THE CLERK:  Have a seat.  For the record, please state
5 your full name, and spell your last name?
6 A  Roy B. LeBlanc.  Last name is spelled L-e-B-l-a-n-c.
7    THE CLERK:  Thank you.
8    THE COURT:  Go ahead, Ms. Brady.
9 BY MS. BRADY:
10 Q  How long have you been an APD officer?
11 A  A little bit over five years.
12 Q  Okay.  And are you assigned to a particular unit?
13 A  Currently I am assigned to the patrol division.
14 Q  Okay.  And is that the same assignment that you had
15    when this case was going on?
16 A  No, it is not.
17 Q  What assignment did you have then?
18 A  Back then I was assigned to the special assignment
19    unit.
20 Q  All right.  And how did you become involved with this
21    case?
22 A  Basically, our unit focused primarily on vice crimes,
23    street level drugs, prostitution, gambling.  I believe
24    Officer Johnstone had acquired an informant, and we
25    used the informant to make several cases against drug

Page 617

1    dealers.
2 Q  Let me direct your attention to February 8th.  Did you
3    conduct the pre-buy and post-buy searches of Mr. Fish's
4    car?
5 A  Yes, I did.
6 Q  How thorough were these searches?
7 A  Quite thorough.
8 Q  Could you just explain what you do when you do a car
9    search, to the members of the jury?
10 A  Basically I look in every nook and cranny in the
11    vehicle, check in the crack between the seats, under
12    the seats, open all the compartments.  Basically an
13    interior search.  I don't take apart anything in the
14    vehicle.  I don't open the hood.  Usually the informant
15    wouldn't have any reason to get underneath his hood.
16    Basically we are concerned with the area that is under
17    the control of the informant to make sure that there is
18    nothing hidden before or after the buy.
19 Q  And did you find any contraband on February 8th?
20 A  I believe I did.  I'm not sure if it was actually for
21    this case, or another case we worked, because we worked
22    several cases, kind of at the same time.  I do know
23    that on one of the searches of Mr. Fish's vehicle, I
24    did find a small amount of marijuana.
25 Q  All right.  And then, did you attend a briefing about

Page 618

1    this buy?

2 A    Yes, I did.

3 Q    Okay.  And did you participate in the surveillance?

4 A    Yes, I did.

5 Q    What was your assignment in the surveillance?

6 A    For the February 8th buy, I was assigned what we call

7      the close in surveillance.  It was my job to be in

8      position where I could watch the informant get out of

9      his vehicle and go into the suspects house, or actually

10     make contact with the suspect if it was going to be

11     outside.

12 Q    All right.  Now, we have heard other officers testify

13     that someone has the eye.  Is this the position that

14     they are talking about?

15 A    Correct.  When.....

16 Q    So you had the eye?

17 A    I would have the eye at the moment of the contact, and

18     then I would pass it off to another officer as --

19     basically as the -- as the informant would drive into

20     the area it would be passed to me, and I would watch

21     him make the contact, and then watch him leave, and

22     pass it to somebody else as he is leaving the area.

23 Q    All right.  And I think that behind you is a diagram

24     that Officer LaPorte started to draw of the Grand Larry

25     area?

Page 619

1 A    Okay.

2 Q    Is that a true and accurate representation of the Grand

3      Larry area?

4 A    It is pretty accurate.  Muldoon is of course to the

5      west.  Grand Larry runs -- it is a north-south street.

6      202 is actually a part of a duplex.  It is 202 and 200.

7      They're -- they are joined, but they have their own

8      separate addresses.

9 Q    Okay.  So why don't you make a line, and separate

10     those.  Make it accurate.  Okay.  Now, is that a true

11     and accurate representation of the Grand Larry layout?

12 A    Yes.

13 Q    Okay.

14 A    But it is not to scale, of course.

15 Q    Fair enough.

16     MS. BRADY:  And we are going to mark that as state 26.

17 Okay.  And at this time I move to admit state's 26.

18     MR. JAMES:  No objection.

19     THE COURT:  26 is admitted.

20         (Plaintiff's exhibit 26 admitted)

21 Q    Okay.  Now, why don't you show the members of the jury

22     where you were at?

23 A    I was parked across the street basically to the east,

24     kind of kitty corner.  There is -- directly across the

25     street there is a large multi-unit building, like a

Page 620

1      six-plex, or an eight-plex, and next to that is another

2      similar building, a six-plex, or an eight-plex, and I

3      was parked at the -- kind of, I guess, would be the

4      north end of that property.  I believe there was like a

5      dumpster that was here at the time, and I was kind of

6      parked next to the dumpster, almost into the road, but

7      not quite into the road.

8 Q    All right.  And do you know how far that is from the

9      residence?

10 A    Yes, I do.

11 Q    And how do you know that?

12 A    Actually I went by there with my laser range finder,

13     and shot a line of sight measurement.  And it was 45

14     and a half yards.

15 Q    Okay.

16 A    And that would be from where I was sitting to the door

17     that was used, which is on the -- kind of on the back

18     side, the south side of the building more towards the

19     west of the -- of the building.

20 Q    Okay.  And how long were you there prior to Fish

21     arriving?

22 A    A short while.  A matter of minutes.  I would say

23     probably five minutes or more.

24 Q    Okay.  And what happened when Fish arrived?

25 A    On this particular buy, referring to my report, he

Page 621

1      walked up to the door, he knocked.  After several

2      seconds a subject answered the door.  I could tell that

3      it was a black male with shorter -- short hair or bald,

4      but I couldn't make out any facial features, because he

5      was more or less backlit.  Of course, he was in the

6      doorway, and it was -- it was later at night, so it was

7      dark.

8 Q    What else did you observe to happen?

9 A    I watched the informant step into the doorway, and then

10     he returned to his car.  After going off to his car and

11     getting in his car for just a second he went back, and

12     went back inside the house.  He went inside the

13     residence.  Closed the door.  Looks like about 10

14     minutes later he came back out of the house, and

15     returned to the vehicle, and left the area to the

16     north.

17 Q    When he left the area to the north, then what did you

18     do?

19 A    I watched him as he drove, and I passed the eye off to

20     another surveillance officer.

21 Q    Okay.  And then did you participate in the case after

22     the informant returned to APD?

23 A    I believe after there, I conducted the post-buy search

24     of his vehicle, and then that would be the end of my

25     involvement on that buy.

Page 622

1 Q   Okay. Let me direct your attention to February 20th.
2     Were you participating in this case on that day as
3     well?
4 A   Yes, I was.
5 Q   What was your assignment that day?
6 A   I was assigned to operate the wire. Basically which is
7     what -- the term we use for the recording device that
8     we use to record the conversations between the
9     informants and the suspects.
10 Q  Okay. And did you have any other assignment?
11 A  Just for close in surveillance at the residence during
12    the buy, and I believe also that I withdrew some of our
13    buy funds and made photocopies of them.
14 Q  Okay. I am going to approach you with two documents,
15    and I want to direct your attention to nine for right
16    now. Do you recognize this document?
17 A  I do.
18 Q  What is that document?
19 A  This appears to be a photocopy of the photocopy of buy
20    funds that I made.
21 Q  Okay. And how do you know that is what it is?
22 A  Because I initialed it.
23 Q  Okay. It is a true and accurate representation of the
24    photocopy you made of the buy funds you withdrew?
25 A  It appears to be, yes.

Page 623

1 Q   Okay. And is the date anywhere on that document?
2 A   It is.
3 Q   Is the case number on the document?
4 A   Yes, it is.
5 Q   What are those things?
6 A   The case number is 01-7273, and the date would be 2-20
7     of 2000 and one.
8     MS. BRADY: Okay. At this time I move to admit state's
9     9?
10    THE COURT: Number 9, Mr. James?
11    MR. JAMES: No objection. No objection.
12    THE COURT: 9 is admitted.
13         (Plaintiff's exhibit 9 admitted)
14 Q  Okay. And what else did you do besides the buy funds?
15    You had mentioned other things, ran the wire?
16 A  Oh, yes. I ran the wire, and I also was the close in
17    surveillance again on that.
18 Q  Okay. Now, did you prepare the wire?
19 A  Actually I don't believe I did. I believe Officer
20    LaPorte prepared the tape for that one. If you give me
21    a second I'll re -- yes, he had.
22 Q  Okay.
23 A  And basically what that means is, he makes a little
24    pre-announcement on the tape giving the case number,
25    the date, and the fact that it is going to be an

Page 624

1     attempted controlled buy of cocaine.
2 Q   Okay. And when you say you ran the wire then, what are
3     you talking about?
4 A   Basically as the informant pulls into the area I
5     activate the recording, and then once he leaves the
6     area I stop the recording. Part of that is to make
7     sure that it works, make sure it is fitted on him
8     properly. You have to make sure, of course, it is
9     hidden, and then you want to make sure that it is put
10    on the clothes so we don't get a lot of static. The
11    microphones on those are so sensitive that any little
12    bit of rubbing on clothes creates an ungodly amount of
13    static that makes it real difficult to understand.
14 Q  Okay. And once -- did you attend the briefing?
15 A  Yes, I did.
16 Q  And did you participate in the surveillance?
17 A  Yes, I did.
18 Q  What was your role in the surveillance?
19 A  I was the close in surveillance again. Get in a
20    position where I could watch the -- the contact he
21    made.
22 Q  Okay. And where did you position yourself this time?
23 A  This would have been the exact same place as last time.
24    This one occurred at 202 Grand Larry. I parked in the
25    same place I did last time. It had the best advantage

Page 625

1     view of the doorway and the building itself.
2 Q   Okay. So you could actually see Fish enter the
3     residence at 202 Grand Larry on both occasions?
4 A   Correct.
5 Q   Okay. And what happened with Mr. Fish got there this
6     time?
7 A   I have to refer to my report because on this one it was
8     a little different. I watched him drive into the
9     area, of course, and park, and he entered the
10    residence. After a short amount of time he came out
11    and moved his car, which allowed another vehicle that
12    was in the driveway to leave, and then re-parked his
13    car and then went back in.
14 Q  Okay. And how long on this time were you there prior
15    to Fish arriving?
16 A  A matter of maybe five minutes again.
17 Q  Okay. And how long was he in after he moved his car
18    and went back in?
19 A  It looks like he was in there for about five minutes
20    total, and I want to say that he was in there for less
21    than a minute when he went in the first time, before he
22    moved his car, so probably about three minutes, I would
23    say.
24 Q  Okay. And what happened after he left the residence?
25 A  After he left the residence, he left the area

Page 626

| | |
|---|---|
| 1 | southbound. |
| 2 Q | And did you have any further participation in this case |
| 3 | that day? |
| 4 A | I passed off the eye, and that was about it. |
| 5 Q | Okay. Now let me direct your attention to February |
| 6 | 21st. Actually on the 21st, what was your assignment |
| 7 | that day? |
| 8 A | I was assigned to operate the wire. |
| 9 Q | Okay. And were you assigned anything else at the |
| 10 | station before it happened? |
| 11 A | I don't believe so. I believe that was all that I was |
| 12 | assigned to do. |
| 13 Q | Do you wish to read your report and see if that |
| 14 | refreshes your recollection? |
| 15 A | I'm looking through it right now, yes. Looking through |
| 16 | my report, it looks we decided at some point that we |
| 17 | were going attempt to follow the suspect after the buy, |
| 18 | but I don't know if that was an impromptu thing we |
| 19 | decided, or if that was decided initially. |
| 20 Q | Okay. Let me just approach you with something that has |
| 21 | been previously marked as state's exhibit 19, and see |
| 22 | if this helps you refresh your recollection? Does that |
| 23 | refresh your recollection about something else you did |
| 24 | on the 21st? |
| 25 A | It appears that I must have been the one who |

