**Page 747**

1  would do anything he could to get Rico in trouble --
2  Robert, Rico. And -- and then, after he said that, he
3  started crying and acting -- saying he had AIDS -- him
4  and his girlfriend had AIDS.
5 Q  Did you see him.....
6 A  And that was.....
7 Q  Did you see him after that date?
8 A  Yeah. I saw him May 3rd.
9 Q  Why did you see him May 3rd?
10 A  That was our daughter's birthday.
11 Q  All right.
12 A  And I saw him at the Diamond Mall for about 15, 20
13  minutes.
14 Q  All right. Did you see him after May 3rd?
15 A  I saw him September 11th.
16 Q  Why do you -- why are you comfortable with September
17  11th?
18 A  Because I was staying at his sister's house for a
19  couple of days. And that morning the news was on about
20  the terrorist attacks. And that evening we ran into
21  him on the road. And he pulled over behind us, and he
22  got out of the car, and our daughter was eating a
23  sucker, and he took the sucker from her and he at it.
24  And then he went back to his car, and he came back to
25  his sister's car, which is where I was, and he had a

**Page 748**

1  big gallon size bag of weed with him, and he asked me
2  if I wanted to buy any from him. I told him no, I'm
3  pregnant. And then his sister told him to give her
4  some. So he gave her about a bowl, but -- and then he
5  left. And then about 30 minutes later he showed up at
6  her house, because he had forgotten his cell phone in
7  his sister's car. And he came inside, and he was
8  smoking weed with his sister's boyfriend, and then he
9  left. But in the -- when he left, he left weed there,
10  like a eighth of weed. And so he returned again. And
11  that time Jared had took the weed that he left -- Jared
12  is his sister's boyfriend, and he hid it. And he was
13  going to keep it. And Jeremy was mad saying, you know,
14  give me my weed back. And Jared was like, I don't got
15  it. And then Jeremy wanted to fight Jared. And so
16  Jared -- or Jeremy went down to his car, and I was
17  watching him through the window, and he opened his car
18  door, and he bent over and he pulled his seat down, and
19  he took a gun out. And he told Jared to go down there,
20  and he was going to shoot him. And then Tamara -- that
21  is his sister, told Jeremy that she was going to call
22  the cops, so Jeremy got in the car and left. And we
23  called the cops, but they said they couldn't do
24  anything about it.
25 Q  Okay. Is that the last time you saw Jeremy?

**Page 749**

1 A  Yes.
2 Q  Okay. Now, are you familiar with cocaine, and crack
3  cocaine, and marijuana?
4 A  Like, what do you mean?
5 Q  Do you know what it is.....
6 A  Yeah.
7 Q  .....when you see it?
8 A  Yeah. Yeah.
9 Q  All right. When you were with Jeremy before, this
10  year, did you see Jeremy with any cocaine?
11 A  Yes, I did.
12 Q  I'm -- you know I'm talking cocaine. I'm not
13  talking.....
14 A  Yes.
15 Q  .....crack?
16 A  Cocaine, yeah. Powder.
17 Q  The powder?
18 A  Uh-hum. (Affirmative)
19 Q  When was that?
20 A  That was the end of July, or the beginning of August
21  2000. And I ran into him downtown Anchorage, fifth
22  avenue mall, and it was out -- outside by that grass,
23  and me and Jeremy were talking, and it was a couple of
24  months after I had my baby, and I had lost of lot of
25  weight, so I don't know if he thought I was doing coke,

**Page 750**

1  or whatever, but he took it out of his pocket, and he
2  was like, do you want to -- you know, do you want to do
3  some? And I told him, no, you know. And then he put
4  it back in his pocket, and then he never said anything
5  else about it.
6 Q  How do you know it was cocaine?
7 A  Because I saw it. I mean, I know what it is. I have
8  done it before, years ago.
9 Q  All right.
10 A  Before I got pregnant.
11 Q  Okay. Now, do you do drugs -- do any drugs now?
12 A  No.
13 Q  Do you know why Jeremy would be mad, or make a
14  statement that he would do anything he could to get
15  Rico?
16 A  Yeah. Because he -- he knows how Rico would, like --
17  during my pregnancy, Rico would give me rides to the
18  doctor's, and he would buy my daughter diapers and
19  wipes and food. And Jeremy never bought anything for
20  his daughter. And so he was mad, and jealous, or
21  something, I guess.
22 Q  Did you have a relationship with Robert Davis -- a
23  sexual relationship?
24 A  Never.
25 Q  Okay. Now, have you ever been over to 202 Grand Larry?