Page 627

| | |
|---|---|
| 1 A | I believe that is all. |
| 2 Q | Did you participate in the surveillance? |
| 3 A | Yes. |
| 4 Q | Okay. And where did this buy happen? |
| 5 A | This buy happened at a different location. It was in |
| 6 | the area of International Airport Ave and Old Seward |
| 7 | Highway. |
| 8 Q | Okay. Was it at a business of some sort? |
| 9 A | I don't act -- actually recall what business it was at. |
| 10 | If I remember correctly on this one, I actually didn't |
| 11 | have eyes on anything. I was just in the area making |
| 12 | sure I was in a position where I could monitor the |
| 13 | wire. |
| 14 Q | Okay. So is that what you were doing, was just |
| 15 | monitoring the wire? |
| 16 A | Correct. I was -- my job was to operate the wire and |
| 17 | the recording. |
| 18 Q | Okay. And so you were relying on what other officers |
| 19 | were telling you to turn it on and turn it off? |
| 20 A | Correct. |
| 21 Q | Okay. |
| 22 A | Plus I mean, I could hear over the wire, so I could |
| 23 | hear as -- you know, in the vehicle, because we monitor |
| 24 | it continuously. We just record it during the -- the |
| 25 | aspects that are pertinent to the case. So I could |

Page 629

| | |
|---|---|
| 1 | photocopied the buy money. |
| 2 Q | Okay. Now, I have set a document in front of you |
| 3 | marked state's 10. |
| 4 A | Uh-huh. (Affirmative) |
| 5 Q | It is in front of you, upside down..... |
| 6 A | Oh. |
| 7 Q | .....marked state's 10. Do you recognize that |
| 8 | document? |
| 9 A | This would be the buy money from the buy on the 21st. |
| 10 Q | And how do you know that is what it is? |
| 11 A | Because I initialed it, and photocopied it, and wrote |
| 12 | the date, and page 1 of 1 like I normally do when I |
| 13 | photocopy buy money. |
| 14 Q | Is the case number on there? |
| 15 A | The case number is. |
| 16 Q | Okay. And is that a true and accurate representation |
| 17 | of the photocopy that you made of the buy funds? |
| 18 A | Yes, it is. |
| 19 | MS. BRADY: Okay. I move to admit state's 10. |
| 20 | THE COURT: Number 10, Mr. James? |
| 21 | MR. JAMES: No objection. |
| 22 | THE COURT: 10 is admitted. |
| 23 |     (Plaintiff's exhibit 10 admitted) |
| 24 Q | Okay. And what else did you do that day, Officer |
| 25 | LeBlanc? |

Page 628

| | |
|---|---|
| 1 | hear as Jeremy was driving to the scene, listening to |
| 2 | his radio, and as he was stopping at stop signs, and |
| 3 | stuff like that. You could hear the car sounds and |
| 4 | everything. So I could tell when he was driving, when |
| 5 | he was stopped, and you can pretty much understand what |
| 6 | is going on just by listening. |
| 7 Q | Okay. And then -- so what happened after Jeremy got |
| 8 | out of the suburban? Did you do anything there? |
| 9 A | After the buy was done, you mean? |
| 10 Q | Uh-huh. |
| 11 A | After the buy was done we attempted to follow the |
| 12 | suspect away from the area, unsuccessfully. |
| 13 Q | Okay. So you never found out where he was going that |
| 14 | day? |
| 15 A | Actually what I did was I drove back to 202 Grand |
| 16 | Larry..... |
| 17 Q | Uh-huh. |
| 18 A | .....and waited, hoping that maybe he would come back |
| 19 | there. And the vehicle did show up there for a very |
| 20 | brief period of time. I don't know if he ever went in |
| 21 | the house or not. All I know is that the vehicle |
| 22 | pulled in the driveway, the lights were on, and after a |
| 23 | few minutes it left again. |
| 24 Q | All right. Thank you. Let me direct your attention to |
| 25 | February 28th going into March 1st. Did you |

Page 630

**Page 631**

1   participate in this case on that day?
2 A  Yes, I did.
3 Q  And what was your assignment that day?
4 A  I was assigned to be the -- the marked police unit that
5   was going to conduct the takedown, or wh -- the actual
6   arrest of the suspect, and what we call the buy bust.
7 Q  Okay. So where were you at?
8 A  Actually I was hiding, I believe, west of Mul --
9   Muldoon on Duben. I kind of went west on Duben and
10  parked in a little cubby hole there off the side of the
11  road.
12 Q  Okay. So -- and you couldn't be seen from what was
13  going on at the scene?
14 A  Correct.
15 Q  You couldn't see the scene, they couldn't see you?
16 A  Correct.
17 Q  Okay. Then how did you know when to go?
18 A  Basically listening to a bug radio which monitors the
19  wire, but mainly relying on the other officers over the
20  radio.
21 Q  Okay. And then what did you do when you were put into
22  action?
23 A  Basically I drove into the area. They had described
24  the vehicle and where it was at. Once I spotted it I
25  blocked it in with my patrol car with my lights on, and

**Page 632**

1   made contact with the suspect.
2 Q  Was anyone in the car with him?
3 A  No.
4 Q  Okay. And what happened once you contacted him?
5 A  Basically he was placed under arrest.
6 Q  Okay. What -- was he still inside the car?
7 A  He was.
8 Q  Okay. And was the car running?
9 A  I believe it was running when I initially stopped. Of
10  course I would have told him to turn it off. Of course
11  I told him to show me his hands. I remember that his
12  hands were up initially, and then he put them back
13  down, so I drew my -- my handgun, and then his hands
14  went back up, and I had him step out of the vehicle.
15  At that time, of course, everybody else was arriving,
16  too. And he was placed in -- placed under arrest.
17 Q  Okay. Now, once you placed him under arrest, what did
18  you do?
19 A  I conducted a search of him.
20 Q  Okay. And could you just please describe to the
21  members of the jury what kind of search you conducted?
22 A  Basically I -- a pat search. My primary concern, of
23  course, would be weapons. In this case also I was
24  looking for some evidence, money or drugs. Of course,
25  being that it is outside and it is dark, it is a lot

**Page 633**

1   easier to do that once you are inside. Do a more
2   thorough search inside.
3 Q  Okay. Did you find anything on him?
4 A  No.
5 Q  All right. Then were you surprised that you didn't
6   find the buy funds?
7 A  No.
8 Q  Why not?
9 A  I actually expected it to be in the vehicle.
10 Q  All right. And did you search the vehicle right then
11  and there?
12 A  No.
13 Q  All right. So then what did you do with the defendant
14  after he was in your car?
15 A  I believe I -- I went took him to the magistrate's
16  office where Officer LaPorte had gone enroute, and got
17  the appropriate bail paperwork, and warrant paperwork
18  signed. And once I got that paperwork from him, I took
19  him over to Cook Inlet Pretrial where he was processed
20  in under the charges.
21 Q  All right. Now, let me ask you what happened at CIPT.
22  Had you been told to ask anybody at CIPT to do
23  something?
24 A  Well, typically in drugs cases we want the defendant to
25  be searched -- strip searched at the jail by

**Page 634**

1   corrections, so, of course, I asked them to strip
2   search him for drugs or money.
3 Q  Do you recall which officer you asked?
4 A  No, I don't.
5 Q  Okay. Did you see the witness that was here before
6   you?
7 A  I saw the corrections officer that was leaving, yes.
8 Q  Did you -- do you recognize him from having anything to
9   do with this case?
10 A  I recognize him from CIPT, but I -- I couldn't tell you
11  if he was the corrections officer that was working that
12  night or not.
13 Q  Okay. And so you don't recall who you asked?
14 A  Correct. Whoever the booking officer was at that
15  night, that -- that processed that prisoner, that is
16  the person who I asked.
17 Q  Okay. And do you recall whether or not more than one
18  booking officer was working that night?
19 A  There is always several kind of wandering around. I'm
20  not exactly sure how they work, if one books this one,
21  and the next guy that comes in the other does it, or if
22  one person does it for a whole hour. There is always
23  several corrections officers around the booking area.
24 Q  Okay. So did you verify that the person you were
25  talking to was the booking officer for this defendant?

Case 3:05-cv-00255-TMB-JDR    Document 54-8    Filed 01/12/2007    Page 6 of 23
Multi-Page™
State v. Robert Davis
November 20, 2001

3AN-01-1717 CR

Page 639

1 A   Correct.
2 Q   All right. Going to Grand Larry, behind you, the
3     diagram that is now there, okay. You are about 45 and
4     a half yards by your beamer -- or, some kind of a
5     distance.....
6 A   Correct.
7 Q   .....calculator?
8 A   Uh-hum. (Affirmative)
9 Q   Okay. And what is the lighting conditions on -- well,
10    first of all, let's go to the 8th and tell me when that
11    happened? When were you there?
12 A  It was at night. It was dark.
13 Q  All right. And about what time of night was it?
14 A  About 8:10.
15 Q  Okay. And what are the lighting conditions on Grand
16    Larry?
17 A  It is a pretty dark street. There is a few street
18    lights, I believe, but it is fairly dark.
19 Q  Okay. Could you tell me where -- you have been out
20    there because you measured this apparently?
21 A  Correct.
22 Q  Okay. Could you tell me where the street lights are
23    located?
24 A  I don't -- I know -- I believe that there is one at
25    each end. I'm not sure if there is any in between this

Page 641

1 Q   All right.
2 A   That would be like right -- right here. This door is
3     actually under the carport.
4 Q   And that's the door that you were observing?
5 A   Correct. Actually, I could see both doors for where --
6     where I was at, but the only one that was used, in this
7     case, would have been this one.
8 Q   All right.
9 A   The other door would have been right about here. There
10    is a door, and there is a window on each side of the
11    door, and the other half is basically a copy of that.
12 Q  Uh-huh. Now, when you -- on the 8th now, we're
13    talking, okay?
14 A  Okay.
15 Q  Excuse me. When you did your search of the vehicle
16    before -- this happened at the police department,
17    right?
18 A  Correct.
19 Q  Okay. Did you report the finding of the marijuana?
20 A  Report it to?
21 Q  Somebody?
22 A  Yes.
23 Q  Okay. Who did you report it to?
24 A  I reported it back to the unit, of course.
25 Q  Okay.

Page 640

1     span of block at all, or not.
2 Q   Okay.
3 A   I don't believe so.
4 Q   Is it a wide street?
5 A   No, it is a fairly narrow street.
6 Q   And if you can recall, what was the car layout at 202
7     Grand Larry?
8 A   I'm not sure I understand what you mean by car layout.
9 Q   I kind of figured you weren't, because I thought to
10    myself I didn't understand it myself. Is there a
11    driveway at Grand Larry?
12 A  There is.
13 Q  All right.
14 A  Actually.....
15 Q  Where is the driveway?
16 A  .....there is a driveway.....
17 Q  I m -- excuse me, a parking area. Not a driveway, but
18    a.....
19 A  I would call it a driveway.
20 Q  Okay. I'll go with you.
21 A  Basically right here, and the back -- I'd say maybe the
22    back third of the residence has a small little carport.
23 Q  Okay.
24 A  Maybe big enough -- maybe big enough for one car to be
25    under.