**Page 751**

1  A  Yes.
2  Q  All right. And have you ever seen any drugs over
3     there?
4  A  No.
5  Q  And how many times you been over there?
6  A  I don't know.
7  Q  Okay.
8  A  Quite a few times.
9  Q  All right. Did you ever see any guns -- any -- in the
10    possession of Mr. Davis?
11 A  No.
12 Q  Thank you. Like I told you out there, the other side
13    gets to ask questions, too.
14    THE COURT: Cross examination, Ms. Brady?
15              ATHENA SODER
16 testified as follows on:
17              CROSS EXAMINATION
18 BY MS. BRADY:
19 Q  Okay. So you used to date Mr. Fish, is that right?
20 A  Right, yeah.
21 Q  How long did you date him for?
22 A  For about a couple of weeks.
23 Q  A couple of weeks?
24 A  Yes.
25 Q  Okay. So during that couple of weeks, how many times

**Page 752**

1     did you sleep with him?
2  A  Two times.
3  Q  Two times? Okay. So.....
4  A  No, excuse me. Three times.
5  Q  Okay.
6  A  Three.
7  Q  Did you sleep with anybody else around the same time?
8  A  No.
9  Q  Okay. Does Mr. Fish have any way of knowing that?
10 A  That -- knowing that I haven't?
11 Q  Yeah.
12 A  I don't -- I don't know.
13 Q  Okay. Have you ever had a paternity test to establish,
14    then, that he is the father of your daughter?
15 A  No.
16 Q  Okay. Has Mr. Fish asked you to?
17 A  No.
18 Q  Okay. Now, you said that on one time Jeremy Fish left
19    behind an eighth of weed, is that right?
20 A  Right.
21 Q  How do you know it was an eighth?
22 A  Because Jared said so. I saw it. It was in a baggie
23    about that big, and it was filled about that much with
24    weed -- across.
25 Q  Would you recognize an eighth of weed?

**Page 753**

1  A  Yeah.
2  Q  Okay. So you know what that amount of marijuana.....
3  A  Right.
4  Q  .....looks like? You smoked it before?
5  A  To an extent. Yeah.
6  Q  Still smoke it?
7  A  No.
8  Q  When was the last time you smoked it?
9  A  July.
10 Q  Okay. And have you ever smoked marijuana with
11    Mr. Davis?
12 A  No.
13 Q  Never?
14 A  No.
15 Q  So if Mr. Davis said you did, he would be lying?
16 A  Right.
17 Q  Okay. And who is the father of your baby that you are
18    pregnant with now?
19 A  Josh.
20 Q  Okay.
21 A  I have been dating him for about two years, ever since
22    me and Jeremy broke up.
23 Q  When, specifically, did you date Jeremy?
24 A  August of -- August 1st of '99. That's when we dated.
25    That's when we started going out.

**Page 754**

1  Q  And you finished going out on the 15th of '99 -- August
2     of '99?
3  A  Somewhere around there, the middle of August.
4  Q  Okay. Now, you testified that you know what crack and
5     cocaine are?
6  A  Right.
7  Q  How do you know that?
8  A  Well, because I used to do cocaine back when I was
9     dating Jeremy.
10 Q  Okay. So you haven't done it for two years?
11 A  Right.
12 Q  Is that your testimony?
13 A  Right.
14 Q  Okay. And what about crack? You ever smoked crack?
15 A  No.
16 Q  Okay. Then, how do you know what that looks like?
17 A  Because I have seen it before.
18 Q  Under what circumstances have you seen it?
19 A  Jeremy has had it before, and my friend's have had it,
20    and I have seen it.
21 Q  Have you ever seen Mr. Davis with crack?
22 A  No.
23 Q  Ever seen him with cocaine?
24 A  Okay. And.....
25    MS. BRADY: Okay. I don't have any further questions,

**Page 755**

1 Your Honor.
2     ATHENA SODER
3 testified as follows on:
4     REDIRECT EXAMINATION
5 BY MR. JAMES:
6 Q You were asked if you smoked cocaine or crack before.
7   Do you smoke anything else?
8 A Have I what?
9 Q Do you smoke?
10 A Yeah. I smoke cigarettes.
11 Q All right. Thank you.
12   THE COURT: Thank you. You can step down, ma'am. Your
13 next witness?
14   MR. JAMES: What I would like you to do, please, is if
15 you kind of weave your way around, and there is a seat up
16 there, would you just remain standing?
17   MS. EPEAGBA: All right.
18   MR. JAMES: And Madam clerk will swear you in.
19   (Oath administered)
20   MS. EPEAGBA: Yes.
21     BUENA EPEAGBA
22 called as a witness on behalf of the defendant, testified as
23 follows on:
24     DIRECT EXAMINATION
25   THE CLERK: You can have a seat. Please state, for the