Page 642

1 A   I believe Officer LaPorte was the one who went in and
2     had a long come-to-God talk with the informant.
3 Q   Okay. And where do -- you have your police reports in
4     front of you, right?
5 A   Yes, I have the police report from this case.
6 Q   That's what I meant, yeah.
7 A   Yes.
8 Q   And does it have any indication there that you found
9     contraband during your search?
10 A  No.
11 Q  And would you agree, as a five and a half year police
12    officer -- I think it is five and a half years, isn't
13    it?
14 A  Five -- a little over five years.
15 Q  Okay. I'll give you another six months -- that it is
16    important to put in information relating to --
17    especially contraband, in that type of situation when
18    you are -- you are doing such a search?
19 A  Well, I don't think that that is actually indicative of
20    the defendant's guilt or innocence in this case. It is
21    more indicative of the informant's guilt of innocence.
22    And I don't know that specifically the search where the
23    marijuana was found was for this case, or for one of
24    the other cases we used him for. Because, like I said,
25    we did many cases with this -- or several cases with

1   this informant.  It may very well have been this one.
2   I do believe it was the first search we did, because I
3   do recall that his car was quite messy, and it took a
4   long time to search the first time.  And I -- my talk
5   with him was that he needed to clean out his car so
6   that it didn't take so long.
7 Q   And what kind of car was this -- what kind of car was
8   this?
9 A   It was an old beater station wagon.
10 Q   All right.  And if someone had testified that on th --
11   during the search marijuana was found in relationship
12   -- we are talking about this case, now.
13 A   Okay.
14 Q   Would you have put it in your report?
15 A   Probably not, no.
16 Q   Why not?
17 A   Because it is not -- it doesn't have anything to do
18   with the defendant or the subject of this case.
19 Q   But it has to do with the fact you did a thorough
20   search, and what you found?
21 A   Correct.  And there was no contraband in the car when
22   this case proceeded.
23 Q   So you found some but -- so -- you use selective
24   reporting, then, correct?
25 A   No, I wouldn't call it selective reporting.  It would

Page 643

1 Q   That was about 10:10 hours?
2 A   Actually, it was about 20:10 hours.  That is just a
3   typo.
4 Q   Okay, I mean -- but 10 -- 10:00 p.m. is what you are
5   talking about, then?  All right.  I'm sorry, excuse me.
6 A   8:00.  That would be 8:00.
7 Q   8:00.  Okay.  So.....
8 A   8:10.  Correct.
9 Q   All right.  So the one should be a two?
10 A   Correct.
11 Q   You are talking military time then?
12 A   Correct.
13 Q   Okay.  All right.  Okay.  And was there any cars -- how
14   many cars were in the driveway, which is part of the
15   carport?
16 A   I don't recall.
17 Q   All right.
18 A   If I remember correctly, there was something under the
19   carport.  It just kind of looked like it was abandoned
20   there, but I don't remember if there were anything el
21   -- was anything else in the driveway.
22 Q   All right.  Is there parking to the left, if you turn
23   in -- when you are facing 202 from Grand Larry?
24 A   Uh-hum.  (Affirmative)
25 Q   You have already diagramed in a parking driveway?

Page 645

1   just be handled as a separate incident.
2 Q   And do you know whether or not the incident was
3   prosecuted?
4 A   I would take -- I would suspect that it wasn't.
5 Q   All right.  Okay.  Who was involved in that one?  Go
6   ahead and have some water, but watch the pitcher.  I
7   think that is the drippy one.  Who was part of the team
8   at that time?
9 A   At that time it was myself, Officer LaPorte, Officer
10   Johnstone, Officer Steve Haas, Officer -- now Sergeant
11   Bushue.  She was an officer back then, and Officer
12   Sims.  I'm not sure if he was on leave at the time, or
13   if he was involved at all.
14 Q   Okay.
15 A   And Officer Somerset Jones, as well.
16 Q   Uh-huh.  When you saw -- okay, you arrived about five
17   minutes early, I believe, to the scene, is that
18   correct?  You were there.....
19 A   Approximately, correct, yes.
20 Q   Okay.  And -- and that was about -- calling your
21   attention to your report dated 2/9/2001, down at the
22   bottom there, do you see it?
23 A   Yes.
24 Q   Okay.  That was about 10:10 hours?
25 A   I'm sorry?

Page 644

1 A   Correct.
2 Q   Is there parking available on the left of that?
3 A   Here?
4 Q   Yeah.
5 A   What you are referring to?
6 Q   Yes.
7 A   I don't exactly remember.  I believe it is kind of wide
8   enough for two rows of cars, but I'm not positive.  I
9   don't think I could -- could say for sure.
10 Q   Did -- where did Mr. Jeremy Fish's -- where did he
11   park?
12 A   Each time.....
13 Q   Excuse me, I'm talking about the 8th, now.
14 A   The 8th?
15 Q   Uh-huh.
16 A   He pulled right in.
17 Q   Okay.  Behind.....
18 A   Whatever else was in the driveway.
19 Q   Okay.  And you indicated that he got out and he went
20   in, then came back out, then went back in?
21 A   Correct.
22 Q   Okay.  And this -- according to your report basically
23   was about a 10 minute from arrival to departure?
24 A   Correct.
25 Q   Okay.  Now, do you know if anybody else was in the

Page 646

3AN-01-1717 CR

---

Page 647

1  house -- in 202 at that time?
2 A  Other than the one other subject?
3 Q  Right. You saw -- according to the police report, you
4  saw someone open the door?
5 A  Correct.
6 Q  And then you -- obviously Jeremy Fish was there.....
7 A  Correct.
8 Q  .....because you saw him go in and go out? Anybody
9  else?
10 A  I -- I don't know.
11 Q  All right. Okay. After Jeremy Fish left -- got back
12  in the car, what happened then?
13 A  After he left?
14 Q  Well, he got back in the car and then someth -- he
15  obviously.....
16 A  He left.
17 Q  He left. Okay.
18 A  Correct. And I passed surveillance off to another
19  unit.
20 Q  And who was that?
21 A  I don't recall.
22 Q  All right. And are you folks talking to each other on
23  radios, or something during this time?
24 A  Correct.
25 Q  Okay. Okay. Then that was the totality of your

---

Page 649

1 A  I don't really recall exact trash. I mean, I believe
2  there was some fast food stuff, dirt, lots of rocks,
3  and gravel on the floorboards.
4 Q  Okay. Did you search all the fast food stuff?
5 A  I looked through everything, yes. And in the back, I
6  believe, he had a baby car seat, and some other -- some
7  clothes, and some other things.
8 Q  Okay. Now, going to the 20th. That is the next time
9  you had any involvement in this, is that correct?
10 A  Correct.
11 Q  Okay. And the -- you were again assigned to the eye,
12  is that.....
13 A  The close in surveillance, yeah.
14 Q  Surveillance, okay. And where were you that time?
15 A  Same splace [sic].
16 Q  Same spot? So -- okay. Was -- what time was this?
17 A  Looks like the informant showed up at about 8:09.
18 Q  Okay. And were the lighting conditions the same?
19 A  It would have been. It actually would have been a
20  little bit lighter, because it was a little bit later
21  in the month, but at this time of night it would have
22  been the same probably.
23 Q  Okay. 8:00 at night, that time frame?
24 A  Correct. Yes.
25 Q  Okay. And Grand Larry still very dark -- the street

---

Page 648

1  involvement on the 9th, correct?
2 A  Actually it was on the 8th.
3 Q  I'm sorry, the 8th. I was looking at the.....
4 A  After Jeremy got back to the station, I conducted the
5  post-buy search of his vehicle, as well.
6 Q  Okay. Did you -- had you disturbed anything in the
7  vehicle from the time that -- by removing anything
8  other than the marijuana out of his -- you said it was
9  pretty messy, right?
10 A  Correct.
11 Q  Did you take anything -- clean the car out for him?
12 A  I didn't clean the car out. I do believe he had a
13  steak knife under his seat that I put way in the back,
14  but I wasn't going to clean his car for him.
15 Q  Okay. All right. And so the -- there is no mention in
16  your search about finding the steak knife either, is
17  there?
18 A  No.
19 Q  All right. And when you did the post search, is it
20  fair to assume that the interior of the vehicle was
21  basically how you had left it after the pre-search?
22 A  Correct.
23 Q  Okay. What was in the vehicle?
24 A  As far as the trash that was in it?
25 Q  Yeah. Yes.

---

Page 650

1  itself?
2 A  Correct.
3 Q  Okay. And you started the recording -- when did you
4  start the recording?
5 A  As he drove into the area.
6 Q  Okay. What did you hear on the recording when he was
7  driving into the area?
8 A  Well, referring to my report, what I heard was, I heard
9  several people talking.....
10 Q  No, let me stop you, if I may.
11 A  Okay.
12 Q  What did you hear when you -- you turned on the
13  recorder, right?
14 A  Correct.
15 Q  As he was driving in?
16 A  Uh-hum. (Affirmative)
17 Q  What did you hear?
18 A  I don't remember.
19 Q  Okay. And then he pulls in. Where did he pull in?
20 A  I believe it was pretty much the same place, only on
21  this occasion there was other vehicles to where he
22  couldn't pull in all the way.
23 Q  All right. How many vehicles were there?
24 A  Several.
25 Q  Okay. Did you know how many people were in the house?

---

**3AN-01-1717 CR**

| | |
|---|---|
| 1 A  I was to operate the wire -- record the conversation. | 1 Q  When did -- you had testified earlier that you returned |
| 2 Q  All right. And where were you on the 21st -- I mean, | 2      to 202 Grand Larry that day? |
| 3      first of all, let me ask you this. That's an unfair | 3 A  Correct. |
| 4      question. On the 21st your job was assigned the wire. | 4 Q  Okay. When did -- what was the suspect vehicle driving |
| 5      All right. What happened after you got your assignment | 5      at that time? |
| 6      to operate the wire? | 6 A  He was in a large sport utility. I believe it was a |
| 7 A  I set it up to make sure it works, test it, and put a | 7      Durango -- like a Dodge Durango, or something similar. |
| 8      tape in it. | 8 Q  Okay. And that information had to have been supplied |
| 9 Q  All right. And then did you put the wire on Jeremy | 9      to you from some other source if you didn't see |
| 10     Fish? | 10     anything at the scene? |
| 11 A  I don't know if I put it on him that day. I'm sure I | 11 A  Correct. |
| 12     would have double checked to make sure it was on right, | 12 Q  Okay. How long ago was that? How long after the -- |
| 13     make sure it worked right. | 13     that you departed International that you saw the |
| 14 Q  Okay. And -- all right. Now, at about 8:30, according | 14     vehicle arrive at -- the described vehicle that you |
| 15     to your report here, you arrived at what location? | 15     were to watch for? |
| 16     8:24 to be specific? | 16 A  I don't remember. We tried following it around for a |
| 17 A  Oh, International Airport Ave and Old Seward Highway. | 17     while, and then once we lost it I basically made a |
| 18 Q  Okay. And where were you parked? | 18     beeline for that address just with the hopes that it |
| 19 A  I don't remember exactly where I was parked at. | 19     might show back up there. |
| 20 Q  All right. And after -- you had a job to do after | 20 Q  Okay. Okay. And that is -- does that finish off your |
| 21     running the wire. How long did you run the wire? | 21     involvement on the 21st? |
| 22 A  Looks like about a minute. | 22 A  Once I back -- got back to the police station, I turned |
| 23 Q  Okay. And what kind of vehicle was Jeremy driving that | 23     over the tape of the recording to Officer LaPorte. |
| 24     day, same one? | 24 Q  Okay. |
| 25 A  I don't remember. | 25 A  And that would end..... |
| Page 659 | Page 661 |
| 1 Q  Okay. What kind of vehicle was at the location of Old | 1 Q  That was the end? |
| 2      Seward and International, other that -- well, first of | 2 A  Yes. |
| 3      all, did Jeremy make -- who did you see when Jeremy | 3 Q  Okay. Going to the 28th/1st, you were in a marked |
| 4      arrived at International and Seward? | 4      police car at this time? |
| 5 A  I didn't see anything. | 5 A  Yes. |
| 6 Q  Okay. Now, you were assigned to do something after you | 6 Q  Prior times, were you in a marked police car? |
| 7      turned off the wire? | 7 A  No. |
| 8 A  Correct. | 8 Q  Okay. So this is the first time you were in a cop car? |
| 9 Q  Okay. What were you assigned to do? | 9 A  Yes. |
| 10 A  Our -- the remaining members of our unit, those that | 10 Q  Marked..... |
| 11     weren't following Jeremy back to the station, were | 11 A  Right. |
| 12     going to attempt to follow the suspect. | 12 Q  .....police car? Okay. And you were assigned to make |
| 13 Q  Okay. | 13     the arrest, is that correct? |
| 14 A  And I don't recall if that was an -- an assignment that | 14 A  Correct. |
| 15     we decided on at our briefing, or if it is something | 15 Q  Okay. And were you running any wire at that time? |
| 16     that we decided on later on. | 16 A  No. I had a bug radio which monitors the wire but no |
| 17 Q  Okay. | 17     recording device. |
| 18     THE COURT: Move that mike a little closer to you, | 18 Q  All right. And at that particular juncture, |
| 19 would you? That's good. | 19     what kind of car was Mr. Davis -- or, excuse me, |
| 20 Q  Who -- you were a part of that group, correct? | 20     Mr. Jeremy driving then? |
| 21 A  The group to follow the suspect, yes. | 21 A  I don't recall. I imagine probably the same one he has |
| 22 Q  Yeah. All right. And who else was involved in that? | 22     been driving the whole time. |
| 23 A  I don't recall which..... | 23 Q  Okay. You were not involved in any more searches other |
| 24 Q  Okay. | 24     than the -- the ones you previously described of the |
| 25 A  .....which members. | 25     vehicle? |
| Page 660 | Page 662 |