**Page 756**

1 record, your full name, and spell your last name.
2 A My name is Buena Epeagba. E-p-e-a-g-b-a is my last
3   name. B-u-e-n-a is my first name.
4   THE CLERK: Can you spell your last name again, I'm
5 sorry.
6 A E-p-e-a-g-b-a. B as in boy.
7   THE CLERK: Thank you.
8 BY MR. JAMES:
9 Q Mrs. Epeagba, you are the mother of Robert Davis,
10   right?
11 A Yes.
12 Q Okay. The name Rico has come up. You know how --
13   where that name comes from?
14 A Well, his father is Robert. And his dad didn't want
15   two Roberts, you know. So he named him Rico before he
16   was born.
17 Q And he has always been known -- is that his nickname?
18 A Always.
19 Q All right. Okay. Now, what does your son do for a
20   living, what does he work at?
21 A Right now he is an auto mechanic. He works on Old
22   Seward and 72nd. He has a shop there.
23 Q Okay. So he is self employed, is that right?
24 A Yes, he is self employed.
25 Q Okay. And how long has that -- how long has he had the

**Page 757**

1   shop, to your knowledge, at East side?
2 A I think since, maybe, October or November of '99.
3 Q Okay. During February of 2001, was he running a
4   business out of your house?
5 A No. He left -- he did have a business there in maybe
6   June or July of '99 until October of '99, because the
7   storage building that he was using does not have heat.
8   So it was mainly like a garage.
9 Q Now, do you have a suburban?
10 A Yes.
11 Q Is that your car?
12 A Yes.
13 Q All right. And does it have twin -- tinted windows?
14 A Yes.
15 Q Which windows are tinted?
16 A All the windows, except the two windows on the side in
17   the front, and the windshield. The rest of the windows
18   are a dark tint.
19 Q Can you sit -- see in that vehicle, in the back portion
20   of the vehicle?
21 A No. You can't -- you can't see in there. You can see
22   in the front. You can see if a passenger is in the
23   front, but you can't see the back and the sides.
24 Q Okay. All right. Calling your attention to February
25   2001 -- that time frame, February, march 2001, okay?

**Page 758**

1 A Uh-hum. (Affirmative)
2 Q Were you in Anchorage in that time?
3 A Yes.
4 Q Okay. Do you recall whether the weather conditions
5   were -- was it getting towards break up, was it still
6   heavy winter, do you know?
7 A No, it was muddy. Freezing and thawing out. It was
8   really muddy.
9 Q All right. In regards to your vehicle, do you have a
10   schedule about washing it, or.....
11 A Well, during break up, I don't -- I don't worry about
12   washing it, you know. I might take the hose and spray
13   it down, but I don't -- because I live on a alley. My
14   -- my carport is on the alley, and the alley is just
15   dirt and gravel, and there is lots of holes, and there
16   is no point in washing it.
17 Q Okay. Now, have you known your son, Robert, to ever
18   own a firearm -- a handgun?
19 A No. I have never known him to -- to own a gun. Even
20   as a child, I never bought him a gun.
21   MR. JAMES: All right. One moment, please. (Pause)
22 That's all I've got. Thank you. You can ask some
23 questions.
24 A That's it?
25   THE COURT: Thank you, Mr. James. Ms. Brady,

**Page 759**

1  questions?
2          BUENA EPEAGBA
3  testified as follows on:
4          CROSS EXAMINATION
5  BY MS. BRADY:
6  Q  How far is it from your house to International and Old
7     Seward?
8  A  Maybe a mile. Could.....
9  Q  Okay. How long would it take you to drive there,
10    about?
11 A  Five minutes.
12 Q  Okay. And was your son living with you on February
13    21st, 22nd, around there?
14 A  He was living at a hotel, but he was -- his -- most of
15    his clothes were at my house.
16 Q  Okay. So when he was moving out of 202 Grand Larry,
17    did he move his stuff to your house -- a lot of it?
18 A  He moved his personal things, like his clothing, his
19    stereo, and his small items. He put them in the -- the
20    storage shed.
21 Q  All right. And was he driving your car?
22 A  Yes.
23 Q  Okay. Did he frequently drive your car?
24 A  Yes.
25 Q  So how do you know he was driving your car on February