| | |
|---|---|
| 1 Q Did you only search the vehicle in the first buy? | 1 A Basically I analyze drugs. |
| 2 A I believe I searched the vehicle the first and the | 2 Q And where did you work previously? |
| 3    second buy. | 3 A I worked for a company called Analytical Technologies, |
| 4 Q Okay. | 4    Inc. and we analyzed petroleum hydrocarbons, gasoline, |
| 5 A I would suspect it was probably the first time, | 5    diesel, other fossil fuels, and soil and water. |
| 6    because, of course, I would have told him not to bring | 6 Q How long did you do that for? |
| 7    the puppy again, either. And I can't see even Jeremy | 7 A I did that for about a year? |
| 8    bringing a puppy after I told him to clean his car out | 8 Q All right. And what kind of education do you have that |
| 9    after the first buy. | 9    -- what is your specific occupation with the crime lab? |
| 10 Q All right. And even though you couldn't see what Fish | 10 A My specific title is criminalist in the controlled |
| 11    was doing inside of his car, could you hear what was | 11    substance section. |
| 12    going on? | 12 Q What type of education do you have that qualifies you |
| 13 A Yes. | 13    to be a criminalist? |
| 14 Q And Mr. James asked you how long you ran the wire, and | 14 A I have a bachelor's of science degree in chemistry. |
| 15    you responded one minute. What were you talking about | 15 Q And have you instructed or trained others? |
| 16    when you answered that question? | 16 A I have. |
| 17 A That is how long the recording was running, and that | 17 Q And have you done testing for the presence of |
| 18    was on the very last..... | 18    controlled substances including cocaine? |
| 19 Q Okay. | 19 A I have. |
| 20 A .....very last buy. | 20 Q About how many times have you done testing for cocaine? |
| 21 Q And..... | 21 A Thousands of times. |
| 22 A Not the very last buy, but the -- the one before the | 22 Q All right. And have you testified in court before |
| 23    buy bust. | 23    regarding that kind of testing? |
| 24 Q Okay. And when you arrested Mr. Davis, did you know | 24 A I have. |
| 25    the jail was going to do a search on him? | 25 Q About how many times? |
| Page 675 | Page 677 |

| | |
|---|---|
| 1 A Yes. | 1 A As far as cocaine, about 20 times with cocaine. 40 |
| 2 Q Okay. | 2    times altogether in controlled substances. |
| 3   MS. BRADY: That's all the questions I have for this | 3 Q Have you ever been qualified to testify as an expert |
| 4 witness, Your Honor. | 4    and give an opinion as to whether or not a substance is |
| 5   THE COURT: You can step down. Your next witness, Ms. | 5    cocaine before? |
| 6 Brady? | 6 A Yes. |
| 7   MS. BRADY: My next witness is Jack Hurd. | 7 Q In courts in the state of Alaska? |
| 8   (Oath administered) | 8 A Yes. |
| 9   MR. HERD: I do. | 9 Q About how often? |
| 10        JACK HURD | 10 A How often do I testify? |
| 11 called as a witness on behalf of the plaintiff, testified as | 11 Q How often has you been -- have you been accepted as an |
| 12 follows on: | 12    expert in courts of the state of Alaska? |
| 13      DIRECT EXAMINATION | 13 A It is over 40 times. I have lost count. |
| 14   THE CLERK: You can have a seat. State for the record | 14 Q All right. And let's just talk about this particular |
| 15 your full name, and spell your last name. | 15    case, now. First, let's talk in general about the |
| 16 A My full name is Jack Hurd, H-u-r-d. | 16    procedures at the crime lab for chain of custody. |
| 17   THE COURT: Go ahead, Ms. Brady. | 17    Could just explain to the members of the jury what the |
| 18 BY MS. BRADY: | 18    procedure is for items that are received at the crime |
| 19 Q Who do you work for, Mr. Hurd? | 19    lab? |
| 20 A I work for the state of Alaska, the crime lab. | 20 A Sure. Items are received at the crime lab one of two |
| 21 Q And where is the crime lab at? | 21    ways. They are either sent to the crime lab via the |
| 22 A 5500 east Tudor Road. | 22    registered mail system, or they are hand delivered by |
| 23 Q How long have you worked there? | 23    an officer, or a custodian. They -- we do have two |
| 24 A Since 1995. | 24    evidence custodians at the state crime lab, and they |
| 25 Q What kind of work do you do there? | 25    receive the evidence. And upon receipt of the |
| Page 676 | Page 678 |

1 evidence, before they sign on the chain of custody,
2 they will examine the evidence to make sure that it is
3 properly packaged, and that it is properly identified,
4 that the agency case number is on the packaging, the
5 item number, et cetera. They then will sign for it on
6 an internal chain of custody. After receiving that
7 evidence, then they will log that evidence into the
8 database at the computer -- or at the state crime lab,
9 and assign it a unique laboratory number. Then that
10 evidence is basically stored within the evidence room,
11 which is a building within a building. It has its own
12 unique security system, unique to that of the lab.
13 Those that are -- have access to it are the evidence
14 custodians and their supervisor.
15 Q  Okay. Now, what happens once it makes it into that
16 secured room. If it -- like, say, you want to take it
17 out and test it, what do you have to do?
18 A  First of all, each section is given notice that the
19 evidence is there and ready to be worked. We are given
20 a copy of the chain of custody. When it becomes to my
21 attention that there is evidence to work, then I will
22 proceed to check it out. I have to request it from the
23 evidence custodian, and then again as he or she gives
24 me the evidence, there is going to be an exchange of
25 signatures. I sign for the evidence, and then I do the

Page 679

1 whether it is cocaine or not, I use two types of
2 methods to determine if it is cocaine or not. The
3 first method is -- it is what is called a gold chloride
4 test. It is very simple. We take a glass slide -- a
5 microscope slide. We take a representative sample of
6 the suspect substance and apply it to the glass slide.
7 And then we have a chemical called gold chloride, and
8 we add it to mix it up with the unknown sample. And
9 gold chloride does something that is unique to cocaine.
10 When it combines with cocaine, it forms this really
11 quite beautiful crystalline structure, looks kind of
12 like a cross, or a snowflake. And we examine that
13 underneath a microscope. That is the first test. The
14 second test is much more specific. We are actually
15 able to look, in essence, at the molecular structure
16 of the unknown substance. We run it on an instrument
17 called a gas chromatography. And that allows us to
18 actually -- to look at the molecular structure to
19 identify cocaine as such.
20 Q  Are these common methods that are accepted among your
21 colleagues for testing controlled substances that
22 contain cocaine?
23 A  Yes.
24 Q  Okay. And in your experience and opinion, is the --
25 the GCMS is which of the two tests that you were

Page 681

1 same thing the evidence custodian did originally. I
2 look at the evidence, is it properly packaged, is it
3 properly identified. And then I will proceed to work
4 it.
5 Q  And when you work it, what do you do to make sure it
6 doesn't get mixed up with other evidence or -- how do
7 you -- what is the procedure that you use for that?
8 A  We analyze evidence one -- one sample at a time so that
9 we avoid cross contamination issues.
10 Q  All right. And what do you do when you are done with
11 it, after you have tested it?
12 A  After we are done testing the evidence, I repackage it,
13 reseal it, and then I check it back into the evidence
14 custodian, and then I issue a report to the submitting
15 agency.
16 Q  Okay. And what are these procedures all designed to
17 ensure?
18 A  Basically to maintain the integrity of the evidence.
19 Q  Okay. And let's talk about testing cocaine. What
20 kinds.....
21 MR. JAMES: I'm going to object. She has never offered
22 him as a witness.
23 THE COURT: The objection is overruled.
24 Q  What kinds of tests do you perform on cocaine?
25 A  Basically when I receive evidence, and I have an idea

Page 680

1 talking about?
2 A  The instrumental test.
3 Q  The instrumental test. Is that test accurate?
4 A  Yes, it is.
5 MR. JAMES: I'm renewing my objection.
6 THE COURT: Could we have a bench conference please?
7 (Bench conference as follows:)
8 (Inaudible)
9 (End of bench conference)
10 THE COURT: Go ahead, Ms. Brady.
11 Q  In your experience and opinion, is the GCMS test
12 accurate?
13 A  Yes, it is accurate.
14 Q  And how many times have you performed this kind of
15 test?
16 A  Thousands, if not tens of thousands of times.
17 Q  What about the gold chloride test, accurate?
18 A  Yes.
19 Q  And how many times have you performed that test?
20 A  Same amount. Thousands of times.
21 Q  Okay. Now, let's talk about the testing that you did
22 in this case, and I'm going to put some exhibits in
23 front of you, and I'm going to have you look at the
24 item that is marked state's exhibit 1.
25 A  Okay.

Page 682

1 Q  Now, did you do the testing in APD case number 017273?
2 A  Yes, I did.
3 Q  Okay.  And do you recognize that is in front of you?
4 A  I do.
5 Q  Did you test -- and what is the P and E number for that
6    item?
7 A  P and E number is not familiar with me.
8 Q  Okay.  Is there an item -- is there a number on that
9    somewhere that identifies that?
10 A  Yes.
11 Q  So that you know what you are testing?  Okay, what is
12    that?
13 A  Yes, there is.  Item number 503125.
14 Q  And is that the item you tested?
15 A  Yes, it is.
16 Q  How do you recognize it?
17 A  When I first receive the package, I will apply our
18    laboratory number, the item number, my initials, and
19    then the date that I opened it up.
20 Q  Okay.  And when you tested that item, what were you
21    testing it for?
22 A  Well, I was -- on the request for laboratory services
23    form, it said suspect -- or something to that effect,
24    crack cocaine, or cocaine, so I was looking for
25    cocaine.

Page 683

1    onto the scale.  Bef -- actually, back up.  Before we
2    do that, we do a procedure called taring, which takes
3    into account the weight of the weigh boat.  So
4    obviously we are not going to include the weight of the
5    weigh boat in the final weight of the substance.  So we
6    will pour the contents into the weigh boats after it is
7    tared, and weigh that substance out.
8 Q  Do you leave it in the packaging material when you
9    weigh it, or do you take it out of any packaging
10    material it may be in?
11 A  We re -- we removed it from its packaging.
12 Q  All right.  And so that weight that have you just told
13    me, with regard to that particular piece of evidence,
14    represents only the weight of the cocaine?
15 A  Correct.
16 Q  All right.  And now, when you are testing items such as
17    this -- these items in this case, how do you make sure
18    that these items do not contaminate each other then?
19 A  I will open this package.  I will go through all the
20    testing on this package.  And once I am done with it, I
21    will seal the packaging up, and then I will proceed to
22    the next one.
23 Q  All right.  So let's talk about exhibit number 2 now.
24    Okay.
25 Q  Did you test an item marked P and E number 505551?