**Page 760**

1     21st?
2  A  If I didn't drive it, his sister didn't drive the car
3     -- we have the large car because we have a large
4     family, and we can all fit in the car. So there are
5     three people, other than myself, that will drive my
6     car.
7  Q  Okay.
8  A  So if I didn't have the car, and the car was gone, they
9     all have keys. I don't fuss over it, long as they
10    leave me a vehicle to drive.
11 Q  You have other cars?
12 A  Yes.
13 Q  What other kinds of cars do you have?
14 A  There is a Montero Sports SUV. It is not actually my
15    car. It is in my name. It is my daughter's car. So
16    if they drive my car, they leave a car available for
17    me. They leave their car.
18 Q  I see.
19 A  With the keys in the car, because if I come outside and
20    my car is gone, then I use whatever car is available.
21     MS. BRADY: Thank you. That's all the questions I
22 have.
23 A  Uh-hum. (Affirmative)
24     THE COURT: Mr. James, redirect?
25          BUENA EPEAGBA

**Page 761**

1  testified as follows on:
2          REDIRECT EXAMINATION
3  BY MR. JAMES:
4  Q  You said the little items were kept at your house.
5     Where were the big items?
6  A  In the storage.
7  Q  All right. And on February 21, you don't know who was
8     driving the car if you weren't driving the car,
9     correct?
10 A  No.
11 Q  All right. Could -- thank you.
12     THE COURT: All right, ma'am. Thank you very much.
13 You can step down. Mr. James?
14     MR. JAMES: Could I just have one minute? (Pause) If
15 I may just have one second, I want to check and see if I
16 have another witness out there? (Pause) Thank you, Your
17 Honor. At this time we will rest, sir.
18     THE COURT: I need to have a bench conference with you
19 all first, please.
20     MR. JAMES: Before I rest?
21     THE COURT: Uh-hum. (Affirmative)
22     MR. JAMES: Fine.
23     (Bench conference as follows:)
24     (Inaudible)
25     (End of bench conference)

**Page 762**

1     THE COURT: All right. Mr. James?
2     MR. JAMES: Yes, Your Honor. At this time, we rest.
3     THE COURT: All right. The defense rests, means the
4  defense won't be presenting any additional witnesses. If
5  you remember back to the beginning of the trial, I indicated
6  that the state may have the opportunity to present limited
7  rebuttal evidence. Ms. Brady, any rebuttal evidence?
8     MS. BRADY: No, Your Honor.
9     THE COURT: All right. All right. You've received all
10 the evidence you're going to receive. The next step in the
11 case is for the lawyers to make closing arguments or
12 summations. Then I will instruct you on the law. After we
13 do all that I'll check everybody's health, and assuming
14 everybody is healthy, and we have too many jurors, I'll draw
15 a couple of names by random to winnow you down to 12, and
16 we'll send the 12 of you in to begin deliberations.
17     I expect deliberations will begin between 10:30 and
18 11:00 tomorrow. And I'll ask you to be -- I don't know how
19 long it will take you to make whatever decision you make,
20 but I'll ask you to plan on being here the full day. And
21 with that, I'm going to send you home. We're not going to
22 do closing arguments now. And one of the things that I have
23 to do is check with the lawyers to -- double-check that the
24 instructions on the law are accurate. And I'm going to
25 spend the rest of our trial time now doing that.

**Page 763**

1   Can I answer any procedure or scheduling kind of
2 questions?
3   UNIDENTIFIED JUROR: Is there a lunch break? If we go
4 in deliberation at 10:30, then what happens to lunch?
5   THE COURT: We'll buy you lunch tomorrow. And the
6 bailiff will -- you'll have a bailiff who you'll be assigned
7 to. The bailiff will give you menus. You'll be given the
8 option of whether to go out to lunch or whether to order
9 lunch in and have a working power lunch. So it's your
10 choice. And all of that will be handled tomorrow. Yes,
11 sir?
12   UNIDENTIFIED JUROR: You mentioned instructing us in
13 the law. Will you be instructing us as to the exact charges
14 and then also the exact parts of the law that were applied?
15   THE COURT: Yes, sir. I will.
16   UNIDENTIFIED JUROR: Okay. Thank you.
17   THE COURT: And I'll warn you now, I'm required by law
18 to read them to you, but I'll also give you a copy to follow
19 along so if it helps you to absorb information, you can
20 follow along with your copy, and then you'll also have the
21 original instructions and your copies in the jury room to
22 refer to as you begin to deliberate and talk about the case.
23 And -- yes, sir?
24   UNIDENTIFIED JUROR: What time are we to be back here
25 again tomorrow?