Page 685

1 Q  And what procedures did you use on that item?
2 A  I used the two procedures that we talked about earlier.
3    The gold chloride and the instrumental test.
4 Q  And as a result of your testing on that item, did you
5    form any opinions?
6 A  I did.
7 Q  And what was your opinion?
8 A  This evidence tested positive for cocaine.
9 Q  Okay.  And in your testing of this item, did you also
10    weigh the item?
11 A  I did.
12 Q  And how much did this particular item weigh?
13 A  I would have to refer to my notes.  I don't commit that
14    to memory.
15 Q  Would you like to refer to your notes?
16 A  0.8 grams.
17 Q  Okay.  Now, when you take an item out of the lab and
18    weigh it, could you just explain to the members of the
19    jury what the procedure is that you go through?
20 A  Yes.  That is actually the first thing that we do
21    before we actually analyze it is we weigh the product
22    out.  So we have a laboratory scale -- a digital scale,
23    and we have weigh boats that are disposable that are
24    only used once so they are clean.  And we, in essence,
25    pour the contents into the weigh boats and place it

Page 684

1 A  I did.
2 Q  And is that what that is?
3 A  Yes, it is.
4 Q  Is that the item you tested?
5 A  Yes, it is.
6 Q  How do you know that?
7 A  Again, when I checked this out, before I opened it up,
8    I applied the lab number, the item number, my initials
9    and the date, which I see right here.
10 Q  Okay.  And were you testing that for the same kinds of
11    things?
12 A  Yes.
13 Q  What test did you use on that?
14 A  The gold chloride and the instrumental test.
15 Q  All right.  And as a result of your testing, did you
16    form an opinion?
17 A  I did.
18 Q  And what was your opinion?
19 A  This evidence tested positive for cocaine.
20 Q  Did you also weigh that object?
21 A  I did.
22 Q  And what was the weight that it had?
23 A  Again, referring to my notes, I recorded 3.1 grams.
24 Q  All right.  And let's move on to exhibit number 3.  Did
25    you test an item marked P and E number 430515?

Page 686

Case 3:05-cv-00255-TMB-JDR    Document 54-8    Filed 01/12/2007    Page 13 of 23
Multi-Page™    State v. Robert Davis
November 20, 2001

3AN-01-1717 CR

1 A   Can you repeat the number? It is covered up here, so I
2     can't see it in the packaging.
3 Q   Why don't we go ahead and open it. I think there is
4     two in there anyway. That way you'll be able to take a
5     look at it. The number I said was 430515.
6 A   Yes, I did.
7 Q   And is that the item you tested?
8 A   Yes.
9 Q   And how do you recognize it?
10 A  Same reason I recognized the other two.
11 Q  What procedures did you use?
12 A  Same procedures I analyzed the other two.
13 Q  Okay. And as a result of your testing of that item,
14    did you come to any conclusions?
15 A  I did.
16 Q  What was your conclusion?
17 A  This evidence tested positive for cocaine.
18 Q  In your testing did you weigh it?
19 A  I did.
20 Q  And what was the weight of that one?
21 A  1.4 grams.
22 Q  Thank you. And then I ask you to direct your attention
23    to exhibit 4, and did you test an item marked P and E
24    number 413245?
25 A  I did.

Page 687

1 Q   Okay. Is that the item you tested?
2 A   It is.
3 Q   How do you know that?
4 A   I know that because of the same reason I knew the other
5     three, the lab number, the item, my initials and the
6     date applied to the packaging.
7 Q   When you tested that item, what were you testing it
8     for?
9 A   For cocaine.
10 Q  Okay. And did you use the same procedures?
11 A  I did.
12 Q  As a result of your testing on that item, did you form
13    any opinions?
14 A  I did.
15 Q  What conclusion did you reach?
16 A  This evidence also tested positive for cocaine.
17 Q  All right. And did you weigh that object as a part of
18    your test?
19 A  I did.
20 Q  And what was the weight of that particular item?
21 A  It weighed 1.2 grams.
22 Q  Okay. And did you submit a report that contained your
23    conclusions? I'm going to approach with state's
24    exhibit 18.
25 A  Yes, I did.

Page 688

1 Q   Do you recognize that document?
2 A   This looks like a copy of the report that I submitted
3     to the agency that submitted the evidence.
4 Q   Is that a fair and accurate copy of your report?
5 A   Yes, it looks like it.
6     MS. BRADY: Okay. At this time I move to exhibits --
7 move to admit state's exhibit 18.
8     MR. JAMES: No objection.
9     THE COURT: 18 is admitted.
10            (Plaintiff's exhibit 18 admitted)
11    MS. BRADY: Thank you. That's all the questions I have
12 for this witness.
13    THE COURT: All right. Thank you. Mr. James, your
14 questions?
15            JACK HURD
16 testified as follows on:
17            CROSS EXAMINATION
18 BY MR. JAMES:
19 Q   Mr. Hurd, we talked -- is there a different between
20    crack and cocaine?
21 A   There is a difference between crack and cocaine
22    hydrochloride, or powdered cocaine, yes.
23 Q   Okay. And what is the difference there?
24 A   When you look at it, usually there is a difference, but
25    basically hydrochloride, or powdered cocaine is water

Page 689

1     soluble. And the significance of that is that it can
2     be absorbed into the mucous membranes of the body.
3     That means you can toot it up your nose, you can eat
4     it, you can inject it into the body. But you usually
5     wouldn't smoke it, because the melting point of it is
6     too high, and so the psychoactive effect would -- would
7     be negligible there. Crack cocaine, on the other hand,
8     is not water soluble, but it has a low melting point,
9     so you usually smoke crack cocaine. And that is the
10    difference.
11 Q  Okay. And when you test crack cocaine versus -- you
12    described how you test cocaine, is there a difference
13    in the test between crack cocaine and -- and cocaine?
14 A  Well, again, crack cocaine is cocaine, but I think you
15    are referring to cocaine hydrochloride, the powdered
16    form.
17 Q  Right, I'm -- yes.
18 A  We can distinguish the two, and there is a procedure
19    that we can test for coc -- or crack cocaine. We
20    usually don't do that unless it is a federal case,
21    because it is a moot point in the state of Alaska. The
22    state of Alaska doesn't -- it doesn't matter to them if
23    it is crack cocaine or powdered cocaine, it is all
24    cocaine. So unless we are specifically asked to
25    distinguish the two, we don't usually do so. But we

Page 690

1    submitted to you for analysis?
2 A  No, sir.
3 Q  Okay.
4    MR. JAMES: If I may approach the.....
5 Q  And I call your attention to exhibit 2, sir?
6 A  Okay.
7 Q  All right?
8 A  Uh-hum. (Affirmative)
9 Q  And I pointed it out to you. That's what I was doing
10   over there, right?
11 A Sure.
12 Q Okay. How much does that say was there? What was
13   submitted, according to the envelope?
14 A On the packaging it says 11.8 grams.
15 Q Okay. Do you have any idea what those 11.8 grams
16   represent?
17 A I have.....
18   MS. BRADY: Objection, Your Honor. This has been asked
19 and answered.
20   THE COURT: Overruled.
21 Q All right. The answer is no?
22 A I have no idea, no.
23 Q All right. Do you use both tests -- the gold chloride
24   and the gas test on both of them, or do you pick and
25   choose based on your own discretion?

Page 695

1 A We use two tests to be able to report out a controlled
2   substance for just about every controlled substance
3   that comes into the lab. So for every item that I
4   report out cocaine, I have performed two tests on
5   it.....
6 Q Okay.
7 A .....at a minimum.
8 Q Okay. How much is a gram? I mean, can you give me a
9   visual, so.....
10 A Sure. If you -- if you think about the contents of a
11   package of sweet and low, that is about a gram.
12 Q Okay. The little individual packages?
13 A Yes, sir.
14 Q Okay. One moment, please. Thank you, Mr. Hurd.
15   THE COURT: Redirect, Ms. Brady?
16           JACK HURD
17 testified as follows on:
18       REDIRECT EXAMINATION
19 BY MS. BRADY:
20 Q Mr. Hurd, did you actually distinguish between the
21   samples of -- as far as water solubility in this case?
22 A I did.
23 Q Okay. Did you determine that s -- determine that some
24   of those were water soluble and some of them weren't?
25 A I did.

Page 696

1 Q Which of the exhibit numbers I -- let's start with
2   exhibit 1. Was that water soluble?
3 A I'll have to refer back to my notes here.
4    MR. JAMES: I'm going to object. This is beyond the --
5 this is beyond cross, I mean.....
6    THE COURT: No, overruled.
7    MR. JAMES: Fine. That's fine.
8 Q Exhibit number 1 is 503125.
9 A Okay. 503125 was water soluble.
10 Q So that means it is not crack, is that right?
11 A That is correct.
12 Q Okay. And.....
13 A Probably means that.
14 Q Pardon me?
15 A It probably means that.
16 Q Okay.
17 A It's a pretty good -- yeah.
18 Q And for exhibit number 2, was that water soluble?
19 A This was water soluble as well, yes.
20 Q Okay. And what about exhibit number 3?
21 A Exhibit number 3 was not water soluble.
22 Q Meaning it is probably crack?
23 A Correct.
24 Q Okay. And what about exhibit number 4?
25 A And exhibit number 4 was also not water soluble.

Page 697

1 Q Thank you.
2    MS. BRADY: That's all the questions I have for this
3 witness.
4    THE COURT: Any other questions on that subject,
5 Mr. James?
6    MR. JAMES: No, Your Honor. Thank you.
7    THE COURT: All right. Thank you, sir. You can step
8 down. Ms. Brady, your next witness?
9    MS. BRADY: Your Honor, the state rests.
10   THE COURT: All right. That means the state is not
11 going to present any additional witnesses. Let me confer
12 with the lawyers for a moment. Are you all ready for a
13 break or -- I'm having head shaking no, so hold on a second.
14   (Bench conference as follows:)
15   (Inaudible)
16   (End of bench conference)
17   THE COURT: If you remember back, folks, to the -- to
18 the road map of the trial that I gave you. The next stage
19 of the case is the defendant may put on evidence if he
20 chooses to do so. And since defense counsel reserved his
21 right to make opening statement, if you recall, he has an
22 opportunity to make an opening statement before he presents
23 evidence, now. And then he can present his evidence.
24 Mr. James, are you ready with your opening statement?
25   MR. JAMES: If I may have just one minute. I'm trying

Page 698

1 to take care of one item here, please. Thank you.
2     Ladies and gentlemen of the jury, you have heard quite
3 a bit of testimony, and quite a bit from Mr. Fish. And you
4 have heard quite a bit of testimony from different officers,
5 most of which was relied -- relayed from Mr. Fish.
6 Specifically, he talks about what happened on February 20th.
7     I intend to present two witnesses who were there. And
8 I think, when you get done listening to them, you are going
9 to feel more uncomfortable. I intend to present Robert
10 Davis' mother, who is going to clarify some of these
11 statements made by Officer LaPorte. I intend to present
12 Athena Soder, the mother of Jeremy Fish's daughter. And I
13 intend to, if time permits, present Officer Healy, from
14 CIPT. She is going to be the records custodian. And the
15 records custodian is the person, as she will testify, is --
16 they keep all the records. When someone goes to CIPT, it is
17 -- it is kind of like a file is opened up on them, and
18 everything is documented to the best of their ability as a
19 trans -- until they leave CIPT. So theoretically, those
20 records would reflect the entire of an individual in CIPT.
21     Now, the reason we are presenting this testimony is to
22 establish -- to show you that, in fact, what the state
23 alleges has great holes in it. And the holes are such.....
24     MS. BRADY: Objection, Your Honor. This is argument.
25     THE COURT: Just the facts at this point. No argument,

Page 699

1 please.
2     MR. JAMES: That the witnesses are going to relay their
3 own observations, and in -- of course, in question of Mr. --
4 Ms. Healy -- she is a lady -- what the documentation is in
5 CIPT. And that is pretty much it. So with that, I would
6 like to call my first witness.
7     THE COURT: You may call your first witness, Mr. James.
8     MS. BRADY: Your Honor, may I approach and clear the
9 witness bench?
10     THE COURT: That would be good. You may do that.
11     (Pause)
12     MR. JAMES: Darryl, would you come forward and go up to
13 that chair up there? You have to walk around the
14 (indiscernible). Would you remain standing please?
15     MR. CASH: Okay.
16     THE COURT: This lady is going to swear you in.
17     (Oath administered)
18     MR. CASH: I do.
19           DARRYL CASH
20 called as a witness on behalf of the defendant, testified as
21 follows on:
22       DIRECT EXAMINATION
23     THE CLERK: Thank you. You may be seated. For the
24 court record, please state your name, spelling your last
25 name.