**Page 764**

1   THE COURT: 8:30 tomorrow.
2   UNIDENTIFIED JUROR: 8:30?
3   THE COURT: Yes. All right. Let me just remind you
4 again we're getting near the end, and it's as important as
5 ever that you not speak with one another. Even though
6 you've heard all the evidence now, you still haven't heard
7 the closing instruction -- the closing arguments that tie it
8 together, and you haven't heard the instructions on the law.
9 So it's premature to begin talking with one another about
10 how you might decide the case, and of course, it's always
11 premature and inappropriate to talk with anybody else about
12 deciding the case. So don't do any investigation or
13 research on your own and please just remember not to speak
14 with anyone else about the case. And Mr. Iverson, could you
15 stick around? We'll ask you about your schedule after I let
16 everybody else go. We'll see you tomorrow, folks.
17   (Jury excused)
18   THE COURT: All right. Everybody have a seat. Mr.
19 Iverson, what's your schedule for tomorrow? Do you know any
20 more than you knew yesterday?
21   MR. IVERSON: No, sir. My son's attorney, Sid
22 Billingslea, I spoke to her on the phone late yesterday
23 afternoon. The pretrial conference is scheduled at 1:30 in
24 the building next door. She has been attempting to work
25 with the juvenile I guess and probation officer to determine

**Page 765**

1 if she can wrap things up, and if so, then they probably use
2 that time to just dispense of matters and come to agreement.
3 Otherwise it would just be a confirming a court date or
4 something like that. But she -- she would know during the
5 course of -- she should know by the end of today she said,
6 and of course, the morning is gone, but she had planned to
7 be in her office all morning this morning. But that's the
8 situation.
9   THE COURT: All right. Well, either way, it's
10 important for you to be there. And here's what I would like
11 you to do. I'd like you to show up for us tomorrow morning.
12   MR. IVERSON: Okay.
13   THE COURT: I'll take a head count and make sure that
14 everybody is feeling well.
15   MR. IVERSON: Uh-hum. (Affirmative)
16   THE COURT: If everybody is feeling well, then we'll
17 talk about cutting you loose tomorrow morning so that you
18 can make sure -- so that you're not involved here. If
19 something happens and we lose a couple of jurors tonight we
20 may ask you to stay on the jury, but we'll give you a break
21 to take care of your other personal business.
22   MR. IVERSON: Yeah, and any case, she didn't feel it
23 would be a long duration, and I'm willing to do whatever.
24   THE COURT: All right. Well, why don't we check with
25 -- then come back with everybody else tomorrow at 8:30, and

**Page 766**

1 we'll make a decision then if you're not -- if you're going
2 to end up not serving, you don't necessarily have to stick
3 around, but I need to -- if I lost two jurors tonight
4 through pneumonia or a broken leg or something, then I would
5 be hurting, and so why don't we see tomorrow?
6   MR. IVERSON: All right.
7   THE COURT: All right. Good night. Thank you. All
8 right. The rest of our jurors have departed. Let's take
9 care of any additional substantive procedural issues that we
10 can. Mr. James, you wanted to make a motion for.....
11   MR. JAMES: Oh, yeah.
12   THE COURT: .....judgment of acquittal, and I asked you
13 to reserve it until we took a break, without, of course,
14 waiving your right to do that. So.....
15   MR. JAMES: Understood. Your Honor, at this time I
16 make judgement -- my motion. Basically, as the testimony
17 has indicated, this case rises or falls on Jeremy Fish. And
18 I think we've established more than adequate evidence on his
19 direct examination, cross examin -- excuse me, his cross
20 examination testimony that Jeremy Fish is a complete liar.
21 And given that, I don't think reasonable minds can differ
22 that he is a liar and he's totally unbelievable. And the
23 officers who testified, including Officer Johnstone, said he
24 did acknowledge it rises and fall -- Johnstone said that,
25 Officer Johnstone. And without Jeremy Fish, they don't have