Page 700

1 A Darryl Cash, C-a-s-h.
2     THE CLERK: Okay. And what was the first name?
3 A Darryl.
4     THE CLERK: Thank you.
5 BY MR. JAMES:
6 Q Okay. Mr. Cash, do you know Robert Davis?
7 A Yes, I do.
8 Q All right. How long have you known Mr. Davis?
9 A Two years.
10 Q All right. And are you familiar with 202 Grand Larry?
11 A Yes. Yes, sir.
12 Q And why are you familiar -- how are familiar with that?
13 A I used to -- I live right down the street -- I used to
14     live right down the street from him, until he moved.
15 Q All right. Have you.....
16 A I used to be over there every day -- just about every
17     day.
18 Q All right. And calling your attention to February 20th
19     -- the evening of February 20th?
20 A Uh-hum. (Affirmative)
21 Q Were you over there that evening?
22 A Yes, I was.
23 Q All right. And was there anything that focuses your
24     mind on February 20th?
25 A I was just watching TV. In front of the set -- it was

Page 701

1     -- I was just watching TV.
2 Q Okay. Was anything planned to happen on February 21st?
3 A February 21st?
4 Q The next day?
5 A We was supposed to move.
6 Q I'm sorry?
7 A We was supposed to move that day.
8 Q February 21st?
9 A Uh-hum. (Affirmative)
10 Q All right. When we say we were supposed to move, were
11     you moving someplace?
12 A I wasn't.
13 Q Who was?
14 A Rico.
15 Q All right. And Rico is Robert?
16 A Right.
17 Q All right. And how long were you there on February
18     20th?
19 A I'm usually over there just 'til about 12:00 o'clock
20     every night.
21 Q All right. About what time do you get over there?
22 A About 8:00. Just about 8:00 o'clock.
23 Q All right. And you indicated there was going to be a
24     move on the 21st. What were you doing on the 20th?
25     Were you doing anything in anticipation of the move?

Page 702

**Page 703**

1 A  We was just picking up little things here, putting
2     little things there.
3 Q  Are you familiar with the layout of the house?
4 A  Yeah.
5 Q  All right.  What is in the kitchen?
6 A  The kitchen is -- you got a couple of bar stools, and
7     you got the counter, and then there is the
8     refrigerator, and then there is the stove.
9 Q  Okay.  Do you know if there is -- are you familiar with
10    any type of surveillance camera?  Do you know what that
11    means -- or you know -- do you know what I'm talking
12    about?
13 A  Uh-hum.  (Affirmative)
14 Q  Do you ever see one of those over there?
15 A  I never did.
16 Q  All right.  And what was in the front room, if
17    anything?
18 A  There was two couches, an entertainment center, TV and
19    a couple of little electronic things, like stereo
20    equipment.
21 Q  Is that -- had you been over there prior to February
22    20th?
23 A  Uh-hum.  (Affirmative)
24 Q  Were the items the same in there at that time.....
25 A  Yes.

**Page 705**

1     stay in the kitchen.
2 Q  Okay.  Were you ever in the kitchen?
3 A  Uh-hum.  (Affirmative)
4 Q  All right.  Did you see anything unusual in the
5     kitchen, marijuana or anything?  Did you ever see
6     Mr. Davis packing a gun?
7 A  No, I never did.
8 Q  That evening?
9 A  No, I didn't.
10 Q  Prior to that?
11 A  No, sir.
12 Q  All right.  Other than yourself, do you know how many
13    people were there on the 20th?
14 A  About four, mostly family.
15 Q  Okay.  Do you know a Jeremy Fish?
16 A  I never heard of him.
17 Q  All right.  Were there white people as well as -- you
18    are black, for the record.....
19 A  Uh-hum.  (Affirmative)
20 Q  .....right?  African-American.  Were there any white
21    people over there, as well as yourself and Mr. Davis,
22    of course, is African.
23 A  Well, he had friends.  He had -- he had white friends.
24    They would come over once in a while.
25 Q  Did you know all his friends?

**Page 704**

1 Q  .....as prior time?
2 A  Uh-hum.  (Affirmative)
3 Q  Okay.  Were the bar stools still in the kitchen area?
4 A  Bar stools.
5 Q  All right.  Are you familiar with marijuana?
6 A  I am.  I know what it is, but as far as -- I don't me
7     -- I don't do it.
8 Q  All right.  Did you see any marijuana over there that
9     evening.....
10 A  No, sir.
11 Q  .....on the 20th?
12 A  Unh-unh. (Negative)
13 Q  Are you familiar with hand guns?
14 A  Yes, sir.
15 Q  All right.  Pistols and revolvers?
16 A  Uh-hum.  (Affirmative)
17 Q  Okay.  Did you see any hand guns over there on February
18    20th?
19 A  No, sir.  I never did.
20 Q  Were you in a position to observe Robert Davis that
21    evening?
22 A  Yes.
23 Q  Okay.  How were you able to see him?
24 A  Well, he was -- you know, he walked back and forth.  I
25    was sitting down.  He'll come in the front room, he'll

**Page 706**

1 A  I knew them, yes.
2 Q  All right.  Did you ever see Mr. Davis deal any drugs
3     with anybody that evening?
4 A  No, sir.
5 Q  What kind of car does he have?
6 A  Oh, man.
7 Q  Do you have a.....
8 A  He got a couple cars.
9 Q  Okay.  Does he have a pickup?
10 A  Yeah.
11 Q  What kind of pickup is it?
12 A  It is a -- like a gray Toyota.
13 Q  All right.  One of those little Toyotas, a big Toyota?
14 A  It's a little small one.
15 Q  A small one?  Okay.  Were you in a -- were in a
16    position that evening, on February 20th, to see what
17    was going on in that house -- or that apar -- that unit
18    -- it's a duplex, isn't it?
19 A  Uh-hum.  (Affirmative)
20 Q  Two houses there?  But in the house that you were in?
21 A  Uh-hum.  (Affirmative)
22 Q  Yes, no?
23 A  Yes.
24 Q  All right.  Did anything unusual happen to your
25    observation?

1 A   No, sir.

2 Q   All right.  Do you do drugs?

3 A   No, sir.

4 Q   Do you associate with people who do drugs?

5 A   No.  Thank you.  You can -- no.

6      THE COURT:  Hold on.

7 Q   Stay seat.....

8      THE COURT:  A few more questions.

9 Q   Stay seated.

10     THE COURT:  Are you finished with direct?

11     MR. JAMES:  Yes, I am.  Thank you.

12     THE COURT:  Cross examination, Ms. Brady?

13              DARRYL CASH

14 testified as follows on:

15         CROSS EXAMINATION

16 BY MS. JAMES:

17 Q   What is your date of birth, Mr. Cash?

18 A   10/30/67.

19 Q   Okay.  And now, you testified on direct that the night

20     that Mr. James is asking you about, February 20th, you

21     know that it was February 20th because Ricco was moving

22     the next day.  Is that right?

23 A   Right.  We got out on the 22nd.

24 Q   Okay.  And wait -- and you said that that night nothing

25     was packed in boxes, is that right?

Page 707

1      packing up the next day.

2 Q   Okay.  So if you said everything was out on the 22nd,

3      then would the night you have been there -- you were

4      there, would that have been the 21st?

5 A   Right.  I was there the 20th, 21st, and -- I was there.

6 Q   Not sure?

7 A   I was there.

8 Q   You were there which night?

9 A   The 20th and the 21st.  I -- I helped move all the days

10     I was there.

11 Q   Okay.  So when Mr. James was asking you questions about

12     seeing marijuana on a specific night, would it be fair

13     to say that you are saying that you have just never

14     seen marijuana at Mr. Davis' house, or do you have a

15     specific recollection about a specific night?

16 A   I never did.  I never -- never saw any marijuana at his

17     house.

18 Q   Okay.  So based on the fact that you never saw it, that

19     is how you are answering his question about not seeing

20     marijuana, is that right?

21 A   Well, I be -- I'm be -- I mean, I was over there every

22     day.  I have never -- like I said, I'll be over there

23     just about every day, and I never ever seen any drugs

24     or anything.

25 Q   Okay.  And you said you are familiar with marijuana?

Page 709

1 A   We was getting ready.  We was loading stuff up.

2 Q   You were loading stuff up?

3 A   We was getting ready.

4 Q   But you said everything that was in the apartment -- it

5      was all still there, is that right?

6 A   Uh-hum.  (Affirmative)

7 Q   Couches hadn't been moved out, nothing had been moved

8      out?

9 A   Right.

10 Q   Okay.  So what had -- what had been done to prepare for

11     this move the next day?

12 A   Well, we -- the next day -- I know everything was out

13     on the 22nd.  He got out on the 22nd.

14 Q   Okay.  So the night that you are talking about could

15     have been the 21st, is that right?

16 A   Well, I was there.....

17 Q   If you moved the next day?

18 A   I was there the 20th.

19 Q   How do you know it was the 20th?

20 A   Ev -- everything was still there.

21 Q   Everything was still there on the 20th.  That is not

22     the question I'm asking you, though.  I'm asking you

23     how do you know the night that you were there was the

24     20th?

25 A   Well, I know, because we was supposed to pack.  We was

Page 708

1 A   Sure.

2 Q   Seen it before?

3 A   I mean, I seen it before.  I never -- you know, I never

4      messed with it.  I mean, back in New Jersey when I was

5      in -- you know, when I was younger.

6 Q   Okay.  So I'm sorry, is it your testimony that you have

7      seen it before, or you haven't?

8 A   I mean, I have seen it -- you know, back in New Jersey,

9      a while ago, when I was, you know, 16 or younger.

10 Q   Okay.  So if you were born in 1967, when you were 16,

11     that would have been about 20 years ago?

12 A   A little bit.

13 Q   Okay.  And you haven't seen it since?

14 A   I haven't seen it.

15 Q   Okay.  So are you sure you know what it looks like?

16 A   Of course, yeah.

17 Q   Okay.  And did you -- on -- now, we are back to the

18     night of the 20th, do you recall anything about leaving

19     to go get a pot?

20 A   Unh-unh.  (Negative)

21 Q   Do you recall leaving that night from Mr. Davis'

22     apartment?

23 A   Unh-unh.  (Negative)  I didn't leave.  I was over there

24     until like 12:00 o'clock.