**Page 767**

1 a case, and I think he's -- we certainly have established
2 that this should not go to the jury. And that's just it in
3 a nutshell. I mean you've heard all the testimony, so.....
4     THE COURT: Motion is denied. Reasonable minds can
5 differ on whether the state has presented sufficient
6 evidence to convict Mr. Davis on each one of the counts.
7 It's not my de -- I don't get to decide how strong the
8 evidence is. I just have to decide whether there's enough
9 evidence to get past the motion for judgment of acquittal,
10 and there clearly is. Any other procedural issues?
11    MS. BRADY: Yes, Your.....
12    THE COURT: Ms. Brady?
13    MS. BRADY: .....Your Honor. This morning I returned
14 the jury instructions that you asked me to correct, and when
15 I was correcting the count instruction.....
16    THE COURT: Let me get mine.
17    MS. BRADY: Okay.
18    THE COURT: I'll just step out for a second.
19    (Pause)
20    THE COURT: All right. Go ahead, Ms. Brady.
21    MS. BRADY: The way Your Honor asked me to do it, the
22 way it was decided during our discussions of jury
23 instructions is on the first page. It has each individual
24 date that on or about February 8th, February 20th. When I
25 did that, it looked kind of cumbersome. I did the second

**Page 768**

1 one that says on or about the date specified in the count,
2 in that same place. I don't have a strong preference as to
3 which one. I just thought I'd bring them both and we can
4 use whichever. I -- I don't care. I just thought that that
5 was a bit cumbersome, so I wanted to bring that to your
6 attention.
7     THE COURT: Mr. James, do you have a preference as to
8 which one of these we use?
9     MR. JAMES: No, Your Honor. Ms. Brady brought it to my
10 attention earlier this morning. I don't -- I don't care.
11 Probably the -- I'm kind of inclined to agree if she's
12 suggesting the one -- the count rather than the -- the
13 repeat of the dates. But it matters not to us. I mean,
14 quite honestly.
15    THE COURT: On or about the date specified in each
16 count then, rather than.....
17    MR. JAMES: I mean either way. Whatever.
18    THE COURT: That's fine.
19    MR. JAMES: I mean we all know what we're talking about
20 I think, comfortably.
21    THE COURT: All right. We'll use the on or about the
22 date specified in each count.
23    MS. BRADY: Okay.
24    THE COURT: Anything else?
25    MS. BRADY: You reserved ruling on a couple of jury

**Page 769**

1 instructions.
2     THE COURT: On one, I think. And that one is -- I
3 didn't reser -- I don't think I reserved ruling. I
4 indicated that I wasn't going to give it until -- unless I
5 heard a reason to give it, but now I don't remember which
6 one it was.
7     MS. BRADY: That was based on our arguments of counsel.
8     THE COURT: That's closing arguments, yes.
9     MS. BRADY: Right. And then there was also the expert
10 witness one that was discussed, and you said that.....
11    THE COURT: I was going to give the pattern, the new
12 pattern.
13    MS. BRADY: Right. My notes indicated that Mr. James
14 said that no expert had testified.....
15    THE COURT: Well, but one has, and I have the new
16 pattern 1.11 in your packet.
17    MS. BRADY: Thank you.
18    THE COURT: You just wanted to make sure it was there?
19    MS. BRADY: Right.
20    THE COURT: All right. And we'll give the defendant
21 has not testified instruction rather.....
22    MR. JAMES: Right.
23    THE COURT: .....than the defendant has testified
24 instruction. Do I need -- and I'll hold out the arguments
25 of counsel until after hearing arguments of counsel. Are

**Page 770**

1 there any other instruction issues? Ms. Brady?
2     MS. BRADY: Not from me, Your Honor.
3     THE COURT: Mr. James?
4     MR. JAMES: Can we get a packet of those today?
5     THE COURT: They'll be done later this afternoon. I
6 need to double-check them one more time, then I'll have them
7 numbered, and we'll call your office when they're ready.
8     MR. JAMES: Okay. Yeah. That would be great. Because
9 we got to -- Madam clerk, is she going to call or.....
10    THE COURT: My secretary will call.
11    MR. JAMES: Okay. We got a voice machine, so if it
12 clicks into voice machine, we'll be monitoring. But.....
13    THE COURT: Right. We'll leave a message for you.
14    MR. JAMES: Yeah, yeah. Thank you.
15    THE COURT: How much time for your closing? Ms. Brady?
16    MS. BRADY: Forty-five minutes.
17    THE COURT: Forty-five?
18    MS. BRADY: Uh-hum. (Affirmative)
19    THE COURT: Mr. James?
20    MR. JAMES: Forty-five.
21    THE COURT: All right. You can both have 45. I'll
22 give you warnings. Do you want a warning?
23    MS. BRADY: I want a five minute warning. On the first
24 at 20 minutes, I want a five minute warning, so I can save
25 the rest for rebuttal.