25 Q   Okay.  And did anybody else leave from Mr. Davis'

Page 710

Exhibit C – 119

| | |
|---|---|
| 1  coming over to see what -- did we need any help, and | 1  always kept in contact and eye contact, before I left. |
| 2  back and forth.  So -- so me, Darryl and Robert -- | 2 Q  All right.  And did you see him have a conversation |
| 3  basically the main movers. | 3  with Jeremy Fish? |
| 4 Q  Did you see Jeremy Fish that evening? | 4 A  Jeremy Fish?  Maybe a light sl -- light conversation, |
| 5 A  I did. | 5  or whatever.  So I wasn't directly in the kitchen, so I |
| 6 Q  Okay.  About what time and where did you see him? | 6  really weren't concerned on what they was doing. |
| 7 A  Around what time you said? | 7 Q  Did you see any firearms in that house that evening? |
| 8 Q  Yeah, about what time? | 8 A  No. |
| 9 A  Around rightish. | 9 Q  Specifically, did you see a 40 -- do -- do you know the |
| 10 Q  Okay.  And where did you see him? | 10  difference between a revolver and a pistol? |
| 11 A  He was in the kitchen. | 11 A  I do know the difference between a handgun and a |
| 12 Q  All right.  Of 2-0..... | 12  revolver.  So..... |
| 13 A  202 Grand Rot -- Grand Larry. | 13 Q  All right.  Did you see any revolvers there? |
| 14 Q  All right.  What was he doing? | 14 A  No. |
| 15 A  Well, just running the mouth like always. | 15 Q  Did you see any guns stuck in Mr. Davis' waistband, or |
| 16 Q  And were you in the kitchen? | 16  on a holster, or on his person in any way? |
| 17 A  Not at the time, no. | 17 A  No. |
| 18 Q  How do you know he was in the kitchen? | 18 Q  Is there anything that could have -- that he was |
| 19 A  Because you could see -- when you first walk in the | 19  wearing that would have covered up such a weapon? |
| 20  living room section, you could see in the kitchen.  So | 20 A  No. |
| 21  right when you first walk in the living room you don't | 21 Q  Okay.  Are you comfortable with that statement? |
| 22  have -- you can just basically see right into the | 22 A  Sure. |
| 23  kitchen right then, if you pass the wall. | 23 Q  Now, you have earlier testi -- you have indicated you |
| 24 Q  Do you do any marijuana or any drugs? | 24  have a key to the place? |
| 25 A  No. | 25 A  Sure. |
| Page 719 | Page 721 |
| 1 Q  Are you familiar with marijuana? | 1 Q  Do you have free reign of the place? |
| 2 A  I do. | 2 A  For..... |
| 3 Q  And calling your attention to the 20th, did you see a | 3 Q  In other words, do you have free reign -- can you go |
| 4  big pile of marijuana on the kitchen counter? | 4  where you want to in the apartment? |
| 5 A  No. | 5 A  Sure. |
| 6 Q  Okay.  Would you have been in a position to tell | 6 Q  Okay.  And have you ever seen a handgun in that |
| 7  whether there was a big pile of marijuana on the | 7  apartment? |
| 8  kitchen counter? | 8 A  No. |
| 9 A  Yes. | 9 Q  Have you had the opportunity to look in the apartment |
| 10 Q  All right.  I'm talking about all evening, did you ever | 10  so if one was there you would have seen it? |
| 11  see any? | 11 A  I would have.  Well, I have a opportunity to look all |
| 12 A  I never seen any marijuana, no. | 12  over, but that wasn't my choice to do.  But I never |
| 13 Q  All right.  Are you familiar with handguns? | 13  seen any handgun there. |
| 14 A  I do. | 14 Q  How long did -- to your knowledge, did Jeremy Fish stay |
| 15 Q  Did you see Robert Davis that evening? | 15  there? |
| 16 A  Yes. | 16 A  Maybe about f -- no longer than 20 minutes, I know. |
| 17 Q  Okay.  And was that on a -- was that intermittently, | 17 Q  All right. |
| 18  fairly continuously, how would you describe that? | 18 A  So maybe 15 minutes.  So 15, 18 minutes.  Around that |
| 19 A  I really couldn't hear the question good. | 19  time.  So..... |
| 20 Q  Okay.  Was it intermittently, continuously -- I mean, | 20 Q  Was anybody else coming and going in during this time |
| 21  how would you describe your interrelationship with | 21  period? |
| 22  Robert Davis that evening? | 22 A  Not at that time. |
| 23 A  That evening?  Well, we were always by each other that | 23 Q  Okay.  Did anybody leave, and -- do you know? |
| 24  evening anyway, because we were getting ready to, you | 24 A  Yeah.  One person left out.  So..... |
| 25  know, plan on packing little things up.  So we was | 25 Q  All right.  And you know why they left? |
| Page 720 | Page 722 |

1 Q  How is it that you are familiar with marijuana?
2 A  How familiar? Well, basically when I was in school,
3    they give you a picture of everything, crack, and
4    marijuana, pcp, and all that type of stuff. So I'm
5    well educated on that. So.....
6 Q  Okay. So when you were in school they showed you what
7    different drugs look like?
8 A  Yeah. You can rent a book that show you things like
9    that. So.....
10 Q  What school were you going to that you.....
11 A  Lamiere (ph) High in Montgomery, Alabama.
12 Q  Okay. And you rent books that.....
13 A  Uh-hum. (Affirmative)
14 Q  .....tell you -- and, just out of curiosity, why would
15    you want a book about.....
16 A  Because most of the time people do reports on things
17    like that.
18 Q  Did you do a report on marijuana?
19 A  I didn't. So.....
20 Q  Okay. So why did you rent a book about marijuana?
21 A  Well, I didn't say I rented one. My couple friends
22    rented one. We just basically want to know everything,
23    what is going on. We don't want to get on -- you know,
24    start using things that we can't get off of, and cause
25    crimes and problems in this world. So.....
Page 727

1 Q  Okay.
2 A  So I like to know things before I started to do things.
3    So.....
4 Q  And so any familiarity that you have with cocaine or
5    crack, would that have come from the same book?
6 A  That one -- you may had the second edition on that if
7    -- if went down to crack.
8 Q  Okay. So if I understand the testimony, books were
9    rented two times. There was second edition. Is that
10    what you just said?
11 A  Yes. It's different drugs, and whatever. They don't
12    have all of them related on the same book.
13 Q  So you have never seen marijuana in person in real
14    life?
15 A  Yeah, I have seen it in person, too.
16 Q  Oh, okay. When was that?
17 A  Years ago.
18 Q  Many years ago?
19 A  Yes.
20 Q  How many?
21 A  Maybe six years ago.
22 Q  Okay. And what about crack?
23 A  Crack? I know what crack look like. It is a white
24    substance, but I never been too close to it. So.....
25 Q  Have you ever seen it in person?
Page 728

1 A  Yes.
2 Q  Where would that be of at -- where would that have been
3    at?
4 A  In another state.
5 Q  In another state?
6 A  Yes.
7 Q  Okay. What state?
8 A  Atlanta, Georgia.
9 Q  Okay. And how was it that you came about seeing the
10    crack?
11 A  Oh, a couple of friends had it, and they was trying to
12    tell me what was that, and then I say, okay, and get
13    rid of that, because I didn't want to involve myself in
14    that.
15 Q  What about powdered cocaine, have you ever seen that?
16 A  Yes. It's a powder substance. Something like baby
17    powder, basically. So.....
18 Q  Okay. Have you ever seen it in person?
19 A  In person? Yeah.
20 Q  And when would that have been?
21 A  Around the same time.
22 Q  Okay. And do you know how to make crack from cocaine?
23 A  I don't, no.
24 Q  Okay. And on those occasions that you have been over
25    to Mr. Davis' house with a key when he wasn't there,
Page 729

1    and you have looked around in his house, have you ever
2    seen any crack cocaine in this house?
3 A  No, ma'am.
4 Q  Have you ever seen any powder cocaine in this house?
5 A  No, ma'am.
6 Q  Have you ever seen any white powder substances at all
7    at Mr. Davis' house?
8 A  No, ma'am.
9 Q  No baking soda?
10 A  Well, baking soda might be in the freezer for -- to
11    keep food fresh. So.....
12 Q  Okay. So that is a white powdery substance, right?
13 A  Yeah.
14 Q  Okay. And you testified that when Mr. Fish was talking
15    to Mr. Davis, you weren't concerned with they were
16    doing, is that right?
17 A  I didn't say I wasn't concerned, but I was just in
18    there if he need to ask me some things, and make sure
19    we got the court dates, and everything taken care of.
20    So.....
21 Q  Okay. When Mr. Fish was talking to Mr. Davis on the
22    20th -- I think I misdirected you. You said you
23    weren't concerned with what they were doing, is that
24    right?
25 A  I was concerned because I'm -- I'm on trial and so I
Page 730

1   need to know what is going on.
2 Q   You are on trial?
3 A   Well, I'm up here testifying, that is what I'm saying.
4     So.....
5 Q   Okay.  And I was directing your attention to February
6     20th.....
7 A   Uh-hum.  (Affirmative)
8 Q   .....when Mr. Fish and Mr. Davis were talking in the
9     kitchen, you said on direct, when Mr. James was talking
10    to you.....
11 A   Oh, Mr. F -- okay.  Okay.
12 Q   .....that you weren't too concerned with what they were
13    doing, is that right?
14 A   I got the name mixed up.  It's Mr. Fish, that's Jeremy
15    Fish, okay.  We can start there.  I know what you are
16    talking about now.
17 Q   Okay.
18 A   So I really -- I was thinking you was talking about
19    the.....
20 Q   I could tell you were misunderstanding me, and that's
21    why I kept asking you.....
22 A   Yeah, so that is what I'm talking about.  The names and
23    all that, I do know the person, and the names I'm
24    really kind of lost on.  So.....
25 Q   Okay.  Now, when Jeremy Fish was there -- when

Page 731

1     Mr. James was asking you questions, you said you
2     weren't too concerned with what he was doing with
3     Mr. Davis in the kitchen?
4 A   I wasn't.  I was in the living room, at the time.
5 Q   Okay.  Excellent.  Now, did you -- do you know what
6     they discussed -- if they discussed anything?
7 A   No, ma'am.
8 Q   Okay.  Did -- while Mr. Fish was there, now, who was in
9     the apartment at that time?
10 A   Me, Darryl and maybe two other people.
11 Q   Who is the -- who were those other people?
12 A   Just a couple of friends, Heather, and Woogie (ph).
13 Q   Oh, the -- is Woogie (ph) a male person, or a female
14    person?
15 A   It's a male -- it's a female and a male, so it's
16    basically three male -- three males and one female.
17 Q   Okay.  And did someone leave to go buy a pot?
18 A   No, I had no one -- no.
19 Q   Or to go get a pot?
20 A   No.
21 Q   Did -- you know nothing about anybody being sent for a
22    pot?
23 A   Well, I was there until 11:00, so I know no one came
24    back with a pot.  So most likely they haven't left to
25    get a pot.  So.....

Page 732

1 Q   What about a 7-up?
2 A   7-up, no.
3 Q   Okay.  And now, let me ask you this.  You testified
4     that you followed Mr. Fish from the courthouse
5     yesterday?
6 A   I didn't follow him there.  I was sitting right outside
7     the courtroom.  You can see everything on the top
8     floor.
9 Q   Oh, so you were just watching him?
10 A   Yeah.
11 Q   Where was he parked at?
12 A   He was parked in the Anchorage Youth facility across
13    from the courthouse.
14 Q   He was parked where?
15 A   The little youth -- youth court.
16 Q   Youth court?
17 A   Youth court, I guess.  So.....
18 Q   Okay.  And you could see that from where you were?
19 A   Yes, ma'am.
20 Q   All right.  And have you ever seen Mr. Fish at
21    Mr. Davis' house on any other occasion?
22 A   No.
23 Q   Okay.  Did you -- were you aware that Mr. Dish and --
24    Mr. Davis and Mr. Fish were friends?
25 A   Maybe hello and hi and all that type of stuff.  Not

Page 733

1     just like me and him are.  So.....
2 Q   Okay.  So they are not as good of friends as.....
3 A   No.
4 Q   .....you guys are but are you.....
5 A   Maybe hello, how you doing, or whatever like that, you
6     know.  Basically seeing someone you greet them hello.
7     So.....
8    MS. BRADY:  That's all I have, Your Honor.
9    THE COURT:  Redirect, Mr. James?
10            BRANDON MAY
11 testified as follows on:
12        REDIRECT EXAMINATION
13 BY MR. JAMES:
14 Q   When you were in the living room, could you see in the
15    kitchen?
16 A   Yeah, you basically can see just a little distance in
17    the living room.  You couldn't see the whole living
18    room.
19 Q   Could you see Robert in the -- in the kitchen?
20 A   Yes.
21 Q   Okay.  So, thank you.
22    THE COURT:  Thank you, sir.  You can step down.
23 A   Thank you.
24    THE COURT:  How we doing?  Anybody need a break from
25 the jury?  Nobody?  Let me know.  Next witness?

Page 734

3AN-01-1717 CR

---

1  MR. JAMES: I got one fairly quick one, then, if you
2  want to take a break.....
3      THE COURT: All right.
4      MR. JAMES: .....because that would be Officer Healy.
5  So.....
6      THE COURT: All right.
7      MR. JAMES: Please put your coat down, and if you would
8  come forward, and go up to the witness chair, there, and
9  remain standing, and Madam Clerk will swear you in, please.
10      (Oath administered)
11      MS. HEALY: I do.
12              MILDRED HEALY
13  called as a witness on behalf of the defendant, testified as
14  follows on:
15          DIRECT EXAMINATION
16      THE CLERK: Thank you.  You can be seated.  For the
17  court record, please state you name, spelling your last
18  name.
19 A    Mildred Healy, H-e-a-l-y.
20      THE CLERK: Thank you.
21      THE COURT: Go ahead.
22 BY MR. JAMES:
23 Q    Officer Healy, you are in uniform, and is that a CI --
24      department of corrections uniform?
25 A    Yes, it is.

Page 735

---

1 A    I have the records, and a copy of the records.
2 Q    Okay.  And I asked you to bring the records and a copy,
3      so that we could leave one here, if necessary, and you
4      could take the originals back with you?
5 A    Yes.
6 Q    Okay.  And is the copy an exact duplication of the
7      records that you have?
8 A    Yes.
9 Q    Okay.  And you made that yourself, or.....
10 A    This morning.
11 Q    .....had that made?  Okay.  Could you open up your
12      package, please?  And they are both in bound -- did you
13      bind that?
14 A    Yes, I did.
15 Q    Okay.  One is a copy bound, and the other is the -- the
16      original?
17 A    Yeah.
18 Q    Correct?
19 A    Yeah.  I brought a binder so that I could separate it
20      the way it was separated in our folder.
21 Q    Okay.  Could you go through the folder, and tell me --
22      you separated it in different areas, is there areas
23      that are separated, and the reason they are separated?
24 A    The first area is the court paperwork, remand slips,
25      criminal history.

Page 737

---

1 Q    Okay.  And do you work for Cook Inlet Pretrial?
2 A    Yes, I do.
3 Q    Okay.  And how long have you worked there, ma'am?
4 A    Since January of '99.
5 Q    All right.  And so were you employed on or about
6      March 1 of 2001.....
7 A    Yes.
8 Q    .....at the facility?
9 A    Yes, I was.
10 Q    And what do you do at the facility?
11 A    Now I am a correc -- corrections records officer.
12 Q    And as part of your duties as corrections off --
13      records corrections officer, do you keep the records of
14      individuals who are -- are kept at Cook Inlet, as far
15      as when they arrive, what happens when they are there,
16      and when they depart -- up to the point they depart?
17 A    Yes, I do.  And sometimes after they depart.
18 Q    After they depart?  Okay.  And pursuant to my request,
19      did I ask you to bring the records relating to a Robert
20      Davis from about February 1 -- excuse me, February 28
21      slash March 1, which would have been that -- that
22      morning, up and through the 2nd or 3rd of March of
23      2001?
24 A    Yes, I did.
25 Q    Okay.  And you have those with you, ma'am?

Page 736

---

1 Q    All right.
2 A    The second is the paperwork with his booking, and
3      transfers, and releases.
4 Q    All right.
5 A    Then the third page -- which there is nothing there,
6      that is classification and time accounting when they
7      are sentenced.  And then this is any copouts, or any
8      other extra paperwork that comes in.  It is in
9      chronological order.
10 Q    All right.  Going to the first page, ma'am, is there an
11      indication when Mr. Davis arrived at CIPT?
12 A    Mr. Davis arrived on March 1st, 2001, at 1:00 a.m.
13 Q    Okay.  And is there indication as to -- do you have a
14      booking officer in the normal procedures, is that how
15      it works, a CIPT officer?
16 A    We have one booking -- we have a booking -- one booking
17      officer at Cook Inlet.  Occasionally another officer
18      might help, but we have one -- one officer on duty that
19      is considered the booking officer.
20 Q    All right.  And does your records reflect who the
21      booking officer was?
22 A    Well, it is kind of hard to tell, but I think it was
23      Ted Garcia.
24 Q    Okay.  And does that booking indicate what was on
25      Mr. Davis' person at that time?

Page 738

---

1 A   No.

2 Q   All right.

3 A   That would be on the booking.....

4 Q   Another place?

5 A   Booking sheet.

6 Q   All right.  Going to the booking sheet, is there

7       indication as to what was in his pers -- or on his

8       person, or in his person -- on his person, I guess.....

9 A   Yes.

10 Q  .....would be the proper -- what did he have?

11 A  He was booked in with 180 dollars, a blue ball cap, a

12      black wallet, a pair of black jeans, a black coat, a

13      pair of black shorts, a white T-shirt, white socks, one

14      ear stud with a clear stone, one silver-like chain

15      necklace, one gold-colored necklace with a medal.

16 Q  Okay.  And is that signed by what you believe to be

17      possibly.....

18 A  It's -- it is Ted Garcia.

19 Q  .....the same signature?

20 A  Uh-hum.  (Affirmative)

21 Q  All right.  And Mr. Davis also signed that, is that

22      correct, acknowledging that was.....

23 A  Yes, he did.  He signed it in two places.  One that

24      acknowledges the list of personal property, and one

25      that acknowledges that he was given the opportunity to

Page 739

1       make phone calls.

2 Q   Okay.  Now, the -- do you have records about if anybody

3       brought any money into Mr. Davis?

4 A   The records for money, because Mr. -- are not

5       available.  We can only go back two months.

6 Q   Okay.

7 A   I think there is a way to go back further, but I think

8       it is done by some administrator.  I tried, and could

9       not get it, so we have no records for that date.  Our

10      -- you know, we don't have any -- he is gone, so it

11      doesn't bring it up.

12 Q  All right.  How about any type of medical treatment?

13 A  Medicals -- medical.....

14      MS. BRADY:  Objection, Your Honor, relevance.

15      THE COURT:  Rel.....

16      MR. JAMES:  If it is part of that record.  I'm just

17 asking is it part.....

18      THE COURT:  Relevance?

19 A  No, it's not.

20      THE COURT:  No, just a second.

21      MR. JAMES:  I'm -- excuse -- the rel.....

22      THE COURT:  The answer is no?  You don't have any?

23 A  No.

24      MR. JAMES:  All right.

25      THE COURT:  Then never mind.

Page 740

1 Q   Okay.  All right.  Now, how was Mr. Davis -- when

2       did -- when did Mr. Davis leave?

3 A   3/2/2001, at 19:20 hours.

4 Q   Okay.  And that is 7:20 in the evening?

5 A   Yes.

6 Q   All right.  And what did he leave with?

7 A   90 dollars.

8 Q   All right.

9 A   And all of his property.

10 Q  Okay.  And you have what is called -- you indicated

11      there is a cop section, c-o-p, is that what it is?

12 A  Yes.

13 Q  What is -- is there -- is cop mean something?

14 A  Copout.  Well, it is actually a request for interview,

15      but everybody calls it a copout.

16 Q  All right.  Is there anything in that file relating to

17      the time period he was there?

18 A  Well, there is a monetary disbursement.

19 Q  Okay.

20 A  And a -- the release of records that -- permission that

21      you sent to me earlier.  He disbursed 100 dollars to

22      APD.

23 Q  He did, or you did, or.....

24 A  We did it because of a warrant.

25 Q  All right.

Page 741

1 A   And I don't know who verified it, because I don't -- I

2       can't even begin to see who that is.

3 Q   Would you know when that disbursement was made?

4 A   The 2nd of March.  It doesn't give a time.

5 Q   All right.  And is that it, other than the release that

6       you mentioned before?

7 A   Yes.

8 Q   Okay.

9 A   That's it.  And that.....

10 Q  Is that the totality of the file?

11 A  Well, there is a booking sheet, the chart, the warrant

12      -- the warrant for the money, and then the release

13      sheet, and pictures.

14 Q  All right.  Relating to in, out, or the money, have you

15      covered everything in your testimony that relates to

16      the documentation that CIPT has?

17 A  Yes.

18 Q  All right.  If another officer, based on your

19      experience, had been the booking officer, or had

20      assisted in the booking officer, would you expect their

21      signature to appear in some of the intake materials?

22 A  No.

23 Q  No?

24 A  If there had been two there, no.

25 Q  Okay.  Just one?

Page 742

1 A   Yeah.

2 Q   Okay.

3 A   The primary booking officer is the one that signs it --
4    usually signs it.

5 Q   Okay. That's all I got. Thank you, Ms. Healy.

6    THE COURT: Ms. Brady?

7         MILDRED HEALY

8 testified as follows on:

9         CROSS EXAMINATION

10 BY MS. BRADY:

11 Q   Ms. Healy, if Mr. Davis arrived with 180 dollars,
12    right?

13 A   Uh-hum. (Affirmative)

14 Q   And a search warrant seized -- seized $100, is that
15    right?

16 A   Uh-hum. (Affirmative)

17 Q   And he was given $90?

18 A   Yes. I -- I can -- I said I could have access to the
19    monetary records, but somehow he got another $10 on his
20    books, it would seem.

21 Q   Okay. So it.....

22    MS. BRADY: That's all the questions I have, Your

23 Honor. Thank you.

24    THE COURT: Re -- anything else?

25    MR. JAMES: No.

Page 743

---

1    THE COURT: Thank you, ma'am. You are free to go.

2    MR. JAMES: Thank you, Ms. Healy.

3 A   Do you need these files?

4    MR. JAMES: No, ma'am. Not -- you testified.

5    THE COURT: Why don't we take 10 minutes, folks. And
6 then we will come back and continue on.

7    (Off record)

8    THE COURT: Have a seat, please. And are we on record?

9    THE CLERK: We are.

10    THE COURT: All right. We are back on record, and we
11 have all of our jurors back, and you have -- this is your
12 next witness.....

13    MR. JAMES: Yes, sir.

14    THE COURT: .....Mr James? You want to stand up ma'am,
15 and we will swear you in?

16    (Oath administered)

17    MS. SODER: Yeah.

18         ATHENA SODER

19 called as a witness on behalf of the defendant, testified as
20 follows on:

21         DIRECT EXAMINATION

22    THE CLERK: You can have a seat. State your full name,
23 for the record, and spell your last name.

24 A   Athena Jo Soder, S-o-d-e-r.

25    THE CLERK: Thank you.

Page 744

---

1    THE COURT: Go ahead, Mr. James.

2    MR. JAMES: All right.

3 BY MR. JAMES:

4 Q   Athena -- may I call you Athena?

5 A   Yeah.

6 Q   All right. Have you ever been in and testified before?

7 A   No.

8 Q   All right. So if you don't und -- like I told you
9    outside, if you don't understand something, you ask,
10    all right?

11 A   All right.

12 Q   Okay. Do you know Jeremy Fish?

13 A   Yes.

14 Q   How do you know Jeremy Fish?

15 A   He is the father of my daughter.

16 Q   All right. And.....

17 A   We used to date.

18 Q   I'm sorry?

19 A   We used to date.

20 Q   Okay. And calling your attention to April of 2001.....

21 A   Uh-hum. (Affirmative)

22 Q   .....that month. Did you see Jeremy Fish?

23 A   Yeah. I saw him on April 1st.

24 Q   Why do you know it was April 1st?

25 A   Because it was April fool's day.

Page 745

---

1 Q   Why did you go see him -- or did you go see him, or you
2    saw him?

3 A   Yeah. I went and saw him at Subway. He was working
4    there. And I went there just to see if he wanted to,
5    you know, see his daughter, or whatever, because her
6    birthday was the following month.

7 Q   All right.

8 A   Uh-hum. (Affirmative)

9 Q   And when the following month is her birth.....

10 A   May 3rd.

11 Q   All right. Did you have a conversation with Jeremy
12    Fish regarding Robert Davis?

13 A   Yes.

14 Q   Okay. Did you ask?

15 A   Huh?

16 Q   Did you ask Jeremy Fish anything?

17 A   Yeah. I asked him why he turned in Rico -- Robert.
18    And at first he denied doing it. And then he said --
19    he started getting mad.....

20    MS. BRADY: Objection, Your Honor. This is hearsay.

21    MR. JAMES: Okay.

22    THE COURT: The objection is overruled.

23    MR. JAMES: Thank you.

24 Q   That means you can go ahead and answer.

25 A   Oh, he started to get mad, and then he said that he

Page 746